JUDGE BATTS       **'09 CIV  5386**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

CRITERIUM CAPITAL FUNDS B.V., BBF TRUST,
WALL STREET SECURITIES, S.A.,
BANCA ARNER, S.A., and ALVARO CASTILLO,
on behalf of themselves and all others similarly situated,

                       Plaintiffs,

           v.

BERNARD L. MADOFF, KINGATE MANAGEMENT
LIMITED, TREMONT (BERMUDA) LIMITED,
FIM ADVISERS LLP, CITI HEDGE FUND
SERVICES LTD., GRAHAM H. COOK,
JOHN E. EPPS, SANDRA MANZKE,
CHARLES SEBAH, KEITH R. BISH,
CHRISTOPHER WETHERHILL, MICHAEL G.
TANNENBAUM, PHILLIP A. EVANS, MARGARET
EVERY, SHAZIEH SALAHUDDIN, JOHANN WONG
and PRESTON M. DAVIS,

                       Defendants.

-----------------------------------------------------------------X

:
:
: Civil Action No.
:
: **CLASS ACTION**
:
:
:
: **JURY TRIAL**
: **DEMANDED**
:
:
:
:
:
:
:
:
:
:
:
:

## **COMPLAINT**

    Plaintiffs, by and through their attorneys Boies, Schiller & Flexner LLP,

hereby sue Defendants and allege, upon personal knowledge as to matters relating

to themselves, upon information obtained during the course of their attorneys'

investigation, and upon information and belief as to all other matters, as follows:

## NATURE OF ACTION

1.     This suit arises out of the largest and longest-running "Ponzi scheme" in history, an enormous fraud orchestrated by defendant Bernard Madoff and facilitated by the reckless and grossly negligent conduct of the other Defendants, which cost investors many billions of dollars.  This class action is brought on behalf of investors in Kingate Global Fund, Ltd. ("Kingate Global") and Kingate Euro Fund, Ltd. ("Kingate Euro"), two of the so-called "feeder funds" that channeled billions of dollars into Madoff's fraudulent operations.  (References in this complaint to "the Funds" shall be to Kingate Global and Kingate Euro.)

2.     Plaintiffs seek to recoup losses of some $3.5 billion resulting from the Funds' investment of class members' assets in the Ponzi scheme conducted by Madoff and his firm, Bernard L. Madoff Investment Securities ("BMIS"). Plaintiffs and the class members were shareholders or equity holders in the Funds as of December 11, 2008, the date when Madoff's fraud was revealed.  (All references to "Plaintiffs" shall henceforth include the Class.)

3.     Although Madoff operated the Ponzi scheme, Defendants solicited investments from Plaintiffs and oversaw, controlled, and managed those investments, which they turned over to Madoff after purportedly vetting and monitoring him and his operations.  Defendants in fact did not properly vet or monitor Madoff and, instead, falsely reported steadily-increasing account values to

Plaintiffs while paying themselves hundreds of millions of dollars in fees based on those fictitious amounts.  As a result, Defendants are responsible for Plaintiffs' massive losses.

4.     Defendants directly owed duties to Plaintiffs, including fiduciary duties, to conduct due diligence and provide accurate and complete information about Plaintiffs' investments in the Funds and in Madoff's operation (both before and after the initial investments were made), to exercise care with Plaintiffs' investments, to monitor Madoff (who they designated to carry out the Funds' investment strategy), and to safeguard Plaintiffs' assets.  Rather than complying with their representations and duties, the Defendants used the Funds as mere conduits to Madoff.  The loss of Plaintiffs' assets in the Madoff Ponzi scheme is a direct and proximate result of Defendants' false representations and failure to fulfill their duties to Plaintiffs.

5.     Defendants wrongfully collected millions of dollars in fees based on their purported management of Plaintiffs' investments, including fees based on the fictitious profits supposedly generated by Madoff for Plaintiffs.  As a result of Defendants' wrongful actions, Plaintiffs' assets were stolen rather than invested. Because there were no profits on the non-existent investments, Defendants wrongfully collected the fees from the Funds.  A constructive trust must be

3

imposed on those fees and against those who hold them, so that the fees can be returned to Plaintiffs.

## PARTIES

### Plaintiffs

6.     Due to the acts alleged herein, the Plaintiffs identified below have lost their investments in the Funds as of December 11, 2008, and also have paid substantial investment, placement, management, and performance fees that were wrongfully charged based on fictitious investment returns.

7.     Plaintiff **Criterium Capital Funds, B.V.**, is a Netherlands Antilles private limited liability company ("besloten vennootschap") that invested assets in Kingate Global beginning on January 1, 1999.

8.     Plaintiff **BBF Trust** is a trust formed under the laws of the Commonwealth of the Bahamas that invested assets in Kingate Global beginning in October 1997.

9.     Plaintiff **Wall Street Securities, S.A.**, is a Panamanian corporation that invested assets in Kingate Global beginning in November 2008.

10.    Plaintiff **Banca Arner S.A.** is a Swiss corporation that invested assets in Kingate Global beginning in July 1997 and Kingate Euro beginning in May 2000.

11.    Plaintiff **Alvaro Castillo** is an individual residing in Switzerland who invested assets in Kingate Global beginning on October 30, 2008.

Defendants

12.    Defendant **Bernard Madoff** ("Madoff") orchestrated the Ponzi scheme into which the other Defendants funneled Plaintiffs' investments and directed the fraudulent activities of BMIS.  Madoff is a resident of New York.  He is now incarcerated in the Metropolitan Correctional Center following his guilty plea to multiple counts of fraud and other crimes.

13.    Defendant **Graham H. Cook** ("Cook") is a Director of both Kingate Global and Kingate Euro and, in addition to his wrongful actions on behalf of the Funds, breached duties he owed directly to Plaintiffs.  Mr. Cook is a resident of the British Virgin Islands.  As a director of Kingate Global and Kingate Euro, Mr. Cook had knowledge of, and participated in, the Funds' transaction of business within the state of New York, including maintaining of investment accounts in New York, consenting to the transactions related to those accounts, and otherwise by exercising control over the Funds.

14.    Defendant **John E. Epps** ("Epps") is a Director of both Kingate Global and Kingate Euro and, in addition to his wrongful actions on behalf of the Funds, breached duties he owed directly to Plaintiffs.  Mr. Epps is a resident of Bermuda.  As a director of Kingate Global and Kingate Euro, Mr. Epps had

knowledge of, and participated in, the Funds' transaction of business within the state of New York, including maintaining of investment accounts in New York, consenting to the transactions related to those accounts, and otherwise by exercising control over the Funds.

15.    Defendant **Sandra Manzke** ("Manzke") was a Director of Kingate Global from 1995 until at least 2003. In addition to her wrongful actions on behalf of Kingate Global, Ms. Manzke breached duties he owed directly to Plaintiffs. Ms. Manzke was also Chairman and co-CEO of Tremont Advisers, Inc., the parent company of Tremont (Bermuda) Limited. As a director of Kingate Global, Ms. Manzke had knowledge of, and participated in, Kingate Global's transaction of business within the state of New York, including maintaining of investment accounts in New York, consenting to the transactions related to those accounts, and otherwise by exercising control over Kingate Global. Ms. Manzke is a citizen of New York.

16.    Defendant **Charles D. Sebah** ("Sebah") was a Director of Kingate Global, from 1995 and until at least 2003. In addition to his wrongful actions on behalf of Kingate Global, Mr. Sebah breached duties he owed directly to Plaintiffs. As a director of Kingate Global, Mr. Sebah had knowledge of, and participated in, Kingate Global's transaction of business within the state of New York, including

maintaining of investment accounts in New York, consenting to the transactions related to those accounts, and otherwise by exercising control over Kingate Global.

