## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

IN RE KINGATE MANAGEMENT
LIMITED LITIGATION

Master File No. 09 Civ. 5386 (DAB)

This Document Relates To:  All Actions

JURY TRIAL DEMANDED



RECEIVED
MAY 18 2010
U.S.D.C. S.D. N.Y.
CASHIERS

## AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

**BOIES, SCHILLER & FLEXNER LLP**
575 Lexington Avenue
New York, New York 10022
(212) 446-2300

**COHEN MILSTEIN SELLERS**
 **& TOLL PLLC**
88 Pine Street
New York, New York 10005
(212) 838-7797

**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
(212) 907-0700

*Co-Lead Counsel for Plaintiffs and*
*Interim Co-Lead Counsel for the Putative Class*

# TABLE OF CONTENTS

Page

GLOSSARY OF DEFINED TERMS ....................................................................... vii

I.     NATURE OF THE ACTION ...................................................................... 1

II.    JURISDICTION AND VENUE ................................................................. 3

III.   PARTIES ................................................................................................... 4

       A.     Plaintiffs ....................................................................................... 4

       B.     Defendants .................................................................................... 6

              1.     The Kingate Defendants .................................................... 6

              2.     The PricewaterhouseCoopers Defendants ....................... 11

              3.     Citi Hedge Defendants ..................................................... 12

       C.     Relevant Non-Parties ................................................................. 13

IV.    BACKGROUND FACTS ......................................................................... 16

       A.     Madoff's Massive Ponzi Scheme ............................................... 16

       B.     Madoff's Arrest And Subsequent Investigations ....................... 17

V.     THE KINGATE DEFENDANTS' WRONGFUL CONDUCT ................. 19

       A.     The Funds' Investments With Madoff ........................................ 19

       B.     Key Kingate Defendants Were In Close Contact With Madoff ......... 20

       C.     The Kingate Defendants And Citi Hedge Knew Or Should Have Known
              That Madoff Was A Fraud .......................................................... 22

       D.     The Funds' Information Memoranda Were False And Misleading ........ 24

              1.     False and Misleading Statements Concerning the Actual
                     Investment .......................................................................... 25

              2.     False and Misleading Statements Concerning Ongoing Duties to
                     Monitor and Evaluate Madoff ........................................... 27

              3.     False and Misleading Statements Concerning Options Trading and
                     Madoff's Counterparties .................................................... 30

4.    False and Misleading Statements Attempting to Disclaim "The Risk Of Fraud" .......................................................................... 31

VI.   PRICEWATERHOUSECOOPERS' WRONGFUL CONDUCT .................................... 32

A.    PricewaterhouseCoopers Audited The Funds ...................................................... 32

B.    PricewaterhouseCoopers' Audit Failed To Conform To GAAS .......................... 35

1.    Basic Standards Under GAAS ................................................................. 36

2.    PricewaterhouseCoopers Failed to Comply with GAAS .......................... 37

(a)   PricewaterhouseCoopers Failed to Conduct Adequate Procedures Concerning Existence and Occurrence Risk .............. 40

(b)   PricewaterhouseCoopers Failed to Conduct the Required Procedures on BMIS Given Its Role as a Service Organization ................................................................................. 41

C.    PricewaterhouseCoopers' Practice Guide Concerning Audits of Hedge Funds Highlighted the Importance of Confirming the Existence of the Assets ................................................................................................................ 43

D.    The Funds' Financial Statements Were False ...................................................... 46

1.    Kingate Global's Statements of Assets and Liabilities, Operations, and Change of Net Assets Were False ...................................................... 46

2.    Kingate Euro's Statements of Assets and Liabilities, Operations, and Change of Net Assets Were False ...................................................... 47

3.    The Notes to Kingate Global's and Kingate Euro's Financial Statements .............................................................................................. 51

E.    Internal Documents Show That PricewaterhouseCoopers' Audit Violated GAAS .................................................................................................................. 53

F.    PricewaterhouseCoopers Violated Its Duties To Plaintiffs And The Class .......... 60

G.    PricewaterhouseCoopers' Substantial Assistance to Kingate Defendants' Fraud and Breaches of Fiduciary Duty ............................................................... 61

VII.  CITI HEDGE'S WRONGFUL CONDUCT .................................................................... 63

A.    Citi Hedge Committed To Provide Administrative Services Beyond Those Of A Typical Fund Administrator ........................................................................ 63

B.    Citi Hedge Touted Its Superior Financial Services Capabilities ......................... 65

C.     Citi Hedge Owed Duties To Plaintiffs And The Class ........................................ 67

D.     Citi Hedge's Performance Of Its Duties Was Grossly Deficient......................... 68

E.     Citi Hedge Provided Substantial Assistance To The Kingate Defendants'
Fraud And Breaches Of Fiduciary Duty .............................................................. 69

VIII.   THE TREMONT GROUP ........................................................................................ 70

A.     The Tremont Group Had Deep Ties With Madoff Based On Its
Management Of At Least Five Other Madoff Feeder Funds ................................ 70

B.     The Tremont Group Had A Special Relationship With Madoff.......................... 71

C.     The Tremont Group Provided Substantial Assistance To Tremont's Fraud
And Breach Of Fiduciary Duty ........................................................................... 72

IX.     HAD DEFENDANTS MONITORED AND EVALUATED MADOFF AS
REPRESENTED IN THE INFORMATION MEMORANDA, DEFENDANTS
WOULD HAVE DISCOVERED MADOFF'S PONZI SCHEME .................................. 73

A.     Madoff's Custody Of Equity Securities.............................................................. 73

B.     Madoff's Non-Existent Counterparties.............................................................. 73

C.     The Government Securities Purportedly Held At The End Of Each Year
Did Not Exist ...................................................................................................... 73

D.     Madoff's Unknown Auditing Firm...................................................................... 74

E.     Madoff's Paper Trading Records ........................................................................ 74

F.     Madoff's Consistent Returns .............................................................................. 74

G.     Madoff's Fee Structure ....................................................................................... 75

X.     THE COURT HAS SUBJECT MATTER JURISDICTION
PURSUANT TO THE EXCHANGE ACT ..................................................................... 75

A.     The Foreign Defendants Purposefully Availed Themselves Of The
Benefits Of Having The Funds Invest In The United States; It Was
Foreseeable That Defendants Would Be Haled Into Court In The United
States ................................................................................................................... 75

B.     The Conduct And Effects Tests .......................................................................... 77

1.     The Conduct of Defendants KML, FIM Limited, FIM Advisers,
and Grosso in the United States Was More Than Merely

Preparatory, and the Culpable Failures to Act Within the United States Directly Caused the Losses ........................................................... 77

2. PwC Bermuda Had Substantial Conduct in the United States that Was More Than Merely Preparatory and Directly Caused The Losses.................................................................................................... 78

3. Effects Test:  the Foreign Defendants' Conduct Had a Substantial Effect in the United States ...................................................... 78

XI.     CLASS ACTION ALLEGATIONS ................................................. 81

COUNT 1     Fraud Against The Kingate Fraud Claim Defendants (Purchaser Claims)..........................................................................84

COUNT 2     Fraud Against The Kingate Fraud Claim Defendants (Holder Claims) ..............................................................................85

COUNT 3     Negligent Misrepresentation Against The Kingate Defendants (Purchaser Claims) ...........................................88

COUNT 4     Negligent Misrepresentation Against The Kingate Defendants (Holder Claims)................................................90

COUNT 5     Gross Negligence Against The Kingate Defendants ........................................................92

COUNT 6     Negligence Against The Kingate Defendants ........................................................94

COUNT 7     Breach Of Fiduciary Duty Against The Kingate Defendants ........................................................95

COUNT 8     Constructive Fraud Against The Kingate Defendants ........................................................97

COUNT 9     Third Party Beneficiary Breach Of Contract Against KML And Tremont...................................................................100

COUNT 10    Third Party Beneficiary Breach Of Contract Against The FIM Entities....................................................................101

COUNT 11    Constructive Trust Against The Kingate Defendants ........................................................102

COUNT 12    Mutual Mistake Against The Kingate Defendants .......................................................102

iv

COUNT 13    Aiding And Abetting Breach Of Fiduciary Duty
Against The Tremont Group ...................................................................103

COUNT 14    Aiding And Abetting Fraud
Against The Tremont Group ...................................................................104

COUNT 15    Gross Negligence
Against PricewaterhouseCoopers .......................................................107

COUNT 16    Negligence
Against PricewaterhouseCoopers .......................................................109

COUNT 17    Negligent Misrepresentation
Against PricewaterhouseCoopers .......................................................110

COUNT 18    Third Party Beneficiary Breach Of Contract
Against PricewaterhouseCoopers .......................................................111

COUNT 19    Aiding And Abetting Breach Of Fiduciary Duty
Against PricewaterhouseCoopers .......................................................112

COUNT 20    Aiding And Abetting Fraud
Against PricewaterhouseCoopers .......................................................113

COUNT 21    Breach Of Fiduciary Duty
Against Citi Hedge.................................................................................117

COUNT 22    Gross Negligence
Against Citi Hedge.................................................................................118

COUNT 23    Negligence
Against Citi Hedge.................................................................................119

COUNT 24    Negligent Misrepresentation
Against Citi Hedge.................................................................................120

COUNT 25    Third Party Beneficiary Breach Of Contract
Against Citi Hedge.................................................................................121

COUNT 26    Aiding And Abetting Breach Of Fiduciary Duty
Against Citi Hedge.................................................................................123

COUNT 27    Aiding And Abetting Fraud
Against Citi Hedge.................................................................................124

COUNT 28    Unjust Enrichment
Against All Defendants...........................................................................125

COUNT 29    For Violations Of Rule 10b-5 And Section 10(b) Of The Exchange Act Against The Kingate Fraud Claim Defendants ....................................................126

       1.    False And Misleading Statements And Omissions About The Split-Strike Conversion Strategy Used By The Funds ..................................... 128

       2.    False And Misleading Statements And Omissions About Due Diligence For Kingate Global And Kingate Euro ........................... 129

       3.    False And Misleading Statements And Omissions About Madoff's Role As Market Maker ............................................. 130

       4.    False And Misleading Statements And Omissions About Madoff's Over-The-Counter Options Transactions ............................... 131

       5.    Misleading Statements And Omissions About The "Possibility" That Madoff Will Abscond With the Funds' Assets .............................. 132

COUNT 30    For Violations Of Section 20(a) Of The Exchange Act Against Tremont Advisers, Grosso, Ceretti, And Manzke .................................133

COUNT 31    For Violations Of Rule 10b-5 And Section 10(b) Of The Exchange Act Against PricewaterhouseCoopers .......................................................135

COUNT 32    For Violations Of Rule 10b-5 And Section 10(b) Of The Exchange Act Against Citi Hedge ..................................................................139

JURY TRIAL DEMANDED ................................................................................ 141

PRAYER ............................................................................................................. 141

# GLOSSARY OF DEFINED TERMS

| Defined Term | Definition |
|---|---|
| Acorn | Acorn Partners |
| Account Agreements | Customer Agreements, Option Agreements, and Trading Authorizations Between The Funds and BMIS |
| Administration Agreement | Citi Hedge Administration Agreement, as amended and restated effective June 1, 2007 (attached as Exhibit 15) |
| AICPA | American Institute of Certified Public Accountants |
| AICPA Guide | The AICPA Audit Guide: Auditing Derivative Instruments, Hedging Activities, and Investments in Securities |
| Aksia | Aksia LLC |
| AU | AICPA Statements of Accounting Standards |
| Bank of Bermuda | Bank of Bermuda Limited |
| Bish | Defendant Keith R. Bish |
| BISYS | BISYS Hedge Fund Services Limited |
| BMIS | Bernard L. Madoff Investment Securities LLC |
| BMIS Bank Account | BMIS Account at JPMorgan Chase & Co. |
| BMIS' Office | 885 Third Avenue, New York, New York |
| Brown | Scott-Watson Brown |
| Calendar | Calendar of Bernard L. Madoff kept by Eleanor Squillari |
| Castillo | Plaintiff Alvaro Castillo |
| CBOE | Chicago Board Options Exchange |
| Ceretti | Defendant Federico M. Ceretti |
| Citi Hedge | Defendant Citi Hedge Fund Services Ltd. |
| Class | All persons or entities who owned shares of the Funds as of December 10, 2008, and were damaged thereby |

Consultant .......................................... FIM Advisers LLP and its predecessor-in-interest FIM Limited

Cook ................................................... Defendant Graham H. Cook

DTC .................................................... Depository Trust & Clearing Corporation

Epps ................................................... Defendant John E. Epps

Exchange Act ..................................... Securities Exchange Act of 1934

Exchange Act Plaintiffs .................... Plaintiffs Silvana Worldwide Corp., BG Valores, S.A., Alvaro Castillo, Lucien Geldzahler, Jaques Lamac and Nitkey Holdings Corporation

F&H .................................................. Friehling & Horowitz

Fairfield Greenwich ........................... Fairfield Greenwich Advisors, LLC

FBI .................................................... Federal Bureau of Investigation

FIM Advisers ..................................... Defendant FIM Advisers LLP

FIM Defendants ................................. Defendants FIM Advisers LLP, FIM Limited, FIM (USA) Incorporated, Carlo Grosso and Federico M. Ceretti

FIM Entities ...................................... Defendants FIM Advisers LLP, FIM Limited and FIM (USA) Incorporated

FIM Limited ....................................... Defendant FIM Limited

FIM USA ............................................ Defendant FIM (USA) Incorporated

FINRA ............................................... Financial Industry Regulatory Authority

Foreign Defendants ........................... Defendants Kingate Management Limited, FIM Advisers LLP, FIM Limited, Tremont (Bermuda) Limited, Carlos Grosso, Federico M. Ceretti, Graham H. Cook, John E. Epps, Charles D. Sebah, Keith R. Bish, Christopher Wetherhill, PricewaterhouseCoopers Bermuda and Citi Hedge Fund Services Ltd.

Friehling ............................................ David Friehling

Funds ................................................. Kingate Global Fund, Ltd. and Kingate Euro Fund, Ltd.

GAAP ................................................ Generally Accepted Accounting Principles

GAAS ................................................ Generally Accepted Auditing Standards

Geldzahler ......................................... Plaintiff Lucien Geldzahler

Grosso ............................................... Defendant Carlo Grosso

Hemisphere ....................................... Hemisphere Management Limited

IM...................................................... Information Memoranda (attached as Exhibits 1-6)

Investment Advisory......................... Investment Advisory Business Unit of Bernard L. Madoff Investment Securities LLC

Individual Defendants....................... Defendants Carlo Grosso, Federico M. Ceretti, Graham H. Cook, John E. Epps, Sandra Manzke, Charles D. Sebah, Keith R. Bish, Christopher Wetherhill and Michael G. Tannenbaum

IRS ................................................... Internal Revenue Service

KEF 2006-07 FS ............................... Financial Statements of Kingate Euro Fund, Ltd. for the years ending December 31, 2006 and 2007 (attached as Exhibit 10)

KEF 2008 IM .................................... Kingate Euro Fund, Ltd. Information Memorandum, October 6, 2008 (attached as Exhibit 2)

KGF 2000 IM.................................... Kingate Global Fund, Ltd. Information Memorandum, May 1, 2000 (attached as Exhibit 6)

KGF 2003 IM.................................... Kingate Global Fund, Ltd. Amended and Restated Information Memorandum, January 15, 2003 (attached as Exhibit 5)

KGF 2004-05 FS............................... Financial Statements of Kingate Global Fund, Ltd. for the years ending December 31, 2004 and 2005 (attached as Exhibit 8)

KGF 2006-07 FS............................... Financial Statements of Kingate Global Fund, Ltd. for the years ending December 31, 2006 and 2007 (attached as Exhibit 9)

KGF 2006 IM.................................... Kingate Global Fund, Ltd. Amended and Restated Information Memorandum for USD Participating Common Shares, May 1, 2006 (attached as Exhibit 4)

KGF 2006 Management Agreement.. January 1, 2006 Management Agreement between Kingate Global and KML (attached as Exhibit 7)

KGF 2007 IM.................................... Kingate Global Fund, Ltd. Amended and Restated Information Memorandum, August 1, 2007 (attached as Exhibit 3)

KGF 2008 IM.................................... Kingate Global Fund, Ltd. Amended and Restated Information Memorandum, October 6, 2008 (attached as Exhibit 1)

Kingate Euro ..................................... Kingate Euro Fund, Ltd.

Kingate Euro Account....................... Kingate Euro's Account with BMIS

Kingate Defendants........................... Defendants Kingate Management Limited, Tremont (Bermuda) Limited, Tremont Group Holdings, Inc., FIM Advisers LLP, FIM Limited, FIM (USA) Incorporated, Carlo Grosso, Federico M. Ceretti, Graham H. Cook, John E. Epps, Sandra Manzke, Charles D. Sebah, Keith R. Bish, Christopher Wetherhill and Michael G. Tannenbaum

Kingate Fraud Claim Defendants...... Defendants Kingate Management Limited, Tremont (Bermuda) Limited, FIM Advisers LLP, FIM Limited, FIM (USA) Incorporated, Carlo Grosso, Federico M. Ceretti and Sandra Manzke

Kingate Global ................................. Kingate Global Fund, Ltd.

Kingate Global Account ................... Kingate Global's Account with BMIS

KML.................................................. Defendant Kingate Management Limited

Lamac............................................... Plaintiff Jaques Lamac

Madoff.............................................. Bernard L. Madoff

Manzke............................................. Defendant Sandra Manzke

MassMutual...................................... Massachusetts Mutual Life Insurance Company

McGowan......................................... Linda McGowan

Murphy............................................. John V. Murphy

NAV.................................................. Net Asset Value

Nitkey............................................... Plaintiff Nitkey Holdings Corporation

OEX ................................................. Options of the S&P 100 Index

Office Telephone Directory ............. Bernard L. Madoff's Office Telephone Directory kept by Eleanor Squillari

Oppenheimer .................................... Oppenheimer Acquisition Corp.

OppenheimerFunds ........................... OppenheimerFunds, Inc.

Pocket Book ..................................... A copy of Bernard L. Madoff's Pocket Book Telephone Directory kept by Eleanor Squillari

PricewaterhouseCoopers ................... Defendants PwC Bermuda and PwC U.S.

Proxy Statement ................................ Schedule 14A Proxy Statement filed with the SEC by Tremont Group Holdings, Inc. on August 20, 2001

Putnam Lovell ................................... Putnam Lovell Securities, Inc.

PwC 2004 Madoff Report ................. Report of PwC Meeting with Madoff in December 2004 (attached as Exhibit 13)

PwC Bermuda ................................... Defendant PricewaterhouseCoopers Bermuda

PwC Guide ....................................... 2007 PwC U.S. publication entitled, "Auditing Alternative Investments – A Practical Guide for Investor Entities, Investee Funds Managers and Auditors" (attached as Exhibit 11)

PwC Netherlands .............................. PwC Rotterdam

PwC Netherlands Letter .................... Letter from PwC Rotterdam (Netherlands) Recounting Audit Procedures Conducted on Madoff in December 2004 (attached as Exhibit 12)

PwC U.S. .......................................... Defendant PricewaterhouseCoopers LLP

Rye Funds ........................................ Rye Select Broad Market Fund LP, Rye Select Broad Market Prime Fund LP, Rye Select Broad Market XL Fund LP, Rye Select Broad Market Portfolio Limited, and Rye Select Broad Market XL Portfolio Limited.

S&P 100 Index ................................. Standard & Poor's 100 Index

SAS .................................................. AICPA Statements of Accounting Standards

Sebah ............................................... Defendant Charles D. Sebah

SEC ................................................. Securities and Exchange Commission

Silvana ............................................. Plaintiff Silvana Worldwide Corp

SIPA.................................................... Securities Investor Protection Act

SocGen............................................... Société Générale

Tannenbaum....................................... Defendant Michael G. Tannenbaum

Tremont.............................................. Defendant Tremont (Bermuda) Limited

Tremont Advisers.............................. Tremont Advisers, Inc.

Tremont Group................................... Defendant Tremont Group Holdings, Inc.

Wetherhill ......................................... Defendant Christopher Wetherhill

Wolfgruber........................................ Kurt Wolfgruber

Plaintiffs, individually and on behalf of all others similarly situated, by their undersigned counsel, allege the following upon information and belief and counsels' investigation, except for those allegations as to themselves, which are alleged upon personal knowledge.

## I.    NATURE OF THE ACTION

1.    This case arises from the massive fraud perpetrated by Bernard L. Madoff ("Madoff") through his investment firm Bernard L. Madoff Investment Securities LLC ("BMIS").  As the public learned on December 11, 2008, Madoff and BMIS controlled billions of dollars in investments which purportedly earned stable returns.  In truth, these returns were entirely fictitious and part of the largest Ponzi scheme in history.  Investors lost an estimated $64.8 billion based upon the reported value of thousands of BMIS client accounts as of November 30, 2008.

2.    Although Madoff operated the Ponzi scheme, Defendants solicited investments from Plaintiffs and oversaw, controlled, and managed those investments.  Defendants represented to Plaintiffs that they would conduct due diligence, choose investment advisers, monitor the performance of the chosen investment advisers, and provide Plaintiffs with independently verified and calculated statements of their investments.  Instead, Defendants simply turned over all of Plaintiffs' assets to Madoff without conducting any meaningful due diligence or independently verifying any of Madoff's purported trading and profits.

3.    Plaintiffs invested indirectly with Madoff through two so-called "feeder funds" that channeled billions of dollars into Madoff's fraudulent operations – Kingate Global Fund, Ltd. ("Kingate Global") and Kingate Euro Fund, Ltd. ("Kingate Euro," collectively with Kingate Global, "the Funds").  The Funds had billions of dollars in assets, substantially all of which were invested with Madoff, and all of which are now lost.

4.      Each of the Defendants owed duties to Plaintiffs, including fiduciary duties, (i) to conduct due diligence and provide accurate and complete information to Plaintiffs about the Funds, both before and after the initial investment, (ii) to exercise due care with Plaintiffs' investments, and (iii) to monitor Madoff and others chosen by Defendants to carry out the Funds' investment strategy and safeguard their assets.  Rather than complying with their representations and duties, Defendants used the Funds as mere conduits to facilitate Madoff's Ponzi scheme. The loss of Plaintiffs' assets in the Madoff Ponzi scheme is a direct and proximate result of Defendants' failure to fulfill their duties.  In so doing, Defendants wrongfully collected hundreds of millions of dollars in unearned fees based on the fictitious profits.  These fees were wrongly paid out of the Funds and must be returned.

5.      Plaintiffs assert common law claims for fraud, negligent misrepresentation, gross negligence, negligence, breach of fiduciary duty, constructive fraud, third party beneficiary breach of contract, mutual mistake, aiding and abetting breach of fiduciary duty, aiding and abetting fraud, and unjust enrichment.  Plaintiffs also assert claims under Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b5, promulgated thereunder by the Securities and Exchange Commission ("SEC").

6.      Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all persons or entities who owned shares of the Funds as of December 10, 2008, and were damaged thereby (the "Class").  Excluded from the Class are the Defendants, any entity in which Defendants have a controlling interest, and the officers, directors, affiliates legal representatives, immediate family members, heirs, successors, subsidiaries and/or assigns of any such individual or entity.

## II.     JURISDICTION AND VENUE

7.     This Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, codified at 28 U.S.C. § 1332(d)(2).  The amount in controversy exceeds the jurisdictional amount, the members of the Class are in the thousands, and at least one Plaintiff is a citizen of a foreign state and one Defendant is a citizen of New York.

8.     This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

9.     This Court has jurisdiction over the Exchange Act claims asserted herein pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

10.     This Court has personal jurisdiction over all Defendants because all Defendants:

(a)     have systematic and continuous contacts with New York, including:

(i)     maintaining offices in New York;

(ii)     being citizens of New York;

(iii)     establishing investment accounts with BMIS in New York;

(iv)     maintaining ongoing investment activity in BMIS accounts, including transferring all of Plaintiffs' investments to BMIS in New York as custodian of such assets;

(v)     making telephone calls, faxing and mailing documents and directing computer and internet communications to New York;

(vi)     receiving fees derived from the foregoing activity conducted in New York; or

(b)     are subject to New York's long arm statute, N.Y. C.P.L.R. § 302, because Defendants transacted business in New York concerning the allegations in this Complaint and purposefully availed themselves of the privilege of conducting activities in this forum.

11.     The exercise of personal jurisdiction over Defendants by this Court is appropriate and will not offend traditional notions of fair play and substantial justice because each of the Defendants had sufficient minimum contacts with the State of New York.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(3), as one or more of the Defendants resides in this District, a substantial number of relevant events occurred in this District, and the principal place of business of one or more Defendants is in this District.

13.     Venue in this judicial District also is proper pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because substantial acts in furtherance of the alleged wrongdoing and/or its effects have occurred within this District.

III.    **PARTIES**

        A.     **Plaintiffs**

14.     Due to the acts alleged herein, the Plaintiffs identified below have lost their investments in the Funds as of December 10, 2008, and also have paid substantial fees that were wrongfully charged based on fictitious investment returns.

15.     Plaintiff **Silvana Worldwide Corp.** ("Silvana") is, and was at all times relevant hereto, incorporated in Panama.  Silvana invested in Kingate Global beginning in March 2008 and was damaged thereby.

16.     Plaintiff **Criterium Capital Funds, B.V.** is, and was at all times relevant hereto, a Netherlands Antilles private limited liability company ("besloten vennootschap") that invested assets in Kingate Global beginning on January 1, 1999.  This purchase occurred more than five years from the commencement of this action and therefore does not form the basis for any Exchange Act claims, only common law claims.

17.     Plaintiff **BBF Trust** is, and was at all times relevant hereto, a trust formed under the laws of the Commonwealth of the Bahamas that invested assets in Kingate Global beginning in October 1997.  This purchase occurred more than five years from the commencement of this action and therefore does not form the basis for any Exchange Act claims, only common law claims.

18.     Plaintiff **BG Valores, S.A.** (f/k/a Wall Street Securities, S.A.) is, and was at all times relevant hereto, a Panamanian corporation that invested assets in Kingate Global beginning in November 2008.

19.     Plaintiff **Banca Arner S.A.** is, and was at all times relevant hereto, a Swiss corporation that invested assets in Kingate Global beginning in July 1997 and Kingate Euro beginning in May 2000.  This purchase occurred more than five years from the commencement of this action and therefore does not form the basis for any Exchange Act claims, only common law claims.

20.     Plaintiff **Alvaro Castillo** ("Castillo") is, and was at all times relevant hereto, an individual residing in Switzerland who invested assets in Kingate Global beginning in October 2008.

21.     Plaintiff **Lucien Geldzahler** ("Geldzahler") is, and was at all times relevant hereto, an individual residing in Israel who invested assets in Kingate Global beginning in January 2008.

22.     Plaintiff **Jaques Lamac** ("Lamac") is, and was at all times relevant hereto, an individual residing in Brazil who invested assets in Kingate Global beginning in January 2006.

23.     Plaintiff **Nitkey Holdings Corporation** ("Nitkey") is, and was at all times relevant hereto, a Panamanian corporation that invested assets in Kingate Global beginning in March 2008.

24.     Plaintiffs Silvana, BG Valores, S.A., Castillo, Geldzahler, Lamac and Nitkey are referred to herein as the "Exchange Act Plaintiffs."  Only these plaintiffs assert claims pursuant to the Exchange Act.[1]

---

[1]   Certifications pursuant to 15 U.S.C. § 78u-4(a)(2)(A) are attached as Exhibit A.

**B.    Defendants**

**1.    The Kingate Defendants**

25.    Defendant **Kingate Management Limited** ("KML") is a corporation organized under the laws of Bermuda on February 24, 1994.  KML's principal place of business is located at 99 Front Street, Hamilton, Bermuda.

(a)    KML served as Co-Manager of the Funds with Tremont (defined *infra* ¶ 26) from the inception of the Funds until approximately December 31, 2005.  Beginning on January 1, 2006, KML served as sole Manager.  As Co-Manager and Manager, KML was responsible for the selection, evaluation, and oversight of Madoff, and for arranging all the accounting and administrative services for the Funds pursuant to certain management agreements dated March 1, 1995, May 1, 2000, and January 1, 2006, as amended.

(b)    For its purported services as Co-Manager, KML received a portion of the annual management fee of 1.5 percent of the Fund's net asset value ("NAV"), and the entire fee when it acted as sole Manager.

(c)    KML transacted business related to the Funds in New York, including maintaining the Funds' investment accounts with Madoff in New York, communicating regularly with Madoff, and conducting due diligence and oversight of Madoff in New York.

26.    Defendant **Tremont (Bermuda) Limited** ("Tremont") is a corporation organized under the laws of Bermuda on November 16, 1988, and its principal place of business is located at Tremont House, 4 Park Road, Hamilton, Bermuda.

(a)    Tremont is a wholly owned subsidiary of Tremont Advisers, Inc. ("Tremont Advisers").  Tremont Advisers is currently known as Tremont Group Holdings, Inc. (defined *infra* ¶ 27), which is a wholly owned subsidiary of Oppenheimer Acquisition Corp.

(defined *infra* ¶ 53).  Tremont Advisers and Oppenheimer Acquisition Corp. are incorporated in Delaware.

        (b)      Tremont served as Co-Manager of the Funds with KML from the inception of the Funds until December 31, 2005.  As Co-Manager, Tremont was responsible for the selection, evaluation, and oversight of Madoff, and for arranging all the accounting and administrative services for the Funds, pursuant to certain management agreements dated March 1, 1995 and May 1, 2000, as amended.

        (c)      For its purported services as Co-Manager, Tremont received a portion of the annual management fee of 1.5 percent of the Fund's NAV.

        (d)      Tremont transacted business related to the Funds in New York, including maintaining the Funds' investment accounts with Madoff in New York, communicating regularly with Madoff, and conducting due diligence and oversight of Madoff in New York.

        27.      Defendant **Tremont Group Holdings, Inc.** ("Tremont Group") is a corporation organized under the laws of the State of Delaware and maintains its principal place of business at 555 Theodore Fremd Avenue, Rye, New York.  Tremont Group was formerly Tremont Advisers and is currently a wholly owned subsidiary of Oppenheimer Acquisition Corp.

        28.      Defendant **FIM Limited** ("FIM Limited" or the "Consultant") is a limited liability company established in 1980 under the laws of England and Wales.  FIM Limited has its principal place of business at 25-28 Old Burlington Street, London, United Kingdom.  FIM Limited was appointed to provide consultancy services to KML and Tremont pursuant to a Consulting Services Agreement dated December 1, 1995, and provided consultancy services until approximately July 31, 2005.  FIM Limited is the predecessor-in-interest to FIM Advisers

LLP, and is associated with FIM (USA) Incorporated.  FIM Limited earned millions of dollars in fees from KML for its consulting services.

