*Privy Council Appeal No. 70 of 2002*

**The Attorney General**  *Appellant*

v.

**Craig Hartwell**  *Respondent*

FROM

## THE COURT OF APPEAL OF THE BRITISH VIRGIN ISLANDS

---------------

JUDGMENT OF THE LORDS OF THE JUDICIAL COMMITTEE OF THE PRIVY COUNCIL,

Delivered the 23rd February 2004

------------------

*Present at the hearing:-*

Lord Nicholls of Birkenhead
Lord Hope of Craighead
Lord Walker of Gestingthorpe
Baroness Hale of Richmond
Lord Brown of Eaton-under-Heywood

*[Delivered by **Lord Nicholls of Birkenhead**]*

------------------

1.   On 2 February 1994 Police Constable Kelvin Laurent was the sole police officer stationed on the island of Jost Van Dyke in the British Virgin Islands.  It was the last day of his three day tour of duty on the island.  Jost Van Dyke is a small island with a population of about 135 people.  Laurent was still on probation. He was subject to daily supervisory visits by a police sergeant from the West End police station on the nearby larger island of Tortola.

2.   As the officer in charge of the Jost Van Dyke police substation PC Laurent had a key to the substation's strongbox.  Kept in this metal box were a .38 calibre service revolver and ammunition.  The Royal Virgin Islands Police Force is not an armed force.  Police officers do not normally carry arms.  Guns are kept in police stations and only issued to police officers when needed.

3.   During the evening of 2 February 1994 PC Laurent abandoned his post.  He left the island, taking with him the police revolver and

[2004] UKPC 12

ammunition. He went five miles by boat to West End, Tortola. He then travelled nine miles by road across Tortola to Road Town and from there 13 miles by boat to the island of Virgin Gorda. Presumably he was not wearing his police uniform.

4. PC Laurent next made his way to the Bath & Turtle bar and restaurant at The Valley where his partner, or former partner, and mother of his two children, Lucianne Lafond worked as a waitress. The bar was busy and full of local residents and tourists. It was a popular evening, with a band playing. At about 10.30 pm Laurent entered the bar in search of Ms Lafond. He wanted to see if she had anyone with her. In the bar was Hickey Vanterpool who, so it was said, was associating with Ms Lafond. Without further ado and without any warning Laurent fired four shots with his police service revolver. He was, apparently, intent on maiming Mr Vanterpool and, possibly, Ms Lafond herself. Two of the shots caused minor injuries to Ms Lafond and a tourist. A further shot struck and caused serious injuries to Craig Hartwell, a customer at the pub, who was standing near the doorway. Mr Hartwell was a British resident visiting the island.

5. Laurent was prosecuted and pleaded guilty to charges of unlawfully and maliciously wounding Mr Hartwell and Ms Lafond and having a firearm with intent to do grievous bodily harm. He was sentenced to five years' imprisonment and dismissed from the police force.

6. Mr Hartwell then brought these civil proceedings against Laurent and the Attorney General as the representative of the Government of the British Virgin Islands. The claim was for damages. It is common ground that as a police constable PC Laurent was an employee of the Government. Judgment in default of appearance was entered against Laurent. On 21 November 2000 Georges J dismissed the action against the Attorney General. On 17 September 2001 the Court of Appeal, comprising Byron CJ and Singh and Redhead JJA, allowed an appeal by Mr Hartwell and gave judgment in his favour for damages to be assessed. The Attorney General appealed against that decision to your Lordships' Board.

PC Laurent's police career

7. PC Laurent's career as a police officer was short. He was appointed a police constable on 2 July 1992 subject to satisfactory completion of two years' probationary service. He was then 26 years old. He underwent five months' training at the regional

police training centre in Barbados. He performed satisfactorily. His training included use of a .38 revolver. During his period of training he committed a number of misdemeanours such as being improperly turned out, disobedience to orders, malingering, absent without leave, and stating a falsehood. In the context in which they occurred these transgressions were minor. Laurent's overall performance was well regarded by the commandant: "quite commendable ... He has the potential to develop into a useful police officer".

8. After completing his training Laurent had postings at Road Town, Tortola, and at Virgin Gorda. In September and again in November 1993 he was warned about his conduct, once concerning absences from duty and once over telling a falsehood. In his annual report in December 1993 PC Laurent received good or average grades. The personal assessment of the Commissioner of Police, Commissioner Malone QPM, was that PC Laurent was well above average. The commissioner considered Laurent had extremely good promise and was "certainly" one of the persons in the force who could reach senior rank quickly.

