ANTIGUA AND BARBUDA

IN THE COURT OF APPEAL

CIVIL APPEAL NO.37 OF 2004

BETWEEN:

OLIVER DAVIS<br>Trading as Davis Engineering

Appellant

and

[1]   RONA HENRY
[2]   ERIC HENRY

Respondents

Before:
   The Hon. Mr. Brian Alleyne, SC                    Chief Justice [Ag.]
   The Hon. Michael Gordon, QC                       Justice of Appeal
   The Hon. Mr. Denys Barrow, SC                     Justice of Appeal

Appearances:
   Mr. Jerry Watt QC, Dr. David Dorsette with him, for Appellant
   Mrs. Stacy Richards-Anjo for the Respondents

-------------------------------------------------<br>2006:   July 17; 18;<br>December 4.<br>-------------------------------------------------

JUDGMENT

[1]   **ALLEYNE, C.J.[AG.]:**  This appeal arises out of a building contract between the respondents (hereinafter 'the respondents', 'the Henrys', or 'the owners') and Tropic Builders Limited, a construction company headed by Bengt Berntsson and his wife, for the construction by Tropic Builders Limited of a dwelling house for the Henrys, at a fixed contract price of $684,500.00.   The contract is dated 12th September 1994.

[2]   By letter dated 10th June 1994, from the appellant Oliver Davis to Mrs. Berntsson of Tropic Builders Limited, Mr. Davis proposed to provide certain engineering services involving the designing of the foundations and substructure up to the

1

main floor slab, design of cisterns, to provide three sets of drawings of all design work, and to supervise the construction of all work related to his design.  For this work he proposed a fee of $9,500.00, and made it clear that this fee did not include soil tests, which did not appear to him at the time to be necessary.

[3]     Mr. Davis, in the said letter to Mrs. Berntsson, indicated that if soil tests were required, that would be at an extra charge.  No reference is made to the Henrys in this letter, either as a party to the contract or otherwise.

[4]     Nevertheless, Mrs. Rona Henry claimed in evidence that there was a separate agreement between herself and her husband on the one hand and Oliver Davis on the other for engineering services in connection with the construction of the house, which, she claimed, was witnessed by a letter written by Mr. Davis to her and her husband.  She was unable to locate or produce the letter, and the learned trial judge placed no reliance on that evidence.

[5]     The contract between the Henrys and Tropic Builders recited that they had 'caused drawings and specifications setting forth the work to be done to be prepared by the Builder', being Tropic Builders.

[6]     It is an agreed fact that the fee of $9,500.00 due to Davis was paid to him directly by Mrs. Henry, outside of and above and beyond the contract sum agreed to be paid to the builders.  However, all invoices in respect of the said engineering works were directed to Tropic Builders Limited.   Mr. Davis denies any contractual relationship with the Henrys.

[7]     Some time after completion of the construction, cracks appeared in the upper level floor slab and walls, and the cistern leaked.  A number of deficiencies and defects in the construction were noted.   The Henrys sued Tropic Builders and Oliver Davis.

[8]     In their statement of claim the Henrys claimed, as against Oliver Davis, that he was engaged to act in his professional capacity with regard to the construction and supervision of the house, and particularly the designing and construction of the foundation, cisterns and floor slab of the said house.

[2]     The Henrys went on to make reference to the letter of 10th June 1994, referred to in paragraph 2 of this judgment, asserting, in effect, that this letter contained the terms of the contract between them and Mr. Davis.  They claimed that Mr. Davis's services to them in relation to the said house were completed in or about February 1995, and that Mr. Davis has been paid for his services.

[3]     The Henrys set out particulars of the deficiencies in the construction, and claim that a Civil Engineer visited the house in 1999 and submitted a report dated 28th October 1999, in which he describes "tremendous cracking" and "extremely severe cracks" observed at the house.

[4]     The statement of claim alleges negligence and breach of duty on the part of Tropic Builders, the first defendants, in terms of paragraphs 9, 10 and 11 of the Statement of Case, which I set out below;

"9.     By the said agreement executed between the Plaintiffs and the Fist Defendant, the First defendant agrees therein to build and complete the dwelling house in a substantial and workmanlike manner in accordance with particular plans annexed to the said agreement.  The Plaintiffs will refer to the said plans at trial.

10.     The implied terms of the contract are as follows:-
        (a)     that the First Defendant would use materials of good quality
        (b)     that the First Defendant would use materials which were reasonably fit for the intended purposes.
        (c)     that the First Defendant would exercise reasonable skill and care in carrying out its duties.
        (d)     that the Defendant would carry out the works in a good and workmanlike manner.

11.     The First Defendant owed a duty of care to the Plaintiffs in carrying out the works negligently and in breach of his contract

3

the Defendant and or his servants or agents carried out defective works using inferior, inadequate, insufficient or unsuitable materials thereby causing loss and damage to the Plaintiffs."

[5]   In paragraph 12 of the Statement of Claim, the Henrys allege that

**Formatted:** Bullets and Numbering

"The said faults and defects were caused by negligence and/or the breach of contract of the First Defendants their servants/agents or the Second Defendants their servants and/or agents.

