ANGUILLA

IN THE COURT OF APPEAL

CIVIL APPEAL NO.4 OF 2005

BETWEEN:

|  |  |  |
|---|---|---|
| [1] | JOHN PAUL DEJORIA | |
| [2] | THE ISLAND COMPANY LIMITED | |
| | | Appellants |

and

|  |  |  |
|---|---|---|
| [1] | GIGI OSCO-BINGEMAN | |
| [2] | VADIM FRIDMA | |
| | (Executors of the Estate of Martin Crowley, Deceased) | |
| [3] | PENDRAGON INTERNATIONAL LIMITED | |
| | | Respondents |

Before:
The Hon Mr. Michael Gordon, QC                    Justice of Appeal
The Hon Mr. Denys Barrow, SC                       Justice of Appeal
The Hon Mr. Hugh Rawlins                           Justice of Appeal

Appearances:
Mr. Kenneth MacLean, QC with Ms. Jenny Lindsay for the Appellants
Mr. James Corbett, QC with Mr. Keithley Lake, Mr. Mark Brantley and Ms. Cora Richardson Hodge for the Respondents

-------------------------------------------
2005:   October 6;
2006:   April 24.
-------------------------------------------

JUDGMENT

[1]      **GORDON, J.A.:**  By a fixed date claim the Respondents, as claimants, sought the determination of certain questions in relation to the interpretation of a document called "Unanimous Shareholders Agreement" and dated 13th July 1996 (hereafter referred to as "the Shareholders' Agreement" or "the Agreement") entered into by Martin Crowley and John Paul Jones De Joria (De Joria). The Shareholders'

Agreement was by its terms to be governed by the laws of Anguilla. Martin Crowley died and the 1st and 2nd Respondents are the executors of his estate and also the trustees of the Windsong Trust established under a declaration of trust dated August 17, 2001. The Windsong Trust is the sole residuary beneficiary under the will of Martin Crowley.

[2]     By order of the court the 2nd Appellant (hereafter "Island") and the 3rd Respondent (hereafter "Pendragon") were joined as parties in the proceedings. Island is a company incorporated in Anguilla and is principally or wholly owned by De Joria (nothing turns on this) whilst Pendragon is a company, also incorporated in Anguilla, and was wholly owned by Martin Crowley. Crowley and De Joria were business partners who through the instrumentality of Island and Pendragon were the ultimate beneficiaries of the ownership of certain shares in a number of companies the most important of which was Caribbean Distillers Corporation Limited (CDC).

[3]     The questions posed by the respondents (Claimants) in the Fixed Date Claim for the determination of the Court, to the extent relevant for this appeal, were :

1.   Is the Shareholders Agreement valid and enforceable as a matter of Anguillan law?

2.   As a matter of Anguillan law, could Crowley and de Joria specifically contracting with each other as individuals bind companies and impose contractual obligations on companies which were not parties to the agreement and in which Crowley and De Joria held no direct interest?

3.   As a matter of Anguillan law does a disregard of corporate formalities invalidate the Shareholders Agreement or make it unenforceable as a matter of public policy?

4.   If the court finds that the Shareholders Agreement is valid and enforceable as a matter of law, is it valid and enforceable as against or in relation to CDC.

[4]     In her judgment, the learned trial Judge sets out in a most clear manner the factual background and little better can be done than to borrow from that judgment:

"(a)   Crowley and De Joria, conducted certain business interests together in Anguilla and caused various companies to be incorporated in Anguilla for this and other purposes. On 13th July,

2

1996, Crowley and De Joria, as individuals, executed the [Shareholders] Agreement. The Agreement was drafted by Justice Ian D. Mitchell QC, then a lawyer practicing in Anguilla who later ascended to the bench as a judge of the high court and is now retired. He said in his witness statement that the Agreement was prepared on the joint instructions of Crowley and De Joria, and that it took several months and several revisions before Crowley and De Joria and their US counsel were happy with the draft and ready to sign it.

"(b)    Recital A of the Agreement stated as follows:
*"The Shareholders are currently the sole legal and beneficial owners of all the issued and outstanding shares of the Anguillian Corporations listed in Schedule A hereto … and as signed by the shareholders and as amended from time to time."*

**Schedule A** of the Agreement listed the following entities:
(1)    **St. Maarten Spirits Limited (" SMS")–** *"held as to 50% by Crowley through his wholly owned and controlled Anguillian company Pendragon International Limited, and as to the other 50% by De Joria through his wholly owned and controlled Anguillian company The Island Company Limited"*
(2)    **Anguilla Rums Limited** – *"held as to 50% by De Joria and as to the other 50% by Crowley"*
(3)    **Sea Grape Beach Club Limited** – *"held as to 50% by Crowley through the said Pendragon International Limited and as to the other 50% by De Joria through the said Island Company Limited"*

SMS, Anguilla Rums Limited ("Anguilla Rums") and Sea Grape Beach Club Limited will hereafter together be referred as "the Schedule A Corporations".

"(c)    **SMS** and **CDC** were incorporated in Anguilla on 9th September 1993. Anguilla Rums was incorporated in Anguilla on 7th July, 1994. There were two Sea Grape Companies and there is some confusion as to which of them was intended to be listed in Schedule A. Suffice it to say however, that whichever of them it referred to, is not relevant for the purposes of these proceedings since one was struck off the register of companies on 19th January 2000 and the other disposed of by sale and the proceeds dealt with between the parties and thus not in issue. **Pendragon** and **Island** were incorporated sometime prior to the Agreement.

"(d)     **CDC's** main business is the manufacture and distribution of the Patrón brand of ultra premium tequila and to all intents and purposes is a highly successful operation. The shares of **CDC** held by Pendragon represent the bulk of the value of Crowley's Estate.

"(e)     **SMS** merged with and into **CDC** on or about March 22nd 2002 pursuant to an agreement and plan of merger dated 11th March 2002, and **SMS** was subsequently struck from the Register of companies.

"(f)     Crowley died in Anguilla on April 19th 2003. Letters Testamentary and Letters of Administration were issued by the courts of California and Anguilla respectively, on 20th June 2003 and November 4th 2003.

"(g)     Prior to Crowley's death he had defended proceedings in the California court ("the California Palimony Proceedings") brought by his former paramour Edelstein who had claimed an interest in certain of Crowley's assets including his interests held In the various Anguillian entities.

"(h)     Clause 5 of the Agreement provided a sell/purchase provision in favour of the surviving shareholder upon the death of the other at a selling price to be determined in accordance with Clause 6 of the Agreement. Clause 5 also provided that the trigger date for determining the price of the deceased shareholder's shares was the date of death of such Shareholder.

"(i)     The Agreement also provided, inter alia, for restriction on the sale, transfer or disposition of the shares in the Schedule A Corporations and the Shareholder's certificates for shares held by them were to bear legends reflective of such restrictions.

"(j)     Crowley having died, De Joria has sought to invoke the provisions of the Agreement, specifically Clauses 5 and 6 thereof, in respect of the sale and purchase of Pendragon's shares in **CDC** and the price to be paid therefor, the contention being that Crowley and himself intended to bind and did bind   Pendragon,   Island,   and the Schedule A Corporations to the Agreement, and by extension, **CDC** to the Agreement.

"(k)     The Claimants (the Respondents herein) aver that they did in fact appoint an appraiser for Pendragon's 50% share in **CDC** purportedly in pursuance of the terms of the Agreement but say this was at the insistence of De Joria who had produced the

4

Agreement to them just a few days after Crowley's death when they were in a state of bereavement and before they were able to fully read or understand the same or had an opportunity to seek legal advice thereon. They say this was the first time they became aware of the existence of the Agreement. The valuation resulting from this placed the value of Pendragon's 50% ownership in the region of US $43 million.

"(l)     Whilst Crowley was alive, there were third parties namely, Campari International ("Campari") and Barcardi Limited ("Barcardi") interested in purchasing CDC or its assets. Campari in April, 2003, had indicated its interest in purchasing CDC's assets for US$ 150 Million. De Joria in a letter to Crowley on 12th April, 2003 described the Campari offer as "very low". After Crowley's death in April, 2003 Barcardi renewed its interest in purchasing CDC or its assets or Pendragon's shares and made this interest known to Pendragon by letter dated May 18th 2004 and indicated that they believed Pendragon's shares to be worth in the region of US $200 Million.

"(m)    The 1st and 2nd Claimants say that Crowley's investment banking firm had estimated     the fair market value of Pendragon's shares to be approximately $US 150 – 175 Million shortly after Crowley's death.

[5]     The trial Judge, after a fulsome enquiry into the relevant law and a commendable analysis of the factual circumstances came to the following conclusion at paragraph 48 of her judgment:

"Based on the foregoing, I answer the questions posed in the Fixed Date Claim Form thus:
1. "The purported Unanimous Shareholders Agreement dated 13th July 1996 and entered into as between Martin Crowley and John Paul Jones De Joria on the other hand is not valid and enforceable as a matter of Anguillan Law."

