the petition and schedule, to be given to three distinct classes of creditors: first, the creditors at whose suit the prisoner shall be in custody; secondly, the other creditors in the schedule; and, thirdly, all creditors (if any) not named in the schedule; for, after expressly directing that the Court shall decree notice to be given to the first and second classes, the Act adds, "and to be inserted in the *London Gazette*; and also, if the said Court shall think fit, in the *Edinburgh* and *Dublin Gazettes*, or either of them; and also in such other newspaper or newspapers as the said Court shall direct."]

Now, adverting to the scope of the petition, namely, that the prisoner may be discharged from prison in respect of all debts owing at the time of presenting his petition; that the schedule is to contain all debts and claims; that notice is to be publicly given of the hearing of the petition, and consideration of the schedule generally, as well as particularly to the creditors therein named; that any creditor upon proving his debt may oppose the prisoner's discharge, and challenge the correctness of the schedule; that the Act contemplates the case of the schedule requiring amendment, that its truth may be the subject of examination and report, and that the prisoner is ultimately [460] to swear to the truth of it (considering what the truth so to be sworn to must be), and the different rules for making dividends before and after adjudication, I cannot discover the foundation for the arguments of the Plaintiff's counsel, that no creditors of the insolvent at the time of filing his petition have any interest in his estate under the insolvency, unless the insolvent has volunteered to put their names upon his schedule. The obvious purport of the Act appears to be that all the debts of the insolvent shall be ascertained; and I presume the Court would not adjudicate that he be discharged unless and until he submitted to make his schedule true.

So far, therefore, as the case depends upon the tender alone, I think the assignees were not guilty of a breach of duty in proceeding to a sale after the tender was made.

In these circumstances, without reference to the question whether the purchase to be effected by the deed was proposed to be made for the benefit of a Plaintiff or of a stranger, and whatever the result of any inquiry as to that fact might be, even supposing the case were now open to any such inquiry, it is impossible that a Court of Equity can say that the assignees were guilty of a breach of trust, of which a purchaser was bound to take notice, because they made no better offer, as a condition upon which the sale should be stayed, than that which was made on their behalf by their solicitor, Mr. Acton, and refused by Mr. Hughes, on the part of the proposed purchaser. The bill must be dismissed as against Babb, with costs, and as against the assignees without costs. I leave the costs of the assignees to the judgment of the Court for the Relief of Insolvent Debtors, to whom it will properly belong to determine, with reference to the question of costs, whether they have or not taken the proper course in dealing with the insolvent's estates.

### [461] FOSS v. HARBOTTLE.   *March* 4, 6, 7, 8, 25, 1843.

[See *Hallows* v. *Fernie*, 1867-68, L. R. 3 Eq. 532; L. R. 3 Ch. 467; *Hoole* v. *Great Western Railway Company*, 1867, L. R. 3 Ch. 274; *Seaton* v. *Grant*, 1867, 36 L. J. Ch. 642; *Clinch* v. *Financial Corporation*, 1868, L. R. 5 Eq. 482; L. R. 4 Ch. 117; *Atwool* v. *Merryweather*, 1868, L. R. 5 Eq. 467, n.; *Turquand* v. *Marshall*, 1869, L. R. 4 Ch. 386; *Gray* v. *Lewis* (No. 1), 1869-73, L. R. 8 Eq. 541; L. R. 8 Ch. 1050; *Pickering* v. *Stephenson*, 1872, L. R. 14 Eq. 339; *Menier* v. *Hooper's Telegraph Works*, 1874, L. R. 9 Ch. 353; *Ward* v. *Sittingbourne and Sheerness Railway Company*, 1874, L. R. 9 Ch. 492, n.; *Macdougall* v. *Gardiner* (No. 1), 1875, L. R. 20 Eq. 393; L. R. 10 Ch. 606; *Macdougall* v. *Gardiner* (No. 2), 1875, 1 Ch. D. 13; *Russell* v. *Wakefield Waterworks Company*, 1875, L. R. 20 Eq. 480; *Duckett* v. *Gover*, 1877, 25 W. R. 554; *Pender* v. *Lushington*, 1877, 6 Ch. D. 80; *Isle of Wight Railway Company* v. *Tahourdin*, 1883, 25 Ch. D. 333; *Studdert* v. *Grosvenor*, 1886, 33 Ch. D. 535; *La Compagnie de Mayville* v. *Whitley* [1896], 1 Ch. 807; *Tiessen* v. *Henderson* [1899], 1 Ch. 866; *Alexander* v. *Automatic Telephone Company* [1900], 2 Ch. 69; *Burland* v. *Earle* [1902], A. C. 93; *Punt* v. *Symons & Company Ltd.* [1903], 2 Ch. 516.]

Bill by two of the proprietors of shares in a company incorporated by Act of Parliament, on behalf of themselves and all other the proprietors of shares except the Defendants,

against the five directors (three of whom had become bankrupt), and against a proprietor who was not a director, and the solicitor and architect of the company, charging the Defendants with concerting and effecting various fraudulent and illegal transactions, whereby the property of the company was misapplied, aliened and wasted; that there had ceased to be a sufficient number of qualified directors to constitute a board; that the company had no clerk or office; that in such circumstances the proprietors had no power to take the property out of the hands of the Defendants, or satisfy the liabilities or wind up the affairs of the company; praying that the Defendants might be decreed to make good to the company the losses and expenses occasioned by the acts complained of; and praying the appointment of a receiver to take and apply the property of the company in discharge of its liabilities, and secure the surplus: the Defendants demurred.

Held, that, upon the facts stated, the continued existence of a board of directors *de facto* must be intended; that the possibility of convening a general meeting of proprietors capable of controlling the acts of the existing board was not excluded by the allegations of the bill; that in such circumstances there was nothing to prevent the company from obtaining redress in its corporate character in respect of the matters complained of; that therefore the Plaintiffs could not sue in a form of pleading which assumed the practical dissolution of the corporation; and that the demurrers must be allowed.

When the relation of trustee and *cestui que trust* begins, as between the projectors of public companies and such companies.

Some forms prescribed for the government of a corporation may be imperative, and others directory only.

On argument of a demurrer, facts not averred in the bill, and which might possibly have been denied by plea, if they had been averred, intended against the pleader.

The bill was filed in October 1842 by Richard Foss and Edward Starkie Turton, on behalf of themselves and all other the shareholders or proprietors of shares in the company called "The Victoria Park Company," except such of the same shareholders or proprietors of shares as were Defendants thereto, against Thomas Harbottle, Joseph Adshead, Henry Byrom, John Westhead, Richard Bealey, Joseph Denison, Thomas Bunting and Richard Lane; and also against H. Rotton, E. Lloyd, T. Peet, J. Biggs and S. Brooks, the several assignees of Byrom, Adshead and Westhead, who had become bankrupts.

The bill stated, in effect, that in September 1835 certain persons conceived the design of associating for the purchase of about 180 acres of land, situated in the parish of Manchester, belonging to the Defendant, Joseph Denison, and others, and of enclosing and planting the same in an ornamental and park-like manner, and erecting houses thereon with attached gardens and pleasure-grounds, and selling, letting or otherwise disposing thereof; and the Defendants, Harbottle, Adshead, Byrom, Westhead, Bealey, Denison, Bunting and Lane, agreed to form a joint stock company, to consist of themselves and others, for the said purpose: that in October 1835 **[462]** plans of the land, and a design for laying it out, were prepared; that, after the undertaking had been projected and agreed upon, Denison purchased a considerable portion of the said land of the other original owners with the object of reselling it at a profit, and Harbottle, Adshead, Byrom, Westhead, Bunting and Lane, and one P. Leicester, and several other persons, not members of the association, purchased the said land in parcels of Denison and the other owners, so that at the time of passing the Act of Incorporation Harbottle, Adshead, Byrom, Westhead, Bunting and Lane owned more than half of the land in question, the remainder being the property of persons who were not shareholders: that Denison and the last-named five Defendants made considerable profits by reselling parts of the said land at increased chief rents before the Act was passed.

