BRITISH VIRGIN ISLANDS

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
(CIVIL)

Claim No. BVIHCV2007/0278

In the Matter of Y2K Finance Inc
And in the Matter of the BVI Business Companies Act 2004

BETWEEN:

(1)  HEADSTART CLASS F HOLDINGS LIMITED
(2)  CITCO GLOBAL CUSTODY NV

Claimants/Respondents

-and-

Y2K FINANCE INC

Defendant/Applicant

Appearances:
    Ms Barbara Dohmann QC of Blackstone Chambers, Temple, London and Mr Samuel
    Jackson Husbands of Walkers for the Defendant/Applicant
    Ms Jo Cunningham and Ms Marisol Marsh of Maples & Calder for the
    Claimants/Respondents

    ---------------------------------------------------------------------------------------
                              2008: May 19
                              2008: October 24
    ---------------------------------------------------------------------------------------


CATCHWORDS:

Unfair prejudice – Section 184I of the BVI Business Companies Act – whether application
under section 184I may be made by registered shareholder only or by beneficial owner of
the shares whose name is not entered on the share register – standing to pursue a claim
under section 184I –principle of no recovery for "reflective loss" by a shareholder – power
to strike out a claim –relationship between application to strike out and application for
summary judgment – CPR Part 26.1 and Part 15.


HEADNOTE:

The Defendant ("Y2K") is a company incorporated under the International Business Companies Act
and continued under the BVI Business Companies Act (the "BC Act"). It carries on the business of

1

a mutual fund. The First claimant ("Headstart") claims to be the beneficial owner of the shares of Y2K registered in the name of the Second Claimant ("Citco"). In their Amended Statement of Claim the Claimants claim (1) that the affairs of Y2K are being conducted in a manner which is unfairly prejudicial to their interests as shareholders, and (2) that Y2K permitted redemptions without proper notice in breach of its articles of association or that Y2K acted in a manner which equity would regard as contrary to good faith.

Headstart is a professional fund. Its shares are redeemable at the option of shareholders subject to certain conditions in its memorandum and articles of association. Pursuant to article 10(2) the redemption price for each share is the net asset value (the "NAV") per share calculated pursuant to a formula set out in article 11.

Under article 11(6) the directors could suspend calculation of NAV and therefore prevent redemptions. Up to March 2007 Y2K enjoyed lucrative returns. Around April 2006, Citco purchased class A shares. In July 2007, things changed for the worse and several shareholders redeemed their shares. Around 16 August 2007, the massive liquidity event in the global capital markets caused Y2K to sell its assets and unwind its investments. Citco did not redeem its shares and on 10 September 2007, the directors suspended calculation of the NAV and therefore the further redemption of shares.

Citco alleges at paragraphs 21 and 22 of the Amended Statement of Claim that (i) the redemptions were carried out without proper notice in breach of the articles of association, (ii) Y2K favoured the investors who had been permitted to redeem their shares just prior to the suspension of calculation of the NAV, (iii) it had relied on assurances from a Mr Walkinson and a Mr Salem from a Mr Shastri on behalf of Y2K that he expected the NAV to increase in August 2007, and (iv) a significant redemption on 15 August 2007 had triggered the collapse of Y2K.

The Claimants sought the following relief: (i) at paragraph 2 of the prayer, an order that Y2K pay compensation, (ii) repayment of all sums withdrawn from Y2K in breach of its memorandum and articles of association, (iii) an order that Y2K instruct investigating accountants to prepare an independent business review on the reasons for the decline in its NAV, and (iv) an injunction

restraining Y2K from determining a NAV until 28 days after the report is provided to the Court and the Claimants.

Y2K applied to strike out (i) the claim against Headstart on the ground that Headstart is not a registered shareholder and therefore lacks standing to pursue a claim under section 184 I, (ii) the claim as against Citco on the ground that the Amended Statement of Claim discloses no complaint of unfair prejudice and therefore no ground for the relief sought, (iii) the claim for compensation at paragraph (2) of the prayer on the ground that the rule against reflective loss and the rule that a shareholder may not claim more than his own loss prevented the court from granting this relief. Y2K also sought a declaration that it is at liberty to distribute its net assets.

The court held, striking out the claim in its entirety, that:

(1)     It is open for a litigant to apply to strike out under CPR Part 26.1 or to apply for summary judgment under Part 15 if he thinks the opponent's case has no real prospect of success or that his case is bound to succeed or the opponent's case fails on a point of law. On a strike out application the court must determine whether the claim is bound to fail and in that regard is only concerned with the statement of case. The court will have regard to the overriding objective and to its general power of case management, and should concentrate on the intrinsic judgment of the case in the light of the overriding objective and take into account all relevant circumstances and make a broad judgment after considering the available possibilities.

**Robert Cornish v Ann Van Der Elst - AXA HCV 2002/0002**;

**Bank of Bermuda Ltd v Pentium (BVI) Ltd and Landcleve Ltd-  BVI HAP 2003/-14 and Walsh v Misseldinen [2000] CPLR 201** followed.

(2)     A "nominee" shareholder and a beneficial owner of shares who is not registered as owner may apply under Section 184I but the Claimants failed to establish on the evidence that Headstart is the beneficial owner of the shares of Y2K or that Citco is the nominee of Headstart and accordingly to Headstart has no locus standi and should be removed as a claimant.

(3)     The allegations at paragraphs 21 and 22 of the Statement of Claim do not amount to an allegation of unfair prejudice. Citco was not prejudiced by the making of redemptions by other shareholders and there was no lack of even-handedness between shareholders who wished to redeem and those who did not. Headstart had failed to establish reliance on representations of Mr Shastri and any representation by Mr Shastri took place after redemptions had been suspended. Headstart's claim under paragraphs 21 and 22 must accordingly be struck out.

(4)     The claim for compensation at paragraph 2 of the prayer could not succeed on the ground that it is exorbitant relief and that the payment of compensation would offend the rule against reflective loss. The recovery of monies wrongfully paid and by directors is a claim that may be properly made by Y2K not by its shareholders.

**Johnson v Gore Wood & Co [2002] 2 AC 1**, and

**Prudential Assurance Co Ltd v Newman Industries ltd (no 2) [1982] Ch 204** followed.

(5)     It is no answer to Y2K's objections that Citco intends to apply to bring a derivative action in the name of Y2K for compensation. Such derivative action would be brought by Y2K against third parties and there is no reason why Citco should be permitted to seek the same relief against Y2K. Further, if Citco could be permitted to bring the same claim for compensation as Y2K, then either Citco's claim or Y2K's would be barred for double recovery.

