SAINT CHRISTOPHER & NEVIS
NEVIS CIRCUIT

IN THE COURT OF APPEAL

CIVIL APPEAL NO.9 OF 2001

BETWEEN:

W. T. WESTERN LIMITED

and

IAN SIMPSON

and

ANNE SIMPSON

Appellants

and

JEFFREY COLEN
[Lawful Attorney of Joan E. Kroehling]

Respondent

**Before:**
    The Hon. Sir Dennis Byron      Chief Justice
    The Hon. Mr. Albert Redhead      Justice of Appeal
    The Hon. Mr. Ephraim Georges      Justice of Appeal [Ag.]

**Appearances:**
    Mr. Emile Ferdinand for the Appellant
    No appearance for the Respondent

--------------------------------------------------
    2002:    April 16;
                 May 27.
--------------------------------------------------

JUDGMENT

[1]    **BYRON, C.J.:**  This is an appeal against the decision of Bruce-Lyle J delivered on 6th April 2001 in which he disallowed claims by the Respondent for specific performance of an agreement for sale of property and for damages for breach of the said contract but nonetheless ordered that judgment be entered in favour of the Respondent for the

1

        Appellants to pay to the Respondent the sum of US$50,000.00 being 10% deposit as per clause 3 of the said agreement for sale, and one half of his costs to be taxed if not agreed.

[2]    The Notice of Appeal raised several grounds of appeal. The main issues are whether:

    [i]    It was wrong in law and on the evidence to find the second and third defendants personally liable.

    [ii]    It was wrong in law to conclude that there was a binding contract between the parties.

[3]    I think that it is necessary to mention that the respondent did not appear in person or by counsel at the hearing of the appeal. Written skeleton arguments had been filed by the appellant on the 8th of March 2002. We decided to proceed.

**The Background Facts**

[4]    The basic facts were not in dispute. The second and third Appellants are married to each other and live in England. The first Appellant is a limited liability company with its registered offices in Chipping Norton, Oxfordshire, in England. The second Appellant is a director and the third appellant is secretary of the first Appellant. The Respondent resides in Gladwyne, Pennsylvania, United States of America. The learned trial Judge found that the Respondent was owner of property, in Nevis as Attorney for Joan Kroehling, including his home at Hog Valley and Mount Pleasant Estate, which is the property in dispute in this case. He is a qualified Attorney-at-Law.

[5]    A document of agreement which commenced as follows was prepared:

> "This agreement is made the 4th day of April 1997 between Jeffrey A. Colen of Gladwyne, PA, USA the lawful Attorney of Joan E. Froehling of the USA (hereinafter called "the vendor"…..) of the one part and W.T. Western Limited a company incorporated under the laws of England with its registered office in England ( hereinafter called "the Purchasers" which expression shall where the context so requires or admits shall include its assigns) of the other part."

        The seal of the first appellant company was affixed to it and it bore the signatures of the second Appellant as director and the third Appellant as secretary of the first Appellant. This document was sent to the respondent by Solicitor Ms. M. Walwyn.

[6]    When the Respondent received the document he amended it. Paragraph 2 described the property to be sold as "2.19 acres with dwelling house thereon and the furniture therein and the Generator". The Respondent wrote in his handwriting at the end of the paragraph "excepting three coconut tables", and initialed the added entry. Paragraph 7 contained an agreement conferring a "right of first refusal" for a two-acre lot on the western boundary of the parcel being sold. The Respondent deleted this paragraph and initialed his marks of deletion. The document thus amended was signed by the Respondent and returned to the solicitor. The Appellants took legal advice and decided to withdraw from the intended purchase. The Respondent, then signed the original agreement without his alterations and returned this to the appellant's solicitor.. No deposit was paid in respect to the purchase price. The parameters of the dispute was articulated in two letters. Daniel, Brantley & Associates, Solicitors wrote Ms. Walwyn on behalf of the respondent as follows:

> "The intentions were made clear in a letter date the 6th day of May, 1997 when Mr. Simpson wrote to the effect that upon the advice of a Mr. K. B. DaCosta the Purchaser was withdrawing from the agreement as there had been a counter offer by our client which had destroyed the offer of W.T. Western Limited. We deny that there was ever any such counter offer whether in fact or in law. Our client merely queried the inclusion of a particular clause in the agreement and promptly agreed to the inclusion thereof when Mr. Simpson insisted. We therefore feel Mr. Simpson acted less than honourably in the circumstances and his letter of May 6th 1997 and his continued refusal to allow the company to perform its obligations under the agreement amount to a gross breach of contract."

