UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x
                                                     :

                                                     :      Master File No. 09 Civ. 5386

IN RE KINGATE MANAGEMENT          (DAB)

LIMITED LITIGATION                      :

This Document Relates To: All Actions          :

                                                     :

-------------------------------------------------------------------- x

## <u>DECLARATION OF SIMON BROWNE-WILKINSON Q.C.</u>

Pursuant to 28 U.S.C. §1746, Simon Browne-Wilkinson Q.C. deposes and says:

1.  I was called to the Bar of England and Wales in 1981 and appointed as a Queen's Counsel in 1998. I was called to the Bar of the British Virgin Islands in 2009. I specialise in commercial litigation and, in particular, the field of civil fraud. My curriculum vitae is attached as Exhibit 1 to this declaration.

2.  I have read the Amended Consolidated Class Action Complaint ("Compl.") brought against Citi Hedge Fund Services Limited ("Citi Hedge") in the Southern District of New York and have been asked to advise whether it discloses a reasonable cause of action by the Plaintiffs against Citi Hedge. I have also been asked to consider Counts 21 to 28 against Citi Hedge.

3.  For these purposes, I have been asked to assume that the law governing the relationship between the Plaintiffs and Citi Hedge is that of the British Virgin Islands, which comprises the principles of English common law subject to any local statutory provisions.

4.  The Claim is brought as a class action on behalf of all shareholders in Kingate Global Fund, Ltd. and Kingate Euro Fund, Ltd. ("the Funds"), two hedge funds that allegedly invested all of their assets in Bernard L. Madoff Investment Securities LLC ("Madoff"), and it is said of the Plaintiffs that "their claims are typical, and they do not have interests antagonistic to, or in conflict with those of the Class". Compl. ¶ 239. It is said that "Plaintiffs bring this action as a

class action . . . on behalf of all persons or entities who owned shares of the Funds as of December 10, 2008, and were damaged thereby". Compl. ¶ 6.

5.   The claims made against Citi Hedge include Breach of Fiduciary Duty (Count 21), Gross Negligence (Count 22), Negligence (Count 23), Negligent Misrepresentation (Count 24), Third Party Beneficiary Breach of Contract (Count 25), Aiding and Abetting Breach of Fiduciary Duty (Count 26), Aiding and Abetting Fraud (Count 27), and Unjust Enrichment (Count 28).

6.   The damages claimed by the Plaintiffs are in respect of their lost investments in the Funds. See, e.g., Compl. ¶¶ 1, 3, 48-49, 68-69, 102, 204, 206, 357, 363, 367, 374. They also make claims for the return of fees paid to Citi Hedge. Compl. ¶¶ 4, 396.

**The Rule Against Reflective Loss**

7.   In my view, each of the claims made by the Plaintiffs offends the rule against claims for reflective loss as recently reaffirmed by the House of Lords in *Johnson v. Gore Wood & Co. (a firm)* [2002] 2 AC 1 (H.L.), which authority would be applied in the Courts of the British Virgin Islands and forms part of the law of that territory. As such, the claims would be bound to fail and would be struck out (in English and BVI practice a claim will be "struck out" when a Court, whilst assuming the allegations of fact are true, nonetheless concludes that the claim is bound to fail as a matter of law).

8.   The rule against claims for reflective loss was stated by Lord Bingham, [2002] 2 AC 1, 35E-F, as follows:

> "These authorities support the following propositions. (1) Where a company suffers loss caused by a breach of duty owed to it, only the company may sue in respect of that loss. No action lies at the suit of a shareholder suing in that capacity and no other to make good a diminution in the value of the shareholder's shareholding where that merely reflects the loss suffered by the company. A claim will not lie by a shareholder to make good a loss which would be made good if the company's assets were replenished through action against the party responsible for the loss, even if the company, acting through its constitutional organs, has declined or failed to make good that loss . . . (2) Where a company suffers loss but has no cause of action to sue to recover that loss, the shareholder in the company may sue in respect of it (if the shareholder has a cause of action to do so), even though the loss is a diminution in the value of the shareholding. . . . (3) Where a company suffers loss caused by a breach of duty to it, and a shareholder suffers a loss separate and distinct from that

2

suffered by the company caused by breach of a duty independently owed to the shareholder, each may sue to recover the loss caused to it by breach of the duty owed to it but neither may recover loss caused to the other by breach of the duty owed to that other."

