| | |
|---|---|
| **IN RE KINGATE MANAGEMENT LIMITED LITIGATION**<br><br>**This document relates to all actions** | **Master File**<br><br>**No. 09 Civ. 5386 (DAB)** |

## DECLARATION OF ANTHONY GEORGE BOMPAS QC

Anthony George Bompas QC declares the following:

**Introduction**

1.      I am a Queen's Counsel practising as a barrister from Chambers in London.

2.      I am making this my Declaration in relation to the Amended Complaint ("the Complaint") in the above-captioned proceedings ("the Proceedings").    In this Declaration I explain the law of the British Virgin Islands and of Bermuda applicable to certain matters complained of in the Complaint, assuming the law of the either of those jurisdictions to be the relevant law.

3.      In what follows I adopt for convenience the definitions used in the Complaint.

4.      In addition to the Complaint I have read the Affidavit of David Chivers QC and the several Declarations of Narinder K Hargun, Richard G Evans, Barbara Dohmann QC and Simon Browne-Wilkinson QC.  I refer to the makers of these documents as "the Defendants' Experts", and the Affidavit and Declarations made by them as "the

Defendants' Expert Reports". I have also read certain of the documents referred to in the Complaint and mentioned later in this Declaration.[1] Where I refer to the Investment Memoranda in this Declaration I have assumed that, to the extent that there were Memoranda other than the ones referred to in footnote 1 below, they were in materially the same terms as those which I have read.

5    I first explain my qualification to make this Declaration. Then I set out my opinion on various of the matters discussed by the Defendants' Experts.


## Qualifications

6.   I graduated from Oxford University in 1974 with First Class degree in the Honours School of Jurisprudence. I was called to the Bar of England and Wales in July 1975, having joined the Honourable Society of Middle Temple. In October 1976 I started in independent practice at the Bar at my present Chambers, 4 Stone Buildings, Lincoln's Inn, and have continued in practice from those Chambers without interruption ever since. In 1976 I joined the Honourable Society of Lincoln's Inn. In 1989 I was appointed to be Junior Counsel to the Department of Trade and Industry. In July 1991 I was called to the Bar of the BVI, where I have appeared in the High Court. In 1994 I was appointed to be a Queen's Counsel. In 2001 I was elected to be a Bencher of the Honourable Society of Lincoln's Inn. In 2003 I became the Head of my Chambers. Also in 2003 I was appointed by the Lord Chancellor to sit as a Deputy Judge of the High Court in the Chancery Division (the Division to which is assigned, by paragraph 1 of Schedule 1 of the Senior Courts Act 1981, all causes or matters involving the exercise of the High Court's jurisdiction under the enactments relating to companies).

7.   As a practising barrister I have throughout specialised in company and business law. In the 2010 edition of The Chambers and Partners Guide to the Legal Profession I am named as one of the 14 first-ranked leading Queen's Counsel specialising in company law. In the 2010 edition of the Legal 500 I am named as one of the 11 of the first-ranked Queen's Counsel specialising in company law. In these directories I am also named as a leading specialist in other areas (such as Chancery-Commercial, Financial Services Insolvency). These are independent directories. I have

[1] The Investment Memorandum for Kingate Global dated 1 May 2006; The Investment Memorandum for Kingate Global dated 6 October 2008; the Management Agreement between Kingate Global and KML dated 1 January 2006; the Administration Agreement between Kingate Global, KML and BISYS Hedge Fund Services Limited dated 1 June 2007; the audited financial statements for Kingate Euro for the years ending 31 December 2006 and 2007; the audited financial statements for Kingate Global for the years ending 31 December 2004 and 2005 and 31 December 2007 and 2008

contributed to practitioners' text books on company and insolvency law (namely Tolley's "Company Law", Butterworths "Practical Insolvency", and "The Annotated Companies Acts" published by Oxford University Press).

8.    I agree with what is stated by Mr Chivers in paragraphs 6 to 11 of his Affidavit concerning the laws, and sources of law, of Bermuda and the BVI. Having had experience of appearing in the courts of or advising in relation to the laws of jurisdictions which apply English law, including the BVI, Bermuda, the Bahamas, the Republic of Trinidad and Tobago, the Cayman Islands, Hong Kong and the Republic of Singapore, and having regard to my expertise in English law germane to the substance of the matters in issue in the Complaint, I believe that I am able to provide expert evidence about the applicable law of the British Virgin Islands and Bermuda, assuming the law of the BVI or Bermuda to be relevant.

**The matters complained of**

9.    It will be for the Court trying these proceedings to decide upon the meaning and effect of the Complaint. The question will not be how some other court, or a court in some other jurisdiction, might view the Complaint. So, by way of illustration, rules of pleading applicable in the BVI or Bermuda will not be relevant. On the other hand what may be relevant is the view which the courts of those jurisdictions would take in respect of particular causes of action, or alleged causes of action. Here too, the question for present purposes is not whether or not the courts of those jurisdictions would allow the Complaint to go to trial, if the proceedings were before those courts; rather it is whether on a view of the facts which might be found after a trial by reference to the Complaint the Plaintiffs could be held to be entitled to the claimed remedy: it is only once the facts have been found at a trial that the Court will decide whether those facts entitle the Plaintiffs to any and if so what relief.

10.    In order to make my Declaration I have read the Complaint as setting out in ordinary language a number of allegations of fact, and as indicating causes of action sought to be put forward by reference to those allegations of fact. I have assumed that the facts alleged in the Complaint are true. In relation to these causes of action I have taken the approach that what is important is not nomenclature but the substance of the relief claimed by reference to alleged fact. As mentioned earlier, I recognise of course that it is the Court before which the Complaint is being dealt with to determine its meaning and effect.

11    In the Complaint, in paragraphs 1 to 6, the Plaintiffs' claim against the Defendants is summarised being that the Defendants induced the Plaintiffs to invest indirectly with Bernard Madoff "through two so-called feeder funds", investment with Madoff having been merely investment into a Ponzi scheme and now lost. The allegation is that the Defendants were in breach of duties owed to the Plaintiffs in inducing the investment, in inducing Plaintiffs not to seek to withdraw the investment, and in failing to deal properly in relation to the investment. In particular it is said that the Defendants made fraudulent misrepresentations to induce the making and retention of the Plaintiffs' investments or were wilfully blind and provided substantial assistance to those making the misrepresentations (for example, paragraph 184 of the Complaint).

12.   In considering the Defendants' Expert Reports it is important to keep in mind two critical points.

12.1.   The first is that the causes of action as put forward in the Complaint are all expressed to be the Plaintiffs' own causes of action for some legal wrong to, or giving rise to some right of recovery by, the Plaintiffs themselves.

12.2.   Second, except to the extent that the third party beneficiary breach of contract Counts in the Complaint (namely Counts 9, 10, and 25) rest upon a breach of contract with the Funds, the Complaint does not in terms make any allegation as to any wrong done by any of the Defendants to the Funds themselves as entities distinct from the Plaintiffs. Subject to the third party beneficiary breach of contract Counts, there is no pleaded allegation that the Defendants were in breach of any duty to the Funds or that the Funds have causes of action against the Defendants.

**Reflective loss**

13.   Each of the Defendants' Experts makes reference to the decision of the House of Lords, on an English appeal, in the case of Johnson v Gore Wood & Co [2002] 2 AC 1. This case is relied upon as establishing a "*principle*" (per Mr Chivers, Mr Hargun and Mr Evans) or "*rule*" (per Mr Browne-Wilkinson and Ms Dohmann) against reflective loss. It is then argued that this principle or rule precludes many of the causes of action relied upon by the Plaintiffs, if those causes of action are governed by the law of the BVI or Bermuda.

14.   The reflective loss principle, the principle in Johnson v Gore Wood & Co, is a modern development. It may be viewed as part of the law of companies, a law which is

founded in the common law of partnerships together with statute law. In particular the Johnson v Gore Wood & Co principle is related to and has evolved out of a different principle, the principle established by the case of Foss v Harbottle (1843) 2 Hare 461.

15    The Foss v Harbottle principle is a natural consequence of the act of the legislature in providing statutory machinery for the incorporation of companies as legal entities separate and distinct from their members. Implications of the recognition of companies as separate legal entities are summarised in paragraphs 46 and 47 of Mr Hargun's Expert Report, albeit that his general statements in sub-paragraphs 1 to 5 of his paragraph 46 and in his paragraph 47 do not represent propositions to which there can never be exception in given cases. Indeed, Mr Hargun acknowledges as much in his paragraphs 48 to 50.[2]

16    The Foss v Harbottle principle is that where a company has a cause of action in respect of an actionable wrong to the company, the cause of action is vested in and belongs to the company so that in principle no member of the company may sue on the cause of action: the cause of action is the company's property and is not held on trust for and does not belong to any particular member or to the members collectively. This principle may be characterised as the proper plaintiff principle, as applied to companies  In general one person may not sue another for an injury done to a third party

17.    The cases referred to at paragraphs 21.1 to 21.3 and 21.5 of Mr Evans' Expert Report contain entirely conventional and uncontroversial descriptions of this principle and of its rationale: in the absence of any exception applying to the specific case, a cause of action belonging to one person may not be made the subject of a suit in an action brought by another.[3]

18.    So far as concerns the Foss v Harbottle principle, and before legislation directed specifically at its operation (for example section 184C of the BVI Business Companies Act 2004, referred to at paragraph 22 of Mr Evans' Expert Report[4]), the

---

[2] What Mr Hargun says in his paragraphs 48 to 50 is discussed later in this Declaration

[3] The case referred to in paragraph 21.4 of Mr Evans' Expert Report, a case also mentioned in footnote 12 to Mr Hargun's Expert Report, was one in which the Eastern Caribbean Court of Appeal allowed the Plaintiffs' appeal: this appeal was against the striking out of the plaintiffs' proceedings by reference to the reflective loss principle  Ms Dohmann points out at paragraph 58 of her Expert Report that as Counsel in the case she had relied upon the no reflective loss principle. She might have added that, in the Court of Appeal, her argument failed

[4] The English, Bermudan and BVI courts would view the question whether a derivative action is available to be a substantive one governed by the law of the company's place of incorporation; the

English courts had found that there were indeed recognised exceptions to the principle: materially, in certain circumstances a shareholder could be permitted to bring a derivative action in right of his company and to recover damages on its behalf. Essentially the circumstances would be when the wrong to the company had been particularly egregious and where the company itself was, through the actions of the intended defendants, incapable of being put in motion to assert its cause of action for itself.

19. The extract from a recent Opinion of the Privy Council quoted in paragraph 21 3 of Mr Evans' Expert Report gives a perfectly conventional formulation of the principle and the exception to the principle. This formulation is as follows:

> " ... A shareholder cannot prosecute for the benefit of the company a cause of action belonging to the company unless it can be shown that the alleged wrongdoers are in control of the company and wrongly preventing the prosecution by the company of its cause of action ...".

20. However, the Foss v Harbottle principle is not directly in point in relation to the Complaint, for the reason that in the Complaint the Plaintiffs do not profess to put forward any causes of action which are vested in anyone but themselves. They are not claiming to put forward any of the Funds' causes of action, assuming the Funds to have had any, but are claiming to put forward their own. Therefore there is no need to give further detailed consideration to the principle or the exception.

21. The Johnson v Gore Wood & Co principle on the other hand is of modern origin. It was first recognised in the judgment of the Court of Appeal in Prudential Assurance v Newman Industries [1982] 1 Ch 204, in particular at 222E to 224D. In that case a plaintiff sought to put forward in a derivative action a claim against a company's directors for an injury alleged to have been done to the company by the directors by a conspiracy to injure actionable by the company. This claim was on behalf of the company. At the same time the plaintiff sought to put forward in the action a personal claim to the effect that the plaintiff in its capacity as a shareholder had been injured by the conspiracy to the extent of the loss in value of it shares and had its own cause of action against the directors. The Court of Appeal held that the personal claim was "misconceived". It was put forward, said the Court of Appeal at 224A, as "means of subverting the rule in Foss v Harbottle"

---

question whether permission should be granted for a derivative action is determined by the law of the forum where the action is to take place.

22    Materially, the reasoning of the Court of Appeal in denying the plaintiff the right to claim for that loss (although not, for example, wasted expenditure suffered by the plaintiff in consequence of the fraud – page 222H) was as follows (page 222H-223E):

> "In our judgment the personal claim is misconceived. It is of course correct, as the judge found and Mr. Bartlett did not dispute, that he and Mr. Laughton [that is, the Defendants], in advising the shareholders to support the resolution approving the agreement, owed the shareholders a duty to give such advice in good faith and not fraudulently. It is also correct that if directors convene a meeting on the basis of a fraudulent circular, a shareholder will have a right of action to recover any loss which he has been personally caused in consequence of the fraudulent circular; this might include the expense of attending the meeting. But what he cannot do is to recover damages merely because the company in which he is interested has suffered damage. He cannot recover a sum equal to the diminution in the market value of his shares, or equal to the likely diminution in dividend, because such a "loss" is merely a reflection of the loss suffered by the company. The shareholder does not suffer any personal loss. His only "loss" is through the company, in the diminution in the value of the net assets of the company, in which he has (say) a 3 per cent. shareholding. The plaintiff's shares are merely a right of participation in the company on the terms of the articles of association. The shares themselves, his right of participation, are not directly affected by the wrongdoing. The plaintiff still holds all the shares as his own absolutely unencumbered property. The deceit practised upon the plaintiff does not affect the shares; it merely enables the defendant to rob the company. A simple illustration will prove the logic of this approach. Suppose that the sole asset of a company is a cash box containing £100,000. The company has an issued share capital of 100 shares, of which 99 are held by the plaintiff. The plaintiff holds the key of the cash box. The defendant by a fraudulent misrepresentation persuades the plaintiff to part with the key. The defendant then robs the company of all its money. The effect of the fraud and the subsequent robbery, assuming that the defendant successfully flees with his plunder, is (i) to denude the company of all its assets, and (ii) to reduce the sale value of the plaintiff's shares from a figure approaching £100,000 to nil. There are two wrongs, the deceit practised on the plaintiff and the robbery of the company. But the deceit on the plaintiff causes the plaintiff no loss which is separate and distinct from the loss to the company. The deceit was merely a step in the robbery. The plaintiff obviously cannot recover personally some £100,000 damages in addition to the £100,000 damages recoverable by the company."

23.   In the years following <u>Prudential v Newman</u> the parameters of the Court of Appeal's decision have been explored in several cases, notably in <u>Johnson v Gore Wood & Co</u> in the House of Lords.

