**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE KINGATE MANAGEMENT LIMITED LITIGATION | Master File No. 09 Civ. 5386 (DAB) |
| This Document Relates To:  All Actions | |

**PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO THE MOTIONS OF THE KINGATE DEFENDANTS TO DISMISS THE AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

**BOIES, SCHILLER & FLEXNER LLP**
575 Lexington Avenue
New York, New York 10022
(212) 446-2300

**COHEN MILSTEIN SELLERS**
**& TOLL PLC**
88 Pine Street
New York, New York 10005
(212) 838-7797

**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
(212) 907-0700

*Co-Lead Counsel for Plaintiffs and*
*Interim Co-Lead Counsel for the Putative Class*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...............................................................................................1

FACTUAL BACKGROUND ...............................................................................................4

I.    THE STRUCTURE OF THE FUNDS AND THE POSITIONS OF THE KINGATE DEFENDANTS ...............................................................................................4

    A.    The Funds...................................................................................................4

    B.    Defendants Grosso, Ceretti, and Manzke Sponsored and Managed the Funds Through Defendants Tremont, KML, and the FIM Entities ........................5

    C.    The Remaining Kingate Defendants .......................................................6

II.    THE KINGATE DEFENDANTS' FALSE AND MISLEADING STATEMENTS...........7

III.    THE KINGATE DEFENDANTS KNEW OR WERE RECKLESS IN NOT KNOWING THAT MADOFF WAS RUNNING A PONZI SCHEME .................................................9

    A.    Madoff Reported Trades Outside the Daily Trading Range ...................................9

    B.    The Kingate Defendants Knew or Ignored Many Indicia of Fraud .......................11

ARGUMENT .....................................................................................................................12

I.    LEGAL STANDARD FOR MOTION TO DISMISS .......................................................12

II.    CHOICE OF LAW .............................................................................................................13

    A.    The Court Can Apply New York Law Where There Is No Genuine Conflict Between New York Law and the Law of BVI or Bermuda with Respect to a Particular Legal Issue or Claim.................................................................................13

        1.    Fraudulent Inducement and Deceit ..........................................................14

        2.    Negligent Misrepresentation and Negligence............................................14

        3.    Aiding and Abetting Breach of Fiduciary Duty and Fraud.......................15

        4.    Breach of Fiduciary Duty..........................................................................16

    B.    New York Has the Most Significant Interest In This Litigation.............................18

III.    PLAINTIFFS HAVE STANDING TO PURSUE COMMON LAW CLAIMS AGAINST THE KINGATE DEFENDANTS.....................................................................................21

A.      The Court Is Free to Determine Standing Under New York Law Where New York Has the Strongest Interest of Any Jurisdiction in the Kingate Fraud .......................22

B.      Plaintiffs Have Standing Under New York Law .......................................................25

      1.      Plaintiffs Assert Direct Claims That Can Be Pursued Only by the Investors 25

      2.      Plaintiffs Also Have Standing Because the Funds' Claims May Be Precluded by an *In Pari Delicto* Defense .......................................................27

C.      Plaintiffs Would Have Standing Under BVI Law .....................................................28

      1.      *Johnson v. Gore Wood & Co.* and the Modern Law of Standing .................29

      2.      The Reflective Loss Principle Does Not Bar Plaintiffs' Claims....................30

            a.      Counts 1 Through 4 for Fraud and Negligent Misrepresentation Against the Kingate Fraud Claim Defendants and Kingate Defendants ...........................................................................................31

            b.      Additional Counts That Fall Within the Second Proposition in *Johnson v. Gore Wood & Co.* ............................................................31

            c.      Remaining Counts...................................................................................32

      3.      General Exceptions to the Reflective Loss Exclusionary Principle...............32

            a.      Defenses Barring Recovery by the Joint Liquidators .......................32

            b.      Asymmetrical Losses.............................................................................33

            c.      The Reflective Loss Principle Allows Room for Practical Measures to Avoid Double Recovery and Infringement on the Company's Rights .....................................................................................................34

            d.      The Reflective Loss Rule Is Not Applied Where It Would Cause an Unjust Result......................................................................................36

D.      Plaintiffs Have Article III Constitutional Standing ..................................................36

IV.      PLAINTIFFS' COMMON LAW CLAIMS ARE NOT PREEMPTED...............................38

A.      SLUSA Does Not Preempt Plaintiffs' Common Law Claims ...................................38

      1.      The Supreme Court's *Morrison* Decision Precludes Interpreting SLUSA to Cover This Case.............................................................................................39

      2.      Plaintiffs Did Not Purchase "Covered Securities"........................................40

3.  SLUSA's "In Connection With" Requirement Is Not Met Here ...................42

4.  In Any Event, SLUSA Is Not Applicable to Plaintiffs' Non-Fraud Claims ..45

5.  Defendants' SLUSA Argument Is Inconsistent with Congressional Intent to Promote Federalism By Preserving State Jurisdiction Over Non-Covered Securities ............................................................47

B.  The Martin Act Does Not Bar Plaintiffs' Common Law Claims ..............................48

1.  The Martin Act Does Not Preempt Common Law Claims That Do Not Allege Violation of the Act or Its Implementing Regulations ......................48

2.  Alternatively, the Martin Act Does Not Apply Because Securities Were Not Sold "Within or From" New York ............................................................54

V.  PLAINTIFFS ADEQUATELY ALLEGE CLAIMS FOR FRAUD AND NEGLIGENT MISREPRESENTATION ...................................................................................55

A.  Legal Standard ............................................................................................56

1.  Fraud ...........................................................................................56

2.  Negligent Misrepresentation ..........................................................57

B.  Defendants' False Statements ...................................................................58

1.  False Statements Concerning the Nature of the Investment .........................58

2.  False Statements Concerning Ongoing Duties to Monitor and Evaluate Madoff ...................................................................................................59

3.  False Statements Regarding Madoff's Options Trading and Counterparties ......................................................................................60

4.  False Statements Concerning the Risk That Madoff Could Abscond with the Funds' Assets ...............................................................................61

5.  False Statements Concerning the Funds' Performance .................................62

C.  Each of the Kingate Defendants Made False Statements ..........................................62

D.  The Kingate Defendants' Cautionary Statements Do Not Insulate Them From Liability ...................................................................................................63

E.  Plaintiffs Have Adequately Alleged the Kingate Fraud Claim Defendants' Scienter ....................................................................................................69

F.  Plaintiffs Justifiably Relied on the Kingate Defendants' Statements .......................75

VI.     PLAINTIFFS ADEQUATELY ALLEGE TORT CLAIMS ARISING FROM THE
        KINGATE DEFENDANTS' DUTIES TO INVESTORS.....................................................77

        A.     The Kingate Defendants Owed Investors a Duty of Care and Honesty ...................77

        B.     Plaintiffs Properly Assert Claims for Breach of Fiduciary Duty...............................81

        C.     Plaintiffs Properly Assert Claims for Gross Negligence and Negligence ................85

        D.     Plaintiffs Are Entitled to a Remedy of Constructive Trust.......................................87

VII.    PLAINTIFFS PROPERLY ALLEGE CONTRACT-RELATED CLAIMS .........................88

        A.     Plaintiffs State a Claim for Third-Party Beneficiary Breach of Contract Against
               the Kingate Defendants.............................................................................................88

        B.     Plaintiffs Have the Right to Pursue a Claim for Unjust Enrichment If No
               Contractual Basis for Recovery Exists .....................................................................90

VIII.   PLAINTIFFS PROPERLY ASSERT AIDING AND ABETTING CLAIMS AGAINST
        TREMONT GROUP.............................................................................................................92

IX.     PLAINTIFFS PROPERLY ALLEGE PERSONAL JURISDICTION OVER THE
        INDIVIDUAL DEFENDANTS.............................................................................................94

        A.     Legal Standard ..........................................................................................................94

        B.     This Court Has Personal Jurisdiction Over the Individual Defendants ....................95

        C.     The Court's Exercise of Personal Jurisdiction Is Constitutional ..............................100

        D.     At a Minimum, Plaintiffs Are Entitled to Conduct Jurisdictional Discovery............101

X.      MADOFF'S CRIMINAL ACTS DID NOT CONSTITUTE AN INTERVENING
        CAUSE IMMUNIZING DEFENDANTS FROM LIABILITY ...........................................102

XI.     DEFENDANTS CANNOT PRECLUDE INVESTOR CLAIMS BY RECOURSE TO A
        CONTRACTUAL SIX-MONTH STATUTE OF LIMITATIONS.......................................104

XII.    PLAINTIFFS ARE ENTITLED TO PUNITIVE DAMAGES ............................................107

XIII.   PLAINTIFFS HAVE PROPERLY PLED STATE LAW CLAIMS AGAINST GROSSO
        AND CERETTI ....................................................................................................................108

CONCLUSION..................................................................................................................................109

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.*,
    957 F. Supp. 1308 (S.D.N.Y. 1997)....................................................................17

*Ackert v. Ausman*,
    218 N.Y.S. 2d 814 (N.Y. Sup. Ct. 1961) ............................................................22

*Adelphia Recovery Trust v. Bank of Am., N.A.*,
    No. 05 Civ. 9050 (LMM), 2010 WL 2077214 (S.D.N.Y. May 14, 2010)............37

*AllGood Entm't, Inc. v. Dileo Entm't & Touring, Inc.*,
    No. 09-CV-5377(HB), 2010 WL 2606042 (S.D.N.Y. June 29, 2010) ..................24

*In re AlphaStar Ins. Group. Ltd.*,
    383 B.R. 231 (Bankr. S.D.N.Y. 2008 )............................................................15, 33

*In re Alstom SA Sec. Litig.*,
    406 F. Supp. 2d 433 (S.D.N.Y. 2005)..................................................................64

*Ambac Assurance Corp. v. EMC Mortgage Corp.*,
    No. 08 Civ. 9464(RMB)(MHD), 2009 WL 734073 (S.D.N.Y. Mar. 16, 2009)....92

*Amusement Indus., Inc. v. Stern*,
    693 F. Supp. 2d 301 (S.D.N.Y. 2010)................................................................107

*AMW Materials Testing, Inc. v. Town of Babylon*,
    584 F.3d 436 (2d Cir. 2009)................................................................................85

*Anwar v. Fairfield Greenwich Ltd.*,
    No. 09-CV-118, 2010 WL 3341636 (S.D.N.Y. Aug.18, 2010)..................... *passim*

*APWU v. Potter*,
    343 F.3d 619 (2d Cir. 2003)..............................................................................101

*Ashcroft v. Iqbal*,
    ____ U.S. ____, 129 S. Ct. 1937 (2009)........................................................12, 13

*In re AstraZeneca Sec. Litig.*,
    559 F. Supp. 2d 453 (S.D.N.Y. 2008)................................................................100

*ATSI Commc'ns, Inc. v. The Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)............................................................................12, 88

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*,
    902 F.2d 194 (2d Cir. 1990)..................................................................................95

*Barron v. Igolnikov*,
    No. 09 Civ. 4471 (TPG), 2010 WL 882890 (S.D.N.Y. Mar. 10, 2010) ...........................45, 52

*Barry v. Atkinson*,
    No. 96 Civ. 8436(PKL), 1998 WL 255431 (S.D.N.Y. May 20, 1998)..................................88

*In re Bayou Hedge Fund Litig.*,
    534 F. Supp. 2d 405 (S.D.N.Y. 2007)..............................................................52, 73

*In re Beacon Assocs. Litig.*,
    No. 09 Civ. 777(LBS), 2010 WL 3895582 (S.D.N.Y. Oct. 5, 2010) ..............................45, 54

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).................................................................................12, 13

*In re Bernard L. Madoff Inv. Sec. LLC*,
    424 B.R. 122 (Bankr. S.D.N.Y. 2010) ...................................................................27

*In re BISYS Sec. Litig.*,
    397 F. Supp. 2d 430 (S.D.N.Y. 2005)...................................................................64

*Bluestone Capital Partners v. MGR Funds Ltd.*,
    No. 98 Civ. 3128(WHP), 1999 WL 322658 (S.D.N.Y. May 20, 1999) ........................95, 101

*Brehm v. Capital Growth Fin., Inc.*,
    No. 8:07 CV 315, 2008 WL 553238 (D. Neb. Feb. 25, 2008)...............................................44

*Bruhl v. Kingate Global Fund Ltd..*,
    No. 601526/09 (N.Y. Sup. Ct. Jan. 25, 2010).........................................................24

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985)..................................................................................100

*Burnett v. Columbus McKinnon Corp.*,
    887 N.Y.S.2d 405 (N.Y. App. Div. 2009) .............................................................18

*Butler v. Stagecoach Group, PLC*,
    900 N.Y.S.2d 541 (N.Y. App. Div. 2010) .............................................................18

*Caboara v. Babylon Cove Dev., LLC*,
    862 N.Y.S.2d 535 (N.Y. App. Div. 2008) .............................................................50

*In re Canon Cameras Litig.*,
    No. 05 Civ. 7233(JSR), 2006 WL 1751245 (S.D.N.Y. June 23, 2006)...................................91

*Caudle v. Towers, Perrin, Forster & Crosby, Inc.*,
    580 F. Supp. 2d 273 (S.D.N.Y. 2008) ................................................................88

*Centrifugal Force, Inc. v. Softnet Commc'n, Inc.*,
    No. 08 Civ. 5463(CM)(GWG), 2009 WL 1059647 (S.D.N.Y. Apr. 17, 2009) ......................95

*Century Pac., Inc. v. Hilton Hotels Corp.*,
    528 F. Supp. 2d 206 (S.D.N.Y. 2007) ................................................................79

*Colnaghi, U.S.A., Ltd. v. Jewelers Prot. Servs., Ltd.*,
    595 N.Y.S.2d 381 (N.Y. 1993) ................................................................85

*Comprehensive Habilitation Servs., Inc. v. Commerce Funding Corp.*,
    No. 05-CV-9640(PKL), 2009 WL 935665 (S.D.N.Y. Apr. 7, 2009) ..............................24

*CPC Int'l Inc. v. McKesson Corp.*,
    519 N.Y.S.2d 804 (N.Y. 1987) ................................................................49, 50, 51

*Craig v. First Web Bill, Inc*,
    No. Civ. A. 04-CV-1012 DGT, 2004 WL 2700128 (E.D.N.Y. Nov. 29, 2004) ................98

*Credit Lyonnais Sec. (USA) Inc. v. Alcantara*,
    183 F.3d 151 (2d. Cir. 1999) ................................................................96

*Cromer Fin. Ltd. v. Berger*,
    137 F. Supp. 2d 452 (S.D.N.Y. 2001) ................................................................18, 20, 103

*Cromer Fin. Ltd. v. Berger*,
    No. 00 Civ. 2284 DLC, 2003 WL 21436164 (S.D.N.Y. June 23, 2003) ........................14

*Cromer Fin. Ltd. v. Berger*,
    No. 00 Civ. 2498, 2001 WL 1112548 (S.D.N.Y. Sept. 19, 2001) ..............................49

*Cruz v. McAneney*,
    816 N.Y.S.2d 486 (N.Y. App. Div. 2006) ................................................................91

*Cullen v. BMW of N. Am.*,
    691 F.2d 1097 (2d Cir. 1982) ................................................................103

*D.H. Blair & Co., Inc. v. Gottdiener*,
    462 F.3d 95 (2d. Cir. 2006) ................................................................95, 97

*Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    395 F.3d 25, 47 (2d Cir. 2005) ................................................................45

*Dallas Cowboys Football Club, Ltd. v. Nat'l Football League Trust*,
    No. 95 CIV. 9426, 1996 WL 601705 (S.D.N.Y. Oct. 18, 1996) ..............................27

*Daventree Ltd. v. Azerbaijan*,
    349 F. Supp. 2d 736 (S.D.N.Y. 2004)................................................................102

*Debary v. Harrah's Operating Co.*,
    465 F. Supp. 2d 250 (S.D.N.Y. 2006)................................................................88

*Dessert Beauty, Inc. v. Platinum Funding Corp.*,
    519 F. Supp. 2d 410 (S.D.N.Y. 2007)................................................................24

*Deutsche Bank Sec., Inc. v. Mont. Bd. of Inv.*
    797 N.Y.S.2d 439 (N.Y. App. Div. 2005) .........................................................96

*Devore v. Pfizer Inc.*,
    867 N.Y.S.2d 428 (N.Y. App. Div. 2008) .........................................................19

*DGM Invs., Inc. v. N.Y. Futures Exch., Inc.*,
    265 F. Supp. 2d 254 (S.D.N.Y. 2003)................................................................56

*Dommert v. Raymond James Fin. Servs, Inc.*,
    No. Civ. A. 1:06-CV-102, 2007 WL 1018234 (E.D. Tex. Mar. 29, 2007) ............45

*Don Buchwald & Assocs. v. Rich*,
    723 N.Y.S.2d 8 (N.Y. App. Div. 2001) ...........................................................107

*Druck Corp. v. Macro Fund Ltd.*,
    290 F. App'x 441 (2d Cir. 2008) ..............................................................17, 28

*Drulias v. Ade Corp.*,
    No. Civ. A. 06-11033 PBS, 2006 WL 1766502 (D. Mass. June 26, 2006)............41

*E.F. Hutton & Co. v. Hadley*,
    901 F.2d 979 (11th Cir. 1990) .........................................................................28

*Eagle Tenants Corp. v. Fishbein*,
    582 N.Y.S.2d 218 (N.Y. App. Div. 1992) .........................................................51

*EBC I, Inc. v. Goldman Sachs & Co.*,
    832 N.E.2d 26 (N.Y. 2005)..............................................................................17

*ECA v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)........................................................................69, 72

*Eurycleia v. UBS Sec. LLC*,
    No. 600874/2007, 2008 N.Y. Slip. Op. 32073(U) (N.Y. Sup. Ct. July 1, 2008)....78

*Falkowski v. Imation Corp.*,
    309 F.3d 1123 (9th Cir. 2002) .........................................................................45

*Fourth Ocean Putnam Corp. v. Interstate Wrecking Co. Inc.*,
  66 N.Y.2d 38 (N.Y. 1985) ................................................................88, 89

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*,
  376 F. Supp. 2d 385 (S.D.N.Y. 2005).............................................26, 55

*Fraternity Fund v. Beacon Hill Asset Management, LLC*,
  479 F. Supp. 2d 349 (S.D.N.Y. 2007).................................................94

*Gavin v. AT&T Corp.*,
  464 F.3d 634 (7th Cir. 2006) ..............................................................41

*In re Global Crossing, Ltd. Sec. Litig.*,
  313 F. Supp. 2d 189 (S.D.N.Y. 2003)..................................................66

*Globalnet Financial.com, Inc. v. Frank Crystal & Co.*,
  449 F.3d 377 (2d Cir. 2006)..........................................................14, 18

*Goldstein v. Pataki*,
  516 F.3d 50 (2d Cir. 2008)..................................................................12

*Gould v. Tricon, Inc.*,
  272 F. Supp. 385 (S.D.N.Y. 1967)......................................................66

*In re Granite Partners, L.P. v. Primavera Familienstiftung*,
  194 B.R. 318 (Bankr. S.D.N.Y. 1996).................................................25

*Greenlight Capital, Inc. v. Greenlight (Switz.) S.A.*,
  No. 04 Civ. 3136(HB), 2005 WL 13682 (S.D.N.Y. Jan. 3, 2005)..........96, 100, 101

*Greenspun v. Lindley*,
  36 N.Y.2d 473 (N.Y. 1975) .................................................................22

*Greystone Equip. Fin. Corp. v. Motion Imaging, Inc.*,
  No. 021283-09, 2010 WL 1655454 (N.Y. Sup. Ct. Apr. 7, 2010) .......106

*Hamilton v. Garlock, Inc.*,
  31 F. Supp. 2d 351 (S.D.N.Y. 1998).....................................................95

*In re Hampton Hotel Investors L.P.*,
  289 B.R. 563 (Bankr. S.D.N.Y. 2003) .................................................28

*Harmelin v. Man Fin. Inc.*,
  No. 06-CV-1944, 2007 WL 3146666 (E.D. Pa. Oct. 26, 2007) ............14

*Harsco Corp. v. Segui*,
  91 F.3d 337 (2d Cir. 1996)....................................................................77

*Hart v. Internet Wire, Inc.*,
  145 F. Supp. 2d 360 (S.D.N.Y. 2001) ................................................................. 74

*Hevesi v. Citigroup, Inc.*,
  366 F.3d 70 (2d Cir. 2004) ................................................................................. 66

*Higgins v. N.Y. Stock Exch., Inc.*,
  806 N.Y.S.2d 339 (N.Y. Sup. Ct. 2005) ............................................................. 26

*Hirsh v. Arthur Andersen & Co.*,
  72 F.3d 1085 (2d Cir. 1995) ............................................................................... 28

*Horn v. 440 East 57th Co.*,
  547 N.Y.S.2d 1 (N.Y. App. Div. 1989) ................................................................ 51

*Independent Order of Foresters v. Donaldson Lufkin & Jenrette, Inc.*,
  919 F. Supp. 149 (S.D.N.Y. 1996) ...................................................................... 48

*In re Initial Pub. Offering Sec. Litig.*,
  241 F. Supp. 2d 281 (S.D.N.Y. 2003) ................................................................. 67

*Int'l Bus. Machines Corp. v Liberty Mut. Ins. Co.*,
  363 F.3d 137 (2d Cir. 2004) ............................................................................... 14

*Int'l Shoe Co. v. Washington*,
  326 U.S. 310 (1945) ......................................................................................... 100

*Intellectual Capital Partner v. Inst. Credit Partners LLC*,
  No. 08 Civ. 10580 (DC), 2009 WL 1974392 (S.D.N.Y. July 8, 2009) ............. 90, 91

*Iowa Pub. Empl. Ret. Sys. v. MF Global, Ltd.*,
  No. 09-3919-cv, 2010 WL 3547602 (2d Cir. Sept. 14, 2010) .......................... 67, 68

*Jaffe v. Capital One Bank Servs.*,
  No. 09 Civ. 4106 (PGG), 2010 WL 691639 (S.D.N.Y. Mar. 1, 2010) ................... 69

*Jamaica Hosp. Med. Ctr., v. Carrier Corp.*,
  772 N.Y.S.2d 592 (N.Y. App. Div. 2004) .......................................................... 106

*JM Vidal, Inc. v. Texdis USA, Inc.*,
  No. 08 Civ. 6398 (CM)(KNF), 2010 WL 3528883 (S.D.N.Y. Sept. 3, 2010) ....... 75

*Johnson v. Gore Wood & Co.*
  [2002] 2 A.C. 1 (H.L.), 14 Dec. 2001 (Eng.) ........................................... 29, 30, 31

*Jones v. PricewaterhouseCoopers, LLP*,
  800 N.Y.S.2d 348 (N.Y. Sup. Ct. 2004) ............................................................. 26

*Jordan (Bermuda) Inv. Co. v. Hunter Green Inv. LLC*,
 No. 00 Civ. 9214 (RWS), 2007 WL 2948115 (S.D.N.Y. Oct. 3, 2007) ................................83

*Kaufman v. Cohen*,
 307 A.D.2d 113 (N.Y. App. Div. 2003) ...............................................................56

*Kenneth Rothschild Trust v. Morgan Stanley Dean Witter*,
 199 F. Supp. 2d 993 (C.D. Cal. 2002) ...............................................................42

*Kerusa Co. LLC v. W10Z/515 Real Estate Ltd. P'ship*,
 879 N.Y.S.2d 17 (N.Y. 2009) ..........................................................................51

*Kimmell v. Schaefer*,
 652 N.Y.S.2d 715 (N.Y. 1996) ........................................................................77

*Kinetic Instruments, Inc. v. Lares*,
 802 F. Supp. 976 (S.D.N.Y. 1992) ..............................................................98, 99

*Kirschner v. KPMG LLP*,
 No. 2010-0152, 2010 WL 4116609 (N.Y. Oct. 21, 2010) ................................27, 33

*Kottler v. Deutsche Bank AG*,
 607 F. Supp. 2d 447 (S.D.N.Y. 2009) ...............................................................92

*Kreutter v. McFadden Oil Corp.*,
 71 N.Y.2d 460 (N.Y. 1988) ........................................................................96, 98

*L.F. Rothschild v. Thompson*,
 433 N.Y.S.2d 6 (N.Y. App. Div. 1980) ...............................................................96

*LaSala v. Bank of Cyprus Pub. Co. Ltd.*,
 510 F. Supp. 2d 246 (S.D.N.Y. 2007) ...............................................................45

*LaSala v. Lloyds TSB Bank, PLC*,
 514 F. Supp. 2d 447, 473 (S.D.N.Y. 2007) ........................................................46

*Levinson v. PSCC Servs., Inc.*,
 No. 3:09-CV-00269 (PCD), 2009 WL 5184363 (D. Conn. Dec. 23, 2009) ...........45

*Longines-Wittnauer Watch Co. v. Barnes & Reinecke, Inc.*,
 15 N.Y.2d 443 (N.Y. 1965) ..............................................................................95

*In re Lord Abbett Mut. Funds Fee Litig.*,
 553 F.3d 248 (3rd Cir. 2009) ...........................................................................44

*Lujan v. Defenders of Wildlife*,
 504 U.S. 555 (1992)........................................................................................36

*M&T Bank Corp. v. Gemstone CDO VII, Ltd.*,
    No. 7064/08, 2009 WL 921381 (N.Y. Sup. Ct. Apr. 7, 2009)................................................57

*Majer v. Sonex Research, Inc.*,
    541 F. Supp. 2d 693 (E.D. Pa. 2008) ...................................................................................68

*Marine Midland Bank, N.A. v. Miller*,
    664 F.2d 899 (2d Cir. 1981)................................................................................................101

*McCarthy v. Am. Int'l Group, Inc.*,
    283 F.3d 121 (2d Cir. 2002)........................................................................................105, 106

*MDCM Holdings, Inc. v. Credit Suisse First Boston Corp.*,
    216 F. Supp. 2d 251 (S.D.N.Y. 2002)...................................................................................48

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996).......................................................................................................38, 43

*Meridian Horizon Fund, LP v. Tremont Group Holdings, Inc.*,
    No. 09 Civ. 3708(TPG), 2010 WL 1257567 (S.D.N.Y. Mar. 31, 2010) ..........................52, 72

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
    547 U.S. 71 (2006)................................................................................................. *passim*

*Metro Life Ins. Co. v. Robertson-Ceco Corp.*,
    84 F.3d 560 (2d Cir. 1996)....................................................................................................94

*MLSMK Invs. Co. v. JP Morgan Chase & Co.*,
    No. 09 Civ. 4049 (BSJ), 2010 WL 2925403 (S.D.N.Y. July 15, 2010) ..................................72

*Morrison v. Nat'l Australia Bank*,
    130 S. Ct. 2869 (2010).....................................................................................................39, 40

*Muller-Paisner v. TIAA*,
    289 Fed. Appx. 461 (2d Cir. 2008)...........................................................................56, 77, 79

*Musalli Factory for Gold & Jewellry v. JPMorgan Chase Bank, N.A.*,
    261 F.R.D. 13 (S.D.N.Y. 2009), *aff'd*, 2010 WL 2588195 (2d Cir. June 29, 2010) ...................
    ........................................................................................................................78, 81, 92

*Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*,
    No. 02 Civ. 0767(LBS), 2003 WL 22052894 (S.D.N.Y. Sept. 2, 2003) ................................54

*NCA Holding Corp. v. Ernestus*,
    No. 97 Civ. 1372, 1998 WL 388562 (S.D.N.Y. July 13, 1998) ...........................................100

*NM IQ LLC v. McVeigh*,
    No. 03 Civ. 4371, 2004 WL 2827618 (S.D.N.Y. Dec. 9, 2004)...............................................56

*Norex Petro. Ltd. v. Access Indus., Inc.*,
No. 07-4553-cv, 2010 WL 3749281 (2d Cir. Sept. 28, 2010) ................................40

*Norlin Corp. v. Rooney*,
744 F.2d 255 (2d Cir. 1984)...................................................................................22

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)............................................................................60, 69

*In re NTL Inc. Sec. Litig.*,
347 F. Supp. 2d 15 (S.D.N.Y. 2004)......................................................................68

*Outside Connection, Inc. v. DiGennaro*,
795 N.Y.S.2d 669 (N.Y. App. Div. 2005) ...........................................................107

*Penato v. George*,
383 N.Y.S.2d 900 (N.Y. App. Div. 1976) ..............................................................80

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of America Sec., LLC*,
446 F. Supp. 2d 163 (S.D.N.Y. 2006) ("*Montreal Pension I*") ....................... passim

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of America Sec., LLC*,
592 F. Supp. 2d 608 (S.D.N.Y. 2009) ("*Montreal Pension II*").............................55

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of America Sec., LLC*,
No. 05 Civ. 9016(SAS), 2010 WL 546964 (S.D.N.Y. Feb. 16, 2010) ("*Montreal Pension III*")...............................................................................................42, 43, 44

*People v. Merkin*,
907 N.Y.S.2d 439 (N.Y. Sup. Ct. 2010) ...............................................................78

*Peoples Department Stores Inc. (trustee of) v. Wise (Peoples)*,
244 D.L.R. 4th (2004)............................................................................................83

*Phyle v. Duffy*,
334 U.S. 431 (1948).........................................................................................52, 54

*Picard v. Elbaum*,
707 F. Supp. 144 (S.D.N.Y. 1989)................................................................. passim

*Picard v. FIM Advisors LLP*,
[2010] (Ch.), [2010] All ER(D) 216 (Jul), 27 May 2010 (Eng) ............................63

*Pludeman v. N. Leasing Sys., Inc.*,
10 N.Y.3d 486 (N.Y. 2008) ...................................................................................56

*Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.*,
No. 08 Civ. 1958 (JGK), 2010 WL 3860397 (S.D.N.Y. Oct. 4, 2010) ...................62

*Plumitallo v. Hudson Atl. Land Co., LLC,*
   903 N.Y.S.2d 127 (N.Y. App. Div. 2010) ....................................................87, 88

*Primavera Familienstiftung v. Askin,*
   130 F. Supp. 2d 450 (S.D.N.Y. 2001)....................................................................26

*In re Prudential Sec. Inc. P'ships Litig.,*
   930 F. Supp. 68 (S.D.N.Y. 1996)...........................................................................68

*Rabalais v. Starrett City, Inc.,*
   No. 16811/08, 2010 WL 3463730 (N.Y. Sup. Ct. Aug. 30, 2010) ........................87

*Rahl v. Bande,*
   328 B.R. 387 (S.D.N.Y. 2005)................................................................................81

*Rasmussen v. A.C.T. Envtl. Servs. Inc.,*
   739 N.Y.S.2d 220 (N.Y. App. Div. 2002) ..............................................................27

*Rego Park Gardens Owners, Inc. v. Rego Park Gardens Assocs.,*
   595 N.Y.S.2d 492 (N.Y. App. Div. 1993) ..............................................................51

*Retail Software Serv., Inc. v. Lashlee,*
   854 F.2d 18 (2d Cir. 1988).....................................................................................98

*In re Rhodia S.A. Sec. Litig.,*
   531 F. Supp. 2d 527 (S.D.N.Y. 2007)...................................................................100

*Robeco-Sage v. Citigroup Alternative Invs. LLC,*
   No. 601030/08, 2009 WL 2626244 (N.Y. Sup. Ct. July 28, 2009) ..................24, 54

*Rolf v. Blyth, Eastman Dillion & Co.,*
   570 F.2d 38 (2d Cir. 1978).....................................................................................27

*Rombach v. Chang,*
   355 F.3d 164 (2d Cir. 2004)...................................................................................12

*Roselink Investors, L.L.C. v. Shenkman,*
   386 F. Supp. 2d 209 (S.D.N.Y. 2004)....................................................................22

*In re Royal Ahold N.V. Sec. & ERISA Litig.,*
   351 F. Supp. 2d 334 (D. Md. 2004) ......................................................................100

