**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE KINGATE MANAGEMENT
LIMITED LITIGATION

Master File No. 09 Civ. 5386 (DAB)

This Document Relates To:  All Actions

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE
MOTION OF PRICEWATERHOUSECOOPERS LLP TO DISMISS THE
AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

**BOIES, SCHILLER & FLEXNER LLP**

575 Lexington Avenue
New York, New York 10022
(212) 446-2300

**COHEN MILSTEIN SELLERS
& TOLL PLC**
88 Pine Street
New York, New York 10005
(212) 838-7797

**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
(212) 907-0700

*Co-Lead Counsel for Plaintiffs and
Interim Co-Lead Counsel for the Putative Class*

# TABLE OF CONTENTS

STATEMENT OF FACTS ................................................................................................1

ARGUMENT ..............................................................................................................2

    I.      Issues Common to Multiple Defendants............................................. 2

    II.     Plaintiffs Properly Allege Acts by PwC U.S. as Part of
           "PricewaterhouseCoopers" ............................................................ 2

    III.    The CAC States Claims for Aiding and Abetting Breach of Fiduciary
           Duty and Fraud ............................................................................ 5

          A.     The CAC States Claims for Aiding and Abetting Breach of
                   Fiduciary Duty and Fraud under New York Law ..................5

                 1.     Actual Knowledge ....................................................6

                 2.     Substantial Assistance.............................................15

          B.     Plaintiffs Properly Allege Aiding and Abetting Breach of
                   Fiduciary Duty under English, Bermuda, or BVI Law ......................16

          C.     Plaintiffs Properly Allege Aiding and Abetting Fraud under
                   English, Bermuda, or BVI Law ............................................17

    IV.    The CAC States a Claim for Gross Negligence............................................. 19

          A.     The CAC States a Claim for Gross Negligence Under New
                   York Law ..............................................................................19

          B.     Plaintiffs Properly Allege Gross Negligence Under English,
                   Bermuda, or BVI Law.......................................................21

    V.     The CAC States a Claim for Unjust Enrichment Under New York Law ....... 22

CONCLUSION.....................................................................................................24

# TABLE OF AUTHORITIES

## Cases

*Able Energy, Inc. v. Marcum & Kliegman LLP*,
   893 N.Y.S.2d 36 (App. Div. 2010) ...................................................................... 20

*Ades v. Deloitte & Touche*,
   Nos. 90-CV-4959, 90-CV-5056, 1993 WL 362364 (S.D.N.Y. Sept. 17, 1993) .................. 4

*ADL, LLC v. Tirakian*,
   No. 06-CV-5076, 2010 WL 3925131 (E.D.N.Y. Aug. 26, 2010) ......................................... 6

*Anwar v. Fairfield Greenwich Ltd.*,
   No. 09-CV-118, 2010 WL 3341636 (S.D.N.Y. Aug. 18, 2010) ........................................... 5

*Apple Bank for Savs. v. PricewaterhouseCoopers LLP*,
   895 N.Y.S.2d 361 (App. Div. 2010) ...................................................................... 19

*Baptist Churches of Metro. N.Y. v. Galloway*,
   710 N.Y.S.2d 12 (App. Div. 2000) ........................................................................ 7

*Barclow Clowes International v. Eurotrust International*
   [2006] 1 WLR 1476 ........................................................................................ 16

*Bildstein v. MasterCard Int'l, Inc.*,
   03-CV-9826, 2005 WL 1324972 (S.D.N.Y. June 6, 2005) ................................................ 23

*Bothmer v. Schooler, Weinstein, Minsky & Lester, P.C.*,
   698 N.Y.S.2d 486 (App. Div. 1999) ...................................................................... 20

*Cox v. Microsoft Corp.*,
   778 N.Y.S.2d 147 (App. Div. 2004) ...................................................................... 23

*Credit Alliance Corp. v. Arthur Anderson & Co.*,
   483 N.E.2d 110 (N.Y. 1985) ............................................................................... 19

*Cromer Fin. Ltd. v. Berger*,
   No. 00-CV-2284, 2003 WL 21436164 (S.D.N.Y. June 23, 2003) ................................ 6, 19

*Equitable Life Assur. Soc. of U.S. v. Alexander Grant & Co.*,
   627 F. Supp. 1023 (S.D.N.Y. 1985) ...................................................................... 19

*Fed. Nat'l Mortg. Assoc. v. Olympia Mortg. Corp.*,
　No. 04-CV-4971, 2006 WL 2802092 (E.D.N.Y. Sept. 28, 2006) ...................................... 14

*Foothill Capital Corp. v. Grant Thornton LLP*,
　715 N.Y.S.2d 389 (App. Div. 2000) ................................................................................. 20

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*,
　479 F. Supp. 2d 349 (S.D.N.Y. 2007)................................................................................. 6

*Gregory v. Daly*,
　243 F.3d 687 (2d Cir. 2001)................................................................................................. 3

*HAS Residential Servs. of Tex. v. Casuccio*,
　350 F. Supp. 2d 352 (E.D.N.Y. 2003) .............................................................................. 19

*High Tides, LLC v. Demichele*,
　27 Misc. 3d 1233(A) (N.Y. Sup. Ct. 2010) ...................................................................... 16

*Houbigant, Inc. v. Deloitte & Touche LLP*,
　753 N.Y.S.2d 493 (App. Div. 2003) ................................................................................. 15

*Kaufman v. Choen*,
　760 N.Y.S.2d 157 (App. Div. 2003) ................................................................................. 15

*Kirschner v. Bennett*,
　648 F. Supp. 2d 525 (S.D.N.Y. 2009)................................................................................. 6

*Kottler v. Deutsche Bank AG*,
　607 F. Supp. 2d 447 (S.D.N.Y. 2009)................................................................................. 5

*Lawrence v. Wilder Richman Sec. Corp.*,
　No. 09-CV-4782, 2010 WL 3584229 (2d Cir. Sept. 16, 2010) ....................................... 11

*Millennium Capital Mkts. LLC v. U.S. Nat'l Leasing Corp.*,
　No. 97-CV-8397, 1999 WL 311923 (S.D.N.Y. May 18, 1999) ......................................... 4

*Monaghan v. Ford Motor Co.*,
　897 N.Y.S.2d 482 (App. Div. 2010) ................................................................................... 5

*Morrison v. National Australia Bank Ltd.*,
　130 S. Ct. 2869 (2010)......................................................................................................... 1

*Nathel v. Siegal*,
　592 F. Supp. 2d 452 (S.D.N.Y. 2008)............................................................................... 15

*Oster v. Kirschner*,
   77 A.D.3d 51 (N.Y. App. Div. 2010) ............................................................... 6

*Paramount Film Distrib. Corp. v. New York*,
   285 N.E.2d 695 (N.Y. 1972)......................................................................... 22

*Piccolo v. N.Y.C. Campaign Fin. Bd.*,
   No. 05-CV-7040, 2007 WL 2844939 (S.D.N.Y. Sept. 28, 2007)...................... 8

*Pro Bono Inv., Inc. v. Gerry*,
   No. 03-CV-4347, 2008 WL 4755760 (S.D.N.Y. Oct. 29, 2008)...................... 22

*Royal Brunei Airlines v. Tan*
   [1995] 2 AC 378 ......................................................................................... 16

*Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*,
   748 F.2d 774 (2d Cir. 1984)........................................................................... 4

*Silverman v. KPMG LLP (In re Allou Distribs., Inc.)*,
   395 B.R. 246 (Bankr. E.D.N.Y. 2008)............................................................ 20

