**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE KINGATE MANAGEMENT
LIMITED LITIGATION

Master File No. 09 Civ. 5386 (DAB)

This Document Relates To:  All Actions

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION OF
PRICEWATERHOUSECOOPERS BERMUDA TO DISMISS THE AMENDED
CONSOLIDATED CLASS ACTION COMPLAINT**

**BOIES, SCHILLER & FLEXNER LLP**
575 Lexington Avenue
New York, New York 10022
(212) 446-2300

**COHEN MILSTEIN SELLERS
& TOLL PLC**
88 Pine Street
New York, New York 10005
(212) 838-7797

**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
 (212) 907-0700

*Co-Lead Counsel for Plaintiffs and*
*Interim Co-Lead Counsel for the Putative Class*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ....................................................................................................2

ARGUMENT ............................................................................................................................5

    I.       Legal Standard for Deciding Motion to Dismiss ....................................................5

    II.      Plaintiffs Have Standing under BVI and New York Law.......................................5

    III.    The Case Should be Decided Under New York Law Because There Is No
           Substantive Conflict of Law Between New York and Bermuda Law on the
           Claims at Issue, and New York Has the Most Significant Interests in the
           Litigation..................................................................................................................8

           **A.**    The Court Can Apply New York Law Because There Is no
                   Substantial Divergence Between New York Law and the Law of
                   Bermuda or BVI on Negligence, Negligent Misrepresentation and
                   Aiding and Abetting Claims .........................................................................9

                  1.      Negligent Misrepresentation and Negligence.................................9

                  2.      Aiding and Abetting Breach of Fiduciary Duty and Fraud............10

    IV.    New York Has the Most Significant Interest in the Litigation .............................13

    V.      The CAC States Claims for Negligent Misrepresentation and Negligence
           against PwC Bermuda under New York Law and Bermuda Law ........................15

           **A.**    Plaintiffs' Claims for Negligent Misrepresentation and Negligence
                   Are Viable Under New York Law .............................................................15

                    1.      PwC Bermuda Knew that its Audits Were to Be Used for a
                          Particular Purpose .........................................................................16

                    2.      PwC Bermuda Intended for Known Parties to Rely on its
                          Audit Reports .................................................................................17

                        a.      Pwc Bermuda Knew The "End And Aim" Of The
                              Audit Reports Was To Assure Investors..............................17

                        b.      The Plaintiffs Were Parties Known to PwC Bermuda..........18

                    3.      The Requisite "Linking Conduct" Existed Between PwC
                          Bermuda and Plaintiffs. .................................................................20

**B.**    The CAC States a Claim for Negligent Misrepresentation under U.K., Bermuda and BVI Law ....................................................................22

VI.    Issues Common to Multiple Defendants...................................................24

CONCLUSION...........................................................................................................................25

# TABLE OF AUTHORITIES

## Cases

*Ades v. Deloitte & Touche*,
  Nos. 90-CV-4959, 90-CV-5056, 1993 WL 362364 (S.D.N.Y. Sept. 17, 1993) ...................... 3

*ADT Ltd v. BDO Binder Hamlyn,*
  [1996] BCC 808 ....................................................................................................... 23

*AlphaStar Ins. Group. Ltd.,*
  383 B.R. 231 (S.D.N.Y. Bankr. 2008) ...................................................................... 11

*Anwar v. Fairfield Greenwich Ltd.,*
  09 Civ. 0118, 2010 U.S. Dist. LEXIS 78425, 2010 WL 3022848 (S.D.N.Y. July 29,
  2010) .................................................................................................................. passim

*Anwar v. Fairfield Greenwich Ltd.,*
  2010 U.S. Dist. LEXIS 86716 (S.D.N.Y. Aug.18, 2010) ...................................... 8

*Barrett v. Freifeld,*
  883 N.Y.S. 2d 305 (N.Y.A.D. 2nd Dep't 2009) ...................................................... 18

*Benjamin v. KPMG Bermuda,*
  [2007] Bda L.R. 22 ................................................................................................ 10

*Candler v. Crane Christmas & Co.,*
  [1951] 2 KP 164 ..................................................................................................... 23

*Caparo Industries PLC v. Dickman,*
  [1990] 2 A.C. 605 ........................................................................................ 10, 22, 23

*Credit Alliance Corp. v. Arthur Andersen & Co.,*
  65 N.Y.2d 536 (1985) ..................................................................................... passim

*Cromer Fin. Ltd. v. Berger,*
  137 F. Supp. 2d 452 (S.D.N.Y. 2001) ............................................................ 15, 17

*Cromer Finance Ltd. v. Berger,*
  2003 U.S. Dist. LEXIS 10554 (S.D.N.Y. June 23, 2003) ......................... 10, 20, 23

*Dinerstein v. Anchin, Block & Anchin,*
  838 N.Y.S.2d 46 (N.Y.A.D. 1st Dep't 2007) ...................................................... 18

*Dorking Genetics v. United States,*
  76 F.3d 1261 (2d Cir. 1996) .................................................................................. 20

*Duke v. Touche Ross & Co.,*
  765 F. Supp. 69 (S.D.N.Y. 1991) .......................................................................... 19

*Hedley Byrne & Co v. Heller & Partners Ltd.*,
[1964] AC 465. ........................................................................... 23

*Johnson v. Gore Woods & Co.*,
[2002] 2 AC 1 .......................................................................... 6, 7

*Katz v. Image Innovations Holdings, Inc.*,
2008 WL 4840880 (S.D.N.Y. Nov. 5, 2008) ............................ 21

*Kirschner v. KPMG*,
2010 N.Y. LEXIS 2949 (N.Y. Oct. 21, 2010) ............................ 7

*Millennium Capital Mkts. LLC v. U.S. Nat'l Leasing Corp.*,
No. 97-CV-8397, 1999 WL 311923 (S.D.N.Y. May 18, 1999) ............... 3

*Morgan Crucible Co. plc v. Hill Samuel & Co. Ltd.*,
[1991] Ch 295 ............................................................................ 23

*Morrison v. National Australia Bank*,
130 S. Ct. 2869 (2010) ............................................................... 1

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC*,
446 F. Supp. 2d 163 (S.D.N.Y. 2006) ....................................... 13

*Residential Mortg. Servs. of Tex. v.Casuccio*,
350 F. Supp. 2d 352 (E.D.N.Y. 2003) ...................................... 15

*Royal Brunei Airlines v. Tan*
[1995] 2 AC 378 ......................................................................... 11

*SIPC v. BDO Seidman, LLP*,
222 F.3d 63 (2d Cir. 2000)......................................................... 19

*Ultramares Corporation v. George A. Touche*,
255 N.Y. 170 (1931) ........................................................... 10, 19

*Westpac Banking v. Deschamps*,
494 N.Y.S. 2d 848 (1985) ........................................................ 19

*White v. Guarente*,
43 N.Y.2d 356 (N.Y. 1977) ...................................................... 19

## **Rules**

Fed. R. Civ. P. 9(b) .................................................................... 16

Plaintiffs respectfully submit this Memorandum of Law in opposition to the motion of PricewaterhouseCoopers, Chartered Accountants, ("PwC Bermuda") to dismiss the claims asserted against it in the Amended Consolidated Class Action Complaint filed May 18, 2010 (the "CAC").[1]

## PRELIMINARY STATEMENT

PwC Bermuda and PricewaterhouseCoopers LLP ("PwC U.S."), collectively the "PwC Defendants," knew that as the "independent auditor" of the Kingate Funds, ("the Funds"), the Funds' investors would rely on them to ensure that the Funds' audited financial statements accurately portrayed the Funds' assets.[2]  In particular, the PwC Defendants knew that Kingate investors would rely upon their audits in making decisions to invest or remain invested in the Funds. Accordingly, the PwC Defendants authorized the use of their name and their reports in the Information Memoranda ("IMs") distributed to investors.  They also addressed the audit reports directly to the shareholders of the Funds.

