UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/30/11
```

IN RE KINGATE MANAGEMENT
LIMITED LITIGATION

                                    09 Civ. 5386 (DAB)
                                         ORDER

----------------------------------------X
DEBORAH A. BATTS, United States District Judge.

    This action arises from the massive fraud perpetrated by

Bernard L. Madoff ("Madoff") through his investment firm Bernard

L. Madoff Investment Securities LLC ("BMIS").  Plaintiffs bring

claims against Defendants associated with two "feeder funds" that

channeled investments into BMIS.  All Defendants have moved to

dismiss the Amended Consolidated Class Action Complaint

("Complaint" or "CAC").[1]  For reasons that follow, the motions

are granted and the complaint is dismissed.


I. BACKGROUND


    The following facts, drawn from the Complaint, are assumed

true for purposes of the motions to dismiss. Familiarity with the

---

    [1]All of the Motions request dismissal pursuant to Fed. R.
Civ. P. 12(b)(6), and various among them also present grounds for
dismissal pursuant to Rules 12(b)(1) and 12(b)(2) and raise
issues concerning sufficiency of pleading under Rules 8(a) and
9(b). Because the Court dismisses the complaint in its entirety
pursuant to Rule 12(b)(6), it does not reach whether dismissal is
also required, in whole or in part, under the other Federal rules
cited.

facts is assumed, and the facts are only briefly set out here.

Plaintiffs are investors in two funds, Kingate Global Fund, Ltd. ("Kingate Global") and Kingate Euro Fund, Ltd. ("Kingate Euro," together with Kingate Global, the "Funds"), which acted as "feeder funds" channeling capital into Madoff's fraudulent operations. (CAC ¶ 3.) Defendants are the Funds' Bermuda-based managers, Kingate Management Limited ("KML") and Tremont (Bermuda) Limited ("Tremont") (collectively, the "Managers"); Tremont's United States-based corporate parent, Tremont Group Holdings, Inc.; the Managers' U.K.-based consultant, FIM Limited and its successor in interest FIM Advisors LLP ("FIM" or the "Consultant"); certain individual directors and officers of the Funds, the Managers, and the Consultant; the Funds' Bermuda-based administrator, Citi Hedge Fund Services, Ltd. ("Citi") (as successor in interest to the prior administrators of the Funds, BISYS Hedge Fund Services Limited and Hemisphere Management Limited); and PricewaterhouseCoopers LLP, a United States-based audit company, along with its Bermuda subsidiary PricewaterhouseCoopers Bermuda, which was the Bermuda auditor of the Funds (collectively, "PwC"). (CAC ¶¶ 25-47.) Plaintiffs assert that the Funds were mere conduits into Madoff's Ponzi scheme. (CAC ¶ 4.) The Funds invested billions of dollars with Madoff, all of which are now lost. (CAC ¶ 3.)

a. Madoff's Ponzi Scheme

The basic facts surrounding Madoff's Ponzi scheme are by now well-known. Madoff founded BMIS, a securities broker-dealer firm, in 1959 and was its chairman and chief executive officer. (CAC ¶ 54.)  Madoff and BMIS represented that they used a "split-strike conversion" strategy to manage invested assets, including those belonging to the Funds. (CAC ¶ 57.)  Pursuant to that strategy, BMIS purportedly purchased between 45 and 50 stocks underlying the Standard & Poor's 100 index ("S&P 100 Index"), while concurrently selling out-of-the-money call options and buying out-of-the-money put options on the S&P 100 Index. (CAC ¶ 57.)  This investment strategy purportedly sought to limit volatility, reducing gains compared to the benchmark index in an up market and, likewise, limiting losses to less than the benchmark in a down market. (CAC ¶ 57.)

BMIS provided its investors, including the Funds, with monthly or quarterly statements purportedly showing (i) trades in equities and options using the assets turned over by the Funds, (ii) the equity securities, options, and government securities that the investors supposedly owned, and (iii) the purported growth of and profit from those accounts over time. (CAC ¶ 58.)

None of the trades listed on the monthly or quarterly reports actually took place. (CAC ¶ 58.)  Similarly, Madoff and

3

BMIS never completed any of the options sales or purchases which were reported to BMIS investors, including the Funds. (CAC ¶ 59.) Options related to S&P 100 companies are typically traded on the Chicago Board Options Exchange ("CBOE"), but Madoff never purchased or sold any options on the CBOE or with any other counterparty in an over-the-counter transaction. (CAC ¶ 59.)

The purported growth of and profits on assets invested with BMIS was fictitious. (CAC ¶ 60.)  In fact, the income BMIS reported (and the money it paid out in the form of redemptions) actually came from additional investments made through feeder funds like Kingate Global and Kingate Euro. (CAC ¶ 60.) Rather than investing incoming assets in actual securities, Madoff fraudulently used those assets for his personal benefit and distributed them to earlier investors to create the illusion of profits. (CAC ¶ 60.)

