## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE KINGATE MANAGEMENT LIMITED LITIGATION | Master File No. 09 Civ. 5386 (DAB) |
| This Document Relates To:  All Actions | **JURY TRIAL DEMANDED** |

## <u>CORRECTED SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT</u>

**BOIES, SCHILLER & FLEXNER LLP**
575 Lexington Avenue
New York, New York 10022
(212) 446-2300


**COHEN MILSTEIN SELLERS
  & TOLL PLLC**
88 Pine Street
New York, New York 10005
(212) 838-7797

*Co-Lead Counsel for Plaintiffs and*
*Interim Co-Lead Counsel for the Putative Class*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

GLOSSARY OF DEFINED TERMS ........................................................................ vii

I.    NATURE OF THE ACTION ................................................................. 1

II.   JURISDICTION AND VENUE .............................................................. 3

III.  PARTIES ............................................................................................... 4

    A.    Plaintiffs ..................................................................................... 4

    B.    Defendants .................................................................................. 5

        1.    The Kingate Defendants ................................................. 5

        2.    Defendant PricewaterhouseCoopers Bermuda ............... 9

        3.    Defendant Citi Hedge .................................................... 10

        4.    Relevant Non-Parties ..................................................... 11

IV.   BACKGROUND FACTS ...................................................................... 13

    A.    Madoff's Massive Ponzi Scheme ............................................... 13

    B.    Madoff's Arrest and Subsequent Investigations ....................... 14

V.    THE KINGATE DEFENDANTS' WRONGFUL CONDUCT ................ 15

    A.    The Funds' Investments With Madoff ........................................ 15

    B.    Key Kingate Defendants Were in Close Contact With Madoff ........... 16

    C.    The Kingate Defendants Knew or Should Have Known That Madoff Was a Fraud ........................................................................................ 18

    D.    The Kingate Defendants Failed to Fulfill Ongoing Duties to Monitor and Evaluate Madoff ....................................................................... 20

VI.   THE TREMONT GROUP ..................................................................... 24

    A.    The Tremont Group Had Deep Ties With Madoff Based on its Management of Other Madoff Feeder Funds .............................. 24

    B.    The Tremont Group's Special Relationship With Madoff ................... 25

i

C.     The Tremont Group Provided Substantial Assistance to Tremont's Breach of Fiduciary Duty ............................................................................ 26

VII.   PRICEWATERHOUSECOOPERS' WRONGFUL CONDUCT ................................... 26

A.     PwC Audited the Funds ............................................................... 26

B.     PwC's Audits Failed to Conform to GAAS ........................................ 29

     1.     Basic Standards Under GAAS .............................................. 29

     2.     PwC Failed to Comply with GAAS ....................................... 31

          (a)   PwC Failed to Conduct Adequate Procedures Concerning Existence and Occurrence Risk .................................... 34

          (b)   PwC Failed to Conduct the Required Procedures on BMIS Given Its Role as a Service Organization ..................... 36

C.     PricewaterhouseCoopers' Practice Guide Concerning Audits of Hedge Funds Highlighted the Importance of Confirming the Existence of the Assets ............................................................................................ 37

D.     PwC Met With Madoff Periodically to Gain an Understanding of BMIS's Functions, But Never Tested the Existence or Operational Effectiveness of Key Controls as Required by GAAS ..................................................... 38

E.     PwC Admitted That it Did Not Test the Operating Effectiveness of the Controls at BMIS ......................................................................... 42

F.     PwC Violated GAAS By Making Use of Reports Prepared by Friehling & Horowitz Without Investigating Its Professional Reputation ..................... 44

G.     Without Sufficient Adequate Evidence That the Controls at BMIS Existed and Were Operating Effectively, PwC Violated GAAS by Relying on Confirmations From BMIS ........................................................... 45

H.     PwC Violated GAAS by Performing Circular Confirmations Based on Information Derived Solely From BMIS .............................................. 47

I.     The Funds' Financial Statements Were False ..................................... 48

     1.     Kingate Global's Statements of Assets and Liabilities, Operations, and Change of Net Assets Were False ................................. 48

     2.     Kingate Euro's Statements of Assets and Liabilities, Operations, and Change of Net Assets Were False ................................. 49

3. The Notes to Kingate Global's and Kingate Euro's Financial Statements ................................................................. 52

J. Unique Knowledge of the Volume of Assets Madoff Was Purportedly Trading Should Have Increased Scrutiny of the Information Provided by Madoff ................................................................................................ 54

K. PwC Violated Its Duties to Plaintiffs and the Class ............................... 55

L. PwC's Substantial Assistance to Kingate Defendants' Breaches of Fiduciary Duty ........................................................................................ 57

VIII. CITI HEDGE'S WRONGFUL CONDUCT .................................................... 58

A. Citi Hedge Committed to Provide Critical Administrative Services to the Investors .................................................................................................. 58

B. Citi Hedge's Superior Financial Services Capabilities .......................... 60

C. Citi Hedge Owed Duties to Plaintiffs and the Class ............................. 61

D. Citi Hedge's Performance of Its Duties Was Grossly Deficient ........... 62

E. Citi Hedge Provided Substantial Assistance to the Kingate Defendants' Breaches of Fiduciary Duty ................................................................... 63

IX. IF DEFENDANTS HAD NOT BREACHED THEIR DUTIES, PLAINTIFFS' LOSSES WOULD HAVE BEEN AVOIDED ................................................ 64

A. Madoff's Custody of Equity Securities .................................................. 64

B. Madoff's Non-Existent Counterparties .................................................. 65

C. The Government Securities Purportedly Held at the End of Each Quarter Did Not Exist ......................................................................................... 65

D. Madoff's Unknown Auditing Firm ........................................................ 66

E. Madoff's Paper Trading Records ........................................................... 66

F. Madoff's Fee Structure .......................................................................... 66

G. Madoff's Impossible Trading Volume ................................................... 67

H. Madoff's Statistically Impossible Execution ......................................... 68

I. Madoff's Impossible Dividend Activity ................................................ 68

X.      CLASS ACTION ALLEGATIONS ....................................................... 69

COUNT 1     PRECLUDED
            Fraud Against The Kingate Fraud Claim Defendants
            (Purchaser Claims) ..................................................................72

COUNT 2     PRECLUDED
            Fraud Against The Kingate Fraud Claim Defendants
            (Holder Claims) ......................................................................72

COUNT 3     PRECLUDED
            Negligent Misrepresentation
            Against The Kingate Defendants (Purchaser Claims) ...........................72

COUNT 4     PRECLUDED
            Negligent Misrepresentation
            Against The Kingate Defendants (Holder Claims)................................72

COUNT 5     Gross Negligence
            Against The Kingate Defendants ......................................................73

COUNT 6     Negligence
            Against The Kingate Defendants ......................................................74

COUNT 7     Breach Of Fiduciary Duty
            Against The Kingate Defendants ......................................................75

COUNT 8     PRECLUDED
            Constructive Fraud
            Against The Kingate Defendants ......................................................77

COUNT 9     Third Party Beneficiary Breach Of Contract
            Against KML And Tremont..............................................................77

COUNT 10    Third Party Beneficiary Breach Of Contract
            Against The FIM Entities................................................................78

COUNT 11    Constructive Trust
            Against The Kingate Defendants ......................................................79

COUNT 12    Mutual Mistake
            Against The Kingate Defendants ......................................................79

COUNT 13    Aiding And Abetting Breach Of Fiduciary Duty
            Against The Tremont Group..............................................................80

COUNT 14    PRECLUDED
            Aiding And Abetting Fraud
            Against The Tremont Group ........................................................ 81

COUNT 15    Gross Negligence
            Against PwC .............................................................................. 81

COUNT 16    Negligence
            Against PwC .............................................................................. 82

COUNT 17    Negligent Misrepresentation
            Against PwC .............................................................................. 83

COUNT 18    Third Party Beneficiary Breach Of Contract
            Against PwC .............................................................................. 85

COUNT 19    Aiding And Abetting Breach Of Fiduciary Duty
            Against PwC .............................................................................. 85

COUNT 20    PRECLUDED
            Aiding And Abetting Fraud
            Against PwC .............................................................................. 87

COUNT 21    Breach Of Fiduciary Duty
            Against Citi Hedge ..................................................................... 87

COUNT 22    Gross Negligence
            Against Citi Hedge ..................................................................... 88

COUNT 23    Negligence
            Against Citi Hedge ..................................................................... 89

COUNT 24    Negligent Misrepresentation
            Against Citi Hedge ..................................................................... 89

COUNT 25    Third Party Beneficiary Breach Of Contract
            Against Citi Hedge ..................................................................... 91

COUNT 26    Aiding And Abetting Breach Of Fiduciary Duty
            Against Citi Hedge ..................................................................... 92

COUNT 27    PRECLUDED
            Aiding And Abetting Fraud
            Against Citi Hedge ..................................................................... 93

COUNT 28    Unjust Enrichment
            Against All Defendants ............................................................... 93

COUNT 29     VOLUNTARILY DISMISSED
             For Violations Of Rule 10b-5
             And Section 10(b) Of The Exchange Act
             Against The Kingate Fraud Claim Defendants......................................................94

COUNT 30     VOLUNTARILY DISMISSED
             For Violations Of Section 20(a) Of The Exchange Act
             Against Tremont Advisers, Grosso, Ceretti, And Manzke ...................................94

COUNT 31     VOLUNTARILY DISMISSED
             For Violations Of Rule 10b-5
             And Section 10(b) Of The Exchange Act
             Against PricewaterhouseCoopers ..........................................................................94

COUNT 32     VOLUNTARILY DISMISSED
             For Violations Of Rule 10b-5
             And Section 10(b) Of The Exchange Act
             Against Citi Hedge...............................................................................................94

JURY TRIAL DEMANDED ..................................................................................................... 94

PRAYER .................................................................................................................................. 95

# GLOSSARY OF DEFINED TERMS

| Defined Term | Definition |
| --- | --- |
| Acorn | Acorn Partners |
| Account Agreements | Customer Agreements, Option Agreements, and Trading Authorizations Between The Funds and BMIS |
| Administration Agreement | Citi Hedge Administration Agreement, as amended and restated effective June 1, 2007 (attached as Exhibit 15) |
| AICPA | American Institute of Certified Public Accountants |
| AICPA Guide | The AICPA Audit Guide: Auditing Derivative Instruments, Hedging Activities, and Investments in Securities |
| Aksia | Aksia LLC |
| AU | AICPA Statements of Accounting Standards |
| Bank of Bermuda | Bank of Bermuda Limited |
| Bish | Keith R. Bish |
| BISYS | BISYS Hedge Fund Services Limited |
| BMIS | Bernard L. Madoff Investment Securities LLC |
| BMIS Bank Account | BMIS Account at JPMorgan Chase & Co. |
| BMIS' Office | 885 Third Avenue, New York, New York |
| Brown | Scott-Watson Brown |
| Calendar | Calendar of Bernard L. Madoff kept by Eleanor Squillari |
| Castillo | Plaintiff Alvaro Castillo |
| CBOE | Chicago Board Options Exchange |
| Ceretti | Defendant Federico M. Ceretti |
| Citi Hedge | Defendant Citi Hedge Fund Services Ltd. |
| Class | All persons or entities who owned shares of the Funds as of December 10, 2008, and were damaged thereby |

Consultant ........................................... FIM Advisers LLP and its predecessor-in-interest FIM Limited

Cook.................................................... Graham H. Cook

DTC..................................................... Depository Trust & Clearing Corporation

Epps.................................................... John E. Epps

Exchange Act ...................................... Securities Exchange Act of 1934

F&H ................................................... Friehling & Horowitz

Fairfield Greenwich ........................... Fairfield Greenwich Advisors, LLC

FBI ..................................................... Federal Bureau of Investigation

FIM Advisers ..................................... Defendant FIM Advisers LLP

FIM Defendants ................................. Defendants FIM Advisers LLP, FIM Limited, FIM (USA) Incorporated, Carlo Grosso and Federico M. Ceretti

FIM Entities ....................................... Defendants FIM Advisers LLP, FIM Limited and FIM (USA) Incorporated

FIM Limited....................................... Defendant FIM Limited

FIM USA ........................................... Defendant FIM (USA) Incorporated

FINRA................................................ Financial Industry Regulatory Authority

Friehling............................................ David Friehling

Funds.................................................. Kingate Global Fund, Ltd. and Kingate Euro Fund, Ltd.

GAAP................................................. Generally Accepted Accounting Principles

GAAS................................................. Generally Accepted Auditing Standards

Geldzahler......................................... Plaintiff Lucien Geldzahler

Grosso ............................................... Defendant Carlo Grosso

Hemisphere ....................................... Hemisphere Management Limited

IM....................................................... Information Memoranda (attached as Exhibits 1-6)

Investment Advisory.......................... Investment Advisory Business Unit of Bernard L. Madoff Investment Securities LLC

Individual Defendants ...................... Defendants Carlo Grosso, Federico M. Ceretti, Sandra Manzke, and Michael G. Tannenbaum

IRS .................................................. Internal Revenue Service

KEF 2006-07 FS ............................. Financial Statements of Kingate Euro Fund, Ltd. for the years ending December 31, 2006 and 2007 (attached as Exhibit 10)

KEF 2008 IM .................................. Kingate Euro Fund, Ltd. Information Memorandum, October 6, 2008 (attached as Exhibit 2)

KGF 2000 IM .................................. Kingate Global Fund, Ltd. Information Memorandum, May 1, 2000 (attached as Exhibit 6)

KGF 2003 IM .................................. Kingate Global Fund, Ltd. Amended and Restated Information Memorandum, January 15, 2003 (attached as Exhibit 5)

KGF 2004-05 FS ............................. Financial Statements of Kingate Global Fund, Ltd. for the years ending December 31, 2004 and 2005 (attached as Exhibit 8)

KGF 2006-07 FS ............................. Financial Statements of Kingate Global Fund, Ltd. for the years ending December 31, 2006 and 2007 (attached as Exhibit 9)

KGF 2006 IM .................................. Kingate Global Fund, Ltd. Amended and Restated Information Memorandum for USD Participating Common Shares, May 1, 2006 (attached as Exhibit 4)

KGF 2006 Management Agreement.. January 1, 2006 Management Agreement between Kingate Global and KML (attached as Exhibit 7)

KGF 2007 IM .................................. Kingate Global Fund, Ltd. Amended and Restated Information Memorandum, August 1, 2007 (attached as Exhibit 3)

KGF 2008 IM .................................. Kingate Global Fund, Ltd. Amended and Restated Information Memorandum, October 6, 2008 (attached as Exhibit 1)

Kingate Euro .................................... Kingate Euro Fund, Ltd.

Kingate Euro Account ....................... Kingate Euro's Account with BMIS

Kingate Defendants............................ Defendants Kingate Management Limited, Tremont (Bermuda) Limited, Tremont Group Holdings, Inc., FIM Advisers LLP, FIM Limited, FIM (USA) Incorporated, Carlo Grosso, Federico M. Ceretti, Sandra Manzke, and Michael G. Tannenbaum

Kingate Fraud Claim Defendants...... Defendants Kingate Management Limited, Tremont (Bermuda) Limited, FIM Advisers LLP, FIM Limited, FIM (USA) Incorporated, Carlo Grosso, Federico M. Ceretti and Sandra Manzke

Kingate Global ................................... Kingate Global Fund, Ltd.

Kingate Global Account ................... Kingate Global's Account with BMIS

KML.................................................. Defendant Kingate Management Limited

Lamac............................................... Plaintiff Jaques Lamac

Madoff.............................................. Bernard L. Madoff

Manzke............................................. Defendant Sandra Manzke

MassMutual....................................... Massachusetts Mutual Life Insurance Company

McGowan.......................................... Linda McGowan

Murphy............................................. John V. Murphy

NAV ................................................. Net Asset Value

Nitkey............................................... Plaintiff Nitkey Holdings Corporation

OEX ................................................. Options of the S&P 100 Index

Office Telephone Directory ............. Bernard L. Madoff's Office Telephone Directory kept by Eleanor Squillari

Oppenheimer..................................... Oppenheimer Acquisition Corp.

OppenheimerFunds........................... OppenheimerFunds, Inc.

Pocket Book...................................... A copy of Bernard L. Madoff's Pocket Book Telephone Directory kept by Eleanor Squillari

Proxy Statement................................ Schedule 14A Proxy Statement filed with the SEC by Tremont Group Holdings, Inc. on August 20, 2001

Putnam Lovell................................... Putnam Lovell Securities, Inc.

PwC 2004 Madoff Report ................ Report of PwC Meeting with Madoff in December 2004 (attached as Exhibit 13)

PwC ................................................. Defendant PricewaterhouseCoopers Bermuda

PwC Guide ....................................... 2007 PwC U.S. publication entitled, "Auditing Alternative Investments – A Practical Guide for Investor Entities, Investee Funds Managers and Auditors" (attached as Exhibit 11)

PwC Netherlands ............................. PricewaterhouseCoopers Accountants, N.V.

PwC Netherlands Letter ................... Letter from PwC Netherlands Recounting Audit Procedures Conducted on Madoff in December 2004 (attached as Exhibit 12)

PwC U.S. .......................................... PricewaterhouseCoopers LLP

Rye Funds ....................................... Rye Select Broad Market Fund LP, Rye Select Broad Market Prime Fund LP, Rye Select Broad Market XL Fund LP, Rye Select Broad Market Portfolio Limited, and Rye Select Broad Market XL Portfolio Limited.

S&P 100 Index ................................. Standard & Poor's 100 Index

SAS .................................................. AICPA Statements of Accounting Standards

Sebah ............................................... Charles D. Sebah

SEC .................................................. Securities and Exchange Commission

Silvana............................................. Plaintiff Silvana Worldwide Corp

SIPA ................................................. Securities Investor Protection Act

SocGen ............................................. Société Générale

Tannenbaum ..................................... Defendant Michael G. Tannenbaum

Tremont ............................................ Defendant Tremont (Bermuda) Limited

Tremont Advisers ............................. Tremont Advisers, Inc.

Tremont Group ................................. Defendant Tremont Group Holdings, Inc.

Wolfgruber ....................................... Kurt Wolfgruber

Plaintiffs, individually and on behalf of all others similarly situated, by their undersigned counsel, allege the following upon information and belief and counsels' investigation, except for those allegations as to themselves, which are alleged upon personal knowledge.

## I.   NATURE OF THE ACTION

1.     The Defendants in this case were managers and service providers to the Kingate Global Fund, Ltd. ("Kingate Global") and Kingate Euro Fund, Ltd. ("Kingate Euro," together with Kingate Global, "the Funds").  As a result of Defendants' breaches of fiduciary and common law duties and of contractual obligations, investors in the Funds were induced to purchase and hold virtually worthless investments, thereby causing the investors to suffer massive out-of-pocket losses.  If Defendants had performed their duties properly, Plaintiffs would not have suffered these losses.

2.     As the public learned on December 11, 2008, Bernard L. Madoff ("Madoff") through his investment firm Bernard L. Madoff Investment Securities LLC ("BMIS") controlled billions of dollars in investments which purportedly earned stable returns.  In truth, these returns were entirely fictitious and part of the largest Ponzi scheme in history and investors lost many billions of dollars.

3.     The Kingate Defendants solicited investments from Plaintiffs, which they oversaw, controlled, and managed by funneling them into Madoff's Ponzi scheme.  Professional and industry standards required that Defendants would conduct due diligence, choose investment advisers, monitor the performance of the chosen investment advisers, and provide Plaintiffs with independently verified and calculated statements valuing their investments.  Instead, Defendants turned over all of Plaintiffs' assets to Madoff without conducting any meaningful due diligence or independently verifying Madoff's purported trading and profits.

4.       The Kingate Defendants owed duties to Plaintiffs (i) to conduct due diligence both before and after the initial investment, (ii) to exercise due care with respect to Plaintiffs' investments, and (iii) to monitor Madoff and others chosen to carry out the Funds' investment strategy and safeguard their assets.  The loss of Plaintiffs' assets in the Madoff Ponzi scheme is a direct and proximate result of the Kingate Defendants' failure to fulfill their duties.  In so doing, Defendants wrongfully collected hundreds of millions of dollars from Plaintiffs in unearned fees based on the fictitious profits.

5.       Defendants PwC and Citi Hedge were service providers to the Funds.  They undertook duties to Plaintiffs to audit the Funds' financial statements and to administer the Funds' operations, including accurate calculation of the NAV and the value of each investor's holdings.  PwC and Citi Hedge grossly failed to fulfill these duties by, *inter alia*, accepting at face value Madoff's statements about securities trades and holdings without ever verifying anything with an independent third-party.  For years, they told Plaintiffs the Funds were worth billions when their true value was virtually zero.

6.       Plaintiffs assert common law claims for gross negligence, negligence, breach of fiduciary duty, third-party beneficiary breach of contract, mutual mistake, aiding and abetting breach of fiduciary duty, and unjust enrichment.  Plaintiffs also assert negligent misrepresentation claims against PwC and Citi Hedge based on their false statements and omissions regarding their own conduct and the value of Fund shares, which are not "covered securities" as that term is defined by the Securities Litigation Uniform Standards Act of 1998 ("SLUSA").