17.     Defendant **Keith R. Bish** ("Bish") was a Director of Kingate Global, from 1995 to 2002.  Bish is a citizen of the United Kingdom residing in the British Virgin Islands.  In addition to his wrongful actions on behalf of Kingate Global, Mr. Bish breached duties he owed directly to Plaintiffs.  As a director of Kingate Global, Mr. Bish had knowledge of, and participated in, Kingate Global's transaction of business within the state of New York, including maintaining of investment accounts in New York, consenting to the transactions related to those accounts, and otherwise by exercising control over Kingate Global.

18.     Defendant **Kingate Management Limited** ("Kingate Management") is a corporation organized under the laws of Bermuda on February 24, 1994. Kingate Management manages capital and investments for Kingate Global and Kingate Euro, pursuant to "manager agreements" with each Fund.  Kingate Management's duties include managing all aspects of the investment advisory services provided to Kingate Global and Kingate Euro, including selection and evaluation of the Fund's Investment Advisor, in this case Madoff's company, BMIS.  Kingate Management was also responsible for arranging for all accounting and administrative services for the Funds.  Kingate Management was not registered with the SEC as an investment advisor under the Investment Advisers Act of 1940.

Kingate Management transacted business related to the Funds in New York, including maintaining of an investment account with a New York broker-dealer.

19.     Defendant **Christopher Wetherhill** ("Wetherhill") is a Director of Kingate Global, Kingate Euro, and Kingate Management.  Wetherhill has been a Director of Kingate Global and Kingate Management since 1995 and a Director of Kingate Euro since the Fund's inception.  Mr. Wetherhill, a citizen of the United Kingdom, is a resident of Bermuda.  As a director of Kingate Global, Kingate Euro, and Kingate Management, Mr. Wetherhill had knowledge of, and participated in, the Funds' transaction of business within the state of New York, including maintaining of investment accounts in New York, consenting to the transactions related to those accounts, and otherwise by exercising control over the Funds.  In addition to his wrongful actions on behalf of the Funds, Mr. Wetherhill breached duties he owed directly to Plaintiffs.

20.     Defendant **Michael G. Tannenbaum** ("Tannenbaum") is a Director of Kingate Management.  In addition to overseeing and directing Kingate Management's wrongful actions on behalf of the Funds, Mr. Tannenbaum owed duties directly to Plaintiffs.  Mr. Tannenbaum is a United States citizen and domiciliary of New York.  Mr. Tannenbaum transacted business related to Kingate Management in New York.

21.    Defendant **Phillip A. Evans** ("Evans") is a Director of Kingate Management. Mr. Evans is a resident of Monaco.  As a director of Kingate Management, Mr. Evans had knowledge of, and participated in, the Funds' transaction of business within the state of New York, including maintaining of investment accounts in New York, consenting to the transactions related to those accounts, and otherwise by exercising control over the Funds.  In addition to his wrongful actions on behalf of the Funds, Mr. Evans breached duties he owed directly to Plaintiffs.

22.    Defendant **Margaret Every** ("Every") was a Director of Kingate Management.  As a director of Kingate Management, Ms. Every had knowledge of, and participated in, the Funds' transaction of business within the state of New York, including maintaining of investment accounts in New York, consenting to the transactions related to those accounts, and otherwise by exercising control over the Funds.  In addition to her wrongful actions on behalf of the Funds, Ms. Every breached duties he owed directly to Plaintiffs.

23.    Defendant **Shazieh Salahuddin** ("Salahuddin") is a Director of Kingate Management.  Ms. Salahuddin is a resident of Bermuda.  Ms. Salahuddin is also a senior employee of the FIM group of companies.  As a director of Kingate Management, Ms. Salahuddin had knowledge of, and participated in, the Funds' transaction of business within the state of New York, including maintaining of

investment accounts in New York, consenting to the transactions related to those accounts, and otherwise by exercising control over the Funds. In addition to her wrongful actions on behalf of the Funds, Ms. Salahuddin breached duties he owed directly to Plaintiffs.

24.    Defendant **Tremont (Bermuda) Limited** ("TBL") is a corporation organized under the laws of Bermuda on November 16, 1988. TBL is a wholly-owned subsidiary of Tremont Group Holdings, Inc. (formerly Tremont Advisers, Inc.), a Delaware corporation registered as a foreign corporation in New York. TBL was a Co-Manager of Kingate Global through at least 2003. TBL's duties included managing all aspects of the investment advisory services provided to the Kingate Global, including selection and evaluation of the Investment Advisor, in this case BMIS. TBL was further responsible for arranging for all accounting and administrative services for Kingate Global. TBL transacted business related to Kingate Global in New York, including maintaining an investment account with a New York broker-dealer.

25.    Defendant **Johann Wong** ("Wong") was President and a Director of TBL from 1994 to 2005. Mr. Wong is a Canadian citizen and a domiciliary of Connecticut. As a director of TBL, Mr. Wong had knowledge of, and participated in, the Funds' transaction of business within the state of New York, including maintaining of investment accounts in New York, consenting to the transactions

related to those accounts, and otherwise by exercising control over the Funds. In addition to his wrongful actions on behalf of the Funds, Mr. Wong breached duties he owed directly to Plaintiffs.

26.   Defendant **Preston M. Davis** ("Davis") was the Accounting Manager for TBL from at least 1995 to 2003. As Accounting Manager of TBL, Mr. Davis had knowledge of, and participated in, the Funds' transaction of business within the state of New York, including maintaining of investment accounts in New York, consenting to the transactions related to those accounts, and otherwise by exercising control over the Funds. In addition to his wrongful actions on behalf of the Funds, Mr. Davis breached duties he owed directly to Plaintiffs.

27.   Defendant **FIM Advisers LLP** ("FIM") is a limited liability partnership incorporated under the laws of the United Kingdom. FIM is an asset management company specializing in the management of hedge fund portfolios for institutions and private clients. FIM is regulated by the Financial Services Authority of the United Kingdom. Pursuant to a Consulting Services Agreement dated August 1, 2005, FIM rendered consulting advice and services to Kingate Management with respect to the Funds' investment, operational, administrative, marketing, accounting, and legal matters. FIM is the successor-in-interest to FIM Limited, a limited liability company formed in 1980, under the laws of England and Wales. FIM acted in New York under the Consulting Services Agreement

through its agent, **FIM (USA) Inc.** ("FIM USA"), a Delaware corporation qualified to do business in New York.

28.     Defendants Kingate Management, TBL, FIM, Cook, Epps, Manzke, Sebah, Bish, Wetherhill, Tannenbaum, Evans, Every, Salahuddin, Wong, and Davis are referred to collectively as the "Kingate Defendants."

29.     Defendant **Citi Hedge Fund Services Limited** ("Citi"), formerly known as BISYS Hedge Fund Services Limited, is incorporated under the laws of Bermuda. Citi is responsible for all matters pertaining to the administration of Kingate Global and Kingate Euro, including communications with shareholders and the general public, soliciting sales of the Funds' shares, accepting subscriptions for share purchases, maintaining the Funds' corporate records and accounts, distributing payments of dividends and fees, calculating and publishing the subscription and redemption prices and net asset values of the Funds, conducting meetings of the Funds' shareholders and directors, and making redemptions from the Funds. Citi is an affiliate of Citigroup, Inc., and Citi Hedge Fund Services, Inc., a Delaware corporation registered to do business in New York. Citi is the successor-in-interest to Hemisphere Management Limited, the prior administrator of Kingate Global and Kingate Euro. Citi administered Plaintiffs' investments in the Funds' New York investment accounts by communicating subscription and redemption requests to Madoff.

## JURISDICTION AND VENUE

30.     This Court has jurisdiction over this dispute pursuant to the Class

Action Fairness Act of 2005, *codified at* 28 U.S.C. § 1332(d)(2)(B).  The amount

in controversy in this action exceeds $5,000,000.  The Class consists of more than

100 individuals; at least one Plaintiff is a citizen of a foreign state and at least one

Defendant is a citizen of New York.