29.     Defendant **FIM Advisers LLP** ("FIM Advisers" or the "Consultant") is a limited liability partnership incorporated under the laws of the United Kingdom on October 8, 2004. FIM Advisers' principal place of business is 20 St. James Street, London, United Kingdom.

(a)     FIM Advisers is an asset management company specializing in the management of hedge fund portfolios for institutions and private clients, with approximately $5 billion under management.  FIM Advisers is regulated by the Financial Services Authority of the United Kingdom.

(b)     Pursuant to a Consulting Services Agreement dated August 1, 2005, FIM Advisers rendered consulting advice and services to KML and Tremont with respect to the Funds' investment, operational, administrative, marketing, accounting, and legal matters.

(c)     FIM Advisers is the successor-in-interest to FIM Limited.  At all relevant times, FIM Advisers had employees located in Bermuda, London, and New York, and conducted a substantial amount of its business in the United States through its affiliate FIM (USA) Incorporated.

30.     Defendant **FIM (USA) Incorporated** ("FIM USA" and together with FIM Limited and FIM Advisers, the "FIM Entities") is a Delaware corporation incorporated on January 25, 2005 and is qualified to do business in New York.  FIM USA is the American affiliate of FIM Advisers, and is located at 780 Third Avenue, New York, New York 10017.

31.     Defendant **Carlo Grosso** ("Grosso") founded the FIM Entities.  Grosso served as Executive Chairman and Chief Investment Officer of FIM Limited.  Grosso is a resident of the

United Kingdom.  Grosso is the Executive Chairman and Chief Investment Officer of FIM

Advisers, which he also co-founded.  Grosso controlled the FIM Entities.

32.     Defendant **Federico M. Ceretti** ("Ceretti") joined FIM Limited in 1986 and co-

founded FIM Advisers with Defendant Grosso.  Ceretti is a resident of the United Kingdom.

Ceretti is Chief Executive Officer of FIM Advisers.  Ceretti controlled the FIM Entities.

33.     Defendants FIM Limited, FIM Advisers, FIM USA, Grosso and Ceretti are

collectively referred to herein as the "FIM Defendants."

34.     Defendant **Graham H. Cook** ("Cook") is a Director of the Funds and a resident

of the British Virgin Islands.  As a director of the Funds, Cook had knowledge of, and

participated in, the Funds' transaction of business within the state of New York, including by

maintaining investment accounts in New York, consenting to the transactions related to those

accounts, and otherwise exercising control over the Funds.

35.     Defendant **John E. Epps** ("Epps") is a Director of the Funds and a resident of

Bermuda.  As a director of the Funds, Epps had knowledge of, and participated in, the Funds'

transaction of business within the state of New York, including by maintaining investment

accounts in New York, consenting to the transactions related to those accounts, and otherwise

exercising control over the Funds.

36.     Defendant **Sandra Manzke** ("Manzke") was a Director of Kingate Global from

1995 until approximately 2003.  Manzke was also Chairman and co-CEO of Tremont Group

(f/k/a Tremont Advisers), the parent company of Tremont throughout the time that Tremont

served as Co-Manager of the Funds.  As a director of Kingate Global, Manzke had knowledge

of, and participated in, Kingate Global's transaction of business within the state of New York,

including by maintaining investment accounts in New York, consenting to the transactions

related to those accounts, and otherwise exercising control over Kingate Global.  Manzke is a citizen of New York.

37.     Defendant **Charles D. Sebah** ("Sebah") was a Director of Kingate Global from 1995 until approximately 2003.  As a director of Kingate Global, Sebah had knowledge of, and participated in, Kingate Global's transaction of business within the state of New York, including by maintaining investment accounts in New York, consenting to the transactions related to those accounts, and otherwise exercising control over Kingate Global.  Sebah is a resident of France.

38.     Defendant **Keith R. Bish** ("Bish") was a Director of Kingate Global from 1995 to 2002.  Bish is a national of the United Kingdom residing in the British Virgin Islands.  As a director of Kingate Global, Bish had knowledge of, and participated in, Kingate Global's transaction of business within the state of New York, including by maintaining investment accounts in New York, consenting to the transactions related to those accounts, and otherwise exercising control over Kingate Global.

39.     Defendant **Christopher Wetherhill** ("Wetherhill") is a Director of Kingate Global, Kingate Euro, and KML.  Wetherhill has been a Director of Kingate Global and KML since 1995 and a Director of Kingate Euro since the Fund's inception.  Wetherhill, a national of the United Kingdom, is a resident of Bermuda.  As a director of Kingate Global, Kingate Euro, and KML, Wetherhill had knowledge of, and participated in, the Funds' transaction of business within the state of New York, including by maintaining investment accounts in New York, consenting to the transactions related to those accounts, and otherwise exercising control over the Funds.

40.     Defendant **Michael G. Tannenbaum** ("Tannenbaum") is a Director of KML, and oversaw and directed KML's wrongful actions on behalf of the Funds.  Tannenbaum is a citizen of New York.

41.     Defendants Grosso, Ceretti, Cook, Epps, Manzke, Sebah, Bish, Wetherhill, and Tannenbaum are collectively referred to herein as the "Individual Defendants."  All of the Individual Defendants had knowledge of and participated in the Funds' transactions conducted in New York, New York.

42.     Defendants KML, Tremont, Tremont Group, the FIM Entities, and the Individual Defendants are referred to collectively as the "Kingate Defendants."

43.     Defendants KML, Tremont, the FIM Entities, Grosso, Ceretti and Manzke are collectively referred to as the "Kingate Fraud Claim Defendants."  These are the Kingate Defendants against whom Plaintiffs assert fraud claims.  The Kingate Fraud Claim Defendants were active participants in the preparation and dissemination of materially false and misleading documents, including the Information Memoranda, and had actual knowledge of or recklessly disregarded the falsity and material omissions in these documents.

## 2.     The PricewaterhouseCoopers Defendants

44.     Defendant **PricewaterhouseCoopers Bermuda** ("PwC Bermuda") is an accounting firm organized under the laws of Bermuda.  PwC Bermuda is a member of PricewaterhouseCoopers and is part of PricewaterhouseCoopers' global network of firms. Pursuant to its membership in PricewaterhouseCoopers, PwC Bermuda is licensed to use the names "PwC" and "PricewaterhouseCoopers" and is required to maintain uniform standards with other members of PricewaterhouseCoopers, including PwC U.S.

(a)     The audit opinions accompanying the Funds' financial statements for the years ended December 31, 2005, 2006, and 2007, were signed by "PricewaterhouseCoopers,

Chartered Accountants," and stated that "PricewaterhouseCoopers refers to the members of the worldwide PricewaterhouseCoopers organization."  PricewaterhouseCoopers certified that these audits were conducted "in conformity with accounting principles generally accepted in the United States of America."

(b)      PwC Bermuda was one of the PricewaterhouseCoopers member organizations that conducted the audit of the Funds and reported on the financial statements and results of the operations of the Funds by issuing unqualified audit opinions.  The audit opinions were issued on PwC Bermuda's letterhead.

45.      Defendant **PricewaterhouseCoopers LLP** ("PwC U.S." and together with PwC Bermuda, "PricewaterhouseCoopers") is an accounting firm with offices at 300 Madison Avenue, New York, New York.  PwC U.S. was one of the PricewaterhouseCoopers member organizations that conducted the audit of the Funds, and reported on the financial statements and results of the operations of the Funds by issuing unqualified audit opinions.

### 3.      Citi Hedge Defendants

46.      Defendant **Citi Hedge Fund Services Ltd.** ("Citi Hedge") is a company registered in accordance with the laws of Bermuda.  Citi Hedge has its principal place of business located at 9 Church Street, Hamilton, Bermuda.

(a)      Citi Hedge served as the Funds' administrator pursuant to an Administration Agreement, as amended and restated effective June 1, 2007.  Citi Hedge is the successor-in-interest to the prior administrators of the Funds, BISYS Hedge Fund Services Limited ("BISYS") and Hemisphere Management Limited ("Hemisphere").

(b)      As the Funds' administrator, Citi Hedge was responsible for performing significant day-to-day administrative services for the Funds, including:  (i) preparing and distributing monthly reports to the investors containing the amount of the Funds' net assets, the

amount of any distributions from the Funds, and accounting and legal fees and all other fees and expenses of the Funds; (ii) maintaining the Funds' financial books and records; (iii) calculating and publishing the Funds' subscription and redemption prices and the Funds' NAVs; (iv) handling communications with shareholders and the general public; (v) soliciting sales of the Funds' shares; (vi) accepting Subscriptions for share purchases; (vii) maintaining the Funds' corporate records and accounts; (viii) distributing payments of dividends and fees; (ix) conducting meetings of the Funds' shareholders and directors; and (x) making redemptions from the Funds.

(c)     Citi Hedge is an affiliate of Citigroup, Inc. and Citi Hedge Fund Services, Inc., a Delaware corporation registered to do business in New York.  Citi Hedge administered Plaintiffs' investments in the Funds' New York investment accounts by communicating subscription and redemption requests to Madoff.

47.     "Foreign Defendants" refers to all Defendants who are not residents or citizens of the United States, specifically, KML, FIM Limited, FIM Advisers, Tremont, Grosso, Ceretti, Cook, Epps, Sebah, Bish, Wetherhill, PwC Bermuda, and Citi Hedge.

## C.     Relevant Non-Parties

48.     **Kingate Global** is an open-ended investment company organized as an international business company under the laws of the British Virgin Islands on February 11, 1994.  Its principal place of business is located at Bison Court, P.O. Box 3460, Road Town, Tortola, British Virgin Islands.

(a)     Shares in Kingate Global were first sold on March 1, 1995.  Since its inception, all, or substantially all, of Kingate Global's assets were invested with Madoff. Plaintiffs acquired shares or equity in Kingate Global when they turned over their assets to the Kingate Defendants, who in turn gave them to Madoff.

(b)      According to BMIS' records, Kingate Global maintained an account with BMIS designated 1FN061 (the "Kingate Global Account").  The Kingate Global Account was opened on or about March 2, 1994 when a Customer Agreement, an Option Agreement, and a Trading Authorization Limited to Purchases and Sales of Securities and Options (the "Account Agreements") were executed and delivered to BMIS at its headquarters at 885 Third Avenue, New York, New York.  The Kingate Global Account was held in New York through BMIS.

49.      **Kingate Euro** is an open-ended investment company organized as an international business company under the laws of the British Virgin Islands on April 19, 2000. Kingate Euro's principal place of business is at Bison Court, P.O. Box 3460, Road Town, Tortola, British Virgin Islands.

(a)      Kingate Euro commenced operations on May 1, 2000.  Since its inception, all, or substantially all, of Kingate Euro's assets were invested with Madoff.  Plaintiffs acquired shares or equity in Kingate Euro when they turned over their assets to the Kingate Defendants, who in turn gave them to Madoff.

(b)      Kingate Euro was essentially identical to Kingate Global, except that the functional currency of the fund was the Euro rather than the U.S. Dollar.  This made Kingate Euro more attractive to Euro-based investors than Kingate Global.  However, as the Information Memoranda for Kingate Euro explained, because Madoff invested in the NYSE in U.S. Dollars, Kingate Euro still incurred currency risk which it hedged through currency forward contracts.  In effect, Kingate Euro internalized the currency hedge within the fund rather than forcing investors to hedge independently on their own.

(c)      According to BMIS' records, Kingate Euro maintained an account with BMIS designated 1FN086 (the "Kingate Euro Account").  The Kingate Euro Account was

opened pursuant to a corresponding set of Account Agreements, which were executed and delivered to BMIS at its headquarters at 885 Third Avenue, New York, New York.  The Kingate Euro Account was held in New York through BMIS.

50.      The Account Agreements signed by BMIS and the Funds were executed in New York.  They state that all transactions are subject to the laws of the United States, including the Securities Exchange Act of 1934, the Commodities Exchange Act, and the rules and regulations of the SEC, the Board of Governors of the Federal Reserve System and the Commodities Futures Trading Commission.  The Account Agreements also state that they are subject to New York law, and were deemed to have been made in New York and to be performed in New York through New York-based securities trading activities.

51.      Kingate Global and Kingate Euro have appointed provisional liquidators, pursuant to orders issued by Justice Edwin Bannister in the Eastern Caribbean Supreme Court in the High Court of Justice of the British Virgin Islands on May 8, and June 4, 2009.  The provisional liquidators are William R. Tacon and Richard E. F. Fogerty.  The appointment of provisional liquidators, however, does not place the Funds in liquidation.

52.      **Bank of Bermuda Limited** ("Bank of Bermuda") was, at all relevant times, the Funds' banker for purposes of receiving subscription funds, disbursing redemption payments and processing cash transactions.  Bank of Bermuda is a banking institution located at 9 Bermuda Road, Compass Point, 5th Floor, Pembroke, Bermuda.

53.      **Oppenheimer Acquisition Corp.** ("Oppenheimer") is a corporation organized under the laws of the State of Delaware and maintains its principal place of business at 2 World Financial Center, New York, New York.  Oppenheimer is the parent company of the Tremont

Group.  Oppenheimer is an indirect, wholly owned subsidiary of Massachusetts Mutual Life

Insurance Company ("MassMutual").

## IV.    BACKGROUND FACTS

### A.    Madoff's Massive Ponzi Scheme

54.    Madoff founded BMIS in 1959 as a New York limited liability company and was

its chairman and chief executive officer.  Since at least 1990, Madoff perpetrated a massive

Ponzi scheme through BMIS.

55.    BMIS was registered with the SEC as a securities broker-dealer under Section

15(b) of the Exchange Act, 15 U.S.C. § 78o(b) and, by 2008, was registered with the Financial

Industry Regulatory Authority ("FINRA").  BMIS had three business units:  market making,

proprietary trading, and investment advisory ("Investment Advisory").  BMIS' website stated

that it had been providing "quality executions" for broker-dealers, banks and financial

institutions since its inception in 1960.  BMIS "self-cleared" transactions, trading through its

own affiliated broker-dealer.

56.    Madoff's family members held the key control positions at BMIS.  The direct

owners and executive officers of BMIS were Madoff and his brother, Peter Madoff.  Peter

Madoff served as BMIS' Director of Trading and Chief Compliance Officer.  Madoff's sons,

Mark and Andrew, were BMIS' Directors of Proprietary Trading.  Mark and Andrew Madoff ran

BMIS' proprietary trading services on a separate floor from the firm's other business activities

and kept the financial statements for the firm under lock and key.

57.    Madoff and BMIS represented that they used a "split-strike conversion" strategy

to manage the Investment Advisory assets, including those of the Funds.  Pursuant to the

strategy, BMIS purportedly purchased between 45 and 50 stocks underlying the Standard &

Poor's 100 index ("S&P 100 Index"), while concurrently selling out-of-the-money call options

and buying out-of-the-money put options on the S&P 100 Index.  This investment strategy purportedly sought to limit volatility – reducing gains compared to the benchmark index in an up market and, likewise, limiting losses to something less than the benchmark in a down market.

58.  BMIS provided its investors, including the Funds, with monthly or quarterly statements purportedly showing (i) trades in equities and options using the assets turned over by the Funds, (ii) the equity securities, options, and government securities that the investors supposedly owned, and (iii) the purported growth of and profit from those accounts over time. These statements, however, were a complete fabrication, as none of the trades listed on the monthly or quarterly reports actually took place.

59.  Similarly, Madoff and BMIS never purchased or sold any of the options they claimed to have purchased and sold and that were reported to BMIS' investors, including the Funds.  Options related to S&P 100 companies are typically traded on the Chicago Board Options Exchange ("CBOE"), but Madoff never purchased or sold any options on the CBOE or with any other counterparty in an over-the-counter transaction.

60.  The purported growth of and profits on investor's assets also was fictitious, as Madoff's only source of asset growth was from additional contributions made by feeder funds such as Kingate Global and Kingate Euro.  Rather than investing assets in actual securities as represented by Madoff and Defendants, Madoff fraudulently used those assets for his personal benefit (and the benefit of his family and associates) and otherwise distributed them to prior investors to create the illusion of profits.

**B.  Madoff's Arrest And Subsequent Investigations**

61.  On December 11, 2008, federal authorities arrested Madoff and charged him with violations of the securities laws.  Madoff admitted that his money management operation was "all just one big lie" and "basically, a giant Ponzi scheme" wherein he "paid investors with

money that wasn't there." Madoff further admitted that he had "personally traded money and lost money for institutional clients," and that "there is no innocent explanation." That same day, the SEC filed an emergency action to halt all ongoing activities by Madoff and BMIS. The action is styled, *SEC v. Bernard L. Madoff*, 08 Civ. 10791 (S.D.N.Y. Dec. 11, 2008).

62.     On December 15, 2008, SIPC filed an application in the United States District Court for the Southern District of New York alleging that BMIS was not able to meet its obligations to investors as they came due and, accordingly, that the investors needed the protection afforded by the Securities Investor Protection Act ("SIPA"). The Court granted the SIPC application and appointed Irving H. Picard as the Trustee to liquidate BMIS.

63.     At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC), Madoff pled guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York, including counts of fraud, perjury, theft from an employee benefit plan, and two counts of international money laundering. Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BMIS]," and that "I knew what I was doing was wrong, indeed criminal." Madoff explained that he had been paying returns to certain investors out of the assets received from other investors. Madoff stated that BMIS was insolvent and had been for years.

64.     The size of Madoff's global fraud has been estimated at $64.8 billion, based upon the reported value of approximately 4,800 BMIS client accounts as of November 30, 2008. Madoff is now incarcerated and serving out his 150-year sentence.

65.     The auditor for BMIS, Friehling & Horowitz ("F&H"), was an accounting firm located in a 13-by-18 foot office in a strip-mall in New City, New York. David Friehling ("Friehling") was the only certified public accountant at the three-person firm. Jerome

Horowitz, the other partner in the firm, was inactive and living in Florida.  The third F&H

employee was, reportedly, a secretary.  F&H audited Madoff's investment advisory firm while at

the same time telling the American Institute of Certified Public Accountants ("AICPA") that he

had not performed audits for the past fifteen years.  The AICPA instituted an ethics investigation

into Friehling's conduct as an auditor of BMIS, and on March 18, 2009, the AICPA expelled

Friehling from membership for failure to cooperate.

66.     On November 3, 2009, Friehling pled guilty to nine charges of wrongdoing,

including securities fraud, making false statements and violations of the internal revenue laws.

As part of his guilty plea, Friehling agreed to cooperate with the government in its ongoing

investigation of Madoff and BMIS.

## V.     THE KINGATE DEFENDANTS' WRONGFUL CONDUCT

### A.     The Funds' Investments With Madoff

67.     Each member of the class invested in Kingate Global and/or Kingate Euro, which,

in turn, delegated all investment duties and custody of the investments to Madoff and BMIS in

New York.  Madoff was described in the Funds' offering documents as a "New York based

NASD registered broker-dealer employing approximately 350 people and acting primarily as a

market-maker in listed and unlisted stocks and convertible securities."[2]  Madoff was not

identified by name in the offering documents.

---

[2]     Kingate Global Fund, Ltd. Amended and Restated Information Memorandum, October 6, 2008, at 14
("KGF 2008 IM," attached as Exhibit 1); Kingate Euro Fund, Ltd. Amended and Restated Information
Memorandum, October 6, 2008, at 15 ("KEF 2008 IM," attached as Exhibit 2); Kingate Global Fund, Ltd. Amended
and Restated Information Memorandum, August 1 ,2007, at 14 ("KGF 2007 IM," attached as Exhibit 3); Kingate
Global Fund, Ltd. Amended and Restated Information Memorandum for USD Participating Common Shares, May
1, 2006, at 14 ("KGF 2006 IM," attached as Exhibit 4); Kingate Global Fund, Ltd. Amended and Restated
Information Memorandum, January 15, 2003, at 15 ("KGF 2003 IM," attached as Exhibit 5); *see also* Kingate
Global Fund, Ltd. Information Memorandum, May 1, 2000, at 15 ("KGF 2000 IM," attached as Exhibit 6) (using
similar language) (collectively, the "Information Memoranda" or "IMs").

68.     Between March 1994 and December 10, 2008, Kingate Global invested $963.45 million with BMIS through 63 separate wire transfers directly into BMIS' account at JPMorgan Chase & Co. in New York City, Account Number 000000140081703 (the "BMIS Bank Account").  From inception through December 10, 2008, Kingate Euro invested $767.44 million with BMIS through 92 separate wire transfers directly into the BMIS Bank Account. Accordingly, through their control of the Funds, the Kingate Defendants intentionally took advantage of the benefits of conducting transactions in the State of New York.  By November 30, 2008, Kingate Global's and Kingate Euro's investments had purportedly grown to over $3 billion based on Madoff's fictitious reports to the Funds.

69.     The losses that Plaintiffs and other members of the Class suffered when the Funds collapsed would have been avoided if Defendants had fulfilled their duties to Plaintiffs and other members of the Class, if they had lived up to their own representations, and if they had adequately investigated and monitored Madoff and BMIS.  In failing to do so, Defendants breached their duties to Plaintiffs and the Class, and effectively wiped out their investments.  At the same time, Defendants reaped millions of dollars in fees.

**B.     Key Kingate Defendants Were In Close Contact With Madoff**

70.     Key Kingate Defendants regularly met with Madoff in New York, according to Madoff's former personal secretary, Eleanor Squillari.  Plaintiffs' counsel interviewed Ms. Squillari who supplied the information discussed below.

71.     Madoff hired Ms. Squillari in March 1984 when BMIS' former offices were located at 110 Wall Street, New York, New York.  The offices were subsequently moved to 885 Third Avenue, New York, New York in the late 1980s ("BMIS' Office").  Ms. Squillari worked as Madoff's secretary for almost 25 years until Madoff's arrest on December 10, 2008.

72.     As part of her duties, Ms. Squillari kept his calendar, office telephone directory, and a copy of Madoff's pocket book telephone directory which Madoff customarily carried with him at all times ("Calendar," "Office Telephone Directory," and "Pocket Book," respectively). The original documents were provided to the Federal Bureau of Investigation ("FBI") as part of Ms. Squillari's extensive cooperation with the FBI and other governmental authorities. Ms. Squillari kept a true and accurate copy of these documents and provided copies to Plaintiffs' counsel.

73.     Madoff's Calendar reflects numerous meetings at BMIS' Office between Madoff and some of the key Kingate Defendants.  Specifically, Madoff met with Manzke on May 11, 2005 and March 15, 2006.  Madoff also met repeatedly with Grosso on October 4, 2006, March 8, 2007, September 17, 2007, and September 22, 2008.[3]

74.     Madoff' Pocket Book included the phone numbers he needed more often and represented an abbreviated list of his Office Telephone Directory.  A transcription of the phone numbers from Madoff's Pocket Book is six pages long, while the comprehensive Office Telephone Directory is 43 pages.

75.     Madoff's Pocket Book included Grosso's phone numbers at home in London, on his English mobile phone, and at FIM's New York office.  Of the business contacts included in Madoff's Pocket Book, very few included home phone numbers.  In fact, out of approximately 160 entries, only 15 included home numbers.

76.     Madoff's Office Telephone Directory included, (i) Grosso's office number in London next to the annotation, "FIM Limited/Kingate," (ii) Ceretti's office number in London next to the annotation, "FIM Limited," and (iii) Manzke's office number.

---

[3]     Copies of the Calendar prior to 2005 were not available.

21

**C.     The Kingate Defendants And Citi Hedge Knew Or Should Have Known That Madoff Was A Fraud**

77.     The Kingate Defendants and Citi Hedge had overwhelming evidence that Madoff's operation was a fraud – evidence they knew about or should have discovered, but instead simply ignored.  Specifically, almost two hundred of the trades reported by Madoff to Citi Hedge and the Kingate Defendants were reported at prices that were outside the daily trading range.  Those trades could never have taken place, obviously did not, and the Kingate Defendants and Citi Hedge knew that or, at a minimum, had the evidence to know that.  If Defendants had verified the pricing information for these trades, they would have immediately discovered that the trades had not taken place as reported.  Further, if Defendants had made a single inquiry to the Depository Trust & Clearing Corporation ("DTC"), the clearing house for such transactions, they would have discovered that there was no record of BMIS or Madoff having cleared a single purchase or sale of securities through the DTC, or any other trading platform on which BMIS could have possibly traded securities.

78.     Specifically, the monthly account statements received by the Kingate Defendants and Citi Hedge for the month of October 2003 reported purchases of 984,137 and 240,240 shares of Intel Corporation (INTC), for Kingate Global and Kingate Euro, respectively.  These purchases were purportedly executed on October 2, 2003 at a price of $27.63.  However, the price for Intel Corporation stock on October 2, 2003, ranged from $28.41 to $28.95.  Accordingly, Madoff could never have purchased the shares at the reported price of $27.63, and obviously he never did.

79.     In a second example, this time a purported sale, the monthly account statements for the month of December 2006 reported sales of 233,281 and 60,449 of Merck & Co., Inc. (MRK) shares for Kingate Global and Kingate Euro, respectively.  These sales were purportedly

executed on December 22, 2006, at a price of $44.61.  However, the price for Merck stock on the purported trade date of December 22, 2006, ranged from $42.78 to $43.42.

80.     In total, the monthly reports reflected 185 trades that were reportedly executed at prices outside the daily price ranges.  This pattern in each of Kingate Global's and Kingate Euro's accounts should have caused a sophisticated hedge fund manager and administrator like the Kingate Defendants and Citi Hedge to independently verify the trades with the public exchange.

81.     Madoff also often reported option trading volumes that contradicted information readily accessible to the Defendants.  As mentioned above, the split-strike investment strategy required purchases of underlying stocks in the S&P 100 Index in combination with purchases of options of the S&P 100 Index ("OEX").  These options are traded on the CBOE.  As reported on the monthly statements for January 2008 received by the Kingate Defendants and Citi Hedge, on January 23, 2008, Madoff purportedly bought a total of 17,859 and 5,762 OEX put options (with February expiration and a strike price of 600) for Kingate Global's and Kingate Euro's accounts, respectively.  The total volume traded on the CBOE on that day for such contracts, however, was only 8,645 – about one-third of Madoff's reported put options trades.  Similarly, Madoff purportedly bought a total of 17,859 and 5,762 OEX call options (with February expiration and a strike price of 610) for these same accounts.  The total volume traded on the CBOE for such contracts was 631 – about 1/40 of Madoff's reported call option trades.

82.     The fact that the option volume reported by Madoff was impossible, as there were not nearly that many option contracts available on the CBOE, should have caused Defendants to seriously question Madoff.  While Madoff could have theoretically executed this massive volume of option trades in the over-the-counter market with private counterparties (not through

public exchanges), Defendants could have verified with those counterparties whether **any** of those options trades existed – not a single one did. Accordingly, the fictitiously reported options volume constituted yet another tell-tale sign that Madoff simply could not have been executing the split-strike conversion strategy.

      **D.**      **The Funds' Information Memoranda Were False And Misleading**

      83.      Beginning in 1995 and continuing through December 11, 2008, the Kingate Defendants induced Plaintiffs and the Class to invest in the Funds on the basis of false and misleading representations and omissions. Investors in the Funds or their nominees were provided copies of an Information Memorandum, which was periodically updated, and Plaintiffs and the Class were required to acknowledge that they had received the respective Information Memorandum as a condition of buying shares in the Funds.

      84.      The Kingate Defendants drafted, reviewed, authorized or otherwise participated in the preparation and dissemination of the Information Memoranda provided to prospective and current investors in the Funds, including Plaintiffs, and were responsible for the content of those materials. The Information Memoranda contained uniform misrepresentations and material omissions that induced Plaintiffs and the Class to invest in the Funds and retain their investments in the Funds, and on which Plaintiffs and the Class relied.

      85.      As set forth below, the Kingate Defendants misrepresented to Plaintiffs, through the Information Memoranda, that Plaintiffs' assets were being invested using a split-strike conversion strategy, and that the assets in the Funds were earning substantial, consistent returns over time. The Kingate Defendants further misrepresented that they and their contracted for advisors, consultants, auditors and administrators were conducting extensive due diligence and monitoring Madoff's operations, and that they had full transparency to all of Madoff's operations. The Kingate Defendants failed to disclose to Plaintiffs the material facts that (i) no

one had conducted meaningful due diligence, (ii) no one was monitoring or had independently

verified any of Madoff's purported trading activity, (iii) they had no transparency, and did not

seek better transparency, into Madoff's operations, and (iv) they had no independent, factual

basis for stating that Madoff was executing a split-strike conversion strategy which resulted in

profits for Plaintiffs.

### 1.      False and Misleading Statements Concerning the Actual Investment

86.    The Information Memoranda made numerous false and misleading statements

representing that Madoff made investments which, in reality, never existed and were entirely

fictitious.  Kingate Global and Kingate Euro were essentially identical, except for the functional

currency, and the Information Memoranda were also materially identical with respect to the

representations relevant to this lawsuit.

87.    According to the 2008 Information Memoranda for each of the Funds, Kingate

Global and Kingate Euro were "open-end investment compan[ies]" that "[sought] long-term

capital growth by allocating USD Share capital to a selected investment advisor to execute the

Fund's Investment Objective and Process."[4]

88.    The Funds' "investment objective" as set forth in the Information Memoranda

was "to obtain capital appreciation of its assets through the utilization of a non-traditional

stock/options trading strategy."[5]  The Information Memoranda further described the investment

strategy of the Funds as seeking to obtain capital appreciation of assets principally through a

"split-strike conversion" strategy.  For example, according to the Information Memoranda,

Madoff used a "non-traditional investment strategy" to achieve long-term capital appreciation

---

[4]    KGF 2008 IM, Ex. 1 at 1; KEF 2008 IM, Ex. 2 at 1; KGF 2007 IM, Ex. 3 at 1; KGF 2006 IM, Ex. 4 at 1; KGF 2003 IM, Ex. 5 at 1; KGF 2000 IM, Ex. 6 at 1.

[5]    KGF 2008 IM, Ex. 1 at 2; KEF 2008 IM, Ex. 2 at 1-2; KGF 2007 IM, Ex. 3 at 2; KGF 2006 IM, Ex. 4 at 2; KGF 2003 IM, Ex. 5 at 2; KGF 2000 IM, Ex. 6 at 2-3.

"that is a variation of the traditional 'option conversion' strategies," known as "split-strike conversion."[6] These representations were false, since Madoff did not use the split-strike conversion investment strategy or make any investments at all.