The threat incident

9. On 16 January 1994 there occurred the first of two events of prime importance. On that day, as recorded in the Virgin Gorda police station diary, Murphy Flavien, who lived at The Valley, Virgin Gorda, came to the station and complained about the conduct of PC Laurent. Flavien complained that Laurent had assaulted him with an eight inch blade white-handled knife. Laurent had threatened he would kill "the mother's cunt" the next time he, Laurent, met Flavien at Ms Lafond's apartment. Flavien requested police assistance.

10. PC Joseph and another police constable went to Ms Lafond's apartment and interviewed PC Laurent. Laurent said Flavien was having an intimate relationship with Lucianne Lafond but denied he had threatened Flavien. Laurent's account of the incident was that he was in Ms Lafond's apartment, for whose rent he was responsible, peeling an orange with a knife when Flavien came into the apartment with Laurent's two young children. Laurent had told Flavien to leave at once, which Flavien did, and not return.

11. PC Joseph told Laurent that if there were problems in his relationship with his girl friend he should handle them in a more professional way. PC Laurent was warned about his behaviour.

The entry in the Virgin Gorda station diary recorded that the inspector, Inspector Pickering, was to be informed.

The White Bay incident

12. The second incident occurred two weeks later on the morning of 2 February 1994. It was on the evening of this day that the shooting took place at Virgin Gorda. On this day, as already noted, PC Laurent was stationed on Jost Van Dyke. During the morning Sergeant Dean Fahie made a routine supervisory visit to Jost Van Dyke from Tortola. He met Laurent, who said all was quiet. Sgt Fahie then told Laurent that he, Fahie, had received information that Laurent had been seen walking in the neighbourhood with a gun at his waist. Laurent's explanation was that during the night he had received a call from White Bay, a small cay on Jost Van Dyke, that an armed man was in the area. This was why he, Laurent, had gone out armed with his gun.

13. Sergeant Fahie was satisfied with this explanation. He told Laurent that in future he should not take the gun without Fahie's permission. Laurent accepted this. When this conversation took place Laurent had not entered a report of his night call in the substation diary. He should have already done this. He told Sgt Fahie he was about to do so.

Vicarious liability

14. The immediate cause of Mr Hartwell's injuries was the deliberate, reckless act of Laurent firing his revolver in the crowded bar. Laurent was consumed by anger and jealousy at the sight of Ms Lafond in company with Mr Vanterpool on the fateful evening. He fired shots at one or other or both of them. So this is not a case where a police officer used a service revolver incompetently or ill-advisedly in furtherance of police duties. Laurent used a service revolver, to which he had access for police purposes, in pursuit of his own misguided personal aims.

15. Mr Hartwell's claim is that, nonetheless, the Government of the British Virgin Islands is liable in law for the consequences of PC Laurent's wrongful acts. There are many circumstances where one person may be liable for a wrong deliberately committed by another. Foremost among such instances are those giving rise to "vicarious" liability of an employer for acts done by an employee in the course of his employment. Mr Hartwell has advanced a case based on the Government's vicarious liability as employer for acts done by Laurent as a police officer.

16. This is not Mr Hartwell's primary case, but it will be convenient to mention it first as the outcome of this claim is clear cut. The applicable test is whether PC Laurent's wrongful use of the gun was so closely connected with acts he was authorised to do that, for the purposes of liability of the Government as his employer, his wrongful use may fairly and properly be regarded as made by him while acting in the ordinary course of his employment as a police officer: see *Lister v Hesley Hall Ltd* [2001] UKHL 22, [2002] 1 AC 215, 230, 245, paras 28, 69, and *Dubai Aluminium Co Ltd v Salaam* [2002] UKHL 48, [2003] 2 AC 366, 377, para 23,. The connecting factors relied upon as satisfying this test are that Laurent was a police constable on duty at the time of the shooting (working his three day shift on Jost Van Dyke), that his jurisdiction extended to Virgin Gorda, and that before leaving Jost Van Dyke he had improperly helped himself to the police revolver kept in the substation on that island.

17. These factors fall short of satisfying the applicable test. From first to last, from deciding to leave the island of Jost Van Dyke to his use of the firearm in the bar of the Bath & Turtle, Laurent's activities had nothing whatever to do with any police duties, either actually or ostensibly. Laurent deliberately and consciously abandoned his post and his duties. He had no duties beyond the island of Jost Van Dyke. He put aside his role as a police constable and, armed with the police revolver he had improperly taken, he embarked elsewhere on a personal vendetta of his own. That conduct falls wholly within the classical phrase of "a frolic of his own".