<u>PARTICULARS</u>

(a)  Failing to sufficiently reinforce the upper storey block work.
(b)  Failing to construct the lower storey floor of the said house as specified in the drawings prepared by the Second Defendant.
(c)  Failing to carry out the works in a good and workmanlike manner.
(d)  Failing to exercise reasonable care and skill in carrying out its duties."

[6]   The only aspect of this pleading which could possibly relate to the appellant and attach liability to him in negligence is paragraph (d).   The obligations under paragraphs (a), (b0 and (c) were exclusively obligations of the contractor.

**Formatted:** Bullets and Numbering

[7]   In paragraphs 15 and 16 the Henrys further aver against the appellant Oliver Davis the following:

**Formatted:** Bullets and Numbering

"15.   The Plaintiffs further avers that the Second Defendant was also obligated in performing his services as professional civil engineer to supervise the preparation of the said land at Friars Hill for construction and to oversee the works as carried out by the First Defendant up to the level of the foundation of the said building.  There was implied into the contract between the parties that the Second Defendant would exercise reasonable skill and care in carrying out his duties and particularly in supervising the construction of the foundation, cistern and floor slab of the building and advising the Plaintiffs.

16.   In breach of his contract the Second Defendant and his servant/agents have carried out defective work and have failed to exercise due care and skill required under the Second Defendant's contract with the Plaintiffs.  The Plaintiff's will rely on the report of Cedric Henry dated 1st July, 2000 at trial.

<u>PARTICULARS</u>

(a)   Failing to give adequate consideration to the history of the site prior to the decision as to the level of site investigation having regard to the fact that the property sits on the shoulder of Friars Hill Road in an area where the road was constructed by cutting

into the side of the hill and the resulting material would have overlaid the natural soil.

(b)    Failure to undertake and complete a proper investigation of the subsoil conditions of the property or to advise that the Plaintiffs seek the services of another professional who could give advice relating to the subsoil and who would carry our geotechnical investigations to supplement the geotechnical investigations already available.

(c)    Failure to assess and analyse the presence of natural or manmade waterways in or around the site and to recognize that there was a natural manmade storm drainage path.

(d)    Failure to implement precautions accepted with the Second Defendant's profession within the jurisdiction of Antigua and Barbuda to guard against the potential threat of water coming into contract with the foundation or to divert the water around the building.

(e)    Failure to exercise due care and skill in the supervision of the progress of the construction of the lower floor slab, foundation and cistern.

(f)    Failure to exercise due care and skill in carrying out the contract for the Plaintiffs."

[8]    A second report was prepared by Civil Engineer Cedric Henry in 2000, which, **Formatted: Bullets and Numbering** together with Cedric Henry's witness statement and testimony, was relied on by the Henrys.  In his testimony the engineer offered the opinion that the cracks which he observed in the wall suggest a lack of reinforcement and excessive settlement which is pulling down the master bedroom wall.  With regard to the crack in the master bedroom floor, it 'appears to split the east wing of the building in two, leave the building altogether and reappear in the driveway, splitting that slab in two.'  He opines that this suggests a failure in the soil causing the building to slide down hill relative to the east wing.  Finally he expressed the view that the problem stems from an incomplete investigation of the subsoil conditions, that such an investigation is costly and not usually applied to a dwelling house project, but in light of the history of that particular site, which he says is 'far from usual', such an investigation was warranted.

[9]     The appellant pleaded that he entered into contractual relations with the builders, not with the Henrys.  I note here that the contract entered into by the appellant made it clear that his fee did not include soil tests, which did not appear to him at the time to be necessary.  The document dated June 10th 1994, being the contract between Davis Engineering and Tropic Builders, stated explicitly 'It must be understood that this engineering fee does not include soil tests.  At this time these do not appear to be necessary; but will be an extra charge should they be required.'  The engineering fee on that contract was $9,500.00.

[10]    In her evidence Mrs. Rona Henry stated that she paid for soil tests.  She continued 'I cannot recall what I paid.  It was more than $9,500.00.  It was not so much.  It was less.'

[11]    It is clear from the evidence that if payment was made for soil tests, it was not to Davis Engineering.

[12]    In a lengthy and comprehensive written judgment the learned trial judge found both the first defendant Tropic Builders Ltd. and the second defendant Oliver Davis liable for breach of contract and negligence, ordered damages to be assessed, further ordered that the damage assessed in relation to the substructure and cistern is to be apportioned between the first defendant and the second defendant, with costs also to be determined.

[13]    The learned judge considered the question of the relationship between the Henrys and the appellant in paragraphs [30] to [39] of the judgment and concluded at paragraph [40] as follows;

> "It is considered that the totality of the communication between Mrs. Henry and the First Defendant, that between First and Second Defendants, including the Second Defendant's letter of 10th June 1994 (inter alia specifies the services to be performed) to Mrs. L. Berntsson of Tropic Builders Ltd, the payment for the services by Mrs. Henry (being one of the signatories to the agreement of 12th September 1994) are sufficient in law

6

to constitute a contract between the Claimants (acting through Mrs. Henry) on the one hand and the Second Defendant on the other.  There are no strangers or third parties in this instance."