[6]     The trial Judge makes it perfectly clear in the body of her judgment that her decision does not go to the legality of the contract, in the strict sense of that phrase, but rather its enforceability in the context of the *lis* between the parties to the suit. Learned Queen's Counsel for the appellants urges that if this Court finds that the agreement is valid and enforceable as a matter of Anguillan law, then the appeal must be allowed. Counsel made the throwaway argument - based on the

authority of **Cie Noga SA v Australia and New Zealand Banking Group**[1] (an English Court of Appeal case) - that appeals are against orders not reasoned judgments.

[7]     Section 29 (1) (b) of the Eastern Caribbean Supreme Court (Anguilla) Act reads as follows:

> "29 (1) Subject to the provisions of this Act or any other enactment –
>> (a)     …
>> (b)     an appeal shall lie to the Court of Appeal and the Court of Appeal shall have jurisdiction to hear and determine the appeal, from any judgment or order of the High Court and for the purposes of, and incidental to, the hearing and determination of any appeal and the amendment, execution and enforcement of any judgment or order made thereon, the Court of Appeal shall have all the powers, authority and jurisdiction of the High Court."

[8]     In the **Cie Noga SA** case Waller LJ said the following at paragraph 27 of his judgment:

> "*Lake v Lake* [1955] P 336 properly understood means that if the decision when properly analysed and if it were to be recorded in a formal order would be one that the would-be appellant would not be seeking to challenge or vary, then there is no jurisdiction to entertain an appeal. That is in my view consistent with *In re B*.  That this is so is not simply by virtue of interpretation of the words "judgment" or "order", but as much to do with the fact that the court only has jurisdiction to entertain "an appeal". A loser in relation to a "judgment" or "order" or "determination" has to be appealing if the court is to have any jurisdiction at all. Thus if the decision of the court on the issue it has to try (or the judgment or order of the court in relation to the issue it has to try) is one which a party does not wish to challenge in the result, it is not open to that party to challenge a finding of fact simply because it is not one he or she does not like."

If the object of learned Queen's Counsel was to short circuit this appeal, then commendable though his motives might be, he has not succeeded.

[9]     It appears that the fundamental issue to be decided in this case is whether the shareholders of **CDC**, namely Island and Pendragon, are bound by the terms of the Shareholders' Agreement entered into by Martin Crowley and De Joria. The

---

[1] [2003] 1 WLR 307

appellants argue that the case can be decided on the basis of three basic propositions which they express as follows:

(1)     The individual contracting parties (De Joria and Crowley) can (and have always been able to) perform the personal obligations which they freely assumed in both their interests under the Shareholder Agreement through their 100% owned and controlled companies.

(2)     The underlying purpose of the Shareholder Agreement was to ensure the continued successful operation of the individual contracting parties' joint venture business through harmonious management.

(3)     CDC now runs the individual contracting parties' most successful joint venture business which was run by one of their Anguillan joint venture corporations listed in Schedule A of the Shareholder Agreement (SMS) for which it is the economic and legal substitute in every sense, including the Shareholder Agreement.

[10]     The appellants seek from this Court the following:

(1)     A declaration that the Shareholders Agreement is valid and enforceable as a matter of Anguillan law;

(2)     A declaration that the Shareholder Agreement applies to the shares of CDC and Anguilla Rums held by Crowley's estate through Pendragon; and

(3)     An order for Specific Performance of the Shareholder Agreement against the Executors of Crowley's estate requiring the sale of the CDC and Anguilla Rums shares held by them through Pendragon to De Joria.

[11]     As intimated above, there is nothing intrinsically illegal with the Shareholder Agreement. To the extent, therefore, that the appellants seek a declaration that the Shareholder Agreement is a valid agreement and enforceable to its tenor such a declaration can be and is made by this court. This, however, does not resolve the issue that lies at the heart of this appeal.

[12]     The issue of whether the Agreement applies to the CDC and Anguilla Rums shares is much more complex. Again borrowing heavily from the judgment of the trial Judge, the following are the facts with which this Court must deal:

-     neither Pendragon, Island nor CDC are listed companies in the schedule of the Agreement though each of the companies were in existence at the time of the execution of the Agreement. By no other means are they incorporated as parties to the Agreement;

-     the Agreement is not stated to be entered into by Crowley and De Joria in any representative capacity;

-     there is no evidence of the adoption in any form by Pendragon, Island or CDC of the Agreement or any terms therein;

-     Island is owned as to 100% by De Joria and Pendragon by Crowley as to the same percentage;

-     SMS, Anguilla Rums and CDC are each owned as to 50% by Pendragon and as to 50% by Island;

-     there is a manuscript note by Crowley on one copy of the Agreement, to wit "add CDC";

-     SMS was merged with and into CDC in 2002 by virtue of an Agreement and Plan of Merger.

[13]     The learned trial judge found at paragraph 37 of her judgment as follows:

"It is accepted that SMS was merged with and into CDC in 2002 by virtue of an Agreement and Plan of merger dated as of March 11th 2002. I have already found for the reasons already advanced in this judgment that SMS cannot be said as a matter of law to be bound by the terms of the Agreement. The same holds true for Pendragon and Island. I have also concluded that no legal basis has been established justifying the court implying terms into the Agreement which would make the terms thereof binding on Pendragon and Island and thus bind SMS being one of the Schedule A corporations or on CDC by virtue of Pendragon's and Island's ownership of CDC. It also follows, as a matter of law, that if SMS is not bound by the terms of the Agreement its subsequent merger with and into CDC cannot as a matter of law, bind CDC, as the surviving company, to the terms of the Agreement and I so hold"

[14]     Learned Queen's Counsel for the appellant has characterized the finding in the above quotation from the trial judge as being irrelevant as, he argues, the enforceability of the Shareholders' Agreement does not depend on whether CDC (a non party he concedes) is bound by the Agreement but rather whether De Joria and Crowley who were parties to the Agreement are bound by its provisions. He argued that the issue can be decided on the basis of three basic propositions:

(1)     De Joria and Crowley can (and always have been able to) perform the personal obligations, which they freely assumed in both their interests through their 100% owned and controlled companies.

(2)     The underlying purpose of the Shareholders'Agreement was to ensure the continued successful operation of the joint ventures of the individuals through harmonious management.

(3)     CDC now runs the joint venture's most successful business which was run by SMS which was listed in Schedule A for which it is the economic and legal substitute in every sense including under the Agreement.

[15]     The primary plank in the appellants' argument, as expressed in their written outline submissions, is that the individuals, De Joria and Crowley, as owners and controllers of all of the issued shares of Island and Pendragon respectively, were in a position at all material times to procure that the assets held by Island and Pendragon be dealt with in accordance with the terms of the Agreement and were under a personal obligation pursuant to the Agreement to procure this result. The appellants' base their argument on the authority of **Re Duomatic Ltd**[2].

[16]     In **Re Duomatic,** a case from the Chancery Division, the ratio relied on by the appellants is captured by the following statement by Buckley J:

"In other words, I proceed on the basis that where it an be shown that all shareholders who have a right to attend and vote at a general meeting of the company assent to some matter which a general meeting of the company could carry into effect, that assent is as binding as a resolution in general meeting would be."

---

[2] [1969] 1 All ER 161

9

As Oliver J said in **Re New Cedos Engineering Co Ltd**[3]:

> "The ratio of Buckley J's decision [in Re Duomatic Ltd] is that where that which has been done informally could, but for an oversight, have been done formally and was assented to by 100% of those who could have participated in the formal act, if one had been carried out, then it would be idle to insist upon formality as a precondition to the validity of the act which all those competent to effect it had agreed should be effected."

Another case in similar vein relied on by learned Queen's Counsel for the appellants was **Euro Brokers Holdings Ltd. v Monecor (London) Ltd**[4].

[17]   It is observed that in **Duomatic** and in all of the cases which preceded it and were relied on by it as well as in the cases that rely on **Duomatic** subsequently, the issue was always whether an action performed by a company was properly performed in the absence of certain formalities. In the case at bar the issue is different. The issue is whether a company, wholly owned by a single shareholder can be forced to perform obligations undertaken by the shareholder in his own name.

[18]   The fundamental and underlying principle of company law is that a company is a separate and distinct legal entity from its incorporators. As it is put in **Halsbury's Laws of England**[5]:

> "**Effect of incorporation**. From the date of incorporation, the subscribers of the memorandum, together with such other persons as may from time to time become members of the company, are a body corporate by the name contained in the memorandum, separate and distinct from individual members of the company."

The usual authority quoted for the above proposition is **Salomon v A. Salomon & Co Ltd**[6] though there have been many cases which have followed and reinforced the basic premise.