The bill stated that, between September 1835 and the beginning of 1836, various preliminary steps were taken for enabling the projectors of the said company to set it on foot: that in April 1836 advertisements, describing the objects of the proposed company and the probabilities of its profitable result, were published, in which it was proposed to form the association on the principle of a tontine: that the first eight

named Defendants and several other persons subscribed for shares in the proposed company, and, among others, the Plaintiff, Foss, subscribed for two shares, and the Plaintiff, Turton, for twelve shares of £100 each, and signed the contract, and paid the deposit of £5 per share : that at a public meeting of the subscribers called in May 1836 it was resolved that the report of the provisional committee should be received, and the various suggestions therein contained be adopted, subject to the approval of the directors, who were requested to complete such purchases of land, and also such other acts as they might **[463]** consider necessary for carrying the objects of the undertaking into effect ; and it also resolved that Harbottle, Adshead, Byrom, Westhead and Bealey should be appointed directors, with power to do such acts as they might consider necessary or desirable for the interests of the company ; and Westhead, W. Grant and J. Lees were appointed auditors, Lane architect, and Bunting solicitor : that, in order to avoid the responsibilities of an ordinary partnership, the Defendants Harbottle and others suggested to the subscribers the propriety of applying for an Act of Incorporation, which was accordingly done : that in compliance with such application, by an Act, intituled " An Act for Establishing a Company for the Purpose of Laying Out and Maintaining an Ornamental Park within the Townships of Rusholme, Chariton-upon-Medlock and Moss Side, in the County of Lancaster," which received the Royal assent on the 5th of May 1837 (7 Will. 4), it was enacted that certain persons named in the Act, including Harbottle, Adshead, Bealey, Westhead, Bunting and Denison and others, and all and every such other persons or person, bodies or body politic, corporate or collegiate, as had already subscribed or should thereafter from time to time become subscribers or a subscriber to the said undertaking, and be duly admitted proprietors or a proprietor as thereinafter mentioned, and their respective successors, executors, administrators and assigns, should be and they were thereby united into a company for the purposes of the said Act, and should be and they were thereby declared to be one body politic and corporate by the name of " The Victoria Park Company," and by that name should have perpetual succession and a common seal, and by that name should and might sue and be sued, plead or be impleaded, at law or in equity, and should and might prefer and prosecute any bill or bills of indictment or information against any person or **[464]** persons who should commit any felony, misdemeanour, or other offence indictable or punishable by the laws of this realm, and should also have full power and authority to purchase and hold lands, tenements and hereditaments to them, and their successors and assigns, for the use of the said undertaking, in manner thereby directed. [The bill stated several other clauses of the Act.(1)]

---

(1) The substance of the Act, as stated in the bill, was as follows :—Section 3. The company empowered to purchase the lands mentioned in the schedule ; 5. And other lands within a mile from the boundary of the said lands ; 15. For a sum or sums in gross, or annual rent service or perpetual rent-charge (notwithstanding the existence of any unperformed contract for the sale of any such lands to the company of proprietors, or any of them). 16. Power to lay out the lands ; and build thereon, as the directors might think proper. 18. Capital to be £500,000, and to be applied first, in payment of the expenses of obtaining the Act ; and then in payment of the purchase-monies of the lands, and making and maintaining the parks and buildings, and the other purposes of the Act. 19. None of the powers given by the Act to be exercised before £50,000 should be raised. 20. The capital to be divided in 5000 shares of £100 each. 22. The shares to be personal estate. 23, 24, 25, 26, 27. Provisions with respect to the nominees of shareholders, and the duration of the interests of the shareholders, on the principle of tontine. 29. Register of the names and additions of shareholders and their nominees to be kept by the clerk or secretary of the company, and the common seal affixed thereto. 34. Directors to make calls, and enforce payment of the same, such calls not to exceed £10 per share at one time, and to be at least two months from each other : the money to be put into the hands of the treasurer, and applied as aforesaid. 35. Declaration and evidence necessary in actions for calls. 38. That the business affairs and concerns of the company shall, from time to time, and at all times hereafter, be under the control of five shareholders (to be appointed directors), who shall have the entire ordering, managing and conducting of the company, and of the capital, estates, revenue.

[465] The bill also stated the schedule annexed to the Act, whereby the different plots of the said land, numbered [466] from 1 to 37, were stated to have been purchased by the Victoria Park Company from the various persons whose [467] names were therein set forth, and including the following names :—" Mr. P. Leicester and others ; " " Mr. Lacy and another ; " " Mr. Lane " and " Mr. Adshead ; " that [468] the land so stated to be purchased of " P. Leicester and others " was at the time of passing of the Act vested partly in P. Leicester, and partly in Westhead, Bunting

effects and affairs, and other the concerns thereof, and who shall also regulate and determine the mode and terms of carrying on and conducting the business and affairs of the company, conformably to the provisions contained in this Act ; and no proprietor, not being a director, shall, on any account or pretence whatsoever, in any way meddle or interfere in the managing, ordering or conducting the company, or the capital, estates, revenue, effects or other the business, affairs or concerns thereof, but shall fully and entirely commit, entrust and leave the same to be wholly ordered, managed and conducted by the directors for the time being, and the persons whom they shall appoint, save as hereinafter mentioned. 39. That the said T. Harbottle, J. Adshead, H. Byrom, J. Westhead and R. Bealy shall be the present and first directors of the company. 40. Three directors to constitute a board, and the acts of three or more to be as effectual as if done by the five. 42. Minutes of the proceedings of every board to be entered in a book to be kept by the clerk or secretary at the office of the company. 43. The board of directors for the time being to have full power and authority to appoint or remove the banker, broker, architect, surveyor, solicitor, builder, treasurer and clerk, and also a secretary, and all other agents, officers, clerks and servants. 45. Books of account of all the transactions of the company to be kept, and half-yearly reports and balance-sheets to be made : the proprietors to have access to, and to be at liberty to inspect, all books, accounts, documents and writings belonging to the company, at all reasonable times. 46. That a meeting of the proprietors of the company shall be convened and held on the first Monday in the month of July 1837, and on the same day in every succeeding year, at eleven o'clock in the forenoon, at their office, or such other convenient place in Manchester as the directors may think proper to appoint, of which meeting the clerk or secretary for the time being of the company shall give fourteen days' previous notice, by an advertisement in one of the Manchester newspapers ; and each meeting so to be convened and held shall be called " The Annual General Meeting," and the proprietors respectively qualified to act and vote therein, according to the provisions therein contained, and who personally, or by such proxy as hereinafter authorised, shall attend the same shall have full power and authority to decide upon all such matters and questions as by virtue of this Act shall be brought before such annual general meeting. 47. Board of directors empowered to call extraordinary general meetings. 48. That ten or more proprietors of the company for the time being qualified to vote as hereinafter mentioned, or three full fourth parts in number and value of all the proprietors for the time being of the company may, at any time, by writing under their hands, require the board of directors for the time being to call an extraordinary general meeting of the proprietors, and every such requisition shall set forth the object of such extraordinary meeting, and shall be left with the clerk or secretary for the time being at the principal office of the company, at least one calendar month before the time named in the requisition for the meeting to be holden, otherwise the said board shall not be bound to take notice thereof ; but in case the directors shall refuse or neglect for fourteen days, after such requisition shall be so left as aforesaid, to call such extraordinary meeting, then the proprietors signing the requisition may, for the purposes mentioned in such requisition, call an extraordinary general meeting of the proprietors, by notice signed by them, and advertised in one or more of the Manchester newspapers, at least fourteen days before the time fixed for holding the meeting ; and in every such advertisement the object of such extraordinary meeting, and the day and hour and place in the town of Manchester of holding the same, and the delivery of the requisition to the said board, and of its refusal to call such extraordinary meeting, shall be specified. 65. Two of the directors selected by lot amongst themselves to retire from office at

and Byrom, and the land so stated to be purchased of "Mr. Lacy and another" was at the time of the passing of the Act vested partly in Mr. Lacey and partly in Lane.

The bill stated that the purchase and sale of the said land as aforesaid was the result of an arrangement fraudulently concerted and agreed upon between Harbottle, Adshead, Byrom, Westhead, Denison, Bunting and Lane, at or after the formation of the company was agreed upon, with the object of enabling themselves to derive a

the annual general meeting in July 1841, and be replaced by two qualified proprietors, to be then elected by the majority of votes at such meeting, and two others, the longest in office, are so selected to retire, at every subsequent annual general meeting ; but the retiring directors to be re-eligible.   67. No person shall be a director who shall not be a holder in his own right of the number of shares hereinafter mentioned in the capital of the company, viz., who shall not be a holder of ten shares at least, so long as the total number of the shares shall exceed 500 ; and from and after the total number of shares of the company shall be reduced to and shall not exceed 100, then who shall not be a holder of five shares at least ; and, if any of the then or future directors shall cease to hold the respective number of shares aforesaid in his own right, his office as director shall thereupon and thenceforth become vacated. 68. Directors may vacate by resigning their offices.   70. Board of directors to appoint qualified persons to fill up the offices of directors dying, resigning, removed or becoming disqualified before their time of retirement ; such appointments to be subject to the approbation of the next general meeting.   73. Cheques, bills, notes and other negotiable securities to be signed, &c., by the treasurer or such other officer of the company as the board should by minute appoint, and no others to be binding on the company.   74. That all actions, suits and other proceedings at law or in equity to be commenced and prosecuted by or on behalf of the company shall and lawfully may be commenced and instituted or prosecuted in the name of the treasurer, or any one of the directors of the company for the time being, as the nominal Plaintiff for and on behalf of the company ; and all actions, &c., against the company shall be commenced and instituted and prosecuted against the treasurer, or any one of the directors of the company for the time being, as the nominal Defendant for and on behalf of the company.   78. Directors to have power to sell or declare forfeited shares for non-payment of debts or liabilities to the company.   83, 84, 85.   Shares vested in executors, legatees and assignees of proprietors, upon being transferred and duly registered, and such executors, legatees, assignees, &c., to be liable to calls, &c., as if original proprietors.   90. After one-half of the capital of £500,000 should have been paid up, the board of directors, with the sanction of a general meeting, empowered to borrow at interest any sum or sums of money, not exceeding £150,000 in the whole, on the security of the lands, property and effects of the company, by deed or writing under their common seal : entries of all such mortgages, and the particulars thereof, to be made in a book to be kept by the clerk of the company, and such book to be open for the perusal at all reasonable times of any proprietor or creditor of the company.   93. Mortgagees not required to see to the necessity for or application of the mortgage money.   105. Board of directors, with the sanction of two successive general meetings, and the proportion in number and value of the proprietors and shares therein mentioned, empowered to put an end to the tenure by way of tontine, and discharge the shares from all benefit of survivorship.   107, 108.   Power to dissolve the company, and wind up the affairs thereof, in manner therein mentioned, under the sanction of such general meetings.   112. Notices to proprietors sent by post, according to their addresses in the register, to be sufficient.   129. That in all cases wherein it may be requisite or necessary for any person or party to serve any notice, or any writ or other legal proceedings upon the said company, the service thereof upon the clerk or secretary to the company, or any agent or officer employed by the said director, or leaving the same at the office of such clerk or secretary, agent or officer, or at his last or usual place of abode, or upon any one of the said directors, or delivery thereof to some inmate at his last or usual place of abode, shall be deemed good and sufficient service of the same respectively on the company or their directors.