(6)     The court has a wide discretion to make orders under section 184I (2) but for the purposes of a strike out application the court must pay attention to the specific relief which is claimed.

## JUDGMENT

### Introduction

[1]     **HARIPRASHAD-CHARLES J:** Y2K, also known as the millennium bug, was a clicking time bomb for all major computer applications. But, the name is not synonymous at all with computer or software problem. In reality, it is an International Business Company ("IBC") incorporated in the BVI. At all material times, it carried on the business of operating a fixed

income mutual performance fund. It is also the Defendant in this substantive action commenced by the First Claimant, Headstart on 22 November 2007. Headstart alleges that it is the beneficial owner of a minority shareholding of 8,000 Class A (Series 4) shares worth US$8 million in Y2K in April, 2006, through Citco Global Holdings NV ("Citco"), which acts as its nominee. Initially, Citco was not a party to these proceedings. It was joined as the Second Claimant on 15 April 2008 on an ex parte application. On 23 April 2008, an Amended Claim Form and Statement of Claim were filed to reflect that change.

[2]     On 5 May 2008, Y2K filed an Amended Notice of Application to strike out the Claim in its entirety or alternatively, in part ("the Application") on four grounds namely:

(i)      Headstart is not a registered shareholder in Y2K and therefore has no locus standi to bring the claim. Further, even if Headstart has any beneficial interest in the shares of Y2K (which is denied) it has no locus standi to make any of the complaints contained in the Amended Statement of Claim ("ASC").

(ii)     Citco does not complain of any unfair prejudice by reason of the matters set out in paragraph 22 of the ASC and therefore that paragraph should be struck out as against it.

(iii)    The complaint of unfair prejudice in paragraph 21 is an allegation that Y2K permitted various redemptions and should not have done so. The complaint of unfair prejudice in paragraph 22 of the Statement of Claim is an allegation that Headstart lost the opportunity to make a redemption itself. In the premises, paragraphs 21 and 22 of the ASC are contradictory. No other complaint of unfair prejudice is made by either Claimant against Y2K and therefore the Claim should be struck out as disclosing no ground for the relief sought.

(iv)     By reason of the rule against reflective loss and the rule that a shareholder cannot claim more than his own loss, neither of the Claimants has locus standi to seek the relief claimed in paragraph 2 of the Prayer to the Claim and therefore the paragraph should be struck out.

## Background

[3]     A helpful summary of the facts in the absence of any admitted contradictory evidence from the Claimants is contained in the written submissions filed by Learned Queen's Counsel, Ms Dohmann, which I now paraphrase.

[4]     Headstart is a mutual fund company incorporated in the BVI. It is also a financial services company authorized and regulated in the United Kingdom by the Financial Services Authority[1]. Its investment adviser is Headstart Advisers Limited, a UK based investment adviser to several hedge funds. Citco is a registered shareholder/member of Y2K.

[5]     Y2K was a professional fund within the meaning of the Mutual Funds Act 1996 and investment in it is restricted to professional investors. It was designed to generate returns by applying leverage to the highest-quality portion of high grade asset-backed securities. As its Prospectus explained[2], investment in Y2K was suitable for sophisticated investors who fully understood and were willing to assume the risks involved in Y2K's investment program. Moreover, as the Prospectus explained, that investment program was speculative and entailed substantial risks. There could be no assurance that the investment objectives of Y2K would be achieved and results may vary substantially over time.

[6]     Generally speaking, the means by which investors invested in Y2K was to apply for and purchase its shares. The fund was not designed to pay dividends to its shareholders. Rather, the investors would realise their investment by applying to redeem their shares pursuant to a procedure set out in article 10 of its Articles of Association[3]. Pursuant to article 10(2), the redemption price for each share shall be the net asset value per share ("the NAV") of the applicable class or series of share, calculated pursuant to a formula in article 11.

---

[1] See affidavit of Henry Charles Watkinson filed on 22 November 2007.
[2] See paragraph 6 of the Defence.
[3] See paragraph 12 of the Amended Statement of Claim and paragraph 13 of the Defence.

[7]     Pursuant to article 11(6), the directors of Y2K could suspend calculation of the NAV (and therefore prevent the redemption of shares) where, inter alia, circumstances existed as a result of which it was not reasonably practicable for Y2K to dispose of investments in its fund or such disposals would be materially prejudicial to members and moreover, where a breakdown occurred in any of the means normally employed in ascertaining the value of investments or when for any other reason the value of any investments or other assets of the fund cannot reasonably or fairly be ascertained.

[8]     Up to March 2007, Y2K enjoyed lucrative returns. In or around April 2006, Citco purchased US$8,000,000 of class A shares in Y2K.

[9]     Y2K provided monthly performance reports as to its fund for its investors and their advisers. The July 2007 performance report states that Y2K's return was -14.30% for that month, -15.12% for the last 12 months, and -18.79% for the year 2007 to date [4]. In late July 2007, things changed for the worse. Several shareholders filed redemption notices and duly redeemed their shares. Citco did not.

[10]    After about 16 August 2007, the massive liquidity event in the global capital markets caused Y2K to sell its assets and unwind investments. Citco still did not make any application to redeem its shares.

[11]    The market got weaker and on 10 September 2007, the directors of Y2K duly exercised their power under article 11(6)(b) and (c) of the Articles of Association to suspend determination of NAV per share of Y2K and accordingly, the redemption of its shares. By notice on the Irish Stock Exchange (where Y2K was listed) it stated that such suspension would have effect at least until 1 December 2007.

[12]    Before that suspension ended, Headstart issued its Claim against Y2K. Citco was later joined as a claimant. They complained of the following:

---

[4] See paragraph 20 of the Defence.

1. that the redemptions in July done by other shareholders were done without proper notice being given to Y2K, which is against the Memorandum and Articles of Association of Y2K;

2. that Y2K favoured some shareholders by advising and allowing them to redeem the shares when the redemptions should have been suspended;

3. that it relied on the assurances received by Mr Watkinson from Mr Salem (who acted on behalf of Y2K);

4. that Mr Shastri (who acted on behalf of Y2K) had several conversations with Mr. Watkinson, eventually advising him that he expected the value of the fund in Y2K to increase in August 2007;

5. that there was a significant redemption on the 15 August, 2007 which caused Y2K to dispose of assets at a discount, eventually leading to its collapse, and this disposal was prejudicial to its members.