[7]    In a letter signed by the second appellant as director of the first appellant a reply was sent which included the following comments:

> "The fact that Mr. Colen changed the form of the contract we were at that time prepared to enter into by deleting Clause 7. He did not, as you suggest, "merely query" the inclusion of it. He crossed it out and signed his part of the agreement with it deleted. Accordingly, as a matter of contract law, when your client deleted Clause 7 he effectively made a new offer to sell which we rejected. His alteration cancelled the old contract. It could be said that we made an "offer" including clause 7; Mr. Colen rejected that offer by deleting it; Mr. Colen made a counter offer which we rejected. An "offer" and "acceptance" are the basic building blocks

3

of a contract. In addition there was no intention by us to create legal relations based on a contract without Clause 7."

### Personal Liability

[7]  The appeal on the issue of personal liability arose because the learned trial Judge found thus:

> "Although I agree that the Company is a separate legal entity or persona, its officers signed on its behalf and as such cannot divorce themselves from the agreement or hide behind it – **Salomon vs Salomon** case. They are therefore personally liable for any breaches flowing from the said agreement. This I hold to be settled law."

[8]  **Salomon v Salomon & Co Ltd** is in fact a leading case on this issue and was recently considered in **Maclaine Watson v Dept. of Trade** (1989) 3 All E R 523 (H.L.) per Lord Templeman at p.531:

"In **Salomon v Salomon & Co Ltd** (1897) A.C. 22 at 30, (1895-9) All E.R. Rep. 33 at 35 Lord Halsbury LC pointed out:
> "...once a company has been legally incorporated it must be treated like any other independent person with rights and liabilities appropriate to itself, and the motives of those who promote the company ( e.g., to enable them to trade with the benefit of limited liability ) are absolutely irrelevant in discussing what those rights and liabilities are."

Since Salomon's case, traders and creditors have known that they do business with a company at their peril if they do not require guarantees from members of the corporation or adequate security."

And per Lord Oliver at p.553:

> "..the consequences in English law of the creation of an artificial person, separate from the members who compose it, is that that artificial person alone is answerable for the debts which it incurs in its own name and for its own benefit.."

And at p.556:

> "..there appears to me to be no escape from the principle established by this house in **Salomon v Salomon & Co. Ltd** (1895-9) All E.R. Rep. 33, where the suggestion that **Salomon & Co. Ltd** carried on business as agents for the corporators was firmly and decisively rejected."

[9]  With due respect, the cases and learning show the settled law is exactly the opposite of what the learned trial Judge stated it to be. Persons who sign as officers of a company are not liable for the obligations of the company for that reason only.  The law is that a company is a separate and distinct legal person from its members and its officers.  The learned trial Judge accepted the erroneous submissions by counsel as to the effect of **Salomon's** case. The conclusion of the learned trial Judge must be reversed, and the appeal allowed on behalf of the second and third appellants.

The Binding Contract

[10]  The learned trial Judge ruled that there was a binding contract and reasoned as follows: :

> "As per their discussions the plaintiff said there were two clauses included in this written faxed document that did not reflect their oral discussions. He made the necessary adjustments to reflect their oral discussions before sighing the document and sending it back through his lawyers to the defendants.  He later learnt through his solicitor that the defendants were insisting on him sign the document as it was sent to him, without amendments or adjustments.  The original of the faxed copy then reached the plaintiff and pursuant to discussions with his solicitor he signed the agreement without the adjustments made on the faxed copy which had been rejected by the defendants.  I agree therefore with learned counsel for the plaintiff, that the plaintiff at no time counter-offered to the defendants, and that the plaintiff by signing the original agreement without the adjustments had completed or agreed with what the defendants had offered or wanted.  Therefore there was acceptance."

[11]  The law is set out in Chitty on Contracts 28th Ed. Volume 1 Paras 2-029 and 2-084.