9.   At [2002] 2 AC 1, 36B-D, Lord Bingham stated the relevant inquiry at the strike-out stage as follows, namely:

"the object is to ascertain whether the loss claimed appears to be or is one which would be made good if the company had enforced its full rights against the party responsible, and whether (to use the language of *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204, 223) the loss claimed is 'merely a reflection of the loss suffered by the company.' In some cases the answer will be clear, as where the shareholder claims the loss of dividend or a diminution in the value of a shareholding attributable solely to depletion of the company's assets, or a loss unrelated to the business of the company."

10.    At [2002] 2 AC 1, 62E-63A, Lord Millett's judgment further explained the above principles:

"The position is, however, different where the company suffers loss caused by the breach of a duty owed both to the company and to the shareholder. In such a case the shareholder's loss, in so far as this is measured by the diminution in value of his shareholding or the loss of dividends, merely reflects the loss suffered by the company in respect of which the company has its own cause of action. If the shareholder is allowed to recover in respect of such loss, then either there will be double recovery at the expense of the defendant or the shareholder will recover at the expense of the company and its creditors and other shareholders. Neither course can be permitted. This is a matter of principle; there is no discretion involved. Justice to the defendant requires the exclusion of one claim or the other; protection of the interests of the company's creditors requires that it is the company which is allowed to recover to the exclusion of the shareholder. These principles have been established in a number of cases, though they have not always been faithfully observed. The position was explained in a well known passage in *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204, 222-223:

'But what [the shareholder] cannot do is to recover damages merely because the company in which he is interested has suffered damage. He cannot recover a sum equal to the diminution in the market value of his shares, or equal to the likely diminution in dividend, because such a 'loss' is merely a reflection of the loss suffered by the company. The shareholder does not suffer any personal loss. His only 'loss' is through the company, in the diminution of the value of the net assets of the company, in which he has (say) a 3% shareholding. The plaintiff's shares are merely a right of participation in the company on the terms of the articles of association. The shares themselves, his right of

3

> participation, are not directly affected by the wrongdoing. The plaintiff
> still holds all the shares as his own absolutely unencumbered property.
> The deceit practised upon the defendant does not affect the shares; it
> merely enables the defendant to rob the company. . . .'

. . . It is equally obvious, however, that if the damages were recoverable by the shareholder instead of by the company, this would achieve the same extraction of the company's capital to the prejudice of the creditors of the company as the defendant's misappropriation had done."

11.    Lord Goff and Lord Hutton, also on the panel of *Johnson v. Gore Wood & Co. (a firm)*, gave judgments substantially in accordance with those of Lord Bingham and Lord Millett and the claims of the plaintiff that offended against the rule against reflective loss were struck out.

12.    In *Gardner v. Parker*, [2004] EWCA Civ 781, ¶ 33, the Court of Appeal summarised the principles to be derived from *Johnson v. Gore Wood*, as follows:

"(1)    a loss claimed by a shareholder which is merely reflective of a loss suffered by the company – i.e. a loss which would be made good if the company had enforced in full its rights against the defendant wrongdoer – is not recoverable by the shareholder save in a case where, by reason of the wrong done to it, the company is unable to pursue its claim against the wrongdoer;

(2)    where there is no reasonable doubt that that is the case, the court can properly act, in advance of trial, to strike out the offending heads of claim;

(3)    the irrecoverable loss (being merely reflective of the company's loss) is not confined to the individual claimant's loss of dividends on his shares or diminution in the value of his shareholding in the company but extends to 'all other payments which the shareholder might have obtained from the company if it had not been deprived of its funds' and also to other payments which the company would have made if it had had the necessary funds even if the plaintiff would have received them qua employee and not qua shareholder save that this does not apply to the loss of future benefits to which the claimant had an expectation but no contractual entitlement;

(4)    the principle is not rooted simply in the avoidance of double recovery in fact; it extends to heads of loss which the company could have claimed but has chosen not to and therefore includes the case where the company has settled for less than it might . . . ;

(5)    provided the loss claimed by the shareholder is merely reflective of the company's loss and provided the defendant wrongdoer owed duties both to the company and to the shareholder, it is irrelevant that the duties so owed may be different in context."