24.   In <u>Johnson v Gore Wood & Co</u> the House of Lords established authoritatively that there is a limit on the bringing of personal claims for damages where the relevant loss is a reflection of the loss suffered by a company. In England and Wales, and in the

BVI and Bermuda, the <u>Johnson v Gore Wood & Co</u> principle is now certainly the law. However it is also the case that the law is still developing, with the detailed scope of the principle and its implications still being worked out.[5]

25. The <u>Johnson v Gore Wood & Co</u> principle is well summarised in the judgment of Lord Bingham in that case at 35F-36B, where he set out three propositions:

> "(1) Where a company suffers loss caused by a breach of duty owed to it, only the company may sue in respect of that loss. No action lies at the suit of a shareholder suing in that capacity and no other to make good a diminution in the value of the shareholder's shareholding where that merely reflects the loss suffered by the company. A claim will not lie by a shareholder to make good a loss which would be made good if the company's assets were replenished through action against the party responsible for the loss, even if the company, acting through its constitutional organs, has declined or failed to make good that loss. .... (2) Where a company suffers loss but has no cause of action to sue to recover that loss, the shareholder in the company may sue in respect of it (if the shareholder has a cause of action to do so), even though the loss is a diminution in the value of the shareholding. .... (3) Where a company suffers loss caused by a breach of duty to it, and a shareholder suffers a loss separate and distinct from that suffered by the company caused by breach of a duty independently owed to the shareholder, each may sue to recover the loss caused to it by breach of the duty owed to it but neither may recover loss caused to the other by breach of the duty owed to that other."

26. The first of Lord Bingham's three propositions is no more than a restatement of the <u>Foss v Harbottle</u> principle.

27. The second of Lord Bingham's propositions should really need little articulation. As an obvious application of the second proposition, it has never been suggested that a plaintiff fraudulently induced to subscribe for shares or debentures in a company is, by reason of some reflective loss principle, denied the right to claim damages from the dishonest director who made the fraudulent misrepresentation inducing the subscription: and if the company was worthless at the time of the subscription, in principle the damages would be the amount subscribed, that being the amount of the

---

[5] One area of development as been as to the precise nature of the plaintiff's losses which are considered to be a reflection of company losses. By way of example, lost dividends are a reflection, where the reason for their loss is the loss caused to the company by the wrong for which the company has a cause of action for full recovery. Again, a plaintiff creditor's loss of the value of his debt from a company may be a reflection of damage actionable by the company. However these refinements need no discussion in the present case, and I therefore refrain from lengthening this Declaration with a discussion of them.

plaintiff's loss (the difference between the price paid and the value of what he obtained).[6]

28      Further, it would be no defence to the plaintiff's claim against the director for the tort of deceit for the director to explain that the reason why the company was worthless was because he had already stolen all the company's property rather than simply losing it in lawful speculation. The plaintiff shareholder's loss would not be a mere reflection of the loss suffered by the company by the previous actionable wrong done to it. The existence or otherwise of a cause of action by the company against the director could only be of relevance if it was of real worth and therefore affected the value of the company and hence the measure of the plaintiff's damages. It does not make the shareholder's loss "reflective" of the company's.

29      I note that in his Expert Report Mr Chivers has made no comment upon Counts 1 and 2 in the Complaint, which summarise the Plaintiffs' claims against the Kingate Fraud Claim Defendants for the tort of deceit. Mr Chivers, rightly in my opinion, has not suggested that the Johnson v Gore Wood & Co principle is a bar to the Plaintiffs' claim for damages for fraudulent misrepresentation. Also, I agree with his comment in paragraph 126 of his Expert Report, that Counts 3 and 4 (negligent misrepresentation) would not be barred by the reflective loss principle.

30      In so far as Mr Hargun (expressly in paragraph 44 of his Declaration) and Ms Dohmann (implicitly in paragraph 50 of her Declaration) suggest that claims either for fraudulent misrepresentation inducing a person to purchase shares or for negligent misrepresentation to the same effect are barred by the Johnson v Gore Wood & Co principle, I disagree.

31      Mr Hargun appears to base his conclusion simply on the fact that the loss described in the Complaint is the loss of the investment made in the Funds. This is not something which is determinative of whether the loss claimed by the shareholder is reflective loss.

32      Taking the example of the lock-box from the Prudential Assurance case referred to in paragraph 22 above (on which Ms Dohmann places emphasis), the Court of Appeal referred to the fact that the deceit practised did not affect the shares, it merely provided the opportunity to rob the company and thereby diminish the value of the

---

[6] Edgington v Fitzmaurice (1884) 29 Ch D 459; McConnel v Wright [1902] 1 Ch 546; Smith New Court v Citibank NA [1997] AC 254

claimant's shares  However, the misrepresentations alleged in the Complaint are of an entirely different character.  They are said to have induced the purchase or retention of shares and therefore they directly affected the purchaser/investor and his shares in that the purchaser parted with money in order to purchase the shares or made a decision to retain them.  There is therefore a direct relationship between the misrepresentation and the Plaintiffs' decision in relation to shares not present in the lockbox case.  Further the shareholder is not claiming for a diminution in the value of his shares caused by an act done to the company but is claiming because the shares he purchased or retained were not as valuable as had been represented and were purchased or retained in reliance no the misrepresentation.

33.     None of the case referred to by Ms Dohmann in her paragraphs 53 to 56 (Day v Cooke [2002] 1 BCLC 1, Gardner v Parker [2004] 2 BCLC 554 and Webster v Sandersons Solicitors [2009] PNLR 37) was a case of fraudulent or negligent misrepresentation inducing the purchase of shares in the very company which is said to have the claim which "franks" the shareholder's loss making it reflective.  Further, it is instructive that in Hedley Byrne & Co v Heller & Partners Ltd [1964] AC 465 Lord Reid, in overruling a previous Court of Appeal case[7] which had denied a plaintiff's case in negligent misrepresentation, plainly entertained no idea that the "no-reflective loss" principle might have precluded that plaintiff's claim:  at page 487 he concluded that the plaintiff should have been allowed to claim for his damage against a company's negligent accountants for the accounts of a company provided to the plaintiff, even though the accountants had prepared the accounts at the request of the company.[8]

34.     It is the third of Lord Bingham's three propositions which sets a limit in actions to recover reflective loss by way of damages, and may be characterised as the principle in Johnson v Gore Wood & Co.

---

[7] Candler v Crane Christmas & Co [1951] 2 KB 164

[8] As Lord Reid said of the Candler case, "*There the plaintiff wanted to see the accounts of a company before deciding to invest in it. The defendants were the company's accountants, and they were told by the company to complete the company's accounts as soon as possible because they were to be shown to the plaintiff who was a potential investor in the company  At the company's request the defendants showed the completed accounts to the plaintiff, discussed them with him, and allowed him to take a copy. The accounts had been carelessly prepared and gave a wholly misleading picture. It was obvious to the defendants that the plaintiff was relying on their skill and judgment and on their having exercised that care which by contract they owed to the company, and I think that any reasonable man in the plaintiff's shoes would have relied on that. This seems to me to be a typical case of agreeing to assume a responsibility: they knew why the plaintiff wanted to see the accounts and why their employers, the company, wanted them to be shown to him, and agreed to show them to him without even a suggestion that he should not rely on them.*"

35. The third proposition, and its rationale and scope, was further explained by Lord Bingham in the following passage of his judgment (my emphasis added):

> "These principles do not resolve the crucial decision which a court must make on a strike-out application, whether on the facts pleaded a shareholder's claim is sustainable in principle, nor the decision which the trial court must make, whether on the facts proved the shareholder's claim should be upheld. On the one hand the court must respect the principle of company autonomy, ensure that the company's creditors are not prejudiced by the action of individual shareholders and ensure that a party does not recover compensation for a loss which another party has suffered. On the other, **the court must be astute to ensure that the party who has in fact suffered loss is not arbitrarily denied fair compensation**. The problem can be resolved only by close scrutiny of the pleadings at the strike-out stage and all the proven facts at the trial stage the object is to ascertain whether the loss claimed appears to be or is one which would be made good if the company had enforced its full rights against the party responsible, and whether (to use the language of <u>Prudential Assurance Co Ltd v Newman Industries Ltd (No 2) [1982] Ch 204 , 223</u>) the loss claimed is "merely a reflection of the loss suffered by the company". In some cases the answer will be clear, as where the shareholder claims the loss of dividend or a diminution in the value of a shareholding attributable solely to depletion of the company's assets, or a loss unrelated to the business of the company. In other cases, inevitably, a finer judgment will be called for: **At the strike-out stage any reasonable doubt must be resolved in favour of the claimant**."

36. This third proposition, was summarised by Lord Millett in his judgment in the <u>Gore-Wood & Co</u> case at page 62 in a passage cited by Kawaley J in his decision at first instance in <u>Lisa SA v Leamington Reinsurance Company Ltd</u> [2006] Bda L.R. 9.[9]

> " ... The position is, however, different where the company suffers loss caused by the breach of duty owed to both the company and the shareholder. In such a case the shareholder's loss, in so far as this is measured by the diminution in value of his shareholding or the loss of dividends, merely reflects the loss suffered by the company in respect of which the company has its own cause of action ... "

37. Nevertheless, it is important to note, given Lord Bingham's observation, that in relation to his third proposition, " ... the object is to ascertain whether the loss claimed appears to be [at the strike out stage] or is [at the trial stage] one which would be made good if the company had enforced its **full** rights against the party

---

[9] This is the case referred to in footnote 12 of Mr Hargun's Expert Report. It is commented on later in my Declaration.

*responsible ...*",[10] the principle will not be applicable if and to the extent that the plaintiff shareholder's claimed loss is asymmetrical to (ie greater than) the loss suffered by his company. Obviously this is the case where the company does not have any cause of action at all (Lord Bingham's second proposition). But if the company does have a cause of action the pursuit of which could never result in the elimination of the whole of plaintiff's own separate loss, the plaintiff's own claim will not be wholly defeated by the exclusionary principle in Johnson v Gore-Wood & Co, the principle encapsulated in Lord Bingham's third proposition.

38. The need for the company's claim to cover the entirety of the amount of the shareholder's loss is also evident from:

   38.1. The statement of Lord Millett in Johnson v Gore Wood & Co, in discussing Prudential v Newman, where he referred to the fact that the shareholder's action was barred in that case because:

   "*the plaintiff's own loss would be **fully remedied** by the restitution to the companies of the value of the misappropriated assets*" (emphasis added)

   38.2. Neuberger LJ's judgment in Gardner v Parker [2004] 2 BCLC 554 in which he described (in paragraph 33) the principle in Johnson v Gore Wood & Co as barring the recovery of:

   "*(1) a loss claimed by a shareholder which is merely reflective of a loss suffered by the company i.e. a loss which would be made good if the company had enforced in full its rights against the defendant wrongdoer is not recoverable by the shareholder save in a case where, by reason of the wrong done to it, the company is unable to pursue its claim against the wrongdoer*"

   38.3. The discussion in Shaker v. Al-Bedrawi [2003] Ch 350 at paragraphs 83 and 84 in which the Court of Appeal considered the prospect that the company's claim could be smaller than that available to the individual claimant. This was not a point which could be determined prior to trial but would have allowed the individual to bring his own claim

39. Further, this third proposition, which underpins the argument by the Defendants' Experts as to reflective loss, is subject to an exception which demonstrates that the rule is not an absolute one detached from any principle of practical justice. This exception is without question part of the present law in England and Wales, as noted by Mr Chivers in his Expert Report, it having been established by a strong Court of Appeal (Waller, Chadwick and Keene LJJ) in the case of Giles v Rhind [2003] Ch

---

[10] The quoted text is from the passage quoted at paragraph 30 above, but repeated here with my interpolation and emphasis added.

618, in which I appeared as Counsel for the successful appellant plaintiff.[11]  The proposition (with the exception in bold italics)[12] may now be taken from its restatement in the judgment of Neuberger LJ in Gardner v Parker [2004] 2 BCLC 554 at paragraph 33:

> "... a loss claimed by a shareholder which is merely reflective of a loss suffered by the company – a loss which would be made good if the company and enforced in full its rights against the defendant wrongdoer – is not recoverable by the shareholder **save in a case where, by reason of the wrong done to it, the company is unable to pursue its claim against the wrongdoer**".

40    Mr Chivers, in his Expert Report, at paragraph 30, points out that the Giles v Rhind case has been regarded as binding on the English Court of Appeal in the case of Webster v Sandersons Solicitors [2009] PNLR 37.[13]  The latter case was decided after the decision of the Hong Kong Court of Final Appeal in Waddington Ltd v Chan Chun Hoo [2008] HKLR 1382, referred to below.  Mr Chivers states that in the Waddington case Lord Millett, with whom the rest of the Court agreed, "disapproved Giles v Rind"; and he suggests that the English Court of Appeal in the Webster case "regarded Giles v Rind as binding because it was bound to do so by precedent, and it did so without any enthusiasm and without overtly endorsing the decision ..."

41    I disagree with the conclusion which Mr Chivers has reached as to the lack of enthusiasm of the Court of Appeal in Webster for the decision in Giles v Rhind.  The case contains no indication whatsoever as to degrees of enthusiasm.  On the other hand the Court of Appeal, in the judgment of the Court given by Lord Clarke MR, did take the trouble to point out that Lord Millett had been mistaken in the Waddington case when he said that Giles v Rhind had been decided before a different case (Day v Cooke) which, as it so happened, was referred to in the judgment of Chadwick LJ in Giles v Rhind at paragraph 58 and was discussed at some length in the judgment of Waller LJ at paragraphs 37 to 38.

---

[11] Mr Evans, Mr Hargun, Ms Dohmann and Mr Browne-Wilkinson in their Expert Reports all omit any reference to Giles v Rhind.

[12] The emphasis is not mine but that of Neuberger LJ.  In his reproduction of the text of Neuberger LJ's judgment at paragraph 12 of his Expert Report Mr Browne-Wilkinson has omitted the emphasis.

[13] At paragraphs 56 and 57 of her Expert Report Ms Dohmann describes the Webster v Sanderson case  She omits to point out that in the case the existence of the Giles v Rhind exception to the Johnson v Gore Wood & Co principle was accepted, but that the Court held on the facts that it was not applicable

42    The significance of the <u>Giles v Rhind</u> case, and the point in that case which Lord Millett finds objectionable, is that it denies for the <u>Johnson v Gore Wood & Co</u> principle the status of an absolute rule, detached from any principle of practical justice, which shuts out a plaintiff shareholder from having, much less from pursuing in court, any cause of action where the loss claimed is or would be purely reflective of the loss suffered by his company.

43.    There are a variety of ways in which courts might deal with reflective loss questions.

    43.1.    In New Zealand, the matter has been dealt with as a practical matter for avoiding double recovery. Lord Cooke in <u>Johnson v Gore Wood & Co</u> (see at 43ff) quoted extensively from the New Zealand case of <u>Christiensen v Scott</u> [1996] 1 NZLR 273. As the New Zealand law was expounded in the <u>Christiensen</u> case, where there are independent duties owed by a defendant both to a company and to a shareholder (perhaps, as in the <u>Giles</u> case, on a contract such as a shareholders' agreement), and breach of those duties causes loss to the plaintiff by reason of a reduction in the value of the plaintiff's shareholding, the plaintiff's own cause of action is not "extinguished"; whether he is as a matter of procedure to be permitted to pursue it, and for what compensation, will be decided on pragmatic grounds in the particular case to prevent double recovery.

    43.2.    In Hong Kong the law, as expounded by Lord Millett in the <u>Waddington</u> case, appears to be that where a plaintiff's claimed loss can be characterised as a reflection of loss suffered by a company, the plaintiff's cause of action is without exception wholly incapable of being pursued in proceedings.