*Rubin v. MF Global, Ltd.,*
   634 F. Supp. 2d 459 (S.D.N.Y. 2009)....................................................................68

*Russo v. Mass. Mut. Life Ins. Co.,*
   No. 96-368, 1997 N.Y. Misc. LEXIS 170 (N.Y. Sup. Ct. Mar. 25, 1997) ............91

*S.H. and Helen R. Scheuer Family Found. v. 61 Assocs.*,
    582 N.Y.S.2d 662 (N.Y. App. Div. 1992) ...........................................................86

*San Diego County Empl. Ret. Assoc. v. Maounis*,
    No. 07 Civ. 2618, 2010 WL 1010012 (S.D.N.Y. Mar. 15, 2010) ...........................................19

*Scalp & Blade, Inc. v. Advest, Inc.*,
    722 N.Y.S.2d 639 (N.Y. App. Div. 2001) ......................................................50, 51

*SEC v. Cohmad Sec. Corp.*,
    No. 09 Civ. 5680 (LLS), 2010 WL 363844 (S.D.N.Y. Feb. 2, 2010) ....................................72

*SEC v. Zandford*,
    535 U.S. 813 (2002)..................................................................................41, 42

*Shearson Lehman Hutton, Inc. v. Wagoner*,
    944 F.2d 114 (2d Cir. 1991)..........................................................................27

*Sheldon v. Khanal*,
    No. 08-CV-3676(KAM)(LB), 2009 WL 3233093 (E.D.N.Y. Sept. 30, 2009).......................78

*South Cherry St., LLC v. Hennessee Group LLC*,
    573 F.3d 98 (2d Cir. 2009)........................................................................73, 74

*Space, Inc. v. Simowitz*,
    No. 08 Civ. 2854 (SAS), 2008 WL 2676359 (S.D.N.Y. July 7, 2008) ...................................91

*Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    332 F.3d 116 (2d Cir. 2003)..........................................................................38

*Steinberg v. A Analyst Ltd.*,
    No. 04-60898, 2009 WL 806780 (S.D. Fla. Mar. 26, 2009)....................................97

*Stephenson v. Citco Group Ltd.*,
    700 F. Supp. 2d 599 (S.D.N.Y. 2010)................................................28, 52, 72, 74

*Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*,
    925 F.2d 566 (2d Cir. 1991)..........................................................................89

*United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*,
    216 F. Supp. 2d 198 (S.D.N.Y. 2002)............................................................80, 82

*VantagePoint Venture Partners 1996 v. Examen, Inc.*,
    871 A.2d 1108 (Del. 2005) ...........................................................................22

*Vermeer Owners, Inc. v. Guterman*,
    578 N.Y.S.2d 128 (N.Y. 1991) .................................................................49, 50, 51

*Visual Scis., Inc. v. Integrated Commc'ns Inc.*,
    660 F.2d 56 (2d Cir. 1981)........................................................101

*Warner Theatre Assocs. Ltd. P'ship v. Metro. Life Ins. Co.*,
    149 F.3d 134 (2d Cir. 1998)........................................................75

*Wickers Sportswear, Inc. v. Gentry Mills, Inc.*,
    411 F. Supp. 2d 202 (E.D.N.Y. 2006) ........................................96

*Williams v. Calif. 1st Bank*,
    859 F.2d 664 (9th Cir. 1988) ........................................................28

*World-Wide Volkswagon Corp. v. Woodson*,
    444 U.S. 286 (1980)........................................................100

*In re Xerox Corp. Sec. Litig.*,
    165 F. Supp. 2d 208 (D. Conn. 2001) ........................................60

## STATUTES

15 U.S.C. § 77r ........................................................47

15 U.S.C. § 77r(b)(1)(A)........................................................40

15 U.S.C. § 78bb(f)(1) ........................................................39

15 U.S.C. § 78j(b) ........................................................39

N.Y. C.P.L.R. 302(a)(1) (McKinney 2008) ........................................................95

C.P.L.R. § 302........................................................*passim*

Martin Act, N.Y. Gen. Bus. Law §§ 352-59........................................................49

N.Y. Gen. Bus. Law § 352-(c)(1)(c)........................................................54

## OTHER AUTHORITIES

Bermuda Companies Act 1981 § 97(1) ........................................................83

Black's Law Dictionary 608 (7th ed. 1999)........................................................33

Canada Business Corporations Act, R.S.C. 1985, c. C-44 ........................................................83

Fed. R. Civ. P. 8(a) ........................................................*passim*

Fed. R. Civ. P. 9(b) ............................................................................................ *passim*

Fed. R. Civ. P. 12(b) ....................................................................................12, 94

M. Woodruff, *Does the Martin Act Preempt Common Law Causes of Action?, N.Y.L.J.*,
    Sept. 4, 2008 ...........................................................................................................51

Restatement (Second) of Contracts § 302 (1981) .........................................................88

# PRELIMINARY STATEMENT

By their motions to dismiss, the Kingate Defendants[1] seek to avoid responsibility for inducing thousands of investors around the world to invest billions of dollars in two investment vehicles that the Kingate Defendants sponsored, marketed, and managed.[2] The Defendants, in turn, handed virtually all of those billions of dollars to Bernard Madoff ("Madoff") with no meaningful pre-investment inquiry or post-investment oversight or monitoring. The Kingate Defendants thereby provided a substantial source of capital to the largest financial fraud in history. While providing no discernible services, Defendants took hundreds of millions of investors' dollars as compensation. Yet they now seek to keep this undeserved windfall and avoid all liability for their reckless and fraudulent conduct. Plaintiffs, meanwhile, have lost billions of dollars.

Defendants' motions to dismiss are substantially premised on their claim that they were completely ignorant of Madoff's fraud until learning, on "December 11, 2008 … along with the rest of the world," that Madoff "had been operating an extremely well-disguised Ponzi scheme." FIM at 1.[3] But the Defendants are not being sued for their purported failure to know that Madoff was the world's biggest fraudster. The Defendants are liable to Plaintiffs and the proposed Class members because for at least a decade before 2008 they recklessly made false statements and omitted material information in uniform sales documents distributed to thousands of investors. The false statements include: (1) that their multi-billion dollar Funds had a track record of consistent returns; (2) that the Kingate Defendants took great care in selecting and supervising

---

[1]	The Individual Defendants together with Defendants KML, Tremont, Tremont Group, and the FIM Entities are referred to as the "Kingate Defendants." CAC ¶ 42.

[2]	These two funds are Kingate Global Fund, Ltd. ("Kingate Global") and Kingate Euro Fund, Ltd. ("Kingate Euro," together the "Funds"). CAC ¶ 3.

[3]	Citations in the form "[name of Defendant] at [page number]" refer to memoranda in support of the Kingate Defendants' motions to dismiss.

the Funds' investment managers; and (3) that the Kingate Defendants were undertaking rigorous measures to safeguard investments in the Funds. Each of these representations by Defendants about their own conduct was false, and Defendants knew they were false, or at least recklessly made. Finally, it was not Madoff who made these false representations to Plaintiffs; it was the Kingate Defendants. Thus, it is Defendants' false statements about their own knowledge and activities that caused Plaintiffs to lose billions of dollars and are the foundation of this lawsuit.

When Defendants' conduct is viewed as a whole in the context of Madoff's scheme, it is clear that Defendants have failed to provide legal justification to escape liability for their blatant misconduct:

First, Plaintiffs have standing to bring these claims because they were the direct recipients of the misrepresentations and omissions by the Kingate Defendants that led them to invest and hold money in the Funds. These representations were not made to the Funds, but to the investors, and are the basis for classic direct claims for intentional and negligent misrepresentations.

Second, the Kingate Defendants assured investors that the monies entrusted to them were being placed in real investments, based on a proven track record of profitability, and assured Plaintiffs that they – the Kingate Defendants – together with the auditors and administrators were conducting due diligence to protect those investments. These statements about the Kingate Defendants' actions and about the Funds that the Kingate Defendants managed – not about Madoff's operations – were either knowingly false or made with extraordinary recklessness. If these misrepresentations and omissions do not state a claim for fraud, then fund managers will have open season to say anything to raise money.

Third, Defendants failed to fulfill their professional and fiduciary duties to manage and monitor the Funds and to provide Plaintiffs with accurate information regarding their investment performance. These facts support claims for negligent misrepresentation, breach of fiduciary duty and gross negligence.

Fourth, Plaintiffs' contract-based claims properly seek recovery for money that the Kingate Defendants paid themselves on the false basis that the Funds actually made large profits, when in fact the Madoff investments were illusory. Similarly, the contracts with fund managers and advisors were clearly for the benefit of the Funds' investors, giving rise to third-party beneficiary claims.

Fifth, Plaintiffs' claims are not preempted by either the Martin Act or the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"). The most recent and better-reasoned New York decisions recognize that the Martin Act only preempts private claims that allege violations of the Act itself or its implementing regulations. And SLUSA cannot plausibly be read as intended by Congress to preempt claims arising from investments in off-shore funds that are not regulated by the federal securities laws.

Sixth, the exculpatory provisions in investment management agreements do not – and lawfully, could not – shield the Kingate Defendants from liability for their grossly negligent and fraudulent actions. Indeed, having chosen to speak to investors about the possibility of fraud, it was incumbent upon Defendants to fully and fairly disclose the risks of the investment, including the specific indicia of fraud that were evident.

Finally, the Kingate Defendants assert they should not be held to answer for punitive damages. If Plaintiffs ultimately prove that the Kingate Defendants recklessly raised billions of dollars from investors around the world without any concern for the truth or falsity of their

statements, and without doing anything remotely approaching the actions they said they would take to protect investors, it is hard to imagine a fraud case more deserving of punitive damages.

In sum, Plaintiffs have stated valid claims against the Kingate Defendants, and the Kingate Defendants' motions to dismiss should be denied.

## FACTUAL BACKGROUND

### I.      THE STRUCTURE OF THE FUNDS AND THE POSITIONS OF THE KINGATE DEFENDANTS

#### A.      The Funds

Plaintiffs and the putative Class invested indirectly with Madoff through two so-called feeder funds, Kingate Global Fund, Ltd. ("Kingate Global") and Kingate Euro Fund, Ltd. ("Kingate Euro," collectively the "Funds").  CAC ¶ 3.[4]  The Funds were nearly identical except that Kingate Global accepted investments in U.S. dollars, while Kingate Euro, as denoted by its name, did so in Euros.  CAC ¶ 49(b).  Kingate Global was incorporated in 1994 and Kingate Euro in 2000.  By 2008, the Funds had billions of dollars in assets, substantially all of which were invested with Madoff, and all of which are now lost.  The Funds are not parties to this Action.

The Funds executed a series of agreements to open their accounts with Bernard L. Madoff Investment Securities ("BMIS") (the "Account Agreements").  CAC ¶¶ 48(b), 49(c).  The Account Agreements are subject to New York law, and were deemed to have been made and performed in New York based on the New York trading activities contemplated therein.  CAC ¶ 50.

---

[4]      "CAC ¶ __" designates citations to the Consolidated Amended Complaint (the "Complaint").

## B. Defendants Grosso, Ceretti, and Manzke Sponsored and Managed the Funds Through Defendants Tremont, KML, and the FIM Entities

The principal sponsors of the Funds and main culprits here were Defendants Carlos Grosso ("Grosso"), Federico Ceretti ("Ceretti"), and Sandra Manzke ("Manzke"). CAC ¶¶ 31, 32, 36.

Grosso and Ceretti sponsored, managed, marketed, and sold the Funds to investors through Defendants (i) FIM Limited, (ii) FIM Advisers LLP ("FIM Advisers"), and (iii) FIM (USA) Inc. ("FIM USA," collectively with FIM Limited and FIM Advisors, the "FIM Entities"; the FIM Entities, Grosso, and Ceretti, collectively, are the "FIM Defendants"). CAC ¶¶ 28-30. Grosso and Ceretti were the founding members of the FIM Entities which they further controlled through their positions as Chairmen, Chief Executive Officers and Chief Investment Officers. CAC ¶¶ 31-32. FIM Limited and FIM Advisers managed the Funds through a Consultancy Services Agreement with the managers of the Funds, Defendants Kingate Management Limited ("KML") and Tremont (Bermuda) Limited ("Tremont"). CAC ¶¶ 25-26, 28.[5] In other words, Grosso and Ceretti controlled FIM Advisers and FIM Limited, which entered into Consultancy Agreements with the entities formally managing the Funds (KML and Tremont). Through the Consultancy Agreements, Grosso and Ceretti managed and controlled the Funds.

Defendants Grosso and Ceretti also had control of the management of the Funds to the extent they owned the manager, KML. The Madoff Trustee, Irving Picard, believes they did. Mr. Picard has represented in documents submitted in a lawsuit in the United Kingdom that he

---

[5] Defendants KML and Tremont co-managed the Funds until December 31, 2005, after which KML remained as sole manager. CAC ¶ 26(b).

"has strong grounds for believing that Mr. Grosso and Mr. Ceretti are the owners of and control [KML,] and were responsible for the establishment and investment of the Kingate Funds."[6]

In addition to Grosso and Ceretti, Defendant Manzke was the other individual who played a controlling and prominent role in the wrongful conduct here. Manzke was the Chairman and co-CEO of Defendant Tremont Group Holdings, Inc. (the "Tremont Group," together with Tremont, the "Tremont Defendants"), which was the parent company of the Co-Manager of the Funds, Tremont. CAC ¶¶ 26(b), 36.

Manzke's, Grosso's, and Ceretti's role as sponsors and principal wrongdoers here is evidenced from their close relationship with Madoff. Manzke introduced Grosso and Ceretti to Madoff shortly after Manzke met them in 1993 or 1994, approximately. Manzke, Grosso and Ceretti then met regularly with Madoff in New York. CAC ¶¶ 70-76. Plaintiffs have documented numerous meetings of these Defendants with Madoff since 2005 based on Madoff's calendar, which was provided to Plaintiffs' counsel by Madoff's former secretary. *Id.* Specifically, Madoff met with Manzke, at a minimum, on May 11, 2005, and March 15, 2006. CAC ¶ 73. Madoff also met with Grosso on October 4, 2006; March 8, 2007; September 17, 2007; and September 22, 2008. Madoff's close contact and regular communications with Grosso and Ceretti are further evidenced by Madoff's pocketbook telephone directory; it included Ceretti's office number and Grosso's mobile phone and home numbers, as well as his office number. CAC ¶ 75-76.

### C. The Remaining Kingate Defendants

The remaining Kingate Defendants are a Director of Co-Manager KML, Michael G. Tannenbaum ("Tannenbaum"), and the Directors of the Funds: (i) Graham H. Cook ("Cook"),

---

[6] *Picard v. FIM Advisers LLP*, [2010] EWHC 1299 (Ch), [2010] All ER (D) 216 (Jul), [17]-[18], 27 May 2010 (Eng.) (Declaration of S. Douglas Bunch ("Bunch Dec.") Ex. A).

(ii) John E. Epps ("Epps"), (iii) Charles D. Sebah ("Sebah"), (iv) Keith R. Bish ("Bish"), and (v)

Christopher Wetherhill ("Wetherhill"). CAC ¶¶ 34-35, 37-40. These individuals, together with

Manzke, Grosso and Ceretti, are referred to as the "Individual Defendants." CAC ¶ 41. The

Individual Defendants together with Defendants KML, Tremont, Tremont Group, and the FIM

Entities are referred to as the "Kingate Defendants." CAC ¶ 42.

## II.    THE KINGATE DEFENDANTS' FALSE AND MISLEADING STATEMENTS

Beginning in 1995 and continuing through December 11, 2008, the Kingate Defendants

induced Plaintiffs to invest and hold their investments in the Funds on the basis of false and

misleading representations and omissions. These false statements and omissions were primarily

made through the offering documents provided to investors (the "Information Memoranda," or

"IM"). CAC ¶¶ 83-105. The Kingate Defendants drafted, reviewed, authorized, and/or

otherwise participated in the preparation and dissemination of the Information Memoranda, and

were responsible for the content of those materials. The Information Memoranda contained

uniform misrepresentations and material omissions that induced Plaintiffs to invest and retain

their investments in the Funds, and on which Plaintiffs relied. *Id.*

Among the many false statements included in the Information Memoranda, the Kingate

Defendants misrepresented that Plaintiffs' assets were actually being invested, that they were

being invested using a split-strike conversion strategy, and that these assets had earned returns

over time. CAC ¶¶ 86-91. For example, the Information Memoranda said that the "strategy

utilized by the Fund's Investment Advisor [*i.e.*, Madoff] is called 'split-strike conversion' and

entails …. (i) purchasing a basket of … S&P 100 stocks …. (ii) selling out-of-the money S&P

100 Index call options …. and (iii) buying out-of-the-money or at-the-money S&P 100 Index put

options." CAC ¶ 89. All of this, of course, was false, as Madoff never executed a single trade.

Similarly, the Information Memoranda contained a section titled "Operating History," which falsely stated that the Funds had an actual history of financial returns: "The Fund commenced operations with respect to USD shares on March 1, 1995 and as such has an operating history with regard to such Shares since such date."[7] The Kingate Defendants also issued monthly performance reports to the Funds' investors that supposedly showed past performance. *See* Bunch Dec. Exs. B-J. All these statements of past performance were false: there had been no real returns in the past or any prior performance because Madoff stole the money before he invested a single penny.

The Kingate Defendants also misrepresented that they, and their contracted-for advisors, consultants, auditors, and administrators, were conducting extensive due diligence and monitoring Madoff's operations. CAC ¶¶ 92-98. For instance, the Information Memoranda represented that the Funds' Manager had undertaken the obligation to "evaluate[] and monitor[] the Investment Advisor [*i.e.*, Madoff]," including "the selection and evaluation of [Madoff]." CAC ¶ 92. The Manager's obligation to monitor and evaluate Madoff also arose out of the Management Agreement. CAC ¶ 94. That agreement explicitly stated that the Manager delegated its duties to Madoff, but that, in delegating those duties, the Manager undertook the obligation to "ascertain [Madoff's] competence" and to "monitor generally the faithful performance by [Madoff]." *Id.* The Kingate Defendants all failed to uphold this basic obligation. They never independently monitored or confirmed that Madoff executed the represented investment strategy because, of course, Madoff never did.

---

[7] KGF 2008 IM, CAC Ex. 1 at 4; KGF 2007 IM, CAC Ex. 3 at 4; KGF 2006 IM, CAC Ex. 4 at 4; KGF 2003 IM, CAC Ex. 5 at 4; KGF 2000 IM, CAC Ex. 6 at 4; and KEF 2008 IM, CAC Ex. 2 at 4 ("The Fund commenced operations with respect to USD shares on May 1, 2000 and as such has an operating history with regard to such Shares since such date. There can be no assurance that future returns will be similar to returns achieved since inception date.").

The Kingate Defendants also failed to disclose material facts, including that (i) no one had conducted meaningful due diligence; (ii) no one was monitoring or had independently verified any of Madoff's purported trading activity, such as options trading and purported transactions with counterparties; (iii) the Kingate Defendants had no information about, and did not seek better transparency on, Madoff's operations; and (iv) the Kingate Defendants had no independent, factual basis for stating that Madoff was executing a split-strike conversion strategy. CAC ¶¶ 83-105.

The Kingate Defendants are therefore liable here not because of their purported ignorance that Madoff was responsible for the largest Ponzi scheme in history. They are liable because *for more than a decade* they induced Plaintiffs to invest and maintain their investments in the Funds based on recklessly false statements and omissions. It is through these statements that the Kingate Defendants undertook the obligation to monitor, evaluate and, effectively, ensure the safeguard of Plaintiffs' monies. Yet, they never performed the obligation they chose to undertake. Accordingly, it was not Madoff who made these false statements to Plaintiffs, or who caused the statements to be false. It was the Kingate Defendants. And it was the Kingate Defendants' false statements about their own knowledge and activities that caused Plaintiffs to lose billions of dollars and which are the foundation of this lawsuit.

## III.    THE KINGATE DEFENDANTS KNEW OR WERE RECKLESS IN NOT KNOWING THAT MADOFF WAS RUNNING A PONZI SCHEME

### A.    Madoff Reported Trades Outside the Daily Trading Range

The Kingate Defendants had overwhelming evidence that Madoff's operation was a fraud – evidence they knew about or should have discovered, but simply ignored. Madoff reported to the Funds almost two hundred trades at prices that were outside the daily trading range. CAC ¶¶ 77-82. Those trades could never have taken place, obviously did not, and the Kingate

Defendants knew that or, at a minimum, had the evidence and obligation to know that. If the Kingate Defendants had verified the pricing information for these trades, they would have immediately discovered that the trades had not taken place as reported. *Id.*

For example, the account statement received by the Kingate Defendants for the month of October 2003 reported purchases of more than a million shares of Intel Corporation ("Intel"). CAC ¶ 78. These purchases were purportedly executed on October 2, 2003, at a price of $27.63. However, the price for Intel stock that day ranged from $28.41 to $28.95. *Id.* Likewise, the monthly account statement received by defendants for December 2006 reported sales of shares of Merck & Co., Inc. ("Merck") on December 22, 2006 at a price of $44.61; the price of Merck stock that day, however, ranged from $42.78 to $43.42. CAC ¶ 79. Accordingly, Madoff could never have purchased these shares at the reported price, and obviously never did.

In total, the Funds' monthly reports reflected 185 trades that Madoff reportedly executed at prices outside the daily price ranges. CAC ¶ 80. This pattern should have caused sophisticated financial professionals, such as the Kingate Defendants, to independently verify these and more trades with the public exchanges.

Madoff also reported trading options in a volume that vastly exceeded the volume in the public markets. CAC ¶ 81. Madoff needed to supposedly purchase and sell options in the S&P 100 Index in order to execute the split-strike conversion strategy. These options are traded on the Chicago Board of Exchange ("CBOE"). On January 23, 2008, Madoff purportedly bought a total of 17,589 and 5,762 put options for each of the Funds. CAC ¶ 81. Yet, the total volume traded on the CBOE on that day for the options supposedly traded by Madoff was only 8,645 – about one-third of Madoff's reported transactions. *Id.* The fact that the option volume reported by Madoff was so outlandishly large should have caused the Kingate Defendants to seriously

question Madoff. Even if Madoff had executed a trade of such massive scale in the over-the-counter market with private counterparties (not through public exchanges), the Kingate Defendants should have verified with those counterparties whether any of those trades existed – not a single one did.

**B.      The Kingate Defendants Knew or Ignored Many Indicia of Fraud**

The Kingate Defendants either knew or willfully ignored the numerous additional indicia of fraud in Madoff's operation:

- Madoff purportedly served as his own custodian, which precluded any third-party and independent confirmation of his trades. CAC ¶ 215.

- Madoff refused to identify the counterparties with whom he purportedly traded. CAC ¶ 216.

- Every year-end, Madoff reported that 100% of the Funds were invested in U.S. Treasury securities. It was extremely suspicious that, between 1995 and 2008, Madoff never allowed the auditors at year-end to confirm the existence of any stock holdings. CAC ¶ 217.

- Madoff's auditors were unknown and plainly unequipped to audit a company of BMIS's purported size. The auditors had only three employees and had offices in a strip mall. In addition, the auditors had filed documents with the American Institute of Certified Public Accountants stating that they had not conducted any audits since 1993. CAC ¶ 218.

- Madoff reported his fictitious trades using paper confirmations with average trading prices, not electronic trade tickets for each trade. Paper confirmations are patently susceptible to manipulation. CAC ¶ 219.

- Madoff's consistent returns were implausible. The split-strike conversion strategy can dampen volatility, but it cannot produce gains in a down market. Yet, this is exactly what Madoff reported. CAC ¶ 220.

- Madoff did not charge an investment advisory fee that would have entitled him to tens of millions of dollars every year based on the Funds' fictitious balances. CAC ¶ 221.

If the Kingate Defendants had done what they said they were doing, they would have known all of these facts.

**ARGUMENT**

## I.  LEGAL STANDARD FOR MOTION TO DISMISS

Rule 8(a)(2) of the Federal Rules of Civil Procedure governs Plaintiffs' claims.[8]

Accordingly, to survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), Plaintiffs must

only have alleged a "short and plain statement of the claim showing that the pleader is entitled to

relief." Fed. R. Civ. P. 8(a)(2).  In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the

Supreme Court held that Rule 8(a) does not require "detailed factual allegations."  550 U.S. at

555.  Rather, to survive a motion to dismiss, a complaint must plead "enough facts to state a

claim that is plausible on its face." *Id.* at 570.  Additionally, "[o]nce a claim has been adequately

stated, it may be supported by showing any set of facts consistent with the allegations in the

complaint." *ATSI Commc'ns, Inc. v. The Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)

(citing *Twombly*, 550 U.S. at 563).  On a motion to dismiss, the Court should accept all factual

allegations as true, and draw all reasonable inferences in Plaintiffs' favor.  *See Goldstein v.*

*Pataki*, 516 F.3d 50, 56 (2d Cir. 2008).

The Supreme Court clarified the contours of the "plausibility" requirement in *Ashcroft v.*

*Iqbal*, ____ U.S. ____, 129 S. Ct. 1937, 1950 (2009).  According to *Iqbal*, "[a] claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949.

---

[8]       Plaintiffs' claims for fraud, constructive fraud and aiding and abetting fraud are subject to the pleading standard set forth in Fed. R. Civ. P. 9(b).  *See infra* at Section V.A.1.  The FIM Defendants cite *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004), to support their assertion that all Plaintiffs' claims "sound in fraud" and therefore must be pled with particularity.  FIM at 10.  *Rombach*, however, held that negligence claims, brought pursuant to Section 11 of the Securities Act of 1933, sounded in fraud when those claims depended on misstatements and omissions which were identical to those which were the basis of plaintiffs' fraud claims under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act").  355 F.3d at 175-76.  Here, the elements of Plaintiffs' common law claims, brought under state law, are indisputably different from the elements of a fraud claim; indeed, they are brought against different Defendants and depend on different facts than Plaintiffs' fraud claims. Accordingly, the Court should apply a Rule 8(a) pleading standard to these claims.  *See Anwar v. Fairfield*

12

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Notably, the Court is not required, at this stage, to *believe* Plaintiffs' allegations. *Twombly*, 550 U.S. at 556 (citing *Neitzke v. Williams*, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance … dismissals based on a judge's disbelief of a complaint's factual allegations.")). Indeed, even if a complaint "strikes a savvy judge that actual proof of [its] facts is improbable" and "that a recovery is very remote and unlikely," all *Twombly* requires is "enough fact to raise a reasonable expectation that discovery will reveal evidence" of wrongdoing. *Id.* Plaintiffs must only "nudge[] their claims across the line from conceivable to plausible." *Id.* at 570.

## II. CHOICE OF LAW

Defendants contend that the Court should decide this motion in accordance with the substantive law of BVI or Bermuda interchangeably because these jurisdictions purportedly have the most significant relationship with the claims asserted in the Complaint. The Court, however, need not concern itself with BVI or Bermuda law because Defendants have not carried their burden of showing that there is a genuine conflict between BVI or Bermuda law, on the one hand, and New York law, on the other, with respect to the claims asserted in the Complaint. Even where there is a discrepancy between the two sets of law with respect to discrete issues, the Court should still apply New York law because New York has the most significant contacts with the litigation.

### A. The Court Can Apply New York Law Where There Is No Genuine Conflict Between New York Law and the Law of BVI or Bermuda with Respect to a Particular Legal Issue or Claim

---

*Greenwich Ltd.*, No. 09-CV-118, 2010 WL 3341636, at *35 (S.D.N.Y. Aug.18, 2010) ("*Anwar II*") (applying a Rule 8(a) pleading standard to Plaintiffs' common law claims in the context of the Madoff Ponzi scheme).

A federal court in a diversity case applies the conflict of law principles of the forum state. *See Globalnet Financial.com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 382 (2d Cir. 2006).  A conflicts analysis is unnecessary if there is no substantive conflict between New York law and the law of the foreign jurisdiction in question.  *See id.*; *see also Int'l Bus. Machines Corp. v Liberty Mut. Ins. Co*., 363 F.3d 137, 143-44 (2d Cir. 2004).  In the absence of a substantive conflict, the court may apply New York law.

A choice of law analysis must be conducted separately for each claim.  *See Globalnet*, 449 F.3d at 384.

## 1.    Fraudulent Inducement and Deceit

The elements of a cause of action for deceit under United Kingdom, Bermuda, and BVI law are identical to the elements of a New York cause of action for fraud in the inducement.  *See* Declaration of George Bompas, Q.C. ("Bompas Dec.") at ¶ 54.   The plaintiff must show that he has been induced to act to his detriment by a false statement made by the defendant in circumstances where the defendant made the statement intending that the plaintiff should rely upon it and without honest belief in its truth.  *See id.*  A false statement will have been made fraudulently where it was made: (1) knowingly, (2) without belief in its truth, or (3) recklessly, careless whether it be true or false.  *See id.*

## 2.    Negligent Misrepresentation and Negligence

The substantive law of the United Kingdom, Bermuda, and the BVI governing negligent misrepresentation and negligence claims is harmonious with New York law.  *See* Bompas Dec. ¶¶ 59-120.  *Cromer Fin. Ltd. v. Berger*, No. 00 Civ. 2284 DLC, 2003 WL 21436164, at *11 (S.D.N.Y. June 23, 2003) (finding no substantive difference between Bermuda and New York negligence law as applied to accountants); *Harmelin v. Man Fin. Inc*., No. 06-CV-1944, 2007

14

WL 3146666, at *2 (E.D. Pa. Oct. 26, 2007) (no substantive difference between Cayman Island law of negligent misrepresentation and Pennsylvania law).[9]

### 3. Aiding and Abetting Breach of Fiduciary Duty and Fraud

Defendants disingenuously claim that Bermuda and BVI do not recognize a cause of action for "aiding and abetting" breach of fiduciary duty. Bermuda and BVI, however, do recognize a cause of action for knowing assistance in breach of trust (also referred to as "dishonest assistance") which is the functional equivalent of aiding and abetting a breach of fiduciary duty. Bompas Dec. ¶¶ 160-69; *In re AlphaStar Ins. Group. Ltd.*, 383 B.R. 231, 274 (Bankr. S.D.N.Y. 2008 ) ("Bermuda law recognizes a claim for 'dishonest assistance,' similar to the aiding and abetting claim under New York law. To establish liability, the plaintiff must show that the third-party dishonestly procured or assisted a breach of trust or fiduciary obligations.").

Taking the allegations in Counts 13, 19, and 26 as true, a claim for knowing assistance in breach of trust is made out. Bompas Dec. ¶ 160-69. If the defendants knew of the fiduciary duties owed by the Kingate Defendants and of the breaches of these duties as alleged in the Complaint, and assisted with such breaches, then a finding of dishonesty could be reached. *Id.* ¶ 169. Thus, the claims of aiding and abetting fraud in this instance are interchangeable with knowing assistance in breach of trust. There is no need for the court to make a hard and fast determination of governing law when the same result would be reached in either case.

Similarly, under BVI and Bermuda law, a person may be held liable as a joint tortfeasor with a principal fraudster if the defendant "joined in a common design" or did something "to further a common design" pursuant to which the tort was committed. Bompas ¶ 148, 158. It is not necessary to make an allegation of conspiracy if there is a common design. *Id.* ¶ 153.

---

[9] The Cayman Islands, like BVI and Bermuda, follow U.K. precedent.