*Sperry v. Crompton Corp.*,
   863 N.E.2d 1012 (N.Y. 2007)....................................................................... 23

*State Street Trust Co. v. Alwin C. Ernst*,
   15 N.E.2d 416 (N.Y. 1938)........................................................................... 20

*Truncellito v. Scholastic Corp. (In re Scholastic Corp. Secs. Litig.)*,
   252 F.3d 63 (2d Cir. 2001)........................................................................... 10

*VTech Holdings Ltd. v. Pricewaterhouse Coopers LLP*,
   348 F. Supp. 2d 255 (S.D.N.Y. 2004)............................................................ 14

*Waldman v. New Chapter, Inc.*,
   714 F. Supp. 2d 398 (S.D.N.Y. May 19, 2010) .............................................. 22

*Watson v. Grady*,
   No. 09-CV-3055, 2010 WL 3835047 (S.D.N.Y. Sept. 30, 2010)...................... 8

Plaintiffs respectfully submit this Memorandum of Law in opposition to the motion of PricewaterhouseCoopers LLP to dismiss the claims asserted against it in the Amended Consolidated Class Action Complaint filed May 18, 2010 (the "CAC").[1]

## STATEMENT OF FACTS

To avoid duplication, the Court is respectfully referred to the Preliminary Statement and Statement of Facts contained in Plaintiffs' Memorandum of Law in Opposition to the Motion of PricewaterhouseCoopers Bermuda to Dismiss the Amended Consolidated Class Action Complaint ("Plaintiffs' PwC Bermuda Memorandum").[2]  The most critical fact is that for more than ten years, the PwC Defendants audited funds that had *absolutely no assets*, yet the PwC Defendants, knowing that the Plaintiff investors would rely on their audits, gave those worthless funds a clean bill of health, valuing them at many millions of dollars.

This Memorandum refers to PricewaterhouseCoopers LLP as "PwC U.S.," to PricewaterhouseCoopers, Chartered Accountants as "PwC Bermuda," to both collectively as "PwC Defendants," and to the international network of PricewaterhouseCoopers firms as either "PricewaterhouseCoopers," or "PwC."

---

[1] Plaintiffs have voluntarily dismissed the federal securities law claims against PwC U.S. (count 31) pursuant to the Supreme Court's decision in *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010).  In addition, Plaintiffs now agree to dismiss without prejudice count 18 (third party beneficiary breach of contract), but reserve the right to amend the complaint should additional facts emerge during discovery that would support these claims. Plaintiffs' remaining claims against PwC U.S. are gross negligence (count 15), negligence (count 16), negligent misrepresentation (count 17), aiding and abetting breach of fiduciary duty (count 19), aiding and abetting fraud (count 20), and unjust enrichment (count 28).

[2] Plaintiffs asked the PwC Defendants to agree to the filing of a consolidated opposition memorandum that would have avoided redundancies, but Defendants refused to consent.

**ARGUMENT**

I.      **Issues Common to Multiple Defendants**

        The legal standard governing PwC U.S.'s motion to dismiss is set forth in Plaintiffs'

Consolidated Memorandum of Law in Opposition to the Motions of the Kingate Defendants to

Dismiss the Amended Consolidated Class Action Complaint (the "Consolidated Memorandum")

§ I, to which the Court is respectfully referred.

        Plaintiffs have standing under New York law to assert claims against the PwC

Defendants for the reasons set forth in § III(B) of the Plaintiffs' Consolidated Memorandum and

in § 2 of Plaintiffs' PwC Bermuda Memorandum, to which the Court is respectfully referred.

        PwC U.S.'s arguments concerning Plaintiffs' claims for negligence and negligent

misrepresentation parallel those made by PwC Bermuda.  Accordingly, Plaintiffs respectfully

refer the Court to § 5 of Plaintiffs' PwC Bermuda Memorandum.

        Plaintiffs' common law claims are not barred by SLUSA or the Martin Act sections, as

shown in Consolidated Memorandum § IV.A-B, to which the Court is respectfully referred.

        Finally, although PwC U.S. concedes that New York law applies to it with respect to all

issues except standing, PwC Bermuda argues that Bermuda or BVI law applies to claims against

it.  In the interests of clarity and avoiding repetition, Plaintiffs' discussion of the various causes

of action in this Memorandum addresses the law of all three jurisdictions – New York, Bermuda

and BVI.

II.     **Plaintiffs Properly Allege Acts by PwC U.S. as Part of**
        **"PricewaterhouseCoopers"**

        As an initial matter, PwC U.S. takes issue with Plaintiffs' grouping of PwC U.S. and

PwC Bermuda together as a single entity "PricewaterhouseCoopers," or "PwC."  PwC U.S.

argues that Plaintiffs "know[] full well that the 'PricewaterhouseCoopers' entity is a fiction."

2

(Mem. of Law of PricewaterhouseCoopers LLP in Supp. of its Mot. to Dismiss the Am. Consol. Class Action Compl. ("PwC U.S. Mem.") 22.)  To the contrary, what Plaintiffs "know full well" at this stage of the proceedings is that, as alleged in the CAC, PwC U.S. participated in the audits of the Funds, including by meeting with Madoff himself.  (CAC ¶¶ 160-65.)

Those allegations must, of course, be taken as true at this stage.  *See Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001) ("[Courts] must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally.").  Contrary to what PwC U.S. claims, the CAC alleges the facts that both PwC U.S. and PwC Bermuda held themselves out as being members of the worldwide PricewaterhouseCoopers organization, (CAC ¶¶ 44-45),[3] and that PwC U.S., specifically, conducted audits of the Funds and reported on the Funds through audit opinions, (*id.* ¶ 45).  Plaintiffs allege that the audit opinions accompanying the Fund's financial statements "were signed by 'PricewaterhouseCoopers, Chartered Accountants,'" and that those financial statements expressly represented to their readers that "'PricewaterhouseCoopers refers to the members of the worldwide PricewaterhouseCoopers organization.'"  (*Id.* ¶ 44(a).)  Furthermore, PwC U.S. (separate and apart from PwC Bermuda) "was one of the PricewaterhouseCoopers member organizations that conducted the audit of the Funds, and reported on the financial statements and results of the operations of the Funds by issuing unqualified audit options."  (*Id.* ¶

---

[3] The "About us" page on PwC's website states:

> **PwC is one** of the world's largest providers of assurance, tax, and business consulting services. We believe that the best outcomes are achieved through close collaboration with our clients and the many stakeholder communities we serve. So every day, 161,000 PwC people in 154 countries work hard to build strong relationships with others and understand the issues and aspirations that drive them.

pwc Global, About us, http://www.pwc.com/gx/en/about-pwc/index.jhtml (last visited Nov. 4, 2010) (emphasis added).  Despite its fine-print disclaimer on the same page that "[e]ach member firm is a separate legal entity," PwC plainly wants the world to think that PwC is "one" firm operating with its own "PwC people in 154 countries."  *Id.*

45.)  In fact, PwC U.S. appears to have been the point-firm in charge of coordinating with, and investigating, Madoff.  (*Id.* ¶ 165 (alleging that PwC U.S. was Madoff's contact with "PricewaterhouseCoopers"); Dec. of Howard L. Vickery in Supp. of Pls.' Mem. of Law in Opp'n to the Mots. of PricewaterhouseCoopers LLP & PricewaterhouseCoopers, Chartered Accountants to Dismiss the Am. Consol. Class Action Compl. ("Vickery Dec.") Ex. 1, at 2, 4-5 (relying on "experts from *our* New York office" and coordinating meeting with Madoff through PwC U.S. (emphasis added))[4].)