In fact, the PwC Defendants knew that the primary purpose of their audits was to provide investors in the Funds with assurances that the Funds' assets were legitimately invested and accurately valued.  In order to provide these assurances, the PwC Defendants were required to insist on proper proof that the transactions reflected on the books and records of the Funds were real. Most important, the PwC Defendants were required to verify on the basis of reliable audit evidence that the Funds' assets existed and were properly valued.  The PwC Defendants' complaint that they

---

[1] Plaintiffs have voluntarily dismissed the federal securities law claims against PwC Defendants (count 31) pursuant to the Supreme Court's decision in *Morrison v. National Australia Bank,* 130 S. Ct. 2869 (2010).  Plaintiffs also have decided to dismiss without prejudice count 18 (third party beneficiary breach of contract), but reserve the right to amend the CAC should additional facts emerge that would support this claim.  Plaintiffs' remaining claims against PwC Defendants are for gross negligence (count 15), negligence (count 16), negligent misrepresentation (count 17), aiding and abetting breach of fiduciary duty (count 19), aiding and abetting fraud (count 20) and unjust enrichment (count 28).

[2] The term "independent auditor" is taken from the title of the audit reports directed to the shareholders of the Funds. See, e.g., CAC, Ex. 8.

were only auditing the Funds and were not the auditor of Bernard L. Madoff Investment Securities ("BMIS") or Madoff simply misses the point: their audits *of the Funds* obligated them under GAAP and GAAS to scrutinize Madoff's operation and purported trading on behalf of the Kingate Funds, particularly given the nature of the Funds and their relationship to Madoff, who occupied the critical roles of investment advisor, custodian, and broker-dealer.

The PwC Defendants' failure to conduct proper audits of the Funds was all the more egregious because they touted their expertise in auditing hedge funds and alternative investments. Rather than conduct a thorough audit as required by GAAS and GAAP (and in accordance with their own represented audit standards), the PwC Defendants' audits amounted to no audits at all— they failed to even confirm that the assets represented on the Funds' financial statements even existed. These misrepresentations embedded in the PwC Defendants' audit reports lulled investors into purchasing and retaining investments in the Funds. And when the risks concealed by the audit reports came to light, the plaintiffs' investments in the Funds were wiped out. In short, the PwC Defendants' clean audit opinions—their seal of approval—allowed the Kingate Fraud Claim Defendants to carry on their business of selling the Funds to the unwary, with no regard for the truth or for those investing in the Funds.

## STATEMENT OF FACTS

The PwC Defendants[3] were the first and only auditors of the Kingate Global and Euro Funds from their inception in 1995 and 2000 respectively (CAC ¶¶106, 48-49). During this period, the PwC Defendants had full access to the books and records of the Funds. PwC U.S., like PwC Bermuda, is a member of the global PricewaterhouseCoopers accounting firm. PwC U.S. collaborated with PwC Bermuda in the preparation of the Funds' audits.

---

[3] PwC Bermuda is the successor to Coopers & Lybrand Bermuda.

As part of their audit work, representatives of PwC U.S. and PwC Bermuda jointly interviewed Madoff on two occasions, although the questioning was perfunctory and the PwC Defendants did nothing more than observe and make inquiries with "limited examination of documentary evidence."  *See Letter dated November 7, 2002 to Kingate Management Limited*, appended to the Vickery Declaration dated November 4, 2010 as ex. 1 at 5;[4] CAC ¶¶160-167 (reports of these visits are appended to the CAC as Ex. 12-13).  The PwC Defendants were aware of their "responsibility" to conduct audit procedures upon the Funds' advisor and broker/dealer in order "to meet [their] responsibilities where significant use is made of 'service organizations,'" but failed to do so.[5]  Vickery Dec., ex. 1 at 2.  PwC Bermuda coordinated the PricewaterhouseCoopers members firms' audits of the Madoff feeder funds and the periodic visits to Madoff's office on a global basis although PwC U.S. served as the go-between to Madoff.  *Id.* at 160.  PwC Bermuda brought in so-called "experts" from PwC U.S.'s capital market division, who had previously visited BMIS, to jointly meet with Madoff.  *Id.* at 2.

For good reason, the PwC Defendants do not dispute for purposes of their motions to dismiss that the CAC adequately alleges that they were negligent in auditing the Funds.  The CAC exhaustively catalogs the shortcomings of the PwC Defendants' audits, which were so deficient that

---

[4] Plaintiffs only gained access to the documents attached to the Vickery Declaration recently through ongoing investigation.  While Plaintiffs believe that the CAC is sufficient on its own, these documents further support the allegations already contained in the CAC, (*e.g.,* CAC ¶ 106), and are related to the financial statements that Plaintiffs attached to the CAC.  Courts in the Southern District of New York have properly considered exhibits submitted *by plaintiffs* in opposition to a motion to dismiss without converting the motion into one for summary judgment because when documents within the defendants' control are submitted in good faith by a plaintiff to support legal claims clearly alleged in the complaint, there is no danger of inequitable prejudice.  *See Millennium Capital Mkts. LLC v. U.S. Nat'l Leasing Corp.*, No. 97-CV-8397, 1999 WL 311923, at *4 n.4  (S.D.N.Y. May 18, 1999) ("The Court may consider exhibits submitted in opposition to a motion to dismiss without converting the motion into one for summary judgment."); *Ades v. Deloitte & Touche*, Nos. 90-CV-4959, 90-CV-5056, 1993 WL 362364, at *7-8 (S.D.N.Y. Sept. 17, 1993) (considering documents submitted in opposition to a motion to dismiss).   However, to the extent that the Court is unwilling to consider these documents and determines that the current allegations are insufficient, Plaintiffs seek leave to amend the CAC.

[5] In addition to PwC's obligations under GAAS to conduct audit procedures at BMIS to confirm the existence of securities and the occurrence of transactions (CAC ¶¶ 128-129), PwC was obligated to perform additional procedures at BMIS because it was a "service organization," including assessing the internal controls at BMIS in order to determine the risk of material misstatement. *Id.* ¶¶130-31.

they failed to verify whether the Funds' represented assets *even existed* (CAC ¶¶113-184).   In

addition to failing to conduct proper audit procedures, the PwC Defendants willfully chose to ignore

a sea of red flags (discussed in Plaintiffs' Consolidated Memorandum of Law in Opposition to the

Motions of the Kingate Defendants to Dismiss the Amended Consolidated Class Action Complaint

(the "Consol. Mem." at 67)) that put them on notice that the Funds' financial statements were

materially false because Madoff's operation was a Ponzi scheme.