On December 11, 2008, federal authorities arrested Madoff and charged him with violations of the securities laws. (CAC ¶ 61.)  Madoff admitted that his money management operation was "all just one big lie" and "basically, a giant Ponzi scheme" in which he "paid investors with money that wasn't there." (CAC ¶ 61.)  Madoff further admitted that he had "personally traded money and lost money for institutional clients," and that "there is no innocent explanation." (CAC ¶ 61.)  That same day, the SEC

4

filed an emergency action to halt all ongoing activities by Madoff and BMIS. (CAC ¶ 61.)

On December 15, 2008, the Securities Investor Protection Corporation ("SIPC") filed an application in the United States District Court for the Southern District of New York alleging that BMIS was not able to meet its obligations to investors as they came due and, accordingly, that the investors needed the protection afforded by the Securities Investor Protection Act ("SIPA"). (CAC ¶ 62.) The Court granted the SIPC application and appointed Irving H. Picard as the Trustee to liquidate BMIS. (CAC ¶ 62.)

On March 12, 2009, Madoff pled guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York, including counts of fraud, perjury, theft from an employee benefit plan, and two counts of international money laundering. (CAC ¶ 63.) Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BMIS]," and that "I knew what I was doing was wrong, indeed criminal." (CAC ¶ 63.) Madoff explained that he had been paying returns to certain investors out of the assets received from other investors, and that BMIS had been insolvent for years. (CAC ¶ 63.)

The size of Madoff's global fraud has been estimated at

$64.8 billion. (CAC ¶ 64.)  Madoff is now incarcerated and
serving a 150-year sentence. (CAC ¶ 64.)


b. The Funds

    Kingate Global and Kingate Euro are funds which acted as
"feeder funds" channeling capital into Madoff's fraudulent
operations. (CAC ¶ 3.)  The Funds, now in liquidation, are open-
end investment companies organized as international business
companies under the laws of the British Virgin Islands. (CAC ¶¶
48-49.)  Plaintiffs assert that the Funds channeled their
investors' money (i.e., Plaintiffs' money) to Madoff to invest,
and that Madoff served as investment advisor, broker-dealer, and
custodian for the Funds.  (CAC ¶¶ 3, 48-49, 123.)

    Every investor in each of the Funds (and thus every member
of the proposed Class) received a copy of an Information
Memorandum defining the Funds and detailing duties owed by
various parties involved with the Funds (the "Memoranda"). (CAC ¶
83; see e.g. CAC ¶¶ 83-85, 92, 97, 101, 103, 111-13). Investors
were required to acknowledge receipt of the relevant Information
Memorandum as a condition of buying shares in the Funds. (CAC ¶
83.)  The Memoranda were periodically updated, but are materially
identical with respect to the provisions relevant to this
lawsuit. (CAC ¶ 86). Additional contracts between the Funds and

various defendants further set forth the terms of shares in the
Funds and the duties owed pursuant to the Memoranda and the
Funds. (See, e.g., CAC ¶ 94-95 and CAC Ex. 7 ("KGF 2006
Management Agreement") (detailing duties owed by Manager); CAC ¶¶
186-87, 191, 196-97 and CAC Ex. 15 ("Administration Agreement")
(detailing duties owed by Administrator)).

Plaintiffs invested in the Funds by executing Subscription
Agreements which incorporated the terms of the Memoranda. CAC Ex.
1 at S-4; CAC Ex. 2 at S-4.  By the terms of each of the
Memoranda, "no person [was] authorized . . . to give any
information or make any representations [in connection with the
offered securities] other than as contained" in the Memoranda.
E.g., CAC Ex. 1. Each Information Memorandum further advised
investors that "No person has been authorized to make any
representations concerning the Fund or the . . . shares which is
inconsistent with those contained in this Memorandum, and any
such representations should accordingly be treated as
unauthorized and may not be relied upon by the recipient."  Id.
The Memoranda defined the ongoing duties owed by the Funds'
Managers and other administrators and described and defined the
investment securities sold pursuant to the Memoranda, including
the Funds' objectives and the strategies its administrators
employed.  E.g., CAC ¶¶ 83-93, 99-105; Memoranda annexed at CAC

7

Ex. 1-6.

The Memoranda indicated that the Funds delegated all investment duties and custody of the assets invested to Madoff and BMIS. CAC ¶ 67.  Madoff was not identified by name in the Memoranda; rather, he was described as a "New York based NASD registered broker-dealer employing approximately 350 people and acting primarily as a market-maker in listed and unlisted stocks and convertible securities." CAC ¶ 67.

Between March 1994 and December 10, 2008, Kingate Global invested $963.45 million with BMIS through 63 separate wire transfers directly into BMIS' account at JPMorgan Chase & Co. in New York City (the "BMIS Bank Account"). CAC ¶ 68.  From inception through December 10, 2008, Kingate Euro invested $767.44 million with BMIS through 92 separate wire transfers directly into the BMIS Bank Account. CAC ¶ 68.  By November 30, 2008, according to the account statements provided by BMIS, the Funds' investments had purportedly grown to over $3 billion. CAC ¶ 68.  All of those assets are now lost. CAC ¶ 3.