7.       Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all persons or entities who owned shares of

the Funds as of December 10, 2008, and were damaged thereby (the "Class").  Excluded from

the Class are the Defendants, any entity in which Defendants have a controlling interest, and the

officers, directors, affiliates, legal representatives, immediate family members, heirs, successors,

subsidiaries and/or assigns of any such individual or entity.

## II.      JURISDICTION AND VENUE

8.      This Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28

U.S.C. § 1332(d)(2).  The amount in controversy exceeds the jurisdictional amount, the members

of the Class are in the hundreds, and at least one Plaintiff is a citizen of a foreign state and one

Defendant is a citizen of New York.

9.      This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

10.      This Court has personal jurisdiction over all Defendants under New York's long

arm statute, N.Y. C.P.L.R. § 302, because, as alleged below, the claims alleged herein arose from

business that Defendants transacted in New York or contractual duties to supply services in New

York, or tortious acts committed in New York.

11.      For example, significant conduct, including trading and purported due diligence

on Madoff and BMIS, was supposed to take place in New York.  The Funds' assets were held in

New York by BMIS as custodian.  KGF 2006 IM, Ex. 4 at 9.  All Defendants understood that the

Funds were run by a broker-dealer in New York.  The IMs stated that KML did not "have any

control over the investment and trading decisions of the Investment Advisor [BMIS]."  *Id.* at 5.

Having agreed to turn over investment decisions to BMIS in New York, the Defendants

understood that trading and investment decisions for the Funds would be directed by BMIS in

New York.  *Id.* at 14.

12.      In addition, as alleged herein, certain Defendants conducted meetings with

Madoff at his offices in New York, and had conversations with individuals located in, and

obtained documents from, New York, which related to the claims alleged herein.  The exercise of personal jurisdiction over Defendants by this Court is appropriate and will not offend traditional notions of fair play and substantial justice because each of the Defendants had sufficient minimum contacts with the State of New York.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(3), as one or more of the Defendants resides in this District, a substantial number of relevant events occurred in this District, and the principal place of business of one or more Defendants is in this District.

## III.    PARTIES

### A.    Plaintiffs

14.     Due to the acts alleged herein, the Plaintiffs identified below have lost their investments in the Funds and also have paid substantial fees that were wrongfully charged by Defendants based on investment returns that never existed.

15.     Plaintiff **Silvana Worldwide Corp.** ("Silvana") is, and was at all times relevant hereto, incorporated in Panama.  Silvana invested in Kingate Global beginning in March 2008 and was damaged thereby.

16.     Plaintiff **Criterium Capital Funds, B.V.** is, and was at all times relevant hereto, a Netherlands Antilles private limited liability company ("besloten vennootschap") that invested assets in Kingate Global beginning on January 1, 1999.

17.     Plaintiff **BBF Trust** is, and was at all times relevant hereto, a trust formed under the laws of the Commonwealth of the Bahamas that invested assets in Kingate Global beginning in October 1997.

18.     Plaintiff **BG Valores, S.A.** (f/k/a Wall Street Securities, S.A.) is, and was at all times relevant hereto, a Panamanian corporation that invested assets in Kingate Global beginning in November 2008.

4

19.     Plaintiff **Banca Arner S.A.** is, and was at all times relevant hereto, a Swiss corporation that invested assets in Kingate Global beginning in July 1997 and Kingate Euro beginning in May 2000.

20.     Plaintiff **Alvaro Castillo** ("Castillo") is, and was at all times relevant hereto, an individual residing in Switzerland who invested assets in Kingate Global beginning in October 2008.

21.     Plaintiff **Lucien Geldzahler** ("Geldzahler") is, and was at all times relevant hereto, an individual residing in Israel who invested assets in Kingate Global beginning in January 2008.

22.     Plaintiff **Jaques Lamac** ("Lamac") is, and was at all times relevant hereto, an individual residing in Brazil who invested assets in Kingate Global beginning in January 2006.

23.     Plaintiff **Nitkey Holdings Corporation** ("Nitkey") is, and was at all times relevant hereto, a Panamanian corporation that invested assets in Kingate Global beginning in March 2008.

### B.     Defendants

#### 1.     The Kingate Defendants

24.     Defendant **Kingate Management Limited** ("KML") was a corporation organized under the laws of Bermuda on February 24, 1994.  KML's principal place of business was located at 99 Front Street, Hamilton, Bermuda.

(a)     KML served as Co-Manager of the Funds with Tremont (defined *infra* ¶ 25) from the inception of the Funds until approximately December 31, 2005.  Beginning January 1, 2006, KML served as sole Manager.  As Co-Manager and Manager, KML was responsible for the selection, evaluation, and oversight of Madoff, and for arranging accounting

and administrative services for the Funds pursuant to management agreements dated March 1, 1995, May 1, 2000, and January 1, 2006, as amended.

(b)     For its purported services as Manager and Co-Manager, KML received millions of dollars in fees, that were paid by Plaintiffs, measured as all or a portion of the "management fee" equal to 1.5 percent of each Fund's net asset value ("NAV").

(c)     KML transacted business related to the Funds in New York, including maintaining the Funds' investment accounts with Madoff in New York, communicating regularly with Madoff, and conducting due diligence and oversight of Madoff in New York.

25.     Defendant **Tremont (Bermuda) Limited** ("Tremont") is a corporation organized under the laws of Bermuda on November 16, 1988, and its principal place of business is located at Tremont House, 4 Park Road, Hamilton, Bermuda.

(a)     Tremont is a wholly owned subsidiary of Tremont Advisers, Inc. ("Tremont Advisers").  Tremont Advisers is currently known as Tremont Group Holdings, Inc. (defined *infra* ¶ 26), which is a wholly owned subsidiary of Oppenheimer Acquisition Corp. Tremont Advisers and Oppenheimer Acquisition Corp. are incorporated in Delaware.

(b)     Tremont served as Co-Manager of the Funds with KML from the inception of the Funds until December 31, 2005.  As Co-Manager, Tremont was responsible for the selection, evaluation, and oversight of Madoff, and for arranging accounting and administrative services for the Funds, pursuant to certain management agreements dated March 1, 1995 and May 1, 2000, as amended.

(c)      For its purported services as Co-Manager, Tremont received millions of dollars in fees, that were paid by Plaintiffs, measured as all or a portion of the "management fee" equal to 1.5 percent of each Fund's NAV.

(d)      Tremont transacted business related to the Funds in New York, including maintaining the Funds' investment accounts with Madoff in New York, communicating regularly with Madoff, and conducting due diligence and oversight of Madoff in New York.

26.      Defendant **Tremont Group Holdings, Inc.** ("Tremont Group") is a corporation organized under the laws of the State of Delaware and maintains its principal place of business at 555 Theodore Fremd Avenue, Rye, New York.  Tremont Group was formerly Tremont Advisers and is currently a wholly owned subsidiary of Oppenheimer Acquisition Corp.

27.      Defendant **FIM Limited** ("FIM Limited" or the "Consultant") is a limited liability company established in 1980 under the laws of England and Wales.  FIM Limited has its principal place of business at 62 Wilson Street, London, United Kingdom.  FIM Limited was appointed to provide consultancy services to KML and Tremont pursuant to a Consulting Services Agreement dated December 1, 1995, and provided consultancy services until approximately July 31, 2005.  FIM Limited is the predecessor-in-interest to FIM Advisers LLP, and is associated with FIM (USA) Incorporated.  FIM Limited was paid millions of dollars in fees by Plaintiffs through KML for its purported consulting services.

28.      Defendant **FIM Advisers LLP** ("FIM Advisers" or the "Consultant") is a limited liability partnership incorporated under the laws of the United Kingdom on October 8, 2004.  FIM Advisers' principal place of business is 62 Wilson Street, London, United Kingdom.

(a)      FIM Advisers is an asset management company specializing in the management of hedge fund portfolios for institutions and private clients, with approximately $5 billion under management.  FIM Advisers is regulated by the Financial Services Authority of the United Kingdom.

(b)     Pursuant to a Consulting Services Agreement dated August 1, 2005, FIM Advisers rendered consulting advice and services to KML and Tremont with respect to the Funds' investment, operational, administrative, marketing, accounting, and legal matters.

(c)     FIM Advisers is the successor-in-interest to FIM Limited.  At all relevant times, FIM Advisers had employees located in Bermuda, London, and New York, and conducted a substantial amount of its business in New York through its affiliate FIM (USA) Incorporated.

29.     Defendant **FIM (USA) Incorporated** ("FIM USA" and together with FIM Limited and FIM Advisers, the "FIM Entities") was a Delaware corporation incorporated on January 25, 2005 and was qualified to do business in New York.  FIM USA was the American affiliate of FIM Advisers, and was located at 780 Third Avenue, New York, New York 10017.

30.     Defendant **Carlo Grosso** ("Grosso") founded the FIM Entities.  Grosso served as Executive Chairman and Chief Investment Officer of FIM Limited.  Grosso is the Executive Chairman and Chief Investment Officer of FIM Advisers, which he also co-founded.  Grosso controlled the FIM Entities.  Grosso is a resident of the United Kingdom.

31.     Defendant **Federico M. Ceretti** ("Ceretti") joined FIM Limited in 1986 and co-founded FIM Advisers with Defendant Grosso.  Ceretti is Chief Executive Officer of FIM Advisers.  Ceretti controlled the FIM Entities.  Ceretti is a resident of the United Kingdom.

32.     Defendants FIM Limited, FIM Advisers, FIM USA, Grosso and Ceretti are collectively referred to herein as the "FIM Defendants."

33.     Defendant **Sandra Manzke** ("Manzke") was a Director of Kingate Global from 1995 until approximately 2003.  Manzke was also Chairman and co-CEO of Tremont Group (f/k/a Tremont Advisers), the parent company of Tremont throughout the time that Tremont served as Co-Manager of the Funds.  As a director of Kingate Global, Manzke had knowledge

of, and participated in, Kingate Global's transaction of business in New York, including by maintaining investment accounts in New York, directing or approving transactions related to those accounts, and otherwise exercising control over Kingate Global.  Manzke is a citizen of Florida.

34.     Defendant **Michael G. Tannenbaum** ("Tannenbaum") was a Director of KML, and oversaw and directed KML's wrongful actions on behalf of the Funds.  Tannenbaum is a citizen of New York.

35.     Defendants Grosso, Ceretti, Manzke, and Tannenbaum are collectively referred to herein as the "Individual Defendants."  All of the Individual Defendants had knowledge of and participated in activities and transactions in New York of the Funds, KML, Tremont, Tremont Group, and/or FIM Entities with which they were associated.

36.     Defendants KML, Tremont, Tremont Group, the FIM Entities, and the Individual Defendants are referred to collectively as the "Kingate Defendants."

## 2.     Defendant PricewaterhouseCoopers Bermuda

37.     Defendant **PricewaterhouseCoopers Bermuda** ("PwC") is an accounting firm organized under the laws of Bermuda.  PwC is part of PricewaterhouseCoopers' global network of firms.  Pursuant to its membership in PricewaterhouseCoopers, PwC is licensed to use the names "PwC" and "PricewaterhouseCoopers" and is required to maintain uniform standards with other members of PricewaterhouseCoopers.

(a)     The audit opinions accompanying the Funds' financial statements were signed by "PricewaterhouseCoopers, Chartered Accountants," were issued on PwC's letterhead, and stated that "PricewaterhouseCoopers refers to the members of the worldwide PricewaterhouseCoopers organization."  PwC's audit opinions reported on the financial statements and results of the operations of the Funds and certified that these audits were

9

conducted "in conformity with accounting principles generally accepted in the United States of America," and were unqualified, or "clean" audit opinions, without which Plaintiffs would not have invested in the Funds.  On information and belief, PwC had a continuing relationship with the Funds and provided other services to the Funds in addition to the yearly audit of the Funds.

### 3.      Defendant Citi Hedge

38.      Defendant **Citi Hedge Fund Services Ltd.** ("Citi Hedge") was, at all relevant times, a company registered in accordance with the laws of Bermuda.  In 2013, Citi Hedge changed its name to Citi Fund Services (Bermuda) Ltd.  Citi Fund Services (Bermuda) Ltd. has its principal place of business at 5 Reid Street, Hamilton, Bermuda.

(a)      Citi Hedge served as the Funds' administrator pursuant to an Administration Agreement, as amended and restated effective June 1, 2007.  Citi Hedge is the successor-in-interest to the prior administrators of the Funds, BISYS Hedge Fund Services Limited ("BISYS") and Hemisphere Management Limited ("Hemisphere").

(b)      As the Funds' administrator, Citi Hedge was responsible for performing significant day-to-day administrative services for the Funds, including:  (i) preparing and distributing monthly reports to the investors containing the amount of the Funds' net assets, the amount of any distributions from the Funds, and accounting and legal fees and all other fees and expenses of the Funds; (ii) maintaining the Funds' financial books and records; (iii) calculating the Funds' NAVs and subscription and redemption prices; (iv) handling communications with shareholders and the general public; (v) soliciting sales of the Funds' shares; (vi) accepting Subscriptions for share purchases; (vii) maintaining the Funds' corporate records and accounts; (viii) distributing payments of dividends and fees; (ix) conducting meetings of the Funds' shareholders and directors; and (x) making redemptions from the Funds.

(c)      Citi Fund Services (Bermuda) operates as a subsidiary of Citibank Overseas Investment Corporation.  Citi Hedge administered Plaintiffs' investments in the Funds' New York investment accounts by, among other things, communicating subscription and redemption requests to Madoff and obtaining trade confirmations and monthly account statements from Madoff.

### 4.      Relevant Non-Parties

39.      **Kingate Global** is an open-end investment company organized as an international business company under the laws of the British Virgin Islands on February 11, 1994.  Its principal place of business is located in Road Town, Tortola, British Virgin Islands.  Kingate Global's liquidation is pending.

(a)      Shares in Kingate Global were first sold on March 1, 1995.  Since its inception, substantially all of Kingate Global's assets were invested with Madoff.  Plaintiffs acquired shares or equity in Kingate Global when they turned over their assets to the Kingate Defendants.

(b)      According to BMIS' records, Kingate Global maintained an account with BMIS designated 1FN061 (the "Kingate Global Account").  The Kingate Global Account was opened on or about March 2, 1994 when a Customer Agreement, an Option Agreement, and a Trading Authorization Limited to Purchases and Sales of Securities and Options (the "Account Agreements") were executed and delivered to BMIS at its headquarters at 885 Third Avenue, New York, New York.  The Kingate Global Account was maintained in New York at BMIS at all relevant times.

40.      **Kingate Euro** is an open-ended investment company organized as an international business company under the laws of the British Virgin Islands on April 19, 2000.

11

Kingate Euro's principal place of business is in Road Town, Tortola, British Virgin Islands. Kingate Euro's liquidation is pending.

(a)     Kingate Euro commenced operations on May 1, 2000.  Since its inception, substantially all of Kingate Euro's assets were invested with Madoff.  Plaintiffs acquired shares or equity in Kingate Euro when they turned over their assets to the Kingate Defendants.

(b)     Kingate Euro was essentially identical to Kingate Global, except that the functional currency of the fund was the Euro rather than the U.S. Dollar.  This made Kingate Euro more attractive to Euro-based investors.  The Information Memoranda for Kingate Euro stated that because Madoff invested in U.S. Dollars, Kingate Euro incurred currency risk which it hedged through currency forward contracts.

(c)     According to BMIS' records, Kingate Euro maintained an account with BMIS designated 1FN086 (the "Kingate Euro Account").  The Kingate Euro Account was opened pursuant to a corresponding set of Account Agreements, which were executed and delivered to BMIS at its headquarters at 885 Third Avenue, New York, New York.  The Kingate Euro Account was maintained in New York at BMIS at all relevant times.

41.     The Funds' Account Agreements were executed in New York.  They state that all transactions are subject to the laws of the United States, including the Securities Exchange Act of 1934, the Commodities Exchange Act, and the rules and regulations of the SEC, the Board of Governors of the Federal Reserve System and the Commodities Futures Trading Commission. The Account Agreements state that they are subject to New York law, and are deemed to have been made in New York and to be performed in New York through New York-based securities trading activities.

42.     Justice Edwin Bannister of the Eastern Caribbean Supreme Court in the High Court of Justice of the British Virgin Islands appointed provisional liquidators for Kingate Global and Kingate Euro on May 8, 2009.  On June 4, 2009, the BVI court appointed William E.R. Tacon and Richard E.F. Fogerty as joint liquidators of the Funds.  On March 6, 2012, the BVI court appointed Stuart C.E. Mackellar as joint liquidator in place of Mr. Fogerty.

## IV.    BACKGROUND FACTS

### A.    Madoff's Massive Ponzi Scheme

43.     Madoff founded BMIS in 1959 as a New York limited liability company and was its chairman and chief executive officer.  Since at least 1990, Madoff perpetrated a massive Ponzi scheme through BMIS.

44.     BMIS was registered with the SEC as a securities broker-dealer under Section 15(b) of the Exchange Act, 15 U.S.C. § 78o(b) and, by 2008, was registered with the Financial Industry Regulatory Authority ("FINRA").  BMIS had three business units:  market making, proprietary trading, and investment advisory.  BMIS' website stated that it had been providing "quality executions" for broker-dealers, banks and financial institutions since its inception in 1960.  BMIS "self-cleared" transactions, trading through its own affiliated broker-dealer.

45.     Madoff's family members held the key control positions at BMIS.  The direct owners and executive officers of BMIS were Madoff and his brother, Peter Madoff.  Peter Madoff served as BMIS' Director of Trading and Chief Compliance Officer.  Madoff's sons, Mark and Andrew, were BMIS' Directors of Proprietary Trading.  Mark and Andrew Madoff ran BMIS' proprietary trading services on a separate floor from the firm's other business activities and kept the financial statements for the firm under lock and key.

46.     Madoff and BMIS purported to manage the Funds' assets.  BMIS provided the Funds with monthly statements purportedly showing (i) trades in equities and options using the

13

assets turned over by the Funds, (ii) the equity securities, options, and government securities that the investors supposedly owned, and (iii) the purported growth of and profit in the Funds' accounts over time.  These statements were a complete fabrication, as none of the trades actually took place.

47.     Rather than investing the Funds' assets in actual securities, Madoff fraudulently used those assets for his personal benefit (and the benefit of his family and associates) and otherwise distributed new investments to other investors when they requested redemptions to create the illusion of profits.

### B.     Madoff's Arrest And Subsequent Investigations

48.     On December 11, 2008, federal authorities arrested Madoff and charged him with violations of the securities laws.  Madoff admitted that his money management operation was "all just one big lie" for which "there is no innocent explanation."  He admitted it was "basically, a giant Ponzi scheme" wherein he "paid investors with money that wasn't there."  That same day, the SEC filed an emergency action to halt all ongoing activities by Madoff and BMIS.  The action is styled, *SEC v. Bernard L. Madoff*, 08 Civ. 10791 (S.D.N.Y. Dec. 11, 2008).

49.     On December 15, 2008, SIPC filed an application in the United States District Court for the Southern District of New York alleging that BMIS was not able to meet its obligations to investors as they came due and, accordingly, that the investors needed the protection afforded by the Securities Investor Protection Act ("SIPA").  The Court granted the SIPC application and appointed Irving H. Picard as the Trustee to liquidate BMIS.

50.     At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, No. 09-CR-213 (DC) (S.D.N.Y.), Madoff pled guilty to an 11-count criminal information.  Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BMIS]," and that "I knew what I was doing was wrong, indeed criminal."  Madoff stated

14

that he had been paying returns to certain investors out of the assets received from other

investors.  Madoff stated that BMIS was insolvent and had been for years.  Madoff is now

incarcerated and serving a 150-year sentence.

51.     The auditor for BMIS, Friehling & Horowitz ("F&H"), was an accounting firm

located in a 13-by-18 foot office in a strip-mall in New City, New York.  David Friehling

("Friehling") was the only certified public accountant at the three-person firm.  Jerome

Horowitz, the other partner in the firm, was inactive and living in Florida.  The third F&H

employee was, reportedly, a secretary.  F&H purported to audit Madoff's investment advisory

firm while at the same time telling the American Institute of Certified Public Accountants

("AICPA") that Friehling had not performed audits for the past fifteen years.  The AICPA

instituted an ethics investigation into Friehling's conduct as an auditor of BMIS, and on March

18, 2009, the AICPA expelled Friehling from membership.

52.     On November 3, 2009, Friehling pled guilty to nine charges of wrongdoing,

including securities fraud, making false statements and tax violations.  As part of his guilty plea,

Friehling agreed to cooperate with the government in its ongoing investigation of Madoff and

BMIS.

## V.     THE KINGATE DEFENDANTS' WRONGFUL CONDUCT

### A.     The Funds' Investments With Madoff

53.     Each member of the class invested in Kingate Global and/or Kingate Euro.  The

Funds turned over Plaintiffs' investments to Madoff and BMIS, which purportedly bought and

sold securities and otherwise managed the Funds' assets and had custody of the Funds' assets in

New York.  Madoff was described in the Funds' offering documents as a "New York based

NASD registered broker-dealer employing approximately 350 people and acting primarily as a

market-maker in listed and unlisted stocks and convertible securities."[1]  Madoff was not

identified by name in the offering documents.