31.     This Court has personal jurisdiction over all Defendants because all

Defendants have maintained minimum contacts with New York related to

Plaintiffs' claims by transacting business and engaging in continuous activity in the

state of New York, including:

> a.     Establishing investment accounts with BMIS in New York;
>
> b.     Maintaining ongoing investment activity in BMIS accounts,
> including transferring all of Plaintiffs' investments to BMIS in
> New York as custodian of such assets;
>
> c.     Making telephone calls, faxing and mailing documents and
> directing computer and internet communications to New York;
> and
>
> d.     Receiving fees derived from the foregoing activity conducted in
> New York.

32.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(3), as one or more of the individual Defendants reside in this District.

## FACTUAL ALLEGATIONS

### A.    Madoff's Massive Ponzi Scheme

33.    Madoff founded BMIS in 1960, and eventually expanded the firm to a worldwide client base.  Since at least 1990, Madoff perpetrated a massive Ponzi scheme through the investment advisory services of BMIS.  Rather than investing assets in actual securities as represented by him and Defendants, Madoff fraudulently used those assets for his personal benefit (and the benefit of his family and associates) and otherwise distributed them to prior investors to create the illusion of profits.  BMIS's account statements, which purported to set forth trades in equities and options using the assets turned over by the Funds, as well as trading gains and losses and securities holdings, including U.S. Treasury bills, were during the time the Funds existed entirely fictitious, and no trades of securities were executed for years.

34.    The size of Madoff's global fraud has been estimated at $64.8 billion, based upon the reported value of approximately 4,800 BMIS client accounts as of November 30, 2008.  Madoff's fraudulent scheme unraveled in December 2008 when BMIS did not have sufficient funds to cover investors' redemption requests. On December 11, 2008, Madoff was arrested and charged in a criminal complaint

after admitting that his money management operations were "all just one big lie" and "basically, a giant Ponzi scheme." On March 12, 2009, Madoff pleaded guilty to an 11-count criminal complaint, including fraud, perjury, theft from an employee benefit plan, and two counts of international money laundering. He is now incarcerated awaiting sentencing.

35.    At his plea hearing, Madoff explained that he had been paying returns to certain investors out of the assets received from other investors. Madoff stated that BMIS was insolvent and had been for years. Madoff estimated the losses from his fraud to be approximately $50 billion.

**B.    Kingate Funneled Plaintiffs' Assets to Madoff**

36.    **Kingate Global** is an open-end investment company organized as an international business company under the laws of the British Virgin Islands. Kingate Global commenced operation in 1994. Shares in Kingate Global were first sold on March 1, 1995. Since its inception, all, or substantially all, of Kingate Global's assets were invested with Madoff. Plaintiffs acquired shares or equity in Kingate Global when they turned over their assets to the Kingate Defendants, who in turn funneled them to Madoff.

37.    **Kingate Euro** is an open-end investment company organized as an international business company under the laws of the British Virgin Islands. Kingate Euro commenced operations on May 1, 2000. Since its inception, all, or

substantially all, of Kingate Euro's assets were invested with Madoff. Plaintiffs acquired shares or equity in Kingate Euro when they turned over their assets to the Kingate Defendants, who in turn funneled them to Madoff.

38.     Each member of the class invested in either Kingate Global or Kingate Euro. The investments were made outside of New York. Kingate Global, Kingate Euro, and Kingate Management, in turn, delegated all investment duties and custody of the investments to Madoff and BMIS, both located in New York, where they operated the Ponzi scheme.

39.     The Funds used Madoff as their sole Investment Advisor from their inception. Madoff was described by the Kingate Defendants as a "New York based NASD registered broker-dealer employing approximately 350 people and acting primarily as a market-maker in listed and unlisted stocks and convertible securities." (Kingate Global Fund, Ltd. Amended and Restated Information Memorandum, October 6, 2008, at 14 [hereinafter KGF 2008 IM]; Kingate Euro Fund, Ltd. Amended and Restated Information Memorandum, October 6, 2008, at 15 [hereinafter KEF 2008 IM]; Kingate Global Fund, Ltd. Amended and Restated Information Memorandum, August 1, 2007, at 14 [hereinafter KGF 2007 IM]; Kingate Global Fund, Ltd. Amended and Restated Information Memorandum, May 1, 2006, at 14 [hereinafter KGF 2006 IM]; Kingate Global Fund, Ltd. Amended and Restated Information Memorandum, January 15, 2003, at 15 [hereinafter KGF

2003 IM]; *see also* Kingate Global Fund, Ltd. Information Memorandum, May 1, 2000, at 15 [hereinafter KGF 2000 IM].) Reportedly, over $3 billion was invested in Kingate Global and Kingate Euro, and virtually all of those moneys were funneled to Madoff.

40.     The losses that Plaintiffs suffered when the Funds collapsed would have been avoided if Defendants had fulfilled their duties to Plaintiffs, if they had lived up to their own representations, and if they had adequately investigated and monitored Madoff and BMIS. In failing to do so, Defendants breached their duties to Plaintiffs and the Class, and effectively wiped out the investments of Plaintiffs and the Class. At the same time, the fund managers of Kingate Global and Kingate Euro paid themselves millions of dollars in fees. For instance, Kingate Management's fees were approximately $38 million in 2007 and $35 million in 2006.

41.     By virtue of their education, business experience and sophistication, and the dominant role that the Madoff relationship played in the business of the Funds, each of the Defendants either knew or should have known of the "red flags" associated with Madoff's operation and either knew or should have known the true facts alleged herein with regard to Kingate's false representations and lack of due diligence with respect to Madoff's operations.

**C.    Kingate Defendants Falsely Represented the Funds' Investments With Madoff and the Absence of Due Diligence and Oversight of Madoff's Operations**

42.    Beginning in 1995 and continuing to December 11, 2008, the Kingate Defendants marketed the Funds on the basis of false and misleading representations and omissions. The Information Memoranda issued by the Kingate Defendants consistently – and falsely – described the investment strategy of the Funds as seeking to obtain capital appreciation of assets principally through a "split-strike conversion" strategy. For example, according to the Information Memoranda, Madoff used a "non-traditional investment strategy" to achieve long-term capital appreciation "that is a variation of the traditional 'option conversion' strategies," known as "split-strike conversion." (KGF 2008 IM, at 2; KEF 2008 IM, at 1-2; KGF 2007 IM, at 2; KGF 2006 IM, at 2; KGF 2003 IM, at 2; KGF 2000 IM, at 2-3.) These representations were false, since Madoff did not use the split-strike conversion investment strategy or make any investments at all.