89.     The description of the "split-strike conversion" strategy was virtually identical in all the Information Memoranda from 2000 through 2008, stating:

> The Fund seeks to obtain capital appreciation of its assets through the utilization of a non-traditional stock/options trading strategy.
>
> * * *
>
> The strategy utilized by the Fund's Investment Advisor [*i.e.*, Madoff] is called "split-strike conversion" and entails:
>
> (i)     purchasing a basket of forty-five (45) to fifty (50) large capitalization S&P 100 stocks (*e.g.*, General Electric, Microsoft, Pfizer, Exxon Mobil, Wal-Mart Stores, Citigroup, Intel, American International, IBM, Johnson & Johnson, etc.), which together account for the greatest weight of the Index and therefore, when combined, present a high degree of correlation with the general market;
>
> (ii)    selling out-of-the money S&P 100 Index call options representing a dollar amount of the underlying Index equivalent to the dollar amount of the basket of shares purchased; and
>
> (iii)   purchasing out-of-the-money or at-the-money S&P Index put options in the same dollar amount.[7]

90.     The Information Memoranda from 2000 through 2008 further stated that:

> The investment advisor is a New York based NASD registered broker-dealer employing approximately 350 people and acting primarily as a market-maker in listed and unlisted stocks and convertible securities. . . .   The Manager [or co-manager] has established a discretionary account with such Investment Advisor on behalf of the Fund for the management of the USD assets.  The

---

[6]   *Id.*

[7]   KGF 2008 IM, Ex. 1 at 2; KEF 2008 IM, Ex. 2 at 2; KGF 2007 IM, Ex. 3 at 2; KGF 2006 IM, Ex. 4 at 2; *see also* KGF 2003 IM, Ex. 5 at 2 (stating Madoff would purchase a basket of thirty (30) to forty (40) large capitalization S&P 100 stocks); KGF 2000 IM, Ex. 6 at 2 (same).

> Investment Advisor utilizes a 'split strike conversion' strategy consistent with the strategy of the Fund. . . .[8]

91.    These representations were false, and the Kingate Defendants failed to disclose to Plaintiffs the material fact that they had not independently verified any of Madoff's purported trading activity and had no factual basis for stating that Madoff was executing a split-strike conversion strategy.

### 2.    False and Misleading Statements Concerning Ongoing Duties to Monitor and Evaluate Madoff

92.    The Information Memoranda from 2000 through 2008 represented that the Manager (or Co-Managers) had an ongoing obligation to evaluate and monitor Madoff:

> Pursuant to the Manager [or Co-Manager] Agreement, the Manager [or Co-Managers] **evaluates** and **monitors** the Investment Advisor and, in general, provides all necessary management services to the Fund.[9]

> * * *

> The Manager [or Co-Managers] has agreed (i) to manage all aspects of the investment advisory services provided to the Fund, including the **selection** and **evaluation** of [Madoff] and (ii) to arrange for the performance of all accounting and administrative services which may be required by the Fund's operations. The Manager [Co-Manager] Agreement authorizes the Manager [or Co-Managers] to delegate responsibilities to others, subject to retaining responsibilities for **evaluating** and coordinating the services offered by others.[10]

93.    These representations were false and misleading because the Kingate Defendants did not evaluate and monitor Madoff as represented in the Information Memoranda.

---

[8]    KGF 2008 IM, Ex. 1 at 14; KEF 2008 IM, Ex. 2 at 15; KGF 2007 IM, Ex. 3 at 14; KGF 2006 IM, Ex. 4 at 14; *see also* KGF 2003 IM, Ex. 5 at 15; KGF 2000 IM, Ex. 6 at 15.

[9]    KGF 2008 IM, Ex. 1 at (ii); KGF 2007 IM, Ex. 3 at (ii); KGF 2006 IM, Ex. 4 at (ii); KGF 2000 IM, Ex. 6 at (iii); KEF 2008 IM, Ex. 2 at (iii).  (All emphasis supplied throughout unless otherwise stated).

[10]    KGF 2008 IM, Ex. 1 at 13; KEF 2008 IM, Ex. 2 at 14 (further agreeing to make decisions with respect to hedging transactions utilizing the recommendations of the Consultant, FIM Advisers); KGF 2007 IM, Ex. 3 at 13; KGF 2006 IM, Ex. 4 at 13; KGF 2003 IM, Ex. 5 at 14.

94.     The Manager's obligation to monitor and evaluate Madoff was also clearly set forth in the January 1, 2006 Management Agreement between Kingate Global and KML (the "KGF 2006 Management Agreement," Ex. 7).  While Section 5.9 of that agreement authorized the Manager to delegate its duties and obligations, the Manager undertook the continued monitoring of the execution of those delegated duties:

(a)     The Manager shall be authorized to delegate as appropriate, or in its discretion, any of the duties or obligations hereunder to one or more other persons or entities, whether affiliated with or independent of the Manager.

(b)     In the event of any such delegation of duties . . . the Manager shall be relieved and discharged of its obligations to perform services so delegated **other than the continuing obligation** (subject at all times to the standard of care set forth in Section 5.4 [gross negligence, bad faith, or willful or reckless malfeasance]), to take reasonable measures to,

(i)     ascertain the competence of the delegatee [*i.e*., Madoff] to perform the services so delegated,

(ii)     monitor generally the faithful performance by the delegatee of the duties specified in the relevant delegation agreement,

(iii)     coordinate such performance with the performance of the other services contemplated hereunder, and

(iv)     perform or procure the future performance of the delegated services in the event of the expiration or termination of any such agreement with such delegatee.

* * *

(c)     For the avoidance of doubt, the Manager has delegated responsibilities as follows, which have the consent of the Fund's Directors,

(i)     To Madoff, investment advisory activities and custody services;

28

(ii)     To BISYS Hedge Fund Services Limited, Hamilton, Bermuda, as to administrative services; and

(iii)     To Bank of Bermuda with respect to banking matters.[11]

95.     KML failed to uphold this basic obligation it voluntarily accepted, and its representation that it would manage all aspects of the investment advisory services provided to the Funds was false.  KML and the Kingate Defendants never independently monitored or confirmed that the represented investment strategy was being executed, and in fact no such investment strategy was being followed.

96.     KML also failed to conduct any meaningful evaluation of Madoff's trading and performance; indeed, there was no investment of Plaintiffs' or the Class' assets in any legitimate securities.

97.     KML not only failed to properly monitor and evaluate Madoff, but also failed to monitor Citi Hedge and Citi Hedge's oversight over Madoff.  Pursuant to the Information Memoranda, Citi Hedge had to verify the trading information provided by Madoff to calculate the NAV of the Funds.  In a section entitled, "Determination of Net Asset Value," the Information Memoranda said that, "[Citi Hedge] verifies the prices attributed to the securities held by the USD Shares of the Fund by reference to pricing sources independent of the Investment Advisor whenever reasonably possible."[12]

98.     Madoff provided prices outside of the daily trading range to Citi Hedge and the Funds on at least 185 different occasions, and KML and Citi Hedge failed to properly verify the prices provided by Madoff.  If they had done so, they would have discovered Madoff's Ponzi scheme.

---

[11]   KGF 2006 Management Agreement, § 5.9, Ex. 7 at 8-9.

[12]   KGF 2008 IM, Ex. 1 at 23; KEF 2008 IM, Ex. 2 at 24; KGF 2007 IM, Ex. 3 at 23-24; KGF 2006 IM, Ex. 4 at 24; KGF 2003 IM, Ex. 5 at 24.

### 3.    False and Misleading Statements Concerning
Options Trading and Madoff's Counterparties

99.     In addition to falsely representing that Madoff executed trades which never took

place, the Information Memoranda also included false and misleading statements concerning

Madoff's supposed trading counterparties:  "[t]he options transactions executed for the benefit of

the USD portfolio are effected primarily in the over-the-counter market, not on a registered

options exchange."[13]  Madoff never executed any options transactions.

100.    Because of these purported over-the-counter transactions, the Information

Memoranda said that the Funds were "subject to counterparty risk and [were] without the

protection afforded with respect to options transactions on regulated exchanges through the

Options Clearing Corporation."[14]  Despite acknowledging the lack of protection provided by

trading options over-the-counter, the Kingate Defendants never sought to determine whether

Madoff was trading with creditworthy counterparties or, in fact, making any over-the-counter

option trades at all.

101.    Similarly, the Information Memoranda also stated that "[t]he Investment Advisor

acts as a market-maker in the stocks purchased and sold by the USD portfolio," and as a result of

the Investment Advisor's role as market-maker, "the portfolio is subject to credit risks (the

exposure to the possibility of loss resulting from a counterparty's failure to meet its financial

obligations)."[15]  Once again, the Kingate Defendants never conducted due diligence to verify or

assess the credit risks created by the Investment Advisor's status as market-maker, as they were

---

[13]   KGF 2008 IM, Ex. 1 at 3; KGF 2006 IM, Ex. 4 at 3; KGF 2003 IM, Ex. 5 at 4; KGF 2000 IM, Ex. 6 at 4.

[14]   KGF 2008 IM, Ex. 1 at 6; KEF 2008 IM, Ex. 2 at 6; KGF 2007 IM, Ex. 3 at 6; KGF 2006 IM, Ex. 4 at 6;
KGF 2003 IM, Ex. 5 at 7.

[15]   KGF 2008 IM, Ex. 1 at 3, 6; KGF 2007 IM, Ex. 3 at 3, 6; KGF 2006 IM, Ex. 4 at 3, 6; *see also* KGF 2003
IM, Ex. 5 at 3, 6; KGF 2000 IM, Ex. 6 at 3-4, 6.

required to do under the Management Agreement and as they committed to do in the Information

Memoranda.

### 4.   False and Misleading Statements
### Attempting to Disclaim "The Risk Of Fraud"

102.   Defendants knew that Madoff's overlapping responsibilities as Investment

Advisor, execution agent, and custodian created a risk rarely existing with other funds – that

Madoff could steal the money.  Accordingly, the Information Memoranda sought (ineffectively)

to disclaim this risk:

> Neither the Fund nor the Custodian has actual custody of the
> assets.  Such actual custody rests with the Investment Advisor and
> its affiliated broker-dealer.  Therefore, there is the risk that the
> custodian [Madoff] could abscond with those assets.  There is
> always the risk that the assets with the Investment Advisor
> [Madoff] could be misappropriated.  In addition, information
> supplied by the Investment Advisor may be inaccurate or even
> fraudulent.  The Manager [or Co-Manager] is entitled to rely on
> such information (provided they do so in good faith) and are not
> required to undertake any due diligence to confirm the accuracy
> thereof.[16]

103.   Rather than insulating themselves from liability for failing to conduct due

diligence, by disclosing such a known risk, the Kingate Defendants undertook a heightened

obligation to monitor and evaluate Madoff.  Stating the truism that there is "always the risk" that

assets could be misappropriated does not relieve the Kingate Defendants of their obligations

under the Information Memoranda, particularly when the facts show that they could have

discovered Madoff's fraud and avoided the risk of misappropriation if they had acted in

accordance with their representations and duties to Plaintiffs and the Class.  Indeed, the

boilerplate language that "[t]here is always a risk" critically failed to address the probability of

that risk materializing.  That statement also was meaningless and ineffective because by the time

---

[16]   KGF 2008 IM, Ex. 1 at 9; KEF 2008 IM, Ex. 2 at 10; KGF 2007 IM, Ex. 3 at 10; KGF 2006 IM, Ex.4 at 9;
KGF 2003 IM, Ex. 5 at 9-10; KGF 2000 IM, Ex. 6 at 10.

the "disclosure" was made in the Information Memoranda, the risk had already materialized and was ongoing.  The Kingate Defendants had already failed to conduct any meaningful monitoring or evaluation to determine the scope of that possibility, and allowed the monies to be stolen.

104.    Moreover, while purporting to limit the amount of due diligence conducted by KML and Tremont on information provided to it by Madoff, such a clause in no way exonerates KML or Tremont – or the FIM Defendants – from conducting due diligence on the propriety of Madoff as the selected Investment Advisor to whom the Fund delegated all investment management discretion and authority in the first instance.  Because the Kingate Defendants failed to take reasonable steps to monitor or conduct due diligence concerning Madoff, any purported reliance by Defendants on information received from Madoff was not in good faith. This is because the Kingate Defendants took no steps during the entire time the Funds' assets were invested with Madoff to verify the accuracy of the information provided by Madoff.

105.    Indeed, it is clear that Defendants never confirmed with any of Madoff's counterparties that the billions of dollars in trades that Madoff claimed he executed every year actually took place.  Although Madoff was a broker-dealer and custodian, Madoff still had to buy stocks, bonds, and options from the outside world.  But Defendants never called a single counterparty to confirm that Madoff had traded with them.  If Defendants had made such inquiry, the fact of Madoff's fraud would have been immediately revealed.  Simply put, Defendants took no action to confirm the existence of the assets invested with Madoff or of Madoff's assertions regarding investment activity, strategy, and performance.

## VI.   PRICEWATERHOUSECOOPERS' WRONGFUL CONDUCT

### A.   PricewaterhouseCoopers Audited The Funds

106.    PricewaterhouseCoopers – and its predecessor entity Coopers & Lybrand Bermuda – audited the Funds every year since inception.  Each year, PricewaterhouseCoopers

issued an unqualified audit opinion – also commonly referred to as a "clean" audit opinion – stating that the financial statements and audit conformed with the requisite accounting and auditing standards.  Plaintiffs attach hereto (i) Kingate Global's financial statements for the years ending December 31, 2004, 2005, 2006, and 2007[17], and (ii) Kingate Euro's financial statements for the years ending December 31, 2006 and 2007.[18]

107.    PricewaterhouseCoopers addressed its unqualified audit opinions "To the Shareholders of [Kingate Global/Kingate Euro]" – that is, to Plaintiffs and the Class.  PricewaterhouseCoopers' unqualified audit opinions were included as the first page in the Kingate Global and Kingate Euro financial statements.  PricewaterhouseCoopers was aware that investors in the Funds, including Plaintiffs and the Class, relied on the Funds' financial statements, including the unqualified audit opinions, to determine whether to invest and maintain their assets in the Funds.

108.    Not only did PricewaterhouseCoopers know that Plaintiffs and the Class would rely on its audit opinions, PricewaterhouseCoopers also knew and accepted that it had an obligation to provide assurances directly to the shareholders regarding the financial condition of the Funds.  In defining the objectives for providing an audit for similar Madoff feeder funds managed by Fairfield Greenwich, a related PricewaterhouseCoopers entity acknowledged that it was responsible for reporting to the shareholders on the financial statements for the funds and committed to providing to the shareholders independent opinions and reports that provide assurance on the financial statements released by the funds.  Accordingly, Pricewaterhouse-Coopers understood and accepted that it owed a direct duty to Plaintiffs and members of the Class to conduct proper audits of the Funds.

---

[17]  "KGF 2004-05 FS" and "KGF 2006-07 FS".  Exs. 8 and 9.
[18]  "KEF 2006-07 FS."  Ex. 10.

109.    The unqualified opinions for Kingate Global for the years 2004 through 2007, and

for Kingate Euro for the years 2006 and 2007, are identical, and stated:

> In our opinion, the accompanying statements of assets and
> liabilities, including the schedules of investments, and the related
> statements of operations and of changes in net assets present fairly,
> in all material respects, the financial position of Kingate Global
> Fund, Ltd.[/Kingate Euro Fund, Ltd.] (the "Company") at
> December 31, 200[5-7], and the results of its operations and the
> changes in its net assets for the years then ended, in conformity
> with accounting principles generally accepted in the United States
> of America. . . .  [PricewaterhouseCoopers'] responsibility is to
> express an opinion on these financial statements based on our
> audits.  [PricewaterhouseCoopers] conducted [its] audits of these
> financial statements in accordance with auditing standards
> generally accepted in the United States of America. . . .  We
> believe our audits provide a reasonable basis for our opinion.[19]

110.    The audit opinions were signed, "PricewaterhouseCoopers, Chartered

Accountants."  The footer in the audit opinions defines PricewaterhouseCoopers to include its

worldwide members:  "PricewaterhouseCoopers refers to the members of the worldwide

PricewaterhouseCoopers organization."  The opinions were issued on letterhead of the

PricewaterhouseCoopers member organization located in Hamilton, Bermuda.[20]

111.    Based on the repeated use of the PricewaterhouseCoopers name,

PricewaterhouseCoopers knew that its name was used by the Funds in marketing so as to give

the Funds legitimacy and to draw investors to the Funds.  Indeed, according to the Information

Memoranda, "PricewaterhouseCoopers has given its written consent to the inclusion of its name,

report and reference to itself in the form and context in which they appear in this

Memorandum."[21]  Accordingly, PricewaterhouseCoopers knew that existing and potential

---

[19]   KGF 2004-05 FS, Ex. 8 at second page (not numbered); KGF 2006-07 FS, Ex. 9 at second page (not
numbered); and KEF 2006-07 FS, Ex. 10 at second page (not numbered).

[20]   *Id.*

[21]   KGF 2008 IM, Ex. 1 at 32; KEF 2008 IM, Ex. 2 at 33; KGF 2007 IM, Ex. 3 at 33; KGF 2006 IM, Ex. 4 at
33; KGF 2003 IM, Ex. 5 at 29; KGF 2000 IM, Ex. 6 at 28.

investors, including Plaintiffs and other members of the Class, would rely on the fact that

PricewaterhouseCoopers was the auditor of the Funds, represented it conducted proper audits,

and issued unqualified audit opinions on the Funds' financial statements.

112.    PricewaterhouseCoopers further knew that there was no independent market

mechanism or evidence to value the shares of Funds, and that there was no other independently-

verified third-party financial information about the Funds besides the audited financial

statements.  PricewaterhouseCoopers knew that the primary purpose of its audits was to provide

investors in the Funds with assurances that the Funds' assets were legitimately invested and

accurately valued.  PricewaterhouseCoopers also knew that the Funds were not in any sense

"operating" businesses but were, instead, merely vehicles to aggregate investments and transfer

them to Madoff.

### B.    PricewaterhouseCoopers' Audit Failed To Conform To GAAS

113.    The AICPA is the professional organization that promulgates the national auditing

standards known as Generally Accepted Auditing Standards ("GAAS").  GAAS set the

minimum level of performance and quality that auditors are required to meet.  The AICPA has

further codified a detailed interpretation of GAAS through the Statements of Accounting

Standards ("SAS," commonly referred to as "AU").  PricewaterhouseCoopers violated GAAS in

conducting its audits of Kingate Global and Kingate Euro.

114.    Generally Accepted Accounting Principles ("GAAP") are those principles

recognized by the accounting profession as the uniform rules, conventions, and procedures

necessary to define generally accepted accounting principles in the United States.  AU § 411.02

(applicable prior to November 15, 2008).  The AICPA prohibits members, including PwC U.S.,

from expressing an opinion or stating affirmatively that financial statements or other financial

data conform with GAAP if such information departs from generally accepted accounting principles.

### 1.    Basic Standards Under GAAS

115.    GAAS is comprised of ten basic standards that establish the quality of an auditor's performance and the overall objectives to be achieved in a financial statement audit. The ten basic GAAS standards fall into three basic categories:  General Standards; Fieldwork Standards; and Reporting Standards.

116.    The General Standards provide guidance to the auditor on the exercise of professional care, as follows:

> (a)    The auditor must have adequate technical training and proficiency to perform the audit.
>
> (b)    The auditor must maintain independence in mental attitude in all matters relating to the audit.
>
> (c)    The auditor must exercise due professional care in the performance of the audit and the preparation of the report.  (AU § 150.02).

117.    The Standards of Fieldwork provide guidance on audit planning, proper evaluation of internal controls, and the collection of evidential matter sufficient to allow the auditor a reasonable basis for rendering an opinion regarding the financial statements under audit, as follows:

> (a)    The auditor must adequately plan the work and must properly supervise any assistants.
>
> (b)    The auditor must obtain a sufficient understanding of the entity and its environment, including its internal control, to assess the risk of material misstatement of the financial statements whether due to error or fraud, and to design the nature, timing, and extent of further audit procedures.
>
> (c)    The auditor must obtain sufficient appropriate audit evidence by performing audit procedures to afford a reasonable basis for an opinion regarding the financial statements under audit.  (AU § 150.02).

118.     The Standards of Reporting provide guidance to the auditor on the content of the

audit report and the auditor's responsibility contained therein.

(a)     The auditor must state in the auditor's report whether the financial statements are presented in accordance with generally accepted accounting principles (GAAP).

(b)     The auditor must identify in the auditor's report those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period.

(c)     When the auditor determines that informative disclosures are not reasonably adequate, the auditor must so state in the auditor's report.

(d)     The auditor must either express an opinion regarding the financial statements, taken as a whole, or state that an opinion cannot be expressed, in the auditor's report.  When the auditor cannot express an overall opinion, the auditor should state the reasons therefore in the auditor's report.  In all cases where an auditor's name is associated with financial statements, the auditor should clearly indicate the character of the auditor's work, if any, and the degree of responsibility the auditor is taking, in the auditor's report. (AU § 150.02).

### 2.     PricewaterhouseCoopers Failed to Comply with GAAS

119.     As set forth above, GAAS required PricewaterhouseCoopers to exercise due

professional care in the performance of the audits and the preparation of the reports.  (AU §§

150.02, 230.02).  Due professional care meant that PricewaterhouseCoopers had to exercise

professional skepticism, an attitude that includes a questioning mind and a critical assessment of

audit evidence.  (AU § 230.07).  It also meant that PricewaterhouseCoopers had "to plan and

perform the audit to obtain *reasonable assurance* about whether the financial statements are free

of material misstatement, *whether caused by error or fraud*."  (AU § 110.02).

120.     Due professional care obligations also extended to the design of the audit.  In

designing the nature, timing, and extent of audit procedures and in evaluating the results of those

procedures, GAAS obligated PricewaterhouseCoopers to consider audit risk and materiality.

(AU § 312.01).  GAAS further required use of professional judgment and, in particular,

professional skepticism in determining whether a risk factor is present and should be considered in identifying and assessing the risk of material misstatement due to fraud.  (AU §§ 230.07-09, 316.13).

121.    PricewaterhouseCoopers further had an obligation to obtain a sufficient understanding of the Funds' environment, including internal controls, in order to assess the risk of material misstatement of the Funds' financial statements, whether due to error or fraud, and to design the nature, timing, and extent of further audit procedures.  (AU § 150.02).

122.    As part of the process of obtaining an understanding of the Funds and their environment, PricewaterhouseCoopers had to obtain an understanding of, among other things, the hedge fund industry in general, and, in particular, the nature of the Funds and the objectives, strategies, and related business risks which may result in a material misstatement in the financial statements of the Funds.  This included obtaining an understanding of the Funds' operations, ownership, governance, structure, how they were financed, and the types of investments they made.  (AU §§ 314.21, 314.26).

123.    Within the hedge fund industry, Madoff's concentration of functions was extremely rare.  PricewaterhouseCoopers knew that Madoff and BMIS served as the Funds' investment advisor, broker-dealer, and custodian.  This concentration of functions at BMIS created risks requiring special audit consideration – what GAAS refers to as "significant risks." (AU § 314.110).  Because primarily all of the Funds' investment and income information available to PricewaterhouseCoopers was based on information from Madoff and/or BMIS, PricewaterhouseCoopers was required to do more than rely solely on the procedures it performed with respect to the Funds.  (AU §§ 314.115, 318.53, 332.20).

124.    GAAS also required PricewaterhouseCoopers to evaluate Madoff's internal controls, including the design of those controls, and determine whether they had been implemented and were operating effectively.  (AU §§ 318.13, 318.23, 318.24, 318.45, 314.40).

> Internal control is a process – effected by those charged with
> governance, management, and other personnel – designed to
> provide reasonable assurance about the achievement of the entity's
> objectives with regard to reliability of financial reporting,
> effectiveness and efficiency of operations, and compliance with
> applicable laws and regulations.  (AU § 314.41).

125.    But even reviewing Madoff's internal controls was not enough.  GAAS recognizes that an understanding of an entity and its environment, including its internal controls, does not provide by itself a sufficient basis for forming an opinion on an entity's financial statements.  GAAS further requires the auditor to perform additional audit procedures.  (AU § 150.02).  These additional audit procedures include "tests of controls" and/or "substantive procedures."

126.    Tests of controls are used to "obtain audit evidence that controls operate effectively.  This includes obtaining audit evidence about how controls were applied at relevant times during the period under audit, the consistency with which they were applied, and by whom or by what means they were applied."  (AU § 318.26).  Substantive procedures are performed to detect material misstatements, and primarily include tests of details of balance sheet and income statement accounts, and of analytical procedures.  (AU § 318.50).

127.    Because effective internal controls generally reduce, but do not eliminate, the risk of material misstatement, and because an auditor's assessment of risk is judgmental and may not be sufficiently precise to identify all risks of material misstatement, tests of controls reduce, but do not eliminate, the need for substantive procedures.  (AU §§ 318.09, 318.51).  Accordingly, GAAS required PricewaterhouseCoopers to design and perform substantive procedures for each

of the Funds' material balance sheets and income statement accounts – such as the Funds'

investments and investment income.  More specifically, PricewaterhouseCoopers was required to

test:  (i) the **existence** and valuation **of the Funds' securities at every balance sheet date**;

(ii) the Funds' ownership of those securities; (iii) the **occurrence** and accuracy of **the Funds'**

**transactions in U.S. Treasuries**, stocks, and options; and (iv) the reasonableness of the Funds'

reported investment income.  (AU §§ 318.09, 318.51, 326.15, 332.21-22, 332.25).

(a)     **PricewaterhouseCoopers Failed to Conduct Adequate
Procedures Concerning Existence and Occurrence Risk**

128.    GAAS required PricewaterhouseCoopers to conduct special procedures when

auditing an entity with securities investments in light of the obvious assertion risk:  "The

inherent risk for an assertion about a derivative or security is its susceptibility to a material

misstatement, assuming there are no related controls."  (AU § 332.08).  This was particularly

critical in light of the concentration of functions at BMIS.

129.    The special procedures in auditing the **existence** of the securities with Madoff

required, among other things, confirmations with the security's issuer or physical inspections of

the security.  These same confirmation procedures were necessary in order to confirm the

**occurrence** of the transactions.  This is set forth in detail in AU 332, entitled, "Auditing

Derivative Instruments, Hedging Activities, and Investments in Securities," as follows:

> **Existence** assertions address whether the derivatives and securities
> reported in the financial statements through recognition or
> disclosure exist at the date of the statement of financial position.
> **Occurrence** assertions address whether derivatives and securities
> transactions reported in the financial statements, as a part of
> earnings, other comprehensive income, or cash flows or through
> disclosure, occurred.  Paragraph [332].19 provides guidance on the
> auditor's determination of the nature, timing, and extent of
> substantive procedures to be performed.  Examples of substantive
> procedures for existence or occurrence assertions about derivatives
> and securities include –

40

- **Confirmation with the issuer of the security.**

- **Confirmation with the holder of the security,** including securities in electronic form, **or with the counterparty to the derivative [*i.e.*, options].**

- **Confirmation of settled transactions with the broker-dealer or counterparty.**

- Confirmation of unsettled transactions with the broker-dealer or counterparty.

- **Physical inspection of the security or derivative contract.**

* * *

- Inspecting supporting documentation for subsequent realization or settlement after the end of the reporting period.

- **Performing analytical procedures.**  For example, the absence of a material difference from an expectation that interest income will be a fixed percentage of a debt security based on the effective interest rate determined when the entity purchased the security provides evidence about existence of the security. (AU § 332.21).

   **(b)      PricewaterhouseCoopers Failed to Conduct the Required Procedures on BMIS Given Its Role as a Service Organization**

130.    In addition to the requirements imposed by the foregoing standards, Pricewater-houseCoopers should have treated BMIS as a service organization because BMIS' services were part of the Funds' "information system," pursuant to AU §§ 324.03, 332.11, and 332.20.  Here, BMIS' services were part of the Funds' information systems because:  (i) BMIS' operations and transactions were significant to the Funds; (ii) BMIS initiated, authorized, recorded, processed and reported the Funds' transactions from their occurrence to their inclusion in the financial statements; (iii) BMIS affected the accounting records relating to the initiation, recording, processing, and reporting of the Funds' transactions; (iv) BMIS affected how the Funds' information system captures all information concerning the Funds' transactions; and (v) BMIS affected the financial reporting process used to prepare the Funds' financial statements.  *Id.*

131.    Accordingly, because BMIS' services were part of the Funds' "information system," PricewaterhouseCoopers was required to perform additional procedures, including assessing the internal controls at BMIS in order to assess the risk of material misstatement.  (AU § 324.04; 06-21).

132.    PricewaterhouseCoopers was also required to obtain audit evidence where, as here, there was a lack of segregation of the investment advisory, brokerage, and custodial duties at BMIS.  (AU § 332.20).  Indeed, even the Funds acknowledged that there was a risk of misappropriation of the assets due to the fact that they did not have custody of them.[22]  This heightened risk required PricewaterhouseCoopers to perform additional procedures to opine on the financial statements of the Funds.  SAS § 332.16 specifically directs that confirmations from service organizations are not sufficient audit evidence to assess internal controls.

133.    Moreover, where, as here, the service organization (BMIS) both initiated the transactions and held and serviced the securities, the greater risk of fraud required that PricewaterhouseCoopers perform additional procedures, including site visits to inspect documentation, and identification of controls by the service organization:

> If one service organization initiates transactions as an investment adviser and also holds and services the securities, all of the information available to the auditor is based on the service organization's information.  The auditor may be unable to sufficiently limit audit risk without obtaining evidential matter about the operating effectiveness of one or more of the service organization's controls.  An example of such controls is establishing independent departments that provide the investment advisory services and the holding and servicing of securities, then reconciling the information about the securities that is provided by each department.  (AU § 332.20).

---

[22]   KGF 2008 IM, Ex. 1 at 9; KEF 2008 IM, Ex. 2 at 9; KGF 2007 IM, Ex. 3 at 9; KGF 2006 IM, Ex. 4 at 9; KGF 2003 IM, Ex. 5 at 9-10; KGF 2000 IM, Ex. 6 at 10.

> **C.** **PricewaterhouseCoopers' Practice Guide Concerning**
> **Audits of Hedge Funds Highlighted the Importance**
> **of Confirming the Existence of the Assets**

134.    PricewaterhouseCoopers was well aware of the enormous risks posed by the type

of investments such as the Funds' investments with Madoff.  In 2007, for example, claiming a

"leadership position as auditors for both investee funds and investor entities," PwC U.S.[23] issued

a publication entitled, "Auditing Alternative Investments – A Practical Guide for Investor

Entities, Investee Funds Managers and Auditors" (the "PwC Guide," Ex. 11).  The PwC Guide

was largely based on a similar publication by the AICPA, "The AICPA Audit Guide:  *Auditing*

*Derivative Instruments, Hedging Activities, and Investments in Securities*" (the "AICPA Guide").

135.    One of the central purposes of the PwC Guide was to provide guidance for

auditors of funds-of-funds (such as Kingate Global and Kingate Euro) about their auditing

obligations with respect to the underlying hedge funds (such as Madoff) in which the funds-of-

funds had invested.