Police force negligence: duty of care

18. The next and more difficult question is whether the police authorities were negligent in permitting PC Laurent to have access to the revolver kept at the Jost Van Dyke substation. Mr Hartwell's primary case is that, wholly distinct from any question of *vicarious liability* for its employee's wrongful acts, the Government was *itself* at fault. The police authorities knew or ought to have known that Laurent was not a fit and proper person to be entrusted with a gun. Had they exercised reasonable care they would not have permitted him to have access to a police firearm. The courts below reached different conclusions on this claim. The trial judge rejected it, but the Court of Appeal accepted it.

19. On behalf of the Attorney General Mr Guthrie QC submitted that the Government owed no duty of care to Mr Hartwell in respect of the persons to whom the police entrusted firearms. There

was no sufficiently proximate relationship between the police authorities and Mr Hartwell.

20. This wide submission makes it necessary to start with fundamental principles. Negligence as a basis of liability is founded on the impersonal ("objective") standard of how a reasonable person should have acted in the circumstances. Shortfall from this standard of conduct does not always give rise to legal liability. In order to elucidate the circumstances in which shortfall will give rise to liability the courts have fashioned several concepts, such as "duty of care". This familiar phrase is legal shorthand. Expressed more fully, a duty of care is a duty owed in law by one person or class of persons to another particular person or class of persons. The duty comprises an obligation to take reasonable care to ensure that the person or persons to whom the duty is owed do not suffer a particular type or types of damage. Thus drivers of cars owe, among other duties, a duty to other road users to take reasonable care to avoid inflicting personal injury on the latter.

21. Speaking generally, one of the necessary prerequisites for the existence of a duty of care is foresight that carelessness on the part of the defendant may cause damage of a particular kind to the plaintiff. Was it reasonably foreseeable that, failing the exercise of reasonable care, harm of the relevant description might be suffered by the plaintiff or members of a class including the plaintiff? "Might be suffered" embraces a wide range of degrees of possibility, from the highly probable to the possible but highly improbable. Bearing in mind that the underlying concept is fairness and reasonableness, the degree of likelihood needed to satisfy this prerequisite depends upon the circumstances of the case. Reasonable foreseeability does not denote a fixed point on the scale of probability: see Lord Hoffmann in *Jolley v Sutton London Borough Council* [2000] 1 WLR 1082, 1091. There must be reasonable foreseeability of a risk which a reasonable person would not ignore. The risk must be "real" in the sense that a reasonable person "would not brush [it] aside as far-fetched": see Lord Reid in *Overseas Tankship (UK) Ltd v Miller Steamship Co Pty (The Wagon Mound No 2)* [1967] 1 AC 617, 643. As the possible adverse consequences of carelessness increase in seriousness, so will a lesser degree of likelihood of occurrence suffice to satisfy the test of reasonable foreseeability.

Human intervention
22. A feature of the present case is that deliberate, wrongful conduct intervened between the defendant's alleged negligence

and the plaintiff's damage. The immediate cause of Mr Hartwell's injuries was Laurent's deliberate act of firing the revolver, in a reckless manner, in the crowded bar.

23. This type of situation has arisen more than once in recent years. In the well known case of *Dorset Yacht Co Ltd v Home Office* [1970] AC 1004 the plaintiff's yacht was damaged by Borstal boys who had escaped from custody. Lord Reid observed, at page 1030, that where human action forms one of the links between the original wrongdoing of the defendant and the plaintiff's loss that action must "at least have been something very likely to happen if it is not to be regarded as novus actus interveniens breaking the chain of causation". He added that "a mere foreseeable possibility" is not sufficient.

24. Lord Reid expressed himself in terms of causation and remoteness of damage. He might equally well have expressed himself in terms of the scope of the duty, as did the other members of the House. Lord Morris of Borth-y-Gest, at page 1034, spoke of foresight that the boys "might" interfere with one of the yachts and that the risk of this happening was "glaringly obvious". In those circumstances a duty of care was owed by the Borstal officers to the owners of the nearby yachts. Lord Pearson, at page 1053, said it was arguable that interference by the boys with the boats was eminently foreseeable as "likely" to happen. "Likely", without elaboration, was also the term adopted by Lord Diplock, at page 1071.