[14]    Oliver Davis, the appellant, has appealed against the decision.  Tropic Builders has not appealed and was not served with the Notice of Appeal.  That company was not represented at the hearing of the appeal.  At the hearing, the Court indicated its concern that the interests of Tropic Builders could conceivably be affected adversely by the outcome of the appeal, and wondered whether they should not be served and given the opportunity to be heard.  The hearing was suspended for consultations, and counsel for Tropic Builders appeared before the Court and indicated that his clients had no interest in participating in the appeal, and were prepared to accept any consequences which might flow from the appeal.

**Formatted:** Bullets and Numbering

[15]    The appellant has appealed against the decision on the grounds that:

**Formatted:** Bullets and Numbering

(a)     The Learned Trial Judge erred in law and in fact when he found that there existed a valid sub contract between the Claimants and the Second Defendant and that in failing to supervise his designs he was in breach of his obligations under the contract.

(b)     The Learned Trial Judge erred in law and in fact that on the evidence before him it was reasonable to regard the First Defendant and Mrs. L. Bengston agents of the Claimants.

(c)     The Learned Trial Judge erred in law and in fact when he failed to find on the evidence before him that the Second Defendant was engaged by the First Defendant Company as a subcontractor, that the Second Defendant was not a party to the building Agreement dated the 12th September 1994.  That there was no privity of contract between the Second Defendant and the Claimants, neither were there contractual relations between them.

(d)     The Learned Trial Judge erred in Law when he found that the Second Defendant was in breach of contract in failing to supervise his designs when the evidence disclosed that the Second Defendant had visited the site regularly, but had not been informed by the First Defendant and

7

requested to be present when there was major construction relating to the foundations and cistern based on the second Defendant's plans and drawings.

(e)     The Learned Trial Judge erred in law and in fact when he found that the Second Defendant was liable in negligence for breach of a duty of care to the Claimants.

(f)     The Learned Trial Judge erred in law when he ordered that "the damages to be assessed in relation to the substructure and cistern was to be apportioned between the First Defendant and the Second Defendant", but made no finding in respect of the percentage of liability in this regard.

[16]     It would be convenient to treat grounds (a) to (c) together, in that they all essentially challenge the finding that there existed a contractual relationship between the appellant and the respondents.  Ground (e) challenges the finding that there existed a duty of care as between the appellant and the respondents. Ground (d) relates to a finding of fact, and ground (f), relating to the remedy, would depend on the results of the appeal on the substantive issues.

### The Contractual Relationship

[17]     Mr. Bengt Berntsson, director of Tropic Builders Ltd., in his witness statement, asserts that the company built the respondents' house on foundations built by the company which were designed by the appellant Oliver Davis at the request of the respondents, the Henrys.  He says, and this is not disputed, that the appellant was paid for the design by the respondents.  He says further that in requiring the company to build on foundations designed by the appellant the respondents absolved the company of any obligation to ascertain the condition of the subsoil and represented to the company that the foundations were adequate for the site and for the house to be built on it.  He also asserted that the vast majority of the damages suffered were the result of inadequate foundations and thus not the responsibility of the builders.

8

[18]   Mr. Berntsson, in cross-examination by counsel for the company, said that the drawings were provided by the company, by his wife who is an architect or a designer.  He said that 'we', that is the company, insisted on Mr. Davis doing the drawings, but that the company was not obliged to follow the plans of Mr. Davis. He agreed that he did not follow the E plans, which indicated the type of steel to be used.

[19]   In answer to cross-examination by counsel for Mr. Davis, this witness confirmed that 'I hired an engineer to prepare the foundation and slab'.  He asserted that the client (the Henrys) accepted his recommendation in that regard, and Mr. Davis was engaged.  He confirmed that there was nothing he did not understand on the engineering drawings, the only thing he had difficulty with is the slab.  However, he confirmed that he had no difficulty with the bedroom slab.  He also said that he did not tell the Henrys that he was not going to follow the plan, which they were entitled to expect him to do.  He in fact did not follow the plan, but said 'I cannot say why I did not follow the plan'.

[20]   This witness disputed the opinion of the engineer who gave evidence on behalf of the respondent, Mr. Workman, that the cracks occurred because he did not follow the plans.  He agreed with Mr. Workman that there was nothing wrong with the E plans.  Indeed he said they were excellent.  He did not dispute Mr. Workman's opinion that the reinforcement provided for in the plans was more than necessary.

[21]   This witness said that he did not discuss the change with Mr. Davis, nor inform him about it.  The appellant may well have been unaware of the changes made by the builder, as also apparently were the Henrys.  The appellant inspected the building after the damage became apparent and observed a number of defects and deficiencies in the construction, detailed at page 131 to 133 of the record.  These all seem to have been created by the builder without the knowledge or approval of either the Henrys or the appellant, and to have caused or contributed largely to the damage complained of.

[22]   The learned trial judge came to the conclusion that a sub contract for engineering services existed between the Henrys and the appellant, and that arose by virtue of the fact, as found by him, that Mrs. Henry paid the appellant for his services, and that the appellant "did perform services for someone and for which he was paid. He based this conclusion also on his finding that before securing the services of the appellant as engineer, the contractor consulted Mrs. Henry.  The learned judge cited in support the evidence of Bengt Bernsson, the Director of the builder, in cross-examination by counsel for the appellant, that

> "I hired an engineer to prepare the foundation and slab.   We recommended strongly that we should have an engineer on board because of the location and size of the house.  The clients accepted the recommendation."