---

[3] [1994]1 BCLC 797 at 814
[4] [2003] 1 BCLC 506
[5] 4th Ed. 1996 Reissue Vol 7 (1) paragraph 92
[6] [1897] AC 22

[19]     Both De Joria and Crowley decided, for their own purposes, that they would utilize a further level of corporate insulation from the operation of their joint venture companies by the incorporation of Island and Pendragon  respectively as holding companies into which they placed their respective entitlements to shares from the joint-venture companies. It would not, I believe, be contentious to say that if either Pendragon or Island incurred some liability arising out of a contract entered into by either of them then, notwithstanding that they were each owned as to 100 by a single shareholder, such liability would not flow through to that single shareholder. That is the result of separating the corporate personality from the personality of the shareholder(s). This effect is frequently referred to as the corporate veil. I am of the view, and I do so hold, that the corporate veil operates in both directions. In the circumstances, in the context of the strict construction of the Agreement neither Island nor Pendragon are caught by the obligations undertaken by their respective shareholders in their personal capacities.

[20]     I am fortified in this view by the authority of **Tunstall v Steigmann**[7], an English Court of Appeal decision. In that case on the determination of her lease of a shop by notice given by the landlord the tenant applied to the court for a new lease under section 24(1) of the Landlord and Tennant Act 1954. The landlord gave notice of her intention to oppose the grant of a further tenancy on the ground (afforded by the Act) that she intended to occupy the premises for the purposes of a business to be carried out by the landlord there. The business to be carried on was the extension of a pork butcher which the landlord carried on in adjacent premises. In the mean time the landlord transferred the business to a company in which she owned all but two of the shares, which latter two were owned by nominees of hers. The issue was whether the business was to be carried on by her within the meaning of section 30 of the Landlord and Tennant Act.  The court at first instance held that the landlord would be carrying on the business through the company. I echo the sentiment of Wilmer LJ expressed at the commencement of his judgment, "The problem which has arisen in this case is one of engaging

---

[7] [1962] 2 All ER 417

simplicity, but I do not find it at all easy of solution". Later in the judgment[8]   he continues:

> "I have certainly felt the force of the argument on behalf of the landlord; but in the end I am satisfied that it cannot prevail. There is no escape from the fact that a company is a legal entity entirely separate from its corporators – see **Salomon v. Salomon & Co**. Here the landlord and her company are entirely separate entities.  This is no matter of form; it is a matter of substance and reality.  Each can sue and be sued in its own right; indeed, there is nothing to prevent the one from suing the other. Even the holder of one hundred percent of the shares in a company does not by such holding become so identified with the company that he or she can be said to carry on the business of the company.  This clearly appears from **Gramophone & Typewriter, Ltd. V. Stanley**[9],  a decision of this court which seems to me, on due consideration, to be destructive of the argument for the landlord.   As was pointed out by **Fletcher Moulton, L.J.**[10], control of a company by a corporator is wholly different in fact and law from carrying on the business himself: "… the individual corporator does not carry on the business of the corporation".  This being so, I do not see how it is possible for the landlord in the present case to assert that she intends to occupy the holding for the purpose of a business to be carried on by her.  Her intention, as has been made plain, is that the company which she controls shall carry on its business on the holding. But that, unfortunately for her, is something for which the Act makes no provision.

### The Implied Term

[21]     A secondary plank in the argument advanced on behalf of the appellants in the event that their primary argument failed, which it has, is that a court in interpreting the Agreement should imply or supply the necessary terms to ensure commercial effectiveness of the Agreement. As the Appellants put it in their written arguments:

> "The exercise is primarily one of **construing** the contract to give effect to the parties objective intentions as expressed in the Shareholders' Agreement. However, to the extent that it is necessary to give business efficacy to the Shareholders' Agreement, the Court should imply a term in the relevant clauses of the Shareholders' Agreement to the effect that Individuals are obliged to procure that their wholly owned companies deal with the shares in accordance with the agreement."

---

[8] Page 423
[9] [1908]2 KB 89
[10] Ibid at page 98

[22]     Learned Queen's Counsel for the appellant argued that such a term would satisfy the requirements for implying a term, namely, that it would be reasonable and equitable; that would give business efficacy to the Agreement; that it is so obvious that it goes without saying; that it is capable of clear expression; and, that it does not contradict any express term in the contract.

[23]     Most text books start their discourse on the subject of implied terms in a contract with the quotation from Bowen LJ in "**The Moorcock**"[11] to the following effect:

> "Now, an implied warranty, or, as it is called, a covenant in law, as distinguished from an express contract or express warranty, really is in all cases founded upon the presumed intention of the parties, and upon reason. The implication which the law draws from what must obviously have been the intention of the parties, the law draws with the object of giving efficacy to the transaction and preventing such a failure of consideration as cannot have been within the contemplation of either side; and I believe if one were to take all the cases, and there are many, of implied warranties or covenants in law, it will be found that in all of them the law is raising an implication from the presumed intention of the parties with the object of giving to the transaction such efficacy as both parties must have intended that at all events it should have."

[24]     The broad principle as expressed in the above quotation has been applied in innumerable cases and a number of refinements can be elicited to assist in determining whether the implied term argued for by the appellants can be inserted into the Agreement.

[25]     "Prima facie that which in any contract which is left to be implied and need not be expressed is something so obvious that it goes without saying; so that, if while the parties were making their bargain, an officious bystander were to suggest some express provision for it in the agreement, they would testily suppress him with a common "oh, of course"[12]   This test, often referred to as the officious bystander test, is as good a starting point as any.  A term, even an apparently obvious one

---

[11] (1889) 14 PD 64 at Page 68
[12] Shirlaw v Southern Foundries (1926) Ltd [1939] 2 KB 206, 227

will not, however, be implied if such implication would be inconsistent with the express wording of the contract.

[26]     Sometimes words in a recital are used by a court as a basis to imply certain terms. As it is put in **Chitty**[13]:    "Where words of a recital or reference manifest a clear intention that the parties should do certain acts, the courts will from these infer a covenant to do such acts, just as if the instrument had contained an express agreement to that effect."    However, the learned authors continue: "In contrast with the use of words of recital in order to ascertain the construction of a deed, the courts are reluctant to imply such a covenant in the absence of a manifest intention. 'It is one thing for the court to effectuate the intention of the parties to the extent to which they may have, even imperfectly, expressed themselves, and another to add to the instrument all such covenants as upon a full consideration the court may deem fitting for completing the intentions of the parties but which they, either purposely or unintentionally, have omitted'"[14]. A classic case of 'on the one hand...but then again on the other'.

[27]     It was urged with considerable vigour on behalf of the appellants that the days of a literalist approach have long gone and that this Court should seek to make commercial sense out of what would otherwise be nonsensical. We were referred to **Sirius International Insurance Co v FAI General Insurance Ltd**[15] wherein Lord Steyn said the following at paragraph 19 of the judgment:

> "There has been a shift from literal methods of interpretation towards a more commercial approach.  In *Antaios Compania Naviera SA v Salen Rederierna AB* [1985] AC 191, Lord Diplock, in an opinion concurred in by his fellow Law Lords, observed (at 201): "if detailed semantic and syntactical analysis of a word in a commercial contract is going to lead to a conclusion that flouts business common sense, it must be made to yield to business common sense."  In *Mannai Investment Co Ltd v Eagle Star Life Assurance Co Ltd* [1997] AC 749, I explained the rationale of this approach as follows (771A-B): "In determining the meaning of the language of a commercial contract...the law...generally favours a

---

[13] Chitty on Contracts 29th Ed. Paragraph 13-024-13-025
[14] Aspdin v Austin (1844) 5 QB 671
[15] [2004] UKHL 54

commercially sensible construction.  The reason for this approach is **that a commercial construction is more likely to give effect to the intention of the parties.  Words are therefore interpreted in the way in which a reasonable commercial person would construe them.**  And the standard of the reasonable commercial person is hostile to technical interpretations and undue emphasis on niceties of language."   The tendency should therefore generally speaking be against literalism.  What is literalism?  It will depend on the context.  But an example is given in *The Works of William Paley (1838 ed), Vo. III, 60.*  The moral philosophy of Paley influenced  thinking on contract in the 19th century.  The example is as follows:  The tyrant Temures promised the garrison of Sebastia that no blood would be shed if they surrendered to him.  They surrendered.  He shed no blood.  He buried them all alive.  This is literalism.  If possible it should be resisted in the interpretative process.  This approach was affirmed by the decisions of the House in *Mannai Investment Co Limited v Eagle Star Life Assurance Co Limited* [1997] AC 749, at 775 E-G, per Lord Hoffmann and in *Investors Compensation Scheme Limited v West Bromwich Building Society* [1998] 1 WLR 896, at 913D-E, per Lord Hoffmann." (emphasis added)

[28]    It is to be noted, however, that in the immediately preceding paragraph of the judgment Lord Steyn said the following which, in my view, is to be read as qualifying or restricting what followed and is quoted above:

"The settlement contained in the Tomlin order must be construed as a commercial instrument. **The aim of the inquiry is not to probe the real intentions of the parties** but to ascertain the contextual meaning of the relevant contractual language. **The inquiry is objective: the question is what a reasonable person, circumstanced as the actual parties were**, would have understood the parties to have meant by the use of specific language. The answer to that question is to be gathered from the text under consideration and its relevant contextual scene. (Emphasis added)