profit or personal benefit from the establishment of the said company; and that the arrangement amongst the persons who were parties to the plan was that a certain number from amongst themselves should be appointed directors, and should purchase for the company the said plots of land from the persons in whom they were vested, at greatly increased and exorbitant prices: that it was with a view to carry the arrangement into effect that Harbottle, Adshead, Byrom and Westhead procured themselves to be appointed directors, and Denison procured himself to be appointed auditor: that accordingly, after the said plots of land had become vested in the several persons named in the schedule, and before the passing of the Act, the said directors, on behalf of the company, agreed to purchase the same from the persons named in the schedule at rents or prices greatly exceeding those at which the said persons had purchased the same: that after the Act was passed Harbottle, Adshead, Byrom, Westhead and Bealey continued to act as directors of the incorporated company in the same manner as before: that Adshead continued to act as director until the 18th of July 1839, Byrom until the 2d of December 1839, and **[469]** Westhead until the 2d of January 1840, at which dates respectively fiats in bankruptcy were issued against them, and they were respectively declared bankrupts, and ceased to be qualified to act as directors, and their offices as directors became vacated.

The bill stated that upwards of 3000 shares of £100 in the capital of the company were subscribed for: that the principle of tontine was abandoned: that before 1840 calls were made, amounting, with the deposit, to £35 per share, the whole of which were not, however, paid by all the proprietors, but that a sum exceeding £35,000 in the whole was paid.

The bill stated that, after the passing of the Act, Harbottle, Adshead, Byrom, Westhead, Bunting and Lane, with the concurrence of Denison and of Bealey, proceeded to carry into execution the design which had been formed previously to the incorporation of the company, of fraudulently profiting and enabling the other persons who had purchased and then held the said land, to profit by the establishment of the company and at its expense; and that the said directors accordingly, on behalf of the company, purchased, or agreed to purchase, from themselves, Harbottle, Adshead, Byrom and Westhead, and from Bunting and Lane, and the other persons in whom the said land was vested, the same plots of land, for estates corresponding with those purchased by and granted to the said vendors, by the original owners thereof, charged with chief or fee-farm rents, greatly exceeding the rents payable to the persons from whom the said vendors had so purchased the same: that of some of such plots the conveyances were taken to the Victoria Park Company, by its corporate name; of others, to Harbottle, Adshead, Byrom, Westhead and Bealey, as directors in trust for the company; **[470]** and others rested in agreement only, without conveyance: that by these means the company took the land, charged not only with the chief rents reserved to the original landowners, but also with additional rents, reserved and payable to Harbottle, Adshead, Byrom, Westhead, Denison, Bunting, Lane and others: that, in further pursuance of the same fraudulent design, the said directors, after purchasing the said land for the company, applied about £27,000 of the monies in their hands, belonging to the company, in the purchase or redemption of the rents so reserved to themselves, Harbottle, Adshead, Byrom, Westhead, Denison, Bunting, Lane and others, leaving the land subject only to the chief rent reserved to the original landowners.

The bill stated that the plans of the park were contrived and designed by Lane, in concert with Denison, the directors and Bunting, so as to render the formation of the park the means of greatly increasing the value of certain parcels of land, partly belonging to Denison and partly to Lane, situated on the outside of the boundary line of the park, but between such boundary line and one of the lodges and entrance gates, called Oxford Lodge and Gate, erected on a small part of the same land purchased by the company; and through which entrance, and the land so permitted to be retained by Denison and Lane, one of the principal approaches to the park was made: that the said land so retained by Denison and Lane was essentially necessary to the establishment of the park, according to the plans prepared by Lane, and the same was virtually incorporated in the park, and houses erected thereon would enjoy

all the advantages of the park, and plots thereof were in consequence sold by Denison and Lane for building land at enhanced prices.

[471] The bill stated that, after the purchase of the land as aforesaid, the directors proceeded to carry into effect the design of converting the same into a park, and they accordingly erected lodges and gates, marked out with fences the different crescents, terraces, streets and ways; formed drains and sewers, and made roadways, and planted ornamental trees and shrubs; that they also caused to be erected in different parts of the park several houses and buildings, some of which only were completed; and that the directors alleged the monies expended in the roads, drains and sewers amounted to £12,000, and in the houses and buildings to £39,000, or thereabouts: that the said directors sold and let several plots of land, and also sold and let several of the houses and buildings, and received the rents and purchase-money of the same.

The bill stated that Harbottle, Denison, Bunting and Lane did not pay up their calls, but some of them retained part, and others the whole thereof; Harbottle and Lane claiming to set off the amount of the calls against the chief rents of the lands which they sold to the company, Bunting claiming to set off the same against the chief rents, and the costs and charges due to him from the company; and Denison claiming to set off the amount of the calls against the rents payable to him out of the land which he sold to persons who resold the same to the company.

The bill stated that owing to the large sums retained out of the calls, the sums appropriated by the said directors to themselves, and paid to others in reduction of the increased chief rents, and payment of such rents, and owing to their having otherwise wasted and misapplied a considerable part of the monies belonging to the company, the funds of the company which came [472] to their hands shortly after its establishment were exhausted: that the said directors, with the privity, knowledge and concurrence of Denison, Bunting and Lane, borrowed large sums of money from their bankers upon the credit of the company: that, as a further means of raising money, the said directors, and Bunting and Lane, with the concurrence of Denison, drew, made and negotiated various bills of exchange and promissory notes; and that the said directors also caused several bonds to be executed under the corporate seal of the company for securing several sums of money to the obligees thereof: that by the middle or latter part of the year 1839 the directors, and Bunting and Lane, had come under very heavy liabilities; the chief rents payable by the company were greatly in arrear, and the board of directors, with the concurrence of Denison, Bunting and Lane, applied to the United Kingdom Life Assurance Company to advance the Victoria Park Company a large sum of money by way of mortgage of the lands and hereditaments comprised in the park; but the Assurance Company were advised that the Victoria Park Company were, by the 90th section of their Act, precluded from borrowing money on mortgage, until one-half of their capital (namely £500,000) had been paid up, and on that ground declined to make the required loan: that the directors, finding it impossible to raise money by mortgage in a legitimate manner, resorted to several contrivances for the purpose of evading the provisions of the Act, and raising money on mortgage of the property of the company, by which means several large sums of money had been charged by way of mortgage or lien upon the same: that to effect such mortgages or charges, the directors procured the persons who had contracted to sells plots of land to the company, but had not executed conveyances, to convey the same, by the direction of the board, to some [473] other person or persons in mortgage, and afterwards to convey the equity of redemption to the directors in trust for the company: that the directors also conveyed some of the plots of land which had been conveyed to them in trust for the company to some other persons by way of mortgage, and stood possessed of the equity of redemption in trust for the company: that, for the same purpose, the board of directors caused the common seal of the company to be affixed to several conveyances of plots of land which had been conveyed to the company by their corporate name, and to the directors in trust for the company, whereby the said plots of land were expressed to be conveyed for a pretended valuable consideration to one or more of the said directors absolutely, and the said directors or director then conveyed the same to other persons on mortgage to secure sometimes

monies advanced to the said directors, and by them paid over to the board in satis-
faction of the consideration monies expressed to be paid for the said prior conveyances
under the common seal, sometimes antecedent debts in respect of monies borrowed
by the board, and sometimes monies which had been advanced by the mortgagees
upon the security of the bills and notes which had been made or discounted as
aforesaid : that, in other cases, the said directors and Bunting deposited the title-deeds
of parcels of the land and buildings of the company with the holders of such bills and
notes to secure the repayment of the monies due thereon, and in order to relieve the
parties thereto : that, by the means aforesaid, the directors, with the concurrence of
Denison, Bunting and Lane, mortgaged, charged or otherwise incumbered the greater
part of the property of the company : that many of such mortgagees and incum-
brancers had notice that the said board of directors had not power under the Act to
mortgage or charge the property of the company, and that the [474] said mortgages,
charges and incumbrances were fraudulent and void as against the company, but that
the Defendants allege that some of the said incumbrances were so planned and
contrived that the persons in whose favour they were created had not such notice.