[13]    The Claimants brought its claim on two discrete grounds namely (1) that the affairs of the Defendant have been and are being conducted in a manner which is unfairly prejudicial to the interests of the Claimants, as members of the Defendant and (2) the Defendant has acted in breach of Article 11 of its Articles of Association or alternatively, that the Defendant has acted in a manner which equity would regard as contrary to good faith.

[14]    They sought, amongst other relief the following: (1) an order that Y2K pay such compensation as the Court may determine after (if necessary) an account and enquiry; (2) the repayment of all sums withdrawn from Y2K in breach of its Memorandum and Articles of Association as pleaded in paragraph 21 and such further directions and Orders as are necessary in order to achieve that result; (3) an order that investigating accountants be instructed to prepare an independent business review and an injunction against Y2K determining the NAV of its shares pending the preparation of that report.

[15]     Y2K has now sold all its remaining assets and investments. This Claim appears to be the only barrier to the existing shareholders in Y2K (including Citco) being entitled to redeem their shares and thereby receive their respective payments at the current NAV per share.

## The Court's powers to strike out

[16]     Striking out is often described as a draconian step, as it usually means that either the whole or part of that party's case is at an end. The court has two distinct powers to achieve this. One is under CPR 26.1 where the Court can strike out a statement of case or part of it if it discloses no reasonable grounds for bringing or defending a claim[5]; or where the statement of case or the part to be struck out is an abuse of the process of the court or is likely to obstruct the just disposal of the proceedings.[6] The phrase "discloses no reasonable grounds for bringing or defending a claim" addresses two situations:

1.   where the content of a statement of case is defective in that, even if every allegation contained in it were proved, the party whose statement of case it is, cannot succeed; or

2.   where the statement of case, no matter how complete and apparently correct it may be, will fail as a matter of law.

[17]     The other power is under CPR 15. It gives the court the power to enter summary judgment against a claimant or a defendant when that party has no real prospect of succeeding on the claim or defence. Undoubtedly, there is a substantial overlap between the two powers and an application can be made under both rules.

[18]     If a party believes he can show without a trial that an opponent's case has no real prospect of success on the facts, or that his case is bound to succeed or the opponent's fail because of a point of law, he can apply either under CPR 26 or CPR 15 or both as he thinks appropriate. When deciding whether or not to strike out, the court takes into account

---

[5] See Part 26.3 (b)
[6] See Part 26.3 (c)

all the relevant circumstances and "makes a broad judgment after considering the available possibilities".[7]

[19]   In **Bank of Bermuda Ltd v Pentium (BVI) Ltd and Landcleve Ltd**[8], the EC Court of Appeal upheld an order by the trial judge striking out a claim. At [15] the court noted that:

> '... in this case one has to examine the essence of the claim put forward against the bank on the summary judgment application. That claim was quite simple. The companies were alleging that the Bank had acted unlawfully, in breach of the mandate given to it, by paying out the companies' monies on instructions that were not authorised. That the payment instructions were not authorised was established by the evidence of Mr. Gibson. He having done that, it now fell to the bank to show that it had a real prospect of successfully defending that claim. Merely pointing to the fact that Mr. Gibson's evidence was self serving or uncorroborated and repeatedly utilising the expression that the companies were being put "to strict proof" to establish the allegations made by them did not, by itself indicate a real prospect of successfully defending the claim. Mr. Elkinson complains that the learned judge did not take into account all the evidence that might be available at a full hearing but any such evidence could only have been let in if the Defence had foreshadowed it, if the Defence had put forward some case that could cast doubt on the allegations put forward by the companies. The point is that if the only defence to the allegation that the mandate was breached was to say to the companies, "Prove that!", then Mr. Gibson's affidavit evidence does just that. The risk of conducting a mini-trial only arises where there are conflicts to be resolved. Here there were none. No counterargument was put forward by the Bank. The learned judge had before him evidence that was not contested...
>
> [18] A judge should not allow a matter to proceed to trial where the defendant has produced nothing to persuade the court that there is a realistic prospect that the defendant will succeed in defeating the claim brought by the claimant. In response to an application for summary judgment, a defendant is not entitled, without more, merely to say that in the course of time something might turn up that would render the claimant's case untenable. To proceed in that vein is to invite speculation and does not demonstrate a real prospect of successfully defending the claim.'

[20]   In **Robert Conrich v Ann Van Der Elst**[9] Rawlins J (as he then was) after considering the case of **Biguzzi v. Rank Leisure plc**[10] stated that it is only where a statement of case does not amount to a viable claim or defence, or is beyond cure that the court may strike

---

[7] See Caribbean Civil Court Practice, 2008, page 230, Note 23.22.
[8] BVI Civil Appeal No. 14 of 2003 – See Caribbean Civil Court Practice, 2008, page 232.
[9] AXA HCV 2001/0002, Judgment delivered on 13 February 2003,
[10] [1999] 4 All E. R. 934

out. He resonated that the aim of the judicial role in this regard is justice to the parties in all of the circumstances.

[21]    So, in an application to strike out a statement of case, the Court is to determine whether the claim is bound to fail and in that regard the court is only concerned with the statement of case which it is alleged discloses no reasonable grounds for bringing or defending the claim. The Court, when exercising the power to strike out, will have regard to the overriding objective and to its general powers of case management. The court has the power to strike out only part of a statement of case or direct a party shall have permission to amend.

[22]    In **Walsh v Misseldine**[11], Brooke LJ held that, when deciding whether or not to strike out , the court should concentrate on the intrinsic justice of a particular case in the light of the overriding objective, take into account all the relevant circumstances and make 'a broad judgment after considering the available possibilities.'

[23]    It is on these principles that the Court will consider the striking out application.

**Ground 1- Standing of Headstart to bring claim**

[24]    The first complaint of Y2K is that Headstart is and was not the legal or registered owner of the shares in Y2K and therefore, there is no jurisdictional basis for it to bring a complaint of unfair prejudice against it. Learned Queen's Counsel for Y2K, Ms Dohmann QC relied on the case of **Atlasview Ltd & Ors v Brightview & Ors**[12] where Jonathan Crow (sitting as a deputy High Court Judge) held:

> "The right to petition the court under s. 459 is conferred only on members and those to whom shares have been transferred by operation of law, and neither [of the petitioners] falls within those categories. No rights are conferred onto them by s. 459, and although there may be room for nominal defendants in certain types of proceedings, there is in my view no room for nominal petitioners in this context."