> "2-029:  **Correspondence between acceptance and offer**.  A communication may fail to take effect as an acceptance because it attempts to vary the terms of the offer.  Thus an offer to sell 1,200 tons of iron is not accepted by a reply asking for 800 tons; an offer to pay a fixed price for building work cannot be accepted by a promise to do the work for a variable price; an offer to supply goods cannot be accepted by an "order" for their "supply and installation".  Nor, generally, can an offer be accepted by a reply which varies one of its other terms (eg. that specifying the time of performance), or by a reply which introduces an entirely new term.  Such a reply is not an acceptance; but it may, on the contrary, be a counter-offer, which the original offeror can then accept or reject."

> "2-084:  **What amounts to rejection; counter-offers**.  A rejection terminates an offer, so that it can no longer be accepted.  For this purpose, an attempt to accept an offer on new terms (not contained in the offer) may be a rejection accompanied

5

by a counter-offer. Thus in *Hyde v Wrench* the defendant offered to sell a farm for £1,000. The offeree replied offering to buy for £950, and when that counter-offer was rejected, purported to accept the defendant's original offer to sell for £1,000. It was held that there was no contract as the offeree had, by making a counter-offer of £950, rejected, and so terminated, the original offer."

[11]   The point was expressed with equal cogency in the letter sent by the appellant to the respondent's solicitor, which I would categorise as a correct exposition on the legal issue.

[12]   The facts as found by the learned trial Judge applied to the learning clearly indicate that there was a counter-offer. The offer to purchase was contained in the signed written agreement submitted by the first Appellant to the Respondent. The Respondent caused two variations to the offer. It is true that in giving his evidence he referred to conversations on these points which according to him reflected the points he inserted in the agreement.

[13]   These did not fall within the definition of an inquiry. They were not elucidations but variations of the agreement. The Respondent physically amended the document and then initialed the amendments and signed the agreement. In my view this action changed the terms offered by the first appellant and constituted a counter offer which if accepted would have been the basis of the contract of sale. The law is clear that this rejects the original offer. The new terms required acceptance before there could be said to be a binding contract. There could be no reversion to the original terms without the original offer having been renewed expressly or impliedly. There was no evidence or allegation or any such renewal and clearly there was none.

[14]   In my view therefore there was no contract at all. The appellant also succeeds on this issue.

**The Deposit**

[15]   The contract documents contained Clause 2 as follows:

"The price of the property shall be Four Hundred and Twenty-eight Thousand Eight Hundred and Fifty-six Dollars United States Currency ($428,856.00 U.S.) allocated as follows:

6

> (i)  Fifty-five Thousand Dollars United States Currency ($55,000.00) for the furniture contained therein and US$373,856.00 for the Realty.  (i.e. house & land) and the generator.
> A deposit of 10% (of the cost of furniture, generator and Realty) being US$42,885.60 to be paid to the law offices of Daniel Brantley and Associates on behalf of Vendor on the signing of this agreement.  The balance of Three Hundred and Eighty-five Thousand Nine Hundred and Seventy Dollars and Forty cents ($385,970.40) U.S to be paid 4 days of the Registration of the Alien Land Holding Licence which will be the closing date."

[16]   This deposit was not paid and could not have been due unless there was an agreement of sale. It is clear that if there is no binding contract the purchaser could have no liability to pay the deposit. The order made by the learned trial judge must be set aside for this reason. I must however, go on to add that I find that the order to pay the deposit was inconsistent with the refusal of the order for specific performance.  An order for specific performance against a purchaser would compel the payment of the purchase price which in this case  was payable in two installments the deposit being the first such installment.. Therefore the order refusing specific performance included the deposit.