13.     There is no distinction in this respect between the damages claims made by the Plaintiffs and the restitutionary claims. The principles and policy underlying the decision in *Johnson v. Gore Wood* apply equally to both types of claim, and the fact such claims are equally barred was confirmed by the Court of Appeal in *Gardner v. Parker*. At paragraph 49 Lord Neuberger, the Master of the Rolls, with whom Mance LJ and Bodey J agreed, stated:

> "It is clear, from the analysis and discussion in the cases to which I have referred, that the rule against reflective loss is not concerned with barring causes of action as such, but with barring recovery of certain types of loss. On that basis, there is obviously a powerful argument for concluding, as this court did in Shaker, that, whether the cause of action lies in common law or equity, and whether the remedy lies in damages or restitution, should make no difference as to the applicability of the rule against reflective loss."

14.     The principles enunciated in *Johnson v. Gore Wood & Co.* and summarised in *Gardner v. Parker* appear to me to be precisely in point. Even assuming, for the sake of analysis, that Citi Hedge owed and breached duties to the Plaintiffs, the claim is for the diminution in the value of their shareholdings in the Funds attributable to the depletion of the Funds assets in consequence of Madoff's misappropriations. As such the only proper plaintiffs in respect of any such losses are the Funds themselves, and claims by the shareholders themselves are bound to fail since their losses are merely reflective of the losses suffered by the Funds.

15.     Section 184C of the BVI Business Companies Act of 2004 ("the BC Act"), as amended, sets out the procedure for a shareholder to seek leave from the High Court of the British Virgin Islands ("High Court") to file a derivative action. Under Section 184C:

> "(3) Leave to bring or intervene in proceedings may be granted under subsection (1) only if the [High] Court is satisfied that
>
> (a)     the company does not intend to bring, diligently continue or defend, or discontinue the proceedings, as the case may be; or
>
> (b)     it is in the interests of the company that the conduct of the proceedings should not be left to the directors or to the determination of the shareholders or members as a whole."

The High Court must take into account the shareholder's good faith, the interests of the company, the views of the directors, the likelihood of success, the likely costs of the proceedings and the availability of alternative remedies to the derivative claim.

## Count 21 – Breach of Fiduciary Duty

16.     Count 21 alleges that Citi Hedge owed fiduciary duties to the Plaintiffs, who are shareholders of the funds, Compl. ¶ 356, and that it breached those duties, as a result of which the Plaintiffs suffered damage. Compl. ¶ 357.

17.     The relevant principles of BVI law are as follows: There are a number of settled categories of fiduciary relationship such as agent and principal, solicitor and client, company directors and the company, and partners where there is a strong presumption that fiduciary obligations (in the sense explained below) are owed. See SNELL'S EQUITY 7-06 (31st ed. 2004). The administrator of a hedge fund is not within such settled categories.

18.     The categories of fiduciary relationships are not closed. Fiduciary duties may be owed despite the fact that the relationship does not fall within one of the settled categories of fiduciary relationships, provided the circumstances justify the imposition of such duties. See SNELL'S EQUITY, 7-07.

19.     In *Bristol & West Building Society v. Mothew*, [1998] Ch. 1, 18A-F, Millet, L.J., set out the central aspects of the inquiry:

> "A fiduciary is someone who has undertaken to act for or on behalf of another in a particular matter in circumstances which give rise to a relationship of trust and confidence. The distinguishing obligation of a fiduciary is the obligation of loyalty. The principal is entitled to the single-minded loyalty of his fiduciary. This core liability has several facets. A fiduciary must act in good faith; he must not make a profit out of his trust; he must not place himself in a position where his duty and his interest may conflict; he may not act for his own benefit or the benefit of a third person without the informed consent of his principal. This is not intended to be an exhaustive list, but it is sufficient to indicate the nature of fiduciary obligations. As Dr. Finn pointed out in his classic work Fiduciary Obligations (1977), p.2, he is not subject to fiduciary obligations because he is a fiduciary; it is because he is subject to them that he is a fiduciary. . . . The nature of the obligation determines the nature of the breach. The various obligations of a fiduciary merely reflect different aspects of his core duties of loyalty and fidelity. Breach of fiduciary obligation, therefore connotes disloyalty or infidelity. Mere incompetence is not enough. A servant who loyally does his incompetent best for his master is not unfaithful and is not guilty of a breach of fiduciary duty."