    43.3.    In England and Wales the law takes a midway position. In other words the plaintiff shareholder's cause of action may be pursued in proceedings, and substantial recovery made on the cause of action, where exceptionally that is necessary to prevent injustice.

44.    Mr Chivers gives the opinion, at paragraph 30 of his Expert Report, that *"there may be an issue, in Bermuda and the BVI as to whether a local court might prefer the reasoning in <u>Waddington v Chan</u> to that in <u>Giles v Rhind</u>"*. As to this, I would make three comments.

    44.1.    First, the observations of Lord Millett in the <u>Waddington</u> case concerning <u>Giles v Rhind</u> were, strictly speaking, obiter as being unnecessary to the actual decision in the case (that a double derivative action was indeed permissible at

common law within the exception to the <u>Foss v Harbottle</u> principle, so that the plaintiffs' action was to be allowed to continue). In contrast the existence of the exception to the <u>Johnson v Gore Wood & Co</u> principle was a matter of decision in <u>Giles v Rhind.</u>

44.2. Second, a court seeking for the English common law is more likely to be treat that law as correctly expounded by the English Court of Appeal than by the Hong Kong Court of Final Appeal. This is relevant in both Bermuda and the BVI (see paragraphs 6 and 11 of Mr Chivers' Expert Report).

44.3 Third, once it is accepted (as it must be) that a plaintiff with a good cause of action does not cease to have a good cause of action merely because he is a shareholder in a company which has its own cause of action against the same defendant, the <u>Johnson v Gore Wood & Co</u> principle can be seen to be no more than a procedural device aimed at the prevention of double recovery and the preservation of a company's assets. It is not a substantive rule of the law of corporations. Specifically, it is only concerned with the question whether certain heads of damage may not be successfully claimed for, and not with the existence or otherwise of underlying causes of action.[14] If this is so there is no reason why the procedural bar arising from its operation should not be lifted where necessary to achieve practical justice.

45. Simply, the principle in <u>Foss v Harbottle</u> has had a long-standing exception based on the need to do practical justice. The pith of the decision in <u>Giles v Rhind</u> was that there is an exception to the principle in <u>Johnson v Gore Wood & Co</u> where necessary to avoid injustice The critical facts in <u>Giles v Rhind</u> were summarised by Waller LJ (in paragraph 20) as follows:

> "*How then, it may be asked, can Mr Rhind [the Defendant] effectively strike out Mr Giles's [the Claimant's] heads of damage? He does that by relying on the fact that the contractual duty that he owed to Mr Giles is the same contractual duty that he owed to the company, and in reliance on <u>Johnson v Gore Wood & Co</u> He submits that the heads of damage claimed by Mr Giles are merely reflective of the claim that the company would have had if it could have pursued its action and are thus irrecoverable by Mr Giles. The irony of this line of argument is that, not content with misusing confidential information in order to take the Netto contract which had the effect of rendering the company*

---

[14] Thus in the <u>Giles v Rhind</u> case Waller LJ was careful to refer to the principle as applicable to restrict the pursuit of certain "*heads of damages*" (or, in other words, categories of loss). So also, Lord Bingham's articulation of the principle, his third proposition set out in the extract from his judgment in <u>Johnson v Gore Wood & Co</u> quoted above, describes the bar as being to the recovery of loss rather than to the absence of any cause of action.

> insolvent, he achieved his aim of defeating the company's claim by
> dishonestly denying that he had broken any duty to the company, and
> then seeking security for costs. Once having achieved the objective of
> stopping the company's claim, when faced by a claim by Mr Giles
> personally he accepted and relied on the fact that he broke his
> contract with the company in order to defeat Mr Giles's claim. If he is
> successful his wrongdoing will render him liable to nobody."

46      The approach of the members of the Court of Appeal in the Giles v Rhind case was to
        view the exception as a matter of causation: although technically the company might
        at one stage have had a cause of action which would have entitled it to claim
        damages for the injury by reference to which the plaintiff was seeking to claim for his
        own loss, where the actions of the defendant had caused the company to be deprived
        of that cause of action so that the company had no ability to pursue its own claim to
        "full recovery" the plaintiff should be allowed to pursue his own separate cause of
        action for the loss he had sustained.  In effect the case would be taken to be within
        the scope of Lord Bingham's second proposition referred to above and therefore to
        be outside, and an exception to, Lord Bingham's third proposition (the Johnson v
        Gore Wood & Co principle).

47      In Perry v Day (2005) BCC 375 Rimer J (now Rimer LJ, a member of the Court of
        Appeal) sitting at first instance refused to strike out an action by reference to the
        Johnson v Gore Wood & Co principle and commented (at paragraph 62) that, by
        parity of reasoning with Giles v Rhind, a plaintiff could well be able to take advantage
        of the exception to the Johnson v Gore Wood & Co principle in circumstances where
        a company has been deprived of its cause of action against the defendant through its
        ignorance of the existence of its cause of action.

48.     Perry v Day also demonstrates two further points.
        48.1.   The Johnson v Gore Wood & Co principle will not be a bar to a plaintiff's claim
                for loss which is a reflection of loss suffered by his company, where the
                company could never have itself brought a claim for the loss, for example
                because of defences available to the company's claim (as, for example, where
                the company is bound by an exemption clause or because the company could
                be met with an ex turpi causa defence).  As to this reference should be made
                to the extract from the judgment of Peter Gibson LJ in the case of Shaker v Al-
                Bedrawi [2003] BCC 465 referred to below, a judgment relied upon by Rimer
                J.

48.2. Second, even where a cause of action may fall foul of the <u>Johnson v Gore Wood & Co</u> principle, it will not necessarily be struck out and prevented from being litigated but may be allowed to go to trial. For a plaintiff shareholder's claim to be struck out before trial the court should be satisfied that the claimed losses are reflective of losses for which his company did in fact have its own cause of action against the defendant. This point is borne out by the extract from the judgment of Lord Bingham in <u>Johnson v Gore Wood & Co</u> set out in paragraph 30 above.

49. These two points are clear from the passage at paragraph 65 of Rimer J's judgment in <u>Perry v Day</u>. As the Judge put it there:

> "...when, in litigation such as this, the court has to determine whether the company had its own claim against the wrongdoer, it is not concerned to conduct any sort of notional trial of the alleged claim. But, whilst I had no developed argument on this point, my provisional view is that it must at least be satisfied on the evidence whether or not the company had a claim which was likely to succeed, an exercise which involves considering not just the case which the company could have made, but the defences which could have been raised to it."

50. What Rimer J gave as his *"provisional view"* in the quoted passage is plainly correct, as appears from proposition (2) in paragraph 57 of Ms Dohmann's Expert Report, a proposition taken from the judgment of the Court of Appeal given by Lord Clarke MR in <u>Webster v Sandersons Solicitors</u>: the Court will only apply the <u>Johnson v Gore Wood & Co</u> principle in cases where, on the facts, there is no reasonable doubt. Indeed, this is supported by the comment of Peter Gibson LJ in the case of <u>Shaker v Al-Bedrawi</u> [2003] BCC 465 at paragraph 83 (a case decided in the Court of Appeal) that, *"As the ... principle is an exclusionary rule denying a claimant what would otherwise be his right to sue, the onus must be on the defendants to establish its applicability. It would not be right to bar the claimant's action unless the defendants can establish not merely that the company has a claim to recover a loss reflected by the [claimant's claimed loss], but that such claim is available on the facts.*"[15]

51. Further, the case of <u>Lisa SA v Leamington Reinsurance Co Ltd</u>, referred to above and in footnote 12 to Mr Hargun's Expert Report is instructive. Mr Hargun helpfully draws attention to the first instance decision before Kawaley J. As it happens, the case went on appeal to the Court of Appeal for Bermuda, with Mr Hargun representing the successful plaintiff/appellant. In the case the Plaintiff shareholder, Lisa SA, claimed that insurance contracts placed by a company (Avicola Villalobos SA, a Guatamalan

company in which it was a shareholder) with a different company, Leamington Reinsurance Co Ltd, were fraudulent and part of a conspiracy to extract money from Avicola. The Plaintiff's action was against Leamington and Avicola. At issue on the appeal was the question whether the Plaintiff had a viable personal (as opposed to a derivative) cause of action for which proceedings should be allowed to be continued in Bermuda, the heads of loss including loss as a shareholder in Avicola. The decision was that it did. The Court of Appeal approached the case on the basis that arguably the company itself had no cause of action, if the company had been party to the conspiracy, so that the case would be outside the third, exclusionary, principle in Johnson v Gore-Wood & Co. Further, once it was decided that the case should be allowed to go to trial on this basis, the Court of Appeal while expressing doubt about the viability of any claim by the Plaintiff to establish a proprietary interest in respect of payments made by the company to Leamington nevertheless allowed such a claim to go to trial.

52. In summary, so far as concerns the Complaint, my conclusions as to reflective loss are as follows:

52.1. The exclusionary principle is procedural and not substantive: in the same way that a court will refuse to permit a plaintiff to pursue claims which are abusive of its process, for example because a plaintiff is seeking to re-litigate claims, the Court will refuse to permit a plaintiff to pursue claims for certain heads of relief.

52.2. The exclusionary principle only applies where a plaintiff shareholder's claim for damages against a defendant is for a wrong actionable by the plaintiff causing him loss, where his loss (as, by way of example, diminution in the value of his shareholding) is merely a reflection of a loss suffered by his company by reason of an injury to the company by the defendant giving rise to a right of action which if fully enforced by the company would have made good the whole of the plaintiff's loss.

52.3. The exclusionary principle will only result in a plaintiff shareholder's claim for a particular head of damages (or, in other words, category of loss) being struck out without a trial where it is clear that the exclusionary principle must apply to the particular head of damages.

---

[15] The emphasis was added by Rimer J in his citation of the extract at paragraph 65 of his judgment

52.4. By way of exception to the exclusionary principle, a plaintiff shareholder will be permitted to pursue his claim seeking damages for merely reflective loss (that is loss which is reflective of loss suffered by his company), where this is necessary to avoid an injustice caused by the defendant's conduct.

53. In the light of these conclusions the position with the Complaint is as follows, so far as concerns the exclusionary principle in <u>Johnson v Gore Wood & Co</u>[16]:

53.1. Counts 1 to 4 (fraudulent and negligent misrepresentation by the Kingate Fraud Defendants and the Kingate Defendants respectively): these claims are not for loss which is a reflection of the Funds' own losses (see paragraph 29 above), being within the second of Lord Bingham's three propositions in paragraph 25 above.

53.2. Counts 14 (aiding and abetting fraud by Tremont Group), 17 (negligent misrepresentation by PricewaterhouseCoopers), 20 (aiding and abetting fraud by PricewaterhouseCoopers), 24 (negligent representation by Citi Hedge) and 27 (aiding and abetting fraud by Citi Hedge) are in the same position as Counts 1 to 4, the foundation of the claims being misrepresentation causing the Plaintiffs loss in circumstances where the loss is not a reflection of the Funds' own losses. What is more, although they are given the heading "Aiding and abetting fraud", Counts 14, 20 and 27 are simply claims to the effect that the relevant defendants (that is the Tremont Group (Count 14), PricewaterhouseCoopers (Count 20) and Citi Hedge (Count 27)) made themselves liable as joint tortfeasors with the Kingate Fraud Claim Defendants for the tort of deceit, that is fraudulent misrepresentation. In this respect the claims are therefore no different to those in Counts 1 and 2 (the Counts which allege the deceit itself).

53.3. The claims in certain of the other Counts appear to have been founded in misrepresentations to the Plaintiffs. If so, they will be in the same case as those mentioned above. Examples are Count 8 (against the Kingate Defendants for "constructive fraud" – see paragraph 287 of the Complaint) and Count 19 (against the PricewaterhouseCoopers Defendants for "aiding and abetting breach of fiduciary duty" – see paragraph 344)

---

[16] I say nothing about Counts 29 onwards, which in terms cannot be subject to Bermudian or BVI law.

53 4. The claims in the remaining Counts have not yet been shown to be necessarily within the exclusionary principle: it is not yet demonstrated that the Funds have, or ever had, causes of action against the Defendants for the alleged activities which, if pursued in full, could have made good the losses claimed by the Plaintiffs in those Counts. If the existence of claims on the part of the Funds is demonstrated, it will be necessary to consider (a) whether the activities of the Defendants have prevented the Funds' claims, so that the case falls within the exception to the exclusionary principle, and (b) whether the Funds' claims represent the whole of the loss claimed by the Plaintiffs

**Fraudulent misrepresentation (deceit) (Counts 1 and 2)**

54. For fraud to be established, as a matter of the common law of Bermuda and the BVI, it is necessary to show that one person has been induced to act to his detriment by a false statement made by another in circumstances where that other made the statement intending it to be relied upon[17] and without honest belief in its truth As to this last ingredient, the conventional formulation is that the false statement will have been made fraudulently if it has been made *"(1) knowingly, or (2) without belief in its truth, or (3) recklessly, careless whether it be true or false"* Where a defendant is shown to have been guilty of fraud in inducing a plaintiff to act to his detriment in reliance on the truth of the statement, the defendant is liable for the damage suffered by the plaintiff as a result: the limit to be found in the case of <u>Banque Bruxelles Lambert SA v Eagle Star Insurance Co Ltd</u> [1997] AC 191, discussed below.[18] In this situation the defendant has committed the tort of deceit, making a fraudulent misrepresentation; and the expression "fraud" when used strictly refers to the tort of deceit, rather than to more generalised dishonesty

55. It will be apparent from the formulation of the tort of deceit given above that various of the restricting and limiting principles discussed by the Defendants' Experts in connection with the torts of negligence and negligent misrepresentation are not in point where a plaintiff is seeking to plead and prove a case of fraudulent misrepresentation.

---

[17] This intention may be established by showing the maker of the representation to have appreciated that in the absence of some unforeseen intervention the plaintiff would act on the representation: <u>Shinhan Bank v Sea Containers Ltd</u> [2000] 2 Lloyds Rep 406 at 414

[18] See <u>Smith New Court Securities Ltd v Citibank NA</u> [1997] AC 254

56.     In the Complaint Counts 1 and 2 (directed at the Kingate Defendants) are plainly put forward as claims for the tort of deceit.

57.     Counts 17 and 24 (directed respectively at the PricewaterhouseCoopers Defendants and Citi Hedge) not so clear. The headings suggest that the case is one of negligence only, not deceit. Yet the body of the Complaint contains in relation to each count allegations which repeat everything which has gone before elsewhere in the Complaint so as to result in the allegations in relation to the relevant Counts being stated as allegations that the material false statements were made by the particular Defendant with the state of mind required for deceit. Nevertheless I discuss Counts 17 and 24 further below on the assumption that they are claims in negligence only, for negligent misrepresentation.