The Complaint alleges claims for aiding and abetting fraud against the Tremont Group, PricewaterhouseCoopers (including PricewaterhouseCoopers Bermuda and PricewaterhouseCoopers LLP) ("PwC"), and Citi Hedge Fund Services Ltd. ("Citi Hedge")[10] based on allegations that: (1) fraudulent misrepresentations were made to Plaintiffs by the Kingate Fraud Claim Defendants, (2) Plaintiffs acted upon the misrepresentations by investing and holding investments, thereby suffering loss; and the Tremont Group, PwC and/or Citi Hedge with willful blindness or recklessness assisted the Kingate Fraud Claim Defendants in the perpetration of the fraud by taking various steps (*e.g.*, issuing unqualified audit reports). *Id.* at ¶ 146. Mr. Bompas concludes that these allegations which are made in support of aiding and abetting claims have all the ingredients required for a person to be found liable as a joint tortfeasor with the Kingate Fraud Claim Defendants under BVI law even if the nomenclature is different. Consequently, the Court does not have to make an either-or choice of law election because the same result is reached regardless of which law is applied. If New York law applies, the elements of an aiding and abetting fraud claim under New York law have been pled. Conversely, if the Court finds that BVI law should prevail, then the same elements alleged in the Complaint to state a claim against Tremont Group, PwC, and Citi Hedge for aiding and abetting fraud would do double-duty to make these defendants liable as joint tortfeasors with the Kingate Fraud Claim Defendants cooperating in furtherance of a common design. *Id.* ¶¶ 147, 158. Either way, Counts 14, 20, and 27 should survive a motion to dismiss. The labels are unimportant.

### 4. Breach of Fiduciary Duty

The substantive law of the United Kingdom, Bermuda, and the BVI is not materially different from New York law as to Plaintiffs' claims for breach of fiduciary duty. Under both

---

[10] Memoranda in opposition to PwC's and Citi Hedge's motions to dismiss are being filed concurrently

legal systems, officers and directors of a company do not owe fiduciary duties to individual shareholders under ordinary circumstances. *Compare* Bompas Dec. ¶ 130 *with Druck Corp. v. Macro Fund Ltd.*, 290 F. App'x 441, 444 (2d Cir. 2008) (summary order) (finding that under both New York and Cayman Island law, a shareholder cannot normally assert a direct claim for breach of fiduciary duty against a corporate officer). However, again under both legal systems, the specific facts of a case may give rise to such a direct duty. *Compare* Bompas. Dec. ¶¶ 131-34 (outlining factors giving rise to fiduciary duties "to shareholders . . . not aris[ing] from the legal relationship with the company," such as a high degree of insider knowledge or where directors supply information directly to shareholders) *with Anwar II*, 2010 WL 3341636, at * 15 ("Under New York law, a shareholder may sue individually when the wrongdoer has breached a duty independent of any duty owing to the corporation wronged." (internal quotation marks omitted)), *id.* at *29 (noting the importance of superior access to insider knowledge to determining the existence of a fiduciary relationship) *and ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.*, 957 F. Supp. 1308, 1332 (S.D.N.Y. 1997) (finding that Cayman Island law and Delaware law were substantively the same on the issue of when a shareholder may sue an officer or director directly for breach of fiduciary duty). Under such circumstances, the Court should examine the "general principles governing the existence of a fiduciary duty," which are identical under both legal systems. *Compare* Bompas Dec. ¶ 135 (describing the general principle as "whether there is a sufficient relationship of trust and confidence," and describing a fiduciary as "someone who has undertaken to act for or on behalf of another in a particular matter in circumstances which give rise to a relationship of trust and confidence" (internal quotation marks omitted)) *with EBC I, Inc. v. Goldman Sachs & Co.*, 832 N.E.2d 26, 31 (N.Y. 2005) ("A

---

herewith.

legal systems, officers and directors of a company do not owe fiduciary duties to individual shareholders under ordinary circumstances. *Compare* Bompas Dec. ¶ 130 *with Druck Corp. v. Macro Fund Ltd.*, 290 F. App'x 441, 444 (2d Cir. 2008) (summary order) (finding that under both New York and Cayman Island law, a shareholder cannot normally assert a direct claim for breach of fiduciary duty against a corporate officer). However, again under both legal systems, the specific facts of a case may give rise to such a direct duty. *Compare* Bompas. Dec. ¶¶ 131-34 (outlining factors giving rise to fiduciary duties "to shareholders . . . not aris[ing] from the legal relationship with the company," such as a high degree of insider knowledge or where directors supply information directly to shareholders) *with Anwar II*, 2010 WL 3341636, at * 15 ("Under New York law, a shareholder may sue individually when the wrongdoer has breached a duty independent of any duty owing to the corporation wronged." (internal quotation marks omitted)), *id.* at *29 (noting the importance of superior access to insider knowledge to determining the existence of a fiduciary relationship) *and ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.*, 957 F. Supp. 1308, 1332 (S.D.N.Y. 1997) (finding that Cayman Island law and Delaware law were substantively the same on the issue of when a shareholder may sue an officer or director directly for breach of fiduciary duty). Under such circumstances, the Court should examine the "general principles governing the existence of a fiduciary duty," which are identical under both legal systems. *Compare* Bompas Dec. ¶ 135 (describing the general principle as "whether there is a sufficient relationship of trust and confidence," and describing a fiduciary as "someone who has undertaken to act for or on behalf of another in a particular matter in circumstances which give rise to a relationship of trust and confidence" (internal quotation marks omitted)) *with EBC I, Inc. v. Goldman Sachs & Co.*, 832 N.E.2d 26, 31 (N.Y. 2005) ("A

---

herewith.

fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another . . . . Such a relationship, . . . is grounded in a higher level of trust than normally present . . . ." (internal quotation marks omitted)). Finally, in both jurisdictions, the existence of a fiduciary duty is a fact-intensive question. *Compare* Bompas Dec. ¶ 137 (describing the question as "fact sensitive") *with Anwar II*, 2010 WL 2010 WL 3341636, at *26 ("Whether the [fiduciary] duty exists is a fact-specific inquiry."). Therefore, the Court may apply New York law to Plaintiffs' breach of fiduciary duty claims. *See Globalnet*, 449 F.3d at 382.

**B.     New York Has the Most Significant Interest In This Litigation**

Even if New York law conflicts with the law of Bermuda and BVI on some issues, the Court should still apply New York law because it is the jurisdiction with the most significant contacts with the litigation. The New York courts apply an "interests analysis" to determine which law should govern tort claims. *See Anwar II*, 2010 WL 3341636, at *14. Under that analysis, the court applies the law of the jurisdiction with the most significant interest in or relationship to the litigation. *See id.* "[T]he facts or contacts which obtain significance in defining [s]tate interests are those which relate to the purpose of the particular law in conflict." *Butler v. Stagecoach Group, PLC*, 900 N.Y.S.2d 541, 543 (N.Y. App. Div. 2010) (internal quotation marks omitted). Where, as here, the supposedly conflicting laws "are intended to regulate conduct, … the conflict of laws issue is typically resolved by applying the law of the place of the tort." *Burnett v. Columbus McKinnon Corp.*, 887 N.Y.S.2d 405, 409 (N.Y. App. Div. 2009). "[T]he place where the injury was inflicted, as opposed to the place where the fraudulent act originated" is generally deemed the place where the tort occurred. *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 492 (S.D.N.Y. 2001) (internal quotation marks omitted); *see*

*Devore v. Pfizer Inc.*, 867 N.Y.S.2d 428, 429 (N.Y. App. Div. 2008) ("[T]he place of the wrong is considered to be the place where the last event necessary to make the actor liable occurred." (internal quotation marks and punctuation omitted)).  While this is "usually where the plaintiff is located," "controlling effect [is given] to the law of the jurisdiction which, because of its relationship or contact with the occurrence of the parties, has the greatest concern with the specific issue raised in the litigation."  *San Diego County Empl. Ret. Assoc. v. Maounis*, No. 07 Civ. 2618, 2010 WL 1010012, at *18 (S.D.N.Y. Mar. 15, 2010) (internal quotation marks omitted).

In this case, the locus of the tort is New York.  The injury to the class relates to monies "invested" in a New York-based Ponzi scheme.  The Funds were passive shell companies with no employees.  Their sole function was to collect and funnel funds from investors to BMIS in New York.  BMIS maintained custody of the accounts in New York.  The assets of the Funds were purportedly invested in New York.  Moreover, the Court of Appeals of Bermuda observed in another case involving Kingate that there was a pattern whereby "funds subscribed [to the Kingate Funds] would be actively managed by the broker/dealer in New York [Madoff], and the role of the local Manager, if not simply nominal, would be very limited indeed."  *Kingate Global Fund, Ltd. v. Knightsbridge (USD) Fund Ltd.*, [2009] CA (Bda) 17 Civ. at 9, ¶ 22, 19 Nov. 2009 (Berm.) (Bunch Dec. Ex. K).  Consequently, neither the BVI nor Bermuda has strong ties with this litigation, while New York has significant ties.

Even assuming, *arguendo*, that New York is not the locus of the tort, New York law should apply because the members of the plaintiff class are scattered throughout the world.  No foreign country can assert that it has the strongest claim to the conduct alleged in this lawsuit by virtue of injuries suffered by investors resident in its jurisdiction.  *Maounis*, 2010 WL 1010012,

at *18 (place where injury occurred is not a dispositive factor where injuries "ha[ve] occurred in locations with only limited connection to the conduct at issue" (internal quotation marks omitted)); *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of America Sec., LLC*, 446 F. Supp. 2d 163, 193 (S.D.N.Y. 2006) ("*Montreal Pension I*").

The primary conduct giving rise to this lawsuit occurred in New York where the assets of the Funds supposedly were located. Madoff, the Funds' investment adviser, was located in New York, and he managed his Ponzi scheme from New York. Individual Defendants Ceretti, Grosso, and Manzke frequently conferred with Madoff in New York on behalf of the Kingate Defendants. CAC ¶¶ 73-76. Indeed, the Funds' Information Memoranda state in block letters on their cover pages that shares issued by the Funds may not be offered for sale "to any member of the public in the British Virgin Islands." *See*, *e.g.*, CAC Ex. 1. Faced with similar facts, Judge Cote held that New York had the strongest connection to a hedge fund fraud that was centered in New York. *Cromer*, 137 F. Supp. 2d at 492-93. There, as here, the plaintiffs were dispersed throughout the world with each country only having limited contact with the conduct at issue in the case. The hedge fund was organized under BVI law, but the investment manager of the Fund was based in New York. The Court concluded that New York law should apply because New York was the jurisdiction with the greatest interest in the litigation.

New York has a strong interest in applying its laws to regulate the conduct of offshore fund promoters, managers, and service providers who raise money to fuel fraudulent schemes orchestrated by fraudsters in New York. In *Montreal Pension I*, Judge Scheindlin noted that the breach of fiduciary claims against a fund's administrator, Citco, related to the alleged failure of the administrator to independently verify false information received from the fund manager located in New York. The core facts of the complaint – Madoff's fraud and allegations of

reckless ignorance of this fraud or other breaches of duty – centered on conduct that occurred in New York. The court also emphasized that the victims of the fraud were dispersed throughout the world and their injuries were sustained in various locations with only limited connection to the conduct at issue. *Montreal Pension I*, 446 F. Supp. 2d at 193. Similarly, in *Anwar II*, Judge Marrero held that New York law should apply to claims made by investors in BVI hedge funds because activities in New York and the parties' contacts with that forum bore the closest relation to the claims at issue. *Anwar II*, 2010 WL 3341636, at *14. The same reasoning leads to the conclusion that New York law should apply to govern the claims in this case.

## III.    PLAINTIFFS HAVE STANDING TO PURSUE COMMON LAW CLAIMS AGAINST THE KINGATE DEFENDANTS

Defendants argue that the Court must adhere to the "internal affairs" doctrine and determine the threshold issue of standing in accordance with BVI law based on the bare fact that the Funds were incorporated there. The Court, however, should apply New York law to decide standing for three separate and independent reasons. First, the internal affairs doctrine is not applicable in this case because the shareholders are bringing claims primarily against third parties, not the Funds or the officers or directors of the Funds. Second, the New York courts do not apply the internal affairs doctrine in a mechanical fashion. Rather, standing is determined in accordance with the law of the jurisdiction with the greatest interest in the specific issues under consideration. As explained above, of all the jurisdictions with which the Kingate Funds came into contact, New York has the strongest connection to the issues at stake in this litigation. Third, there is no substantive difference between the standing rules of New York and the BVI, so the Court is free to follow New York law.

In the final analysis, however, it would not make any difference to the outcome if standing were determined under BVI law, because Plaintiffs also would have standing to bring their claims under that law.

**A.** **The Court Is Free to Determine Standing Under New York Law Where New York Has the Strongest Interest of Any Jurisdiction in the Kingate Fraud**

Defendants incorrectly urge the Court to determine standing under BVI law pursuant to the "internal affairs" doctrine. With the exception of the claims asserted against directors of the Funds, however, the internal affairs doctrine is not implicated because all the other Defendants are third-party service providers to the Funds. Consequently, the claims brought against these Defendants does not involve the relationships among the shareholders, directors and officers of the Funds. *See VantagePoint Venture Partners 1996 v. Examen, Inc.,* 871 A.2d 1108, 1113 (Del. 2005) ("The internal affairs doctrine applies to those matters that pertain to the relationships among or between the corporation and its officers, directors, and shareholders."); *Roselink Investors, L.L.C. v. Shenkman,* 386 F. Supp. 2d 209, 225 (S.D.N.Y. 2004); *Ackert v. Ausman,* 218 N.Y.S.2d 814, 817-18 (N.Y. Sup. Ct. 1961) (*quoting Blue v. Standard Coil Prods. Co.,* 117 N.Y.S.2d 858, 860 (N.Y. Sup. Ct. 1952)) ("The internal affairs doctrine applies only to 'controversies among the stockholders *inter se*, or between stockholders as a group and the corporation.'").

The New York Court of Appeals has rejected the "automatic application of the so-called 'internal affairs' choice-of-law rule." *Greenspun v. Lindley,* 36 N.Y.2d 473, 478 (N.Y. 1975) (noting that "we reject any automatic application of the so-called 'internal affairs' choice-of-law rule"). Likewise, the Second Circuit has taken a flexible approach to the internal affairs doctrine. *Norlin Corp. v. Rooney,* 744 F.2d 255, 263-64 (2d Cir. 1984) (applying New York law instead of

Panamanian law to the existence and extent of fiduciary duties owed by Panamanian

corporation); *Anwar II*, 2010 WL 3341636, at *15-16 (applying New York law to determine

whether investors in BVI funds had standing to pursue claims).  As explained in greater detail

below, the Court should apply New York principles of standing because New York, the place

where the fraud occurred, has a greater interest in the issues raised by this lawsuit than the BVI

and any of the jurisdictions where the victimized investors resided.

In *Montreal Pension I*, the court held that New York law should be applied to resolve

claims arising out of two defunct hedge funds organized under BVI law.  A group of

predominately foreign investors sued the former directors of the funds, the administrator of the

funds and the funds' prime broker, alleging violations of federal securities law and common law

causes of action.  The complaint alleged that the New York fund managers inflated the NAVs of

the funds by engaging in a fraudulent practice known as "marking the close."  Citco, the

administrator of the funds, moved to dismiss the complaint, alleging that it failed to state a claim

under BVI law.   In holding that New York law applied, the Court found that the "internal

affairs" doctrine was inapplicable because the two hedge funds were defunct and the directors of

the funds no longer served on the boards of the funds.  *Montreal Pension I,* 446 F. Supp. 2d at

194.  Consequently, there was no danger that the funds or the directors would be exposed to

conflicting obligations.

Similarly, the Funds here are in liquidation and the defendant directors have been

removed from their positions with the Funds.  Apart from the fact that they were incorporated in

the BVI, the only other contact between the Funds and BVI was the existence of a brass plaque

on the walls of Bison Financial Services in Roadtown and a P.O. Box.[11]  The Funds' respective

---

[11]     The fact that agreements between the Funds and the defendants contain choice of law provisions is not
controlling with respect to tort claims brought by third-party plaintiffs.  *Montreal Pension I*, 446 F. Supp. at 194

Memoranda and Articles of Association prohibit the Funds from carrying on business with persons resident in the BVI, with limited exceptions for activities pertaining to the maintenance of their registered offices. *See, e.g.*, Livshiz Dec. Ex. B (Kingate Euro Fund, Memorandum of Association and Articles of Association, Apr. 19, 2000, Art. 4(2)-4(3)). As noted above, the Funds' Information Memoranda state in block letters on their cover pages that shares issued by the Funds may not be offered for sale "to any member of the public in the British Virgin Islands." *See*, *e.g.*, CAC Ex. 1. The investors in the Funds are scattered around the globe. Indeed, in submissions to the Bermuda Supreme Court, the liquidators of the Kingate Funds conceded that the links with the BVI were "of a formal nature only." *In re Kingate Global Fund, Ltd. (In Liquidation)*, [2010] SC (Bda) 47 Com at 2, ¶ 2, 20 Aug. 2010 (Berm.) (Bunch Dec. Ex. L). In sum, there is no reason to defer to BVI law with respect to investor standing where the Funds only had a distant relationship with the jurisdiction.[12]

Further, the Court can apply New York law to determine whether the plaintiffs have standing because there is little practical difference between BVI and New York law on this issue. *Robeco-Sage v. Citigroup Alternative Invs. LLC*, No. 601030/08, 2009 WL 2626244 (N.Y. Sup.

---

n.225; *AllGood Entm't, Inc. v. Dileo Entm't & Touring, Inc.*, No. 09-CV-5377(HB), 2010 WL 2606042, at *5 (S.D.N.Y. June 29, 2010) ("Under New York law[,] tort claims are outside the scope of contractual choice-of-law provisions that specify what law governs construction of the terms of the contract." (internal quotation marks and ellipses omitted)); *Comprehensive Habilitation Servs., Inc. v. Commerce Funding Corp.*, No. 05-CV-9640(PKL), 2009 WL 935665, at *10 (S.D.N.Y. Apr. 7, 2009) (same); *Dessert Beauty, Inc. v. Platinum Funding Corp.*, 519 F. Supp. 2d 410, 419 (S.D.N.Y. 2007) (same).

[12]     *Bruhl v. Kingate Global Fund Ltd..,* No. 601526/09 (N.Y. Sup. Ct. Jan. 25, 2010) (Chaffetz Dec. Ex. E), KML at 17-18, is inapposite. Bruhl was seeking to usurp the role of the joint liquidators by filing an unauthorized derivative action on behalf of Kingate Global Fund. At issue was whether the plaintiff was required to first obtain leave of the BVI courts as required by BVI law. Bruhl sought to short-circuit this requirement by seeking leave of the New York courts to file a derivative action. Naturally, the New York court was hesitant to interfere with the orderly liquidation of a BVI company where a BVI court had already appointed joint liquidators to wind up the Fund. The court did not make a definitive ruling that the internal affairs doctrine required deference to the BVI court because it also analyzed the case under New York law to determine whether demand on the board of directors or the liquidators should be excused as an exercise in futility. That case does not stand for the proposition that BVI law should be applied in this instance to determine whether shareholders bringing a direct action in New York against third parties have standing to bring a claim. The Joint Liquidators have not asserted an objection to Plaintiffs' bringing this action.

Ct. July 28, 2009) (court determined standing of hedge fund shareholders to bring suit under New York law because "there is no discernible conflict between New York and Caymanian law[13] with respect to an individual shareholder's standing to pursue claims"); *In re Granite Partners, L.P. v. Primavera Familienstiftung*, 194 B.R. 318, 325 n.9 (Bankr. S.D.N.Y. 1996) ("Cayman Islands law and the English law from which it derives recognize the same distinction between direct and derivative actions … that exist under American law.").

For the reasons explained above, New York is the jurisdiction with the greatest connection to and interest in this litigation. Consequently, New York law should be applied to determine whether Plaintiffs have standing to bring this action.

## B. Plaintiffs Have Standing Under New York Law

Plaintiffs have standing to assert each of their claims. This action does not involve a lawsuit by shareholders against the fund in which they invested. Rather, this case pits investors against the promoters, managers, sponsors and other third-party vendors of the Kingate Funds who induced Plaintiffs' investment in the Funds through reckless and fraudulent representations, abdicated their fiduciary duties to Plaintiffs, and engaged in grossly negligent conduct that directly caused Plaintiffs to lose billions of dollars. Having chosen not to sue the Kingate Funds, but rather the third-party providers, Plaintiffs clearly have standing.

### 1. Plaintiffs Assert Direct Claims That Can Be Pursued Only by the Investors

Plaintiffs assert direct claims that belong to them only, and could not be asserted by the Funds. Contrary to Defendants' assertions, Plaintiffs are not suing to recover the losses that the Funds incurred by investing in Madoff, but to recover their ***own*** losses after being induced to make and then maintain investments in the Funds. The Kingate Defendants sold and marketed

---

[13]     The Cayman Islands, like BVI and Bermuda, follow U.K. precedent.

the Funds to Plaintiffs using misleading offering materials, and thus Plaintiffs are the proper

parties to assert fraud and negligent misrepresentation claims; the Funds, not having been

defrauded by their own marketing materials, cannot assert such claims on behalf of their

investors.  Indeed, fraud and misrepresentation claims are textbook examples of direct claims

that can be pursued by investors who relied on misleading statements in making and holding

investments.

This was the precise conclusion reached by Judge Marrero in *Anwar II*: "allegations by

investors of having been tortiously induced to invest or to retain an investment are not derivative

claims."  *Anwar II*, 2010 WL 3341636, at *15 (citing *Montreal Pension I*, 446 F. Supp. 2d at

205) (shareholders may bring direct claims based on the theory that they were "induced to make

and/or retain their investments"); *see also Primavera Familienstiftung v. Askin*, 130 F. Supp. 2d

450, 494 (S.D.N.Y. 2001) ("Investors may assert a fraud claim based on the theory that they

were induced to make and/or retain their investments."); *Jones v. PricewaterhouseCoopers, LLP*,

800 N.Y.S.2d 348, at *4 (N.Y. Sup. Ct. 2004) ("[D]irect claims, such as fraud in the inducement

of their initial investment in the Partnership … are not derivative.").

Similarly, Plaintiffs have standing to assert claims for breach of fiduciary duty.

Investment advisors, promoters, and sponsors – such as the Kingate Defendants – owe a

fiduciary duty to their investors, and those investors have standing to sue directly when that duty

is breached.  *See Higgins v. N.Y. Stock Exch., Inc.*, 806 N.Y.S.2d 339, 349 (N.Y. Sup. Ct. 2005)

(upholding breach of fiduciary claims as direct); *Fraternity Fund Ltd. v. Beacon Hill Asset

Mgmt. LLC*, 376 F. Supp. 2d 385, 409 (S.D.N.Y. 2005) (shareholders in investment funds could

bring claims for breach of fiduciary duty arising from overstating net assets in reports

tobinvestors); *see also Rolf v. Blyth*, *Eastman Dillion & Co.,* 570 F.2d 38, 45 (2d Cir. 1978);

*Rasmussen v. A.C.T. Envtl. Servs. Inc.*, 739 N.Y.S.2d 220, 222 (N.Y. App. Div. 2002).

Further, the claims here are not derivative because the Funds and the investors did not

suffer the same losses. Plaintiffs' losses are measured on a "net equity" basis – total amount

invested minus redemptions. The Funds' losses consist of Plaintiffs' losses, reduced, however,

by the amount gained by other investors who were "net winners." Therefore, the Funds' losses

are necessarily much smaller than the aggregate net losses of the Plaintiffs because many

investors were "net winners" on a net equity basis. Judge Marrero explicitly adopted this

distinction as a basis to rule that the claims of the investors in the Fairfield feeder fund were

direct. *Anwar II*, 2010 WL 3341636, at *16 (" availability of direct actions is further shown by

the asymmetrical injury"). Similarly, Judge Lifland also held that the only fair method for

recognizing losses in a Ponzi scheme is the net equity method. *See In re Bernard L. Madoff Inv.

Sec. LLC*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010). Accordingly, the losses that could be claimed

by the Funds will be far smaller than the aggregate losses of the Plaintiffs, whose claims are

direct. The different positions of Plaintiffs and the Funds imbue Plaintiffs with standing.[14]

### 2. Plaintiffs Also Have Standing Because the Funds' Claims May Be Precluded By an *In Pari Delicto* Defense

Apart from any other basis, Plaintiffs also have standing to bring claims that would

otherwise belong to the Funds because of the "Wagoner Rule." *See Shearson Lehman Hutton,

Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991). Under this rule, the corporation (or the

trustee on its behalf) cannot assert a claim where it was involved in the defendant's alleged

wrongdoing. *Id. See also Kirschner v. KPMG LLP*, No. 2010-0152, 2010 WL 4116609 (N.Y.

---

[14]     The Tremont Defendants' citation to *Dallas Cowboys Football Club, Ltd. v. Nat'l Football League Trust*,
No. 95 CIV. 9426, 1996 WL 601705, at *2 (S.D.N.Y. Oct. 18, 1996), is unavailing. In that case the trust and the
beneficiary had suffered identical injuries.

Oct. 21, 2010) (state law doctrine of *in pari delicto* bars guilty corporation or trustee from asserting claims against co-conspirators or accomplices). In such instances, creditors or investors may assert claims that the corporation or trustee would be barred from bringing because of its own complicity in the wrongdoing. *See In re Hampton Hotel Investors L.P.*, 289 B.R. 563 (Bankr. S.D.N.Y. 2003). "A claim against a third-party for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty corporation." *Id.* at 574 (*quoting Wright v. BankAmerica Corp.*, 219 F.3d 79, 86 (2d Cir. 2000)).

Indeed, the Second Circuit has explicitly held that claims arising out of a Ponzi scheme can be asserted only by the investors, not by the debtor's trustee. *See Hirsh v. Arthur Andersen & Co.*, 72 F.3d 1085, 1093-95 (2d Cir. 1995) (trustee of debtor, which perpetrated a Ponzi scheme, lacked standing to sue the debtor's former accountants for assisting in the fraud). Accordingly, it is particularly appropriate to grant standing to investors in a Ponzi scheme because their investment vehicle – or the trustee – may be subject to an *in pari delicto* defense. *See, e.g., E.F. Hutton & Co. v. Hadley*, 901 F.2d 979, 986-87 (11th Cir. 1990) (claims arising from Ponzi scheme belonged only to defrauded investors, as trustee lacked standing); *Williams v. Calif. 1st Bank*, 859 F.2d 664, 667 (9th Cir. 1988) (same).[15]

## C. Plaintiffs Would Have Standing Under BVI Law

Even assuming, *arguendo*, that the Court finds that standing must be determined under BVI law, Plaintiffs have standing to assert all the claims alleged against Defendants in the Complaint. As explained in the Bompas Declaration, Plaintiffs have standing under BVI and

---

[15] The cases relied on by the Tremont Defendants holding that the claims here are derivative do not apply New York law. Tremont at 15-16. *See Druck Corp. v. Macro Fund Ltd.*, 290 F. App'x 441, 443-44 (2d Cir. 2008) (applying Cayman Islands law); *Stephenson v. Citco Group Ltd.*, 700 F. Supp. 2d 599, 608 (S.D.N.Y. 2010) (applying Delaware law).

U.K. law because Defendants' experts have over-simplified the reflective loss principle and ignored the applicable exceptions to that doctrine.

1.    *Johnson v. Gore Wood & Co.* **and the Modern Law of Standing**

The reflective loss principle is a modern refinement on the rule of the British (and, therefore, BVI and Bermuda) case *Foss v. Harbottle*, 2 Hare 461 (1843), recognizing that where a company has a cause of action with respect to an actionable wrong, the cause of action is vested in and belongs to the company, not the shareholders. Bompas Dec. ¶¶ 14, 16 (the reflective loss principle and its exceptions are explained in detail in the Bompas Dec. ¶¶ 13-53). The *Foss v. Harbottle* principle is not on point here, however, because Plaintiffs do not purport to put forward any claims that are vested in anyone but themselves, *id.* ¶ 20, and (as noted above) they do not put forward any of the Funds' claims. *Id.*

In the seminal case of *Johnson v. Gore Wood & Co.*, [2002] 2 A.C. 1 (H.L.), 14 Dec. 2001 (Eng.), Lord Bingham articulated three propositions with respect to shareholder standing. First, where a company suffers loss caused by a breach of duty owed to it, only the company may sue with respect to the loss. Bompas Dec. ¶ 25. This is simply a restatement of *Foss*. *Id.* ¶ 26.

Second, a shareholder may bring an action for a loss suffered by the company if the company has no cause of action to recover for the loss even if the loss is a diminution in the value of the shareholding. *Id.* ¶ 27. The reflective loss principle thus does not apply to claims by shareholders that they were wrongfully induced by fraudulent or negligent misrepresentations to purchase or retain shares. *Id.* ¶ 28. A shareholder suffers a personal loss when he purchases the shares at an inflated price even if the concealed risk does not materialize until sometime later. *Id.* ¶ 27.

Third, where a company suffers a loss caused by a breach of a duty to it, and a shareholder suffers a loss separate and distinct from that suffered by the company caused by a breach of a duty independently owed to the shareholder, each may sue to recover the loss caused to it by breach of the duty owed to it, but neither may recover loss caused to the other by breach of the duty owed to the other. This last proposition, setting a recovery limit, is the reflective loss principle of *Johnson v. Gore Wood & Co.* Bompas Dec. ¶ 34. Even where the reflective loss principle is engaged, which is not the case here, a shareholder is not precluded from bringing a direct claim if the company for whatever reason is unable to fully remedy the loss inflicted on the shareholder. *Id.* ¶ 38. Each of the claims brought by the shareholders against Defendants fall into these established exceptions to the *Johnson v. Gore Wood & Co.* principles.

In the eight years since *Johnson v. Gore Wood & Co.* was issued, the U.K. courts have gradually explored the scope of the principle and its ramifications. Bompas Dec. ¶ 24. What is certain is that the U.K. courts will not dismiss a shareholder's direct claim unless it is crystal clear that the cause of action is within the scope of the reflective loss rule and the company has a valid claim, taking into account the defenses to the claim, and will be able to make the shareholder whole. Bompas Dec. ¶¶ 48-50. In applying the reflective loss rule, the U.K. courts err on the side of allowing a case to proceed. Bompas Dec. ¶ 35. In his judgment in *Johnson v. Gore Wood & Co.*, Lord Bingham cautioned that "the court must be astute to ensure that the party who has in fact suffered loss is not arbitrarily denied fair compensation" and that "at the strike-out stage any reasonable doubt must be resolved in favour of the claimant." *Id.* The onus is on the defendants to demonstrate the applicability of the exclusionary rule under the circumstances. *Id.* ¶ 50.

### 2. The Reflective Loss Principle Does Not Bar Plaintiffs' Claims

Mr. Bompas summarizes the reasons why the claims asserted in the Complaint are not precluded by the exclusionary principle in *Johnson v. Gore Wood & Co.* in paragraph 53 of his declaration.

a. **Counts 1 Through 4 for Fraud and Negligent Misrepresentation Against the Kingate Fraud Claim Defendants[16] and Kingate Defendants**

Fraud claims and negligent misrepresentation claims are direct claims that belong to a shareholder. Bompas Dec. ¶ 53.1. A company does not suffer loss from its own misrepresentations and has no claims itself against third parties for misrepresentations made to induce investors to purchase shares. These claims fall within the second of Lord Bingham's three propositions referred to in paragraph 25 of Mr. Bompas's declaration.