PwC U.S. seeks to have the Court ignore the well-established pleading standard at this stage of the litigation: that the factual allegations set out in the CAC are deemed true, and that any inferences the court draws from them should be done in the light most favorable to plaintiff. *Gregory*, 243 F.3d at 691.  PwC U.S. is requesting that the Court make findings of fact and conclusions of law based solely on the CAC, before Plaintiffs have had an opportunity to develop the record, offer their evidence, and make their arguments about what certain terms and facts mean.  The Court must decline PwC U.S.'s invitation.  *See Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984) ("[T]he district court must limit itself to a consideration of the facts that appear on the face of the complaint.").

---

[4] Plaintiffs only gained access to the documents attached to the Vickery Declaration recently through ongoing investigation.  While Plaintiffs believe that the CAC is sufficient on its own, these documents further support the allegations already contained in the CAC, (CAC ¶ 106), and are related to the financial statements that Plaintiffs attached to the CAC.  Courts in the Southern District of New York have properly considered exhibits submitted *by plaintiffs* in opposition to a motion to dismiss without converting the motion into one for summary judgment because when documents within the defendants' control are submitted in good faith by a plaintiff to support legal claims clearly alleged in the complaint, there is no danger of inequitable prejudice.  *See Millennium Capital Mkts. LLC v. U.S. Nat'l Leasing Corp.*, No. 97-CV-8397, 1999 WL 311923, at *4 n.4  (S.D.N.Y. May 18, 1999) ("The Court may consider exhibits submitted in opposition to a motion to dismiss without converting the motion into one for summary judgment."); *Ades v. Deloitte & Touche*, Nos. 90-CV-4959, 90-CV-5056, 1993 WL 362364, at *7-8 (S.D.N.Y. Sept. 17, 1993) (considering documents submitted in opposition to a motion to dismiss).   However, to the extent that the Court is unwilling to consider these documents, Plaintiffs seek leave to amend the CAC.

Plaintiffs have properly alleged that PwC U.S. participated in the audits, and that it did so not just as part of the worldwide PwC network, but as an active participant in the audits, including by meeting with Madoff to gather information for members of the network.  (CAC ¶¶ 45, 160, 164-65.)  Plaintiffs allegations of entanglement between the PwC entities, outlined further *infra* § III.A.1, together with the allegations targeted specifically at PwC U.S., are sufficient to state causes of action against PwC U.S.  *See Ryder Energy*, 748 F.2d at 779.

## III.    The CAC States Claims for Aiding and Abetting Breach of Fiduciary Duty and Fraud

### A.    The CAC States Claims for Aiding and Abetting Breach of Fiduciary Duty and Fraud under New York Law

To state a claim for aiding and abetting a breach of fiduciary duty under New York law, Plaintiffs must allege (1) a "'breach of fiduciary obligations to another;'" (2) actual knowledge of the aider and abettor; (3) that "'the defendant knowingly induced or participated in the breach;'" and (4) "'actual damages.'"  *Anwar v. Fairfield Greenwich Ltd.*, No. 09-CV-118, 2010 WL 3341636, at *54 (S.D.N.Y. Aug. 18, 2010) (quoting *Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 466 (S.D.N.Y. 2009)); *see Monaghan v. Ford Motor Co.*, 897 N.Y.S.2d 482, 484-85 (App. Div. 2010) (requiring only a "prima facie showing" of these elements, and not mentioning a requirement to show actual knowledge (internal quotation marks omitted)).

Similarly, to state a claim for aiding and abetting fraud, Plaintiffs must allege "'(1) the existence of an underlying fraud; (2) knowledge of this fraud on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor.'"  *Anwar*, 2010 WL 3341636, at *54 (quoting *Kottler*, 607 F. Supp. 2d at 464).  Unlike for aiding and abetting a breach of fiduciary duty, "[t]he particularity requirements of Rule 9(b) apply to claims of aiding and abetting fraud."  *Id.*  Crucially, Plaintiffs need allege "knowledge of th[e] fraud," not fraudulent intent.  *Id.*

Plaintiffs allege the first element of both claims through the Kingate Defendants' misconduct.  (CAC ¶¶ 342-50; *see generally* Consol. Mem.)  The fourth element of aiding and abetting breach of fiduciary duty – damages – is not in dispute, and is alleged by virtue of Plaintiffs' lost investments and the fees paid to the Kingate Defendants.  (CAC ¶¶ 14, 283.)

          1.     Actual Knowledge

To establish actual knowledge, Plaintiffs need only "allege facts giving rise to a strong inference of [PwC Defendants'] actual knowledge of the underlying harm, or the conscious avoidance of the same."  *Kirschner v. Bennett*, 648 F. Supp. 2d 525, 544 (S.D.N.Y. 2009) (Lynch, J.) (internal quotation marks omitted); *see Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 368 (S.D.N.Y. 2007) ("[T]he Court sees no reason to spare a putative aider and abettor who consciously avoids confirming facts that, if known, would demonstrate the fraudulent nature of the endeavor he or she substantially furthers."); *Cromer Fin. Ltd. v. Berger*, No. 00-CV-2284, 2003 WL 21436164, at *9 (S.D.N.Y. June 23, 2003) (denying summary judgment on an aiding and abetting breach of fiduciary duty claim because plaintiff "rais[ed] questions of fact as to whether [defendant] consciously avoided confirming the existence of the . . . breach of fiduciary duty").[5]

Actual knowledge can be "discerned from the surrounding circumstances."  *Oster v. Kirschner*, 77 A.D.3d 51, 72 (N.Y. App. Div. 2010); *see ADL, LLC v. Tirakian*, No. 06-CV-5076, 2010 WL 3925131, at *17 (E.D.N.Y. Aug. 26, 2010) ("[K]nowledge may be averred

---

[5] PwC U.S.'s argument that constructive knowledge is insufficient to state a claim for aiding and abetting a breach of fiduciary duty or fraud is not to the contrary.  *See Fraternity Fund*, 479 F. Supp. 2d at 367-68 (explicitly distinguishing between constructive knowledge and conscious avoidance, and finding the latter sufficient because "[c]onscious avoidance . . . occurs when it can almost be said that the defendant actually knew because he or she suspected a fact and realized its probability, but refrained from confirming it in order later to be able to deny knowledge" (internal quotation marks omitted)); *Cromer Fin.*, 2003 WL 21436164, at *9 (explicitly distinguishing between constructive knowledge and conscious avoidance, and finding the latter sufficient).

generally . . . ." (internal quotation marks and ellipsis omitted)), *adopted by* 2010 WL 3926135 (E.D.N.Y. Sept. 29, 2010). Indeed, evidence that might "even if believed, [] only be sufficient to support a finding of recklessness" is sufficient to avoid *summary judgment* because the distinction between recklessness and conscious avoidance is best left to the trier of fact. *Cromer Fin.*, 2003 WL 21436164, at *9; *see Am. Baptist Churches of Metro. N.Y. v. Galloway*, 710 N.Y.S.2d 12, 17 (App. Div. 2000) ("[W]hat the parties actually knew is a matter for discovery, since much of the information is in defendants' control.").