The CAC alleges that the plaintiffs invested in the Funds in reliance on the audited financial

statements prepared by the PwC Defendants supposedly in accordance with U.S. GAAP. (CAC ¶¶

107-108, 111, 327-328, 334-336).  The PwC Defendants addressed their clean audit opinions to the

shareholders of the Kingate Funds (*Id.* ¶107, Exs. 8-10).  The PwC Defendants thus were aware and

intended that investors and existing shareholders of the Funds would rely on its audited financial

statements (*Id.* ¶¶ 107-108).  The PwC Defendants further authorized the use of

PricewaterhouseCoopers' name and reports in the Information Memoranda ("IMs") used by the

Funds to solicit subscriptions, knowing that the purpose of the repeated references to the PwC

Defendants' name was to lend legitimacy to the Funds for marketing purposes (*Id.*, ¶111, Ex. 1 at

32 "Auditor's Consent").   Moreover, the PwC Defendants were fully cognizant that potential and

existing shareholders had no independent means to verify the accuracy of the representations in the

financial statements concerning the existence and value of the Funds' assets (CAC ¶ 112).  Finally,

the PwC Defendants knew that the Funds were not operating companies, but rather vehicles to

aggregate investments and transfer them to Madoff, making it all the more critical that those

investments be properly audited.  (*Id.*).

As the PwC Defendants knew, Kingate Management Limited ("KML") as manager of the

Kingate Euro Fund and KML and Tremont (Bermuda) as co-managers of the Kingate Global Fund,

were contractually obligated to "deliver, or arrange for delivery by any authorized dealer selected

by the Manager, to each person to whom Shares are offered a copy of the Funds' most recent published Information Memorandum and a copy of the Funds' most recently published annual report [audited financial statement]."  (CAC, Ex. 7 at § 4.4(a); Vigna Dec. in Support of the Tremont Motion to Dismiss (Ex. A)).  The PwC Defendants expressly consented to the use of the PricewaterhouseCoopers name and its report in the Information Memoranda (Kingate Global Fund IM dated October 6, 2008 at 32 of the IM, CAC, Ex. 1; Kingate Euro Fund IM dated October 6, 2008 at  33 of the IM, CAC, Ex. 2).  In subscribing to the Funds, investors acknowledged that they had relied on the IMs and audited reports (Kingate Global Fund Subscription Agreement, S-8; CAC, Ex. 1, Kingate Euro Fund Subscription Agreement, Exh. 2 at S-8).

**ARGUMENT**

**I.  Legal Standard for Deciding Motion to Dismiss**

The legal standard governing PwC Bermuda's motion to dismiss is set forth in the Consol. Mem. (at § I), to which the Court is respectfully referred.

**II.  Plaintiffs Have Standing under BVI and New York Law**

PwC Bermuda and PwC U.S. base their standing argument entirely on BVI law.  If the Court decides that standing should be governed by New York law because New York has the greatest interest in the issues in this case, the PwC Defendants will have conceded standing.   Nevertheless, for the reasons set forth in § III (B) of the Consol. Mem., plaintiffs have standing under New York law to assert claims against the PwC Defendants.

The plaintiffs also have standing under BVI law as explained in the Consol. Mem. at § III (C).  Plaintiffs arguments under BVI law are supported by the expert declaration of Anthony George Bompas, Q.C., dated November 4, 2010 on U.K., BVI., and Bermuda law (the "Bompas Dec.").

The principles of *Johnson v. Gore Woods & Co.*, [2002] 2 AC 1 and the applicable exceptions to the reflective loss rule are discussed in detail in the Consol. Mem. at § III (C).  This section will focus narrowly and in an abbreviated fashion on the plaintiffs' standing to assert the claims in the CAC against PwC Bermuda without reprising the principles and the general exceptions to the reflective loss rule found in the Consol. Mem.  Significantly, the plaintiffs are seeking to pursue personal claims against the PwC Defendants and do not make any claims for wrongs suffered by the Funds themselves as entities distinct from the plaintiffs (Bompas Dec. at ¶12).

In counts 16 and 17 of the CAC, plaintiffs claim that they were induced to purchase or retain shares in the Kingate Funds based on the PwC Defendants' negligence and negligent misrepresentations in the audited financial reports of the Funds.   The losses inflicted on the shareholders are not a reflection of the Funds' losses.  (Bompas Dec. ¶ 53.1-53.2; 29).   Mr. Chivers, the foreign law expert for defendants KML and FIM, agreed in his affidavit that negligent misrepresentation claims would not be barred by the reflective loss principle (*Id.* ¶29).  In Mr. Chivers words:

> The allegations of Counts 3 and 4 are that certain defendants made misrepresentations to the Plaintiffs and the Class which induced them to buy or hold shares in the Funds. The reflective loss principle cannot in my opinion be said to render these claims unsustainable because it is not clear whether, or to what extent, the Funds would themselves have any claim against the Defendants arising out of the alleged facts.

(Chivers Aff. at ¶34, 126).

The Funds, of course, have no claim that they were induced to purchase or retain their own shares.  Moreover, the Funds themselves were responsible for failing to oversee the investments and for the misrepresentations in the IMs and audited financial reports. The Funds have no realistic hope of recovery against the PwC Defendants because the Funds produced the financial statements that were then certified by the PwC Defendants.  The Funds were fully aware of their own financial

condition and could not have relied on the false statements in the PwC Defendants' audited financial statements.  Thus, the Funds have no claims against the PwC Defendants.  Under the second of Lord Bingham's propositions in *Johnson v. Gore Wood & Co.* – a shareholder is not barred from bringing a claim where the company has no cause of action even if the shareholder's claim is a diminution in the value of his shareholding.  (Bompas Dec. at ¶¶25-33).

The negligence claims against the PwC Defendants, likewise, are not impacted by the reflective loss rule because the CAC alleges the existence of a special relationship between the plaintiffs and the PwC Defendants.  (Bompas Dec. ¶ 120.1).  Among other things, the special relationship is demonstrated by the fact that the audit reports were addressed directly to the shareholders and there was no statutory requirement that the Funds be audited.  For standing purposes, the gross negligence claims would be on an equal footing.

The reflective loss principle, likewise, would not deprive the plaintiffs of standing to assert claims for aiding and abetting breach of fiduciary duty and breach of trust (counts 19 and 20) because the CAC alleges that the PwC Defendants made themselves liable as joint tortfeasors with the Kingate Defendants for fraudulent misrepresentation (count 20) (Bompas Dec.¶¶ 53.2, 74, 104).  Similarly, the claims against the PwC Defendants alleging aiding and abetting breach of fiduciary duty (count 19) relate to the PwC's dishonest assistance to the Kingate Defendants in breaching their fiduciary duties owed directly to the plaintiffs in connection with the purchase and retention of shares.  (*Id.* ¶53.3).  Again, the plaintiffs, not the Funds, suffered the loss.

As discussed in the Consol. Mem. at III(C)(3)(a), the Joint Liquidators are likely to find themselves stymied in bringing suits against third parties by defenses of *in pari delico* and *ex turpi causa non oritur action.*  *Kirschner v. KPMG*, 2010 N.Y. LEXIS 2949 (N.Y. Oct. 21, 2010) (affirming narrow scope of exemptions to *in pari delicto* defense in action brought by litigation trust against accountants).  The Funds made misrepresentations to the PwC Defendants concerning their

knowledge of Madoff's activities on behalf of the Funds as investment adviser.  Indeed, the CAC

alleges that the sponsors, directors, and the Funds themselves were complicit in the Madoff fraud.