c. Procedural History

On May 18, 2010, Plaintiffs filed the CAC on behalf of a class consisting of "all persons or entities who owned shares of the Funds as of December 10, 2008, and were damaged thereby,"

8

excluding from the Class all Defendants and related persons and entities. CAC ¶ 6. In the CAC, Plaintiffs asserted common law claims for fraud, negligent misrepresentation, gross negligence, negligence, breach of fiduciary duty, constructive fraud, third party beneficiary breach of contract, mutual mistake, aiding and abetting breach of fiduciary duty, aiding and abetting fraud, and unjust enrichment.[2]  CAC ¶ 5.  Plaintiffs also originally

---

[2]Plaintiffs' common law claims, all of which sound in fraud, are as follows: Count 1 (fraud, brought as purchasers of shares in the Funds); Count 2 (fraud, brought as holders); Count 3 (negligent misrepresentation, as purchasers); Count 4 (negligent misrepresentation, as holders); Count 5 (gross negligence, based on failure to conduct due diligence as promised); Count 6 (negligence in discovering fraud and in failing to perform due diligence as promised); Count 7 (breach of fiduciary duty); Count 8 (constructive fraud); Count 9 (breach of contract based, inter alia, on "collecting fees based on fictitious profits and for services not properly performed," CAC ¶ 297); Count 10 (breach of contract based, inter alia, on "collecting fees based on fictitious profits and for services not properly performed," CAC ¶ 302); Count 11 (constructive trust, based on fees paid on the basis of fictitious profits, CAC ¶ 305); Count 12 (mutual mistake, based on the existence of Madoff's fraud); Count 13 (aiding and abetting breach of fiduciary duty); Count 14 (aiding and abetting fraud); Count 15 (gross negligence, including allegations of misrepresentation, CAC ¶ 323); Count 16 (negligence, based on failure to conduct audits as represented); Count 17 (negligent misrepresentation); Count 18 (breach of contract, based on failure to conduct audits as represented); Count 19 (aiding and abetting the breach of fiduciary duty alleged in Count 7); Count 20 (aiding and abetting fraud); Count 21 (breach of fiduciary duty based in part on communicating fictitious valuations, CAC ¶ 356, and on collecting fees on the basis of fraudulent information, CAC ¶ 358); Count 22 (gross negligence); Count 23 (negligence); Count 24 (negligent misrepresentation); Count 25 (breach of contract, based on failure to calculate values as promised); Count 26 (aiding and abetting breach of fiduciary duty); Count 27 (aiding and abetting fraud); and Count 28 (unjust enrichment).

asserted claims under the Securities Exchange Act of 1934. CAC ¶ 5.

On June 24, 2010, the Supreme Court of the United States decided <u>Morrison v. National Australia Bank Ltd.</u>, in which it held that § 10(b) of the Exchange Act of 1934 does not apply extraterritorially. <u>Morrison v. Nat'l Australia Bank Ltd.</u>, ____ U.S. ___, 130 S.Ct. 2869, 2883 (2010). Subsequently, on August 12, 2010, Plaintiffs filed a Notice of Voluntary Dismissal of Federal Securities Claims, requesting voluntary dismissal of all of their claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b5 (Counts 29, 30, 31, and 32 of the Amended Consolidated Class Action Complaint) as to all Defendants. This Court entered the voluntary dismissal of all Federal claims on November 12, 2010. Only common law claims remain pending in this action.

The CAC alleges that this Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA") as codified at 28 U.S.C. § 1332(d)(2), because the amount in controversy exceeds the jurisdictional amount, the members of the proposed Class are in the thousands, and at least one Plaintiff is a citizen of a foreign state and one defendant a citizen of New York. CAC ¶ 7. At the time of filing, this Court also had jurisdiction over the Exchange Act claims pursuant to

Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and pursuant to 28 U.S.C. § 1331.

All Defendants moved for dismissal on July 19, 2010.


II. STANDARD OF REVIEW

For a complaint to survive a motion brought pursuant to Rule 12(b)(6), the plaintiff must have pleaded "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility," the Supreme Court has explained,

> when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'

Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 556-57).  "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (internal quotation marks omitted).  "In keeping with these principles," the Supreme Court has stated,

11

> a court considering a motion to dismiss can choose to
> begin by identifying pleadings that, because they are
> no more than conclusions, are not entitled to the
> assumption of truth.  While legal conclusions can
> provide the framework of a complaint, they must be
> supported by factual allegations.  When there are
> well-pleaded factual allegations, a court should assume
> their veracity and then determine whether they
> plausibly give rise to an entitlement to relief.

Iqbal, 129 S.Ct. at 1950.

In considering a Motion under Rule 12(b)(6), the Court must accept as true all factual allegations set forth in the complaint and draw all reasonable inferences in favor of the plaintiff. See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n. 1 (2002); Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 217 (2d Cir. 2004).  However, this principle is "inapplicable to legal conclusions," Iqbal, 129 S. Ct. at 1949, which, like the complaint's "labels and conclusions," Twombly, 550 U.S. at 555, are disregarded. Nor should a court "accept [as] true a legal conclusion couched as a factual allegation." Id. at 555.