54.     Between March 1994 and December 10, 2008, Kingate Global invested $963.45

million with BMIS through 63 separate wire transfers directly into BMIS' account at JPMorgan

Chase & Co. in New York City, Account Number 000000140081703 (the "BMIS Bank

Account").  From inception through December 10, 2008, Kingate Euro invested $767.44 million

with BMIS through 92 separate wire transfers directly into the BMIS Bank Account.

Accordingly, through their control of the Funds, the Kingate Defendants intentionally took

advantage of the benefits of conducting transactions in New York.  By November 30, 2008,

Kingate Global's and Kingate Euro's investments had purportedly grown to over $3 billion

based on Madoff's fictitious reports to the Funds.

**B.     Key Kingate Defendants Were In Close Contact With Madoff**

55.     Key Kingate Defendants regularly met with Madoff in New York, according to

Madoff's former personal secretary, Eleanor Squillari.

56.     Madoff hired Ms. Squillari in March 1984 when BMIS' former offices were

located at 110 Wall Street, New York, New York.  The offices were subsequently moved to 885

Third Avenue, New York, New York in the late 1980s ("BMIS' Office").  Ms. Squillari worked

as Madoff's secretary for almost 25 years until Madoff's arrest on December 10, 2008.

---

[1]     Kingate Global Fund, Ltd. Amended and Restated Information Memorandum, October 6, 2008, at 14
("KGF 2008 IM," attached as Exhibit 1); Kingate Euro Fund, Ltd. Amended and Restated Information
Memorandum, October 6, 2008, at 15 ("KEF 2008 IM," attached as Exhibit 2); Kingate Global Fund, Ltd. Amended
and Restated Information Memorandum, August 1, 2007, at 14 ("KGF 2007 IM," attached as Exhibit 3); Kingate
Global Fund, Ltd. Amended and Restated Information Memorandum for USD Participating Common Shares, May
1, 2006, at 14 ("KGF 2006 IM," attached as Exhibit 4); Kingate Global Fund, Ltd. Amended and Restated
Information Memorandum, January 15, 2003, at 15 ("KGF 2003 IM," attached as Exhibit 5); *see also* Kingate
Global Fund, Ltd. Information Memorandum, May 1, 2000, at 15 ("KGF 2000 IM," attached as Exhibit 6) (using
similar language) (collectively, the "Information Memoranda" or "IMs").

57.     As part of her duties, Ms. Squillari kept Madoff's calendar, office telephone directory, and a copy of Madoff's pocket book telephone directory which Madoff customarily carried with him at all times ("Calendar," "Office Telephone Directory," and "Pocket Book," respectively).  The original documents were provided to the FBI as part of Ms. Squillari's cooperation with government authorities.

58.     Madoff's Calendar reflects numerous meetings at BMIS' Office between Madoff and some of the Kingate Defendants.  For example, Madoff met with Manzke on May 11, 2005 and March 15, 2006.  Madoff met with Grosso on October 4, 2006, March 8, 2007, September 17, 2007, and September 22, 2008.[2]

59.     Madoff' Pocket Book included the phone numbers he needed more often and represented an abbreviated list of his Office Telephone Directory.  A transcription of the phone numbers from Madoff's Pocket Book is six pages long, while the comprehensive Office Telephone Directory is 43 pages.

60.     Madoff's Pocket Book included Grosso's phone numbers at home in London, on his English mobile phone, and at FIM's New York office.  Grosso was unusual in this respect because very few business contacts in Madoff's Pocket Book included home phone numbers; out of approximately 160 entries, only 15 included home numbers.

61.     Madoff's Office Telephone Directory included (i) Grosso's office number in London next to the annotation "FIM Limited/Kingate," (ii) Ceretti's office number in London next to the annotation "FIM Limited," and (iii) Manzke's office number.

---

[2]   Copies of the Calendar prior to 2005 were not available.

62.     According to the complaint filed in *Picard v. Ceretti*, Adv. Proc. No. 09-01161 (SMB) (Bankr. S.D.N.Y. filed Mar. 17, 2014) (the "Trustee's complaint"),[3] Ceretti, Grosso and Madoff, together with their wives, dined together in London.  Additionally, Grosso met with Madoff at least twice a year, and during those meetings and various telephone conversations they discussed the purported performance of the Funds.

63.     Besides in-person meetings, Ceretti and Grosso and other employees of the FIM Entities participated in 286 telephone conversations with BMIS between 2004 and 2008, including a long talk on December 2, 2008, days before Madoff's arrest.  Grosso also had 225 telephone calls with Cohmad Securities Corp., an entity co-owned by Madoff that referred investors to BMIS.

**C.      The Kingate Defendants Knew Or Should Have Known That Madoff Was A Fraud**

64.     The Kingate Defendants had overwhelming information indicating that Madoff's operation was a fraud – evidence they knew about or should have discovered, but instead ignored.  For example, almost two hundred of the trades reported by Madoff to the Kingate Defendants supposedly occurred at prices that were outside the daily trading range.  Those trades could never have taken place, obviously did not, and the Kingate Defendants knew that or, at a minimum, had the evidence to know that.  If the Kingate Defendants had verified the pricing information for these trades, they would have discovered that the trades had not taken place as reported.  Further, if the Kingate Defendants had made a single inquiry to the Depository Trust & Clearing Corporation ("DTC"), the clearing house for such transactions, they would have discovered that there was no record of BMIS or Madoff having cleared a single purchase or sale

---

[3]     In an order issued on August 21, 2015, the bankruptcy court denied in part defendants' motion to dismiss the Trustee's complaint.  Defendants have filed a motion for leave to appeal portions of the bankruptcy court's order to the district court, which is pending.

of securities through the DTC.  Similarly, Madoff claimed he was holding U.S. Treasury Bills on behalf of the Funds at the Bank of New York.  If the Kingate Defendants had made an inquiry with the Bank of New York, they would have learned that Madoff did not hold a sufficient amount of Treasury Bills to support his claimed trading.

65.     From 1998 to 2008, BMIS reported 281 trades for the Funds that fell outside the daily price range for their respective securities.  BMIS reported hundreds of Treasury Bill trades that fell outside the daily price range by at least one basis point (and at least ten basis points on 144 occasions).  Indeed, spreadsheets created by the FIM Entities during monthly reviews of Madoff's trading specifically identified whether BMIS's reported prices fell within the daily range.  Based on this information, sophisticated hedge fund managers like the Kingate Defendants should have made follow up inquiries, including independently verifying the trades with DTC and BONY.

66.     Similarly, Madoff reported trades in option contracts that were obviously highly suspect.  Although Madoff claimed he was executing massive volumes of option trades in the over-the-counter market with private European counterparties, this explanation was highly unlikely, not least because major players in OTC options trading had never heard of Madoff being in their market.  The Kingate Defendants could have verified with Madoff's supposed counterparties whether any of the options trades existed – not a single one did.

67.     The FIM Entities' investment committee considered a fund manager's persistent refusal to meet with investors to be a sign of a high probability of fraud.  The FIM Entities' records show that where an investment advisor lacked transparency, lacked independent oversight, and had operational issues, as well as investment results with low correlation with peer funds, there was cause for concern.  On at least once in August 2007, FIM recommended

19

liquidating an investment that its analysts described as "too good to be true" with a "limited downside" that made them feel "uneasy."  BMIS had all of the foregoing suspicious characteristics, yet the Kingate Defendants either knew of them or were willfully blind to them.

68.     For example, in March 2008, the FIM Entities' investment committee reported on 31 funds' holdings; the report contained detailed information on 30, while Kingate Global's page was blank.  That same month, an investor contacted KML requesting due diligence materials on the Funds.  Salahuddin forwarded the email to Ceretti, Grosso and Christopher Wetherhill, a director of the Funds, noting that KML did not have "half the things" requested.

69.     In a November 2008 email to the FIM Entities' Head of Operational Due Diligence, Eric Lazear, Defendant Grosso acknowledged, "We have never done much [due diligence on Kingate], as it will be impossible to go inside Madoff to do a proper D[ue] D[iligence]."  After news of the Madoff scandal broke, Lazear wrote to Grosso, "[Kingate] is not a fund that went through our normal diligence process and I think it should not be depicted as if it had."  One day after Madoff's arrest, Lazear stated in an email that prior to disclosure of Madoff's fraud, he believed BMIS was a "scam," and had informed Defendant Grosso of "all the details" supporting his belief.

**D.     The Kingate Defendants Failed to Fulfill Ongoing Duties to Monitor and Evaluate Madoff**

70.     As the Funds' Manager (or Co-Managers) admitted in the Information Memoranda given to investors from 2000 through 2008, they had an ongoing obligation to evaluate and monitor Madoff:

> Pursuant to the Manager [or Co-Manager] Agreement, the Manager [or Co-Managers] **evaluates** and **monitors** the

Investment Advisor and, in general, provides all necessary management services to the Fund.[4]

\* \* \*

The Manager [or Co-Managers] has agreed (i) to manage all aspects of the investment advisory services provided to the Fund, including the **selection** and **evaluation** of [Madoff] and (ii) to arrange for the performance of all accounting and administrative services which may be required by the Fund's operations. The Manager [Co-Manager] Agreement authorizes the Manager [or Co-Managers] to delegate responsibilities to others, subject to retaining responsibilities for **evaluating** and coordinating the services offered by others.[5]

71. The Manager's obligation to monitor and evaluate Madoff also appears in the January 1, 2006 Management Agreement between Kingate Global and KML (the "KGF 2006 Management Agreement," Ex. 7). While Section 5.9 authorized the Manager to delegate its duties and obligations, the Manager undertook the continued monitoring of the execution of those delegated duties:

(a)     The Manager shall be authorized to delegate as appropriate, or in its discretion, any of the duties or obligations hereunder to one or more other persons or entities, whether affiliated with or independent of the Manager.

(b)     In the event of any such delegation of duties . . . the Manager shall be relieved and discharged of its obligations to perform services so delegated **other than the continuing obligation** (subject at all times to the standard of care set forth in Section 5.4 [gross negligence, bad faith, or willful or reckless malfeasance]), to take reasonable measures to,

---

[4]   KGF 2008 IM, Ex. 1 at (ii); KGF 2007 IM, Ex. 3 at (ii); KGF 2006 IM, Ex. 4 at (ii); KGF 2000 IM, Ex. 6 at (iii); KEF 2008 IM, Ex. 2 at (iii).  (All emphasis supplied throughout unless otherwise stated).

[5]   KGF 2008 IM, Ex. 1 at 13; KEF 2008 IM, Ex. 2 at 14 (further agreeing to make decisions with respect to hedging transactions utilizing the recommendations of the Consultant, FIM Advisers); KGF 2007 IM, Ex. 3 at 13; KGF 2006 IM, Ex. 4 at 13; KGF 2003 IM, Ex. 5 at 14.

21

(i)     ascertain the competence of the delegatee [*i.e.*, Madoff] to perform the services so delegated,

(ii)    monitor generally the faithful performance by the delegatee of the duties specified in the relevant delegation agreement,

(iii)   coordinate such performance with the performance of the other services contemplated hereunder, and

(iv)    perform or procure the future performance of the delegated services in the event of the expiration or termination of any such agreement with such delegatee.

72.     KML also failed to monitor Citi Hedge and Citi Hedge's oversight over Madoff. The Information Memoranda admit that Citi Hedge had to verify the trading information provided by Madoff to calculate the NAV of the Funds.  In a section entitled, "Determination of Net Asset Value," the Information Memoranda said that "[Citi Hedge] verifies the prices attributed to the securities held by the USD Shares of the Fund by reference to pricing sources independent of the Investment Advisor whenever reasonably possible."[6]

73.     For example, when Madoff provided prices outside of the daily trading ranges to Citi Hedge and the Funds on at least 185 occasions, KML and Citi Hedge failed to properly verify the trades.  They relied entirely on information furnished solely by Madoff in violation of their agreements and industry standards.

74.     The Information Memoranda stated that "[t]he options transactions executed for the benefit of the USD portfolio are effected primarily in the over-the-counter market, not on a registered options exchange."[7]

---

[6]     KGF 2008 IM, Ex. 1 at 23; KEF 2008 IM, Ex. 2 at 24; KGF 2007 IM, Ex. 3 at 23-24; KGF 2006 IM, Ex. 4 at 24; KGF 2003 IM, Ex. 5 at 24.

[7]     KGF 2008 IM, Ex. 1 at 3; KGF 2006 IM, Ex. 4 at 3; KGF 2003 IM, Ex. 5 at 4; KGF 2000 IM, Ex. 6 at 4.

75.     The Funds were therefore "subject to counterparty risk and [were] without the protection afforded with respect to options transactions on regulated exchanges through the Options Clearing Corporation."[8]  Despite acknowledging the lack of protection provided by trading options over-the-counter, the Kingate Defendants never sought to determine whether Madoff was trading with creditworthy counterparties or, in fact, making any over-the-counter option trades at all.  Indeed, if the Kingate Defendants had ever checked, they would have learned that Madoff was not known to regular participants in the over-the-counter options market.

76.     According to the Information Memoranda, "[t]he Investment Advisor acts as a market-maker in the stocks purchased and sold by the USD portfolio," and as a result of the Investment Advisor's role as market-maker, "the portfolio is subject to credit risks (the exposure to the possibility of loss resulting from a counterparty's failure to meet its financial obligations)."[9]  Again, the Kingate Defendants never conducted due diligence to verify or assess the credit risks created by the Investment Advisor's status as market-maker.

77.     The Kingate Defendants knew that Madoff's overlapping responsibilities as Investment Advisor, execution agent, and custodian created a risk that Madoff could steal the investors' money.  The Information Memoranda sought (ineffectively) to disclaim this risk:

> Neither the Fund nor the Custodian has actual custody of the assets.  Such actual custody rests with the Investment Advisor and its affiliated broker-dealer.  Therefore, there is the risk that the custodian [Madoff] could abscond with those assets.  There is always the risk that the assets with the Investment Advisor [Madoff] could be misappropriated.  In addition, information supplied by the Investment Advisor may be inaccurate or even fraudulent.  The Manager [or Co-Manager] is entitled to rely on

---

[8]   KGF 2008 IM, Ex. 1 at 6; KEF 2008 IM, Ex. 2 at 6; KGF 2007 IM, Ex. 3 at 6; KGF 2006 IM, Ex. 4 at 6; KGF 2003 IM, Ex. 5 at 7.

[9]   KGF 2008 IM, Ex. 1 at 3, 6; KGF 2007 IM, Ex. 3 at 3, 6; KGF 2006 IM, Ex. 4 at 3, 6; *see also* KGF 2003 IM, Ex. 5 at 3, 6; KGF 2000 IM, Ex. 6 at 3-4, 6.

such information (provided they do so in good faith) and are not required to undertake any due diligence to confirm the accuracy thereof.[10]

78.    While purporting to absolve the Managers from due diligence with respect to information provided by Madoff, the provision in no way exonerates KML or Tremont – or the FIM Defendants – from their responsibilities.  Because the Kingate Defendants failed to take reasonable steps to monitor or conduct due diligence concerning Madoff, any reliance on information received from Madoff was not in good faith.  This is particularly true given all of the other suspicious information known to the Kingate Defendants, as well as their knowledge that they had never verified anything that Madoff told them with an independent third-party.

## VI.    THE TREMONT GROUP

### A.    The Tremont Group Had Deep Ties With Madoff Based On Its Management Of Other Madoff Feeder Funds

79.    The Tremont Group was the parent company of the Funds' manager, Tremont. The Tremont Group had extensive ties with Madoff based on its management of at least five other feeder funds with over $3 billion invested by December 2008.  These feeder funds were commonly referred to as the "Rye Funds," after Rye, New York, where the Tremont Group was based.  The Rye Funds included:  (i) Rye Select Broad Market Fund LP; (ii) Rye Select Broad Market Prime Fund LP; (iii) Rye Select Broad Market XL Fund LP; (iv) Rye Select Broad Market Portfolio Limited; and (v) Rye Select Broad Market XL Portfolio Limited.

80.    These funds were managed and controlled by the Tremont Group through its subsidiaries.  For example, the Rye Select Broad Market Portfolio Limited was managed by Tremont, the Co-Manager of the Kingate Global and Kingate Euro funds.  Other funds were managed by Rye Investment Management, which was a division of the Tremont Group.

---

[10]   KGF 2008 IM, Ex. 1 at 9; KEF 2008 IM, Ex. 2 at 10; KGF 2007 IM, Ex. 3 at 10; KGF 2006 IM, Ex.4 at 9; KGF 2003 IM, Ex. 5 at 9-10; KGF 2000 IM, Ex. 6 at 10.

81.     The Tremont Group created multiple Madoff feeder funds because of Madoff's long-standing relationship with the founder of the Tremont Group, Defendant Manzke.  Manzke first started investing and working with Madoff shortly after forming the Tremont Group (then known as Tremont Advisers) in 1984.  These deep ties to Madoff were cryptically acknowledged in the Tremont Group's public filings.  For example, the Tremont Group's Form 10-K SB filed with the SEC in March 2001 stated that many of its funds were designed "to provide clients with vehicles for investments with 'hard-to-access' managers."  Madoff was the most prominent of these "hard-to-access" managers.

### B.     The Tremont Group's Special Relationship with Madoff

82.     The Tremont Group's special relationship with Madoff is also evident from documents made public in connection with the acquisition of the Tremont Group by Oppenheimer in 2001 for $145 million.  The acquisition was described in detail in the Schedule 14A Proxy Statement filed with the SEC by the Tremont Group on August 20, 2001 (the "Proxy Statement").  According to the Proxy Statement, in early March 2001, Oppenheimer approached the Tremont Group's financial advisor, Putnam Lovell Securities, Inc. ("Putnam Lovell"), and expressed "an interest in exploring a strategic transaction with Tremont."

83.     Tremont Group's relationship with Madoff became a key selling point to Oppenheimer.  During the negotiations, Putnam Lovell provided Oppenheimer with an information package it had prepared about the Tremont Group.  The package included Putnam Lovell's "analysis of the significant contribution to Tremont's revenues from a single relationship it has with an investment manager to its proprietary products," according to the Proxy Statement.  The "single relationship" was Madoff.  As O. Leonard Darling, vice chairman and chief investment officer of OppenheimerFunds, explained, the acquisition of Tremont "will

enable us to enhance and expand our alternative products offering for high net worth and institutional clients alike."

84.     Oppenheimer closed the Tremont Group's acquisition on July 10, 2001.  In the press release announcing the deal, John V. Murphy ("Murphy"), OppenheimerFunds' chief executive officer, alluded to the importance of the Tremont Group's relationship with Madoff.

> There is growing interest among high net worth investors and institutions alike in hedge funds and other **alternative investment products that seek to provide positive returns regardless of the direction of the stock markets** [i.e., Madoff].
>
> * * *
>
> Tremont's unique product offerings, in combination with our distributing network, will open the world of alternative investing to a new segment of investors.

## C.     The Tremont Group Provided Substantial Assistance To Tremont's Breach Of Fiduciary Duty

85.     The Tremont Group knowingly provided substantial assistance to Tremont in the breaches of fiduciary duty that it perpetrated on investors.  By virtue of the Tremont Group's long-standing involvement in the Rye Funds and the Kingate Funds, as well as its experience in fund management, the Tremont Group knew or was willfully blind to the fact that the due diligence and risk controls employed by Tremont were grossly deficient.  Rather than alerting investors to these problems, the Tremont Group provided substantial assistance to Tremont by helping to conceal its breach of fiduciary duty and by failing to act when required to do so in the face of that breach.

# VII.   PRICEWATERHOUSECOOPERS' WRONGFUL CONDUCT

## A.     PwC Audited The Funds

86.     PwC – and its predecessor entity Coopers & Lybrand Bermuda – audited the Funds every year since inception.  Each year, PwC issued an unqualified audit opinion –

commonly referred to as a "clean" audit opinion – stating that the financial statements and audit conformed with the requisite accounting and auditing standards.  For example, Plaintiffs attach hereto PwC's audits of (i) Kingate Global for the years ending December 31, 2004, 2005, 2006, and 2007,[11] and (ii) Kingate Euro for the years ending December 31, 2006 and 2007.[12]

87.     PwC addressed its unqualified audit opinions "To the Shareholders of [Kingate Global/Kingate Euro]" – that is, to Plaintiffs and the Class.  PwC's unqualified audit opinions were included as the first page in the Kingate Global and Kingate Euro financial statements. PwC was aware that investors in the Funds, including Plaintiffs and the Class, relied on PwC's audits of the Funds' financial statements, including the unqualified audit opinions, to determine whether to invest and maintain their assets in the Funds.

88.     Not only did PwC know that Plaintiffs and the Class would rely on its audit work, PwC also knew and accepted that it had an obligation to provide assurances directly to the shareholders regarding the financial condition of the Funds.  In defining the objectives for auditing similar Madoff feeder funds managed by Fairfield Greenwich, a related PricewaterhouseCoopers entity acknowledged that it was responsible for reporting to the shareholders on the financial statements for the funds and committed to providing to the shareholders independent opinions and reports that provide assurance on the financial statements released by the funds.