43.    The May 1, 1996, Information Memorandum for Kingate Global ("KGF 1996 IM"), by which investments in the Funds were solicited, represented to investors that the Kingate Defendants would exercise care and due diligence in selecting and monitoring Madoff, that Defendants had transparency with respect to Madoff and his operations, and that they would exercise oversight over Madoff:

a.   "In selecting a particular Investment Advisor to which [Kingate Global] will allocate assets, the Co-Managers will be guided by" factors such as the "Investment Advisor's past performance and reputation"; the "[s]ize and efficiency of assets managed"; the "[c]ontinued favorable outlook for the strategy employed"; and the "[a]bility of [Kingate Global] to make withdrawals or liquidate its investment." (KGF 1996 IM, at 1.)

b.   "[T]he Co-Managers have agreed . . . to manage all aspects of the investment advisory services provided to the Fund, including the selection and evaluation of the Investment Advisors and the allocation of the Fund's assets among the Investment Advisors." (KGF 1996 IM, at 19.)

c.   "The Co-Managers, in their sole discretion, arrange for the investment of the Fund's assets by the Investment Advisors." (KGF 1996 IM, at 19.)

d.   "The Co-Managers have an international perspective regarding investments and believe that by allocating the Fund's investment portfolio either directly or through one or more Sub-Funds among a limited number of above-average Investment Advisors having different investment styles and strategies and

emphasizing various techniques, products and geographic markets, the impact of any one such style, strategy or market on investment performance will be diluted." (KGF 1996 IM, at 20.)

e.    "The Co-Managers collect, analyze and evaluate information regarding the personnel, history and background, and the investment styles, products, strategies and performance of professional investment management firms." (KGF 1996 IM, at 20.)

f.    "FIM researches, screens and nominates of [sic] selection by Co-Manager Kingate investment advisors that may be appointed to manage the Fund's assets.  Based upon its analysis, FIM makes recommendations to Co-Manager Kingate concerning a proposed allocation of assets among asset classes and among investment advisors that it believes are suitable for the investment program of the Fund's various Classes of shares." (KGF 1996 IM, at 20-21.)

g.    "FIM continuously monitors the asset allocation made by the Fund among various asset classes and among investment advisors." (KGF 1996 IM, at 21.)

h. "Based upon its continuous analysis of the performance of the investment advisors, FIM will recommend changes in the allocation of the Fund's assets among different investment advisors." (KGF 1996 IM, at 21.)

These representations were false because, at the least, the Kingate Defendants did not conduct the represented due diligence and oversight of Madoff.

44. In later Information Memoranda from 2000 through 2008, the Kingate Defendants repeated representations regarding how assets in the Fund were invested:

a. "The Fund seeks to obtain capital appreciation of its assets through the utilization of a non-traditional stock/options trading strategy," i.e., the split-strike conversion. (KGF 2008 IM, at 2; KEF 2008 IM, at 2; KGF 2007 IM, at 2; KGF 2006 IM, at 2; KGF 2003 IM, at 2; KGF 2000 IM, at 2.)

b. The split-strike conversion investment strategy "entails: purchasing a basket of forty-five (45) to fifty (50) large-capitalization S&P 100 stocks . . . which together account for the greatest weight of the Index . . . selling out-of-the money S&P 100 Index call options representing a dollar amount of the underlying Index equivalent to the dollar amount of the basket

21

of shares purchased;" and "purchasing out-of-the money or at-the-money S&P Index put options in the same dollar amount." (KGF 2008 IM, at 2; KEF 2008 IM, at 2; KGF 2007 IM, at 2; KGF 2006 IM, at 2; *see also* KGF 2003 IM, at 2-3; KGF 2000 IM, at 2.)

c.    "The investment advisor is a New York based NASD registered broker-dealer employing approximately 350 people and acting primarily as a market-maker in listed and unlisted stocks and convertible securities . . . . The Manager has established a discretionary account with such Investment Advisor on behalf of the Fund for the management of the USD assets.  The Investment Advisor utilizes a 'split strike conversion' strategy consistent with the strategy of the Fund. . . ."  (KGF 2008 IM, at 14; KEF 2008 IM, at 15; KGF 2007 IM, at 14; KGF 2006 IM, at 14; *see also* KGF 2003 IM, at 15.)

d.    Kingate Management, pursuant to the Manager Agreement, "manage[d] all aspects of the investment advisory services provided to the Fund, including selection and evaluation of the Investment Advisor."  (KGF 2008 IM, at 13; KEF 2008 IM, at

14; KGF 2007 IM, at 13; KGF 2006 IM, at 13; KGF 2003 IM, at 14).

These representations were false because the represented investment strategy was in fact not followed and Defendants conducted no meaningful evaluation of Madoff; indeed, there was no investment of Plaintiffs' assets in any legitimate securities.

45.     In their correspondence to Plaintiffs, Defendants repeated the misrepresentation that the assets in the Funds were legitimately invested and misrepresented the status of the investments.  For example, as recently as October 2008, Kingate Management represented that Kingate Global's "portfolio [invested with Madoff] started the month 100% invested in US Treasury bills and ended the month with the same positions."  (Kingate Global Fund, October 2008 Update.) Defendants had no reasonable basis for making that statement, which was false because the assets of the Fund were not invested in U.S. Treasury bills or in any other securities.

46.     Through FIM, the Kingate Defendants consistently represented to Plaintiffs the high level of diligence and risk monitoring they conducted with respect to investment managers such as Madoff, including the following:

a.  "Regular reviews of markets, strategies, managers and peer groups on a qualitative and quantitative basis are used to evaluate and monitor changes in risk factors and profiles":

b.  "[R]esearch specialists will . . . conduct in-depth analysis into every aspect of a fund, its manager and its service providers";

c.  Members of the Investment Committee "review and analyse all aspects of the strategy, manager, risk and operational due-diligence to ensure completeness of process and suitability for investment";

d.  "Each portfolio is subject to continuous analysis to ensure all risk factors are identified and controlled and all internal and external management portfolio policies are adhered to"; and

e.  "Strategy and manager conclusions are subject to active monitoring by the research teams, investment committee and risk management to ensure accuracy of analysis."

FIM, Research & Investment, http://www.fim-group.com/research.asp.  These representations were false because the Kingate Defendants did not conduct the represented due diligence, monitoring or oversight.

47.  Although the Kingate Defendants represented that they would delegate "all investment management duties with regard to USD Shares to the

Investment Advisor," in this case Madoff (KGF 2008 IM, at 5; KEF 2008 IM, at 6; KGF 2007 IM, at 5; KGF 2006 IM, at 5; KGF 2003 IM, at 5; KGF 2000 IM, at 5), Kingate Management explicitly retained control over Kingate Global and Kingate Euro: "All decisions with respect to the general management of the Fund are made by the Manager, who has complete authority and discretion in the management and control of the business of the Fund." (KGF 2008 IM, at 4; KEF 2008 IM, at 5; KGF 2007 IM, at 4; KGF 2006 IM, at 4; *see also* KGF 2003 IM, at 5; KGF 2000 IM, at 5.) These representations were false because the Kingate Defendants in fact turned over to Madoff Plaintiffs' investments in the Funds and abdicated their responsibility and discretion with respect to control of the invested assets.

48.   Defendants sent periodic, false updates to the Plaintiffs regarding the performance of Kingate Global, representing, for example, the following:

      a.    "Kingate USD performed well in November [2008] closing the month with a gain of +1.45% after fees" (Kingate Global Fund, November 2008 Update);

      b.    Three year returns of 30.78% (Kingate Global Fund, October 2008 Update); and

      c.    Five year returns of 51.94%.

These representations were false, and Defendants had no reasonable basis for making them. The Fund in fact did not "perform well" in November 2008 or any other month, nor did it ever achieve the represented returns.

49.     Defendants likewise sent periodic updates to the Plaintiffs regarding the purported performance of Kingate Euro, representing the following:

   a.     "Kingate Euro performed well in November [2008] closing the month with a gain of +1.34% after fees" (Kingate Euro Fund, November 2008 Update);

   b.     Three year returns of 25.06% (Kingate Euro Fund, October 2008 Update); and

   c.     Five year returns of 43.53%.

These representations were false and Defendants had no reasonable basis for making them. The Fund did not in fact hold the represented assets or achieve the represented investment return.

50.     By making these false representations alleged above, by failing to act with diligence, and by failing to confirm the accuracy of the information disseminated to Plaintiffs, the Kingate Defendants were grossly negligent, breached their duties to Plaintiffs and did not act in good faith.