136.    The PwC Guide's first concern was the existence of assets at the underlying

hedge fund.  The main focus of the new guidance was as follows:

> With respect to existence, the question is:  Do the investor entity's
> alternative investments exist at the financial statement date, and
> have the related transactions occurred during the period? While
> confirming the existence of assets that are held by third parties
> generally provides adequate audit evidence, the Interpretation and
> AICPA Practice Aid say that, by itself, a confirmation in the
> aggregate does not constitute adequate audit evidence.  (PwC
> Guide, Ex. 11, at "Our Perspective").

137.    Because "confirmation in the aggregate" that the assets existed was no longer

sufficient, the auditor had an obligation to "confirm the holdings on a security-by-security basis."

---

[23]    The PwC Guide states that "'PricewaterhouseCoopers' refers to PricewaterhouseCoopers LLP (a Delaware
limited partnership) or, as the context requires, the PricewaterhouseCoopers global network or other member firms
of the network, each of which is a separate legal entity." (Ex. 11; at last page (not numbered)).

(*Id.* at 1).  And even then, the PwC Guide warned that that was not always enough, and additional procedures were necessary in certain circumstances, such as here:

> Even if the auditor obtains a detailed confirmation of the investee fund's holdings [*i.e.*, Madoff's holdings], . . . the auditor may need to perform additional procedures, depending on the **significance of the investments to the financial statements**.  Considerable auditor judgment is required to determine whether the auditor has sufficient evidence to satisfy the existence assertion.  (*Id.* at 24).

138.    One of the "additional procedures" consisted in checking with the banks that the assets actually existed.  "Comparing cash activity in the records of the investor entity with the corresponding cash movements reflected in bank or brokerage statements generally provides the auditor with valuable audit evidence."  (*Id.* at 26).  Madoff never provided trade tickets or statements from third parties – only statements from "Madoff Securities."  Yet, the PwC Guide clearly said, **"simply receiving a confirmation from the investee fund [*i.e.*, Madoff]** of its underlying investments, either in the aggregate or on a security-by-security basis, **does not, in and of itself, constitute adequate audit evidence with respect to the valuation assertion**." (*Id.* at 27).

139.    Confirming the existence of the assets was even more critical in this case because Madoff held 100% of the Funds' assets.  The AICPA Guide highlights this point.  It provides that the extent of the audit evidence necessary to issue an opinion increases as:  (1) the percentage of alternative investments to both the total assets, as well as the total investment portfolio increases; and (2) the nature, complexity and volatility of the underlying investments increases.  Here, because the investments in BMIS accounted for virtually 100% of the Funds' assets and 100% of the Funds' trading, and because BMIS' operations were opaque, this should have alerted PricewaterhouseCoopers that the highest level of audit evidence was necessary in order to opine on the Funds' financial statements.

140.    PricewaterhouseCoopers further failed to conduct an additional basic confirmation procedure listed in the PwC Guide concerning Madoff's auditors.  The PwC guide said that, if PricewaterhouseCoopers was going to rely on Madoff's financial statements audited by F&H, PricewaterhouseCoopers had to conduct some basic due diligence on F&H and its supposed audit of Madoff.  The first critical factor was the "professional reputation and standing of [F&H]."  (*Id.* at 30).  For auditors whose reputation was not sufficient (such as F&H) the PwC Guide listed "illustrative additional procedures," any of which would have uncovered the fact that the Funds' financial statements were incorrect if PricewaterhouseCoopers had carried them out:

- Investigate the professional reputation and standing of [F&H].

- Request that [KML and Tremont] apply, or have [F&H] apply, appropriate procedures to [Madoff's] financial statements and/or the underlying records.

- Request that [KML and Tremont] call or visit [F&H] to discuss audit procedures followed and the results thereof.  Review the audit program and/or working papers of [F&H], to the extent permissible.  (*Id.*).

141.    The PwC Guide requirements that PricewaterhouseCoopers conduct additional procedures concerning F&H were based on specific GAAS guidance.  Specifically, pursuant to AU § 332.30, because F&H's "audits" of BMIS were unsatisfactory, PricewaterhouseCoopers had the additional obligation:

> If [BMIS'] financial statements are not audited, or if [BMIS'] auditor's report is not satisfactory to the investor's auditor for this purpose [*i.e.*, PricewaterhouseCoopers], the investor's auditor should apply, or should request that the investor arrange with the investee to have another auditor apply, appropriate auditing procedures to such financial statements, considering the materiality of the investment in relation to the financial statements of the investor.

45

142.    Despite its own internal guidelines' clear instructions to conduct, at a minimum, a background check on F&H, PricewaterhouseCoopers did not do so.  PricewaterhouseCoopers never checked F&H's status with the AICPA.  Had it done so, it would have discovered that F&H had filed a form every year with the AICPA certifying that F&H **did not** conduct any audits.  This should have set off all kinds of alarm bells at PricewaterhouseCoopers requiring an in-depth review of F&H's audit of Madoff – a review Madoff never could have survived.

### D.    The Funds' Financial Statements Were False

#### 1.    Kingate Global's Statements of Assets and Liabilities, Operations, and Change of Net Assets Were False

143.    Kingate Global's Financial Statements included a Statement of Assets and Liabilities.  This Statement supposedly reflected the value of Kingate Global's assets purportedly held by Madoff at the end of each respective year.  These statements were false because the assets no longer existed at the time of each annual audit.

(a)    In 2004, Kingate Global supposedly held:  (i) $2.20 billion in U.S. Treasury bills; and (ii) $37.9 million in cash and cash equivalents.  Total assets at the end of 2004 attributable to the putative Class were supposedly $2.24 billion.  (KGF 2004-05 FS, Ex. 8 at third and sixth pages (not numbered)).

(b)    In 2005, Kingate Global supposedly held:  (i) $2.23 billion in U.S. Treasury bills; and (ii) $16.7 million in cash and cash equivalents.  Total assets at the end of 2005 attributable to the putative Class were supposedly $2.25 billion.  (*Id.*).

(c)    In 2006, Kingate Global supposedly held:  (i) $2.37 billion in U.S. Treasury bills; and (ii) $124.4 million in cash and cash equivalents.  Total assets at the end of 2006 attributable to the putative Class were supposedly $2.50 billion.  (KGF 2006-07 FS, Ex. 9 at third and sixth pages (not numbered)).

(d)      In 2007, Kingate Global supposedly held:  (i) $2.63 billion in U.S. Treasury bills; and (ii) $128.3 million in cash and cash equivalents.  Total assets at the end of 2007 attributable to the putative Class were supposedly $2.75 billion.  (*Id.*)

144.    Kingate Global's Financial Statements also included a Statement of Operations, which included the following line items:[24]

(a)      "Net realized gain from investment" for the years 2004 through 2007, inclusive, of $158.1 million, $163.6 million, $244.1 million, and $237.1 million, respectively. This line item reflected the fictitious annual returns from Madoff.

(b)      "Management fee" (KML and Tremont) for the years 2004 through 2007, inclusive, of $31.7 million, $34.0 million, $34.4 million, and $38.8 million, respectively.  This line item reflected the cash payments actually paid by Plaintiffs and the Class to KML and Tremont based on Madoff's fictitious returns.

(c)      "Administration fee" (Citi Hedge) for the years 2004 through 2007, inclusive, of $0.58 million, $0.61 million, $0.61 million, and $0.67 million, respectively.  This line item reflected the cash payments actually paid by Plaintiffs and the Class to Citi Hedge based on Madoff's fictitious reports.

(d)      "Professional fees" (PricewaterhouseCoopers) for the years 2004 through 2007, inclusive, of $54,997, $49,381, $66,894, and $82,407, respectively.

### 2.      Kingate Euro's Statements of Assets and Liabilities, Operations, and Change of Net Assets Were False

145.    Kingate Euro's Financial Statements also included a Statement of Assets and Liabilities.  This Statement reflected the supposed value of Kingate Euro's assets purportedly

---

[24]    KGF 2004-05 FS, Ex. 8 at fourth page (not numbered); KGF 2006-07 FS, Ex. 9 at fourth page (not numbered).

held by Madoff at the end of each respective year.  These statements were false because the assets no longer existed at the time of each annual audit.

       (a)    In 2006, Kingate Euro supposedly held:  (i) €474 million in U.S. Treasury bills; (ii) €49.5 million in cash held as collateral on forward currency contracts; and (iii) €9.1 million in net unrealized gains on forward currency contracts.  Total assets at the end of 2006 attributable to the putative Class were supposedly €532 million.  (KEF 2006-07 FS, Ex. 10 at third and sixth pages (not numbered)).

       (b)    In 2007, Kingate Euro supposedly held:  (i) €580 million in U.S. Treasury bills; (ii) €46.0 million in cash held as collateral on forward currency contracts; and (iii) €7.5 million in net unrealized gains on forward currency contracts.  Total assets at the end of 2007 attributable to the putative Class were supposedly €634 million.  (*Id.*).

146.    Kingate Euro's Financial Statements also included a Statement of Operations, which included the following line items[25]:

       (a)    "Net realized gain on investment and foreign currency transactions" for the years 2006 and 2007 of €25.0 million and €45.0 million, respectively.  This line item reflected, in part, the fictitious annual returns from Madoff.

       (b)    "Management fee" (KML and Tremont) for 2006 and 2007 of €7.9 million and €9.1 million, respectively.  This line item reflected the cash payments actually paid by Plaintiffs and the Class to KML and Tremont based on Madoff's fictitious reports.

       (c)    "Administration fee" (Citi Hedge) for 2006 and 2007 of €0.132 million and €0.146 million, respectively.  This line item reflected the cash payments actually paid by Plaintiffs and the Class to Citi Hedge based on Madoff's fictitious reports.

---

[25] KEF 2006-07 FS, Ex. 10 at fourth page (not numbered).

(d)      "Professional fees" (PricewaterhouseCoopers) for 2006 and 2007 of €44,429 and €46,567, respectively.

147.    PricewaterhouseCoopers failed in its obligation to obtain reasonable assurance that the assets included in the Funds' financial statements in fact existed and were appropriately valued.  Contrary to the applicable auditing standards, PricewaterhouseCoopers failed to gather sufficient, competent evidence to support its opinion that the Funds' financial statements were free of material misstatement with respect to the claimed assets, instead inappropriately relying on the Funds' management's representations.  (AU § 333).  As a result, although PricewaterhouseCoopers opined that the multi-billion dollar valuations of the Funds' investments were fairly presented in the financial statements, PricewaterhouseCoopers failed to determine whether the assets, which constituted nearly 100% of the Funds' value, even existed.

148.    With respect to the line item, "net realized gain from investment," PricewaterhouseCoopers did not perform the necessary procedures to audit the occurrence of the transactions underlying the split-strike conversion strategy which would have constituted the basis for the "gain."  PricewaterhouseCoopers knew that Madoff was purportedly using that strategy, a nontraditional options trading strategy.  PricewaterhouseCoopers knew that the split-strike strategy required the use of options trading, and that Madoff purportedly relied on counter parties outside of listed exchanges to execute those transactions, yet PricewaterhouseCoopers failed to confirm the existence of those transactions with the supposed counterparties.

149.    Had PricewaterhouseCoopers undertaken the proper analysis and testing of the strategy purportedly employed by Madoff, it would have determined that the strategy, including the claimed liquidation of all positions at the end of each quarter to acquire U.S. Treasury bills, could not have functioned as described.  Moreover, PricewaterhouseCoopers would have

determined that BMIS' reported consistent, positive returns, even in down markets, were not possible. While the split-strike conversion strategy can limit the downside of the trade, it could never convert negative returns in the underlying stocks into positive returns. The only factually possible explanation for having consistent, positive returns (even in down markets) was Madoff's market timing ability – which, based on the level of consistency reported, was statistically impossible.

150.     Several publicly available articles noted that Madoff's consistent positive results were suspicious and raised significant questions about Madoff's purported trading strategy. For instance, a May 2001 article in *Barrons* titled *Don't Ask Don't Tell; Bernie Madoff Is So Secretive, He Even Asks His Investors To Keep Mum,* reported that three option strategists at major investment banks were highly skeptical about Madoff's unusually steady double-digit returns and quoted one of the strategists as stating:  "Anyone who's a seasoned hedge fund investor knows the split-strike conversion is not the whole story.  To take it at face value is a bit naïve."  Also in May 2001, an article in the hedge fund industry newsletter MAR/Hedge titled *Madoff Tops Charts; Skeptics Ask How*, noted that numerous traders, money managers, and fund managers employing a split-strike conversion strategy experienced far greater volatility and significantly lower returns than what Madoff was reporting.  PricewaterhouseCoopers ignored these issues when conducting its audits for the Funds and failed to verify whether Madoff was in fact executing the trades necessary to implement the split-strike conversion strategy.

151.     In addition, despite the knowledge of the interconnection between the Funds and BMIS, and of the Funds' reliance on the supposed integrity of BMIS' operations, PricewaterhouseCoopers did not review the data required by the auditing standards with respect to an auditor's obligation to examine the "controls over derivatives and securities transactions

from their initiation to their inclusion in the financial statements."  (AU § 332.11).

PricewaterhouseCoopers did not test the trades supposedly made by BMIS or confirm the actual

existence of securities in BMIS accounts.  If PricewaterhouseCoopers had made any such efforts,

it would have discovered that neither the securities nor the trades ever existed.

**3.      The Notes to Kingate Global's and
         Kingate Euro's Financial Statements**

152.    The Notes to Kingate Global's Financial Statements for the years 2004 through

2007, and for Kingate Euro's 2007 Financial Statements, were identical with respect to the

statements discussed below.

153.    Note 2(b) discussed "significant accounting policies" for "cash and cash

equivalents."  Note 2(b) shows that PricewaterhouseCoopers understood that Madoff acted as

custodian and held cash on deposit:  "Cash and cash equivalents include . . . amounts on deposit

with the broker-dealer."[26]

154.    Note 5 discussed the "investment advisor, broker dealer, custodian and banker,"

in relevant part, as follows:

> The [Fund's] investment advisor is Bernard L. Madoff Investment
> Securities LLC ("Madoff"), a New York based financial
> institution.  Madoff also acts as the [Fund's] broker-dealer **for all
> equity, US Treasury and option transactions**, these transactions
> being executed in certain instances with Madoff as the principal.
> During the year [2005], the [Fund] executed transactions of
> approximately $48 billion (2004 - $49 billion).[27]  Madoff's only
> form of remuneration is from any principal spread and/or
> commission on the transactions.  Madoff also acts as custodian for
> investment assets of the [Fund].  (KGF 2004-05 FS, Ex. 8 at 3).

---

[26]    KGF 2004-05 FS, Ex. 8 at 1; KGF 2006-07 FS, Ex. 9 at 1; and KEF 2006-07 FS, Ex. 10 at 1.

[27]    The comparable figures for 2006 and 2007 were $48 billion and $58 billion, respectively.  (KGF 2006-07 FS, Ex. 9 at 3).

155. Note 7 to the Financial Statements was entitled "Financial Instruments," and addressed the risks incurred by the Funds due to Madoff's supposed trading activities.

> In the normal course of business, the [Fund] invests in U.S. publicly traded securities as well as U.S. investments, which have off-balance sheet risk. These financial instruments include purchased and written put and call options, which expose the Company to market and credit risk. . . . Credit risk arises from the potential inability of the counter-party to perform under the terms of the contracts.
>
> * * *
>
> During the year the [Fund] traded in listed and over the counter index options. Where the Company trades in listed options, the counter-party and guarantor is the Options Clearing Corporation. Where the [Fund] trades in over the counter options, the [Fund] is exposed to credit risk due to the potential inability of the counter-party to perform under the terms of the contract. (KGF 2004-05 FS, Ex. 8 at 3).

156. All these statements in the Notes to the Financial Statements showed that PricewaterhouseCoopers understood that Madoff held nearly 100% of the assets of the Funds, served as the broker-dealer for **"all"** of the Funds' transactions, and that Madoff did not charge an investment advisory fee. PricewaterhouseCoopers further understood the risk that one of the parties that held the assets on behalf of the Funds, or that had obligations to the Funds (the counterparties), would not perform. Yet, contrary to the statements in the Notes, PricewaterhouseCoopers never confirmed that Madoff actually held any of the assets Madoff so claimed, nor confirmed any of Madoff's purported trades of approximately $50 billion annually with the counterparties – the counterparties who never existed.

157. The Funds' Financial Statements were also signed each year by two Directors. The signatures are illegible.[28]

---

[28] KGF 2004-05 FS, Ex. 8 at third page (not numbered); KGF 2006-07 FS, Ex. 9 at third page (not numbered); and KEF 2006-07 FS, Ex. 10 at third page (not numbered).

**E.      Internal Documents Show That
         PricewaterhouseCoopers' Audit Violated GAAS**

158.    Kingate Global and Kingate Euro were not the only Madoff feeder funds audited

by the "worldwide members of the PricewaterhouseCoopers organization."  Plaintiffs are aware

of at least seven additional feeder funds audited by such PricewaterhouseCoopers member

organizations with more than $16 billion purportedly held by Madoff in 2007.

| Madoff Feeder Funds Audited By PwC | Assets Under Management - 2007[29] |
|---|---|
| Fairfield Sentry (includes Fairfield Lambda & Sigma) | $ 7,277,386,000 |
| Greenwich Sentry, LP | $ 262,531,000 |
| Kingate Global, Ltd. | $ 2,754,291,825 |
| Kingate Euro Fund, Ltd. | $ 633,934,973 |
| Optimal Strategic US Equity, Ltd. | $ 2,770,250,674 |
| Thema International Fund, PLC | $ 1,447,688,803 |
| Zeus Partners, Ltd. | $ 300,000,000 |
| Defender Fund Ltd. | $ 312,282,024 |
| Plaza Investments International Ltd. | $ 657,241,006 |
| **Total** | **$16,415,606,305** |

159.    According to Madoff's form ADV publicly filed with the SEC on January 7,

2008, BMIS represented that its assets under management totaled $17,091,640,696.  Feeder

---

[29]    Assets under management is the amount that Madoff reported to the feeder funds.  This amount thus
reflects the fictitious appreciation of the total cash invested.  For Kingate Global, for example, while the total cash
invested by Kingate Global between 1994 and 2008 was $963.45 million (*infra* ¶ 68), Madoff reported assets under
management of $2,754,291,825 as of the end of 2007.

funds audited by PricewaterhouseCoopers member organizations had assets under management at the end of 2007 of $16.415 billion – or about 96% of BMIS' supposed entire Investment Advisory business. Accordingly, the audits of Madoff's feeder funds by the PricewaterhouseCoopers member organizations provided them with a unique ability and opportunity to verify information about BMIS. That information, particularly in the aggregate, should have raised significant suspicions about Madoff.

160. These suspicions also should have been obvious because PwC Bermuda coordinated the PricewaterhouseCoopers member firms' audits of the feeder funds and visits to Madoff's offices on a global basis. Starting at least as early as 2004, PwC Bermuda and PwC U.S. conducted procedures on Madoff which were then communicated in written form to the various PricewaterhouseCoopers member organizations. These procedures on Madoff were conducted at least twice, in December 2004 and again in December 2006.[30]

161. The procedures conducted in December 2004 are the subject of a letter from PwC Rotterdam ("PwC Netherlands"), dated March 15, 2005, to another feeder fund (Fairfield Greenwich Advisors, LLC ("Fairfield Greenwich")). ("PwC Netherlands Letter," Ex. 12). The letter discloses PwC Bermuda's involvement in meeting with Madoff. In relevant part, the letter states as follows:

> In our previous conference call, we have informed you about the fact that PwC Bermuda had a meeting in December 2004 with Bernard L. Madoff Investments Securities LLC (hereinafter 'BLM') in order to obtain and/or update PwC's understanding of the procedures in place at BLM. PwC Bermuda has shared with PwC Rotterdam their procedures program, notes of meeting and conclusions for the purpose of our audit of Fairfield Sentry Limited.

---

[30] The December 2006 meeting is confirmed by Madoff's Calendar which reflects an entry for Linda McGowan from PwC U.S. on December 4, 2006. The copy of Madoff's Calendar obtained by Plaintiffs does not include any records prior to 2005.

* * *

> The procedures performed by PwC Bermuda were only directed towards obtaining an understanding of certain procedures and organisation aspects of BLM for **the purpose of gaining comfort thereon for the audits by several PwC offices of a number of funds having moneys managed by BLM.**

(PwC Netherlands Letter, Ex. 12 at 1).

162.    The letter also included an appendix entitled, "Summary of procedures performed at BLM."  (PwC Netherlands Letter, Ex. 12 at 3).  The appendix stated that "[b]y means of an interview with [Madoff], the following controls and procedures were discussed. . . ."  GAAS, however, is clear that discussions alone do not suffice to provide appropriate audit evidence.

163.    PricewaterhouseCoopers blindly accepted, and never confirmed, verified, or independently ascertained, any of the information provided by Madoff.  Particularly with respect to sub-custodians, the PwC Netherlands Letter further explained that according to Madoff "there [were] agreements with other US custodians."  (*Id.* at 5).  PricewaterhouseCoopers never confirmed who the "other US custodians" were, and accepted all of Madoff's verbal representations at his word.

164.    PwC Bermuda and PwC U.S. issued an even more detailed report about the same meeting with Madoff in December 2004.  ("PwC 2004 Madoff Report," Ex. 13).  The PwC 2004 Madoff Report was issued to the PricewaterhouseCoopers member organization in Ireland concerning another feeder fund named Optimal Strategic U.S. Equity Ltd. SUS.   The report is on "PricewaterhouseCoopers" letterhead and labeled "Strictly Private And Confidential."  *Id.* PwC Ireland paid a fee to obtain the PwC 2004 Madoff Report.  PwC Ireland obtained a similar report for the 2006 audit.

165.    The PwC 2004 Madoff Report concerning the 2004 audit follows a similar structure to the appendix included in the PwC Netherlands letter, but provides additional

information.  For example, the attendees to the meeting with Madoff are disclosed as Linda McGowan ("McGowan") and Scott-Watson Brown ("Brown").  McGowan is a partner at PwC U.S., and based in PwC U.S.'s office in New York City at 300 Madison Avenue – about ten blocks from Madoff's offices in the Lipstick Building.  Brown was a partner at PwC Bermuda, based in Hamilton, Bermuda.  Brown's phone number in Bermuda appeared in Madoff's personal Office Telephone Directory next to "PricewaterhouseCoopers."

166.    Although the report purports to "document" BMIS' management "procedures," the conclusions contained therein are based exclusively on McGowan and Brown's interview with Madoff himself, and his own self-serving representations.  Neither McGowan nor Brown made any attempt to verify, document, or confirm with evidentiary materials any of Madoff's statements.  Instead, McGowan and Brown simply transcribed Madoff's unsubstantiated assertions.  PwC Bermuda and PwC U.S. then, notwithstanding the cursory nature of the review and that it did not comply with GAAS, relied on that review to sign-off on the Funds' Financial Statements for that year and to issue the Funds' audit opinions.

167.    The PwC 2004 Madoff Report states that "99% of all trades [were] electronic, therefore records are updated daily and all reconciliations [were] performed daily (automated process)."  (PwC  2004 Madoff Report, Ex. 13 at 1).  Yet, KML and Tremont received all trade confirmations in paper format with a considerable time lag that allowed Madoff to fabricate the trades.  Indeed, the paper records did not include time stamps for each trade nor individualized prices.  Instead, the paper confirmation tickets only reflected average prices for the day.  This inconsistency between the fact that virtually all of Madoff's purported trades were electronic and the fact that all trade information from Madoff was sent in paper format, days later, was irreconcilable.  Accordingly, PricewaterhouseCoopers' inability to obtain electronic

confirmations, and its reliance only on paper confirmations received by KML and Tremont, should have raised significant questions regarding the assets claimed on the Funds' financial statements.

168. The exclusive production of paper confirmations was at odds with Madoff's supposedly high-tech, electronic trade execution – at least as understood by Pricewaterhouse-Coopers. The PwC 2004 Madoff Report explained that Madoff's operation was highly automated and relied on sophisticated computer models and systems:

> **Trades are initiated by the system without trader intervention** and routed in accordance with the firms [sic] routing priority. Trades are bunch[ed] but the system maintains detail by account, which upon **electronic confirmation of execution is automatically posted to each individual account** in accordance with the original trade break out. Bunched trades are allocated on a prorate[d] basis. Performance is the same across all funds/accounts for which this strategy is employed. Madoff receives 4 cents a share mark up on all trades. **The system chooses the trades** by generally using 35 of the S&P 100 stocks and hedges the positions with S&P options. . . . The parameters of the strategy require the correlation to be in the 90's. Based on the **models** matrix, positions are adjusted as correlative factors dictate. If the **model** determines that there is not a current factor conducive to positioning, the cash will be invested in US Treasury securities. The **model** runs on a dynamic basis and is adjusted periodically as market conditions dictate.

("PwC 2004 Madoff Report," Ex. 13 at 2).

169. Because PwC Bermuda and PwC U.S. could have only reviewed paper copies of the trades purportedly executed for and sent to the Funds, PwC Bermuda and PwC U.S. never confirmed that the electronic trading for the Funds' assets in fact occurred.

170. Also according to the PwC 2004 Madoff Report, "all securities are segregated in accordance with US brokerage rules (primarily at DTC for equities and **BONY for governments, GSCC clears governments**)." (PwC 2004 Madoff Report, Ex. 13 at 4; emphasis supplied). The phrase, "BONY for governments, GSCC clears governments" meant that BONY

(the Bank of New York) held the government securities, or U.S. Treasury bills, and that GSCC

(Government Securities Clearing Corporation) was the clearing agent for the purchase and sales

of U.S. Treasury bills.  The U.S. Treasury bills were purportedly held at BONY and cleared

through GSCC because Madoff was not an authorized broker-dealer for government securities,

only for equity securities.  FINRA's 2008 report on BMIS specifically stated that BMIS was a

broker dealer, but not a "government securities broker or dealer."  (FINRA BrokerCheck Report

– BMIS, Ex. 14 at 6).

171.    The PricewaterhouseCoopers audit opinions, however, all said that "Madoff

act[ed] as the [Fund's] broker-dealer for all equity, **US Treasury** and option transactions."[31]

This was false and contradicted by FINRA's 2008 report.

172.    The PricewaterhouseCoopers audit opinions were also false because, for example,

with respect to Kingate Global, the 2007 opinion represented that $2.60 billion was held in U.S.

Treasury bills as of December 31, 2007.  In fact, every year-end and every financial statement

audited by PricewaterhouseCoopers reflected that virtually all the assets were being supposedly

held in U.S. Treasury bills, and the rest in cash.  Yet, PricewaterhouseCoopers never confirmed

that the U.S. Treasury bills that were reflected on the Funds' financial statements – in which the

Funds' assets were purportedly invested when not invested in the split-strike conversion strategy

– actually existed.

173.    Indeed, PricewaterhouseCoopers failed to check to make sure that these assets –

the U.S. Treasury bills – existed every single year it conducted its audits.  Yet, the assertion that

the assets existed and that the Funds' monies were safe because they were being held in U.S.

---

[31]   KGF 2004-05 FS, Ex. 8 at 3; KGF 2006-07 FS, Ex. 9 at 3; and KEF 2006-07 FS, Ex. 10 at 3.

Treasury bills was the critical assertion of the financial statements and of Pricewaterhouse-Coopers' audit opinion.

174.    The PwC 2004 Madoff Report also indicated that "all securities [were] segregated in accordance with US brokerage rules (primarily at DTC for equities)."  ("PwC 2004 Madoff Report," Ex. 13 at 4).  PricewaterhouseCoopers never confirmed that there existed a "segregated" account at DTC for the benefit of the Funds.

175.    PricewaterhouseCoopers further failed to obtain confirmations from yet another critical set of third parties:  Madoff's supposed trading counterparties.  PricewaterhouseCoopers knew that the counterparties to the put options supposedly purchased by Madoff were critical and questioned Madoff on this point during the December 2004 meeting.  The PwC 2004 Madoff Report states that, according to Madoff, "all options [were] traded [over-the-counter], but use same expiration date as listed index options; Madoff uses various, numerous counterparties." ("PwC  Madoff Report," Ex. 13 at 7).

176.    Over-the-counter traded options meant that Madoff entered into private contracts with other market participants and that Madoff did not purchase exchange-traded options. Exchange-traded options carry no credit risk because the exchange ensures that all exchange participants are credit worthy.  In the event they are not, the exchange suffers the loss. Accordingly, PricewaterhouseCoopers knew that Madoff supposedly did not purchase any puts in an exchange, and that all its puts consisted of direct, private transactions, with considerable credit risk.

177.    The audit opinions issued by PricewaterhouseCoopers, however, falsely stated that, "[d]uring the year the [Fund] traded in **listed** and over the counter index options.  Where the [Fund] trades in **listed** options, the counter-party and guarantor is the Options Clearing

Corporation."[32]  This contradicted PricewaterhouseCoopers' own PwC 2004 Madoff Report which said that Madoff traded all options over-the-counter.

### F. PricewaterhouseCoopers Violated Its Duties To Plaintiffs And The Class

178.    As the independent party charged with certifying that it had reasonable assurance that the Funds' financial statements were free of material misstatements, Pricewaterhouse-Coopers failed to meet its obligation to the Funds' investors when it issued its audit opinions – opinions upon which it knew those parties would rely.  Had PricewaterhouseCoopers performed appropriate audits (as it represented it had), it would have learned that the securities transactions purportedly conducted by Madoff did not occur and the assets of the Funds did not exist.

179.    In addition, the audits PricewaterhouseCoopers represented it conducted, and even the limited audit work that PricewaterhouseCoopers must have conducted, would have given PricewaterhouseCoopers actual knowledge or information that it willfully ignored specifically that:

- BMIS was not audited pursuant to GAAS by a "qualified and reputable independent audit firm";

- the Kingate Defendants performed no meaningful due diligence on BMIS;

- the Kingate Defendants did not test the validity of Madoff's performance or strategy; and

- the Kingate Defendants had no process in place to verify the occurrence of the transactions purportedly made by BMIS with counterparties or other third parties, or the existence of the assets.

180.    PricewaterhouseCoopers also breached its duties as independent auditor of the Funds at least as follows:

---

[32]   KGF 2004-05 FS, Ex. 8 at 3; KGF 2006-07 FS, Ex. 9 at 4; and KEF 2006-7 FS, Ex. 10 at 4.

- PricewaterhouseCoopers failed to exercise due professional care and professional skepticism in its audit of the Funds. Specifically, PricewaterhouseCoopers failed to use professional skepticism "when considering the risk of material misstatement due to fraud;"

- PricewaterhouseCoopers failed to obtain a sufficient understanding of the Funds and their environment, including their internal controls, to assess the risk of material misstatement of the financial statements whether due to error or fraud;

- PricewaterhouseCoopers failed to obtain sufficient competent audit evidence with respect to existence of the Funds' investments through BMIS and PricewaterhouseCoopers did not perform the necessary procedures to audit the existence of the Funds' securities;

- PricewaterhouseCoopers failed to obtain an understanding of the internal controls (or lack thereof) of BMIS and did not perform the necessary procedures to audit the occurrence of the transactions which constituted the purported split-strike conversion strategy, such as confirmation with counterparties, confirmation of settled transactions, physical inspection of the securities, or performance of analytical procedures;

- PricewaterhouseCoopers failed to perform additional procedures required in situations where, as here, there was a lack of segregation of duties at a service organization. Numerous issues and risks, discussed above, indicated that Madoff was a fraud and required PricewaterhouseCoopers to investigate further and perform additional audit procedures prior to opining on the Funds' financial positions; and

- Any reliance by PricewaterhouseCoopers on the financial statements of BMIS was improper because F&H was not qualified or able to audit BMIS in accordance with GAAS.