25. These observations on the significance of deliberate human intervention must be read in the context of the facts of the case then under consideration by the House. The *Dorset Yacht* case concerned liability for alleged omissions on the part of the Borstal staff. Liability for omissions is less extensive than for positive acts. But that is not a satisfactory ground for putting the *Dorset Yacht* case on one side and distinguishing it from the present case. The better approach is to recognise that, as with the likelihood that loss will occur, so with the likelihood of wrongful third party intervention causing loss, the degree of likelihood needed to give rise to a duty of care depends on the circumstances. In some circumstances the need for the high degree of likelihood of harm

mentioned by Lord Reid may be an appropriate limiting factor in cases involving deliberate wrongful human actions. In other cases foresight of a lesser risk of harm flowing from a third party's intervention will suffice to give rise to a duty of care. The law of negligence is not an area where fixed absolutes of universal application are appropriate. In each case the governing consideration is the underlying principle. The underlying principle is that reasonable foreseeability, as an ingredient of a duty of care, is a broad and flexible objective standard which is responsive to the infinitely variable circumstances of different cases. The nature and gravity of the damage foreseeable, the likelihood of its occurrence, and the ease or difficulty of eliminating the risk are all matters to be taken into account in the round when deciding whether as a matter of legal policy a duty of care was owed by the defendant to the plaintiff in respect of the damage suffered by him.

26. This accords with the approach adopted in *Smith v Littlewoods Organisation Ltd* [1987] AC 241, another "omissions" case. There the owner of a disused cinema was sought to be made liable in respect of damage caused to adjacent buildings when trespassing children lit a fire in the old cinema building. The owner, it was claimed, should have taken steps to prevent trespassing vandals entering the cinema. Lord Griffiths, at page 251, doubted the existence of a touchstone which could be applied as a universal test. He robustly declared that it should be left to the good sense of judges "to apply realistic standards in conformity with generally accepted patterns of behaviour" when deciding whether an occupier should be liable in negligence for a danger created on his property by the act of a trespasser. Lord Mackay of Clashfern, at page 270, adopted as the "fundamental principle" the words of Lord Radcliffe in the cricket ball case of *Bolton v Stone* [1951] AC 850, 868-869:

> "unless there has been something which a reasonable man would blame as falling beneath the standard of conduct that he would set for himself and require of his neighbour, there has been no breach of legal duty."

Different types of damage

27. Similarly, there are no hard-and-fast rules applicable when distinguishing one description of damage, which was reasonably foreseeable and in respect of which a duty of care arose, from another description of damage, which was not reasonably foreseeable and in respect of which there was no duty of care. This

is a further point raised by the facts of the present case. Whether, for the purpose of identifying the scope of a duty of care, one kind of damage is relevantly different from another depends upon the degree of generality applicable in the particular case. That, in turn, depends upon what is fair and reasonable in the circumstances.

28. Sometimes, depending on the circumstances, personal injury as a type of damage may need to be broken down further, distinguishing between personal injury arising from one particular cause and personal injury arising from another. A defendant may be regarded as owing a duty of care in respect of one but not the other. In *Doughty v Turner Manufacturing Co Ltd* [1964] 1 QB 518 the cover on a cauldron of exceedingly hot molten sodium cyanide was accidentally knocked into the cauldron and the plaintiff was damaged by the resultant explosion. The plaintiff's claim failed. The defendant employer owed a duty of care in respect of the only foreseeable risk, namely, that of splashing of the liquid if the cover fell into it.

29. It must be questionable whether a distinction of this character would commend itself to the courts today. The "meddlesome children" cases of *Hughes v Lord Advocate* [1963] AC 837 and *Jolley v Sutton London Borough Council* [2000] 1 WLR 1082 suggest not. In the latter case the duty of care owed by a local authority in respect of non-removal of an old abandoned boat was not confined to the obvious risk that a child might climb on the boat and suffer injury by falling through the rotten planking. The duty of care included damage suffered by the plaintiff when the boat fell on him as he lay underneath it while attempting to restore it. Fairness and reasonableness required that the applicable degree of generality should not exclude personal injury suffered in the latter way.

30. A caveat must be added, in passing, to all these broad statements of general principle. In many parts of this extensive and difficult area of the law the courts have developed guidelines. Cases of nervous shock are an instance. These guidelines assist in promoting a desirable degree of uniformity of approach from one case to the next. Nothing said above is intended to gainsay such guidelines.