[23]   The appellant by his counsel strongly challenges this finding, which amounts in effect to a finding that in entering into the contract the builder acted as agent for the Henrys.  Learned Queens Counsel Mr. Watt cited the learning in Halsbury's Laws of England fourth edition (reissue) volume 4(2) at paragraph 346;

> 'There is no privity of contract between the employer and the subcontractor or between the architect and the sub-contractor, although the employer or his architect often nominates the sub-contractor. …. Acceptance by the employer of work done by a sub-contractor will in no way bring about an implication that the employer has made any contract with the sub-contractor.'

[24]   The same volume of Halsbury's, at paragraph 342, under the rubric **Relationship between main contractor and sub-contractor**, says

> 'The sub-contractor …. is liable to the main contractor for defective work , as the relation between them is similar to that of employer and contractor. Thus where the sub-contractor is in breach of either an express or an implied term of the sub-contract and this has caused injury to a third party, the sub-contractor will be liable in contract to the contractor *even if both have been held liable to the third party in tort.'* (my emphasis).

10

[25]    The case of **Hampton v Glamorgan County Council**[1] cited by learned Queen 's Counsel for the appellant provides an interesting illustration of the principle.  In that case a builder contracted with the Council to build a school in accordance with specifications and directions of the Council's architect.  The specification contained a certain provisional item.  An engineer submitted a scheme to the architect for that item, and by the direction of the architect, this scheme was accepted by the builder.  The builder paid to the engineer a portion of the sum agreed but as a result of bankruptcy was unable to pay the balance.  In an action by the engineer against the Council it was held that the builder, in employing a specialist to undertake that aspect of the work, was acting as a principal and not as the agent of the Council.  The claim against the Council failed.  Lord Loreburn, in his judgment, after recognizing the misfortune of the supplier, asks the rhetorical question and supplies the answer; "but can the plaintiff (the engineer) say that the county council owes this money to him?  I think not."

[Formatted: Bullets and Numbering]

[26]    Viscount Haldane[2] added:

[Formatted: Bullets and Numbering]

> 'the real question that arises …. is the answer to the inquiry where privity is to be found in the contract. …. [T]he only relation between the (engineer) and (the builder) was that of two parties dealing as principals; there is nothing in that contract which establishes a relation of privity between (the engineer) and the (council) and nothing in the course of dealing which displaces the inference that that is not only the true construction of the contract, but the position in which the parties left themselves.'

Lord Shaw of Dunfermline[3] added

> 'In those circumstances, my Lords, fortunate or unfortunate as it may have turned out for the tradesman that he dealt with the builder, he cannot now, I fear, be permitted to set up a privity of contract with someone else, namely the owner.'

---

[1] [1917] A.C. 13, 16.
[2] *Ibid.* at page 21.
[3] *Ibid.* at page 23.

To add to the engineer's woes, Lord Parmoor [4] joined the chorus.  He said:

'I agree …. that you simply have to see in a case of this kind with whom the contract has been made, and I can come to no other conclusion than that the appellant made his contract with the building contractor as principal and not with the building owners, or any agent with authority to make them liable.'

[27]    **Hudson's Building and Engineering Contracts**[5] states the following proposition:

It cannot be over-emphasised that no privity of contract between the employer and the sub-contractor can arise out of a sub-contract concluded between the main contractor and the sub-contractor.  Attempts have been made from time to time to argue that the main contractor or architect on the facts contracted as agent for the employer, and at one time this view appears to have prevailed in the courts, at least in relation to nominated or selected sub-contractors, but it is clear that only the most special and unusual facts, showing that the employer expressly or by his conduct authorized the main contractor or the architect so to contract, could justify such a finding, which is contrary to the sense of the usual main contract and the almost universal practice in the building industry.

[28]    It seems to me that the evidence in this case is far from satisfying the criteria laid down to create a relationship of privity between the Henrys and the appellant in this case, and I would hold that the learned trial judge was wrong in holding that the appellant was liable to the Henrys for breach of contract.  I would allow the appeal in respect of these grounds.

**The Duty of Care**

[29]    That leaves the question of breach of duty of care to be determined.  As indicated in paragraph 30 of this judgment, and as I have found, the absence of contractual liability does not preclude liability in tort for breach of a duty of care and in my view the appellant clearly owed a duty of care to the Henrys.  The learned trial judge found the appellant jointly liable with the contractor in negligence to the Henrys.

---

[4] *Ibid.* at page 24
[5] At page 579.

He addresses the factual basis of this finding at paragraph [127] of the judgment in these terms:

> 'in the case of the second defendant (the appellant) he failed to supervise those structures which he designed in accordance with his obligations.'

And at paragraph [132] the learned judge said

> 'The damage to the house as outlined above is as a direct consequence of the actions of the First and Second Defendants.'