[29]    When the learned law Lord refers to the "relevant contextual scene" he invites, I believe, a holistic approach to the language, the circumstances in which the contract was drawn, the parties and their relative sophistication etc; in other words all relevant factors that might assist a court in the divining of meaning.  It will be recalled that the Shareholders' Agreement was drafted by Ian D. Mitchell Q.C. and that in his witness statement he said that the agreement was prepared on the joint instructions of both Crowley and De Joria and that it took several months and several revisions before Crowley and De Joria and their US Counsel were happy

15

with the draft and ready to sign it. (see paragraph [4](a) above)  One of the factors that courts have taken cognizance of is the circumstances in which an agreement was drafted. In **Shell U.K. Ltd v Lostock Garage Ltd**[16], an English Court of Appeal case, Ormrod LJ said the following when commenting on being invited to imply terms into a written contract:

> "Nevertheless, Mr. Kemp has two extremely formidable obstacles to surmount. The House of Lords in *Liverpool City Council v Irwin [1976] 2 WLR 562* has recently reviewed the law on this question and has affirmed the principle that where the parties have entered into a carefully drafted written contract containing the detailed terms agreed between them, as in this case, the court should only imply a term or terms if it is "necessary" to do so. The necessity test is a stringent one…"

It is unquestionably true that the evidence of the draftsman of the Shareholders' Agreement stated that "my instructions from Mr. Crowley and Mr. De Joria were that the agreement should bind them personally as well as the companies that they had formed expressly to own their shares in their joint ventures" and further "I drafted the agreement so that to the extent the shares were held not by themselves but by a company of which they held 100% of the shares they would be obliged to procure that the company complied with the obligations which they had assumed." This, however, does not solve the problem for the appellants. If, indeed, the circumstances were as described by the draftsman of the Shareholders' Agreement, then what the appellants should be seeking is a rectification of its terms which is not the appellants' case as argued. Rectification of contracts brings into play wholly different considerations.

[30]    In the circumstances I hold that there is no legal justification for the implying of such language as would require Crowley and De Joria to procure Island and Pendragon to fulfill the obligations undertaken by them personally.

---

[16] [1976] 1 WLR 1187

16

### Estoppel

[31]    The Appellants have also advanced the following ground of appeal:

>    "The learned Judge misdirected herself as to the law of estoppel by convention by:
>
>    (i)    Failing to recognize and give effect to the estoppel based on the mutually agreed statement of fact   (or mixed law and fact) recorded in the recitals, which formed the basis for the Agreement between the individuals;
>
>    (ii)   Adopting an erroneous approach as to the requirements of estoppel by convention in particular the elements of 'reliance' and 'detriment/benefit' giving rise to unconscionability."

[32]    Estoppel by convention, as I understand the principles, requires that the party raising the estoppel (in this case the appellants) to prove at the very least that both parties to the Agreement acted on an "assumed state of facts or law the assumption being either shared or acquiesced in by the other"[17] **and** that it would be unjust or unconscionable to allow one party to resile from that common assumption. As I understood the argument of learned Queen's Counsel for the appellants, he would exclude from the criteria for application of this form of estoppel, the requirement of unjustness or unconscionableness. I am unaware of any authority that lends support to this argument. It was suggested to us that **Trinidad Home Developers Ltd. v I.M.H. Investment Ltd (No.2)**[18], a case deriving from the Court of Appeal of Trinidad and Tobago, was authority for such a proposition. With respect, what **Trinidad Home Developers** is authority for is that in certain circumstances detriment can be inferred. This is an evidential ruling and neither adds nor subtracts from the requirement for detriment or benefit.

[33]    I hold that the party alleging the estoppel must show, in addition to a mistake shared by the parties or acquiesced in by the party alleged to be estopped, that both parties conducted themselves on the basis of that shared or acquiesced in mistake; the estoppel "requires communications to pass across the line between

---

[17] Republic of India v Indian Steamship Co (The Indian Endurance) [1998] AC 878
[18] (1993) 46 WIR 365

the parties. It is not enough that each of two parties acts on an assumption not communicated to the other"[19]

[34]     A much cited  case of estoppel by convention is **Amalgamated Investment and Property Co. Ltd. v Texas Commerce International Bank Ltd.**[20], a case which has been cited by this Court with approval. In that case a bank entered into a series of transactions on the basis of the existence of a certain state of  fact. The Court of Appeal of England found that the bank would not have acted in the way that it did if it had been aware of the true state of affairs. As Denning MR put it : "*in pursuance of the belief, the bank embarked on a course of conduct – rearranging their portfolio of investments – releasing properties and monies to the plaintiffs – which they would not have done except on the basis that the guarantee of the plaintiffs covered the loan to A.N.P.P.*"  As a result of that Denning MR held that it would be "*altogether unjust to allow either party to insist on the strict interpretation of the original terms of the contract – when it would be inequitable to do so, having regard to the dealings which have taken place between the parties."* In other words, the party seeking to establish that the other party is estopped from insisting on the strict interpretation of the terms of a contract must demonstrate that it has suffered detriment and hence, in that context, it would be inequitable or unjust not to interpret the contract as if it were written as the parties thought it to be.

[35]     In the case at bar, I have been unable to find any evidence adduced by the appellants that they acted in any way to their detriment based on their alleged understanding of the terms of the Agreement, nor can detriment be inferred from the evidence adduced. One argument put forward by the appellants was that Crowley, in proceedings which were commenced in California by his former paramour (the palimony proceedings) had used the  Agreement interpreted as the appellants contended for to defeat the claim of Crowley's former paramour. Assuming that the appellants were correct, and I do not need to find one way or

---

[19] Compania Portorafti Commerciale SA v Ultramar Panama Inc (The Captain Gregos) [1990] 2 Lloyds Rep. 295
[20] [1982] QB 84

the other, it would make not the slightest bit of difference to the position of the appellants. There is no evidence that they were in any way impacted by what Crowley might or might not have said in the palimony proceedings in California.

[36]    Absent any evidence of detriment to the appellants or advantage to Crowley within the context of the Agreement between De Joria and Crowley I am of the view that estoppel by convention does not arise in this case.

**Abuse of Process**

[37]    A further ground of appeal of the appellant reads as follows: "Further or alternatively, the learned judge ought to have held that the First and Second Claimants were precluded from denying the application of the Agreement to the shares in AR and CDC by reason of the abuse of the process as set out at paragraph 16 above." The paragraph 16 referred to reads as follows:

> "Further or alternative, the learned Judge erred in failing to recognise that it is an abuse of the Anguillian courts' process to permit Crowley/the First and Second Claimants to adopt diametrically opposed positions, as to the validity of the Agreement and its application to the shares in  CDC and AR, in difference jurisdictions namely California and Anguilla by:
>
> (a)    On the one hand, relying on the validity of the Agreement and its application to the shares in AR and CDC between August 2001 and February 2004
>
> > (i)    Defending the claim brought by Ms Edelstein in the California Palimony Proceedings:
> >
> > (ii)    Applying to the court to appoint the First and Second Claimants as special administrators with a view to participating in and implementing the valuation of the shares in Anguillian Corporations (including AR and CDC) under the Agreement;
> >
> > (iii)    Applying to the court to expeditiously approve the settlement of the claims brought by Ms. Edelstein in the California Palimony Proceedings to enable the First and Second Claimants to comply with the obligations under the Agreement including delivering to DeJoria good and

marketable title to the shares in the Anguillian Corporations (including AR and CDC).

(b)     And on the other hand, from March 2004, denying the validity of the Agreement or its application to the shares in AR and CDC before the Anguillian courts.

[43]     The essence of this ground of appeal is that it is an abuse of this Court's process for the respondents to aver as they do that the Agreement does not apply to CDC or AR when they have been the beneficiaries of opposite averments before the California courts. This issue does not seem to have been raised in any way before the court below. In this Court the totality of the appellants' written argument is quoted below:

"This conduct is an abuse of this Court's process and a violation of the principles of comity. If the earlier proceedings had been in Anguilla (or elsewhere in the Eastern Caribbean), there can be little doubt that the Court would have regarded such conduct as an abuse. As a matter of comity and first principle, the position should be no different simply because Crowley/the Executors' longstanding and unequivocal reliance on the Shareholders' Agreement (the same subject matter) took place before the California courts."

No authority is quoted for the proposition.

[44]     The general rule, as stated in Halsbury's Laws of England, 4th Edition Vol.37 at paragraph 693, is that "[a] party to an appeal will not normally be allowed to raise for the first time a point which was not taken in the court below".  There would seem to be a logical reason for such a rule, namely that by definition, an approach to an appellate court is to appeal from something. In **A. Gaydamak et al v (i) UBS Bahamas Ltd, and (ii) The Attorney General of the Bahamas**[21] Lord Scott of Foscote who delivered the opinion of the Board had this to say, which is apposite in this case:

"Mr Dingemans came before their Lordships prepared to argue that the appellants' proposed appeal did indeed have no chance of success and for that reason should not be re-entered for hearing.  However their Lordships did not, for two reasons, permit Mr Dingemans to address them on that point.  First, the point had not been argued below and their

---

[21] Privy Council Appeal No. 67 of 2004 delivered 28th February 2006 [[2006] UKPC 8]

Lordships would not have the advantage of knowing the Court of Appeal's views on it.  Second, the merits of the appeal would have been considered by Austin Davis J on the *inter partes* application for leave to appeal.  The Attorney General has, therefore, had an opportunity for contending that the appellants' prospects of success on an appeal were too weak to justify an appeal hearing and, presumably, did so contend on the application for leave.  An appeal against the grant of leave to appeal, or an application to discharge the grant of leave, cannot be entertained without some fresh material, unavailable when the application for leave was heard and apparently determinative as to the result of the appeal, being placed before the court."