That the said directors having exhausted every means which suggested themselves
to them of raising money upon credit, or upon the security of the property and effects
of the company, and being unable by those means to provide for the whole of the
monies due to the holders of the said bills and notes, and the other persons to whom
the said directors in the said transactions had become indebted as individuals, and to
satisfy the debts which were due to the persons in whose favour the said mortgages
and incumbrances had been improperly created, and in order to release themselves
from the responsibility which they had personally incurred by taking conveyances or
demises of parts of the said land to the said directors as individuals in trust for the
company, containing covenants on their parts for payment of the reserved rents, the
said directors resolved to convey and dispose of the property of the company, and
they accordingly themselves executed and caused to be executed under the common
seal of the company, divers conveyances, assignments and other assurances, whereby
divers parts of the said lands and effects of the company were expressed to be
conveyed or otherwise assured absolutely to the holders of some of the said bills and
notes, and some of the said mortgagees and incumbrancers, in consideration of the
monies thereby purported to be secured ; and also executed, and caused to be executed
under the common seal of the company, divers conveyances and assurances of other
parts of the said lands to the persons who sold the same to the company, in considera-
tion of their releasing them from [475] the payment of the rents reserved and
payable out of the said lands : that many of such conveyances had been executed by
Harbottle, Adshead, Westhead and Bealey, and a few by Byrom, who had been
induced to execute them by being threatened with suits for the reserved rents : that
Harbottle, Adshead, Byrom, Westhead and Bealey threatened and intended to convey
and assure the remaining parcels of land belonging to the company to the holders of
others of the said bills and notes, and to others of the said mortgagees and incum-
brancers and owners of the chief rents, in satisfaction and discharge of the said monies
and rents due and to become due to them respectively.

The bill stated that, upon the bankruptcy of Byrom, Adshead and Westhead,
their shares in the company became vested in the Defendants, their assignees, and
that they (the bankrupts) had long since ceased to be, and were not, shareholders in
the company : that the whole of the land resold by them was vested in some persons
unknown to the Plaintiffs, but whose names the Defendants knew and refused to
discover : that, upon the bankruptcy of Westhead, there ceased to be a sufficient
number of directors of the company to constitute a board for transacting the business
of the company in manner provided by the Act, and Harbottle and Bealey became
the only remaining directors whose office had not become vacated, and no person or
persons had been appointed to supply the vacancies in the board of directors occasioned
by such bankruptcies, and consequently there never had been a properly constituted
board of directors of the company since the bankruptcy of Westhead.

That Byrom, Adshead and Westhead, nevertheless, after their respective bank-
ruptcies, executed the several [476] absolute conveyances and other assurances of the
lands and property of the company, which were so executed for the purposes and in

manner aforesaid, after the directors had exhausted their means of raising money upon credit or upon the security of the property of the company.

That about the end of the year 1839, or commencement of the year 1840, the said directors discharged Brammell, the secretary of the company, and gave up the office taken by the company in Manchester, and transferred the whole or the greater part of the title-deeds, books and papers of the said company into the hands of Bunting; and from that time to the present the company had had no office of its own, but the affairs of the company had been principally conducted at the office of Bunting.

That the only parts of the land bought by the company which had not been conveyed away either absolutely or by way or mortgage, and the only part of the other property and effects of the company which had not been disposed of and made away with in manner aforesaid, remained vested in, and in the order and disposition of, Harbottle, Adshead, Byrom, Westhead, Bealey and Bunting, in whose custody or power the greater part of the books, deeds and papers belonging to the company which had not been made away with remained : that by the fraudulent acts and proceedings in the premises to which Harbottle, Adshead, Byrom, Westhead, Bealey and Bunting were parties, the property and effects of the said company had been and then were involved in almost inextricable difficulties, and if such property and effects were any longer allowed to remain in their order and disposition, the same would be in danger of being wholly dissipated and irretrievably **[477]** lost : that the said company were then largely indebted to their bankers and other persons who had *bonâ fide* advanced money to the company, and to the builders and other persons who had executed some of the works in the park, and provided materials for the same ; while, in consequence of the property of the company having been wasted and improperly disposed of by the directors, there were at present no available funds which could be applied in satisfaction of the debts of the company, and that some of the creditors of the said company had obtained judgments in actions at law brought by them against the company for the amount of their debts, on which judgments interest was daily accumulating.

The bill stated that in the present circumstances of the company, and the board of directors thereof, the proprietors of shares had no power to take the property and effects of the company out of the hands of Harbottle, Adshead, Byron, Westhead, Bealey and Bunting, and they had no power to appoint directors to supply the vacancies in the board occasioned by the said bankruptcies, and the proprietors of shares in the company had no power to wind up, liquidate or settle the accounts, debts or affairs of the company, or to dissolve the company, nor had they any power to provide for and satisfy the existing engagements and liabilities of the company with a view to its continuance, and the prosecution of the undertaking for which it was established without the assistance of the Court : that if a proper person were appointed by the Court to take possession of and manage the property and effects of the company, and if the company were to be repaid the amount of all losses and expenses which it had sustained or incurred by reason of the fraudulent and improper acts and proceedings of the Defendants in the premises, and **[478]** which the Defendants, or any of them, were liable to make good to the said company, as thereinafter prayed ; and if the company were decreed to take and have conveyed to them so much of the said land which was retained by Denison and Lane as aforesaid, upon paying or accounting to them for the fair value thereof at the time when the undertaking was first projected ; and Denison and Lane were to pay or account to the said company for the price received by them for so much of the same land as had been sold by them, over and above what was the fair price for the same at the time the undertaking was first projected ; and if the mortgages, charges, incumbrances and liens, and the said conveyances and other assurances, by means of which the property and effects of the company had been improperly incumbered and disposed of, which could be redeemed or avoided, as against the persons claiming thereunder, were redeemed and set aside, and the property and effects of the company thereby affected were restored to it, and the Defendants, who had not become bankrupt, and who had not paid up, but ought to have paid up, into the joint stock capital of the company the amounts of the several calls made by the directors on their respective shares, were to pay up the same, the lands, property and effects of the company would not only be

sufficient to satisfy the whole of its existing debts and liabilities, but leave a surplus, which would enable the company to proceed with, and either wholly or in part accomplish, the undertaking for which it was incorporated.

The bill stated that the Defendants concealed from the Plaintiffs, and the other shareholders in the company, who were not personally parties thereto, the several fraudulent and improper acts and proceedings of the said directors and the said other Defendants, and **[479]** the Plaintiffs and the other shareholders had only recently ascertained the particulars thereof, so far as they were therein stated, and they were unable to set forth the same more particularly, the Defendants having refused to make any discovery thereof, or to allow the Plaintiffs to inspect the books, accounts or papers of the company.

The bill charged that Harbottle and Bealey, and the estates of Adshead, Byrom and Westhead, in respect of that which occurred before their said bankruptcies, and Adshead, Byrom and Westhead, as to what occurred since their said bankruptcies, were liable to refund and make good to the company the amount of the losses and expenses which it had sustained in respect of the fraudulent and improper dealings of the said directors of the company with its lands and property : that Denison, Bunting and Lane had counselled and advised the directors in their said proceedings, and had derived considerable personal benefit and advantage therefrom : that Denison, Bunting and Lane were all parties to the said fraudulent scheme planned and executed as aforesaid, by which the several plots or parcels of land in the park were purchased and resold to the said company at a profit and at a price considerably exceeding the real value of the same, and that Denison, Bunting and Lane had derived considerable profit from the increased price or chief rents made payable out of the several plots or parcels of land which were purchased and resold by them in manner aforesaid, and from the monies which were paid to them as a consideration for the reduction of the same chief rents as before mentioned.

The bill charged that several general meetings, and extraordinary general meetings, and other meetings of **[480]** the shareholders of the company, were duly convened and held at divers times, between the time when the company was first established and the year 1841, and particularly on or about the several days or times thereinafter mentioned (naming ten different dates, from July 1837 to December 1839), and that at such meetings false and delusive statements respecting the circumstances and prospects of the company were made by the directors to the proprietors who attended such meetings, and the truth of the several fraudulent and improper acts and proceedings therein complained of was not disclosed.

The bill charged that, under the circumstances, Denison, Bunting and Lane, having participated in and personally benefited by and concealed from the other shareholders the several fraudulent and improper acts aforesaid, were all jointly and severally liable together, with the said directors, to make good to the company the amount of the losses and expenses which had been or might be incurred in consequence of such of the said wrongful and fraudulent acts and proceedings as they were parties or privies to : that Harbottle, Byrom, Adshead, Westhead and Bealey, respectively, had still some of the property and effects belonging to the company : that the said last-named Defendants had not paid up the calls due and payable on their respective shares : that the Plaintiffs had as yet paid only three of the calls on their shares, not having paid the remainder in consequence of learning that, owing to some misconduct of the directors, the affairs of the company were in difficulties, the cause of which difficulties the Plaintiffs had but lately, and with considerable difficulty, ascertained to have arisen from the proceedings aforesaid, but in all other respects the Plaintiffs had conformed to the provisions of the Act : that there were not any **[481]** share-holders in the company who had not paid up the calls on their shares besides the Plaintiffs and the said Defendants : that the names and places of abode of the other persons who are not shareholders in the company, but are interested in or liable in respect of any of the said matters, were unknown to the Plaintiffs, and the Defendants ought to discover the same : that the number of shareholders in the company was so great, and their rights and liabilities were so subject to change and fluctuation, by death and otherwise, that it would be impossible to prosecute the suit with effect if they were all made parties thereto.