[25]    For this reason, Y2K contends that Headstart should be removed as a claimant from this Claim and that all claims brought by it should be struck out, particularly the claim which concerns representations allegedly made by Mr Shastri (whom Y2K says, was an

---

[11] [2000] CPLR 201 – see Caribbean Civil Court Practice, 2008, page 238.
[12] [2004] B.C.C. 542, at [31].

employee of a Bermudian company, Tankard Lane Holdings Company Ltd.) to a representative of Headstart, Mr Watkinson[13].  Y2K, however, agrees that Citco is in fact a registered shareholder in Y2K.

[26]   Y2K contends that the burden is upon Citco to establish whether it is a nominee for Headstart, and argues that Citco has failed to establish such and cannot do so for the following reasons:

a)   Y2K has repeatedly requested[14] that the Claimants disclose any nominee agreement between themselves; as such agreements are required as a matter of law and financial regulation. The Claimants have refused to disclose any such document/s or whether such document/s exists.

b)   Citco is in fact the nominee for Lyxor Asset Management ("Lyxor") and not that of Headstart. By a Notice giving Disclosure of Shareholder Identity dated the 10 April 2008, Citco Bank Nederland NV[15] identified an account in the name of "Citco Global Custody NV Ref Lyxor/Headstart" in the Fund and stated that "the underlying investor of the above account is Lyxor". Y2K, by Notice of Application by the Defendant for Specific Disclosure[16], has sought disclosure of the documentary evidence of Headstart's alleged beneficial interest or explanation as to the change of beneficial ownership from Lyxor (if that ever occurred).

c)   Maples disclosed a copy of a further notice from Citco Nederland concerning Disclosure of Shareholder Identity for the Account[17] which stated "since our last response we have established that the Beneficial Owner of this investment is Headstart Class F Holdings Limited."

---

[13] Paragraph 22 of the Amended Statement of Claim.
[14] Particularly by application of notice, supported by the Affidavit of Annabel Gillham both dated the 8 May, 2008.
[15] Dublin Branch.
[16] Dated the 8 May, 2008.
[17] Dated the 7 May, 2008

[27]     However, this document does not suggest that the previous Notice of the 10 April, 2008 was wrong; it does not state any date on which it is alleged that Headstart became the beneficial owner; it does not indicate how Citco Nederland came to establish this as a fact; and it does not indicate whether Headstart is a direct beneficial owner or at the end of a chain of imtermediate beneficial or other interests.

[28]     Ms Cunningham, Learned Counsel for the Claimants concedes that Headstart is not, and has never been, a registered shareholder of Y2K and as such, has no *locus standi* to bring an action for unfair prejudice against Y2K. However, Counsel contends that Headstart has a beneficial interest in Y2K because Citco, which is a registered shareholder of Y2K, is its nominee.   Therefore, as Citco represented Headstart as its nominee, they claim that Headstart has locus standi to bring this claim, and in the alternative, if Headstart is struck out, the claim will be continued in identical terms in the name of Citco.

[29]     Further, Counsel argues that the events which gave rise to this action, in the first place, directly concerns it as the beneficial owner of the shares in Y2K, and as a key participant to (1) exchanges which took place between representatives of Headstart and Y2K only, and (2) documents of communications to which Headstart alone, and not Citco, is privy.

[30]     Counsel next contends that the court should avoid striking Headstart out of the claim, as its participation in the proceedings is desirable to ensure that all matters in the case are resolved.   Counsel relies on CPR 19.2 for this argument.   Further, she argues that there will be nothing to gain from Headstart's exclusion from these proceedings. According to Ms Cunningham, to strike out a party whose participation in proceedings is desirable to ensure that all matters can be resolved would be odd and fly not only in the face of good case management practice but also the deliberate intention of CPR 19.2.

## Court's analysis

[31]     All parties are agreed that Citco is a registered shareholder of Y2K.  Section 184I of the BVI Business Companies Act, 2004 as amended, ("the BCA") gives a member the right and power to apply to the court for redress when that member has been unfairly prejudiced. The section states as follows:

> " (1) A member of a company who considers that the affairs of the company have been, are being or are likely to be, conducted in a manner that is, or any act or acts of the company have been, or are, likely to be oppressive, unfairly discriminatory, or unfairly prejudicial to him in that capacity, may apply to the Court for an order under this section".

[32]     Therefore, it is clear that Citco, being a member of Y2K, can make an application to the court concerning matters of prejudice. However, according to the BCA, Headstart, being a non-member of Y2K cannot make such an application to the Court.

[33]     Headstart, not being a member of Y2K, alleges that Citco acted as its nominee at the material times in question. It is not in contention, that if Citco did act as the nominee for Headstart, then Headstart will be the beneficial owner of the shares in Y2K and thereby, have locus standi in this matter. Thus, the burden is upon the Claimants to show whether there is a nominee relationship between them, which gives Headstart the locus standi, with beneficial interest, to make this claim against Y2K for unfair prejudice.

[34]     Since the BCA does not make mention of the right to make an application being available to non-members, I must now consider the common law. Now, assuming for a moment, that Headstart is in fact the beneficial owner of the shares, the question to determine is whether the beneficial owner has the same right to bring such an action against Y2K.

[35]     A similar section to Section 184I of the BCA is Section 459(1) of the UK Companies Act, 1985, which was examined in the cases of **Brightview** and **Terence Hecquet et al v Tom McCarthy et al**[18]. Section 459 (1) states:

> "(1) a member of a company may apply to the court by petition for an order under this Part on the ground that the company's affairs are being or have been conducted in a manner which is unfairly prejudicial to the interests of its members generally or of some part of its members (including at least himself) or that any actual or proposed act or omission of the company (including an act or omission on its behalf) is or would be so prejudicial."

[36]     The court in **Terence Hecquet** was of the opinion that "those who are not members within this definition can petition under Section 459 only if they come within subsection (2)", (which specifically makes provision for non-members of a company to whom shares in the

---

[18] (2006) EWHC, 832.

company have been transferred or transmitted by operation of law) and not in subsection (1). While the BCA contains a section similar to section 459(1), it does not contain a section similar to subsection (2). In **Brightview**[19], the court held a similar view stating as follows:

> "The right to petition the court under section 459 was conferred only on members…No rights were conferred on them (the petitioners) by section 459 and although there might be room for nominal defendants in certain types of proceedings, there was no room for nominal petitioners in this context…Since it was impossible for a 'dispute' under section 459 to arise at the suit of a person who was not a member, the rule could not be invoked to support the joinder of a non-member as a party".