Costs

[17]   The Appellant appealed against the Order of the Court that the Respondents will have one half of their costs of the trial to be taxed if not agreed.    Under CPR2000 the learned trial Judge was expected to quantify the costs and include the sum in his judgment. It is no longer acceptable to make an order for taxation of costs to be conducted by another judicial officer at some future time.  We have decided that in this case we should merely set aside the order for costs in favour of the respondent and make no further order for the costs at the trial.  We have decided that the appellants should get the costs on appeal. The detailed  provisions for costs at the trial are prescribed in the said rules CPR 2000  at Parts 64 and 65  In this case the costs come under the prescribed costs rule, Part 65.5, and although the claimant sued for US$428,866.00, the sum actually ordered and against which this appeal was made was US$50,000.00 computed at EC$135,000.00. We have decided that the costs are to be calculated on the value of the order of the learned trial Judge.  The basic computation of the prescribed costs is set out Part 65  Appendix B at the

7

rate of 15%. The costs therefore are 15% of EC$135,000. This works out at $29,250.00. Part 65.13 stipulates that on appeal the costs to be allowed should limited to two-thirds of the amount that would otherwise be ordered. I calculate the sum to be $19,500.00.

**Order**

[18]  I would allow the appeal and set aside the order of the learned trial Judge in the Court below. The costs on appeal are awarded to the appellants against the respondent quantified in the sum of $19,500.00.

Sir Dennis Byron  
Chief Justice

[19]  **GEORGES J.A. [Ag.]:** This appeal stems from an action for breach by the appellants of an alleged agreement dated 14th April, 1997 for sale by the respondent of a plot of land situate at Hog Valley and Mount Pleasant Estate Nevis comprising 2.19 acres with dwelling house thereon and the furniture therein as well as the generator for the price of US$428,856.00 of which a deposit of 10% was to have been paid on the signing of the agreement.

[20]  The said agreement which was prepared by the appellants' solicitor recites and was ostensibly made between the respondent as vendor and the first appellant company a company incorporated under the laws of England as purchaser and was signed by the second and third appellants as director and secretary respectively of the first appellant company and was executed under the common seal of the company.

[21]  A copy of the agreement was thereupon faxed to the respondent in the USA who on receipt unilaterally altered clauses 2 and 7 by excluding from the furniture 'three wood coconut tables' which were to have been included in the sale and by deleting a right of first refusal which the purchaser should have to purchase a further 2 acre plot of land on the western boundary of the area of land being purchased.

[22]　After making and initialing those alterations to the original agreement the respondent faxed a copy of it to the appellants' solicitor for onward transmission to the appellants.

[23]　For all intents and purposes negotiations between the parties broke down thereafter and all communications from the appellants to the respondent via his solicitor were to the effect that the appellants were unwilling to treat on the amended terms. Whereupon the respondent sought to bind them to the original (unamended) agreement by bringing an action for breach of contract.

[24]　The foregoing is as I see it a convenient summary of the agreed facts upon which the respondent's claim is founded.

[25]　Notwithstanding the trial judge's specific finding that the agreement in question is stated to have been between the respondent as vendor of the one part and **the first appellant company** a separate legal entity with a distinct legal and corporate persona as purchaser of the other part (purporting to follow the seminal case of **Saloman v. A. Saloman & Co. Ltd. (1897) AC 22**) he nevertheless held the second and third appellants "personally liable for any breaches flowing from the said agreement."

[26]　The learned trial Judge opined that since the second and third appellants had signed the agreement on behalf of the first appellant company "they could not divorce themselves from the agreement or hide behind it."

[27]　That reasoning is with respect patently flawed for as Mr. Ferdinand pointed out in his skeleton arguments Lord Oliver in **Maclaine Watson v. Dept of Trade (1989) 3ALL ER 523 (HL) AT 533C** confirmed that:

> "………the consequence in English law of the creation of an artificial person separate from the members who compose it, is that that artificial person alone is answerable for the debts which it incurs in its own name and for its own benefit…"

[28]   The documentary evidence clearly shows that it was only the first appellant company which purported to have entered into the sale agreement as purchaser with the respondent vendor and this is confirmed by fixation of the common seal of the company to the agreement.  In the circumstances therefore neither of the individual appellants who signed as officers of the company can be held to be personally liable under the agreement.

[29]   The other issue which falls to be decided is whether having regard to all the circumstances a binding agreement had been concluded between the parties.  At paragraph 21 of his judgment the learned trial Judge wrote:

> "The intent of the parties to my mind is clear on examining the manner in which the events unfolded.  To my mind again a valid agreement existed between the plaintiff and the defendants by way of the two agreements – faxed copy with the adjustments and the original agreement without the adjustments.  Having so held, I also hold that the plaintiffs' adjustments made on the faxed copy of the agreement amounted to 'mere inquiry' and does not go against the tide of the evidence.  What the plaintiff did was to adjust the agreement to reflect his discussions with the second defendant by telephone.  This piece of evidence is uncontroverted."