20.     The analysis of Millett, L.J. was further explained by Elias J. in *Nottingham University v. Fishel* [2000] ICR 1462, at 1490C, as follows:

"It is vital to recognise that, although the key feature identified is the obligation of loyalty, that has a precise meaning, namely the duty to act in the interests of another. This is the fundamental feature which, in this category of relationship at least, marks out the relationship as a fiduciary one."

21.     No specific fiduciary duty is positively identified in Count 21. However it appears from paragraph 356 and the allegations of breach made therein that the duties alleged are:

a)     To discharge properly Citi Hedge's responsibility as Administrator;

b)     Not to communicate fictitious fund valuations to the Plaintiffs and the Class;

c)     Not to entrust its responsibilities to BMIS without adequate supervision and control.

22.     The basis on which it is alleged that Citi Hedge owed the Plaintiffs fiduciary duties is "Citi Hedge's discretion, control, and superior position over the Plaintiffs and the Class". Compl. ¶ 355. Applying the above principles of BVI law to the allegations made in Count 21, it can be observed that:

a)     The duties alleged by the Plaintiffs are not fiduciary duties;

b)     Accordingly Citi Hedge cannot have been a fiduciary of the Plaintiffs, since a fiduciary is someone who owes fiduciary duties;

c)     No breach of any fiduciary duty (in the true sense) has been pleaded. The allegations are of a lack of competence, rather than a lack of loyalty.

## Counts 22, 23 and 24 – Gross Negligence, Negligence and Negligent Misrepresentation

23.     In Count 22 it is alleged that Citi Hedge owed a duty to the Plaintiffs and the Class "to exercise reasonable care in providing administrative and financial services to the Funds," that "Citi Hedge grossly failed to exercise due care," and that "as a direct and proximate result" the Plaintiffs and the Class lost their investments in the Funds. See Compl. ¶¶ 361-63.

24.     In Count 23 it is alleged that Citi Hedge "had a special relationship with the Plaintiffs and the Class that gave rise to a duty to exercise due care," that Citi Hedge breached such a duty, and that as a result the Plaintiffs and the Class lost their investments in the Funds. See Compl. ¶¶ 365-67.

25.    In Count 24 it is alleged that Citi Hedge owed a duty to the Plaintiffs and the Class "to impart correct information" to the Plaintiffs and the Class, that representations made by Citi Hedge in NAV calculations and account balance information were "false," that Citi Hedge acted "recklessly" in relation to that information, and that as a result of their reliance upon false representations made by Citi Hedge, the Plaintiffs lost their investments in the Funds. See Compl. ¶¶ 369-77.

26.    In paragraphs 54 to 69 of the Complaint it is alleged that the funds invested by the Plaintiffs with the Funds were fraudulently misappropriated by Madoff for his personal benefit.[1]

27.    There is no separate tort of "gross negligence" independent of the tort of negligence under BVI law. Negligence consists of the breach of a duty of care that causes damage, and if such a breach is established the degree or seriousness of that breach is immaterial[2] (other than in relation to issues of contributory negligence). "Gross negligence" is not known to the English common law so far as civil proceedings are concerned . . .", per Lynskey J. in *Pentecost v. London District Auditor* [1951] 2 KB 759, 764.

*The Existence of a Duty of Care to Prevent Pure Economic Loss*

28.    BVI law draws a distinction between physical damage and pure economic loss. The loss claimed by the Plaintiffs appears to be pure economic loss.

29.    In the case of physical damage the reasonable foreseeability of harm is sufficient to generate a duty of care.[3] In the case of pure economic loss more is required to give rise to a duty of care to avoid such loss.

30.    Three tests have been developed for the existence of a duty of care to avoid pure economic loss, as summarised by Lord Bingham in *Her Majesty's Commissioners of Customs and Excise v. Barclays Bank plc* [2007] 1 AC 181, at paragraph 4: a) whether the defendant

---

[1]    See, in particular, Compl. ¶ 60.

[2]    Lord Goddard CJ in *Pentecost v. London District Auditor* [1951] 2 KB 759, 766.

[3]    See, for example, Lord Hoffman In *Her Majesty's Commissioners of Customs and Excise v. Barclays Bank plc* [2007] 1 AC 181 at paragraph 31.

assumed responsibility to the plaintiff, b) whether the loss suffered by the plaintiff was reasonably foreseeable, whether there was sufficient proximity between the plaintiff and the defendant, and whether it was fair, just and reasonable to impose a duty of care on the defendant, and c) whether a duty would be incremental and analogous to cases in which duties of care had already been established.