58.     It is convenient at this point to comment on a point made by Mr Hargun in his Expert Report. Mr Hargun refers in paragraph 65 of his Expert Report to contractual clauses imposing limitation periods on the bringing of claims. I would agree with him that such clauses are generally available to the parties to a contract. However, I would also point out that (a) such clauses will generally be effective only between the parties to the particular contract in which they are contained; (b) whether or not a particular claim is caught by a limitation clause is a matter of construction of the relevant clause; (c) time bar clauses are construed strictly and *contra proferentem* (ie ambiguities are resolved against the party seeking to rely on the clause) (Odfjell Seachem A/S v Continentale des Petroles et d'Investissments [2005] 1 Lloyd's Rep 275); and (d) a party cannot, on the grounds of public policy, exclude liability for fraud (HIH Casualty & General Insurance Ltd v Chase Manhattan Bank [2003] 2 Lloyd's Rep 61 where the fraud was an inducement to enter into to the contract containing the exclusion clause and Lord Bingham referred to the fact that *"fraud unravels all"*). Granville Oil & Chemicals Limited v Davis Turner & Co Ltd [2003] 2 CLC 418 is an example of a case in which the Court of Appeal held that a time bar clause could not be construed to cover claims which had been fraudulently concealed.

## Negligence and Negligent misrepresentation[19] (Counts 3 to 6, 15 to 17 and 22 to 24)

59.     The Complaint contains a number of claims arising from the Defendants' negligent misrepresentations and actions:

---

[19] Where I refer in this Declaration to "Negligent misrepresentation" that is a reference to the common law tort which is often referred to as "negligent misstatement", and which was presaged in the seminal dissenting judgment of Denning LJ in Candler v Crane Christmas & Co [1951] 2 KB 164 and definitively established in Hedley Byrne & Co Ltd v Heller & Partners Ltd [1964] AC 465

59.1. Counts 3 to 6 of the Complaint[20] relate to the Kingate Defendants.

59.2 Counts 15 to 17 of the Complaint[21] relate to the PricewaterhouseCoopers Defendants.

59.3. Counts 22 to 24 of the Complaint[22] relate to Citi Hedge.

Principles

60    Essential to success at trial on a cause of action for the tort of negligence will be a finding that, on the facts of the case, the defendant owed to the plaintiff a duty of care which the defendant has broken and the breach of which has caused injury to the plaintiff falling within the scope of the duty. Where the tort is alleged to have consisted of the making of some negligent misrepresentation, it will be essential that the defendant in fact made the representation.[23]

61    In their Expert Reports the Defendants' Experts set out a variety of reasons on the basis of which, after a trial of the present case in Bermuda or the BVI, the court before which the trial was conducted might conclude that the Plaintiffs' case fails. Each of the Defendants' Experts addresses in relation to a particular Defendant or group of Defendants argument which might be deployed and which, depending on the facts found, might succeed.

62    Nevertheless, for reasons set out below, I do not agree that on the present materials it can be demonstrated that, on no possible view of the Complaint or of the facts which might be found, could the Plaintiffs hope to prevail on the relevant counts. In what follows I consider further certain of the ingredients for negligent misrepresentation and negligence. However, for the first formulation of negligent misrepresentation as a tort recognised in English common law I would, refer to the extract from the judgment of Lord Reid in <u>Hedley Byrne & Co Ltd v Heller & Partners</u>

---

[20] Negligent misrepresentation to purchasers of shares in the Funds, negligent misrepresentation to holders of shares in the Funds, gross negligence and negligence respectively.

[21] Gross negligence, negligence and negligent misrepresentation respectively

[22] Gross negligence, negligence and negligent misrepresentation respectively

[23] For this part of the discussion it is not necessary to consider the law relating to joint tortfeasors: that is discussed later.

<u>Ltd</u> [1964] AC 465 quoted in footnote 8 above.[24] Later in his judgment Lord Reid referred to the judgment of *"that great Judge"* Cardozo CJ in <u>Ultramares Corporation v Touche (1931)</u> 255 NY 170, but commented that he considered the judgment of Cardozo CJ in <u>Glanzer v Shepherd</u> (1922) 233 NY 236 to be more in point in relation to the particular case of negligent misstatement then before the House of Lords in that there was a *"direct relationship"* between plaintiff and defendant.[25] As mentioned below, the relevant law may still be regarded as in a "state of transition or development". Now, at any rate, it is clear that liability will not depend necessarily and exclusively upon a finding of a voluntary assumption of responsibility by the defendant towards the plaintiff; that is, upon the acceptance of a relationship akin to one of contract: as explained by Lord Bingham in <u>Customs & Excise Commissioners v Barclays Bank plc</u> [2007] 1 AC 181 at para 4, *"I think it correct to regard an assumption of responsibility as a sufficient but not a necessary condition of liability, a first test which, if answered positively, may obviate the need for further inquiry. If answered in the negative, further consideration is called for."*[26]

63. **[Misrepresentation]** The Complaint sets out a case that various representations were made to the Plaintiffs by various of the Defendants. As a general proposition the Defendants' Experts deny that there can be any case for negligent misrepresentation on the basis that no relevant representations were in fact made by the Defendants to the Plaintiffs.

64. Insofar as the matter is one of pure pleading for determination now, rather than one of law, the resolution of this particular issue will depend upon the view which the Court takes of the Complaint. So, for example, Mr Chivers says at his paragraph 48 that *"Each of the Funds offered shares by way of an Information Memorandum published*

---

[24] <u>Hedley Byrne</u> was itself concerned with a negligently given bank reference following inquiry by the plaintiff: the defendant bankers did not deal directly with the plaintiff, but knew their reference was to be relied upon. As mentioned in footnote 8 above, in the case the House of Lords overruled <u>Candler's</u> case (a decision of the Court of Appeal, by a majority, denying the existence of a duty of care owed by an auditor to a person proposing to invest in the subject company) and preferred the reasoning of Denning LJ in his dissenting judgment in the case to the judgments of the majority of the Court of Appeal.

[25] In <u>Hedley Byrne</u> Counsel for the plaintiff, in contending for the existence of an actionable duty of care in the making of representations, submitted that *"In considering the development of this branch of the law the American cases are significant"* (see at page 478).

[26] In <u>Morgan Crucible Co plc v Hill Samuel & Co Ltd</u> [1991] Ch 295 the Court of Appeal allowed an action to go to trial where the action was by a successful bidder against the advisers, accountants and directors of the target company for negligent misrepresentations following the bid made in audited financial statements, in an unaudited interim statement and in a series of representations in defence documents. In the case the Court of Appeal approached the issue as being one of foreseeability, proximity, and justice and reasonableness.

*by it"*; and at paragraph 71 that although the Kingate Defendants are all alleged to have been involved in the preparation of the Investment Memorandum, *"that does not of itself amount to a representation made by such a person to the recipient of the document"*. This may not be a correct reflection of the allegations actually made, taking the Complaint as a whole. Notably, paragraph 84 of the Complaint alleges that the Kingate Defendants *"drafted, reviewed, authorized or otherwise participated in the preparation and dissemination of the Information Memorandum provided to prospective and current investors..."*. I can see this as amounting to an allegation that each Kingate Defendant was a person who made the relevant representations in various of the Information Memoranda to the Plaintiffs and other investors.

65. There is no principle of law which would prevent any of the Kingate Defendants from being found to have made the representations contained in the Investment Memoranda

    65.1. The fact that a misrepresentation is made with a view to inducing a contract with a third party does not prevent a misrepresentation from being in law that of the person who made it.

    65.2. The Investment Memoranda I have seen nowhere identify in terms any particular person as a maker, or as not having been a maker, of the document or of statements in it. In other words each of the Investment Memoranda leaves the identity of the maker of the statements in the document open to be determined as one of fact: no-one mentioned in the document is expressed as claiming or denying ownership or authorship of the document or of the statements made in it.

    65.3. The case of <u>Williams v Natural Life Health Foods</u> [1998] 1 WLR 830, referred to by Mr Chivers in paragraph 72 of his Expert Report, does not establish as a universal proposition that a director cannot be held personally liable for untrue representations made in a document put out by his company.

66. It is perhaps necessary to say a little more about the last point. Of course, an agent is not automatically liable for the tort of his principal, even where the tort is committed through the agent. However:

    66.1. Where the tort is that of fraudulent misrepresentation (discussed later), and the misrepresentation is made by the agent, the agent cannot escape liability for fraud by saying 'I am making this fraudulent misrepresentation on behalf of

someone else'. This is plain from the decision of the House of Lords in Standard Chartered Bank v Pakistan Shipping Corp [2003] 1 AC 959.[27]

66.2 In the case of negligent misrepresentation, as the House of Lords decided in the <u>Natural Life</u> case, liability will depend upon a finding that, as a matter of objective analysis of the facts, the defendant agent assumed personal responsibility for the relevant misrepresentation. Whether or not there has been in any given case the necessary assumption of responsibility is a factual one for the trial judge. But the question of liability, and hence the question of assumption of responsibility, is not the same as the different factual question whether the misrepresentation was that of the defendant or of someone else. The point in the <u>Natural Life</u> case was that there was nothing in the materials to show any kind of objective indication that the defendant personally, as opposed to his company, was doing anything for the plaintiff so as to fix on the defendant liability for the false statements made to the plaintiff in documents presented as being the company's documents.

67. **[Existence of duty of care]** The existence of a duty of care is fundamental to the tort of negligence. Where the damage caused by the defendant's act or omission giving rise to the plaintiff's claim is alleged to be purely economic, something more than the foreseeability of the damage needs to be found in the facts to establish the existence of a relevant duty of care on the part of the defendant. Mr Chivers' Expert Report refers in paragraphs 76 and 77 to this "something" as either an "assumption of responsibility" or a "special relationship".

68. I agree that these are terms or labels which have frequently been used in connection with the test to be applied to determine whether a defendant is liable in tort for causing pure economic loss to a claimant. Nevertheless, in <u>Customs and Excise Commissioners v Barclays Bank Plc</u> [2007] 1 AC 181 (referred to in paragraph 30 of Mr Browne-Wilkinson's Expert Report) the House of Lords gave further consideration to this issue. Having reviewed all of the authorities referred to in Mr Chivers' Expert Report, their Lordships concluded that there was no single common denominator to be applied to determine whether a defendant sued as causing pure economic loss owed a duty of care to the claimant. In that case the House of Lords identified the test involving "assumption of responsibility" as just one of three tests which had been applied by the Courts to pure economic loss cases. The others were referred to as

---

[27] See in particular paragraphs 21 to 23 in the judgment of Lord Hoffmann.

(a) the threefold test as espoused by the House of Lords in <u>Caparo v Dickman</u> [1990] 2 AC 605 (the three elements being foreseeability, proximity[28] and fairness, justice and reasonableness) and (b) whether the alleged duty would be incremental the duties in other cases.

69. I would draw attention to five particular points from the analysis of the case-law by the House of Lords in the <u>Barclays Bank</u> case:

69.1. The use of labels (or slogans as Lord Hoffmann called them) does not assist greatly in determining whether a duty of care exists (see for example, paragraphs 35 and 72).

69.2. The concept of "assumption of responsibility" may be particularly useful in two particular cases where a special relationship would arise: (a) where there was a fiduciary relationship and (b) where the defendant has voluntarily answered a question or has tendered skilled advice or services in circumstances where he knows or ought to know that an identified plaintiff will rely on his answers or advice (Lord Mance at paragraph 92 referring to Lord Goff in <u>White v Jones</u> [1995] 2 AC 207 at 274F-G).

69.3. The absence of an "assumption of responsibility" by the defendant is not decisive. Thus, Lord Bingham said at paragraph 4:

> "…I think that it is correct to regard an assumption of responsibility as a sufficient but not a necessary condition of liability, a first test which, if answered positively, may obviate the need for further inquiry. If answered negatively, further consideration is called for."

(see also Lord Rodger at paragraph 52).[29]

69.4. Further, in so far as the Court is looking for an assumption of responsibility, this phrase does not connote a subjective intention on the part of the person

---

[28] Essentially a relationship of some sort (see per Lord Hoffmann in <u>Customs & Excise Commissioners v Barclays Bank plc</u> [2007] 1 AC 181 at paragraph 35 (page 199D). The concept was further commented upon by Lord Mance in the same case, at paragraph 99, when he said that "*Proximity is a vaguer notion, which may take in aspects which can also be considered under the head of fairness, justice and reasonableness*", and added that in the instant case a court order obtained by the plaintiff restraining dispositions of a third party's property once notified to the defendant bank "*created a most proximate relationship between the [plaintiffs] and the [defendants]*".

[29] So, for example, Longmore J in <u>Shinhan Bank v Sea Containers Ltd</u> [2000] 2 Lloyds Rep 406, in finding a duty of care owed to a bank not to issue false receipts, at 415 adopted as alternative to the "assumption of responsibility" test the threefold requirements formulation of Lord Bridge in <u>Smith v Bush</u> [1990] 1 AC 831, namely was the loss suffered reasonably foreseeable by the defendant, was there a sufficiently proximate relationship between the defendant and the plaintiff and was it just and reasonable that the defendant should owe the plaintiff a duty of care.

said to have assumed responsibility. Rather it is something which is to be judged objectively (see for example, Lord Bingham at paragraph 6)

69.5   The judgments in the House of Lords highlighted the need to look at:

> "*the detailed circumstances of the particular case and the particular relationship between the parties in the context of their legal and factual situation as a whole*" (Lord Bingham at paragraph 8)

70.   These detailed circumstances and the legal and factual situation as a whole will, in the usual course of events, only be clear after a trial of the relevant proceedings and findings of fact by the trial judge. The Barclays Bank case was a notable exception to the usual position as it was able to proceed on very limited agreed facts. However, the general difficulty in striking out a claim against professionals in negligent misrepresentation at a preliminary stage was recognised by the Court of Appeal in Coulthard v. Neville Russell (a firm) [1998] BCC 359. In that case the Court of Appeal dismissed an application to strike out a claim based on the allegation that professionals (accountants) owed a duty to the directors of a company. Chadwick LJ reviewed the authorities including Hedley Byrne & Co Ltd v Heller & Partners Ltd [1964] AC 465,[30] Caparo Industries plc v Dickman [1990] 2 AC 605, White v Jones [1995] 2 AC 207 and Henderson v Merrett Syndicates Ltd [1995] 2 AC 145 and concluded at p. 369B:

> "*In my view the liability of professional advisers, including auditors, for failure to provide accurate information or correct advice can, truly, be said to be in a state of transition or development. As the House of Lords has pointed out, repeatedly, this is an area in which the law is developing pragmatically and incrementally. It is pre-eminently an area in which the legal result is sensitive to the facts. I am very far from persuaded that the claim in the in the present case is bound to fail whatever, within the reasonable confines of the pleaded case, the facts turn out to be. That is not to be taken as an expression of view that the claim will succeed; only as an expression of my conviction that this is not one of those plain and obvious cases in which it could be right to deny the plaintiffs the opportunity to attempt to establish their claim at a trial.*"

71.   In relation to auditors in particular, it is right as Ms Dohmann states in paragraph 67 of her Expert Report that in the Caparo case the House of Lords denied the existence of a duty of care owed by an auditor to an investor in the relevant company. In that case the House of Lords held that an auditor did not owe a duty of care to a

---

[30] As explained above, Hedley Byrne was the case in which the House of Lords established that liability could exist for a negligent misrepresentation made outside of a contractual or fiduciary relationship.

shareholder who relied on a statutory audit report carried out pursuant to the Companies Act 1948 (replaced by the time the case reached the House of Lords by the Companies Act 1985) when making a further investment. Generally speaking, therefore, an auditor of a UK company carrying out a statutorily required audit owes his duties only to the company he is auditing[31]; and this will be the same in the case of an auditor of a Bermudian or BVI company carrying out a statutorily required audit.