Mr. Chivers, the expert for the Kingate Defendants and the FIM Entities, does not contend in his affidavit that claims for fraud and deceit are subject to the reflective loss rule. Bompas Dec. ¶ 29. He also admits in paragraph 126 of his affidavit that Counts 3 and 4 of the Complaint for negligent misrepresentation would not be barred by the reflective loss principle "because it is not clear as to whether, and to what extent, the Funds might have a claim against the defendants on the alleged facts."[17]

b. **Additional Counts That Fall Within the Second Proposition in *Johnson v. Gore Wood & Co.***

Counts 8 (constructive fraud by the Kingate Defendants), 14 (aiding and abetting fraud by the Tremont Group), 17 (negligent misrepresentation by PricewaterhouseCoopers), 20 (aiding and abetting fraud by PricewaterhouseCoopers), 24 (negligent misrepresentation by Citi Hedge) and 27 (aiding and abetting fraud by Citi Hedge) similarly are not barred, because the foundation

---

[16] The Kingate Fraud Claim Defendants include Defendants KML, Tremont, the FIM Defendants, and Manzke.

of the claims is the misrepresentation causing Plaintiffs' loss in circumstances where the loss is not a reflection of the Funds' own losses. Bompas Dec. ¶ 53.2. The aiding and abetting claims are premised on Defendants' provision of knowing assistance to the Kingate Defendants in fraudulently inducing Plaintiffs to purchase or retain shares in the Funds, and thus these claims are not within the scope of the reflective loss rule. *Id.*

### c. The Remaining Counts

With respect to the remaining counts in the Complaint, Defendants have failed to demonstrate that the Funds have, or ever had, causes of action against them for the alleged misconduct that could recover the losses that Plaintiffs have suffered. Bompas Dec. ¶ 53.4. Even assuming, *arguendo*, that these claims would fall within Lord Bingham's third principle, the claims should not be dismissed because of other exceptions to the exclusionary rule set forth below.[18]

### 3. General Exceptions to the Reflective Loss Exclusionary Principle

### a. Defenses Barring Recovery by the Joint Liquidators

Even assuming that the reflective loss principle were applicable to certain of the claims, the Joint Liquidators' claims could be barred by Defendants' tortious acts being attributed to the Funds, or by contractual exclusions and disclaimers. Bompas Dec. ¶ 53.4. Defendants, in any action brought by the Joint Liquidators, undoubtedly will raise the defense that the Funds were knowing and active participants in Madoff's fraud. Thus, the Joint Liquidators may be barred

---

[17]    Mr. Bompas explains why Mr. Hargun's and Ms. Dohmann's analyses of the law are incorrect in ¶¶ 30-33 of his declaration.

[18]    Mr. Chivers concedes that Count 7 (breach of fiduciary duty against the Kingate Defendants) would not be barred by the reflective loss rule to the extent that it relies on Defendants' failure to publish accurate and reliable information regarding Plaintiffs' investments because a failure to publish accurate information could not lead to any loss to the Funds. Affidavit of David Chivers, Q.C. ("Chivers Aff.") at ¶ 38.

from any recovery under the doctrines of *in pari delico* and *ex turpi causa non oritur actio*.[19] *Kirschner v. KPMG LLP*, 2010 WL 4116609 (affirming narrow scope of exemptions to *in pari delicto* defense in action brought by litigation trust against accountants); *In re Alphastar*, 383 B.R. at 274 (noting that bankruptcy trustee's claim could be barred by the defense of *ex turpi causa* under Bermuda law). In addition, the Joint Liquidators may be barred by contractual restrictions and disclaimers in the agreements between the Funds and the Defendant service providers.[20] For example, the various agreements may require the Funds to indemnify service providers against liability unless the loss, liability, or damage was caused by the service provider due to gross negligence, bad faith, willful or reckless malfeasance, or disregard of its obligations. *See*, *e.g.*, Vigna Dec. Ex. 5 (Tremont Co-Manager Agreement) § 5.4 (no liability other than for gross negligence, bad faith, willful or reckless malfeasance); *id.* § 5.5 (providing for indemnification); CAC Ex. 7 (KML Co-Manager Agreement) § 5.5 (providing for indemnification); *id.* § 10 (no liability in the absence of gross negligence, willful default or fraud). These restrictions, however, are not binding on plaintiffs who are alleging fraud and negligent misrepresentation claims. Diel Dec. ¶ 31.

### b.    Asymmetrical Losses

A BVI court would not dismiss shareholder claims against third parties unless it were absolutely certain that the company could make the shareholders whole by asserting its full rights against the party responsible for the losses. The reflective loss exclusionary principle will not be applicable if the plaintiff shareholders' claimed loss is larger than the companies'. Bompas Dec.

---

[19]     The principle of *ex turpi causa non oritur actio* translated means "no court shall lend its aid to a man who founds his cause of action upon an immoral or illegal act." It is essentially the equivalent of *in pari delicto*. Black's Law Dictionary 608, 794 (7th ed. 1999)

[20]     Under Bermuda law, Plaintiffs, in bringing tort actions against the service providers, would not be bound by the exculpatory provisions, disclaimers, and waivers in the agreements between the service providers and the Funds. Declaration of Mark A.C. Diel ("Diel Dec.") ¶ 31.

¶¶ 37-38 (citing cases). Here, the Funds' claims cannot remedy Plaintiffs' entire losses because of the asymmetry in losses. The Funds suffered damages only to the extent that their capital infusions to Madoff exceeded the redemptions paid by Madoff – a net amount. The redemptions paid to redeeming shareholders were calculated on the basis of the fictitious NAVs, which included phantom appreciation. The aggregate losses suffered by the net losers (many or most of whom did not benefit from redemptions) exceed the Funds' net losses. *Anwar II*, 2010 WL 3341636, at *16 (noting "asymmetrical injury"). And even assuming that the Joint Liquidators were to make a recovery, they would be obligated by BVI law to pay any distributions from the liquidation on a *pro rata* basis to net losers and net winners alike. This would mean that investors who were net winners because they had been paid fictional profits in excess of what they had paid into the Kingate Funds would receive distributions at the expense of the net losers, assuring that Plaintiffs would never be made whole for their separate and independent claims.

Moreover, the Court should take judicial notice that the Trustee of the BMIS estate has filed a claw-back action against the Kingate Funds in the United States Bankruptcy Court for the Southern District of New York. *Picard v. Kingate Global*, Ad. Pro. No. 09-1161 (BRL) (Bankr. S.D.N.Y.) (filed Apr. 17, 2009) (a copy of the complaint is appended to the Bunch Dec. as Ex. M). The Trustee is seeking to recapture $150 million in preference payments paid to the Kingate Global Fund and an additional $245 million in preference payments disbursed to the Kingate Euro Fund over a two-year period. Thus, the BMIS estate may be in a position to seize any recoveries that the Joint Liquidators are able to obtain, leaving little to be distributed to the Funds' shareholders by the latter.

        **c.**        **The Reflective Loss Principle Allows Room for Practical Measures to Avoid Double Recovery and Infringement on the Company's Rights**

The reflective loss exclusionary principle is procedural and not a substantive rule of corporate law. Bompas Dec. ¶ 52.1. It does not extinguish a shareholder's claim, and it is not an absolute bar even when applicable. *Id.* ¶ 42. Courts in the jurisdictions that adhere to U.K. law have used various procedural mechanisms to allow shareholder suits to proceed without allowing windfalls or subjecting defendants to double jeopardy. The courts in New Zealand, for example, have dealt with reflective loss questions as a practical matter, to avoid double recoveries. *Id.* ¶ 43.1. The United Kingdom allows a plaintiff shareholder to pursue a cause of action and obtain substantial recoveries where it is necessary to avoid injustice. *Id.* ¶ 43.3.

If the reflective loss rule is viewed as a procedural device, we respectfully submit that there is no reason why courts in the United States, like their counterparts, cannot adopt flexible ways of dealing with the issues of double recovery and allocation of recoveries between shareholders and the company where there are overlapping claims, without extinguishing the shareholders' claims. The federal courts have ample procedural means to modify judgments to prevent double recoveries. This issue arises frequently in the context of overlapping shareholder securities fraud class actions, ERISA claims, derivative claims, and direct claims brought by a company arising from the same core of operative facts. Damages awards, for example, may be modified to take into account recoveries from the same defendant in different actions. Thus, the Court should not tie the hands of shareholders when the sophisticated U.S. legal system has practical ways of dealing with the concerns addressed by the reflective loss rule.[21]

---

[21] The two core concerns of the reflective loss doctrine – to avoid exposing defendants to double recovery and the possibility that some shareholders may recover on claims belonging to the corporation at the expense of creditors and other shareholders – are not present here. The double recovery issue can be dealt with when determining damages, and the Funds do not have any unpaid creditors other than shareholders. The proposed Class consists of all shareholders who are net losers. The net winners have already been compensated or over-compensated by redeeming more than what they contributed to the Ponzi scheme. No shareholders who suffered net losses will be prejudiced if Class members rather than the Funds recover from Defendants.

#### d. The Reflective Loss Rule Is Not Applied Where It Would Cause an Unjust Result

An important exception to the reflective loss rule has been recognized, showing that the rule is not absolute and not detached from principles of practical justice. Bompas Dec. ¶¶ 39, 42. A year after the *Johnson v. Gore Wood & Co.* decision, the British courts created a catch-all exception to the reflective loss principle, emanating from the Court of Appeals' decision in *Giles v. Rhind*, [2003] EWCA (Civ) 1428, [2003] Ch. 618, 17 Oct. 2002 (Eng.), holding that the reflective loss principle will not be enforced where there is a need to do practical justice. Bompas Dec. ¶¶ 39-42, 45.

As noted above, this Court also has greater procedural flexibility than the U.K. and BVI courts to adjust damage awards to credit recoveries by the Funds that inure to the benefit of shareholders or to protect Defendants from double recoveries. For all these reasons, the Court should uphold the standing of Plaintiffs to bring the claims asserted in the Complaint under BVI law.

### D. Plaintiffs Have Article III Constitutional Standing

Constitutional standing has three elements: (1) an injury in fact, (2) a fairly traceable connection between the asserted injury-in-fact and the alleged actions of the defendant, and (3) redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The FIM Defendants challenge only the second element, asserting that the loss incurred by Plaintiffs is not fairly traceable to the FIM Defendants' failure to conduct proper oversight of Madoff. FIM at 6.

The FIM Defendants do not cite a single case concerning a Ponzi scheme in which the "fairly traceable connection" element was not met. This is because a "fairly traceable connection" requires a much lower threshold than the element of proximate cause, despite the FIM Defendants' incorrect attempt to equate the two. *Id.* "In *Bennet v. Spear*, the Supreme

36

Court clarified that 'injury 'fairly traceable' to the defendant' should not be equated 'with injury as to which the defendant's actions are the very last step in the chain of causation.'" *Adelphia Recovery Trust v. Bank of America, N.A.,* No. 05 Civ. 9050 (LMM), 2010 WL 2077214, at *6 (S.D.N.Y. May 14, 2010) ("*Adelphia*") (quoting *Bennet v. Spear*, 520 U.S. 154, 168-69 (1997)). Even if a "fairly traceable connection" were equivalent to proximate cause, that threshold is easily met here. In *Anwar II*, Judge Marrero found that "Plaintiffs easily carry their burden" with respect to causation, and rejected as "without merit" the claim that Madoff's fraud served as an "intervening force" that cuts off all liability. *Anwar II*, 2010 WL 3341636, at *26. Indeed, the FIM Defendants' argument is so weak that no other Defendant argues that Plaintiffs lack Article III standing.

The injury is fairly traceable to the FIM Defendants in this case. Plaintiffs allege that they relied on the FIM Defendants' representations that the Kingate Funds invested in a split-strike investment strategy and that, as the Funds' Consultant and Sponsors, they oversaw Madoff. Neither of those statements was true, directly causing Plaintiffs' losses. The injury *alleged* is therefore clearly traceable to the FIM Defendants, regardless of whether Plaintiffs can ultimately prove those allegations, and the argument is unavailing on a motion to dismiss.

Tellingly, the only case cited by the FIM Defendants concerning Article III standing and the financial industry (*Adelphia*) demonstrates that their argument is frivolous. In *Adelphia*, the company's bankruptcy trustee sued the banks that provided loans to the company. The suit alleged that Adelphia owed more money and fees in bankruptcy, and hence was more damaged, because the banks actually granted the loans. But there was no claim that the banks had made any misrepresentations or undertaken any duties to ensure that management did not steal the money – which is what ultimately happened. 2010 WL 2077214, at *7. Nothing could be

further from the allegations in this case, which set forth a direct claim against the FIM

Defendants for misrepresentations made to Plaintiffs regarding the Funds' investment strategy

and their promises to oversee Madoff.

## IV. PLAINTIFFS' COMMON LAW CLAIMS ARE NOT PREEMPTED

The Complaint alleges that Defendants had a central role in financing the greatest fraud

in financial history. Yet Defendants argue that they should walk out of court scot-free because

their outrageous conduct is protected by statutory preclusion bars. This argument flies in the

face of both common sense and fundamental fairness. Given the magnitude and public

importance of the Madoff fraud and Defendants' involvement in its facilitation, the Court should

not preempt Plaintiffs' claims absent clear and binding authority that compels only that result.

### A. SLUSA Does Not Preempt Plaintiffs' Common Law Claims

Defendants' claim that "[a]ll of plaintiffs' common law claims are barred by SLUSA,"

Tremont at 14, rests on the following statutory language:

> No covered class action based upon statutory or common law of any State
> . . . may be maintained in any State or Federal court by any private party
> alleging . . . a misrepresentation or omission of a material fact in
> connection with the purchase or sale of a covered security. . . .

Securities Act of 1933, 15 U.S.C. § 77p(b)(1) ("SLUSA"). While this case is a "covered class

action," the securities at issue are not "covered securities," nor have Plaintiffs alleged any fraud

"in connection with the purchase or sale of a covered security."[22]

---

[22]     SLUSA must be interpreted in light of its "very narrow" purpose. *See* 144 Cong. Rec. S4811 (daily ed. May 13, 1998) (statement of Sen. Dodd).. SLUSA's sole intent was to close a perceived "loophole" that allowed securities fraud cases to be filed as state court class actions so as to avoid the heightened pleading requirements and limitations on early discovery under the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *See Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 332 F.3d 116, 123 (2d Cir. 2003). SLUSA was never intended to create new and significant incursions into areas traditionally reserved for longstanding common law remedies. "[B]ecause the States are independent sovereigns in our federal system, . . . [courts] have long presumed that Congress does not cavalierly pre-empt state-law causes of action." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).

### 1. The Supreme Court's *Morrison* Decision Precludes Interpreting SLUSA to Cover This Case

Defendants have argued that the Supreme Court decision in *Morrison v. National Australia Bank*, 130 S. Ct. 2869 (2010), precludes Plaintiffs from bringing claims in this case under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b). *See* FIM at 25; Tremont at 8; Manzke at 23. As Defendants point out, the Supreme Court in *Morrison* interpreted the statutory language of Section 10(b) – which penalizes fraud "in connection with the purchase or sale of any security" – as applying only to "the purchase or sale of a security listed on an American Stock Exchange, and the purchase or sale of any other security in the United States." *Morrison*, 130 S. Ct. at 2888. Crucial to the Supreme Court's decision was its analysis of this statutory language in Section 10(b), which the Court found negated any Congressional intent to apply the statute to non-U.S. securities transactions. *Id.* at 2881. Based on this holding, Defendants argue that *Morrison* bars any Exchange Act claims because the Kingate shares that Plaintiffs purchased are not "listed on an American Stock Exchange" and the Kingate share transactions invariably took place outside the United States. *See* FIM at 25; Tremont at 8; Manzke at 23.

What Defendants fail to acknowledge, however, is that exactly the same process of statutory construction also precludes application of SLUSA to this case. By its express terms, SLUSA applies only to a "covered class action … alleging a misrepresentation . . . of material fact *in connection with the purchase or sale of a covered security*." 15 U.S.C. §78bb(f)(1) (emphasis added). The relevant operative language of this provision is identical to the words that the Supreme Court held in *Morrison* applied solely to domestic U.S. securities transactions – "*in connection with the purchase or sale of any security*." 15 U.S.C. § 78j(b) (emphasis added). Applying the same methodology of statutory construction as did the Supreme Court in

*Morrison*[23] – that is, considering whether anything in the text of SLUSA indicates that Congress intended SLUSA to apply to extra-territorial transactions, *see Morrison*, 130 S. Ct. at 2881 – must necessarily lead to exactly the same result.  That result, of course, is that SLUSA has no application to non-U.S. purchases and sales of securities.  Accordingly, having argued that Plaintiffs' purchases of Fund shares are not covered by Section 10(b), Defendants have effectively conceded that they are not covered by SLUSA either, and therefore not preempted.[24]

## 2. Plaintiffs Did Not Purchase "Covered Securities"

Under SLUSA, a "covered security" is limited to securities "listed … on the New York Stock Exchange or the American Stock Exchange, or … on the National Market System of the Nasdaq Stock Market."  *See* 15 U.S.C. § 77r(b)(1)(A).  Plaintiffs never purchased any such "covered securities."  Rather, Plaintiffs' claims are based on their purchases of shares in the Kingate Global and Kingate Euro Funds, both BVI companies.  CAC ¶¶ 242, 263, 276, 285, 316, 348.  None of these shares were ever traded on the three national exchanges identified in the statutory definition.

The claims in the Complaint arise from Defendants' wrongful inducement of Plaintiffs to buy these non-covered Fund shares and failure to fulfill their professional and fiduciary duties to manage and monitor the Funds that issued those securities and deliver accurate information regarding their investment performance.  Indeed, these non-covered securities were the only

---

[23]    It is clear that in this Circuit, courts are required to apply the methodology of statutory construction set forth in *Morrison*.  *See Norex Petro. Ltd. v. Access Indus., Inc.*, No. 07-4553-cv, 2010 WL 3749281, at *1 (2d Cir. Sept. 28, 2010) (applying *Morrison* and dismissing RICO claim because "absent an express intention by Congress of extraterritorial effect, a statute applies only domestically").

[24]    As Justice Breyer recognized in *Morrison*, "state law …. may apply to the fraudulent activity," even if the federal securities law do not.  *Morrison*, 130 S. Ct. at 2888 (Breyer, J., concurring).  Although the Supreme Court in *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71 (2006), found that SLUSA applied even though the plaintiff there had no federal securities claims, it did so only because it found that the "holder" claims that plaintiff was asserting were "in connection with the purchase or sale of a security."  *Id*. at 84-87.  Here, however, if

securities ever bought, held or sold by Plaintiffs in their dealings with Defendants, who regularly

sent Plaintiffs account statements listing only such non-covered securities. *See, e.g.,* CAC ¶ 197.

Instead of recognizing this inconvenient truth, Defendants focus on the purported

"covered securities" that Madoff was supposed to have purchased through BMIS but never did.

Defendants argue that "[w]hile the shares that Plaintiffs bought in the Funds are not themselves

covered securities, Plaintiffs' claims arise from Madoff's purported purchase and sale [*sic*] S&P

100 stocks and options." KML at 22. Defendants' arguments are unavailing.

Between the time when Plaintiffs purchased non-covered Fund shares and Madoff's

eventual theft of investor monies, Defendants had independent contractual and legal duties and it

is Defendants' failure to fulfill those duties that is the basis of Plaintiffs' claims. Indeed, the

only "securities" that ever existed were the shares of the Funds that were sold to Plaintiffs and

are not covered by SLUSA. In short, "[i]nvestments in the Funds simply were not purchases of

covered securities." *Anwar II*, 2010 WL 3341636, at *13.

Defendants' legal argument – both as to whether "covered securities" are at issue and as

to the "in connection with" requirement – turns on an out-of-context quotation from the Supreme

Court in *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) (*citing*

*United States v. O'Hagan*, 521 U.S. 642, 651 (1997)), that "it is enough that the fraud alleged

'coincide' with a securities transaction – whether by the plaintiff or by someone else." Tremont

at 14.[25] In *Dabit,* the Supreme Court clarified its holding in *SEC v. Zandford*, 535 U.S. 813

---

Defendants' Section 10(b) argument is accepted, Plaintiffs by definition did not acquire their Fund shares "in connection with" a purchase covered by Section 10(b).

[25] Courts have warned against taking *Dabit* beyond its logical extreme, which is just what Defendants are attempting here. *See, e.g., Gavin v. AT&T Corp.*, 464 F.3d 634, 639-40 (7th Cir. 2006) ("the 'connection' requirement must be taken seriously." "[O]f course there is a literal sense in which anything that happens that would not have happened but for some prior event is connected to that event … in the same sense the fraud is connected to the Big Bang."); *Drulias v. Ade Corp.*, No. Civ. A. 06-11033 PBS, 2006 WL 1766502, at *2 (D. Mass. June 26, 2006) ("While the Supreme Court recently embraced a broad interpretation of SLUSA, it did not suggest

(2002), stating that the requisite showing of deception for a securities law claim could be in connection with the purchase or sale of a security, and not just deception of a particular purchaser or seller. *Dabit,* 547 U.S. at 85.[26] In *Dabit*, the Supreme Court did not need to look any further than the deception practiced by Merrill Lynch analysts in publishing misleading reports that proximately caused investors' losses, and the Supreme Court used the "coincides with" terminology only in ruling that SLUSA applies to holders, as well as purchasers and sellers, of "covered securities." Just as in *Dabit,* this Court need not – and should not – look any further than at Plaintiffs' direct dealings with Defendants, which caused Plaintiffs' losses through purchases of the non-covered shares of the Funds.[27] It is the securities actually purchased and about which Plaintiffs complain that are relevant to the application of SLUSA. *See, e.g., Anwar II,* 2010 WL 3341636, at *13; *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of America Sec., LLC*, No. 05 Civ. 9016(SAS), 2010 WL 546964, at *2-3 (S.D.N.Y. Feb. 16, 2010) ("*Montreal Pension III*"); *Kenneth Rothschild Trust v. Morgan Stanley Dean Witter*, 199 F. Supp. 2d 993 (C.D. Cal. 2002).

### 3. SLUSA's "In Connection With" Requirement Is Not Met Here

Defendants' argument concerning the standard for the "connection" nexus rests on a similarly flawed attempt to expand *Dabit*'s "coincide with" standard beyond all bounds of reasonable statutory construction and common sense. Defendants attempt to turn SLUSA into a

---

that all claims of breach of fiduciary duty in connection with the purchase or sale of securities are sucked into the SLUSA sluice.").

[26] In *Zandford* the Supreme Court did not consider SLUSA, but instead addressed the proper scope of the "in connection with" requirement under other federal securities laws. In limiting the theoretical reach of that phrase, the Supreme Court noted: "our analysis does not transform every breach of fiduciary duty into a federal securities violation. If …. a broker embezzles cash from a client's account … then the fraud would not include the requisite connection to a purchase or sale of securities." *Zandford*, 535 U.S. 813, 825 n.4. Here, Madoff's conduct with respect to the Funds is analogous.

[27] The *Dabit* court also stressed that SLUSA preemption is not unlimited: "In concluding that SLUSA pre-empts state-law holder class-action claims of the kind alleged in Dabit's complaint, we do not lose sight of the

black hole that would effectively subsume any tort or contract claim involving any security. They claim that the "essence of the Complaint is the alleged perpetuation of Madoff's fraudulent and manipulative scheme through misstatements and omissions of material facts." FIM at 13. However, "this argument overlooks the basic facts of this case, which concern misrepresentations and breaches of duties concerning shares purchased in the Funds." *Anwar II*, 2010 WL 3341636, at *13. Plaintiffs have never alleged that they had any contact with Madoff or BMIS, nor that they relied on anyone other than the Defendants in purchasing and holding the Funds' securities.

Based on similar facts, Judge Marrero rejected SLUSA preemption in the Fairfield feeder fund cases. *See id.* at *12-13. A few months earlier, Judge Scheindlin analyzed the issue at length in *Montreal Pension III*. In that case, investors in two BVI hedge funds sued to recover losses stemming from the funds' liquidation. As in the instant case, the plaintiffs alleged, *inter alia,* that Citco (the administrator of the funds) had prepared and distributed false NAVs and other performance data for the funds. Like the Defendants here, Citco argued that because those funds had in turn purchased covered securities, SLUSA preemption applied under *Dabit*. The court held, however, that "[o]nly the alleged misstatements by the Citco Defendants are relevant for an analysis of SLUSA preemption," and since those alleged misstatements concerned only the valuation of the funds, they were not made "in connection with" the purchase or sale of covered securities. *Montreal Pension III,* 2010 WL 546964, at *2.

Accordingly, "[b]ecause plaintiffs purchased shares in hedge funds, rather than covered securities, SLUSA does not preempt plaintiffs' state-law claims." *Id.* at *2; *see Anwar II*, 2010 WL 3341636, at *13 ("Investments in the Funds simply were not purchases of covered

---

general 'presum[ption] that Congress does not cavalierly pre-empt state-law causes of action.' *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)." *Dabit*, 547 U.S. at 87.

securities."). In reaching this conclusion, the *Montreal Pension III* court refused "to look beyond SLUSA's plain meaning and hold that the Citco Defendants' alleged untrue statements concerning the *Funds* were made in connection with the purchase or sale of covered securities," and concluded that:

> The interpretation of SLUSA urged by the Citco Defendants stretches the statute beyond its plain meaning. There are no grounds on which to justify applying *Dabit* to statements made by the Citco Defendants concerning *uncovered hedge funds* – even when a portion of the assets in those funds include covered securities. This outcome is required because the alleged fraud relates to those hedge funds rather than the covered securities in the portfolios.

*Montreal Pension III,* 2010 WL 546964, at *2 (emphasis in original). Judge Marrero reached the same conclusion on comparable facts:

> Though the Court must broadly construe SLUSA's "in connection with" phrasing, stretching SLUSA to cover this chain of investment – from Plaintiffs' initial investment in the Funds, the Funds' reinvestment with Madoff, Madoff's supposed purchases of covered securities, to Madoff's sale of those securities and purchases of Treasury bills – snaps even the most flexible rubber band.

*Anwar II*, 2010 WL 3341636, at *13.

As Judge Scheindlin noted: "It is for Congress, not this Court, to extend SLUSA's 'in connection with' requirement to apply to untrue statements concerning the purchase, sale, and holding of shares of unregistered hedge funds like the Funds at issue here." *Montreal Pension III,* 2010 WL 546964, at *3. *See also Brehm v. Capital Growth Fin., Inc.*, No. 8:07CV315, 2008 WL 553238, at *2 (D. Neb. Feb. 25, 2008) (no SLUSA preemption where plaintiffs alleged that they were induced to purchase private placements and debentures by omissions made by Defendants "by means of a facility of a national securities exchange" where there was no

additional showing that such national exchange had listing requirements commensurate with required SLUSA "covered security" standards).[28]

### 4. In Any Event, SLUSA Is Not Applicable to Plaintiffs' Non-Fraud Claims

Even if the Court were to conclude that some of Plaintiffs' common law claims are preempted by SLUSA – which they are not – the remaining, non-SLUSA claims cannot be dismissed. *See Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 395 F.3d 25, 47 (2d Cir. 2005), *rev'd on other grounds*, 547 U.S. 71 (2006) ("SLUSA's language and legislative history indicate no intent to preempt categories of state actions that do not represent 'federal flight' litigation."); *LaSala v. Bank of Cyprus Pub. Co. Ltd.*, 510 F. Supp. 2d 246, 274-75 (S.D.N.Y. 2007) (*Dabit* remains law of Circuit); *In re Lord Abbett Mut. Funds Fee Litig.*, 553 F.3d 248, 255-56 (3rd Cir. 2009) ("To require the dismissal of all of the other claims in the same action … is not supported by the plain language or legislative history. We hold therefore that SLUSA does not mandate dismissal of an action in its entirety where the action includes only some pre-empted claims"); *Falkowski v. Imation Corp.*, 309 F.3d 1123, 1131 (9th Cir. 2002) ("The breach

---

[28] Without undertaking the thorough analysis of the SLUSA issue in *Montreal Pension III,* and without citing that decision, Judge Griesa in *Barron v. Igolnikov*, No. 09 Civ. 4471 (TPG), 2010 WL 882890, at *8-13 (S.D.N.Y. Mar. 10, 2010), held that SLUSA did preempt all state law claims against the manager and associated individuals of several Madoff feeder funds. The *Barron* opinion ignores the factual distinctions discussed herein, and its reasoning boils down to stating that the Supreme Court has "command[ed] that SLUSA be construed expansively," *id.* at *5 (which, as shown above, is wrong), and then stating, as an *ipse dixit* with no case support, that while the plaintiff class purchased only shares of non-covered hedge funds (just as in *Montreal Pension III* and *Anwar II),* "which in turn invested in covered securities – rather than [purchasing] covered securities directly from Madoff, SLUSA preemption is justified because the securities transaction need not have been performed by plaintiff." *Id.* at *13. Likewise, *In re Beacon Associates Litigation*, No. 09 Civ. 777(LBS), 2010 WL 3895582, at *35-36 (S.D.N.Y. Oct. 5, 2010) (Sand., J.), ignored *Montreal Pension III* and *Anwar II* in holding that SLUSA preempted claims of investors in another Madoff feeder fund. Instead, the *Beacon* court relied on inapposite cases in which the covered securities were the only securities involved. *See, e.g., Levinson v. PSCC Servs., Inc.*, No. 3:09-CV-00269 (PCD), 2009 WL 5184363, at *12 (D. Conn. Dec. 23, 2009) (claims preempted by SLUSA where bank invested IRA funds directly with Madoff who was supposed to purchase covered securities); *Dommert v. Raymond James Fin. Servs, Inc.*, No. Civ. A. 1:06-CV-102, 2007 WL 1018234, at *11 (E.D. Tex. Mar. 29, 2007) (claims preempted by SLUSA where defendant adviser invested plaintiff's funds directly in covered securities). Plaintiffs respectfully submit that the better-reasoned and better-supported view is that expressed in *Anwar II* and *Montreal Pension III*.

of contract claims – garden variety state law claims … are not preempted by federal securities laws”).

In this case, while the common law fraud and negligent misrepresentation claims may meet SLUSA’s requirement in that they allege a “misrepresentation or omission” (albeit not with respect to a “covered security”), the other common law counts plainly do not include such allegations.  The test for whether SLUSA applies to such claims is simple:

> [A] material misstatement or omission in connection with the purchase or sale of a covered security is a necessary component of the [SLUSA] claim. To make this determination the simple inquiry is whether plaintiff is pleading fraud in words and substance.

*Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc*., 341 F. Supp. 2d 258, 268 (S.D.N.Y. 2004) (emphasis omitted); *see LaSala v. Lloyds TSB Bank, PLC,* 514 F. Supp. 2d 447, 473 (S.D.N.Y. 2007) (breach of contract claims not involving explicit allegations of misrepresentation and material omission survive SLUSA preemption).

Defendants’ argument on this issue attempts to conflate Plaintiffs’ fraud and negligent misrepresentation claims with Plaintiffs’ other common law claims.  *See* FIM at 12 ( “All of Plaintiffs’ state law claims … are preempted by SLUSA.”); KML at 23 (“all of Plaintiffs’ state law claims” implicate SLUSA).  But the reality of the Complaint is far different.  The non-fraud claims simply do not include any allegations of “a material misstatement or omission” as a “necessary component of the claim.”  *Xpedior, supra.*  All such counts can stand on their own based on their allegations that Defendants failed to exercise the duties imposed on them by law or proper business practice, without regard to whether Defendants misrepresented any facts.  *See, e.g.,* CAC ¶¶ 268-283.[29]

---

[29]     A particularly apt warning applies here:

5. **Defendants' SLUSA Argument Is Inconsistent with Congressional Intent to Promote Federalism By Preserving State Jurisdiction Over Non-Covered Securities**

Defendants' SLUSA argument ignores Congress' clear intent to enhance federalism by preserving state authority to regulate the sale of non-covered securities. SLUSA's enactment was preceded by the National Securities Markets Improvement Act of 1996, 15 U.S.C. § 77r ("NSMIA"). In NSMIA, Congress established a bright-line test under which certain "covered securities" were exclusively subject to federal regulation. *See* 15 U.S.C. § 77r(a) ("no law, rule, regulations, or order, or other administrative action of any State … requiring, or with respect to, registration or qualification of securities … shall directly or indirectly apply to a security that – is a covered security."). Securities that did not meet this bright-line test continued to be regulated under state statutory and common law.