Plaintiffs' allegations satisfy the actual knowledge requirement. First, PwC Defendants' extensive knowledge of the Funds accumulated over more than a decade of auditing of the Funds' financial statements creates a strong inference of actual knowledge. (CAC ¶¶ 48-49, 106.) Indeed, PwC Defendants had actual knowledge of many red flags[6] that demanded closer scrutiny. (*Id.* ¶¶ 141-42, 158-60, 181, 215-22). For a fuller description of the red flags PwC Defendants had actual knowledge of, or were willfully blind regarding, the Court is respectfully referred to Plaintiffs' Consolidated Memorandum § V.E.

Several publicly available articles that were written by people who did not have unfettered access to the Kingate Defendants' financial records were able to accurately identify highly suspicious red flags concerning Madoff's investment strategy and results. (*Id.* ¶ 150.) Indeed, one such article stated that "[t]o take [Madoff's purported use of the split-strike conversion method] at face value is a bit naïve." (*Id.* (internal quotation marks omitted).) Again, this was written by someone who did not have access to the Kingate Funds' confidential

---

[6] These red flags included Madoff's supposed auditor, F&H, "fil[ing] a form every year with the AICPA certifying that F&H **did not** conduct any audits," (CAC ¶¶ 141-42 (emphasis in original)), the fact that PwC entities audited funds with a combined investment in Madoff supposedly totaling almost all of Madoff's reported assets under management, (*id.* ¶¶ 158-59), Madoff's failure to trade through an independent broker, (*id.* ¶ 215), his refusal to identify his trading partners, (*id.* ¶ 216), his use of an unknown accounting firm, (*id.* ¶ 218), and his preternaturally consistent results, (*id.* ¶ 220).

financial records.  If it was possible to identify red flags without such information, the Court should draw a very strong inference that the entity who had that information and *whose job it was to determine whether the flags were cause for concern* had actual knowledge of, or was willfully blind concerning, the massive fraud being perpetrated.  These are exactly the kind of "surrounding circumstances," *Oster*, 77 A.D.3d at 72, that should lead the Court to draw an inference of knowledge.

Second, PwC Defendants accumulated actual knowledge through the sort of information they collected when performing their repeated audits.  PwC Defendants purportedly audited the Funds in accordance with Generally Accepted Accounting Procedures ("GAAP").  (CAC ¶ 106, Exs. 8, 9.)  One of GAAP's four basic objectives is ensuring that the audited entity's "financial management systems and internal accounting and administrative controls are adequate to ensure that . . . assets are properly safeguarded to deter fraud, waste, and abuse."  Fed. Accounting Standards Advisory Bd., Statements of Federal Financial Accounting Concepts and Standards 42-43 (June 30, 2010), *available at*, http://www.fasab.gov/pdffiles/codification_report2010.pdf [hereinafter, "FASAB Stmt."].[7]  This involves, inter alia, ensuring that the audited entity had "[s]ound controls over internal processes . . . to safeguard assets," and "determin[ing] whether the entity ha[d] established reasonable, cost-effective programs to safeguard assets, prevent and detect waste and abuse, and reduce error rates."  *Id.* at 43.

---

[7] The Federal Accounting Standards Advisory Board ("FASAB") is "the body that establishes generally accepted accounting principles (GAAP) for federal reporting entities," and the FASAB Statement is the most authoritative statement of those principles.  Fed. Accounting Standards Advisory Bd., Generally Accepted Accounting Principles, http://www.fasab.gov/accepted.html (last visited Nov. 4, 2010).  The Court may take judicial notice of these principles because they are "not subject to reasonable dispute in that [they are] . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2); *see Watson v. Grady*, No. 09-CV-3055, 2010 WL 3835047, at *12 (S.D.N.Y. Sept. 30, 2010) (taking judicial notice of the contents of the New York Red Book); *Piccolo v. N.Y.C. Campaign Fin. Bd.*, No. 05-CV-7040, 2007 WL 2844939, at *2 n.2 (S.D.N.Y. Sept. 28, 2007) (noting that courts could take judicial notice of "matters in the public record").  Plaintiffs also incorporate these standards into the CAC by reference.  (CAC ¶¶ 115-33.)

PwC acknowledged that, under certain circumstances, an auditor had an obligation to "confirm the investee fund holdings on a security-by-security basis," (CAC Ex. 11, at 1), and that "simply receiving a confirmation from the investee fund [*i.e.* Madoff] of its underlying investments . . . does not . . . constitute adequate audit evidence," (*id.* Ex. 11, at 27). Similarly, PwC understood its professional obligations to include, inter alia, "conduct[ing] some basic due diligence on [Madoff's supposed auditor] F&H." (*Id.* ¶¶ 139-41.)

More specifically, in their planning for the 2008 audit, PwC Defendants confirmed that they considered investigation of the existence of the Funds' assets a key obligation. PwC Defendants identified several "[k]ey [r]isks," such as the risk "that investments are incorrectly valued or that these investments are not in fact held by the Funds," the "[r]isk of management override of controls and fraudulent financial reporting or misstatements," the fact that "Madoff, as investment advisor and custodian, [was] compensated on each security transaction," and the risk of "[i]ncorrect calculation of the [Net Asset Values ("NAV")]." (Vickery Dec. Ex. 2 (2008 Service Plan) 2.) To ensure that these risks were considered in its audits, PwC Defendants assumed responsibility for "obtain[ing] independent prices for re-valuation purposes" "[f]or 100% of investments held," "gain[ing] an understanding of management's fraud risk assessment and related controls established to mitigate specific fraud risks . . . or that otherwise help prevent, deter and detect fraud," "performing sample testing on the reasonableness of security trades throughout the year[,] and test[ing] a sample of months to review the execution of the investment strategy," and "test[ing] capital transactions and examin[ing] control activities over NAV preparation." (*Id.*)

The PwC Defendants committed to doing all these things, and it is simply inconceivable that in performing tests of specific transactions, or obtaining independent price valuations for

specific assets, the PwC Defendants would not have discovered that there *were no transactions to test and no assets to value*.[8] "[W]hat the parties actually knew is a matter for discovery, since much of the information is in defendants' control," *Am. Baptist Churches*, 710 N.Y.S.2d at 17, and here Plaintiffs have shown that they deserve that discovery because they have alleged – and produced evidence demonstrating – that the PwC Defendants understood their decade-long job to involve actively seeking out the very facts that prove that the Kingate Funds were frauds.

These accounting standards and service plans raise a strong inference that, over the course of more than a decade, PwC Defendants gained actual knowledge of the Funds' complete lack of internal controls and safeguards and, hence, of the Kingate Defendants' fraud and breaches of fiduciary duty. *Cf. Truncellito v. Scholastic Corp.* (*In re Scholastic Corp. Secs. Litig.*), 252 F.3d 63, 77 (2d Cir. 2001) (holding that failure to follow an accounting standard adopted by defendant could "form the basis of proof for recklessness" in the context of a securities fraud case); *Cromer Fin.*, 2003 WL 21436164, at *4 (holding that the difference between recklessness and conscious avoidance is best left to the trier of fact). PwC Defendants failed to live up to its obligations because "in the course of even an inadequate audit, PricewaterhouseCoopers must have known or willfully ignored that the Kingate Defendants did not, in fact, conduct the due diligence they falsely represented that they conducted." (CAC ¶ 183.) Any audit, even an inadequate one, that approached being conducted in accordance with GAAP, or PwC Defendants' own standards (especially an audit that actually examined the key risks that the PwC Defendants identified) would necessarily have discovered: (1) that the Kingate Defendants had no mechanism for verifying that Madoff's reported trades, almost 200 of