In addition, the Joint Liquidators may be barred by contractual limitations on liability and

disclaimers in the engagement letters with PwC Bermuda and other potential defendants (e.g.

provisions purporting to exempt PwC Bermuda from liability for ordinary negligence or

requirements that the Funds indemnity and hold PwC Bermuda harmless for all liabilities relating to

the audit reports except those involving gross negligence or fraud).[6]

In addition, as explained in the Consol. Mem. at III(C)(3)(b), a BVI court would not "strike

out" plaintiffs' claims against the PwC Defendants because of the asymmetry between the Funds'

damages and the plaintiffs' damages.    The Funds' claims are at best a composite of the gains some

investors received and the losses of other investors, and thus, by definition less than the cumulative

losses of investors who lost money.  No matter how successful the Joint Liquidators are in their

lawsuits, they cannot make the investors whole.  Moreover, some shareholders suffered

disproportionate losses in comparison with other more fortunate investors who had withdrawn

fictitious profits, but retained their shares in the Funds.  *Anwar v. Fairfield Greenwich Ltd.,* 2010

U.S. Dist. LEXIS 86716 (S.D.N.Y. Aug.18, 2010) ("*Anwar II*") at *61-62.  In addition, the BMIS

Trustee has asserted claw-back claims against the Funds in the hundreds of millions of dollars.  Any

recoveries made by the Funds may be seized by the BMIS estate.

**III.    The Case Should be Decided Under New York Law Because There Is No Substantive
Conflict of Law Between New York and Bermuda Law on the Claims at Issue, and
New York Has the Most Significant Interests in the Litigation**

PwC Bermuda contends that the Court should decide whether the claims made in the CAC

state a claim in accordance with the substantive law of Bermuda because Bermuda purportedly has

---

[6] PwC Bermuda did not see fit to attach copies of its engagement letters to its motion to dismiss and should not be
permitted to do so in its reply papers.

the most significant relationship with the claims asserted in the CAC. The Court, however, need not

concern itself with Bermuda or BVI law for the most part because PwC has not carried its burden of

showing that there is a genuine conflict between BVI or Bermuda law, on the one hand, and New

York law, on the other, with respect to the claims against the PwC Defendants for negligent

misrepresentation, negligence, aiding and abetting fraud, and aiding and abetting breach of fiduciary

duty.[7]

**A.** **The Court Can Apply New York Law Because There Is no Substantial Divergence Between New York Law and the Law of Bermuda or BVI on Negligence, Negligent Misrepresentation and Aiding and Abetting Claims**

A federal court in a diversity case applies the conflicts of law principles of the forum state.

*GlobalNet Fin. Com., Inc. Frank Crystal & Co.*, 449 F.3d 377, 382 (2d Cir. 2006). A conflicts

analysis, however, is unnecessary if there is no substantive conflict between New York law and the

law of the foreign jurisdiction in question. *Id.* at 382. In the absence of a substantive conflict, the

court may apply New York law. As explained in the Consol. Mem., there is no difference between

New York law and the law of BVI and Bermuda with respect to most of the claims asserted against

PwC Bermuda for negligent misrepresentation, negligence, aiding and abetting fraud, and aiding

and abetting breach of fiduciary duty.

**1.** **Negligent Misrepresentation and Negligence**

Narinder K. Hargun, the expert witness on Bermuda law for KML and Tremont was cited by

the Supreme Court of Bermuda as representing that U.K. and Bermuda law on professional liability

---

[7] Plaintiffs' claims against the PwC Defendants for gross negligence and unjust enrichment are discussed in plaintiffs' Memorandum of Law in Opposition to the Motion of PricewaterhouseCoopers LLP to Dismiss the Amended Consolidated Class Action Complaint (the "PwC U.S. brief"). If the court decides that Bermuda law is the applicable law, then the claims against the PwC Defendants would survive a "motion to strike" under U.K. or Bermuda law to the extent that plaintiffs were required to plead an elevated standard of negligence in order to overcome any defenses based on contractual limitations. (Bompas Dec. ¶¶ 121-126). The gross negligence claims would also state a claim under New York law (PwC U.S. brief at § III). Conversely, if the Court decides that the motions should be decided under New York law, the unjust enrichment claims that would be borderline under Bermuda law would be viable (*see* discussion of unjust enrichment in the PwC U.S. brief at § IV, which is incorporated by reference herein).

was derived from New York law:  "The Defendant's Counsel [Mr. Hargun] submitted that the modern law on tortious liability for negligent statements was derived from the famous judgment of Chief Judge Cardoza (sic) in the New York Court of Appeals decision in *Ultramares Corporation v. George A. Touche* (1931) 255 N.Y. 170."  *Benjamin v. KPMG Bermuda,* [2007] Bda L.R. 22 at ¶16, Vickery Dec., Ex. 2.  Similarly, Lord Oliver in *Caparo Industries PLC v. Dickman,* [1990] 2 A.C. 605, 638, observed that the principles applied for determining the necessary relationship of proximity for purposes of a claim for negligent misrepresentation under U.K. law under are "in accord with the two United States authorities [*Glanzer v. Shepard* and *Ultramares Corporation v. Touche*] which were referred to in the course of the speeches in the *Hedley Byrne* decision."

Judge Cote in *Cromer Finance Ltd. v. Berger*, 2003 U.S. Dist. LEXIS 10554 (S.D.N.Y. June 23, 2003) *35-36 concluded that *Caparo,* a leading U.K. case on accountant liability, was consistent with New York principles of accountant liability for negligent misrepresentation:

> It is not, in any event, clear even now (and even without the benefit of any foreign law affidavits that the plaintiffs wish to present if their motion to strike is not granted) that there is any difference between New York and Bermuda negligence law. DTB admits that English cases since the seminal House of Lords decision on which it relies, *Caparo Industries PLC v. Dickman,* [1990] 2 A.C. 605, have held that "an auditor may be liable to an investor under circumstances evidencing an 'assumption of responsibility' which is *similar* to the New York law requirement that an accountant must intend plaintiff's reliance for a particular purpose as 'a primary, if not the end and aim of auditing' its client." (Emphasis supplied.)

## 2.  Aiding and Abetting Breach of Fiduciary Duty and Fraud

Defendants disingenuously claim that Bermuda and BVI do not recognize a cause of action for "aiding and abetting" breach of fiduciary duty and fraud.  Bermuda and BVI, however, do recognize an analogous cause of action for "knowing assistance in a breach of trust."  (Bompas Dec. ¶ 163).  The elements of this claim are: (i) the existence of a trust or fiduciary obligation, (ii) breach of trust or fiduciary obligation by the trustee, (iii) that the relevant defendant assists in or induces

that breach of trust, and (iv) the relevant defendant acts dishonestly in doing so." (*Id.* ¶ 163, citing *Royal Brunei Airlines v. Tan* [1995] 2 AC 378). Dishonesty for these purposes is judged by an objective standard. A person is dishonest if he fails to attain the standard which would be observed by an honest person placed in those circumstances. The tort of knowing assistance in a breach of trust is the functional equivalent of the New York cause of action for aiding and abetting a breach of fiduciary duty. Bompas Dec. at ¶¶ 160-169; *In re AlphaStar Ins. Group. Ltd.*, 383 B.R. 231, 274 (S.D.N.Y. Bankr. 2008) ("[B]ermuda law recognizes a claim for 'dishonest assistance,' similar to the aiding and abetting claim under New York law. To establish liability, the plaintiff must show that the third party dishonestly procured or assisted a breach of trust or fiduciary obligation.").