In ruling on a 12(b)(6) motion, a court may consider the complaint as well as "any written instrument attached to the complaint as an exhibit or any statements or documents incorporated in it by reference."  Zdenek Marek v. Old Navy (Apparel) Inc., 348 F.Supp.2d 275, 279 (S.D.N.Y. 2004) (citing Yak v. Bank Brussels Lambert, 252 F.3d 127, 130 (2d Cir. 2001)

(internal quotations omitted)).  However, though such evidence

may be considered when attached to or incorporated into the

Complaint, the Court's function is "not to weigh the evidence

that might be presented at a trial but merely to determine

whether the complaint itself is legally sufficient." Id. (citing

Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985)).

Allegations of fraud must meet the heightened pleading

standard of Rule 9(b), which requires that the plaintiff "state

with particularity the circumstances constituting fraud."

Fed.R.Civ.P. 9(b). The complaint must "(1) specify the statements

that the plaintiff contends were fraudulent, (2) identify the

speaker, (3) state where and when the statements were made, and

(4) explain why the statements were fraudulent." ATSI Comm's,

Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007).


III. DISCUSSION


A. SLUSA Preemption

The Securities Litigation Uniform Standards Act of 1998,

Pub.L. No. 105-353, 112 Stat. 3227 ("SLUSA") explicitly provides

for the preemption by federal law of certain categories of

securities actions brought under state law. H-Quotient, Inc. v.

Knight Trading Group, No. 03 Civ. 5889 (DAB), 2007 WL 2729010 at

*3 (S.D.N.Y. Sep. 13, 2007). Defendants argue, inter alia, that all of Plaintiffs' state law causes of action are barred by SLUSA.[3]

Congress enacted SLUSA to prevent plaintiffs from seeking to evade the protections against abusive securities litigation codified in the Private Securities Litigation Reform Act ("PSLRA") by filing class action fraud claims based on state law rather than on Federal securities law. Ring v. AXA Fin., Inc., 483 F.3d 95, 97-98 (2d Cir. 2007) (describing history of PSLRA and SLUSA); Barron v. Igolnikov, 09 Civ. 4471 (TPG), 2010 WL 882890, at *3 (S.D.N.Y. Mar. 10, 2010) (Griesa, J.).

SLUSA provides:

CLASS ACTION LIMITATIONS
No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging-

(A) an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security; or

(B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

15 U.S.C. §§ 77p(b), 78bb(f)(1).

---

[3]Because the Court finds that all of Plaintiffs' claims are barred by SLUSA and that repleading would be futile, the Court does not reach Defendants' numerous remaining grounds for dismissal.

14

In other words, SLUSA mandates dismissal when 1) a suit is a covered class action; 2) brought under state or local law; 3) concerning a covered security; and 4) the defendant is alleged to have misrepresented or omitted a material fact or employed a manipulative device or contrivance "in connection with the purchase or sale" of that security. Barron v. Igolnikov, 2010 WL 882890 at *3-5 (citations omitted).

To trigger SLUSA, a complaint must allege either "(1) an explicit claim of fraud or misrepresentation (e.g., common law fraud, negligent misrepresentations, or fraudulent inducement), or (2) other garden-variety state law claims that sound in fraud." Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc., 341 F.Supp.2d 258, 261 (S.D.N.Y. 2004)(citation omitted). "A claim sounds in fraud when, although not an essential element of the claim, the plaintiff alleges fraud as an integral part of the conduct giving rise to the claim." Id. at 269.

The law of the Second Circuit requires a claim-by-claim analysis as to SLUSA preemption. Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 395 F.3d 25, 47 (2d Cir. 2005), rev'd as to other grounds, 547 U.S. 71, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006); Gray v. Seaboard Securities, 126 F.App'x 14, 16 (2d Cir. 2005). Because plaintiffs may seek to avoid SLUSA preemption

15

through artful pleading, courts "must look beyond the face of the complaint to analyze the substance of the allegations made." Dabit, 395 F.3d at 34.  Any claim may trigger SLUSA preemption if the basis of that claim sounds in fraud or relies on alleged misstatements or omissions. See, e.g., McCullagh v. Merrill Lynch & Co., No. 01 Civ. 7322 (DAB), 2002 WL 362774 (S.D.N.Y. 2002) (Batts, J.) (dismissing breach of fiduciary duty and unjust enrichment claims against securities broker which allegedly failed to provide customers with objective research and advisory services); In re Worldcom, Inc. Securities Litigation, No. 02 Civ. 3288, 2004 WL 315143, at *11 (S.D.N.Y. Feb. 20, 2004) (dismissing with prejudice state law securities fraud and negligence claims preempted by SLUSA); In re Livent, Inc. Noteholders Securities Litigation, 151 F.Supp.2d 371, 442-43 (S.D.N.Y. 2001) (dismissing with prejudice state law fraud, negligence, and negligent misrepresentation claims preempted by SLUSA).