89.     PwC knew the names of Plaintiffs and the Class because their names were included among the documents that PwC reviewed or had the ability to access in the course of its audit work.

---

[11]  "KGF 2004-05 FS" and "KGF 2006-07 FS."  Exs. 8 and 9.
[12]  "KEF 2006-07 FS."  Ex. 10.

90.     PwC's opinions for Kingate Global for the years 2004 through 2007, and for

Kingate Euro for the years 2006 and 2007, are identical, and stated:

> In our opinion, the accompanying statements of assets and
> liabilities, including the schedules of investments, and the related
> statements of operations and of changes in net assets present fairly,
> in all material respects, the financial position of Kingate Global
> Fund, Ltd.[/Kingate Euro Fund, Ltd.] (the "Company") at
> December 31, 200[5-7], and the results of its operations and the
> changes in its net assets for the years then ended, in conformity
> with accounting principles generally accepted in the United States
> of America. . . .  [PricewaterhouseCoopers'] responsibility is to
> express an opinion on these financial statements based on our
> audits.  [PricewaterhouseCoopers] conducted [its] audits of these
> financial statements in accordance with auditing standards
> generally accepted in the United States of America. . . .  We
> believe our audits provide a reasonable basis for our opinion.[13]

91.     The audit opinions were signed, "PricewaterhouseCoopers, Chartered

Accountants," and were issued on its Hamilton, Bermuda letterhead.  The footer in the audit

opinions defines PricewaterhouseCoopers as follows:  "PricewaterhouseCoopers refers to the

members of the worldwide PricewaterhouseCoopers organization."[14]

92.     According to the Information Memoranda, "PricewaterhouseCoopers has given its

written consent to the inclusion of its name, report and reference to itself in the form and context

in which they appear in this Memorandum."[15]  Accordingly, PwC knew that existing and

potential investors, including Plaintiffs and other members of the Class, would rely on the fact

that PwC was the auditor of the Funds, represented it had conducted proper audits, and issued

unqualified audit opinions on the Funds' financial statements.

---

[13]   KGF 2004-05 FS, Ex. 8 at second page (not numbered); KGF 2006-07 FS, Ex. 9 at second page (not numbered); and KEF 2006-07 FS, Ex. 10 at second page (not numbered).

[14]   *Id.*

[15]   KGF 2008 IM, Ex. 1 at 32; KEF 2008 IM, Ex. 2 at 33; KGF 2007 IM, Ex. 3 at 33; KGF 2006 IM, Ex. 4 at 33; KGF 2003 IM, Ex. 5 at 29; KGF 2000 IM, Ex. 6 at 28.

93.     PwC further knew that there was no independent market mechanism or evidence to value shares of Funds, and that there was no other independently-verified third-party financial information about the Funds besides the audited financial statements.  PwC knew that the primary purpose of its audits was to provide investors in the Funds with assurances that the Funds' assets existed and were accurately valued.

### B.     PwC's Audits Failed to Conform to GAAS

94.     The AICPA is the professional organization that promulgates the national auditing standards known as Generally Accepted Auditing Standards ("GAAS").  GAAS set the minimum level of performance and quality that auditors are required to meet.  The AICPA has further codified a detailed interpretation of GAAS through the Statements of Accounting Standards ("SAS," commonly referred to as "AU").  PwC violated GAAS in conducting its audits of Kingate Global and Kingate Euro.

95.     Generally Accepted Accounting Principles ("GAAP") are those principles recognized by the accounting profession as the uniform rules, conventions, and procedures necessary to define generally accepted accounting principles in the United States.  AU § 411.02 (applicable prior to November 15, 2008).  PwC's audit opinions stated that they were conducted in accordance with such principles, while the AICPA prohibits expressing an opinion or stating affirmatively that financial statements conform with GAAP if they depart from generally accepted accounting principles.

### 1.     Basic Standards Under GAAS

96.     GAAS is comprised of ten basic standards that establish the quality of an auditor's performance and the overall objectives to be achieved in a financial statement audit. The ten basic GAAS standards fall into three basic categories:  General Standards; Fieldwork Standards; and Reporting Standards.

97.    The General Standards provide guidance to the auditor on the exercise of

professional care, as follows:

(a)    The auditor must have adequate technical training and proficiency to perform the audit.

(b)    The auditor must maintain independence in mental attitude in all matters relating to the audit.

(c)    The auditor must exercise due professional care in the performance of the audit and the preparation of the report.  (AU § 150.02).

98.    The Standards of Fieldwork provide guidance on audit planning, proper

evaluation of internal controls, and the collection of evidential matter sufficient to allow the

auditor a reasonable basis for rendering an opinion regarding the financial statements under

audit, as follows:

(a)    The auditor must adequately plan the work and must properly supervise any assistants.

(b)    The auditor must obtain a sufficient understanding of the entity and its environment, including its internal control, to assess the risk of material misstatement of the financial statements whether due to error or fraud, and to design the nature, timing, and extent of further audit procedures.

(c)    The auditor must obtain sufficient appropriate audit evidence by performing audit procedures to afford a reasonable basis for an opinion regarding the financial statements under audit.  (AU § 150.02).

99.    The Standards of Reporting provide guidance to the auditor on the content of the

audit report and the auditor's responsibility contained therein.

(a)    The auditor must state in the auditor's report whether the financial statements are presented in accordance with generally accepted accounting principles (GAAP).

(b)    The auditor must identify in the auditor's report those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period.

(c)     When the auditor determines that informative disclosures are not reasonably adequate, the auditor must so state in the auditor's report.

(d)     The auditor must either express an opinion regarding the financial statements, taken as a whole, or state that an opinion cannot be expressed, in the auditor's report.  When the auditor cannot express an overall opinion, the auditor should state the reasons therefore in the auditor's report.  In all cases where an auditor's name is associated with financial statements, the auditor should clearly indicate the character of the auditor's work, if any, and the degree of responsibility the auditor is taking, in the auditor's report. (AU § 150.02).

### 2.     PwC Failed to Comply with GAAS

100.     In the course of PwC's audits of the Funds, PwC knew that (i) all of the Funds' assets were managed by Madoff, (ii) Madoff was both the investment advisor and the broker-dealer with respect to those assets, and (iii) Madoff also served as the custodian of the assets. PwC thus knew that Madoff was responsible for managing, trading and holding the Funds' assets, an unusual multi-faceted role that made possible Madoff's fraudulent scheme.

101.     Nevertheless, PwC failed to account for these risks and to conduct the audit procedures required by GAAS.  Indeed, PwC's failure to comply with GAAS and its own policies and procedures was so egregious that PwC failed to detect that the purported Fund assets did not even exist.  In sum, PwC's audits were so deficient that in reality there were no audits at all.

102.     As set forth above, GAAS required PwC to exercise due professional care in the performance of the audits and the preparation of the reports.  (AU §§ 150.02, 230.02).  Due professional care meant that PwC had to exercise professional skepticism, an attitude that includes a questioning mind and a critical assessment of audit evidence.  (AU § 230.07).  It also meant that PricewaterhouseCoopers had "to plan and perform the audit to obtain *reasonable assurance* about whether the financial statements are free of material misstatement, *whether caused by error or fraud*." (AU § 110.02).  In stark contrast, PwC improperly relied on

31

statements from Madoff despite being aware of the significant risks of fraud presented by Madoff's operations, such as the lack of segregation of duties at BMIS, as well as the unrealistic results and volume of Madoff's purported trading.

103.    Due professional care obligations also extended to the design of the audit.  In designing the nature, timing, and extent of audit procedures and in evaluating the results of those procedures, GAAS obligated PwC to consider audit risk and materiality.  (AU § 312.01).  GAAS further required use of professional judgment and, in particular, professional skepticism in determining whether a risk factor is present and should be considered in identifying and assessing the risk of material misstatement due to fraud.  (AU §§ 230.07-09, 316.13).

104.    PwC further had an obligation to obtain a sufficient understanding of the Funds' environment, including internal controls, in order to assess the risk of material misstatement of the Funds' financial statements, whether due to error or fraud, and to design the nature, timing, and extent of further audit procedures.  (AU § 150.02).

105.    As part of the process of obtaining an understanding of the Funds and their environment, PwC had to obtain an understanding of, among other things, the hedge fund industry in general, and, in particular, the nature of the Funds and the objectives, strategies, and related business risks which may result in a material misstatement in the financial statements of the Funds.  This included obtaining an understanding of the Funds' operations, ownership, governance, structure, how they were financed, and the types of investments they made.  (AU §§ 314.21, 314.26).

106.    Within the hedge fund industry, Madoff's concentration of functions was extremely rare.  PwC knew that Madoff and BMIS served as the Funds' investment advisor, broker-dealer, and custodian.  This concentration of functions at BMIS created risks requiring

special audit consideration – what GAAS refers to as "significant risks."  (AU § 314.110).

Because primarily all of the Funds' investment and income information available to PwC was

based on information from Madoff and/or BMIS, PwC was required to do more than rely solely

on the procedures it performed with respect to the Funds.  (AU §§ 314.115, 318.53, 332.20).

107.    GAAS also required PwC to evaluate Madoff's internal controls, including the

design of those controls, and determine whether they had been implemented and were operating

effectively.  (AU §§ 318.13, 318.23, 318.24, 318.45, 314.40).

> Internal control is a process – effected by those charged with
> governance, management, and other personnel – designed to
> provide reasonable assurance about the achievement of the entity's
> objectives with regard to reliability of financial reporting,
> effectiveness and efficiency of operations, and compliance with
> applicable laws and regulations.  (AU § 314.41).

108.    But reviewing Madoff's internal controls was not enough.  GAAS recognizes that

an understanding of an entity and its environment, including its internal controls, does not

provide by itself a sufficient basis for forming an opinion on an entity's financial statements.

GAAS further requires the auditor to perform additional audit procedures.  (AU § 150.02).

These additional audit procedures include "tests of controls" and/or "substantive procedures."

PwC violated GAAS because it never conducted sufficient tests or procedures to determine

whether BMIS had sufficient internal controls and to test whether these controls were operating

effectively.

109.    Tests of controls are used to "obtain audit evidence that controls operate

effectively.  This includes obtaining audit evidence about how controls were applied at relevant

times during the period under audit, the consistency with which they were applied, and by whom

or by what means they were applied."  (AU § 318.26).  Substantive procedures are performed to

detect material misstatements, and primarily include tests of details of balance sheet and income statement accounts, and of analytical procedures.  (AU § 318.50).

110.    Because effective internal controls generally reduce, but do not eliminate, the risk of material misstatement, and because an auditor's assessment of risk is judgmental and may not be sufficiently precise to identify all risks of material misstatement, tests of controls reduce, but do not eliminate, the need for substantive procedures.  (AU §§ 318.09, 318.51).  Accordingly, GAAS required PwC to design and perform substantive procedures for each of the Funds' material balance sheets and income statement accounts – such as the Funds' investments and investment income.  More specifically, PwC was required to test:  (i) the **existence** and valuation **of the Funds' securities at every balance sheet date**; (ii) the Funds' ownership of those securities; (iii) the **occurrence** and accuracy of **the Funds' transactions in U.S. Treasuries,** stocks, and options; and (iv) the reasonableness of the Funds' reported investment income.  (AU §§ 318.09, 318.51, 326.15, 332.21-22, 332.25).

**(a)      PwC Failed to Conduct Adequate Procedures Concerning Existence and Occurrence Risk**

111.    GAAS required PwC to conduct special procedures when auditing an entity with securities investments in light of the obvious assertion risk:  "The inherent risk for an assertion about a derivative or security is its susceptibility to a material misstatement, assuming there are no related controls."  (AU § 332.08).  This was particularly critical in light of the concentration of functions at BMIS.

112.    The special procedures in auditing the **existence** of the securities with Madoff required, among other things, confirmations with the security's issuer or physical inspections of the security.  These same confirmation procedures were necessary in order to confirm the

34

**occurrence** of the transactions.  This is set forth in detail in AU 332, entitled, "Auditing

Derivative Instruments, Hedging Activities, and Investments in Securities," as follows:

> **Existence** assertions address whether the derivatives and securities reported in the financial statements through recognition or disclosure exist at the date of the statement of financial position. **Occurrence** assertions address whether derivatives and securities transactions reported in the financial statements, as a part of earnings, other comprehensive income, or cash flows or through disclosure, occurred.  Paragraph [332].19 provides guidance on the auditor's determination of the nature, timing, and extent of substantive procedures to be performed.  Examples of substantive procedures for existence or occurrence assertions about derivatives and securities include –
>
> - **Confirmation with the issuer of the security.**
>
> - **Confirmation with the holder of the security,** including securities in electronic form, **or with the counterparty to the derivative [*i.e.*, options].**
>
> - **Confirmation of settled transactions with the broker-dealer or counterparty.**
>
> - Confirmation of unsettled transactions with the broker-dealer or counterparty.
>
> - **Physical inspection of the security or derivative contract.**
>
>                * * *
>
> - Inspecting supporting documentation for subsequent realization or settlement after the end of the reporting period.
>
> - **Performing analytical procedures.**  For example, the absence of a material difference from an expectation that interest income will be a fixed percentage of a debt security based on the effective interest rate determined when the entity purchased the security provides evidence about existence of the security. (AU § 332.21).

113.    In performing its audits, PwC reviewed or had access to statements regarding

Madoff's purported trading.  If PwC properly analyzed this information, it would have learned

that Madoff's trading was unrealistic both in terms of its results and its volume.

**(b)      PwC Failed to Conduct the Required Procedures on BMIS Given Its Role as a Service Organization**

114.    PwC recognized that BMIS was a service organization to the Funds because BMIS' services were part of the Funds' "information system," pursuant to AU §§ 324.03, 332.11, and 332.20.  BMIS' services were part of the Funds' information systems because: (i) BMIS' operations and transactions were significant to the Funds; (ii) BMIS initiated, authorized, recorded, processed and reported the Funds' transactions from their occurrence to their inclusion in the financial statements and held custody of and serviced the Funds' assets; (iii) BMIS affected the accounting records relating to the initiation, recording, processing, and reporting of the Funds' transactions; (iv) BMIS affected how the Funds' information system captures all information concerning the Funds' transactions; and (v) BMIS affected the financial reporting process used to prepare the Funds' financial statements.  *Id.*

115.    Accordingly, because BMIS' services were part of the Funds' "information system," PwC was required to perform additional procedures, including assessing the internal controls at BMIS in order to assess the risk of material misstatement.  (AU § 324.04; 06-21).

116.    PwC was also required to obtain audit evidence that the investment advisory, brokerage, and custodial functions at BMIS were segregated from one another.  (AU § 332.20).  PwC knew that the Funds had acknowledged there was a risk of misappropriation due to the fact that the Funds did not have custody of the assets.[16]  This heightened risk required PwC to perform additional procedures.  SAS § 332.16 specifically directs that confirmations from service organizations are not sufficient audit evidence to assess internal controls.

117.    Moreover, where, as here, the service organization (BMIS) both initiated the transactions and held and serviced the securities, the greater risk of fraud required that PwC

---

[16]   KGF 2008 IM, Ex. 1 at 9; KEF 2008 IM, Ex. 2 at 9; KGF 2007 IM, Ex. 3 at 9; KGF 2006 IM, Ex. 4 at 9; KGF 2003 IM, Ex. 5 at 9-10; KGF 2000 IM, Ex. 6 at 10.

perform additional procedures, including site visits to inspect documentation and internal

controls of the service organization:

> If one service organization initiates transactions as an investment
> adviser and also holds and services the securities, all of the
> information available to the auditor is based on the service
> organization's information.  The auditor may be unable to
> sufficiently limit audit risk without obtaining evidential matter
> about the operating effectiveness of one or more of the service
> organization's controls.  An example of such controls is
> establishing independent departments that provide the investment
> advisory services and the holding and servicing of securities, then
> reconciling the information about the securities that is provided by
> each department.  (AU § 332.20).

    **C.**    **PricewaterhouseCoopers' Practice Guide Concerning Audits of Hedge Funds
Highlighted the Importance of Confirming the Existence of the Assets**

118.    PricewaterhouseCoopers was well aware of the enormous risks posed by the type

of investments such as the Funds' investments with Madoff.  In 2007, for example, claiming a

"leadership position as auditors for both investee funds and investor entities,"

PricewaterhouseCoopers LLP ("PwC U.S.")[17] issued a publication entitled, "Auditing

Alternative Investments – A Practical Guide for Investor Entities, Investee Funds Managers and

Auditors" (the "PwC Guide," Ex. 11).  The PwC Guide was largely based on a similar

publication by the AICPA, "The AICPA Audit Guide:  *Auditing Derivative Instruments,*

*Hedging Activities, and Investments in Securities*" (the "AICPA Guide").

119.    Confirming the existence of the assets was critical in this case because Madoff

held virtually all of the Funds' assets.  Here, because Madoff conducted all of the Funds' trading

and held virtually of the Funds' assets, and because BMIS' operations were opaque, PwC should

---

[17]   The PwC Guide states that "'PricewaterhouseCoopers' refers to PricewaterhouseCoopers LLP (a Delaware
limited partnership) or, as the context requires, the PricewaterhouseCoopers global network or other member firms
of the network, each of which is a separate legal entity." (Ex. 11; at last page (not numbered)).

have known that the highest level of audit evidence was necessary in order to opine on the

Funds' financial statements.

### D. PwC Met with Madoff Periodically to Gain an Understanding of BMIS's Functions, But Never Tested the Existence or Operational Effectiveness of Key Controls as Required by GAAS

120.    In its work papers, PwC recognized that BMIS was a service organization to the

Funds and controlled substantially all of the Funds' assets.  PwC also recognized that there was a

risk of fraud if the controls at BMIS were weak.  In addition, PwC expressly noted that since

BMIS was a family-run company, there was a risk of misappropriation if the family members

collaborated to override controls.

121.    Since PwC had identified BMIS as a service organization to the Funds, it was

required by GAAS to gain an understanding of the structure, processes and controls at BMIS and

to test the operational effectiveness of the key controls, including segregation of duties among

internal departments and reconciliations among those departments.  Absent verification that the

internal controls at BMIS were in existence and operating effectively, PwC could not rely on

confirmations and monthly statements from BMIS that the assets in the custody of BMIS existed

or that the transactions that were reflected on the Funds' income statements actually occurred.

122.    PwC arranged a series of site visits to BMIS in 2000, 2002, 2004 and 2006.

During these visits, representatives of PwC met with Madoff and posed a series of questions

which never varied.  PwC gave Madoff the outline for questioning in advance.

123.    For example, PwC issued a detailed report summarizing its meeting with Madoff

in December 2004.  ("PwC 2004 Madoff Report," Ex. 13).  The PwC 2004 Madoff Report was

issued to the PricewaterhouseCoopers member organization in Ireland concerning another feeder

fund named Optimal Strategic U.S. Equity Ltd. SUS and to the PwC member firm in the

Netherlands concerning the Fairfield Sentry Fund.  The report is on "PricewaterhouseCoopers"

letterhead and labeled "Strictly Private And Confidential."  *Id*.  PwC Ireland and PwC
Netherlands paid a fee to obtain the PwC 2004 Madoff Report.  PwC Ireland and PwC Canada
obtained a similar report in 2006.

124.    The attendees to the meeting with Madoff were Linda McGowan ("McGowan")
and Scott-Watson Brown ("Brown").  McGowan is a partner at PwC U.S., and based in PwC
U.S.'s office in New York City at 300 Madison Avenue – about ten blocks from Madoff's
offices.  Brown was a partner at PwC, based in Hamilton, Bermuda.  Brown's phone number in
Bermuda appeared in Madoff's personal Office Telephone Directory next to
"PricewaterhouseCoopers."

125.    Although the report purports to "document" BMIS' management "procedures,"
the conclusions contained therein are based exclusively on McGowan and Brown's interview
with Madoff himself, and his own self-serving representations.  Neither McGowan nor Brown
made any attempt to verify, document, or confirm with evidentiary materials any of Madoff's
statements.  Instead, McGowan and Brown simply transcribed Madoff's unsubstantiated
assertions.  Notwithstanding the cursory nature of this "review" and that it did not comply with
GAAS, PwC relied on the review to sign off on the Funds' Financial Statements and issue audit
opinions.

126.    The PwC 2004 Madoff Report states that "99% of all trades [were] electronic,
therefore records are updated daily and all reconciliations [were] performed daily (automated
process)."  (PwC 2004 Madoff Report, Ex. 13 at 1).  Yet, KML and Tremont received all trade
confirmations in paper format with a considerable time lag that allowed Madoff to fabricate the
trades.  The paper records did not include time stamps for each trade nor individualized prices.
Instead, the paper confirmation tickets only reflected average prices for the day.  This

inconsistency between the fact that virtually all of Madoff's purported trades were electronic and the fact that all trade information from Madoff was sent in paper format and reported average prices, not specific trades, days later, was irreconcilable.  Accordingly, PwC's inability to obtain electronic confirmations, and its reliance only on paper confirmations received by KML and Tremont, should have raised significant questions for auditing purposes.