**D.    Defendants Ignored Red Flags That Madoff Was Operating a Ponzi Scheme**

51.    In addition to making false representations, the Kingate Defendants failed to react to or to disclose, in the Investment Memoranda or elsewhere, the existence of numerous "red flags" regarding the conduct of Madoff's business, which should have put them on notice that Madoff was not operating a legitimate investment fund.  These red flags included the lack of any transparency into Madoff's actual operations, the lack of segregation of duties with respect to the trading and custody of assets, Madoff's reporting to Defendants of purported securities trades at prices outside the actual trading ranges, inadequate auditing of Madoff's operations, and the consistently profitable returns for a fund pursuing the stated strategy, which were not attainable.

52.    The Kingate Defendants ignored the warning flag of Madoff's use of Friehling & Horowitz ("F&H"), an unknown accounting firm that was plainly unequipped to audit a company of BMIS's size.  The firm had only three employees – a retired partner living in Florida, a secretary, and one active certified public accountant.  While F&H was a member of the American Institute of Certified Public Accountants ("AICPA"), it had not been subjected to a peer review since 1993 – a requirement of membership of AICPA – because F&H represented to the AICPA, in writing, that it did not perform any audits.  This information was ignored by the Kingate Defendants.

53.    Although Madoff claimed his operation was technologically

advanced, and the Kingate Defendants claimed transparency to Madoff and his

operation, Madoff only used paper tickets for his trades, and copies of the tickets

were given to the Kingate Defendants only 3-5 days after the trades supposedly

occurred.  The use of delayed paper trade records, which are susceptible to

manipulation, was a red flag ignored by the Kingate Defendants.  Had Defendants

instead insisted on immediate electronic confirmation of the supposed trades, they

would have uncovered Madoff's fraud.

54.    BMIS frequently executed "trades" on behalf of the Funds for

securities at prices that were outside of the trading ranges for those securities on

the listed execution date.  For example, in the complaint filed against the Funds by

BMIS Trustee Irving Picard, Picard alleges that for the month of October 2003, the

Kingate Defendants received account statements reporting purchases of 984,137

shares of Intel Corporation for Kingate Global and 240,240 shares for Kingate

Euro.  The settlement date of these purchases was listed as of October 7, 2003, and

the purchases were purportedly executed on October 2, 2003, at a price of $27.63.

However, the daily price range for Intel Corporation stock on October 2, 2003,

ranged from a low of $28.41 to a high of $28.95.  In a second example, this time a

purported sale, the monthly account statements received by the Kingate Defendants

for the month of December 2006 reported a sale of 233,281 and 60,499 shares, for

Kingate Global and Kingate Euro respectively, of Merck & Co., Inc. at a purported executed price of $44.61 on the trade date of December 22, 2006, with a settlement date of December 28, 2006. However, the daily price range for Merck stock on the purported trade date of December 22, 2006, ranged from a low of $42.78 to a high of $43.42. In total for the analyzed time period through November 2008, the Funds received monthly statements that showed 185 trades that were purportedly executed at a price outside the daily price range. Based on this pattern, a sophisticated hedge fund manager like the Kingate Defendants should have investigated Madoff's operations and verified the trades independently. If Defendants fulfilled that duty, they would have uncovered Madoff's fraud.

55.     In a highly irregular arrangement, the Kingate Defendants allowed BMIS to act as the purported "custodian" of the Funds' assets, in addition to acting as the investment advisor purportedly making decisions about how to implement the split-strike conversion strategy and the broker for such trades. Defendants' acquiescence in this suspicious arrangement was equivalent to inviting the fox to guard the chicken coop and enabled Madoff to hide his Ponzi scheme.

56.     Moreover, if the Kingate Defendants had scrutinized Madoff's purported investment returns as they represented they did, they would have discovered that the purported results were unattainable. Had they applied a critical and knowledgeable understanding of the split-strike conversion strategy – which

the Kingate Defendants represented they had the ability to apply – they would have recognized that: (1) Madoff bought near daily lows and sold near highs with uncanny consistency; (2) Madoff always invested in U.S. Treasury bills at the end of each quarter, even though the strategy supposedly took weeks to execute; and (3) Madoff's reported results were impossible to attain with the split-strike strategy, which might reduce volatility, but would not produce gains in a declining stock market. In short, had the Kingate Defendants done what they represented they did in exchange for their huge fees, they would have reached the conclusion that the returns reported by Madoff – but never verified by the Kingate Defendants – were unattainable, another sign that Madoff was a fraud.

57.   At the same time the Kingate Defendants were soliciting investments from Plaintiffs, including by misrepresenting the nature of the Funds and their oversight and monitoring of Madoff's operations, they included in the Information Memoranda the following language in an attempt to disclaim liability for virtually any malfeasance by Madoff:

> Neither the Fund nor the Custodian has actual custody of the assets. Such actual custody rests with the Investment Advisor and its affiliated broker-dealer. Therefore, there is the risk that the custodian could abscond with those assets. There is always the risk that the assets with the Investment Advisor could be misappropriated. In addition, information supplied by the Investment Advisor may be inaccurate or even fraudulent. The Manager is entitled to rely on such information (provided they do so in good faith) and is not required to undertake any due diligence to confirm the accuracy thereof.

(KGF 2008 IM, at 9; KGF 2007 IM, at 9; KGF 2006 IM, at 9; KGF 2003 IM, at 9-10; KGF 2000 IM, at 10; *see also* KEF 2008 IM, at 10; KGF 1996 IM, at 11.) Because the Kingate Defendants failed to take reasonable steps to monitor or conduct due diligence concerning Madoff, any purported reliance by Defendants on information received from Madoff was not in good faith. Moreover, Defendants' attempt to disclaim liability for Madoff's malfeasance is ineffective because Defendants should not have turned over assets to Madoff if they had any reason to believe that the assets could be misappropriated – as the purported "disclaimers" suggest they did. Nor can the Kingate Defendants insulate themselves from liability for their affirmative breaches of duty and gross negligence by stating the truism that there is "always a risk" that assets could be misappropriated when, in fact, they would have discovered Madoff's fraud and avoided the risk if they had acted in accordance with their representations and duties to Plaintiffs.

## E.    Defendants Received Substantial Fees for "Investing" Plaintiffs' Assets

58.    The Kingate Defendants received substantial fees for funneling Plaintiffs' investments into the Madoff fraud. The IMs established the fee amounts that Defendants would receive for their supposed management and oversight of Plaintiffs' investments:

a.  "The Manager receives a monthly fee from the Fund calculated at an annual rate equal to approximately one and one-half percent (1.5%) of the month-end Net Asset Value of the Fund attributable to the [applicable] shares." (KGF 2008 IM, at 17; KEF 2008 IM, at 17-18; KGF 2007 IM, at 17; KGF 2006 IM, at 17; *see also* KGF 2003 IM, at 18; KGF 2000 IM, at 17-18; KGF 1996 IM, at 23.)

b.  "[T]he Administrator receives customary fees paid out of the Fund assets based upon the nature and extent of the services performed by the Administrator for the Fund." (KGF 2008 IM, at 17; KEF 2008 IM, at 18; KGF 2007 IM, at 17; KGF 2006 IM, at 17; KGF 2003 IM, at 18; KGF 2000 IM, at 18.)

c.  "Each Director of the Fund who is not an officer or employee of the [Co-]Manager or the Administrator receives a fee in accordance with reasonable practice." (KGF 2008 IM, at 17; KEF 2008 IM, at 18; KGF 2007 IM, at 17; KGF 2006 IM, at 18; KGF 2003 IM, at 19; KGF 2000 IM, at 19.)

d.  "The Investment Advisor's compensation is derived from the market making activities of its affiliated broker-dealer and bid-

ask spreads." (KGF 2008 IM, at 17; KEF 2008 IM, at 18; KGF 2007 IM, at 17; KGF 2000 IM, at 18.)

e.    FIM "is paid by [the] Manager for its services at no additional cost to the Fund." (KGF 2008 IM, at 17; KEF 2008 IM, at 18; KGF 2007 IM, at 17; *see also* KGF 2000 IM, at 18; KGF 1996 IM, at 23.)