### G.   PricewaterhouseCoopers' Substantial Assistance to Kingate Defendants' Fraud and Breaches of Fiduciary Duty

181.    In the course of PricewaterhouseCoopers' audits of the Funds, Pricewaterhouse-

Coopers knew that (i) all of the Funds' assets were managed by Madoff, (ii) Madoff was both the

investment advisor and the broker-dealer with respect to those assets, and (iii) Madoff also

served as the custodian of the assets.  PricewaterhouseCoopers thus knew that Madoff was responsible for managing, trading and holding the Funds' assets, an unusual multi-faceted role that made possible Madoff's fraudulent scheme.

182.    Nevertheless, PricewaterhouseCoopers failed to account for these risks and to conduct the audit procedures required by GAAS.  As a result, the audit opinions misrepresented the fact that PricewaterhouseCoopers had concluded the audits in compliance with GAAS and falsely stated that the Funds' financial statements reflected the true and accurate condition of the Funds.  Indeed, PricewaterhouseCoopers' failure to comply with GAAS and its own policies and procedures was so egregious that PricewaterhouseCoopers failed to detect that the purported Fund assets did not even exist.  In sum, PricewaterhouseCoopers' audits were so deficient that in reality there were no audits at all.

183.    Moreover, in the course of even an inadequate audit, PricewaterhouseCoopers must have known or willfully ignored that the Kingate Defendants did not, in fact, conduct the due diligence they falsely represented that they conducted.  PricewaterhouseCoopers further must have known or willfully ignored that the Kingate Defendants did not monitor or verify the investments purportedly made by Madoff in order to confirm that BMIS operated legitimately, using the represented investment strategy, and in accordance with the legal and regulatory requirements.

184.    In conducting its audits, PricewaterhouseCoopers was willfully blind to the Kingate Defendants' breaches of fiduciary duty and fraud, and PricewaterhouseCoopers thereby provided substantial assistance to the Kingate Defendants in that regard by providing clean audit opinions and by failing in its other duties as set forth above.

## VII.   CITI HEDGE'S WRONGFUL CONDUCT

### A.   Citi Hedge Committed To Provide Administrative Services Beyond Those Of A Typical Fund Administrator

185.   Citi Hedge and its predecessors served as the administrator of the Funds at all relevant times.  Specifically, from the inception of the Funds through 2002, the administrator was Bermuda-based Hemisphere.  In 2002, Hemisphere was acquired by BISYS Group, Inc. (BISYS's parent) and renamed BISYS Hedge Fund Services Ltd. (Bermuda).  In 2007, Citigroup acquired BISYS Group, Inc. and gave the administrator its present name, Citi Hedge.

186.   As administrator, Citi Hedge and its predecessors were subject to the Administration Agreement, as amended and restated effective June 1, 2007 (the "Administration Agreement," Ex. 15), and the Registrar Agreement, as amended and restated effective January 1, 2002.

187.   Pursuant to these agreements, one of Citi Hedge's critical responsibilities included the calculation of the Funds' NAV.

> The Administrator will determine the net asset value of the Fund's Portfolio assets attributable to the USD shares as of the close of business on the last Business Day of each calendar month.  **The Administrator verifies the prices attributed to the securities held by the USD shares of the Fund by reference to pricing sources independent of the Investment Advisor whenever reasonably possible.**[33]

188.   Citi Hedge failed to meet this commitment as it failed to verify the prices provided by Madoff in at least 185 separate instances where the prices were demonstrably false. In all instances, the information necessary for Citi Hedge to verify the prices of the securities traded by Madoff – consisting of S&P 100 stocks – was readily available through private financial information services, such as Bloomberg, as well as through the internet.  Indeed, it is

---

[33]   KGF 2008 IM, Ex. 1 at 23; KEF 2008 IM, Ex. 2 at 24; KGF 2007 IM, Ex. 3 at 23-24; KGF 2006 IM, Ex. 4 at 24; KGF 2003 IM, Ex. 5 at 24; KGF 2000 IM, Ex. 6 at 24.

unlikely that there are any prices of securities that are more readily available than the prices of S&P 100 stocks that trade in the NYSE.

189.   The Information Memoranda further explained that the NAV "is the market value of the Fund[s'] total assets, calculated as described below, less all accrued debts and liabilities. . . .  The Fund[s'] total assets include:  (i) all cash and cash equivalent, including bank deposits and interest bearing obligations; (ii) all securities positions; and (iii) all options position."[34]  Although the securities and options positions were reported and purportedly custodied by Madoff, Citi Hedge had a duty to independently verify the information.

190.   With respect to the securities and options, they were supposedly "valued at the last sale price reported on the principal securities exchange or market on which [they] traded.  In the absence of reported sales prices on the valuation date, [the securities and options] generally are valued at the last reported bid quotation."[35]

191.   Additional responsibilities of the administrator set forth in the Information Memoranda included:  (i) communicating with the Funds' shareholders; (ii) communicating with the general public; (iii) soliciting sales of the Funds' stock; (iv) accepting the subscriptions of new Shareholders; (v) maintaining the Funds' principal corporate records and books of account; (vi) disbursing payments of dividends, legal fees, accounting fees, and officers' and directors' salaries; (vii) calculating, publishing or furnishing the subscription or redemption price of the shares, (viii) conducting meetings of the Funds' shareholders and Directors; and (ix) making redemptions.[36]

---

[34]  *Id.*

[35]  *Id.*

[36]  KGF 2008 IM, Ex. 1 at 15; KEF 2008 IM, Ex. 2 at 16; KGF 2007 IM, Ex. 3 at 15; KGF 2006 IM, Ex. 4 at 15; KGF 2003 IM, Ex. 5 at 16; KGF 2000 IM, Ex. 6 at 16.

192.     For its services, Citi Hedge collected an annual fee.  From 2005 through 2007, Kingate Global paid approximately the following amounts in management fees to Citi Hedge, respectively:  $605,000; $611,000; and $666,000.[37]  Kingate Euro paid Citi Hedge approximately the following amounts in 2006 and 2007, respectively:  €132,000 and €146,118.[38]  These payments were based on the fictitious value of the Funds' assets, as calculated by Citi Hedge. As a result, Citi Hedge did not earn these fees, which should be returned to Plaintiffs and the Class.

**B.      Citi Hedge Touted Its Superior Financial Services Capabilities**

193.     Citi Hedge holds out its Funds Services division as "among the world's largest providers of Hedge Fund Administration Services."  (http://www.citibank.com/transaction services/home/securities_svcs/fund/docs/hedgefundend_end.pdf (last visited May 17, 2010)).  It asserts that "Citi has the experience, the global scale and the state-of-the-art technology to meet the comprehensive and complex needs of hedge funds and their managers today and in the years to come.  Our unmatched global presence and economy of scale create efficiencies and reduce operational costs."  (*Id.*).

194.     Citi Hedge also boasts that its hedge fund services group in Bermuda is number one.  "Bermuda is home to Citi's industry-leading offshore fund services. . . .  Ours is the most highly rated alternative fund services team here, ranked the #1 fund administrator for three straight years by Global Custodian magazine."  (http://www. citigroup.com/transactionservices/ home/region/lam/countries/bermuda.jsp (last visited May 17, 2010)).  Citi Hedge further emphasizes the many "Number One Wins" obtained by its Fund Services group, including "#1 Fund-of-Fund Administrator in North America," according to HedgeFundNet.

---

[37] KGF 2004-05 FS, Ex. 8 at fourth page (not numbered); KGF 2006-07 FS, Ex. 9 at fourth page (not numbered).

[38]   KEF 2006-07 FS Ex. 10 at fourth page (not numbered).

(http://www.citigroup.com/transactionservices/home/securities_svcs/sfsawardscampgn.jsp (last visited May 17, 2010)).

195.     Based on these accolades, Citi Hedge concludes that it has a "unique competitive advantage" largely based on the fact that it has, "the industry's largest global footprint with 53 proprietary branches"; "the strongest presence across all regions"; and the "most diversified product line in the industry."  (http://www.citigroup.com/transactionservices/home /securities_svcs/investors.jsp (last visited May 17, 2010)).

196.     In light of its supposedly unique advantages, Citi Hedge committed to provide administration services beyond those of a typical Fund administrator.  As set forth in the Administration Agreement, Citi Hedge agreed to "calculate and publish the net asset value per Share . . . and the subscription and redemption prices per Share."  (Administration Agreement, Ex. 15 at § 4.1.1).  Citi Hedge was also responsible for providing corporate secretarial services (§ 4.2), including having an employee act as corporate secretary (§ 4.2.1), and establishing and maintaining the Funds' bank accounts (§ 4.2.9).  Citi Hedge further agreed to the preparation of draft financial statements for the auditors (§ 4.3.4), maintenance of the books and records (§ 4.3.1), and to the reconciliation of accounting issues with the Funds' Directors, auditors, and legal counsel (§ 4.3.3).

197.     Moreover, Citi Hedge was to serve as the Funds' agent with the general public, and was specifically responsible for communications with investors,[39] and communicated directly with Plaintiffs and members of the Class.  In fact, Plaintiffs sent their subscription documents directly to Citi Hedge, sent monies for investments to Citi Hedge, and received investment confirmations from Citi Hedge.

---

[39] KGF 2008 IM, Ex. 1 at 15; KEF 2008 IM, Ex. 2 at 16; KGF 2007 IM, Ex. 3 at 15; KGF 2006 IM, Ex. 4 at 15; KGF 2003 IM, Ex. 5 at 16; KGF 2000 IM, Ex. 6 at 16.

C.       **Citi Hedge Owed Duties To Plaintiffs And The Class**

198.     Citi Hedge was a fiduciary to Plaintiffs and the Class, and owed Plaintiffs and the Class a duty of due care in the performance of the financial services it provided.  Citi Hedge had significant discretionary responsibilities that went beyond that of a typical fund administrator. Citi Hedge was aware that potential and current investors knew that Citi Hedge was providing significant financial services to the Funds, and were relying on Citi Hedge in making their investment decisions.  Citi Hedge was aware that its involvement in the Funds lent significant credibility to the Funds, and provided potential and current investors with assurance about the quality of financial services provided to the Funds and the accuracy of the reported values of the Funds and the investors' individual accounts.  Citi Hedge knowingly placed its imprimatur on the Funds.

199.     As fully intended by Citi Hedge, Plaintiffs and the Class reposed their trust and confidence in Citi Hedge, which occupied a superior position, to provide these financial services, when Plaintiffs and the Class made their initial investment in the Funds, re-invested in the Funds, and retained those investments in the Funds.

200.     The NAV, which was to be independently calculated and reported by Citi Hedge, was critical to Plaintiffs' and the Class' initial investment decisions, decisions to invest additional funds, and decisions to maintain the investments over time.  The number of shares that Plaintiffs received in exchange for their investment amounts depended on Citi Hedge's NAV calculations.  Plaintiffs' and the Class' subsequent reported profits also turned on Citi Hedge's calculations.  Accordingly, Plaintiffs and the Class necessarily relied on Citi Hedge's NAV calculations.  Their initial and subsequent investments were sent directly to Citi Hedge.

**D.     Citi Hedge's Performance Of Its Duties Was Grossly Deficient**

201.    Citi Hedge was grossly deficient in the fulfillment of its duties to Plaintiffs.  Citi

Hedge utterly failed to take reasonable steps to fulfill its duties as administrator.  For instance, in

contravention of its commitments set forth in the Information Memoranda, Citi Hedge failed to

take reasonable, industry-standard steps to calculate the Funds' NAV; to independently confirm

and verify the pricing information provided by Madoff; to reconcile balances at BMIS; to

reconcile information provided by Madoff as the Funds' prime broker with information provided

by KML and Tremont; to prepare the monthly financial statements in accordance with GAAP; or

to relay accurate information to investors.

202.    Instead, Citi Hedge blindly and recklessly relied on information provided by

Madoff to calculate and disseminate the Funds' NAV, and to perform its duties, even though that

information was manifestly incorrect and should not have been relied on.  Citi Hedge agreed to

utilize independent pricing services in order to calculate the Funds' NAV, but Citi Hedge failed

to perform its obligation to independently verify the pricing information provided by Madoff.

203.    Citi Hedge also should not have relied on the information provided by Madoff

because the roles of the investment manager, custodian, and trade execution agent were

consolidated in Madoff, thus dramatically increasing the risk of fraud, and the need for

independent verification and scrutiny, as Citi Hedge well knew.  Furthermore, as alleged above,

the profits generated by Madoff were virtually impossible to achieve.  Moreover, numerous

questions and risks surrounding Madoff's operations and purported results should have caused

Citi Hedge to increase its scrutiny of the information provided, and seek independent

verification.

204.    If Citi Hedge had not breached its duties as set forth above, Plaintiffs and the

Class would not have invested in the Funds, or retained their investments in the Funds.  Plaintiffs

and the Class could have redeemed their investments and recovered their principal at any time during the many years in which the Funds were making redemptions, prior to the revelation of Madoff's fraud in December 2008.

E.     **Citi Hedge Provided Substantial Assistance To The Kingate Defendants' Fraud And Breaches Of Fiduciary Duty**

205.    Citi Hedge knowingly provided substantial assistance to the Kingate Defendants in the fraud and breaches of fiduciary duty that they perpetrated on investors.  By virtue of Citi Hedge's long-standing involvement in the Funds, and its experience in fund management, Citi Hedge knew or was willfully blind to the fact that the due diligence and risk controls employed by the Kingate Defendants were grossly deficient.  Citi Hedge further knew that the Kingate Defendants uniformly represented to Plaintiffs and the Class that they employed thorough due diligence, monitoring and oversight of Fund managers, including Madoff, and strict risk controls – representations which Citi Hedge knew to be false or to the falsity of which it was willfully blind.

206.    Rather than alerting investors to these problems, Citi Hedge provided substantial assistance to the Kingate Defendants.  For example, Citi Hedge assisted the Kingate Defendants by receiving investments from Plaintiffs and the Class and transferring their funds to BMIS; sending Plaintiffs investment confirmations; calculating the Funds' NAV and disseminating the false NAV values; receiving and transmitting other Fund information from the Kingate Defendants to Plaintiffs; allowing Citi Hedge's name and the services it was ostensibly providing to be included in the Funds' placement memoranda and other documents; and recording the securities Madoff said he was holding.  The Kingate Defendants could not have perpetrated their fraud and breaches of fiduciary duty without this substantial assistance by Citi Hedge.  If Citi Hedge had refused to fulfill the instructions of the Kingate Defendants or rely on the information

they transmitted, as it had a right to do, or alerted investors to the conduct of the Kingate

Defendants, Plaintiffs' and the Class' investment would have been saved.

## VIII.   THE TREMONT GROUP

### A.   The Tremont Group Had Deep Ties With Madoff Based On Its Management Of At Least Five Other Madoff Feeder Funds

207.    The Tremont Group was the parent company of the Funds' manager, Tremont.

The Tremont Group had extensive ties with Madoff based on its management of at least five

other feeder funds with over $3 billion invested by December 2008.  These feeder funds were

commonly referred to as the "Rye Funds," after Rye, New York, where the Tremont Group was

based.  The Rye Funds included:  (i) Rye Select Broad Market Fund LP; (ii) Rye Select Broad

Market Prime Fund LP; (iii) Rye Select Broad Market XL Fund LP; (iv) Rye Select Broad

Market Portfolio Limited; and (v) Rye Select Broad Market XL Portfolio Limited.

208.    These funds were managed and controlled by the Tremont Group through its

subsidiaries.  For example, the Rye Select Broad Market Portfolio Limited was managed by

Tremont, the Co-Manager of the Kingate Global and Kingate Euro funds.  Many of the other

funds were managed by Rye Investment Management, which was a division of the Tremont

Group.

209.    The Tremont Group had so many Madoff feeder funds because of Madoff's long-

standing relationship with the founder of the Tremont Group, Defendant Manzke.  Manzke had

first started investing and working with Madoff shortly after forming the Tremont Group (then

known as Tremont Advisers) in 1984.  These deep ties to Madoff were cryptically acknowledged

in the Tremont Group's public filings.  For example, the Form 10-K SB filed with the SEC in

March 2001 stated that many of its funds were designed "to provide clients with vehicles for

investments with 'hard-to-access' managers."  Madoff was the most prominent of these "hard-to-access" managers.

### B.      The Tremont Group Had A Special Relationship With Madoff

210.    The Tremont Group's special relationship with Madoff is also evident from documents made public in connection with the acquisition of the Tremont Group by Oppenheimer.  In 2001, Oppenheimer acquired the Tremont Group for $145 million.  The acquisition was described in detail in the Schedule 14A Proxy Statement filed with the SEC by the Tremont Group on August 20, 2001 (the "Proxy Statement").  According to the Proxy Statement, in early March 2001, Oppenheimer approached the Tremont Group's financial advisor, Putnam Lovell Securities, Inc. ("Putnam Lovell"), and expressed "an interest in exploring a strategic transaction with Tremont."

211.    Tremont Group's relationship with Madoff became a critical selling point to Oppenheimer.  In fact, during the negotiations, Putnam Lovell provided Oppenheimer with an information package it had prepared about the Tremont Group.  The package included Putnam Lovell's "analysis of the significant contribution to Tremont's revenues from a single relationship it has with an investment manager to its proprietary products," according to the Proxy Statement.  The "single relationship" was Madoff.  Accordingly, at the very outset of the transaction, Tremont Group's close and highly lucrative relationship with Madoff was a key focus for Oppenheimer.  As O. Leonard Darling, vice chairman and chief investment officer of OppenheimerFunds, explained, the acquisition of Tremont "will enable us to enhance and expand our alternative products offering for high net worth and institutional clients alike."

212.    Oppenheimer closed the Tremont Group's acquisition on July 10, 2001.  In the press release announcing the deal, John V. Murphy ("Murphy"), OppenheimerFunds' chief executive officer, alluded to the importance of the Tremont Group's relationship with Madoff.

71

> There is growing interest among high net worth investors and institutions alike in hedge funds and other **alternative investment products that seek to provide positive returns regardless of the direction of the stock markets.**
>
> * * *
>
> Tremont's unique product offerings, in combination with our distributing network, will open the world of alternative investing to a new segment of investors.

213.    As Oppenheimer's acquisition of the Tremont Group shows, the Tremont Group had a deep and long-standing relationship with Madoff and was capable of, but failed in, discovering Madoff's fraud.

### C.    The Tremont Group Provided Substantial Assistance To Tremont's Fraud And Breach Of Fiduciary Duty

214.    The Tremont Group knowingly provided substantial assistance to Tremont in the fraud and breaches of fiduciary duty that it perpetrated on investors.  By virtue of the Tremont Group's long-standing involvement in the Rye Funds, as well as their experience in fund management, the Tremont Group knew or was willfully blind to the fact that the due diligence and risk controls employed by Tremont were grossly deficient.  The Tremont Group further knew that Tremont uniformly represented to Plaintiffs and the Class that it employed thorough due diligence, monitoring and oversight of Madoff, and strict risk controls – representations which the Tremont Group knew to be false or to the falsity of which it was willfully blind. Rather than alerting investors to these problems, the Tremont Group provided substantial assistance to Tremont by helping to conceal its breach of fiduciary duty and by failing to act when required to do so in the face of that breach.

IX.    **HAD DEFENDANTS MONITORED AND EVALUATED MADOFF AS REPRESENTED IN THE INFORMATION MEMORANDA, DEFENDANTS WOULD HAVE DISCOVERED MADOFF'S PONZI SCHEME**

A.    **Madoff's Custody Of Equity Securities**

215.    Defendants knew that Madoff failed to trade through an independent broker and, instead, self-cleared all trading activities through his wholly-owned company, BMIS. Defendants also knew that Madoff served as his own custodian for the Funds' assets, even though this greatly increased the risk of self-dealing and of Madoff perpetrating a Ponzi scheme. Had Defendants conducted any monitoring or evaluation of Madoff's purported self-clearing and custodian functions, they would have uncovered the fraud.

B.    **Madoff's Non-Existent Counterparties**

216.    Madoff refused to identify the counterparties with whom he purportedly traded options in over-the-counter, off-exchange transactions when executing the split-strike conversion strategy.  Alternatively, if Madoff did identify them, Defendants failed to learn that Madoff had never traded with any of them.  Had Defendants monitored or evaluated Madoff's purported counterparties, they would have uncovered the fraud.

C.    **The Government Securities Purportedly Held At The End Of Each Year Did Not Exist**

217.    Madoff claimed that he held all assets, one-hundred percent, in government securities at the end of every year.  While a possible coincidence, it is extremely suspicious that not one, single year-end coincided with an opportune time to be invested in the split-strike conversion strategy.  Defendants, however, never determined whether Madoff actually converted all of his holdings into government securities each year.  Madoff also claimed that the government securities were cleared through GSCC and held by BONY.  Had Defendants

contacted GSCC or BONY and sought to confirm the existence of the government securities
(which in fact did not exist), they would have uncovered the fraud.

### D. Madoff's Unknown Auditing Firm

218.    Defendants knew that Madoff supposedly used F&H, an unknown accounting
firm that was plainly unequipped to audit a company of BMIS' purported size.  F&H had only
three employees – a retired partner living in Florida, a secretary, and one active certified public
accountant.  While F&H was a member of the AICPA, it had not been the subject of a peer
review since 1993 – which is a membership requirement – because F&H represented to the
AICPA, in writing, that it did not conduct any audits.  Had Defendants conducted minimal due
diligence into Madoff's auditors, they would have uncovered the fraud.

### E. Madoff's Paper Trading Records

219.    Madoff claimed that BMIS was technologically advanced, and that BMIS had a
world-class trading floor.  Yet, Madoff reported his trades to Defendants using only paper
confirmation forms which did not include the exact time of the trade nor the exact price of each
trade.  Instead, the paper confirmations only provided average prices for the transactions that had
supposedly been executed each day.  The delayed paper confirmations are patently susceptible to
manipulation.  Had Defendants conducted any due diligence into Madoff's paper trading records
and verified whether the trades had been executed, they would have uncovered the fraud.

### F. Madoff's Consistent Returns

220.    Madoff reported extraordinarily consistent results purportedly by executing a
split-strike conversion strategy.  However, while the split-strike conversion strategy can dampen
volatility, it cannot produce gains in a declining market.  Had Defendants conducted any
investigation into Madoff's positive results when the market declined, they would have
uncovered the fraud.

### G.      Madoff's Fee Structure

221.     Madoff's fee structure was extremely unusual and perhaps unique.  A typical investment firm like BMIS charged two percent of assets annually, plus twenty percent of profits.  "Two-twenty," as this arrangement is commonly referred to, is the industry standard. On the Funds' investment of approximately $2.5 billion with Madoff in 2008, a "two-twenty" fee arrangement would have entitled Madoff to an annual $75 million fee, assuming a low five percent annual return.  Madoff did not charge any such fees and effectively relinquished tens of millions of dollars every year.  There was no explanation for this apparent "generosity."

222.     Instead, Madoff supposedly charged a commission per trade.  PwC U.S. and PwC Bermuda reported to PwC Ireland that Madoff supposedly charged four cents a share on each trade.  But if Madoff was not charging for results, as a "two-twenty" fee structure does, and charged only for trading, Madoff had an incentive to churn the account.  Had Defendants conducted any due diligence into Madoff's fees per trade, they would have uncovered the fraud.

### X.      THE COURT HAS SUBJECT MATTER JURISDICTION PURSUANT TO THE EXCHANGE ACT

#### A.      The Foreign Defendants Purposefully Availed Themselves Of The Benefits Of Having The Funds Invest In The United States; It Was Foreseeable That Defendants Would Be Haled Into Court In The United States

223.     The IMs explained that the Funds' assets were to be exclusively and entirely invested with and controlled by BMIS, a "New York based NASD registered broker-dealer." KGF 2006 IM, Ex. 4 at 14.  The IMs further explained that BMIS "invests primarily in the United States" through a "split-strike conversion" strategy that entails purchasing a basket of stocks listed on U.S. exchanges, selling call options based on a U.S. stock index (typically the Standard & Poor's 100 Index ("S&P 100"), and purchasing put options also based on the S&P 100.  *Id*. at 2.  The Funds also were permitted to hold cash or cash equivalents, including

"obligations of the United States Government, its agencies or instrumentalities, commercial paper, and certificates of deposit and bankers' acceptances issued by United States banks that are members of the Federal Deposit Insurance Corporation."  *Id*. at 3.  The Funds' assets were held in the United States, as BMIS had actual custody of the assets.  *Id*. at 9.  The Funds' legal counsel is based in New York.  *Id*.  Finally, the Funds were required to "comply with various legal requirements, including requirements imposed by the federal securities laws, tax laws and pension laws."  *Id*.

224.    Plaintiffs' sole purpose of investing in the Funds was to invest in the United States and in United States equities that are part of the S&P 100.

225.    The Foreign Defendants knew that the Funds' sole objective was to be invested with Madoff and BMIS in New York.  All significant conduct (including trading and purported due diligence on Madoff and BMIS) was supposed to take place in New York.  The Foreign Defendants, as well as Plaintiffs and the Class, all understood that the Funds were run by a broker-dealer in New York.  The IMs explicitly stated that KML did not "have any control over the investment and trading decisions of the Investment Advisor [BMIS]."  *Id.* at 5.  Having agreed to turn over all investment decisions and ascribed to the "split strike conversion strategy," the Foreign Defendants accepted that all trading and investment decisions for the Funds would be directed by BMIS in New York.  *Id.* at 14.

226.    Further, in creating funds whose sole objectives were to invest in the United States, the Foreign Defendants took advantage of the exemplary reputation of the laws and securities markets of the United States as being the best regulated and most efficient markets in the world.  Having benefited from the advantages of the United States, the Foreign Defendants

cannot seek now to disavow the concomitant obligations which include being subject to the laws of the United States.

227.    Accordingly, all Foreign Defendants availed themselves of the benefits and privileges of investing in the United States, pursuant to its laws and regulations.  It was foreseeable that, having chosen to operate investment funds that were invested in United States securities by a United States-based investment advisor, all Foreign Defendants would be haled into court in the United States.

**B.    The Conduct And Effects Tests**

**1.    The Conduct of Defendants KML, FIM Limited, FIM Advisers, and Grosso in the United States Was More Than Merely Preparatory, and the Culpable Failures to Act Within the United States Directly Caused the Losses**

228.    Pursuant to a Consulting Services Agreement dated August 1, 2005, FIM Advisers rendered consulting advice and services to KML with respect to the Funds' investment, operational, administrative, marketing, accounting, and legal matters.  Accordingly, FIM Advisers was KML's agent.

229.    FIM Advisers and FIM Limited had a presence in the United States through their U.S. affiliate, FIM USA.  FIM USA had key employees based in New York, including employees specifically dedicated to due diligence of funds investing in the United States, such as Kingate Global and Kingate Euro.  At least the following employees were based in New York: (a) Scott Dragoo; (b) Brendan Robertson; (c) Michael Dziegielewski; (d) Jonathan Krause; (e) Eric Lazear; and (f) Brian Clegg.

230.    Grosso met repeatedly with Madoff in New York.

231.    Accordingly, FIM Advisers, FIM Limited and Grosso conducted and/or failed to conduct the requisite due diligence in New York with respect to Madoff.  The due diligence

conducted in New York did not meet the adequate standard of care and, thus, (i) constituted conduct that was more than merely preparatory to the wrongdoing, and (ii) directly caused the losses.

### 2. PwC Bermuda Had Substantial Conduct in the United States that Was More Than Merely Preparatory and Directly Caused The Losses

232.    The conduct of PwC Bermuda in the United States represented the centerpiece and fundamental aspect of the wrongful conduct at the heart of the claims against PricewaterhouseCoopers.  PwC Bermuda held repeated meetings with Madoff in New York which served as the central basis for the faulty audits.  Specifically:

(a)    at least one PwC Bermuda partner met with Madoff at his offices in New York in December 2004 and December 2006;

(b)    PwC Bermuda obtained critical documents in the United States necessary for PricewaterhouseCoopers to issue an audit opinion, including, (i) the PwC Madoff Report for 2004, (ii) a similar report to the PwC Madoff Report in 2006, (iii) a copy of F&H's Independent Auditor's Report on Internal Control for Madoff pursuant to SEC Rule 17a-5(g)(1), received in connection with the 2004, 2006, and 2007 audits, (iv) a copy of Madoff's Statement of Financial Condition, with an Independent Auditor's Report on Internal Control for Madoff from F&H, received in connection with the 2006 and 2007 audits, and (v) a FINRA BrokerCheck report for the 2004 and 2006 audits.

### 3. Effects Test:  the Foreign Defendants' Conduct Had a Substantial Effect in the United States

233.    Madoff's Ponzi scheme caused investors to believe they had approximately $65 billion in assets when in reality those assets did not exist.  Billions of dollars of these fictitious assets caused substantial harm to thousands of United States citizens whose supposed wealth

evaporated overnight.  This wealth had served to collateralize investments and assets of thousands of United States citizens who had to liquidate these assets and suffered real losses.

234.    The Foreign Defendants' wrongful conduct permitted Madoff to perpetuate the Ponzi scheme.  The nature of a Ponzi scheme required that Madoff use the funds from new investors to pay old ones.  The Funds provided Madoff with billions of dollars to continue the Ponzi scheme.  But for the billions of dollars that the Funds gave to Madoff, the scheme would have unraveled substantially earlier and not damaged thousands of United States citizens.  Similarly, but for the withdrawal of hundreds of millions of dollars from Madoff in the later years of the Ponzi scheme which were effectively taken from United States citizens, substantially fewer United States citizens would have been harmed by Madoff's Ponzi scheme.

235.    The effect of the feeder funds in perpetuating Madoff's Ponzi scheme has been widely reported in the press.  According to *The Wall Street Journal*'s article, "Mad Men," published on January 7, 2009, "[f]eeder funds appear to explain . . . the longevity of money manager Bernie Madoff."  Other news agencies issued similar reports, including:

(a)    *Time Magazine* published an article entitled, "How Madoff's Feeder Funds Stole My Retirement," which stated that, "Bernard Madoff built his $65 billion Ponzi empire at least half on the backs of his feeder funds."[40]  The feeder funds allowed Madoff "to keep his house of cards standing much longer than he otherwise could have with his ragtag band of family members, small time accountants."  *Id*.; and

---

[40]    Time, April 5, 2009, *How Madoff's Feeder Funds Stole My Retirement*.