The present case

31. When applying these principles in the present case two factual features of cardinal importance stand out. This case does not fall on the "omissions" side of the somewhat imprecise boundary line

separating liability for acts from liability for omissions. In a police case this distinction is important. Here the police are not sought to be made liable for failure to carry out their police duties properly. This is not a case such as *Hill v Chief Constable of West Yorkshire* [1989] AC 53 where liability was sought to be imposed on the police in respect of an alleged failure to investigate the Sutcliffe murders properly. In the present case the police authorities were in possession of a gun and ammunition. They took the positive step of providing PC Laurent with access to that gun. Laurent did not break into the strongbox and steal the gun. The police authorities gave him the key. True, Laurent disobeyed orders in taking the gun as he did. But the fact remains that the police authorities chose to entrust Laurent, who was on the island by himself, with ready access to a weapon and the ammunition needed for its use. The question is whether in taking that positive step the Government, through the police authorities, owed a relevant duty to Mr Hartwell.

32. The second feature of cardinal importance is that the alleged duty of care relates to entrusting PC Laurent with access to a hand gun and ammunition. Loaded hand guns are highly dangerous weapons. They are easy to carry and potentially lethal. One would expect to find that in deciding whom to entrust with such weapons the police would, expressed in general terms, owe a duty to exercise reasonable care. This would not impose a special duty on police authorities. One would expect a like duty to exist on everyone who entrusts another with a loaded firearm. That is eminently fair and reasonable. The serious risks involved, if a gun is handed over carelessly, are obvious. The precautionary steps required of a careful person are unlikely to be particularly burdensome.

33. The law has long recognised the special dangers associated with certain types of articles such as loaded firearms, explosives and poisons. In past days when the distinction mattered, articles such as these were classified as "inherently dangerous". Those who sent forth inherently dangerous articles were subject to a common law duty to take precautions: see Lord Dunedin in *Dominion Natural Gas Co Ltd v Collins* [1909] AC 640, 646. This was a special exception to the general rules existing in the 19th century and earlier. The greater the danger the higher was the standard of diligence required. The law extracted from those giving out things as dangerous as loaded firearms a high degree of care "amounting in effect to insurance against risk": see Lord Macmillan in *Donoghue v Stevenson* [1932] AC 562, 612.

34. When the majority decision of the House of Lords in *Donoghue v Stevenson* [1932] AC 562 set the law of negligence on a new path, this special rule regarding inherently dangerous goods was subsumed into the wider, more general principles of negligence. This did not mean that thenceforth the scope of the duty of care and the required standard of diligence became the same in respect of all types of articles. Lord Atkin was at pains to point out that the nature of an article "may very well call for different degrees of care". He continued, at page 596:

> "the person dealing with [an inherently dangerous article] may well contemplate persons as being within the sphere of his duty to take care who would not be sufficiently proximate with less dangerous goods; so that not only the degree of care but the range of persons to whom the duty is owed may be extended."

35. In *Burfitt v A and E Kille* [1939] 2 KB 743 Atkinson J applied this approach where a shopkeeper in Minehead sold a "blank cartridge pistol" to a twelve year old boy. Later, when the boy fired the pistol in the air, the plaintiff was injured by a tiny piece of copper going into his eye. Atkinson J held, at pages 746-747, that the duty of care was owed not only to the boy who bought the gun. The shopkeeper also owed a duty of care towards "all such persons as may reasonably be contemplated as likely to be endangered".

36. Thus, where an article as dangerous as a loaded gun is handed over the class of persons to whom the duty of care is owed is wide and the standard of care required is high.

37. In the present case the police authorities plainly owed a duty to take reasonable care to see that police officers to whom they entrusted firearms were competent and suitable. But to whom was that duty owed, and in respect of what types of damage? If police firearms are entrusted to police officers who are not competent to use them there is an obvious risk of danger to members of the public. Similarly, if firearms are allocated to police officers whose temperament makes them unsuited to carry and use firearms in discharge of police duties.

38. But the present case is different. The risk in the present case was that a police officer, entrusted with access to a firearm for police purposes, might take and use the weapon for his own purposes, namely, with the object of maliciously injuring someone else, this risk inevitably carrying with it the further risk that in the course of such criminal activity a member of the public might be

injured. Were these two risks, and particularly the first of them, reasonably foreseeable? It is always *possible* that anyone may behave in such an irresponsible and criminal fashion. Strange and unexpected things are always happening. But were these risks so remote that a reasonable police officer would ignore them as fanciful?