[30]   The question to be determined is whether on the facts in this case, proved by the evidence, the appellant was in breach of his duty of care.  In order to make that determination, it must first be decided the extent of the duty owed by the appellant to the Henrys.  The views of the Henrys in relation to that question can be inferred from their pleaded particulars of negligence, which have been helpfully reproduced by the learned trial judge at paragraph [13] of his judgment, and which I here reproduce:

1.   Failing to give adequate consideration to the history of the site prior having regard to the fact that the property sits on the shoulder of Friars Hill Road in an area where the road was constructed by cutting into the side of the hill and the resulting material would have overlaid the natural soil.

2.   Failure to undertake and complete a proper investigation of the subsoil conditions of the property or to advise that the Claimants seek the services of another professional who could give advice relating to the subsoil and who would carry out geotechnical investigations.

3.   Failure to assess and analyse the presence of natural or manmade waterways in or around the site and to recognize that there was a natural manmade (sic) storm drainage path.

4.   Failure to implement precautions accepted within the Second Defendant's profession within the jurisdiction of Antigua and Barbuda to guard against

13

the potential threat of water coming into contact with the foundation or to divert the water around the building.

5.      Failure to exercise due care and skill in the supervision of the progress of the construction of the lower floor slab, foundation and cistern.

6.      Failure to exercise due care and skill in carrying out the contract for the Claimants.

[31]    In response the appellant pleaded, according to the learned judge at paragraph [23] of his judgment that his engineering services were executed in a professional manner and conformed to the normal practice of soil investigation and surveys done in this regard and fully in accordance with the standard practice with regard to the construction of dwelling houses.  He pleaded further that he was not aware of the history of the land in question and had no reason to suspect that the building site was a natural or man made storm damage (*sic*)[6] path in that the culvert was completely hidden at the time of the performance of the contract and that at the stage of execution there were no unusual properties in the soil to warrant further or extraordinary and expensive tests.

[32]    In determining the extent of the appellant's duty of care, the limits of his contractual undertaking must be recognized, and in particular, the appellant's reservation in his letter of June 10th 1994, which constitutes the basis of his contract with the builder, that

> "It must be understood that this engineering fee does not include soil tests.  At this time these do not appear to be necessary; but will be an extra charge should they be required."

[33]    The scope of his responsibility was also limited, by that letter, to "work related to our design."  This was accepted by the builder, who entered into the contract on that basis.  In that respect, the question to be asked and answered is whether the

---

[6] I think the word intended is 'drainage'.

14

appellant's duty to the Henrys in the context of this litigation extended beyond those limits.  I would answer that question in the negative.  His contract, in my view, would establish the limits of the areas of his duty of care and thus his potential liability in tort to the third party owners, the Henrys.

[34]   In relation to the first and second paragraphs of the particulars of negligence pleaded against the appellant, it seems to me that, by specifically excluding soil tests from the scope of his contractual responsibilities, the appellant has protected himself also against any responsibility to the Henrys in respect of damage arising from the condition of the soil, unless he had been subsequently engaged to undertake such tests, which would have incurred additional charges.   Any responsibility in relation to the soil conditions would have rested on the main contractor, who might exercise his judgment as to whether any additional tests should be carried out.  The appellant had specifically excluded any responsibility on his part in that respect.  In my view no claim in tort could succeed against the appellant on that ground.

[35]   The third paragraph of the particulars relates to an alleged failure to take full and proper account of natural or manmade waterways in or around the site.

[36]   In this regard, the Henrys' expert witness, Cedric Henry, a civil engineer, in his witness statement, stated at paragraph 5 that no effort has been made to prevent the flow of storm water towards, or divert it around, the building so that the flow of storm water is towards the building and down to the foundation.  I have seen nothing to indicate that this was part of the duty of the appellant.  His engagement was for the very limited tasks of designing the foundations and substructure up to main floor slab, and the cistern, and to supervise the construction of the work related to that design.  It seems to me that site drainage would have been the responsibility, not of the appellant but of the main contractor.

[37]    Engineer Henry also observed large cracks in the walls, which he said suggest a lack of reinforcement in the block work, and excessive settlement in a wall, causing further damage to the master bedroom wall.  There are also cracks in the master bedroom floor, splitting the east wing in two, and reappearing in the driveway slab, apparently caused by a failure in the soil.

[38]    In cross examination by Mr. Watt Q.C. for the appellant, engineer Henry agreed that test pits of 6 to 8 ft, as done by the appellant, would be adequate, and 'correct in terms of the pits and the standard practice'.  He agreed that deeper pits would cost more money.  He agreed that the appellant did not find anything 'untoward' when he dug the test pits, and that in those circumstances he would be entitled to design as he did.