If there has been no decision on an issue, then there can be no appeal. Thus, in this instance, the appellate court is, in effect, being asked to rule as a court of first instance. Further, if an issue is not raised at first instance, the party against whom the point is taken is left bereft of the opportunity to advance his case by additional evidence or focused cross-examination. Absolutely no reason is offered by the appellants for the failure to raise this point at first instance. In the new paradigm that is the Civil Procedure Rules, 2000, the Court is duty bound to pay regard to the overriding objective, and in that context to ensure that the parties are on an even footing. In my view to permit the appellants to raise this issue for the first time before the Court of Appeal is to put the respondents at a disadvantage. In coming to this conclusion I derive support from **United Marketing Company v Hasham Kara**.[22]

[45]   Given the determinations already made in this judgment I do not find it necessary to delve further, or at all into the arguments of the respondents raised in their Counter Notice.

[46]   For all the reasons adumbrated above I would dismiss this appeal with costs of this appeal to the Respondents. In the context that this is a Part 67 proceeding costs to be agreed or otherwise assessed.

Michael Gordon, QC
Justice of Appeal

---

[22] [1963] 2 All ER 553

[43]     **BARROW, J.A.:**   Humanity reaches its apogee in actions such as that of Mr. Martin Crowley, deceased, who left his entire Anguilla fortune in a trust for the education of the underprivileged children of Anguilla. There is dispute whether that fortune is valued at US$50 million or US$250 million. It does not matter to our regard which is the correct figure. It was an act of monumental generosity that even judicial restraint permits to be celebrated and accorded the highest praise.

### The scope of the Part 67 procedure

[44]     Proceedings were commenced in the High Court by the Executors of the estate of the deceased pursuant to Part 67.4 of the Civil Procedure Rules 2000 for the determination of certain questions and the giving of certain directions.  Mr. John Paul De Joria was named defendant presumably because the questions and directions concerned a document entitled Unanimous Shareholders' Agreement (the Agreement) dated 13th July 1996 that was made between Mr. Crowley and Mr. De Joria. Part 67 deals with claims for the administration of the estate of a deceased person and the execution of a trust under the direction of the court (called Administration Claims) and it deals, as well, with:

> "claims to determine any question or grant any relief relating to the administration of the estate of a deceased person or the execution of a trust."[23]

[45]     Part 67.4 defines the "determination of any question" to include any question arising in the administration of the estate of a deceased person and states that "any relief" includes an order directing a person to do or abstain from doing a particular act in the capacity of executor. The questions that the Executors raised and the relief they sought were as follows:

> "1.     (i)     Is the purported Unanimous Shareholders' Agreement dated 13th day of July, 1996 and entered into as between Martin Crowley on the one hand and John Paul Jones De Joria on the other hand

---

[23] Part 67.1 (1) (b) of CPR 2000

(hereinafter the "Agreement") valid and enforceable as a matter of Anguillian law?

(ii)   As a matter of Anguillian law, could Martin Crowley and John Paul Jones De Joria specifically contracting with each other as individuals contractually bind companies and impose contractual obligations upon companies which were not party to the Agreement and in which Martin Crowley and John Paul Jones De Joria held no direct interest?

(iii)   As a matter of Anguillian law does the complete disregard for corporate boundaries and corporate formalities invalidate the Agreement or make it otherwise unenforceable as a matter of public policy?

2.   (i)   If the Court finds that the Agreement is valid and enforceable as a matter of Anguillian law, is it valid and enforceable as against or in relation to Caribbean Distillers Corporation Limited?

(ii)   If the Court finds that the Agreement is valid and enforceable as a matter of Anguillian law what is the appropriate methodology to be employed as to a valuation so as to ensure mutual benefit to the parties thereto as contemplated by the Agreement?

3.   A direction that the Claimants be indemnified out of the assets of the Estate of Martin Crowley, Deceased held by them as Executors in respect of the costs and expenses of and occasioned by this claim.

4.   That such further or other consequential directions may be given in relation to the Agreement (and the costs and expenses of implementing those directions) as may be necessary or proper.

5.   Costs.

6.   Further or other relief as the Court deems just."

[46]     It is a very useful procedure that Part 67 of CPR 2000 provides because it enables an executor to know how to act by obtaining an authoritative answer to questions on which he is uncertain and on which opinions may be divided. The Executors stated that was their experience in the present case. In making the observations that follow about the course that the proceedings took, I wish to emphasize that we did not have the benefit of counsel's views or any expression by the judge as to the scope of Part 67.4 proceedings and therefore they must be regarded as only preliminary observations.

[47]     An executor need not wait until litigation, in the sense of a cause of action, arises and by this procedure he may avoid triggering such litigation. This procedure provides for answers to be obtained in proceedings that are non-adversarial, timesaving and cost-effective because, among other things, it is not intended to resolve factual disputes. It is a specialized procedure that is available only to administrators, executors and trustees because the rule mentions only them as the persons who may issue a claim:

> "67.4 (1) An executor, administrator or trustee may issue a claim for
>
> (a)     any relief; or
>
> (b)     the determination of any question;
>
> without bringing an administration claim.

The limitation on the availability of the procedure naturally follows from the definition of "any question" that confines that reference to a question that arises in the administration of the estate.

[48]     Along the way, it seems to me, sight was lost of the limits of the procedure. An order was made at some point before the hearing to add Mr. Crowley's company, Pendragon International Limited, as a claimant and Mr. De Joria's company, The Island Company Limited, as a defendant. Since Pendragon was not an executor, administrator or trustee I would need to be persuaded that it had the standing to

be joined as a claimant. The permitted object of the procedure is confined to determining questions for the guidance of the Executors and giving directions to them so, as I have presently advised myself, Pendragon could have no interest in the proceedings. The Island Company Limited could similarly have had no interest in the result of the proceedings because any answer or directions that the court gave to the Executors could have no coercive effect and so could not legally affect it. The idea that the two companies needed to be joined so that they could be bound by the court's determination confused these proceedings with normal litigation. I wonder if the confusion did not stem from the very origin of these proceedings, namely, the questions that the Executors chose to ask and the way they chose to frame those questions.  At the time they brought these proceedings the Executors did not have a dispute with or a cause of action against Mr. De Joria. They sought no relief against Mr. De Joria. At that time, it seems to me, what the Executors really needed was to be guided as to how to act. Perhaps what they needed to have asked was whether, on a preliminary view of the Agreement, it was open to them to contend that the Agreement did not bind the Estate rather than to ask whether it bound the Corporations, which is what they asked.

[49]     The nature of these proceedings bears close comparison with a claim for a declaratory judgment, the nature of which is lucidly described by Lord Woolf and Jeremy Woolf in their book, **The Declaratory Judgment**[24]:

> "A declaratory judgment is a formal statement by a court pronouncing upon the existence or non-existence of a legal state of affairs. It is to be contrasted with an executory, in other words coercive, judgment which can be enforced by the courts. In the case of an executory judgment, the courts determine the prospective rights of the parties and then order the defendant to act in a certain way, for example, by an order to pay damages or to refrain from interfering with the *claimant's* rights; if the order is disregarded, it can be enforced by official action, usually by levying execution against the defendant's property or by imprisoning him for contempt of court. A declaratory judgment, on the other hand, pronounces upon a legal relationship but does not contain an order which can be enforced against the defendant. Thus the court may, for example, declare that the claimant is the owner of certain property, that he is a

---

[24] At page 1,  3rd edition, 2002, Sweet & Maxwell

> British subject, that a contract to which he is a party has or has not been determined, or that a notice served upon him by a public body is invalid and of no effect. In other words, the declaration simply pronounces on what is the legal position."

[50]     The effect of the thinking that led to, and the consequence of the joinder were to significantly extend the scope of the proceedings and cause them to be conducted as if they were normal civil litigation. Thus, on this appeal the parties have presented the court with factual disputes, pleas of estoppel by convention, abuse of process and mistake of law, and a claim by the appellant (who made no counterclaim) for two declarations and an order for specific performance. How far the creation and the litigation of a dispute between the Executors and Mr. De Joria have gone beyond the permitted scope of the procedure is seen by considering the provision in Part 67 that:

> " The general rule is that the claimant need not join as a defendant any person having a beneficial interest under the estate or trust."[25]

Clearly if the general rule is that a person with such an interest need not be joined as a defendant then, as a general rule, no one else will need to be joined. The procedure that is contemplated, it appears, must be that executors can get their questions answered in proceedings in which there is no defendant at all. In the instant claim the Executors could have had their questions answered without making Mr. De Joria a defendant. This further emphasizes that the Part 67 procedure was not intended for the litigation of disputes. It may be too late to case manage the proceedings at this stage and strike out parties, pleas and issues but it is not too late to hold firmly to the limits of the procedure in considering the submissions made on this appeal.