Case 1:09-cv-05386-DAB   Document 89-10   Filed 07/19/10   Page 11 of 20

The bill charged that Bunting claimed a lien upon the documents in his posses-sion belonging to the company for the costs of business done by him as the attorney of the company, but a great part of such business consisted of the fraudulent acts aforesaid ; and that he had received out of the funds of the company divers large sums of money exceeding the amount properly due to him : that Bunting had deposited some of the deeds belonging to the company with certain bankers at Liverpool, and, among the rest, the contract executed by the Plaintiffs and the other shareholders before the Act was passed, as a security for the payment of a bill of exchange for £3000, to which Bunting was individually a party, but for which he untruly pretended that the company was responsible ; and that the holders of such deeds threatened to sue the Plaintiffs for the said £3000, as parties to the contract, on the ground that the capital was not paid up ; and also that the said directors threatened to cause actions at law to be brought against the Plaintiffs, under the powers of the Act, in the name of Harbottle or Bealey, as the nominal Plaintiff on behalf of the company, for the amount of the unpaid calls on their shares.

[482] The bill charged that Harbottle and Bealey were two directors of the company, but they respectively refused to use or allow either of their names to be used as the nominal Plaintiffs in this suit on behalf of the company ; but that Harbottle was a necessary party, not only in respect of his liability, but also as a nominal Defendant on behalf of the company.

After various charges, recapitulating in terms the alleged title of the Plaintiffs to the relief and discovery sought by the prayer, the bill prayed that an account might be taken of all monies received by the Defendants, Harbottle, Adshead, Byrom, Westhead, Bealey, Denison and Lane, or any of them, for the use of the company, or which but for their wilful default might have been received, and of the application thereof ; also an account of the losses and expenses incurred in consequence of the said fraudulent and improper dealings of the Defendants with the monies, lands and property of the company which they or any of them were liable to make good, and that they might be respectively decreed to make good the same, including in particular the profits made by Harbottle, Denison, Bunting and Lane, by buying and reselling the said land, and the profits made by Denison and Lane out of the said land retained by them ; and that Denison and Lane might be decreed to convey the residue of the said land to the company, upon payment of the fair value thereof at the time the undertaking was projected : that it might be declared that the said mortgages, charges, incumbrances and liens upon the lands and property created as aforesaid, so far as regards the Defendants who executed the same or were privy thereto, were created fraudulently and in violation of the provisions of the Act, and that Harbottle, Bealey, Denison, Bunting and Lane might be decreed to make good to the company the principal [483] money and interest due and owing upon security of such of the mortgages, charges and liens as were still subsisting, with all costs sustained by the company in relation thereto ; and that it might be declared that Harbottle, Adshead, Byrom, Westhead and Bealey, by executing the said con-veyances and assurances of the lands and property of the company to the said mortgagees, holders of notes and bills and others, committed a fraudulent breach of trust, and that Harbottle, Adshead, Byrom, Westhead, Bealey, Denison, Bunting and Lane might be decreed to make good to the company the purchase-money and rents paid by the company for such lands, and expended in building and improving the same, with interest and expenses ; and that the monies so recovered from the Defendants might be applied in redeeming and repurchasing the said lands and restoring them to the company.  And that inquiries might be directed to ascertain which of the mortgages and incumbrances, and of the conveyances and assurances, of the lands and property of the company could be avoided and set aside as against the persons claiming the benefit thereof, and that proceedings might be taken for avoiding them accordingly.  And that an account might be taken of all the property and effects of the company, and the unpaid calls sued for and recovered, and that a sufficient part of such property might be applied in liquidating the existing debts and liabilities of the company, and the residue secured for its benefit.  And that, for the purposes aforesaid, a receiver might be appointed to take possession of, recover and get in the lands, property and effects of the company, and for that purpose to sue in

the names of Harbottle and Bealey, or otherwise, as occasion might require; and that Harbottle, Adshead, Byrom, Westhead, Bealey and Bunting might be decreed to deliver up to **[484]** such receiver the property, effects, deeds, muniments and documents belonging to the company. And that the same Defendants might be restrained by injunction from holding, receiving or intermeddling with the property and effects of the company, and from executing, or causing to be executed, under the common seal of the company, any deed or instrument conveying, assigning or disposing of the same. And that Harbottle, Denison, Bunting and Lane might be restrained from entering or distraining upon any of the said lands sold by them to or in trust for the company as aforesaid. And the Plaintiffs thereby offered to pay into Court the amount of the unpaid calls due from them to the company.

The Defendants, Harbottle, Adshead and Westhead, demurred to the bill, assigning for cause want of equity, want of parties and multifariousness; and suggesting that all the proprietors of shares in the company, the assignees of P. Leicester, and the owners of land named in the schedule to the Act, were necessary parties. The Defendant Bealey, the Defendant Denison and the Defendants Bunting and Lane also put in three several demurrers, assigning like causes.

Mr. Lowndes and Mr. Rolt, in support of the demurrers of Harbottle, Adshead and Westhead, and of Bunting and Lane.

Mr. Walker and Mr. Glasse, in support of the demurrers of Bealey and Denison.

Mr. James Russell, Mr. Roupell and Mr. Bartrum, for the bill.

**[485]** On the part of the Defendants it was contended that the suit complaining of injuries to the corporation was wholly informal in having only some of its individual members, and not the corporation itself, before the Court; that this defect would not be cured by adding the corporation as parties Defendants, for the Plaintiffs were not entitled to represent the corporate body, even as distinguished from the Defendants and for the purpose of impeaching the transactions complained of; and the Plaintiff's bill could not therefore be sustained.

It was further argued that the Plaintiffs, if they had any ground for impeaching the conduct of the Defendants, might have used the name of the corporation; and, in that case, it would have been open to the Defendants, or to the body of directors or proprietors assuming the government of the company, to have applied to the Court for the stay of proceedings, or to prevent the use of the corporate name; and, upon that application, the Court would have inquired into the alleged usurpation or abuse of authority, and determined whether the Plaintiff should be permitted to proceed. Or the suit might have been in the shape of an information by the Attorney-General to correct the alleged abuse of powers granted for public purposes. The statements of fact in the bill, it was also contended, did not support the general charges of fraud upon which the title to relief was founded. Several other points of equity, as applicable to the cases made against the several Defendants, and in respect of the suggested defects of parties, were also made, but the judgment did not turn on these points.

On the part of the Plaintiff, so far as related to the **[486]** point on which the decision proceeded, namely, their right to sustain the bill on behalf of themselves and the other shareholders against the Defendants, without regard to the corporate character of the body, it was argued that the company was not to be treated as an ordinary corporation; that it was in fact a mere partnership, having objects of private benefit, and that it must be governed by rules analogous to those which regulated partnerships or joint stock companies, consisting of numerous persons, but not incorporated. The Act of Incorporation was intended to be beneficial to the company, and to promote the undertaking, but not to extinguish any of the rights of the proprietors *inter se.* The directors were trustees for the Plaintiffs to the extent of their shares in the company; and the fact that the company had taken the form of a corporation would not be allowed to deprive the *cestui que trusts* of a remedy against their trustees for the abuse of their powers. The Act of Incorporation, moreover, expressly exempted the proprietors of the company, or persons dealing with the company, from the necessity of adopting the form of proceeding applicable to a pure corporation; for the 74th section (*supra,* p. 464, n.) enabled them to sue and be sued

in the name of the treasurer, or any one of the directors for the time being: the bill alleged that the two remaining directors had refused to institute the suit, and shewed, in fact, that it would be against their personal interest to do so, inasmuch as they were answerable in respect of the transactions in question; if the Plaintiffs could not, therefore, institute the suit themselves they would be remediless.   The directors were made Defendants; and, under the 74th clause of the Act, any one of the directors might be made the **[487]** nominal representative of the company; the corporation was therefore distinctly represented in the suit.   The present proceeding was, in fact, the only form in which the proprietors could now impeach the conduct of the body to whom their affairs had been intrusted.   The 38th section expressly excluded any proprietor, not being a director, from interfering in the management of the business of the company on any pretence whatever.   The extinction of the board of directors by the bankruptcy and consequent disqualification of three of them (sect. 67), and the want of any clerk or office, effectually prevented the fulfilment of the form which the 46th, 47th and 48th sections of the Act required, in order to the due convening of a general meeting of proprietors competent to secure the remaining property of the company, and provide for its due application.