[37]     However, the court in **Brightview** continued, and took into consideration, the position of the law on 'nominee shareholders' and 'beneficial owners' of shares, which is applicable in the case at hand. The court explored the law and eventually found that it was within the right of both the nominee shareholder and the beneficial owner of the shares to make an application under Section 459 of the CA. The court stated as follows:

> "37. It is striking that this specific point, relating to a nominee shareholder as petitioner, seems never to have been argued or decided before. However, it is also striking that numerous cases have argued and decided on the assumed basis that a nominee shareholder is fully entitled to complain under s. 459 about any diminution in value of the shares registered in its name, and that its 'interests' are for these purposes co-extensive with the interests of the beneficial owner: see *Estill v Cowling Swift & Kitchin* (2000)LI Rep PN 378, at para. 101, *Arrow Nominees Inc v Blackledge* (2001) BCC 591, at p 594 D-E, *Lloyd v Casey* (2002) 1 BCLC 466, at paras. 2-3 (pp 467- 468)…
>
> 38. For the purposes of this strike-out application, all I have to decide is whether it is properly arguable that the 'interests' of a nominee shareholder under s. 459 are capable of including the economic and contractual interests of the beneficial owners of the shares. In my judgment, based on both the language of s. 459 and the authorities mentioned above, I consider it to be well arguable: indeed, if I had to decide the point, I would find that it was correct".

[38]     As shown above, Section 459 can be interpreted to include petitions from both nominee shareholders and beneficial owners of shares, apart from only members. As such, it is reasonable to conclude that Section 184I of the BCA also can be interpreted to include

---

[19] Pgs 543 – 544.

applications made by both nominee shareholders and beneficial owners of shares. Therefore, assuming that Headstart is the beneficial owner of shares in Y2K, then it has the right to make an application under the BCA.

[39]     Consequently, the issue to determine is whether the evidence put forward by the Claimants showed the relationship of Citco being a nominee shareholder of Headstart and Headstart being a beneficial owner of the shares in Y2K. This is a question of fact. In this case, the evidence which was adduced by the Claimants to prove that such a relationship existed between them was as follows:

1.   A Notice dated the 10 April, 2008 from Citco Nederland (the Corporate Actions Department) which states as follows:

> ACCOUNT DESIGNATION:  Citco Global Custody NV Ref Lyxor/Headstart…
> ACTION TO BE TAKEN:      The underlying investor of the above account is Lyxor Asset Management.

2.   A letter headed 'Consent' from Citco Nederland which states that Citco duly represented by Messrs AAM de Brujin and RJ Boonstra, consent to the Company (Citco) being added as a Second Claimant to the proceedings, and that Citco acts as a nominee and is the registered shareholder of the shares in the Defendant Fund.

3.   A further Notice from Citco Nederland concerning Disclosure of Shareholder Identity for the Account[20] which stated: "Since our last response we have established that the Beneficial Owner of this investment is Headstart Class F Holdings Limited".

[40]     In my judgment, the Claimants have not provided sufficient evidence to support the allegation that Citco is the nominee for Headstart, and that Headstart is in fact the beneficial owner of the shares in Y2K. None of the above-mentioned documents state crucial facts which include, among other things:

a)   when did the alleged relationship between the Claimants commence;

---

[20] Dated the 7th May, 2008

b)   for what reason was this relationship formed;

c)   for how long did this relationship continue; and

d)   what is the significance of Lyxor and how is it that Headstart is instead now the underlying investor of the account?

[41]   Since there is no documentary evidence disclosed by the Claimants to clearly explain their relationship, I find that the Claimants failed to prove that such a relationship existed. I am therefore constrained to find that Headstart has no *locus standi* to bring this claim. Accordingly, Headstart should be removed as a Claimant from the Claim and all claims brought by it should be struck out. Specifically, the claim set out in paragraph 22 of the ASC which concerns representations allegedly made by Mr Shastri  (who was in fact an employee of a Bermudian company, Tankard Lane Holdings Company Limited), to Mr Watkinson, a director of Headstart. The allegation does not concern Citco and ought to be struck out.

[42]   Furthermore, there are two additional reasons why the claim made by Headstart in paragraph 22 is bound to fail and should be struck out:

(i)   (As pleaded in paragraph 38 of the Defence) Headstart does not allege that it (let alone Citco) actually relied on any of the representations which it alleges were made by Mr Shastri. Therefore even if Mr Shastri made those representations or any of them (which he did not) on Headstart's own case they did not give rise to any unfair prejudice.

(ii)   (As pleaded in paragraph 39.3 of the Defence) on Headstart's own case, the alleged conversations took place in August 2007. At and after that time, no shareholder could redeem. All redemptions were suspended with the suspension of the calculation of NAV per share on 10 September 2007 and any requests made for redemptions to take effect at the NAV per share as at 31 August 2007 (or in subsequent months) were therefore postponed until the end of that period of suspension.

**Ground 2: Does Citco complain of unfair prejudice?**

[43]     Y2K argues that the complaint in paragraph 22 of the Amended Statement of Claim is a complaint solely concerning Headstart and not Citco. Paragraph 22 states as follows:

> "In the light of the information provided by Mr Salem and by the Bank of Bermuda it also appears that:
>
> 1)   Mr Shastri's statement shortly after 1 August 2007 that Mr Salem's US$30 million investment remained in the Fund and that he had not redeemed his shares was false in that Mr Salem had provided a purported notice of redemption dated 25 July 2007 for a value of $9,787,375.80 as pleaded in paragraph 21(1) (d) above.
>
> 2)   Mr Shastri's statement shortly after 1 August 2007 that there were US$20 million of redemptions as at the end of July 2007 was false in that it excluded the Goldman Sachs purported redemption notice dated 26 July 2007 for a value of $29,332,905.37.
>
> 3)   Mr Shastri's two statements to Mr Watkinson in about the middle of August 2007 that the <u>First</u> Claimant should not apply to redeem its shares in the Fund at that stage were false, in particular because Mr Shastri did not advise Mr Watkinson about the true level of redemption notices that the Fund had allowed or was about to allow.
>
> 4)   Mr Shastri's statement to Mr Watkinson in a telephone conversation in late August 2007 that he could reasonably expect the value of the Fund to be up in August 2007 was false in particular because Mr Shastri did not advise Mr Watkinson about the true level of redemptions that had already taken place."