[30]   He went on to hold the appellants "jointly and severally liable for breach of the contract signed between themselves and the respondent" and ordered that they pay to the respondent the sum of US$50,000.00 being 10% deposit as agreed  per clause 3 of the said agreement and "one half of the respondent's costs to be taxed if not agreed."  He declined specific performance of the agreement.

[31]   It is my considered view that the learned trial judge fell in error when he held that the alterations/adjustments made by the respondent to the original agreement which had been faxed to him by the appellants' solicitors constituted 'mere inquiry'.  For the weight of judicial authority clearly shows that such changes are in fact tantamount in law to rejection of the original offer and represent a counter-offer, which the other side is free to accept or to reject.  The case of **Hyde v. Wrench (1840) 3 Beav. 334; 49 ER 132 (Rolls Court)** is apposite.

[32] In that case the defendant on 6th June offered in writing to sell his farm for £1,000; the plaintiff offered £950, which the defendant, on 27th June, refused to accept. On 29th June, the plaintiff, by letter, agreed to give £1,000, but the defendant did not indicate assent to this. Held: there was no binding contract for the purchase of the farm.

[33] The ratio of the Master of the Rolls Lord Langdale aptly illustrates the position when he declares:

> "……Under the circumstances stated in this bill, I think there exists no valid binding contract between the parties for the purchase of the property. The defendant offered to sell it for £1,000, and if that had been at all unconditionally accepted, there would undoubtedly have been a perfect binding contract, instead of that, the plaintiff made an offer of his own to purchase the property for £950, and he thereby rejected the offer previously made by the defendant. I think that it was not afterwards competent for him to revive the proposal of the defendant, by tendering an acceptance of it, and that, therefore, there exists no obligation of any sort between the parties……."

This was confirmed more recently by the Court of Appeal in **Norfolk County Council v. Dencora Properties Ltd (1995) EGCS 173** and is also exemplified in the Court of Appeal judgment of Wooding CJ in **Sousa v. Marketing Board (1962) 5 WIR 152 at 161F** where the learned jurist held that as a matter of law such a counter-offer had the effect of destroying the original offer.

[34] As Mr. Ferdinand contends at paragraph 4.2(c) of his skeleton arguments, I am fully satisfied and accept that by making the changes which he did to the original agreement and communicating those amendments back to the appellants' solicitor in Nevis the respondent was in law making a counter-offer and it was not thereafter open to him to revive the original (unamended) agreement/offer by acceptance of it. In short the respondent could not reprobate and approbate.

[35] I accordingly hold that in all the circumstances no legally binding contract was ever concluded between the parties. The appeal is consequently allowed and the order of the learned trial judge set aside with costs of the appeal to the appellants.

[36]    The appellants have appealed against the order of the court that the respondent will have one half of his costs of the trial to be taxed if not agreed and have applied for their costs in the court below and on appeal.  We indicated to Counsel that under CPR2000 the trial judge is expected to quantify the costs and the idea of taxation of costs is now something of the past.  The relevant provision for costs at the trial is to be found at Part 65:5 (1) and (2).

[37]    In this case the court is empowered to calculate the costs to the defendant based on the amount claimed which is US$428,866.00.  However, the court has discretionary powers and is entitled to award costs on the basis of the claimant's entitlement which would be based on the amount actually awarded which was in this case US$50,000.00.  However, in this case on appeal that award has been set aside.  Nonetheless, we would consider that amount as an appropriate value of the proceedings on which to calculate the costs using the prescribed costs at Appendix B.  The costs therefore are 15% of EC$135,000.00.  This works out at $29,250.00.  On appeal the costs are based on 2/3rds of that percentage, which works out at $19,500.00.

[38]    Order accordingly.

**Ephraim F. Georges**
Justice of Appeal [Ag.]

I Concur.                                                                                              **Albert Redhead**
                                                                                                       Justice of Appeal