*The Scope of a Duty of Care*

31.    In each case it is necessary to determine the scope of the duty of care by reference to the kind of damage from which A must take care to save B harmless (i.e., the kind of damage A was obliged to avoid or protect B from). This is illustrated by the judgment of Laddie J. in *Bank of Credit and Commerce International (Overseas) Ltd v. Price Waterhouse* [1999] BCC 351, between paragraph 26 and 28:

> "'It is never sufficient to ask simply whether A owes B a duty of care, it is always necessary to determine the scope of the duty by reference to the kind of damage from which A must take care to save B harmless. . . . The question is always whether the defendant was under a duty to avoid or prevent that damage, but the actual nature of the damage suffered is relevant to the existence and extent of any duty to avoid or prevent it.'"

(citing *Caparo Industries plc v Dickman* [1990] B.C.C. 164 at 176E; [1990] 2 AC 605 (Lord Bridge)).

> "'[R]eliance, even if probable, thereby establishing proximity, does not establish a duty of care of unlimited scope. Regard must be had to the transaction or transactions for the purpose of which the statement was made. It is loss arising from such transaction or transactions rather than "any loss" to which the duty of care extends.'"

(citing *Caparo Industries* at 203D (Lord Jauncey)).

> "'[T]he duty of care is inseparable from the damage which the plaintiff claims to have suffered from its breach. It is not a duty to take care in the abstract but a duty to avoid causing to the particular plaintiff damage of the particular kind which he has in fact sustained."

(citing *Caparo Industries* at 195D (Lord Oliver)). Put another way,

> "'The question is always whether the defendant was under a duty to avoid or prevent that damage, but the actual nature of the damage suffered is relevant to the existence and extent of any duty to avoid or prevent it.'"

(citing *John Pfeiffer Pty Ltd v. Canny* (1981) 148 CLR 218 at 241-42). Laddie, J., therefore concluded:

> "It follows that even if an adviser is guilty of a breach of duty, he is not liable for all losses which may be said to flow directly or indirectly from that breach."

32.    In *Bank of Credit and Commerce*, Laddie, J., also referred to *Banque Bruxelles Lambert SA v Eagle Star Insurance Co Ltd* [1997] AC 191:

> "In that case the defendant valuers had valued some properties. The valuations were to be used by the plaintiffs as the basis upon which they would decide to advance money on mortgage. The valuations were excessive and negligently so. The property market had collapsed by the time the plaintiffs realised their security. They sought to recover the totality of their loss, including that part attributable to the fall in the value of the property market. This they did on the basis that had they known the true value of the properties they would not have lent at all. They would not have been exposed to the fall in the property market. Therefore all of their losses could be traced back to those valuations."

In that case, Lord Hoffman's judgment made it clear that the defendant is liable only if the plaintiff is able to "show that the duty was owed *to him* and that it was *a duty in respect of the kind of loss which he has suffered*" *Banque Bruxelles*, [1997] AC 191, at p. 211, 1181F (emphasis added). As Lord Hoffman further explained at [213F]:

> "Normally the law limits liability to those consequences which are attributable to that which made the act wrongful. In the case of liability in negligence for providing inaccurate information, this would mean liability for the consequences of the information being inaccurate."

Lord Hoffman therefore found that the valuer defendants were not liable for the loss attributable to the fall in the property market. Id. at 222, 1190G. Laddie, J., added that *Banque Bruxelles*

> "emphasises the importance of identifying the scope of the duty by reference to the kind of damage from which the adviser must take care to save the advisee harmless and the necessity of making that identification at an early stage in the analysis of the advisee's claim. As Lord Hoffman explains, save in special circumstances, the adviser is not an insure[r] of the advisee against all future losses."

*Bank of Credit and Commerce*, [1999] BCC 351, paragraph 30.

33.    In the circumstances alleged by the Plaintiffs, the relevant question for the Court will be whether Citi Hedge owed the Plaintiffs a duty of care to hold them harmless from (i.e. to avoid or prevent) the damage resulting from Madoff misappropriating the assets of the Funds.

34.    In considering whether or not to find that such a duty of care was owed a Court will take into account the principle that the law does not generally impose on a person a duty to protect another from suffering financial loss by reason of the deliberate acts of a third person.