72    In his judgment (at page 630) in <u>Caparo</u> Lord Oliver explained as follows:

> "... if and so far as the purpose for which the audit was carried out is a relevant consideration in determining the extent of any general duty in tort owed by [the auditors] to persons other than the company which is their immediate employer, that purpose was simply that of fulfilling the statutory requirements of the Companies Act 1985. That, in turn, raises the question – and it is one which lies at the threshold of the inquiry upon which your lordships are invited to embark – of what is the purpose behind the legislative requirement for the carrying out of an annual audit and the circulation of the accounts. For whose protection were these provisions enacted and what object were they intended to achieve?"

Lord Oliver went on to answer his question by concluding (at page 631) that:

> "...the original, central and primary purpose of [the statutory] provisions, ... is ... the informed exercise by those interested in the property of the company ... of such powers as are vested in them by virtue of their proprietary interests'"

73.   However, I would point out that:

73.1.   The decision in the case is based on the application, to the particular facts of the case, of the principles referred to above in relation to liability for causing pure economic loss. It would be wrong in my view to say that, as a result, all claims by investors or shareholders against auditors in relation to audited financial statements will be barred. An example of an assumption of responsibility by an auditor can be found in <u>ADT Ltd v BDO Binder Hamlyn</u> [1996] BCC 808.

73.2.   A critical factor identified by the House of Lords (Lord Oliver in particular) in the <u>Caparo</u> case was that the audit of the company's accounts, and the production of an audit report on the accounts, was a statutory requirement, the engagement of the auditors being to meet this requirement. Further the

---

[31] This is the force of the comment of Lord Phillips in <u>Moore Stephens v Stone & Rolls</u> [2009] at paragraph 19 quoted in footnote 21 of Mr Hargun's Expert Report. It is noteworthy that Lord Phillips' comment had been prefaced by his pointing out (emphasis added) that *"the duties of an auditor are founded in contract and the extent of <u>the duties undertaken by contract must be interpreted in the light of the relevant statutory provisions</u> and the relevant auditing standards."*

statutory purpose of the audit report was to provide shareholders with the information necessary to enable them properly to exercise their rights to vote at general meetings (see 629H-633G). As Lord Mance explained in the case of Stone & Rolls Ltd v Moore Stephens [2009] AC 1391 at paragraph 214 (emphasis added) "*Caparo establishes that the auditor's **statutory duty** is not to any individual shareholder as a purchaser or potential shareholder of shares in the company, but to the shareholders collectively, and that their remedy for any breach lies through the company*". In other words there was no reason for a person contemplating making a purchase of shares in the company, which was a public company with shares listed and trading on a securities exchange, to suppose that the accounts were prepared to assist him with his decision whether or not to make the purchase: the background of the Companies Act amply explained the purpose for which, and use properly to be made of, the auditors' report on the annual accounts.

73 3. It was not alleged in Caparo that the defendant auditor had authorised its name to be used in marketing securities of the company under audit, or was aware that its name was being used for that purpose to draw in investors (compare paragraphs 111 and 112 of the Complaint).

74. In the present case, having regard to the points in the previous paragraph, the Caparo decision can be distinguished. This is because there was no statutory requirement for the production of audited accounts for the Funds. Further, an alleged purpose of PricewaterhouseCoopers' audit of financial statements for the Funds was to produce an audited net asset value figure to be communicated to investors along with the fact that the audit was by PricewaterhouseCoopers, it being stated in the Complaint that "*the primary purpose of [PricewaterhouseCoopers'] audits was to give investors assurances that the Funds' assets were legitimately invested and accurately valued*" (paragraph 112 of the Complaint; and see also paragraphs 106 to 111) If correct, this would place the case outside what might be considered the Caparo paradigm, where an investor relies upon a representation for a purpose which was altogether outside the scope of anything the maker of the representation could reasonably be taken to have contemplated. In this respect the case would be closely akin to that of Morgan Crucible Co Ltd v Hill Samuel & Co Ltd [1991] Ch 295, discussed in footnote 26 above: in that case too Caparo was held to be capable of being distinguished [32]

---

[32] The case would, indeed, fall squarely within the paradigm for liability suggested by Lord Morris of Borth-y-Gest in Hedley Byrne at page 503 (emphasis added): " *if in a sphere in which a person is so*

75. **[Disclaimers]** Relevant to the existence or scope of a duty of care in any case may be any disclaimers given by the defendant to the plaintiff. This is particularly so in relation to a case founded on an alleged negligent misrepresentation. As to this, it appears that Defendants may seek to rely upon various disclaimers or warnings contained in the Information Memoranda as having either precluded the existence of a duty of care or as allowing those Defendants to avoid liability even if such a duty had existed and was breached. Thus, Mr Chivers at paragraph 91 of his Export Report draws attention to disclaimers and warnings identified by him and characterised as factors relevant to his conclusion that there was no "*assumption of responsibility*" sufficient for establishing a duty to take reasonable care in the making of representations to the Plaintiffs. Mr Browne-Wilkinson makes a similar point when discussing the relevance of any terms entered into between Citi Hedge and the Funds (paragraphs 39 and 40 of his Expert Report)

76. There is no doubt that liability for negligent misrepresentation can be avoided by an appropriately worded disclaimer. Indeed, this was the result in <u>Hedley Byrne</u>. Ultimately this depends on the proper construction of the disclaimer and whether or not the words used, as properly construed, apply to the factual situation alleged by the plaintiff.

77. The first disclaimer to which Mr Chivers refers (in paragraph 91(d) of his declaration) is a disclaimer in relation to reliance by a Subscriber on the Information Memorandum for advice. In my opinion this disclaimer does not deal with the gravamen of the complaint made by the Plaintiffs which is that the factual content of the Information Memoranda was simply false. Thus for example, when the Memoranda set out the "Investment process" used by the Funds including the "split-strike conversion strategy", this was, it is alleged in the Amended Complaint, false as the "Investment Manager" had made no investments and used no strategy.

78. Thus, the Complaint does not concern purely advice but principally the underlying factual statements made in the Information Memoranda on the basis of which the Plaintiffs were encouraged to seek their own advice. That advice would not obviously have concerned whether or not the factual statements in the Information Memoranda were correct but rather whether the shares in the Funds were a suitable investment

placed that others could reasonably rely upon his judgment or his skill or upon his ability to make careful inquiry, a person takes it upon himself to give information or advice to, or allows his information or advice to be passed on to, another person who, as he knows or should know, will place reliance upon it, then a duty of care will arise."

given their nature as described in those Memoranda. In this regard it is notable that the Information Memoranda themselves referred to the lack of independent data available to assist a prospective investor in his analysis of the Fund, a fact which could be said to emphasise the need for accuracy in what was said in those Memoranda.

79. Further, the second disclaimer referred to by Mr Chivers (in paragraph 91(e)) is a forward looking disclaimer in that it warns that the Investment Manager would not be performing due diligence on the Investment Manger in the future. The misrepresentations relied on by the Plaintiffs in the Complaint are not just about future due diligence but are about the present state of the Funds. These would not be covered by the disclaimer.

80. Accordingly, I do not consider that a BVI or Bermuda court would conclude at this stage that either of the disclaimers would be sufficient to preclude the existence of a duty of care between the Kingate Defendants and the Plaintiffs in relation to the factual statements concerning the existing state of the Funds.

81. The comments of Mr Browne-Wilkinson at paragraphs 39 and 40 of his Expert Report, where he discusses the relevance of contractual restrictions of liability agreed to by the Funds with Citi Hedge, are dealt with later. In principle, however, I do not agree that the terms of the Administration Agreement referred to by Mr Browne-Wilkinson, or the fact of the contractual relationship between the Funds and Citi Hedge, are sufficient to preclude the existence of a duty of care owed by Citi Hedge to the Plaintiffs.

82. **[Scope of duty of care, causation & intervening third party acts)]** Mr Browne-Wilkinson in his Expert Report addresses in particular the question of the scope of the duty of care (paragraphs 28 to 36). His point is that the mere fact that a person is in breach of a duty of care does not necessarily entail that the person to whom the duty was owed can recover damages for all loss which could be said to have been caused by the breach.

83. I agree that the mere existence of a duty of care is not enough to found liability, even were a breach to be established along with resulting loss. For liability the duty must be one which was owed to the claimant in respect of the kind of loss that he has suffered (see for example Lord Hoffman in <u>Banque Bruxelles Lambert SA v Eagle Star Insurance Co Ltd</u> [1997] AC 191, referred to in paragraph 32 of Mr Browne-

Wilkinson's Expert Report). The point is quite neatly put by Laddie J in the extract from his judgment in <u>Bank of Credit and Commerce International (Overseas) Ltd v Price Waterhouse</u> [1999] BCC 351 at paragraph 30 quoted in paragraph 32 of Mr Browne-Wilkinson's Expert Report: the mere fact that one person owes a duty of care to a second does not mean that the first is insurer of the second against all future loss.

84. Nevertheless, in any given case the scope of the duty will depend upon all the facts as found. The <u>Banque Bruxelles Lambert</u> case is a good illustration. A surveyor advising a mortgage lender of the value of a property proposed to be taken by way of security is not liable for the loss the lender suffers by reason of a subsequent fall in the market value of the property, the borrower having defaulted: the relevant loss, where the valuer has negligently valued the property at too low a price, is capped at the difference between the correct value and the value negligently provided. In effect the scope of the duty of care owed by the valuer in such a situation is limited, the duty being to use reasonable care to provide an accurate valuation to an intending lender only for the purpose of enabling the plaintiff lender to decide upon the amount of security necessary to be taken.

85. In the present case, however, it is difficult to see much room for the application of this limiting principle, a principle applicable where the material loss has been caused by something extraneous to the duty and its breach; where, in other words, the loss has been caused by something not reasonably within the contemplation of the parties as a consequence of the breach, so that the breach is to be regarded as only the occasion for the loss and not its cause.

86. In relation to the point in the previous paragraph I should also comment on Mr Browne-Wilkinson's suggestion that "*the law does not generally impose on a person a duty to protect another from suffering financial loss by reason of the deliberate acts of a third person*".[33]

87. I would agree with this suggestion in any situation in which there is otherwise no duty owed to the person suffering the loss. Where, however, there is found to be a duty, the court will approach the question more broadly by seeking to identify the scope of the duty having regard to the relevant facts. This was in fact Lord Hoffmann's point in <u>Environment Agency v Empress Car Co Ltd</u> [1999] 2 AC 22 at 31E, referred to in

---

[33] Paragraph 34 of Mr Browne-Wilkinson's Expert Report.

footnote 4 to Mr Browne-Wilkinson's Expert Report. In his judgment Lord Hoffmann also quoted a comment made by Tucker LJ on the statement set out in paragraph 35 of Mr Browne-Wilkinson's Expert Report, the comment indicating the limited help to be gained from that statement. The passage in Lord Hoffmann's judgment is as follows:

> "I turn next to the question of third parties and natural forces. In answering questions of causation for the purposes of holding someone responsible, both the law and common sense normally attach great significance to deliberate human acts and extraordinary natural events. A factory owner carelessly leaves a drum containing highly inflammable vapour in a place where it could easily be accidentally ignited. If a workman, thinking it is only an empty drum, throws in a cigarette butt and causes an explosion, one would have no difficulty in saying that the negligence of the owner caused the explosion. On the other hand, if the workman, knowing exactly what the drum contains, lights a match and ignites it, one would have equally little difficulty in saying that he had caused the explosion and that the carelessness of the owner had merely provided him with an occasion for what he did. One would probably say the same if the drum was struck by lightning. In both cases one would say that although the vapour-filled drum was a necessary condition for the explosion to happen, it was not caused by the owner's negligence. One might add by way of further explanation that the presence of an arsonist workman or lightning happening to strike at that time and place was a coincidence.
>
> On the other hand, there are cases in which the duty imposed by the rule is to take precautions to prevent loss being caused by third parties or natural events. ... A legal example is the well known case of <u>Stansbie v. Troman</u> [1948] 2 K.B. 48. A decorator working alone in a house went out to buy wallpaper and left the front door unlocked. He was held liable for the loss caused by a thief who entered while he was away. For the purpose of attributing liability to the thief (e.g. in a prosecution for theft) the loss was caused by his deliberate act and no one would have said that it was caused by the door being left open. But for the purpose of attributing liability to the decorator, the loss was caused by his negligence because his duty was to take reasonable care to guard against thieves entering.
>
> These examples show that one cannot give a common sense answer to a question of causation for the purpose of attributing responsibility under some rule without knowing the purpose and scope of the rule. Does the rule impose a duty which requires one to guard against, or makes one responsible for, the deliberate acts of third persons? If so, it will be correct to say, when loss is caused by the act of such a third person, that it was caused by the breach of duty. In <u>Stansbie v. Troman</u> [1948] 2 K.B. 48, 51-52, Tucker L.J. referred to a statement of Lord Sumner in <u>Weld-Blundell v. Stephens</u> [1920] A.C. 956, 986, in which he had said:
>
> > "In general ... even though A is in fault, he is not responsible for injury to C which B, a stranger to him, deliberately chooses to do. Though A may have given the occasion for B's mischievous activity, B then becomes a new and independent cause."

*Tucker L.J. went on to comment:*

> *"I do not think that Lord Sumner would have intended that very general statement to apply to the facts of a case such as the present where, as the judge points out, the act of negligence itself consisted in the failure to take reasonable care to guard against the very thing that in fact happened."*
>
> *Before answering questions about causation, it is therefore first necessary to identify the scope of the relevant rule. This is not a question of common sense fact, it is a question of law. In <u>Stansbie v. Troman</u> the law imposed a duty which included having to take precautions against burglars ..."*

88.  The case of <u>Stansbie v Troman</u> referred to by Hoffmann LJ was one in which a painter had been engage decorate a house. It was held that he owed a duty to take reasonable care with regard to the state of the premises if he left them during the course of his work. Leaving the front door open and the premises unattended was a breach of this duty, the theft from the premises by a third party being something which proper performance of the duty might have prevented. It is not difficult to see an analogy with the present case, where on the Plaintiffs' case their loss was caused by their being duped into investing, and their investments being lost, in a disguised Ponzi scheme.

89  In paragraph 35 of his Expert Report Mr Browne-Wilkinson refers to the causation question which can arise when a third party's actions have an impact on the losses suffered by a plaintiff. Mr Hargun and Mr Evans at paragraphs 66 to 67 and 31 respectively of their Expert Reports refer to this question, and point out that where a third party's actions have been involved the court may conclude that the actions result in the plaintiff's breach of duty being found to be the occasion, not the cause, of the loss.