In 1998, Congress passed SLUSA, extending preemption of state securities laws to private claims asserted in certain class actions. SLUSA expressly incorporated by reference the definition of a "covered security" that Congress had used in NSMIA. *See* 15 U.S.C. § 77r(a). As a result, investors in "covered securities" could assert private claims exclusively through federal causes of action in covered class actions, but under NSMIA were afforded substantial protection in the form of federal securities regulation and the availability of non-fraud private rights of action under the Securities Act of 1933 (the "Securities Act"), including Section 5 (filing of Registration Statements), Section 11 (false and misleading Registration Statements)

---

[T]he facts underlying a complaint may often give rise to multiple allegations (*e.g.*, fraud, misrepresentation, and breach of contract). Because the determination of whether SLUSA applies may only be made by reference to what a party has alleged, and not what it could have alleged, *courts should be wary of a defendant's attempts to recast the plaintiff's complaint as a securities lawsuit in order to have it preempted by SLUSA.*

and 12(a)(2) (public offerings pursuant to a prospectus). Where the subject matter is not a "covered security," however, and federal protection in the form of registration and remedies under the Securities Act are unavailable, federal law is not affected by, and Plaintiffs should not be precluded from asserting, state law remedies. Rather, under the coordinated system of state/federal regulation that Congress put in place with NSMIA and SLUSA (using the identical definition of "covered security"), it is an affront to federalism to preempt state law claims.

      **B.**       **The Martin Act Does Not Bar Plaintiffs' Common Law Claims**

            **1.**       **The Martin Act Does Not Preempt Common Law Claims That Do Not Allege Violation of the Act or Its Implementing Regulations**

      In an exhaustive recent opinion that rejected Martin Act preemption in the context of Madoff feeder-fund litigation, Judge Marrero painstakingly analyzed and refuted all of the arguments propounded by Defendants here. *See Anwar I*, 2010 WL 3022848. In particular, Judge Marrero carefully explained how and why many judges in this District have misread New York state cases to find preemption and in later decisions perpetuated that fallacious reasoning. *Id*. at *1, 10 ("[A]n error … becomes perpetuated when the fallacy is uncritically adopted and copied … [T]he snake has eaten its own tail and many courts apply preemption simply by citing to other decisions that have found preemption, without examining whether the doctrine was warranted in the first place."). In light of Judge Marrero's comprehensive analysis of these issues, to which Plaintiffs respectfully refer the Court, we will not address them at length.[30]

_____

*MDCM Holdings, Inc. v. Credit Suisse First Boston Corp.*, 216 F. Supp. 2d 251, 257 n.12 (S.D.N.Y. 2002) (emphasis added).

[30]       Plaintiffs recognize that this Court applied Martin Act preemption in a case decided nearly 15 years ago. *See Independent Order of Foresters v. Donaldson Lufkin & Jenrette, Inc.*, 919 F. Supp. 149, 153-54 (S.D.N.Y. 1996) (Batts, J.). Plaintiffs respectfully submit that reconsideration of this view is appropriate in light of intervening developments, including Judge Marrero's analysis of the issues in *Anwar* and, as discussed below, more recent decisions of the New York appellate courts and particularly the New York Attorney General's formal expression of the State's opposition to preemption.

The controlling principle is clear: "When interpreting a state statute, it is a federal court's 'job to predict how the forum state's highest court would decide the issues' before it." *Cromer Fin. Ltd. v. Berger*, No. 00 Civ. 2498, 2001 WL 1112548, at *4 (S.D.N.Y. Sept. 19, 2001) (*quoting Sprint PCS L.P. v. Conn. Siting Council*, 222 F.3d 113, 115 (2d Cir. 2000)). Defendants' arguments that the New York Court of Appeals would find that the Martin Act preempts common law claims must be rejected because (i) the Act contains no express or implied preemption provisions; (ii) no Court of Appeals decision justifies preemption here; (iii) rather, state case law – and now the formal position of the State of New York as expressed by the State Attorney General – supports private litigants' assertion of common law claims that may parallel Martin Act claims by the State Attorney General; and (iv) no public policy warrants preemption.

The Martin Act, N.Y. Gen. Bus. Law, §§ 352-59, was passed in 1921. Its purpose, among others, was to grant the Attorney General jurisdiction to investigate and prosecute "fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale" with respect to securities transactions. The Act contains no language that expressly or implicitly preempts common law causes of action, nor have Defendants advanced any policy rationale why the New York legislature, in augmenting the Attorney General's authority, would seek to preclude private common law actions.

The Court of Appeals has held that there is no private right of action for violations of the Martin Act. *See CPC Int'l Inc. v. McKesson Corp.*, 519 N.Y.S.2d 804 (N.Y. 1987); *Vermeer Owners, Inc. v. Guterman,* 578 N.Y.S.2d 128 (N.Y. 1991). The absence of a private right of action, however, logically says nothing about whether common law claims should be preempted. In fact, the Court in *CPC* allowed common-law fraud claims to proceed, and did not address

plaintiff's breach of warranty claims, while in *Vermeer* it addressed common law causes of action (breach of fiduciary duty, unconscionability and fraud) *on the merits* with no suggestion that they were preempted.

More recently, in *Caboara v. Babylon Cove Dev., LLC*, 862 N.Y.S.2d 535, 538 (N.Y. App. Div. 2008), the Appellate Division thoroughly analyzed the issue and held that the Martin Act does not preempt common law claims for fraud or breach of contract that rest upon the same facts that also would support a Martin Act violation as long as the facts satisfy traditional pleading rules. The court noted that "[n]o case from the Court of Appeals holds that the Martin Act not only failed to provide, expressly or impliedly, for a private right of action, but also abrogated or supplanted an otherwise viable private cause of action whenever the allegations [also] would support a Martin Act violation." *Id.* at 538. *Caboara* found that the Martin Act must be read as cumulative with, rather than antagonistic to, private litigation:

> [W]e note that the above determinations are in accord with *basic tenets of statutory construction*. The Legislature is presumed to be aware of the law in existence at the time of an enactment and to have abrogated the common law only to the extent that the clear import of the language of the statute requires [(citations omitted)]. … Here, *nothing in the clear import of the language of the Martin Act requires a conclusion that the Legislature intended to abrogate any common-law remedy* arising from conduct prohibited under the act. Nor are the remedies afforded the Attorney General made exclusive by the Martin Act.[31]

*Id.* at 539 (emphasis added).

Preemption of claims for breach of fiduciary duty and negligent misrepresentation also has been specifically rejected by the Appellate Division. In *Scalp & Blade, Inc. v. Advest, Inc.*, 722 N.Y.S.2d 639, 640 (N.Y. App. Div. 2001), the court cited *CPC* and *Vermeer* (which federal

---

[31] The federal court cases that find preemption, upon which Defendants rely, have failed to recognize these controlling state law principles of statutory construction, which must be applied when interpreting a New York statute such as the Martin Act.

courts have incorrectly read to justify preemption), and explained that these cases do not foreclose common law claims. The court held that "[n]othing in the Martin Act, or in the Court of Appeals cases construing it, precludes a plaintiff from maintaining common-law causes of action based on such facts as might give the Attorney General a basis for proceeding civilly or criminally against a defendant under the Martin Act." *Id.*

Federal courts that have upheld preemption of state common law claims have done so primarily on the basis of three early state court decisions: *Horn v. 440 East 57th Co.*, 547 N.Y.S.2d 1, 5 (N.Y. App. Div. 1989); *Eagle Tenants Corp. v. Fishbein*, 582 N.Y.S.2d 218, 219 (N.Y. App. Div. 1992); and *Rego Park Gardens Owners, Inc. v. Rego Park Gardens Assocs.*, 595 N.Y.S.2d 492, 494 (N.Y. App. Div. 1993). All three of these cases, however, involved common law claims that alleged violation of Martin Act disclosure requirements for residential real estate transactions. As to such real estate offerings, the Attorney General has issued extensive regulations pursuant to his authority under the Act. Under *CPC,* the three state cases were properly dismissed because violation of the Attorney General's regulations cannot be the basis for a private right of action.[32] Indeed, the New York Court of Appeals has now recognized precisely this distinction. In *Kerusa Co. LLC v. W10Z/515 Real Estate Ltd. P'ship*, 879 N.Y.S.2d 17, 23 (N.Y. 2009), the court recognized that *CPC* allows private plaintiffs to pursue common law fraud claims that do "not turn on alleged nondisclosure of information required by the Attorney General's Martin Act regulations." In the instant case, of course, Plaintiffs'

---

[32]     *See* M. Woodruff, *Does the Martin Act Preempt Common Law Causes of Action?*, N.Y.L.J., Sept. 4, 2008, at 4 (federal cases finding preemption "were decided on improper grounds," because "they rely on [] Appellate Division cases involving litigation between sponsors and purchasers [of real estate projects], which reliance is misplaced since these Appellate Division decisions 'stand on materially different grounds' – *i.e.*, that 'the plaintiff was attempting to use the Martin Act to make up for an element that would otherwise be missing under traditional rules of pleading and proof.'").

common law causes of action are pleaded without reference to any Martin Act violations and thus cannot be preempted.

Finally, and perhaps most importantly, the New York Attorney General has formally and emphatically announced the State's opposition to any interpretation of the Martin Act that preempts private causes of action which allege common law claims without reference to violations of the Act or its implementing regulations. The Attorney General has done so in *amicus* briefs filed in both the Second Circuit and the Appellate Division.[33]

The Attorney General's position on this issue of state law is "entitled to great weight in the absence of controlling statutes or court decisions." *See Phyle v. Duffy*, 334 U.S. 431, 441 (1948). Further, it is a position that eviscerates the ostensible logical underpinning of the decisions relied upon by Defendants to support their preemption argument.[34] The principal justification for preemption is that allowing private tort claims "would impinge on the Attorney General's authority under the Martin Act," s*ee, e.g., Stephenson v. Citco Group Ltd*., 700 F. Supp. 2d 599, 615 (S.D.N.Y. 2010), but the Attorney General has now expressly rejected any such concerns about judicial interference with his work. Indeed, he welcomes the assistance of "private attorneys general" in actions such as this case:

---

[33]     *See* Brief for the Attorney General of the State of New York as *Amicus Curiae* in *Barron v. Igolnikov*, No. 10-1387-cv (filed Aug. 13, 2010), on appeal from *Barron v. Igolnikov*, No. 09 Civ. 4471, 2010 WL 882890 (S.D.N.Y. Mar. 10, 2010) (Griesa, J.); *Assured Guaranty (UK) Ltd. v. J.P. Morgan Inv. Mgmt. Inc.*, Index No. 603755/08 (N.Y. App. Div. Apr. 7, 2010); and *CMMF, LLC v. J.P. Morgan Inv. Mgmt., Inc.*, Index No. 601924/09 (N.Y. App. Div. Apr. 7, 2010) ("AG Brief," attached as Bunch Decl. Ex. N). Notably, although the briefs in the state cases were filed more than three months before Defendants' briefs in this case and are clearly relevant to issues before the Court, Defendants chose to ignore them in their moving briefs.
[34]     *See* FIM at 12; KML at 24; Tannenbaum at 6 (*citing Barron*, 2010 WL 882890; *In re Tremont Sec. Law, State Law, and Ins. Litig*., No. 08 Civ,. 11117(TPG), 2010 WL 1257580 (S.D.N.Y. Mar. 30, 2010); *Stephenson v. Citco Group Ltd*., No. 09 Civ. 00716 (RJH), 2010 WL 1244007 (S.D.N.Y. Apr. 1, 2010); *Meridian Horizon Fund, LP v. Tremont Group Holdings, Inc*., No. 09 Civ. 3708(TPG), 2010 WL 1257567 (S.D.N.Y. Mar. 31, 2010); *Heller v. Goldin Restructuring Fund,* 590 F. Supp. 2d 603, 609 (S.D.N.Y. 2008); *In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d 405, 421 (S.D.N.Y. 2007); *CRT Inv., Ltd. v. J. Ezra Merkin*, No. 601052/2009 (N.Y. Sup. Ct. May 5, 2010)).

> The Martin Act … neither increased nor diminished the remedies available to private litigants.  First, there is no warrant in the text and history of the Martin Act for finding any intent to preempt existing common-law actions.  Second, the policy argument most often advanced to support preemption is that it is needed in order to protect the exclusive authority of the Attorney General to enforce the Martin Act. . . .  *Private common-law actions for the most part advance, and do not hinder, the Attorney General's fundamental mission under the Martin Act to eliminate fraudulent practices in the sale or purchase of securities* across this State, because the Attorney General cannot possibly take sole responsibility for policing the marketplace.

AG Brief at 2 (emphasis added).

As the Attorney General has now eloquently demonstrated, "the Martin Act creates no private right of action, but also does not preempt common-law remedies whose source is independent of the statute" (AG Brief at 8) – which is true of all of Plaintiffs' claims here. Rather, there is a "separation between the Martin Act and the common law as independent bodies of law." *Id*. at 18.  If valid claims are stated "under common-law principles … those claims should be sustained"; if not, "the claims should be dismissed.  The Martin Act has no relevance to that question." *Id*.  In short, "the simple and correct understanding [is] that the Martin Act neither created nor destroyed any private rights of action." *Id*.[35]  As demonstrated below, when judged by the appropriate "common-law principles," the claims in the Complaint should be upheld.

Defendants offer no reason why the New York legislature – in contrast to virtually every other state across the country – would give financial tortfeasors a free pass from non-fraud tort claims involving securities.  Although the larger number of cases in this District may favor preemption, for the reasons discussed here, and in *Anwar I* and the Attorney General's briefs,

---

[35]      As the Attorney General points out, if courts – including federal courts – were to "decide questions about the proper reach of the Martin Act in private litigation" (*i.e.,* whether a common law claim is preempted because it also "fall[s] within the purview of the Martin Act"), the court would, in effect, be making a decision about the scope

these cases were wrongly decided under the text and history of the Martin Act; are inconsistent with New York state court decisions; and find distinctions between common law fraud and negligent misrepresentation that have "no support in the statute." AG Brief at 12. Defendants' Martin Act preemption arguments should be rejected.[36]

## 2. Alternatively, the Martin Act Does Not Apply Because Securities Were Not Sold "Within or From" New York

Even if this Court were to recognize Martin Act preemption, Plaintiffs' claims should not be dismissed because Defendants here did not issue, sell or distribute securities to Plaintiffs "within or from" New York to the extent necessary to apply the Act to Defendants' conduct. *See* N.Y. Gen. Bus. Law §352-(c)(1)(c); *Nanopierce,* 2003 WL 22052894, at *6 (declining to dismiss breach of fiduciary duty claim as preempted by the Martin Act because securities in question were not offered for sale within or from New York). Rather, this is a case which challenges the sale and marketing of the Funds – as Defendants concede – entirely on behalf of Plaintiffs who reside outside of the United States.

Where, as here, "the conduct was not confined to New York and [] some plaintiffs may have interacted with defendants exclusively outside of New York," Martin Act preemption does not apply. *See, e.g., Robeco-Sage Capital,* 2009 WL 2626244, at *18 ("because the solicitation of subscriptions in the CSO Funds was not confined to New York but largely took place in

---

of the State's enforcement authority without the Attorney General's participation – a highly inappropriate intrusion upon State sovereignty. *See* AG Brief at 18.

[36] In the most recent Martin Act preemption decision involving a Madoff feeder fund, Judge Sand refused to recognize the paramount importance of the Attorney General's interpretation of the Act. *See In re Beacon Assocs. Litig.*, 2010 WL 3895582, at *36 ("Indeed, the same policy arguments set out in the N.Y. AG's briefs were considered and rejected.") (citing *Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*, No. 02 Civ. 0767(LBS), 2003 WL 22052894, at *4 (S.D.N.Y. Sept. 2, 2003) (Sand. J.)). Because the Attorney General is the State official having direct responsibility for enforcement of the Act, his interpretation is entitled to "great weight" where a federal court is predicting how the State's highest court would decide the issue. *See Phyle*, 334 U.S. at 441. With all respect, Judge Sand's position is inexplicable, although he has previously described both state and federal cases that rejected preemption as "solitary islands in a stream of contrary opinion." *See Nanopierce*, 2003 WL 22052894, at *4. Plaintiffs respectfully submit that this approach, which substitutes headcounting for analytical

Cayman Islands, their interests do not relate to the solicitation and purchase of securities 'within or from New York'"); *Fraternity Fund Ltd.*, 376 F. Supp. 2d at 410; *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of America Sec., LLC*, 592 F. Supp. 2d 608, 639-40 (S.D.N.Y. 2009) ("*Montreal Pension II*") (claims for breach of fiduciary duty and negligence not barred because, "[a]lthough the Citco Defendants communicated regularly with Lauer in New York, they performed most of their work for the Funds in Curacao, Netherlands Antilles"). In *Montreal Pension II*, the court held that the Martin Act was inapplicable where "the securities were mostly marketed and sold to foreign investors, and only a limited number of investors in the United States participated." *Id.* at 639-40 (citing *Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 159, 165 (S.D.N.Y. 2001) (Martin Act did not apply where negotiations occurred between traders in London and Hong Kong and investor in Beijing)).[37]

In the present action, the Funds were marketed and sold *only* to international investors and Plaintiffs interacted with Defendants exclusively outside of New York. Accordingly, the Martin Act does not apply to these transactions.[38]

## V. PLAINTIFFS ADEQUATELY ALLEGE CLAIMS FOR FRAUD AND NEGLIGENT MISREPRESENTATION

---

rigor, should not be followed in light of Judge Marrero's more persuasive analysis in *Anwar I* and the Attorney General's formal expression of the State's views.

[37] The fact that application of New York substantive law is appropriate here given that substantial wrongdoing at the core of the claims occurred in New York, *see* Section II.4.B, *supra*, does not impact the construction of the Martin Act's language ("within or from"), which looks to where the offending sales at issue took place. Where activity occurs both within and outside New York, as here, Plaintiffs' foreign presence renders the Act inapplicable.

[38] The cases cited by Defendants are factually distinguishable because the Defendants had much closer ties to New York. *See* FIM at 15; KML at 24 (citing *Stephenson* ,700 F. Supp. 2d at 617 (finding Martin Act applied where fund was "centered in New York," had its office in New York, and transacted business in New York); *Sedona Corp. v. Ladenburg Thalmann & Co., Inc.*, No. 03Civ.3120(LTS)(THK), 2005 WL 1902780, at *21-22  (S.D.N.Y. Aug. 9, 2005) (finding Martin Act applied where Defendant was based in New York, sent correspondence to plaintiff from New York and a substantial part of the actions underlying the complaint took place in New York)).

Plaintiffs have adequately alleged fraud claims against the Kingate Fraud Claim Defendants and negligent misrepresentation against the Kingate Defendants.

## A.    Legal standard

### 1.    Fraud

A plaintiff successfully pleads fraud when "plaintiffs' complaint adequately alleges a misrepresentation or failure to disclose a material fact, falsity, scienter, justifiable reliance by plaintiff and damages."[39] *Kaufman v. Cohen*, 307 A.D.2d 113, 121 (N.Y. App. Div. 2003).[40] The stringent pleadings requirements of the PSLRA do not apply to a fraud claim brought under New York law; rather, Plaintiffs must only meet the pleading requirements of Fed. R. Civ. P. 9(b). *Muller-Paisner v. TIAA*, 289 Fed. Appx. 461, 463 (2d Cir. 2008). Notably, the pleading requirements of Rule 9(b) are relaxed when, as here "information is exclusively within the defendant's knowledge." *DGM Invs., Inc. v. N.Y. Futures Exch., Inc.*, 265 F. Supp. 2d 254, 264 (S.D.N.Y. 2003) (noting that "[d]ismissal on the ground that facts within [d]efendants' knowledge have not yet been proven in the pleading stage is 'particularly inappropriate'") (citation omitted).[41]

---

[39]    The Kingate Defendants' only argument that they did not cause Plaintiffs' damages is that Madoff himself did. KML at 20-21; Tremont at 19-20; FIM at 24-25. This argument, however, holds no weight, and has already been rejected by at least one federal court in this District that has considered it. *Anwar II*, 2010 WL 3341636, at *26 (concluding that this argument is "without merit"); *see also infra* at Section X.

[40]    The elements of fraudulent inducement under U.K., Bermuda and BVI law are similar in all respects to New York law. *See* Bompas Dec. ¶54 and Section II.A., *supra*. Accordingly, the Court may apply New York law to decide counts sounding in fraud.

[41]    C.P.L.R. 3016(b) is "New York's version of Rule 9(b)," and the two rules are interpreted similarly. *NM IQ LLC v. McVeigh*, No. 03 Civ. 4371, 2004 WL 2827618, at *7 (S.D.N.Y. Dec. 9, 2004). Recognizing that "[m]isrepresenters have not been known to keep elaborate diaries of their fraud for the use of the defrauded in court," the New York Court of Appeals has cautioned that "[t]he purpose of section 3016(b)'s pleading requirement is to inform a defendant with respect to the incidents complained of. … [S]ection 3016(b) should not be so strictly interpreted as to prevent an otherwise valid cause of action in situations where it may be impossible to state in detail the circumstances constituting a fraud." *Pludeman v. N. Leasing Sys., Inc.*, 10 N.Y.3d 486, 491-92 (N.Y. 2008) (internal citations omitted). "Thus, where concrete facts are peculiarly within the knowledge of the party charged with the fraud, it would work a potentially unnecessary injustice to dismiss a case at an early stage where any pleading deficiency might be cured later in the proceedings." *Id.*

Plaintiffs' allegations of fraud against the Kingate Fraud Claim Defendants more than meet this standard.

## 2. Negligent Misrepresentation

Under New York law, negligent misrepresentation is adequately pled where a plaintiff alleges that "(1) the defendant had a duty, as a result of a special relationship, to give correct information;[42] (2) the defendant made a false representation that he or she should have known was incorrect; (3) the defendant knew that the plaintiff desired the information supplied in the representation for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Montreal Pension I*, 446 F. Supp. 2d at 198.[43] Critically, "[c]ourts have recognized that the 'tort of negligent misrepresentation involves most of the same elements as fraud, with a negligence standard substituted for the scienter requirement.'" *M&T Bank Corp. v. Gemstone CDO VII, Ltd.*, No. 7064/08, 2009 WL 921381, at *13 (N.Y. Sup. Ct. Apr. 7, 2009).

Here, Plaintiffs have adequately alleged each element of a claim for negligent misrepresentation, and have easily demonstrated that the Kingate Defendants acted with the requisite degree of negligence.

---

[42] The Kingate Defendants' duty of care is discussed *infra* at Section V.I.A.

[43] U.K. law of negligent misrepresentation is substantially similar to New York law. *See* Section II.A.2, *supra*; Bompas Dec. ¶¶ 59-120. The pleadings must establish that the defendant had a special relationship with the plaintiff which exists because the defendant assumed responsibility or a sufficiently proximate relationship exists between the defendant and the plaintiff so that it is just and reasonable that the defendant should owe the plaintiff a duty of care. Mr. Chivers refers to negligent misrepresentation based on a "special relationship of trust and confidence." Chivers Aff. ¶ 45(a); 69(b). His conclusion that the Kingate Defendants did not owe a duty to Plaintiffs is based on the erroneous assumption that the Kingate Defendants "appear to have performed the ordinary functions of directors, managers, and advisers of the Funds." *Id.* ¶ 73. He proceeds from the false premise that "Plaintiffs did not contract or otherwise deal with the Kingate Defendants." *Id.* ¶ 60. He also overlooks the central role of the Kingate Defendants in marketing the Funds to the class (*see, e.g.*, CAC ¶¶ 262-63, 279). The special relationship arose because the Kingate Defendants were making false representations to Plaintiffs in order to induce them to purchase shares in the Funds. Plaintiffs had no means to verify the information concerning, *inter alia*, the investments and performance of the Funds and were wholly dependent on the Kingate Defendants' supposed superior knowledge and expertise in this area.

## B. Defendants' False Statements

Plaintiffs allege that for fourteen years, between 1995 and 2008, the Kingate Defendants made false and misleading statements to Plaintiffs and members of the Class, regarding, *inter alia*, (i) the nature of their investment; (ii) their ongoing duties to monitor and evaluate Madoff; (iii) Madoff's options trading and counterparties; (iv) the risk that Madoff could abscond with assets; and (v) the performance of the Funds.

### 1. False Statements Concerning the Nature of the Investment

According to the Funds' Information Memoranda, issued by the Kingate Defendants throughout the Class Period, the Funds were "open-end investment compan[ies]" that "[sought] long-term capital growth by allocating USD Share capital to a selected investment advisor to execute the Fund's Investment Objective and Process." CAC ¶ 87. Specifically, the Funds' "investment objective," as set forth in the Information Memoranda, was "to obtain capital appreciation of its assets through the utilization of a non-traditional stock/options trading strategy." CAC ¶ 88. As noted, the Information Memoranda described this "non-traditional … strategy" as a "split-strike conversion strategy" which entailed:

> (i) purchasing a basket of forty-five (45) to fifty (505) large capitalization S&P 100 stocks (*e.g.*, General Electric, Microsoft, Pfizer, Exxon Mobil, Wal-Mart Stores, Citigroup, Intel, American International, IBM, Johnson & Johnson, etc.), which together account for the greatest weight of the Index and therefore, when combined, present a high degree of correlation with the general market;

> (ii) selling out-of-the-money S&P 100 Index call options representing a dollar amount of the underlying Index equivalent to the dollar amount of the basket of shares purchased; and

> (iii) purchasing out-of-the-money or at-the-money S&P Index put options in the same dollar amount.

CAC ¶ 89.  As Plaintiffs have alleged, these statements were false and misleading because

Madoff did not use the split-strike conversion strategy, or any strategy, and actually made no

investments at all.  CAC ¶ 88.  The Kingate Defendants also failed to disclose that they had not

independently verified any of Madoff's trading activity and had no factual basis for stating that

Madoff was executing a split-strike conversion strategy.  CAC ¶ 89.

> ### 2.  False Statements Concerning Ongoing Duties to Monitor and Evaluate Madoff

From 2000 through 2008, the Information Memoranda represented that the Manager (or

Co-Managers) of the Funds had an ongoing obligation to evaluate and monitor Madoff:

> Pursuant to the Manager [or Co-Manager] Agreement, the Manager [or Co-Managers] evaluates and monitors the Investment Advisor and, in general, provides all necessary management services to the Fund.
>
> ***
>
> The Manager [or Co-Managers] has agreed (i) to manage all aspects of the investment advisory services provided to the Fund, including the selection and evaluation of [Madoff] and (ii) to arrange for the performance of all accounting and administrative services which may be acquired by the Fund's operations.  The Manager [or Co-Manager] Agreement authorizes the Manager [or Co-Managers] to delegate responsibilities to others, subject to retaining responsibilities for evaluating and coordinating the services offered by others.

CAC ¶ 92.  The Management Agreement referenced in the Information Memoranda gave the

Manager (or Co-Managers) of the Funds the "continuing obligation" to:

> (i)     ascertain the competence of the delegatee [*i.e.*, Madoff] to perform the services so delegated;
> (ii)    monitor generally the faithful performance by the delegatee of the duties specified in the relevant delegation agreement;
> (iii)   coordinate such performance with the performance of the other services contemplated hereunder; and

(iv)    perform or procure the future performance of the
delegated services in the event of the expiration of termination of
any such agreement with such delegatee.

CAC ¶ 94 (citing KG 2006 Management Agreement, CAC Ex. 7).  "For the avoidance of doubt,"

the Management Agreement continued, "the Manager has delegated responsibilities as follows,

which have the consent of the Fund's Directors, (i) to Madoff, investment advisory activities and

custody services."  *Id.*

These statements were false and misleading because, as Plaintiffs have alleged, the

Manager (or Co-Managers) did not evaluate, monitor, or otherwise coordinate the activities of

Madoff.  CAC ¶ 93.[44]

### 3.    False Statements Regarding Madoff's Options Trading and Counterparties

In addition to falsely representing that Madoff executed trades that never took place, the

Information Memoranda included false and misleading statements concerning Madoff's

supposed counterparties: "[t]he options transactions executed for the benefit of the USD portfolio

are effected primarily in the over-the-counter market, not on a registered options exchange."

CAC ¶ 99.  The Information Memoranda further stated that the Funds were "subject to

counterparty risk and [were] without the protection afforded with respect to options transactions

on regulated exchanges through the Options Clearing Corporation." CAC ¶ 100.  These

statements were false and misleading since Madoff never executed any options transactions, and

had no counterparties; notably, despite acknowledging "counterparty risk," the Kingate

---

[44]    Manzke asserts that false statements regarding due diligence of Madoff relate to "internal mismanagement" or, alternatively, are mere "puffery."  Manzke at 19-20 & n.17.  Neither characterization is accurate.  The Kingate Defendants' statements might relate to internal mismanagement if they had done at least *some* due diligence of Madoff as they represented they had; here, Plaintiffs allege they did effectively none.  Likewise, specific statements that the Manager "evaluates and monitors" Madoff are hardly puffery.  *See Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) ("misrepresentations of existing facts" not puffery); *In re Xerox Corp. Sec. Litig.*, 165 F. Supp. 2d 208,

Defendants never sought to determine whether Madoff's counterparties were credit-worthy or, indeed, whether they existed at all. *Id.*

The Information Memoranda similarly stated that "[t]he Investment Advisor [Madoff] acts as a market-maker in the stocks purchased and sold by the USD portfolio," and as a result of the Investment Advisor's role as market-maker, "the portfolio is subject to credit risks (the exposure to the possibility of loss resulting from a counterparty's failure to meet its financial obligations)." CAC ¶ 101. This statement, too, was false, since there were no stocks purchased or sold, and Madoff was not a market-maker; in addition, here again, the Kingate Defendants did not evaluate the "credit risks" that purportedly existed as a result of Madoff's role as market-maker, as they said they would. *Id.*

### 4. False Statements Concerning the Risk That Madoff Could Abscond with the Funds' Assets

The Kingate Defendants also falsely represented the risk that Madoff would abscond with the assets of the Funds. As set forth in the Information Memoranda:

> Neither the Fund nor the Custodian has actual custody of the assets. Such actual custody rests with the Investment Advisor and its affiliated broker-dealer. Therefore, there is the risk that the custodian [Madoff] could abscond with those assets. There is always the risk that the assets with the Investment Advisor [Madoff] could be misappropriated. In addition, information supplied by the Investment Advisor may be inaccurate or even fraudulent. The Manager [or Co-Manager] is entitled to rely on such information (provided they do so in good faith) and are not required to undertake any due diligence to confirm the accuracy thereof.

CAC ¶ 102. This statement was false and misleading because it failed to disclose 1) the probability of the "risk" materializing; and 2) the fact that the "risk" had already transpired. CAC ¶ 103.

---

218 (D. Conn. 2001) (plaintiffs' allegations "go beyond claims of mere puffery" because defendants "made specific

### 5. False Statements Concerning the Fund's Performance

Throughout the Class Period, the Kingate Defendants issued monthly performance reports to the Funds' investors that purported to show the Funds' performance, both on a month-to-month basis and cumulatively, since inception. *See* Bunch Dec. Exs. B-J. Each of these statements of the Funds' financial performance was false, since, in fact, the Funds' assets were nonexistent.[45]

### C. Each of the Kingate Defendants Made False Statements

Unable to dispute the falsity of their statements, the Kingate Defendants complain that the statements were the Funds' and not their own. KML at 12; Tremont at 9; FIM at 22. This is untrue. It was the Kingate Defendants who prepared the Information Memoranda and were most knowledgeable about their contents; every one of the Information Memoranda had the Manager's or Co-Managers' names and FIM's name on the front cover, and referred investors with questions about the Information Memoranda to the Manager or Co-Managers. *See* CAC Exs. 1-6. Likewise, monthly performance reports issued during the Class Period proclaimed that they were "prepared by Kingate Management Limited"; many also indicated that they had been "approved and issued in the United Kingdom by FIM Advisers LLP." *See* Bunch Dec. Exs. B-J.

---

statements … knowing they were contrary to the company's actual situation").