---

[8] These commitments were not made by PwC Bermuda only. When PwC Bermuda sent fee proposals to the Kingate Funds, they specifically noted that the work related to "the Funds advisor and broker/dealer," i.e. Madoff, would "be undertaken with experts from *our* New York office." (Vickery Dec. Ex. 1, at 2 (emphasis added).)

which were impossible, actually occurred, (*id.* ¶ 77); (2) did not have any procedures for monitoring Madoff's trading activity and had not made "a single enquiry" to Madoff's clearing house, (*id.*); (3) that the Kingate Defendants never took any steps to monitor Madoff, (*id.* ¶ 104); and (4) the other red flags that any audit would have revealed, (*id.* ¶¶ 142, 158-60, 181, 215-22).[9]

As alleged in the CAC, "even . . . limited audit work . . . would have given PricewaterhouseCoopers actual knowledge or information that it willfully ignored[;] specifically that: BMIS was not audited pursuant to GAAS by a 'qualified and reputable independent audit firm'; the Kingate Defendants performed no meaningful due diligence on BMIS; the Kingate Defendants did not test the validity of Madoff's performance or strategy; and the Kingate Defendants had no process in place to verify the occurrence of the transactions purportedly made by BMIS with counterparties or other third parties, or the existence of the assets." (*Id.* ¶ 179.)

Finally, PwC Defendants also gained actual knowledge of the Kingate Defendants' breach of fiduciary duty and fraud through their own interactions with Madoff. PwC U.S. and PwC Bermuda met with Madoff. (*Id.* ¶¶ 164-66, Ex. 13.) "PricewaterhouseCoopers blindly accepted, and never confirmed, verified, or independently ascertained, any of the information provided by Madoff" at that meeting. (*Id.* ¶ 163.) PwC Defendants knew that Madoff's self-serving statements required further investigation,[10] and, through their audits of the Kingate Defendants, (*id.* ¶ 106), knew that no further steps were being taken. Despite their knowledge of

_____

[9] Plaintiffs allege that PwC Defendants did not fulfill their auditing obligations. (CAC ¶ 140.) To the extent that the Court believes that it is contradictory to assert both that PwC Defendants failed in their auditing obligations, and that the auditing obligations PwC Defendants assumed demonstrate that they gained actual knowledge, Plaintiffs exercise their right to plead in the alternative. *See Lawrence v. Wilder Richman Sec. Corp.*, No. 09-CV-4782, 2010 WL 3584229, at *2 (2d Cir. Sept. 16, 2010) (summary order) ("Federal Rule of Civil Procedure 8(d)(2) specifically permits a party to plead inconsistent positions in the alternative, even in the same action.").

[10] Indeed, PwC Defendants identified "[o]btain[ing] an understanding of the segregation of the Investment Advisor, Brokerage and Custody functions" within Madoff and "[g]ain[ing] an understanding of the structure of the organisation, to determine the extent of high level controls in operation (e.g. governance, internal audit, etc.)" as procedures they would perform as part of their audits, signaling their knowledge of the need to probe beyond Madoff's blanket assurances that everything was fine. (Vickery Dec. Ex. 1, at 4.)

the red flags, the questions about Madoff raised in public articles, and the acknowledged importance of probing beyond Madoff's placating assertions, the PwC Defendants chose not to seek confirming information. The PwC Defendants' meetings with Madoff were actual instances of choosing not to "confirm[] facts that, if known, would demonstrate the fraudulent nature of the" Kingate Defendants' activities. *Fraternity Fund*, 479 F. Supp. 2d at 368. Again, conscious avoidance can be "discerned from the surrounding circumstances," *Oster*, 77 A.D.3d at 72, but here Plaintiffs have gone further and drawn together enough facts to raise a "strong inference of [PwC Defendants'] actual knowledge of the underlying harm, or the conscious avoidance of the same." *Kirschner*, 648 F. Supp. 2d at 544.

To the extent that PwC U.S. denies complicity in these failings, its argument fails. *First*, as explained above, PwC U.S. was explicitly part of PwC Defendants' agreements with the Funds. *See supra* § II & n.8 and surrounding text. PwC U.S. was described as "experts from our New York Office," who would share responsibility for investigating Madoff. (Vickery Dec. Ex. 1, at 2.)

*Second*, PwC audited at least seven other Madoff feeder funds, and the various member firms coordinated their activity. (CAC ¶ 158.) For example, PwC Bermuda "coordinated PricewaterhouseCoopers member firms' audits of the feeder funds and visits to Madoff's offices on a global basis." (*Id.* ¶ 160; *see also* Vickery Dec. Ex. 1, at 2 (noting that if "the other Funds that PricewaterhouseCoopers audits which have Madoff as advisor . . . take part in th[e] process" of investigating Madoff's business practices, the cost of the services to the Kingate Funds would fall proportionally).) PwC U.S. was an explicit partner in this coordination. (CAC ¶ 160; Vickery Dec. Ex. 1, at 2.) Furthermore, on at least two separate occasions, PwC U.S. was involved in issuing reports together with PwC Bermuda for various PwC member firms,

including PwC Netherlands, and PwC Ireland.  (*Id.* ¶¶ 160-65.)  These reports contained crucial endorsements of Madoff's internal controls and procedures which were then relied upon in issuing clean audits despite the fact that the asserted controls had not been verified in any way. (*Id.* ¶¶ 162-63.)  Indeed, PwC U.S. appears to have been Madoff's primary contact with the PwC network.  (*Id.* ¶ 165.)

Given the PwC Defendants' shared responsibility, if PwC U.S. did not actually know that the inadequate meetings it attended, and the inadequate reports it prepared were the sole basis for a clean report on Madoff, it "suspected [as much] and realized [the] probability, but refrained from confirming it in order later to be able to deny knowledge."[11]  *Fraternity Fund Ltd.*, 479 F. Supp. 2d at 368 (internal quotation marks omitted).

These allegations parallel those found sufficient in *Anwar*.  The *Anwar* Court relied on the defendants' "aware[ness] of the roles consolidated in Madoff," and other red flags, together with the defendants' "familiarity with the [f]unds, as well as their general experience in providing financial services to funds" in concluding that "[p]laintiffs allege a strong inference that the [defendants] consciously avoided confirming facts that, if known, would demonstrate" both a breach of fiduciary duty and fraud.  *Anwar*, 2010 WL 3341636, at *55 (internal quotation marks omitted).  Here, PwC Defendants were aware of the roles consolidated in Madoff, (CAC ¶ 181); had actual knowledge of, or were willfully blind concerning, the failings in the Kingate Defendants' safeguarding procedures, and of the Funds' true value, gained through their audits, (*id.* ¶¶ 77, 106, 158-60, 163, 142, 183, 215-22); had familiarity with the Funds, (*id.* ¶ 106); and

---

[11] A strong inference that PwC U.S. refrained from confirming the final step in the logical chain that, if publicly disclosed, would have saved Plaintiffs billions can be drawn from the fact that the PwC network was responsible for auditing funds with a combined value in excess of $16.4 billion, despite the fact that BMIS publicly represented that it had under $17.1 billion in assets.  (CAC ¶¶ 158-59.)  *See Anwar*, 2010 WL 3341636, at *9 (noting that this fact "should have put PwC on alert").