The CAC alleges that the Kingate Defendants occupied a superior position over plaintiffs with respect to the management and control over the assets of the Funds and had superior access to confidential information about the investment of assets and superior access to Madoff. (CAC ¶343). The PwC Defendants were aware of the fiduciary duties owed by the Kingate Defendants to plaintiffs. (*Id.* ¶ 343). The PwC Defendants knew that the plaintiffs reasonably and foreseeably relied on the Kingate Defendants' misrepresentations to invest and remain invested in the Funds. (*Id.* ¶ 344). Despite knowledge that the Kingate Defendants' representations could not be relied upon, the PwC Defendants substantially assisted the Kingate Defendants by issuing unqualified audit reports and failing to conduct proper independent audits of the Funds. (*Id.* ¶345). Even the deficient audits performed by the PwC Defendants would have given them actual knowledge, or gave them knowledge which they willfully ignored, that the Kingate Defendants had performed no meaningful due diligence on BMIS, that they did not test the validity of Madoff's performance or strategy, and that they had no process in place to verify the existence of assets or the occurrence of transactions purportedly made by BMIS. (*Id.* ¶¶ 179, 183). The PwC Defendants had actual knowledge of, or were willfully blind to, the Kingate Defendants' breaches of fiduciary duty and

11

fraud.  (*Id.* ¶ 184).  Nevertheless, the PwC Defendants provided substantial assistance to the Kingate

Defendants' breaches of fiduciary duty to the investors by providing clean audit opinions that

enabled the Kingate Defendants to market the Funds' shares to unsuspecting investors.  (*Id.* ¶ 184).

These ingredients of a claim for aiding and abetting a breach of fiduciary duty also

constitute the tort of knowing assistance to a breach of trust under BVI law.  (Bompas Dec. ¶ 169).

Consequently, the Court does not have to engage in an elaborate choice of law analysis.   It makes

no difference whether the claim is decided under BVI law or New York law.   The same claims

support valid allegations under the law of both jurisdictions.

Similarly, the PwC Defendants can be held liable under the Bermuda law as joint tortfeasors

for facilitating the commission of a tort when their assistance is given in pursuance and furtherance

of a common design.  The CAC alleges that the Kingate Fraud Claims Defendants made

misrepresentations to plaintiffs to persuade them to purchase shares in the Funds.  (CAC ¶¶ 85, 242-

244).  The plaintiffs justifiably relied on the misrepresentations made by the Kingate Fraud Claims

Defendants by investing their assets in the Funds.  (*Id.* ¶ 245).  The PwC Defendants knowingly

assisted the Kingate Fraud Claim Defendants to commit fraud by providing deficient audit reports

which were essential to the common goal of drawing investors into the Funds.  (CAC ¶ 349).  Even

the deficient audit work that the PwC Defendants did was enough to give them actual knowledge, or

sufficient information that the PwC Defendants had to willfully ignore to avoid knowing, that the

Kingate Fraud Claim Defendants were not monitoring Madoff, yet were falsely representing to

investors that they were.  (*Id.* ¶¶ 179, 183).  The PwC Defendants knew enough to know that the

representations made by management in the financial statements could not be relied upon.  (*Id.* ¶

349).

Mr. Bompas concluded that these allegations would be a sufficient description of the

elements required for the PwC Defendants to be found liable as joint tortfeasors with the Kingate

Fraud Claims Defendants.  (Bompas ¶147).  The PwC Defendants provided the audited financial statements in furtherance of a common design to attract investors willing to pour money  into the Funds.  Again, for the reasons set forth with respect to aiding and abetting breach of fiduciary duty, a laborious conflicts of law analysis can be avoided because the CAC states a claim against the PwC defendants whether the claims are considered as aiding and abetting fraud under New York law or treated as assistance in furtherance of a common design under BVI law.

## IV.     New York Has the Most Significant Interest in the Litigation

Even if it conflicts with the law of Bermuda and BVI on some issues, the Court should still apply New York law because New York is the jurisdiction with the most significant interest or relationship to the litigation.  (*See* more detailed discussion at § II of the Consol. Mem. which is incorporated herein by reference).   The New York courts apply an "interests analysis" to determine which law should govern tort claims.   Under that analysis, the court applies the law of the jurisdiction which has the most significant interest in or relationship to the litigation.  *Anwar II,* 2010 U.S. Dist. LEXIS 86716, at *53.  The most significant contacts are generally the parties' domiciles and the locus of the tort.   Where, as here, the issue is conduct-regulation, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders.   In the case of  negligent misrepresentation, the locus of the fraud generally is the place where the injury was inflicted, which, in turn, is determined by where the plaintiff is located.   Where, as here, there are multiple plaintiffs located in diverse jurisdictions, the Court may choose the law of one jurisdiction to determine all tort claims.  *Id.* at *54; *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC*, 446 F. Supp. 2d 163, 193-94 (S.D.N.Y. 2006).

PwC Bermuda's principal argument why Bermuda law should apply is that it is located in Bermuda.   The Funds, however, are BVI Funds.   More importantly, the Funds' assets were in New

York in Madoff's custody.  Thus, the focus of PwC Bermuda's audit procedures should have been

concentrated in New York to verify that the assets existed, that the transactions conducted on behalf

of the Funds were real, and that the net asset value of the Funds was properly calculated.

Furthermore, PwC's audit reports were distributed to investors dispersed in multiple jurisdictions.

The damages resulting from PwC's misrepresentations were suffered outside of Bermuda.  As

explained in the Consol. Mem. New York has the strongest interest of all the jurisdictions in the

claims arising out of the Ponzi scheme conducted by the Funds' Investment Adviser in New York.

Recently, in a parallel class action involving similar claims against domestic and offshore

feeder funds involved in the Madoff fraud, Judge Marrero in *Anwar II*, U.S. Dist. LEXIS 86716, at

*53-54 applied New York law to decide motions to dismiss brought by PwC Canada and PwC

Netherlands, the auditors for the Fairfield Greenwich feeder funds.  The court found that a

substantial part of the events and actions of the defendants that gave rise to the plaintiffs' claims

occurred within New York.  *Id*. at *53-54.  The core facts of the complaint – Madoff's fraud and

allegations of reckless ignorance of this fraud or other breaches of duty – centered on conduct that

occurred in New York.  *Id*. at *54.  The court also emphasized that the victims of the fraud were

dispersed throughout the world and their injuries were sustained in various locations with only

limited connection to the conduct at issue.  *Id*.  Because activities in New York and the parties'

contacts with that forum bore the closest relation to the claims at issue, Judge Marrero held that

New York law should apply. *Id*.  The same reasoning leads to the conclusion that New York law

should apply to govern the claims in this case.