The class action here is "covered,"[4] see CAC ¶ 240, Plaintiffs' remaining claims are brought under state law, CAC ¶

---

[4]A covered class action is a lawsuit in which damages are sought on behalf of more than 50 prospective class members and in which common questions of law or fact predominate over questions affecting only individual members of the class. 15 U.S.C. § 78bb(f)(5)(B)(i)(I). Claims which would be barred by SLUSA if brought as covered class actions may nevertheless be brought individually or by a class of fewer than 50 individual investors. Romano v. Kazacos, 609 F.3d 520 n.2 (2d Cir. 2010); Dabit, 547 U.S. at 87 ("The Act does not deny any individual plaintiff, or indeed any group of fewer than 50 plaintiffs, the right to enforce any state-law cause of action that may exist.").

5, and the Court has reviewed Plaintiffs' claims individually and finds that each sounds in fraud or alleges misrepresentations, material omissions, or the use of a deceptive device.  However, Plaintiffs argue that they purchased shares in overseas funds, not "covered securities," and that SLUSA's "in connection with" requirement is not met, since the misrepresentations they allege relate to the Funds, not to Madoff's conduct.  Plaintiffs further argue that the logic applied in Morrison forbids the application of SLUSA to suits based on the purchase of such overseas assets, and that their non-fraud claims are in any event not barred by SLUSA. None of Plaintiffs' arguments are availing.

Plaintiffs' argument that the logic of Morrison bars the application of SLUSA to the current action may swiftly be dispatched. In Morrison, the Supreme Court found that Congress did not intend to regulate extraterritorial conduct when it passed the Securities Act of 1934, and that Section 10(b) of the Exchange Act therefore did not apply extraterritorially. Morrison v. Nat'l Australia Bank Ltd., 130 S.Ct. 2869, 2888 (2010). SLUSA, by its terms, applies to class actions in State and Federal courts of the United States, 15 U.S.C. § 8bb(f)(1), and is applied here to a class action in a court of the United States.  SLUSA is not being applied extraterritorially in this matter, and the logic of Morrison therefore has no effect on

SLUSA's applicability.

Plaintiffs' arguments concerning whether their claims are in connection with covered securities are equally unavailing. Plaintiffs argue that SLUSA does not reach their claims because they purchased shares in the Funds, rather than any covered securities within the meaning of SLUSA; accordingly, they assert that SLUSA's requirement of a misstatement in connection with the sale or purchase of covered securities is not met. District courts within the Second Circuit, addressing similar arguments in the context of the Madoff affair, have almost universally found SLUSA preemption, and this Court agrees with those sister courts.

Under SLUSA, a "covered security" includes any security that is listed or authorized for listing on the New York Stock Exchange or another national exchange, as well as securities issued by investment companies registered with the Securities Exchange Commission. See 15 U.S.C. § 77r(b). SLUSA's "in connection with" requirement is to be construed broadly; "it is enough that the fraud alleged 'coincide' with a securities transaction — whether by the plaintiff or by someone else." Dabit, 571 U.S. 85-86 (citations omitted).

The majority of district courts within the Second Circuit have found, under similar facts, that claims like the ones brought here are "in connection with covered securities." See In

18

re J.P. Jeanneret Assoc's, Inc., 2011 WL 35594, at *33 (S.D.N.Y.
Jan. 31, 2011) (McMahon, J.) (state law claims against defendants
associated with funds which invested with Madoff barred by
SLUSA); Wolf Living Trust v. FM Multi-Strategy Investment Fund,
LP, No. 09 Civ. 1540 (LBS), 2010 WL 4457322 at *3 (S.D.N.Y. Nov.
2, 2010); Newman v. Family Management Corp., No. 08 Civ. 11215
(LBS), --- F.Supp.2d ----, 2010 WL 4118083 at *9 - *10 (S.D.N.Y.
Oct. 20, 2010)(dismissing common law fraud, negligent
misrepresentation, breach of fiduciary duty, gross negligence and
mismanagement, unjust enrichment, malpractice and professional
negligence, and aiding and abetting breach of fiduciary duty
claims as barred by SLUSA); In re Beacon Associates Litigation,
2010 WL 3895582, at *33-35 (S.D.N.Y. Oct. 5, 2010) (Sand, J.)
(SLUSA preempted class-action claims for fraud, aiding and
abetting fraud, breach of fiduciary duty, aiding and abetting
breach of fiduciary duty, negligent misrepresentation, gross
negligence, unjust enrichment, and breach of contract); Barron v.
Igolnikov, 2010 WL 882890 at *3-5 (S.D.N.Y. Mar. 10, 2010)
(Griesa, J.) (claims for breach of fiduciary duty, aiding and
abetting breach of fiduciary duty, gross negligence, and unjust
enrichment barred by SLUSA); Backus v. Connecticut Comm'ty Bank,
N.A., No. 3:09-CV-1256, 2009 WL 5184360 (D.Conn. Dec. 23, 2009)
(Dorsey, J.); Levinson v. PSCC Services, Inc., No. 3:09-CV-00269

19

(PCD), 2009 WL 5184363 (D.Conn. Dec. 23, 2009); but see Anwar v.