127.    The use of paper confirmations was at odds with Madoff's supposedly high-tech, electronic trade execution – at least as understood by PwC.  The PwC 2004 Madoff Report asserted that Madoff's operation was highly automated and relied on sophisticated computer models and systems:

> **Trades are initiated by the system without trader intervention** and routed in accordance with the firms [sic] routing priority.  Trades are bunch[ed] but the system maintains detail by account, which upon **electronic confirmation of execution is automatically posted to each individual account** in accordance with the original trade break out.  Bunched trades are allocated on a prorate[d] basis.  Performance is the same across all funds/accounts for which this strategy is employed.  Madoff receives 4 cents a share mark up on all trades.  **The system chooses the trades** by generally using 35 of the S&P 100 stocks and hedges the positions with S&P options. . . .  The parameters of the strategy require the correlation to be in the 90's.  Based on **models** matrix, positions are adjusted as correlative factors dictate.  If the **model** determines that there is not a current factor conducive to positioning, the cash will be invested in US Treasury securities.  The **model** runs on a dynamic basis and is adjusted periodically as market conditions dictate.

(PwC 2004 Madoff Report, Ex. 13 at 2).

128.    Because PwC only reviewed paper copies of the trades purportedly executed for and sent to the Funds, PwC never confirmed the electronic trading that PwC reported internally had in fact occurred.

129.    Also according to the PwC 2004 Madoff Report, "all securities are segregated in accordance with US brokerage rules (primarily at DTC for equities and **BONY for governments, GSCC clears governments**)."  (PwC 2004 Madoff Report, Ex. 13 at 4; emphasis

supplied).  The phrase, "BONY for governments, GSCC clears governments" meant that BONY (the Bank of New York) held the government securities, or U.S. Treasury bills, and that GSCC (Government Securities Clearing Corporation) was the clearing agent for the purchase and sales of U.S. Treasury bills.  The U.S. Treasury bills were purportedly held at BONY and cleared through GSCC because Madoff was not an authorized broker-dealer for government securities, only for equity securities.  FINRA's 2008 report on BMIS specifically stated that BMIS was a broker dealer, but not a "government securities broker or dealer."  (FINRA BrokerCheck Report – BMIS, Ex. 14 at 6).

130.    The PwC audit opinions, however, all said that "Madoff act[ed] as the [Fund's] broker-dealer for all equity, **US Treasury** and option transactions."[18]  This was false and contradicted by FINRA's 2008 report.

131.    For example, with respect to Kingate Global, the 2007 opinion represented that $2.60 billion was held in U.S. Treasury bills as of December 31, 2007.  In fact, every year-end and every financial statement audited by PwC reflected that virtually all the assets were being supposedly held in U.S. Treasury bills, and the rest in cash.  Yet, PwC never confirmed that the U.S. Treasury bills actually existed, which it could easily have done by contacting BONY.

132.    PwC failed to check to make sure that these assets – the U.S. Treasury bills – existed every single year it conducted its audits.  Yet, the assertion that the assets existed and that the Funds' monies were safe because they were being held in U.S. Treasury bills was a critical assertion of the financial statements and of PwC's audit opinion.

133.    The PwC 2004 Madoff Report also indicated that "all securities [were] segregated in accordance with US brokerage rules (primarily at DTC for equities)."  (PwC 2004 Madoff

---

[18]   KGF 2004-05 FS, Ex. 8 at 3; KGF 2006-07 FS, Ex. 9 at 3; and KEF 2006-07 FS, Ex. 10 at 3.

Report, Ex. 13 at 4).  PwC never confirmed that there existed a "segregated" account at DTC for the benefit of the Funds.

134.    PwC met with Madoff again in 2006 and issued another report of the meeting to other PwC member firms.  The content of the 2006 Report was substantially the same as the 2004 Madoff Report.  Madoff, however, failed to mention that BMIS had been forced to register as an investment adviser by the SEC in August 2006.  Instead, he informed PwC that there had been "no changes occurring in the regulatory environment that BM [Madoff] feels has an impact on the managed accounts that we advise."  If PwC had been doing its job, it would have caught this omission and questioned why Madoff had failed to mention BMIS registration as an investment adviser with the SEC and why Madoff had been operating as an unregistered investment adviser for many years.

**E.    PwC Admitted that it Did Not Test the Operating Effectiveness of the Controls at BMIS**

135.    The procedures conducted in December 2004 are the subject of a letter from PricewaterhouseCoopers Accountants, N.V. ("PwC Netherlands"), dated March 15, 2005, to another feeder fund (Fairfield Greenwich Advisors, LLC ("Fairfield Greenwich")).  ("PwC Netherlands Letter," Ex. 12).  The letter discloses PwC's involvement in meeting with Madoff. In relevant part, the letter states as follows:

> In our previous conference call, we have informed you about the fact that PwC had a meeting in December 2004 with Bernard L. Madoff Investments Securities LLC (hereinafter 'BLM') in order to obtain and/or update PwC's understanding of the procedures in place at BLM.  PwC has shared with PwC Rotterdam their procedures program, notes of meeting and conclusions for the purpose of our audit of Fairfield Sentry Limited.
>
> * * *
>
> The procedures performed by PwC were only directed towards obtaining an understanding of certain procedures and organization aspects of BLM for **the purpose of gaining comfort thereon for the audits by several PwC offices of a number of funds having moneys managed by BLM.**

(PwC Netherlands Letter, Ex. 12 at 1).

136.    The letter also included an appendix entitled, "Summary of procedures performed at BLM."  (PwC Netherlands Letter, Ex. 12 at 3).  The appendix stated that "[b]y means of an interview with [Madoff], the following controls and procedures were discussed. . . ."  Under GAAS, however, is clear that discussions alone do not suffice to provide appropriate audit evidence.

137.    The PwC Netherlands letter states unequivocally that "the procedures performed [by PwC Bermuda during the Madoff site visit] are not directed to the providing of assurance in respect of internal controls, nor to the detection of fraud, errors or illegal acts.  The procedures do not constitute an audit nor an investigation of the internal controls of/at BLM.  The procedures consisted of gathering factual information through an interview with Mr. Madoff . . . No testing of controls and procedures was performed."

138.    In an email dated October 12, 2007 from PwC's Brown to Stephen Wall, the PwC Canada engagement leader for the audit of the Fairfield Sentry fund, Brown admitted that PwC Bermuda relied on inquiry to gain an understanding of BMIS's role and designed the visit not to "step into 'reauditing' Madoff's auditor's work (i.e. we do not look at reconciliations etc. that occur in the custody/brokerage part of the business)."  PwC did nothing to test whether there was effective segregation of the functions at BMIS and the operating effectiveness of other controls at BMIS that would safeguard the assets of the Funds.  PwC never sought to speak with internal auditors.  If it had, PwC would have learned that Madoffs' representations that BMIS had an internal audit function were false.

**F.     PwC Violated GAAS By Making Use of Reports Prepared by Friehling &
Horowitz Without Investigating Its Professional Reputation**

139.    PwC further failed to investigate the professional reputation and competence of
Friehling & Horowitz, BMIS' auditor, before relying upon or making use of reports or financial
statements prepared by that firm, as required by AU 324.18 and AU 543.10.  PwC obtained and
relied upon an internal controls report and a statement of condition for BMIS that were prepared
by Friehling & Horowitz as audit evidence that BMIS was in good regulatory standing and that it
had effective internal controls.

140.    The PwC guide said that if PwC was going to rely on reports or financial
statements prepared by another firm (here, F&H), PwC had to conduct basic due diligence on
F&H and its supposed audits of Madoff.  The first critical factor was the "professional reputation
and standing of [F&H]."  (*Id.* at 30).  For auditors whose reputation was not sufficient (such as
F&H), additional procedures were required.

141.    The PwC Guide listed "illustrative additional procedures," which PwC never
performed:

- Investigate the professional reputation and standing of [F&H].

- Request that [KML and Tremont] apply, or have [F&H] apply,
  appropriate procedures to [Madoff's] financial statements
  and/or the underlying records.

- Request that [KML and Tremont] call or visit [F&H] to discuss
  audit procedures followed and the results thereof.  Review the
  audit program and/or working papers of [F&H], to the extent
  permissible.  (*Id.*).

142.    The PwC Guide requirements that PwC conduct additional procedures concerning
F&H were based on specific GAAS guidance.  Pursuant to AU § 332.30, because F&H's
"audits" of BMIS were unsatisfactory, PwC had the additional obligation:

> If [BMIS'] financial statements are not audited, or if [BMIS']
> auditor's report is not satisfactory to the investor's auditor for this
> purpose [*i.e.*, PricewaterhouseCoopers], the investor's auditor
> should apply, or should request that the investor arrange with the
> investee to have another auditor apply, appropriate auditing
> procedures to such financial statements, considering the materiality
> of the investment in relation to the financial statements of the
> investor.

143.     Despite its own internal guidelines' clear instructions to conduct, at a minimum, a background check on F&H, PwC did not do so.  PwC never checked F&H's status with the AICPA.  Had it done so, it would have discovered that F&H had filed a form every year with the AICPA certifying that F&H **did not** conduct any audits.  As a result, PwC was required to undertake an in-depth review of F&H's audit of Madoff, but it failed to do so.

144.     Indeed, according to the Trustee's complaint, Defendant Grosso emailed Wetherhill in February 2008 that "the auditors [at PwC] have not looked at all into the matter of cash and cash movements [*sic*] controls.  Several questions have not been addressed," and in another February 2008 email to Wetherhill, Grosso expressed his concern that PwC might actually "start to ask all sort [*sic*] of questions next time they visit Madoff."

### G.     Without Sufficient Adequate Evidence that the Controls at BMIS Existed and Were Operating Effectively, PwC Violated GAAS by Relying on Confirmations From BMIS

145.     In the absence of sufficient audit evidence that the controls at BMIS were operating effectively, including controls with respect to the segregation of functions, PwC was required by GAAS to assume that control risk was at the maximum and could not rely on confirmations and monthly statements from BMIS.

146.     PwC also failed to recognize that as a service organization, BMIS was considered a functional part of the Funds' management and could not be considered an independent source for purposes of confirmations.  PwC was required to perform alternative procedures and seek

confirmations from independent sources (e.g., the Bank of New York) to confirm the existence of the Funds' assets at year-end.

147.    PwC also was negligent in relying on year end statements of account from BMIS for confirmation purposes without any verification that the statements were prepared by an independent custodial department rather than the investment advisory function or some other back office within BMIS.

148.    PwC made no effort to seek verification from independent sources such as the Bank of New York, the NSCC or the DTC.  For example, PwC was advised by Madoff that he held the U.S. Treasury bills in an account at the Bank of New York; however, PwC never once sought confirmation from the Bank of New York.  Although PwC opined that the multi-billion dollar valuations of the Funds' investments were fairly presented in the financial statements, PwC failed to determine whether these assets, which constituted nearly 100% of the Funds' value, even existed.

149.    PwC further failed to obtain confirmations from yet another critical set of third parties:  Madoff's supposed trading counterparties.  PwC knew that the counterparties to the put options supposedly purchased by Madoff were critical and questioned Madoff on this point during the December 2004 and 2006 meetings.  The PwC 2004 Madoff Report states that, according to Madoff, "all options [were] traded [over-the-counter], but use same expiration date as listed index options; Madoff uses various, numerous counterparties."  (PwC Madoff Report, Ex. 13 at 7).

150.    Over-the-counter traded options meant that Madoff entered into private contracts with other market participants and that Madoff did not purchase exchange-traded options. Exchange-traded options carry minimal credit risk because the exchange ensures that all

exchange participants are credit worthy.  In the event they are not, the exchange bears the loss.
Accordingly, PwC knew that Madoff supposedly did not purchase any options on an exchange,
but rather in direct, private transactions, with considerable credit risk.

151.    The audit opinions issued by PwC falsely stated that "[d]uring the year the [Fund]
traded in **listed** and over the counter index options.  Where the [Fund] trades in **listed** options,
the counter-party and guarantor is the Options Clearing Corporation."[19]  PwC knew this was
false because its own PwC 2004 Madoff Report and 2006 Madoff Report said that Madoff traded
all options over-the-counter ("OTC").  PwC also failed to examine the underlying options
agreements with the counterparties to the options trades or make inquiries with the options
trading desks at major financial institutions to confirm that Madoff was a major player in the
OTC market.  If Madoff had made billion dollar trades on the OTC market, he would have been
known to the specialists in the field.  Had PwC performed its audits properly, it would have
discovered that the specialists in the OTC market place had no knowledge of Madoff or his
purported trades.

### H.    PwC Violated GAAS by Performing Circular Confirmations Based on Information Derived Solely from BMIS

152.    PwC's confirmation procedures consisted of comparing year-end statements
provided by BMIS with the books and records of the Funds maintained by the Kingate
Defendants and Citi Hedge.

153.    PwC's procedure for verifying the existence of assets was fundamentally flawed
because BMIS was the sole source of information to the Kingate Defendants, Citi Hedge and
PwC.  The Kingate Defendants did no processing or checking of the trade tickets and monthly
statements that they received from BMIS.  Thus, the whole process was circular and provided no

---

[19]   KGF 2004-05 FS, Ex. 8 at 3; KGF 2006-07 FS, Ex. 9 at 4; and KEF 2006-7 FS, Ex. 10 at 4.

meaningful verification that the assets shown on the financial statements of the Funds actually existed as of year-end.

154.    PwC failed in its obligation to obtain reasonable assurance that the assets included in the Funds' financial statements in fact existed and were appropriately valued.  Contrary to the applicable auditing standards, PwC failed to gather sufficient, competent evidence to support its opinion that the Funds' financial statements were free of material misstatement with respect to the claimed assets, instead inappropriately relying on the Funds' management's representations. (AU § 333).

      I.     **The Funds' Financial Statements Were False**

           1.     **Kingate Global's Statements of Assets and Liabilities, Operations, and Change of Net Assets Were False**

155.    Kingate Global's Financial Statements included a Statement of Assets and Liabilities.  This Statement supposedly reflected the value of Kingate Global's assets purportedly held by Madoff at the end of each year.  Regardless of market conditions, Madoff was supposedly invested solely in U.S. Treasury bills at year-end.  These statements were false because the assets did not exist at the time of each annual audit.

      (a)     In 2004, Kingate Global supposedly held:  (i) $2.20 billion in U.S. Treasury bills; and (ii) $37.9 million in cash and cash equivalents.  (KGF 2004-05 FS, Ex. 8 at third and sixth pages (not numbered)).

      (b)     In 2005, Kingate Global supposedly held:  (i) $2.23 billion in U.S. Treasury bills; and (ii) $16.7 million in cash and cash equivalents.  (*Id.*).

      (c)     In 2006, Kingate Global supposedly held:  (i) $2.37 billion in U.S. Treasury bills; and (ii) $124.4 million in cash and cash equivalents.  (KGF 2006-07 FS, Ex. 9 at third and sixth pages (not numbered)).

(d)      In 2007, Kingate Global supposedly held:  (i) $2.63 billion in U.S. Treasury bills; and (ii) $128.3 million in cash and cash equivalents.  (*Id.*)

156.      Kingate Global's Financial Statements also included a Statement of Operations, which included the following line items:[20]

(a)      "Net realized gain from investment" for the years 2004 through 2007 of $158.1 million, $163.6 million, $244.1 million, and $237.1 million, respectively.  This line item reflected fictitious annual returns from Madoff.

(b)      "Management fee" (KML and Tremont) for the years 2004 through 2007 of $31.7 million, $34.0 million, $34.4 million, and $38.8 million, respectively.  This line item reflected the cash actually paid by Plaintiffs and the Class to KML and Tremont based on Madoff's fictitious returns.

(c)      "Administration fee" (Citi Hedge) for the years 2004 through 2007 of $0.58 million, $0.61 million, $0.61 million, and $0.67 million, respectively.  This line item reflected the cash actually paid by Plaintiffs and the Class to Citi Hedge based on Madoff's fictitious reports.

(d)      "Professional fees" (PricewaterhouseCoopers) for the years 2004 through 2007 of $54,997, $49,381, $66,894, and $82,407, respectively.

## 2.      Kingate Euro's Statements of Assets and Liabilities, Operations, and Change of Net Assets Were False

157.      Kingate Euro's Financial Statements included a Statement of Assets and Liabilities.  This Statement reflected the supposed value of Kingate Euro's assets purportedly held by Madoff at the end of each respective year.  These statements were false because the assets did not exist at the time of each annual audit.

---

[20]    KGF 2004-05 FS, Ex. 8 at fourth page (not numbered); KGF 2006-07 FS, Ex. 9 at fourth page (not numbered).

(a) In 2006, Kingate Euro supposedly held:  (i) €474 million in U.S. Treasury bills; (ii) €49.5 million in cash held as collateral on forward currency contracts; and (iii) €9.1 million in net unrealized gains on forward currency contracts.  (KEF 2006-07 FS, Ex. 10 at third and sixth pages (not numbered)).

(b) In 2007, Kingate Euro supposedly held:  (i) €580 million in U.S. Treasury bills; (ii) €46.0 million in cash held as collateral on forward currency contracts; and (iii) €7.5 million in net unrealized gains on forward currency contracts.  (*Id.*).

158.  Kingate Euro's Financial Statements also included a Statement of Operations, which included the following line items:[21]

(a) "Net realized gain on investment and foreign currency transactions" for the years 2006 and 2007 of €25.0 million and €45.0 million, respectively.  This line item reflected, in part, the fictitious annual returns from Madoff.

(b) "Management fee" (KML and Tremont) for 2006 and 2007 of €7.9 million and €9.1 million, respectively.  This line item reflected the cash payments actually paid by Plaintiffs and the Class to KML and Tremont based on Madoff's fictitious reports.

(c) "Administration fee" (Citi Hedge) for 2006 and 2007 of €0.132 million and €0.146 million, respectively.  This line item reflected the cash payments actually paid by Plaintiffs and the Class to Citi Hedge based on Madoff's fictitious reports.

(d) "Professional fees" (PricewaterhouseCoopers) for 2006 and 2007 of €44,429 and €46,567, respectively.

159.  PwC failed in its obligation to obtain reasonable assurance that the assets included in the Funds' financial statements in fact existed and were appropriately valued.  Contrary to the

---

[21] KEF 2006-07 FS, Ex. 10 at fourth page (not numbered).

applicable auditing standards, PwC failed to gather sufficient, competent evidence to support its opinion that the Funds' financial statements were free of material misstatement with respect to the claimed assets, instead inappropriately relying on the Funds' management's representations. (AU § 333).  For example, PwC was advised by Madoff that he held the U.S. Treasury bills in an account at the Bank of New York; however, PwC never once sought confirmation from the Bank of New York.  Although PwC opined that the multi-billion dollar valuations of the Funds' investments were fairly presented in the financial statements, PwC failed to determine whether these assets, which constituted nearly 100% of the Funds' value, even existed.

160.    With respect to the line item, "net realized gain from investments," PwC did not perform the necessary procedures to audit the occurrence of the transactions which would have constituted the basis for the "gain," as required by GAAS.

161.    For example, PwC knew or should have known about articles saying that Madoff's consistent positive results were suspicious and raising significant questions about Madoff's purported trading strategy.  A May 2001 article in *Barrons* titled *Don't Ask Don't Tell; Bernie Madoff Is So Secretive, He Even Asks His Investors To Keep Mum,* reported that three option strategists at major investment banks were highly skeptical about Madoff's unusually steady double-digit returns and quoted one of the strategists as stating:  "Anyone who's a seasoned hedge fund investor knows the split-strike conversion is not the whole story.  To take it at face value is a bit naïve."  Also in May 2001, an article in the hedge fund industry newsletter MAR/Hedge titled *Madoff Tops Charts; Skeptics Ask How*, noted that numerous traders, money managers, and fund managers employing a split-strike conversion strategy experienced far greater volatility and significantly lower returns than what Madoff was reporting.  PwC ignored

these issues when conducting its audits for the Funds and failed to verify whether Madoff was in fact executing the trades that he claimed.

162.    In addition, despite the knowledge of the interconnection between the Funds and BMIS, and of the Funds' reliance on the supposed integrity of BMIS' operations, PwC did not review the data required by the auditing standards with respect to an auditor's obligation to examine the "controls over derivatives and securities transactions from their initiation to their inclusion in the financial statements." (AU § 332.11). PwC did not test the trades supposedly made by BMIS or confirm the actual existence of securities in BMIS accounts. If PwC had made any such efforts, it would have discovered discrepancies and impossible trades.

163.    For example, another PricewaterhouseCoopers member firm, which audited the Fairfield Greenwich feeder funds, tested a sample of 57 trades. Expert analysis has demonstrated that for 7 of the 57 tested trades, Madoff's reported execution (price and volume traded) was impossible. For 34 of the remaining 50 trades, the probability of obtaining Madoff's reported execution was virtually impossible. It is reasonable to infer that similar results would obtain for PwC's audits here, and if PwC did not test any trades, that itself is a gross audit failure.

### 3.    The Notes to Kingate Global's and Kingate Euro's Financial Statements

164.    The Notes to Kingate Global's Financial Statements for the years 2004 through 2007, and for Kingate Euro's 2007 Financial Statements, were identical with respect to the statements discussed below. These Notes confirm that PwC was well aware of the matters discussed therein. Yet it did not take these matters properly into account in planning and performing its audits.