59.    The Funds paid Kingate Management tens of millions of dollars in fees each year based on the fictional Madoff "investment returns." For instance, in 2007, Kingate Global paid Kingate Management $38,783,479 in fees. Likewise, in 2007, Kingate Euro paid Kingate Management €9,054,137 in fees. (Kingate Global Fund, Ltd. Financial Statements Dec. 31, 2007 and 2006; Kingate Euro Fund, Ltd. Financial Statements Dec. 31, 2007 and 2006.)

60.    Additionally, Kingate Management directed the Funds to pay substantial fees to the Administrator, Citi, based on the fictitious value of the Funds' assets. For instance, in 2007, Kingate Global paid $666,795 and Kingate Euro paid €146,118 in administration fees. (Kingate Global Fund, Ltd. Financial Statements Dec. 31, 2007 and 2006; Kingate Euro Fund, Ltd. Financial Statements Dec. 31, 2007 and 2006.)

61.    These fees were paid on the basis of falsely reported investment activity and returns. They were not earned by those who received them. Rather

than perform their obligations to Plaintiffs, Defendants instead simply enabled Madoff's theft of Plaintiffs' assets.

## CLASS ACTION ALLEGATIONS

62.     Plaintiffs bring this proceeding as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of all shareholders in Kingate Global and Kingate Euro, as of December 10, 2008 (the "Class"). Excluded from the Class are the Defendants herein, and any entity in which the Defendants have a controlling interest, and the officers, directors, affiliates, legal representatives, immediate family members, heirs, successors, subsidiaries, and/or assigns of any such individual or entity.

63.     Plaintiffs seek to designate two subclasses, one for the investors in Kingate Global and one for the investors in Kingate Euro.

64.     The Class satisfies the requirements of Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure:

> a.     *Numerosity*.  During the Class Period, shares in the Funds were sold to thousands of investors.  The membership of the Class is so numerous as to render joinder of all Class members impracticable.  The precise number of Class members remains indeterminate and can only be ascertained through discovery, but Plaintiffs believe it is in the thousands.

b.   *Typicality.* The losses suffered by the named Plaintiffs were caused by the same events, patterns of practice, and courses of conduct that give rise to the claims of the other members of the Class. The named Plaintiffs are members of the Class and the losses to the named Plaintiffs are based on the same legal theories.

c.   *Common Questions.* Among the numerous predominant questions of law and fact that are common to the Class are:

(A)   Whether the Defendants made false statements regarding Madoff's operations, the investment strategy for the Funds, and historical results achieved by the Funds;

(B)   Whether Defendants falsely misrepresented, *inter alia*, the investment services that would be provided by them; the extent and quality of the due diligence, ongoing risk monitoring, and transaction verification that they performed and would perform on Madoff and BMIS; the transparency to Madoff and BMIS; the split-strike conversion method ostensibly used by Madoff and BMIS;

each Funds' appreciation; and BMIS's qualifications to serve as custodian of the Funds' assets;

(C)   Whether Defendants' false statements were negligent misrepresentations;

(D)   Whether the Defendants breached their fiduciary and other duties to Plaintiffs;

(E)   Whether and to what extent Plaintiffs were damaged by the Defendants' misrepresentations and breaches of fiduciary duty;

(F)   Whether the Defendants were grossly negligent in:

    (1)   Failing to perform adequate due diligence before selecting BMIS as each Fund's investment advisor and broker-dealer for the purported split-strike conversion strategy, and before allowing BMIS to serve as actual custodian of the Funds' assets;

    (2)   Failing to monitor Madoff and BMIS on any ongoing basis and to any reasonable degree; and

        (3)    Failing to take adequate steps to confirm BMIS's purported account statements, transactions, and holdings of each Fund's assets;

     (G)    Whether Plaintiffs are entitled to the imposition of a constructive trust on all monies and other property in the possession of the Defendants which derive from their compensation in the form of management and performance and other fees based on fraudulent Madoff investments;

     (H)    Whether Plaintiffs are entitled to an accounting of: (1) the actual investments and transactions done on Plaintiffs' behalf, (2) the actual calculation used to determine each management and performance fee, and (3) the amounts taken in management and performance fees.

d.    *Adequate Representation.*  The representative Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have retained experienced counsel qualified in class

action litigation who are competent to assert the interests of the Class.

e.   *Superiority.*  A class action is superior to other methods for the fair and efficient adjudication of this controversy involving thousands of similarly situated investors.

## COUNT I

### Fraud against Bernard L. Madoff

65.   Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

66.   Bernard Madoff orchestrated and implemented a fraudulent scheme by which he intentionally defrauded Plaintiffs by operating a Ponzi scheme, whereby instead of implementing a "split-strike conversion strategy," as falsely represented, he simply took Plaintiffs' assets when received and used them to pay off already-existing fund investors who were demanding redemptions on their earlier investments.

67.   Plaintiffs have been damaged and are entitled to recover their losses.

68.   Because of the outrageous nature of Madoff's willful and wanton conduct, Plaintiffs are entitled to punitive damages.

## COUNT II

### Negligent Misrepresentation against All Defendants
### (Purchaser Claims)

69.     Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

70.     Based on their unique or special expertise with respect to investments generally and the Madoff funds in particular, Defendants had a special relationship of trust or confidence with Plaintiffs, which created a duty on the part of Defendants to impart full and correct information to Plaintiffs.

71.     Defendants falsely represented to Plaintiffs in connection with their purchase of shares in the Funds that:  (i) Defendants had conducted thorough due diligence and exercised oversight of Madoff's operations; (ii) the Funds would invest their monies into a legitimate fund, principally relying upon a split-strike conversion involving the purchase of equities and options; (iii) that by using this strategy, the Funds historically had achieved consistent profitable returns and had a long track record of achieving positive investment returns; (iv) Defendants would monitor the investments made by the Funds with Madoff to confirm that the Funds were operated legitimately, following the stated investment strategy, and in accordance with all legal and regulatory strictures; (v) the due diligence and oversight process employed by Defendants was thorough and provided transparency to all aspects of Madoff's operations, which allowed Defendants to

assure that the funds invested with Madoff were being actually and legitimately invested; and (vi) Madoff's operations and accounts were audited by reputable, independent auditors utilizing appropriate and accepted accounting and auditing procedures, which provided further assurance that the Funds actually held the represented assets and were otherwise operated lawfully.

72.    Defendants failed to disclose the following material information, among other things, which rendered other representations false and misleading: (i) that Defendants were in fact not engaging in customary, or any other meaningful, due diligence or monitoring to verify that the Funds' assets were being properly invested and managed by the fund manager, or that the assets even existed; and (ii) the existence of numerous "red flags" regarding Madoff including, among others, the lack of transparency into Madoff's actual operations, the lack of segregation of duties, inadequate auditing of Madoff, the impossibility of making numerous specific trades that Madoff reported to Defendants and the unattainability of consistently profitable returns for a fund pursuing the stated strategy.

73.    Defendants made the false representations and material omissions knowing that Plaintiffs would use and rely upon the representations and omissions for the particular purpose of determining where and how to invest their assets and, in particular, to decide to invest their assets in the Funds.

74.     Defendants made the false representations without regard to their truth or falsity and were grossly negligent in making them.

75.     Plaintiffs justifiably relied upon the false representations and material omissions made by Defendants in furtherance of that particular purpose by investing their assets in the Funds.

76.     Defendants knew that Plaintiffs were investors and understood that they would rely upon the false statements and material omissions for the particular purpose of investing their assets in the Funds.

77.     As a result of their reliance upon the false representations and material omissions of Defendants, Plaintiffs have suffered damages, namely the loss of their investments in the Funds, and Defendants, in turn, have derived substantial profits.