(b)      *The New York Times* published an article entitled, "In Fraud Case, Middlemen in Spotlight," which reported that the feeder funds "were essentially pouring billions of dollars each into Bernard L. Madoff Investment Securities."[41]

236.      Madoff's Ponzi scheme had additional substantial and direct effects on U.S. citizens:

(a)      It is estimated that the Internal Revenue Service ("IRS") will lose up to $17 billion in lost tax revenue.  In some instances, the IRS may have to refund filers who paid taxes on fictitious gains from Madoff.  Individual states may also lose substantial tax revenue due to Madoff; [42]

(b)      The effect of Madoff on U.S. charities and their respective beneficiaries is substantial and well-documented.  The collateral effect of Madoff's Ponzi scheme has sent "shock waves throughout the medical and scientific communities – with far-reaching implications for everything from diabetes research to palliative care.  Philanthropy experts say that **the negative effect of the Madoff scandal on health care could ultimately affect millions of people**."[43]  As a result, "hospitals, food banks, schools and community outreach programs throughout the world are being forced to cut life-giving services as they watch millions of dollars in grants from large Jewish charities dry up in the wake of Bernard Madoff's alleged $50 billion Ponzi scheme."[44]

---

[41]   The New York Times, December 17, 2008, *In Fraud Case, Middlemen in Spotlight*.

[42]   Huffington Post, December 18, 2008, *Madoff's Ponzi Scheme Could Cost IRS $17 Billion In Lost Tax Revenue*.

[43]   The Wall Street Journal, February 12, 2009, *Madoff Scandal's Deep Impact on Funding For Health, Science*.

[44]   Fox News online report, December 18, 2008, *Long Tentacle of Madoff's Scheme Impacting Life-Giving Programs*.

(c)      The insurance industry has reported that it will be affected by Madoff's scheme in the "range of direct insured losses . . . between $760 million and $3.8 billion . . . with the maximum potential exposed insurance limits at more than $6 billion."[45]

(d)      United States banks have also been affected by Madoff, including lending institutions, like Wells Fargo, who recently recorded losses of $294 million related to customers who were unable to pay their mortgages because they were wiped out by Madoff.[46]  Similarly, hedge funds have seen substantial redemptions:  "The Madoff scandal has contributed to redemptions that could shrink the hedge fund industry by half, to $1 trillion, by the end of the year"[47]; and

(e)      Investors who suffered enormous losses at the hands of Madoff included "pensioners, municipal workers, students on scholarship, and middle class Americans, not just wealthy investors."[48]

237.      Accordingly, the Foreign Defendants' wrongful conduct had a substantial effect in the United States and upon United States citizens.

## XI.   CLASS ACTION ALLEGATIONS

238.      This action is brought as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of all shareholders in Kingate Global and Kingate Euro as of December 10, 2008 (the "Class").  Excluded from the Class are the Defendants herein, and any entity in which any Defendant has a controlling interest, and the officers, directors, affiliates, legal representatives, immediate family members, heirs, successors, subsidiaries, and/or assigns of any such individual or entity.

---

[45]  Medill Reports, January 15, 2009, *Aon Estimates Madoff's Alleged Ponzi Scheme Could Cost Insurers Billions*.
[46]  New York Times, January 28, 2009, *Wells Fargo Says Madoff Scheme Cost It $294 Million*.
[47]  Reuters, March 27, 2008, *Hedge Fund Industry Still Feeling Madoff Effect*.
[48]  Newsweek, December, 17, 2008, *Did Bernie Madoff Steal Your Money?*

239.    Plaintiffs will fairly and adequately protect the interests of the members of the

Class.  Plaintiffs are members of the Class, their claims are typical, and they do not have interests

antagonistic to, or in conflict with, those of the Class.  Plaintiffs have also retained competent

counsel experienced in class action litigation.

240.    The Class satisfies the requirements of Rules 23(a) and 23(b)(3) of the Federal

Rules of Civil Procedure:

(a)    *Numerosity* - During the Class Period, shares in the Funds were sold to

thousands of investors.  The membership of the Class is so numerous as to render joinder of all

Class members impracticable.  While the exact number of Class members is unknown to

Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs

believe that Class members number in the thousands.

(b)    *Typicality* - The losses suffered by the named Plaintiffs were caused by the

same events, patterns of practice, and wrongful courses of conduct that give rise to the claims of

the other members of the Class.  The named Plaintiffs are members of the Class and the losses to

the named Plaintiffs are based on the same legal theories.

(c)    *Common Questions* - There are numerous questions of law and fact which

are common to the Class and which predominate over any questions affecting individual

members, including:

> (i)    whether Defendants made false statements regarding Madoff's
> operations, the investment strategy for the Funds, and historical
> results achieved by the Funds;

> (ii)    whether Defendants falsely misrepresented, *inter alia*:  the
> investment services that would be provided by them; the extent and
> quality of the due diligence, ongoing risk monitoring, and
> transaction verification that they performed and would perform on
> Madoff and BMIS; the transparency to Madoff and BMIS; the
> split-strike conversion method ostensibly used by Madoff and

BMIS; each Funds' appreciation; and BMIS' qualifications to serve as custodian of the Funds' assets;

(iii)    whether Defendants' false statements were negligent misrepresentations;

(iv)    whether Defendants breached their fiduciary and other duties to Plaintiffs;

(v)    whether and to what extent Plaintiffs were damaged by Defendants' misrepresentations and breaches of fiduciary duty;

(vi)    whether Defendants were grossly negligent in:

    (A)    failing to perform adequate due diligence before selecting BMIS as each Fund's investment advisor and broker-dealer for the purported split-strike conversion strategy, and before allowing BMIS to serve as actual custodian of the Funds' assets;

    (B)    failing to monitor Madoff and BMIS on any ongoing basis and to any reasonable degree;

    (C)    failing to take adequate steps to confirm BMIS' purported account statements, transactions, and holdings of each Fund's assets; and

(vii)    Whether Plaintiffs are entitled to the imposition of a constructive trust on all monies and other property in the possession of the Defendants which derive from their compensation in the form of management and performance and other fees based on fraudulent Madoff investments.

(d)    *Adequate Representation* - The representative Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs have retained experienced counsel qualified in class action litigation who are competent to assert the interests of the Class.

(e)    *Superiority* - A class action is superior to other available methods for the fair and efficient adjudication of this controversy since a multiplicity of actions could result in an unwarranted burden on the judicial system and could create the possibility of inconsistent judgments.  Moreover, a class action will allow redress for many persons whose claims would

otherwise be too small to litigate individually.  There will be no difficulty in the management of this action as a class action.

## COUNT 1

### Fraud Against The Kingate Fraud Claim Defendants
### (Purchaser Claims)

241.    Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.

242.    The Kingate Fraud Claim Defendants falsely represented to Plaintiffs and the Class in connection with their purchase of shares and/or equity interests in the Funds that:  (i) the Funds would invest in a legitimate investment, principally relying on the split-strike conversion strategy involving the purchase of equities and options; (ii) by using this strategy, the Funds historically had consistent profitable returns since inception; and (iii) the Kingate Fraud Claim Defendants would conduct oversight and due diligence, and monitor, verify and confirm the investments made by the Funds with Madoff to ensure that Madoff operated legitimately, using the stated investment strategy, and in accordance with the required legal and regulatory requirements.

243.    The Kingate Fraud Claim Defendants failed to disclose the following material information, among other things, which rendered their other representations false and misleading:  (i) that the Kingate Fraud Claim Defendants were not in fact engaging in customary, industry-standard, or even minimal, due diligence to verify that the Funds' assets were being properly invested and managed by Madoff, or that the assets ever existed; and (ii) the existence of numerous risks and questions regarding BMIS and Madoff including, among others, the lack of transparency into Madoff's actual operations, the lack of segregation of duties, inadequate

auditing of Madoff, and the consistently profitable returns for a fund pursuing the split-strike

conversion strategy.

244.    The Kingate Fraud Claim Defendants made these false and misleading

misrepresentations and omissions knowingly or recklessly, without regard for their truth or

falsity, and with the intent to induce Plaintiffs and the Class to rely upon them by investing assets

in the Funds.

245.    Plaintiffs and the Class justifiably relied upon the false representations made by

the Kingate Fraud Claim Defendants by investing their assets in the Funds.

246.    As a direct and proximate result of their reliance upon the false representations

and omissions of the Kingate Fraud Claim Defendants, Plaintiffs and the Class have suffered

damages, including the loss of their investments in the Funds, and the Kingate Fraud Claim

Defendants, in turn, have wrongfully taken substantial assets belonging to the Plaintiffs and the

Class in the form of improper and unearned fees.

## COUNT 2

### Fraud Against The Kingate Fraud Claim Defendants
### (Holder Claims)

247.    Plaintiffs restate and reallege each of the preceding allegations as if fully stated

herein.

248.    The Kingate Fraud Claim Defendants induced purchasers to hold their positions

in the Funds by falsely representing to Plaintiffs and the Class that:  (i) the Kingate Fraud Claim

Defendants had conducted thorough due diligence and exercised oversight of Madoff's

operations and had determined that Madoff was legitimate, utilized the split-strike conversion

strategy, and had a long track record of achieving positive investment returns; (ii) Plaintiffs' and

the Class' assets invested in the Funds operated by the Kingate Fraud Claim Defendants would,

in turn, be invested in the legitimate funds operated by Madoff that utilized such strategy; (iii) the Kingate Fraud Claim Defendants would monitor the investments made with Madoff to confirm that the Funds were operated legitimately, using the split-strike conversion strategy, and in accordance with all legal and regulatory strictures; (iv) the Kingate Fraud Claim Defendants would verify the transactions, including that Madoff actually made the represented trades and held the represented assets; (v) the due diligence and oversight process employed by the Kingate Fraud Claim Defendants was so thorough as to be privileged in providing full transparency to all aspects of Madoff's operations, which allowed the Kingate Fraud Claim Defendants to assure that the monies invested with Madoff were being actually and legitimately invested; and (vi) Madoff's operations and accounts were audited by reputable, independent auditors utilizing appropriate and accepted accounting and auditing principles, which provided further assurance that Madoff's accounts actually held the represented assets and were otherwise operated lawfully.

249.    The Kingate Fraud Claim Defendants made the representations knowing that they were false in that:  (i) the Kingate Fraud Claim Defendants did not, in fact, conduct thorough or appropriate due diligence of, or exercise oversight over Madoff and his operations and had not determined that Madoff actually invested assets utilizing the split-strike conversion strategy, with a long track record of achieving positive investment returns; (ii) the Kingate Fraud Claim Defendants did not invest Plaintiffs' nor the Class' assets in legitimate funds that utilized such strategy; (iii) the Kingate Fraud Claim Defendants did not meaningfully monitor the investments operated by Madoff to confirm that Madoff operated legitimately using the split-strike conversion strategy and in accordance with all legal and regulatory strictures, and did not verify the transactions, including that Madoff actually made the represented trades and that the Funds

held the represented assets; (iv) the due diligence and oversight processes employed by the Kingate Fraud Claim Defendants were non-existent, much less so thorough as to be privileged in providing total transparency to all aspects of Madoff's operations, and did not allow the Kingate Fraud Claim Defendants the ability to assure that the assets provided to Madoff were actually and legitimately invested; and (v) Madoff's operations and accounts were not audited by reputable, independent auditors utilizing appropriate and accepted accounting and auditing procedures, and thus did not provide any assurance that Madoff actually held the represented assets and otherwise operated lawfully.

250.    When they made their false statements and committed their omissions, the Kingate Fraud Claim Defendants knew facts or had access to information suggesting that their public statements were not accurate or failed to check information they had a duty to monitor and which would have demonstrated the falsity of their statements.

251.    The Kingate Fraud Claim Defendants made the false representations knowing of their falsity and with the intent to induce Plaintiffs and the Class to rely upon the false representations by holding assets in the Funds.

252.    Plaintiffs justifiably relied upon the false representations made by the Kingate Fraud Claim Defendants in holding their assets in the Funds.

253.    As a direct and proximate result of their reliance upon the false representations and omissions of the Kingate Fraud Claim Defendants, Plaintiffs and the Class have suffered damages, namely the loss of their investments in the Funds, and the Kingate Fraud Claim Defendants, in turn, have wrongfully taken substantial assets belonging to the Plaintiffs in the form of improper and unearned fees.

**COUNT 3**

**Negligent Misrepresentation**
**Against The Kingate Defendants (Purchaser Claims)**

254.     Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.

255.     Based on their unique or special expertise with respect to investments generally and Madoff's investments in particular, the Kingate Defendants had a special relationship of trust or confidence with Plaintiffs and the Class, which created a duty on the part of the Kingate Defendants to impart full and correct information to Plaintiffs and the Class, including to:  (i) act with reasonable care in preparing and disseminating information, statements and representations made to, and relied upon by, Plaintiffs and the Class in deciding to invest in the Funds; and (ii) use reasonable diligence in determining the accuracy and truthfulness of the information, statements and representations made to, and relied upon by, Plaintiffs and the Class in deciding to invest in the Funds.

256.     The Kingate Defendants falsely represented to Plaintiffs and the Class in connection with their purchase of shares in the Funds that:  (i) the Kingate Defendants had conducted thorough due diligence and exercised oversight of Madoff's operations; (ii) the Funds would invest their monies in a legitimate fund, principally relying upon a split-strike conversion strategy involving the purchase of equities and options; (iii) by using this strategy, the Funds historically had achieved consistent profitable returns and had a long track record of achieving positive investment returns; (iv) the Kingate Defendants would monitor the investments made by the Funds with Madoff to confirm that Madoff operated legitimately, followed the stated investment strategy, and complied with all legal and regulatory strictures; (v) the due diligence and oversight process employed by the Kingate Defendants was thorough and provided

transparency to all aspects of Madoff's operations, which allowed the Kingate Defendants to assure that the funds invested with Madoff were being actually and legitimately invested; and (vi) Madoff's operations and accounts were audited by reputable, independent auditors utilizing appropriate and accepted accounting and auditing procedures, which provided further assurance that Madoff actually held the represented assets and otherwise operated lawfully.

257.     The Kingate Defendants failed to disclose the following material information, among other things, which rendered other representations false and misleading:  (i) that the Kingate Defendants were in fact not engaging in customary, or any other meaningful due diligence or monitoring to verify that the Funds' assets were being properly invested and managed by Madoff, or that the assets even existed; and (ii) the existence of numerous risks and questions regarding BMIS and Madoff including, among others, the inadequate auditing of Madoff, the impossibility of making numerous specific trades that Madoff reported to the Kingate Defendants and Citi Hedge, and the unattainable nature of consistently profitable returns obtained by Madoff pursuant to the stated investment strategy.

258.     The Kingate Defendants made the false representations and material omissions knowing that Plaintiffs and the Class would use and rely upon the representations and omissions for the particular purpose of determining where and how to invest their assets and, in particular, to decide to invest their assets in the Funds.

259.     Plaintiffs and the Class justifiably relied upon the false representations and material omissions made by the Kingate Defendants in furtherance of that particular purpose by investing their assets in the Funds.

260.     As a result of their reliance upon the false representations and material omissions of the Kingate Defendants, Plaintiffs and the Class have suffered damages, namely the loss of

their investments in the Funds, and the Kingate Defendants, in turn, have derived substantial

profits.  The Kingate Defendants' wrongful conduct was the direct and proximate cause of the

losses suffered by Plaintiffs and the Class.

## COUNT 4

### Negligent Misrepresentation
### Against The Kingate Defendants (Holder Claims)

261.    Plaintiffs restate and reallege each of the preceding allegations as if fully stated

herein.

262.    Based on their unique or special expertise with respect to investments generally

and the investments in Madoff in particular, the Kingate Defendants had a special relationship of

trust or confidence with Plaintiffs and the Class, which created a duty on the part of Defendants

to impart correct information to Plaintiffs and the Class, including to:  (i) act with reasonable

care in preparing and disseminating information, statements and representations made to, and

relied upon by, Plaintiffs and the Class in deciding to invest in the Funds; and (ii) use reasonable

diligence in determining the accuracy and truthfulness of the information, statements and

representations made to, and relied upon by, Plaintiffs and the Class in deciding to invest in the

Funds.

263.    The Kingate Defendants induced purchasers to hold their positions in the Funds

by falsely representing to Plaintiffs and the Class that:  (i) the Kingate Defendants had conducted

thorough due diligence and exercised oversight of Madoff's operations, and had determined that

those operations were legitimate, utilized the split-strike conversion strategy, and had a long

track record of achieving positive investment returns; (ii) the assets invested by Plaintiffs and the

Class in the Funds operated by the Kingate Defendants would, in turn, be invested in a legitimate

manner by Madoff who utilized the split-strike conversion strategy; (iii) the Kingate Defendants

would monitor the investments made by Madoff to confirm that he was operating legitimately,

using the split-strike conversion strategy, and in accordance with all legal and regulatory

strictures, and further that the Kingate Defendants would verify the transactions, including that

Madoff actually made the represented trades and that Madoff held the represented assets; (iv) the

due diligence and oversight process employed by the Kingate Defendants was thorough and

provided transparency to all aspects of Madoff's operations, which supposedly allowed the

Kingate Defendants to assure that the monies invested with Madoff were being actually and

legitimately invested; and (v) Madoff's operations and accounts were audited by reputable,

independent auditors utilizing appropriate and accepted accounting and auditing procedures,

which provided further assurance that Madoff actually held the represented assets and otherwise

operated lawfully.

264.    The representations made by the Kingate Defendants were false in that, among

other things:  (i) the Kingate Defendants did not, in fact, conduct thorough due diligence of, or

exercise oversight over, Madoff and his operations, and had not determined that Madoff actually

invested assets utilizing the split-strike conversion strategy with a long track record of achieving

positive investment returns; (ii) the Kingate Defendants did not invest assets of the Plaintiffs and

the Class with a legitimate investment advisor who utilized the split-strike conversion strategy;

(iii) the Kingate Defendants did not monitor the investments operated by Madoff to confirm that

Madoff operated legitimately using the split-strike conversion strategy and in accordance with all

legal and regulatory structures, and did not verify the transactions, including that Madoff actually

made the represented trades and that Madoff actually held the represented assets; (iv) the due

diligence and oversight process employed by the Kingate Defendants was non-existent and thus

did not allow the Kingate Defendants the ability to assure that the assets provided to Madoff

were actually and legitimately invested; and (v) Madoff's operations and accounts were not audited by reputable, independent auditors utilizing appropriate and accepted accounting and auditing procedures, and thus did not provide any assurance that Madoff actually held the represented assets and otherwise operated lawfully.

265.    The Kingate Defendants made the false representations knowing that Plaintiffs and the Class would use and rely upon the representations for the particular purpose of determining whether to hold their assets in the Funds.

266.    Plaintiffs and the Class justifiably relied upon the false representations made by the Kingate Defendants in furtherance of that particular purpose by continuing to hold their assets in the Funds.

267.    As a result of their reliance upon the false representations made by the Kingate Defendants, Plaintiffs and the Class have suffered damages, namely the loss of their investments in the Funds, and the Kingate Defendants, in turn, have derived substantial profits.  The Kingate Defendants' misconduct was the direct and proximate cause of the losses suffered by Plaintiffs and the Class.

**COUNT 5**

**Gross Negligence**
**Against The Kingate Defendants**

268.    Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.

269.    The Kingate Defendants, as investment advisors, managers and placement agents with discretionary control over the assets entrusted to them by Plaintiffs and the Class had a special relationship with Plaintiffs and the Class that gave rise to a duty to exercise due care in the management and monitoring of the assets invested by Plaintiffs and the Class, and in the

selection and monitoring of the investments with reasonable care.  The Kingate Defendants knew or should have known that Plaintiffs and the Class were relying on the Kingate Defendants to manage the investments entrusted to the Funds with reasonable care, and Plaintiffs and the Class did reasonably and foreseeably rely on the Kingate Defendants to exercise such care by entrusting their assets to the Funds.

270.    The Kingate Defendants grossly failed to exercise due care, and acted in reckless disregard of their duties, and thereby injured Plaintiffs and the Class.  The Kingate Defendants failed to exercise the degree of prudence, caution, and good business practice that would be expected of any reasonable investment professional.  The Kingate Defendants failed to perform adequate due diligence before selecting Madoff as the Funds' investment advisor, and before allowing Madoff custody of the assets of the Funds; failed to monitor Madoff on an ongoing basis to any reasonable degree; and failed to take adequate steps to confirm Madoff's purported account statements, transactions and holdings of the Funds' assets.

271.    If the Kingate Defendants had not been grossly negligent with respect to the assets of the Plaintiffs and the Class invested with Madoff, they would have discovered that Madoff was a fraud, and would not have entrusted the assets of the Plaintiffs and the Class invested in the Funds to Madoff.

272.    As a direct and proximate result of the Kingate Defendants' gross negligence, Plaintiffs and the Class have suffered damages and are entitled to such damages from the Kingate Defendants, jointly and severally, as well as a return of all fees paid to the Kingate Defendants.

## COUNT 6

### Negligence
### <u>Against The Kingate Defendants</u>

273.     Plaintiffs restate and reallege each of the preceding allegations as if fully stated

herein.

274.     The Kingate Defendants, as investment advisors, managers and placement agents

with discretionary control over the assets entrusted to them by Plaintiffs and the Class, had a

special relationship with Plaintiffs and the Class that gave rise to a duty to exercise due care in

the management and monitoring of the assets invested by Plaintiffs and the Class, and in the

selection and monitoring of the investments with reasonable care.  The Kingate Defendants knew

or should have known that Plaintiffs and the Class were relying on the Kingate Defendants to

manage the investments entrusted to the Funds with reasonable care, and Plaintiffs and the Class

did reasonably and foreseeably rely on the Kingate Defendants to exercise such care by

entrusting their assets to the Funds.

275.     The Kingate Defendants negligently failed to exercise due care and thereby

injured Plaintiffs and the Class.  The Kingate Defendants failed to exercise the degree of

prudence, caution, and good business practice that would be expected of any reasonable

investment professional.  The Kingate Defendants failed to perform adequate due diligence

before selecting Madoff as the Funds' investment advisor, and before allowing Madoff custody

of the assets of the Funds; failed to monitor Madoff on an ongoing basis to any reasonable

degree; and failed to take adequate steps to confirm Madoff's purported account statements,

transactions, and holdings of the Funds' assets.

276.     If the Kingate Defendants had not been negligent with respect to the assets that

the Plaintiffs and the Class invested with Madoff, the Kingate Defendants would have discovered

that Madoff was operating a Ponzi scheme, and would not have entrusted the assets that the Plaintiffs and the Class invested in the Funds to Madoff.

277.     As a direct and proximate result of the Kingate Defendants' negligence, Plaintiffs and the Class have suffered damages and are entitled to such damages from the Kingate Defendants, as well as a return of all fees paid to the Kingate Defendants.

### COUNT 7

### Breach Of Fiduciary Duty
### Against The Kingate Defendants

278.     Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.

279.     Plaintiffs and the Class entrusted their assets to the Kingate Defendants who had substantial discretion and control over the Plaintiffs' and the Class' assets invested in the Funds, the marketing of those Funds, and communications to Plaintiffs and the Class.

280.     This discretion and control gave rise to a fiduciary duty and duty of care on the part of the Kingate Defendants to the Plaintiffs and the Class as evidenced by the following:

(a)     the Kingate Defendants occupied a superior position over Plaintiffs and the Class with respect to their management and control over their assets in the Funds, and had superior access to confidential information about the investment of the assets and about Madoff;

(b)     the Kingate Defendants' superior position necessitated that Plaintiffs and the Class repose their trust and confidence in the Kingate Defendants to fulfill their duties, particularly with respect to Madoff's investment activities, and Plaintiffs and the Class did so by investing in the Funds; and

(c)     the Kingate Defendants held themselves out as providing superior client investment services, and evinced an understanding that they were the fiduciaries of the investors.

Plaintiffs and the Class reasonably and foreseeably relied on such representations, and trusted in the Kingate Defendants' purported expertise and skill.

281.    The Kingate Defendants were obligated to deal fairly and honestly with the Plaintiffs and the Class; to act with loyalty and good faith towards Plaintiffs and the Class; to avoid placing themselves in situations involving a conflict of interest with Plaintiffs and the Class; to manage and operate each Plaintiffs' and member of the Class' investments exclusively for the best interest of the Plaintiffs and the Class; to make recommendations and execute transactions in accordance with the goals, investment objectives, and permissible degree of risk; and to oversee the investment of the assets of the Plaintiffs and the Class to confirm that they were maintained in a prudent and professional manner.

282.    The Kingate Defendants breached their fiduciary duties to Plaintiffs and the Class members, including the following duties:

(a)    to act with loyalty and good faith;

(b)    to take all possible steps to oversee that the investment of the assets of Plaintiffs and the Class were made and maintained in a prudent and professional manner;

(c)    to take reasonable steps and observe the strictest of formalities in seeking to preserve for Plaintiffs and the Class the value of their investments;

(d)    to take all reasonable steps to publish information regarding Plaintiffs' and the Class' investments that was accurate and verifiable;

(e)    to perform all necessary and adequate due diligence and monitoring with respect to the Funds' investments; and

(f)    to exercise generally the degree of prudence, caution and good business practices that would be expected of reasonable investment professionals overseeing client funds.

283.     As a direct and proximate result of the breaches of fiduciary duties of the Kingate Defendants, Plaintiffs and the Class have suffered damages and are entitled to such damages from the Kingate Defendants, jointly and severally, as well as a return of all fees paid to the Kingate Defendants, and appropriate equitable relief, including an accounting and imposition of a constructive trust.

**COUNT 8**

**Constructive Fraud**
**Against The Kingate Defendants**

284.     Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.

285.     The Kingate Defendants falsely represented to Plaintiffs and the Class in connection with their purchases of shares in the Funds and as inducement to hold their positions in the Funds that:  (i) the Funds would invest in a legitimate fund, principally relying on the split-strike conversion strategy involving the purchase of equities and options; (ii) by using this strategy, the Funds historically had consistent profitable returns since inception; (iii) the Kingate Defendants had conducted and would conduct oversight and due diligence to monitor, verify and confirm the investments made by the Funds with Madoff to confirm that Madoff operated legitimately, using the stated investment strategy, and in accordance with the required legal and regulatory requirements, and further that the Kingate Defendants would verify the transactions, including that Madoff actually made the represented trades and held the represented assets; (iv) the due diligence and oversight process employed by the Kingate Defendants was so thorough as to be privileged in providing full transparency to all aspects of Madoff's operations, which allowed the Kingate Defendants to assure that the monies invested with Madoff were being actually and legitimately invested; and (v) Madoff's operations and accounts were audited by

97

reputable, independent auditors utilizing appropriate and accepted accounting and auditing principles, which provided further assurance that Madoff's accounts actually held the represented assets and were otherwise operated lawfully.

286.   The Kingate Defendants failed to disclose the following material information, among other things, which rendered their other representations false and misleading:  (i) that the Kingate Defendants were in fact not engaging in customary, industry-standard, or even minimal, due diligence to verify that the Funds' assets were being properly invested and managed by Madoff or that the assets ever existed; and (ii) the existence of numerous risks and questions regarding BMIS and Madoff including, among others, the lack of transparency into Madoff's actual operations, the lack of segregation of duties, inadequate auditing of Madoff, and the attainability of consistently profitable returns for a fund pursuing the split-strike conversion strategy.

287.   The Kingate Defendants made these false and misleading misrepresentations and omissions with the intent to induce Plaintiffs and the Class to rely upon them by investing and holding their assets in the Funds.

288.   Plaintiffs and the Class justifiably relied upon the false representations made by the Kingate Defendants by investing and holding their assets in the Funds.

289.   As investment managers and administrators with discretionary control over the assets entrusted to them by Plaintiffs and the Class, the Kingate Defendants had a special relationship with Plaintiffs and the Class that gave rise to a duty to manage and monitor their investments with reasonable care.

290.   This discretion and control gave rise to a fiduciary duty and duty of care on the part of the Kingate Defendants to the Plaintiffs and the Class as evidenced by the following:

(a)     the Kingate Defendants occupied a superior position over Plaintiffs and the Class with respect to their management and control over their assets in the Funds, and had superior access to confidential information about the investment of the assets and about Madoff;

(b)     the Kingate Defendants' superior position necessitated that Plaintiffs and the Class repose their trust and confidence in the Kingate Defendants to fulfill their duties, particularly with respect to Madoff's investment activities, and Plaintiffs and the Class did so by investing in the Funds; and

(c)     the Kingate Defendants held themselves out as providing superior client investment services, and evinced an understanding that they were the fiduciaries of the investors. Plaintiffs and the Class reasonably and foreseeably relied on such representations, and trusted in the Kingate Defendants' purported expertise and skill.

291.    The Kingate Defendants were obligated to deal fairly and honestly with the Plaintiffs and the Class; to act with loyalty and good faith towards Plaintiffs and the Class; to avoid placing themselves in situations involving a conflict of interest with Plaintiffs and the Class; to manage and operate each Plaintiff's and member of the Class' investments exclusively for the best interest of the Plaintiffs and the Class; to make recommendations and execute transactions in accordance with the goals, investment objectives, and permissible degree of risk; and to oversee the investment of the assets of the Plaintiffs and the Class to confirm that they were maintained in a prudent and professional manner.

292.    As a direct and proximate result of their reliance upon the false representations and omissions of the Kingate Defendants, Plaintiffs and the Class have suffered damages, including the loss of their investment in the Funds, and the Kingate Defendants, in turn, have

wrongfully taken substantial assets belonging to the Plaintiffs and the Class in the form of improper and unearned fees.

**COUNT 9**

**Third Party Beneficiary Breach Of Contract**
**<u>Against KML And Tremont</u>**

293.    Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.

294.    Plaintiffs and the Class are third-party beneficiaries of the Management Agreements executed among KML, Tremont, and the Funds.  The Management Agreements are valid and binding contracts and evince a clear intent to benefit shareholders in the Funds – Plaintiffs and the Class.  The Management Agreements required KML and Tremont to selecting and evaluating appropriate investment advisors, allocate the assets of the Funds, and monitor the selected investments advisor's performance and adherence to the stated investment strategy.

295.    The benefits to Plaintiffs and the Class under the Management Agreements between the Funds, KML, and Tremont were immediate, not simply incidental, in that the Funds' only motivations for executing these agreements were to provide investors with capital appreciation and returns on their investments in the Funds.

296.    KML and Tremont's duties pursuant to the Management Agreement included selecting and evaluating appropriate investment advisors and the allocation of assets with a chosen appropriate investment advisor.  KML and Tremont also had a continuing obligation to ascertain Madoff's competence and monitor Madoff's performance and adherence to the mandated split-strike conversion strategy.