39. In agreement with the Court of Appeal, their Lordships consider this last question must be answered "no". In the view of their Lordships the appropriate analysis is that when entrusting a police officer with a gun the police authorities owe to the public at large a duty to take reasonable care to see the officer is a suitable person to be entrusted with such a dangerous weapon lest by any misuse of it he inflicts personal injury, whether accidentally or intentionally, on other persons. For this purpose no distinction is to be drawn between personal injuries inflicted in the course of police duties and personal injuries inflicted by a police officer using a police gun for his own ends. If this duty seems far-reaching in its scope it must be remembered that guns are dangerous weapons. The wide reach of the duty is proportionate to the gravity of the risks. Moreover, the duty imposes no more than an obligation to exercise the appropriately high standard of care to be expected of a reasonable person in the circumstances.

40. For these reasons, and contrary to Mr Guthrie's submission, their Lordships consider that, in deciding to entrust PC Laurent with the key to the strongbox in the Jost Van Dyke police substation, the police authorities owed a duty of care to Mr Hartwell in respect of damage arising in the way it did.

Breach of the duty of care

41. The question which next arises is whether the police authorities failed to exercise reasonable care when giving PC Laurent access to the gun in the strongbox at Jost Van Dyke police substation. The answer to this question turns largely on whether the police response to the "threat incident" on 16 January 1994 was adequate. On its face Mr Flavien's complaint was serious. He alleged that Laurent had assaulted him with an eight inch blade knife. The only recorded police response was the visit made to Laurent by PC Joseph and his colleague. They appear to have accepted Laurent's explanation. But there is no evidence that anyone interviewed Flavien or, indeed, Ms Lafond. This being so, it is difficult to see how the police could have been satisfied that Laurent's explanation represented the truth of what had occurred. It is not suggested that the police acted in bad faith. But the police

response can be described as relaxed to the extent of being overly casual.

42. In his evidence Commissioner Malone was dismissive of this incident. The basis on which he reached this conclusion is not clear. He knew nothing of this incident until after the shooting had occurred on 2 February 1994. Whether he then instigated an investigation into the threat incident, on the basis of which he reached his dismissive conclusion, is not clear.

43. Nor is it clear whether the officer responsible for posting Laurent to Jost Van Dyke knew of the threat incident. That he knew, or that it would have made no difference had he known, were matters to be established in evidence by the police. The police called no evidence on these points. Nor did the police adduce any evidence to show there was in place, as there ought to have been, a system whereby information of this nature was made available to the officer responsible for making postings.

44. Their Lordships consider that Flavien's complaint, and the fact that it seems not to have been investigated thoroughly, are matters which should have been drawn to the attention of the officer responsible for the decision to post Laurent, still only a probationer, to Jost Van Dyke. Had this been done warning bells must surely have been set ringing. A reasonable police officer would have concluded that in the context of his family problems Laurent might well be volatile, even unstable. Until Laurent's domestic problems were resolved it would be prudent not to entrust him with sole, unsupervised responsibility for a police firearm.

45. The White Bay incident adds little, save to confirm the surprisingly casual approach adopted by the police. Sergeant Flahie accepted PC Laurent's explanation of why he had been carrying a gun even though Laurent had just reported to him all was quiet on the island and even though Laurent had not recorded in the station diary the (alleged) report of the sighting of an armed man at White Bay. Sergeant Flahie did not report the incident to headquarters. It is not clear whether Sergeant Flahie might have acted differently had he known, which he did not, of the threat incident which had occurred just two weeks previously.

46. The material available in support of this head of claim is distinctly meagre. The case is closely-balanced. But all in all their Lordships prefer the Court of Appeal's conclusion regarding breach of duty to that of the trial judge. As already emphasised, the standard of diligence expected of a reasonable person when

entrusting another with a gun is high. Knowing what they did because of Flavien's complaint, the police authorities ought to have foreseen there was a risk, which could not sensibly be ignored, that Laurent might lose control of himself over his family problems and find the lure of a gun irresistible, with consequent risk of personal injury to members of the public. The police authorities failed to exercise the degree of care the situation demanded.

47. For these reasons their Lordships will humbly advise Her Majesty that this appeal should be dismissed. Their Lordships will consider written submissions on costs to be delivered by the parties in accordance with directions to be given by the Registrar.