[39]    In relation to the cistern, this witness was of the view that the design of a cistern over 6 ft. high with 8 inch blocks was 'chancy'.  This cistern was 10 ft. high.  On the other hand, as the learned judge found, engineer Workman opined that if the cistern was built as designed, 'it would be OK'.  The witness was of the view that the separation of its walls and the floor slab could be caused if reinforcement was not placed properly, and that if the cistern had been constructed in accordance with the plan he would not expect to see this.  In the end the learned judge found, correctly in my view, in relation to the cistern and to the other affected elements of the building, that the main source of the defects was inadequacy of the reinforcement, which was not in accordance with the plans.  The appellant cannot be held responsible in negligence in respect of his designs.[7]

[40]    Engineer Workman, also called as an expert witness by the respondent, observed that instead of ½ inch rods specified by the appellant in his design, the builder used BRC mesh in the master bedroom suspended floor slab.  He explained that that reinforcement was far less than what the engineer designed.  Similarly, in relation to the walk-in closet, engineer workman observed that the contractor failed

---

[7] See paragraphs 73 to 79 of the judgment in the court below.

to construct a beam which was specified in the appellant's design to take account of the load of a wall that was expected to be borne by that beam.  The omission of that beam led to his conclusion that 'The result would be as we have seen.'

[41]   Engineer Workman made the observation that

> 'this drawing (done by the appellant) is particularly good, as a matter of fact, because it shows all the locations where steel was to have been put. ….  Now those details should continue right up through the house, not only in the foundation, but go right up through the house.  That has the obvious effect of strengthening the corners of the house.  If you go to the house and you look, you will see that the corners are separated, and that steel is to stop that happening, and that has not been done.'

[42]   Again, in his 4th observation, engineer Workman points out that the beam provided for at 'Detail Y' was not installed as required by the appellant's drawing.  The builder again departed from the engineer's specifications, undermining the integrity of the building.  This expert witness points out

> 'the ring beams are put in at every level, so if you have the ring beam at floor level missing, it means that the bracing that you should be getting for your building, you don't have, so the corner is free to open.'

[43]   The witness also observed the absence of interlocking blocks with steel and filled with concrete at the corners, and the absence of a ring beam at roof level (this last not part of the appellant's design responsibility), all of which affected the integrity of the entire structure.  In cross examination this witness opined that 'If the construction was carried out as required the events may not have occurred.'  He also expressed the opinion that 'the plans were excellent'.  He observed that 'the builder had departed from the drawings – very much so.'  The appellant has not been shown to have been negligent in relation to his design work.

[44]   The only area that remains is the question whether the appellant adequately fulfilled his duty to the owners to supervise the work in relation to his design.  In paragraph 13 of this judgment I made the observation that the only pleading of negligence that could apply to and be potentially viable against the appellant was the pleading in the particulars of negligence (paragraph 12(d) of the statement of

claim) that the appellant failed to exercise reasonable care and skill in carrying out his duties.   The sum total of the learned trial judge's findings in relation to the appellant in that regard is to be found in paragraphs 131 and 132 of the judgment, which I quote:

> "131. When the risk factor is brought to bear on the issue, there can be no doubt as to the magnitude of the risk, the likelihood of injury and the gravity of the consequences.  This translates into a breach of the duty of care on the part of both Defendants and a determination is so made.
>
> 132. The damage to the house as outlined above is as a direct consequence of the actions of the First and Second Defendants."

[45]   Learned counsel for the respondent submits that the appellant was negligent in allowing the construction of the elements of the building designed by him without the necessary reinforcement, by virtue of failure to supervise the works.   In particular learned counsel submits that the appellant was under an obligation to insist that the floor slab be poured in his presence to ascertain whether the floor was reinforced as per his drawings.

[46]   In response, learned counsel for the appellant submits first, that the appellant owed no duty of care outside of his contractual obligations, and thus owed no duty to the respondent.  Whether such a duty is owed or not depends on the facts of each case.  **Halsbury's Laws of England** [8] says 'The sub-contractor owes a duty of care to the employer and will be liable for any foreseeable physical loss or damage caused to him and for any consequent economic loss.'

[47]   Learned counsel for the appellant further submitted that the evidence discloses that the appellant was always available to supervise as he had contracted to do, and that Rona Henry agreed that 'she had seen the appellant on the site on several occasions.'   In particular, in his written submissions, learned Queen's Counsel cites the evidence of Mrs. Henry that 'Mr. Davis to my knowledge visited

---

[8] Fourth edition reissue, Vol. 4(2) at page 312, para. 347.  see also Henderson v. Merrett Syndicates Ltd., [1994] 3 All E.R. 506

the site many times while the foundations were being built and a few times afterwards.'

[48]    The matter of the liability of a person providing services to another apart from a contractual relationship between the parties  is dealt with in considerable detail in **Henderson v Merrett**[9], in particular in the judgment of Lord Goff in his examination of the principle established in **Hedley Byrne & Co. Ltd. v Heller & Partners Ltd.**[10], at pages 519 to 521 of that report.  Lord Goff, at page 521, says

> 'an assumption of responsibility by, for example, a professional man may give rise to liability in respect of negligent omissions as much as negligent acts of commission, as for example when a solicitor assumes responsibility for business on behalf of his client and omits to take a certain step, such as the service of a document, which falls within the responsibility so assumed by him.'