## The Agreement

[51]     Mr. Crowley and Mr. De Joria stated in the Agreement that they were acting as individuals and as shareholders. In Recital A they stated that they were the sole

---

[25] Part 67.2 (3)

legal and beneficial owners of all the shares in the Corporations listed in Schedule A to the Agreement, signed by them, and as amended from time to time. In Recital B they stated their desire to promote their mutual interests by imposing restrictions on the sale, transfer or other disposition of the shares. They expressed their object for doing so as being to ensure "the continued successful operation of the business of the Corporations through continued harmonious management". They also expressed their desire to set forth their understandings on other matters.

[52]    The first clause stated the scope of the Agreement – that it shall apply to each party and all of the shares of the Corporations now held or hereafter acquired, and all shares owned, acquired or transferred by each shareholder, whether voluntarily, involuntarily or by operation of law. It was that composite that they defined as the "Shares".

[53]    Clause 2 provided that legends were to be placed on the share certificates giving notice of restrictions on dealings with them and of the option to purchase that the other held. Newly issued shares were to be inscribed with the legend. A copy of the Agreement was to be given to the secretary of each Corporation for her to show to any person who inquired about it. Restrictions were imposed, in clause 3, on the transfer of any of the shares and clause 4 gave a right of first refusal.

[54]    Clause 5 was entitled "Purchase Upon Death" and provided that upon the death of any Shareholder his personal representative shall offer to sell all of the Shares owned by the deceased at the time of his death. Details were given of the procedure to be followed. Clause 6 provided the method and mechanism for valuing the Shares to fix the price.

[55]    The Agreement contained 23 clauses and provided for a number of other matters on some of which counsel made submissions and references will be made to the relevant clauses in the course of this judgment. It is sufficient to conclude this summary to refer to Schedule A, which listed the Corporations then in existence. It

is stated in the schedule that the company named SMS was held as to 50% by each shareholder through his wholly owned and controlled company and the same was said for the company named Sea Grape. The wholly owned and controlled companies, to which I will refer for convenience as holding companies, were Pendragon International Limited in the case of Mr. Crowley and The Island Company Limited, in the case of Mr. De Joria. It was stated in the schedule that Anguilla Rums was held as to 50% by each of the individuals directly.

### The primary questions

[56]    In summary, the judge decided[26] that the Agreement suffered from fundamental flaws as matters of law because it purported to deal with property not owned by the parties to the agreement and to create legal obligations in respect of persons who were not parties to or privies to the Agreement. The judge found that Mr. Crowley and Mr. De Joria, who contracted as individuals, sought to deal with the shares of the Schedule A Corporations by creating rights and obligations in respect of those shares, which at the time were not owned by them but rather by the holding companies that were not parties or privies to the Agreement. Those flaws, she found, made the Agreement incapable of performance in respect of the Schedule A Corporations, the holding companies, and CDC as well. The judge found that the parties must be taken on the totality of the evidence to have known the facts but laboured under a fundamental mistake as to the law. She relied on the proposition that "…where performance of a contract is impossible at the time of contracting, the case is one of initial impossibility or mistake, and such a contract is generally void ab initio."[27] Based on that reasoning the judge answered the questions posed by stating that the Agreement was not valid and enforceable as a matter of Anguillan law. That answer, she stated disposed of the other questions and it followed that the Agreement was not valid or enforceable in relation to CDC.

---

[26] At  paragraphs 46 to 48 of the judgment
[27] Per Liverpool JA in Dammer v Wallace (1993) 45 WIR 161 at 168

[57]     From that summary and from the arguments presented two primary questions arise on this appeal: (1) was the Agreement valid and enforceable as a matter of Anguillan law? And (2), if it is valid and enforceable, does the Agreement apply to the shares in CDC and AR?

[58]     Although the judge expressly held that the Agreement was not valid and enforceable as a matter of Anguillan law it is clear that that conclusion flowed directly from her decision that the Agreement did not bind or affect the holding companies or the Corporations listed in Schedule A. The core of the judgment was its discussion and application of the principle that the separate legal personality of the companies made the companies distinct from their shareholders (and from the shareholders of their shareholder) and of the principle, derived from the doctrine of privity of contract, that a contract cannot bind persons who are not parties to it.

[59]     The judge did not pronounce on whether the Agreement was valid as between the parties to it. The Executors never argued against the validity of the Agreement, as between the parties, as a matter of personal obligations. The argument for the Executors was that because the parties did not own the shares the Agreement, in purporting to deal with such shares, was ineffective and incapable of enforcement. Indeed, on the appeal counsel for the Executors objected that the appellants did not argue the personal obligation point below and should not be allowed to argue that point on this appeal. Counsel for the appellants presented material to show that the point was argued below but the fact that the objection could have been made shows how little attention was given in the court below to the point that the Agreement was valid as a matter of the personal obligations of the two parties to it. Because the point is as to the interpretation of the Agreement the appellants are permitted to argue the point on appeal even if they did not argue it below and it is a point that this court would be bound to consider even if neither side raised it. The judgment shows that one of the arguments for the appellant in the court below[28] was that the court should not "subject [the holding companies] to the level of

---

[28] In the court below different counsel appeared for the appellants.

corporate formalities other companies may have as they were merely corporate vehicles or in essence the alter egos of Crowley and De Joria."[29]

[60]    It is now clear that the appellants' case is not that the Agreement bound anyone other than the parties to it. The appellants' case is that the parties to the Agreement bound themselves and their executors to do what was necessary in relation to their holding companies so as to be able to perform the obligation in the Agreement. It is in this connection that the arguments on whether the court should imply a term, to that effect, call for consideration. The summaries that are given under the next two headings simply set out the submissions made on behalf of the appellants and the respondents without noting and repeating in the text that what is stated are only summaries of what the parties submitted and contains no judicial contribution but this must be borne in mind.

### The appellants' arguments on whether to imply a term

[61]    The appellants argued that on a true construction of the agreement the parties bound themselves to procure that the shares that were not registered in their names but in the names of their holding companies were dealt with as the agreement required. This is the only construction of the agreement that makes any sense. This construction was consistent with clause 23 (c) of the agreement by which the parties agreed:

> "Each of the parties hereto shall execute and deliver any and all additional papers, documents and other assurances and shall do any and all acts and things reasonably necessary in connection with the performance of their obligations hereunder to carry out the intent of the parties hereto."

The exercise for the court was primarily one of construing the contract to give effect to the intention of the parties as expressed in the agreement. However, to the extent that it was necessary to give effect to the agreement the court should

---

[29] See paragraph [10] of the judgment. Counsel who appeared below may well have been drawn into making that argument in response to question 1 (iii) posed by the claimants; does the complete disregard of corporate boundaries and formalities invalidate the Agreement or make it otherwise unenforceable as a matter of public policy?

imply a term into the relevant clauses of the agreement to the effect that the individuals are obliged to procure that their wholly owned companies deal with the shares as they are required to do under the agreement.

[62]   Such a term would satisfy all the requirements for the implication of a term that were stated in **BP Refinery (Westernport) Pty Ltd v Shire of Hastings**[30], namely:

      a.     It must be reasonable and equitable;

      b.     It must be necessary to give business efficacy to the contract so that no term will be implied if the contract is effective without it;

      c.     It must be so obvious that it goes without saying;

      d.     It must be capable of clear expression; and

      e.     It must not contradict any express term of the contract.

[63]   Such a term would serve the expressed intention of the parties of securing the continued successful operation of the joint venture business through continued harmonious management. The Executors' case on the other hand was commercially absurd and productive of disharmony. The trial judge's reasoning for rejecting the appellants' construction and, if necessary, the implication of a term was wrong. In the first place it defeated the obvious commercial purpose of the agreement and produced a commercially absurd result, namely that there is not and never has been any agreement regulating the operation and ownership of the (50/50) Anguillan joint venture corporations through which the individuals developed their joint venture business for over a decade. That result was contrary to the principle that if, by a particular construction, the agreement would be rendered ineffectual and the apparent object of the contract would be frustrated, whilst by another construction a different effect would be produced, the latter interpretation is to be applied, if it can possibly be supported by anything in the contract: see **Chitty on Contracts** (29th ed. 2004) at paragraph 12-081. As Lord

---

[30] (1978) 52 ALJR 20 at 26

Tomlin said in **Hillas v Arcos**[31], the court should not incur the reproach of being the destroyer of bargains. This commonsense approach is not limited to cases where the agreement is drawn up by businessmen without the benefit of legal advice, according to Gibbs J in **ABC v Australian Performing Rights Association**.[32]

[64]   The second reason why the judge was wrong was that she relied on the subsequent conduct of the parties to conclude that they had largely ignored the provisions of the agreement in the conduct of their affairs. The judge was both factually wrong as well as wrong in principle since the subsequent conduct of the parties is not admissible as an aid to the construction of a contract, as was restated by the House of Lords in **Schuler AG v Wickman Machine Tool Sales Ltd**.[33]

[65]   Thirdly, the judge treated the construction or the implication of terms proposed by the appellants as inconsistent with various express terms of the agreement. The reasoning of the judge reveals a misunderstanding of the nature of the arguments that were advanced by the appellants. Thus, the judge stated:

> "I am unable to conclude on an application of the officious bystander test that if asked whether the Agreement applied to the shares of Pendragon and Island the answer would be 'of course'"

Similarly, the judge stated that:

> "I have also concluded that no legal basis has been established justifying the court in implying the terms into the Agreement which would make the terms thereof binding on Pendragon and Island and thus bind SMS being one of the Schedule A Corporations or on CDC by virtue of Pendragon's and Island's ownership of CDC."