The following cases were cited during the argument:—*The Charitable Corporation* v. *Sutton* (2 Atk. 400), *Attorney-General* v. *Jackson* (11 Ves. 365), *Adley* v. *The Whitstable Company* (17 Ves. 315; 2 M. & Sel. 53; 19 Ves. 304; 1 Mer. 107, S. C.), *Blackburn* v. *Jepson* (3 Swans. 138), *Hichens* v. *Congreve* (4 Russ. 562), *Blain* v. *Agar* (2 Sim. 289), *Richards* v. *Davies* (2 R. & M. 347), *Ranger* v. *Great Western Railway Company* (1 Railway Cases, 1), *Seddon* v. *Connell* (10 Sim. 58, 79), *Preston* v. *Grand Collier Dock Company* (11 Sim. 327, S. C. ; 2 Railway Cases, 335), *Attorney-General* v. *Wilson* (Cr. & Ph. 1), *Wallworth* v. *Holt* (4 Myl. & Cr. 619), *Bligh* v. *Brent* (2 Y. & Coll. 295 ; *per* Alderson, B.), 6 Viner. Ab. 306, tit. Corporation, U., Bacon, Ab. tit. Statute, I. 2.

**[488]** *March* 25.  THE VICE-CHANCELLOR [Sir James Wigram].   The relief which the bill in this case seeks, as against the Defendants who have demurred, is founded on several alleged grounds of complaint ; of these it is only necessary that I should mention two, for the consideration of those two grounds involves the principle upon which I think all the demurrers must be determined.   One ground is that the directors of the Victoria Park Company, the Defendants Harbottle, Adshead, Byrom and Bealey, have, in their character of directors, purchased their own lands of themselves for the use of the company, and have paid for them, or rather taken to themselves out of the monies of the company a price exceeding the value of such lands : the other ground is that the Defendants have raised money in a manner not authorized by their powers under their Act of Incorporation ; and especially that they have mortgaged or incumbered the lands and property of the company, and applied the monies thereby raised in effect, though circuitously, to pay the price of the land which they had so bought of themselves.

I do not now express any opinion upon the question whether, leaving out of view the special form in which the Plaintiffs have proceeded in the suit, the bill alleges a case in which a Court of Equity would say that the transactions in question are to be opened or dealt with in the manner which this bill seeks that they should be ; but I certainly would not be understood by anything I said during the argument to do otherwise than express my cordial concurrence in the doctrine laid down in the case of *Hichens* v. *Congreve* (4 Russ. 562) and other cases of that class.   I take those cases to be in accordance with the principles of this Court, and to be founded on **[489]** justice and commonsense.   Whether particular cases fall within the principle of *Hichens* v. *Congreve* is another question.   In *Hichens* v. *Congreve* property was sold to a company by persons in a fiduciary character, the conveyance reciting that £25,000 had been paid for the purchase ; the fact being that £10,000 only had been paid, £15,000 going into the hands of the persons to whom the purchase was entrusted.   I should not be in the least degree disposed to limit the operation of that doctrine in any case in which a person projecting the formation of a company invited the public to join him in the project, on a representation that he had acquired property which was intended to be applied for the purposes of the company.   I should strongly incline to hold that to be an invitation to the public to participate in the benefit of the property purchased, on the terms on which the projector had acquired it.   The fiduciary

V.-C. XII.—7*

character of the projector would, in such a case, commence from the time when he first began to deal with the public, and would of course be controlled in equity by the representation he then made to the public.   If persons, on the other hand, intending to form a company, should purchase land with a view to the formation of it, and state at once that they were the owners of such land, and proposed to sell it at a price fixed, for the purposes of the company about to be formed, the transaction, so far as the public are concerned, commencing with that statement, might not fall within the principle of *Hichens* v. *Congreve*.   A party may have a clear right to say : "I begin the transaction at this time ; I have purchased land, no matter how or from whom, or at what price ; I am willing to sell it a certain price for a given purpose."   It is not necessary that I should determine the effect of the transactions that are stated to have occurred in the present case.   I make these observations only that I may not be supposed, from anything which fell from me during the argu-[490]-ment, to entertain the slightest hesitation with regard to the application, in a proper case, of the principles I have referred to.   For the present purpose I shall assume that a case is stated entitling the company, as matters now stand, to complain of the transactions mentioned in the bill.

The Victoria Park Company is an incorporated body, and the conduct with which the Defendants are charged in this suit is an injury not to the Plaintiffs exclusively ; it is an injury to the whole corporation by individuals whom the corporation entrusted with powers to be exercised only for the good of the corporation.   And from the case of *The Attorney-General* v. *Wilson* (Cr. & Ph. 1) (without going further) it may be stated as undoubted law that a bill or information by a corporation will lie to be relieved in respect of injuries which the corporation has suffered at the hands of persons standing in the situation of the directors upon this record.   This bill, however, differs from that in *The Attorney-General* v. *Wilson* in this—that, instead of the corporation being formally represented as Plaintiffs, the bill in this case is brought by two individual corporators, professedly on behalf of themselves and all the other members of the corporation, except those who committed the injuries complained of—the Plaintiffs assuming to themselves the right and power in that manner to sue on behalf of and represent the corporation itself.

It was not, nor could it successfully be, argued that it was a matter of course for any individual members of a corporation thus to assume to themselves the right of suing in the name of the corporation.   In law the corporation and the aggregate members of the corporation are not the same thing for purposes like this ; and the [491] only question can be whether the facts alleged in this case justify a departure from the rule which, *primâ facie*, would require that the corporation should sue in its own name and in its corporate character, or in the name of someone whom the law has appointed to be its representative.

The demurrers are—first, of three of the directors of the company, who are also alleged to have sold lands to the corporation under the circumstances charged ; secondly, of Bealey, also a director, alleged to have made himself amenable to the jurisdiction of the Court to remedy the alleged injuries, though he was not a seller of land ; thirdly, of Denison, a seller of land, in like manner alleged to be implicated in the frauds charged, though he was not a director ; fourthly, of Mr. Bunting, the solicitor, and Mr. Lane, the architect of the company.   These gentlemen are neither directors nor sellers of lands, but all the frauds are alleged to have been committed with their privity, and they also are in this manner sought to be implicated in them. The most convenient course will be to consider the demurrer of the three against whom the strongest case is stated ; and the consideration of that case will apply to the whole.

The first objection taken in the argument for the Defendants was that the individual members of the corporation cannot in any case sue in the form in which this bill is framed.   During the argument I intimated an opinion, to which, upon further consideration, I fully adhere, that the rule was much too broadly stated on the part of the Defendants.   I think there are cases in which a suit might properly be so framed.   Corporations like this, of a private nature, are in truth little more than private partnerships ; and in cases which may easily be suggested it would be too much to hold that a society [492] of private persons associated together in under-

takings, which, though certainly beneficial to the public, are nevertheless matters of private property, are to be deprived of their civil rights, *inter se*, because, in order to make their common objects more attainable, the Crown or the Legislature may have conferred upon them the benefit of a corporate character.   If a case should arise of injury to a corporation by some of its members, for which no adequate remedy remained, except that of a suit by individual corporators in their private characters, and asking in such character the protection of those rights to which in their corporate character they were entitled, I cannot but think that the principle so forcibly laid down by Lord Cottenham in *Wallworth* v. *Holt* (4 Myl. & Cr. 635 ; see also 17 Ves. 320, *per* Lord Eldon) and other cases would apply, and the claims of justice would be found superior to any difficulties arising out of technical rules respecting the mode in which corporations are required to sue.

But, on the other hand, it must not be without reasons of a very urgent character that established rules of law and practice are to be departed from, rules which, though in a sense technical, are founded on general principles of justice and convenience ; and the question is whether a case is stated in this bill entitling the Plaintiffs to sue in their private characters.   [His Honor stated the substance of the Act, sections 1, 38, 39, 43, 46, 47, 48, 49, 67, 70, 114 and 129 (*supra*, p. 464, n. *et seq.*).]   The result of these clauses is that the directors are made the governing body, subject to the superior control of the proprietors assembled in general meetings ; and, as I understand the Act, the proprietors so assembled have power, due notice being given of the purposes of the meeting, to originate proceedings for any purpose within **[493]** the scope of the company's powers, as well as to control the directors in any Acts which they may have originated.   There may possibly be some exceptions to this proposition, but such is the general effect of the provisions of the statute.

Now, that my opinion upon this case may be clearly understood, I will consider separately the two principal grounds of complaint to which I have adverted, with reference to a very marked distinction between them.   The first ground of complaint is one which, though it might *primâ facie* entitle the corporation to rescind the trans-actions complained of, does not absolutely and of necessity fall under the description of a void transaction.   The corporation might elect to adopt those transactions, and hold the directors bound by them.   In other words, the transactions admit of con-firmation at the option of the corporation.   The second ground of complaint may stand in a different position ; I allude to the mortgaging in a manner not authorized by the powers of the Act.   This, being beyond the powers of the corporation, may admit of no confirmation whilst any one dissenting voice is raised against it.   This distinction is found in the case of *Preston* v. *The Grand Collier Dock Company* (11 Sim. 327, S. C. ; 2 Railway Cases, 335).