[44]     What is alleged is that shortly after 1 August 2007, there was a conversation between Mr Shastri, not a director of Y2K but who is employed by the marketing company, Tankard in

Bermuda and Mr Watkinson about this investment and Mr Shastri is said to have made these representations. It is quite bizarre that Mr Shastri, not an investment advisor could advise Mr Watkinson, an investment professional. Moreover, even if Mr Shastri made these representations to Mr Watkinson, there is nothing in the ASC to demonstrate that Citco relied upon these statements.

[45]  The Claimants contend that it matters not whether the representations were made to the Headstart, to Citco, or to some other third party not privy to these proceedings, that the evidential weight lies in the very fact that they were made at all.

[46]  Nowhere in the ASC does Citco complain of unfair prejudice. Other than paragraph 22 of the ASC, the only paragraph in which conduct amounting to unfair prejudice is alleged is paragraph 21.  Headstart alleges the following:

1)  Y2K allowed various redemptions to be made (paragraph 22(1));

2)  No proper notice had been given in respect of those redemptions (paragraphs 22(2) and(3));

3)  Y2K should have suspended the determination of the NAV prior to (and thereby preventing) the redemptions being made (paragraphs 22(5) and (8));

4)  Y2K should have exercised their powers to delay payments of those redemptions (paragraph 22(10)); and the making of those redemptions were an "*effective cause*" of margin calls being made on Y2K and its "*collapse*" (paragraph 22(7)).

[47]  Y2K makes a detailed defence of these allegations in paragraphs 27 to 36 of its Defence but, for the purposes of this Application, Y2K needs only to rely on the fact (which is agreed) that Citco has never made a request for redemption.

[48]  Citco was therefore not prejudiced by the making of those redemptions. This is not a case in which other shareholders of Y2K were permitted to redeem and Citco was not. Y2K further contends that Citco had an option whether it wanted to redeem its shares or not, and the fact that other shareholders did redeem at the time did not prevent Citco from doing the same. As Learned Queen's Counsel attractively argued, "[T]here is no lack of

even-handedness between the shareholders who wished to redeem, did submit redemption notices (and were duly permitted to redeem) and Citco, which did not wish to redeem and therefore did not submit any redemption notice". On the proper analysis of paragraph 22, Citco makes no complaint of unfair prejudice against Y2K.

[49]   At the end of the day, Citco has not made any complaint of unfair prejudice against Y2K. Such a complaint ought to be properly pleaded with particulars. In the event that I am wrong to come to this conclusion, in any event, Citco never submitted a redemption request.

[50]   At this stage, I am entitled to strike out the application in its entirety because Citco has made no complaint of unfair prejudice against Y2K. However, in the event that I am wrong to come to this conclusion, I will continue to explore the application.

## Ground 3: Are the complaints of unfair prejudice in paragraph 21 and paragraph 22 of the Amended Statement of Claim contradictory?

[51]   Y2K complains that the complaints of paragraph 21 and that of paragraph 22 of the Amended Statement of Claim are contradictory and should therefore be struck out.

[52]   Paragraph 21 of the ASC alleges that various redemptions should not have been made for diverse alleged reasons (short notice, it not being reasonably practicable for Y2K to dispose of the investments comprised in its fund and a breakdown having occurred in the means normally employed in ascertaining the value of investments and assets of that fund).

[53]   Paragraph 22 of the ASC does not involve any allegation of reliance on the part of anyone on behalf of Citco. Therefore it is not a complaint of unfair prejudice. Moreover, if Citco were to be permitted to allege that (somehow) it had relied on those alleged representations, then presumably this would amount to an allegation that Citco would otherwise have chosen to redeem.

[54]   In my opinion, the two paragraphs address two discrete aspects of the Claimants' case. Paragraph 21 pleads the facts which demonstrate the unfair prejudice detailing the payments made; Y2K's failure to comply with the Articles of Association; its failure to

suspend calculation of the NAV and/or redemptions and/or payments and its ensuing financial decline. Paragraph 22 contains a summary of the contemporaneous false representations made by Y2K's representatives as to their own continued investment in and financial status of Y2K.

[55]     In my view, the paragraphs are not contradictory but it makes no difference to the case based on my prior findings.

## Ground 4: Claim for relief in paragraph 2 should be struck out

[56]     Y2K insisted that the Claimants have no *locus standi* to seek the relief in paragraph 2 of the Prayer of the Statement of Claim and that paragraph should be struck out. Further or alternatively, the relief sought in respect of these complaints of unfair prejudice is unlawful, bound to fail and should therefore be struck out. Further, it is not included in the Amended Claim Form and for that reason alone should be struck out.

[57]     The relief sought in that paragraph is as follows:

> "That the Court order the repayment of all sums withdrawn from the Defendant in breach of the Memorandum and Articles of Association as pleaded in paragraph 21 and make such further directions and Orders as are necessary to achieve that result.

[58]     Y2K asserts that the relief offends the rule that a shareholder cannot recover more than his own loss and it offends against the rule against reflective loss.

## A shareholder cannot claim more than his own loss

[59]     Y2K contends that this relief sought is an exorbitant form of relief, especially since the payments which are pleaded in paragraph 21 of the ASC would not appear to have caused Citco any loss other than by diminution of the value of its shares.

[60]     Ms Dohmann QC correctly argued that if (and putting aside the objection on account of the rule against reflective loss to be dealt with later) the purpose of the relief were therefore to put Y2K in sufficient funds to pay compensation to Citco, it would plainly be unnecessary for *all* (and perhaps any of) the sums withdrawn from Y2K to be repaid to it. Citco cannot

recover more than its own loss. Put differently, Citco cannot recover on behalf of other members of Y2K. *A fortiori,* this is the case where, as here:

(i) The recipients of the payments are no longer members of Y2K, the payments having been made for the very purpose of Y2K redeeming their shares.

(ii) Those members were not themselves prejudiced by receiving those payments. The applications for redemption were of course made by those members.