This is established by *Smith v. Littlewoods Ltd.* [1987] 1 AC 241, per Lord Goff 270-272; *Box and Others v. Barclays Bank* [1998] Lloyds Law Rep. Banking 185, per Ferris J. at 205; *Environmental Agency (formerly National Rivers Authority) v. Empress Car Co. (Abertillery) Ltd.* [1999] AC 22, per Lord Hoffman at 30-31.

35.     Similar principles underlay the rule of *novus actus interveniens*, whereby the deliberate act of a third party would be found to break the chain of causation. In *Weld-Blundell v. Stephens* [1920] AC 956, at 986, Lord Sumner stated: "In general … even though A is in fault, he is not responsible for injury to C which B, a stranger to him, deliberately chooses to do."

36.     The modern approach would be to take such considerations into account when deciding whether or not a duty was owed by the Defendant to hold the Plaintiff harmless from loss caused by the deliberate act of a third party, rather than applying them as giving rise to a break in causation.[4] In circumstances in which loss has been caused by the deliberate act of a third party, the Court is more likely to hold that no duty was owed by the defendant to the plaintiff to hold him harmless from that loss, than to find that a duty was owed by the defendant but that there was no sufficient causative link between a breach of that duty and the plaintiff's loss because of the deliberate act of the third party ("novus actus interveniens").

37.     A further factor which has been found to negative the existence of a duty of care is the existence of contracts inconsistent with the existence of such a duty of care[5].

38.     Clerk & Lindsell on Torts 19th Ed. at 10-12 states:

"Duties to third parties: economic loss
. . . (4) There will generally be no duty imposed where the duty owed to the client would conflict with the duty owed to the third party, or where there is a chain of contractual relationships between the professional and his client, and the client and the third party, which would be subverted by the imposition of a direct duty in tort."

---

[4]     See Lord Goff in *Smith v. Littlewoods Ltd.* [1987] 1 AC 241, at 272 B, and Lord Hoffman in *Environment Agency v. Empress Car Co. Ltd.* [1999] AC 22, at 31E.

[5]     *Henderson v. Merrett Syndicates Ltd.* [1995] 2 AC 145, 195-196 per Lord Goff, *Simaan General Contracting Co. v. Pilkington Glass Ltd.* (No.2) [1988] QB 758, 781.

39.     The question that arises in the present case is whether a duty of care owed by Citi Hedge direct to the Plaintiffs would be consistent with the contractual restrictions of liability on the part of Citi Hedge to be found in the Administration Agreement. See Compl. Ex. 15 (Administration Agreement), at §§ 10.3, 10.6.  If it would not that would be a substantial factor tending to negative the existence of a duty of care direct to the Plaintiffs.

40.     This principle was applied by the Court of Appeal in *Simaan General Contracting Co. v. Pilkington Glass Ltd. (No.2)* [1988] 1 QB 758, at 782, when reaching the conclusion that it would not be just and reasonable to find a duty of care to a third party existed because such a duty would be unfair to a defendant since it would render ineffective contractual restrictions negotiated by him. In *Henderson v. Merrett Syndicates Ltd.* [1995] 2 AC 145, at 196 Lord Goff stated " . . . there is generally no assumption of responsibility by the sub-contractor or supplier direct to the building owner, the parties having so structured their relationship that it is inconsistent with any such assumption of responsibility. This was the conclusion of the Court of Appeal in *Simaan General Contracting Co. v. Pilkington Glass Ltd. (No.2)* [1988] QB 758. As Bingham LJ put it, at p. 781: "'I do not, however, see any basis on which the [nominated suppliers] could be said to have assumed a direct responsibility for the quality of the goods to [the building owners]: such a responsibility is, I think, inconsistent with the structure of the contract the parties have chosen to make.'"

### Count 25 – Third Party Breach of Contract

41.     In Count 25, the Plaintiffs assert that (1) Citi Hedge entered into Administration Agreements with the Funds, Compl. ¶ 376, and (2) the Plaintiffs and the Class were third party beneficiaries of the Administration Agreements which evinced a clear intent to benefit the Plaintiffs, Compl. ¶ 377. It is alleged that Citi Hedge breached the Administration Agreements and that "Citi Hedge is liable to Plaintiffs as third party beneficiaries of those contracts". Compl. ¶ 380.

42.     Count 25 thus rests on the premise that a third party beneficiary of a contract is entitled to enforce that contract.