90.  I disagree with the assertion made by Mr Hargun in his Expert Report, that (emphasis added) *"the courts have also recognised the principle that the voluntary act of a third person intervening between a breach of duty by the defendant and the loss suffered by the Plaintiff will **normally** 'break the chain of causation'."* As pointed out by Lord Hoffmann in the passage from the <u>Environment Agency</u> case cited above, the causation question will depend upon the question of the scope of the duty which the plaintiff is claiming the defendant has broken. As mentioned above in my discussion of the <u>Environment Agency</u> case, the statement of Lord Sumner in <u>Weld-Blundell v Stephens</u> set out in paragraph 35 of Mr Browne-Wilkinson's Expert Report is of limited assistance. I wholly disagree with any suggestion, if made by the Defendants'

Experts, that the statement can possibly lead to a conclusion that as a matter of Bermudian or BVI law the Defendants cannot possibly be liable to the Plaintiff for any damages for the reason that all their losses have been caused by thefts by Madoff.

The claims for negligent misrepresentation (Counts 3, 4, 17 and 24)[34]

91. It is against this background that I will consider the claims in negligent misrepresentation made in the Complaint, commenting on the points made in relation to the various Defendants.

92. **[The Kingate Defendants]** Mr Chivers' Expert Report concludes in paragraph 69 that (a) there was no representation by the Kingate Defendants and (b) that the Amended Complaint does not plead sufficient facts to establish the existence of a duty of care between the Plaintiffs and the Kingate Defendants.

93. Both of these arguments are intimately bound up with the underlying facts[35] and in particular the role played by each of the Kingate Defendants in the process by which the Plaintiffs subscribed for shares in the Funds. These facts have not yet been found in the present case.

94. However:

94.1. Paragraph 43 of the Complaint alleges that the Kingate Fraud Defendants were active participants in the preparation and dissemination of materially false and misleading documents, including the Information Memoranda.

94.2. Paragraph 84 of the Complaint includes the allegation that the Kingate Defendants were, amongst other things, involved in the dissemination of the Information Memoranda and "*responsible for the content of those materials*" namely the Information Memoranda.

95. It is therefore being alleged in the Complaint that the Kingate Defendants were the authors and distributors of the documents containing the alleged misrepresentations. This is, to all intents and purposes, an allegation that the Kingate Defendants made the representations. It is also alleged that the Kingate Defendants played an active role in the process by which the Plaintiffs became investors in the Funds.

---

[34] These are directed at the Kingate Defendants (Counts 3 and 4), PricewaterhouseCoopers (Count 17) and Citi Hedge (Count 24)

[35] The question who made any particular representation is, as Mr Chivers recognises in paragraph 69(a) of his Expert Report, one of fact and the existence of a duty of care requires (as explained by the House of Lords in Barclays Bank) consideration of the detailed factual circumstances of the case

96      Further, the Information Memorandum and attached subscription agreement which an investor was obliged to execute envisage a broader relationship than simply one between the Funds and the individual investor. In particular:

96.1    Pursuant to the "Subscriber representations and warranties" the investor was acknowledging that not just the Funds but also the Manager, the Investment Advisor, the Administrator and Consultant had all made available the opportunity to ask questions of and receive answers from them concerning the terms and conditions of the offering described in the Information Memoranda and to obtain any further information necessary to verify the information contained in the Information Memoranda.

96.2    Pursuant to the section entitled "Trustee, Agent, Representative, Nominee or other Third Parties", the investor agrees to indemnify not just the Funds but also the Manager, the Investment Adviser, the Consultant and the Administrator and their officers and agents in connection with any damages arising from the investor's misrepresentation or misrepresentation

96.3    Pursuant to the section entitled "Indemnification" the investor agrees to provide a broad indemnity not just to the Funds but also to the Manager, the Investment Adviser, the Consultant and the Administrator and to their respective affiliates, employees, officers, directors and agents and each other subscriber from any loss or damage arising out of any breach of any representation or warranty of the investor contained in any document furnished by the investor in connection with the offering and sale of the shares in the Funds.

96.4    The investor agreed to appoint KML as its proxy for the purpose of voting shares in the Funds issued to the investor

96.5    The investor provided KML with a wide-ranging and irrevocable power of attorney.

97      It is also notable that clause 5.4 of the Management Agreement dated 1 January 2006 seeks to limit the liability of KML not just to the Funds but also, expressly, to "its Shareholders". The drafting of this clause in this way implies that there was some relevant contractual duty or duty of care owed by KML to the "Shareholders".

98    On the basis of these materials I cannot agree that, on any view which may reasonably be arrived at as to the facts, the Plaintiffs' claim against the Kingate Defendants for the tort of negligent misrepresentation is certain to fail as a matter of Bermudian law or the law of the BVI.

99    Mr Hargun takes a particular objection to the claims against Tremont Group which he suggests in paragraph 48 to 51 of his declaration require the corporate veil to be pierced. I would not agree that this is the effect of the Complaint in so far as it relates to Tremont Group. The Plaintiffs are alleging that Tremont Group is liable for its own actions and alleged wrongdoing. Piercing the corporate veil would only be necessary if the Plaintiffs were seeking to make Tremont Group liable for the wrongdoing of Tremont (Bermuda) in circumstances where the Plaintiffs were not asserting an independent cause of action against Tremont Group.

100.  **[The PricewaterhouseCoopers Defendants]** As regards the auditors of the Funds, it seems to me that there is a material difference between the factual situation in <u>Caparo</u> and that it the present case. This I have addressed earlier in this Declaration.

101.  As I have referred to above, in <u>Caparo</u> the House of Lords considered it important that the relevant audited financial statements had been produced by the auditors pursuant to a statutory requirement placed on companies to have annual audits and for the particular purpose of allowing shareholders to exercise their rights to vote.

102   By contrast, the position in relation to the Funds was, as I understand it, materially different.

      102.1. First, there was, at the material time set out in the Complaint (between the inception of the Funds and December 2008), no statutory requirement under the law of the BVI for the Funds, which according to the Information Memoranda were registered as "professional funds", to have their financial statements audited or for such financial statements to be provided to shareholders [36]

      102.2 Second, pursuant to the subscription agreement which each Plaintiff was obliged to sign in order to invest in the Funds, that Plaintiff provided a "standing proxy" to KML to vote the shares issued pursuant to the relevant

---

[36] This position has since changed with the enactment of the Mutual Funds Regulations 2010 which requires professional funds to have audited financial statements.

subscription An example of the proxy can be found at page S-14 of the Information Memorandum dated 1 May 2006

102.3. Third, according to the Complaint, the Funds' audited accounts underpinned the valuations of the Funds represented in the Information Memoranda, valuations which were referred to in the Information Memoranda along with the fact that PricewaterhouseCoopers were the Funds' auditors and had consented to the inclusion of "*its name, report and reference to itself*" in the Information Memoranda (see for example, page 33 of the IM dated 1 May 2006).[37]

102.4 Fourth, the Management Agreement between the Funds and KML obliged KML to deliver to each person to whom shares in the Funds were offered, a copy of the most recently published Information Memorandum and a copy of the Fund's most recently published annual report.

103. In these circumstances, I do not consider that the reasoning in <u>Caparo</u> can simply be carried across to the present case in order to conclude that the PricewaterhouseCoopers Defendants cannot, on any view of the facts which may be established, have owed any duty of care to the Plaintiffs.

104. Materially, considering what is alleged about the circumstances in which the audited financial statements were produced and the use for which they were intended, a duty of care could be found to have existed In this regard, the Complaint alleges in paragraph 111 (noted above) that PricewaterhouseCoopers were aware that their name was used by the Funds in their marketing to give legitimacy to the Funds and to draw investors into the Funds. In other words the Complaint is putting forward a case that PricewaterhouseCoopers were carrying out their audits and reporting the results in their reports on the Fund's audited annual financial statements with the knowledge that the Plaintiff investors would be provided with and rely upon the information in making and retaining their investments

105. **[Citi Hedge]** The Complaint alleges, amongst other things, in paragraphs 368 to 374, that Citi Hedge produced NAV and account balance calculations which were false; that Citi Hedge had a unique and special expertise and superior position with regard to producing such documents; that Citi Hedge was in a special relationship

---

[37] See especially paragraphs 108, 111 and 112 of the Complaint.

with the Plaintiffs; that the Plaintiffs relied on the misrepresentations to make and retain their investments; that Citi Hedge was reckless in producing the misrepresentations and that Citi Hedge knew that the Plaintiffs would use and rely on the misrepresentations to make and retain investments.

106. In my opinion, if the Plaintiffs make good these allegations of fact then Citi Hedge will be liable to them for negligent misrepresentation.

107. Mr Browne-Wilkinson suggests in paragraph 33 of his Expert Report that the relevant question is whether Citi Hedge owed the Plaintiffs a duty of care to hold them harmless from the damage resulting from the misappropriation of the Funds by Mr Madoff. He then links this to a reference in paragraph 34 to the law generally not imposing on a person a duty to protect another from pure economic loss by reason of the deliberate acts of a third person.

108. Whatever may be the position in respect of other counts relating to Citi Hedge (discussed elsewhere in this Declaration) I would disagree with Mr Browne-Wilkinson's characterisation of the relevant question so far as it relates to the claim in Count 24. There the alleged duty is not put forward as being one to use reasonable care to hold the Plaintiffs harmless from anything. It is a duty to use reasonable care to see that the information provided to them in contemplation of their using the information to make investment decisions was correct. As to the scope of the duty of care, having regard to the Banque Bruxelles Lambert case discussed earlier damage sustained in consequence of the Plaintiffs relying on the information as accurate will be limited to what was suffered directly through the actual investment decisions made on the basis of the inaccurate information. In other words, if a duty of care was owed by Citi Hedge it was in respect of losses which the Plaintiffs suffered by purchasing or retaining shares in the Funds.

109. I would also wish to qualify the comments in paragraph 34 of Mr Browne-Wilkinson's Expert Report on the relevance of deliberate acts of a third person (a topic which I have also addressed at paragraphs 84 to 86 above).

110. First, there is a difference between claims purely in negligence and claims for negligent misrepresentation. Whilst the deliberate acts of third parties may be relevant in assessing whether a duty of care is owed in cases where the claim is for negligent breach of a duty such as a duty to take reasonable care in carrying out

one's functions as administrator and financial services provider, the essence of a claim in negligent misrepresentation is different. The duty is properly characterised not as a duty to prevent loss caused by the deliberate acts of the third party but rather as one to take reasonable care to see that the statements made are accurate. The fact that the statements may be inaccurate because of a deliberate act of a third party (rather than, say, a negligent act) does not alter the scope of the duty to take care in making the relevant statements

111. Thus, for example, in <u>Caparo</u>, it was alleged that negligent misrepresentation by the auditors related to an overvaluation of stock which had been carried out fraudulently by the directors. It was not said in that case that the deliberate acts of any third party (the directors) would have negated the existence of a duty of care on the part of the auditors.

112. Second and in any event, I refer to what I have said earlier in this Declaration and add the following. As Lord Goff explained in <u>Smith v Littlewoods Ltd</u> [1987] 1 AC 241, the court has to look at the purpose of the duty in question, when considering the significance of the acts of third parties, because, although there may have been intervening deliberate acts of a third party, the very scope of the duty may be to guard against such acts:

> "Of course, if a duty of care is imposed to guard against deliberate wrongdoing by others, it can hardly be said that the harmful effects of such wrongdoing are not caused by such breach of duty."

113. In the present case, it seems to me to be arguable at the very least that, if Citi Hedge owed a duty of care to the Plaintiffs as alleged, this duty encompassed taking reasonable care to make accurate reports which would cast light on, and thereby reduce the likelihood of, the wrongdoing of individuals such as Mr Madoff. After all, it may well be said that the purpose of having an independent party produce NAV and account balance calculations is to prevent fictitious valuations

114. Further, whilst I would agree with Mr Browne-Wilkinson that the existence of the Administration Agreement and in particular the provisions in that agreement which seek to limit the liability of Citi Hedge to the Funds is part of the factual matrix which a court would take into account in determining the existence and scope of a duty of care, I would point out that:

114.1 The limitations on liability in the Administration Agreement (in clause 10.3 and 10 6) are not absolute. By way of illustration, clause 10.3 provides expressly

that claims for or involving gross negligence, wilful default or fraud are not excluded

114.2  The "negligence" allegations in the Complaint include that Citi Hedge acted with gross negligence, and that the misrepresentations were made recklessly Given the express exclusions in clause 10 3 of the Administration Agreement, which are calculated to permit certain claims for negligence, it cannot be said that the duties of care on the part of Citi Hedge contended for by the Plaintiffs are inconsistent with the contractual limitations in the Administration Agreement.

115.  It is also notable that clause 10.3 of the Administration Agreement seeks to limit the liability of Citi Hedge not just to the Funds but also, expressly, to "any Shareholder". This drafting suggests that there was recognised to be a relevant duty owed by Citi Hedge to the "Shareholders" which was appropriately to be made the subject of a restriction.  Further the Information Memoranda expressly contemplated the provision of NAV calculations directly by Cith Hedge to investors in the Funds

116.  These factors contrast with the position in cases such as <u>Simaan General Contracting Co. v Pilkington Glass Ltd (No. 2)</u> [1988] 1 QB 758 (referred to by Mr Browne-Wilkinson in paragraph 40) in which there was a chain involving a building owner, a main contractor and a sub-contractor in which the sub-contractor had no dealings with the building owner.  There were thus separate contractual relationships between on the one hand the building owner and the main contractors and on the other hand the main contractor and the sub-contractor.  The building owner was not entitled to override this contractual structure.  But differs in nature from the relationship between the Plaintiffs, the Funds and Citi Hedge   As a result, I do not agree that the existence of the clauses limiting Citi Hedge's liability would conclusively negative the existence of a duty of care owed by Citi Hedge to the Plaintiffs.

<u>The claims for negligence (Counts 6, 16 and 23)</u>

117.  I turn now to the particular counts in the Complaint which make allegations of negligence.  The focus of the Defendants' Expert Reports in so far as they deal with these counts is on the existence of a duty of care.

118.  Count 6 concerns the Kingate Defendants.  In it, the Plaintiffs make the necessary allegations to establish a cause of action in negligence.  In particular, they allege the existence of a special relationship between those Defendants and the Plaintiffs giving

rise to a duty of care in the management and monitoring of the assets invested by the Plaintiffs in the Funds; that this duty of care was breached by the negligent failure to exercise due care; and that the Plaintiffs were injured by the negligent acts

119. As referred to above in the context of the claims against the Kingate Defendant for negligent misrepresentation, the existence of a duty of care will be one of the central issues at trial, an issue which will depend very much upon the facts found. However, if the Plaintiffs prove the facts alleged in relation to the special relationship between them and the Kingate Defendants, then it would be open for the court at trial to conclude that a duty of care existed. These facts and matters include all of the matters pleaded earlier in the Complaint such as the alleged close contact between Madoff and the "key Kingate Defendants" (paragraphs 70 to 76).

120. Similar points can be made in respect of:

120.1. Count 16 which alleges negligence against the PricewaterhouseCoopers. Again the allegation is made that a special relationship existed between the Plaintiffs and PricewaterhouseCoopers. In this Count the allegation has the particular factual element that the audit reports were, it is alleged, addressed and directed to the Plaintiffs as investors in the Funds. As I have explained above, there was no "statutory purpose" for the appointment of auditors as existed in the Caparo case.