[45]     On a motion to dismiss, the Court may properly consider documents referenced in the Complaint and that Plaintiffs relied on in bringing suit. *Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.*, No. 08 Civ. 1958 (JGK), 2010 WL 3860397, at *2 (S.D.N.Y. Oct. 4, 2010) ("When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken.") (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)). The Complaint alleges in paragraph 43 that the Kingate Defendants were "active participants in the preparation and dissemination of materially false and misleading documents, including Information Memoranda, and had actual knowledge of or recklessly disregarded the falsity and material omissions in these documents." The false and misleading documents include, *inter alia*, the monthly performance reports and other materials provided to investors with false information on the past returns of the Funds. In addition, the October 6, 2008 Kingate Global Information Memorandum indicates that past monthly performance reports were given to investors (CAC Ex. 1 at ii, "Past Performance") and states that monthly performance reports will be provided to investors (CAC Ex. 1 at vii, "Reporting").

Each of them listed KML and FIM as sources of additional information, should investors have questions.  *Id.*

The findings of other courts, subsequent to the filing of Plaintiffs' complaint, confirm the Kingate Defendants' collective involvement in marketing and promoting the Funds to Plaintiffs. In one case brought against FIM in the U.K. by Irving Picard as the Trustee of BMIS, the court adopted the Trustee's view that the role of FIM was "of fundamental importance" and "very wide ranging," and included "reviewing the [F]unds' structure and operating procedure, providing advice regarding the [F]unds' investment programme, providing assistance and support on investor relations; providing advice regarding hedging activities; providing assistance on operational, administrative, accounting, and legal matters; and identifying and soliciting investors, preparing marketing material and maintaining investor distribution lists."  *Picard v. FIM Advisers LLP*, [2010] EWHC 1299 (Ch), [2010] All ER (D) 216 (Jul), [17]-[18], 27 May 2010 (Eng.) (Bunch Dec. Ex. A).  As to Messers. Grosso and Ceretti, the court recognized that "[t]he Trustee has strong grounds for believing that Mr. Grosso and Mr. Ceretti are the owners of and control Kingate Management and were responsible for the establishment and investment of the Kingate Funds.  Specifically, Ms. Manske suggested in her deposition that Mr. Grosso and Mr. Ceretti founded the Kingate Funds for the purpose of investing in BLMIS."  *Id.* at [14].  The court's findings are instructive:

> Mr Grosso and Mr Ceretti were [] closely involved with the activities of BLMIS and Mr. Madoff from the outset, having first met Mrs Manzke in 1993 or 1994 and through her, Mr Madoff, and subsequently they had communications with Mr Madoff by telephone and face-to-face to a degree that the Trustee considers unusual.  These matters, the consultancy and distribution agreements and the payments of fees to Kingate Management and FIM Limited and FIM Advisers, all suggest that Kingate Management, FIM Limited, and FIM Advisers played an important role in the recruitment of new investors and the management of

their funds and so ensured a flow of funds to the Kingate Funds
and on to BLMIS which helped to support and promote the fraud
until December 2008.

*Id.* at ¶ [42].  Thus, the Kingate Defendants' involvement in the administration, marketing and promotion of the Funds was highly interrelated.  Against this backdrop, it defies logic to conclude that the false statements in the Information Memoranda and the monthly performance reports are not the Kingate Defendants' statements, but the Funds' statements.  On the contrary, the Kingate Defendants' sole purpose was to make the statements they made, with the goal of persuading potential investors to invest in the Funds.

Attributing the Kingate Defendants' collective statements to each of the Individual Defendants, moreover, is consistent with the "group pleading" doctrine – a doctrine which "arose out of recognition that 'plaintiffs charging fraud with respect to corporate utterances seldom have access, prior to the commencement of discovery, to information permitting identification of the particular officers, directors and employees who bear personal responsibility for the utterances in question.'"  *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 448-49 (S.D.N.Y. 2005) (quoting *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 438 (S.D.N.Y. 2005)).  "[T]hus courts have allowed plaintiffs, for pleading purposes only, to 'rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases and other group published information, are the collective works of those individuals with direct involvement in the everyday business of the company.'"  *Id.*[46]

Here, Plaintiffs have adequately alleged that each of the Individual Defendants "was a corporate insider, with direct involvement in day-to-day affairs" of KML, Tremont, and/or FIM,

---

[46]     The Tremont Defendants argue that the group pleading doctrine did not survive passage of the PLSRA. Tremont at 11 n.6.  Not true.  *In re BISYS*, 397 F. Supp. 2d at 439 (collecting cases, and concluding that "the majority of courts in this and other jurisdictions have found that the doctrine is alive and well").  Even assuming,

and the Funds themselves. Grosso founded the FIM Entities and was their Executive Chairman

and Chief Investment Officer. CAC ¶ 31. Ceretti co-founded FIM Advisers with Grosso, and

was its Chief Executive Officer. CAC ¶ 32. According to Manzke, moreover, it was Grosso and

Ceretti who established the Funds for the sole purpose of investing in BMIS. *Picard* at [14].

Likewise, Defendants Cook, Epps, Manzke, Sebah, Bish, Wetherhill, and Tannenbaum were

each directors of one or more of the Funds, and/or KML, during at least part of the Class Period.

CAC ¶¶ 34-40. Manzke was also Chairman and co-CEO of Tremont Group, the parent company

of Tremont throughout the time that Tremont served as co-Manager of the Funds. CAC ¶ 36.

Judge Marrero recently applied the group pleading doctrine to fraud claims against

defendants in *Anwar II*. There, the Court found that, as here, plaintiffs had alleged "a tight

weave of connections between the [defendants] such that group pleading is appropriate. . . . At

this stage of the litigation, any misstatements that could reasonably be found to have issued from

one, essentially issued from all." *Anwar II*, 2010 WL 3341636, at *19-20.

Further, under English law, the Complaint adequately alleges that the Kingate Defendants

were each responsible for misrepresentations made in the Information Memoranda and other

marketing materials. Bompas Dec. ¶¶ 63-66. In particular, paragraph 84 of the Complaint

alleges that the Kingate Defendants "drafted, reviewed, authorized or otherwise participated in

the preparation and dissemination of the Information Memorandum provided to prospective and

current investors. . . . " The Complaint further alleges that the Kingate Defendants were the

authors and distributors of the documents containing the misrepresentations. This is, to all

intents and purposes, an allegation that the Kingate Defendants made the representations, *id.* ¶

94, and is a sufficient allegation under U.K. law that each Kingate Defendant was a person who

---

*arguendo*, that the PSLRA did foreclose the group pleading doctrine, however, the PSLRA does not apply to
Plaintiffs' common law claims for fraud or negligent misrepresentation.

made the relevant representation in the various Information Memoranda to Plaintiffs. *Id.* ¶¶ 64, 95. Moreover, an agent cannot evade responsibility for making a fraudulent misrepresentation by asserting that he is "making the misrepresentation on behalf of someone else." *Id.* ¶ 66.1.

Manzke asserts, in addition, that because Plaintiffs did not purchase shares of the Funds until she had left Kingate Global and after Tremont's management of the Funds ended, she is not liable for any misstatement. Manzke at 8-9.[47] Manzke fails to recognize that this is a class action. Plaintiffs pursue claims on behalf of all members of the Class, many of whom *did* purchase shares during the eight years Manzke was a director of Kingate Global and the ten years Tremont was a Co-Manager of the Funds. CAC ¶¶ 26, 36. It is well-established that Plaintiffs may pursue these claims on behalf of the Class even if they lack standing to bring them individually. *See, e.g.*, *Hevesi v. Citigroup, Inc.*, 366 F.3d 70, 82 (2d Cir. 2004) ("Nothing in the PSLRA indicates that district courts must choose a lead plaintiff with standing to sue on every available cause of action. . . . [I]t is inevitable that, in some cases, the lead plaintiff will not have standing to sue on every claim."); *see also In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189 (S.D.N.Y. 2003).[48]

> **D.     The Kingate Defendants' Cautionary Statements Do Not Insulate Them From Liability**

The Kingate Defendants assert that certain cautionary statements in the Funds' Information Memoranda render their false statements immaterial. KML at 8-12; Manzke at 20-22. Specifically, they claim, the Information Memoranda warned that information provided to

---

[47]     Tremont similarly argues that it should be excused from liability because "TBL was not a Co-Manager of Kingate Global when any of the 'Exchange Act Plaintiffs' invested." Tremont at 9 n.5. Its argument is defective for the same reasons as Manzke's.

[48]     The only authority Manzke cites in support of dismissing claims which pre-date Co-Lead Plaintiffs' purchases, *Gould v. Tricon, Inc.*, 272 F. Supp. 385 (S.D.N.Y. 1967), Manzke at 9, is not a class action, was filed before Fed. R. Civ. P. 23 even existed, and was decided nearly thirty years before enactment of the PSLRA. The law has developed considerably in the interim.

the Manager by the Investment Advisor, and its affiliated broker-dealer (Madoff), could be "inaccurate or even fraudulent," that the Investment Advisor "could abscond with [the Funds'] assets," and that "[t]here is always the risk that the assets with the Investment Advisor could be misappropriated," and that these warnings were adequate to render any statements about the Funds' assets immaterial as a matter of law. *Id.* (citing *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002); *Olkley v. Hyperion 1999 Term Trust, Inc.*, 90 F.3d 2, 5 (2d Cir. 1996)).

Judge Marrero considered and rejected precisely the same argument in *Anwar II*. There, in language that matches the Kingate Funds' Information Memoranda almost verbatim, the Fairfield Sentry Fund's Placement Memo proclaimed that "[w]hen the Fund invests utilizing the 'split-strike conversion' strategy. . . , it will not have custody of the assets so invested. Therefore, there is always the risk that the personnel of any entity with which the Fund invests [*i.e.*, Madoff] could misappropriate the securities or funds (or both) of the Fund." According to that court, "Defendants argue that these two anodyne sentences, innoculously embedded within a single-spaced document exceeding fifty pages in length, completely protect and absolve them from all liability for having funneled billions of dollars, even if done recklessly, into the largest financial fraud yet witnessed in the record of human wrongdoing and tragedy. The Court is not persuaded. This disclaimer does not reflect a warning hollered 'from the rooftops.'" *Anwar II*, 2010 WL 3341636, at *25 (citing *Halperin*, 295 F.3d at 360).[49]

Even more recently, the Second Circuit weighed in on the effectiveness of cautionary language in an offering memorandum, in *Iowa Public Employees Retirement System v. MF*

---

[49] Indeed, such disclaimers are themselves misleading since, having chosen to speak, the Funds had a duty to do so completely and truthfully. *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 380 (S.D.N.Y. 2003) ("[A] half-truth … is *always* misleading because a speaker, having begun to speak, is obliged to do so completely

*Global, Ltd.*, No. 09-3919-cv, 2010 WL 3547602 (2d Cir. Sept. 14, 2010).  In *MF Global*, the

district court had held that cautionary language in a prospectus warning that the Company's risk

management systems could fail, and, specifically, that "[e]mployee or introducing broker

misconduct could subject us to financial losses or regulatory sanctions and seriously harm our

reputation," was sufficient to render allegedly false statements about the integrity of risk controls

immaterial under the so-called "bespeaks caution" doctrine.  *Rubin v. MF Global, Ltd.*, 634 F.

Supp. 2d 459, 473 (S.D.N.Y. 2009).  The Second Circuit disagreed, holding that at the time the

prospectus was issued, statements about the integrity of risk controls were not warnings of future

risks that might transpire, but, rather, were statements of present fact that were false when made,

since they failed to disclose a risk that had already transpired.  *MF Global*, 2010 WL 3547602, at

*5 ("Cautionary words about future risk cannot insulate from liability the failure to disclose that

the risk has transpired.") (citing *Rombach*, 355 F.3d at 173 (2d Cir. 2004)); *see also In re*

*Prudential Sec. Inc. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("The doctrine of

bespeaks caution provides no protection to someone who warns his hiking companion to walk

slowly because there might be a ditch ahead when he knows with near certainty that the Grand

Canyon lies one foot away.").[50]

    Here, too, the risk that the Kingate Defendants attempted to warn against had already

transpired.  Every word in the Information Memoranda about the nature of the Funds'

investments was "inaccurate or even fraudulent"; indeed, Madoff had already "misappropriated"

and "abscond[ed] with [the Funds'] assets."  CAC ¶ 102.  Far from being cautionary language

---

and truthfully."); *In re NTL Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 27 (S.D.N.Y. 2004) ("[O]nce a corporation speaks on a subject, it must speak truthfully and completely.").

[50]    *Majer v. Sonex Research, Inc.*, 541 F. Supp. 2d 693 (E.D. Pa. 2008), an out-of-circuit opinion KML cites in support of its argument, is distinguishable on this basis.  KML at 11-12.  In *Sonex*, the offering document warned of a risk that might transpire; here, by contrast, the Kingate Defendants warned Plaintiffs of a supposed risk that was not a risk at all – it had already occurred.

that rendered the Kingate Defendants' false statements immaterial, these statements, as Plaintiffs have alleged, were themselves false and misleading when made.  *Id.*[51]

E.      **Plaintiffs Have Adequately Alleged the Kingate Fraud Claim Defendants' Scienter**

Rule 9(b) requires that a party alleging fraud or mistake "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  "Malice, intent, knowledge, and other conditions of a person's mind," however, "may be alleged generally."  *Id.*  Thus, Rule 9(b) "relax[es] . . . the specificity requirement in pleading the scienter element of fraud claims, requiring only that they be 'alleged generally.'"  *Jaffe v. Capital One Bank Servs.*, No. 09 Civ. 4106 (PGG), 2010 WL 691639, at *6 (S.D.N.Y. Mar. 1, 2010).  Accordingly, plaintiffs satisfy Rule 9(b) when they allege "a strong inference of fraudulent intent," which "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000).  Among other ways, plaintiffs adequately allege recklessness where the risk of fraud was "so obvious that the defendant must have been aware of it."  *ECA v. JP Morgan Chase Co.*, 553 F. 3d 187, 198 (2d Cir. 2009) (internal quotation marks and citation omitted).

---

[51]      The disclaimers in the Information Memoranda that misrepresented current facts (*e.g.*, the Funds' investment process and split-strike conversion strategy) would be ineffectual under BVI or Bermuda law.  Bompas Dec. ¶¶ 77-80.  The disclaimer advising investors to consult with their own professional advisers relevant to the suitability of an investment in the Funds only addressed the suitability of the investment assuming the accuracy of the information and description given in the Information Memoranda, not that the professional advisers could conduct due diligence.  The Information Memoranda stated that information was not available to professional advisers, which would enable them to verify the accuracy of representations made in the Information Memoranda and marketing documents.  Risk of Lack of Independent Data, Kingate Global IM, CAC Ex. 1 at 6.  Bompas Dec. ¶ 78.  The disclaimer stating that the Manager "is not required to undertake any due diligence" to confirm the accuracy of information provided by the Investment Manager is a representation of future due diligence, and not a representation about the present state of the Funds.  *Id.* ¶ 79.  Neither a BVI nor a Bermuda court would conclude at the pleading stage that the disclaimers would be sufficient to preclude a duty of care between the Kingate Defendants and Plaintiffs in relation to the factual statements concerning the existing state of the Funds.  *Id.* ¶ 80.

Here, Plaintiffs' allegations of scienter surpass the threshold set by Rule 9(b). Plaintiffs have alleged that the Kingate Fraud Claim Defendants had actual knowledge of Madoff's fraud based, in part, on the fact that Madoff's reports to those Defendants on his trading activity reflected no fewer than 185 trades purportedly executed at prices that were outside the daily price ranges for those securities, and therefore impossible, CAC ¶¶ 77, 80, and purchases of option contracts at volumes that exceeded the total volume traded on the CBOE. CAC ¶ 81. Simply put, Madoff's trades were impossible, and the Kingate Fraud Claim Defendants knew it – or, if they did not, were severely reckless in not knowing it. This is especially true given the ease with which Defendants could have checked this basic, readily-available information.

Plaintiffs have also alleged the seven red flags noted above at Section III.B, which further demonstrate that the Kingate Fraud Claim Defendants either knew or were severely reckless in not knowing of Madoff's fraud. CAC ¶¶ 215-22. These related to the core of his operations, and thus were substantive issues and warnings. The many meetings of the Kingate Fraud Claim Defendants with Madoff at his offices in New York City also allow Plaintiffs to allege that these Defendants knew or were reckless in not knowing of Madoff's fraud. CAC ¶¶ 72-73.[52]

Finally, Plaintiffs allege that the Kingate Fraud Claim Defendants received millions of dollars in fees based on the Funds' fictitious profits, and were therefore highly motivated to attract new investors and mask the true nature of the Fund's investments. CAC ¶¶ 4, 25, 26, 28, 69, 246, 253.

Defendants assert the "red flags" Plaintiffs allege here are not sufficient evidence of scienter. KML at 15-17; Tremont at 10-13; FIM at 22-24; Manzke at 11-15. Again, Judge

---

[52]     Manzke argues that her "deep ties" with Madoff – including multiple visits to his offices and the fact that her phone number was listed in his Office Telephone Directory – are what one would expect, and not evidence of scienter. Manzke at 17. A more reasonable inference of such extensive contact with Madoff, however, is the one

Marrero's decision in *Anwar II* is instructive. On nearly the same set of facts – and given an almost identical set of red flags – Judge Marrero concluded that Plaintiffs had adequately pled an inference of scienter. As to each of the "red flags," Judge Marrero drew an inference of scienter in the plaintiffs' favor:

| Red Flag | Inference of Scienter |
|---|---|
| Madoff's secret operations. | "Plaintiffs plausibly allege that the [defendants'] inability over several years to open a channel of communication with Madoff, who allowed his multi-billion operation to be run by a small circle of family members, would put any reasonable corporate executive or fiduciary or diligent professional on high alert that something big was terribly wrong." *Anwar II,* 2010 WL 3341636, at *21 |
| Madoff had no independent broker, served as his own custodian, and provided only paper trading records. | "This circumstance allowed Madoff unfettered access to and control over the money invested with him. . . . This small, closed system formed the perfect incubator for Madoff's Ponzi scheme." *Id.* at *22 |
| Madoff used F&H, a small, three-person accounting firm, only one of whom was an actual accountant. | "[Defendants] knew they had never heard of this firm and did next to nothing to learn more about it." *Id.* |
| Madoff's consistently positive returns. | "Plaintiffs allege that Madoff's returns had such an uncanny consistency and outsize implausibility that the slightest analysis of them would have revealed they were impossible." *Id.* |
| Madoff's trades occurred outside the daily trading ranges. | "Madoff's trade confirmations themselves were often fraudulent on their face because they purported to show transactions outside of the actual trading range. . . . Plaintiffs do not allege merely that Madoff was returning unprecedented profits, but that the profits he reported to investors were not just fanciful but actually impossible." *Id.* |

---

the *Picard* court drew, namely, that such "face-to-face meetings and regular telephone calls" were "unusual because Mr. Madoff tended to limit contact with investors as much as possible." *Picard*, at [19].

Here, too, where the same red flags were present, and were "so obvious that the defendant[s] must have been aware of [them]," Plaintiffs have adequately pled an inference of scienter. *JP Morgan*, 553 F. 3d at 198. As scienter has adequately been pled for Grosso, Cerretti, and Manzke, who were "closely involved with the activities of BLMIS and Mr Madoff from the outset," *see Picard* at [42],[53] scienter "can be easily imputed to the corporate [defendants] because the individuals comprise variously the principals or otherwise high-ranking officers of the entities." *Anwar II*, 2010 WL 3341636, at *23 (citing *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F. 3d 190, 195 (2d Cir. 2008) ("[T]he most straightforward way to raise such an inference [of scienter] for a corporate defendant will be to plead it for an individual defendant.")).

Finally, in *Anwar II*, Judge Marrero noted that in light of such significant red flags, any competing inference that the defendants had been "bamboozled" by Madoff was hardly compelling:

> To discount Plaintiffs' allegations at this stage would be to wave away the [defendants'] exposure lasting almost two decades to the red flags and other markers of scienter cataloged above. The Court finds more cogent the inference that. . . the [defendants'] finer faculties were overcome by the fees they earned and that they turned a blind eye to obvious signs of fraud.

*Anwar II*, 2010 WL 3341636, at *23.[54]

---

[53]     As evidence of scienter, these facts clearly surpass the mere fact that Manzke held a certain title or position within Tremont or the Funds. *See* Manzke at 16.

[54]     The other Madoff cases cited by the Kingate Fraud Claim Defendants, KML at 15-16, Tremont at 12 n.8, Manzke at 13 n.10, are inapposite. None reached the question of whether, as here and as in *Fairfield*, a feeder fund's managers, directors, advisors, and executives, who were each intimately connected to Madoff and met regularly with him, recklessly disregarded red flags. *Stephenson*, 700 F. Supp. 2d at 622-24 (determining that outside auditor had no knowledge of red flags); *Meridian Horizon Fund, LP v. Tremont Group Holdings, Inc.*, No. 09 Civ. 3708 (TPG), 2010 WL 1257567, at *5-6 (S.D.N.Y. Mar. 31, 2010) (same); *SEC v. Cohmad Sec. Corp.*, No. 09 Civ. 5680 (LLS), 2010 WL 363844, at *3-6 (S.D.N.Y. Feb. 2, 2010) (determining that firm hired to market Madoff's investment advisory business did not have knowledge of his fraudulent activities); *MLSMK Invs. Co. v. JP Morgan Chase & Co.*, No. 09 Civ. 4049 (BSJ), 2010 WL 2925403, at *2-6 (S.D.N.Y. July 15, 2010) (determining that bank that traded with Madoff and provided his banking services did not have knowledge of his fraudulent

Defendants here, just as did the *Anwar II* defendants, rely heavily on *South Cherry Street, LLC v. Hennessee Group LLC*, 573 F.3d 98 (2d Cir. 2009), another Ponzi scheme case, to argue that scienter is insufficiently alleged.  KML at 16; Tremont at 10-12; FIM at 22-23; Manzke at 12-13.  As Judge Marrero noted, however, *South Cherry* is wholly distinguishable from the facts alleged here.  *South Cherry* involved a one-off recommendation to invest in what ultimately turned out to be a Ponzi scheme, whereas here, as in *Fairfield*, Plaintiffs allege "an ongoing fraud spanning many years," where the Kingate Fraud Claim Defendants "had a continuous stream of incoming red flag information" to which they turned a blind eye.  *Anwar II*, 2010 WL 3341636, at *24.

In *South Cherry*, moreover, the plaintiffs had alleged that the defendants, *if* they had done more to inform themselves, would have discovered the Ponzi scheme – allegations that amounted to negligence, at most.  573 F.3d at 112.  Here, as in *Anwar II*, by contrast, "Plaintiffs allege that the [defendants] ignored not only what was handed to them but that what they were given was readily suspicious to any reasonable person exercising ordinary prudence.  When presented with notorious signs of fraud, they discounted them and were unwilling to recognize what other similarly situated financial firms were able to do with the same information to protect their investors from a massive Ponzi scheme."  *Anwar II*, 2010 WL 3341636, at *24.  These allegations amount to recklessness, if not willful blindness.[55]

Citing *South Cherry*, Manzke urges the Court to discount Plaintiffs' allegations that the Kingate Fraud Claim Defendants were motivated to commit fraud by their receipt of lucrative

---

activities).  Indeed, unlike the Kingate Fraud Claim Defendants, the defendants in these cases were not fiduciaries of funds.

[55]     The district court's decision in *In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d 405 (S.D.N.Y. 2007), made this same critical distinction itself, as Manzke acknowledges.  Manzke at 15 (citing *In re Bayou*, 534 F. Supp. at 417 ("The failure to conduct due diligence is not the same thing as knowing of or closing one's eyes to a known 'danger' or participating in the fraud.")).

fees based on the Funds' fictitious profits. Manzke at 17; *see also* Tremont at 11, FIM at 24. In *Anwar II*, Judge Marrero stated that defendants' fees, although not determinative of scienter, were "important background information in analyzing scienter," particularly where, as here, there was a direct correlation between the amount of money invested in the funds and the manager's compensation – a correlation absent in the case of a company's executive who owns shares in a company and benefits from increases in the company's share price. *Anwar II*, 2010 WL 3341636, at \*21. Critically, however, Judge Marrero distinguished *South Cherry*'s treatment of the issue of whether fees should be evidence of scienter, noting that in *South Cherry*, the defendant was an "industry leader" that would not have risked its professional reputation on investment in a Ponzi scheme for the sake of a fee, *id.* at \*24; here, as in *Anwar II*, the corporate fraud claim defendants – KML, FIM, and Tremont – were formed for the exclusive purpose of investing in Madoff's Ponzi scheme. *See Picard* at [14] ("Mr Grosso and Mr Ceretti founded the Kingate Funds for the purpose of investing in BLMIS."). Without the lucrative fees from Madoff's Ponzi scheme, KML, FIM, and Tremont would not have been viable enterprises – indeed, they existed for those fees – and their receipt of these fees, accordingly, carries more weight as evidence of their scienter.[56]

Accordingly, Plaintiffs have adequately pled an inference of scienter as to the Kingate Fraud Claim Defendants. Their "'fraud alert' should have been flashing red. A fair inference that flows from the facts alleged is that if they failed to see the perceptible signs of fraud, it may have been because they chose to wear blinders." *Anwar II*, 2010 WL 3341636, at \*24.[57]

---

[56] The Tremont Defendants' reliance on *Stephenson*, 700 F. Supp. 2d at 621, Tremont at 11, where receipt of a fee was determined to be insufficient evidence of scienter as to Pricewaterhouse Coopers, is similarly distinguishable. PwC is a global organization whose viability depended on enormous amounts of income other than fees from Madoff's Ponzi scheme.

[57] Manzke cites *Hart v. Internet Wire, Inc.*, 145 F. Supp. 2d 360, 368-69 (S.D.N.Y. 2001), for the proposition that an "egregious failure to gather information will not establish 10b-5 liability as long as the defendants did not

**F. Plaintiffs Justifiably Relied on the Kingate Defendants' Statements**

Finally, the Kingate Defendants argue that Plaintiffs could not have reasonably relied on the Information Memoranda given the boilerplate disclaimers they contained. In particular, the Kingate Defendants point to language in the Information Memoranda stating that "[the] Manager . . . is not required to undertake any due diligence to confirm the accuracy" of information provided by Madoff, that "no person should invest in the Fund unless willing to entrust all aspects of the investment management of the Fund to [Madoff], having evaluated [his] capability to perform such functions," and that "each prospective investor should consult his own legal, tax, and financial advisors regarding desirability of an investment in the Fund." KML at 9; Tremont at 9-10; Manzke at 21-23. Based on these sentences, the Kingate Defendants argue over and over again that they had no duty of due diligence. Their efforts to walk away from their positions are without effect. As shown above, their own Information Memoranda misrepresented their ongoing obligation to review, evaluate, and monitor Madoff.

In addition, "[u]nder New York law, 'a general, boilerplate disclaimer of a party's representations cannot defeat a claim for fraud." *JM Vidal, Inc. v. Texdis USA, Inc.*, No. 08 Civ. 6398 (CM)(KNF), 2010 WL 3528883, at *21 (S.D.N.Y. Sept. 3, 2010) (quoting *Dallas Aero., Inc. v. CIS Air Corp.*, 352 F.3d 775, 785 (2d Cir. 2003)). "[I]f the allegedly misrepresented facts are peculiarly within the misrepresenting party's knowledge," moreover, "even a specific disclaimer will not undermine another party's allegation of reasonable reliance on the misrepresentations." *Warner Theatre Assocs. Ltd. P'ship v. Metro. Life Ins. Co.*, 149 F.3d 134,

---

deliberately shut their eyes to the facts." Manzke at 14. To the extent this same principle is applicable to common law fraud, Plaintiffs have satisfied it; Plaintiffs have pled what Judge Marrero concluded in *Anwar II*: that the Kingate Fraud Claim Defendants *did* "deliberately shut their eyes to the facts." The ultimate determination of fact on this issue, moreover, must be held to a later stage in this case.

136 (2d Cir. 1998). Here, the facts regarding the nature of Plaintiffs' investments in the Funds were exclusively within the knowledge of the Kingate Defendants.[58]

Even if the Kingate Defendants' disclaimers were effective, however, the Information Memoranda themselves instructed Plaintiffs to rely on the language they contained. The October 6, 2008 Information Memorandum, for example, stated on its cover page that "no person has been authorized in connection with this offering to give any information or make any representations other than as contained in this memorandum." CAC Ex. 1. On the following page, the Information Memorandum similarly stated, "No person has been authorized to make any representations concerning the Fund or the USD Shares which are inconsistent with those contained in this Memorandum, and any such representations should accordingly be treated as unauthorized and may not be relied upon by the recipient." *Id.* Likewise, the Information Memorandum stated, "This Memorandum is intended solely for the use of the person to whom it has been delivered by the Fund for the purpose of evaluating a possible investment by the recipient. *Id.* The Subscription Agreement for shares of the Fund required investors to certify that they had "received, reviewed, and understood" the Information Memorandum. *Id.* at S-4. Investors also represented as follows:

> (a) **Reliance on Information Memorandum**. The Subscriber acknowledges that the Fund has delivered to the Subscriber the Information Memorandum. *The Subscriber has not relied on any representations or other information purported to be given on behalf of the Fund except as set forth in the Information Memorandum or the published, financial accounts of the Fund.*

***

---

[58] Under Bermuda law, Plaintiffs would not be bound by contractual limitations and disclaimers in the contracts between the service providers and the Funds. Diel Dec. ¶ 31.

(v) **<u>Entire Agreement</u>**. This Agreement represents the entire agreement of the parties in respect of the subscription for Shares and may not be changed or terminated orally.

*Id.* at S-8, S-10 (emphasis added). In sum, the Information Memoranda instructed Plaintiffs to rely on the Information Memoranda, and published financial information consistent with the Information Memoranda, in making their investments, and required them to certify that they had done so. The Kingate Defendants cannot now assert that Plaintiffs' reliance was unjustified.[59]

## VI. PLAINTIFFS ADEQUATELY ALLEGE TORT CLAIMS ARISING FROM THE KINGATE DEFENDANTS' DUTIES TO INVESTORS

### A. The Kingate Defendants Owed Investors a Duty of Care and Honesty

Plaintiffs have properly pled claims in which Defendants owed a duty to Plaintiffs, including negligent misrepresentation (Counts 3 and 4), gross negligence (Count 5), negligence (Count 6), breach of fiduciary duty (Count 7), constructive fraud (Count 8), constructive trust (Count 11), and unjust enrichment (Count 28). By representing their special expertise with respect to investments generally, and Madoff specifically, the Kingate Defendants placed themselves in a position of trust with respect to Plaintiffs.[60] Where defendants seek to "induce plaintiffs to invest" by holding themselves out as possessing "unique or specialized expertise," they occupy "a special position of confidence and trust with [respect to] the injured party such that reliance on the negligent misrepresentation is justified." *Kimmell v. Schaefer*, 652 N.Y.S.2d 715, 719-20 (N.Y. 1996) (finding special relationship where defendant corporate chairman and CFO induced plaintiffs' investment based on financial projections he created); *see also Muller–*

---

[59]     *Harsco Corp. v. Segui*, 91 F.3d 337, 342 (2d Cir. 1996), Manzke at 22-23, is inapposite. In *Harsco*, the Second Circuit affirmed the district court's conclusion that a contract effectively disclaimed representations other than those expressly enumerated therein; here, the Kingate Defendants fault Plaintiffs for relying on the very statements they instructed them to – namely, "the Information Memorandum or the published, financial accounts of the Fund." CAC Ex. 1 at S-8.

*Paisner*, 289 F. App'x at 466 (finding a special relationship for purposes of a negligent misrepresentation claim where defendant represented in marketing materials that their investment products were backed by considerable infrastructure).