had general experience in auditing funds, (*id.* ¶¶ 44-45). It follows that what PwC Defendants did not actually know about the Kingate Defendants' misconduct, they chose not to know. *See Fed. Nat'l Mortg. Assoc. v. Olympia Mortg. Corp.*, No. 04-CV-4971, 2006 WL 2802092, at *10 (E.D.N.Y. Sept. 28, 2006) (finding actual knowledge adequately pled by allegations that "[a]ccounting defendants audited [the fraudster's] books and records, [and] failed to report . . . numerous financial irregularities"); *Cromer Fin.*, 2003 WL 21436164, at *1, *9 (finding a material dispute of fact when plaintiffs argued that the defendant auditing firm "ignored evidence of [defendant's] fraud and failed their responsibilities as auditors"); *Oster*, 77 A.D.3d at 72 (finding that knowledge of misrepresentations as to dates, and criminal background of the people running an investment vehicle, was sufficient to demonstrate actual knowledge that the investment vehicle was a Ponzi scheme); *see also ADL, LLC*, 2010 WL 3925131, at *17 (relying, in part, on auditors' "extensive experience performing auditing and accounting services" in order to infer actual knowledge).[12]

Any remaining doubt as to whether Plaintiffs have sufficiently alleged actual knowledge is dispelled by the First Department's discussion of accountant liability:

> Keeping in mind the difficulty of establishing in a pleading exactly what the accounting firm knew when certifying its client's financial statements, it should be sufficient that the complaint contains some rational basis for inferring that the alleged misrepresentation was knowingly made. Indeed, to require anything beyond that would be particularly undesirable at this time, when it has been widely acknowledged that our society is experiencing a proliferation of frauds perpetrated by officers of large corporations, for their own personal gain, unchecked by the "impartial" auditors they hired.

---

[12] PwC Bermuda's reliance on *VTech Holdings Limited. v. Pricewaterhouse Coopers LLP*, 348 F. Supp. 2d 255 (S.D.N.Y. 2004) actually supports Plaintiffs' position. In that case, the court noted that had the plaintiff "sufficiently alleged" knowledge of "severe internal control and reporting problems," plaintiff would have prevailed. *VTech Holdings*, 348 F. Supp. 2d at 270 (internal quotation marks omitted). Furthermore, in *VTech*, "PwC . . . told [the plaintiff] that it could not conduct a full audit" due to a lack of information. *Id.* at 258-59. Here, the precise opposite is true. (CAC ¶ 106.)

*Houbigant, Inc. v. Deloitte & Touche LLP*, 753 N.Y.S.2d 493, 498 (App. Div. 2003) (internal

citations omitted).  Noting that cases had imposed fraud liability on accountants where the

accountant "recklessly failed to independently verify and investigate the documents of a

corporation it knew had severe internal control and reporting problems," the First Department

went on to impose liability for aiding and abetting fraud "based on audit reports and financial

statements that allegedly did not accurately reflect the financial condition of [the accountant's]

clients."  *Id.* at 498, 500 (internal quotation marks and emphasis omitted).

## 2.  Substantial Assistance

"[S]ubstantial assistance occurs 'when a defendant affirmatively assists, or helps conceal,

or fails to act when required to do so, thereby enabling the fraud to occur.'"  *Nathel v. Siegal*,

592 F. Supp. 2d 452, 470 (S.D.N.Y. 2008) (internal ellipsis omitted) (quoting *Fraternity Fund*,

479 F. Supp. 2d at 370).[13]  Here, the substantial assistance is clear: PwC Defendants issued clean

audits that were clean either because PwC Defendants helped to conceal the Kingate Defendants'

misconduct, or because PwC Defendants failed to fulfill their audit obligations.  (CAC ¶¶ 182-

83.)  Additionally, PwC Defendants failed to disclose that the representations of management

could not be relied upon.  (*Id.* ¶ 349.)  Issuing a false and unsubstantiated audit report is

substantial assistance.  *See ADL, LLC*, 2010 WL 3925131, at *1 n.1, *18 ("The [a]uditors'

issuance of the audited financial statements and later representations as to their accuracy on

which [plaintiff's predecessor in interest] relied is sufficient to demonstrate substantial

assistance."); *Fed. Nat'l Mortg. Assoc.*, 2006 WL 2802092, at *10 ("[T]he substantial assistance

element of the claim is established by the allegation that the [a]ccounting [d]efendants prepared

_____

[13] "[M]ere inaction of an alleged aider and abettor constitutes substantial assistance only if the defendant owes a
fiduciary duty directly to the plaintiff."  *Kaufman v. Choen*, 760 N.Y.S.2d 157, 170 (App. Div. 2003) (internal
citation omitted).  However, here PwC Defendants took action by preparing and issuing audit reports giving false
information with the intent that Plaintiffs rely on them.

false financial statements . . . ."); *Oster*, 77 A.D.3d at 72 ("Preparation of [private placement memoranda] constitutes substantial assistance." (internal quotation marks and citation omitted)).

Plaintiffs further allege that PwC Defendants provided substantial assistance by directing their audit opinions to the shareholders of the Funds, and allowing its name to be used in the promotion of the Funds, with actual knowledge that there was no other way for potential investors to gain an independent valuation of the Funds.[14]  (CAC ¶¶ 107-08, 111-12.)  Even standing alone, which is not the case here, endorsement has been found to satisfy the substantial assistance requirement.  *See High Tides, LLC v. Demichele*, 27 Misc. 3d 1233(A), at *3, *5 (N.Y. Sup. Ct. 2010) (finding that allegations of sponsoring a golf tournament at which someone met the plaintiff, and issuing press releases and statements praising that person, were sufficient to establish substantial assistance of that person's fraud and embezzlement).

**B.      Plaintiffs Properly Allege Aiding and Abetting Breach of Fiduciary Duty under English, Bermuda, or BVI Law**

English, BVI and Bermudan law recognize a parallel cause of action to aiding and abetting a breach of fiduciary duty known as "knowing assistance in a breach of trust."  (Bompas Dec. ¶¶ 161-63.)  The elements of such liability are (i) a breach of trust, and (ii) dishonest assistance by the alleged wrongdoer in that breach of trust.  *See Royal Brunei Airlines v. Tan* [1995] 2 AC 378; *Barclow Clowes International v. Eurotrust International* [2006] 1 WLR 1476. (Bompas Dec. ¶ 163 (outlining the elements as "(i) the existence of a trust or fiduciary obligation, (ii) breach of trust or fiduciary obligation by the trustee, (iii) that the relevant defendant assists in or induces that breach of trust or fiduciary obligation and (iv) the relevant

---

[14] There is also inferential evidence that PwC Defendants "knew and accepted that it had an obligation to provide assurances directly to the shareholders," as that was the conclusion of an affiliate PwC entity auditing "similar Madoff feeder funds," (CAC ¶ 108), and the PwC Defendants were aware of these other funds and coordinated audits with the other PwC entities, (Vickery Dec. Ex. 1, at 2).

defendant acts dishonestly in doing so").) Dishonesty is judged by an objective standard. (Bompas. Dec. ¶ 164.) The standard is met where the defendant "fails to attain the standard which would be observed by an honest person placed in those circumstances," or where the defendant has "suspicion coupled with a deliberate decision not to make inquires which might result in knowledge" that the action would fail the honest person test. (*Id.*)

The only difference between the concept of "aiding and abetting" under New York law and "dishonest assistance" is one of semantics. Both causes of action require knowledge or conscious avoidance of the breach of trust, and both require that the defendant assist the wrongdoer. (*Id.* ¶¶ 163-65); *In re AlphaStar Ins. Group. Ltd.*, 383 B.R. 231, 274 (Bankr. S.D.N.Y. 2008) ("[B]ermuda law recognizes a claim for 'dishonest assistance,' similar to the aiding and abetting claim under New York law. To establish liability, the plaintiff must show that the third party dishonestly procured or assisted a breach of trust or fiduciary obligations.") As alleged in the CAC, PwC Defendants' assisted the Kingate Defendants breach of trust by issuing clean, but false, audit opinions, without which the Kingate Defendants would not have been able to effectuate a breach of their fiduciary duties to potential and current investors.[15] (*See, e.g.*, CAC ¶¶ 107, 178.) PwC Defendants were dishonest because they publicly advertised that they adhered to accounting standards that the audits could not possibly have been performed in accordance with and still have been honest. (*Id.* ¶¶ 113-27.)