Similarly, *Cromer Finance* demonstrates the weakness of Defendants' choice of law

argument.  In that case, an accounting firm based in Bermuda argued "that Bermuda law should

govern because the . . . plaintiffs as well as [the accounting firm] are domiciled outside the United

States and the locus of [the accounting firm's] alleged torts [was] Bermuda."  *Cromer Fin. Ltd. v.*

*Berger*, 137 F. Supp. 2d 452, 492 (S.D.N.Y. 2001).  Judge Cote, however, held that because the

"audit reports were based on financial information emanating from New York and were

disseminated to [f]und shareholders in many countries," New York law applied.  *Id.* at 492-93.  In

so holding, Judge Cote noted that "New York [] has a strong interest in regulating the conduct of an

entity which relies in its marketing and in the performance of its work on the implicit representation

that it has conformed its conduct to the standards set in New York."  *Id.* at 493; *see also Pension

Comm.*, 446 F. Supp. 2d at 194-95 (holding that where the tort was based on "[d]efendants' failure

to independently verify false information issued to them from [fund managers] in New York," New

York law applied despite the defendants' incorporation outside the United States); *HAS Residential

Mortg. Servs. of Tex. v. Casuccio*, 350 F. Supp. 2d 352, 365 (E.D.N.Y. 2003) (applying New York

law to accounting firms when the firm being audited was in Texas and heavily relying, in its

reasoning, on the fact that the audit work was performed in New York and New York's

corresponding interest in regulating that conduct).

**V.**     **The CAC States Claims for Negligent Misrepresentation and Negligence against PwC
          Bermuda under New York Law and Bermuda Law**

The CAC states a claim for negligent misrepresentation and negligence under both Bermuda

and New York law.

**A.**     **Plaintiffs' Claims for Negligent Misrepresentation and Negligence Are Viable
          Under New York Law**

To state a claim for negligence or negligent misrepresentation against an accounting firm

under New York law, the plaintiffs must allege that: (1) the accountants must have been aware that

the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of

which a known party or parties were intended to reply; and (3) there must have been some conduct

on the part of the accountants linking them to that party or parties, which evidences the accountants'

understanding of that party or parties' reliance.  *Credit Alliance Corp. v. Arthur Andersen & Co.,* 65

N.Y.2d 536, 551 (1985); *Anwar II*, 2010 U.S. Dist. LEXIS 86716 *221-229.[8]

### 1.    PwC Bermuda Knew that its Audits Were to Be Used for a Particular Purpose

PwC Bermuda was fully aware that its audit statements were crucial to the success of the

Funds and that the primary purpose of the audits was to convince investors that the Funds were

reputable and trustworthy.  The CAC alleges that PwC Bermuda knew that its name was used by the

Funds in marketing so as to give the Funds legitimacy and, therefore, to draw investors to the

Funds; it further knew that the audit letters would be provided or made available to potential

investors and to existing investors.  (CAC ¶¶107, 111).  Moreover, the PwC defendants "knew that

the primary purpose of the audits was to provide investors in the Funds with assurances that the

Funds' assets were legitimately invested and accurately valued." (*Id.* ¶112).  Last, but not least, the

CAC alleges that the PwC Bermuda knew that plaintiffs and the class would rely on its audit

opinions in determining whether to invest and to maintain their investments in the Funds.  (CAC

¶¶107, 108, 178).

In *Anwar II*, Judge Marrero found that allegations that the PwC Member Firms "knew that

Plaintiffs would use and rely upon [their] representations for the particular purpose of determining

whether to hold their assets in the Funds and whether to purchase additional interests in the Funds"

was sufficient to support a plausible inference that the financial reports produced by the Funds were

to be used for the particular purpose of investors evaluating investments in the Funds.  *Anwar II*,

2010 U.S. Dist. LEXIS 86716, at *221.

---

[8]  The Second Circuit has yet to decide whether common law claims for negligent misrepresentation are subject to the heightened pleading standards of Fed. R. Civ. P. 9(b) or the notice pleadings requirements of Fed. R. Civ. P. 8(a). *Anwar II*, at *156 n.19.  The allegations in the CAC meet either standard.

### 2.   PwC Bermuda Intended for Known Parties to Rely on its Audit Reports

#### a.   Pwc Bermuda Knew The "End And Aim" Of The Audit Reports Was To Assure Investors.

PwC Bermuda consented to the use of its name and reports in the IMs used to market the Funds.  (CAC Ex. 3 Kingate Global IM dated August 1, 2007 at 33; CAC Ex. 2 Kingate Euro IM dated Oct. 6, 2008 at 33).   PwC Bermuda was also aware that KML and Tremont were contractually obligated to provide copies of the IMs and the Funds' most recent audited financial statements to all prospective and existing investors.  (CAC Ex. 7, Management Agreement between the Global Fund and KML dated as of January 1, 2006 at ¶4.4(a)).  The Subscription Agreements appended to the Information Memoranda contemplate that the investors would subscribe based on the information memoranda or "published financial accounts" of the Funds.  (Global Fund Subscription Agreement, CAC, Ex. 3, S-8).

New York courts have long recognized that facts such as those pled here establish "near privity" with an auditor.  As noted in *Credit Alliance*, in 1922 the court in *Glanzer*, recognizing that "[t]here is nothing new here in principle," held public weighers liable to the buyer of beans, despite the lack of contractual privity, because the buyer's "use of the [weight] certificates was not an indirect or collateral consequence of the action of the weighers.  It was a consequence which, to the weighers' knowledge, *was the end and aim of the transaction*."  233 N.Y. at 238-39 (emphasis supplied).  One need not go beyond PwC's own documents to establish that the "end and aim" of the audits addressed to plaintiffs was to "assure" them about the soundness of the Funds' financial statements.  (CAC ¶¶ 107-08).

In *Cromer Fin. Ltd. v. Berger,* 2003 WL 21436164, at *12, the court sustained the right of an investor in a fund to sue the fund's auditors for negligent misrepresentation.  The court denied the auditors' summary judgment motion, noting that the auditors addressed the audit reports to the funds' shareholders and holding that the *Credit Alliance* criteria were met because, "[b]ased on the

accountant's knowledge, the consequence [of plaintiffs' reliance on the audit] must have been the 'end and aim of the transaction.'"  *Id.  See also Dinerstein v. Anchin, Block & Anchin*, 838 N.Y.S.2d 46 (N.Y.A.D. 1st Dep't 2007) (in a claim by shareholder, court denied auditor's motion for summary judgment in part because the "audit reports…were addressed to 'the Stockholders and Directors of [the company]'"); *Barrett v. Freifeld*, 883 N.Y.S. 2d 305 (N.Y.A.D. 2nd Dep't 2009) (court allowed negligence claims to proceed because sufficient facts alleged "to suggest" that the accountants "were aware" that seller would use financial statements in connection with sale of a business); *Anwar II*, 2010 U.S. Dist LEXIS 86716, at *232  (the fact that the PwC Member Firms addressed audit reports to shareholders and limited partners of the Funds allowed a reasonable inference to be drawn that PwC intended for investors in the Fairfield Greenwich feeder funds to rely on their financial reports).

### b.  The Plaintiffs Were Parties Known to PwC Bermuda

The requirement that the relationship between plaintiffs and PwC approach privity is satisfied by the allegations that PwC was aware that its audited financial reports would be distributed to a limited set of investors. [9]  *Anwar II,* 2010 U.S. Dist. LEXIS 86716 at 223 (the "known party" prong does not require that an auditor know a particular third party by name or issue specific reports to particular plaintiffs).