Fairfield Greenwich Ltd., 728 F.Supp.2d 372 (S.D.N.Y. 2010)
(Marrero, J.)("Anwar II") (discussed supra).

Plaintiffs primarily rely on two cases for the proposition
that misstatements like those alleged here are not sufficiently
in connection with covered securities to be barred by SLUSA:
Anwar II and Pension Comm. of the Univ. of Montreal Pension Plan
v. Banc of America Sec., LLC, No. 05 Civ. 9016 (SAS), 2010 WL
546964 (S.D.N.Y. Feb. 16, 2010) (Scheindlin, J.) ("Montreal
Pension III").

Anwar II is the sole case in which a court within the
Southern District found that SLUSA did not preempt fraud claims
related to a Madoff feeder fund.  In Anwar II, the plaintiffs
invested in funds which "were not a cursory, pass-through entity"
and which placed many millions of dollars of their assets in non-
Madoff investments.  Anwar II, 728 F.Supp.2d at 397-99.  Judge
Marrero concluded that under such circumstances, and because
there were "multiple layers [of non-instantaneous transactions]
between Plaintiffs' investments and the purported purchase of
covered securities [by Madoff]," SLUSA's "in connection with"
requirement was not met.  Id. at 397-99 and n.7.

Even if this Court were to adopt Judge Marrero's "multiple
layers" approach to determining whether fraud coincides with a

20

purchase or sale of covered securities, rather than the broad
approach adopted by other courts in the Southern District, Anwar
II can be distinguished on its facts.  Here, unlike the
plaintiffs in Anwar II, Plaintiffs allege that the Funds were
essentially cursory pass-through vehicles by which investors
could place their assets with Madoff, and the Funds placed the
entirety of their assets with Madoff, making no independent
investments whatsoever. See, e.g., CAC ¶¶ 48(a), 49(a) ("Since
[their] inception, all, or substantially all, of [each Fund's]
assets were invested with Madoff.  Plaintiffs acquired shares or
equity in [the Funds] when they turned their assets over to the
Kingate Defendants, who in turn gave them to Madoff."); CAC ¶ 139
("Madoff held 100% of the Funds' assets" and "the investment in
BMIS accounted for virtually 100% of the Funds' assets and 100%
of the Funds' trading . . ."). Accordingly, the allegations here
are more closely connected to Madoff's conduct than those in
Anwar II.

In Montreal Pension III, Judge Scheindlin considered whether
misstatements concerning the valuation of shares in hedge funds,
were sufficiently "in connection with" covered securities in
which the hedge funds had invested some of their assets to
warrant SLUSA preemption. Montreal Pension III at *2.
Distinguishing Backus v. Connecticut Comm'ty Bank, 2009 WL

21

5184360 (D. Conn. Dec. 23, 2009), in which the court found

preclusion after determining that "the individual [covered]

securities fraudulently represented to be bought, sold, and held

by [Madoff] . . . [were] at the heart of the case," Judge

Scheindlin reasoned that the alleged fraud in the case before her

related to the hedge funds themselves rather than to any covered

securities in the funds' investment portfolios and determined

that SLUSA did not bar the claims.  Id. at *2-*3.

Here, by contrast, Madoff's fraud is at the heart of the

case.  Plaintiffs allege that their case "arises from the massive

fraud perpetrated by [Madoff] through his investment firm

[BMIS]." CAC ¶ 1.  They allege that the funds they purchased were

essentially transparent conduits to BMIS, such that "Plaintiffs'

sole purpose of investing in the Funds was to invest in the

United States and in United States equities that are part of the

S&P 100." CAC ¶ 224.  They allege that the entirety of the Funds'

assets were invested with Madoff and BMIS, CAC ¶¶ 48(a), 49(a),

and that "Plaintiffs and the Class[] all understood [when

investing] that the Funds were run by a broker-dealer in New

York" id. ¶ 225.  "[T]he Funds' sole objective was to be invested

with Madoff and BMIS in New York." CAC ¶ 225. Further, the

misstatements and omissions Plaintiffs allege largely concern

Madoff's purported trading strategy and/or Defendants' alleged

duties and promises to oversee Madoff, audit Madoff, or otherwise ensure that Madoff was purchasing covered securities on behalf of the Funds — and thus on behalf of Plaintiffs — as Plaintiffs intended him to do. <u>See</u>, <u>e.g.</u>, CAC ¶¶ 69, 77, 85-93, 95, 97-101, 103, 112, 143-47, 183, 187-88, 201-06, 214, 215-22, 242-250, 256-57, 263-64, 270-71, 275, 285-86, 294-97, 301-02, 311-13, 316, 323, 333, 348, 356, 369-72, 384, 389-90.   The Court therefore concludes that Plaintiffs' claims are brought in connection with the covered securities Madoff pretended to purchase, bringing them within SLUSA's purview.[5]

Accordingly, having also found that each of Plaintiffs' twenty-eight state law claims sounds in fraud, the Court concludes that SLUSA bars Plaintiffs from pursuing any of their claims as a class in any state or federal court.   Each of Plaintiffs' state law claims must be and hereby is DISMISSED.