165.    Note 2(b) discussed "significant accounting policies" for "cash and cash equivalents." Note 2(b) shows that PwC understood that Madoff acted as custodian and held

cash on deposit: "Cash and cash equivalents include . . . amounts on deposit with the broker-dealer."[22]

166.    Note 5 discussed the "investment advisor, broker dealer, custodian and banker," in relevant part, as follows:

> The [Fund's] investment advisor is Bernard L. Madoff Investment Securities LLC ("Madoff"), a New York based financial institution.  Madoff also acts as the [Fund's] broker-dealer **for all equity, US Treasury and option transactions**, these transactions being executed in certain instances with Madoff as the principal. During the year [2005], the [Fund] executed transactions of approximately $48 billion (2004 - $49 billion).[23]  Madoff's only form of remuneration is from any principal spread and/or commission on the transactions.  Madoff also acts as custodian for investment assets of the [Fund].  (KGF 2004-05 FS, Ex. 8 at 3).

167.    Note 7 to the Financial Statements was entitled "Financial Instruments," and addressed the risks incurred by the Funds due to Madoff's supposed trading activities.

> In the normal course of business, the [Fund] invests in U.S. publicly traded securities as well as U.S. investments, which have off-balance sheet risk.  These financial instruments include purchased and written put and call options, which expose the Company to market and credit risk. . . .  Credit risk arises from the potential inability of the counter-party to perform under the terms of the contracts.
>
> \* \* \*
>
> During the year the [Fund] traded in listed and over the counter index options.  Where the Company trades in listed options, the counter-party and guarantor is the Options Clearing Corporation. Where the [Fund] trades in over the counter options, the [Fund] is exposed to credit risk due to the potential inability of the counter-party to perform under the terms of the contract. (KGF 2004-05 FS, Ex. 8 at 3).

---

[22]   KGF 2004-05 FS, Ex. 8 at 1; KGF 2006-07 FS, Ex. 9 at 1; and KEF 2006-07 FS, Ex. 10 at 1.

[23]   The comparable figures for 2006 and 2007 were $48 billion and $58 billion, respectively.  (KGF 2006-07 FS, Ex. 9 at 3).

168. All these statements in the Notes to the Financial Statements showed that PwC understood that Madoff held nearly 100% of the assets of the Funds, served as the broker-dealer for **"all"** of the Funds' transactions, and that Madoff did not charge an investment advisory fee. PwC further understood the risk that one of the parties that held the assets on behalf of the Funds, or that had obligations to the Funds (the counterparties), would not perform. Yet, PwC never confirmed that Madoff actually held any of the assets Madoff so claimed, nor confirmed any of Madoff's purported trades.

**J.      Unique Knowledge of the Volume of Assets Madoff Was Purportedly Trading Should Have Increased Scrutiny of the Information Provided by Madoff**

169. The "worldwide members of the PricewaterhouseCoopers organization" audited seven other Madoff feeder funds. Together with Kingate Global and Kingate Euro, these funds had total assets of more than $16 billion purportedly held by Madoff in 2007.

| Madoff Feeder Funds Audited By PwC | Assets Under Management - 2007[24] |
|---|---|
| Fairfield Sentry (includes Fairfield Lambda & Sigma) | $ 7,277,386,000 |
| Greenwich Sentry, LP | $ 262,531,000 |
| Kingate Global, Ltd. | $ 2,754,291,825 |
| Kingate Euro Fund, Ltd. | $ 633,934,973 |
| Optimal Strategic US Equity, Ltd. | $ 2,770,250,674 |
| Thema International Fund, PLC | $ 1,447,688,803 |

---

[24] Assets under management is the amount that Madoff reported to the feeder funds. This amount thus reflects the fictitious appreciation of the total cash invested. For Kingate Global, for example, while the total cash invested by Kingate Global between 1994 and 2008 was $963.45 million (*infra* ¶ 68), Madoff reported assets under management of $2,754,291,825 as of the end of 2007.

| Zeus Partners, Ltd. | $ 300,000,000 |
| Defender Fund Ltd. | $ 312,282,024 |
| Plaza Investments International Ltd. | $ 657,241,006 |
| **Total** | **$16,415,606,305** |

170.    According to a Form ADV publicly filed with the SEC on January 7, 2008, BMIS represented that its assets under management totaled $17,091,640,696.  In other words, feeder funds audited by PricewaterhouseCoopers member organizations comprised about 96% of BMIS' supposed entire Investment Advisory business.  PwC should have realized that the figure given for assets under management was false because many other hedge funds and entities not audited by PwC had invested large amounts with Madoff.  The understatement of assets under management should have led to further investigation by PwC and a ratcheting upwards of its risk profile for the Funds.  This, in turn, should have increased efforts by PwC to confirm the existence of the assets supposedly held by BMIS for the Funds by means independent of Madoff.

171.    These suspicions also should have been obvious because PwC coordinated the PricewaterhouseCoopers member firms' audits of the feeder funds and visits to Madoff's offices on a global basis.

**K.      PwC Violated Its Duties to Plaintiffs and the Class**

172.    As the independent party charged with certifying that it had reasonable assurance that the Funds' financial statements were free of material misstatements, PwC failed to meet its obligations to the Funds' investors both when it conducted improper audits and when it issued its audit opinions – opinions upon which it knew those parties would rely.  Had PwC performed appropriate audits (as it represented it had), Plaintiffs would have avoided substantial losses.

173.    The audits PwC represented it conducted, and the limited audit work that PwC

must have conducted, gave PwC actual knowledge or it should have known that, among other

things:

- BMIS was not audited pursuant to GAAS by a "qualified and reputable independent audit firm";

- the Kingate Defendants performed no meaningful due diligence on BMIS; and

- the Kingate Defendants had no process in place to verify the occurrence of the transactions purportedly made by BMIS with counterparties or other third parties, or the existence of the assets.

174.    PwC breached its duties to Plaintiffs at least as follows:

- PwC failed to exercise due professional care and professional skepticism in its audit of the Funds.  PwC failed to use professional skepticism "when considering the risk of material misstatement due to fraud;"

- PwC failed to obtain a sufficient understanding of the Funds and their environment, including their internal controls, to assess the risk of material misstatement of the financial statements whether due to error or fraud;

- PwC failed to test or obtain sufficient competent audit evidence that the internal controls at BMIS were operating effectively;

- PwC engaged in meaningless circular confirmation procedures that compared a year-end statement obtained from BMIS with the books and records of the Funds that were prepared based on trade tickets and monthly statements provided by BMIS;

- PwC failed to obtain sufficient competent audit evidence with respect to existence of the Funds' investments and PwC did not perform the necessary procedures to audit the existence of the Funds' investments;

- PwC failed to perform additional procedures required in situations where, as here, there was a lack of segregation of duties at a service organization.  Numerous issues and risks required PwC to investigate further and perform additional audit procedures prior to opining on the Funds' financial statements;

- Any reliance by PwC on BMIS's financial statements was improper because F&H was not qualified or able to audit BMIS in accordance with GAAS; and

- Any reliance by PwC on the 17a-5 internal control reports prepared by F&H was improper because the control reports were designed for regulatory purposes, contained an express prohibition against use by third parties; were based on a study, not an audit; did not include a description of the procedures performed; and addressed only certain controls at the broker-dealer, not controls at the investment advisor function.

**L.  PwC's Substantial Assistance to Kingate Defendants' Breaches of Fiduciary Duty**

175.   PwC was required by GAAS to gain an understanding of the nature of the services provided by the Kingate Defendants to the Funds, including the nature and extent of the monitoring that the Kingate Defendants did of BMIS on behalf of the Funds.  To the extent that PwC wished to rely on information provided by the administrators of the Funds for purposes of its audits, PwC was required to verify the existence and operating effectiveness of controls at the administrators or obtain a SAS 70 prepared by an independent auditor.  PwC, however, failed to take reasonable steps to gain an understanding of the measures taken by the Funds to supervise BMIS.

176.   Even in the course of its inadequate audits, PwC must have known or willfully ignored that the Kingate Defendants did not, in fact, conduct the due diligence they falsely represented that they conducted.  PwC further must have known or willfully ignored that the Kingate Defendants did not monitor or verify the investments purportedly made by Madoff in order to confirm that BMIS operated legitimately, using the represented investment strategy, and in accordance with the legal and regulatory requirements.

177.   In conducting its audits, PwC was willfully blind to the Kingate Defendants' breaches of fiduciary duty, and PwC thereby provided substantial assistance to the Kingate

Defendants in that regard by providing clean audit opinions and by failing in its other duties as set forth above.

## VIII.   CITI HEDGE'S WRONGFUL CONDUCT

### A.   Citi Hedge Committed To Provide Critical Administrative Services to the Investors

178.   Citi Hedge and its predecessors served as the administrator of the Funds at all relevant times.  From the inception of the Funds through 2002, the administrator was Bermuda-based Hemisphere.  In 2002, Hemisphere was acquired by BISYS Group, Inc. (BISYS's parent) and renamed BISYS Hedge Fund Services Ltd. (Bermuda).  In 2007, Citigroup acquired BISYS Group, Inc. and gave the administrator the name Citi Hedge.

179.   As administrator, Citi Hedge and its predecessors were subject to the Administration Agreement, as amended and restated effective June 1, 2007 (the "Administration Agreement," Ex. 15), and the Registrar Agreement, as amended and restated effective January 1, 2002.

180.   Pursuant to these agreements, Citi Hedge's responsibilities included the calculation of the Funds' NAV.  The Information Memoranda informed investors that the NAV "is the market value of the Fund[s'] total assets, calculated as described below, less all accrued debts and liabilities. . . .  The Fund[s'] total assets include:  (i) all cash and cash equivalent, including bank deposits and interest bearing obligations; (ii) all securities positions; and (iii) all options position."[25]

181.   Citi Hedge was aware that all of the information regarding the Funds' purported trading and assets was provided solely by Madoff.  In accordance with standard industry practice, Citi Hedge had a duty to verify this information from a source independent from

---

[25]   *Id.*

Madoff.  If Citi Hedge had taken steps to independently verify the information being provided by Madoff, it would have discovered the manifest errors contained in the statements provided by Madoff to Citi Hedge.

182.   Additional responsibilities of the administrator set forth in the Information Memoranda included:  (i) communicating with the Funds' shareholders; (ii) communicating with the general public; (iii) soliciting sales of the Funds' stock; (iv) accepting the subscriptions of new Shareholders; (v) maintaining the Funds' principal corporate records and books of account; (vi) disbursing payments of dividends, legal fees, accounting fees, and officers' and directors' salaries; (vii) calculating, publishing or furnishing the subscription or redemption price of the shares, (viii) conducting meetings of the Funds' shareholders and Directors; and (ix) making redemptions.[26]

183.   For its services, Citi Hedge collected an annual fee.  For example, from 2005 through 2007, Citi Hedge collected approximately the following respective amounts in management fees with respect to Kingate Global, respectively:  $605,000; $611,000; and $666,000.[27]  Similarly, Citi Hedge collected approximately the following respective amounts in 2006 and 2007, with respect to Kingate Euro:  €132,000 and €146,118.[28]  These payments were made from funds invested by Plaintiffs and the Class and were based on the fictitious value of the Funds' assets, as calculated by Citi Hedge.  As a result, Citi Hedge did not earn these fees, which should be returned to Plaintiffs and the Class.

---

[26] KGF 2008 IM, Ex. 1 at 15; KEF 2008 IM, Ex. 2 at 16; KGF 2007 IM, Ex. 3 at 15; KGF 2006 IM, Ex. 4 at 15; KGF 2003 IM, Ex. 5 at 16; KGF 2000 IM, Ex. 6 at 16.

[27] KGF 2004-05 FS, Ex. 8 at fourth page (not numbered); KGF 2006-07 FS, Ex. 9 at fourth page (not numbered).

[28]   KEF 2006-07 FS, Ex. 10 at fourth page (not numbered).

### B.        Citi Hedge's Superior Financial Services Capabilities

184.    Citi Hedge held out its Funds Services division as "among the world's largest providers of Hedge Fund Administration Services."  (http://www.citibank.com/transaction services/home/securities_svcs/fund/docs/hedgefundend_end.pdf (last visited May 17, 2010)).  It asserts that "Citi has the experience, the global scale and the state-of-the-art technology to meet the comprehensive and complex needs of hedge funds and their managers today and in the years to come.  Our unmatched global presence and economy of scale create efficiencies and reduce operational costs."  (*Id.*).

185.    Citi Hedge claimed that its hedge fund services group in Bermuda is number one.  "Bermuda is home to Citi's industry-leading offshore fund services. . . .  Ours is the most highly rated alternative fund services team here, ranked the #1 fund administrator for three straight years by Global Custodian magazine."  (http://www. citigroup.com/transactionservices/ home/region/lam/countries/bermuda.jsp (last visited May 17, 2010)).  Citi Hedge further emphasized the many "Number One Wins" obtained by its Fund Services group, including "#1 Fund-of-Fund Administrator in North America," according to HedgeFundNet. (http://www.citigroup.com/transactionservices/home/securities_svcs/sfsawardscampgn.jsp (last visited May 17, 2010)).

186.    Citi Hedge claimed that it has a "unique competitive advantage" largely based on the fact that it has, "the industry's largest global footprint with 53 proprietary branches"; "the strongest presence across all regions"; and the "most diversified product line in the industry." (http://www.citigroup.com/transactionservices/home/securities_svcs/investors.jsp (last visited May 17, 2010)).

187.    In light of its position as the top fund administrator in the world, Citi Hedge was obligated to provide the highest possible quality of administration services, even beyond those of

a typical fund administrator.  As set forth in the Administration Agreement, Citi Hedge agreed to "calculate and publish the net asset value per Share . . . and the subscription and redemption prices per Share."  (Administration Agreement, Ex. 15 at § 4.1.1).  Citi Hedge was also responsible for providing corporate secretarial services (§ 4.2), including having an employee act as corporate secretary (§ 4.2.1), and establishing and maintaining the Funds' bank accounts (§ 4.2.9).  Citi Hedge further agreed to the preparation of draft financial statements for the auditors (§ 4.3.4), maintenance of the books and records (§ 4.3.1), and to the reconciliation of accounting issues with the Funds' Directors, auditors, and legal counsel (§ 4.3.3).

188.    In addition, Citi Hedge was to serve as the Funds' agent with the general public, and was responsible for communications with investors,[29] including communications directly with Plaintiffs and members of the Class.  Plaintiffs sent their subscription documents directly to Citi Hedge, sent monies for investments to Citi Hedge, and received investment confirmations from Citi Hedge.

### C.    Citi Hedge Owed Duties to Plaintiffs and the Class

189.    Citi Hedge was a fiduciary to Plaintiffs and the Class, and owed Plaintiffs and the Class a duty of due care in the performance of the services it provided.  Citi Hedge had significant discretionary responsibilities that went beyond a typical fund administrator.  Citi Hedge was aware that potential and current investors knew that Citi Hedge was providing significant services to the Funds, and were relying on Citi Hedge in making their investment decisions.  As its promotional and marketing materials show, Citi Hedge was aware that its involvement in the Funds lent significant credibility to the Funds, and provided potential and current investors with assurance about the quality of financial services provided to the Funds and

---

[29] KGF 2008 IM, Ex. 1 at 15; KEF 2008 IM, Ex. 2 at 16; KGF 2007 IM, Ex. 3 at 15; KGF 2006 IM, Ex. 4 at 15; KGF 2003 IM, Ex. 5 at 16; KGF 2000 IM, Ex. 6 at 16.

the accuracy of the reported values of the Funds and the investors' individual accounts.  Citi
Hedge knowingly placed its imprimatur on the Funds.

190.    As fully intended by Citi Hedge, Plaintiffs and the Class reposed their trust and
confidence in Citi Hedge, which occupied a superior position in providing administration
services, when Plaintiffs and the Class made their initial investment in the Funds, re-invested in
the Funds, and retained investments in the Funds.

191.    The NAV, which was to be independently calculated and reported by Citi Hedge,
was critical to Plaintiffs' and the Class' initial investment decisions, decisions to invest
additional funds, and decisions to maintain the investments over time.  The number of shares in
the Funds that Plaintiffs received in exchange for their cash investments depended on Citi
Hedge's NAV calculations.  The profits that Plaintiffs and the Class supposedly earned and the
increasing value of their investments also turned on Citi Hedge's calculations.  All of these
amounts were communicated directly by Citi Hedge to Plaintiffs and the Class.  Plaintiffs and the
Class necessarily relied on Citi Hedge's NAV calculations.

**D.      Citi Hedge's Performance Of Its Duties Was Grossly Deficient**

192.    Citi Hedge was grossly deficient in the fulfillment of its duties to Plaintiffs.  Citi
Hedge failed to take reasonable steps to fulfill its duties as administrator.  For instance, Citi
Hedge failed to take reasonable, industry-standard steps to calculate the Funds' NAV; to
independently confirm and verify the pricing information provided by Madoff; to reconcile
balances at BMIS; to reconcile information provided by Madoff as the Funds' prime broker with
information provided by KML and Tremont; to prepare the Funds' monthly financial statements
in accordance with GAAP; and to provide accurate information to investors.

193.    Citi Hedge should not have relied solely on information provided by Madoff
because the roles of investment manager, custodian, and trade execution agent were consolidated

in Madoff, thus dramatically increasing the risk of fraud and concomitant need for independent

verification and scrutiny, as Citi Hedge well knew.  Moreover, numerous questions and risks

surrounding Madoff's operations and purported results should have caused Citi Hedge to

increase its scrutiny of the information it received from Madoff, and seek independent

verification.

194.    Instead, Citi Hedge blindly and recklessly relied solely on information provided

by Madoff to calculate and disseminate the Funds' NAV, and to perform other duties, even when

that information was manifestly incorrect.  Given what Citi Hedge knew about Madoff and the

sources of information, it failed to follow standard industry practice in failing to verify Madoff's

information with independent sources.

195.    If Citi Hedge had not breached its duties as set forth above, Plaintiffs and the

Class would not have invested or reinvested in the Funds, or retained their investments in the

Funds.  Plaintiffs and the Class could have redeemed their investments and recovered their

principal during the many years in which the Funds were making redemptions prior to the

revelation of Madoff's fraud in December 2008, or avoided making additional investments.

**E.     Citi Hedge Provided Substantial Assistance To The Kingate Defendants'
         Breaches Of Fiduciary Duty**

196.    Citi Hedge knowingly provided substantial assistance to the Kingate Defendants

in the breaches of fiduciary duty that they perpetrated on investors.  By virtue of Citi Hedge's

long-standing involvement in the Funds, Citi Hedge knew or was willfully blind to the fact that

the sole source of information regarding the Funds' supposed trading was Madoff.  Citi Hedge

was aware that the Kingate Defendants never sought or obtained any independent verification of

the assets that Madoff was purportedly trading and holding on behalf of the Funds.  Citi Hedge

further knew that the Kingate Defendants claimed that they employed thorough due diligence,

monitoring and oversight of Madoff, and strict risk controls – which Citi Hedge knew to be false or to the falsity of which it was willfully blind.

197.    Rather than alerting investors to these problems, Citi Hedge provided substantial assistance to the Kingate Defendants.  For example, Citi Hedge assisted the Kingate Defendants by receiving investments from Plaintiffs and the Class and transferring their funds to BMIS; sending Plaintiffs investment confirmations; calculating the Funds' NAV and disseminating the false NAV values; receiving and transmitting other Fund information from the Kingate Defendants to Plaintiffs; allowing Citi Hedge's name and the services it was ostensibly providing to be included in the Funds' placement memoranda and other documents; and recording the securities Madoff said he was holding.  The Kingate Defendants could not have perpetrated their breaches of fiduciary duty without this substantial assistance by Citi Hedge.  If Citi Hedge had refused to fulfill the instructions of the Kingate Defendants or rely on the information they transmitted, as it had a right to do, or alerted investors to the conduct of the Kingate Defendants, Plaintiffs' and the Class' investment would not have been lost.

## IX.    IF DEFENDANTS HAD NOT BREACHED THEIR DUTIES, PLAINTIFFS' LOSSES WOULD HAVE BEEN AVOIDED

### A.    Madoff's Custody Of Equity Securities

198.    Defendants knew that Madoff failed to trade through an independent broker and, instead, self-cleared all trading activities through his wholly-owned company, BMIS.  Defendants also knew that Madoff served as his own custodian for the Funds' assets, even though this greatly increased the risk of self-dealing and fraud.  Indeed, when a Hemisphere employee told Defendant Ceretti in May 2000 that a potential investor was concerned with Madoff's roles as broker and manager, Ceretti said, "keep them away from now on and let me know if they contact you again."  A 2004 FIM report described Kingate Global as "[b]elow

expectations" for fund legal set-up and corporate governance, and a 2007 FIM report stated, "[t]here is a lack of independent oversight of the fund as there is no prime broker and the co-managers have delegated substantially all of the trading authority to the advisor." Had any of the Defendants conducted any monitoring or evaluation of Madoff's purported self-clearing and custodian functions, the Funds would have ceased transferring investor funds to Madoff and redeemed existing investments.