78.     Because of the outrageous nature of Defendants' willful and wanton conduct, Plaintiffs are entitled to punitive damages.

## COUNT III

### Negligent Misrepresentation against All Defendants
### (Holder Claims)

79.     Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

80.     Based on their unique or special expertise with respect to investments generally and the Madoff funds in particular, Defendants had a special relationship

of trust or confidence with Plaintiffs, which created a duty on the part of

Defendants to impart correct information to Plaintiffs.

81.    Defendants induced purchasers to hold their positions in the Funds by

falsely representing to Plaintiffs that: (i) Defendants had conducted thorough due

diligence and exercised oversight of Madoff's operations and had determined that

those operations were legitimate, utilized the split-strike conversion investment

strategy, and had a long track record of achieving positive investment returns; (ii)

Plaintiffs' assets invested in the Funds operated by the Kingate Defendants would,

in turn, be invested in a legitimate manner by Madoff that utilized the split-strike

conversion investment strategy; (iii) Kingate Defendants and Citi would monitor

the investments made by Madoff to confirm that he was operating legitimately,

using the split-strike conversion investment strategy, and in accordance with all

legal and regulatory strictures, and further that Defendants would verify Fund

transactions, including that the Madoff funds actually made the represented trades

and that the Funds held the represented assets; (iv) the due diligence and oversight

process employed by Defendants was thorough and provided transparency to all

aspects of Madoff's operations, which allowed Defendants to assure that the funds

invested with Madoff were being actually and legitimately invested; and (v)

Madoff's operations and accounts were audited by reputable, independent auditors

utilizing appropriate and accepted accounting and auditing procedures, which

provided further assurance that the Funds actually held the represented assets and were otherwise operated lawfully.

82.     The representations made by Defendants were false in that, among other things:  (i) Defendants did not, in fact, conduct thorough due diligence of, or exercise oversight over, Madoff and his operations and had not determined that Madoff actually invested assets utilizing the split-strike conversion investment strategy, with a long track record of achieving positive investment returns; (ii) Defendants did not invest Plaintiffs' assets in legitimate funds that utilized the split-strike conversion investment strategy; (iii) Defendants did not monitor the investments in the Funds operated by Madoff to confirm that the funds were operated legitimately using the split-strike conversion investment strategy and in accordance with all legal and regulatory structures, and did not verify Fund transactions, including that Madoff actually made the represented trades and that the Funds actually held the represented assets; (iv) the due diligence and oversight process employed by Defendants was non-existent and thus did not allow Defendants the ability to assure that the assets provided to Madoff were actually and legitimately invested; and (v) Madoff's operations and accounts were not audited by reputable, independent auditors utilizing appropriate and accepted accounting and auditing procedures, and thus did not provide any assurance that

the Funds actually held the represented assets and were otherwise operated lawfully.

83. Defendants made the false representations knowing that Plaintiffs would use and rely upon the representations for the particular purpose of determining whether to hold their assets in the Funds.

84. Defendants made the false representations without regard to their truth or falsity and were grossly negligent in making them.

85. Plaintiffs justifiably relied upon the false representations made by Defendants in furtherance of that particular purpose by continuing to hold their assets in the Funds.

86. Defendants knew that Plaintiffs were investors in the Funds and understood that Plaintiffs would rely upon the false statements for the particular purpose of continuing to hold their assets in the Funds.

87. As a result of their reliance upon the false representations made by Defendants, Plaintiffs have suffered damages, namely the loss of their investments in the Funds, and all Defendants, in turn, have derived substantial profits.

88. Because of the outrageous nature of Defendants' willful and wanton conduct, Plaintiffs are entitled to punitive damages.

## COUNT IV

### Breach of Fiduciary Duty against All Defendants

89.     Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

90.     Defendants had substantial discretion and control over Plaintiffs' assets in the Funds, the marketing of those Funds, and communications to Plaintiffs.

91.     This discretion and control gave rise to a fiduciary duty and duty of care on the part of the Kingate Defendants to the Plaintiffs as evidenced by the following:

a.      The Kingate Defendants occupied a superior position over Plaintiffs with respect to their management and control over their assets in the Funds, and had superior access to confidential information about the investment of the assets and about Madoff and BMIS.

b.      The Kingate Defendants' superior position necessitated that Plaintiffs repose their trust and confidence in the Kingate Defendants to fulfill their duties, particularly with respect to Madoff's investment activities, and Plaintiffs did so by investing in the Funds.

c. The Kingate Defendants held themselves out as providing superior client investment services, and evinced an understanding that they were the fiduciaries of the investors. Plaintiffs reasonably and foreseeably relied on such representations, and trusted in the Kingate Defendants' purported expertise and skill.

92. As administrator, Citi had discretion regarding Plaintiffs' assets invested in the Funds, including calculation of the Funds' net asset value, solicitation of subscriptions, and communications to Plaintiffs regarding their investments. This discretion gave rise to fiduciary duties of due care, good faith, loyalty and candor on the part of Citi to Plaintiffs. Citi occupied a superior position over Plaintiffs with respect to its discretionary responsibilities and had superior access to confidential information regarding, among other things:

a. The identity of the investment advisor;

b. The transparency of investment advisor's investment practices;

c. The legitimacy of the investment advisor's practices;

d. The accuracy of monthly Net Asset Value Statements; and

e. Any and all steps taken to safeguard the value of shareholder investments.

93.    All Defendants were obligated to deal fairly and honestly with the Plaintiffs; to act with loyalty and good faith towards Plaintiffs; to avoid placing themselves in situations involving a conflict of interest with Plaintiffs; to manage and operate each Plaintiff's investments exclusively for the best interest of the Plaintiffs; to make recommendations and execute transactions in accordance with the goals, investment objectives, and permissible degree of risk; and to oversee the investment of Plaintiffs' assets to confirm they were maintained in a prudent and professional manner.

94.    Defendants breached their fiduciary duties to Plaintiffs by failing to conduct adequate due diligence and monitoring with respect to the Funds' investments, by failing to follow-up on "red flags" that would have caused them to discover that Madoff was conducting Ponzi scheme, by publishing information regarding Plaintiffs' investments without confirming the validity of those statements, and by pocketing millions of dollars in fees based on fraudulent asset values and investment returns.

95.    Plaintiffs have been damaged as a proximate result of these breaches of fiduciary duty and are entitled to damages, and appropriate equitable relief, including accounting and imposition of a constructive trust.

96.    Because of the outrageous nature of Defendants' willful and wanton conduct, Plaintiffs are entitled to punitive damages.

## COUNT V

### Gross Negligence against All Defendants

97.     Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

98.     Defendants, as managers and administrators with discretionary control over Fund assets, had a special relationship with Plaintiffs that gave rise to a duty to exercise due care in the management of Plaintiffs' assets invested in the Funds, and in the selection and monitoring of Fund investment advisors and custodians. Defendants knew or should have known that Plaintiffs were relying on Defendants to manage the investments entrusted to the Fund with reasonable care, and Plaintiffs did reasonably and foreseeably rely on Defendants to exercise such care by entrusting their assets to their Funds.

99.     By virtue of the conduct and failures to act alleged above, Defendants grossly failed to exercise due care, and acted in reckless disregard of their duties, and thereby injured Plaintiffs.  Defendants failed to perform any meaningful due diligence before selecting BMIS as the Funds' investment advisors; failed to monitor Madoff and BMIS on an ongoing basis to any reasonable degree; and failed to take any meaningful steps to confirm BMIS's purported account statements, transactions and holdings of the Funds' assets.  Although Defendants expressly recognized the likelihood of fraud in their warnings to Plaintiffs

concerning investments in the Funds, Defendants in fact exercised no meaningful diligence or monitoring whatever concerning Plaintiffs' investments or BMIS.