297.    KML and Tremont breached their management contracts by grossly failing to meet the obligations of these agreements to provide competent management services to the

Funds.  They also breached their contracts by collecting fees based on fictitious profits and for services not properly performed.  Both entities are liable to Plaintiffs and the Class, who are third party beneficiaries of those contracts.

## COUNT 10

### Third Party Beneficiary Breach Of Contract
### Against The FIM Entities

298.    Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.

299.    Plaintiffs and the Class are third-party beneficiaries of the Consulting Services Agreements executed among the FIM Entities, KML, Tremont, and the Funds.  The Consulting Services Agreements are valid and binding contracts and evince a clear intent to benefit shareholders in the Funds – Plaintiffs and the Class.  The Consulting Services Agreements required the FIM Entities to make recommendations to KML and Tremont regarding allocation of the Funds' assets for suitable investment and appreciation.

300.    The benefits to Plaintiffs and the Class under the Consulting Services Agreements among the Funds, the FIM Entities, KML, and Tremont were immediate, not simply incidental, in that the Funds' only motivations for executing these agreements were to provide investors with capital appreciation and returns on their investments in the Funds.

301.    The FIM Entities' duties included screening and nominating investment advisors for selection by KML and Tremont.  The FIM Entities also made recommendations regarding the proposed allocation of assets among investment managers.  The FIM Entities were also obligated to "continuously monitor[]" the asset allocation and the investment advisor's performance.

302.    The FIM Entities breached their consulting services contracts by grossly failing to meet the obligations of these agreements to provide competent management and consulting

101

services to the Funds.  The FIM Entities also breached the contracts by receiving and holding

fees based on fictitious profits and for services not properly performed.  The FIM Entities are

liable to Plaintiffs and the Class, who are third party beneficiaries of those contracts.

## COUNT 11

### Constructive Trust
### Against The Kingate Defendants

303.    Plaintiffs restate and reallege each of the preceding allegations as if fully stated

herein.

304.    The Kingate Defendants had a fiduciary relationship with Plaintiffs and the Class

which included an obligation to invest the assets of the Plaintiffs and the Class in legitimate

investments, and perform adequate due diligence and monitoring as set forth in the Information

Memoranda.  The Kingate Defendants were compensated by Plaintiffs and the Class with fees

based on the fictitious assets of the Funds.

305.    The Kingate Defendants were unjustly enriched by the retention of fees that were

predicated on fictitious profits and assets.  Plaintiffs and the Class are entitled to have a

constructive trust imposed on the amount of all monies and other property in the possession of

the Kingate Defendants which relate to fees paid to them on account of fictitious profits and

assets of the Funds, the amount of which is to be determined.

## COUNT 12

### Mutual Mistake
### Against The Kingate Defendants

306.    Plaintiffs restate and reallege each of the preceding allegations as if fully stated

herein.

307.    Pursuant to the Information Memoranda and other agreements, the Kingate Defendants were paid fee amounts well exceeding $100 million.  The Kingate Defendants were paid those fees under a mutual mistake of the parties as to the amount and value of the assets under management and amount of profits.  In fact, there were no assets under management and no profits.

308.    The investments by Plaintiffs and the Class were used to pay the foregoing fees to the Kingate Defendants.  Plaintiffs and the Class demand recovery of the foregoing fee payments made pursuant to a mutual mistake.

## COUNT 13

### Aiding And Abetting Breach Of Fiduciary Duty
### <u>Against The Tremont Group</u>

309.    Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.

310.    By virtue of their ownership and control of Tremont, the Tremont Group was aware of the fiduciary duties owed by Tremont to Plaintiffs and the Class as alleged above.  The Tremont Group acted with willful blindness or recklessness in its ownership and exercise of control of Tremont and is thus charged with constructive knowledge that:

(a)    Tremont had the discretion and control giving rise to a fiduciary duty and duty of care to the Plaintiffs and the Class;

(b)    Tremont occupied a superior position over Plaintiffs and the Class with respect to its management and control over their assets in the Funds, and had superior access to confidential information about the investment of the assets and about Madoff;

(c)     Tremont's superior position necessitated that Plaintiffs and the Class repose their trust and confidence in Tremont to fulfill its duties, and Plaintiffs and the Class did so by investing in the Funds; and

(d)     Tremont held itself out as providing superior client investment services, and evinced an understanding that it was the fiduciary of the investors.

311.    The Tremont Group also had actual knowledge of the obvious risks concerning, and warnings against, investing in Madoff by virtue of its ownership and control of the Rye Funds, which included five additional Madoff feeder funds independently of the Funds.

312.    The Tremont Group was also aware that Plaintiffs and the Class reasonably and foreseeably relied on Tremont's representations and trusted Tremont's purported expertise and skill.

313.    The Tremont Group substantially assisted Tremont by helping to conceal Tremont's breach of fiduciary duty and by failing to act when required to do so in the face of those breaches.

314.    As a direct and natural result of (i) Tremont's breaches of fiduciary duty, and (ii) the Tremont Group aiding and abetting those breaches, the Plaintiffs and the Class have suffered substantial damages.

## COUNT 14

### Aiding And Abetting Fraud
### <u>Against The Tremont Group</u>

315.    Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.

316.    By virtue of their ownership and control of Tremont, the Tremont Group was aware of the fiduciary duties owed by Tremont to Plaintiffs and the Class as alleged above.  The

Tremont Group acted with willful blindness or recklessness in its ownership of and exercise of control over Tremont and is thus charged with constructive knowledge that:

(a)      Tremont falsely represented to Plaintiffs and the Class in connection with their purchase of shares and/or equity interests in the Funds that:

(i)      the Funds would invest their monies in a legitimate investment, principally relying upon the split-strike conversion strategy involving the purchase of equities and options;

(ii)      by using this strategy, the Funds historically had consistent profitable returns since inception; and

(iii)      Tremont would conduct due diligence, and monitor and verify the investments made with Madoff to confirm that Madoff operated legitimately, using the stated investment strategy, and in accordance with the required legal and regulatory requirements.

(b)      Tremont failed to disclose the following material information, among other things, which rendered their other representations false and misleading:

(i)      that Tremont was in fact not engaging in customary, or even minimal, due diligence to verify that the Funds' assets were being properly invested and managed by Madoff or that the assets even existed; and

(ii)      the existence of numerous obvious risks regarding the Funds including, among others, inadequate auditing of Madoff, and the attainability of consistently profitable returns for a fund pursuing the stated strategy.

(c)      Tremont induced purchasers to hold their positions in the Kingate Funds by falsely representing to Plaintiffs and the Class that:

(i)      Tremont had conducted thorough due diligence and exercised oversight of Madoff's operations and had determined that those operations were legitimate, utilized the split-strike conversion strategy, and had a long track record of achieving positive investment returns;

(ii)      the assets of the Plaintiffs and the Class invested in the Funds operated by Tremont would, in turn, be invested in the legitimate funds operated by Madoff that utilized the split-strike conversion strategy;

(iii)      Tremont would monitor the investments made with Madoff to confirm that Madoff operated legitimately, using the split-strike conversion strategy, and in accordance with all legal and regulatory strictures, and further that Tremont would verify Madoff's transactions, including that Madoff actually made the represented trades and held the represented assets; and

(iv)      Madoff's operations and accounts were audited by reputable, independent auditors utilizing appropriate and accepted accounting and auditing procedures, which provided further assurance that Madoff's accounts actually held the represented assets and were otherwise operated lawfully.

(d)      Tremont made the representations knowing that they were false in that:

(i)      Tremont did not, in fact, conduct thorough or appropriate due diligence of, or exercise oversight over Madoff and his operations and had not determined that Madoff actually invested utilizing the split-strike conversion strategy, with a long track record of achieving positive investment returns;

(ii)      Tremont did not invest the assets of the Plaintiffs and the Class legitimately utilizing the split-strike conversions strategy;

(iii)    Tremont did not intend to monitor the investments operated by Madoff to confirm that Madoff operated legitimately using the split-strike conversion strategy and in accordance with all legal and regulatory structures, and did not intend to verify Madoff's transactions, including that Madoff actually made the represented trades and that Madoff held the stated assets; and

(iv)    Madoff's operations and accounts were not audited by reputable, independent auditors utilizing appropriate and accepted accounting and auditing procedures, and thus did not provide any assurances that Madoff actually held the represented assets and operated lawfully.

317.    The Tremont Group was also aware that Plaintiffs and the Class reasonably and foreseeably relied on Tremont's representations and trusted Tremont's purported expertise and skill.

318.    The Tremont Group substantially assisted Tremont by helping to conceal Tremont's breach of fiduciary duty and by failing to act when required to do so in the face of that breach.

319.    As a direct and natural result of (i) Tremont's fraudulent scheme, and (ii) the Tremont Group aiding and abetting that fraudulent scheme, the Plaintiffs and the Class have suffered substantial damages.

## COUNT 15

### Gross Negligence
### Against PricewaterhouseCoopers

320.    Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.

321.     PricewaterhouseCoopers, as the Funds' auditor, had a special relationship with Plaintiffs and the Class that gave rise to a duty to exercise due care.   PricewaterhouseCoopers' audit reports were specifically addressed and directed to the shareholders of the Funds – Plaintiffs and the Class.  PricewaterhouseCoopers knew that its audit reports would be relied upon by Plaintiffs and the Class in deciding to make or retain investments in the Funds in that, among other things, PricewaterhouseCoopers addressed its audit reports directly to investors in the Funds.  PricewaterhouseCoopers also knew that the Funds advised Plaintiffs and the Class that PricewaterhouseCoopers (i) audited the Funds' financial statements and (ii) had given the Funds unqualified audit opinions.

322.     Plaintiffs and the Class foreseeably and reasonably relied, directly or indirectly, on PricewaterhouseCoopers to exercise such care as ordinarily exercised by auditors generally and as required by GAAS and GAAP in conducting the audits of the Funds.

323.     PricewaterhouseCoopers was grossly negligent in knowingly or recklessly failing to properly audit the Funds in accordance with GAAS and GAAP and then misrepresenting that it had conducted proper audits of the Funds.  PricewaterhouseCoopers also willfully turned a blind eye to numerous questions and risks about Madoff's operations, both as to Madoff's fraud and the Kingate Defendants' misrepresentations, omissions, and breaches of duty. PricewaterhouseCoopers nevertheless knowingly or recklessly issued clean audit opinions that the Funds' financial statements fairly represented the financial condition of the Funds.

324.     Had PricewaterhouseCoopers not acted recklessly and with willful blindness it would not have issued the clean audit opinions concerning the Funds.

325.     As a direct and proximate result of PricewaterhouseCoopers' gross negligence, Plaintiffs and the Class have lost all, or substantially all, of their investments in the Funds.

## COUNT 16

### Negligence
### Against PricewaterhouseCoopers

326.    Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.

327.    PricewaterhouseCoopers, as the Funds' auditor, had a special relationship with Plaintiffs and the Class that gave rise to a duty to exercise due care.   PricewaterhouseCoopers' audit reports were specifically addressed and directed to the shareholders of the Funds – Plaintiffs and the Class.  PricewaterhouseCoopers knew that its audit reports would be relied upon by Plaintiffs and the Class in deciding to make or retain investments in the Funds in that, among other things, PricewaterhouseCoopers addressed its audit reports to investors in the Funds.  PricewaterhouseCoopers also knew that the Funds advised Plaintiffs and the Class that PricewaterhouseCoopers (i) audited the Funds' financial statements and (ii) had given the Funds unqualified audit opinions.

328.    Plaintiffs and the Class foreseeably and reasonably relied, directly or indirectly, on PricewaterhouseCoopers to exercise such care as ordinarily exercised by auditors generally and as required by GAAS and GAAP in conducting the audits of the Funds.

329.    PricewaterhouseCoopers negligently failed to exercise due care by failing to properly audit the Funds in accordance with GAAS and GAAP.  As a direct and proximate result of PricewaterhouseCoopers' failure to exercise due care, Plaintiffs and the Class have lost all, or substantially all, of their investments in the Funds.

## COUNT 17

### Negligent Misrepresentation
### Against PricewaterhouseCoopers

330.     Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.

331.     PricewaterhouseCoopers, as the Funds' auditor, had a special relationship with Plaintiffs and the Class.  PricewaterhouseCoopers' audit reports were specifically addressed and directed to the shareholders of the Funds – *i.e.*, Plaintiffs and the Class.  PricewaterhouseCoopers knew that its audit reports would be relied upon by Plaintiffs and the Class in deciding to make or retain investments in the Funds in that, among other things, PricewaterhouseCoopers addressed its audit reports to investors in the Funds, and PricewaterhouseCoopers knew the Funds advised Plaintiffs and the Class that PricewaterhouseCoopers audited the Funds' financial statements and had given the Funds unqualified audit opinions.  Based on this role, PricewaterhouseCoopers had a duty to impart correct information to Plaintiffs and the Class.

332.     PricewaterhouseCoopers induced purchasers to hold their positions in the Funds and to purchase additional interests in the Funds by falsely representing to Plaintiffs and the Class that:  (i) it had conducted its audits in accordance with GAAS; and (ii) the Funds' financial statements conformed with GAAP

333.     These representations made by PricewaterhouseCoopers were false in that:  (i) PricewaterhouseCoopers failed to conduct the audits of the Funds in accordance with GAAS; and (ii) the Funds' financial statements, including the claimed value of the Funds' investments through Madoff, did not present fairly in all respects the financial positions of the Funds.  In fact, PricewaterhouseCoopers made the false statements without so much as properly confirming the existence of the Funds' assets.

334.     PricewaterhouseCoopers made the false representations knowing that Plaintiffs and the Class would use and rely upon the representations for the particular purpose of determining whether to hold their assets in the Funds and whether to purchase additional interests in the Funds.

335.     Plaintiffs and the Class justifiably relied upon the false representations made by PricewaterhouseCoopers in furtherance of that particular purpose by continuing to hold their assets in the Funds and by purchasing additional interests in the Funds.

336.     PricewaterhouseCoopers knew that Plaintiffs were investors in the Funds and understood that Plaintiffs and the Class would rely upon the false statements for the particular purpose of continuing to hold their assets in the Funds and to purchase additional interests in the Funds.

337.     As a result of their reliance upon the false representations made by PricewaterhouseCoopers, Plaintiffs and the Class have suffered damages, namely the loss of their investments in the Funds, and PricewaterhouseCoopers, in turn, derived audit fees. PricewaterhouseCoopers' misconduct was the direct proximate cause of the losses suffered by Plaintiffs and the Class.


**COUNT 18**

**Third Party Beneficiary Breach Of Contract**
**Against PricewaterhouseCoopers**

338.     Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.

339.     PricewaterhouseCoopers entered into contracts with the Funds to perform audits in accordance with GAAS.  Plaintiffs and the Class are third-party beneficiaries of those contracts.

340.     The contracts evince a clear intent to benefit Plaintiffs and the Class, who had invested in the Funds, to whom the audit reports were addressed, and who relied upon PricewaterhouseCoopers to audit the financial statements of the Funds and to opine that the financial statements fairly represented the financial condition of the Funds only if that professional opinion was based upon a proper audit of the Funds conducted in accordance with GAAS and other applicable auditing standards.  The benefits to Plaintiffs and the Class under the contracts were immediate, not simply incidental.

341.     PricewaterhouseCoopers breached its agreements to perform its audits for the Funds pursuant to GAAS, and this breach proximately caused Plaintiffs' losses. PricewaterhouseCoopers is liable to Plaintiffs and the Class as third party beneficiaries of those contracts.

## COUNT 19

### Aiding And Abetting Breach Of Fiduciary Duty
### Against PricewaterhouseCoopers

342.     Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.

343.     As the auditor of the Funds, PricewaterhouseCoopers was aware of the fiduciary duties owed by the Kingate Defendants to Plaintiffs and the Class as alleged above. PricewaterhouseCoopers acted with willful blindness or recklessness in conducting its audits and is thus charged with constructive knowledge that:

(a)     the Kingate Defendants had discretion and control giving rise to a fiduciary duty and duty of care to the Plaintiffs and the Class;

(b)     the Kingate Defendants occupied a superior position over Plaintiffs and the Class with respect to their management and control over their assets in the Funds, and had superior access to confidential information about the investment of the assets and about Madoff;

(c)     the Kingate Defendants' superior position necessitated that Plaintiffs and the Class repose their trust and confidence in the Kingate Defendants to fulfill their duties, and that Plaintiffs and the Class did so by investing in the Funds; and

(d)     the Kingate Defendants held themselves out as providing superior client investment services, and evinced an understanding that they were the fiduciaries of the investors.

344.    PricewaterhouseCoopers was further aware that Plaintiffs and the Class reasonably and foreseeably relied on such representations, and trusted the Kingate Defendants' purported expertise and skill.

345.    PricewaterhouseCoopers substantially assisted the Kingate Defendants by issuing unqualified audit reports on the Funds and failing to conduct proper independent audits of the Funds, including PricewaterhouseCoopers' failure to disclose that the representations made by management in the financial statements could not be relied upon.

346.    As a direct and natural result of (i) the Kingate Defendants' breaches of their fiduciary duties, and (ii) PricewaterhouseCoopers' aiding and abetting those breaches, the Plaintiffs and the Class have suffered substantial damages.

## COUNT 20

### Aiding And Abetting Fraud
### Against PricewaterhouseCoopers

347.    Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.

348.     PricewaterhouseCoopers acted with willful blindness or recklessness in conducting its audits and is thus charged with constructive knowledge that:

(a)     The Kingate Fraud Claim Defendants falsely represented to Plaintiffs and the Class in connection with their purchase of shares in the Funds that:

(i)     the Funds would invest their monies in a legitimate investment, principally relying upon the split-strike conversion strategy involving the purchase of equities and options;

(ii)     that by using this strategy, the Funds historically had consistent profitable returns since inception; and

(iii)     the Kingate Fraud Claim Defendants would conduct due diligence, and monitor and verify the investments made with Madoff to confirm that Madoff operated legitimately, using the stated investment strategy, and in accordance with the required legal and regulatory requirements.

(b)     The Kingate Fraud Claim Defendants failed to disclose the following material information, among other things, which rendered their other representations false and misleading:

(i)     that the Kingate Fraud Claim Defendants were in fact not engaging in customary, or even minimal, due diligence to verify that the Funds' assets were being properly invested and managed by Madoff or that the assets even existed; and

(ii)     the existence of numerous risks to the Funds including, among others, inadequate auditing of Madoff, and the attainability of consistently profitable returns for a fund pursuing the stated strategy.

(c)     The Kingate Fraud Claim Defendants induced purchasers to hold their positions in the Kingate Funds by falsely representing to Plaintiffs that:

(i)     the Kingate Fraud Claim Defendants had conducted thorough due diligence and exercised oversight of Madoff's operations and had determined that those operations were legitimate, utilized the split-strike conversion strategy, and had a long track record of achieving positive investment returns;

(ii)     the assets of the Plaintiffs and the Class invested in the Funds operated by the Kingate Fraud Claim Defendants would, in turn, be invested in the legitimate funds operated by Madoff that utilized the split-strike conversion strategy;

(iii)     the Kingate Fraud Claim Defendants would monitor the investments made by them with Madoff to confirm that Madoff operated legitimately, using the split-strike conversion strategy, and in accordance with all legal and regulatory strictures, and further that the Kingate Fraud Claim Defendants would verify Madoff's transactions, including that Madoff actually made the represented trades and held the represented assets; and

(iv)     Madoff's operations and accounts were audited by reputable, independent auditors utilizing appropriate and accepted accounting and auditing procedures, which provided further assurance that Madoff's accounts actually held the represented assets and were otherwise operated lawfully.

(d)     The Kingate Fraud Claim Defendants made the representations knowing that they were false in that:

(i)     the Kingate Fraud Claim Defendants did not, in fact, conduct thorough or appropriate due diligence of, or exercise oversight over Madoff and his operations,

and had not determined that Madoff actually invested utilizing the split-strike conversion strategy, with a long track record of achieving positive investment returns;

        (ii)     the Kingate Fraud Claim Defendants did not invest the assets of the Plaintiffs and the Class legitimately utilizing the split-strike conversion strategy;

        (iii)     the Kingate Fraud Claim Defendants did not intend to monitor the investments operated by Madoff to confirm that Madoff operated legitimately using the split-strike conversion strategy and in accordance with all legal and regulatory structures, and did not intend to verify Madoff's transactions, including that Madoff actually made the represented trades and that Madoff held the stated assets; and

        (iv)     Madoff's operations and accounts were not audited by reputable, independent auditors utilizing appropriate and accepted accounting and auditing procedures, and thus did not provide any assurances that Madoff actually held the represented assets and operated lawfully.

349.    PricewaterhouseCoopers substantially assisted the Kingate Fraud Claim Defendants by issuing unqualified audit reports and failing to conduct proper independent audits of the Funds, including its failure to disclose that the representations made by management in the financial statements could not be relied upon.

350.    As a direct and natural result of (i) the Kingate Fraud Claims Defendants' fraudulent scheme, and (ii) PricewaterhouseCoopers' aiding and abetting that fraudulent scheme, the Plaintiffs and the Class have suffered substantial damages.

## COUNT 21

### Breach Of Fiduciary Duty
### Against Citi Hedge

351.    Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.

352.    As Administrator to the Funds, Citi Hedge had discretionary duties and obligations regarding the assets of the Funds, including the calculation of the Funds' NAV, accounting for the Funds, communications to the Plaintiffs and the Class about their investments, and receipt of the Plaintiffs' and the Class' monies.

353.    Citi Hedge occupied a superior position over Plaintiffs and the Class with respect to their discretionary responsibilities, and had superior access to confidential information about the investments, including the location, security, and value of the assets.  Citi Hedge held itself out as providing superior administrative and other financial services.

354.    Citi Hedge's superior position necessitated that Plaintiffs and the Class repose their trust and confidence in Citi Hedge to fulfill its duties, and Plaintiffs and the Class did so by investing in the Funds, and retaining their investments in the Funds.  Plaintiffs and the Class reasonably and foreseeably trusted in Citi Hedge's purported expertise and skill, and Citi Hedge recognized that Plaintiffs and the Class would rely and repose their trust in Citi Hedge when deciding to invest and retain their investment in the Funds.

355.    Citi Hedge's discretion, control, and superior position over Plaintiffs and the Class gave rise to a fiduciary duty and duty of care on the part of Citi Hedge to Plaintiffs and the Class who invested in the Funds.

356.    Citi Hedge breached its fiduciary duties to Plaintiffs and the Class by, among other things, failing to discharge properly its responsibilities as Administrator, including by

communicating fictitious Fund valuations to Plaintiffs and the Class.  Citi Hedge's fiduciary duties could not be delegated to BMIS or any third party and the fact that Citi Hedge entrusted its responsibilities to BMIS without adequate supervision or control constituted a *per se* breach of fiduciary duty.

357.    Plaintiffs and the Class have been damaged as a proximate result of the breach of fiduciary duties by Citi Hedge.  Had Citi Hedge fulfilled its fiduciary duties, (i) Plaintiffs and the Class would not have invested or re-invested in the Funds, (ii) Plaintiffs and the Class would not have retained their investments in the Funds, (iii) Plaintiffs' and the Class' assets would not have been turned over to Madoff, and (iv) Plaintiffs and the Class would not have lost their investments.

358.    Citi Hedge collected fees in return for the services they were ostensibly providing.  Those fees were calculated on the basis of Madoff's fictional profits that were never actually earned.  Because the fees were calculated on the basis of fraudulent information, and Citi Hedge did not fulfill its duties, Citi Hedge did not earn those fees and they should be repaid to Plaintiffs and the Class.

359.    By reason of the foregoing, Citi Hedge is liable to Plaintiffs and the Class, and Plaintiffs and the Class are entitled to a constructive trust on fees received, damages, and appropriate equitable relief.

## COUNT 22

### Gross Negligence
### Against Citi Hedge

360.    Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.

361.    Citi Hedge, as the Funds' administrator and financial services provider, had a special relationship with Plaintiffs and the Class that gave rise to a duty to exercise due care. Citi Hedge knew or should have known that Plaintiffs and the Class would be relying on Citi Hedge to exercise reasonable care in providing administrative and financial services to the Funds, and Plaintiffs and the Class reasonably and foreseeably relied on Citi Hedge to exercise such care by entrusting their assets to the Funds.

362.    Citi Hedge grossly failed to exercise due care, and acted in reckless disregard of its duties.  Citi Hedge failed to exercise the degree of prudence, caution, and good business practice that would be expected of any reasonable investment professional.

363.    As a direct and proximate result of Citi Hedge's gross negligence, Plaintiffs and the Class have lost all, or substantially all, of their investments in the Funds.

## COUNT 23

### Negligence
### Against Citi Hedge

364.    Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.

365.    Citi Hedge, as the Funds' administrator and financial services provider, had a special relationship with Plaintiffs and the Class that gave rise to a duty to exercise due care. Citi Hedge knew or should have known that Plaintiffs and the Class would be relying on Citi Hedge to exercise reasonable care in providing administrative and financial services to the Funds, and Plaintiffs and the Class reasonably and foreseeably relied on Citi Hedge to exercise such care by entrusting their assets to the Funds.

366.     Citi Hedge negligently failed to exercise due care, and failed to exercise the degree of prudence, caution, and good business practice that would be expected of any reasonable investment professional.

367.     As a direct and proximate result of Citi Hedge's negligence, Plaintiffs and the Class have lost all, or substantially all, of their investments in the Funds.

## COUNT 24

### Negligent Misrepresentation
### Against Citi Hedge

368.     Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.

369.     Citi Hedge, as the Funds' administrator and financial services provider, had a unique and special expertise and superior position with respect to providing administrative services and calculating the Funds' NAV and account balances.  With respect to Madoff in particular, Citi Hedge had a special relationship of trust and confidence with Plaintiffs and the Class, which created a duty to impart correct information to Plaintiffs and the Class.

370.     Citi Hedge induced Plaintiffs and the Class to make their initial investments in the Funds, to retain their investments in the Funds, and (where applicable) to make additional investments in the Funds by issuing false NAV and account balance statements for the Funds that they then disseminated to Plaintiffs and the Class, or knew would be disseminated to Plaintiffs and the Class.

371.     Citi Hedge made the false representations knowing that Plaintiffs and the Class would use and rely upon the misrepresentations for the particular purpose of determining whether to invest in the Funds, hold their assets in the Funds, and (where applicable) purchase additional interests in the Funds.

372.     Citi Hedge's NAV calculations and account balance information were false.  In issuing the statements, Citi Hedge acted recklessly because it knew or had access to information suggesting that its statements were not accurate.  Citi Hedge also acted recklessly by failing to verify the information received from BMIS despite a duty to scrutinize and verify independently information relating to the NAV and account balances.  In addition, its failure to check or verify the information was reckless because Citi Hedge was aware of the increased risks surrounding BMIS, including the consolidation of the roles of investment manager, custodian and broker-dealer in Madoff and BMIS.

373.     Plaintiffs and the Class justifiably relied upon the false representations made by Citi Hedge.  Citi Hedge was paid substantial fees for performing administrative services. Plaintiffs and the Class justifiably relied, to their detriment, on Citi Hedge's false statements and omissions, in ignorance of their falsity, by making their initial investments in the Funds, retaining their investments in the Funds, and (where applicable) making additional investments in the Funds.

374.     As a result of their reliance upon the false representations made by Citi Hedge, Plaintiffs and the Class have suffered damages, namely the loss of their investments in the Funds.

## COUNT 25

### Third Party Beneficiary Breach Of Contract
### Against Citi Hedge

375.     Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.

376.     Citi Hedge entered into Administration Agreements with the Funds, and Citi Hedge breached its obligations to the Plaintiffs and the Class as third party beneficiaries of those

contracts.  The Administration Agreements executed by Citi Hedge with the Funds each represent valid contracts binding on both Citi Hedge and the Funds.

377.    The Administration Agreements evince a clear intent to benefit shareholders by affirmatively recognizing Citi Hedge's obligation to keep the Funds' shareholders informed of the status and performance of their investments, as set forth in the Administration Agreement (§§ 4.1, 4.4).

378.    The benefits to Plaintiffs and the Class under the Administration Agreements between the Funds and Citi Hedge were immediate, not simply incidental, in that the Funds' only motivations for entering the Administration Agreement were to provide shareholders with administrative services including keeping them informed of the status of the Funds.

379.    Citi Hedge agreed to act in good faith in the performance of its services as Fund Administrator.  Citi Hedge's duties that required good faith, due care and diligence in their execution included the following:

> (a)    communicating with the general public;
>
> (b)    communicating with shareholders;
>
> (c)    soliciting sales of shares in the Funds;
>
> (d)    accepting new subscriptions in the Funds;
>
> (e)    maintaining the Funds' corporate records and books of account;
>
> (f)    disbursing payments of dividends, fees, and salaries;
>
> (g)    calculating, publishing and furnishing the subscription price, redemption

price, and net asset value of the Funds' shares; and

> (h)    conducting meetings of the Funds' boards of directors.

380.     Citi Hedge breached the Administration Agreements, by, among other things, failing to discharge its responsibility to calculate accurately the Funds' NAV.  Citi Hedge is liable to Plaintiffs as third party beneficiaries of those contracts.

## COUNT 26

### Aiding And Abetting Breach Of Fiduciary Duty
### Against Citi Hedge

381.     Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.

382.     The Kingate Defendants breached their fiduciary duties to Plaintiffs and the Class, as alleged above.

383.     Citi Hedge, as the Funds' administrator and financial services provider, had actual knowledge of and substantially participated in the breaches of fiduciary duty committed by the Kingate Defendants.  As Administrator, Citi Hedge gained significant knowledge of the operations of the Funds and their investment managers and other service providers.  As a leading provider of back office services to the hedge fund industry, and by virtue of its long-standing relationship with the Funds, Citi Hedge knew that the Kingate Defendants owed a fiduciary duty to Plaintiffs and the Class.  Citi Hedge also knew that the due diligence and risk controls employed by the Kingate Defendants were grossly deficient in breach of their fiduciary duties.

384.     With knowledge that the Kingate Defendants were breaching their fiduciary duties owed to Plaintiffs and the Class, Citi Hedge substantially assisted the Kingate Defendants in this breach.  For example, Citi Hedge substantially assisted the Kingate Defendants by receiving investments from Plaintiffs and the Class and transferring their investments directly to BMIS; calculating the Funds' NAV and disseminating the NAV values; receiving and transmitting other Fund information from the Kingate Defendants to Plaintiffs and the Class; and

allowing Citi Hedge's name and the services it was ostensibly providing to be included in the Funds' Information Memoranda.  The Kingate Defendants' breach of fiduciary duty would not have occurred without this substantial assistance by Citi Hedge.

385.    As a direct and natural result of (i) the Kingate Defendants' breach of fiduciary duty, and (ii) Citi Hedge's aiding and abetting in that breach, Plaintiffs and the Class have suffered substantial damages.

## COUNT 27

### Aiding And Abetting Fraud
### Against Citi Hedge

386.    Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.