[55]    The landmark cases of **Donoghue v Stevenson**[11], **Hedley Byrne**, and **Home Office v Dorset Yacht Co. Ltd.**[12] were reviewed by Lord Wilberforce in **Anns v Merton London Borough**[13] and cited by Lord Bridge in **Caparo Industries plc v Dickman**[14].  The passage quoted reads in part;

> 'the position has now been reached that in order to establish that a duty of care arises in a particular situation, it is not necessary to bring the facts of that situation within those of previous situations in which a duty of care has been held to exist.  Rather the question has to be approached in two stages.  First one has to ask whether, as between the alleged wrongdoer and the person who has suffered damage there is a sufficient relationship of proximity or neighbourhood such that, in the reasonable contemplation of the former, carelessness on his part may be likely to cause damage to the latter, in which case a prima facie duty of care arises.  Secondly, if the first question is answered affirmatively, it is necessary to consider whether there are any considerations which ought to negative, or to reduce or limit

---

[9] *Supra.*
[10] [1963] 2 All E.R. 575.
[11] [1932] AC 562.
[12] [1970] 2 All ER 294.
[13] [1977] 2 All ER 492.
[14] [1990] 1 All ER 568 at 573.

the scope of the duty or the class of person to whom it is owed or the damages to which a breach of it may give rise.'

[49]    Lord Bridge, however, after reviewing the further development of the law and examining a number of cases on the issue, had this to say;

> 'The salient feature of all these cases is that the defendant giving advice or information was fully aware of the nature of the transaction which the plaintiff had in contemplation, knew that the advice or information would be communicated to him directly or indirectly, and knew that it was very likely that the plaintiff would rely on that advice or information in deciding whether or not to engage in the transaction in contemplation.  In these circumstances the defendant could clearly be expected, subject always to the effect of any disclaimer of responsibility, specifically to anticipate that the plaintiff would rely on the advice or information given by the defendant for the very purpose for which he did in the event rely on it.  So also the plaintiff, subject again to the effect of any disclaimer, would in that situation reasonably suppose that he was entitled to rely on the advice or information communicated to him for the very purpose for which he required it.'[15]

[50]    His Lordship, after clearly excluding a duty of care to 'all and sundry for any purpose for which they may choose to rely on it, continued;

> "I should expect to find that the limit or control mechanism imposed on the liability of a wrongdoer towards those who have suffered economic damage in consequence of his negligence rested on the necessity to prove, in this category of the tort of negligence, as an essential ingredient of the 'proximity' between the plaintiff and the defendant, that the defendant knew that his statement would be communicated to the plaintiff …. specifically in connection with a particular transaction or transactions of a particular kind, and that the plaintiff would be very likely to rely on it for the purpose of deciding whether or not to enter on that transaction….

[51]    Lord Bridge expressed the view that this expectation was 'fully supported by the dissenting judgment of Denning LJ in **Candler v Crane Christmas & Co.** …. in the following passages:

> 'let me now be constructive and suggest the circumstances in which I say that a duty to use care in making a statement does exist apart from a contract in that behalf.  First, what persons are under that duty?  My answer is those persons such as accountants, surveyors, valuers and analysts, whose profession and occupation it is to examine books,

---

[15] *Ibid* at page 576.

accounts and other things and to make reports on which other people –
other than their clients – rely in the ordinary course of business.   ….
Secondly, to whom do these professional people owe this duty?   …. They
owe the duty, of course, to their employer or client; and also, I think, to
any third person to whom they themselves show the accounts, or to whom
they know their employer is going to show the accounts so as to induce
him to invest money or take some other action on them.   …. The test of
proximity in these cases is: Did the accountants know that the accounts
were required for submission to the plaintiff and use by him?   …. Thirdly,
to what transactions does the duty of care extend?  It extends, I think, only
to those transactions for which the accountants knew their accounts were
required.   …. the duty extends only to the very transaction in mind at the
time.'

Lord Bridge concluded: 'It seems to me that this masterly analysis, if I may say so
with respect, requires little, if any, amplification or modification in light of later
authority ….'

[52]   **Hudson's Building and Engineering Contracts**[16] speaks of the '*final wholesale
demolition*' of the *Anns* principle by seven judges of the House of Lords in
**Murphy v Brentwood District Council**[17].   The headnote to that case indicates
that it was held that, while the principle in **Donoghue v Stevenson** *(supra)* applied
to impose a duty on the builder of a house to take reasonable care to avoid injury
or damage, through defects in its construction, to the person or property of those
whom he ought to have in contemplation as likely to suffer such injury or damage,
that principle as stated extended only to latent defects.   The case does not in any
way cast doubt on the right of a claimant to recover for loss, not being *pure
economic loss not flowing from physical injury*, suffered as a result of negligence
under the **Donoghue v Stevenson** principle[18].

---

[16] Eleventh edition 1995, at page 206, paragraph 1-345.
[17] [1991] 1 A.C. 398.
[18] *Ibid* at page 468.

21

[53]     Lord Bridge affirmed[19] the application of the principles regarding liability for defects in buildings.  He said:

> 'If a builder erects a structure containing a latent defect which renders it dangerous to persons or property, he will be liable in tort for injury to persons or damage to property resulting from that dangerous defect.  But if the defect becomes apparent before any injury or damage has been caused, the loss sustained by the building owner is purely economic.  If the defect can be repaired at economic cost, that is the measure of the loss.  If the building cannot be repaired it may have to be abandoned as unfit for occupation and therefore valueless.  These economic losses are recoverable if they flow from breach of a relevant contractual duty but, here again, *in the absence of a special relationship of proximity* they are not recoverable in tort.'