---

[31] (1932) 147 LT 503
[32] (1973) 47 ALJR 526 at 529 (cited in The Interpretation of Contracts by Lewison 2004 at 231 at paragraph 7.14
[33] [1974] AC 235

[66]      "It was **not** the Appellants' case that the shares in Pendragon and Island were subject to the buy and sell provisions of the Shareholders' Agreement. The Appellants' case was that the Individuals were under a *personal* obligation to procure that their wholly owned and controlled vehicle companies complied with the Shareholders' Agreement, which as a matter of fact and law, they were able to do. The learned Judge erred in failing to recognize the Individuals' obvious ability to exercise **complete power and control** over the Companies (within the law), including the power to sell any of the assets held in their names."[34]

[67]      The judge was also wrong to treat the 'entire agreement clause' in clause 23 (f) as effective to exclude the implication of a term which should otherwise be implied based upon the presumed intention of the parties since such a term is part of the entire agreement and takes effect as if it was written out in express language; see Laws LJ refusing leave to appeal in **Hotel Services Ltd v Hilton International Hotels (UK) Ltd**[35] and **Etna v Arif**.[36]

**The respondents' arguments on whether to imply a term**

[68]      The respondents argued that the implication of a term is a matter of law for the court and that the intention of the parties, as collected from the words of the agreement and the surrounding circumstances, will determine whether or not to imply a term. The respondents set out the following propositions:

      a.     A term will be implied if it is necessary, in the business sense, to give efficacy to the contract. A term ought not to be implied unless it is in all the circumstances equitable and reasonable. Simply because it is reasonable to do so is not a sufficient basis for implying a term: **Liverpool City Council v Irwin**.[37]

---

[34] Paragraph 4.46 of the appellants' submissions dated 25th April 2005.
[35] (unreported) 5 February 1999
[36] 1999 VSCA 99
[37] [1977] AC 239

b.      A term will not be implied if it would be inconsistent with the express wording of the contract: **Equitable Life Assurance Society v Hyman**.[38]

c.      A term cannot be implied the effect of which is contrary to law, for example by violating the doctrine of privity of contract.

d.      The court must not rewrite the contract that the parties made or, if they failed to make a valid contract at all, to change the nature of the contract so that it can be upheld. Neither must the court permit rectification through the back door.

[69]    The respondents contended that as applied to this case the implied term for which the appellants contend is inconsistent with 10 express terms of the agreement: the Preamble, Recital A and clauses 1, 2, 3, 4, 5, 8, 13 and 18. The proposed term is also inconsistent with clause 23 (f), the 'entire agreement clause' and it is to be remembered that this agreement was the product of lengthy consideration, was scrutinized by three law firms and was signed by two experienced and successful businessmen.

[70]    The effect of the implied term contended for is to turn the agreement into something completely different in nature. The focus becomes not the shares in the 3 named companies but the shares in Pendragon and Island. The appellants are in truth seeking to rewrite the agreement in order to turn it into something quite different and to make it lawful.

[71]    The appellants' reliance on 'business efficacy' does not avail because it is not that the agreement is not efficacious in the sense that it was inefficient. It is that it is invalid. If the parties wanted to make a valid agreement they needed to have made a different agreement and that is not something that the court can now do for them by the implication of terms.

---

[38] [2002] 1 AC 408 at 459

34

[72]     In the passage referred to above[39], Lord Steyn said in **Equitable Life Assurance Society v Hyman**:

> "It is necessary to distinguish between the processes of interpretation and implication. The purpose of interpretation is to assign to the language of the text the most appropriate meaning which the words can legitimately bear.   The language of article 65(1) contains no relevant express restriction on the powers of the directors.  It is impossible to assign to the language of article 65(1) by construction a restriction precluding the directors from overriding GARs.   To this extent I would uphold the submissions made on behalf of the Society.   The critical question is whether a relevant restriction may be implied into article 65(1).   It is certainly not a case in which a term can be implied by law in the sense of incidents impliedly annexed to particular forms of contracts.   Such standardized implied terms operate as general default rules:  see <u>Scally v Southern Health and Social Services Board</u> [1992] 1 AC 294.  If a term is to be implied, it could only be a term implied from the language of article 65 read in its particular commercial setting.  Such implied terms operate as ad hoc gap fillers.  In <u>Luxor (Eastbourne) Ltd v Cooper</u> [1941] AC 108, 137 Lord Wright explained this distinction as follows:
>
>> "The expression `implied term' is used in different senses. Sometimes it denotes some term which does not depend on the actual intention of the parties but on a rule of law, such as the terms, warranties or conditions which, if not expressly excluded, the law imports, as for instance under the Sale of Goods Act and the Marine Insurance Act … But a case like the present is different because what it is sought to imply is based on an intention imputed to the parties from their actual circumstances."

[73]     The requirement of necessity for implication has been reiterated on many occasions. In **Liverpool City Council v Irwin**[40], in a dispute whether the landlord had an implied duty to keep common parts in repair, Lord Wilberforce stated:

> "My Lords, in order to be able to choose between these, it is necessary to define what test is to be applied, and I do not find this difficult.  In my opinion such obligation should be read into the contract as the nature of the contract itself implicitly requires, no more, no less; a test, in other words, of necessity."

---

[39] At paragraph 67
[40] 1977 AC 239 at 254 F

[74]     In that same case Lord Cross of Chelsea stated[41]:

> "When it implies a term in a contract the court is sometimes laying down a general rule that in all contracts of a certain type – sale of goods, master and servant, landlord and tenant and so on – some     provision is to be implied unless the parties have expressly excluded it.  In deciding whether or not to lay down such a prima facie rule the court will naturally ask itself whether in the general run of such cases the term in question would be one which it would be reasonable to insert.  Sometimes, however, there is no question of laying down any prima facie rule applicable to all cases of a defined type but what the court is being in effect asked to do is to rectify a particular – often a very detailed – contract by inserting in it a term which the parties have not expressed.  Here it is not enough for the court to say that the suggested term is a reasonable one the presence of which would make the contract a better or fairer one; it must be able to say that the insertion of the term is necessary to give – as it is put – "business efficacy" to the contract and that if its absence had been pointed out at the time both parties – assuming them to have been reasonable men – would have agreed without hesitation to its insertion.  The distinction between the two types of case was pointed out by Viscount Simonds and Lord Tucker in their speeches in <u>Lister v Romford Ice and Cold Storage Co. Ltd.</u> [1957] A.C.555, 579, 594…"

### The concepts of validity and enforceability

[75]     The major premise of the respondents' argument against the court implying the term for which the appellants contend is that the agreement is invalid and unenforceable. That premise is correct only to the extent that the Agreement does not bind anyone other than the parties to it and therefore does not impose obligations on anyone other than the parties to it. If the issue that the respondents take with the enforceability of the Agreement is put aside for a brief moment it is revealed that the respondents advance no argument against the validity of the Agreement as between Mr. Crowley and Mr. De Joria as individuals and none occurs to me. Therefore, I would hold that the Agreement is valid as a matter of the personal obligations of the parties.

---

[41] at 257 H

[76]     The obligation that each party contracted to perform and which the survivor seeks to enforce was that the executors of a deceased party "*shall offer*" for sale to the survivor all of the Shares that the deceased owned at the time of his death. The law is very familiar with the situation where a party contracts to sell goods that he does not own and for which he holds no title. There is no question as to the validity of such a bargain or its enforceability. As Mustill J (as he then was) stated in **Karlshamns Oljefabriker v Eastport Navigation**[42]

> "A contract of sale can perfectly well be formed by a seller who never has title at any time, by causing a third party to transfer it directly to the buyer."

In oral argument counsel for the respondents conceded as much. The different remedies for breach of that bargain that may be obtained in enforcement proceedings - return of the price, damages for breach of contract or specific performance - confirm the validity and enforceability of the obligation.