On the first point it is only necessary to refer to the clauses of the Act to shew that, whilst the supreme governing body, the proprietors at a special general meeting assembled, retain the power of exercising the functions conferred upon them by the Act of Incorporation, it cannot be competent to individual corporators to sue in the manner proposed by the Plaintiffs on the present record.   This in effect purports to be a suit by *cestui que trusts* complaining of a fraud committed or **[494]** alleged to have been committed by persons in a fiduciary character.   The complaint is that those trustees have sold lands to themselves, ostensibly for the benefit of the *cestui que trusts*.   The proposition I have advanced is that, although the Act should prove to be voidable, the *cestui que trusts* may elect to confirm it.   Now, who are the *cestui que trusts* in this case ?   The corporation, in a sense, is undoubtedly the *cestui que trust* ; but the majority of the proprietors at a special general meeting assembled, indepen-dently of any general rules of law upon the subject, by the very terms of the incorporation in the present case, has power to bind the whole body, and every individual corporator must be taken to have come into the corporation upon the terms of being liable to be so bound.   How then can this Court act in a suit constituted as this is, if it is to be assumed, for the purposes of the argument, that the powers of the body of the proprietors are still in existence, and may lawfully be exercised for a purpose like that I have suggested ?   Whilst the Court may be declaring the acts complained of to be void at the suit of the present Plaintiffs, who in fact may be the only proprietors who disapprove of them, the governing body of proprietors may

defeat the decree by lawfully resolving upon the confirmation of the very acts which are the subject of the suit. The very fact that the governing body of proprietors assembled at the special general meeting may so bind even a reluctant minority is decisive to shew that the frame of this suit cannot be sustained whilst that body retains its functions. In order then that this suit may be sustained it must be shewn either that there is no such power as I have supposed remaining in the proprietors, or, at least, that all means have been resorted to and found ineffectual to set that body in motion : this latter point is nowhere suggested in the bill : there is no suggestion that an attempt has been made by any proprietor to set the body of proprietors in **[495]** motion, or to procure a meeting to be convened for the purpose of revoking the acts complained of. The question then is whether this bill is so framed as of necessity to exclude the supposition that the supreme body of proprietors is now in a condition to confirm the transactions in question ; or, if those trans-actions are to be impeached in a Court of Justice, whether the proprietors have not power to set the corporation in motion for the purpose of vindicating its own rights.

[His Honor recapitulated the history and present situation of the company, as it appeared upon the bill.]

I pause here to examine the difficulty which is supposed by the bill to oppose itself to the body of proprietors assembling and acting at an extraordinary general meeting. The 48th section of the Act says that a certain number of proprietors may call such a meeting by means of a notice to be addressed to the board of directors, and left with the clerk or secretary, at the principal office of the company, one month before the time of meeting, or the board is not bound to notice it. The bill says that there is no board of directors properly constituted, no clerk, no principal office of the company, no power of electing more directors, and that, the appointment of the clerk being in the board of directors, no clerk can in fact now be appointed. I am certainly not prepared to go the whole length of the Plaintiff's argument founded upon the 48th section. I admit that the month required would probably be considered imperative ; but is not the mode of service directory only ? Could the board of directors *de facto*, for the time being, by neglecting to appoint a clerk or have a principal office, deprive the superior body, the body of proprietors, of the power which the Act gives that body over the board of directors ? Would not a notice in substance, a notice for example such as the 129th sec-**[496]**-tion provides for in other cases, be a sufficient notice ? Is not the particular form of notice which is pointed out by the 48th section a form of notice given only for the convenience of the proprietors and directors ? And if an impediment should exist, and, *à fortiori*, if that impediment should exist by the misconduct of the board of directors, it would be difficult to contend with success that the powers of the corporation are to be paralyzed, because there is no clerk on whom service can be made. I require more cogent arguments than I have yet heard to satisfy me that the mode of service prescribed by the 48th section, if that were the only point in the case, is more than directory. The like observations will apply to the place of service ; but, as to that, I think the case is relieved from difficulty by the fact that the business of the company is stated to be principally conducted at the office of the solicitors, for I am not aware that there is anything in the statute which attaches any peculiar character to the spot designated as the principal office. In substance, the board of directors *de facto*, whether qualified or not, carry on the business of the company at a given place, and under this Act of Parliament it is manifest that service at that place would be deemed good service on the company.

If that difficulty were removed, and the Plaintiff should say that by the death or bankruptcy of directors, and the carelessness of proprietors (for that term must be added), the governing body has lost its power to act, I should repeat the inquiries I have before suggested, and ask whether, in such a case also, the 48th section is not directory, so far as it appears to require the refusal or neglect of the board of directors to call a general meeting, before the proprietors can by advertisement call such a meeting for themselves. Adverting to the undoubted powers conferred upon the proprietors to hold special general meetings without the consent and **[497]** against the will of the board of directors, and the permanent powers which the body of proprietors must of necessity have, I am yet to be persuaded that the existence of this corporation (for without a lawful governing body it cannot usefully or practically

continue) can be dependent upon the accidents which at any given moment may reduce the number of directors below three. The board of directors, as I have already observed, have no power to put a *veto* upon the will of any ten proprietors who may desire to call a special general meeting; and if ten proprietors cannot be found who are willing to call a special general meeting, the Plaintiffs can scarcely contend that this suit can be sustained. At all events what is there to prevent the corporators from suing in the name of the corporation? It cannot be contended that the body of proprietors have not sufficient interest in these questions to institute a suit in the name of the corporation. The latter observations, I am aware, are little more than another mode of putting the former questions which I have suggested. I am strongly inclined to think, if it were necessary to decide these points, it could not be successfully contended that the clauses of the Act of Parliament which are referred to are anything more than directory, if it be, indeed, impossible from accident to pursue the form directed by the Act. I attribute to the proprietors no power which the Act does not give them: they have the power, without the consent and against the will of the directors, of calling a meeting, and of controlling their acts; and if by any inevitable accident the prescribed form of calling a meeting should become impracticable, there is still a mode of calling it, which, upon the general principles that govern the powers of corporations, I think would be held to be sufficient for the purpose.

It is not, however, upon such considerations that I **[498]** shall decide this case. The view of the case which has appeared to me conclusive is that the existence of a board of directors *de facto* is sufficiently apparent upon the statements in the bill. The bankruptcy of Westhead, the last of the three directors who became bankrupt, took place on the 2d of January 1840: the bill alleges that he thereupon ceased to be *qualified* to act as director, and his office became vacated; but it does not say that he ceased to *act* as a director; nor, although it is said that thenceforward there was no board "properly constituted," is it alleged that there was no board *de facto* exercising the functions of directors. These, and several other statements of the bill, are pregnant with the admission of the existence of a board *de facto*. By whom was the company governed, and its affairs conducted, between the time of Westhead's bankruptcy and that of the filing of the bill in October 1842? What directors or managers of the business of the company have lent their sanction to the mortgages and other transactions complained of, as having taken place since January 1840, and by which the corporation is said or supposed to be, at least to some extent, legally bound? Whatever the bill may say of the *illegal* constitution of the board of directors, because the individual directors are not duly qualified, it does not anywhere suggest that there has not been during the whole period, and that there was not when the bill was filed, a board of directors *de facto*, acting in and carrying on the affairs of the corporation, and whose acting must have been acquiesced in by the body of proprietors; at least, ever since the illegal constitution of the board of directors became known, and the acts in question were discovered. But if there has been or is a board *de facto*, their acts may be valid, although the persons so acting may not have been duly qualified. The 114th section (not stated in the bill) of the Act provides **[499]** that all acts, deeds and things done or executed at any meeting of the directors, by any person acting as a director of the said company, shall, notwithstanding it may afterwards be discovered that there was some defect or error in the appointment of such director, or that such director was disqualified, or being an *interim* director, was disapproved of by an annual general meeting of proprietors, be as valid and effectual as if such person had been duly appointed and was qualified to be a director. The foundation upon which I consider the Plaintiffs can alone have a right to sue in the form of this bill must wholly fail, if there has been a governing body of directors *de facto*. There is no longer the impediment to convening a meeting of proprietors, who by their vote might direct proceedings like the present to be taken in the name of the corporation or of a treasurer of the corporation (if that were necessary); or who, by rejecting such a proposal, would, in effect, decide that the corporation was not aggrieved by the transactions in questions. Now, since the 2d of January 1840, there must have been three annual general meetings of the company held in July in every year, according to the provisions of the Act. These

annual general meetings can only be regulary called by the board of directors. The bill does not suggest that the requisitions of the Act have not been complied with in this respect, either by omitting to call the meeting, or by calling it informally ; but the bill, on the contrary, avers that several general meetings and extraordinary general meetings, and other meetings of the shareholders of the company, were duly convened and held at divers times between the time when the company was established and the year 1841 ; including, therefore, in this period of formality of proceeding, as well as of capacity in constitution, an entire year after Westhead's bankruptcy.

[500] Another statement of the bill leading to the same inference—the existence of an acting board—is that which avers that since the year 1839 down, in fact, to the time of filing the bill, that is, during these three years, the company has had no office of its own, but the affairs of the company have been principally conducted at the office of Mr. Bunting. Now this, as I must read it, is a direct admission that the affairs of the company have been carried on by some persons. By whom then have they been carried on ? The statute makes the board of directors the body by whom alone those affairs are to be ordered and conducted. There is no other person or set of persons empowered by the Act to conduct the affairs of the company ; and there is no allegation in the bill that any persons, other than the board of directors originally appointed, have taken upon themselves that business. In the absence of any special allegation to the contrary I am bound to assume that the affairs of the company have been carried on by the body in whom alone the powers for that purpose were vested by the Act, namely, a board of directors.