**Relief offends against the rule against reflective loss**

[61] Ms Dohmann QC argues that the relief offends against the rule against reflective loss. She says that the rule against reflective loss provides that a shareholder may not bring proceedings to recover loss which is merely reflective of loss suffered by his company. The following principles apply:

a) Four conditions can be identified for the rule to be engaged (adopting the analysis of counsel for the petitioner in **Shaker v Mohammed Al-Bedrawi** [2002] EWCA Civ 1452 at [37]

1. A claim is brought by or on behalf of a shareholder in a company;

2. The claim is for damages for loss to the shareholder;

3. The loss, through a diminution in value of shares or in distributable assets, is reflective of loss to the company; and

4. The company has its own cause of action to recover the loss.

b) The paradigm situation for application of the rule is where the shareholder complains of loss which is measured in loss of value of his shareholding and/or the loss of dividends payable in respect of that shareholding. She referred to the dictum of Lord Millett in **Johnson v. Gore Wood & Co**[21] where he held:

---

[21] [2002] 2 A.C. 1, 62E.

"The position is … where the company suffers loss caused by the breach of a duty owed both to the company and to the shareholder. In such a case the shareholder's loss, in so far as this is measured by the diminution in value of the shareholding or loss of dividends, merely reflects the loss suffered by the company in respect of which the company has its own cause of action. If the shareholder is allowed to recover in respect of such loss, then either there will be double recovery at the expense of the defendant or the shareholder will recover at the expense of the company and its creditors and other shareholders. Neither course can be permitted. This is a matter of principle; there is no discretion involved".

Further, Lord Bingham held (at p.36C-D):

"The problem can be resolved only **by close scrutiny of the pleadings at the strike-out stage** and all the proven facts at the trial stage: the object is to ascertain whether the loss claimed appears to be or is one which would be made good if the company had enforced its full rights against the party responsible, and **whether** (to use the language of *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204, 223) **the loss claimed is "merely a reflection of the loss suffered by the company". In some cases the answer will be clear, as where the shareholder claims the loss of dividend or a diminution in the value of a shareholding attributable solely to depletion of the company's assets,** or a loss unrelated to the business of the company."[emphasis added]

c)   The fact that the company omits to take action (even any action at all) in respect of the alleged wrongdoing does not justify any exception to the rule. In **Johnson**, Lord Bingham said at p.35F:

"A claim will not lie by a shareholder to make good a loss which would be made good if the company's assets were replenished through action against the party responsible for the loss, even if the company, acting through its constitutional organs, has declined or failed to make good that loss."

Moreover, as Lord Millett said at p.66D-E:

"[I]f the company chooses not to exercise its remedy, the loss to the shareholder is caused by the company's decision not to pursue its remedy and not by the defendant's wrongdoing".

d)   The usual case is where a shareholder sues a third party (such as a professional adviser) that owes duties to him and the company and the third party defends by reference to the rule. However, the rule applies equally to petitions for unfair prejudice between a shareholder and the company.

e) Where there is no reasonable doubt that a loss claimed by a shareholder is merely reflective of a loss suffered by the company then the court can properly act, in advance of trial, to strike out the offending heads of claim: *Gardner v. Parker* [2004] EWCA Civ 781 at [33] per Neuberger LJ (approving a dictum of Blackburne J in *Giles v. Rhind* [2001] 2 BCLC 582 at [27]).

[62]    Y2K submits that the rule is engaged in this case and paragraph 2 of the Prayer should be struck out:

(i)    The determination of NAV is made by the directors of Y2K (article 11(1) of the Articles of Association) and the directors have the power to suspend its calculation (article 11(6)) and thereby the redemption of shares. Therefore:

(1)    The conduct alleged to be unfairly prejudicial in paragraph 21 of the ASC (effectively that certain redemptions should <u>not</u> have been permitted) concerns the directors of Y2K.

(2)    This complaint may be characterised as an allegation of a breach or breaches of fiduciary duties of the directors. It is axiomatic that such duties were owed by the relevant directors to Y2K. If it were assumed that the duties were also owed to Citco, then its cause of action is the same as that of Y2K.

(ii)    The loss which is alleged to have been caused by the unfairly prejudicial conduct is loss of value of Citco's shareholding (on account of the depletion of Y2K's assets). It is therefore the same loss as and reflective of the loss suffered by Y2K.[22]

[63]    The Claimants do not dispute the fact that a claim to recover monies wrongfully paid out by the directors to the detriment of itself belongs to Y2K and does not belong to the members. However, by Maples' letter dated 9 May 2009, they assert that paragraph 2 of the Prayer should not be struck out for three procedural reasons namely:

---

[22] See paragraphs 26 and 27 of the skeleton argument of the Defendant for application to strike-out claim filed on 16 May 2008 for this helpful summary of the rule against reflective loss.

1. On account of the possibility that in the future the Claimants or either of them are "… *likely to seek an order from the Court in due course that shareholders be entitled to bring derivative proceedings in the name of the Fund to recover the loss suffered by the Fund as a result of the short notice transfers pleaded in paragraph 21*".

2. "*The question of the appropriate relief is a matter for the Court after it has determined that there has been unfair prejudice pursuant to Section 184 I of the 2004 Act*".

3. The Court could somehow and in any event order the relief that is sought by paragraph 2 of the Prayer under paragraph 6 thereof, which seeks "*That such other Order or Orders may be made as the Court thinks fit*".

[64]   In oral and written submissions, the Claimants rehearsed these procedural reasons. They contend that the Court has an unfettered discretion to make any number of orders under section 1841 of the BCA, which includes the appointment of a liquidator who, they argue, is an officer of the Court tasked with pursuing all remedies available to the company including any claims to recover those monies wrongfully paid. The liquidator, according to the Claimants, will facilitate or achieve the "repayment of all sums withdrawn from the Defendant…and such further directions and Orders as are necessary in order to achieve that result".

[65]   Alternatively, the Claimants contend that the Court has the power to make any order it considers to be just and equitable, including the power to grant leave to commence a derivative action.

[66]   The Claimants are puzzled as to why Y2K wishes to strike out paragraph 2, as they believe that even if the Court strikes out paragraph 2, nothing precludes the Court from subsequently appointing a liquidator.