43.    That premise is contrary to the fundamental principle of BVI law that only a party to a contract can enforce a contract, i.e. the rule of privity of contract. It is stated by the leading textbook, 1 CHITTY ON CONTRACTS, 18-001 (30th ed.), that "[u]nder the common law doctrine of privity of contract, the general rule is that contracts cannot be enforced either by or against third parties". To the same effect are paragraphs 18-003 and 18-019.

44.    In *Dunlop Pneumatic Tyre Company, Limited v. Selfridge and Company, Limited* [1915] AC 847 Lord Haldane stated, at 853:

> "My Lords, in the law of England certain principles are fundamental. One is that only a person who is a party to a contract can sue on it. Our law knows nothing of a jus quaesitum tertian arising by way of contract. Such a right may be conferred by way of property, as, for example, under a trust, but it cannot be conferred on a stranger to a contract as a right to enforce the contract in personam."

45.    In *Beswick v. Beswick* [1968] AC 58, the House of Lords proceeded on the assumption that the rule of privity (as stated above) remained good law: see pages 72D, 81G, 92-93, and 95G.

46.    In England and Wales, the Contracts (Rights of Third Parties) Act 1999 provides that, in certain circumstances, a third party may in his own right enforce a term of a contract to which he is not a party.[6] This is a statutory exception to the common law doctrine of privity.[7]

47.    However, that Act does not have effect in the BVI and no local equivalent has been enacted. As such the common law rule of privity (as referred to above) continues to represent the relevant legal principle in the BVI. Therefore, under the law of the BVI, the Plaintiffs cannot bring claims for breach of the Administration Agreement against Citi Hedge.

## Counts 26 and 27 – Aiding and Abetting Breach of Fiduciary Duty and Aiding and Abetting Fraud

48.    Count 26 alleges that Citi Hedge is liable for aiding and abetting breaches of fiduciary duties allegedly owed by the Kingate Defendants to the Plaintiffs and the Class. In

---

[6]    See Contracts (Rights of Third Parties) Act 1999, section 1(1).

[7]    CHITTY ON CONTRACTS, 18-002 (30th ed.).

paragraph 384 of the Complaint, it is alleged that "With knowledge that the Kingate Defendants were breaching their fiduciary duties owed to Plaintiffs and the Class, Citi Hedge substantially assisted the Kingate Defendants in this breach."

49.    Count 27 alleges that Citi Hedge is liable for aiding and abetting an alleged fraud by the Kingate Fraud Claim Defendants upon the Plaintiffs and the Class. In paragraph 388 of the Complaint, it is alleged that "Citi Hedge . . . had actual knowledge of and substantially assisted in the fraudulent scheme perpetrated by the Kingate Fraud Claim Defendants."

50.    In English and BVI law, "aiding and abetting" is a principle confined to criminal liability, derived from the Aiders and Abetters Act 1861. It is not the applicable test for secondary liability in tort. In *Credit Lyonnais v. EGCD* [1998] 1 Ll. Rep. 19, at page 46 Hobhouse LJ said as follows:

> "The criminal law for obvious policy reasons goes further than the civil law. Acts which knowingly facilitate the commission of a crime amount to the crime of aiding and abetting but they do not amount to a tort or make the aider liable as a joint tortfeasor. . . .
>
> Accordingly, in my judgment there is no second category in the law of tort. Mere assistance, even knowing assistance, does not suffice to make the "secondary" party jointly liable as a joint tortfeasor with the primary party. What he does must go further. He must have conspired with the primary party or procured or induced his commission of the tort . . . ; or he must have joined in the common design pursuant to which the tort was committed . . . ."

51.    The analysis of Hobhouse LJ was approved by Stuart-Smith LJ and Thorpe LJ at pages 36 and 47. An appeal from the judgment of the Court of Appeal was dismissed by the House of Lords at [2000] 1 AC 486.