120.2. Count 23 which alleges negligence against Citi Hedge on the basis of a special relationship between the Plaintiffs and Citi Hedge. This Count expressly repeats the facts and matters alleged earlier in the Complaint which include allegations as to Citi Hedge, including that it "touted" its superior financial services capabilities (paragraphs 193 to 197). It seems to me that if these factual allegations are made out they could be sufficient to support a finding that a duty of care existed.

**Gross negligence (Counts 5, 15 and 22)**

121. I have already considered above the principles which apply to the existence of a duty of care in relation to the Counts which contain allegations of gross negligence against the various Defendants (Counts 5, 15 and 22). I would agree with the Defendants' Experts that, for the purposes of identifying a cause of action, the laws of England and Wales and of Bermuda and the BVI do not recognise a separate tort of gross negligence as something different from simple negligence.

122. However, the term "gross negligence" is not necessarily irrelevant because it is one which is frequently used in exclusion clauses and disclaimers and the Courts have accordingly had occasion to consider its meaning as described, for example, in paragraph 75 of Mr Hargun's declaration.

123. In relation to the case of The Hellespont Ardent referred to in paragraph 75 of Mr Hargun's Declaration, Gloster J has in a recent case in the Commercial Court, JP Morgan Chase Bank v Springwell Navigation Corporation [2008] EWHC 1793, questioned the application of the comments by Mance J (as he then was) to the contractual circumstances of the case before her when she said:

> "[204] Like Romer J in Re City Fire Insurance [1925] Ch 407, I have some difficulty in defining precisely what is meant by "gross negligence", once the duty of care has been articulated by reference to the lesser standard of care that the obligor exercises in relation to his own affairs. It could be said that, by definition, necessarily, any breach of that lower level of duty of care involved "gross negligence". Mr. Beltrami, however, submitted that there was, in the contractual context of the Notes, a meaningful difference between "negligence" and "gross negligence", even in a situation where Chase was in breach of the lower level duty of care. He relied upon certain obiter remarks in the judgment of Mance J (as he then was) in the Hellespont Ardent [1997] 2 Lloyds Rep 547 to support the approach that in the contractual context of section 3(c) "gross negligence" must mean something more than a "mere" breach of Chase's lower level duty of care and must involve "serious" negligence on Chase's part. Mr. Baker, on the other hand, submitted that these remarks were inconsistent with the older authorities and that Mance J's comments breach Lord Goddard CJ's injunction not to import the law of manslaughter into the realms of common law negligence liabilities: see Pentecost v London District Auditor [1951] 2 KB 751. Mr. Baker submitted that the older authorities were not cited to Mance J, and his remarks should not be followed.
>
> [205] I have to confess to finding this debate a somewhat sterile and semantic one. As Mr. Beltrami submitted, ultimately a liability for "gross negligence" is just the other side of the coin to "what is the duty owed". Experience would suggest that the term "gross negligence" derives from United States commercial contracts, rather than English ones. I propose to proceed by: (i) identifying factually what Chase is alleged to have done or failed to have done, (ii) deciding whether that was in breach of its lower level duty of care; and (iii) deciding whether such breach amounts to "serious" negligence. Whether questions (ii) and (iii) are in fact the same question may well not matter.
>
> Wilful Misconduct
>
> [206] It was common ground that "wilful misconduct" involved a knowingly wrongful action or failure to act, or acting (or failing to act) "with reckless carelessness, not caring what the results of [the] carelessness may be"; see per Lord Alverstoke CJ in Forder v Great Western Railway [1905] 2 KB 535.

124. Thus Gloster J (albeit dealing with the particular contractual terms in operation in that case pursuant to which the defendant was only obliged to act with the same care as he would show towards his own affairs rather than with a higher objective standard of care) treated liability for gross negligence as relating to the nature of the duty owed and applied a cross-check by looking to see whether the negligence was "serious" without any additional epithets.

125. Looking at the present case in this way, the limitation of liability to gross negligence as opposed to simple negligence could affect the standard and scope of the duty of care which the relevant defendant owes but would not extinguish it. Further the fact that the Complaint contains allegations not just of negligence but also of gross negligence is an important factor; and the facts and matters relied on in the Counts alleging negligence are comprehended within the Counts alleging gross negligence (with the addition of pleas that the Defendants were reckless). There is therefore no scope for any part of the claims in negligence to be defeated in limine by the exclusion clauses.

126. Further and in any event, in my opinion the allegations of gross negligence in Counts 5, 15 and 22 with their particular focus on the allegedly reckless nature of the relevant acts would amount either to "serious" negligence or to "gross negligence" within the terms of the definition offered by Mance J.

**Breach of fiduciary duty (Counts 7 and 21)**

127. The Complaint includes complaints against the Kingate Defendants (in Count 7) and Citi Hedge (in Count 21) for breach of a fiduciary duty alleged to have been owed by those Defendants to the Plaintiffs.

128. The complaint in Count 7 is considered in particular in paragraphs 57 to 68 of Mr Chivers' Expert Report and paragraphs 52 and 78 to 84 of Mr Hargun's Expert Report. They each say that the allegations in the Amended Complaint do not give rise to a fiduciary duty under Bermuda or BVI law. The complaint in Count 21 is considered in particular in paragraphs 16 to 22 of Mr Browne-Wilkinson's Expert Report, his conclusion (in his paragraph 22) being that the Complaint has not alleged that Citi Hedge owed any fiduciary duties, that "*accordingly Citi Hedge cannot have been a fiduciary of the Plaintiffs, since a fiduciary is someone who owes fiduciary duties*", and that no breach of any fiduciary duty "*in the true sense*" has been pleaded.

129. Dealing first with Count 7 and the Kingate Defendants, these individuals or entities occupied various different positions within the broad structure of the Funds as set out in paragraphs 50 to 55 of Mr Chivers' Expert Report.

130. As regards those of the Kingate Defendants who were directors of the Funds (Cook, Epps, Sebah, Manzke and Weatherill), I would agree that directors and/or officers of a company do not generally owe fiduciary duties to individual shareholders simply by virtue of occupying such office, and without more. That general proposition is a reflection of the separate legal personality of companies, and of the position of a company's officers as agents of the company.

131. However, English law recognises that directors can owe fiduciary duties to shareholders in special circumstances. Thus in Peskin v Anderson [2001] 1 BCLC 372 at paragraph 32 Mummery LJ said that "A duality of duties may exist", referring to the fact that a fiduciary duty may be owed by a director to his company and another to a shareholder, and continued:

> "In Stein v Blake & Ors (No 2) [1998] 1 BCLC 573 at 576, 579 Millett LJ recognised that there may be special circumstances in which a fiduciary duty is owed by a director to a shareholder personally and in which breach of such a duty has caused loss to him directly (e.g. by being induced by a director to part with his shares in a company at an undervalue) ...."

132. Mummery LJ went on to point out that a duty to shareholders does not arise from the legal relationship with the company, but "are dependent on establishing a special factual relationship between the directors and the shareholders **in the particular case**" (emphasis added). The examples he then gave, at paragraphs 33 and 34 were as follows:

> "[33] ....Events may take place which bring the directors of the company into direct and close contact with the shareholders in a manner capable of generating fiduciary obligations, such as a duty of disclosure of material facts to the shareholder, or an obligation to use confidential information and valuable commercial and financial opportunities, which have been acquired by the directors in that office, for the benefit of the shareholders, and not to prefer and promote their own interests at the expense of shareholders.
>
> [34] These duties may arise in special circumstances which replicate the salient features of well established categories of fiduciary relationships. Fiduciary relationships, such as agency, involve duties of trust, confidence and loyalty. Those duties are, in general, attracted by and attached to a person who undertakes, or who, depending on all the circumstances, is treated as having assumed, responsibility to act on behalf of, or for the benefit of, another person. That other

> *person may have entrusted or, depending on all the circumstances, may be treated as having entrusted, the care of his property, affairs, transactions or interests to him. There are, for example, instances of the directors of a company making direct approaches to, and dealing with, the shareholders in relation to a specific transaction and holding themselves out as agents for them in connection with the acquisition or disposal of shares; or making material representations to them; or failing to make material disclosure to them of insider information in the context of negotiations for a take-over of the company's business; or supplying to them specific information and advice on which they have relied. These events are capable of constituting special circumstances and of generating fiduciary obligations, especially in those cases in which the directors, for their own benefit, seek to use their position and special inside knowledge acquired by them to take improper or unfair advantage of the shareholders. "*

133. What is significant in this judgment is that:

   133.1  the fact that a director owes fiduciary duties to his company is no bar to his owing fiduciary duties to the company's shareholders as well; and

   133.2  the existence or otherwise of fiduciary duties owed to shareholders is question of fact in each case.

134. An example of a special factual relationship can be found in the case where directors supply information to shareholders in relation to an offer for the purchase of their shares or where they express a view as to whether or not such a take-over offer should be accepted: see Dawson International plc v Coats Paton plc (1988) 4 BCC 305 and the earlier New Zealand case of Coleman v Myers [1977] 2 NZLR 297. In the latter case, one factor of particular importance was the high degree of inside knowledge of the directors

135. As regards the other Kingate Defendants, the question whether or not they owed fiduciary duties to the Plaintiffs will be determined by the general principles governing the existence of a fiduciary duty, namely whether there is a sufficient relationship of trust and confidence. Millett LJ (as he then was) expressed this simply in Bristol and West Building Society v Mothew [1998] 1 Ch 1 at 18:

   > "a fiduciary is someone who has undertaken to act for or on behalf of another in a particular matter in circumstances which give arise to a relationship of trust and confidence"

136. Ratiu & Ors v Conway [2005] EWCA 1302 provides an illustration of circumstances in which a court will look beyond the contractual position to determine the existence of a fiduciary duty. The case concerned whether a solicitor owed a fiduciary duty not to

his client (which was a company) but to the individual who owned that company. Auld LJ said that:

> "[78] There is, it seems to me, a powerful argument of principle, in this intensely personal context of considerations of trust, confidence and loyalty, for lifting the corporate veil where the facts require it to include those in or behind the company who are in reality the persons whose trust in and reliance upon the fiduciary may be confounded.
>
> [79] Such was the approach of this Court in _Johnson v Gore Wood [1999] BCC 474_, at 485, where the issue was whether it was arguable so as to defeat an abuse of process application that solicitors to a company alleged to have been negligent in its advice to the company, also owed a duty of care to its controlling shareholder, Ward LJ, giving the judgment of the Court, held, at page 485C–E, that it was arguable, citing with approval the reasoning of Staughton J (as he then was) on a similar issue in _R P Howard Ltd v Woodman Matthews & Co (a firm) [1983] QB 117._
>
> "... arguments of a very similar nature prevailed in the judgment of Staughton J in ... Howard v Woodman Matthews ... where the solicitor knew that the company was a family company effectively run by Mr Witchell from whom they received their instructions. He held at p. 121A:
>
> 'In my judgment, in the circumstances of this case, Mr Witchell as well as the company was the client of Mr Mason. That seems to me to reflect the reality of the situation. Mr Mason knew that Mr Witchell ... was the company. He probably knew that Mr Witchell derived his livelihood and some profit from the company, and was vitally concerned in its well-being. Mr Witchell had first been his personal friend, and had then come to him in connection with other matters for legal advice, both as the representative of the company and in a personal capacity. When Mr Witchell sought his advice on ... [a matter concerning the company] Mr Mason owed a contractual duty of care both to the company and to Mr Witchell.'"
>
> [80] Nor, in my view, should it matter in principle, where a fiduciary duty is engendered by a contractual relationship, whether the client has entered into a direct contractual relationship with the fiduciary or through an agent or, in the case of a corporate client, through the use of a nominee company, as Regent used Pristbrook in this case."

137. The fact sensitive nature of the investigation required emerges clearly from the decision of Peter Smith J in _JD Wetherspoon Plc v Van Den Berg & Co_ [2009] EWHC 639 in which the Judge held that one of the directors of the first defendant owed a fiduciary duty to the claimant but that the other two directors did not.

138. An example of the imposition of a fiduciary duty in a commercial context from Bermuda can be found in _Horizon Bank International Ltd v Walsh & Ors_ [2009] CA (Bda) 6 Civ. In this case, the Mr Justice Kawaley, whose decision was upheld on

appeal, held that Horizon Bank International Limited owed fiduciary duties to two investors who had transferred assets to a company incorporated as part of an offshore investment structure. The Judge held that a fiduciary duty arose from the fact that HBI acted as agent or de facto agent in establishing the offshore structure pursuant to which the investors would place assets into companies which HBI would control on their behalf. HBI became a fiduciary to the extent that it was trusted to ensure that the principal investment company would be managed consistently with the interests of the investors and in accordance with the mandate they had provided. These findings were upheld on appeal.

139. In relation to the facts alleged in the Complaint, Mr Chivers and Mr Hargun take issue with the statement that the Plaintiffs *"entrusted"* their assets to the Kingate Defendants (for example in paragraphs 274 and 279 of the Complaint).

140. I would agree with Mr Chivers and Mr Hargun that it is an inference to be drawn from the Complaint that the Plaintiffs, when investing in the Funds, are alleged to have exchanged one asset for another (a share or other security in the relevant Fund issued to the Plaintiffs) with the consequence that as shareholders in the Funds the Plaintiffs did not have rights directly to the underlying assets of the Funds.[38] However, the allegation is that the Plaintiffs reposed trust and confidence in the Kingate Defendants and it is in that sense that the Plaintiffs entrusted their assets to them, not that the Kingate Defendants became trustees of the Plaintiffs' assets (whether or not they became trustees of any of the Funds' assets).

141. In the same way the Judge in <u>Horizon</u> held that the investors had "entrusted" their assets to HBI notwithstanding that the assets were transferred to two Bahamian International Business Companies owned by the investors and managed by a trading company (called Boomer) owned indirectly by the investors.

142. If there was, as a matter of fact, a sufficient relationship of trust and confidence between the Plaintiffs and the Kingate Defendants, a court in the BVI or Bermuda would be entitled to find that the Plaintiffs had "entrusted" their assets to those Defendants and that they became fiduciaries owing fiduciary duties to the Plaintiffs. Key to this factual enquiry will be an investigation as what it is that the Kingate

---

[38] Whether this is the intended meaning of the Complaint may be open to argument: at places the Complaint conveys that what was invested by the Plaintiffs remained their property as and when passed to Madoff: see, for example, paragraph 2 of the Complaint

Defendants did within paragraph 280 of the Complaint, in particular 280(c)[39], to bring about the requisite relationship.