The Complaint alleges that the Kingate Defendants, as reflected in the Information Memoranda, took on obligations to monitor and safeguard Plaintiffs' investments. CAC ¶¶ 92-98. These obligations put the Kingate Defendants in a "special relationship" with the Plaintiffs, both as holders and purchasers, and exposed the Kingate Defendants to liability. The Kingate Defendants' obligations are also consistent with the holdings in other Madoff-related cases. For example, in *Anwar II*, the equivalent of the Kingate Defendants (the Fairfield Defendants) represented that they would monitor and supervise Madoff and thereby induced plaintiffs to invest in the split-strike conversion strategy. This sufficed for a finding of a special relationship. *Anwar II*, 2010 WL 3341636, at *27-30 (finding a special relationship as to the "Fairfield Defendants"). Similarly, in *People v. Merkin*, 907 N.Y.S.2d 439 (N.Y. Sup. Ct. 2010), the Court concluded that "[t]he relationship created by the Offering Documents imposed on Merkin a duty to act with care and loyalty independent of the terms of those agreements." *Merkin*, 907 N.Y.S.2d at 439.[61]

---

[60]    "[T]he standard of a special relationship in the context of a negligent misrepresentation claim is less rigorous than that of a fiduciary duty" claim. *Musalli Factory for Gold & Jewellry v. JPMorgan Chase Bank, N.A.*, 261 F.R.D. 13, 28 (S.D.N.Y. 2009), *aff'd*, 2010 WL 2588195 (2d Cir. June 29, 2010).

[61]    The FIM Defendants argue that negligence or gross negligence require a "relationship approaching privity." FIM at 18. As set forth below (*infra* at Section VI.A), Plaintiffs have pleaded facts sufficient to establish the requisite privity-like relationship. That relationship is evidenced here by the Kingate Defendants providing to Plaintiffs the information concerning the Funds, with the understanding that Plaintiffs would use that information in deciding whether to make and maintain their investments in the Funds. *See Sheldon v. Khanal*, No. 08-CV-3676(KAM)(LB), 2009 WL 3233093, at *14 (E.D.N.Y. Sept. 30, 2009) (finding that a special relationship existed between the selling property owner and real estate broker).

The FIM Defendants' reliance on *Eurycleia v. UBS Sec. LLC*, No. 600874/2007, 2008 N.Y. Slip. Op. 32073(U) (N.Y. Sup. Ct. July 1, 2008), is easily distinguishable because the court there found that there was no duty owed to the prime broker of the hedge fund, UBS. Plaintiffs are not suing the prime broker or custodian here.

The Kingate Defendants were responsible for the statements made to investors that induced them to purchase shares in the Funds. CAC ¶¶ 83-85. In such circumstances, a special relationship is properly pled because the alleged misrepresentations included information that Plaintiffs considered in making their decision to invest. CAC ¶¶ 255, 262, 269, 274, 289; *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 232 (S.D.N.Y. 2007) (special relationship exists where "defendants sought to induce" plaintiffs to purchase by making statements or providing information that the plaintiffs would rely upon). The misrepresentations by the Kingate Defendants were made for the specific purpose of inducing Plaintiffs to purchase or hold interests in the Funds – there could be no other purpose for the statements providing information about the Funds' investment strategy, performance and the robustness of the Kingate Defendants' due diligence. Where a defendant's misrepresentations induce a plaintiff to do something, the absence of a "preexisting" relationship is not exculpatory. *See Muller-Paisner*, 289 F. App'x at 466 (misstatements in materials provided in connection with sale of annuity provide basis for negligent misrepresentation claim). For those same reasons, and due to the Kingate Defendants' superior information and purported "special expertise," they cannot escape liability by contending that this was an "arms-length" transaction. The "special relationship" element is clearly established in Plaintiffs' allegations.[62]

KML argues that it did not owe a duty to, nor have a special relationship with, the investors because "the investors warranted that they were investment professionals." KML at 19. KML does not cite any authority for this proposition that an investor's professional status

---

[62] Indeed, the FIM Defendants' characterization of the transaction as arms-length is misleading in that it ignores that they touted their financial expertise to induce Plaintiffs to invest in the Funds. The FIM Defendants were prominently featured in the "Management" section of the Information Memoranda as a "leading investment management company, specializing in the creation and management of portfolios of hedge funds." CAC Ex. 1 at 14. The FIM Defendants' years of "experience" spans two long paragraphs detailing Defendants Grosso's and Ceretti's financial resumes. *Id.*

(and, of course, whether that is the case here or not is a factual determination and KML's bare

allegation cannot establish such a fact) is of any relevance. It is not. "[A] fiduciary relationship

is one founded upon trust or confidence reposed by one person in the integrity and fidelity of

another. … The rule embraces both technical fiduciary relations and those informal relations

which exist whenever one man trusts in, and relies upon, another." *Penato v. George*, 383

N.Y.S.2d 900, 904-05 (N.Y. App. Div. 1976). As this Court has stated, "[w]hile the 'exact

limits' of what constitutes a fiduciary relationship are 'impossible of statement,' a fiduciary

relationship may be found in any case 'in which influence has been acquired and abused, in

which confidence has been reposed and betrayed.'" *United Feature Syndicate*, 216 F. Supp. 2d

at 218 (quoting *Penato*, 338 N.Y.S.2d at 904). Contrary to KML's argument that Madoff's

status as the Investment Advisor relieves the Kingate Defendants of all their duties (KML at 19),

a fiduciary relationship is not limited to one party, nor does one defendant's assumption of a duty

of care exonerate all other defendants. *United Feature Syndicate, Inc.*, 216 F. Supp. 2d at 218

(stating that the ongoing conduct between parties must be considered in order to assess whether a

fiduciary relationship existed and finding that plaintiff's relationship with one defendant did not

preclude a fiduciary relationship with other defendants).

BVI and Bermuda law mirror U.S. law on negligent misrepresentation and negligence.

The existence of a duty of care is fundamental to the tort of negligence misrepresentation. Not

only must it be foreseeable that the defendant's act or omission would cause the plaintiff

economic loss, the defendant must either assume responsibility to or have a special relationship

with the plaintiff. Bombas Dec. ¶ 67. A special relationship can arise where (a) there is a

fiduciary relationship or (b) where the defendant has voluntarily answered a question or has

tendered skilled advice or services in circumstances where he knows or ought to know that an

identified plaintiff will rely on his answers or advice. *Id.* ¶ 698.2. The Complaint alleges that the Kingate Defendants were actively involved in the marketing of the Funds to Plaintiffs. The Subscription Agreements stated that the Manager had made available the opportunity to investors to ask questions and receive answers from it concerning the terms and conditions of the offering described in the Information Memoranda and to obtain any further information necessary to verify the information contained in the Information Memoranda. *Id.* ¶ 96.1. Thus, there were direct dealings between the Kingate Defendants and the investors. Under these circumstances, Mr. Bompas has concluded that a BVI or Bermuda court would not rule that the claims against the Kingate Defendants for misrepresentation would fail as a matter of law. *Id.* ¶ 98. Consequently, the claims for negligent misrepresentation would survive a motion to dismiss.

### B. Plaintiffs Properly Assert Claims for Breach of Fiduciary Duty

Plaintiffs assert a valid claim for breach of fiduciary duty against the Kingate Defendants on behalf of investors in the Funds. CAC ¶¶ 278-83 (Count 7). Notice pleading under Rule 8(a) applies to claims for breach of fiduciary duty; the heightened pleading standards of Rule 9(b) are not applicable. *Rahl v. Bande*, 328 B.R. 387, 413 (S.D.N.Y. 2005) (Rule 8(a) applied to breach of fiduciary duty even where fraud claims are asserted in other counts within the same complaint).

Further, "whether [a breach of fiduciary] duty exists is a fact specific inquiry." *Anwar II*, 2010 WL 3341636, at *29. Accordingly, "New York courts generally avoid dismissing a claim of breach of fiduciary duty . . . because it usually involves a question of fact: whether someone reposed trust and confidence in another who thereby gains a resulting superiority or influence." *Musalli Factory for Gold & Jewelry*, 261 F.R.D. at 26, *aff'd*, 2010 WL 2588195 (2d Cir. June 29, 2010).

In New York, a claim for breach of fiduciary duty requires: (1) the existence of a fiduciary duty between the parties, (2) a breach of that duty, and (3) damages resulting from that breach. *Montreal Pension I*, 446 F. Supp. 2d at 196-98. Such a breach arises in any case "in which influence has been acquired and abused, in which confidence has been reposed and betrayed." *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.,* 216 F. Supp. 2d 198, 218 (S.D.N.Y. 2002) (*quoting Penato*, 383 N.Y.S.2d at 904). No contractual relationship is necessary.

Most recently, Judge Marrero in *Anwar II* found that the equivalent of the Kingate Defendants owed fiduciary duties to the investors of that Madoff feeder fund. *Anwar II*, 2010 WL 3341636, at *29. Those defendants "had special knowledge and expertise about Madoff's operations," in part, because they undertook to supervise and monitor Madoff. *Id.*

Here, the facts are the same. The investment managers (KML and TBL), the FIM Defendants (the FIM Entities, Grosso and Ceretti), and the other Individual Defendants (Cook, Epps, Manzke, Sebah, Bish, Wetherhill and Tannenbaum) all held themselves out to Plaintiffs as possessing the necessary financial experience and expertise to select, evaluate, and monitor Madoff. As noted *supra*, the IMs for the Funds included a long section on "Management" reciting each of these Defendants' decades of experience in the financial industry. *See*, *e.g.*, CAC Ex. 1 at 11-16.

Relying on these misrepresentations, Plaintiffs entrusted their investments to Defendants. Yet, rather than exercising due care and loyalty with respect to Plaintiffs and their investments, Defendants entirely disregarded and abdicated those responsibilities. In fact, Grosso and Manzke repeatedly met with Madoff personally over several years at Madoff's New York office. CAC ¶¶ 70-73. In spite of all these meetings, they never once asked for a single piece of

evidence that Madoff had real counterparties, executed trades in the New York Stock Exchange, or held the billions of dollars in U.S. Treasury securities at JP Morgan, as he claimed. One simple phone call would have sufficed – but it was never made. Accordingly, Plaintiffs adequately state a claim for breach of fiduciary duty.

Defendants' half-hearted attempt to dismiss the breach of fiduciary duty claims can be easily rejected. The FIM Defendants first argue that under BVI law there was a contractual relationship among the parties that does not give rise to a fiduciary one. FIM at 17. Similarly, Cook, Epps, Sebah, Manzke, Wetherhill and Tannenbaum contend that BVI or Bermuda law foreclose any fiduciary duty to Plaintiffs. Cook, Epps, Sebah at 18; Tannenbaum at 2-3; Manzke at 2-3; Wetherhill at 4. As discussed *supra* at Section II.A.4, there are no compelling reasons for the application of BVI or Bermuda law, particularly when the Funds bore only a nominal connection to the BVI or Bermuda. Messrs. Grosso and Ceretti also contend that they were not parties to the agreements between the FIM Entities and the Funds. *Id.* That is irrelevant. A contractual relationship is not an element of a breach of fiduciary duty.[63]

Under BVI or Bermuda law, the Kingate Defendants could be held liable for breach of fiduciary duty as well. Bompas Dec. ¶¶ 127-44. The key inquiry is whether there is a relationship of trust and confidence between the Defendants and Plaintiffs. *Id.* ¶¶ 142. There is no reason why a service provider or directors cannot assume a duty to investors separate and apart from obligations owed to a company. *Id.* ¶¶ 131-43; Diel Dec. ¶ 33.[64]

---

[63] The FIM Defendants' reliance on *Jordan (Bermuda) Investment. Co. v. Hunter Green Investments LLC*, No. 00 Civ. 9214 (RWS), 2007 WL 2948115, at *23 (S.D.N.Y. Oct. 3, 2007), is misplaced because it was decided on a motion for summary judgment, not on the pleadings. FIM at 17.

[64] Under § 97(1) of the Bermuda Companies Act, every officer and director of a company owes a duty to exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances. Bermuda Companies Act 1981 § 97(1) . § 97(1) is modeled on § 122 of the Canadian Business Corporations Act, and the Bermuda courts would look to Canadian case law to construe this provision. Canada Business Corporations Act, R.S.C. 1985, c. C-44 § 122. The Supreme Court of Canada held in *Peoples Department Stores Inc. (trustee of)*

In *Horizon Bank International Ltd. v. Walsh & Ors*, [2009] CA (Bda) 6 Civ., 19 Mar. 2009 (Berm.) the Bermuda Court of Appeals held that a bank owed a fiduciary duty to American investors who had transferred assets to a company incorporated as part of an offshore investment scheme. Horizon Bank became a fiduciary to the extent that it was trusted to ensure that the principal investment company would be managed consistently with the interests of the investors and in accordance with the mandate they had provided. Bompas Dec. ¶ 138. Notwithstanding the uncontested fact that the investors purchased stock in the Funds, Plaintiffs could still be held to have reposed trust and confidence in the Kingate Defendants. It is in this sense that Plaintiffs "entrusted" assets to the Kingate Defendants. *Id.* ¶140. The Bermuda Court of Appeals applied the same logic in holding that Plaintiffs in *Horizon Bank* had entrusted their assets to the defendant bank notwithstanding that the assets were legally transferred to two Bahamian International Business Companies owned by the investors and managed by a trading company owned indirectly by the investors. *Id.* ¶ 141. If, as alleged in paragraph 280 of the Complaint,[65] there was a sufficient relationship of trust and confidence between Plaintiffs and the Kingate Defendants, a court in the BVI or Bermuda would be entitled to find that Plaintiffs had entrusted their assets to those Defendants and that they had become fiduciaries owing fiduciary duties to Plaintiffs. *Id.* ¶ 142; Diel Dec. ¶¶ 16-23 (discussing *Horizon Bank* and *Daly v. Sydney Stock Exchange Ltd.*, [1986] 160 CLR 371, 377 (Austl.) (the High Court of Australia held that a firm of stockbrokers owed a fiduciary duty to a client who it convinced to lend money to the firm

---

*v. Wise (Peoples)*, 244 D.L.R. 4th 564, 586 (2004), that the duty of care owed under § 122 (and by implication § 97(1) of the Bermuda Companies Act) is open-ended, including creditors as beneficiaries. Where, as here, the Funds have no creditors other than shareholders, the shareholders are the beneficiaries of the duties imposed on officers and directors by the Bermuda Companies Act. Diel Dec. ¶¶ 14-16. Even assuming, however, that directors (Defendants Cook, Epps, Sebah, Manzke and Weatherhill) did not owe a fiduciary duty to shareholders simply by virtue of occupying such office, Bermuda and BVI law recognize that directors can owe fiduciary duties to shareholders in special circumstances. Bompas Dec. ¶¶ 131-34; Diel Dec. ¶¶ 16-23, 31.

without disclosing that the firm was in a precarious financial position at the time. The fiduciary duty arose because a relationship of confidence existed between the parties)).[66]

## C. Plaintiffs Properly Assert Claims for Gross Negligence And Negligence

Gross negligence is an "extreme departure from the standards of ordinary care." *AMW Materials Testing, Inc. v. Town of Babylon*, 584 F.3d 436, 454 (2d Cir. 2009) (citation omitted); *see also Anwar II*, 2010 WL 3341636, at *28 ("conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing") (citation omitted); *Colnaghi, U.S.A., Ltd. v. Jewelers Protection Servs., Ltd.*, 595 N.Y.S.2d 381, 383 (N.Y. 1993). Plaintiffs easily meet this standard.

Plaintiffs allege that the Kingate Defendants "grossly failed to exercise due care, and acted in reckless disregard of their duties"; "failed to exercise the degree of prudence, caution, and good business practice that would be expected of any reasonable investment professional"; "failed to perform adequate due diligence before selecting Madoff as the Funds' investment advisor, and before allowing Madoff custody of the assets of the Funds; failed to monitor Madoff on an ongoing basis to any reasonable degree; and failed to take adequate steps to confirm

---

[65]  ".[T]the Kingate Defendants held themselves out as providing superior client investment services, and evinced an understanding that they were the fiduciaries of the investors. Plaintiffs and the Class reasonably and foreseeably relied on such representations, and trusted in the Kingate Defendants' purported expertise and skill."

[66]  Mr. Chivers concedes that Defendants could owe a fiduciary duty to Plaintiffs, but concludes that there is no such duty based on a misreading of the allegations in the Complaint. He states: "[m]y primary reason for drawing the conclusion is based on the separate corporate personality of the Funds. The Plaintiffs did not contract or otherwise deal with the Kingate Defendants." Chivers Aff. ¶ 60. He also assumes incorrectly that the Complaint does not allege that the Kingate Defendants acted or made representations outside the Investment Memoranda and that "they appear to have performed the ordinary functions of directors, managers and advisers to the Funds." *Id.* ¶ 73. Nothing could be further from the truth. The Kingate Directors were the salesmen for the Funds. They enticed Plaintiffs to invest in the Funds by providing them with the misleading Information Memoranda and marketing materials touting the fictitious performance of the Funds (*see, e.g.*, the monthly performance reports prepared by KML and approved by FIM, Bunch Dec. Exs. B-j). Based on his invalid assumptions, Chivers errs when he concludes that "[t]here are no pleaded facts which could be said to amount to 'direct and close contact' between the Kingate Defendants and the Plaintiffs." *Id.* ¶ 67.

Madoff's purported account statements, transactions and holdings of the Funds' assets."  CAC ¶ 270.

More specifically, the Kingate Defendants were grossly negligent because they (i) failed to confirm that Madoff had actual custody of the securities (CAC ¶ 215); (ii) did not conduct confirmation procedures on Madoff's supposed counterparties to ensure their existence (CAC ¶ 216); (iii) conducted minimal due diligence into Madoff's auditors, if any (CAC ¶ 218); (iv) did not verify the accuracy of Madoff's paper records which included dozens of trades outside the daily trading range of the securities (CAC ¶ 219); (v) failed to investigate Madoff's consistent positive returns even when the market declined, which was impossible if Madoff had executed a split-strike conversion strategy (CAC ¶ 220); and (vi) failed to investigate despite Madoff's unique fee structure pursuant to which Madoff relinquished the customary investment advisory fees (CAC ¶ 221).

These allegations of gross negligence fall squarely within *Anwar II*:

> The Court is persuaded that Plaintiffs adequately allege gross negligence against the Fairfield Defendants. Plaintiffs allege that the Fairfield Defendants, as "investment advisors, managers, and placement agents" exercised discretionary control over the Funds' assets, giving rise to a duty of care, and then "grossly failed to exercise due care, and acted in reckless disregard of their duties" by investing substantially all of the Funds' money with Madoff, on whom these defendants conducted no due diligence and who they failed to monitor.

*Anwar II*, 2010 WL 3341636, at *28.

Having met the requirements for gross negligence, Plaintiffs also satisfy the elements of a negligence claim:  duty, breach of that duty, and damages proximately caused by that breach. *S.H. and Helen R. Scheuer Family Found. v. 61 Assocs.*, 582 N.Y.S.2d 662, 666 (N.Y. App. Div. 1992) (actionable negligence claim against investment advisor who "negligently selected,

supervised, and monitored [Defendant] as its delegee with the authority to invest, reinvest, and manage the funds of the Foundation"); *Rabalais v. Starrett City, Inc.*, No. 16811/08, 2010 WL 3463730, at *2 (N.Y. Sup. Ct. Aug. 30, 2010).

Following the U.K., Bermuda and BVI do not recognize a separate cause of action for gross negligence, but would treat the gross negligence claim as if it were a cause of action for simple negligence. In light of the disclaimers' exclusion of liability provisions in the contracts with the service providers, however, the Bermuda and BVI courts would consider the facts and circumstances alleged in the Complaint in considering the standard and scope of the Defendants' duty of care. Bompas Dec. ¶¶ 121-26; Diel Dec. ¶ 44.[67] The claim of gross negligence would not be dismissed.

### D. Plaintiffs Are Entitled to a Remedy of Constructive Trust

The elements of a constructive trust are: (1) a fiduciary relationship, (2) a promise, (3) a transfer in reliance thereon, and (4) unjust enrichment. *Plumitallo v. Hudson Atl. Land Co., LLC*, 903 N.Y.S.2d 127, 129 (N.Y. App. Div. 2010). Here, Plaintiffs alleged a fiduciary relationship (*supra* at Section VI.A), a promise by Defendants to conduct adequate due diligence and supervision of Madoff, an investment in the Funds in reliance on these promises, and Defendants' unjust enrichment based on Madoff's fictitious profits. Accordingly, Plaintiffs sufficiently allege the elements for a constructive trust.

Plaintiffs recognize that if they ultimately succeed in their contract claims they would not be entitled to a remedy of constructive trust as to those Defendants. However, "[w]here, as here,

---

[67] The Bermuda Supply of Services (Implied Terms) Act of 2003 invalidates contractual limitation or exclusion provisions in service contracts that purport to impose a standard of care other than "reasonable care and skill." Diel Dec. ¶¶ 35-39. Section 6 of this Act explicitly provides that the reasonable care and skill standard shall apply "notwithstanding any agreement, course of dealing between the parties or usage." *Id.* ¶ 38. Thus, the disclaimers and limitation provisions in the service agreements governed by Bermuda law (*i.e.*, the KML

there is a *bona fide* dispute as to the existence of a contract, or where the contract does not cover the dispute in issue, a plaintiff may proceed upon a theory of quasi-contract as well as breach of contract, and will not be required to elect his or her remedies." *Id.* at 128 (*citing Hochman v. LaRea*, 789 N.Y.S.2d 300, 301-02 (N.Y. App. Div. 2005)).  This is also pertinent here because, even if Plaintiffs are able to establish the existence of a contract, Plaintiffs may not be able to do so against all Defendants.

## VII.    PLAINTIFFS PROPERLY ALLEGE CONTRACT-RELATED CLAIMS

### A.    Plaintiffs State a Claim for Third-Party Beneficiary Breach of Contract Against the Kingate Defendants

Plaintiffs' claims for third-party breach of contract also are governed by the liberal notice pleading standards of Rule 8(a).  *Caudle v. Towers, Perrin, Forster & Crosby, Inc.*, 580 F. Supp. 2d 273, 284 (S.D.N.Y. 2008).  The Complaint must only allege facts "sufficient 'to raise a right to relief above the speculative level.'"  *ATSI Commc'ns*, 493 F.3d at 98 (*quoting Twombly*, 550 U.S. at 555).  Even without the benefit of discovery, Plaintiffs plead facts that support claims that they were intended third-party beneficiaries.  Significantly, the determination of "third-party beneficiary status is a question of fact."  *Debary v. Harrah's Operating Co.,* 465 F. Supp. 2d 250, 261 (S.D.N.Y. 2006).  Where there is any ambiguity in the contractual language, courts – even at summary judgment – typically refuse to decide the issue of whether the contract intended to confer third-party beneficiary status.  *See, e.g., Barry v. Atkinson,* No. 96 Civ. 8436(PKL), 1998 WL 255431 (S.D.N.Y. May 20, 1998).

New York has adopted the Restatement (Second) of Contracts § 302 (1981), which sets forth the elements of a third-party breach of contract claim.  *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co. Inc.*, 66 N.Y.2d 38, 44 (N.Y. 1985).  Under the Restatement, a party will

---

Management Agreement, CAC Ex. 7, § 5.12 (Bermuda law), and Tremont Co-Manager Agreement, Vigna Dec. Ex.

be deemed an intended beneficiary with rights to enforce a contract if "recognition of the beneficiary's right to performance must be appropriate to effect the intention of the parties" and "the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." *Id.* at 44 n.2. The promise to benefit the third-party does not have to be expressly stated in the contract. *Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 573 (2d Cir. 1991) ("In determining third-party beneficiary status it is permissible for the court to look at the *surrounding circumstances* as well as the agreement … it is well-settled that the obligation to perform to the third-party beneficiary need not be expressly stated in the contract.") (emphasis added).

Here, the surrounding circumstances indicate that the Management Agreement (between KML, Tremont and the Funds) and the CSA (between the FIM Entities, KML, Tremont and the Funds) intended to give the benefit of the promised performance to Plaintiffs. The IMs set forth the understanding that the Manager and the Consultant would provide management services that would benefit the shareholders of the Fund. *See, e.g.*, CAC Ex. 1 at 12-13 ("The Manager") and at 14 ("The Consultant"). Indeed, according to the last IM, "the Manager has agreed [ ] to manage **all aspects** of the investment advisory services provided to the Fund, including the selection and evaluation of [Madoff]. . . ." *Id.* (emphasis added). In turn, the "Consultant renders consulting advice to the Manager [*i.e.*, KML and TBL] with respect to certain aspects of the Fund's operational, administrative, marketing, accounting and legal matters." *Id.*

This so-called "consulting advice," in truth, consisted of the FIM Entities, together with Defendants Grosso and Ceretti, managing and controlling all aspects of the Funds for the benefit of investors. As Mr. Picard and the High Court of the United Kingdom concluded, "it is hard to

A, § 5.12 (Bermuda law)), would be void.

imagine what, if any, services remained for [KML] to provide" to the Funds in light of the FIM Entities' actual responsibilities. *Picard* at [18].

All these surrounding circumstances reinforce the conclusion that the Funds intended to make investors beneficiaries of the agreements. The Court can look at the reasons why the Funds retained the Managers and Consultant and the course of performance as indications of the parties' intent. *Anwar II*, again, is directly on point here:

> It comports with common sense that an entity hired to manage the investments of a pool of capital, particularly considering the massive Funds at issue here, is intended to give benefit to the investors. The very purpose of pooling capital may be to maximize investment opportunities, leverage and profits by virtue of sheer volume, while avoiding the transaction costs associated with each investor having a separate contract with an investment manager and still benefiting directly from the manager's expertise.

*Anwar II*, 2010 WL 3341636, at *32.[68]

### B. Plaintiffs Have the Right to Pursue a Claim for Unjust Enrichment If No Contractual Basis for Recovery Exists

"To state a claim for unjust enrichment in New York, a plaintiff must allege that (1) defendant was enriched; (2) the enrichment was at plaintiff's expense; and (3) the circumstances were such that equity and good conscience require defendants to make restitution." *Intellectual Capital Partner v. Inst. Credit Partners LLC*, No. 08 Civ. 10580 (DC), 2009 WL 1974392, at *8 (S.D.N.Y. July 8, 2009) (citation omitted). A direct relationship is not required to assert unjust

---

[68]     Plaintiffs' third-party beneficiary claim also fit within the equitable concept of duties owed to third parties under U.K. and Bermuda law. Diel Dec. ¶ 27; Hargun Dec. ¶ 54. The Complaint alleges that the various service agreements were meant to benefit Plaintiffs and the Class directly and not incidentally. Diel Dec. ¶ 25, CAC ¶ 295. Moreover, the service agreements purport to exclude liability to shareholders. There would be no need for this exculpatory provision unless the Funds and the service providers were conscious that the shareholders otherwise had rights to enforce the agreements. Diel Dec. ¶ 26. Based on the allegations in the Complaint, a Bermuda court would not dismiss the third-party beneficiary claims as "hopeless," "unarguable," "unsustainable" and "clear beyond" doubt, particularly given the fact that the law in this area is still developing. *Id.* ¶¶ 24-27. In the event the Court concludes that there is no viable third-party beneficiary claim under Bermuda law, however, then New York law would clearly apply. *See* Plaintiffs' Opposition to Defendant Citi Hedge's Motion to Dismiss, at Section III.E.

enrichment.  *See In re Canon Cameras Litig.*, No. 05 Civ. 7233(JSR), 2006 WL 1751245, at *2

(S.D.N.Y. June 23, 2006).

Plaintiffs allege that "Defendants wrongfully collected hundreds of millions of dollars in

unearned fees based on the fictitious profits," fees which "were wrongly paid out of the Funds

and must be returned."  CAC ¶ 4.  Defendants collected these fees in the form of commissions

and performance fees for the purported, but in fact non-existent and wholly-fabricated, capital

appreciation of the Funds.  CAC ¶ 393.  Based on the gross failures by the Defendants – and the

fees, salaries and bonuses those Defendants received despite those failures – Plaintiffs most

certainly did not receive "what they paid for."  This suffices to plead unjust enrichment.  *Anwar*

*II*, 2010 WL 3341636, at *34 (sustaining unjust enrichment claims); *see also Intellectual Capital*

*Partner*, 2009 WL 1974392, at *8-9; *Space, Inc. v. Simowitz*, No. 08 Civ. 2854 (SAS), 2008 WL

2676359, at *3 (S.D.N.Y. July 7, 2008); *Cruz v. McAneney*, 816 N.Y.S.2d 486, 490-91 (N.Y.

App. Div. 2006).

Defendants argue that Plaintiffs' unjust enrichment claim fails where, as here, certain

contracts govern.  FIM at 20; KML at 15 n.3.  The same Defendants, however, dispute the

application of those agreements.  They further dispute that Plaintiffs and certain Defendants were

parties to the agreements.  The significant disputes surrounding the relevant agreements preclude

dismissal of the unjust enrichment claims.  This is particularly appropriate on a motion to

dismiss, absent more concrete findings of fact available at the summary judgment or trial phases

of the case.  *See Russo v. Mass. Mut. Life Ins. Co.*, No. 96-368, 1997 N.Y. Misc. LEXIS 170, at

*16 (N.Y. Sup. Ct. Mar. 25, 1997) ("[W]hether an injustice occurred which resulted in an

enrichment of the defendant must await trial of the fraud-related causes of action.  The remedy, if

any, may never involve the imposition of a trust and we see no reason why the Court should be

compelled to dispose of these issues, as a matter of law, when no discovery has occurred and any nature of the final outcome, not to mention any nature of the remedies, is far from clear."); *Ambac Assurance Corp. v. EMC Mortgage Corp.*, No. 08 Civ. 9464(RMB)(MHD), 2009 WL 734073, at *2 (S.D.N.Y. Mar. 16, 2009) (denying Rule 12(f) motion to strike Plaintiff's request for rescissory damages under New York law "'because '[t]he relief provided for [Plaintiff's] claims will be determined if any entitlement to remedies is proved'").

## VIII.   PLAINTIFFS PROPERLY ASSERT AIDING AND ABETTING CLAIMS AGAINST TREMONT GROUP

Plaintiffs assert valid claims for aiding and abetting breach of fiduciary duty (Count 13) and aiding and abetting fraud (Count 14) against the Tremont Group.  To state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must show:  "(1) breach of fiduciary obligations to another of which the aider and abettor had actual knowledge; (2) the defendant knowingly induced or participated in the breach; and (3) plaintiff suffered actual damages as a result of the breach."  *Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 466 (S.D.N.Y. 2009); *Anwar II*, 2010 WL 3341636, at *54.  Similarly, to state a claim for aiding and abetting fraud, a plaintiff must show: "(1) the existence of an underlying fraud; (2) knowledge of this fraud on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in achievement of the fraud."  *Kottler*, 607 F. Supp. 2d at 464; *Anwar II*, 2010 WL 3341636, at *54.[69]

The Tremont Defendants assert, through their expert, that the allegations in the Complaint do not establish the constituent elements for an aiding and abetting claim.  Hargun

---

[69]      Plaintiffs' claim for aiding and abetting breach of fiduciary duty is governed by a Rule 8(a) pleading standard, *Musalli Factory for Gold & Jewellry v. JPMorgan Chase Bank, N.A*, 261 F.R.D. 13, 23-24 (S.D.N.Y. 2009), while Plaintiffs' claim for aiding and abetting fraud is governed by Rule 9(b).

Dec. ¶¶ 92-98.[70]  Mr. Hargun disputes whether the Tremont Group knowingly induced or participated in the breach of fiduciary duty (*id.* ¶ 95.3) or provided substantial assistance in achievement of the fraud (*id.* ¶ 97.3).  Putting aside his untimely venture into the facts, Plaintiffs' allegations satisfy both of these requirements on this motion to dismiss.

As alleged in the Complaint, the Tremont Group had extensive ties with Madoff based on its management of at least five other feeder funds.  CAC ¶ 207.  The Tremont Group managed these feeder funds as a result of Madoff's long-standing relationship with the founder of the Tremont Group, Defendant Manzke.  *Id.* ¶ 209.  Madoff's Calendar reflects that Manzke personally met with Madoff on at least two occasions.  *Id.* ¶ 73.  As the Tremont Group further acknowledged in a Form 10K SB filed with the SEC in March 2001, many of its funds were designed "to provide clients with vehicles for investments with 'hard-to-access' managers," of which Madoff was the most prominent.  *Id* ¶ 209.