## C. Plaintiffs Properly Allege Aiding and Abetting Fraud under English, Bermuda, or BVI Law

The same facts that support a claim against the PwC Defendants for aiding and abetting fraud under New York law can be characterized under English law as joint participation in a

---

[15] The Kingate Defendants breached their fiduciary duties when they persuaded investors, who were totally dependent upon their superior knowledge of the Kingate Defendants concerning Madoff and his investment activities, to purchase or retain shares in the Funds.

fraud. (Bompas Dec. ¶ 147.) To establish joint participation, a plaintiff must demonstrate that "something [was] done to further a common design." (*Id.* ¶ 154.) In this case, the PwC Defendants knew that the Kingate Fraud Defendants' representations to potential and actual investors, namely that the Funds were closely monitoring the activities of their investment adviser, that the Funds would invest in legitimate investments, and that the Funds were generating positive returns in all markets, were false. (CAC ¶ 179, 183, 348.) PwC knew the promoters of the Funds made no effort to supervise or verify what Madoff was doing. (*Id.*)

PwC Defendants' knowledge or willful ignorance is particularly egregious because PwC Defendants authorized the Funds to use their name and audit reports in the Information Memoranda. (*Id.* ¶ 111.) They were aware that the financial statements were being used by the Kingate Fraud Defendants to solicit investments and that the primary purpose of having audited financial statements was to lend credibility and respectability to the Funds. (*Id.* ¶ 107.) PwC Defendants also knew that the investors had no independent way of conducting due diligence on Madoff and that the Kingate Defendants had superior access to confidential information about the investments of the Funds' assets and about Madoff. (*Id.* ¶ 343.)

It follows that Plaintiffs allege a common design to fraudulently induce Plaintiffs to invest in the Funds. PwC Defendants provided the respectability that was crucial to helping the Kingate Defendants commit their fraud, and the PwC Defendants did so knowing that the Kingate Defendants were committing fraud. It makes no difference whether the terminology used is aider and abettor under New York law, or enabler under U.K. law. The result is the same.

## IV.     The CAC States a Claim for Gross Negligence

### A.     The CAC States a Claim for Gross Negligence Under New York Law

PwC Defendants' argument that, under New York law, gross negligence is not a recognized cause of action against accountants is simply wrong.  *See Credit Alliance Corp. v. Arthur Anderson & Co.*, 483 N.E.2d 110, 120 (N.Y. 1985) (finding "[t]he prerequisites for the cause of action in negligence, *as well as in gross negligence*, [] fully satisfied" when the defendant accounting partnership "was well aware that a primary, if not [] exclusive, end and aim of auditing its client . . . was to provide [plaintiff] with the financial information it required" (emphasis added) (other emphasis omitted)).  While PwC Defendants' quotation claiming that no such cause of action exists does appear in the case cited, that case goes on to discuss *Credit Alliance*, outline the "gray area" that *Credit Alliance* clarified, and set out the requirements for such a cause of action quoted above.  *See Equitable Life Assur. Soc. of U.S. v. Alexander Grant & Co.*, 627 F. Supp. 1023, 1031-32 (S.D.N.Y. 1985).  Indeed, the court finally concluded that the plaintiff "must therefore meet the pleading requirements as set out in *Credit Alliance*," which the plaintiff in that case had not done.  *Id.* at 1032.  PwC Defendants' other authority is similarly inapposite.  *See HAS Residential Servs. of Tex. v. Casuccio*, 350 F. Supp. 2d 352, 363 (E.D.N.Y. 2003) (noting that no cause of action for gross negligence against accountants is recognized when the action would be redundant due to plaintiff's cause of action for fraud).  PwC Defendants cite no authority suggesting that *Credit Alliance* – a decision of the New York Court of Appeals – is not the controlling law in New York.  Nor could they.  *See Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 495 (S.D.N.Y. 2001) (discussing the requirements of a cause of action for gross negligence as applied to an accountant); *Apple Bank for Savs. v. PricewaterhouseCoopers LLP*, 895 N.Y.S.2d 361, 362 (App. Div. 2010) (dismissing a claim for gross negligence against PricewaterhouseCoopers because "defendant's conduct . . . did not

smack of intentional wrongdoing" without any suggestion that the cause of action did not exist (internal quotation marks and brackets omitted)); *Able Energy, Inc. v. Marcum & Kliegman LLP*, 893 N.Y.S.2d 36, 37 (App. Div. 2010) (affirming dismissal of action for gross negligence against accountants due to failure to allege "actual ascertainable damages" without any suggestion that the cause of action did not exist); *Bothmer v. Schooler, Weinstein, Minsky & Lester, P.C.*, 698 N.Y.S.2d 486, 486 (App. Div. 1999) ("[S]ummary judgment dismissing [a] cause of action for gross negligence [against accountants] may . . . be precluded by an issue of fact as to whether defendants acted without the slightest care and regard to plaintiff's . . . rights . . . ." (internal quotation marks and brackets omitted)).

Furthermore, New York recognizes a claim for "an accountant's . . . gross negligence amounting to fraud, which may give rise to a cause of action in favor of third parties." *Silverman v. KPMG LLP* (*In re Allou Distribs., Inc.*), 395 B.R. 246, 259 (Bankr. E.D.N.Y. 2008).

> A representation certified as true to the knowledge of the accountants when knowledge there is none, a reckless misstatement, or an opinion based on grounds so flimsy as to lead to the conclusion that there was no genuine belief in its truth, are all sufficient upon which to base liability. A refusal to see the obvious, a failure to investigate the doubtful, if sufficiently gross, may furnish evidence leading to an inference of fraud so as to impose liability for losses suffered by those who rely on the balance sheet. In other words, heedlessness and reckless disregard of consequence may take the place of deliberate intention.

*Id.* (quoting *State Street Trust Co. v. Alwin C. Ernst*, 15 N.E.2d 416, 419 (N.Y. 1938)); *see also Foothill Capital Corp. v. Grant Thornton LLP*, 715 N.Y.S.2d 389, 390 (App. Div. 2000) ("The complaint states a cause of action against defendant Grant Thornton LLP, an accounting firm, for gross negligence and recklessness sufficient to give rise to an inference of fraud . . . .").

Regardless of which standard Plaintiffs are held to, they have sufficiently alleged facts giving rise to a gross negligence claim under New York law. (CAC ¶¶ 107-08 (alleging PwC's

knowledge and intent that the audits would be relied on by Plaintiffs); *id.* ¶¶ 178-80 (alleging some of the numerous ways in which PwC Defendants gave opinions based on evidence so flimsy as to suggest that they knew the statements were false).)