The CAC specifically alleges that PwC Bermuda directed its various audit reports to the Funds' shareholders.  (CAC ¶107).  The "known parties" prong of the *Credit Alliance* test does not require an auditor know a "particular" near-privity party by name.  Rather it recognizes that while

---

9  The universe of potential investors and actual shareholders in the Funds was limited.  The Funds are International Business Companies organized under BVI law with a limited number of and shareholders.  (CAC ¶¶ 48-49.) Participation in the Funds was restricted to "professional investors" with a minimum net worth of at least $1 million for individual and $5 million for institutions (Global Fund 2007 Subscription Agreement, CAC, Ex. 3 at S-8).  The minimum initial investment in the Global Fund was $250,000.  (Global Fund IM, CAC, Exh. 3, Id. at iii.).   The Information Memoranda for the Funds represented that investors in the Funds would be provided with audited financial statements yearly (Global Fund IM, CAC, Ex. 3 at vii; Euro Fund IM, CAC, Ex. 2 at viii).

an accountant does not owe a duty to members of an "indeterminate class," *Ultramares Corp. v. Touche*, 255 N.Y. 170, 184 (N.Y. 1931), an accountant owes a duty to "[members] of a particularized class among the members of which [a] report would be circulated…." *White v. Guarente*, 43 N.Y.2d 356, 363 (N.Y. 1977). That is precisely the case here, where Plaintiffs were members of a small, particularized class to which PwC directed its audit reports (CAC ¶ 275). *See Duke v. Touche Ross & Co.*, 765 F. Supp. 69 (S.D.N.Y. 1991) (granting known-party status under New York law where the accountant's report was disseminated to a "select group of qualified investors"); *Anwar II*, 2010 U.S. Dist. LEXUS 86716 8 225 (PwC's intention was that a known class of future investors would rely on its financial reports).[10]

The cases upon which PwC Bermuda mainly relies are inapposite. In fact, the court in one of those cases, *SIPC v. BDO Seidman, LLP*, 222 F.3d 63, 74 (2d Cir. 2000), recognized that plaintiffs in *White* qualified as known parties because "the accounting firm knew, when it agreed to perform an audit, that a group of limited partners, including the plaintiff, would rely on that audit in preparing their tax returns." *Id.* The *BDO Seidman* court only held that a broker dealer's customers, who were not known to the accounting firm and to whom the accountant had not addressed its audit reports, were not "known parties" within the meaning of *Credit Alliance*. *Id.* at 75. Of course, that is a far cry from the situation here, where PwC Bermuda knew that the investors in the Funds would rely on its audit opinions and addressed its audit reports to the shareholders of the Funds.[11] In *Westpac Banking v. Deschamps*, 494 N.Y.S. 2d 848 (1985), a lender unknown to

---

[10] The allegations held to be sufficient for purposes of satisfying the "known party" prong were similar to those in the CAC: "[The] PwC [Member Firms] knew that [their name] was used by the Funds in marketing so as to give the Funds legitimacy and, therefore, to draw investors to the Funds. [The] PwC [Member Firms] also knew that [their] audit letters would be provided or made available to potential investors and to existing investors . . . ." *Anwar II*, at *225.

[11] In the case of the Fairfield Greenwich feeder funds, PwC as auditor to the funds  acknowledged that it was responsible for reporting to the shareholders on the financial statements for the funds and committed to providing to the shareholders independent opinions and reports that would provide assurance on the financial statements released by the funds (CAC §108). In a unified organization like PricewaterhouseCoopers, a fair inference can be drawn that all the

the auditor claimed that the auditor nevertheless knew its client would seek a bridge loan and thus "had a duty to potential bridge lenders, including" the plaintiff.  But there, the auditor did not even know that its report was being shown to the plaintiff lender.  *Id.* at 19.  Here, in contrast, PwC addressed its reports to the Plaintiffs directly in recognition of its duty to report to them.  In light of PwC Bermuda's acknowledged obligation to provide accurate audit reports to Plaintiffs, PwC's assertion that those parties were not known to it ring hollow.

### 3.     The Requisite "Linking Conduct" Existed Between PwC Bermuda and Plaintiffs.

As the court held in *Cromer Finance Ltd. v. Berger*, 2001 WL 1112548 at *5 (Sept. 19, 2001 S.D.N.Y), "audit reports addressed 'to the shareholders,' constitute 'substantial communication' between [the auditor] and the plaintiff-shareholders sufficient to satisfy the 'linking conduct' requirement" of *Credit Alliance*.  PwC Bermuda also knew that its audited reports would be provided to potential investors by the Kingate Defendants (CAC ¶111).   In addition, PwC Bermuda had to have known that its name was prominently featured on the performance summaries that the Kingate Defendants used to market the Funds to prospective investors (Bunch Declaration dated November 4, 2010 in support of the Consol. Mem., Exs. B-J).

Contrary to PwC Bermuda's argument, direct contact between an auditor and a near-privity party is unnecessary to establish "linking conduct."  *Dorking Genetics v. United States*, 76 F.3d 1261, 1270 (2d Cir. 1996) (rejecting narrow reading of "linking conduct" requirement and construing *Credit Alliance* to permit an action "even if the plaintiffs had never interacted directly with the defendant").  Relying on *Dorking Genetics*, Judge Marrero in *Anwar II* found that linkage could be satisfied by PwC's understanding of the investors' reliance.  The fact that PwC Defendants directed the audited financial statements to shareholders evidences this understanding.  *Anwar II,*

---

various PwC entities auditing feeder funds considered themselves responsible to the shareholders.  Moreover there is no basis to contend that PwC Bermuda's responsibilities here would differ.

2010 U.S. Dist. LEXIS 86716, at *226.  Here, the CAC further alleges that PwC knew that the audited financial statements were given to prospective investors with the Information Memoranda and were used as marketing tools.   (CAC ¶¶ 107,111).

PwC Bermuda's cases are not to the contrary.  For example, in *Katz v. Image Innovations Holdings, Inc.*, 2008 WL 4840880, at *9 (S.D.N.Y. Nov. 5, 2008), the CEO of a company claimed that he was induced to join the company based on false representations as to the company's revenues.  In addition to suing those who made the representations, he sued the company's auditors, claiming that they had negligently represented the company's financial situation in draft reports prior to his hiring.  In rejecting the claim, the court held that there was no allegation that the plaintiff's purported reliance on the "financials in deciding whether to become CEO was ever discussed, acknowledged or understood by [the auditor and plaintiff] and there is no plausible claim that an end and aim of [the auditor's] preparing [the company's] financials was to include [plaintiff's] reliance on them, or to induce through such reliance his agreement to become CEO." *Id.*  In this case, the allegations demonstrate Plaintiffs' reliance, hence the facts in *Katz* offer no basis to dismiss Plaintiffs' claims in this case.

Similarly, in *BDO Seidman*, 222 F.3d at 75, there had been no contact between the auditor and its broker-dealer-client's customers. That is not the case here, where the PwC Defendants issued audit reports directed to the Funds' shareholders and knew that the reports were being provided to investors in order to establish the bona fides of the Funds.  (CAC ¶¶ 107, 111).  In fact, the court in that case distinguished that situation from a situation, like the one here, where the accountant provides its opinions to plaintiffs, which would suffice to establish linking.  *See BDO Seidman*, 222 F.3d at 75.

Likewise, the facts in *Sec. Pac. Bus. Credit, Inc.*, 79 N.Y.2d at 704-07, are starkly different than those here.  In that case, a lender sued its borrower's auditor concerning an SEC-required audit.