C. Leave to Replead

Plaintiffs have requested leave to replead their claims in the event of dismissal.   When a complaint has been dismissed, permission to amend it "shall be freely given when justice so

---

[5] "[I]t is not necessary that the purchase or sale actually transpired; claims based on the alleged failure to buy or sell covered securities fall squarely within SLUSA's ambit." <u>Barron v. Igolnikov</u>, 2010 WL 882890 at *3-5 (citations omitted).

requires." Fed. R. Civ. P. 15(a).  However, a court may dismiss without leave to amend when amendment would be "futile", or would not survive a motion to dismiss.  <u>Oneida Indian Nation of New York v. City of Sherrill</u>, 337 F.3d 139, 168 (2d Cir. 2003) (internal citations omitted), <u>rev'd on other grounds sub nom. City of Sherrill v. Oneida Indian Nation of New York</u>, 544 U.S. 197, 125 S.Ct. 1478, 161 L.Ed.2d 386 (2005).

Here, Plaintiffs can avoid SLUSA preemption of their fraud claims only by reconstituting their class of thousands as a class of fewer than fifty, which would in itself bring this action outside this Court's jurisdiction.[6]  Repleading the fraud claims would therefore be futile.  Repleading Plaintiffs' non-fraud claims would also be futile, since all of Plaintiffs' claims would be preempted by the Martin Act even if repleaded. Accordingly, leave to replead is DENIED as futile.

New York's blue sky law, commonly known as the Martin Act, provides for the attorney general to regulate and enforce New York's securities laws. <u>See</u> N.Y. Gen. Bus. Law, art. 23-A, §§ 352 et seq.

The Martin Act provides:

---

[6] As pled, this Court's jurisdiction is founded on the Class Action Fairness Act, which does not grant jurisdiction over actions in which "the number of members of all proposed plaintiff classes in the aggregate is less than 100." 28 U.S.C. § 1332(d)(5)(B).

It shall be illegal and prohibited for any person, partnership, corporation, company, trust or association, or any agent or employee thereof, to use or employ any of the following acts or practices:

(a)   Any fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale;

(b)   Any promise or representation as to the future which is beyond reasonable expectation or unwarranted by existing circumstances;

(c)   Any representation or statement which is false, where the person who made such representation or statement: (i) knew the truth; or (ii) with reasonable effort could have known the truth; or (iii) made no reasonable effort to ascertain the truth; or (iv) did not have knowledge concerning the representation or statement made . . .

N.Y. Gen. Bus. L. § 352-c(1).

It is clearly established that there is no private right of action for claims covered by the Martin Act. <u>Independent Order of Foresters v. Donaldson, Lufkin & Jenrette Inc.</u>, 919 F.Supp. 149, 153 (S.D.N.Y. 1996) (Batts, J.); <u>CPC Int'l Inc. v. McKesson Corp.</u>, 70 N.Y.2d 268, 276; 519 N.Y.S.2d 804, 807, 514 N.E.2d 116 (1987)(promulgating rule). Any claim that is covered by the Martin Act is therefore not actionable by a private party; otherwise, the party essentially would be permitted to bring a private action under the Martin Act. <u>Independent Order of Foresters</u>, 919 F.Supp. at 153; <u>see also</u> <u>Pro Bono Invs., Inc. v.</u>

25

Gerry, No. 03 Civ. 4347, 2005 WL 2429787, at *16 (S.D.N.Y. Sep. 30, 2005) (Koetl, J.) (collecting cases and concluding that "[m]ost New York courts have . . . held that the [Martin] Act precludes a private right of action for common law claims the subject matter of which is covered by the Martin Act. . . . The federal courts have, almost without exception, adopted the same position.") (citations omitted). The Martin Act does not require the pleading or proof of scienter or intent; it preempts every claim which relies on a false statement or an unreasonable or unwarranted promise, whether made knowingly or otherwise. See N.Y. Gen. Bus. L. § 352-c(1); Barron v. Igolnikov, 2010 WL 882890 at *5.