**B.**     **Madoff's Non-Existent Counterparties**

199.     Madoff refused to identify the counterparties with whom he purportedly traded options in over-the-counter, off-exchange transactions. If Madoff did identify counterparties, Defendants failed to verify Madoff's purported trades with them. Had Defendants properly monitored or evaluated involvement of the counterparties to Madoff's purported trading, the Funds would have ceased transferring investor funds to Madoff and redeemed existing investments.

**C.**     **The Government Securities Purportedly Held At The End Of Each Quarter Did Not Exist**

200.     Madoff claimed that he held all assets in government securities at the end of every quarter. While a possible coincidence, it is extremely suspicious that not one, single quarter-end coincided with an opportune time to be otherwise invested in the market. Madoff also claimed that the government securities were cleared through GSCC and held by BONY. Had Defendants contacted GSCC or BONY and sought to confirm the existence of the government securities (which in fact did not exist), the Funds would have ceased transferring investor funds to Madoff and redeemed existing investments.

### D. Madoff's Unknown Auditing Firm

201.    Defendants knew that Madoff supposedly used F&H, a tiny unknown accounting firm that was plainly unequipped to audit a company of BMIS' purported size.  Defendants had no basis to reply on F&H's work and they knew or should have known the obvious reasons not to do so.  Had Defendants conducted minimal due diligence on F&H, the Funds would have ceased transferring investor funds to Madoff and redeemed existing investments.

### E. Madoff's Paper Trading Records

202.    Madoff claimed that BMIS was technologically advanced, and that BMIS had a world-class trading floor.  Yet, Madoff reported his trades to Defendants using only paper confirmation forms which did not include the exact time of the trade nor the exact price of each trade.  Instead, the paper confirmations only provided average prices for transactions that had supposedly been executed each day.  The delayed paper confirmations were patently susceptible to manipulation.  Had Defendants conducted due diligence on Madoff's paper trading records and verified whether the trades had been executed, the Funds would have ceased transferring investor funds to Madoff and redeemed existing investments.

### F. Madoff's Fee Structure

203.    Madoff's fee structure was unusual if not unique.  A typical hedge fund investment manager charged two percent of assets annually, plus twenty percent of profits.  "Two-twenty," as this arrangement is commonly referred to, is the industry standard.  On the Funds' investment of approximately $2.5 billion with Madoff in 2008, a "two-twenty" fee arrangement would have entitled Madoff to an annual $75 million fee, assuming a five percent annual return.  Madoff did not charge any such fees and effectively relinquished tens of millions of dollars every year.  There was no explanation for this apparent "generosity."

204.     Instead, Madoff supposedly charged a commission per trade.  PwC reported that Madoff supposedly charged four cents a share on each trade.  But if Madoff was not charging for results, as a "two-twenty" fee structure does, and charged only for trading, Madoff had an incentive to churn the account.  Had Defendants conducted due diligence into Madoff's fee structure, including foregoing enormous performance fees, the Funds would have ceased transferring investor funds to Madoff and redeemed existing investments.

### G.     Madoff's Impossible Trading Volume

205.      In August 2006, when BMIS registered as an investment adviser, it represented to the SEC that it had approximately $11.7 billion of assets under management as of the end of July 2006.  BMIS stated that it managed $13.2 billion as of the end of 2006.  The Funds' account statements from BMIS reported balances of approximately $2.8 billion as of July 2006, and $3.0 billion as of December 2006.  Based on these figures, Defendants knew that as of July 2006 and year-end 2006, the Funds comprised about 23-24% of BMIS's assets under management.

206.     Because BMIS purported to buy and sell securities in block trades and then allocate the shares or options across all of its accounts, Defendants knew that the aggregate volume of trades purportedly executed by BMIS had to be over four times the volume BMIS claimed to have traded for the Funds.

207.     The Funds' account statements, which Defendants purportedly reviewed and verified, indicated that at least 237 times from 1998 through 2008, BMIS's purported trades for the Funds exceeded 10% of a stock's trading on the entire composite tape, which includes all listed and unlisted market volumes.  That meant that for all his managed funds, Madoff was trading about half of all the stock's daily volume, a highly improbable, if not impossible

circumstance.  Had Defendants conducted due diligence based on this information, the Funds

would have ceased transferring investor funds to Madoff and redeemed existing investments.

### H.     Madoff's Statistically Impossible Execution

208.    The Funds' trade confirmations and account statements revealed that Madoff

consistently purchased equities at or near monthly lows and sold equities at or near monthly

highs.

209.    Madoff claimed that he was time slicing, *i.e.*, entering the market at different

times throughout a trading day, and that the trade price reported on an account statement

reflected the average price.  When Madoff claimed to be purchasing equities, the reported

average price was almost always in the lower half of the daily trade range, and when he claimed

to be selling equities, the sale price was almost always in the upper half of the daily trade range.

210.    The Funds' account statements and trade confirmations, according to the

Trustee's complaint, indicate that from 1998 to 2008, approximately 81% of equity buys

occurred in the lower half of the daily price range and approximately 74% of equity sales

occurred in the upper half of the daily price range.  This consistent execution was statistically

impossible, because if Madoff were purchasing or selling a stock several times throughout the

trading day, the reported prices would have gravitated toward the daily midpoint, as Defendants

knew or should have known.   Had Defendants conducted due diligence based on this

information, the Funds would have ceased transferring investor funds to Madoff and redeemed

existing investments.

### I.     Madoff's Impossible Dividend Activity

211.    At various times, Madoff purported to hold Funds assets in a money market fund

that paid dividends.  On hundreds of occasions, according to the Trustee's complaint, the Funds'

account statements reflected payments of dividends on dates and/or in frequencies inconsistent with industry practice.

212.    Kingate Global's account statements showed purported dividends from money market funds being paid on 217 occasions from December 1995 to November 2008.  On 212 of those occasions, *i.e.*, 97.7%, the statement showed a payment date that differed from the date on which the money market fund actually paid dividends.

213.    Kingate Euro's account statements showed dividends from money market funds being paid on 226 occasions from February 1996 to November 2008.  On 220 of those occasions, *i.e.*, 97.3% of the time, the customer statements showed a payment date that differed from the date on which the money market fund paid dividends.

214.    Typically, money market funds declare dividends daily and pay dividends monthly.  If an investor transacts in a money market fund multiple times in one month, that activity is tracked, the proper dividend is accrued for the days invested, and the dividend is paid at one time.  BMIS's account statements issued to the Funds, however, showed a dividend being paid upon each sale transaction of the money market fund.  The Kingate Global account statements showed multiple dividends from the same money market fund in 40 of 156 months. The Kingate Euro account statements showed multiple dividends from the same money market fund in 43 out of 155 months.

215.    Had Defendants conducted due diligence on these highly suspicious dividend reports from Madoff, the Funds would have ceased transferring investor funds to Madoff and redeemed existing investments.

X.      **CLASS ACTION ALLEGATIONS**

216.    This action is brought as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of all shareholders in Kingate Global and Kingate Euro

69

as of December 10, 2008 who suffered a net loss in principal from investments in the Funds (the "Class").  Excluded from the Class are the Defendants herein, and any entity in which any Defendant has a controlling interest, and the officers, directors, affiliates, legal representatives, immediate family members, heirs, successors, subsidiaries, and/or assigns of any such individual or entity.

217.    Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Plaintiffs are members of the Class, their claims are typical, and they do not have interests antagonistic to, or in conflict with, those of the Class.  Plaintiffs have also retained competent counsel experienced in class action litigation.

218.    The Class satisfies the requirements of Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure:

(a)    *Numerosity* - During the Class Period, shares in the Funds were sold to hundreds of investors.  The membership of the Class is so numerous as to render joinder of all Class members impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that Class members number in the hundreds.

(b)    *Typicality* - The losses suffered by the named Plaintiffs were caused by the same events, patterns of practice, and wrongful courses of conduct that give rise to the claims of the other members of the Class.  The named Plaintiffs are members of the Class and the losses to the named Plaintiffs are based on the same legal theories.

(c)    *Common Questions* - There are numerous questions of law and fact which are common to the Class and which predominate over any questions affecting individual members, including:

(i)     whether Defendants breached their fiduciary duties to Plaintiffs;

(ii)    whether Defendants breached contractual duties of which Plaintiffs were third-party beneficiaries;

(iii)   whether and to what extent Plaintiffs were damaged by Defendants' breaches of contract and fiduciary duty;

(iv)    whether Defendants were negligent or grossly negligent in:

(A)    failing to perform adequate due diligence before selecting BMIS as each Fund's investment advisor and broker-dealer and before allowing BMIS to serve as actual custodian of the Funds' assets;

(B)    failing to monitor Madoff and BMIS on any ongoing basis and to any reasonable degree;

(C)    failing to take adequate steps to confirm BMIS' purported transactions and holdings of each Fund's assets;

(v)     whether PwC and Citi Hedge negligently made material misrepresentations and omissions about the value of Fund shares and performance of their duties to investors; and

(vi)    Whether Plaintiffs are entitled to the imposition of a constructive trust on all monies and other property in the possession of the Defendants which derive from their compensation in the form of management and performance and other fees based on false account values.

(d)     *Adequate Representation* - The representative Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs have retained experienced counsel qualified in class action litigation who are competent to assert the interests of the Class.

(e)     *Superiority* - A class action is superior to other available methods for the fair and efficient adjudication of this controversy since a multiplicity of actions could result in an unwarranted burden on the judicial system and could create the possibility of inconsistent judgments.  Moreover, a class action will allow redress for many persons whose claims would

otherwise be too small to litigate individually.  There will be no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

Plaintiffs recognize that the Court of Appeals' decision in *In re Kingate Management Ltd. Litig.*, 784 F.3d 128 (2d Cir. 2015), effectively precludes certain claims that were alleged in the Amended Consolidated Class Action Complaint and they are not asserted in this Second Amended Consolidated Class Action Complaint.  Plaintiffs reserve the right to reallege those claims, subject to Defendants' right to raise appropriate defenses, in the event that subsequent changes in the law make such claims viable.

**COUNT 1**
**PRECLUDED**
**Fraud Against The Kingate Fraud Claim Defendants**
**(Purchaser Claims)**

**COUNT 2**
**PRECLUDED**
**Fraud Against The Kingate Fraud Claim Defendants**
**(Holder Claims)**

**COUNT 3**
**PRECLUDED**
**Negligent Misrepresentation**
**Against The Kingate Defendants (Purchaser Claims)**

**COUNT 4**
**PRECLUDED**
**Negligent Misrepresentation**
**Against The Kingate Defendants (Holder Claims)**

## COUNT 5
## Gross Negligence
## <u>Against The Kingate Defendants</u>

219.     Plaintiffs restate and reallege each of the preceding allegations as if fully stated

herein.  The parties agree that this claim is not precluded by SLUSA.

220.     The Kingate Defendants, as investment advisors, managers and placement agents

with discretionary control over the assets entrusted to them by Plaintiffs and the Class had a

special relationship with Plaintiffs and the Class that gave rise to a duty to exercise due care in

the management and monitoring of the assets invested by Plaintiffs and the Class.  The Kingate

Defendants knew or should have known that Plaintiffs and the Class were relying on the Kingate

Defendants to manage the investments entrusted to the Funds with reasonable care, and Plaintiffs

and the Class did reasonably and foreseeably rely on the Kingate Defendants to exercise such

care by entrusting their assets to the Funds.

221.     The Kingate Defendants grossly failed to exercise due care, and acted in reckless

disregard of their duties, and thereby injured Plaintiffs and the Class.  The Kingate Defendants

grossly failed to exercise the degree of prudence, caution, and good business practice that would

be expected of any reasonable investment professional.  The Kingate Defendants failed to

perform adequate due diligence before selecting Madoff as the Funds' investment advisor, and

before allowing Madoff custody of the assets of the Funds; failed to monitor Madoff on an

ongoing basis to any reasonable degree; and failed to take adequate steps to confirm Madoff's

purported account statements, transactions and holdings of the Funds' assets.

222.     If the Kingate Defendants had not been grossly negligent, Plaintiffs and the Class

would not have invested, reinvested and held investments in the Funds.

223.     As a direct and proximate result of the Kingate Defendants' gross negligence,

Plaintiffs and the Class have suffered damages and are entitled to such damages from the

73

Kingate Defendants, jointly and severally, as well as a return of all fees paid to the Kingate Defendants.

## COUNT 6
### Negligence
### <u>Against The Kingate Defendants</u>

224.     Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.  The parties agree that this claim is not precluded by SLUSA.

225.     The Kingate Defendants, as investment advisors, managers and placement agents with discretionary control over the assets entrusted to them by Plaintiffs and the Class, had a special relationship with Plaintiffs and the Class that gave rise to a duty to exercise due care in the management and monitoring of the assets invested by Plaintiffs and the Class.  The Kingate Defendants knew or should have known that Plaintiffs and the Class were relying on the Kingate Defendants to manage the investments entrusted to the Funds with reasonable care, and Plaintiffs and the Class did reasonably and foreseeably rely on the Kingate Defendants to exercise such care by entrusting their assets to the Funds.

226.     The Kingate Defendants negligently failed to exercise due care and thereby injured Plaintiffs and the Class.  The Kingate Defendants failed to exercise the degree of prudence, caution, and good business practice that would be expected of any reasonable investment professional.  The Kingate Defendants failed to perform adequate due diligence before selecting Madoff as the Funds' investment advisor, and before allowing Madoff custody of the assets of the Funds; failed to monitor Madoff on an ongoing basis to any reasonable degree; and failed to take adequate steps to confirm Madoff's purported account statements, transactions, and holdings of the Funds' assets.

227.     If the Kingate Defendants had not been negligent, Plaintiffs and the Class would not have invested, reinvested and held investments in the Funds.

228.     As a direct and proximate result of the Kingate Defendants' negligence, Plaintiffs and the Class have suffered damages and are entitled to such damages from the Kingate Defendants, as well as a return of all fees paid to the Kingate Defendants.

## COUNT 7
## Breach Of Fiduciary Duty
## Against The Kingate Defendants

229.     Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.

230.     Plaintiffs and the Class entrusted their assets to the Kingate Defendants who had substantial discretion and control over the Plaintiffs' and the Class' assets invested in the Funds, the marketing of those Funds, and communications to Plaintiffs and the Class.

231.     This discretion and control gave rise to a fiduciary duty on the part of the Kingate Defendants to the Plaintiffs and the Class as evidenced by the following:

(a)     the Kingate Defendants occupied a superior position over Plaintiffs and the Class with respect to their management and control over their assets in the Funds, and had superior access to confidential information about Madoff and Madoff's activities in connection with the Funds' investments;

(b)     the Kingate Defendants' superior position necessitated that Plaintiffs and the Class repose their trust and confidence in the Kingate Defendants to fulfill their duties, and Plaintiffs and the Class did so by investing, reinvesting and holding investments in the Funds; and

(c)     the Kingate Defendants held themselves out as providing superior client investment services, and evinced an understanding that they were the fiduciaries of the investors.

Plaintiffs and the Class reasonably and foreseeably relied on such representations, and trusted in the Kingate Defendants' purported expertise and skill.

232.     The Kingate Defendants were obligated to deal fairly and honestly with the Plaintiffs and the Class; to act with loyalty and good faith towards Plaintiffs and the Class; to avoid placing themselves in situations involving a conflict of interest with Plaintiffs and the Class; to manage and operate each Plaintiffs' and member of the Class' investments exclusively for the best interest of the Plaintiffs and the Class; and to oversee the investment of the assets of the Plaintiffs and the Class to confirm that they were maintained in a prudent and professional manner.

233.     The Kingate Defendants breached their fiduciary duties to Plaintiffs and the Class members, including the following duties:

(a)     to act with loyalty and good faith;

(b)     to take all possible steps to ensure that the investments of Plaintiffs and the Class were made and maintained in a prudent and professional manner;

(c)     to ensure the accuracy and completeness of information provided to Plaintiffs and the Class in connection with their investments;

(d)     to perform all necessary and adequate due diligence and monitoring with respect to the Funds' investments; and

(e)     to exercise generally the degree of prudence, caution and good business practices that would be expected of reasonable investment professionals overseeing client funds.

234.     As a direct and proximate result of the breaches of fiduciary duties of the Kingate Defendants, Plaintiffs and the Class have suffered damages and are entitled to such damages from the Kingate Defendants, jointly and severally, as well as a return of all fees paid to the

Kingate Defendants, and appropriate equitable relief, including an accounting and imposition of a constructive trust.

**COUNT 8**
**PRECLUDED**
**Constructive Fraud**
**Against The Kingate Defendants**

**COUNT 9**
**Third Party Beneficiary Breach Of Contract**
**Against KML And Tremont**

235.    Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.

236.    Plaintiffs and the Class are third-party beneficiaries of the Management Agreements executed among KML, Tremont, and the Funds.  The Management Agreements are valid and binding contracts and evince a clear intent to benefit shareholders in the Funds, that is Plaintiffs and the Class.  The Management Agreements required KML and Tremont to select and evaluate appropriate investment advisors, allocate the assets of the Funds, and monitor the selected investment advisors' performance.

237.    The benefits to Plaintiffs and the Class under the Management Agreements between the Funds, KML, and Tremont were immediate, not incidental, in that the Funds' motivation for executing these agreements were to provide investors with capital appreciation and returns on their investments in the Funds.

238.    KML and Tremont's duties pursuant to the Management Agreement included selecting and evaluating appropriate investment advisors and the allocation of assets with a chosen appropriate investment advisor.  KML and Tremont also had a continuing obligation to ascertain Madoff's competence and monitor Madoff's performance and custody of the Funds' assets.

77

239.     KML and Tremont breached the management contracts by the conduct alleged herein.  They also breached the contracts by collecting fees based on incorrect valuations of the Funds' assets and for services not properly performed.  Plaintiffs and the Class suffered damages as a result of these breaches.

**COUNT 10**
**Third Party Beneficiary Breach Of Contract**
**Against The FIM Entities**

240.     Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.

241.     Plaintiffs and the Class are third-party beneficiaries of the Consulting Services Agreements executed among the FIM Entities, KML, Tremont, and the Funds.  The Consulting Services Agreements are valid and binding contracts and evince a clear intent to benefit shareholders in the Funds, that is Plaintiffs and the Class.  The Consulting Services Agreements required the FIM Entities to make recommendations to KML and Tremont regarding allocation of the Funds' assets for suitable investment and appreciation.

242.     The benefits to Plaintiffs and the Class under the Consulting Services Agreements among the Funds, the FIM Entities, KML, and Tremont were immediate, not incidental, in that the Funds' only motivation for executing these agreements were to provide investors with capital appreciation and returns on their investments in the Funds.

243.     The FIM Entities' duties included screening and nominating investment advisors for selection by KML and Tremont.  The FIM Entities also made recommendations regarding the proposed allocation of assets among investment managers.  The FIM Entities were also obligated to "continuously monitor[]" the asset allocation and the investment advisor's performance.

244.     The FIM Entities breached the consulting services contracts by grossly failing to meet the obligations of these agreements.  The FIM Entities also breached these contracts by collecting fees based on incorrect valuations of the Funds' assets and for services not properly performed.  Plaintiffs and the Class suffered damages as a result of these breaches.

## COUNT 11
## Constructive Trust
## Against The Kingate Defendants

245.     Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.

246.     The Kingate Defendants had a fiduciary relationship with Plaintiffs and the Class which included an obligation to invest the assets of the Plaintiffs and the Class in legitimate investments, and perform adequate due diligence and monitoring as set forth in the Information Memoranda.  The Kingate Defendants were compensated by Plaintiffs and the Class with fees based on incorrect valuations of the Funds' assets.

247.     The Kingate Defendants were unjustly enriched by the retention of fees that were predicated on fictitious profits and assets.  Plaintiffs and the Class are entitled to have a constructive trust imposed on the amount of all monies and other property in the possession of the Kingate Defendants which relate to fees paid to them on account of fictitious profits and assets of the Funds, and to have those monies returned.

## COUNT 12
## Mutual Mistake
## Against The Kingate Defendants

248.     Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.  The parties agree that this claim is not precluded by SLUSA.

249.     The Kingate Defendants were paid fee amounts well exceeding $100 million. The Kingate Defendants were paid those fees under a mutual mistake of the parties as to the amount and value of the assets under management and amount of profits.  In fact, there were no assets under management and no profits.

250.     The investments by Plaintiffs and the Class were used to pay the foregoing fees to the Kingate Defendants.  Plaintiffs and the Class demand recovery of the foregoing fee payments made pursuant to a mutual mistake.

## COUNT 13
### Aiding And Abetting Breach Of Fiduciary Duty
### Against The Tremont Group

251.     Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.

252.     By virtue of its ownership and control of Tremont, the Tremont Group was aware of the fiduciary duties owed by Tremont to Plaintiffs and the Class as alleged above.  The Tremont Group acted with willful blindness or recklessness in its ownership and exercise of control of Tremont and thus knew or should have known that:

(a)     Tremont had the discretion and control giving rise to a fiduciary duty and duty of care to the Plaintiffs and the Class;

(b)     Tremont occupied a superior position over Plaintiffs and the Class with respect to its management and control over their assets in the Funds, and had superior access to confidential information about the analysis and selection of the Funds' investments;

(c)     Tremont's superior position necessitated that Plaintiffs and the Class repose their trust and confidence in Tremont to fulfill its duties, and Plaintiffs and the Class did so by investing in the Funds; and

(d)     Tremont held itself out as providing superior client investment services, and evinced an understanding that it was the fiduciary of the investors.