100.   If Defendants had not been grossly negligent with respect to Plaintiffs' assets invested in Kingate Global and Kingate Euro, they would have discovered that Madoff's operation was a fraud, and not entrusted Plaintiffs' assets invested in the Funds to BMIS.

101.   As a direct and proximate result of Defendants' gross negligence with respect to Plaintiffs' assets invested in Kingate Global and Kingate Euro, Plaintiffs have lost all, or substantially all, their investment in the Funds.

102.   By reason of the foregoing, all Defendants are jointly and severally liable to Plaintiffs.

103.   Because of the outrageous nature of Defendants' willful and wanton conduct, Plaintiffs are entitled to punitive damages.

## COUNT VI

### Unjust Enrichment against All Defendants

104.   Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

105.   Plaintiffs had a quasi-contractual relationship with Defendants by virtue of their investment in Kingate Global and Kingate Euro.

106.   Defendants were enriched at the expense of Plaintiffs by taking Plaintiffs' monies in the form of commissions and other fees for the purported management and administration of Plaintiffs' investments, and the purported, but in fact non-existent, capital appreciation of such assets.

107.   Defendants' performance was so far below the applicable fiduciary and business standards that Plaintiffs involuntarily conferred a benefit upon Defendants without Plaintiffs receiving adequate benefit or compensation in return. In so doing, Defendants acted in reckless disregard of their duties to Plaintiffs.

108.   Equity and good conscience require Defendants to refund all monies paid for any services rendered on Plaintiffs' behalf.

## COUNT VII

## Imposition of Constructive Trust and Accounting against All Defendants

109.   Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

110.   Defendants had a fiduciary relationship with Plaintiffs which included an obligation to invest Plaintiffs' assets in legitimate investments, and perform adequate due diligence and monitoring as set forth in the Information Memoranda and Subscription Agreements.

111.   Defendants were compensated by Plaintiffs with management and administration fees that were calculated based on the Funds' month-end "Net Asset Value."

112.   Defendants were unjustly enriched by the retention of management and administration fees that were predicated on fictitious profits.

113.   Plaintiffs are entitled to have an accounting performed and a constructive trust imposed on the amount of all monies and other property in the possession of Defendants which relate to their compensation in the form of management and administration fees, the amount of which is yet to be determined.

## COUNT VIII

### Third-Party Beneficiary Breach of Contract against Kingate Management and TBL

114.   Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

115.   Plaintiffs are third-party beneficiaries of the Manager Agreements executed by Kingate Management, TBL, and the Funds.  The Manager Agreements are valid and binding contracts.  The Manager Agreements evince a clear intent to benefit shareholders of Kingate Global and Kingate Euro by requiring Kingate Management and TBL to seek suitable investment opportunities for the Funds.

116.   The benefits to Plaintiffs under the Manager Agreements between the Funds, Kingate Management, and TBL were immediate, not simply incidental, in

that the Funds' only motivations for executing these agreements were to provide investors with capital appreciation and returns on their investments in the Funds.

117.   Kingate Management and TBL's duties included selecting and evaluating appropriate investment advisors and the allocation of assets with a chosen appropriate investment advisor.

118.   Kingate Management and TBL breached their management contracts by grossly failing to meet the obligations of these agreements to provide competent management services to the Funds.  They also breached their contracts by collecting fees based on fictitious profits and for services not properly performed. Both entities are liable to Plaintiffs, who are third party beneficiaries of those contracts.

## COUNT IX

## Third-Party Beneficiary Breach of Contract against FIM

119.   Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

120.   Plaintiffs are third-party beneficiaries of the Consulting Services Agreements executed by FIM and the Funds.  The Consulting Services Agreements are valid and binding contracts and evince a clear intent to benefit shareholders in the Funds.  The Consulting Services Agreements required FIM to

make recommendations to Kingate Management, TBL and FIM regarding allocation of the Funds' assets for suitable investment and appreciation.

121.   The benefits to Plaintiffs under the Consulting Services Agreements between the Funds, FIM, Kingate Management, and TBL were immediate, not simply incidental, in that the Funds' only motivations for executing these agreements were to provide investors with capital appreciation and returns on their investments in the Funds.

122.   FIM's duties included screening and nominating investment advisors for selection by Kingate Management and TBL.  FIM also made recommendations regarding the proposed allocation of assets among investment managers.  FIM further was to "continuously monitor[]" the asset allocation and the investment advisor's performance.

123.   FIM breached its consulting services contracts by grossly failing to meet the obligations of these agreements to provide competent management and consulting services to the Funds.  FIM also breached the contracts by receiving and holding fees based on fictitious profits and for services not properly performed. FIM is liable to Plaintiffs, who are third party beneficiaries of those contracts.

## COUNT X

## Third Party Beneficiary Breach of Contract against Citi

124.   Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

125.   Citi entered into Administration Agreements with Kingate Euro and Kingate Global, and it breached its obligations to the Plaintiffs as third party beneficiaries of those contracts.

126.   The Administration Agreements executed by Citi with the Funds each represent valid contracts binding on both Citi and those Funds.

127.   The Administration Agreements evince a clear intent to benefit shareholders by affirmatively recognizing Citi's obligation to keep Fund shareholders informed of the status and performance of their investments in furtherance of the Fund's goal of seeking "capital appreciation of its assets" for the benefit of shareholders.

128.   The benefits to Plaintiffs under the Administration Agreements between the Funds and Citi were immediate, not simply incidental, in that the Funds' only motivations for entering the Administration Agreement were to provide investors with capital appreciation and returns on their investments in the Funds.

129.   Citi agreed to act in good faith in the performance of its services as Fund Administrator.  Citi's duties that required good faith, due care and diligence in their execution included the following:

a.   Communicating with the general public;

b.   Communicating with shareholders;

c.   Soliciting sales of shares in the Funds;

d.   Accepting new subscriptions in the Funds;

e.   Maintaining the Funds' corporate records and books of account;

f.   Disbursing payments of dividends, fees, and salaries;

g.   Calculating, publishing and furnishing the subscription price, redemption price, and net asset value of the Funds' shares; and

h.   Conducting meetings of the Funds' boards of directors.

130.   Citi breached the Administration Agreements, by, among other omissions, failing to discharge its responsibility to calculate accurately the Funds' net asset value.  Citi is liable to Plaintiffs as third party beneficiaries of those contracts.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a jury trial.

## **PRAYER**

WHEREFORE, Plaintiffs request the following:

a)    Certification of this class action as proper and maintainable pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure and declaration of the proposed named Plaintiffs as proper class representatives;

b)    Such preliminary and permanent injunctive relief, including performance of an accounting and imposition of a constructive trust, as is appropriate to preserve the assets wrongfully taken from Plaintiffs;

c)    Compensatory, consequential, and general damages in an amount to be determined at trial;

d)    Disgorgement and restitution of all earnings, profits, compensation and benefits received by Defendants as a result of unlawful acts and practices;

e)    Punitive damages on account of Defendants' willful and wanton disregard of Plaintiffs' rights;

f)    Costs and disbursements of the action;

g)    Pre- and post-judgment interest;

h)    Reasonable attorneys' fees; and

i)      Such other and further relief as this Court may deem just and proper.

Dated:  June 10, 2009

Respectfully submitted,

By: _David A. Barrett_ _____

David Boies
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200
Facsimile:  (914) 749-8300

David A. Barrett
Howard L. Vickery
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300
Facsimile:  (212) 446-2350

Stuart H. Singer
Carlos M. Sires
Sashi Bach Boruchow
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard, #1200
Ft. Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile:  (954) 356-0022

Jeffrey R. Sonn
SONN & EREZ
500 E. Broward Blvd., Suite 1600
Fort Lauderdale, FL 33394
Telephone: (954) 763-4700
Facsimile:  (954) 763-1866