387.    The Kingate Fraud Claim Defendants perpetrated a fraud upon Plaintiffs and the Class, as alleged above.

388.    Citi Hedge, as the Funds' administrator and financial services provider, had actual knowledge of and substantially assisted in the fraudulent scheme perpetrated by the Kingate Fraud Claim Defendants.

389.    As Administrator, Citi Hedge gained significant knowledge of the operations of the Funds and their investment managers and other service providers.  Citi Hedge knew that the Kingate Fraud Claim Defendants were falsely representing to Plaintiffs and the Class that they had undertaken meaningful due diligence and implemented risk controls, and were failing to disclose clear deficiencies in their internal controls and monitoring of Madoff's activities.

390.    Citi Hedge substantially assisted the Kingate Fraud Claim Defendants in the fraud perpetrated on Plaintiffs and the Class by means of the actions alleged above.  The Kingate

Fraud Claim Defendants could not have perpetrated their fraud without this substantial assistance by Citi Hedge

391.    As a direct and natural result of (i) the Kingate Defendants' fraudulent scheme, and (ii) Citi Hedge's aiding and abetting in that fraudulent scheme, Plaintiffs and the Class have suffered substantial damages.

## COUNT 28

### Unjust Enrichment
### <u>Against All Defendants</u>

392.    Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.

393.    Defendants were enriched at the expense of Plaintiffs and the Class by taking the monies of Plaintiffs and the Class in the form of commissions and other fees for the purported management and administration of their investments, and the purported, but in fact non-existent, capital appreciation of such assets.

394.    Defendants' performance was so far below the applicable fiduciary and business standards that Plaintiffs and the Class involuntarily conferred a benefit upon Defendants without Plaintiffs and the Class receiving adequate benefit or compensation in return.  In so doing, Defendants acted in reckless disregard of their duties to Plaintiffs and the Class.

395.    Defendants financially benefited from their unlawful acts, which caused Plaintiffs and the Class to suffer injury and monetary loss.

396.    As a result of the foregoing, it is unjust and inequitable for Defendants to have enriched themselves in this manner and each Defendant should refund all monies paid for any services rendered to Plaintiffs and the Class, and Plaintiffs and the Class are entitled to the

establishment of a constructive trust imposed on the benefits reaped by Defendants from their

unjust enrichment and inequitable conduct.

**COUNT 29**

**For Violations Of Rule 10b-5
And Section 10(b) Of The Exchange Act
Against The Kingate Fraud Claim Defendants**

397.    The Exchange Act Plaintiffs restate and reallege each of the preceding allegations

as if fully stated herein.  This Count is asserted against the Kingate Fraud Claim Defendants and

is based only upon Rule 10b-5 promulgated pursuant to Section 10(b) of the Exchange Act, 15

U.S.C. § 78j(b).

398.    The false and misleading statements and omissions alleged in this Count apply to

this Count only and do not apply to any other Counts, or to any other part of this Complaint.

399.    The Kingate Fraud Claim Defendants recklessly or knowingly made various

deceptive and untrue statements of material facts and omitted to state material facts necessary in

order to make the statements made, in light of the circumstances under which they were made,

not misleading to the Exchange Act Plaintiffs and the Class.  The purpose and effect of said false

and misleading statements, was, among other things, to induce the Exchange Act Plaintiffs and

the Class to purchase shares in Kingate Global and Kingate Euro.

400.    During the Class Period, the Kingate Fraud Claim Defendants sold the Funds

based on false and misleading statements and omissions.  Investors in the Funds or their

nominees were provided copies of the prospectuses, called Information Memoranda, or IMs.

These documents, however, contained uniform misrepresentations and material omissions and

induced the Exchange Act Plaintiffs to invest in the Funds.

401.    The IMs specifically stated that only the representations in the IMs and annual reports for the Funds were to be relied upon by investors:

(a)    "This Agreement represents the entire agreement of the parties in respect of the subscription for Shares and may not be changed or terminated orally."[49]

(b)    The subscription forms necessary to invest in the Funds and attached to the IMs stated:  "The Subscriber acknowledges that the Fund has delivered to the Subscriber the Information Memorandum.  The Subscriber has not relied on any representations or other information purported to be given on behalf of the Fund except as set forth in the Information Memorandum or the published, financial accounts of the Fund."[50]

402.    The Kingate Fraud Claim Defendants, as acknowledged in their own documents, recognized the fundamental importance of proper due diligence, strict monitoring, and oversight of the investment manager, broker, administrator and custodian, and their obligation to perform these functions.  Nevertheless, the Kingate Fraud Claim Defendants recklessly or knowingly failed to perform due diligence that they recognized was essential and required by standard-industry practice.  The Kingate Fraud Claim Defendants also recklessly or knowingly disregarded the obvious risks surrounding Madoff and that should have alerted them, as experienced investment professionals, to the need for heightened scrutiny.

403.    As set forth below in this Count, the Kingate Fraud Claim Defendants recklessly or knowingly misrepresented to the Exchange Act Plaintiffs and other members of the Class that their assets were being invested using a split-strike conversion strategy.  The Kingate Fraud Claim Defendants further recklessly or knowingly misrepresented that they and their financial

_____

[49]   KGF 2008 IM, Ex. 1 at S-10; KEF 2008 IM, Ex. 2 at S-10; KGF 2007 IM, Ex. 3 at S-10; KGF 2006 IM, Ex. 4 at S-10.
[50]   KGF 2008 IM, Ex. 1 at S-8; KEF 2008 IM, Ex. 2 at S-8; KGF 2007 IM, Ex. 3 at S-8; KGF 2006 IM, Ex. 4 at S-7.

services providers and auditors were conducting extensive due diligence and monitoring of

BMIS and Madoff, which served as the Funds' investment advisor, as well as broker, execution

agent, and custodian, and that they had full transparency with respect to all Madoff's operations.

The Kingate Fraud Claim Defendants knowingly or recklessly failed to disclose to the Exchange

Act Plaintiffs and other members of the Class the material facts that in reality no one had

conducted any meaningful due diligence on Madoff prior to establishing the Funds' investments

with Madoff; no one was meaningfully monitoring verifying, or confirming Madoff's trade

activity; effectively there was no transparency into Madoff's operations; and no one had an

independent, factual basis for stating that Madoff was executing a split-strike conversion

strategy.

### 1. False And Misleading Statements And Omissions About The Split-Strike Conversion Strategy Used By The Funds

404.    The IMs consistently described the investment strategy utilized by the Funds as

seeking to obtain "long-term capital appreciation" through the "split strike conversion strategy."

The IMs stated that "[t]he strategy utilized by the Fund's Investment Advisor is called 'split-strike conversion' and entails:

(a)    purchasing a basket of forty-five (45) to fifty (50) large capitalization S&P

100 stocks (*e.g.* General Electric, Microsoft, Pfizer, Exxon Mobil, Wal-Mart Stores, Citigroup,

Intel, American International, IBM, Johnson & Johnson, etc.), which together account for the

greatest weight of the Index and therefore, when combined, present a high degree of correlation

with the general market;

(b)    selling out-of-the money S&P 100 Index call options representing a dollar

amount of the underlying Index equivalent to the dollar amount of the basket of shares

purchased; and

(c)     purchasing out-of-the-money or at-the-money S&P Index put options in the same dollar amount."[51]

405.    These statements were false and misleading.  In reality, no such strategy was being executed because investors' assets were being funneled into Madoff's Ponzi scheme in which no legitimate securities transactions were ever conducted.  Further, the IMs failed to disclose to the Exchange Act Plaintiffs and other members of the Class the material fact that the Kingate Fraud Claim Defendants had no independent factual basis for their representations about the Funds' investment strategy because they had never undertaken any meaningful steps to confirm that the split-strike conversion strategy was actually being implemented by Madoff.

### 2.    False And Misleading Statements And Omissions About Due Diligence For Kingate Global And Kingate Euro

406.    The Information Memoranda falsely and misleadingly reassured investors that the Manager (or Co-Managers) would fulfill their ongoing obligation to evaluate and monitor Madoff.  In that regard, the Information Memoranda from 2000 through 2008 included the following false and misleading statements:

(a)     Pursuant to the Manager [Co-Manager] Agreement, the Manager **evaluates** and **monitors** the Investment Advisor and, in general, provides all necessary management services to the Fund.[52]

(b)     The Manager [or Co-Managers] has agreed (i) to manage all aspects of the investment advisory services provided to the Fund, including the **selection** and **evaluation** of [Madoff] and (ii) to arrange for the performance of all accounting and administrative services which may be required by the Fund's operations.  The Manager [Co-Manager] Agreement

---

[51]   KGF 2008 IM, Ex. 1 at 2; KEF 2008 IM, Ex. 2 at 2; KGF 2007 IM, Ex. 3 at 2; KGF 2006 IM, Ex. 4 at 2; KGF 2003 IM, Ex. 5 at 2; KGF 2000 IM, Ex. 6 at 2.

[52]   KGF 2008 IM, Ex. 1 at ii; KEF 2008 IM, Ex. 2 at iii; KGF 2007 IM, Ex. 3 at ii; KGF 2006 IM, Ex. 4 at ii; KGF 2003 IM, Ex. 5 at iii; KGF 2000 IM, Ex. 6 at iii.

authorizes the Manager to delegate responsibilities to others, subject to retaining responsibilities for **evaluating** and coordinating the services offered by others.[53]

407.    These representations were false and misleading because the Kingate Fraud Claim Defendants did not conduct a careful analysis of Madoff and failed to ensure that Madoff had the necessary competence, standing, and expertise to hold the Funds' assets.  Further, the IMs did not disclose that the Kingate Fraud Claim Defendants failed to conduct any meaningful due diligence of Madoff and had never independently verified with a third-party that any of the trade confirmations provided by Madoff were true and correct, and that the assets reported by Madoff existed.  The IMs also did not disclose that the Kingate Fraud Claim Defendants failed to evaluate the performance of accounting and administrative services necessary for the Fund's operations.

### 3.    False And Misleading Statements And Omissions About Madoff's Role As Market Maker

408.    The Information Memoranda also falsely stated that "[t]he Investment Advisor acts as a market-maker in the stocks purchased and sold by the USD portfolio," and as a result of the Investment Advisor's role as market-maker, "the portfolio is subject to credit risks (the exposure to the possibility of loss resulting from a counterparty's failure to meet its financial obligations)."[54]

409.    This statement was false and misleading.  The IMs failed to disclose that the Kingate Fraud Claim Defendants never conducted due diligence to verify or assess the credit risks created by the Investment Advisor's status as market-maker, as they were required to do under the Management Agreement and as they represented they would do under the Information

---

[53]    KGF 2008 IM, Ex. 1 at 13; KEF 2008 IM, Ex. 2 at 14; KGF 2007 IM, Ex. 3 at 13; KGF 2006 IM, Ex. 4 at 13; KGF 2003 IM, Ex. 5 at 14; KGF 2000 IM, Ex. 6 at 14.

[54]    KGF 2008 IM, Ex. 1 at 6, Ex.; KGF 2007 IM, Ex. 3 at 6; KGF 2006 IM, Ex. 4 at 6; *see* KEF 2008 IM, Ex. 2 at 6; KGF 2003 IM, Ex. 5 at 6; KGF 2000 IM, Ex. 6 at 6.

Memoranda.  The Kingate Fraud Claim Defendants had no independent factual basis for their

representations that the Investment Advisor acted as a market-maker because they had never

undertaken any meaningful steps to confirm that statement.

### 4.   False And Misleading Statements And Omissions About Madoff's Over-The-Counter Options Transactions

410.    In addition to falsely representing that Madoff executed trades which never took

place, the Information Memoranda also included false and misleading statements concerning

Madoff's supposed trading counterparties:  "[t]he options transactions executed for the benefit of

the USD portfolio are effected primarily in the over-the-counter market, not on a registered

options exchange."[55]

411.    This statement was false.  The IMs failed to disclose that the Kingate Fraud Claim

Defendants had no independent factual basis for their representations that options transactions

were executed primarily in the over-the-counter market because they had never undertaken any

meaningful steps to confirm that statement.  The Kingate Fraud Claim Defendants failed to

confirm the over-the-counter options trading despite acknowledging in the Information

Memoranda that trading equity and options in the over-the-counter market meant the Funds were

"subject[ed] to counterparty risk and [were] without the protection afforded with respect to

options transactions on regulated exchanges through the Options Clearing Corporation."[56]

Despite acknowledging the lack of protection provided by trading options over-the-counter, the

Kingate Fraud Claim Defendants never sought to determine whether the Investment Advisor was

trading with creditworthy counterparties or, in fact, making any over-the-counter option trades at

all.

---

[55]   KGF 2008 IM, Ex. 1 at 3; KEF 2008 IM, Ex. 2 at 4; KGF 2007 IM, Ex. 3 at 3; KGF 2006 IM, Ex. 4 at 3; KGF 2003 IM, Ex. 5 at 4; KGF 2000 IM, Ex. 6 at 4.

[56]   KGF 2008 IM, Ex. 1 at 6; KEF 2008 IM, Ex. 2 at 7; KGF 2007 IM, Ex. 3 at 6; KGF 2006 IM, Ex.4 at 6; KGF 2003 IM, Ex. 5 at 7; KGF 2000 IM, Ex. 6 at 7.

5.     **Misleading Statements And Omissions About The "Possibility" That Madoff Will Abscond With the Funds' Assets**

412.     As shown in the IMs, the Kingate Fraud Claim Defendants knew that Madoff's dual responsibilities as Investment Advisor and custodian created a risk that Madoff could abscond with the Funds' assets:

> Neither the Fund nor the Custodian has actual custody of the assets. Such actual custody rests with the Investment Advisor and its affiliated broker-dealer. Therefore, there is the risk that the custodian [Madoff] could abscond with those assets. There is always the risk that the assets with the Investment Advisor [Madoff] could be misappropriated. In addition, information supplied by the Investment Advisor may be inaccurate or even fraudulent. The Manager is entitled to rely on such information (provided they do so in good faith) and are not required to undertake any due diligence to confirm the accuracy thereof.[57]

413.     This statement was misleading. The Kingate Fraud Claim Defendants knew, or were reckless in not knowing, based on the numerous obvious risks of which they were aware, that fraud or misappropriation was, in fact, taking place, and not a mere possibility.

414.     This statement is also misleading because it fails to disclose the long list of obvious risks of which the Kingate Fraud Claim Defendants were aware. Specifically, this statement failed to disclose that: (i) no one had confirmed the existence of Madoff's counterparties; (ii) no one had confirmed the existence of the U.S. Treasury bills at the end of each year; (iii) Madoff's auditing firm was unknown, clearly unequipped to audit Madoff; and had not conducted a single audit of any entity since 1993; (iv) Madoff was extremely secretive; (v) key positions at BMIS were held by Madoff's family members; (vi) Madoff only provided paper confirmations of trading records; and (vii) Madoff's consistent returns were impossible to replicate by others and materially outside the realm of possibility based on statistical analysis.

---

[57]   KGF 2008 IM, Ex. 1 at 9; KEF 2008 IM, Ex. 2 at 10; KGF 2007 IM, Ex. 3 at 9; KGF 2006 IM, Ex. 4 at 9; KGF 2003 IM, Ex. 5 at 9-10; KGF 2000 IM, Ex. 6 at 10.

415.    By reason of the foregoing, the Kingate Fraud Claim Defendants directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they recklessly or knowingly made untrue statements of material facts or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

416.    The Kingate Fraud Claim Defendants engaged in the fraudulent activity described above knowingly, or in such a reckless manner, as to constitute willful deceit and fraud upon the Exchange Act Plaintiffs and the Class.

417.    But for the Kingate Fraud Claim Defendants' fraud, none of the securities that were sold to the Exchange Act Plaintiffs and the Class could have been sold.

418.    As a result of the Kingate Fraud Claim Defendants' fraudulent devices, schemes, artifices, acts, practices and course of business, as alleged herein, the Exchange Act Plaintiffs' and Class members' investments have lost all their value.

419.    The Exchange Act Plaintiffs and the Class suffered damages in connection with their respective purchases of shares of Kingate Global and Kingate Euro, for which the Kingate Fraud Claim Defendants are jointly and severally liable.

### COUNT 30

#### For Violations Of Section 20(a) Of The Exchange Act
#### Against Tremont Advisers, Grosso, Ceretti, And Manzke

420.    The Exchange Act Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.  This Count is asserted against the Tremont Advisers, Grosso, Ceretti, and Manzke pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78j(b).

421.    Tremont Advisers, Grosso, Ceretti, and Manzke acted as controlling persons within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

422.     Tremont was a wholly-owned subsidiary of Tremont Advisers at all times. Tremont Advisers had day-to-day control and exercised day-to-day control of Tremont. Accordingly, Tremont Advisers had the power to control the general business affairs of Tremont, and the power to directly or indirectly control or influence the specific corporate policy (*e.g.*, the failure to conduct due diligence) at Tremont, which resulted in primary liability.

423.     Defendant Grosso founded the FIM Entities and served as Executive Chairman and Chief Investment Officer of FIM Limited.  Grosso is also the Executive Chairman and Chief Investment Officer of FIM Advisers.  As such, Mr. Grosso had knowledge of, and participated in, the FIM Entities' transaction of business, consenting to the FIM Entities' transactions related to the Funds, and otherwise by exercising control over the FIM Entities.  Accordingly, Defendant Grosso had the power to control the general business affairs of the FIM Entities, and the power to directly or indirectly control or influence the specific corporate policy (*e.g.*, the failure to conduct due diligence) at the FIM Entities, which resulted in primary liability.

424.     Defendant Ceretti joined FIM Limited in 1986 and co-founded FIM Advisers with Defendant Grosso.  Ceretti is Chief Executive Officer of FIM Advisers.  As such, Mr. Ceretti had knowledge of, and participated in, the FIM Entities' transaction of business, consenting to the FIM Entities' transactions related to the Funds, and otherwise by exercising control over the FIM Entities.  Accordingly,  Defendant Ceretti had the power to control the general business affairs of the FIM Entities, and the power to directly or indirectly control or influence the specific corporate policy (*e.g.*, the failure to conduct due diligence) at the FIM Entities, which resulted in primary liability.

425.     Defendant Manzke was a director of the Funds from 1995 until approximately 2003.  Ms. Manzke was also Chairman and co-CEO of Tremont Advisers, Inc., the parent

company of Tremont.  As a director of the Funds, Ms. Manzke had knowledge of, and

participated in, the Funds' transaction of business, consenting to the transactions related to

Funds' accounts, and otherwise by exercising control over the Funds.  Accordingly,  Defendant

Manzke had the power to control the general business affairs of the Funds, and the power to

directly or indirectly control or influence the specific corporate policy (*e.g.*, the failure to

conduct due diligence) at KML, Kingate Global and Kingate Euro, which resulted in primary

liability.  As Chairman and co-CEO of Tremont's parent company, Ms. Manzke had knowledge

of, and participated in, Tremont's transaction of business, consenting to Tremont's transactions

related to the Funds, and otherwise by exercising control over Tremont.  Accordingly,

Defendant Manzke had the power to control the general business affairs of Tremont, and the

power to directly or indirectly control or influence the specific corporate policy (*e.g.*, the failure

to conduct due diligence) at Tremont, which resulted in primary liability.

426.    As a direct and proximate result of the wrongful conduct alleged in this Count, the

Exchange Act Plaintiffs and the Class suffered an economic loss and damages in connection with

their purchases of shares in the Funds in an amount to be proven at trial.

## COUNT 31

### For Violations Of Rule 10b-5
### And Section 10(b) Of The Exchange Act
### Against PricewaterhouseCoopers

427.    The Exchange Act Plaintiffs restate and reallege each of the preceding allegations

as if fully stated herein.  This Count is asserted against the PricewaterhouseCoopers and is based

only upon Rule 10b-5 promulgated pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. §

78j(b).

428.    The false and misleading statements and omissions alleged in this Count apply to this Count only and do not apply to any other Counts, or to any other part of this Complaint.

429.    PricewaterhouseCoopers issued audit opinions that constituted the presentation of false and misleading information as to the assets of the Funds.  Instead of billions of dollars, as represented, virtually no assets actually existed.  These statements were made recklessly or knowingly and constitute deceptive and untrue statements of material facts and omissions of material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  These statements induced the Exchange Act Plaintiffs to invest in the Funds.

430.    PricewaterhouseCoopers made the following false and misleading statements: PricewaterhouseCoopers issued audit opinions for every calendar year with respect to the Funds' financial statements.  In each of these opinions, PricewaterhouseCoopers (i) stated that PricewaterhouseCoopers conducted the audits in accordance with GAAS, and (ii) expressed an unqualified opinion that the Funds' financial statements "present fairly, in all material respects, the financial position of [the Funds] as of December 31, 200[4-8], and the results of its operations and the changes in its net assets for the years then ended, in conformity with accounting principles generally accepted in the United States of America."

431.    Each of those statements was false.  The statements were false for the following reasons:

(a)    PricewaterhouseCoopers knew, or was reckless in not knowing, that the Funds' financial statements did not reflect the financial position of the Funds as of December 31, 200[4-8];

(b)      PricewaterhouseCoopers knew, or was reckless in not knowing, that PwC's audits of the Funds did not meet, were in violation of, and were not in accordance with GAAS;

(c)      PricewaterhouseCoopers did not confirm the existence of the Funds' supposed assets.  While purporting to conduct an audit pursuant to GAAS, Pricewaterhouse-Coopers did not take the most fundamental and obvious steps in confirming the existence of the Funds' assets, and did not do so despite the requirements pursuant to GAAS, as set forth above;

(d)      PricewaterhouseCoopers acted recklessly in making the false statements alleged in this Count and their conduct in performing the audits was highly unreasonable and represented an extreme departure from the standards of ordinary care;

(e)      PricewaterhouseCoopers knew facts or had access to information suggesting that their audit opinions were not accurate or failed to check information that they had a duty to monitor and which would have demonstrated the falsity of their statements when made; and

(f)      PricewaterhouseCoopers knew that substantially all of the Funds' assets were managed by Madoff, who as the investment advisor, broker-dealer, and custodian of the assets held highly unusual multiple roles that facilitated Madoff's fraud.  Yet, PricewaterhouseCoopers failed, as described above, to conduct the minimal steps necessary to independently confirm the existence of the Funds' assets, so that PricewaterhouseCoopers' audits failed to uncover the fact that the assets did not exist.

432.     To issue unqualified audit opinions stating that the Funds had hundreds of millions or billions of dollars of assets without any independent confirmation that any of the assets actually existed is a textbook definition of a reckless audit.  PricewaterhouseCoopers'

audits failed to comply with GAAS and the requisite accounting standards and constituted, essentially, no audits at all.  Issuing clean audit opinions in the circumstances here, with the multiple questions and risks set forth above, is even more reckless yet.  The failure of PricewaterhouseCoopers to acquire any confirmatory evidence from independent third parties, such as counterparties to the alleged trades by BMIS or the custodian of the U.S. Treasury bills, or to acquire direct personal knowledge, such as by inspections and physical examination of the assets, not only was a blatant violation of auditing standards, but violated the most common sense and obvious purpose of an audit – to confirm that reported assets in fact exist.

433.    PricewaterhouseCoopers engaged in the fraudulent activity described above knowingly, or in such a reckless manner, as to constitute willful deceit and fraud upon the Exchange Act Plaintiffs and the Class.

434.    But for PricewaterhouseCoopers' fraud, none of the securities that were sold to the Exchange Act Plaintiffs and the Class could have been sold.

435.    As a result of PricewaterhouseCoopers' fraudulent devices, schemes, artifices, acts, practices and course of business, as alleged herein, the Exchange Act Plaintiffs' and Class members' investments have lost all their value.

436.    The Exchange Act Plaintiffs and the Class suffered damages in connection with their respective purchases of shares of Kingate Global and Kingate Euro, for which PricewaterhouseCoopers is liable.

## COUNT 32

### For Violations Of Rule 10b-5
### And Section 10(b) Of The Exchange Act
### <u>Against Citi Hedge</u>

437.    The Exchange Act Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.  This Count is asserted against Defendant Citi Hedge pursuant to Rule 10b-5 promulgated under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b).

438.    The false and misleading statements and omissions alleged in this Count apply to this Count only and do not apply to any other Counts, or to any other part of this Complaint.

439.    Citi Hedge issued false statements containing inflated NAV calculations and account balance information.  Citi Hedge issued these statements, at a minimum, on a monthly basis throughout the Class Period.  In issuing these statements, Citi Hedge acted recklessly or knowingly because Citi Hedge knew or had access to information indicating that its statements were not accurate.  Citi Hedge acted recklessly by failing to check or verify the information received from BMIS despite a duty to scrutinize and verify independently the information relating to the NAV and account balances.  Citi Hedge's failure to check or verify the information was also reckless because Citi Hedge was aware of the obvious risks surrounding Madoff, including the consolidation of the roles of investment manager, custodian, and execution agent.

440.    Citi Hedge also made the following false and misleading statement in the Information Memoranda:

> The Administrator will determine the net asset value of the Fund's Portfolio assets . . . as of the close of business on the last Business Day of each calendar month. . . .  The Administrator verifies the prices attributed to the securities held by the USD Shares of the

Fund by reference to pricing sources independent of the
Investment Advisor whenever reasonably possible."[58]

441.    This statement was false and misleading because Citi Hedge did not use

reasonable efforts to verify pricing information to the extent that BMIS reported to Citi Hedge

purchases and sales of securities at prices that were outside the daily trading range.  Citi Hedge

knew, or was reckless in not knowing, that BMIS reported to Citi Hedge purchases and sales of

securities at prices that were outside the daily trading range.  Citi Hedge's failure to check or

verify the information was also reckless, and lacked good faith, because Citi Hedge was aware of

the obvious risks surrounding Madoff, including the consolidation of the roles of investment

manager, custodian, and execution agent.

442.    The Exchange Act Plaintiffs justifiably relied on the information contained in the

Citi Hedge statements.  Further, Citi Hedge was paid substantial fees for performing

administrative services.

443.    Citi Hedge engaged in the fraudulent activity described above knowingly, or in

such a reckless manner, as to constitute willful deceit and fraud upon the Exchange Act Plaintiffs

and the Class.

444.    But for Citi Hedge's fraud, none of the securities that were sold to the Exchange

Act Plaintiffs and the Class could have been sold.

445.    As a result of Citi Hedge's fraudulent devices, schemes, artifices, acts, practices

and course of business, as alleged herein, the Exchange Act Plaintiffs' and Class members'

investments have lost all their value.

---

[58]   KGF 2008 IM, Ex. 1 at 23; KEF 2008 IM, Ex. 2 at 24; KGF 2007 IM, Ex. 3 at 23-24; KGF 2006 IM, Ex. 4
at 23-24; KGF 2003 IM, Ex. 5 at 24; KGF 2000 IM, Ex. 6 at 24.

446.   The Exchange Act Plaintiffs and the Class suffered damages in connection with their respective purchases of shares of Kingate Global and Kingate Euro, for which Citi Hedge is liable.

## JURY TRIAL DEMANDED

447.   Plaintiffs hereby demand a jury trial.

## PRAYER

WHEREFORE, Plaintiffs request the following:

(a)   certification of this class action as proper and maintainable pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure and declaration of the proposed named Plaintiffs as proper Class representatives;

(b)   such preliminary and permanent injunctive relief, including imposition of a constructive trust, as is appropriate to preserve the assets wrongfully taken from Plaintiffs and the Class;

(c)   compensatory, consequential, and general damages in an amount to be determined at trial;

(d)   disgorgement and restitution of all earnings, profits, compensation and benefits received by Defendants as a result of their unlawful acts and practices;

(e)   punitive damages for each claim to the maximum extent available under the law on account of Defendants' willful and wanton disregard of Plaintiffs' and the Class's rights;

(f)   costs and disbursements of the action;

(g)   pre- and post-judgment interest;

(h)   reasonable attorneys' fees; and

(i)   such other and further relief as this Court may deem just and proper.

Date:  May 18, 2010

**LABATON SUCHAROW LLP**

*Mial Woolly*

Joel H. Bernstein
Javier Bleichmar
Michael Woolley
140 Broadway
New York, NY 10005
Tel: 212-907-0700
Fax: 212-818-0477

**BOIES, SCHILLER
  & FLEXNER LLP**
David Boies
333 Main Street
Armonk, NY 10504
Tel: (914) 749-8200
Fax: (914) 749-8300

David A. Barrett
Howard L. Vickery
575 Lexington Avenue
New York, NY 10022
Tel: (212) 446-2300
Fax: (212) 446-2350

Stuart H. Singer
Carlos M. Sires
Sashi Bach Boruchow
401 East Las Olas Blvd, #1200
Ft. Lauderdale, FL 33301
Tel: (954) 356-0011
Fax: (954) 356-0022

**COHEN MILSTEIN SELLERS
  & TOLL PLLC**
Joel P. Laitman
88 Pine Street
New York, New York 10005
Tel: (212) 838-7797
Fax: (212) 838-7745

Steven J. Toll
Daniel S. Sommers

Joshua Devore
S. Douglas Bunch
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

***Co-Lead Counsel for Plaintiffs***

**Exhibit A**

## CERTIFICATION

I, Hector A. Tobia, hereby certify as follows:

1.    I am fully authorized to enter into and execute this Certification on behalf of Silvana Worldwide Corp. ("Silvana")  I have reviewed a complaint prepared against Kingate Global Fund Limited, et. al. ("Kingate Global") in this action.

2.    Silvana did not invest in Kingate Global at the direction of counsel or in order to participate in any private action arising under the Private Securities Litigation Reform Act (the "PSLRA").

3.    Silvana is willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.    Silvana invested in Kingate Global, and which is the subject of this litigation as follows:

    March 3, 2008: 705 units @ $425.10/unit = $299,695.50

5.    Silvana has not sought to serve as a representative party on behalf of a class during the last three years.

6.    Beyond its pro rata share of any recovery, Silvana will not accept any payment for serving as a representative party on behalf of the class, except the reimbursement of reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this _9_ day of June, 2009.

_____
Hector A. Tobia
Silvana Worldwide Corp.

## CERTIFICATION OF PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Lucien Geldzahler ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1.     I have reviewed a class action complaint asserting securities claims against Kingate Global Fund, Ltd. and Kingate Euro Fund, Ltd., and wish to join as a plaintiff retaining Cohen Milstein Sellers & Toll PLLC and The Law Firm of Jacob Sabo as my counsel.

2.     Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     My transactions in Kingate Global Fund, Ltd. and Kingate Euro Fund, Ltd., which are the subject of this litigation, were as follows:

| DATE | TRANSACTION (buy/sell) | NO. OF SHARES | PRICE PER SHARE |
|------|------------------------|---------------|-----------------|
| Jan 2008 | Buy | 403 | $423.5236 |

5.     During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in any action under the federal securities laws.

6.     I will not accept any payment for serving as a representative party on behalf of the class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __17__ day of __May__, 2010.