[54]     Lord Oliver of Aylmerton[20] defined 'the critical question'  as 'whether the scope of the duty of care in the circumstances of the case is such as to embrace damage of the kind which the plaintiff claims to have sustained.'  He added:

> 'The essential question which has to be asked in every case, given that damage which is the essential ingredient of the action has occurred, is whether the relationship between the plaintiff and the defendant is such – or, to use the favoured expression, whether it is of sufficient "proximity" – that it imposes upon the latter a duty to take care to avoid or prevent that loss which has in fact been sustained.  That the requisite degree of proximity may be established in circumstances in which the plaintiff's injury results from his reliance upon a statement or advice on which he was entitled to rely and upon which it was contemplated that he would be likely to rely is clear from **Hedley Byrne** and subsequent cases, but **Anns** was not such a case'.

[55]     It seems to me that this case meets the 'proximity' test, as between the appellant and the respondents, the Henrys. The question arises, what is the extent of the duty involved.   What is the scope of the duty to supervise, and what, if any, evidence is there of a failure to fulfil that duty.

[56]     Learned counsel at paragraph 43 of his written submissions contends that it was not open to the learned trial judge to find that 'in the circumstances' the appellant was negligent in carrying out his duties and failed to supervise those structures

---

[19] *Ibid* at page 475.
[20] *Ibid* at page 485.

which he designed in accordance with his obligations.   What is the evidence on the matter?

[57]     Bengt Berntsson of Tropic Builders Ltd. has neither pleaded nor given evidence to the effect that the Second Defendant had failed to supervise Tropic Builders Ltd., in respect of all work related to his designs.   Indeed it is clear from the evidence that the contractors deliberately departed from the designs submitted by the appellant and accepted by the contractors and the owners.

[58]     It is also accepted, on the evidence of Mrs. Henry and others, that the appellant spent a considerable amount of time on the site.

[59]     In cross-examination by counsel for the Henrys, the appellant said that he would visit the site from time to time, depending on 'what is going on.'   He asserted that there is no hard and fast rule.   He agreed that supervision is 'just a section of the fee', and that the customer would expect him to supervise.   He conceded that he 'should be on the site for major happenings'.   However, he said that he did not think that he should have been on the site for the capping beam in the master bedroom, which is poured at the same time as the floor slab, and would take about a week.

[60]     The appellant responded to further questioning, that it is not practice in Antigua and Barbuda that the engineer is called in to inspect these elements before they are poured.   As I read the transcript of the evidence, I conclude that the appellant conceded that  he should be there before the capping beam and the floor slab are poured, but asserted that 'the fact that I was not there does not mean that I did not do my job.  I was not there to inspect the steel before the concrete was poured.  I was doing my job even though I was not there.'   I have found no evidence contradicting this.

[61]    The appellant went on to assert that whether or not he went to the site, his plans must be followed, and that he would expect that the builder would do what he was told to do.  He claimed that it was a breach of the trust he placed in the builder. He conceded that the absence of the capping beam would cause the cracks.

[62]    In answer to Mr. Fuller, counsel for the contractor, the appellant agreed that walls separated and there was movement between the walls and the floor slabs.  He agreed that the slabs cracked and moved, and that if there is not sufficient reinforcement the upper level will move.  He rejected the suggestion that the damage to the house would have been caused regardless of the capping beam and reinforcement, due to severe pressure on the west wing.  It must be remembered that provision was made in the appellant's design for sufficient reinforcement, and that it was the contractor who, without informing the appellant or the owners, chose to ignore the appellant's design and cut corners on the project, leading to these failures of the structure.

[63]    From the totality of the evidence, it is pellucid that the absence of these structural elements was a major contributing factor to the damage that occurred, or at any rate to the extent of the damage.  It is clear on the evidence that the contractors decided, without consultation with the appellant or the owners, to eliminate from the structure these important elements.   There is no evidence that the appellant concurred in or was even aware of these changes.  On the contrary, he became aware of this only after the damage had occurred.

[64]    It seems to me that the learned trial judge erred in holding that the appellant is liable for breach of contract, in that there was no privity of contract between the appellant and the respondent.  The judge also erred, on the evidence, in holding that the appellant was liable in negligence, and I would allow the appeal, with costs to the appellant of the appeal and in the court below.  The contractor was not made a party to the appeal, and therefore cannot be ordered to pay the costs of the appeal.  However, liability for the costs of the appellant in the court below rests

24

on the contractors, who are fully responsible and liable for the entire loss to the respondents arising from and as a consequence of the deliberate and inexcusable decision to cut corners and fail to build in accordance with the plans and designs submitted, at the request of the contractor, by the appellant.  The clear evidence is that had the design specifications been followed, the damage would have been avoided.

[65]    For the reasons stated, I would allow the appeal with prescribed costs to the appellant on the basis of  Part 65.5(2)(b)(ii), stipulated at the value of $50,000.00, and Part 65.13(b).

**Formatted:** Bullets and Numbering

**Brian Alleyne, SC**
Chief Justice [Ag.]

I concur.                                              **Michael Gordon, QC**
Justice of Appeal

I concur.                                              **Denys Barrow, SC**
Justice of Appeal