[77]     The classic example of the law's familiarity with a contract for sale by a seller who does not possess title at the time of the making of the contract is found in the **Sale of Goods Act**[43] which provides in section 14:

> "In a contract of sale, unless the circumstances of the contract are such as to show a different intention, there is –
>
> (a)          an implied condition on the part of the seller that in the case of a sale he has a right to sell the goods, and that in the case of an agreement to sell  he will have a right to sell the goods at the time when the property is to pass;
>
> (b)          …"

It will be seen that the Act does not imply a term that the seller will procure that title is transferred. The Act does not imply that obligation because the contract itself creates the obligation and that is the very purpose of the contract. What the Act does is to make the seller's contractual obligation into an implied condition that the seller 'will have a right to sell the goods'. The Act confers upon that obligation the status of a condition as opposed to a warranty or an intermediate or

---

[42] [1982] 1 All ER 208 at 215 g
[43] Revised Statutes of Anguilla, chapter S10

innominate term so as to entitle the buyer to claim not only damages but also a right to treat the contract as repudiated.

[78]    The position is the same with contracts for the sale of land: it is sufficient to satisfy the express or implied obligation to make a good marketable title if the vendor shows that some person whose concurrence he can require can transfer to the purchaser the whole legal and equitable interest in the land sold.[44]  It is commonplace for persons to contract to sell land to which they hold no title. In the real estate business it is called a "flip" when a person buys land and sells it contemporaneously at a profit, often without ever taking title in his own name.

## Construction versus implication

[79]    As a matter of construction, therefore, I see no need to imply into the agreement a term that the Individuals agreed to procure that their holding companies will perform the requirements of the agreement. The Individuals bound their executors to offer the shares to the survivor and there was no need to stipulate in the agreement the mechanics or modality by which the executors should perform that obligation. There is no need to imply a term so as to impose the obligation on the Executors. So far as the Agreement requires, it is sufficient that it imposes the obligation on the Executors to offer the shares for sale to the survivor. There is no reason to doubt that the Executors can perform that obligation and accordingly I would reject the notion of impossibility of performance. If, however, I had been of the view that the Agreement was deficient in that it did not impose an enforceable obligation upon the executors to offer the shares I would have had not the slightest hesitation in implying a term. I do not accept that there would be any inconsistency with the provisions in the Agreement to which the respondents referred[45] to imply such a term.

---

[44] See volume 42 Halsbury's Laws of England, 4th edition reissue, at paragraph 137.
[45] See paragraph 68, above

[80]     The passage cited by the respondents from **Equitable Life Assurance Society v Hyman**[46] shows the proper approach to implying into a contract to sell goods a term that the seller will take appropriate steps to enable him to do so. This is not a case of an ad hoc implication; it is an implication that is to be made as a rule in cases of this type. The term can be implied by law in the sense of an incident impliedly annexed to a particular form of contract; it is in the nature of a standardized implied term that operates as a general default rule.[47] The general default rule in a case of this type may be stated to be that a person who agrees to offer to sell goods of which he is not the owner impliedly promises that he will have the right to sell the goods. This case is only marginally different from the typical sale of goods case, the difference being that instead of there being a contract of sale there is a contract to offer to sell.

[81]     As a matter of construction and, if necessary, as a matter of implication Mr. Crowley bound his executors to offer the shares for sale and to take such steps as were necessary to enable them to do so. It follows, in my view, that the first of the two primary questions must be answered in the affirmative: the Agreement is valid and enforceable as a matter of Anguillan law.

### Application of the Agreement to the shares in CDC

[82]     Because of the approach that the judge took to the interpretation of the Agreement, that entities that were not parties to the Agreement could not be bound by it and therefore that the Agreement was invalid, the judge did not directly decide if the obligation in clause 5 of the agreement to offer for sale the Shares of the deceased applied to the shares in CDC. What the judge decided was that the agreement did not bind SMS and therefore it could not bind CDC into which SMS merged.[48]

---

[46] At paragraph 71, above
[47] Per Lord Steyn in Equitable Life Assurance Society v Hyman [2002] 1 AC 408 at p 458
[48] At paragraph 37 of the judgment.

[83]     The argument that the respondents advanced in relation to the shares in CDC was that CDC was omitted from Schedule A. The respondents argued that to the extent that it is said that the Agreement imposed obligations on Mr. Crowley and Mr. De Joria as individuals, it is instructive and highly relevant that neither Mr. Crowley nor Mr. De Joria saw fit to mention CDC (a company which they owned and which had been in existence for 3 years) at all in the Agreement or in Schedule A. Further, both men failed to take any action to add CDC to the Agreement even after Mr. Crowley publicly recognized the fact by a manuscript note that he made on a copy of the Agreement to "Add CDC" and his testimony in court proceedings in California.

[84]     The opposing argument from the appellants was that it does not matter that CDC was not mentioned in Schedule A nor added because the terms of the Agreement, in particular clause 1, made it not strictly necessary to do so. The appellants also offered the explanation for the omission of CDC from Schedule A that at the time of the making of the Agreement CDC was a shelf company that was inactive and of no significance. The judge found otherwise but the appellants renewed their arguments on appeal and point to material to prove that the judge got it wrong.

[85]     In paragraph 37 of the judgment the judge accepts that CDC was the successor to SMS. The evidence is that those two companies were merged in 2002 and the merged entity was called CDC. The appellants make the argument that the intention of the parties was to capture all of their joint venture business in Anguilla within the scope of the Agreement. It seems to me that Recital B supports that argument in expressing the parties' ultimate objective of "ensuring the continued successful operation of the business of the Corporations". The focus was on the "business" of the Corporations and the use of the singular indicates that it was the parties' view that while there were multiple corporations there was one business. Further, clause 1, which defines the scope of the agreement, is unmistakable in its intent to apply not just to the shares in the Corporations listed in the schedule but to *all shares acquired* by each shareholder, whether voluntarily or involuntarily.

That clause defines the shares in the Corporations and all shares acquired by the parties as the "Shares". Where, therefore, clause 5 obliges the executors of a deceased shareholder to "offer to sell all of the Shares owned by such Deceased Shareholder at the time of his death", it is difficult to see any basis for excluding from that compass the shares in CDC.

[86]     A central finding of the judge and a major argument on behalf of the respondents is that the Shareholders did not own the shares in CDC or for that matter in any of the Corporations. The judge stated that the parties' description of themselves as the owners of the Shares was legally wrong. That is true but it is not important in this particular context because it is clear that the parties treated and expressed themselves as 'owning' what they clearly recognized was held through their holding companies. As I have previously noted, the clearest expressions of this are in Schedule A in which Mr. Crowley and Mr. De Joria refer to shares that they 'held' through their wholly owned and controlled holding companies and in Recital A in which they state that they are the "sole legal and beneficial owners of all the ... shares of the ... Corporations". So, while it is undoubtedly true that as a matter of law the parties did not own these shares that misstatement was entirely irrelevant to the identification of the subject matter of their agreement, namely, the Shares.

[87]     There is no dispute that the parties agreed to sell the shares in the Corporations. There can be little doubt that as a matter of conception, the strict legal position aside, in the popular and practical sense (which, of course, is of no legal effect) Mr. Crowley and Mr. De Joria owned those shares. They expressly said so when they said in Schedule A that they held the shares in the corporations through their wholly owned and controlled holding companies. What they said did not change the legal position, it is true, but it puts beyond doubt the scope of their Agreement and which shares they intended should be offered for sale. It is clear, therefore, that they were agreeing to sell the shares that they 'owned' in the companies that conducted the "business" in which they were engaged in Anguilla as well as all

shares that they acquired in future. I have no doubt that they used the word 'acquired' in the same sense that they used the words 'owned' and 'held' – not in the strict legal sense but in the popular sense. On this reasoning I would hold that the scope of the Agreement extends to the shares in CDC and that the Executors are bound to offer to sell those shares as well.

### Other matters

[88]   In the view that I have taken, both as to the answers to the questions and the limit on the scope of the rule that permitted these proceedings, the other matters on which there were submissions do not call for decision.

[89]   The Executors had raised among their questions in the court below, but it did not arise for consideration on appeal since the judge did not decide on it, the question, what is the appropriate methodology to be employed for valuing the Shares? Because there were no submissions on it I do not propose to answer that question but would merely wonder if there is any reason for employing any basis other than that on which the parties agreed.

[90]   In their claim form the Executors had also sought a direction that they be indemnified out of the estate in respect of the costs and expenses of and occasioned by this claim. Notwithstanding the subversion of the procedure that occurred along the way I consider that it was a most appropriate way for the Executors to have proceeded and would accordingly so direct.

[91]   I would award the costs of the appeal and of the proceedings below to the appellants. I would reserve for a further hearing all aspects of costs, especially in view of the special nature of the procedure for which Part 67 provides.

Denys Barrow, SC
Justice of Appeal

[92]     **RAWLINS. J.A.**:  I have had the opportunity to read the judgments of both Gordon JA and Barrow JA. I concur with the conclusion and findings of Gordon JA and agree with his order.

**Hugh A. Rawlins**
Justice of Appeal