Again the bill alleges that, since the bankruptcy of Westhead, the bankrupts have joined in executing the conveyances of the property of the company to mortgagees. It could only have been in the character of directors that they could confer any title by the conveyance ; in that character the mortgagees would have required them to be parties, and it is in that character that I must assume they executed the deeds.

If the case rested here, I must of necessity assume the existence of a board of directors, and in the absence of any allegation that the board de facto, in whose acting the company must, upon this bill, be taken to have acquiesced, have been applied to and have refused to ap-[501]-point a clerk and treasurer (if that be necessary), or take such other steps as may be necessary for calling a special general meeting, or had refused to call such special general meeting, the bill does not exclude every case which the pleader was bound to exclude in order to justify a suit on behalf of a corporation, in a form which assumes its practical dissolution. But the bill goes on to shew that special general meetings have been holden since January 1840: The bill, as I have before observed, states that several general meetings and extraordinary general meetings have been holden between the establishment of the company and the year 1841, not excluding the year 1840, which was during Westhead's disqualification, " and that at such meetings false and delusive statements respecting the circumstances and prospects of the company were made by the said directors of the company to the proprietors who attended such meetings, and the truth of the several fraudulent and improper acts and proceedings herein complained of was not disclosed ; " and the bill specifies some meetings in particular. Against the pleader I must intend that some such meetings may have been holden at a time when there was no board properly constituted, and no clerk or treasurer or principal office of the company, save such as appear by the bill to have existed ; and if that were so, the whole of the case of the Plaintiffs, founded on the impracticability of calling a special general meeting, fails. Assuming then, as I am bound to do, the existence, for some time at least, of a state of things in which the company was governed by a board of directors de facto, some of the members of which were individually disqualified, and in which, notwithstanding the want of a clerk, treasurer or office, the powers of the proprietors were called into exercise at general meetings, the question is, when did that state of things cease to exist, so as to justify the extraordinary proceeding of the Plain-[502]-tiffs by this suit ? The Plaintiffs have not stated by their bill any facts to shew that such was not the actual state of things at the time their bill was filed, and, in the absence of any statement to the contrary, I must intend that it was so.

The case of *Preston* v. *The Grand Collier Dock Company* was referred to as an example of a suit in the present form ; but there the circumstances were in no respect parallel with the present : the object of that suit was to decide the rights or liabilities of one class of the members of the corporation against another, in respect of a matter in which the corporation itself had no power to vary the situation of either.

I have applied strictly the rule of making every intendment against the pleader in this case—that is, of intending everything to have been lawful and consistent with the constitution of the company, which is not expressly shewn on the bill to have been unlawful or inconsistent with that constitution. And I am bound to make this intendment, not only on the general rule, but also on the rules of pleading which require a Plaintiff to frame his case so distinctly and unambiguously, that the Defendant may not be embarrassed in determining on the form which his defence should assume. *Attorney-General* v. *Corporation of Norwich* (2 Myl. & Cr. 406). The bill, I cannot but observe, is framed with great care, and with more than ordinary professional skill and knowledge ; but the averments do not exclude that which, *primâ facie*, must be taken to have been the case, that during the years 1840, 1841 and 1842 there was a governing body, that by such body the business of the company was carried on, that there was no insurmountable impediment to the **[503]** exercise of the powers of the proprietors assembled in general meetings to control the affairs of the company, and that such general meetings were actually held. The continued existence of a board *de facto* is not merely not excluded by the averments, but the statements in the bill of the acts which have been done suppose, and even require, the existence of such a board. Now, if the Plaintiff had alleged that there had been no board of directors *de facto*, and had on that ground impeached the transactions complained of, the Defendants might have met the case by plea, and thereby have defended themselves from answering the bill. If it should be said that the Defendants might now have pleaded that there was a board of directors *de facto*, the answer is that they might then have been told that the fact sufficiently appeared upon the bill, and therefore they ought to have demurred. Uncertainty is a defect in pleading of which advantage may be taken by demurrer. If I were to overrule these demurrers, I might be depriving the Defendants of the power of so protecting themselves ; and that because the Plaintiff has not chosen, with due precision, to put forward that fact, which, if alleged, might have been met by plea, but which, not being so alleged, leaves the bill open to demurrer.

I must further observe that, although the bill does, with great caution, attempt to meet every case which, it was supposed, might have been fatal to it upon demurrer, yet it is by allegations of the most general kind, and many of which cannot by possibility be true. It alleges the recent discovery of the acts complained of, but it gives no allegation whatsoever for the purpose of telling when or how such discovery was made, or what led to it. I am bound to give the Plaintiff, on a general demurrer, the benefit of the allegation that the matters complained of have been recently discovered, whatever the term " re-**[504]**-cently discovered" may mean ; but when I look into the schedule to the Act I find that many of those matters must have been known at a very early period in the history of the company. I find also provisions of the Act requiring that books shall be kept in which all transactions shall be fully and fairly stated ; and I do not find in the bill anything like a precise allegation that the production of those books would not have given the information, or that there have not been means of seeing those books at least at some time since 1835, or since the transactions in question took place, so that, in point of fact, many of the transactions might and may have been sooner known. These are observations upon which I do not found my judgment, but which I use as explaining why it is I have felt bound in favour of the Defendants to construe this bill with strictness.

The second point which relates to the charges and incumbrances alleged to have been illegally made on the property of the company is open to the reasoning which I have applied to the first point, upon the question whether, in the present case, individual members are at liberty to complain in the form adopted by this bill ; for why should this anomalous form of suit be resorted to, if the powers of the corporation may be called into exercise? But this part of the case is of greater difficulty upon the merits. I follow, with entire assent, the opinion expressed by the Vice-

Chancellor in *Preston* v. *The Grand Collier Dock Company*, that if a transaction be void, and not merely voidable, the corporation cannot confirm it, so as to bind a dissenting minority of its members.  But that will not dispose of this question.  The case made with regard to these mortgages or incumbrances is, that they were executed in violation of the provisions of the Act.  The mortgagees are not Defendants to the bill, nor does the bill seek to avoid the **[505]** security itself, if it could be avoided, on which I give no opinion.  The bill prays inquiries with a view to proceedings being taken *aliunde* to set aside these transactions against the mortgagees.  The object of this bill against the Defendants is to make them individually and personally responsible to the extent of the injury alleged to have been received by the corporation from the making of the mortgages.    Whatever the case might be, if the object of the suit was to rescind these transactions, and the allegations in the bill shewed that justice could not be done to the shareholders without allowing two to sue on behalf of themselves and others, very different considerations arise in a case like the present, in which the consequences only of the alleged illegal Acts are sought to be visited personally upon the directors.  The money forming the consideration for the mortgages was received, and was expended in, or partly in, the transactions which are the subject of the first ground of complaint.  Upon this, one question appears to me to be, whether the company could confirm the former transactions, take the benefit of the money that has been raised, and yet, as against the directors personally, complain of the acts which they have done, by means whereof the company obtains that benefit which I suppose to have been admitted and adopted by such confirmation.  I think it would not be open to the company to do this; and my opinion already expressed on the first point is that the transactions which constitute the first ground of complaint may possibly be beneficial to the company, and may be so regarded by the proprietors, and admit of confirmation.  I am of opinion that this question—the question of confirmation or avoidance—cannot properly be litigated upon this record, regard being had to the existing state and powers of the corporation, and that therefore that part of the bill which seeks to visit the directors personally with the consequences of the impeached mortgages and charges, the benefit of which **[506]** the company enjoys, is in the same predicament as that which relates to the other subjects of complaint.  Both questions stand on the same ground, and, for the reasons which I stated in considering the former point, these demurrers must be allowed.

**[506]**  WOODWARD *v.* CONEBEER.    *April* 27, 28, *May* 11, 25, 1843.

[S. C. 1 Hare, 297.]

A Defendant, in custody for not answering, and brought up to have the bill taken *pro confesso* against him, within the time limited by the statute, 1 W. 4, c. 36, s. 15, rule 13, asked for time to put in his answer, and three weeks was thereupon given him, with liberty to apply for his discharge upon having answered.  The time fixed by the same rule of the statute for retaining a Defendant in custody, without obtaining the order for taking the bill *pro confesso*, expired during the three weeks : no answer was put in.  Held that, in such circumstances, the Defendant was not entitled to his discharge under the 13th rule of the statute, but was remitted to the situation he would have been in if that provision of the statute had not existed.

The process against the Defendant, up to the time that he was committed to the Fleet, *cum causis*, is stated in a former report of proceedings in this cause.  (Vol. 1, p. 297.)  On the 9th of May 1842 the Defendant was brought up by *habeas corpus*, in order that the bill might be taken *pro confesso* against him : the Defendant then asked for time to put in his answer ; the Plaintiff did not oppose the Defendant's application, and three weeks' time was given.(1)  No answer was, however, put in.

(1) The Order of the 9th of May 1842 was as follows :—"Whereas by an order, dated the 21st day of February 1842, it was ordered that the Defendant, R. Conebeer,