## Court analysis

[67]   The Claimants agree with the submissions of Learned Queen's Counsel for Y2K, that they, as shareholders (or beneficial owners), cannot claim for loss which is measured in loss of value of their shareholding and/or loss of dividends payable in respect of that shareholding. The cases of **Johnson** and **Prudential Assurance Co. Ltd** are sound

authorities for this principle. The court in **Prudential Assurance** explains the law where the shareholder claims a loss which is not separate and distinct from the loss suffered by the company but his loss flows from loss suffered by the company. The court opined the following:

> "But what [a shareholder] cannot do is to recover damages merely because the company in which he is interested has suffered damage. He cannot recover a sum equal to the diminution in the market value of his shares, or equal to the likely diminution in dividend, because such a 'loss' is merely a reflection of the loss suffered by the company. The shareholder does not suffer any personal loss. His only 'loss' is through the company, in the diminution of the net assets of the company, in which he has (say) a 3% shareholding. The plaintiff's shares are merely a right of participation in the company on the terms of the articles of association. The shares themselves, his right of participation, are not directly affected by the wrongdoing. The plaintiff still holds all the shares as his own absolutely unencumbered property. The deceit practiced upon the plaintiff does not affect the shares; it merely enables the defendant to rob the company."

[68]     However, the Claimants part company when they submitted that in future, they or either of them are "… *likely to seek an order from the Court in due course that shareholders be entitled to bring derivative proceedings in the name of the Fund to recover the loss suffered by the Fund as a result of the short notice transfers pleaded in paragraph 21*".

[69]     I should quickly say that this is no ground to resist the Application to strike out paragraph 2. The fact of the matter, as properly analysed by Ms Dohmann QC is this:

(i)       No derivative action has been brought by either of the Claimants. *A fortiori*, neither has received the permission of the Court to bring such an action. It is no answer that the respondents [the Claimants] to this application may in the future make an application to bring an entirely separate action that happens to claim the same relief as the existing one.

(ii)      It misunderstands the nature of a derivative action. Such a claim (if brought and if permitted) would by definition be made *by* Y2K against some defendant <u>other than</u> Y2K. It is impossible to understand why the fact that Y2K might possibly be compelled (by the Claimants) to claim some relief against third

parties, should mean that the Claimants should be entitled to seek precisely the same relief against Y2K.

(iii)     If the Claimants or either of them are prepared and permitted to bring such a derivative action and claim the relief which is presently sought in paragraph 2 of the Prayer, then either that claim for relief or this one would be barred for double recovery. It cannot be suggested that the prospect of making a duplicative claim which, even if established, would be barred, should be a reason for not striking out this paragraph.

[70]    The Claimants also contend that the Court has a broad discretion under Section 184I of the BCA to make one or more orders as set out in subsection (2).  Section 184I (2) lists the powers of the Court when an application is made by a member (or beneficial owner of shares) against a company for unfair prejudice as follows:

> "2.    If, on an application under this section, the Court considers that it is just and equitable to do so, it may make such order as it thinks fit, including, without limiting the generality of this subsection, one or more of the following orders:
>
> a)   in the case of a shareholder, requiring the company or any other person to acquire the shareholder's shares;
>
> b)   requiring the company or any other person to pay compensation to the member;
>
> c)   regulating the future conduct of the company's affairs;
>
> d)   amending the memorandum or articles of the company;
>
> e)   appointing a receiver of the company;
>
> f)   appointing a liquidator of the company under section 159 (1) of the Insolvency Act on the grounds specified in section 162 (1) (b) of that Act;
>
> g)   directing the rectification of the records of the company;
>
> h)   setting aside any decision made or action taken by the company or its directors in breach of this Act or the memorandum or articles of the company."

27

[71]     In my view, for the purposes of this Application to strike out the Claim, attention must be paid to the specific subsection under which Y2K seeks to strike out under this ground, rather than looking at the court's wide discretion under section 184I of the BCA.

[72]     In this part of the Application, the Defendant seeks to strike out paragraph 2 of the Prayer in the ASC, which specifically asks for the court to grant an order for the "repayment of all sums withdrawn from the Defendant …and such further orders to achieve that result". Applying the law as outlined above, the relief sought from the Claimants in paragraph 2 of the prayer in the Claim is exorbitant and, if granted, would be prejudicial and unfair to Y2K.

[73]     The Claimants next submitted that the Court could in any event order the relief that is sought by paragraph 2 of the Prayer under paragraph 6 thereof, which seeks *"That such other Order or Orders may be made as the Court thinks fit"*. Learned Queen's Counsel is correct to say that the proposition does not bear scrutiny:

   (i)      If (as Y2K contends) neither of the Claimants is entitled to seek the relief claimed in paragraph 2 of the Prayer, then its striking out determines a very simple issue between the parties.

   (ii)     The relief sought by paragraph 2 is exorbitant. It is a claim to unwind a series of redemption transactions which would entail the repayment of millions of dollars by a number of former shareholders and (presumably) Y2K to re-issue the redeemed shares to each of those shareholders. It is not conceivable that the Court would order such relief.

   (iii)    All these shareholders will have altered their position in good faith in reliance on the redemption and the relevant funds may well by now have been lost in other investments.

[74]     As I see it, paragraph 2 of the Prayer in the ASC ought to be struck out.

## Ancillary issue of distribution

[75]     Y2K seeks an order that the Court should declare that Y2K is at liberty to distribute its remaining net assets to its shareholders in accordance with their respective entitlements. It

is unnecessary for the Court to make such an order given two significant facts namely (i) there is no injunction against Y2K and (ii) the claim against Y2K has been struck out in its entirety.

**Conclusion**

[76]   For all of the above reasons, I will make the following orders:

(i)    Headstart Class F Holdings Limited be struck out as a Claimant in these proceedings; the only Claimant being Citco Global Custody NV.

(ii)   The Claim should be struck out in its entirety as it discloses no reasonable grounds for the claim to be brought.

(iii)  Costs will be awarded to Y2K Finance Limited. This Court did not hear counsel on the applicable costs regime. In the circumstances, it may be helpful to make a provisional order for costs to be assessed in accordance with CPR 65.12, if not agreed[23]. Y2K is to submit its bill of costs in accordance with CPR 65.12 (4) within 30 days; such assessment will be carried out by me in accordance with CPR 65.12 (2).

[77]   Last but not least, I thank all Counsel for their sterling contribution and their extreme patience in awaiting this decision.

**Indra Hariprashad-Charles**

High Court Judge

---

[23] See CPR 26.5 (7) which states "If the party wishing to obtain judgment is a defendant, judgment must be for assessed costs. See also: BVIHCV2006/0307- Michael Wilson & Partners, Limited v Tigerkhan – written judgment delivered on 30 June 2008 – per Hariprashad-Charles J [unreported].