52.    Neither Counts 26 nor 27 make an allegation of conspiracy against Citi Hedge. They only allege "knowledge" on the part of Citi Hedge of the breach of fiduciary duties and fraudulent scheme of the Kingate Defendants and the Kingate Fraud Claim Defendants.[8]

53.    An essential element that must be established in a claim for knowing assistance is dishonesty on the part of the defendant sought to be made liable for such assistance. This was

---

[8]    I do not express an opinion as to whether the Plaintiffs have adequately pleaded "knowledge" under U.S. pleading standards.

established by the Privy Council in *Royal Brunei v. Tan* [1995] 2 WLR 64. Giving the judgment of the Board, at 76 E Lord Nicholls stated:

> "Drawing the threads together, their Lordships' overall conclusion is that dishonesty is a necessary ingredient of accessory liability. It is also a sufficient ingredient. A liability in equity to make good resulting loss attaches to a person who dishonestly procures or assists in a breach of trust or fiduciary obligation. It is not necessary that, in addition, the trustee or fiduciary was acting dishonestly, although this will usually be so where the third party who is assisting him is acting dishonestly. 'Knowingly' is better avoided as a defining ingredient of the principle, and in the context of this principle the Baden [1993] 1 W.L.R. 509 scale of knowledge is best forgotten."

54.    In this context, the meaning of dishonesty was further explained by the Privy Council in *Barlow Clowes Ltd v. Eurotrust Ltd* [2006] 1 WLR 1476. At 1479, giving the opinion of the Board, Lord Hoffman said:

> "The judge stated the law in terms largely derived from the advice of the Board given by Lord Nicholls of Birkenhead in *Royal Brunei Airlines Sdn Bhd* [1995] 2 AC 378. In summary, she said that liability for dishonest assistance requires a dishonest state of mind on the part of the person who assists in a breach of trust. Such a state of mind may consist in knowledge that that the transaction is one in which he cannot honestly participate (for example, a misappropriation of other people's money), or it may consist in suspicion combined with a conscious decision not to make inquiries which might result in knowledge: see *Manifest Shipping Co Ltd v. Uni-Polaris Insurance Co Ltd* [2003] 1 AC 469. Although a dishonest state of mind is a subjective mental state, the standard by which the law determines whether it is dishonest is objective. If by ordinary standards a defendant's mental state would be characterised as dishonest, it is irrelevant that the defendant judges by different standards. The Court of Appeal have found this to be a correct state of the law and their Lordships agree."

55.    Neither Count 26 nor Count 27 appears to allege dishonesty against Citi Hedge.

## Count 28 – Unjust Enrichment

56.    In Count 28 the Plaintiffs allege that the Defendants were unjustly enriched "by taking the monies of the Plaintiffs". Compl. ¶ 393. It is alleged that "Defendants' performance was so far below the applicable fiduciary and business standards that Plaintiffs and Class involuntarily conferred a benefit upon Defendants without Plaintiffs receiving adequate benefit or compensation in return". Compl. ¶ 394. In consequence it is asserted that Citi Hedge has been unjustly enriched and that "each Defendant should refund all monies paid for any services rendered to Plaintiffs and the Class".

57.    Count 28 rests on the proposition that Citi Hedge received "the monies of the Plaintiffs". As a matter of BVI law such monies as were paid by the Funds to Citi Hedge in payment of fees pursuant to the Administration Agreement did not belong to the Plaintiffs but belonged beneficially to the Funds until received by Citi Hedge, at which point beneficial ownership passed to Citi Hedge.

58.    Even if the Plaintiffs' investments in the Funds, in return for which the Plaintiffs were allotted shares in the Funds, were made pursuant to fraudulent misrepresentations by Madoff, the effect of such investments was that the beneficial ownership of the monies passed to the Funds and was not retained by the Plaintiffs. This is established by *Lonrho v. Fayed (No 2)* [1992] 1 WLR 1, Per Millett J. at 11-12, and *Box and Others v. Barclays Bank* [1998] Lloyd's Rep. Banking 185, per Ferris J. at 200.

59.    The further proposition that the Plaintiffs are entitled to restitution of fees because they did not receive "adequate benefit or compensation in return" is contrary to BVI legal principles. Where money has been paid under a transaction that is or becomes ineffective, the payer[9] may recover the value of the money provided that the consideration for the payment has totally failed: see CHITTY ON CONTRACTS 29-054 (30th ed.). Any performance of the promised services is fatal to recovery on the basis of a failure of consideration. See *Stocznia Gdanska SA v. Latvian S.S. Co* [1998] 1 WLR 574, per Lord Goff at 588.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed on this 19th day of July, 2010.

*Simon Browne - Wilkinson*

_____

SIMON BROWNE-WILKINSON Q.C.

_____

[9]    In this case the Funds.

16