143. I have already referred above to the conclusion reached by Mr Browne-Wilkinson in paragraph 22 of his Expert Report. His conclusion is directed at Count 21 (breach of fiduciary duty against Citi Hedge). This Count is of course prefaced by a restatement of what has gone before in the Complaint, which must include Section VII (paragraphs 185 to 206). Having regard what to what is alleged in the Complaint, I do not agree:

143.1 that none of the duties referred to in his paragraph 21 can be fiduciary duties, as, in particular, a duty not to communicate fictitious fund valuations to the Plaintiff could be characterised as an aspect of the duty of loyalty which a fiduciary owes.[40] The duty of loyalty owed by a fiduciary is the broad description or label attached to the core liability of a fiduciary but it will be broken down to encompass the factual circumstances of any particular case in order to understand how particular fiduciary was obliged to act. Henry J giving the judgment of the Privy Council in <u>Arklow Investments Ltd v Maclean</u> [2000] 1 WLR 594 said at page 598G that;

> "The description of the duty under consideration as being one of loyalty was not seen by [Counsel for the Plaintiff] as being the most appropriate one, but for present purposes it is convenient to label it in that way. In the present context, the concept encaptures a situation where one person is in a relationship with another which gives rise to a legitimate expectation, which equity will recognise, that the fiduciary will not utilise his or her position in such a way which is adverse to the interests of the principal. An example of the obligation relevant to the present case is not to exploit or take advantage of the position of fiduciary at the expense of the principal. The existence and extent of the duty will be governed by the particular circumstances."

143.2 that it necessarily follows from this that Citi Hedge cannot have been a fiduciary of the Plaintiffs. In his paragraphs 21 and 22, Mr Browne-Wilkinson has asked the wrong question by focusing on whether or not the particular duties he says are alleged in Count 21 are fiduciary duties. In fact, the first question to ask is whether or not Citi Hedge were fiduciaries. If they were

---

[39] ". the Kingate Defendants held themselves out as providing superior client investment services, and evinced an understanding that they were fiduciaries of the investors, Plaintiffs and the Class reasonably and foreseeably relied on such representations, and trusted in the Kingate Defendants' purported expertise and skill"

[40] Compare <u>Nocton v Lord Ashburton</u> [1914] AC 932. In the present case the allegations made in relation to Citi Hedge's position vis a vis the Plaintiffs include that Citi Hedge received the Plaintiffs' subscription monies, calculated their share entitlements and was remunerated by reference to the valuations.

they will owe fiduciary duties, the core of which are set out in the quotation at paragraph 19 of Mr Browne-Wilkinson's Declaration (including a duty to act in good faith, a duty not to make a profit out of his trust and a duty not to place himself in a position where his duty and his interest may conflict). Once this is established, the duties referred to by Mr Browne-Wilkinson can be seen not as definitive fiduciary duties but as aspects of the fiduciary duties said to be owed by Citi Hedge in this case. I note also that Mr Browne-Wilkinson states that the basis on which Citi Hedge is said to owe fiduciary duties is limited to its superior position (paragraph 355 of the Complaint). However, he makes no reference to paragraph 354 of the Complaint which alleges that the Plaintiffs reposed trust and confidence in Citi Hedge. As referred to in paragraph 135 above, the existence of such a relationship is the touchstone of a fiduciary relationship.

143.3. that no breach of fiduciary duty has been pleaded against Citi Hedge. Mr Browne-Wilkinson asserts in paragraph 21c that the only allegations are of a lack of competence rather than a lack of loyalty. However, I note that paragraphs 201 to 206 of the Complaint make allegations which go beyond mere incompetence and include grossly deficient and reckless conduct (paragraphs 201 to 204) and providing substantial assistance to the Kingate Defendants in the fraud and breaches of fiduciary duty which they said to have perpetrated (paragraphs 205 and 206). It is also alleged in Count 21 that the fictitious fund valuations resulted in the receipt of fees by Citi Hedge to which they were not entitled and which were received at the expense of the Plaintiffs. These allegations are, in my opinion, sufficient to amount to a breach of a fiduciary duty and do not fall into the category of mere incompetence as suggested by Mr Brown-Wilkinson.

144. Accordingly, I would confirm that, if the fiduciary duty alleged in Count 21 (and in paragraphs 198 to 200) of the Complaint is established, the matters alleged in that Count in paragraph 356 as well as in paragraphs 201 to 204 of the Complaint would (if established as a matter of fact) amount to a breach of the fiduciary duty.

## Aiding and abetting fraud (Counts 14, 20 and 27)

145. Counts 14, 20 and 27, which are directed at Tremont Group, PricewaterhouseCoopers and Citi Hedge respectively, all involve causes of action which are summarised as

being for "aiding and abetting fraud".

146. The detailed statement of the causes of action, ie the facts giving rise to the claims made in Counts 14, 20 and 27, may be summarised as being (a) that fraudulent misrepresentations were made to the Plaintiffs by the Kingate Fraud Claim Defendants to induce the plaintiffs to invest and then to continue holding investments; (b) that the Plaintiffs acted upon the misrepresentations by investing and holding investments, thereby suffering loss; and (c) that the relevant Defendant (Tremont Group, PricewaterhouseCoopers or Citi Hedge, as the case may be) "*with wilful blindness or recklessness*" assisted the Kingate Fraud Claim Defendants in the perpetration of the frauds by taking various alleged steps.

147. I agree with Mr Browne-Wilkinson, and also with the comment of Ms Dohmann at paragraph 74 of her Expert Report, that English common law (and that of Bermuda and the BVI) does not recognise a tort by the name of "aiding and abetting fraud". However, in the case of the Complaint the question is one of substance, not labels. And the material Counts are, in my opinion, a sufficient description of the ingredients required for a person to be found liable as a joint tortfeasor with a principal fraudster.

148. In his Expert Report at paragraph 50 Mr Browne-Wilkinson sets out extracts from the judgment of Hobhouse LJ in Credit Lyonnais v EGCD [1998] 1 Ll.Rep. 19 at 46. In the extracts Hobhouse LJ explained that acts which knowingly facilitate the commission of a crime would amount to the crime of aiding and abetting a crime "*but do not amount to a tort or make the aider liable as a joint tortfeasor*". Hobhouse LJ went on to say that for liability a defendant "*must have conspired with the primary party or procured or induced his commission of the tort ... or he must have joined in the common design pursuant to which the tort was committed ....*"

149. In paragraph 51 of his Expert Report Mr Browne-Wilkinson rightly points out that the Credit Lyonnais case was upheld in the House of Lords. However, the House of Lords did not find it necessary to deal with the law of joint tortfeasor beyond referring with approval to the dictum of Scrutton LJ in The Koursk, set out below. That is probably the best summation of the relevant principles.

150. In paragraph 52 of his Expert Report Mr Browne-Wilkinson points out that Count 27, the material Count for present purposes so far as concerns Citi Hedge (the party on whose behalf his evidence is given), only alleges "'*knowledge' on the part of*" Citi Hedge, and does not make an allegation of conspiracy against Citi Hedge. His

conclusion is therefore that Count 27 does not put forward a recognisable cause of action.

151. I respectfully disagree with Mr Browne-Wilkinson's conclusion, and the reasoning on which it is based

152. In the first place, Count 27 puts forward a claim that Citi Hedge did more than merely have knowledge of the fraudulent scheme: the claim is in substance that with knowledge Citi Hedge assisted the Kingate Fraud Claim Defendants in the scheme.[41]

153. In the second place, it is not necessary to make a defendant liable as a joint tortfeasor with a principal for the principal's tort that there must be an actionable conspiracy with the principal to which the defendant is a party. The law as to joint tortfeasors is as stated by Scrutton LJ in The Koursk [1924] P 140 at 155:

> "Certain classes of persons seem clearly to be 'joint tortfeasors' ... two or more persons who agree on common action, in the course of, and to further which, one of them commits a tort These seem clearly to be joint tortfeasors; there is one tort committed by one of them on behalf of and in concert with another.[42]

154. However, what is necessary is that there is something done to further a common design. This point is explained by Stuart Smith LJ in his judgment in the Court of Appeal case of Monsanto plc v Tilly & Ors [2000] Env L R 313[43], where he cited his own observation in the Credit Lyonnais case at page 35 in the following terms:

> "It seems to me to be well established that a person who acts with another to commit a tort in furtherance of a common design will be liable as a joint tortfeasor. It is not enough that he merely facilitates the commission of the tort unless his assistance is given in pursuance and furtherance of the common design."

155. A vivid illustration of a defendant being found liable as a joint tortfeasor in a common design with a principal is the case of Shah v Gale [2005] EWHC 1087, decided by Levison J (now Levison LJ). In that case the defendant had pointed out to the principal wrongdoer the house were a particular person lived, the defendant

---

[41] As to this, see also paragraphs 205 and 206 of the Complaint

[42] See also per Bankes LJ (who, at page 151, made it clear that "each case must depend on its own circumstances") and Sargant LJ at 159

[43] In the Monsanto plc case the defendant was held to have no arguable defence to an action to make him jointly liable as a tortfeasor in the context of a planned trespass where he had been aware of the attack, had reconnoitred the day before and was organising journalists on the day

anticipating that the principal intended to assault that person. The principal wrongdoer assaulted someone quite different at the house; but nevertheless the defendant was held liable as a joint tortfeasor as regards the assault. Levison J summarised this aspect of the case as follow (paragraph 63):

> "*This case has been about the responsibility of the 22 year old woman who, incredibly stupidly, points to [the victim's] house as the home of a man whom others wish to attack. In my judgment, by agreeing to do so, she lent herself to a joint enterprise to inflict injury on whoever was attacked and she is responsible for that…*"

156. In the present case the question is whether the Plaintiffs may after trial establish a case that any of Tremont Group, PricewaterhouseCoopers and Citi Hedge acted in furtherance of a common design with the Kingate Fraud Claim Defendants in the latter's making of their fraudulent misrepresentations

157. On behalf of Tremont Group Mr Hargun (supported by Mr Evans) makes at paragraphs 96 to 98 of his Expert Report certain comments concerning the Count (Count 14) in the Complaint headed "Aiding and Abetting Fraud" in the case of Tremont Group. In particular in his paragraph 97 he identifies three possible bases for the claim, one of which he describes as being where "*A procured or incited B to commit the tort (in which case A and B will be jointly liable as joint tortfeasors)*"

158. It will be apparent from what I have said in relation to Mr Browne-Wilkinson's Expert Report that I respectfully disagree with Mr Hargun's formulation of the necessary ingredients for the court to find a person liable as a joint tortfeasor with a principal. And, disagreeing with Mr Hargun's paragraph 98, I consider that Count 14 does sufficiently allege ingredients which, if established after a trial, could result in a court in Bermuda or the BVI making a finding of joint tort liability with a principal who was guilty of fraud.

159. I have already pointed out at paragraph 147 above that I agree with Ms Dohmann's comment at paragraph 74 of her Expert Report. However, I confirm that what I have said above in relation to Count 14 and the Tremont Group is applicable also to Count 20 and PricewaterhouseCoopers, as well as to Count 27 and Citi Hedge. In other words an affirmative answer is to be given to the question posed in paragraph 156 above.

**Aiding and abetting breach of fiduciary duty (Counts 13, 19 and 26)[44]**

160.   Counts 13, 19 and 26 of the Complaint contain claims described as "Aiding and abetting breach of fiduciary duty".

161.   I would agree with Ms Dohmann (paragraph 74) and Mr Hargun (paragraph 92) that, as a matter of English law and that of the BVI and Bermuda, there is not a tort or cause of action which bears this name.

162.   However, as I have referred to above, it is not the particular label which one attaches to a cause of action which is important but rather one must look at the substantive elements which are pleaded as making up that cause of action to see if a cause of action can be established.

163.   As Mr Hargun accepts in his Expert Report, English law and that of the BVI and Bermuda, recognise accessory liability in the form of knowing assistance in a breach of trust. The constituent elements of this liability are (i) the existence of a trust or fiduciary obligation, (ii) breach of trust or fiduciary obligation by the trustee, (iii) that the relevant defendant assists in or induces that breach of trust or fiduciary obligation and (iv) the relevant defendant acts dishonestly in doing so: Royal Brunei Airlines v Tan [1995] 2 AC 378.

164.   Dishonesty for these purposes is judged by an objective standard.  A person is dishonest if he fails to attain the standard which would be observed by an honest person placed in those circumstances: Royal Brunei Airlines v Tan [1995] 2 AC 378 and Barlow Clowes International v Eurotrust International [2006] 1 WLR 1476 (which clarified earlier comments of the House of Lords in Twinsectra v Yardley [2002] 2 AC 164). It may also consist of suspicion coupled with a deliberate decision not to make inquiries which might result in knowledge (that the transaction is not one in which the person can honestly participate).

165.   In Barlow Clowes Lord Hoffmann, giving the judgment of the Privy Council, said:

> "In summary, [the Judge] said that liability for dishonest assistance requires a dishonest state of mind on the part of the person who assists in a breach of trust. Such a state of mind may consist in knowledge that the transaction is one in which he cannot honestly participate (for example, a misappropriation of other people's money), or it may consist

---

[44] Directed at Tremont Group, the PricewaterhouseCoopers Defendants and  Citi Hedge respectively

*in suspicion combined with a conscious decision not to make inquiries which might result in knowledge... Although a dishonest state of mind is a subjective mental state, the standard by which the law determines whether it is dishonest is objective If by ordinary standards a defendant's mental state would be characterised as dishonest, it is irrelevant that the defendant judges by different standards The Court of Appeal held this to be a correct state of the law and their Lordships agree."*

166. Arden LJ subsequently stated in the Court of Appeal in <u>Abou-Rahman & Anor v Abacha & Ors</u> [2007] Bus LR 220 that <u>Barlow Clowes</u> represents the law of England and Wales and it has since been applied in numerous cases at first instance.

167. Turning therefore to Counts 13, 19 and 26 the question is whether or not, if the factual allegations contained in these counts are proven, the requirements for liability for knowing assistance in breach of trust will be capable of being made out. Whilst this is a matter for the Court hearing the Motion to Dismiss, I note that:

    167.1 Each of the counts alleges a breach of fiduciary duty. I have dealt above with the question of whether or not such a duty might be found to have existed in the circumstances described in the Complaint

    167.2 Each of the counts alleges that the relevant wrongdoer knew, either actually (see paragraph 383 of the Complaint) or constructively (see paragraph 310 of the Complaint) of the existence of the relevant fiduciary duty.

    167.3 Each of the counts alleges that the relevant wrongdoer assisted with the breaches of that duty.

168. Mr Hargun states, in paragraph 95.3, that the primary facts alleged against the Tremont Group do not establish assistance. This is essentially a matter of fact as the courts have not, so far as I am aware, laid down an exhaustive definition of what does and does not amount to "assistance".

169. Mr Browne-Wilkinson states, in paragraph 55, that Count 26 of the Complaint makes no allegation of dishonesty against Citi Hedge. I agree that it would be usual for a pleaded case to refer expressly to "dishonesty" to make plain the nature of the claim being made, the absence of that particular term is not determinative if the underlying facts pleaded are sufficient for the Court to make a finding of dishonesty (in the sense required by <u>Barlow Clowes</u>). In the present case, it is alleged that Citi Hedge knew of the fiduciary duties owed by the Kingate Defendants and of the breaches of those

duties, and assisted with such breaches. It seems to me that if these three elements are established, then a finding of dishonesty could be made against Citi Hedge

**I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.**

**Executed on this 4 day of November 2010**

**ANTHONY GEORGE BOMPAS QC**

**EXHIBITS TO BE PHYSICALLY FILED
WITH THE CLERK OF COURT
PENDING JUDICIAL APPROVAL**