By virtue of the Tremont Group's long-standing involvement with numerous Madoff feeder funds, as well as its touted fund management experience and expertise, the Tremont Group participated in the Kingate Defendants' breach of fiduciary duties by helping to conceal and failing to act to prevent those breaches.  *Id.* ¶ 310, 313.  The Tremont Group also provided substantial assistance to the Kingate Defendants (including Tremont) in achievement of the fraud being perpetrated on Plaintiffs, as set forth in Counts 1, 2, 7, and 8.  *Id.* ¶¶ 77-81, 207-14.

In addition, the Tremont Group's longstanding and extensive involvement with the Funds and its managers creates a strong inference of the Tremont Group's actual knowledge of the breach of fiduciary duty and fraud.  For instance, Plaintiffs allege that the Tremont Group knew

---

[70]     As stated *supra* at Section II.A.3, Bermuda and BVI recognize a cause of action for "dishonest assistance," which is the functional equivalent of aiding and abetting a breach of fiduciary duty.  Bompas Dec. ¶¶ 160-69.  The Tremont Group's expert acknowledges such a claim exists.  Hargun Decl. ¶ 93.  A claim also exists under Bermuda and BVI law for aiding and abetting fraud.  Bompas Dec. ¶¶ 145-59.

that the Kingate Defendants were making false representations to Plaintiffs about the extent of their due diligence and oversight over the Funds' investments and the nature of the Madoff investments, that the Kingate Defendants had absolutely no adequate system in place to monitor the Funds' investments in Madoff, and that they were failing to perform necessary and adequate due diligence. *Id.* ¶¶ 310, 316. Under these circumstances, if the Tremont Group did not know of the fraud and breach of fiduciary duty being perpetrated, it was only because it "refrained from confirming [them] in order later to be able to deny knowledge." *Fraternity Fund v. Beacon Hill Asset Management, LLC*, 479 F. Supp. 2d 349, 368 (S.D.N.Y. 2007) (internal quotation marks omitted); *see, e.g.*, *Anwar II*, 2010 WL 3341636, at *55 (relying on the defendants' "aware[ness] of the roles consolidated in Madoff," and other red flags, together with the defendants' "familiarity with the [f]unds, as well as their general experience in providing financial services to funds" in concluding that "[p]laintiffs allege a strong inference that the [defendants] consciously avoided confirming facts that, if known, would demonstrate" both a breach of fiduciary duty and fraud) (internal quotation marks omitted). Plaintiffs have alleged facts sufficient to establish participation in the breach of fiduciary duties, substantial assistance in achievement of the fraud committed, and both actual knowledge and circumstances from which knowledge of such breaches and fraud can be inferred. Accordingly, the Tremont Group's motion to dismiss the claims for aiding and abetting breach of fiduciary duty and fraud should be denied.

## IX. PLAINTIFFS PROPERLY ALLEGE PERSONAL JURISDICTION OVER THE INDIVIDUAL DEFENDANTS

### A. Legal Standard

A plaintiff need only make a *prima facie* showing of personal jurisdiction over the defendant to defeat a Rule 12(b)(2) motion to dismiss that is filed prior to discovery. *Metro Life*

*Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996); *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990).  A plaintiff establishes a *prima facie* case by "pleading in good faith … legally sufficient allegations of jurisdiction."  *Ball¸* 902 F.2d at 197; *Centrifugal Force, Inc. v. Softnet Commc'n, Inc.*, No. 08 Civ. 5463(CM)(GWG), 2009 WL 1059647, at *2 (S.D.N.Y. Apr. 17, 2009).  Indeed, "[a]t that preliminary stage, the plaintiff's *prima facie* showing may be established solely by allegations."  *Id.*  In evaluating a plaintiff's *prima facie* case, the district court must construe the jurisdictional facts from the pleadings in the light most favorable to the plaintiff.  *Hamilton v. Garlock, Inc.,* 31 F. Supp. 2d 351, 354 (S.D.N.Y. 1998); *Bluestone Capital Partners v. MGR Funds Ltd.*, No. 98 Civ. 3128(WHP), 1999 WL 322658, at *1 (S.D.N.Y. May 20, 1999).

> **B.      This Court Has Personal Jurisdiction Over the Individual Defendants**

This Court has long-arm jurisdiction over the Individual Defendants under New York's Civil Practice Law and Rules ("C.P.L.R.") Section 302(a)(1), which allows personal jurisdiction over an out-of-state defendant if the defendant "transacts any business within the state" and the plaintiff's cause of action "aris[es] from" the business activity.  N.Y. C.P.L.R. 302(a)(1) (McKinney 2008).[71]

Under Section 302(a)(1), a non-domiciliary "transacts … business" in the state when he "purposely avail[s] [himself] of the privilege of conducting activities within New York."  *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 104 (2d. Cir. 2006) (citation omitted); *Longines-Wittnauer Watch Co. v. Barnes & Reinecke, Inc.,* 15 N.Y.2d 443, 457 (N.Y. 1965).  The test for long-arm jurisdiction is "qualitative rather than quantitative," and courts take into account the totality of the circumstances when determining whether a defendant is subject to jurisdiction

under Section 302(a)(1).  *Wickers Sportswear, Inc. v. Gentry Mills, Inc.*, 411 F. Supp. 2d 202, 207, 208 (E.D.N.Y. 2006); *see also Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (N.Y. 1988) (characterizing Section 302(a)(1) as a "single act statute" and finding that even a single act within New York is sufficient for jurisdiction).  Under this test, it is not necessary that the defendant ever physically enter the State, so long as the "defendant's activities [] were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Wickers*, 411 F. Supp. 2d at 207 (internal brackets omitted); *accord Deutsche Bank Sec., Inc. v. Mont. Bd. of Inv.* 797 N.Y.S.2d 439, 442 (N.Y. App. Div. 2005).

Courts have held that "a non-domiciliary's contacts with New York are sufficient to confer [long-arm] jurisdiction [under Section 302(a)(1)] when it maintains an ongoing investment account in New York and conducts securities transactions through such an account." *Greenlight Capital, Inc. v. Greenlight (Switz.) S.A.*, No. 04 Civ. 3136(HB), 2005 WL 13682, at *3 (S.D.N.Y. Jan. 3, 2005); *see also Credit Lyonnais Sec. (USA) Inc. v. Alcantara*, 183 F.3d 151, 154 (2d. Cir. 1999) (*prima facie* case for personal jurisdiction under New York's long-arm statute established when defendant had active account in New York and plaintiff's lawsuit was based on transactions in that account); *Picard v. Elbaum*, 707 F. Supp. 144, 146 (S.D.N.Y. 1989) (asserting long-arm jurisdiction over defendants who never physically entered New York, but maintained an ongoing investment account with a New York investment service and made at least three transactions during a two-year period); *L.F. Rothschild v. Thompson*, 433 N.Y.S.2d 6 (N.Y. App. Div. 1980) (finding long-arm jurisdiction over defendant who managed securities account through contacts with broker in New York).  Particularly "[i]f … the account in question played a role in the activities giving rise to the cause of action, specific [long-arm] jurisdiction

---

[71]    The Individual Defendants argue at length that this Court does not have general personal jurisdiction over

under N.Y. C.P.L.R. § 302 may be proper." *Steinberg v. A Analyst Ltd.*, No. 04-60898, 2009 WL 806780, at *5 (S.D. Fla. Mar. 26, 2009) (applying New York law).

The Individual Defendants' contacts with New York plainly establish that they transacted business within the meaning of C.P.L.R. § 302(a)(1). The Individual Defendants purposefully availed themselves of the privileges of conducting business in New York by creating Funds whose sole objective was investment in securities in New York. CAC ¶ 226. In creating these Funds, the Individual Defendants established a fourteen-year business relationship with BMIS in New York, transferred money to BMIS's account at JPMorgan in New York, and agreed to conduct due diligence and oversight of Madoff, who was located in New York. *See* CAC ¶¶ 25, 67, 68. Further, the Individual Defendants regularly and systematically communicated with BMIS regarding the status, investments, and maintenance of the Funds. *See* CAC ¶¶ 25(c), 225. These contacts fall squarely within the cases cited above and well-established New York case law finding personal jurisdiction over individuals who maintain ongoing investment accounts in New York.

Jurisdiction over the Individual Defendants also meets the second prong of C.P.L.R. § 302(a)(1) because the Plaintiffs' action "aris[es] from" the Individual Defendants' business transactions within New York. N.Y. C.P.L.R. 302(a)(1) (McKinney 2008). An action "arises from" a business activity when there is a "substantial nexus between the transaction of business and the claim." *D.H. Blair & Co*, 462 F.3d at 105 (internal quotations omitted). In this case, Plaintiffs' claims that the Individual Defendants negligently and/or fraudulently misrepresented facts regarding the Funds' investments arise directly out the Individual Defendants' business transactions with Madoff and BMIS, both of which were located in New York.

them under C.P.L.R. § 301. Epps, Cook, Sebah at 10-11; Wetherhill at 2-3. These arguments are irrelevant, however, because Plaintiffs do not seek to establish jurisdiction under this provision of the C.P.L.R. CAC ¶ 10(b).

The Individual Defendants cannot use their status as directors and/or officers as a shield against personal jurisdiction because New York abandoned the "fiduciary shield doctrine" over twenty years ago, thus allowing a court "to obtain jurisdiction over a corporate officer or employee based upon his contacts in New York, even if his activities were performed solely in a corporate capacity." *Kinetic Instruments, Inc. v. Lares*, 802 F. Supp. 976, 983 (S.D.N.Y. 1992); *see also Kreutter*, 71 N.Y.2d at 470 (finding it "neither necessary nor desirable to adopt the fiduciary shield doctrine in New York"). Under settled New York case law, an individual corporate officer who has not personally transacted business in New York can nonetheless be subject to personal jurisdiction under Section 302(a)(1) upon a showing that the corporation transacted business in New York as the individual officer's agent. *Craig v. First Web Bill, Inc*, No. Civ. A. 04-CV-1012 DGT, 2004 WL 2700128, at *10 (E.D.N.Y. Nov. 29, 2004); *see also Kreutter*, 71 N.Y.2d. at 467.[72]

There is no "need [to] establish a formal agency relationship" when alleging that a corporation acted as an individual defendant's agent. *Kreutter*, 71 N.Y.2d. at 467. Because New York intends its long-arm statute to reach individual corporate defendants who are more than "some corporate employee … who played no part in" the business transaction, *id.* at 470; *accord Retail Software Serv., Inc. v. Lashlee*, 854 F.2d 18, 22 (2d Cir. 1988), a plaintiff need only allege that the corporation engaged in purposeful activities in New York, for the benefit of and with the knowledge and consent of the defendant, and that the defendant exercised control over the corporation in the matter. *Id.*

---

[72]  The Individual Defendants themselves acknowledge this basic principle. *See* Epps, Cook, Sebah at 13; Wetherhill at 3 (noting that personal jurisdiction is established where "the plaintiff can show that the corporation was acting as the agent for the officer") (quoting *Duravest, Inc. v. Viscardi, A.G.*, 581 F. Supp. 2d 628, 634 (S.D.N.Y. 2008)).

Plaintiffs have unquestionably met this burden and established that the Funds acted as the agent of the Individual Defendants. The Funds engaged in purposeful activities in New York through their transactions in BMIS's account at JPMorgan in New York. CAC ¶ 68. All significant business involving the Funds occurred in New York, including trading and purported due diligence concerning Madoff. CAC ¶ 225. The Individual Defendants – as directors and/or officers of the Funds, their Manager or Co-Managers, and their Consultant – had a direct economic stake in the success of the Funds, and benefitted from the Funds' activities in New York by deriving compensation from the Funds. Further, the Individual Defendants were more than just "some corporate employee" who played no part in the investments of the Funds. By virtue of their positions as directors and/or officers of the Funds, their Manager or Co-Managers, and their Consultant, the Individual Defendants had knowledge of the Funds' activities and consented to BMIS's investments of the Funds' assets. Lastly, as directors and/or officers of the Funds, their Manager or Co-Managers, and their Consultant, the Individual Defendants had the power to control the Funds, and exercised it by making day-to-day decisions about the operations of the Funds, by placing the assets of the Funds in BMIS's account, and then by conducting purported due diligence and oversight of Madoff and BMIS's investment activities. These allegations adequately establish that the Funds acted as an agent of the Individual Defendants. *See generally, Kinetic Instruments v. Lares*, 802 F. Supp. 976, 985 (finding plaintiffs made adequate showing that a corporation acted as agent of individual corporate defendant when plaintiffs alleged that the "[individual defendant] is involved in the day-to-day business operations of the corporation …. had specific knowledge of the [issue in the litigation] …. controls the corporation and is directly responsible for decisions …. and that [the individual

defendant] profits from [the corporation's] business activities, including the sale of the accused product") (internal quotations omitted).[73]

## C. The Court's Exercise of Personal Jurisdiction Is Constitutional

The Individual Defendants' argument that the Court's exercise of jurisdiction over them might run afoul of the U.S. Constitution is misplaced. Epps, Cook, Sebah at 15.[74] New York's long-arm statute stops short of the maximum exercise of personal jurisdiction that the Constitution permits; thus, once jurisdiction is established under Section 302(a)(1), determining the constitutionality of the exercise of personal jurisdiction is "comparatively easy." *Picard v. Elbaum*, 707 F. Supp. 144, 149 (S.D.N.Y. 1989); *see also Greenlight Capital*, 2005 WL 13682, at *4 ("[I]f jurisdiction is proper under the CPLR, due process will be satisfied because CPLR § 302 does not reach as far as the constitution permits."). For personal jurisdiction to comport with due process, the defendant must have minimum contacts with the forum state, *World-Wide Volkswagon Corp. v. Woodson*, 444 U.S. 286, 291 (1980); *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); and "fair warning that a particular activity may subject [them] to the jurisdiction of the foreign sovereign." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985). Cases applying New York law consistently hold that maintaining and operating investments in New York is sufficient to establish minimum contacts and gives individuals fair

---

[73]     The Individual Defendants' cases are inapposite. Indeed, with the exception of *NCA Holding Corp. v. Ernestus*, No. 97 Civ. 1372, 1998 WL 388562 (S.D.N.Y. July 13, 1998), Epps, Cook, Sebah at 13, none apply New York's long-arm statute, but instead decide personal jurisdiction on due process grounds. In *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 467 (S.D.N.Y. 2008), Epps, Cook, Sebah at 13, the court declined to assert personal jurisdiction over two defendants who had not conducted any business related to the alleged fraud beyond their general responsibilities as board members, either in the U.S. or abroad. This is not the case here, where Plaintiffs have alleged that, acting through the Funds, the Individual Defendants engaged in extensive business activity with Madoff in New York. CAC ¶¶ 68, 225. Such allegations likewise exceed mere allegations of defendants' status as "executives," rejected by the court in *In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527, 542 (S.D.N.Y. 2007), or the lack of any allegations of U.S. conduct in *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 355 (D. Md. 2004). Epps, Cook, Sebah at 14; Wetherhill at 3. Unlike in *NCA Holding Corp.*, moreover, where the fraud occurred in Germany, Iceland, and Texas, *see* 1998 WL 388562, at *5, the Individual Defendants' fraud occurred here in New York.

warning that they may be brought into a New York court to defend an action arising from those investments. *See, e.g.*, *Greenlight Capital*, 2005 WL 13682, at *4; *Bluestone Capital Partners*, 1999 WL 322658, at *5; *Picard*, 707 F. Supp. at 149. In this case, the Individual Defendants reached into New York and purposefully availed themselves of the privileges of maintaining investment accounts in the State. The Individual Defendants entered into a business relationship and maintained an ongoing securities account with BMIS, a New York-based investment advisor. CAC ¶¶ 10(a), 41. In addition, the Individual Defendants agreed to conduct due diligence of Madoff, who was located in New York. They cannot now reasonably argue that they could not foresee being brought into a New York court as a result of these actions. CAC ¶ 227.

**D.     At a Minimum, Plaintiffs Are Entitled to Conduct Jurisdictional Discovery**

The Court has "considerable procedural leeway" when deciding a motion to dismiss for lack of personal jurisdiction and "may permit discovery" to aid in determining the motion. *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981) (holding that motion to dismiss for lack of personal jurisdiction "should not have been granted on the basis of the record as it stood before the district court"); *see also Visual Scis., Inc. v. Integrated Commc'ns Inc.*, 660 F.2d 56, 58 (2d Cir. 1981). If a court questions whether the requirements for personal jurisdiction are met, a plaintiff should be provided with "'ample opportunity to secure and present evidence relevant to the existence of jurisdiction'" through jurisdictional discovery. *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003) (quoting *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)). "If a plaintiff has identified a genuine issue of jurisdictional fact, jurisdiction discovery is appropriate even in the absence of a *prima facie*

---

74          Wetherhill has joined in Epps, Cook, and Sebah's motion to dismiss. Wetherhill at 3.

showing as to the existence of jurisdiction." *Daventree Ltd. v. Azerbaijan*, 349 F. Supp. 2d 736, 761 (S.D.N.Y. 2004) (citing *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 207-08 (2d Cir. 2003) (*per curiam*)).  Indeed, a Court should deny leave to take jurisdictional discovery only when "a plaintiff's proposed discovery, if granted, would not uncover facts sufficient to sustain jurisdiction." *Id.* (citing *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 185-86 (2d Cir. 1998)).

As demonstrated above, Plaintiffs have made a *prima facie* showing of the Court's personal jurisdiction over each of the Individual Defendants.  Should the Court determine that additional facts are necessary to establish personal jurisdiction, however, Plaintiffs respectfully request leave to take jurisdictional discovery.

## X.  MADOFF'S CRIMINAL ACTS DID NOT CONSTITUTE AN INTERVENING CAUSE IMMUNIZING DEFENDANTS FROM LIABILITY

As noted above, Plaintiffs allege that their investment evaporated because Defendants misrepresented that Madoff executed the split-strike conversion strategy and Defendants failed to conduct the oversight, evaluation, and monitoring they agreed to undertake.  CAC ¶¶ 86-98. Plaintiffs further allege that the Kingate Fraud Claim Defendants intentionally or recklessly funneled Plaintiffs' monies to Madoff over time while ignoring clear signs that they were dealing with a thief.  Defendants' misrepresentations and wrongful conduct directly caused Plaintiffs' losses.  The court in *Anwar II* agreed, holding that Defendants' wrongful conduct directly caused Plaintiffs' damages:

> The evaporation of Plaintiffs' investment was directly related to [Defendants'] unwillingness or inability to discover and disclose that Madoff was running a Ponzi scheme or, at the very least, that Madoff was not providing sufficient information to justify [Defendants'] trust in him.  Though Madoff's fraud forms an essential element of the chain of causation in this case, his theft of the Plaintiffs' money could not have struck these defendants as a cataclysmic, last minute surprise.

*Anwar II*, 2010 WL 3341636, at *26.  Accordingly, Defendants' argument that Madoff's fraud was an intervening force that cuts off any duties owed by them to Plaintiffs is without merit. KML at 20-21; Tremont at 19-20.

The cases cited by Defendants are woefully inapposite.  *See* Tremont at 19-20.  In *Van Valkenburgh v. Robinson*, the estate of a police officer's wife sued the village, police department, and former husband for wrongful death after she committed suicide with the police officer's gun. 639 N.Y.S.2d 149, 150 (N.Y. App. Div. 1996).  The Appellate Division concluded that "decedent's suicidal act was so extraordinary in nature that liability therefore cannot reasonably be attributed to defendants."  *Id.* at 151.  Similarly, in *Caraballo v. United States*, the court found that plaintiff was at fault, not a third-party (the United States), when plaintiff sued the United States after diving head-first into shallow water (knowing it was shallow having previously walked in the water) in a national park and was severely injured.  830 F.2d 19, 22 (2d Cir. 1987). These facts could not be further from the case at bar.[75]

Defendants' argument is also wrong because it proves too much.  If only the underlying fraudster and thief was ever liable, that would eviscerate any and all supervisory liability. Indeed, the cases cited by Defendants do not arise in the supervisory context.  Instead, they generally a result of the plaintiff's own criminal or wrongful conduct.

This is also true under U.K. law, under which the deliberate act of a third-party is not a supervening cause when the defendant is responsible for guarding against the very risk that materializes.  Bompas Dec. ¶¶ 82-90 (quoting *Environment Agency v. Empress Car Co. Ltd.*, [1999] 2 AC 22 at 31E ("[t]here are cases in which the duty imposed by the rule is to take

---

[75]    Other cases cited by Defendants are similarly distinguishable.  In *Cullen v. BMW of North America*, 691 F.2d 1097, 1101 (2d Cir. 1982), the customer sued a car dealership when the owner of the car dealership stole the deposit.  Here, however, Plaintiffs are not suing BMIS, the equivalent of the car dealership.  In *Cromer Fin. Ltd. v.*

precautions to prevent loss being caused by third parties"); *Stansbie v. Troman*, [1948] 2.K.B 48

(decorator held liable for loss caused by a thief when he left a house where he was working to

buy wallpaper and left the front door unlocked); *Smith v. Littlewoods Ltd.*, [1987] 1 AC 241 ("Of

course, if a duty of care is imposed to guard against deliberate wrongdoing by others, it can

hardly be said that the harmful effects of such wrongdoing are not caused by such breach of

duty.")).  Further, where the compliant alleges negligent misrepresentation as opposed to

negligence, the defendant's duty is to take reasonable care to see that statements made are

accurate.  The fact that the statements may be inaccurate because of a deliberate act of a third-

party does not alter the core of the duty to take care in making the relevant statements.  Bompas

Dec. ¶¶ 109-11.

        In sum, Defendants' attempts to break the chain of causation by pointing to Madoff's

criminal conduct fails because it was Defendants' duty to monitor Madoff to prevent what

occurred and Defendants deliberately or negligently misrepresented that they were closely

monitoring Madoff's handling of the Funds' investments.

## XI.    DEFENDANTS CANNOT PRECLUDE INVESTOR CLAIMS BY RECOURSE TO A CONTRACTUAL SIX-MONTH STATUTE OF LIMITATIONS

        The Tremont Defendants (at 20) and KML (at 21) argue that Plaintiffs' claims are time-

barred because the IMs, through operation of the Subscription Agreements, provide a six-month

limitation period.  The provisions cited by Defendants, however, are inapplicable to the Tremont

Defendants and KML.  The IMs state: "[b]y subscribing for the Shares, the Shareholder is

agreeing to shortening the period during which a claim may be made against the Fund, the

Manager or the Consultant with regard to any matter relating to such Shareholder's investment in

---

*Berger*, 137 F. Supp. 2d 452, 471 (S.D.N.Y. 2001), the clearing broker was not liable for losses resulting from a Ponzi scheme.  Plaintiffs are not suing the Funds' clearing broker.

the Fund."[76]  As the plain language shows, there is no six-month limitation period provided for in

the IMs.  The six-month limitation period is set forth in the Subscription Agreements attached to

the IMs.  However, that limitation period only applies to "the right to bring any legal claim,

action or other proceeding against *the Fund, its Board of Directors and other officers*…."

(emphasis added).[77]  Because the IMs do not provide for a specific time period of limitations,

and the only specified time period applies to the Fund, Board and other officers, the Tremont

Defendants and KML cannot apply a shortened statute of limitations to Plaintiffs' claims.

*McCarthy v. Am. Int'l Group, Inc.*, 283 F.3d 121, 124 (2d Cir. 2002) (following the well

established *contra proferentem* principle requiring that equivocal contract provisions are

construed against the drafter).

Even if the limitation provisions applied, they are irrelevant because Plaintiffs sued

within the six-month time limitation.  Madoff's fraud became public on December 11, 2008.

The first class action complaint was filed on June 10, 2009.  *Criterium Capital Funds B.V.*, *et al.*

*v. Bernard L. Madoff, et al.*, No. 09 Civ. 5386 (S.D.N.Y. filed June 10, 2009).  Prior to Madoff's

confession, Plaintiffs could not have brought any claims because, instead, they could have

simply withdrawn their monies from the Funds.  This is explicitly contemplated by the six-month

limitation period in the IMs:

> [the investors waive their right to sue] unless such claim, action or
> proceeding is commenced within six (6) months from the date of
> the first to occur of (i) **the original occurrence allegedly giving
> rise to such claim, action or proceeding** or (ii) the Shareholder's
> redemption of any Shares.

---

[76]    KGF 2008 IM, CAC Ex. 1 at 8; KGF 2007 IM, CAC Ex. 3 at 8; KGF 2006 IM, CAC Ex. 4 at 8; and KEF 2008 IM, CAC Ex. 2 at 9.  Earlier IMs contain the same language without reference to a specific time period, but unlike the more recent IMs, contain an additional clause asserting a six-month limitation period.  *See* KGF 2003 IM, CAC Ex. 5 at 20; KGF 2000 IM, CAC Ex. 6 at 20.  For the reasons discussed *infra* at Section XI, those clauses also are ineffective to limit the claims asserted against the Tremont Defendants and KML.

[77]    KGF 2008 IM, CAC Ex. 1 at S-11; KGF 2007 IM, CAC Ex. 3 at S-11; KGF 2006 IM, CAC Ex. 4 at S-10; and KEF 2008 IM, CAC Ex. 2 at S-11.

CAC Ex. 1 at 19 (emphasis added). The "original occurrence giving rise to such claim, action or proceeding" was Madoff's confession when the Ponzi scheme collapsed. Defendants drafted the IM, so all inferences must be construed in Plaintiffs' favor. *McCarthy*, 283 F.3d at 124. This is consistent with *Anwar II*, where the Court held that the "limitations period begins to run 'when all elements of the tort can be truthfully alleged.'" 2010 WL 3341636, at *58 (citing *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E. 2d 268, 274 (N.Y. 2008)). Accordingly, "[u]p until Madoff's fraud was ultimately revealed in December 2008, Plaintiffs – albeit not all of them at once – could have redeemed their money and walked away without ever suffering a loss." *Id.*

In any event, even if Plaintiffs' claims were time-barred, "[t]he equitable estoppel doctrine precludes a defendant from raising the statute of limitations when defendant's affirmative wrongdoing, such as fraud, misrepresentation, or deception, prevented plaintiff from bringing a timely action." *Greystone Equip. Fin. Corp. v. Motion Imaging, Inc.*, No. 021283-09, 2010 WL 1655454, at *9 (N.Y. Sup. Ct. Apr. 7, 2010). The shortened time-limitation is also unenforceable here because take-it-or-leave-it contracts of adhesion cannot shorten the statute of limitations. *See Jamaica Hosp. Med. Ctr., v. Carrier Corp.*, 772 N.Y.S.2d 592, 593 (N.Y. App. Div. 2004) (one of the exceptions to enforcement of abbreviated contractual periods of limitation are form contracts of adhesion).

Bermuda and BVI law are consistent with New York law with respect to contractual provisions limiting the time to sue. Bompas Dec. ¶ 58; Diel Dec. ¶ 42. Time bar clauses are construed strictly and the rule of *contra proferentem* applies. Contractual limitations on filing suit are not enforceable where, as here, the facts giving rise to a claim have been fraudulently concealed. Bompas Dec. ¶ 58.

## XII. PLAINTIFFS ARE ENTITLED TO PUNITIVE DAMAGES

Plaintiffs assert punitive damages in their prayer for relief. *See* CAC, Prayer For Relief ¶ 447 (e). "To sustain a claim for punitive damages in tort, [only] one of the following [four] must be shown: [1] intentional or deliberate wrongdoing, [2] aggravating or outrageous circumstances, [3] a fraudulent or evil motive, or [4] a conscious act that willfully and wantonly disregards the rights of another. *Anwar II*, 2010 WL 3341636, at *28 n.14; *see also Don Buchwald & Assocs. v. Rich*, 723 N.Y.S.2d 8, 8 (N.Y. App. Div. 2001) (surreptitious diversion of clients to a secretly formed competitor gives rise to punitive damages); *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 301, 318 (S.D.N.Y. 2010) (sustaining claim for punitive damages on allegations that an "attorney used its client's name and reputation" to negotiate " a significant real estate transaction without the knowledge or consent of its client, resulting in multiple multi-million dollar claims against the client").[78]

Here, the fraud easily fits this bill. The magnitude, scope, and devastating impact of the Kingate Fraud Claim Defendants' actions is far greater than those in any of these cases. The Kingate Fraud Claim Defendants sold thousands of investors billions of dollars of interests in the Funds, and they reaped profits of hundreds of millions of dollars in fees, while misrepresenting known facts concerning their total failure to conduct due diligence and monitoring that, if performed as represented, would have obviated these losses. As discussed throughout this brief and alleged in the Complaint, Plaintiffs have alleged conduct that is gross, wanton or willful, and this conduct warrants an award of punitive damages.

---

[78] *Outside Connection, Inc. v. DiGennaro*, 795 N.Y.S.2d 669, 670 (N.Y. App. Div. 2005) is inapposite because the claims for punitive damages were rejected on summary judgment, after a full record had been developed. *See* FIM at 20.

## XIII.  PLAINTIFFS HAVE PROPERLY PLED STATE LAW CLAIMS AGAINST GROSSO AND CERETTI

Messrs. Grosso and Ceretti are being sued here for their own wrongful conduct as the masterminds behind the Funds.  Nevertheless, they argue that the claims against them are instead based on the corporate conduct of the entities of which they are owners and directors, not their own individualized conduct.  This is incorrect.  As set forth in the Complaint, and further confirmed by the recent decision of the High Court of Justice of the United Kingdom, Grosso and Ceretti were operating at the ground level of this fraud.

Grosso and Ceretti first met Madoff in late 1993 after being introduced by Manzke.  *Picard* at [10].  They then "founded the Kingate Funds for the purpose of investing in [Madoff]" in early 1994, and raised over $1.6 billion over the next decade.  *Id.* at [14].  The Kingate Funds were managed by KML, which Picard believes is owned and controlled by Grosso and Ceretti.  *Id.*  Indeed, Picard essentially concludes that KML was nothing but a front for the FIM Entities, Grosso, and Ceretti.  *Id.*  This is consistent with the allegations in the Complaint that Grosso and Ceretti controlled and acted for the Kingate Funds, as evidenced by the fact that Madoff carried Grosso's home and mobile telephone numbers in his pocket book – and that Madoff listed "FIM Limited/ Kingate" next to Grosso's office number in his office telephone directory – and that they repeatedly met with Madoff over the years.  CAC ¶¶ 73, 76.  As noted above, "[t]his degree of personal contact was, in the opinion of [Picard], unusual because Mr Madoff tended to limit contact with investors as much as possible."  *Picard* at [19].  Accordingly, Plaintiffs' common law claims are properly predicated on Grosso's and Ceretti's individualized wrongful conduct.

# CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the Kingate Defendants' motions to dismiss, or in the alternative, allow Plaintiffs to amend the Complaint to cure any pleading deficiencies.

Dated:  November 4, 2010

Respectfully submitted,

By:___/s/ S. Douglas Bunch_____

Steven J. Toll
Lisa M. Mezzetti
Daniel S. Sommers
Joshua S. Devore
S. Douglas Bunch (SB-3028)
COHEN MILSTEIN SELLERS
       & TOLL PLLC
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

Joel P. Laitman
COHEN MILSTEIN SELLERS
       & TOLL PLLC
88 Pine Street
New York, New York 10005
Tel: (212) 838-7797
Fax: (212) 838-7745

David Boies
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Tel: (914) 749-8200
Fax: (914) 749-8300

David A. Barrett
Howard L. Vickery, II
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, New York 10022

Tel: (212) 446-2300
Fax: (212) 446-2350

Stuart H. Singer
Carlos Sires
Sashi Bach Boruchow
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard, #1200
Ft. Lauderdale, Florida 33301
Tel:  (954) 356-0011
Fax:  (954) 356-0022

Joel H. Bernstein
Javier Bleichmar
Michael Woolley
LABATON SUCHAROW LLP
140 Broadway
New York, New York 10005
Tel: (212) 907-0700
Fax: (212) 818-0477