**B.    Plaintiffs Properly Allege Gross Negligence Under English, Bermuda, or BVI Law**

PwC Bermuda argues that Bermuda does not recognize a claim called "gross negligence," but this argument is beside the point. PwC Bermuda does not argue, for obvious reasons, that either English or Bermudan courts would refuse to analyze the language in a contract that limited liability. It follows that, confronted with the exclusion of liability provisions in the contracts with service providers, both English and Bermudan courts would seek to determine what the exception for "gross negligence" meant, and would not simply ignore the provision because the phrase "gross negligence" does not refer to a cause of action of the same name under English and Bermudan law. Indeed, Gloster, J, in <u>JP Morgan Chase Bank v Springwell Navigation Corporation</u> [2008] EWHC 1793, explained exactly how English or Bermudan courts would deal with such a problem: they would treat a claim of "gross negligence" as one of "simple negligence," and then ask the factual question of whether the negligence was "serious." (Bompas Dec. ¶¶ 123-25.) Such a result is to be expected, as it balances the need to give meaning to contractual provisions with the causes of action recognized under a specific legal system. It also takes into account the practical reality that the phrase "gross negligence" is "derive[d] from United States commercial contracts" (*id.* ¶ 123 (internal quotation marks omitted)), and prevents defendants from escaping liability they contractually accepted through the cunning use of technicalities. Given this standard, Plaintiffs' claim for gross negligence would not be dismissed under English or Bermudan law. (Bompas Dec. ¶¶ 125-26; CAC ¶¶ 321, 323 (alleging the knowing or reckless failure to audit funds in accordance

with the standards Defendants' publicly announced that they adhered to when Defendants' knew that Plaintiffs would rely on their representations).)

## V.    The CAC States a Claim for Unjust Enrichment Under New York Law[16]

To plead unjust enrichment, Plaintiffs need only allege: "(1) that the defendant was enriched; (2) the enrichment was at the plaintiff's expense; and (3) the circumstances were such that equity and good conscience require the defendants to make restitution." *Pro Bono Inv., Inc. v. Gerry*, No. 03-CV-4347, 2008 WL 4755760, at *19 (S.D.N.Y. Oct. 29, 2008). PwC Defendants do not challenge any of these three basic elements, as Plaintiffs allege that "Defendants were enriched at the expense of Plaintiffs and the Class by taking the monies of Plaintiffs and the Class in the form of commissions and other fees . . . ." (CAC ¶ 393). Plaintiffs allege that they lost billions of dollars because of the actions of the defendants, including PwC Defendants.

Plaintiffs detail how PwC Defendants promised to undertake certain obligations on Plaintiffs' behalf and for Plaintiffs' benefit, while actually doing little, if anything, to faithfully carry out those obligations for which they were being paid with Plaintiffs' money. (*See, e.g.*, *id.* ¶¶ 106-184). Promising to perform a duty, being paid to perform that duty, and not performing that duty but keeping the money, is the classic case where it would be "against equity and good conscience to permit the defendant to retain what is sought to be recovered." *Paramount Film Distrib. Corp. v. New York*, 285 N.E.2d 695, 698 (N.Y. 1972); *see also Waldman v. New Chapter, Inc.*, 714 F. Supp. 2d 398, 404 (S.D.N.Y. May 19, 2010) ("Under New York law, it is contrary to equity and good conscience to enable a party to benefit from misleading representations." (internal quotation marks omitted)).

---

[16] Plaintiffs allege this claim as to both PwC Defendants, but acknowledge that the claim is only viable under New York law.

PwC Defendants argue that Plaintiffs' unjust enrichment claim should be dismissed because Plaintiffs have not alleged that they paid fees directly to PwC in connection with the audits of the Kingate Funds. "Defendant[s] accurately describe[] New York law in 1997, as the S.D.N.Y. understood it. But this is not the law today, as promulgated by New York's own courts." *Waldman*, 714 F. Supp. 2d at 403. "New York law does not require an unjust enrichment plaintiff to plead direct dealing, or an actual, substantive relationship with the defendant. It merely requires that the plaintiff's relationship with a defendant not be too attenuated." *Id.* (internal quotation marks omitted); *see Sperry v. Crompton Corp.*, 863 N.E.2d 1012, 1018 (N.Y. 2007) ("[A] plaintiff need not be in privity with the defendant to state a claim for unjust enrichment . . . .").

PwC Defendants addressed their audit opinions to Plaintiffs with the knowledge that Plaintiffs would rely on them. (CAC ¶ 107.) Furthermore, PwC Defendants knew that affiliate PwC entities in similar situations acknowledged that PwC had responsibilities "to provide assurances directly to shareholders," i.e. to the Plaintiffs. (*Id.* ¶ 108.) Courts have upheld unjust enrichment claims premised on significantly more attenuated relationships. *See Waldman*, 714 F. Supp. 2d 398 (holding that an "indirect Berry Green purchaser who is suing Berry Green's manufacturer . . . [could] maintain an unjust enrichment claim"); *Bildstein v. MasterCard Int'l, Inc.*, 03-CV-9826, 2005 WL 1324972, at *5 (S.D.N.Y. June 6, 2005) (holding that a debit card holder could maintain an unjust enrichment claim against the card network for fees paid through the issuing bank);[17] *Cox v. Microsoft Corp.*, 778 N.Y.S.2d 147, 149 (App. Div. 2004) (holding

_____

[17] *Bildstein* also dispenses with PwC Bermuda's argument that its contract with Kingate Funds bars a claim for unjust enrichment. *See* 2005 WL 1324972, at *5 (holding that a contract between a party and a third party did not preclude recovery for unjust enrichment).

that an indirect purchaser could premise an unjust enrichment claim on the manufacturer's

"deceptive practices [which] caused [plaintiffs] to pay artificially inflated prices").[18]

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the motions

to dismiss filed by the PwC Defendants, and by PwC U.S. in particular, or, in the alternative,

allow Plaintiffs to amend the CAC to cure any deficiencies in pleading.


Dated:  New York, New York
        November 4, 2010

                                        Respectfully submitted,


                                        By:_____/s/ David A. Barrett_____

                                        David Boies
                                        BOIES, SCHILLER & FLEXNER LLP
                                        333 Main Street
                                        Armonk, NY 10504
                                        Telephone: (914) 749-8200
                                        Facsimile: (914) 749-8300

                                        David A. Barrett
                                        Howard L. Vickery, II
                                        BOIES, SCHILLER & FLEXNER LLP
                                        575 Lexington Avenue
                                        New York, NY 10022
                                        Telephone: (212) 446-2300
                                        Facsimile: (212) 446-2350

                                        Stuart H. Singer
                                        Sashi Bach Boruchow
                                        BOIES, SCHILLER & FLEXNER LLP
                                        401 East Las Olas Boulevard, #1200
                                        Ft. Lauderdale, Florida 33301
                                        Telephone:  (954) 356-0011
                                        Facsimile:  (954) 356-0022

_____

[18] These cases also rebut PwC U.S.'s argument that Plaintiffs' unjust enrichment argument is barred by the fact that PwC Bermuda was the entity directly receiving the fees.  Plaintiffs allege sufficient facts, detailed above, to demonstrate that PwC was pooling its resources and acting in concert to audit multiple funds.

Joel H. Bernstein
Javier Bleichmar
Michael Woolley
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
Tel: 212-907-0700
Fax: 212-818-0477


Joel P. Laitman
COHEN MILSTEIN SELLERS
& TOLL PLLC
88 Pine Street
New York, New York 10005
Tel: (212) 838-7797
Fax: (212) 838-7745

Steven J. Toll
Daniel S. Sommers
Joshua Devore
S. Douglas Bunch
COHEN MILSTEIN SELLERS
& TOLL PLLC
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699