21

On summary judgment, the court found that the lender's effort to establish linking conduct was unavailing because the lender "primarily relie[d] on [a] single phone call" with the auditor to establish linking conduct, and there was no evidence that the auditor "shaped" the audit to meet the needs of the lender, or even that it provided the lender with a copy of the audit. *Id*. at 706. PwC Bermuda's assertion that Plaintiffs have alleged no conduct different than what has been held insufficient in these cases is palpably wrong. To the contrary, the facts pled in the CAC satisfy each of the *Credit Alliance* requirements, (*see, e.g.*, CAC ¶¶ 275, 276, 279, 435, 436), thus properly stating a claim for negligence against the PwC Defendants.

### B.      The CAC States a Claim for Negligent Misrepresentation under U.K., Bermuda and BVI Law

PwC Bermuda's reliance on *Caparo Industries, Inc. v. Dickman* [1990] 2 AC 605 is misplaced for two reasons: First, the case construes the duties of a statutory auditor auditing a public company under the U.K. Companies Act. (Bompas Dec. ¶¶ 73.2, 74). In this instance, there was no requirement for the appointment of a statutory auditor under BVI law and the shareholders played no role in corporate governance. Second, PwC Bermuda assumed a duty of care to the investors and intended that investors rely on its audit report in making and retaining investments in the Funds. (*See* Bompas Dec. ¶¶ 71-74). It was not alleged in *Caparo* that the defendant auditor had authorized its name to be used in marketing securities for its audit client or was aware that its name was being used for the purpose to draw in investors. (*Id.* ¶73.3). In contrast, PwC Bermuda authorized the inclusion of "its name, report and reference to itself" in the IMs. (*Id.* ¶ 102.3).

The Funds are professional funds under the BVI Companies Act. Under BVI law, there is no requirement that professional funds appoint statutory auditors. (Bompas Dec. ¶ 102). Moreover, the investors were required to sign standing proxies allowing KML to vote shares on their behalf. (*Id.* ¶102.2). The Funds' subscription agreements provided that the Funds could involuntarily redeem the shares of any shareholder who attempted to rescind his proxy. (CAC Ex. 1, S-15).

KML and Tremont (until it withdrew as co-manager), not the shareholders at annual meetings, ran the Funds.  In *Cromer Finance Ltd. v. Berger*, Judge Cote observed that the general rule in *Caparo* had little relevance to an investment fund where the shareholders did not participate in corporate governance.  2003 U.S. Dist. LEXIS 10554, at *37 (S.D.N.Y. June 23, 2003).  This conclusion holds true in this case.

There is ample authority in the United Kingdom that statutory auditors may incur separate liability to investors who rely on audited financials statements for investment purposes with the knowledge and consent of the auditor.  (Bompas Dec. ¶¶ 73.1, 73.3, 74 & n.26).  *Morgan Crucible Co. plc v. Hill Samuel & Co. Ltd.,* [1991] Ch 295 (Court of Appeals distinguished *Caparo* and allowed an action to go to trial where a successful bidder sued accountants for negligent misrepresentation in connection with audited financial statements relied upon to purchase a company); *ADT Ltd v. BDO Binder Hamlyn,* [1996] BCC 808 (auditing firm held liable to acquiring company where audit partner affirmed accuracy of audited financial statements of target company knowing that the acquirer would not consummate the acquisition without assurances from the target's auditors).   The test for assumption of liability is objective.  (Bompas Dec. ¶69.4).  A mere affirmation that audited financial statements are correct and reliable can suffice.  The requirements are whether the auditor understood who was likely to use the audited statements and for what purpose.  These requirements are adequately alleged in the CAC.

The classic paradigm of accountant liability for negligent misrepresentation is Lord Denning's dissent in the *Candler v. Crane Christmas & Co.,* [1951] 2 KP 164 which was adopted by the House of Lords in the seminal case of *Hedley Byrne & Co v. Heller & Partners Ltd.,* [1964] AC 465.  (Bompas Dec. ¶ 62, fn. 8).  The plaintiff in *Candler* purchased a company after reviewing the accounts of the company with the company's accountants.  The accountants were fully aware that the plaintiff was relying on their skill and judgment and on their having exercised the care

required by their profession.  Lord Denning would have held that the purchaser was entitled to recover from the accountants for losses caused by inaccurate books and records based on an assumption of responsibility.  A decade later, the House of Lords made Lord Denning's approach the law.

Here, the PwC Defendants assumed liability to investors interested in the Funds.  It knew that investors would rely on its audited financial statements for the purpose of making investment decisions to purchase shares in the Funds, and it gave its consent to this use in the IMs and by addressing its audited reports directly to shareholders.  PwC Bermuda knew that the Kingate Defendants would provide its audited reports to potential investors (Bompas Dec. ¶ 104; CAC ¶112, 106-111).   An English court would refuse to strike out the claims for negligent misrepresentation and negligence and would allow the case to proceed to trial.

**VI.     Issues Common to Multiple Defendants**

As PwC Bermuda raises no novel arguments concerning several of Plaintiffs' claims, Plaintiffs respectfully refer the Court to Plaintiffs' Opposition to PwC U.S.'s Motion to Dismiss and to the Consol. Mem. for the reasons why the CAC states a viable claim against the PwC Defendants for gross negligence, aiding and abetting breach of fiduciary duty, aiding and abetting fraud, and unjust enrichment.  Plaintiffs respectfully refer the Court to the Consol. Mem. for the reasons why Plaintiffs common law claims against the PwC Defendants are not pre-empted by the Securities Litigation Uniform Standards Act.[12]

If the claims in this action are governed by foreign law, as Defendants argue, then the Martin Act is not implicated.  Conversely, if the Court determines that New York law should be applied, Plaintiffs respectfully refer the Court to Plaintiffs' Opposition to PwC U.S.'s Motion to

---

[12]   Plaintiffs asked the PwC Defendants to agree to the filing of a consolidated brief that would have avoided redundancies, but PwC Bermuda refused to consent. PwC Bermuda and PwC U.S. split up portions of their arguments between their briefs and incorporated by reference arguments made by the other.  Plaintiffs are following their example.

Dismiss and to the Consol. Mem. for the reasons why the Martin Act does not pre-empt Plaintiffs'

common law claims.  *See Anwar v. Fairfield Greenwich Ltd*., 09 Civ. 0118, 2010 U.S. Dist. LEXIS

78425, 2010 WL 3022848 (S.D.N.Y. July 29, 2010).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the PwC

Defendants' motions to dismiss or, in the alternative, allow Plaintiffs to amend the CAC to cure any

pleading deficiencies.

Dated:  New York, New York
        November 4, 2010

Respectfully submitted,

By:___/s/ David A. Barrett_____

David Boies
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

David A. Barrett
Howard L. Vickery, II
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

Stuart H. Singer
Sashi Bach Boruchow
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard, #1200
Ft. Lauderdale, Florida 33301
Telephone:  (954) 356-0011
Facsimile:  (954) 356-0022

Joel H. Bernstein
Javier Bleichmar
Michael Woolley

25

LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
Tel: 212-907-0700
Fax: 212-818-0477

Joel P. Laitman
COHEN MILSTEIN SELLERS
& TOLL PLLC
88 Pine Street
New York, New York 10005
Tel: (212) 838-7797
Fax: (212) 838-7745

Steven J. Toll
Daniel S. Sommers
Joshua Devore
S. Douglas Bunch
Lisa M. Mezzetti
COHEN MILSTEIN SELLERS
& TOLL PLLC
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699