Every court in this District which has addressed the issue, bar one, has found that the Martin Act preempts New York state law claims brought by investors seeking to recover losses related to the Madoff scandal. See Stephenson v. Citco Group, Ltd., 700 F.Supp.2d 599, 613-16 (S.D.N.Y. April 1, 2010) (Holwell, J.) (dismissing breach of fiduciary duty, negligence, gross negligence, and aiding and abetting breach of fiduciary duty claims as preempted); Barron v. Igolnikov, 2010 WL 882890 at *6 (S.D.N.Y. Mar. 10, 2010) (Griesa, J.) (dismissing claims of breach of fiduciary duty, aiding and abetting breach of fiduciary duty, gross negligence, and unjust enrichment); In re Tremont,

26

703 F.Supp.2d at 373 (S.D.N.Y. 2010) (Griesa, J.) (dismissing
breach of fiduciary duty, negligent misrepresentation, and aiding
and abetting breach of fiduciary duty claims as preempted);
Meridian Horizon Fund LP v. Tremont Grp. Holdings, Inc., 2010 WL
1257567, at *9 (S.D.N.Y. Mar. 31, 2010) (Griesa, J.) (dismissing
common law claims for negligence as preeempted); In re Beacon
Assoc's Litigation, 2010 WL 3895582, at *35-38 (S.D.N.Y. Oct. 5,
2010) (Sand, J.) (dismissing claims for breach of fiduciary duty,
aiding and abetting breach of fiduciary duty, negligent
misrepresentation, gross negligence, unjust enrichment, and
breach of contract); In re J.P. Jeanneret Assoc's, Inc., 2011 WL
35594, at *33-34 (S.D.N.Y. Jan. 31, 2011) (McMahon, J.)
(dismissing all state law claims other than derivative claims
against auditor);  but see Anwar v. Fairfield Greenwich Limited
("Anwar I"), 728 F.Supp.2d 354 (Marrero, J) (S.D.N.Y. July 29,
2010) (examining history of Martin Act preemption rule and
departing from it as erroneous).

     Plaintiffs argue that the line of cases establishing that
the Martin Act precludes private causes of action is erroneous,
drawing the Court's attention to the extensive analysis conducted
by Judge Marrero in Anwar I, 728 F.Supp.2d 354.  In Anwar I,
Judge Marrero identified the roots of Martin Act preclusion;
analyzed the history of Martin Act preclusion in the New York

appellate terms and in Federal courts in this Circuit; identified
a growing trend against preclusion in the New York intermediate
appellate courts; noted the New York Attorney General's recent
position against preclusion; examined the goals and purposes of
the Martin Act itself; and concluded that were the New York Court
of Appeals to examine the issue, it would hold that the Martin
Act does not preclude private causes of action like those brought
here. Anwar v. Fairfield Greenwich Limited, 728 F.Supp.2d 354.

However, the New York Court of Appeals has not examined the
issue, and this Court remains bound to apply the result in the
only Second Circuit case that has addressed the subject:
Castellano v. Young & Rubicam, 257 F.3d 171, 190 (2d Cir. 2001).
In that case, the Second Circuit recognized Martin Act preemption
of common law claims involving securities. Plaintiffs' argument
that the Martin Act does not preempt private actions based on
conduct that would also give rise to Martin Act liability is
therefore without merit.

The Court finds that no repleaded version of the instant
claims could avoid reliance on the existence of Madoff's Ponzi
scheme or avoid alleging that Defendants misrepresented or
omitted material facts, whether knowingly or otherwise, about
that scheme and its effects on the Funds' value. Accordingly,
Plaintiffs' claims, if repleaded, would be preempted if they fell

within the Martin Act's geographic purview — that is, if they
were based on activities engaged in to promote or induce the sale
of securities "within or from" New York. N.Y. Gen. Bus. L. § 352-
c(1); <u>Stephenson v. Citco Group Ltd.</u>, 700 F.Supp.2d at 616-17 and
n.17 (noting that the "Martin Act covers misrepresentations
engaged in to induce or promote the issuance, distribution,
exchange, sale, or purchase within or from New York of any
securities or commodities . . .") (citation and quotations
omitted); <u>Lehman Bros. Comm. Corp. v. Minmetals Int'l Non-Ferrous
Metals Trading Co.</u>, 179 F.Supp.2d 159, 162 (S.D.N.Y. 2001).

Here, as previously noted, the Complaint alleges that
"Plaintiffs' sole purpose of investing in the Funds was to invest
in the United States and in United States equities that are part
of the S&P 100." CAC ¶ 224. It further alleges that "Plaintiffs
and the Class[] all understood [when investing] that the Funds
were run by a broker-dealer in New York." <u>Id</u>. ¶ 225. The Court
therefore finds that the conduct at the core of Plaintiffs'
allegations was engaged in to induce or promote the sale or
purchase of commodities within or from New York, within the
meaning of the Martin Act.

Applying <u>Castellano</u>, this Court holds that any attempt to
replead Plaintiffs' claims would be futile, since such repleaded
claims would necessarily rely on alleged misstatements inducing

29

or promoting the sale or purchase of securities within or from New York, and thus would be preempted by the Martin Act.

## III. CONCLUSION

Defendants' Motions to Dismiss are GRANTED, and the Complaint is dismissed, with prejudice, in its entirety.  For reasons stated herein, leave to replead is DENIED as futile.

The Clerk is directed to close the docket in this matter.

SO ORDERED.

Dated:    New York, New York

March 30 , 2011

Deborah A. Batts
United States District Judge

30