253.    The Tremont Group substantially assisted Tremont by helping to conceal Tremont's breaches of fiduciary duty and by failing to act when required to do so in the face of those breaches.

254.    As a direct and natural result of (i) Tremont's breaches of fiduciary duty, and (ii) the Tremont Group aiding and abetting those breaches, the Plaintiffs and the Class have suffered substantial damages.

**COUNT 14**
**<u>PRECLUDED</u>**
**Aiding And Abetting Fraud**
**<u>Against The Tremont Group</u>**


**COUNT 15**
**Gross Negligence**
**<u>Against PwC</u>**

255.    Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.

256.    PwC, as the Funds' auditor, had a special relationship with Plaintiffs and the Class that gave rise to a duty to exercise due care.   PwC's audit reports were specifically addressed and directed to the shareholders of the Funds, that is Plaintiffs and the Class.  PwC knew that these audit reports would be distributed to Plaintiffs and the Class.  PwC knew that its audit work would be relied upon by Plaintiffs and the Class in deciding to retain or make additional investments in the Funds in that, among other things, PwC addressed its audit reports directly to known investors in the Funds.  PwC knew and consented that the Funds advised Plaintiffs and the Class that PwC (i) audited the Funds' financial statements and (ii) had given

the Funds unqualified audit opinions.  PwC understood that providing assurance to Fund shareholders was the end and aim of PwC's audit.

257.    Plaintiffs and the Class foreseeably and reasonably relied, directly or indirectly, on PwC to exercise such care as ordinarily exercised by auditors generally and as required by GAAS and GAAP in conducting the audits of the Funds.

258.    PwC was grossly negligent in knowingly or recklessly failing to properly audit the Funds in accordance with GAAS and GAAP.

259.    Had PwC not acted with gross negligence, Plaintiffs and the Class would not have invested, reinvested and held investments in the Funds.

260.    As a direct and proximate result of PwC's gross negligence, Plaintiffs and the Class suffered damages.

## COUNT 16
## Negligence
## Against PwC

261.    Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.

262.    PwC, as the Funds' auditor, had a special relationship with Plaintiffs and the Class that gave rise to a duty to exercise due care.   PwC's audit reports were specifically addressed and directed to the shareholders of the Funds, that is Plaintiffs and the Class.  PwC knew that these audit reports would be distributed to Plaintiffs and the Class.  PwC knew that its audit work would be relied upon by Plaintiffs and the Class in deciding to retain or make additional investments in the Funds in that, among other things, PwC addressed its audit reports to known investors in the Funds.  PwC knew and consented that the Funds advised Plaintiffs and the Class that PwC (i) audited the Funds' financial statements and (ii) had given the Funds

unqualified audit opinions.  PwC understood that providing assurance to Fund shareholders was the end and aim of PwC's audit.

263.   Plaintiffs and the Class foreseeably and reasonably relied, directly or indirectly, on PwC to exercise such care as ordinarily exercised by auditors generally and as required by GAAS and GAAP in conducting the audits of the Funds.

264.   PwC negligently failed to exercise due care by failing to properly audit the Funds in accordance with GAAS and GAAP.

265.   Had PwC not acted negligently, Plaintiffs and the Class would not have invested, reinvested and held investments in the Funds.

266.   As a direct and proximate result of PwC's negligence, Plaintiffs and the Class suffered damages.

**COUNT 17**
**Negligent Misrepresentation**
<u>**Against PwC**</u>

267.   Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.

268.   PwC, as the Funds' auditor, had a special relationship with Plaintiffs and the Class.  PwC's audit reports were specifically addressed and directed to the shareholders of the Funds, that is Plaintiffs and the Class.  PwC knew that these audit reports would be distributed to Plaintiffs and the Class.  PwC knew that its audit work would be relied upon by Plaintiffs and the Class in deciding to retain or make additional investments in the Funds in that, among other things, PwC addressed its audit reports to known investors in the Funds, and PwC knew and consented that the Funds advised Plaintiffs and the Class that PwC audited the Funds' financial statements and had given the Funds unqualified audit opinions.  PwC understood that providing

assurance to Fund shareholders was the end and aim of PwC's audit.  Based on this role, PwC had a duty to impart correct information to Plaintiffs and the Class.

269.    PwC induced Plaintiffs and the Class to hold their positions in the Funds and to purchase additional interests in the Funds by falsely representing to Plaintiffs and the Class that: (i) it had conducted its audits in accordance with GAAS; and (ii) the Funds' financial statements conformed with GAAP.  The Funds' financial statements did not refer to any "covered securities," as the Fund investments that were reported on the financial statements were U.S. Treasury bills.

270.    These representations made by PwC were false in that:  (i) PwC failed to conduct the audits of the Funds in accordance with GAAS; and (ii) the Funds' financial statements did not present fairly in all respects the financial positions of the Funds.  In fact, PwC made the representations repeatedly without ever properly confirming the existence of the Funds' assets.

271.    PwC made the false representations knowing that Plaintiffs and the Class would use and rely upon the representations for the particular purpose of determining whether to hold their assets in the Funds and whether to purchase additional interests in the Funds.

272.    Plaintiffs and the Class justifiably relied upon the false representations made by PwC in furtherance of that particular purpose by continuing to hold their assets in the Funds and by purchasing additional interests in the Funds.

273.    PwC knew that Plaintiffs were investors in the Funds and understood that Plaintiffs and the Class would rely upon the false statements for the particular purpose of continuing to hold their assets in the Funds and to purchase additional interests in the Funds.

274.    As a result of their reliance upon the false representations and omissions made by PwC, Plaintiffs and the Class reinvested and held investments in the Funds.

275.     As a direct and proximate result of PwC's false representations and omissions, Plaintiffs and the Class suffered damages.

## COUNT 18
### Third Party Beneficiary Breach Of Contract
### Against PwC

276.     Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.

277.     PwC entered into contracts with the Funds to perform audits in accordance with GAAS.  Plaintiffs and the Class are third-party beneficiaries of those contracts.

278.     The contracts evince a clear intent to benefit Plaintiffs and the Class, who had invested in the Funds, to whom the audit reports were addressed, and who relied upon PwC to audit the financial statements of the Funds and to opine that the financial statements fairly represented the financial condition of the Funds only if that professional opinion was based upon a proper audit of the Funds conducted in accordance with GAAS and other applicable auditing standards.  The benefits to Plaintiffs and the Class under the contracts were immediate, not incidental.

279.     PwC breached its agreements to perform its audits for the Funds pursuant to GAAS, and this breach proximately caused Plaintiffs' losses.  PwC is liable to Plaintiffs and the Class as third party beneficiaries of those contracts.

## COUNT 19
### Aiding And Abetting Breach Of Fiduciary Duty
### Against PwC

280.     Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.

281.    As the auditor of the Funds, PwC was aware of the fiduciary duties owed by the Kingate Defendants to Plaintiffs and the Class as alleged above.  PwC acted with willful blindness or recklessness in conducting its audits and is thus charged with constructive knowledge that:

(a)    the Kingate Defendants had discretion and control giving rise to a fiduciary duty and duty of care to the Plaintiffs and the Class;

(b)    the Kingate Defendants occupied a superior position over Plaintiffs and the Class with respect to their management and control over their assets in the Funds, and had superior access to confidential information about the investment of the assets and about Madoff;

(c)    the Kingate Defendants' superior position necessitated that Plaintiffs and the Class repose their trust and confidence in the Kingate Defendants to fulfill their duties, and that Plaintiffs and the Class did so by investing in the Funds; and

(d)    the Kingate Defendants held themselves out as providing superior client investment services, and evinced an understanding that they were the fiduciaries of the investors.

282.    PwC was further aware that Plaintiffs and the Class reasonably and foreseeably relied on the Kingate Defendants' purported expertise and skill.

283.    PwC substantially assisted the Kingate Defendants by giving clean audit reports to the Funds' financial statements.  Plaintiffs and the Class would not have held their investments in the Funds or made additional investments if PwC had not given clean audit reports.

284.    As a direct and natural result of (i) the Kingate Defendants' breaches of their fiduciary duties, and (ii) PwC aiding and abetting those breaches, the Plaintiffs and the Class have suffered substantial damages.

**COUNT 20**
**PRECLUDED**
**Aiding And Abetting Fraud**
**Against PwC**


**COUNT 21**
**Breach Of Fiduciary Duty**
**Against Citi Hedge**

285.    Plaintiffs restate and reallege each of the preceding allegations as if fully stated

herein.

286.    As Administrator to the Funds, Citi Hedge had discretionary duties and

obligations regarding the assets of the Funds, including the calculation of the Funds' NAV,

accounting for the Funds, communications to the Plaintiffs and the Class about their investments,

and receipt of the Plaintiffs' and the Class' monies.

287.    Citi Hedge occupied a superior position over Plaintiffs and the Class with respect

to their discretionary responsibilities, and had superior access to confidential information about

the investments, including the location, security, and value of the assets.  Citi Hedge held itself

out as providing the best administrative and related services in the world.

288.    Citi Hedge's superior position necessitated that Plaintiffs and the Class repose

their trust and confidence in Citi Hedge to fulfill its duties, and Plaintiffs and the Class did so by

investing and reinvesting in the Funds, and retaining their investments in the Funds.  Plaintiffs

and the Class reasonably and foreseeably trusted in Citi Hedge's purported expertise and skill,

and Citi Hedge recognized that Plaintiffs and the Class would rely and repose their trust in Citi

Hedge when deciding to invest, reinvest and retain their investment in the Funds.

289.    Citi Hedge's discretion, control, and superior position over Plaintiffs and the

Class gave rise to a fiduciary duty and duty of care on the part of Citi Hedge to Plaintiffs and the

Class who invested in the Funds.

290.    Citi Hedge breached its fiduciary duties to Plaintiffs and the Class by, among other things, failing to discharge properly its duties as Administrator.

291.    Had Citi Hedge fulfilled its fiduciary duties, Plaintiffs and the Class would not have invested, reinvested and held investments in the Funds.

292.    As a direct and proximate result of Citi Hedge's breach of fiduciary duties, Plaintiffs and the Class suffered damages.

**COUNT 22**
**Gross Negligence**
**Against Citi Hedge**

293.    Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.

294.    Citi Hedge, as the Funds' administrator and financial services provider, had a special relationship with Plaintiffs and the Class that gave rise to a duty to exercise due care. Citi Hedge knew or should have known that Plaintiffs and the Class would be relying on Citi Hedge to exercise reasonable care in providing administrative and financial services to the Funds, and Plaintiffs and the Class reasonably and foreseeably relied on Citi Hedge to exercise such care by entrusting their assets to the Funds.

295.    Citi Hedge grossly failed to exercise due care, and acted in reckless disregard of its duties.  Citi Hedge grossly failed to exercise the degree of prudence, caution, and good business practice that would be expected of a reasonable investment professional under the circumstances known to and in which Citi Hedge operated.

296.    If Citi Hedge had not been grossly negligent, Plaintiffs and the Class would not have invested, reinvested and held investments in the Funds.

297.     As a direct and proximate result of Citi Hedge's gross negligence, Plaintiffs and the Class suffered damages.

## COUNT 23
## Negligence
## Against Citi Hedge

298.     Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.

299.     Citi Hedge, as the Funds' administrator and financial services provider, had a special relationship with Plaintiffs and the Class that gave rise to a duty to exercise due care. Citi Hedge knew or should have known that Plaintiffs and the Class would be relying on Citi Hedge to exercise reasonable care in providing administrative and financial services to the Funds, and Plaintiffs and the Class reasonably and foreseeably relied on Citi Hedge to exercise such care by entrusting their assets to the Funds.

300.     Citi Hedge negligently failed to exercise due care, and failed to exercise the degree of prudence, caution, and good business practice that would be expected of a reasonable investment professional under the circumstances known to and in which Citi Hedge operated.

301.     If Citi Hedge had not been negligent, Plaintiffs and the Class would not have invested, reinvested and held investments in the Funds.

302.     As a direct and proximate result of Citi Hedge's negligence, Plaintiffs and the Class suffered damages.

## COUNT 24
## Negligent Misrepresentation
## Against Citi Hedge

303.     Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.

304.     Citi Hedge, as the Funds' administrator and financial services provider, had a unique and special expertise and superior position with respect to providing administrative services and calculating the Funds' NAV and account balances.  Citi Hedge had a special relationship of trust and confidence with Plaintiffs and the Class, which created a duty to impart correct information to Plaintiffs and the Class.

305.     Citi Hedge induced Plaintiffs and the Class to make their initial investments in the Funds, to retain their investments in the Funds, and to make additional investments in the Funds by issuing false NAV and account balance statements for the Funds that Citi Hedge disseminated to Plaintiffs and the Class, or knew would be disseminated to Plaintiffs and the Class.

306.     Citi Hedge made false representations knowing that Plaintiffs and the Class would use and rely upon the misrepresentations for the particular purpose of determining whether to invest in the Funds, hold their assets in the Funds, and purchase additional interests in the Funds.

307.     Citi Hedge's NAV calculations and account balance information were false.  In issuing the statements, Citi Hedge acted negligently because it knew or had access to information suggesting that its statements were not accurate.  Citi Hedge also acted negligently by failing to verify the information received from BMIS with independent third-parties.  Its failure to verify Madoff's information was negligent because Citi Hedge was aware of the increased risks surrounding BMIS, including risks of which Plaintiffs and the Class were not aware.

308.     Plaintiffs and the Class justifiably relied upon the false representations made by Citi Hedge in making investments, reinvestments and retaining investments in the Funds.

309.     As a result of their reliance upon the false representations made by Citi Hedge, Plaintiffs and the Class have suffered damages.

**COUNT 25**
**Third Party Beneficiary Breach Of Contract**
**Against Citi Hedge**

310.     Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.

311.     Citi Hedge entered into Administration Agreements with the Funds, and Citi Hedge breached its obligations to the Plaintiffs and the Class as third party beneficiaries of those contracts.  The Administration Agreements executed by Citi Hedge with the Funds each represent valid contracts binding on both Citi Hedge and the Funds.

312.     The Administration Agreements evince a clear intent to benefit shareholders by affirmatively recognizing Citi Hedge's obligation to keep the Funds' shareholders informed of the status and performance of their investments, as set forth in the Agreements.

313.     The benefits to Plaintiffs and the Class under the Administration Agreements between the Funds and Citi Hedge were immediate, not incidental, in that the Funds' motivation for entering the Administration Agreement were to provide shareholders with administrative services including keeping them informed of the financial performance of the Funds.

314.     Citi Hedge's duties that required good faith, due care and diligence in its execution included the following:

      (a)     communicating with the general public;

      (b)     communicating with shareholders;

      (c)     soliciting sales of shares in the Funds;

      (d)     accepting new subscriptions in the Funds;

      (e)     maintaining the Funds' corporate records and books of account;

      (f)     disbursing payments of dividends, fees, and salaries;

91

(g)      calculating the subscription price, redemption price, and net asset value of the Funds' shares; and

(h)      conducting meetings of the Funds' boards of directors.

315.    Citi Hedge breached the Administration Agreements, by, among other things, failing to discharge its responsibility to calculate accurately the Funds' NAV and otherwise as alleged above.

316.    Plaintiffs and the Class suffered damages as a result of these breaches.

**COUNT 26**
**Aiding And Abetting Breach Of Fiduciary Duty**
**Against Citi Hedge**

317.    Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.

318.    The Kingate Defendants breached their fiduciary duties to Plaintiffs and the Class, as alleged above.

319.    Citi Hedge, as the Funds' administrator and financial services provider, had actual knowledge of and substantially participated in the breaches of fiduciary duty committed by the Kingate Defendants.  As administrator, Citi Hedge gained significant knowledge of the operations of the Funds and their investment managers and other service providers.  As the world's leading administrator of hedge funds, and by virtue of its long-standing relationship with the Funds, Citi Hedge knew that the Kingate Defendants owed a fiduciary duty to Plaintiffs and the Class.  Citi Hedge also knew that the due diligence and risk controls employed by the Kingate Defendants were grossly deficient in breach of their fiduciary duties.

320.    With knowledge that the Kingate Defendants were breaching their fiduciary duties owed to Plaintiffs and the Class, Citi Hedge substantially assisted the Kingate Defendants

in this breach.  For example, Citi Hedge substantially assisted the Kingate Defendants by receiving investments from Plaintiffs and the Class calculating and disseminating the Funds' NAV; receiving and transmitting other Fund information from the Kingate Defendants to Plaintiffs and the Class; and allowing Citi Hedge's name and the services it was ostensibly providing to be included in the Funds' Information Memoranda.

321.    As a direct and natural result of (i) the Kingate Defendants' breach of fiduciary duty, and (ii) Citi Hedge's aiding and abetting in that breach, Plaintiffs and the Class have suffered substantial damages.

**COUNT 27**
**PRECLUDED**
**Aiding And Abetting Fraud**
**Against Citi Hedge**


**COUNT 28**
**Unjust Enrichment**
**Against All Defendants**

322.    Plaintiffs restate and reallege each of the preceding allegations as if fully stated herein.

323.    Defendants were enriched at the expense of Plaintiffs and the Class by taking the monies of Plaintiffs and the Class in the form of commissions and other fees for the purported management and administration of their investments, and the purported, but in fact non-existent, capital appreciation of such assets.

324.    Defendants' performance was so far below the applicable fiduciary and business standards that Plaintiffs and the Class involuntarily conferred a benefit upon Defendants without Plaintiffs and the Class receiving adequate benefit or compensation in return.  Defendants breached their duties to Plaintiffs and the Class.

325.     Defendants financially benefited from their breaches of duty, which caused Plaintiffs and the Class to suffer injury and monetary loss.

326.     As a result of the foregoing, it is unjust and inequitable for Defendants to have enriched themselves in this manner and each Defendant should refund all monies paid for any services rendered to Plaintiffs and the Class, and Plaintiffs and the Class are entitled to the establishment of a constructive trust imposed on the benefits reaped by Defendants from their unjust enrichment and inequitable conduct.

**COUNT 29**
**VOLUNTARILY DISMISSED**
**For Violations Of Rule 10b-5**
**And Section 10(b) Of The Exchange Act**
**Against The Kingate Fraud Claim Defendants**

**COUNT 30**
**VOLUNTARILY DISMISSED**
**For Violations Of Section 20(a) Of The Exchange Act**
**Against Tremont Advisers, Grosso, Ceretti, And Manzke**

**COUNT 31**
**VOLUNTARILY DISMISSED**
**For Violations Of Rule 10b-5**
**And Section 10(b) Of The Exchange Act**
**Against PricewaterhouseCoopers**

**COUNT 32**
**VOLUNTARILY DISMISSED**
**For Violations Of Rule 10b-5**
**And Section 10(b) Of The Exchange Act**
**Against Citi Hedge**

**JURY TRIAL DEMANDED**

327.     Plaintiffs hereby demand a jury trial.

## PRAYER

WHEREFORE, Plaintiffs request the following:

(a)     certification of this class action as proper and maintainable pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure and declaration of the proposed named Plaintiffs as proper Class representatives;

(b)     such preliminary and permanent equitable relief, including imposition of a constructive trust, as is appropriate to preserve the assets wrongfully taken from Plaintiffs and the Class;

(c)     compensatory, consequential, and general damages in an amount to be determined at trial;

(d)     disgorgement and restitution of all earnings, profits, compensation and benefits received by Defendants as a result of their unlawful acts and practices;

(e)     punitive damages to the maximum extent available under the law on account of Defendants' willful and wanton disregard of Plaintiffs' and the Class's rights;

(f)     costs and disbursements of the action;

(g)     pre- and post-judgment interest;

(h)     reasonable attorneys' fees; and

(i)     such other and further relief as this Court may deem just and proper.

Dated: October 6, 2015                              Respectfully submitted


                                                    By: /s/ David A. Barrett
                                                    David A. Barrett
                                                    Howard L. Vickery
                                                    BOIES, SCHILLER & FLEXNER LLP
                                                    575 Lexington Avenue
                                                    New York, NY  10022
                                                    (212) 446-2300

Stuart H. Singer
Carlos M. Sires
Sashi Bach Boruchow
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard, #1200
Ft. Lauderdale, Florida 33301
(954) 356-0011

Joel P. Laitman
COHEN MILSTEIN SELLERS
 & TOLL PLLC
88 Pine Street
New York, New York 10005
Tel: (212) 838-7797
Fax: (212) 838-7745

Steven J. Toll
Daniel S. Sommers
Joshua Devore
S. Douglas Bunch
COHEN MILSTEIN SELLERS
 & TOLL PLLC
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

*Co-Lead Counsel for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on October 6, 2015, I caused the foregoing document to be

electronically served on all counsel of record via the Court's ECF system.

<u>Eli J. Glasser</u>
Eli J. Glasser