**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

IN RE KINGATE MANAGEMENT
LIMITED LITIGATION

This Document Relates To:  All Actions

Master File No. 09 Civ. 5386 (DAB)

**PLAINTIFFS' MEMORANDUM OF LAW
IN OPPOSITION TO THE JOINT MOTION OF ALL DEFENDANTS TO DISMISS THE
CORRECTED SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

**BOIES, SCHILLER & FLEXNER LLP**
575 Lexington Avenue
New York, New York 10022
Tel:  (212) 446-2300
Fax: (212) 446-2350

**COHEN MILSTEIN SELLERS
  & TOLL PLLC**
1100 New York Avenue, N.W.
East Tower, Suite 500
Washington, DC 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

*Co-Lead Counsel for Plaintiffs and
Interim Co-Lead Counsel for the Putative Class*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................... 1

BACKGROUND ................................................................................................... 2

    A.    The Funds ............................................................................................. 3

    B.    Defendants Grosso, Ceretti, Manzke and Tannenbaum Sponsored and Managed the Funds through the Tremont Defendants, KML and the FIM Entities ................................................................................................ 4

    C.    The Kingate Defendants Aggressively Marketed the Funds and Regularly Interacted with Investors ....................................................................... 6

    D.    PwC Audited the Funds' Financial Statements and Prepared Audit Opinions For Plaintiffs ....................................................................................... 9

    E.    Citi Hedge Served as the Funds' Administrator Responsible for Calculating the NAV ............................................................................................. 10

    F.    Defendants Failed to Perform Standard Procedures Notwithstanding that They Knew of Significant Fraud Risks Involving Madoff ............................... 12

    G.    Plaintiffs Cannot Share Directly in Recoveries Made by the BMIS Trustee ....... 14

    H.    The Funds Are in Liquidation ................................................................ 15

LEGAL STANDARD .......................................................................................... 16

ARGUMENT ..................................................................................................... 16

I.    SLUSA DOES NOT PRECLUDE PLAINTIFFS' CLAIMS ....................................... 16

    A.    Most Traditional State Law Causes of Action Are Not Precluded by SLUSA .... 19

        1.    The Framework Established by the Court of Appeals in this Case .......... 20

        2.    SLUSA Applies Only when False Conduct by the Defendant Is Essential to the Claim ............................................................................................ 22

    B.    Duty- and Contract-Based Claims against Defendants Are Not Precluded .......... 25

        1.    Counts 5, 6, 7, 9, 10, 11, 13 and 28 Do Not Allege Any Complicity in Madoff's Fraud – Nor Are Such Allegations "Essential" ........................ 25

        2.    Negligence and Gross Negligence .......................................................... 28

        3.      Third-Party Beneficiary Breach of Contract ............................... 32

        4.      Breach of Fiduciary Duty .......................................................... 34

        5.      Aiding and Abetting Breach of Fiduciary Duty ........................ 36

        6.      Unjust Enrichment, Mutual Mistake and Constructive Trust ................. 37

    C.      The Negligent Misrepresentation Claims Are Not Precluded ............................. 39

    D.      If the Court Accepts Defendants' Contention that Plaintiffs' Claims Are Governed by BVI or Bermuda Law, then SLUSA Does Not Apply ................................................................................................. 41

II.     THE COURT SHOULD APPLY NEW YORK LAW, WHICH IS SUBSTANTIALLY SIMILAR TO BVI AND BERMUDA LAW ............................... 44

    A.      There Is No Genuine Conflict between New York Law and the Law of BVI or Bermuda ............................................................................. 45

        1.      Negligence, Negligent Misrepresentation and Gross Negligence ........... 46

        2.      Breach of Fiduciary Duty .......................................................... 46

        3.      Aiding and Abetting Breach of Fiduciary Duty ........................ 48

    B.      New York Has the Most Significant Interest in the Litigation ............................. 48

        1.      New York Law Governs Plaintiffs' Tort Claims ...................................... 48

        2.      New York Law Governs Plaintiffs' Quasi-Contract Claims ................... 52

        3.      Choice of Law Provisions Do Not Apply to Plaintiffs' Contract Claims. 53

III.    PLAINTIFFS HAVE STANDING TO ASSERT DIRECT CLAIMS ........................... 55

    A.      The Internal Affairs Doctrine Is Inapplicable ....................................... 55

    B.      New York Law Governs Plaintiffs' Standing because New York Has the Strongest Interest of Any Jurisdiction ................................................... 58

    C.      Plaintiffs Have Standing under New York Law ................................. 59

        1.      Plaintiffs Have Standing to Assert "Inducement" Claims Directly ......... 59

        2.      Plaintiffs Have Standing to Assert Direct Claims because Defendants' Wrongful Conduct Benefited the Funds and Caused Plaintiffs to Suffer Asymmetrical Losses .............................................................. 62

        3.       Plaintiffs Also Have Standing Because the Funds' Claims May Be Precluded By an *In Pari Delicto* Defense ................................................. 63

    D.       Plaintiffs' Claims Would Be Allowed under BVI and Bermuda Law .................. 64

        1.       Plaintiffs' Claims Are Not Barred by the Reflective Loss Rule ........................................................................................................ 66

        2.       The Joint Liquidators Have No Realistic Prospect of Making Plaintiffs Whole ............................................................................... 69

        3.       Plaintiffs' Claims Come Within the *Giles v. Rhind* Exception to the Reflective Loss Principle ........................................ 70

        4.       This Court Can Safeguard against Double Recovery and Prejudice to Other Shareholders and Creditors ........................................... 73

IV.    THE COMPLAINT PROPERLY ALLEGES DEFENDANTS BREACHED FIDUCIARY DUTIES OWED TO PLAINTIFFS (COUNTS 13, 19, 26) ..................... 74

    A.       Plaintiffs State Claims for Breach of Fiduciary Duty Against the Kingate Defendants and Citi Hedge under New York Law ............................... 74

        1.       The Kingate Defendants Owed Plaintiffs a Fiduciary Duty .................... 75

        2.       Citi Hedge Owed Plaintiffs a Fiduciary Duty ........................................... 77

        3.       The Complaint Adequately Alleges the Kingate Defendants and Citi Hedge Breached Fiduciary Duties ........................................... 78

    B.       Plaintiffs State Claims for Breach of Fiduciary Duty against the Kingate and Individual Defendants and Citi Hedge under BVI and Bermuda Law ................. 80

        1.       The SAC Alleges the Existence of a Fiduciary Relationship .................. 80

    C.       The Kingate Defendants and Citi Hedge Breached Their Fiduciary Duties to Plaintiffs ................................................................................................. 85

V.    PLAINTIFFS HAVE ADEQUATELY PLED CLAIMS FOR AIDING AND ABETTING BREACH OF FIDUCIARY DUTY (COUNTS 13, 19, 26) ...................... 86

    A.       Plaintiffs State Claims for Aiding and Abetting Breach of Fiduciary Duty under New York Law ....................................................................................... 86

    B.       Plaintiffs State Claims for Aiding and Abetting Breach of Fiduciary Duty under BVI and Bermuda Law ............................................................................. 90

        1.       The Tremont Group Aided and Abetted Breach of Fiduciary Duty by Tremont (Count 13) ................................................................. 92

2. Citi Hedge Aided and Abetted Breach of Fiduciary Duty by the Kingate Defendants (Count 26) ............................................................... 94

3. PwC Aided and Abetted Breach of Fiduciary Duty by the Kingate Defendants (Count 19) .............................................................................. 95

VI. PLAINTIFFS PROPERLY ALLEGE NEGLIGENCE-BASED CLAIMS (COUNTS 6, 16, 17, 23 & 24) ......................................................................................... 96

A. Defendants Owed Duties Directly to Plaintiffs under New York Law ............................................................................................................. 96

1. The SAC Satisfies New York's *Credit Alliance* Test as to PwC ................................................................................................. 96

2. Defendants Breached the Duty of Care Owed to Plaintiffs and Acted with Gross Negligence ........................................................... 103

3. PwC and Citi Hedge Made Negligent Misrepresentations to Plaintiffs . 104

B. Plaintiffs State Claims for Gross Negligence, Negligence and Negligent Misrepresentation under BVI and Bermuda Law ................................. 105

C. Plaintiffs' Tort Claims Are Not Limited by Contracts among the Service Providers and the Funds or the Funds and the Shareholders ......................................................................................... 108

D. The Exclusions, Disclaimers and Exculpatory Provisions in the Information Memoranda and Service Agreements Do Not Bar Plaintiffs' Claims ............... 110

1. The Disclaimers and Exculpatory Provisions in the Information Memoranda and Service Agreements Cannot Bar Plaintiffs' Claims for Negligence and Negligent Misrepresentation against the Kingate Defendants ...........................................................................................111

2. The Limitations on Liability in the Investment Management Agreement Do Not Bar Plaintiffs' Claims against the FIM Entities, Grosso, and Ceretti ................................................................................ 116

3. Plaintiffs' Claims against Citi Hedge Are Not Barred by Disclaimers, Exemptions or Exculpatory Provisions in the Information Memoranda 117

4. The Subscription Agreement Does Not Waive Plaintiffs' Claims ......... 120

E. Plaintiffs' Claims Against PwC For Negligence and Negligent Misrepresentation State Claims under Bermuda Law ......................................... 121

F.     Plaintiffs' Claims for Gross Negligence State a Claim under BVI and Bermuda Law ................................................................................................. 125

VII.   PLAINTIFFS PROPERLY ALLEGE THIRD-PARTY BENEFICIARY BREACH OF CONTRACT CLAIMS (COUNTS 9-10, 18, 25) .................................................... 125

    A.     Plaintiffs State Claims under New York Law ..................................................... 125

         1.     Plaintiffs Are Third-Party Beneficiaries of the Service Agreements ...... 128

             a.     Plaintiffs Are Third-Party Beneficiaries of the Management Agreements (Count 9) ................................................................. 128

             b.     Plaintiffs Are Third-Party Beneficiaries of the Consulting Services Agreements with the FIM Entities (Count 10) ............. 132

             c.     Plaintiffs Are Third-Party Beneficiaries of the Administration Agreement with Citi Hedge (Count 25) .................................................................................. 133

             d.     Plaintiffs Are Third-Party Beneficiaries of the Engagement Agreements with PwC (Count 18) ............................................. 135

         2.     Defendants Breached Duties Owed to Plaintiffs under the Service Contracts ....................................................................................................... 135

    B.     Plaintiffs State Claims for Third-Party Beneficiary Breach of Contract Under Bermuda and BVI Law ....................................................................................... 137

         1.     Bermuda and BVI Will Likely Recognize the Rights of Third Parties to Enforce Contracts Meant for Their Benefit ........................................ 138

VIII.  PLAINTIFFS PROPERLY ALLEGE A CLAIM OF MUTUAL MISTAKE AGAINST THE KINGATE DEFENDANTS (COUNT 12) ........................................ 140

    A.     Plaintiffs State a Claim under New York Law .................................................... 140

    B.     Plaintiffs State a Claim under BVI and Bermuda Law ...................................... 140

IX.    PLAINTIFFS CAN PURSUE AN UNJUST ENRICHMENT CLAIM IF NO CONTRACTUAL BASIS FOR RECOVERY EXISTS (COUNT 28) ......................... 142

    A.     Plaintiffs State a Claim under New York Law .................................................... 142

    B.     Plaintiffs State a Claim under BVI and Bermuda Law ...................................... 143

X.     PLAINTIFFS ARE ENTITLED TO A CONSTRUCTIVE TRUST REMEDY AGAINST THE KINGATE DEFENDANTS ............................................................. 145

XI.     JURISDICTION OVER CITI HEDGE IS PROPER ...................................................... 146

        A.      Specific Jurisdiction ............................................................................. 149

        B.      General Jurisdiction ............................................................................ 152

XII.    PLAINTIFFS' CLAIMS AGAINST THE KINGATE DEFENDANTS ARE
        TIMELY ............................................................................................................ 154

        A.      Defendants' Six-Month Shortened Limitations Periods Are Unenforceable ..... 155

        B.      Even Assuming the Shortened Limitations Periods Are Enforceable, the
                Claims against the Kingate Defendants Are Timely .......................................... 156

                1.      Claims against KML, Tannenbaum, Manzke, and FIM Advisers Are
                        Timely ......................................................................................... 156

                2.      Claims against FIM Limited, FIM USA, Grosso, and Ceretti Are
                        Timely ......................................................................................... 157

        C.      The Abbreviated Statute of Limitations Is Only Applicable to Actions Against
                the Funds and Directors Relating to the Subscription Agreements Under BVI
                Law ........................................................................................................ 159

XIII.   INTERNATIONAL COMITY DOES NOT SUPPORT, MUCH LESS REQUIRE,
        DISMISSAL ...................................................................................................... 162

XIV.    PLAINTIFFS FULLY MEET ANY APPLICABLE REQUIREMENTS OF RULE
        9(b) .................................................................................................................. 166

CONCLUSION .......................................................................................................... 168

# TABLE OF AUTHORITIES

## Cases

*Abercrombie v. Andrew Coll.*,
    438 F. Supp. 2d 243 (S.D.N.Y. 2006) .................................................................. 75

*ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.*,
    957 F. Supp. 1308 (S.D.N.Y. 1997) .................................................................... 47

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*,
    910 F. Supp. 2d 543 (S.D.N.Y. 2012) ............................................................... 104

*Ackert v. Ausman*,
    218 N.Y.S.2d 814 (N.Y. Sup. Ct. 1961) ............................................................. 56

*Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I, LLC*,
    637 F. Supp. 2d 185 (S.D.N.Y. 2009) ............................................................... 126

*AllGood Entm't, Inc. v. Dileo Entm't & Touring, Inc.*,
    2010 WL 2606042 (S.D.N.Y. June 29, 2010) ...................................................... 57

*Allied Chem. Int'l Corp. v. Companhia de Navegacao Lloyd Brasileiro*,
    775 F.2d 476 (2d Cir. 1985) ............................................................................. 157

*Anwar v. Fairfield Greenwich Ltd. ("Anwar I")*,
    728 F. Supp. 2d 372 (S.D.N.Y. 2010) ......................................................... *passim*

*Anwar v. Fairfield Sentry ("Anwar II")*,
    745 F. Supp. 2d 360 (S.D.N.Y. 2010) .......................................................... 77, 78

*Anwar v. Fairfield Greenwich Ltd. ("Anwar III")*,
    800 F. Supp. 2d 571 (S.D.N.Y. 2011) ............................................................... 101

*Anwar v. Fairfield Greenwich Ltd. ("Anwar IV")*,
    884 F. Supp. 2d 92 (S.D.N.Y 2012) ................................................................. 101

*Anwar v. Fairfield Greenwich Ltd. ("Anwar V")*,
    306 F.R.D. 134 (S.D.N.Y. 2015) ...................................................................... 101

*Anwar v. Fairfield Greenwich Ltd. ("Anwar VI")*,
    118 F. Supp. 3d 591 (S.D.N.Y. 2015) ......................................................... *passim*

*Aozora Bank Ltd. v. Sec. Investor Prot. Corp.*,
    480 B.R. 117 (S.D.N.Y. 2012) ........................................................................... 15

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .................................................................................... 17, 98

*AUSA Life Ins. Co. v. Ernst & Young*,
  206 F.3d 202 (2d Cir. 2000)............................................................. 103, 104

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*,
  902 F.2d 194 (2d Cir. 1990)................................................................ 150

*Bankers Trust Co. v. Rhoades*,
  859 F.2d 1096 (2d Cir. 1988)................................................................ 63

*Barrett v. Freifeld*,
  883 N.Y.S. 2d 305 (N.Y. App. Div. 2009) ........................................... 103

*Barry v. Atkinson*,
  1998 WL 255431 (S.D.N.Y. May 19, 1998) ...................................... 128

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).......................................................................... 171

*Benedict v. Whitman Breed Abbott & Morgan*,
  418 N.Y.S.2d 586 (N.Y. App. Div. 2001) ............................................ 62

*Bivens v. Watkins*,
  437 S.E.2d 132 (S. C. Ct. App. 1993)............................................. 64, 78

*Blue v. Standard Coil Prods. Co.*,
  117 N.Y.S.2d 858 (N.Y. Sup. Ct. 1952) ............................................. 58

*Brink's Ltd. v. S. African Airways*,
  93 F.3d 1022 (2d Cir. 1996).............................................................. 54

*Brown & Guenther v. North Queensview Homes, Inc.*,
  18 A.D.2d 327 (N.Y. App. Div. 1963) .............................................. 160

*Butler v. Stagecoach Grp., PLC*,
  900 N.Y.S. 2d 541 (N.Y. App. Div. 2010) ........................................ 50

*Calvin Klein Trademark Trust v. Wachner*,
  123 F. Supp. 2d 731 (S.D.N.Y. 2000)............................................... 76

*Century Pac., Inc. v. Hilton Hotels Corp.*,
  2004 WL 868211 (S.D.N.Y. Apr. 21, 2004)..................................... 107

*Ceribelli v. Elghanayan*,
  990 F.2d 62 (2d Cir. 1993)................................................................ 63

*Chadbourne & Parke LLP v. Troice*,
  134 S. Ct. 1058 (2014).............................................................. *passim*

*Comprehensive Habilitation Servs., Inc. v. Commerce Funding Corp.*,
  2009 WL 935665 (S.D.N.Y. Apr. 7, 2009)................................................................ 59

*Conn. Nat'l Bank v. Germain*,
  503 U.S. 249 (1992)................................................................ 45

*Credit Alliance Corp. v. Arthur Andersen & Co. ("Credit Alliance")*,
  65 N.Y.2d 536 (1985)................................................................ *passim*

*Cromer Fin. Ltd. v. Berger*,
  137 F. Supp. 2d 452 (S.D.N.Y. 2001)................................................................ 51, 53

*Cromer Fin. Ltd. v. Berger*,
  2001 WL 1112548 (S.D.N.Y. Sept. 19, 2001)................................................................ 102, 103

*Cromer Fin. Ltd. v. Berger*,
  2003 WL 21436164 (S.D.N.Y. June 23, 2003)................................................................ *passim*

*Cruz v. McAneny*,
  816 N.Y.S.2d 486 (N.Y. App. Div. 2006)................................................................ 146

*Culbert v. Rols Capital Co.*,
  184 A.D.2d 612 (N.Y. App. Div. 1992)................................................................ 55

*Cummins Inc. v. N.Y. Life Ins. Co.*,
  2013 WL 5393885 (S.D.N.Y. Sept. 26, 2013)................................................................ 62

*Daimler AG v. Bauman*,
  134 S. Ct. 746 (2014)................................................................ *passim*

*Daly v. Metro. Life Ins. Co.*,
  782 N.Y.S.2d 530 (N.Y. Sup. Ct. 1992)................................................................ 75

*Debary v. Harrah's Operating Co., Inc.*,
  465 F. Supp. 2d 250 (S.D.N.Y. 2006)................................................................ 128, 134

*Depaola v. 2 Bros. Indus., Inc.*,
  2011 WL 2743130 (N.Y. Sup. Ct. July 6, 2011)................................................................ 147

*Dep't of Econ. Dev. v. Arthur Andersen & Co.*,
  924 F. Supp. 449 (S.D.N.Y. 1996)................................................................ 129

*DeRosa v. Nat'l Envelope Corp.*,
  595 F.3d 99 (2d Cir.2010)................................................................ 155

*Dessert Beauty, Inc. v. Platinum Funding Corp.*,
  519 F. Supp. 2d 410 (S.D.N.Y. 2007)................................................................ 59

*Devore v. Pfizer Inc.*,
    867 N.Y.S.2d 428 (N.Y. App. Div. 2008) ........................................................... 51

*Di Benedetto v. Pan Am World Serv., Inc.*,
    359 F.3d 627 (2d Cir. 2004) ........................................................................................ 29

*Diana Allen Life Ins. Trust v. BP P.L.C.*,
    333 F. App'x 636 (2d Cir. 2009) ................................................................................ 62

*Dinerstein v. Anchin, Block & Anchin*,
    838 N.Y.S.2d 46 (N.Y. App. Div. 2007) ................................................................. 103

*Dorking Genetics v. United States*,
    76 F.3d 1261 (2d Cir. 1996) ...................................................................................... 103

*Druck Corp. v. Macro Fund Ltd.*,
    290 F. App'x 441 (2d Cir. 2008) ................................................................................ 48

*Duke v. Touche Ross & Co.*,
    765 F. Supp. 69 (S.D.N.Y. 1991) ............................................................................ 102

*E.F. Hutton & Co. v. Hadley*,
    901 F.2d 979 (11th Cir. 1990) .................................................................................... 67

*EBC I, Inc. v. Goldman Sachs & Co.*,
    832 N.E.2d 26 (N.Y. 2005) ........................................................................... 49, 76, 80

*Eng v. City of New York*,
    2016 WL 750251 (S.D.N.Y. Feb. 19, 2016) ............................................................. 17

*Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co.*,
    375 F.3d 168 (2d Cir. 2004) ...................................................................................... 173

*Excimer Associates, Inc. v. LCA Vision, Inc.*,
    292 F.3d 134 (2d Cir. 2002) ................................................................................. 61, 62

*Farash v. Cont'l Airlines, Inc.*,
    574 F. Supp. 2d 356 (S.D.N.Y. 2008) .................................................................... 106

*Feiger v. Pitney Bowes Credit Corp.*,
    251 F.3d 386 (2d Cir. 2001) ........................................................................................ 54

*Fen X. Chen v. Street Beat Sportswear, Inc.*,
    226 F. Supp. 2d 355 (E.D.N.Y. 2002) .................................................................... 129

*Fin. One Public Co. Ltd. v. Lehman Bros. Special Fin., Inc.*,
    414 F.3d 325 (2d Cir. 2005) ................................................................................. 54, 56

*Finch, Pruyn & Co. v. M. Wilson Control Servs.*,
  658 N.Y.S.2d 496 (N.Y. App. Div. 1997) ................................... 128, 129

*Flickinger v. Harold C. Brown & Co., Inc.*,
  947 F.2d 595 (2d Cir. 1991) .................................................. 128, 129

*Freeman v. Gordon & Breach, Sci. Publishers, Inc.*,
  398 F. Supp. 519 (S.D.N.Y. 1975) ................................................ 158

*GEM Advisors, Inc. v. Corporación Sidenor, S.A.*,
  667 F. Supp. 2d 308 (S.D.N.Y. 2009) ........................................... 157

*GlobalNet Financial.com, Inc. v. Frank Crystal & Co.*,
  449 F.3d 377 (2d Cir. 2006) .............................................. 46, 49, 51

*Goodyear Dunlop Tires Operations, SA v. Brown*,
  131 S. Ct. 2846 (2011) ................................................ 151, 152, 153

*Gould v. Bd. of Educ. of Seawanhaka Cent. High Sch. Dist.*,
  81 N.Y.2d 446 (N.Y. 1993) ..................................................... 40, 143

*Greenlight Capital, Inc. v. Greenlight (Switz), S.A.*,
  2005 WL 13682 (S.D.N.Y. Jan. 3, 2005) ........................................ 151

*Greenspun v. Lindley*,
  36 N.Y.2d 473 (N.Y. 1975) .......................................................... 58

*Greystone Equip. Fin. Corp. v. Motion Imaging, Inc.*,
  2010 WL 1655454 (N.Y. Sup. Ct. Apr. 7, 2010) ............................... 162

*Hamilton v. Atlas Turner, Inc.*,
  197 F.3d 58, 61 (2d Cir. 1999) .................................................. 152

*Harmelin v. Man Fin. Inc.*,
  2007 WL 2739579 (E.D. Pa. Sept. 20, 2007) ..................................... 79

*Harmelin v. Man Fin. Inc.*,
  2007 WL 3146666 (E.D. Pa. Oct. 26, 2007) ....................................... 47

*Higgins v. N.Y. Stock Exch., Inc.*,
  806 N.Y.S.2d 339 (N.Y. Sup. Ct. 2005) ....................................... 63, 65

*Hirsh v. Arthur Andersen & Co.*,
  72 F.3d 1085 (2d Cir. 1995) ....................................................... 66

*Hochman v. LaRea*,
  789 N.Y.S.2d 300 (N.Y. App. Div. 2005) ....................................... 150

*Hume v. Farr's Coach Lines, Ltd.*,
  2015 WL 5773632 (W.D.N.Y. Sept. 30, 2015) ................................................. 159

*I.B.M. Corp. v. Liberty Mut. Ins. Co.*,
  363 F.3d 137 (2d Cir. 2004) ..................................................................................... 60

*IDT Corp. v. Morgan Stanley Dean Witter & Co.*,
  907 N.E. 2d 268 (N.Y. 2008) ................................................................................. 161

*IIG Capital LLC v. Archipelago, LLC*,
  36 A.D.3d 401 (N.Y. App. Div. 2007) ................................................................. 147

*In re Adelphia Recovery Trust*,
  634 F.3d 678 (2d Cir. 2011) ............................................................................ 155, 156

*In re AlphaStar Ins. Group. Ltd.*,
  383 B.R. 231 (Bankr. S.D.N.Y. 2008) ............................................................... 49, 92

*In re AMC Inv'rs, LLC*,
  406 B.R. 478 (Bankr. D. Del. 2009) ..................................................................... 170

*In re Bernard L. Madoff Inv. Sec. LLC*,
  654 F.3d 229 (2d Cir. 2011) .................................................................................... 65

*In re Bernard L. Madoff Inv. Sec. LLC*,
  740 F.3d 81 (2d Cir. 2014) ...................................................................................... 63

*In re Bernard L. Madoff Inv. Sec. LLC*,
  708 F.3d 422 (2d Cir. 2013) .................................................................................... 15

*In re Bernard L. Madoff Inv. Sec. LLC* ("*Bankruptcy Decision*"),
  2015 WL 4734749 (Bankr. S.D.N.Y. Aug. 11, 2015) ..................................... *passim*

*In re Black & Geddes, Inc.*,
  16 B.R. 148 (Bankr. S.D.N.Y. 1981) ................................................................... 172

*In re BP p.l.c. Sec. Litig. ("BP I")*,
  843 F. Supp. 2d 712 (S.D. Tex. 2012) .................................................................... 45

*In re BP p.l.c. Sec. Litig. ("BP II")*,
  109 F. Supp. 3d 946 (S.D. Tex. 2014) ........................................................ 43, 44, 45

*In re Canon Cameras Litig.*,
  2006 WL 1751245 (S.D.N.Y. June 23, 2006) ..................................................... 146

*In re Granite Partners, L.P. v. Primavera Familienstiftung*,
  194 B.R. 318 (Bankr. S.D.N.Y. 1996) ................................................................... 60

*In re Hampton Hotel Investors L.P.*,
289 B.R. 563 (Bankr. S.D.N.Y. 2003) ................................................................. 66

*In re Herald*,
540 Fed. App'x 19 (2d Cir. 2013) ....................................................................... 28

*In re Herald ("Herald I")*,
730 F.3d 112 (2d Cir. 2013) ...................................................................... *passim*

*In re Kingate Mgmt. Ltd. Litig.*,
784 F.3d 128 (2d Cir. 2015) ...................................................................... *passim*

*In re Lyondell Chem. Co. v. Blavatnik*,
543 B.R. 127 (Bankr. S.D.N.Y. 2016) ............................................................... 157

*In re Parmalat Sec. Litig.*,
383 F. Supp. 2d 587 (S.D.N.Y. 2005) ................................................................. 60

*In re Parmalat Sec. Litig.*,
479 F. Supp. 2d 332 (S.D.N.Y. 2007) ............................................................... 173

*In re Petrobras Sec. Litig.*,
2016 WL 929346 (S.D.N.Y. Mar. 12, 2016) .................................................. 43, 44

*In re R.E. Loans LLC*,
519 B.R. 499 (Bankr. N.D. Tex. 2014) ............................................................... 64

*In re RHTC Liquidating Co.*,
424 B.R. 714 (Bankr. W.D. Pa. 2010) ...................................................... 169, 170

*In re Seven Seas Petro., Inc.*,
522 F.3d 575 (5th Cir. 2008) ............................................................................ 63

*In re Vivendi Universal, S.A. Sec. Litig.*,
2004 WL 876050 (S.D.N.Y. Apr. 21, 2004) ..................................................... 173

*Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Varig S.A.*,
302 F. App'x 10 (2d Cir. 2008) ....................................................................... 168

*Int'l Bus. Machines Corp. v. Liberty Mut. Ins. Co.*,
363 F.3d 137 (2d Cir. 2004) ............................................................................ 46

*Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.*,
475 F. Supp. 2d 456 (S.D.N.Y. 2007) ............................................................... 157

*Int'l Shoe Co. v. Washington, Office of Unemployment Comp. & Placement*,
326 U.S. 310 (1945) ....................................................................................... 152

*Intellectual Capital Partner v. Inst. Credit Partners LLC*,
  2009 WL 1974392 (S.D.N.Y. July 8, 2009) ........................................................ 146

*Jamaica Hosp. Med. Ctr. v. Carrier Corp.*,
  772 N.Y.S.2d 592 (N.Y. App. Div. 2004) ........................................................... 160

*Johnson v. Nextel Comm'ns, Inc.*,
  660 F.3d 131 (2d Cir. 2011)....................................................................... 35, 75

*Jordan (Bermuda) Inv. Co. v. Hunger Green Invs., Ltd.*,
  2003 WL 21263544 (S.D.N.Y. June 2, 2003) ..................................................... 79

*Kidz Cloz, Inc. v. Officially for Kids, Inc.*,
  320 F. Supp. 2d 164 (S.D.N.Y.2004)................................................................. 39

*Klaxon v. Stentor Elec. Mfg. Co.*,
  313 U.S. 487 (1941)..................................................................................... 46

*Knieriemen v. Bache Halsey Stuart Shields Inc.*,
  427 N.Y.S.2d 10 (N.Y. App. Div. 1980) ............................................................ 56

*Kottler v. Deutsche Bank AG*,
  607 F. Supp. 2d 447 (S.D.N.Y. 2009)............................................................ 37, 88

*Krupski v. Costa Crociere S.p.A.*,
  560 U.S. 538 (2010)..................................................................................... 163

*LaSala v. Bordier et Cie ("LaSala")*,
  519 F.3d 121 (3d Cir. 2008)............................................................... 43, 44, 46

*LaSala v. TSB Bank, PLC*,
  514 F. Supp. 2d 447 (S.D.N.Y. 2007)............................................................... 45

*LaSala v. UBS, AG*,
  510 F. Supp. 2d 213 (S.D.N.Y. 2007)............................................................... 45

*Law Debenture v. Maverick Tube Corp.*,
  2008 WL 4615896 (S.D.N.Y. Oct. 15, 2008) .................................................... 151

*Lawrence v. Fox*,
  20 N.Y. 268 (1859) .................................................................................... 142

*Laydon v. Mizhuo Bank, Ltd.*,
  2015 WL 1499185 (S.D.N.Y. Mar. 31, 2015) ................................................... 152

*Lerner v. Fleet Bank, N.A.*,
  459 F.3d 273 (2d Cir. 2006)...................................................................... 81, 88

*LNC Invs., Inc. v. First Fid. Bank, N.A. New Jersey,*
173 F.3d 454 (2d Cir. 1999)................................................................ 33

*MacPherson v. Buick Motor Co.,*
217 N.Y. 382 (1916) ...................................................................... 142

*Madeira v. Affordable Hous. Found., Inc.,*
469 F.3d 219 (2d Cir. 2006)............................................................ 128

*Mann v. Kemper Fin. Cos., Inc.,*
618 N.E.2d 317 (Ill. App. 1992) ................................................. 64, 78

*Marchak v. JPMorgan Chase & Co.,*
84 F. Supp. 3d 197 (E.D.N.Y. 2015) ................................................ 27

*Marine Midland Bank, N.A. v. Miller,*
664 F.2d 899 (2d Cir. 1981)............................................................ 157

*Metro Life Ins. Co. v. Robertson-Ceco Corp.,*
84 F.3d 560 (2d Cir. 1996)............................................................. 150

*Musalli Factory for Gold & Jewellry v. JPMorgan Chase Bank, N.A.,*
261 F.R.D. 13 (S.D.N.Y. 2009) ........................................................ 76

*Musalli Factory for Gold & Jewellry Co. v. JPMorgan Chase Bank, N.A.,*
2010 WL 2588195 (2d Cir. June 29, 2010) ...................................... 76

*New Hampshire v. Maine,*
532 U.S. 742 (2001)............................................................... 155, 156

*Newin Corp. v. Hartford Accident & Indem. Co.,*
371 N.Y.S.2d 884 (N.Y. 1975) ....................................................... 129

*Norlin Corp. v. Rooney,*
744 F.2d 255 (2d Cir. 1984)............................................................. 58

*Norwest Mortgage, Inc. v. Dime Sav. Bank of N.Y.,*
721 N.Y.S.2d 94 (N.Y. App. Div. 2001) .......................................... 81

*Owens v. Haas,*
601 F.2d 1242 (2d Cir. 1979)......................................................... 129

*Penato v. George,*
383 N.Y.S.2d  (1976) ...................................................................... 80

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*
446 F. Supp. 2d 163 (S.D.N.Y. 2006)................................... *passim*

*People v. Merkin*,
  907 N.Y.S.2d 439 (N.Y. Sup. Ct. 2010) ............................................................... 77

*Perkins v. Benguet Consol. Mining Co.*,
  342 U.S. 437 (1952) ................................................................................... 152, 157

*Picard v. Elbaum*,
  707 F. Supp. 144 (S.D.N.Y. 1989) ..................................................................... 151

*Picard v. Fairfield Greenwich Ltd.*,
  762 F.3d 199 (2d Cir. 2014) ............................................................................... 167

*Piccoli v. Calvin Klein Jeanswear Co.*,
  19 F. Supp. 2d 157 (S.D.N.Y. 1998) ......................................................... 132, 137

*Plumitallo v. Hudson Atl. Land Co., LLC*,
  903 N.Y.S.2d 127 (N.Y. App. Div. 2010) .......................................................... 149

*Rasmussen v. A.C.T. Envtl. Servs. Inc.*,
  739 N.Y.S.2d 220 (N.Y. App. Div. 2002) ............................................................ 63

*Reigel v. Medtronic, Inc.*,
  552 U.S. 312 (2008) ............................................................................................. 45

*Richards v. City of New York*,
  433 F. Supp. 2d 404 (S.D.N.Y. 2006) ............................................................... 129

*Robeco-Sage v. Citigroup Alt. LLC*,
  2009 WL 2626244 (N.Y. Sup. Ct. July 28, 2009) ................................................ 60

*Roby v. Corp. of Lloyd's*,
  996 F.2d 1353 (2d Cir. 1993) ............................................................................... 55

*Rolf v. Blyth, Eastman Dillion & Co.*,
  570 F.2d 38 (2d Cir. 1978) ................................................................................... 63

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) ............................................................................... 172

*Roselink Investors, L.L.C. v. Shenkman*,
  386 F. Supp. 2d 209 (S.D.N.Y. 2004) ........................................................... 58, 98

*Royal & Sun Alliance Ins. Co. of Canada v. Century Int'l Arms, Inc.*,
  466 F.3d 88 (2d Cir. 2006) ................................................................................. 167

*San Diego Cnty. Emp. Ret. Assoc. v. Maounis*,
  2010 WL 1010012 (S.D.N.Y. Mar. 15, 2010) ...................................................... 51

*Schwarz v. ThinkStrategy Capital Mgmt. LLC*,
    797 F. Supp. 2d 439 (S.D.N.Y. 2011) ............................................... 78

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    454 B.R. 285 (Bankr. S.D.N.Y. 2011) .............................................. 15

*Shah v. Kuwait Airways Corp.*,
    2002 WL 1631624 (S.D.N.Y. May 7, 2012) ..................................... 60

*Shearson Lehman Hutton, Inc. v. Wagoner*,
    944 F.2d 114 (2d Cir. 1991) ............................................................. 66

*SIPC v. BDO Seidman*, LLP,
    222 F.3d 63 (2d Cir. 2000) ............................................................ 102

*Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*,
    450 F.3d 100 (2d Cir. 2006) .......................................................... 154

*Space, Inc. v. Simowitz*,
    2008 WL 2676359 (S.D.N.Y. July 7, 2008) .................................. 146

*State Farm Mut. Auto. Ins. Co. v. James M. Liguori, M.D., P.C.*,
    589 F. Supp. 2d 221 (E.D.N.Y. 2008) .......................................... 172

*State of N.Y. Workers' Compensation Bd. v. Madden*,
    119 A.D.3d 1022 (N.Y. App. Div. 2014) ....................................... 161

*Stephenson v. PricewaterhouseCoopers, LLP*,
    482 F. App'x 618 (2d Cir. 2012) ..................................................... 62

*Subaru Distribs. Corp. v. Subaru of Am., Inc.*,
    425 F.3d 119 (2d Cir. 2005) .......................................................... 129

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ........................................................................ 17

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,
    845 A.2d 1031 (Del. 2004) .............................................................. 65

*Ultramares Corp. v. Touche*,
    255 N.Y. 170 (N.Y. 1931) ....................................................... 99, 102

*United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*,
    216 F. Supp. 2d 198 (S.D.N.Y. 2002) ............................................ 80

*United States v. Chestman*,
    947 F.2d 551 (2d Cir.1991) ............................................................. 75

*USA United Holdings, Inc. v. Tse-Peo, Inc.*,
   2009 WL 1099462 (N.Y. Sup. Ct. Apr. 23, 2009)................................................ 159

*VantagePoint Venture Partners 1996 v. Examen, Inc.*,
   871 A.2d 1108 (Del. 2005) .................................................................................... 57

*Veleron Holding BV v. Morgan Stanley*,
   117 F. Supp. 3d 404 (S.D.N.Y. 2015)................................................................. 113

*Venizelos v. Oceania Mar. Agency, Inc.*,
   702 N.Y.S.2d 17 (N.Y. App. Div. 2000) .............................................................. 63

*White v. Guarente*,
   43 N.Y.2d 356 (N.Y. 1977) ............................................................................ 99, 102

*Williams v. Calif. 1st Bank*,
   859 F.2d 664 (9th Cir. 1988) .......................................................................... 63, 67

*Wright v. BankAmerica Corp.*,
   219 F.3d 79 (2d Cir. 2000).................................................................................... 66

*Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc.*,
   341 F. Supp. 2d 258 (S.D.N.Y. 2004)................................................................ 172

*Yudell v. Gilbert*,
   949 N.Y.S.2d 380 (App. Div. 2012)...................................................................... 65

## Statutes

15 U.S.C. § 78bb(f)(1) .................................................................................... 22, 43

15 U.S.C. § 78c(a)(16)..................................................................................... 43, 46

Bermuda Limitation Act 1984 ............................................................................ 139

Bermuda Third Parties (Rights Against Insurers) Act 1963 ..................................... 139

Cayman Islands: The Contracts (Rights of Third Parties) Law, 2014 ........................ 139

Hong Kong Contracts (Rights of Third Parties) Ordinance (January 2016) ............... 139

Singapore Contracts (Rights of Third Parties) Act. 2002 ........................................ 139

UK Contracts (Rights of Third Parties) Statute 1999 ............................................. 140

## Rules

Fed. R. Civ. P. 8(a) ................................................................................ 172, 173

Fed. R. Civ. P. 9(b) .......................................................................... 171, 172, 173

Fed. R. Civ. P. 15(c)(1)(C) ............................................................................ 163

Fed. R. Civ. P. 15(c)(1)(C)(ii) ...................................................................... 163

N.Y. C.P.L.R. § 213(2) ................................................................................. 140

N.Y. C.P.L.R. § 302 .............................................................................. 151, 154

N.Y. C.P.L.R. § 302(a) ................................................................................. 151

N.Y. C.P.L.R. § 302(a)(1), (2) ...................................................................... 154

## Other Authorities

1 C. Keating & G. O'Gradney,
   Fletcher Cyclopedia Of Law Of Private Corporations § 43.70 (2007) ...................... 157

22 N.Y. Jur. 2d Contracts § 304 ...................................................................... 129

29A FEDERAL PROCEDURE LAWYERS EDITION § 70:322 (2012) ................................... 43

*ADT Ltd. v. BDO Binder Hamlyn,*
   [1996] BCC 808 ...................................................................................... 126

*Arklow Investments Ltd. v. Maclean,*
   [2000] 1 WLR 594 ..................................................................................... 87

*Barlow Clowes Int'l v. Eurotrust Int'l,*
   [2006] 1 WLR 1476 ............................................................................... 93, 95

*Benjamin v. KPMG Bermuda,*
   [2007] Bda L.R. 22 ........................................................................... 126, 127

*Beswick v. Beswick,*
   [1968] AC 58 ........................................................................................ 141

*Bristol and West Building Society v. Mothew,*
   [1998] 1 Ch .......................................................................................... 82

*Brown v. Belleville (City),*
   2013 ONCA 148 (Ont. Ct. of App.) ................................................................ 142

*Caparo v. Industries Plc. v. Dickman*,
  [1990] 2 AC 605 ................................................................................................ *passim*

*Coulthard & Ors v. Neville Russell*,
  [1998] B.B.C. 359 .................................................................................................... 126

*Customs and Excise Commissioners v. Barclays Bank Plc*,
  [2007] 1 AC 181 ...................................................................................................... 108

*Daly v. Sydney Stock Exchange Ltd.*,
  160-CLR 371(1986) .................................................................................................. 109

*Donoghue v. Stevenson*,
  [1932] A.C. 562, 111 N.E. 1050 (1932) ................................................................. 142

*Foss v. Harbottle*,
  (1843) 2 Hare 461 ...................................................................................................... 69

*Frazer River Pile & Dredge Ltd. v. Can-Dive Services*, *Ltd.*,
  [1999] 3 S.C.R. 108 ................................................................................................. 142

*Frett v. The Owners and Other Persons Interested in the Ship Buckpasser Junneau 36*,
  (1843) 2 Hare 461 .................................................................................................... 141

*Henderson v. Merritt*,
  [1995] AC 154 .......................................................................................................... 111

*Giles v. Rhind*,
  [2003] Ch 618 ...................................................................................................... 72, 73

*In re Kingate Global Fund, Ltd. (In Liquidation)*,
  [2010] SC (Bda) 47 Com, 20 Aug. 2010 (Berm.)..................................................... 60

*Interfoto Picture Library Ltd. v. Stiletto Visual Programmers Ltd.*,
  [1989] Q.B. 433 ....................................................................................................... 119

*Johnson v. Gore Wood & Co.*,
  [2002] 2 A.C. 1 (H.L.), 14 Dec. 2001 (Eng.).......................................................... 68

*Kingate Global Fund, Ltd. v. Knightsbridge (USD) Fund Ltd.*,
  [2009] CA (Bda) 17 Civ., 19 Nov. 2009 (Berm.) ..................................................... 52

*Kingate Global Fund Ltd. (in liquidation) v. Kingate Management Ltd. & Others*,
  [2016] SC (Bda) 3 Com. ........................................................................................... 68

*Mothew*,
  [1998] 1 Ch 1 ............................................................................................................ 82

*Morgan Crucible Co. plc v. Hill Samuel & Co. Ltd.*,
[1991] Ch. 295 ................................................................................................. 126

*Perry v. Day*,
[2005] BCC 375 ................................................................................................. 68

*Peskin v. Anderson*
[2001] 1 BCLC 372 ........................................................................................... 86

*Picard v. FIM Advisers LLP*,
[2010] EWHC 1299 (Ch), [2010] All ER (D) 216 (Jul), 27 May 2010 (Eng.)......................... 5

*Riyad Bank & Others v. Ahli United Bank (UK) Plc.*,
[2006] EWCA Civ. 780 ........................................................................... 111, 112

*Royal Brunei Airlines v Tan*,
[1995] 2 AC 378 ................................................................................................. 92

*Shaker v. Al-Bedrawi*,
[2003] BCC 465 ................................................................................................. 68

*Simaan General Contracting Co. v. Pilkington Glass Ltd. (No. 2)*,
[1988] 1 Q.B. 758 ........................................................................................... 111

*Stein v. Blake and Ors.* (No. 2),
[1998] 1 BCLC 573 ........................................................................................... 86

*Walsh v. Horizon Bank Int'l Ltd.*,
[2008] SC (Bda) LR 20 Com, *aff'd* [2009] CA (Bda) 6 Civ. (March 2009) ........................... 95

# GLOSSARY OF DEFINED TERMS

| Defined Term | Definition |
| --- | --- |
| Barrett Decl. | Declaration of David A. Barrett in Support of Plaintiffs' Opposition to the Joint Motion of All Defendants to Dismiss the Corrected Second Amended Consolidated Class Action Complaint, filed May 6, 2016 |
| Bermuda Proceedings | The Bermuda Proceedings are two actions brought by the Joint Liquidators of the Funds against Defendants KML, the Consultant, Ceretti and Grosso, among others in the Supreme Court of Bermuda (Commercial Jurisdiction. 2010 No. 214) and a separate action against PwC Bermuda also in the Supreme Court of Bermuda (Commercial Jurisdiction 2010 No. 262) |
| BMIS | Bernard L. Madoff Investment Securities LLC |
| Bompas Decl. | Declaration of Anthony George Bompas Q.C., dated November 4, 2010, Dkt. 187-4 |
| Bompas Further Decl. | Further Declaration of Anthony George Bompas Q.C., dated May 6, 2016 |
| Ceretti | Defendant Federico M. Ceretti |
| Citi Hedge | Defendant Citi Hedge Fund Services Ltd. |
| Class | All persons or entities who owned shares of the Funds as of December 10, 2008, and were damaged thereby |
| Consultant | FIM Advisers LLP and its predecessor-in-interest FIM Limited |
| DTC | Depository Trust & Clearing Corporation |
| FIM Advisers | Defendant FIM Advisers LLP |
| FIM Defendants | Defendants FIM Advisers LLP, FIM Limited, FIM (USA) Incorporated, Carlo Grosso and Federico M. Ceretti |
| FIM Entities | Defendants FIM Advisers LLP, FIM Limited and FIM (USA) Incorporated |
| FIM Limited | Defendant FIM Limited |

FIM USA ............................................ Defendant FIM (USA) Incorporated

Funds................................................. Kingate Global Fund, Ltd. and Kingate Euro Fund, Ltd.

GAAP................................................ Generally Accepted Accounting Principles

GAAS................................................ Generally Accepted Auditing Standards

Grosso ............................................... Defendant Carlo Grosso

Hemisphere ....................................... Hemisphere Management Limited

IM...................................................... Information Memorandum

Individual Defendants ....................... Defendants Carlo Grosso, Federico M. Ceretti, Sandra Manzke, and Michael G. Tannenbaum

Kingate Euro ..................................... Kingate Euro Fund, Ltd.

Kingate Defendants........................... Defendants Kingate Management Limited, Tremont (Bermuda) Limited, Tremont Group Holdings, Inc., FIM Advisers LLP, FIM Limited, FIM (USA) Incorporated, Carlo Grosso, Federico M. Ceretti, Sandra Manzke, and Michael G. Tannenbaum

Kingate Global .................................. Kingate Global Fund, Ltd.

KML.................................................. Defendant Kingate Management Limited

Madoff............................................... Bernard L. Madoff

Manzke.............................................. Defendant Sandra Manzke

MassMutual....................................... Massachusetts Mutual Life Insurance Company

NAV .................................................. Net Asset Value

OEX .................................................. Options of the S&P 100 Index

PwC................................................... Defendant PricewaterhouseCoopers Bermuda

Rye Funds ......................................... Rye Select Broad Market Fund LP, Rye Select Broad Market Prime Fund LP, Rye Select Broad Market XL Fund LP, Rye Select Broad Market Portfolio Limited, and Rye Select Broad Market XL Portfolio Limited.

S&P 100 Index .................................. Standard & Poor's 100 Index

SAC ................................................. Corrected Second Amended Consolidated Class Action Complaint, filed October 6, 2015, Dkt. No. 189

SAS .................................................. AICPA Statements of Accounting Standards

SEC .................................................. Securities and Exchange Commission

Service Agreements ......................... The Management Agreements, the Administration Agreements and/or the Consulting Agreements

SIPA ................................................. Securities Investor Protection Act

Tannenbaum ..................................... Defendant Michael G. Tannenbaum

Tracey Decl. ..................................... Declaration of Dennis H. Tracey, III in Support of the Joint Motion of All Defendants to Dismiss the Corrected Second Amended Consolidated Class Action Complaint, filed December 21, 2015, Dkt. No. 199

Tremont ............................................ Defendant Tremont (Bermuda) Limited

Tremont Advisers ............................. Tremont Advisers, Inc.

Tremont Group ................................. Defendant Tremont Group Holdings, Inc.

## PRELIMINARY STATEMENT

Plaintiffs are investors who suffered "net losses" by purchasing and holding investments in the Kingate Global and Kingate Euro funds. Plaintiffs did not directly invest with Bernard Madoff. Indeed, many Plaintiffs did not know Madoff at all, because his name and the name of his firm did not appear in the Funds' offering documents. Instead, Plaintiffs reposed trust in the Kingate Defendants' expertise and experience, PwC's audits, and Citi Hedge's role as the independent administrator responsible for valuing Plaintiffs' investments. Yet the securities sold by Defendants were virtually worthless and Plaintiffs lost billions.

While Plaintiffs suffered massive losses, Defendants reaped hundreds of millions of dollars in unearned "professional fees." In return, however, Defendants recklessly induced Plaintiffs to make and retain investments by failing to perform standard procedures and due diligence, despite their unique knowledge that Madoff's operation presented significant risks of fraud and material misstatements. Defendants contend that the Funds here were "victims" of Madoff's fraud (Br. at 8), but Defendants ignored basic duties owed to Plaintiffs. The Kingate Defendants, PwC and Citi Hedge all had access to Madoff's "entirely fictitious" monthly statements of purported trades on behalf of the Funds that revealed hundreds of impossible trades. *See, e.g.,* SAC ¶¶ 2, 65-66, 207, 210. Plaintiffs had no such access, and were thus dependent on Defendants' superior knowledge and access to information to validate their investments. "As a result of Defendants' breaches of fiduciary and common law duties and of contractual obligations, investors in the Funds were induced to purchase and hold virtually worthless investments, thereby causing the investors to suffer massive out-of-pocket losses. If Defendants had performed their duties properly, Plaintiffs would not have suffered these losses." *Id.* ¶ 1.

Faced with these allegations, Defendants primarily seek recourse in foreign law and make only cursory arguments – largely relegated to footnotes – that the SAC does not state viable claims under New York law.  On the contrary, courts in this District have sustained claims under New York law in similar circumstances.  Defendants argue that Plaintiffs' claims should be dismissed based on SLUSA, standing, jurisdiction and foreign law.  However, SLUSA does not preclude claims, which can be established based solely on Defendants' breach of duties owed directly to Plaintiffs and without any essential allegations of false conduct by Defendants.  These duties are based on the nature of the relationship and the documents exchanged between Defendants and Plaintiffs in connection with Plaintiffs' decisions to purchase and retain worthless investments in the Funds.

Plaintiffs have standing to pursue claims based on their particularized injuries caused by the loss of their subscription proceeds while the Funds continued to thrive, taking in more money and paying out "net winners" and Defendants' fees.  Personal jurisdiction is proper over all Defendants – indeed, only Citi Hedge now belatedly challenges it.  In arguing for dismissal under BVI and Bermuda law, Defendants rely on outdated and inapposite case law that has no application to the facts and circumstances here.  For many of the same reasons that the SAC properly alleges claims under New York law, the claims would also survive if the Court were to apply BVI and Bermuda law.  And if foreign law controls, then SLUSA does not apply at all and Plaintiffs unquestionably can pursue all their claims, including fraud and negligent misrepresentation.

**BACKGROUND**

The Kingate Defendants consist of the owners, managers and consultants to the Funds. The Funds were created for the purpose of investing Plaintiffs' subscription proceeds with an investment advisor selected and overseen by the Kingate Defendants.  SAC ¶ 1.  Since the

investment activity of the Funds was out-sourced to Madoff, the primary role of the Kingate

Defendants was to market the Funds to investors and to evaluate and monitor Madoff on behalf

of the investors.  The Kingate Defendants retained third-party professionals to independently

value and audit the Funds, which were not traded or otherwise valued on any market or

exchange.  *Id.* ¶ 5.  In addition to handling the day-to-day administrative tasks of the Funds

including communications with investors, Citi Hedge calculated the Funds' Net Asset Value

("NAV") that was used to price the shares for subscription and redemption purposes.  *Id.*  PwC

audited the Funds' financial statements.  *Id.*  Citi Hedge and PwC separately prepared reports for

Plaintiffs attesting to the value of the Funds.  *Id.*  As acknowledged in the Funds' offering

documents, there was little publicly available information to value the Funds.  *See, e.g.,* SAC,

Ex. 4, Kingate Global IM, dated May 1, 2006, at 10.

The Kingate Defendants solicited investments from Plaintiffs who purchased interests in

the Funds.  *Id.* ¶ 3.  In turn, the Kingate Defendants funneled that money into Madoff's Ponzi

scheme in his role as the Funds' investment advisor.  *Id.*  Neither Madoff nor his firm were

mentioned by name in the Funds' information memoranda; instead the offering documents

identified the "Investment Advisor" as a "New York based NASD registered broker-dealer

employing approximately 350 people and acting primarily as a market-maker in listed and

unlisted stocks and convertible securities."  *Id.* ¶ 53.

## A.  The Funds

Plaintiffs are investors in Kingate Global Fund, Ltd. ("Kingate Global") and Kingate

Euro Fund, Ltd. ("Kingate Euro," collectively the "Funds").    SAC ¶¶ 39-40.  The Funds were

nearly identical except  that Kingate Global accepted investments in U.S. dollars, while Kingate

Euro did so in Euros.  *Id.* ¶ 40(b).  Kingate Global was incorporated in 1994 and Kingate Euro in

2000.   By 2008, the Funds had taken in billions of dollars in subscription proceeds, substantially

all of which was lost when Madoff's Ponzi scheme collapsed. The Funds are not parties to this action.

The Funds executed a series of agreements to open their accounts with Bernard L. Madoff Investment Securities ("BMIS") (the "Account Agreements"). *Id.* ¶¶ 39(b), 40(c). The Account Agreements are expressly subject to New York law, and were deemed to have been made and performed in New York based on the New York trading activities contemplated therein. *Id.* ¶ 41.

**B.    Defendants Grosso, Ceretti, Manzke and Tannenbaum Sponsored and Managed the Funds through the Tremont Defendants, KML and the FIM Entities**

The principal sponsors and managers of the Funds were Defendants Carlos Grosso ("Grosso"), Federico Ceretti ("Ceretti"), Sandra Manzke ("Manzke"), and Michael Tannenbaum ("Tannenbaum") (collectively, the "Individual Defendants"). SAC ¶¶ 30-35. Grosso and Ceretti formed the Funds, and they sponsored, managed, marketed and sold the Funds to investors through Defendants (i) FIM Limited, (ii) FIM Advisers LLP ("FIM Advisers"), and (iii) FIM (USA) Inc. ("FIM USA," collectively with FIM Limited and FIM Advisors, the "FIM Entities"; the FIM Entities, Grosso, and Ceretti, collectively, are the "FIM Defendants"). SAC ¶¶ 27-30. Ceretti and Grosso were also the founding members of the FIM Entities which they further controlled through their positions as Chief Executive Officer and Chief Investment Officer, respectively. *Id.* ¶¶ 30-31.

FIM Limited and FIM Advisers managed the Funds through a Consultancy Services Agreement with the managers of the Funds, Defendants Kingate Management Limited ("KML") and Tremont (Bermuda) Limited ("Tremont"). SAC ¶¶ 24-28. Defendants KML and Tremont co-managed the Funds until December 31, 2005, after which KML remained as sole manager. SAC ¶ 24(a). Tannenbaum served as a Director of KML and oversaw and directed KML's

4

wrongful actions. *Id.* ¶ 34. Defendants Grosso and Ceretti also had control over KML. The Trustee overseeing the liquidation of BMIS, Irving Picard, has alleged that he "has strong grounds for believing that Mr. Grosso and Mr. Ceretti are the owners of and control [KML,] and were responsible for the establishment and investment of the Kingate Funds." *Picard v. FIM Advisers LLP*, [2010] EWHC 1299 (Ch), [2010] All ER (D) 216 (Jul), [17]-[18], 27 May 2010 (Eng.).

In addition to Grosso, Ceretti, and Tannenbaum, Defendant Manzke played a significant role in the wrongful conduct here. Manzke was Chairman and co-CEO of Defendant Tremont Group Holdings, Inc. (the "Tremont Group," together with Tremont, the "Tremont Defendants"), which was the parent company of Tremont, one of the co-managers of the Funds. SAC ¶¶ 25-26, 33. Manzke, Grosso and Ceretti had close personal relationships with Madoff. Manzke introduced Grosso and Ceretti to Madoff shortly after Manzke met them in approximately 1993 or 1994. Manzke, Grosso and Ceretti thereafter met regularly with Madoff in New York. *Id.* ¶¶ 58-63. Madoff met with Manzke at least on May 11, 2005 and March 15, 2006. *Id.* ¶ 58. Madoff also met with Grosso on October 4, 2006; March 8, 2007; September 17, 2007; and September 22, 2008. *Id.* Madoff's close contact and regular communications with Grosso and Ceretti are further evidenced by Madoff's pocketbook telephone directory which included Ceretti's office number and Grosso's mobile phone and home numbers, as well as his office number. *Id.* ¶¶ 60-61.

The Tremont Group was the parent company of the Funds' manager, Tremont. *Id.* ¶ 79. The Tremont Group, founded by Manzke, created multiple Madoff feeder funds based on Manzke's long-standing relationship with Madoff. *Id.* ¶ 81. By December 2008, the Tremont

Group was managing at least five different Madoff feeder funds with over $3 billion in purported assets. *Id.* ¶ 79.

C. **The Kingate Defendants Aggressively Marketed the Funds and Regularly Interacted with Investors**

Under its Management Agreements with the Funds, KML was responsible for "all duties and functions in connection with the sale of any Shares of the Fund and advising the Fund on general matters affecting the marketing of the Shares . . . ." Barrett Decl., Ex. 12, KML Management Agreement with Kingate Global Fund dated January 1, 2006, at 4.1. As part of its duties with respect to the sale of shares, KML was charged with "maintaining regular contact and updating existing and prospective investors to keep them informed of investment results and other information with regard to the Fund." *Id.* at 4.1(b). Furthermore, "the Manager [KML] shall deliver, or arrange for the delivery by any authorized dealer selected by the Manager, to each person to whom Shares are offered a copy of the Fund's most recently published Information Memorandum and a copy of the Fund's most recently published annual report." SAC, Ex. 7, KML Management Agreement with the Kingate Global Fund, dated January 1, 2006, Part IV Sale of Shares; Tracey Decl., Ex. 15, KML Management Agreement with the Kingate Euro Fund dated May 1, 2000, §§ 3.1, 3.3 (KML appointed as placement agent). For its services, KML was paid an annual fee of 1.5% of the NAV of the Fund. *Id.* 5.2(a). In addition, "other fees, such as without limitation, up-front fees and exit fees, shall be retained by and belong to the Manager." *Id.* 5.2(b). "These other fees" included a load fee of up to 5% referred to as the Subscription Charge.

Until December 31, 2005, KML shared the management duties with Tremont. Like KML, Tremont's mandate was to "perform (or procure) the performance of) all duties and functions in connection with any Shares of the Fund and advising the Fund on general matters

affecting the marketing of Shares."  Tracey Decl., Ex. 16, Tremont Co-Management Agreement

with the Kingate Global Fund, Part IV Sale of Shares.  Like KML, Tremont was responsible for

"maintaining regular contact and updating existing and prospective investors to keep them

informed of investment results and other information with regard to the Fund."  *Id.* at § 4.1(b).

Tremont and KML split a monthly management fee of 1.5% of the NAV of the Fund, based on

respective originations.  Barrett Decl., Ex. 1, Trustee's Fourth Amended Complaint, *Picard v.

Ceretti*, ¶ 107.  As with the KML management fee, other fees, including the 5% "up-front fees,"

were "retained by and belong[ed] to the Co-Manager."  Tracy Decl., Ex. 16 at 5.2(b)).

KML never had more than five employees.  Barret Decl., Ex. 1, Trustee's Fourth

Amended Complaint, ¶ 105, and as a result it out-sourced its marketing duties for the Funds to

FIM Ltd.  *Id.* ¶ 25.  Around August 1, 2005, these duties were assigned to FIM Advisers.  *Id.* ¶¶

52, 112.  Defendants simply ignore these distribution agreements in their motion to dismiss, nor

did they provide these agreements to their foreign law experts.  Rather, Defendants instructed

their foreign law experts that the Kingate Defendants had no interaction with the shareholders

and investors.  *See* Chivers Decl. ¶¶ 5-6.  Accordingly, the opinions of Defendants' experts are

based on an incorrect assumption that there was "no personal interaction" between the

KML/FIM Defendants and Plaintiffs.  Chivers Decl. ¶¶ 71, 89, 94, 106; Hargun Decl. ¶¶ 58,

114-16; Evans Decl. ¶¶ 54-56, 69-70.  For this reason alone, these opinions should be

disregarded.

The distribution agreements acknowledged that FIM Limited was an authorized dealer in

securities and subject to legal obligations to its customers.  Barrett Decl., Exs. 9 & 10,

Distribution Agreement, § 5.1.  The services to be performed by FIM Limited included.

(a)  the identification and solicitation of prospective investors to purchase the Shares;
(b)  the introduction of such prospective investors to the Co-Manager;

7

(c)  the maintenance of regular contact with investors introduced to the Co-Manager to keep them informed of investment results and other information with regard to the Company;
(d)  the preparation of marketing and other material for use in the performance of its duties under the terms of this Agreement, subject to approval by the Co-Manager; and
(e)  the supervision of distribution used by the Co-Manager to keep prospective and existing investors informed of developments with regard to the Fund.

*Id.*  FIM also prepared performance summaries for the Funds which were distributed by KML to investors in the Funds.  █████████████████████████

████████████████████████████████████████████████

██████████

    As compensation, the FIM Entities collected annual fees equal to 0.5% of the NAV of subscriptions sold as a result of FIM's marketing efforts (calculated and paid on a monthly basis).  Barrett Decl., Exs. 9 & 10, Distribution Agreements, Schedule 1.  Since the FIM Entities were a principal entry point for new investors in the Funds, this 0.5% share siphoned off up to a third of the 1.5% management fee from KML to FIM.  Since Messrs. Ceretti and Grosso owned and controlled the FIM Entities these fees went into their pockets.  SAC ¶¶ 30-31.

    Ceretti and Grosso were personally involved in the sales efforts.  They "prepared and otherwise participated in the presentation of the Kingate Funds' public materials sent to shareholders to encourage investments in the Kingate Funds."  *In re Bernard L. Madoff Inv. Sec. LLC*, 2015 WL 4734749, at *3 (Bankr. S.D.N.Y. Aug. 11, 2015) (Bernstein, J.).  They were the point of contact at FIM for questions relating to the business of the Kingate Funds.  Barrett Decl., Ex. 1, Fourth Amended Complaint, *Picard v. Ceretti*, ¶ 131.  Grosso prepared answers for FIM employees to potential questions from shareholders about the "red flags" of fraud at BLMIS.  *Id.* ¶¶ 138-40.  Madoff even referred a potential investor to Grosso to learn more about an investment with BLMIS.  *Id.* ¶ 98.

### D. PwC Audited the Funds' Financial Statements and Prepared Audit Opinions For Plaintiffs

PwC – and its predecessor entity Coopers & Lybrand Bermuda – audited the Funds every year since inception. SAC ¶ 86. Each year, PwC issued an unqualified audit opinion – commonly referred to as a "clean" audit opinion – stating that the financial statements and audit conformed with the requisite accounting and auditing standards. *Id.* PwC addressed its unqualified audit opinions "To the Shareholders of [Kingate Global/Kingate Euro]" – that is, to Plaintiffs and the Class. *Id.* ¶ 87.

PwC was aware that its audits were relied upon by the Funds' investors in deciding whether to invest and maintain their investments in the Funds. *Id.* Not only did PwC know that Plaintiffs and the Class would rely on its audit work, PwC also knew and accepted that it had an obligation to provide audit opinions directly to the shareholders regarding the financial condition of the Funds. *Id.* ¶ 88. In defining the objectives for auditing similar Madoff feeder funds managed by Fairfield Greenwich, a related PwC entity acknowledged that one of the primary objectives of the audit was to provide the shareholders with independent reports that provide assurance on the financial information released by the funds. *Id.* PwC understood that there was no independent market mechanism to value shares of Funds, and PwC also understood that the primary purpose of its audits was to provide investors in the Funds with assurances that the Funds' assets existed and were accurately valued. *Id.* ¶ 93.

Though it was responsible for auditing the Funds for over a decade, PwC never performed a proper audit. For example, PwC never tested Madoff's internal controls and never once sought independent verification of Madoff's purported trading or holding of securities.

However, Generally Accepted Auditing Standards ("GAAS")[1] "required PwC to evaluate Madoff's internal controls, including the design of those controls, and determine whether they had been implemented and were operating effectively." *Id.* ¶ 107 (citing AU §§ 318.13, 318.23, 318.24, 318.45, 314.40); *see* ¶¶ 120-38. PwC also ignored GAAS's requirements to obtain evidence of the "existence" of the securities Madoff supposedly held and the "occurrence" of the trades he reported. SAC ¶¶ 112, 119.

PwC failed to perform adequate audit procedures "despite being aware of the significant risks of fraud presented by Madoff's operations, such as the lack of segregation of duties at BMIS, as well as the unrealistic results and volume of Madoff's purported trading." *Id.* ¶ 102. According to the Trustee's complaint, Defendant Grosso wrote an email in February 2008 stating that "the auditors [at PwC] have not looked at all into the matter of cash and cash movements [*sic*] controls. Several questions have not been addressed," and in another February 2008 email Grosso expressed his concern that PwC might actually "start to ask all sort [*sic*] of questions next time they visit Madoff." *Id.* ¶ 144.

### E.    Citi Hedge Served as the Funds' Administrator Responsible for Calculating the NAV

Citi Hedge and its predecessors served as the administrator of the Funds at all relevant times. SAC ¶ 178. From the inception of the Funds through 2002, the administrator was Bermuda-based Hemisphere. *Id.* In 2002, Hemisphere was acquired by BISYS Group, Inc. (BISYS's parent) and renamed BISYS Hedge Fund Services Ltd. (Bermuda). *Id.* In 2007, Citigroup acquired BISYS Group, Inc. and gave the administrator the name Citi Hedge. *Id.* In 2013, Citi Hedge changed its name to Citi Fund Services (Bermuda) Ltd. *Id.* ¶ 13.

---

[1] GAAS set the minimum level of performance and quality that auditors are required to meet. The AICPA has further codified a detailed interpretation of GAAS through the Statements of Accounting Standards ("SAS," commonly referred to as "AU"). SAC ¶ 94.

Citi Hedge calculated NAVs each month for each of the Funds and disseminated account statements that purported to represent the value of each Plaintiff's purchases, redemptions and month-end holdings. *Id.* ¶ 180, 182. Citi Hedge's NAV both informed investors how much their investments supposedly were worth and served as the transaction price at which shares in the Funds were purchased and redeemed. *Id.*

Citi Hedge was a central actor in the marketing of the Funds' shares. Its duties as Administrator included: (i) communicating with the Funds' shareholders, (ii) soliciting sales of the Funds' shares, (iii) accepting subscriptions of new shareholders, and (iv) calculating the Funds' NAVs, which were the sole basis upon which Fund shares were sold to and redeemed from investors. SAC ¶ 182. Citi Hedge provided monthly reports to investors on the performance of the Funds, Barrett Decl., Ex. 13, Kingate Euro IM, May 1, 2006, at vii, and responded to shareholder inquiries, SAC, Ex. 4, Kingate Global IM, May 1, 2006. Investors sent their subscription documents directly to Citi Hedge. SAC ¶ 188. The Information Memoranda invited investors to direct inquiries to the Administrator. *See, e.g.,* SAC, Ex. 4, Kingate Global IM, May 1, 2006, at cover page; SAC, Ex. 2, Kingate Euro IM, October 6, 2008, at cover page. Investors necessarily reposed trust in Citi Hedge's work when they subscribed for or redeemed shares at the NAV price set by Citi Hedge.

Citi Hedge held out its Funds Services division as "among the world's largest providers of Hedge Fund Administration Services," *id.* ¶ 184, and touted its world-wide top rankings and "unique competitive advantage" based on its size and sophistication. *Id.* ¶¶ 185-86. When it came to the Funds, however, Citi Hedge ignored industry norms and (mis)calculated the NAV used by investors solely in reliance on data from Madoff. *Id.* ¶¶ 181, 192-93. If Citi Hedge had

taken steps required by industry practice to independently verify the information being provided

by Madoff, it would have discovered numerous errors. *Id.* ¶ 181.

F.     **Defendants Failed to Perform Standard Procedures Notwithstanding that They Knew of Significant Fraud Risks Involving Madoff**

Defendants had access to substantial information indicating that Madoff's operation was

a fraud. *See, e.g.,* SAC ¶¶ 64-65, 207, 210, 211-14. For instance, the monthly statements

reflecting BMIS's purported trading on behalf of the Funds, which were provided or available to

the Kingate Defendants, PwC and Citi Hedge, revealed:

- From 1998 to 2008, BMIS reported 281 trades for the Funds that fell outside the daily price range for their respective securities. *Id.* ¶ 65.

- BMIS reported hundreds of Treasury Bill trades that fell outside the daily price range by at least one basis point (and by at least ten basis points on 144 occasions). *Id.*

- Madoff reported trades in option contracts that were obviously highly suspect and unrealistic. *Id.* ¶ 66.

In addition, the FIM Entities' investment committee considered a fund manager's

persistent refusal to meet with investors to be a sign of a high probability of fraud. *Id.* ¶ 67. At

least once, in August 2007, FIM recommended liquidating another investment that its analysts

described as "too good to be true" with a "limited downside" that made them feel "uneasy." *Id.*

BMIS had all of the foregoing suspicious characteristics, yet the Kingate Defendants were

willfully blind to them. *Id.* In March 2008, in another example of facts supporting an inference

of knowledge about Madoff's conduct, the FIM Entities' investment committee reported on 31

funds' holdings; the report contained detailed information on 30, while Kingate Global's page

was blank. *Id.* ¶ 68. In a November 2008 email to the FIM Entities' Head of Operational Due

Diligence, Eric Lazear, Defendant Grosso acknowledged, "We have never done much [due

diligence on Kingate], as it will be impossible to go inside Madoff to do a proper D[ue]

D[iligence]." *Id.* ¶ 69. After news of the Madoff scandal broke, Lazear wrote to Grosso,

"[Kingate] is not a fund that went through our normal diligence process and I think it should not

be depicted as if it had." *Id.* One day after Madoff's arrest, Lazear stated in an email that *prior*

to disclosure of Madoff's fraud, he believed BMIS was a "scam," and had informed Defendant

Grosso of "all the details" supporting his belief." *Id.*

Defendants' awareness of significant risks of fraud and material misstatements further

included the following:

- Madoff's operation lacked segregation because he did not trade through an independent broker and instead self-cleared all purported trading through his wholly-owned company BMIS. SAC ¶ 198.

- Madoff refused to identify the counterparties with whom he purportedly traded options in over-the-counter, off-exchange transactions. *Id.* ¶ 199.

- Madoff always held government securities at the end of every quarter regardless of market conditions. *Id.* ¶ 200.

- Defendants knew that Madoff used a tiny unknown accounting firm, Friehling & Horowitz, that was plainly unequipped to audit BMIS's purported size and trading volume. *Id.* ¶ 201.

- Madoff continued to use paper trading records long after most of the industry had moved to electronic trading data. The delayed paper confirmations were clearly susceptible to manipulation. *Id.* ¶ 202.

- Madoff's fee structure was unusual if not unique. *Id.* ¶ 203.

- The Funds' statements, which Defendants supposedly reviewed and verified, contained impossible trading volume. For example, at least 237 times from 1998 through 2008, BMIS's trades for the Funds exceeded 10% of a stock's trading on the entire composite tape, which includes all listed and unlisted market volumes. That meant for all his managed funds, Madoff was trading about half of all the stock's daily volume, a highly improbable, if not impossible circumstance. *Id.* ¶ 207.

- The Funds' account statements also revealed that from 1998 to 2008, approximately 81% of equity buys occurred in the lower half of the daily price range and approximately 74% of equity sales occurred in the upper half of the daily price range. This consistent execution was statistically impossible, because if Madoff were purchasing or selling a

stock several times throughout the trading day, the reported prices would have gravitated toward the daily midpoint, as Defendants knew or should have known. *Id.* ¶ 210.

- The Funds' account statements also indicated impossible dividend activity. *Id.* ¶¶ 211-14.

Despite knowledge of these significant risks and access to Madoff's impossible trading data, Defendants continued to rely solely on information provided by Madoff without ever once seeking to verify that data with an independent party. For example, if any defendant had made a single inquiry to the Depository Trust & Clearing Corporation ("DTC"), the clearing house for such transactions, they would have discovered that there was no record of BMIS or Madoff having cleared a single purchase or sale of securities through the DTC. *Id.* ¶ 64. Madoff also claimed he was holding U.S. Treasury Bills on behalf of the Funds at the Bank of New York, and if Defendants had made an inquiry with the Bank of New York, they would have learned that Madoff did not hold a sufficient amount of Treasury Bills to support his claimed trading. *Id.*

### G. Plaintiffs Cannot Share Directly in Recoveries Made by the BMIS Trustee

In denying the Plaintiffs and other feeder fund investors the right to participate as "customers" directly in the Liquidation of the BMIS estate, Irving Picard, the BMIS Trustee, successfully argued that, "due to their complete anonymity and total incapacity to have dealings with the broker-debtor, the [feeder fund investors] cannot be 'customers' of BLMIS under SIPA." *See Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 454 B.R. 285, 290 (Bankr. S.D.N.Y. 2011), *aff'd sub nom*, *Aozora Bank Ltd. v. Sec. Investor Prot. Corp.*, 480 B.R. 117 (S.D.N.Y. 2012). The Second Circuit affirmed the decision over the objections of feeder fund investors. *See In re Bernard L. Madoff Inv. Sec. LLC*, 708 F.3d 422, 426-27 (2d Cir. 2013). Consequently, Plaintiffs will not be paid distributions by the Trustee directly and any distributions to Plaintiffs will first flow through the Funds, which vastly dilutes any recovery by Plaintiffs.

14

## H.    The Funds Are in Liquidation

In 2009, the Funds were placed into liquidation in the BVI and Joint Liquidators were appointed to handle the Funds' affairs.  *See* Tracey Decl. ¶ 5.  On December 22, 2010, the Joint Liquidators initiated proceedings in Bermuda against some of the defendants, including KML, FIM Limited, FIM Advisers, Grosso and Ceretti, asserting claims of unjust enrichment, negligent misstatement and breach of duties of care and contract.  *Id.* ¶ 7.  The Joint Liquidators' Bermuda litigation seeks damages for the investment losses suffered by the Funds – not the shareholders.  On January 29, 2010, the Joint Liquidators commenced proceedings against PwC in Bermuda; a Statement of Claims against PwC, however, was not filed until February 21, 2014.  *Id.* ¶ 11.

Although Defendants claim that the Bermuda actions are being "actively litigated," *id.* ¶¶ 10, 13, it is entirely speculative what, if anything, will be recovered by the Joint Liquidators and how much of that recovery might ultimately reach Plaintiffs here.  Indeed, Defendants here are opposing the Joint Liquidators' claims by raising defenses that could limit or defeat recovery altogether. ████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████.  *See* Barrett Decl., Ex.7 ¶¶ 43-
46. ████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████  *See*
Barrett Decl., Ex. 5 ¶¶ 208. ████████████████████████████████
██████████████████████

**LEGAL STANDARD**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "In considering a motion under Rule 12(b)(6), a court must accept as true all factual allegations set forth in a complaint and draw all reasonable inferences in favor of the plaintiff." *Eng v. City of New York*, 2016 WL 750251, at *2 (S.D.N.Y. Feb. 19, 2016) (Batts, J.) In deciding the motion, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

**ARGUMENT**

**I.    SLUSA DOES NOT PRECLUDE PLAINTIFFS' CLAIMS**

SLUSA precludes claims only when "deceptive conduct" by the defendant forms an essential element of the particular claim. *See In re Kingate Mgmt. Ltd. Litig.*, 784 F.3d 128, 132 (2d Cir. 2015). The Second Circuit's opinion in this case directs that application of SLUSA must be analyzed on a claim-by-claim basis and that, even within a particular claim, the court must identify which allegations are "necessary" to the claim, and those that are "inessential" or "extraneous." *Id.* at 132, 142. "[S]tate law claims that do not *depend* on false conduct are not within the scope of SLUSA." *Id.* at 132 (emphasis in original).

Plaintiffs' claims are against Defendants for allowing Madoff's scam to persist by abdicating their duties and obligations to Plaintiffs, and thereby causing the Funds' investors,

16

who never had any contact with Madoff and therefore cannot recover from the BMIS estate as "customers," to lose billions of dollars. Accordingly, Plaintiffs' duty and contract based claims (negligence, gross negligence, third-party breach of contract, breach of fiduciary duty, aiding and abetting breach of fiduciary, unjust enrichment and mutual mistake) can be established without any showing that Defendants engaged in deceptive conduct or were complicit in Madoff's deception. Rather, Plaintiffs will prove these claims by showing Defendants were negligent or reckless in not engaging in basic due diligence procedures that were required under the circumstances. These breaches of duty and contract can be shown without any "essential" misrepresentations by Defendants. As such, under the framework announced in *Kingate*, these claims fall into "Group 4." *See* Section I.B.

For instance, PwC was not required to have conducted a proper audit of the Funds' financial statements because it "represented" it did. Rather, the duty to conduct a proper audit arises from professional standards and the circumstances of the audit separate and apart from anything PwC said. Indeed, the claim raised here against PwC practically mirrors the first example in the *Kingate* opinion of a claim that is *not precluded*.

Defendants argue that *Kingate* requires dismissal of virtually this entire action, except for the claim of mutual mistake against the Kingate Defendants (Count 12). *See* Br. at 2. Thus, Defendants now seek to bar even the gross negligence and negligence claims (Counts 5 and 6) against the Kingate Defendants – claims that *all Defendants* previously agreed were not precluded.[2] But Defendants' arguments would read out of the *Kingate* decision the five

---

[2] Shortly after the *Kingate* decision was issued, this Court directed the parties to meet and confer regarding the application of SLUSA to Plaintiffs' claims. At that time, "Defendants . . . acknowledged that three [claims] are not precluded by SLUSA." Letter from Barry Sher, filed on June 18, 2015, Dkt. No. 180 ("on behalf of the 18 defendants who have appeared in" this action). Defendants agreed that the "gross negligence (Count 5), negligence (Count 6) and

carefully-drawn categories, and instead preclude an entire "action" if a claim alleging "deceptive conduct" by a defendant *could* be made based on the underlying facts. But the *Kingate* decision repeatedly uses the word "essential." *See, e.g.,* 784 3d at 135, 140, 144-45, 147-49. And of course if Defendants' reading of *Kingate* were correct, it begs the question why this Court's decision was reversed and remanded for further review rather than affirmed.

Moreover, Defendants incorrectly argue that the "gravamen" of Plaintiffs' claims is that "Defendants were complicit in Madoff's Ponzi scheme because they turned a blind eye to 'overwhelming information indicating that Madoff's operation was a fraud.'" Br. at 2 (quoting SAC ¶ 64). But the SAC alleges that Defendants breached duties predicated on their relationship with the Funds' investors by failing to perform industry standard due diligence on Madoff's purported trading – not that Defendants were complicit in Madoff's scheme. Indeed, unlike the claims against the banks in *In re Herald*, 730 F.3d 112 (2d Cir. 2013) ("*Herald I*"), the SAC does not allege that Defendants aided and abetted Madoff's fraud. Nor is it "essential" for Plaintiffs to do so here because the SAC alleges, *see, e.g.,* SAC ¶¶ 220, 231, 256, 294, and Plaintiffs will prove, that Defendants owed direct duties to Plaintiffs.

In addition, SLUSA does not bar Plaintiffs' claims against PwC and Citi Hedge for negligent misrepresentation based on their own conduct and their false statements about securities that are not "covered securities." These statements do not even mention Madoff or covered securities and, accordingly, do not fall within SLUSA's scope. *See* Section I.C.

---

mutual mistake (Count 12)" claims against the Kingate Defendants were not barred. Like many other of Plaintiffs' claims, these contract- and duty-based claims do not require any showing of "deceptive conduct" by Defendants.

Finally, if BVI law applies to Plaintiffs' claims as Defendants contend, then SLUSA has no application at all to any of Plaintiffs' claims in the SAC, including fraud and misrepresentation claims. *See* Section I.D.

**A.      Most Traditional State Law Causes of Action Are Not Precluded by SLUSA**

The Supreme Court ruled upon the proper application of SLUSA in *Chadbourne & Parke LLP v. Troice*, 134 S. Ct. 1058 (2014). *Troice* involved a Ponzi scheme in which Allen Stanford and his companies falsely represented that securities that were not "covered securities" for SLUSA purposes (*i.e.*, "uncovered" securities, certificates of deposit in Stanford International Bank) that the plaintiffs purchased were backed by covered securities that the bank supposedly held. The Supreme Court found that SLUSA did not bar the investors' claims, holding that SLUSA does not apply to class actions in which "the plaintiffs allege (1) that they 'purchase[d]' uncovered securities (certificates of deposit that are not traded on any national exchange), but (2) that the defendants falsely told the victims that the uncovered securities were backed by covered securities." *Troice*, 134 S. Ct. at 1062.

The Supreme Court held that SLUSA "defines 'covered security' narrowly." *Id.* at 1062. "[T]o interpret the necessary statutory 'connection' more broadly than we do here would interfere with state efforts to provide remedies for victims of *ordinary state-law frauds*." *Id.* at 1068 (emphasis added). For instance, the Court found that such a broad interpretation of SLUSA could, incorrectly, "prohibit a lawsuit brought by homeowners against a mortgage broker for lying about the interest rates on their mortgages—if, say, the broker (not the homeowners) later sold the mortgages to a bank which then securitized them in a pool and sold off pieces as 'covered securities.'" *Id.* (citation omitted). In the Supreme Court's example, although third parties who bought covered securities (*i.e.*, the securitized mortgages) would be involved in the

chain of events that injured plaintiffs, the Court recognized that interpreting SLUSA broadly to preclude the homeowners' claims would improperly interfere with state law remedies. *Id.*

Accordingly, the Supreme Court rejected "a broad interpretation" of SLUSA that would "work[ ] at cross-purposes" with Congressional intent to preserve appropriate state law claims. *Troice*, 134 S. Ct. at 1069. Under *Troice*, "the *only* issuers, investment advisers, or accountants that today's decision will continue to subject to state-law liability are those who don't sell or participate in selling securities traded on U.S. national exchanges," *id.* (emphasis in original) – which is precisely the situation of Defendants here.

Several months before the Supreme Court announced *Troice*, the Second Circuit had decided *Herald I*. In *Herald I*, the Court of Appeals applied SLUSA to affirm dismissal of state law claims for aiding and abetting and conspiracy brought by investors in a Madoff feeder fund against JPMorgan and Bank of New York (the "Banks"). These Banks were *service providers solely to Madoff, not to the separate feeder funds.* As such, "the liability of JPMorgan and BNY is *predicated not on these banks' relationship with plaintiffs or their investments in the feeder funds* . . . but on the banks' relationship with, and alleged assistance to, Madoff Securities' Ponzi scheme, which indisputably engaged in purported investments in covered securities on U.S. exchanges." 730 F.3d at 118-19 (emphasis added). Unlike *Herald I*, the claims in this case are based on Defendants' "relationship with plaintiffs" and breach of direct duties – not aiding and abetting Madoff's scheme.

### 1.   The Framework Established by the Court of Appeals in this Case

In the *Kingate* decision, the Second Circuit vacated this Court's decision to dismiss all of Plaintiffs' claims under SLUSA. *See Kingate*, 784 F.3d 128. The Court of Appeals first "conclude[d] that the alleged fraud . . . is 'in connection with the purchase or sale of a covered security' and thus qualifies to bring the case within SLUSA's prohibition (assuming SLUSA's

other necessary elements are met)." *Id.* at 132 (citing 15 U.S.C. § 78bb(f)(1)). The Court then considered SLUSA's application to "the numerous distinct state law theories of liability asserted" in this action and held that "(i) state law claims that do not depend on false conduct are not within the scope of SLUSA, even if the complaint includes peripheral, inessential mentions of false conduct; and (ii) claims accusing the defendant of complicity in the false conduct that gives rise to liability are subject to SLUSA's prohibition, while claims of false conduct in which the defendant is not alleged to have had any complicity are not." *Kingate*, 784 F.3d at 132.

To address the various causes of actions and distinct theories of liability against several different groups of defendants in this action, the Court of Appeals divided the allegations "into five groups for purposes of analyzing SLUSA's application, with the understanding that certain counts of the Complaint may include allegations from more than one of these groups." *Id.* at 134. The five groups articulated by the Second Circuit were:

1.    Group 1 consists of those allegations that predicate the named Defendants' liability on their own fraudulent misrepresentations and misleading omissions (*i.e.*, those made with scienter), made in connection with the Funds' investments with Madoff in covered securities and with their oversight of these investments.

2.    The allegations of Group 2 are similar to Group 1, with the exception that liability is premised on the named Defendants' *negligent* misrepresentations and omissions, rather than intentional misrepresentations and omissions.

3.    The Group 3 allegations predicate liability on Defendants' aiding and abetting (rather than directly engaging in) the frauds underlying the Group 1 claims.

4.    The allegations of Group 4 predicate liability on Defendants' breach of contractual, fiduciary, or tort-based duties owed to Plaintiffs, resulting in failure to detect the frauds of Madoff and BMIS.

5.    The allegations of Group 5 seek compensation for fees paid to the named Defendants by the Funds on the grounds that those Defendants failed to perform the duties for which the fees were paid, or that the fees based on

purported profits and values of the Funds were computed on the basis of inaccurate values.[3]

*Id.* at 134-35.  As the Court explained, claims in Groups 1, 2 and 3 are precluded by SLUSA, whereas claims in Groups 4 and 5 are not.  For this case, all of Plaintiffs' remaining claims fall into Groups 4 and 5 and are not precluded.[4]

## 2. SLUSA Applies Only when False Conduct by the Defendant Is Essential to the Claim

Application of SLUSA must be analyzed on a claim-by-claim basis and, even within a particular claim, the court must identify which allegations are "necessary" to the claim, and those that are "inessential."  *Id.* at 132.  "[S]tate law claims that do not *depend* on false conduct are not within the scope of SLUSA."  *Id.* at 132 (emphasis in original).  A cause of action may be covered by SLUSA only if it alleges conduct on the part of the defendant that amounts to a fraud involving covered securities.  "Only conduct by the defendant is sufficient to preclude an otherwise covered class action."  *Id.* at 142.  "[C]onstruing 'alleging' as applying where the false conduct alleged (in connection with a transaction in a covered security) is essential to the success of the state law claim, but is not conduct of the defendant, would result in barring numerous suits that were altogether outside of Congress's purposes in passing SLUSA . . . ."  *Id.* at 147-48.  A

---

[3] The Second Circuit further stated:  "The allegations falling in Groups 3, 4, and 5 do not include allegations proof of which depends on a showing that the named Defendants committed knowing, intentional, or negligent misrepresentations or misleading omissions in connection with transactions in covered securities.  If allegations that otherwise fit within the description of Group 3, 4, or 5, require proof that Defendants committed such misrepresentations, then those allegations belong in Group 1 or 2 rather than in Group 3, 4, or 5."  *Id.* at 135 n.6.  The court also stated "that plaintiffs should not be permitted to escape SLUSA by artfully characterizing a claim as dependent on a theory other than falsity when falsity nonetheless is essential to the claim, such as by characterizing a claim of falsity as a breach of the contractual duty of fair dealing."  *Id.* at 140.

[4] As discussed below, however, Plaintiffs' claims that concededly fall into Groups 1-3 are not precluded by SLUSA if Defendants are correct that foreign law applies.

claim is precluded only if the success of that claim "depends on a showing that the *defendant committed false conduct conforming to SLUSA's specifications*." *Id.* at 149 (emphasis added).

The Second Circuit went on to emphasize that "[i]f, for example, we are told that X has been charged with 'allegations of fraud,' or that X is named as a defendant in a suit 'alleging fraud,' we understand this to mean that X is accused of having committed fraud, and not that he is charged with negligence or breach of contract in failing to detect someone else's fraud . . . ." *Id.* at 147. To illustrate the distinction, the Court gave examples of conduct that would not be barred by SLUSA. *Id.* at 147-48. The first illustrative example involved claims by the clients of a dishonest stockbroker who bring a negligence action against an accounting firm which they hired to audit their brokerage accounts. Because the auditor's examination of the accounts was negligent, it failed to detect the fraud. "It is true that the negligence claim includes an allegation of fraud in connection with transactions in covered securities and that the alleged fraud by the broker is an essential predicate of the plaintiffs' claims against the defendant auditor. However, the auditor is not alleged to have committed any of the conduct specified in SLUSA." *Id.* at 148. Accordingly, a suit against the auditor based on the negligent audit falls outside the scope of SLUSA. *Id.* Other than the fact that the brokerage clients in the Second Circuit's example hired the auditor (a fact which has nothing to do with application of SLUSA), this example is on all fours with the gross negligence and negligence claims here against PwC and the Funds' managers and other service providers.

In applying this framework, the Second Circuit found that "the allegations described in Group 1. . . predicate liability on charges that Defendants fraudulently made misrepresentations and misleading omissions regarding the Funds' investments with Madoff and their oversight of the Funds' investments. Under *Herald I*, these claims allege falsity 'in connection with' covered

securities." *Id.* at 151. Additionally, the claims "allege conduct by Defendants falling within SLUSA's specifications of conduct prohibited by the anti-falsity provisions of the 1933 and 1934 Acts. Accordingly, SLUSA precludes Plaintiffs' Group 1 allegations." *Id.* The Court of Appeals found that the allegations in Group 2 also were precluded because they alleged similar misstatements and omissions involving covered securities and only "differ from those in Group 1 in that they charge Defendants with negligent misrepresentations (i.e., without scienter) rather than fraudulent misrepresentations." *Id.* "The allegations described in Group 3 charge that Defendants aided and abetted (rather than directly committed) the frauds described in Group 1. *Herald* ruled that such allegations are precluded by SLUSA." *Id.*

The Second Circuit then considered the allegations described in Group 4. It found that "[t]hese predicate liability on Defendants' breach of contractual, fiduciary, and/or tort-based duties to Plaintiffs to provide competent management, consulting, auditing, or administrative services to the Funds, thus allowing Madoff's frauds to go undetected, causing Plaintiffs' losses." *Id.* The Court of Appeals concluded "that such allegations are not precluded by SLUSA" based on the following reasoning:

> [A]s defined above, allegations within Group 4 do not include those requiring a showing of false conduct *by the named Defendants* of the sort specified in SLUSA. The only false conduct involved in the Group 4 allegations is that of Madoff and BMIS. Under the Group 4 theories of liability, Defendants, like Plaintiffs, were victims of Madoff's frauds. The asserted liability of Defendants under these claims arises from the fact that Defendants breached their contractual and duty-based obligations to Plaintiffs. Proof of these claims would not require any showing of false conduct on the part of Defendants.

*Id.* at 151-52 (emphasis in original).

**B.    Duty- and Contract-Based Claims against Defendants Are Not Precluded**

**1.    Counts 5, 6, 7, 9, 10, 11, 13 and 28 Do Not Allege Any Complicity in Madoff's Fraud – Nor Are Such Allegations "Essential"**

Defendants argue that most of Plaintiffs' claims are "Group 3 claims that should be dismissed as precluded by SLUSA."  Br. at 40.  But Group 3 claims are defined by the Second Circuit as "aiding and abetting…the "the frauds underlying the Group 1 claims."  784 F.3d at 135.  Counts 5, 6, 7, 9, 10, 11, 13 and 28 allege claims for gross negligence, negligence, breach of fiduciary duty, breach of contract, constructive trust, aiding and abetting breach of fiduciary duty and unjust enrichment against the Kingate Defendants, KML, Tremont, and the FIM Entities.  These are not aiding and abetting fraud claims by label or substance.

Defendants contend that these claims are Group 3 claims that allege complicity in Madoff's scheme.  Br. at 40-41.  Defendants are wrong because all of these claims can be established without alleging any false conduct or complicity in Madoff's fraud.  Accordingly, Plaintiffs' common law claims against Defendants based on Plaintiffs' investment losses fall squarely into Group 4.  Plaintiffs' equitable claims seeking return of unearned professional fees are Group 5 claims.  Therefore, these claims are not barred by SLUSA.[5]

The Second Circuit held that "[t]he Group 4 allegations differ crucially from those found in *Herald* to be precluded by SLUSA."  *Id.* at 152 n.23 (citing *Herald I*, 730 F.3d at 119 n. 7).  "The *Herald* claims asserted liability based on defendants' alleged *complicity in Madoff's fraudulent scheme.  See id.*  Only Groups 1, 2, and 3 allege Defendants to have been, in varying

---

[5] Plaintiffs acknowledge that several claims are precluded.  Counts 1-4 and 8, which allege fraud by the Kingate Defendants based on false statements concerning Madoff's purported trading of "covered securities," are precluded as Group 1 claims.  Counts 14, 20 and 27, which allege that the Tremont Group, PwC and Citi Hedge aided and abetted the Kingate Defendants' fraud, are precluded as Group 3 claims.  As noted below, all of these claims would be permissible if the Court were to find that BVI or Bermuda law applies here, because SLUSA does not cover claims arising under foreign law.  *See* Section I.D.

degrees, *complicit in the falsity*." *Id.* (emphasis added). But Defendants here are not alleged to have been complicit in aiding and abetting Madoff's fraud. Instead, liability arises from the fact that Defendants breached duties owed directly to Plaintiffs as investors in the Kingate Funds. The claims here allege that Defendants negligently and recklessly failed to "provide competent management, consulting, auditing, or administrative services to the Funds, thus allowing Madoff's frauds to go undetected, causing Plaintiffs' losses." *Id.* at 151. Accordingly, these are Group 4 claims which are not precluded.

Defendants wrongly argue that Counts 5, 6, 7, 9, 10, 11, 13 and 28 are "similar to the claims at issue in *Herald I*." Br. at 40. The claims at issue in *Herald I*, however, were claims for aiding and abetting and conspiracy against JPMorgan and Bank of New York, service providers to Madoff and not the Herald funds themselves. Critically, there "the liability of JPMorgan and BNY is predicated not on these banks' relationship with plaintiffs or their investments in the feeder funds . . . but on the banks' relationship with, and alleged assistance to, Madoff Securities' Ponzi scheme." *Herald I*, 730 F.3d at 118-19. Indeed, it was essential for the *Herald* plaintiffs to allege that JPMorgan and Bank of New York were complicit in Madoff's fraud because – unlike here – the plaintiffs could not allege that these banks breached any direct duties that they owed to the plaintiffs.[6] Similarly, Defendants cite the inapposite case of *Marchak v. JPMorgan Chase & Co.*, 84 F. Supp. 3d 197 (E.D.N.Y. 2015). That case, like *Herald I*, involved banks that had no relationship to the plaintiff investors. Rather, the plaintiffs were defrauded by Ponzi scheme mastermind Philip Barry who "placed Plaintiffs' funds in accounts opened with

---

[6] Indeed, the *Herald* plaintiffs also brought claims against the managers, auditors, administrators and custodians of multiple feeder funds based on these defendants' own misstatements and breaches of duty – similar to the claims in the SAC. The *Herald* panel did not dismiss these claims on SLUSA grounds under the reasoning of *Herald I*, but instead wrote a separate, unpublished decision dismissing these claims on different grounds. *In re Herald*, 540 Fed. App'x 19 (2d Cir. 2013) (summary order).

JPMorgan Chase Bank, N.A., M & T Bank Corporation, HSBC North America, N.A., and Commerce Bank, which was later acquired by TD Bank, N.A." – the banks that were named as defendants. *Id.* at 202.

The case that actually dealt with analogous circumstances is *Anwar v. Fairfield Greenwich Ltd.*, 118 F. Supp. 3d 591, 614 (S.D.N.Y. 2015) ("*Anwar VI*"). There, Judge Marrero analyzed the application of SLUSA to claims against auditors of Madoff feeder funds and investment advisors, all of whom are alleged to have owed direct duties of care or contractual duties to the investor plaintiffs. For instance, Judge Marrero found that the duty-based claims alleged against the Standard Chartered defendants, who served as investment advisors, were not barred by SLUSA:

> The Court concludes that these three types of breach of fiduciary duty claims are not precluded by SLUSA. All of the Standard Chartered Plaintiffs allege some form of breach of fiduciary duty claim that is not predicated on false conduct by the Standard Chartered Defendants. In numerous rulings in this litigation, the Court has repeatedly held that allegations that the Standard Chartered Defendants conducted no due diligence (or that Standard Chartered executives have stated as such), or that the Defendants failed to monitor investments after aggressively recommending continued investment in the Funds, satisfactorily plead breach of fiduciary duty. The type of conduct at issue here—whether, for example, the Standard Chartered Defendants did not perform analytical tests as demanded of a fiduciary—entails an inquiry that is wholly distinct from the falsity wrongdoing underlying Madoff's fraud. Those duties exist and are breached *regardless* of whether the Funds were merely a funnel to Madoff.

*Anwar VI*, 118 F. Supp. 3d at 614 (emphasis in original). Judge Marrero also held that "[a]llegations of the underlying fraud are not essential for plaintiffs to plead a sufficient negligence or gross negligence claim; allegations that the Standard Chartered Defendants failed to conduct due diligence and thus breached their duty of care to the Standard Chartered Plaintiffs

are sufficient." *Id.* at 616-17.  The same is true with respect to Counts 5, 6, 7, 9, 10, 11, 13 and 28 asserted here, as discussed in the claim-by-claim analysis that follows.[7]

### 2.    Negligence and Gross Negligence

Defendants similarly argue that the negligence and gross negligence claims against PwC are barred by SLUSA because they "predicate liability on PwC Bermuda's alleged participation in, knowledge of, or, *at a minimum, cognizable disregard of* Madoff's and BLMIS' securities fraud."  Br. at 49 (emphasis in original).  The *Kingate* decision makes clear, however, that negligence by auditors in failing to detect a fraud involving covered securities is a textbook Group 4 claim which is not barred by SLUSA.  *See Kingate*, 784 F.3d at 147-52.  The negligence and gross negligence claims against all Defendants here are similar to the first illustrative example provided in the *Kingate* opinion and, therefore, fall into the Second Circuit's description of Group 4 claims.  *Id.*  A negligence claim must allege "(1) that the defendant owed him or her a cognizable duty of care; (2) that the defendant breached that duty; and (3) that the plaintiff suffered damage as a proximate result of that breach."  *Di Benedetto v. Pan Am World Serv., Inc.*, 359 F.3d 627, 630 (2d Cir. 2004); *see Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 432 (S.D.N.Y. 2010 ("*Anwar I*").  False conduct by the defendant is not "essential" to a negligence or gross negligence claim.

**Kingate Defendants**:  Counts 5 and 6 allege gross negligence and negligence against the Kingate Defendants.  These claims do not require any false conduct on the part of the Kingate

---

[7] Defendants argue that because of the existence of certain exculpatory provisions, Plaintiffs will be required to show that Defendants were complicit with Madoff to succeed in their claims.  Br. at 42-43.  However, even if these provisions apply to Plaintiffs' claims (which they do not, *see* Section VI *infra*), they do not exculpate Defendants from "gross negligence."  And gross negligence can be shown by Defendants' recklessness in failing to perform duties owed directly to Plaintiffs without the need to show complicity in Madoff's scheme.  This same wrongful conduct on the part of Defendants would also support claims such as breach of fiduciary duty and breach of contract.

Defendants – but instead are premised on the following allegations:  The Kingate Defendants owed Plaintiffs a duty of care "as investment advisors, managers and placement agents with discretionary control over the assets entrusted to them by Plaintiffs and the Class."  SAC ¶ 225. The Kingate Defendants breached that duty because they "failed to exercise the degree of prudence, caution, and good business practice that would be expected of any reasonable investment professional."  *Id.* ¶ 226.  For instance, the Kingate Defendants "failed to perform adequate due diligence before selecting Madoff as the Funds' investment advisor, and before allowing Madoff custody of the assets of the Funds; failed to monitor Madoff on an ongoing basis to any reasonable degree; and failed to take adequate steps to confirm Madoff's purported account statements, transactions, and holdings of the Funds' assets."  *Id.*

As such, "[t]he asserted liability of [the Kingate Defendants] under these claims arises from the fact that [the Kingate Defendants] breached their . . . duty-based obligations to Plaintiffs.  Proof of these claims would not require any showing of false conduct on the part of Defendants."  *Kingate*, 784 F.3d at 152.  Therefore, "such allegations are not precluded by SLUSA."  *Id.*  In describing Group 4 claims, the Second Circuit in *Kingate* expressly referred to the failure to provide "competent management . . . services to the Funds" as a claim that is not precluded.  *Id.* at 151.

**PwC**:  Counts 15 and 16 allege gross negligence and negligence claims against PwC. The SAC alleges "PwC, as the Funds' auditor, had a special relationship with Plaintiffs and the Class that gave rise to a duty to exercise due care."  SAC ¶ 262.  It further alleges that "PwC negligently failed to exercise due care by failing to properly audit the Funds in accordance with GAAS and GAAP."  *Id.* ¶ 264.  "Had PwC not acted negligently, Plaintiffs and the Class would not have invested, reinvested and held investments in the Funds."  *Id.* ¶ 265.  The *Kingate*

decision expressly recognizes this situation, where Madoff's role in the causative chain does not bring the claim within SLUSA's ambit. *Kingate*, 784 F.3d at 147 ("we understand this to mean that X is accused of having committed fraud, and not that he is charged with negligence or breach of contract in failing to detect someone else's fraud"). There is no need to plead or prove any misstatement at all, let alone a misstatement about a SLUSA-covered security.

As mentioned, the negligence claim against PwC fits squarely into one of the examples set forth in the *Kingate* opinion as a claim not barred by SLUSA:

> The plaintiffs sue the auditor in a state-law class action, alleging negligence in failing to detect the stockbroker's frauds. It is true that the negligence claim includes an allegation of fraud in connection with transactions in covered securities and that the alleged fraud by the broker is an essential predicate of the plaintiffs' claims against the defendant auditor. However, the auditor is not alleged to have committed any of the conduct specified in SLUSA.

*Kingate*, 784 F.3d at 148. In a similar case in this District involving different Madoff feeder funds, Judge Marrero held that SLUSA did not preclude a negligence claim asserted against the auditors of the feeder funds, which happened to be other PricewaterhouseCoopers member firms. Judge Marrero reasoned:

> Here, the Anwar Plaintiffs allege that the PwC Defendants breached their duties to audit the Funds in accordance with generally accepted domestic and international auditing standards. Failure to abide by such standards could constitute a breach of duty, regardless of whether representations implicating auditing standards were made in financial documents. The Anwar Plaintiffs do not allege that PwC was somehow complicit in Madoff's fraud; instead, here, "[the PwC] Defendants, like Plaintiffs, were victims of Madoff's frauds."

*Anwar VI*, 118 F. Supp. 3d at 605 (quoting *Kingate*, 784 F.3d at 152). Judge Marrero noted the auditor example in the *Kingate* decision and concluded: "Similarly here, the PwC Defendants owed duties of care to the Anwar Plaintiffs, and their alleged failure to follow industry-standard auditing procedures constituted a breach of that duty. Therefore, the Court finds that the negligence claims against the PwC Defendants are not precluded by SLUSA." *Id.*

Defendants try to distinguish the *Kingate* opinion because, in the example, the claim was brought by "*by the accountant's client.*" Br. at 51 (emphasis in original). Judge Marrero rejected the same argument in *Anwar.* "In applying the *Credit Alliance test*, the Court has looked to whether investors relied on the relevant financial materials issued by the PwC Defendants, but not whether investors relied on misrepresentations contained therein. The *Credit Alliance* test determines whether an auditor owes a noncontractual party a duty of care; to establish the existence of such a duty does not require that the auditor engage in false conduct." *Id.* at 604-05 (citation omitted). Likewise, the gross negligence and negligence claims against PwC "would not require any showing of false conduct on the part of [PwC]." *Kingate*, 784 F.3d at 152. In short, these are textbook Group 4 claims that are not precluded.

**Citi Hedge**: Counts 22 and 23 allege gross negligence and negligence against Citi Hedge and are Group 4 claims not barred by SLUSA. "These [claims] predicate liability on [Citi Hedge's] breach of . . . tort-based duties to Plaintiffs to provide competent . . . administrative services," which *Kingate* characterized as Group 4 claims. *Kingate*, 784 F.3d at 151. As discussed above, a negligence (or a gross negligence) claim does not require any false representation. The crux of these claims are that Citi Hedge served as "the Funds' administrator and financial services provider" and "had a special relationship with Plaintiffs and the Class that gave rise to a duty to exercise due care." SAC ¶ 299. The SAC further alleges that Citi Hedge "failed to exercise due care" and "failed to exercise the degree of prudence, caution, and good business practice that would be expected of a reasonable investment professional under the circumstances known to and in which Citi Hedge operated." *Id.* ¶ 300. "If Citi Hedge had not been negligent, Plaintiffs and the Class would not have invested, reinvested and held investments

in the Funds." *Id.* ¶ 301.  Again, these are Group 4 claims, so Counts 22 and 23 are not precluded.

### 3.    Third-Party Beneficiary Breach of Contract

Counts 9, 10, 18, and 25 arise from the alleged breach of contractual duties that KML, Tremont, the FIM Entities, PwC, and Citi Hedge owed to Plaintiffs.  To establish a third-party beneficiary breach of contract claim, there is no need to prove that any defendant made any false statements and, therefore, the claim falls into Group 4, which is expressly defined to include breach of contract-based duties.  All that is "essential" to this claim is a showing that the defendant breached one or more of its contractual duties owed to investors and that Plaintiffs suffered damages as a result.  *See, e.g.*, *LNC Invs., Inc. v. First Fid. Bank, N.A. New Jersey*, 173 F.3d 454, 461 (2d Cir. 1999); *Anwar I*, 728 F. Supp. 2d at 418.

Furthermore, the Second Circuit in describing Group 4 claims expressly stated that the "asserted liability of Defendants under these claims arises from the fact that Defendants breached their contractual . . . obligations to Plaintiffs."  *Kingate*, 784 F.3d at 152.  The Court's example of a contract-based claim not subject to preclusion involved a custodian, *see id.* at 148-49, but the analysis is the same for contractual duties of a manager, auditor or administrator.

**KML and Tremont**:  The SAC alleges that "Plaintiffs and the Class are third-party beneficiaries of the Management Agreements executed among KML, Tremont, and the Funds" and the contracts "evince a clear intent to benefit shareholders in the Funds."  SAC ¶ 236.  "KML and Tremont's duties pursuant to the Management Agreement included selecting and evaluating appropriate investment advisors and the allocation of assets with a chosen appropriate investment advisor" as well as "a continuing obligation to ascertain Madoff's competence and monitor Madoff's performance and custody of the Funds' assets."  *Id.* ¶ 238.  Plaintiffs can show

that KML and Tremont breached these duties without pointing to any false statements by KML or Tremont.

**FIM Entities**:  Plaintiffs allege that they "are third-party beneficiaries of the Consulting Services Agreements executed among the FIM Entities, KML, Tremont, and the Funds."  SAC ¶ 241.  "FIM Entities' duties included screening and nominating investment advisors for selection by KML and Tremont.  The FIM Entities also made recommendations regarding the proposed allocation of assets among investment managers.  The FIM Entities were also obligated to 'continuously monitor[]' the asset allocation and the investment advisor's performance."  *Id.* ¶ 243.  The FIM Entities were obligated to perform due diligence on Madoff before recommending or selling shares in the Funds to investors.  *See Anwar VI*, 118 F. Supp. 3d at 615-17 (claims based on failure to conduct adequate due diligence prior to selling shares are not barred by SLUSA).  This failure to perform, not any misstatement, is the basis of the claim.

**PwC**:  The SAC alleges that "PwC entered into contracts with the Funds to perform audits in accordance with GAAS."  *Id.* ¶ 277.  "The contracts evince a clear intent to benefit Plaintiffs and the Class, who had invested in the Funds, to whom the audit reports were addressed, and who relied upon PwC to audit the financial statements of the Funds . . . ."  *Id.* ¶ 278.  "PwC breached its agreements to perform its audits for the Funds pursuant to GAAS, and this breach proximately caused Plaintiffs' losses."  *Id.* ¶ 279.  As discussed above, although the claim references PwC's audit reports, any false statements contained in those reports are extraneous to the ultimate proof of the claim, which falls in Group 4.

**Citi Hedge**:  The SAC alleges that "Citi Hedge entered into Administration Agreements with the Funds, and Citi Hedge breached its obligations to the Plaintiffs and the Class as third-

party beneficiaries of those contracts." *Id.* ¶ 311. Citi Hedge's duties that required due care included the following:

(a) communicating with the general public;
(b) communicating with shareholders;
(c) soliciting sales of shares in the Funds;
(d) accepting new subscriptions in the Funds;
(e) maintaining the Funds' corporate records and books of account;
(f) disbursing payments of dividends, fees, and salaries;
(g) calculating the subscription price, redemption price, and net asset value of the Funds' shares; and
(h) conducting meetings of the Funds' boards of directors.

*Id.* ¶ 314. "Citi Hedge breached the Administration Agreements, by, among other things, failing to discharge its responsibility to calculate accurately the Funds' NAV." *Id.* ¶ 315. Again, while the claim references statements that Citi Hedge made, the "essential" proof of the claim is Citi Hedge's underlying breach of its contractual duties. This claim too is not precluded.

### 4.    **Breach of Fiduciary Duty**

Counts 7 and 21 assert claims for breach of fiduciary duty against the Kingate Defendants and Citi Hedge. "The elements of a claim for breach of a fiduciary obligation are: (i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom." *Johnson v. Nextel Comm'ns, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011); *see Anwar I*, 728 F. Supp. 2d at 415, 440-42. The breach of fiduciary duty claims alleged in the SAC fall into Group 4 because they "would not require any showing of false conduct on the part of the Defendants." *Kingate*, 784 F.3d at 152. The Court of Appeals expressly identified breach of fiduciary duty as a non-precluded Group 4 claim and, as noted above, gave as an example of such a non-precluded duty-based cause of action a claim against a custodian. *See id.* at 148-49. As discussed above, Judge Marrero recently held that breach of fiduciary duty claims against a bank that recommended investments in Madoff feeder funds without conducting proper due diligence were not barred by SLUSA. *Anwar VI*, 118 F. Supp. 3d at 614 ("The type of conduct

34

at issue here—whether, for example, the Standard Chartered Defendants did not perform analytical tests as demanded of a fiduciary—entails an inquiry that is wholly distinct from the falsity wrongdoing underlying Madoff's fraud.").

**Kingate Defendants**:  Count 7 alleges that Plaintiffs and the "Class entrusted their assets to the Kingate Defendants who had substantial discretion and control over the Plaintiffs' and the Class' assets invested in the Funds," SAC ¶ 230, giving "rise to a fiduciary duty on the part of the Kingate Defendants to the Plaintiffs." *Id.* ¶ 231.  The Kingate Defendants breached fiduciary duties to Plaintiffs, including "to perform all necessary and adequate due diligence and monitoring with respect to the Funds' investments" and "to exercise generally the degree of prudence, caution and good business practices that would be expected of reasonable investment professionals overseeing client funds." *Id.* ¶ 233.  This Group 4 claim can be established without any deceptive conduct or complicity with Madoff on the part of the Kingate Defendants.  *See Anwar VI*, 118 F. Supp. 3d at 614.

**Citi Hedge**:  Count 21 alleges that Citi Hedge owed Plaintiffs a fiduciary duty based on its "discretionary responsibilities" and "superior access to confidential information about the investments, including the location, security, and value of the assets." *Id.* ¶ 287.  "Citi Hedge breached its fiduciary duties to Plaintiffs and the Class by, among other things, failing to discharge properly its duties as Administrator." *Id.* ¶ 290.  For instance, "Citi Hedge should not have relied solely on information provided by Madoff" and the "numerous questions and risks surrounding Madoff's operations and purported results should have caused Citi Hedge to increase its scrutiny of the information it received from Madoff, and seek independent verification." *Id.* ¶ 193.  This is a Group 4 claim for the same reasons discussed above.

### 5. <u>Aiding and Abetting Breach of Fiduciary Duty</u>

The aiding and abetting breach of fiduciary duty claims alleged in the SAC also are not barred by SLUSA. "To state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must show: '(1) breach of fiduciary obligations to another of which the aider and abettor had actual knowledge; (2) the defendant knowingly induced or participated in the breach; and (3) plaintiff suffered actual damages as a result of the breach.'" *Anwar I*, 728 F. Supp. 2d at 442 (quoting *Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 466 (S.D.N.Y. 2009)). The "essential" elements of this claim do not include any misrepresentation, because liability flows from awareness and substantial assistance to the failure by other defendants to conduct proper due diligence and supervision over Plaintiffs' investments as required under the circumstances. As noted above, the breach of fiduciary duty claims here are Group 4 claims.

**Tremont Group**: Count 13 alleges that the Tremont Group aided and abetted the breach of fiduciary duty committed by Tremont. "By virtue of its ownership and control of Tremont, the Tremont Group was aware of the fiduciary duties owed by Tremont to Plaintiffs" and the "Tremont Group acted with willful blindness or recklessness in its ownership and exercise of control of Tremont." SAC ¶ 252. The Tremont Group substantially assisted Tremont's breaches of fiduciary "by failing to act when required to do so in the face" of Tremont's abdication of any meaningful oversight over Madoff. *Id.* ¶ 253. Therefore, the claim can be established without relying on any false conduct by the Tremont Group.

**PwC**: Count 19 alleges that PwC aided and abetted the breach of fiduciary duty committed by the Kingate Defendants. "As the auditor of the Funds, PwC was aware of the fiduciary duties owed by the Kingate Defendants to Plaintiffs" and "PwC acted with willful blindness or recklessness in conducting its audits." *Id.* ¶ 281. "PwC substantially assisted the Kingate Defendants by giving clean audit reports to the Funds' financial statements." *Id.* ¶ 283.

Importantly, it was not the fact that the audit reports contained any (mis)representation about the state of the Funds that underlies this claim, and Plaintiffs need not prove any misstatement to prevail. Thus, false conduct is not "essential" to the claim that PwC aided and abetted the Kingate Defendants' breaches of duty by its *actions* in not conducting proper audits.

**Citi Hedge**: Count 26 alleges that Citi Hedge aided and abetted the Kingate Defendants' breach of fiduciary duty. The SAC alleges that Citi Hedge, through its role as administrator, "had actual knowledge of and substantially participated in the breaches of fiduciary duty committed by the Kingate Defendants." *Id.* ¶ 319. "For example, Citi Hedge substantially assisted the Kingate Defendants by receiving investments from Plaintiffs and the Class; [and] calculating and disseminating the Funds' NAV." *Id.* ¶ 320. Similar to the claim against PwC, this claim does not require Plaintiffs to show that Citi Hedge engaged in any deceptive conduct to prove this claim.

### 6.        Unjust Enrichment, Mutual Mistake and Constructive Trust

Plaintiffs' claims for unjust enrichment, mutual mistake and constructive trust are clearly Group 5 claims which are not barred by SLUSA. The *Kingate* decision explains that the "allegations of Group 5 seek compensation for fees paid to the named Defendants by the Funds on the grounds that those Defendants failed to perform the duties for which the fees were paid, or that the fees based on purported profits and values of the Funds were computed on the basis of inaccurate values." *Kingate*, 784 F.3d at 134-35. "The allegations falling in Groups 3, 4, and 5 do not include allegations proof of which depends on a showing that the named Defendants committed knowing, intentional, or negligent misrepresentations or misleading omissions in connection with transactions in covered securities." *Id.* at 135 n.6. Thus, Counts 11, 12, and 28 do not depend on any misrepresentations made by Defendants.

"To state a claim for unjust enrichment in New York, a plaintiff must allege that (1) defendant was enriched; (2) the enrichment was at plaintiff's expense; and (3) the circumstances were such that equity and good conscience require defendants to make restitution." *Kidz Cloz, Inc. v. Officially for Kids, Inc.*, 320 F. Supp. 2d 164, 177 (S.D.N.Y.2004) (internal quotations omitted).

The SAC alleges that all "Defendants were enriched at the expense of Plaintiffs and the Class by taking the monies of Plaintiffs and the Class in the form of commissions and other fees for the purported management and administration of their investments, and the purported, but in fact non-existent, capital appreciation of such assets." SAC ¶ 323. "Defendants' performance was so far below the applicable fiduciary and business standards that Plaintiffs and the Class involuntarily conferred a benefit upon Defendants without Plaintiffs and the Class receiving adequate benefit or compensation in return." *Id.* ¶ 324. Accordingly, "it is unjust and inequitable for Defendants to have enriched themselves in this manner and each Defendant should refund all monies paid for any services rendered to Plaintiffs and the Class, and Plaintiffs and the Class are entitled to the establishment of a constructive trust imposed on the benefits reaped by Defendants from their unjust enrichment and inequitable conduct." *Id.* ¶ 326. Plaintiffs can succeed on these claims by showing that Defendants committed breaches of duties owed to Plaintiffs without proving any misrepresentations.

Count 12 alleges a claim of mutual mistake against the Kingate Defendants. Defendants concede that this claim is not barred by SLUSA. Br. at 41. A contract is subject to rescission if a "mutual mistake . . . exist[s] at the time the contract is entered into and [is] substantial." *Gould v. Bd. of Educ. of Seawanhaka Cent. High Sch. Dist.*, 81 N.Y.2d 446 (N.Y. 1993). The SAC alleges that the Kingate Defendants were paid over $100 million "under a mutual mistake of the

parties as to the amount and value of the assets under management and amount of profits. In fact, there were no assets under management and no profits." SAC ¶ 249. "The investments by Plaintiffs and the Class were used to pay the foregoing fees to the Kingate Defendants" and Plaintiffs demand recovery of those fees based on a mutual mistake. *Id.* ¶ 250. No misrepresentation by the Kingate Defendants is essential for Plaintiffs to succeed on this Group 5 claim.

### C.    The Negligent Misrepresentation Claims Are Not Precluded

**PwC**: The negligent misrepresentation claim (Count 17) against PwC is not precluded by SLUSA. Although certain negligent misrepresentation claims fall within Group 2, not all negligent misrepresentation claims are barred. *Kingate*'s discussion of Group 1 claims makes clear that SLUSA does not simply bar *any* misrepresentation – but only "fraudulent misrepresentations and misleading omissions . . . made in connection with the Funds' investments with Madoff in covered securities and with their oversight of these investments." *Kingate*, 784 F.3d at 134. Group 2 claims must involve the same type of misrepresentations and omissions, except without scienter. *See id.* at 135.

Defendants argue that the negligent misrepresentation claim against PwC is based on "misrepresentations and/or omissions supposedly made by PwC Bermuda in connection with its audit of the Funds and in turn the Funds' investment with BLMIS." Br. at 49. However, the claim is based on statements in PwC's audit reports "falsely representing to Plaintiffs and the Class that: (i) it had conducted its audits in accordance with GAAS; and (ii) the Funds' financial statements conformed with GAAP. The Funds' financial statements did not refer to any 'covered securities,' as the Fund investments that were reported on the financial statements were U.S. Treasury bills." SAC ¶ 269; *cf. Troice*, 134 S. Ct. at 1069 ("accountants that … don't sell or participate in selling securities traded on U.S. national exchanges" are still liable under state

law).[8]  These misstatements by PwC said nothing about Madoff or his purported trading in

covered securities.  Nor do the misrepresentations in PwC's one-page audit letters make any

mention of Madoff or covered securities.  The only "essential" allegation related to PwC's

misrepresentation is the false statement in the audit report, addressed to the Funds' shareholders,

that PwC "conducted its audits in accordance with GAAS auditing."  *Id.* ¶ 269.  Accordingly,

this claim arises out of the type of "tort-based duties to Plaintiffs to provide competent . . .

auditing . . . services to the Funds, thus allowing Madoff's frauds to go undetected, causing

Plaintiffs' losses," which falls into Group 4.  *Kingate*, 784 F.3d at 151.

**Citi Hedge**:  The negligent misrepresentation claim against Citi Hedge (Count 24) is also

not precluded.  This claim is based on Citi Hedge's "false NAV and account balance statements

for the Funds."  SAC ¶ 307.  The false statements that Citi Hedge made about the Funds' NAVs

are representations made by Citi Hedge about the value of the Funds, which are indisputably not

covered securities.  Citi Hedge's NAV statements make no mention of Madoff or covered

securities; they simply set forth the purported NAV for each Fund that was false because it

overstated the value of Plaintiffs' investments, which were in fact virtually worthless.

Moreover, Citi Hedge's duty to provide Plaintiffs with accurate information regarding the

Funds "is predicated" on Citi Hedge's "relationship with plaintiffs [and] their investments in the

feeder funds," which are not covered securities.  *Herald I*, 730 F.3d at 118-19.  In contrast, the

precluded claims in *Herald I* against JPMorgan and Bank of New York arose out of "the banks'

relationship with, and alleged assistance to, Madoff Securities' Ponzi scheme, which purportedly

---

[8] In *Anwar*, Judge Marrero held that negligent misrepresentation claims against auditors of
Madoff feeder funds were barred by SLUSA.  *See Anwar VI*, 118 F. Supp. 3d at 606.  However,
for the reasons above, Plaintiffs respectfully disagree.  *Anwar* is inconsistent with *Troice*, where
the Supreme Court held that SLUSA was not triggered by misrepresentations that the uncovered
securities at issue purportedly were backed by covered securities.

engaged in investments in covered securities on U.S. exchanges." *Id.* Accordingly, the allegations supporting the negligent misrepresentation claims against Citi Hedge "differ crucially from those found in *Herald* to be precluded by SLUSA" because those claims "asserted liability based on defendants' alleged complicity in Madoff's fraudulent scheme." *Kingate*, 784 F.3d at 152 n.23. The negligent misrepresentation claim against Citi Hedge does not allege that Citi Hedge was complicit in Madoff's fraud – but rather alleges that Citi Hedge is liable for its own misconduct in failing to properly verify the NAVs it distributed and omitting information about Citi Hedge's own conduct (or lack thereof). It follows that the negligent misrepresentation claims are Group 4 claims which are not precluded.

### D.     If the Court Accepts Defendants' Contention that Plaintiffs' Claims Are Governed by BVI or Bermuda Law, then SLUSA Does Not Apply

Defendants contend that "all of the claims alleged in the SAC are governed by Bermuda or BVI law,"[9] but they fail to recognize that if foreign law applies, Defendants' motion to dismiss under SLUSA must be denied. SLUSA applies only to a "covered class action" based on "State" law. *See* 15 U.S.C. § 78bb(f)(1) ("No covered class action based upon the statutory or common law of any *State* or subdivision thereof may be maintained in any State or Federal court ...") (emphasis added). The Exchange Act defines "State" as "any State of the United States, the District of Columbia, Puerto Rico, the Virgin Islands, or any other possession of the United States." 15 U.S.C. § 78c(a)(16). Accordingly, by its plain language SLUSA does not preclude claims under foreign law. *See, e.g.*, *In re Petrobras Sec. Litig.*, 2016 WL 929346, at *3

---

[9] Br. at 66 (Application of choice of law rules of the forum state, New York, "compels the conclusion that all of the claims alleged in the SAC are governed by Bermuda or BVI law."). *See also id.* at 63 (Bermuda or BVI law … governs Plaintiffs' claims"). Similarly, in their motions to dismiss the Amended Consolidated Class Action Complaint (May 18, 2010), Defendants previously maintained that Plaintiffs' common law claims were governed by the law of Bermuda. *See, e.g.*, FIM Mem. at 7 (Dkt. No. 82); Tremont Mem. at 21 (Dkt. No. 86); Manzke Mem. at 2 (Dkt. No. 91).

(S.D.N.Y. Mar. 12, 2016) (SLUSA does not bar claims under Brazilian law) (Rakoff, J.); *LaSala v. Bordier et Cie*, 519 F.3d 121, 139 (3d Cir. 2008) ("*LaSala*") (Claims under Swiss law not precluded by SLUSA); *In re BP p.l.c. Sec. Litig.*, 109 F. Supp. 3d 946 (S.D. Tex. 2014) ("*BP II*") (deceit claims under English common law not precluded by SLUSA); 29A FEDERAL PROCEDURE LAWYERS EDITION § 70:322 (2012) ("SLUSA does not preempt claims under foreign law since SLUSA's explicit definition of 'State' does not include foreign countries.").

In *La Sala*—the only circuit level decision to address the issue—corporate directors engaged in a classic "pump and dump" scheme in which they fraudulently inflated the company's stock price and then sold their shares at a huge profit before the company filed for bankruptcy. The bankruptcy trustee, as assignee, brought a diversity action in New Jersey against Swiss banks that allegedly knew about the scheme and assisted the defendants. Counts I and II asserted claims under Delaware law for aiding and abetting breach of fiduciary duty. Counts III and IV alleged that the Banks violated Swiss banking regulations by failing properly to investigate and interdict the Directors' alleged money-laundering transactions. The defendants attempted to characterize the Swiss-law claims as part of a single "unitary scheme" of fraud in connection with the purchase and sale of securities that was precluded by SLUSA. The Third Circuit held that SLUSA does not preclude claims under foreign law:

> Given that Congress made the explicit policy choice in the [Exchange] Act of defining 'state' so as not to include foreign countries, and, in SLUSA, chose not to alter that definition while defining other terms ... we conclude that, when Congress extended SLUSA preemption to claims 'based upon the law of any State,' it meant just that.

*LaSala*, 519 F.3d at 139.

Courts have relied on *LaSala* and have made it clear that SLUSA does not preclude claims under foreign law *even where those claims allege fraud in connection with the purchase*

*or sale of a covered security. See In re Petrobras Sec. Litig.*, 2016 WL 929346; *In re BP p.l.c. Sec. Litig.*, 109 F. Supp. 3d 946 (S.D. Tex. 2014).[10]

In *Petrobras*, Judge Rakoff rejected a defendant's argument that SLUSA precluded claims under Brazilian law because "it ha[d] no foundation in SLUSA's text, which makes no mention of foreign law claims." *In re Petrobras Sec. Litig.*, 2016 WL 929346, at *3. "Simply put, Brazil is not a State" and "SLUSA's legislative history dwells on state law claims, without discussion of foreign law claims." *Id.* Accordingly, Judge Rakoff held SLUSA did not apply "[b]ecause the plain language of SLUSA does not bar foreign law claims, PwC's first argument fails." *Id.*

In *BP II*, plaintiffs alleged that BP and others materially misrepresented the worth of BP's stock which was traded on the London Stock Exchange ("LSE") prior to and immediately following the Deepwater Horizon disaster in 2010. The court initially dismissed the claims under U.S. federal securities laws, which do not apply to trades on foreign exchanges, and further held that English law controlled. *In re BP p.l.c. Sec. Litig. ("BP I")*, 843 F. Supp. 2d 712, 793-96 (S.D. Tex. 2012) ("*BP I*"); *see also BP II* at 950-51. Thus, at issue in *BP II* were the funds' claims under the English common law of deceit.

The BP defendants sought dismissal under SLUSA, arguing that the actions under English law constituted a "covered class action" brought under "State" law. The court denied the motion, holding that "SLUSA simply does not—on its face—preclude foreign law claims." *BP II*, 109 F. Supp. 3d at 960. As the court explained, in enacting SLUSA,

---

[10] The Supreme Court rendered its decision in *Troice* on February 26, 2014. The *BP* decision is dated September 30, 2014. *Troice* held that "[a] fraudulent misrepresentation or omission is not made 'in connection with' such a 'purchase or sale of a covered security' unless it is material to a decision by one or more individuals (other than the fraudster) to buy or to sell a 'covered security.'" 134 S. Ct. at 1066.

Congress [included] a term expressly defined elsewhere in the Exchange Act not to include foreign jurisdictions. The Court has no authority to ignore unequivocal and deliberate statutory language. As drafted by Congress, SLUSA does not preclude Plaintiffs' English law claims.

*Id.*[11]

As the Third Circuit stated in *LaSala*,

In determining legislative purpose, 'it is not our job to speculate upon congressional motives,' *Reigel v. Medtronic, Inc.*, 552 U.S. 312 (2008); our job is to hew as closely as possible to the meaning of the words Congress enacted. 'We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.' *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992). Here, the difficulty with divining congressional intent to preempt foreign-law claims is that Congress specifically described the claims preempted as those 'based upon the law of any State.' SLUSA constitutes an amendment of the [Exchange Act], which expressly defines 'state' throughout the Act as 'any State of the United States, the District of Columbia, Puerto Rico, the Virgin Islands, or any other possession of the United States," 15 U.S.C. § 78c(a)(16). Though Congress was at pains to set out separate definitions of various terms used in SLUSA, it left the [Exchange] Act definition of 'state' intact.

*LaSala*, 519 F.3d at 138.[12]

## II.  THE COURT SHOULD APPLY NEW YORK LAW, WHICH IS SUBSTANTIALLY SIMILAR TO BVI AND BERMUDA LAW

Notwithstanding that Defendants' SLUSA argument fails if foreign law applies, the Court should still apply New York law to Plaintiffs' claims. Defendants have not carried their burden of showing that there is a genuine conflict between BVI or Bermuda law on the one hand, and

---

[11] *BPI II* correctly rejected earlier decisions in which the courts ignored SLUSA's plain language. *See BP II*, 109 F. Supp. 3d at 960 (rejecting *LaSala v. UBS, AG*, 510 F. Supp. 2d 213, 237-38 (S.D.N.Y. 2007) and *LaSala v. TSB Bank, PLC*, 514 F. Supp. 2d 447, 472 (S.D.N.Y. 2007)).

[12] Following the Court's instructions for the parties to attempt to reach agreement on the scope of SLUSA preemption prior to filing of the SAC, Plaintiffs indicated in Counts 1-4, 8, 14, 20, 27 of the SAC that had been pled in the First Amended Complaint that would be precluded by SLUSA. Although Plaintiffs removed the allegations supporting those counts, those claims are not abandoned. If the Court determines that foreign law applies to Plaintiffs' claims and that SLUSA is therefore inapplicable, those counts would no longer be precluded and Plaintiffs would pursue fraud and other claims that rely on allegations of false conduct by Defendants.

New York law on the other hand. Furthermore, even if there were a discrepancy between those two sets of laws with respect to discrete issues, New York has the most significant interest in this litigation, and thus choice of law principles mandate applying New York law.

### A. There Is No Genuine Conflict between New York Law and the Law of BVI or Bermuda

A federal court in a diversity case applies the conflict of law principles of the forum state. *See GlobalNet Financial.com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 382 (2d Cir. 2006) (citing *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)). A conflicts analysis is unnecessary if there is no substantive conflict between New York law and the law of the foreign jurisdiction in question. *See id.*; *Int'l Bus. Machines Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143-44 (2d Cir. 2004). In the absence of a substantive conflict, New York law applies. *GlobalNet*, 449 F.3d at 382.

Plaintiffs rely on the expert declarations of George Bompas Q.C. on U.K., Bermuda and BVI law. Declaration of Anthony George Bompas Q.C., dated November 4, 2010, Dkt. 187-4 ("Bompas Decl."); Further Declaration of Anthony George Bompas Q.C., dated May 6, 2016 ("Bompas Further Decl."). Mr. Bompas graduated from Oxford University in 1974 with a First Class degree in the Honours School of Jurisprudence. He was admitted to the Bar of England and Wales in July 1975. In July 1991, he was called to the Bar of the BVI, where he appeared in the High Court. He was appointed a Queen's Counsel in 1994. The Lord Chancellor has appointed him as a Deputy Judge of the High Court in the Chancery Division. He is head of the 4 Stone Building Chambers. In 2014 Mr. Bompas was appointed as a Judge of the Court of Appeal of Guernsey and Jersey. He is ranked by Chambers as a preeminent Q.C. specializing in company law. Mr. Bompas' *curriculum vitae* is appended as Attachment 1 to his Further Declaration dated May 6, 2016.

### 1. Negligence, Negligent Misrepresentation and Gross Negligence

The substantive law of the United Kingdom, Bermuda and the BVI governing negligence and negligent misrepresentation (Counts 6, 16, 17, 23, and 24) is harmonious with New York law. Bompas Decl. ¶¶ 59-120; *Cromer Fin. Ltd. v. Berger*, 2003 WL 21436164, at *11 (S.D.N.Y. June 23, 2003) (finding no substantive difference between Bermuda and New York negligence law as applied to accountants); *see also Harmelin v. Man Fin. Inc.*, 2007 WL 3146666, at *2 (E.D. Pa. Oct. 26, 2007) (no substantive difference between Cayman Island law of negligent misrepresentation and Pennsylvania law).[13] Furthermore, although the United Kingdom, BVI and Bermuda do not recognize a separate tort of "gross negligence," U.K. courts have referred to claims of "gross negligence" (Counts 5, 15, and 22) as "serious negligence," to which they have applied the same standard and scope of duty of care as would apply to "gross negligence." Bompas Decl. ¶¶ 121-26. Thus, there is no material difference between "gross negligence" in New York law and "serious negligence" in U.K. law, and thus no need for the Court to determine which law applies. *Id.*

### 2. Breach of Fiduciary Duty

The substantive law of the United Kingdom, Bermuda and BVI is not materially different from New York law as to Plaintiffs' claims for breach of fiduciary duty (Counts 7 and 21). Under both legal systems, officers and directors of a company do not owe fiduciary duties to individual shareholders under ordinary circumstances. *Compare* Bompas Decl. ¶ 130 *with Druck Corp. v. Macro Fund Ltd.*, 290 F. App'x 441, 444 (2d Cir. 2008) (summary order) (under the law of both New York and Cayman Island, a shareholder cannot normally assert a direct claim for breach of fiduciary duty against a corporate officer). However, again under both legal systems, the specific facts of a case may give rise to such a direct duty. *Compare* Bompas Decl.

---

[13] The Cayman Islands, like BVI and Bermuda, follows U.K. precedent.

¶¶ 131-34 (outlining factors giving rise to fiduciary duties "to shareholders … not aris[ing] from the legal relationship with the company," such as a high degree of insider knowledge or where directors supply information directly to shareholders) *with Anwar I*, 728 F. Supp. 2d at 400-01 ("Under New York law, a shareholder may sue individually when the wrongdoer has breached a duty independent of any duty owing to the corporation wronged.") (internal quotation marks omitted); *id.* at 415 (noting the importance of superior access to insider knowledge to determining the existence of a fiduciary relationship); *see also ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.*, 957 F. Supp. 1308, 1332 (S.D.N.Y. 1997) (finding that Cayman Island law and Delaware law are substantively the same on the issue of when a shareholder may sue an officer or director directly for breach of fiduciary duty).

Under such circumstances, the Court should examine the "general principles governing the existence of a fiduciary duty," which are identical under both legal systems. *Compare* Bompas Decl. ¶ 135 (describing the general principle as "whether there is a sufficient relationship of trust and confidence," and describing a fiduciary as "someone who has undertaken to act for or on behalf of another in a particular matter in circumstances which give rise to a relationship of trust and confidence") (internal quotation marks omitted) *with EBC I, Inc. v. Goldman Sachs & Co.*, 832 N.E.2d 26, 31 (N.Y. 2005) ("A fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another …. Such a relationship … is grounded in a higher level of trust than normally present ….") (internal quotation marks omitted). Finally, in both jurisdictions, the existence of a fiduciary duty is a fact-intensive question. *Compare* Bompas Decl. ¶ 137 (describing the question as "fact sensitive") *with Anwar I*, 728 F. Supp. 2d at 415 ("Whether the [fiduciary] duty exists is a fact-specific inquiry."). Therefore, the Court may apply New York law to Plaintiffs' breach of fiduciary duty claims. *See GlobalNet*, 449 F.3d at 382.

### 3.      <u>Aiding and Abetting Breach of Fiduciary Duty</u>

As Defendants concede, BVI and Bermuda recognize a cause of action for knowing assistance in breach of trust (also referred to as "dishonest assistance") which is the functional equivalent of aiding and abetting a breach of fiduciary duty (Counts 13, 19, and 26). Bompas Decl. ¶¶ 160-69; *In re AlphaStar Ins. Group. Ltd.*, 383 B.R. 231, 274 (Bankr. S.D.N.Y. 2008) ("Bermuda law recognizes a claim for 'dishonest assistance,' similar to the aiding and abetting claim under New York law. To establish liability, the plaintiff must show that the third-party dishonestly procured or assisted a breach of trust or fiduciary obligations.").

Taking the allegations in Counts 13, 19, and 26 as true, a claim for knowing assistance in breach of trust is established. Bompas Decl. ¶¶ 160-69. If Defendants knew of the fiduciary duties owed by the Kingate Defendants and of the breaches of these duties as alleged in the SAC, and assisted with such breaches, then a finding of dishonesty could be reached. *Id.* ¶ 169. Thus, the claims of aiding and abetting breach of fiduciary duty in this instance are interchangeable with assistance in breach of trust. There is no need for the Court to make a determination of governing law when the same result will be reached regardless of what law applies.

### B.     **New York Has the Most Significant Interest in the Litigation**

Additionally, although there is no substantive conflict between New York law and the law of Defendants' proposed jurisdictions, if this Court were to conduct a choice of law analysis, New York law would still govern Plaintiffs' claims, because New York has the most significant interest in this litigation.

### 1.     <u>New York Law Governs Plaintiffs' Tort Claims</u>

New York courts apply an "interests analysis" to determine which law should govern tort claims (Counts 5, 6, 7, 13, 15, 16, 17, 19, 21, 22, 23, 24, 26). *See Anwar I*, 728 F. Supp. 2d at

48

399 ("the relevant analytical approach to choice of law in tort actions in New York is the 'interest analysis,' where 'the law of the jurisdiction with the most significant interest in, or relationship to, the dispute' is applied"). In conducting an "interests analysis," "the facts or contacts which obtain significance in defining [s]tate interests are those which relate to the purpose of the particular law in conflict." *Butler v. Stagecoach Grp., PLC*, 900 N.Y.S. 2d 541, 543 (N.Y. App. Div. 2010) (internal quotation marks omitted). Where, as here, the supposedly conflicting laws are intended to regulate conduct, "the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 193 (S.D.N.Y. 2006) ("*Montreal Pension I*") (quoting *GlobalNet Financial.Com, Inc.*, 449 F.3d at 384). "[T]he place where the injury was inflicted, as opposed to the place where the fraudulent act originated," is generally deemed the place where the tort occurred. *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 492 (S.D.N.Y. 2001) (internal quotation marks omitted); *see Devore v. Pfizer Inc.*, 867 N.Y.S.2d 428, 429 (N.Y. App. Div. 2008) ("[T]he place of the wrong is considered to be the place where the last event necessary to make the actor liable occurred.") (internal quotation marks and punctuation omitted). Although this is "usually where the plaintiff is located," "controlling effect [is given] to the law of the jurisdiction which, because of its relationship or contact with the occurrence of the parties, has the greatest concern with the specific issue raised in the litigation." *San Diego Cnty. Emp. Ret. Assoc. v. Maounis*, 2010 WL 1010012, at *18 (S.D.N.Y. Mar. 15, 2010) (internal quotation marks omitted).

In this case, the locus of the tort is New York. The injury to the class relates to monies "invested" in a New York-based Ponzi scheme. SAC ¶ 53. The Funds were passive shell companies with no employees. Their function was to collect and funnel money from investors

to BMIS in New York.  *Id.* ¶¶ 24-28.  BMIS maintained custody of the Funds' accounts in New York.  The assets of the Funds were purportedly invested in New York.  *Id.* ¶ 41.  Moreover, the Court of Appeals of Bermuda observed in another case involving Kingate that there was a pattern whereby "funds subscribed [to the Kingate Funds] would be actively managed by the broker/dealer in New York [Madoff], and the role of the local Manager, if not simply nominal, would be very limited indeed."  *Kingate Global Fund, Ltd. v. Knightsbridge (USD) Fund Ltd.*, [2009] CA (Bda) 17 Civ. at 9, ¶ 22, 19 Nov. 2009 (Berm.).  Consequently, neither BVI nor Bermuda has more than paper ties to this litigation, while New York has significant ties.  Indeed, the Funds' Information Memoranda state in boldface, block letters on their cover pages that shares issued by the Funds may not be offered for sale "**TO ANY MEMBER OF THE PUBLIC IN THE BRITISH VIRGIN ISLANDS**."  *See, e.g.*, SAC, Ex. 1 at 1; Ex. 2 at 1; Ex. 3 at 1; Ex.4 at 1.

Defendants themselves have previously argued that the primary conduct giving rise to this lawsuit occurred in New York where the assets of the Funds supposedly were located.  *See* Joint Memorandum of Law in Further Support of All Defendants' Motions to Dismiss, Dkt. No. 38 ("In this case, the gravamen of the Complaint is that defendants deceptively induced plaintiffs to invest in hedge funds established for the purpose of purchasing and selling covered securities through Madoff.").  Madoff, the Funds' investment adviser, was located in New York, and he managed his Ponzi scheme from New York.

Moreover, New York law also applies because the members of the plaintiff class are scattered throughout the world.  No foreign country can assert that it has the strongest interest in the conduct alleged in this lawsuit by virtue of injuries suffered by investors resident in its jurisdiction.  *See Montreal Pension I*, 446 F. Supp. 2d at 193 (since the plaintiffs were "an international group," the court should analyze the contacts within each jurisdiction in conducting

choice-of-law analysis); *Maounis*, 2010 WL 1010012, at *18 (the place where injury occurred is not a dispositive factor where injuries "ha[ve] occurred in locations with only limited connection to the conduct at issue") (internal quotation marks omitted).

In addition to Madoff and BMIS being in New York, Defendants Ceretti, Grosso, and Manzke frequently conferred with Madoff in New York on behalf of the Kingate Defendants. SAC ¶¶ 55-63. Faced with similar facts, Judge Cote held in *Cromer* that New York had the strongest connection to a hedge fund fraud that was centered in New York. *Cromer*, 137 F. Supp. 2d at 492-93. There, as here, the plaintiffs were dispersed throughout the world with each country only having limited contact with the conduct at issue in the case. The hedge fund was organized under BVI law, but the investment manager of the Fund was based in New York. The court concluded that New York law should apply because New York was the jurisdiction with the greatest interest in the litigation. *Id.* Indeed, New York has a strong interest in applying its laws to regulate the conduct of offshore fund promoters, managers and service providers who raise money to fuel schemes orchestrated by fraudsters in New York.

Additionally, the breach of fiduciary duty and aiding and abetting breach of fiduciary duty claims (Counts 7, 13, 19, 21, and 26) should be governed by New York law. Although Defendants contend that these claims should be governed by the "internal affairs" doctrine, in *Montreal Pension I* Judge Scheindlin explained that "the New York Court of Appeals has rejected any automatic application of the so-called 'internal affairs' choice-of-law rule" and "in certain circumstances 'application of the local law of some other state is required by reason of the overriding interest of that other state in the issue to be decided.'" *Montreal Pension I*, 446 F. Supp. 2d at 192 (internal quotation marks omitted). Judge Scheindlin noted that the breach of fiduciary duty claims against a fund's administrator, Citco, related to the alleged failure of the administrator to independently verify false information received from the fund manager located

in New York. *Montreal Pension I*, 446 F. Supp. 2d at 193. The core facts of that complaint – fraud and allegations of reckless ignorance of the fraud or other breaches of duty – centered on conduct that occurred in New York. *Id.* The court also emphasized that the victims of the fraud were dispersed throughout the world and their injuries were sustained in various locations with only limited connection to the conduct at issue. *Id.* Similarly, in *Anwar I*, Judge Marrero held that New York law should apply to claims made by investors in BVI hedge funds because activities in New York and the parties' contacts with that forum bore the closest relation to the claims at issue. *Anwar I*, 728 F. Supp. 2d at 400. The same reasoning leads to the same conclusion here: that New York law should govern all of the tort claims at issue in this case.

## 2. New York Law Governs Plaintiffs' Quasi-Contract Claims

As Defendants indicate, the Court should apply a "center of gravity" or "grouping of contacts" test to Plaintiffs' quasi-contract claims – constructive trust (Count 11), mutual mistake (Count 12) and unjust enrichment (Count 28). *See Fin. One Public Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 336 (2d Cir. 2005); *Feiger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 394 (2d Cir. 2001). Under this test, courts consider "the place of contracting … the places of negotiation and performance; the location of the subject matter and the domicile or place of business of the contracting parties," with the "places of contracting and performance" given the "heaviest weight in the analysis." *Feiger*, 251 F.3d at 394; *Brink's Ltd. v. S. African Airways*, 93 F.3d 1022, 1031 (2d Cir. 1996).

In *Anwar I*, Judge Marrero applied New York law to the plaintiffs' quasi-contract claims, noting that the defendants operated largely out of New York City, and the core facts of the complaint centered around Madoff's fraud – which occurred in New York. *Anwar I*, 728 F. Supp. 2d at 400. Here, too, the core facts which give rise to Plaintiffs' causes of action are centered in New York. The principal location of the parties and the principal place of

negotiation and performance of the contract was New York. SAC ¶¶ 53-54. As in *Anwar*, here the Account Agreements signed by BMIS and the Funds were executed in New York, and purportedly performed in New York through New York-based trading activities. *Id.* ¶ 11. The Funds' assets purportedly were held in New York by BMIS as custodian. *Id.* Likewise, Defendants conducted numerous meetings, with Madoff at his offices in New York. *Id.* ¶ 12. Defendants maintained investment accounts with Madoff in New York, communicating regularly with Madoff and conducting oversight of Madoff in New York. *Id.* ¶ 24. Moreover, the investment funds were invested in New York accounts and managed by brokers located in New York. For example, Defendant Manzke, Director of Kingate Global, maintained certain of the Funds' investment accounts in New York and directed or approved of transactions relating to those accounts. *Id.* ¶ 33.

### 3.     Choice of Law Provisions Do Not Apply to Plaintiffs' Contract Claims

Defendants contend that BVI or Bermuda law should govern Plaintiffs' contract claims (Counts 9, 10, 18, and 25) pursuant to choice of law provisions contained in the Management and Co-Management Agreements (Count 9), the Consulting Services Agreements (Count 10), the Audit Agreements (Count 18), and the Administration Agreements (Count 25), all of which reference Bermuda or BVI law. The SAC alleges that Plaintiffs were third-party beneficiaries of these agreements. *Id.* ¶¶ 236, 241, 277, 311.

However, a choice of law provision does not apply where it would contravene a "fundamental public policy" of the forum state. *See, e.g.*, *Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1364 (2d Cir. 1993) (the "public policies of [the] securities laws would be contravened if the applicable foreign law failed to adequately deter issuers from exploiting American investors"). Moreover, choice of law provisions are not valid if their purpose is to evade the otherwise applicable law. *See Culbert v. Rols Capital Co.*, 184 A.D.2d 612, 613 (N.Y. App.

Div. 1992) (denying summary judgment on enforcement of choice of law provision "as a question exists regarding whether the defendant is a New York partnership only nominally operating in New Jersey in order to evade New York's usury laws"); *see also Larson, Sonja & Karl Oakes*, 16 Am. Jur. 2d Conflict of Laws § 81 (2016).

As a threshold matter, the law of the forum governs the validity of a choice of law clause. *See Fin. One*, 414 F.3d at 333 ("courts consider the scope of a contractual choice-of-law clause to be a threshold question like the clause's validity. Courts therefore determine a choice-of-law clause's scope under the same law that governs the clause's validity – the law of the forum."). New York courts have been reluctant to construe choice of law clauses broadly. *Id.* at 332 (citing *Knieriemen v. Bache Halsey Stuart Shields Inc.*, 427 N.Y.S.2d 10 (N.Y. App. Div. 1980)).

Here, although the Funds were incorporated in BVI or Bermuda, as discussed above, the Funds were shell companies whose function was to funnel money from investors to BMIS in New York. The Funds could not be sold in the BVI. Not only were Defendants aware that the investment accounts were maintained and managed from New York, but Defendants communicated regularly with Madoff in New York regarding investment decisions. If it is true, as Defendants argue, that Bermuda and BVI law nonetheless would apply to Plaintiffs' claims and that Plaintiffs thus lack standing, then foreclosing Plaintiffs' remedy under New York law would be highly prejudicial to Plaintiffs. Indeed, it would contravene a "fundamental public policy" of New York to allow Defendants to maintain their alleged scheme in order to circumvent the protections afforded to Plaintiffs under New York law. New York law should apply to Plaintiffs claims. *See Montreal Pension I*, 446 F. Supp. 2d at 193; *Anwar I*, 728 F. Supp. 2d at 400.

## III.  PLAINTIFFS HAVE STANDING TO ASSERT DIRECT CLAIMS

Defendants argue that the Court must adhere to the "internal affairs" doctrine and determine the issue of standing under BVI law based on the fact that the Funds were incorporated there.  Br. at 52.  The Court, however, should apply New York law to decide standing for three separate and independent reasons.  *First*, the internal affairs doctrine is not applicable in this case because the shareholders are bringing claims against third parties, not the Funds.  *Second*, New York courts do not apply the internal affairs doctrine in a mechanical fashion.  Rather, standing is determined in accordance with the law of the jurisdiction with the greatest interest in the specific issues under consideration.  As explained above, of all the jurisdictions with which the Kingate Funds came into contact, New York has the strongest connection to the issues at stake in this litigation.  *Third*, there is no substantive difference between the standing rules of New York and the BVI, so New York law applies.

### A.  The Internal Affairs Doctrine Is Inapplicable

Defendants incorrectly urge the Court to determine standing under BVI law pursuant to the "internal affairs" doctrine.  Br. at 52.  This action, however, is not a challenge to the internal affairs of the Kingate Funds.  The claims in the SAC relate to and are based on Plaintiffs' relationships with the Funds' advisors, managers, and service providers.  This action involves Plaintiffs' direct claims against the promoters, managers, sponsors and other third-party service providers who induced and facilitated Plaintiffs' investments in the Funds, induced Plaintiffs to hold and increase their investments, and engaged in other wrongful conduct that caused losses to Plaintiffs that are separate and distinct from the losses of the Funds, which actually benefited from the alleged wrongful conduct.  Accordingly, the internal affairs doctrine is not applicable. *See VantagePoint Venture Partners 1996 v. Examen, Inc.*, 871 A.2d 1108, 1113 (Del. 2005) ("The internal affairs doctrine applies to those matters that pertain to the relationships among or

between the corporation and its officers, directors, and shareholders."); *Roselink Investors, L.L.C. v. Shenkman*, 386 F. Supp. 2d 209, 225 (S.D.N.Y. 2004); *Ackert v. Ausman*, 218 N.Y.S.2d 814, 817-18 (N.Y. Sup. Ct. 1961) (quoting *Blue v. Standard Coil Prods. Co.*, 117 N.Y.S.2d 858, 860 (N.Y. Sup. Ct. 1952)) ("The internal affairs doctrine applies only to 'controversies among the stockholders inter se, or between stockholders as a group and the corporation.'").

The New York Court of Appeals has rejected the "automatic application of the so-called 'internal affairs' choice-of-law rule." *Greenspun v. Lindley*, 36 N.Y.2d 473, 478 (N.Y. 1975). Likewise, the Second Circuit has taken a flexible approach to the internal affairs doctrine. *Norlin Corp. v. Rooney*, 744 F.2d 255, 263-64 (2d Cir. 1984) (applying New York law instead of Panamanian law to the existence and extent of fiduciary duties owed by Panamanian corporation).

Courts in this District have rejected application of the internal affairs doctrine under similar circumstances. For example, Judge Marrero in *Anwar I* applied New York law to the issue of standing because "aside from the fact of incorporation, the Funds ha[d] no connection to either the British Virgin Islands or Delaware" and "the Offshore Funds [were] no longer operating entities and have been turned over to liquidators." *Anwar I*, 728 F. Supp. 2d at 401 n. 8. Likewise, in *Montreal Pension I*, the court held that New York law should be applied to resolve claims arising out of two defunct hedge funds organized under BVI law. A group of predominately foreign investors sued the former directors of the funds, the administrator of the funds and the funds' prime broker, alleging violations of federal securities law and common law causes of action. In holding that New York law applied, Judge Scheindlin found that the "internal affairs" doctrine was inapplicable because the two hedge funds were defunct and the directors of the funds no longer served on the boards of the funds. *Montreal Pension I*, 446 F.

Supp. 2d at 194.  Consequently, there was no danger that the funds or the directors would be exposed to conflicting obligations.

Similarly, the Funds here are in liquidation and the defendant directors have been removed from their positions.  Apart from the fact that they were incorporated in the BVI, the only other contact between the Funds and BVI was the existence of a brass plaque on the walls of Bison Financial Services in Roadtown and a P.O. box.  The fact that agreements between the Funds and Defendants contain choice of law provisions is not controlling with respect to tort claims brought by third-party plaintiffs.  *Montreal Pension I*, 446 F. Supp. at 194 n.225; *AllGood Entm't, Inc. v. Dileo Entm't & Touring, Inc.*, 2010 WL 2606042, at *5 (S.D.N.Y. June 29, 2010) ("Under New York law tort claims are outside the scope of contractual choice-of-law provisions that specify what law governs construction of the terms of the contract.") (internal quotation marks and ellipses omitted); *Comprehensive Habilitation Servs., Inc. v. Commerce Funding Corp.*, 2009 WL 935665, at *10 (S.D.N.Y. Apr. 7, 2009) (same); *Dessert Beauty, Inc. v. Platinum Funding Corp.*, 519 F. Supp. 2d 410, 419 (S.D.N.Y. 2007) (same).

The Funds' respective Memoranda and Articles of Association prohibit the Funds from carrying on business with persons resident in the BVI, with limited exceptions for activities pertaining to the maintenance of their registered offices.  *See, e.g.*, Tracey Decl., Ex. 10 (Kingate Euro Fund, Memorandum of Association and Articles of Association, Apr. 19, 2000, Art. 4(2)-4(3)).  As noted above, the Funds' Information Memoranda state in block letters on their cover pages that shares issued by the Funds may not be offered for sale "to any member of the public in the British Virgin Islands."  *See, e.g.*, SAC, Ex. 1 at 1.  The investors in the Funds are scattered around the globe – but not in the BVI.  Indeed, in submissions to the Bermuda Supreme Court, the liquidators of the Kingate Funds conceded that the links with the BVI were "of a formal nature only."  *In re Kingate Global Fund, Ltd. (In Liquidation)*, [2010] SC (Bda) 47

Com at 2, ¶ 2, 20 Aug. 2010 (Berm.) (Barrett Decl., Ex. 4).  In sum, there is no reason to defer to BVI law with respect to investor standing.

### B. New York Law Governs Plaintiffs' Standing because New York Has the Strongest Interest of Any Jurisdiction

"The burden of identifying a conflict of law is on the party asserting the application of foreign law." *Shah v. Kuwait Airways Corp.*, 2012 WL 1631624, at *3 (S.D.N.Y. May 7, 2012) (where that burden is not met, the court may presume that it is the same as local law); *see In re Parmalat Sec. Litig.*, 383 F. Supp. 2d 587, 595 (S.D.N.Y. 2005).  "In the absence of [a] substantive difference" between New York law and foreign law, "a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it." *I.B.M. Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004).

Defendants here fail to identify any such conflict, and their arguments show there is no material difference between New York law and BVI law in this regard.  This is not surprising. Defendants concede that "the laws of Bermuda and the BVI are nearly identical, as each is primarily derived from English common law principles."  Br. at 66 n.66.  The law of the Cayman Islands also derives from English common law, and New York courts have found that "there is no discernible conflict between New York and Caymanian law with respect to an individual shareholder's standing to pursue claims." *Robeco-Sage v. Citigroup Alt. LLC*, 2009 WL 2626244 (N.Y. Sup. Ct. July 28, 2009); *see In re Granite Partners, L.P. v. Primavera Familienstiftung*, 194 B.R. 318, 325 n.9 (Bankr. S.D.N.Y. 1996) ("Cayman Islands law and the English law from which it derives recognize the same distinction between direct and derivative actions . . . that exist under American law.").  Thus, the Court is "free to apply" the law of New York.

**C.      Plaintiffs Have Standing under New York Law**

Plaintiffs have standing under New York law to assert each of their claims.  This action does not involve a lawsuit by shareholders against the fund in which they invested.  Rather, this case pits investors against the promoters, managers, sponsors and other third-party vendors of the Funds who induced Plaintiffs' investment in the Funds, but abdicated their direct duties owed to Plaintiffs, and who engaged in negligent and reckless conduct that directly caused Plaintiffs to lose billions of dollars.

**1.      Plaintiffs Have Standing to Assert "Inducement" Claims Directly**

Plaintiffs are not suing to recover the losses that the Funds incurred by investing in Madoff, but to recover their *own losses* after Defendants induced them to make and then maintain or increase investments in the Funds.  Inducement claims are textbook examples of direct claims under New York law that can be pursued by investors who relied on misleading statements.  *See Anwar I*, 728 F. Supp. 2d at 401 ("[A]llegations by investors of having been tortiously induced to invest or to retain an investment are not derivative claims.") (citing *Montreal Pension I*, 446 F. Supp. at 205 (shareholders may bring direct claims based on the theory that they were "induced to make and/or retain their investments")).

For purposes of standing, "inducement" claims are not limited to fraud and misrepresentation, as demonstrated by the Second Circuit's decision in *Excimer Associates, Inc. v. LCA Vision, Inc.*, 292 F.3d 134, 140 (2d Cir. 2002).  In *Excimer,* a shareholder sued the defendants for breach of contract and for promissory estoppel, alleging that the plaintiff made and lost its capital contribution in reliance on the defendants' reciprocal promise to contribute to the company.  The district court dismissed for lack of standing, finding that the injury was to the corporation.  The Second Circuit reversed because the essence of plaintiffs' claim was that "as a result of [defendant's] breach of the Operating Agreement, [plaintiff] contributed $495,218.93

over and above that which it was contractually obligated to pay, and it is now seeking to recover

that amount from [defendant].  Such a claim would seek recovery for a direct injury."  The court

explained, "under New York law, a shareholder may bring an individual suit if the defendant has

violated an independent duty to the shareholder, whether or not the corporation may also bring

an action."  *Excimer*, 292 F.3d at 140; *see also Benedict v. Whitman Breed Abbott & Morgan*,

722 N.Y.S.2d 586, 588 (N.Y. App. Div. 2001) ("[T]he wrongs alleged were not only wrongs to

the corporations, but were violations of an independent fiduciary duty owed by the [defendants]

to the plaintiff stockholders.").[14]

"The existence of common parties and shared facts between the bankruptcy and the

[creditor's] suit does not necessarily mean that the claims asserted by the [creditor] are property

of the estate."  *In re Seven Seas Petro., Inc.*, 522 F.3d 575, 585 (5th Cir. 2008).  "'[T]here is

nothing illogical or contradictory about saying that [a third-party defendant] might have inflicted

direct injuries on both the [estate's creditors] and [the debtor estate] during the course of dealings

that form the backdrop of both sets of claims.'"  *In re Bernard L. Madoff Inv. Sec. LLC*, 740 F.3d

81, 91 (2d Cir. 2014) (quoting *Seven Seas*, 522 F.3d at 587).  Where, as here, the creditor "does

---

[14] The U.S. cases cited by Defendants are inapposite because they either did not apply New York law or did not involve the breach of direct duties owed to plaintiffs that led to the purchase of worthless investments.  *See* Br. at 53, 57 n.61.  In *Diana Allen Life Ins. Trust v. BP P.L.C.*, 333 F. App'x 636, 638 (2d Cir. 2009), "the alleged harm, a reduction in royalty payments … was suffered by the Trust, and the Trust would receive the benefit of any recovery.  Plaintiff has alleged no breach of duty owed to Trust Unit Holders as opposed to the Trust itself, and has not alleged that it can prevail on its claims without showing injury to the Trust itself."  *Cummins Inc. v. N.Y. Life Ins. Co.*, 2013 WL 5393885 (S.D.N.Y. Sept. 26, 2013), involved claims by a plaintiff "which [was] not an investor in the Tremont Fund," *id.* at *39, and the "alleged duty is the duty which Tremont owed to the Tremont Fund," *id.* at *9.  In *Stephenson v. PricewaterhouseCoopers, LLP*, 482 F. App'x 618, 621 (2d Cir. 2012) (summary order), the Second Circuit, applying Delaware law, found that the plaintiff "ha[d] standing to assert his inducement claim directly," however, "the complaint fail[ed] to demonstrate that PWC owed him a duty as a potential investor in the fund" and the plaintiff had not alleged that he made any investments subsequent to his initial investment.

not seek recovery for injuries suffered by [debtor] but for injuries it suffered directly," the creditor has "standing to bring [its] claim, regardless of the fact that a bankrupt debtor" relies on the same facts to assert its own claims. *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1101 (2d Cir. 1988).

The claims here are based on Defendants' duties owed directly to Plaintiffs and allege that Plaintiffs were induced to purchase and retain worthless investments. Therefore, Plaintiffs have standing to bring direct claims. *See Ceribelli v. Elghanayan*, 990 F.2d 62, 64 (2d Cir. 1993) ("[T]he sponsor as promoter has breached a fiduciary duty to the corporation, and as seller of stock has breached a duty to the shareholders. The shareholders can maintain a direct action."); *Anwar I*, 728 F. Supp. 2d at 401 n.9 (sustaining direct claims for gross negligence, breach of fiduciary duty and unjust enrichment against investment managers "based on duties that were independently owed to Plaintiffs"); *Higgins v. N.Y. Stock Exch., Inc.*, 806 N.Y.S.2d 339, 349 (N.Y. Sup. Ct. 2005) (upholding breach of fiduciary duty claims as direct); *Rolf v. Blyth, Eastman Dillion & Co.*, 570 F.2d 38, 45 (2d Cir. 1978); *Rasmussen v. A.C.T. Envtl. Servs. Inc.*, 739 N.Y.S.2d 220, 222 (N.Y. App. Div. 2002); *Venizelos v. Oceania Mar. Agency, Inc.*, 702 N.Y.S.2d 17, 18 (N.Y. App. Div. 2000) ("[Defendant] breached fiduciary duties he owed to plaintiffs independent of the duties he owed to the holding company, and the sole purpose and effect of his transactions with respect to the holding company, which required little active management, was to steal from plaintiffs.") (citations omitted).[15]

---

[15] *See also In re R.E. Loans LLC*, 519 B.R. 499, 508 (Bankr. N.D. Tex. 2014) ("[T]hese claims are clearly inducement claims, which California courts and the Fifth Circuit have consistently held are direct, not derivative, claims.") (collecting cases); *Bivens v. Watkins*, 437 S.E.2d 132, 134 (S. C. Ct. App. 1993) ("Injuries emanating from such an inducement are different from injuries arising from any actions these individuals may have taken as officers, directors, and managers of the new corporation in dissipating or wasting its assets. In that regard, [the plaintiff shareholder's] alleged injury is separate and distinct from that of the corporation."); *id.* at 135

**Plaintiffs Have Standing to Assert Direct Claims because Defendants' Wrongful Conduct Benefited the Funds and Caused Plaintiffs to Suffer Asymmetrical Losses**

Plaintiffs also have standing because the nature of their alleged injury means they can "show that Plaintiffs suffered individual harm distinct from losses experienced by other investors," *Anwar I*, 728 F. Supp. 2d at 402, and distinct from any harm purportedly suffered by the Funds. Indeed, while the shareholders here were injured, the Funds affirmatively *benefited* from Defendants' wrongful conduct, with purported Fund assets growing to some $3 billion as of November 2008, just before Madoff's collapse. *See* SAC ¶ 54. In this regard, the Trustee of the BMIS estate filed an action to recapture "transfers aggregating $825 million from Bernard L. Madoff Investment Securities LLC" to the Funds. *See In re Bernard L. Madoff Inv. Sec. LLC*, 2015 WL 4734749, at *1 (Bankr. S.D.N.Y. Aug. 11, 2015) ("*Bankruptcy Decision*").

As in *Anwar I*, Defendants' alleged misdeeds did not harm the Funds, but instead benefited them:

> [T]he alleged concealment or reckless ignorance by Defendants did not harm the Funds as such. Rather, what the pleadings suggest is that Defendants' errors and omission . . . served as the lotus that kept Defendants blissful and that sustained their corporations.

*Anwar I*, 728 F. Supp. 2d at 401. And as in *Anwar I*, Defendants' "breaches of duty were essential to the Funds' corporate forms thriving." *Id.* The New York court in *Higgins* applied the same principle, discussing the "*Tooley* test":

> [U]nder *Tooley*, the ultimate harm suffered by the plaintiff [here] was that he received too little cash for his shareholders' equity in the process of being cashed-out. In contrast, the corporation who cashed-out the plaintiff *was not harmed, but*

(finding defendant promoter owed a fiduciary duty to plaintiff); *Mann v. Kemper Fin. Cos., Inc.*, 618 N.E.2d 317, 327 (Ill. App. 1992) ("[I]ndividual shareholders may bring an action based upon violations of a duty owed directly to them. As sellers of securities, defendants owed common-law fiduciary duties to individual investors. Therefore, count II should not have been dismissed because it was not a shareholder's derivative claim because it alleged a duty owed directly to plaintiffs.").

> *was arguably benefitted, albeit improperly, because the benefit was allegedly obtained through a breach of duty.* The element that distinguishes the harm flowing in the first instance to the plaintiff, rather than the corporation, is that the plaintiff's interests were at odds with the corporation's interests: in paying the plaintiff less for his shares, more equity remained on the corporation's balance sheet, translating into the appearance of more corporate assets.

*Higgins*, 806 N.Y.S.2d at 351-52.[16] As these cases show, the claims are appropriately brought directly by the injured shareholders, not by the corporations that benefited.

Moreover, the Funds and the investors *suffered different losses.* As individual investors, Plaintiffs' losses are measured on a "net equity" basis—total amount invested minus redemptions. *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229 (2d Cir. 2011) (net equity method is the only fair way to ascertain losses in a Ponzi scheme). The Funds' losses, however, are calculated differently. For the Funds, the sum of all of Plaintiffs' individual losses must be reduced by the amount gained by other investors who were "net winners." Therefore, the Funds' losses are necessarily smaller than the aggregate net losses of Plaintiffs because many investors were "net winners" on a net equity basis. Plaintiffs' claims are therefore direct. *See Anwar I*, 728 F. Supp. 2d at 402 ("availability of direct actions is further shown by the asymmetrical injury").

### 3. Plaintiffs Also Have Standing Because the Funds' Claims May Be Precluded By an *In Pari Delicto* Defense

Apart from any other basis, Plaintiffs also have standing to bring claims that would otherwise belong to the Funds because of the "Wagoner Rule." *See Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991). Under this rule, the corporation (or the

---

[16] Defendants claim (Br. at 57 n.61) that the court in *Yudell v. Gilbert*, 949 N.Y.S.2d 380, 383-84 (App. Div. 2012), "adopt[ed] the test provided by the Delaware Supreme Court," *i.e.*, the "*Tooley* test" articulated in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004), to determine questions of shareholder standing. Rather, *Yudell* applied the *Tooley* test "in this case," but did not, as Defendants claim, "adopt" the test as controlling under New York law. *Id.* In any event, application of *Tooley* does not change the outcome here. *See Anwar I*, 728 F. Supp. 2d at 401 n.9.

trustee on its behalf) cannot assert a claim where it was involved in the defendant's alleged wrongdoing. *Id.* In such instances, creditors or investors may assert claims that the corporation or trustee would be barred from bringing because of its own complicity in the wrongdoing. *See In re Hampton Hotel Investors L.P.*, 289 B.R. 563 (Bankr. S.D.N.Y. 2003). "A claim against a third-party for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty corporation." *Id.* at 574 (quoting *Wright v. BankAmerica Corp.*, 219 F.3d 79, 86 (2d Cir. 2000)). As discussed above, defendants have raised *in pari delicto* principles in defending against the claims raised by the Joint Liquidators on behalf of the Funds.

Indeed, the Second Circuit has explicitly held that claims arising out of a Ponzi scheme can be asserted only by the investors, not by the debtor's trustee. *See Hirsh v. Arthur Andersen & Co.*, 72 F.3d 1085, 1093-95 (2d Cir. 1995) (trustee of debtor, which perpetrated a Ponzi scheme, lacked standing to sue the debtor's former accountants for assisting in the fraud). Accordingly, it is particularly appropriate to grant standing to investors in a Ponzi scheme because their investment vehicle – or the trustee – may be subject to an *in pari delicto* defense. *See, e.g., E.F. Hutton & Co. v. Hadley*, 901 F.2d 979, 986-87 (11th Cir. 1990) (claims arising from Ponzi scheme belonged only to defrauded investors, as trustee lacked standing); *Williams v. Calif. 1st Bank*, 859 F.2d 664, 667 (9th Cir. 1988) (same).

### D.     Plaintiffs' Claims Would Be Allowed under BVI and Bermuda Law

As explained in the Bompas Declaration and Bompas Further Declaration, Plaintiffs' claims are direct under BVI law because: (1) the Funds are not asserting claims that belong to the Funds (Bompas Decl. ¶ 12, 20; Bompas Further Decl. ¶¶ 10-11); (2) the Funds have suffered no actionable loss and, therefore, have no cause of action arising from the acts or omissions giving rise to Plaintiffs' claims for wrongful inducement (Bompas Further Decl. ¶¶ 18, 29); (3) Plaintiffs' losses are not reflective of a diminution in the value of the Funds' shares (*Id.* ¶ 18); (4)

Plaintiffs' losses are asymmetrical both with respect to the Funds' losses and with respect to the losses incurred by other shareholders (Bompas Decl. ¶ 37-38; Bompas Further Decl. ¶¶ 43); (5) the Funds do not have viable claims that realistically are likely to make Plaintiffs whole for the entirety of the losses they have suffered (Bompas Decl. ¶ 38); (6) the Joint Liquidators face an uphill battle in the action to enforce the Funds' claims in Bermuda against the Kingate Defendants and PwC in the face of exclusionary clauses and disclaimers in the contracts with the service providers, and affirmative defenses of *in pari delicto* and *ex turpi causa* (Bompas Further Decl. ¶ 48); and (7) even if the reflective loss principle were applicable, Plaintiffs would still be entitled to pursue their claims under an exception to the principle for cases where a company is effectively disabled from pursuing its claims by the wrongdoing of the defendants (Bompas Decl. ¶¶ 39-42; Bompas Further Decl. ¶¶ 30-33, 43-44). Defendants' experts over-simplify the reflective loss principle, misconstrue the nature of Plaintiffs' claims as mismanagement rather than inducement claims, and ignore the exceptions and limitations to the reflective loss principle.

As a threshold matter, the framework for applying the reflective loss principle is straightforward and extremely steep for a defendant to maintain. *First*, Defendants have the burden of demonstrating that Plaintiffs' claims are barred by the reflective loss rule, because the reflective loss rule eliminates what are otherwise legitimate claims. Bompas Decl. ¶ 50; *Shaker v. Al-Bedrawi* [2003] BCC 465 at ¶ 33 ("As the . . . principle is an exclusionary rule denying a claimant what would otherwise be his right to sue, the onus must be on the defendants to establish its applicability."). *Second*, Bermuda and BVI courts will not dismiss a claim under the no-reflective loss principle unless it is *clear beyond doubt* that the plaintiff does not have a viable claim. *Johnson v. Gore Wood & Co.*, [2002] 2 A.C. 1 (H.L.), 14 Dec. 2001 (Eng.) ("At the strike out stage, all reasonable doubt must be resolved in favor of the claimant."). *Third*, if the facts of the case are complex or the claims implicate controversial points of law, resolution

of the standing issue will be deferred until the trial of the case to allow the decision to be made in light of all the relevant facts. Bompas Further Decl. ¶ 50; *Perry v. Day,* [2005] BCC 375 at ¶ 71; Diel Declaration on Bermuda Law, Dkt. No. 134, ¶ 6 (Under Bermuda law for a claim to be struck out, it must be "unarguable," "plain and obvious," "obviously unsustainable," and "clear beyond doubt.") (submitted in opposition to prior motion to dismiss); *Kingate Global Fund Ltd. (in liquidation) v. Kingate Management Ltd. & Others*, [2016] SC (Bda) 3 Com. ¶ 18. Defendants' experts do not seriously dispute that these are the applicable standards that a Bermuda or BVI court would apply in deciding a strike out motion. Dohmann Decl. ¶¶ 38-39 (a strike out application will not be granted if it raises a serious issue of fact or has no serious prospect of succeeding).

Finally, the *Johnson v. Gore Wood & Co.* principles are easily stated, but the courts have faced difficulties applying the principles to complex facts. There has been a discernible trend to limit the scope of the *Johnson v. Gore Wood & Co.* principle. *Id.* ¶ 32 and n. 15. If applied rigidly, the principles may lead to injustice. Consequently, in many cases since *Johnson v. Gore Wood & Co.* was decided, the courts have refused to strike out at a preliminary stage claims that may subject to debarring pursuant to the application of the *Johnson v. Gore Wood & Co.* principles, but instead have allowed claims to go to trial for there to be a determination, after a factual investigation, of the question whether or not the principle is applicable. Bompas Further Decl. ¶¶ 50-56.

## 1.    **Plaintiffs' Claims Are Not Barred by the Reflective Loss Rule**

The leading English case of *Johnson v. Gore Wood & Co*., [2002] 2 A.C. 1 (H.L.), 14 Dec. 2001 (Eng.), articulated three propositions with respect to shareholder standing. The experts generally agree on what the principles are, but disagree on the application of those principles to the facts of this case. *First*, where a company has a cause of action based on a

wrong to the company, the cause of action belongs to the company. Bompas Decl. ¶ 25. This is the *Foss v. Harbottle* principle, which is also referred to as the "proper plaintiff" principle. Bompas Further Decl. ¶ 16. Defendants' experts contend that Plaintiffs are seeking to enforce wrongs to the Funds which violates the *Foss v. Harbottle* principle. Br. at 53; Hargun ¶¶ 80-86; Evans ¶¶ 37-44; Chivers ¶¶ 23-28; Dohmann ¶ 41. As Bompas explains, the investors are the "proper plaintiffs" to assert the claims here because Plaintiffs are pursuing claims inducement claims based on the harm done to them, not the Funds. Bompas Decl. ¶ 20, Bompas Further Decl. ¶¶ 10-11.

Defendants distort the nature of Plaintiffs' claims in a futile effort to come within *Foss v. Harbottle*. Defendants characterize the causes of action in the SAC as "mismanagement claims," Br. at 54, when, in fact, Plaintiffs' claims arise from the breach of duties Defendants owed directly to the investors. Defendants wrongfully induced Plaintiffs to invest in, re-invest in, and hold securities in the Funds, while the Funds benefited from the activities with increased subscription fees. Consequently, Plaintiffs have not usurped claims belonging to the Funds.

*Second*, a shareholder may bring an action if the company has no cause of action to recover the loss. Bompas Decl. ¶¶ 25, 27-28; Bompas Further Decl. ¶¶ 29, 36, 42.1.[17] Accordingly, the reflective loss principle does not apply to bar Plaintiffs' claims that they were wrongfully induced to purchase and retain shares because the Funds do not have a cause of action against their distributors and service providers for wrongful inducement. *Id.* ¶ 28. Consequently, Plaintiffs may bring an action to recover their personal losses in purchasing worthless securities. Bompas Further Decl. ¶ 9. Similarly, shareholders who were induced to retain their investments in the Funds based on Defendants' breach of duties lost the opportunity to

---

[17] Defendants' expert, David Chivers, refers to this principle as an exception to the reflective loss principle. Chivers Affidavit, dated December 21, 2015, Dkt. No. 198.

redeem their investments prior to the collapse of the Madoff Ponzi scheme.[18]  Plaintiffs are not seeking damages for the diminution in the value of their shares based on a decline in the value of the Funds' shares after purchase, due to mismanagement or otherwise.  The reflective loss principle is not applicable because the Funds have suffered no loss of which Plaintiffs' loss would be a reflection.  Bompas Further Decl. ¶¶ 18, 21, 29.

*Third*, where a company suffers a loss caused by a breach of a duty, and a shareholder suffers a loss caused by a breach of a duty that the same person owes independently to the shareholder, each may sue.  Bompas Decl. ¶¶ 34-35.  Defendants assert that the Funds have claims against their service providers for mismanagement and breach of contract that gave rise to the losses suffered by the Funds when Madoff's fraud was exposed.  Plaintiffs' claims, however, are not grounded on the breach of duties owed by the service providers to the Funds with respect to the management of the Funds' assets.  The claims in the SAC are based on the separate relationship between Defendants on the one hand and Plaintiffs on the other that affected Plaintiffs' decisions to invest in the Funds, to purchase additional shares in the Funds, and to remain invested in the Funds.  SAC ¶¶ 1, 3.  Moreover, Defendants' experts are wrong when they claim that Plaintiffs losses are indirect losses, comprised of a diminution in the value of their Fund shares (Br. 56, Evans ¶¶ 59-62, 73, 81, 107; Hargun ¶¶ 119-23, 135, 143, 169; Chivers ¶¶ 51-66, 159, 162, 165, 168, 173, 176; Browne-Wilkinson ¶¶ 23-31; Dohmann ¶¶ 7, 92). Plaintiffs incurred immediate losses when they exchanged substantial subscription proceeds for virtually worthless shares (Bompas Further Declaration ¶¶ 9, 14-18).  Mr. Brown-Wilkinson

---

[18] As Judge Marrero explained in *Anwar I*: "It is plausible that the Citco Defendants caused Plaintiffs to suffer a loss by inducing them to retain their investments.  By the very nature of Madoff's scheme, Plaintiffs were less and less likely to be able to redeem the longer they retained their investments.  Insofar as the Citco Defendants argue that the same run on the Funds would have occurred whether the fraud was disclosed in December 2008 or earlier, it is enough at this point that Plaintiffs allege that BMIS had more than $ 5.5 billion dollars in a bank account in the summer of 2008 available for redemptions."  728 F. Supp. 2d at 445.

said in paragraph six of his declaration that he had been "instructed to assume that the Plaintiffs are seeking to measure damages they are claiming from Citi Hedge by reference to the value of the amounts invested in the Funds less payments received, such as redemptions." These losses, however, occurred immediately, and did not reflect a decline in the value of the Funds' shares after the purchase. Bompas Further Decl. ¶ 16.

## 2. The Joint Liquidators Have No Realistic Prospect of Making Plaintiffs Whole

Even where the reflective loss principle applies, which is not the case here, a shareholder is not precluded from bringing a direct claim if the company, for whatever reason, is unable to fully remedy the loss inflicted on the shareholder (for example, where a defense to the company's claim caps damages or the company's claim is of dubious worth because of contractual disclaimers and exclusions). Bompas Decl. ¶¶ 37-38; Bompas Further Decl. ¶¶ 29-30, 42-48. Only if plaintiffs' losses are reflective of losses for which the company does in fact have its own viable causes of action can the reflective loss principle bar the claims. Bompas Decl. ¶ 48.2; Bompas Further Decl. ¶ 43.2-48. That is not the case here: Plaintiffs' claims cannot be struck out where the company's claim is illusory or the defendant has a strong defense to the company's claim. Bompas Decl. ¶ 48.1; Bompas Further Decl. ¶¶ 30, 32, 43-44. Given the Kingate Defendants' own culpability, as discussed below, the Funds cannot be said to have viable claims. Similarly, a shareholder may bring a claim if, as here, the claim is greater than the loss suffered by the fund. Bompas Decl. ¶¶ 37-38. As previously explained, the losses inflicted on the shareholders here exceed the Funds' losses.

The Joint Liquidators of the Funds are locked in a battle with the Trustee of the SIPA estate over so-called claw-back claims for alleged fraudulent transfers. *Picard v. Ceretti*, *et al.* Adv. Pro. No. 09-1161 (SMB) (Bankr. S.D.N.Y.). The Trustee is seeking to recapture nearly

one billion dollars from the Funds and to subordinate the Funds' SIPA claims. If the Trustee prevails, the Funds will be forced to pay hundreds of millions of dollars into the SIPA estate. Thus, there is a significant likelihood that, even if somehow there were proceeds from a recovery by the Funds in the Bermuda actions, they will be diverted to the Trustee for the benefit of the SIPA estate.

There is a further, critical difference between the Funds' potential recoveries and damages in this action. If the Joint Liquidators have money to distribute after the Trustee's claim is resolved, it is likely that distributions will be made on a *pro rata* basis to all the shareholders of the Funds based on their holdings in December 2008, without regard to whether the recipients are net gainers or net losers, based on traditional principles of Bermuda and BVI law. *See, e.g.,* Barrett Decl., Ex. 8, Order of Justice Edward Bannister QC, dated 22 March 2016. By contrast, the recovery in this class action will be distributed – in accordance with Second Circuit law – only based on actual losses of principal. *See In re Bernard L. Madoff Investment Securities Ltd.*, 654 F.3d 229 (2d Cir. 2011).

### 3. Plaintiffs' Claims Come Within the *Giles v. Rhind* Exception to the Reflective Loss Principle

The reflective loss principle is also subject to an exception where a company is disabled from recovering its loss by the wrongdoing of the defendant, namely the *Giles v. Rhind* principle. Bompas Decl. ¶¶ 45-46; Bompas Further Decl. ¶ 30. Defendants' experts claim that the *Giles v. Rhind* exception is a "very limited" exception based on a statement in *Kazakhstan Kagazy v. Arip* [2014] EWCA Civ. 31, a U.K. Court of Appeals decision. Br. 58 (with citations to Defendants' expert opinions). Defendants, however, misconstrue this statement to mean that the wrong must make it "impossible" for the company to sue. *See, e.g.,* Chivers Decl. at 48. The proper interpretation is that the wrong makes it impractical or impossible for the company

to pursue its remedy against the wrongdoer to conclusion, not that the company is prevented from filing a suit. Bompas Further Decl. at notes 18 and 21. The company in *Giles v. Rhind*, in fact, filed a lawsuit against a former shareholder and director who stripped the company of its most valuable asset and caused the company to fail. The company filed suit, but was unable to continue proceedings because it did not have the wherewithal to post security for costs. The fact that the company was financially disabled by the actions of its faithless director allowed a shareholder to bring an action against the wrongdoer for breach of a shareholder agreement. *Giles v. Rhind* has been cited with approval in man U.K. cases and is open to expansion. Bompas Further Declaration at ¶¶ 30, 33-34.

Defendants argue that the fact that the Joint Liquidators are pursuing claims against certain of the Kingate Defendants and PwC is proof that the Funds are capable of bringing their own claims. Br. at 8, 35, 53 n. 56, 55 n. 58; Browne-Wilkinson Decl. ¶ 21; Hargun Decl. ¶¶ 97-99; Evans Decl. ¶ 46; Chivers Decl. ¶¶ 48-49. Consequently, they argue that this exception is inapposite. *Id.* Defendants' argument misses the mark. The Defendant wrongdoers have effectively incapacitated the Funds from prevailing in the Bermuda actions. Bompas Further Decl. ¶ 34 ("The Liquidators face formidable difficulties in establishing claims against the Kingate Defendants based on the contractual defenses put in place by those Defendants to insulate themselves from claims by the Funds should it turn out that after all the Funds were mere funnels of money from the Plaintiffs to a Ponzi scheme").

Plaintiffs in this action fall within the *Giles v. Rhind* exception. ████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████ Moreover, the Kingate Defendants drafted the contracts between the Funds and themselves and other service providers to include broad disclaimers and

71

exclusions that present significant obstacles to the Funds' ability to bring successful actions against the service providers.

For example, the Management Agreement between the Funds and KML provides:

Scope of Liabilities. Neither the Manager nor its directors, officers, shareholders and employees, shall be liable to the Fund or its Shareholders for any losses, damages, expenses or claims occasioned by any act or omission of the Manager or directors, officers, shareholders or employees in connection with the performance of its services hereunder, other than as a result of its own gross negligence, bad faith or willful or reckless malfeasance.

Barrett Decl., Ex. 12, Management Agreement § 5.4. Similarly, the Consulting Services Agreement between the Funds and FIM Limited dated April 23, 2001 provides at 13.1:

In the absence of gross negligence, fraud or willful default on the part of FIM, or failure to comply with instructions of the Manager pursuant to clause 4.2, its directors, officers, employees or agents, FIM shall not be liable to the Manager of the Company for any act or omission in the course of , or in connection with, the services rendered by it hereunder or for any decline in the value of the assets of the Company or any loss whatsoever that may result to the Company or the Manager.

Barrett Decl., Ex. 11, Consulting Agreement § 13.1.

Defendants Ceretti and Grosso were the founders of the Funds, the indirect owners of KML, and the masterminds behind the organizational structure of the Funds. It is a fair inference that the contracts among the various entities in the Kingate organization were intentionally fortified with these disclaimers and exculpation clauses to fend off liability precisely because Ceretti and Grosso knew that proper due diligence and monitoring procedures were not being performed on Madoff's purported trading on behalf of the Funds.

The Kingate Defendants' exculpation clauses thus present a Catch-22 for the Funds. In order to overcome the contractual barricades, the Funds would have to allege gross negligence, fraud or willful deceit or reckless malfeasance against the managers and service providers. The Funds, however, are ultimately responsible for the actions of their agents. If the managers and

service providers engaged in such misconduct, it would be attributed to the Funds as the acts of the Funds' agents. 

. Consequently, Plaintiffs should be permitted to proceed with their claims that are barred neither by *in pari delicto* nor the contractual exculpatory clauses. Bompas Further Decl. ¶ 46.

### 4. This Court Can Safeguard against Double Recovery and Prejudice to Other Shareholders and Creditors

At bottom, the reflective loss principle is a procedural device developed under U.K. law, as a matter of policy, to prevent double recoveries and preferential payouts to shareholders at the expense of other shareholders and creditors. Bompas Further Decl. ¶¶ 25-26; Bompas Decl. ¶ 44.3. U.S. federal courts, however, have mechanisms to prevent double recovery.

These issues arise, for example, in the context of overlapping shareholder securities fraud class actions, ERISA claims, derivative claims, and direct claims brought by a company arising from the same core of operative facts. Here, if the Class obtains a judgment against Defendants, members of the Class may be required to offset collateral recoveries in the claims process. *See, e.g., Anwar et al v. Fairfield Greenwich Limited et al.*, SDNY Case No.: 09cv118, Dkt. No. 1553, January 6, 2016, Stipulation of Settlement ¶ 4. Defendants also may be able to reduce the damages awarded to the Class by offsetting damages, if any, recovered by the Joint Liquidators. *Id.*

IV.     **THE COMPLAINT PROPERLY ALLEGES DEFENDANTS BREACHED FIDUCIARY DUTIES OWED TO PLAINTIFFS (COUNTS 13, 19, 26)**

A.     **Plaintiffs State Claims for Breach of Fiduciary Duty Against the Kingate Defendants and Citi Hedge under New York Law**

Under New York law, "[t]he elements of a claim for breach of a fiduciary obligation are: (i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom." *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011).  A fiduciary duty arises if "confidence is reposed on one side and there is resulting superiority and influence on the other."  *United States v. Chestman*, 947 F.2d 551, 568 (2d Cir.1991); *see Daly v. Metro. Life Ins. Co.*, 782 N.Y.S.2d 530, 535 (N.Y. Sup. Ct. 1992) ("[A] fiduciary duty arises, even in a commercial transaction, where one party reposed trust and confidence in another who exercises discretionary functions for the party's benefit or possesses superior expertise on which the party relied."); *Calvin Klein Trademark Trust v. Wachner*, 123 F. Supp. 2d 731, 734 (S.D.N.Y. 2000) (a fiduciary duty may arise in the context of an arm's-length negotiation in circumstances where the "superior access [of one party] to confidential information is so great as virtually to require the other party to repose trust and confidence in the first party").

In a footnote, Defendants argue that "[a]llegations that a defendant occupied a 'superior' position are [ ] insufficient to establish a fiduciary duty under New York law."  Br. at 73 n.72.  But Defendants fail to confront the actual allegations in the SAC or cases that have dealt with similar allegations under New York law.  Moreover, "New York courts generally avoid dismissing a claim of breach of fiduciary duty at the motion to dismiss stage because it usually involves a question of fact:  whether someone reposed trust and confidence in another who thereby gain[ed] a resulting superiority or influence."  *Musalli Factory for Gold & Jewellry v. JPMorgan Chase Bank, N.A.*,  261 F.R.D. 13, 26 (S.D.N.Y. 2009), *aff'd*, *Musalli Factory for Gold & Jewellry Co. v. JPMorgan Chase Bank, N.A.*, 2010 WL 2588195 (2d Cir. June 29, 2010);

*see also Anwar I*, 728 F. Supp. 2d at 447 ("[W]hether the fiduciary relationship exists is a fact-specific inquiry."); *Abercrombie v. Andrew Coll.*, 438 F. Supp. 2d 243, 274 (S.D.N.Y. 2006) (whether a fiduciary duty exists "normally depends on the facts of a particular relationship, [and] therefore a claim alleging the existence of a fiduciary duty is not subject to dismissal"); *EBC I, Inc. v. Goldman Sachs & Co*., 832 N.E.2d 26, 31 (N.Y. 2005) (noting that a fiduciary relationship is "necessarily fact-specific"). Here the SAC adequately alleges that the Kingate Defendants and Citi Hedge breached fiduciary duties owed to Plaintiffs.

## 1. The Kingate Defendants Owed Plaintiffs a Fiduciary Duty

By representing their special expertise with respect to investments generally and Madoff specifically, the Kingate Defendants placed themselves in a position of trust with respect to Plaintiffs. The SAC alleges that the Kingate Defendants, as reflected in the Information Memoranda, took on obligations to monitor and safeguard Plaintiffs' investments. SAC ¶¶ 70-71, 230-33. These obligations put the Kingate Defendants in a "special relationship" with Plaintiffs, both as holders and purchasers. Plaintiffs had no discretion over the Funds' investments and did not have access to the statements reflecting Madoff's purported trading on behalf of the Funds. Instead, Plaintiffs reposed their trust in the Kingate Defendants to safeguard and monitor the Funds' investments. *Id.* ¶¶ 230-31.

Courts have held that fund managers owe a fiduciary duty to fund shareholders who have no discretion over the investments. For example, in *Anwar I*, the Fairfield defendants (the equivalent of the Kingate Defendants here) were responsible for monitoring and supervising Madoff and thereby induced plaintiffs to invest in the Fairfield funds. Judge Marrero held that these allegations sufficed for a finding of a fiduciary relationship. *Anwar I*, 728 F. Supp. 2d at 415 (finding plaintiffs adequately alleged that the Fairfield defendants possessed "special knowledge and expertise about Madoff's operations"). Similarly, in *People v. Merkin*, 907

N.Y.S.2d 439 (N.Y. Sup. Ct. 2010), the Court concluded that "[t]he relationship created by the Offering Documents imposed on Merkin a duty to act with care and loyalty independent of the terms of those agreements." *Merkin*, 907 N.Y.S.2d at 439. In *Anwar v. Fairfield Sentry ("Anwar II)*, 745 F. Supp. 2d 360 (S.D.N.Y. 2010) ("*Standard Chartered*"), a case which was consolidated with the *Anwar* class action, Judge Marrero described the duties of a bank, *i.e.*, Standard Chartered, selling the Fairfield Sentry Funds as follows:

> Here, Plaintiffs sufficiently state causes of action for breach of fiduciary duty. Even non-discretionary broker-dealers have a duty to 'recommend [investments] only after studying [them] sufficiently to become informed as to [their] nature, price and financial prognosis and Standard Chartered had a duty to do the same before recommending Fairfield Sentry.

*Standard Chartered*, 745 F. Supp. 2d at 376 (applying Florida law); *see also Schwarz v. ThinkStrategy Capital Mgmt. LLC*, 797 F. Supp. 2d 439, 448 (S.D.N.Y. 2011) ("Plaintiffs have alleged that defendants breached their fiduciary duties by failing to conduct adequate due diligence and monitoring with respect to ThinkStrategy's investments, particularly the Nadel Funds."); *Bivens*, 437 S.E.2d at 135 (S. C. Ct. App. 1993) ("As a promoter, Watkins owed Mrs. Bivens a duty to act in good faith and with due regard for her investment in the corporation.") (applying South Carolina law); *Mann*, 618 N.E.2d 317, 327 ("As sellers of securities, defendants owed common-law fiduciary duties to individual investors.") (applying Illinois law).

The SAC alleges that the Kingate Defendants exercised discretionary control over the assets entrusted to them by Plaintiffs and had superior access to confidential information about Madoff's activities in connection with Plaintiffs' investments. SAC ¶¶ 70-73, 230-32, 307. The Information Memoranda for the Funds included a long section on "Management," reciting each of the Kingate Defendants' decades of experience in the financial industry. *See, e.g.*, SAC Ex. 1 at 11-16. The Information Memoranda also include Lack of Independent Data as a risk factor. SAC Ex. 4 at 6 ("[t]here is very little independent data available to assist a prospective investor

in his analysis of the Fund.").  Accordingly, the "Kingate Defendants' superior position

necessitated that Plaintiffs and the Class repose their trust and confidence in the Kingate

Defendants to fulfill their duties, and Plaintiffs and the Class did so by investing, reinvesting and

holding investments in the Funds."  SAC ¶ 231(b).

## 2.     Citi Hedge Owed Plaintiffs a Fiduciary Duty

The SAC also adequately alleges that Citi Hedge, in serving as the Funds' administrator,

owed Plaintiffs a fiduciary duty.  "New York courts have found that fund administrators have

fiduciary duties to investors to ensure the accuracy of reports concerning the valuation of the

Fund's assets and reviewing statements to investors for accuracy."  *Harmelin v. Man Fin. Inc.*,

2007 WL 2739579 (E.D. Pa. Sept. 20, 2007) (citing *Montreal Pension I*, 446 F. Supp. 2d at 196-

98 (S.D.N.Y. 2006); *Jordan (Bermuda) Inv. Co. v. Hunger Green Invs., Ltd.*, 2003 WL

21263544, at *4 (S.D.N.Y. June 2, 2003) (holding that fund administrator had "a fiduciary duty

to all [f]und shareholders to implement all trades on behalf of those shareholders and to report

the status of each shareholder's account accurately").

Plaintiffs' allegations establish that they had a fiduciary relationship with Citi Hedge.  Citi

Hedge had superior access to confidential information, because it received information

underlying the Funds' values from Madoff, and it was obligated to independently verify the

security prices Madoff reported.  SAC ¶ 189.  The SAC alleges that Citi Hedge had substantial

additional duties with regard to the Funds, which go beyond the duties of a typical fund

administrator, including its duties to:  provide an employee to act as secretary of the Funds (SAC,

Ex. 15, § 4.2.1) and to organize and attend meetings of the Funds' boards of directors (*id.*,

§ 4.2.7); establish and maintain bank accounts for the Funds (*id.*, § 4.2.9), as well as the Funds'

brokerage and custodian accounts (*i.e.*, the Funds' accounts with Madoff) (*id.*, § 4.6.1); maintain

the Funds' accounting books (*id.*, § 4.3.1) and reconcile accounting issues (*id.*, § 4.3.3); prepare

draft financial statements for the Funds' auditors (*id.*, § 4.3.4); process shareholder subscription and redemption requests (*id.*, § 4.4.1); and answer correspondence from shareholders (*id.*, § 4.4.4). SAC ¶ 187. Plaintiffs had to repose trust in Citi Hedge, because Citi Hedge determined the Funds' NAVs as well as the number of shares purchased by Plaintiffs' subscription proceeds, and was responsible for communicating with them and handling their subscriptions and redemptions. *Id.* ¶ 189. Of course, Plaintiffs had no access to the significant underlying information available to Citi Hedge, and so could not independently verify any of the information Citi Hedge provided to them – as the information memoranda explicitly recognize. SAC, Ex. 2 (Kingate Euro IM) at 7; SAC, Ex. 4 (Kingate Global IM) at 6. Plaintiffs had no choice but to repose their trust and confidence in Citi Hedge. *See EBC I, Inc.*, 832 N.E.2d at 31 (finding a fiduciary relationship because, *inter alia*, the plaintiff "was induced to and did repose confidence in [the defendant's] knowledge and expertise to advise it as to a fair IPO price").

In *Montreal Pension I*, the court imposed a fiduciary obligation where – as here – the defendants were required to determine the relevant funds' NAVs by reference to "independent pricing sources." *Montreal Pension I*, 446 F. Supp. 2d at 197; *see also* SAC ¶¶ 189-91. Likewise, in *Anwar I* the court found that "Plaintiffs allege[d] sufficient facts to support an inference that the Citco Defendants owed a fiduciary duty to Plaintiffs." *Anwar I*, 728 F. Supp. 2d at 441. The "Citco Defendants" served as the administrators of the funds at issue in *Anwar I* and Judge Marrero held that a fiduciary relationship was adequately alleged based on "significant responsibilities" similar to those alleged in the SAC. *Id.*

### 3. The Complaint Adequately Alleges the Kingate Defendants and Citi Hedge Breached Fiduciary Duties

A breach of fiduciary duty arises in a case "in which influence has been acquired and abused, in which confidence has been reposed and betrayed." *United Feature Syndicate, Inc. v.*

*Miller Features Syndicate, Inc.*, 216 F. Supp. 2d 198, 218 (S.D.N.Y. 2002) (quoting *Penato v. George*, 383 N.Y.S.2d 904 (1976)). The SAC contains overwhelming facts demonstrating that the Kingate Defendants and Citi Hedge breached their duties to Plaintiffs.

Plaintiffs allege that the Kingate Defendants breached their fiduciary duties by, among other things, failing "to take all possible steps to ensure that the investments of Plaintiffs and the Class were made and maintained in a prudent and professional manner" and "to perform all necessary and adequate due diligence and monitoring with respect to the Funds' investments." SAC ¶ 233. With respect to Citi Hedge, the SAC alleges a breach of fiduciary duties based on Citi Hedge "failing to discharge properly its duties as Administrator." *Id.* ¶ 290. "For instance, Citi Hedge failed to take reasonable, industry-standard steps to calculate the Funds' NAV; to independently confirm and verify the pricing information provided by Madoff; to reconcile balances at BMIS; to reconcile information provided by Madoff as the Funds' prime broker with information provided by KML and Tremont; to prepare the Funds' monthly financial statements in accordance with GAAP; and to provide accurate information to investors." *Id.* ¶ 192.

Similar allegations have been found sufficient to allege a breach of fiduciary duty at the pleading stage. In *Anwar I*, Judge Marrero held that the defendants' actions of "entrustment of Plaintiffs' investments to Madoff without having conducted due diligence or otherwise raising alarms about his operation in accordance with this duty constitutes a sufficient breach." *Anwar I*, 728 F. Supp. 2d at 415; *see also Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 288 (2d Cir. 2006) (stating that financial institution, aware of "'[f]acts sufficient to cause a reasonably prudent person to suspect'" improper use of account holdings, acquires duty to investigate) (quoting *Norwest Mortgage, Inc. v. Dime Sav. Bank of N.Y.*, 721 N.Y.S.2d 94, 95 (N.Y. App. Div. 2001)).

**B.     Plaintiffs State Claims for Breach of Fiduciary Duty against the Kingate and Individual Defendants and Citi Hedge under BVI and Bermuda Law**

The SAC alleges breach of fiduciary duty claims against the Kingate Defendants (Count 7) and Citi Hedge (Count 21).  Defendants argue that the SAC fails to state a claim for breach of fiduciary duty under BVI law against the Kingate Defendants and Citi Hedge for two reasons: (i) the SAC fails to plead the existence of a fiduciary relationship, and (2) assuming a fiduciary relationship did exist, Plaintiffs merely allege that the Kingate Defendants and Citi Hedge acted incompetently, not that they violated a fiduciary duty owed to Plaintiffs.  Br. at 70-71.  Defendants' arguments fail under BVI and Bermuda law.

**1.     The SAC Alleges the Existence of a Fiduciary Relationship**

Under BVI, Bermuda and U.K. law, the existence of a fiduciary duty depends on whether there is a sufficient relationship of trust and confidence.  Bompas Decl. ¶¶ 118, 135.  One of the leading cases, *Bristol and West Building Society v. Mothew*, [1998] 1 Ch 1, expressed this concept as follows:

> A fiduciary is someone who has undertaken to act for or on behalf of another in a particular matter in circumstances which give rise to a relationship of trust and confidence.

*Mothew*, [1998] 1 Ch 1 at 18.  The determination of whether a fiduciary duty exists is a fact-sensitive exercise.  Bompas Decl. ¶ 137.  The touchstone of a fiduciary relationship is that one party reposes trust and confidence in the other.  *Id.* ¶ 143.2.

Defendants completely ignore the crucial role of the Kingate Defendants and Citi Hedge with respect to Plaintiffs' investments in the Funds.  The Kingate Defendants acted as "investment advisors" and "placement agents with discretionary control over the assets entrusted to them by Plaintiffs and the Class."  SAC ¶¶ 220, 225.  Citi Hedge was responsible for calculating the NAV which valued both the Funds' and Plaintiffs' investments.  *Id.* ¶¶ 286-87.

80

Plaintiffs necessarily relied upon and reposed their trust in the Kingate Defendants and Citi Hedge when deciding to invest, reinvest, and retain their investments in the Funds. *Id.* ¶ 288. The allegations that Plaintiffs reposed trust and confidence in the Kingate Defendants and Citi Hedge are sufficient to give rise to a fiduciary relationship under BVI and Bermuda law. Bompas Decl. ¶ 140; Bompas Further Decl. ¶¶ 127-128.

The Kingate Defendants were the gatekeepers to the Funds and the only access to the Funds was through them. They sold shares in the Funds in face-to-face meetings where the FIM Entities and Tremont recommended that the investors purchase shares in the Funds or, in the case of existing shareholders, raise their stakes in the Funds. The distributors were obligated to remain in constant contact with shareholders and send them a steady stream of monthly performance reports. In light of the secretive nature of Madoff's operations, the Kingate Defendants, who were intimately associated with Madoff, were the only source of information concerning the investment strategy of the Funds. Investors necessarily had to rely upon the due diligence that the distributors purported to perform in making their investment decisions.

The SAC alleges that the Kingate Defendants occupied a superior position over plaintiffs with respect to their management and control of the assets of the Funds, and had superior access to confidential information about Madoff and his activities in connection with the Funds' investments. SAC ¶ 231. The Kingate Defendants further held themselves out as providing superior client investment services and evidenced an understanding that they were fiduciaries of the investors. *Id.* Plaintiffs and the Class reasonably and foreseeably reposed their trust and faith in the Kingate Defendants to fulfill their duties and did so by investing, re-investing and holding investments in the Funds. *Id.* ¶ 232. In Mr. Bompas' expert opinion, if these allegations

are borne out in discovery, this would be sufficient to find that a fiduciary duty existed between the Kingate Defendants and Plaintiffs. Bompas Further Decl. at ¶¶ 125-129.

The Bermuda case of *Horizon Bank International Ltd. v. Walsh & Ors*, [2009] CA (Bda) 6 Civ, *aff'd*, is on all fours with this case.[19] There the court held that Horizon Bank International Limited ("HBI"), a private bank, owed fiduciary duties to two individual investors who transferred assets to a company incorporated as part of a tax planning structure. Mr. Justice Kawaley, now the Chief Justice of the Bermuda Supreme Court, held that a fiduciary duty arose from the fact that HBI acted as an agent or *de facto* agent in establishing the offshore structure pursuant to which investors would place assets into companies which HBI controlled on their behalf. HBI became a fiduciary to the extent that it was trusted to ensure that the principal investment company would be managed consistently with the interests of investors and in accordance with the mandate they had provided. Here, as in the HBI case, investors reposed trust and confidence in the Kingate Defendants and this gave rise to a fiduciary relationship.

Justice Kawaley further held that the investors had "entrusted" their assets to HBI notwithstanding that the assets were transferred to two offshore companies owned by the investors and managed by a trading company owned indirectly by the investors. Bompas Decl. ¶ 142; Bompas Further Decl. ¶¶ 128.1.

As financial managers, placement agents, and brokers, the Kingate Defendants owed their clients a fiduciary duty as professionals to conduct thorough due diligence into the nature of the investments that they were selling to Plaintiffs. The Kingate Defendants had been dealing with

---

[19] Mr. Hargun attempts to distinguish the *Horizon Bank* case on the basis that there was a direct relationship between the bank and the claimants, but not between Tremont and the Plaintiffs (Hargun Decl. ¶¶ 40-41). Tremont, however, was in the business of selling shares in the Funds, and it had direct dealings with investors. It traded on its privileged access to Madoff and knowledge of his investment advisory business. Mr. Hargun's efforts to distinguish the *Horizon Bank* case are unpersuasive. Bompas Further Decl. at ¶ 121.

Madoff for many years. In the course of their relationship with Madoff, they were made aware of irregularities that should have caused them to increase scrutiny on Madoff instead of ignoring their obligations.

Citi Hedge was also an active participant in the marketing of the Funds' shares. The Administrator's duties included: (i) communicating with the Funds' shareholders, (ii) soliciting sales of the Funds' shares, (iii) accepting subscriptions of new shareholders, and (iv) calculating the subscription prices of the Funds' shares. SAC ¶ 182. Citi Hedge served as the Funds' agent with the general public and was responsible for communications with investors. *Id.* ¶ 188. Among the duties of the Administrator was to provide monthly reports to investors on the performance of the Funds (Kingate Euro Investment Memorandum dated May 1, 2006 at vii) and to respond to shareholder inquiries (Kingate Global Investment Memorandum dated May 1, 2006 at ii; Administration Agreement, § 4.4.4). Investors sent their subscription documents directly to Citi Hedge. SAC ¶ 188.

Citi Hedge held itself out as providing the best administrative services in the world. SAC ¶ 287. Citi Hedge was aware that its involvement lent credibility to the Funds and provided potential and current investors with assurance about the quality of financial services provided to the Funds and the accuracy of the reported values of the Funds and the investors' individual accounts. *Id.* ¶ 189. Investors necessarily placed trust and confidence in Citi Hedge because there was no other source of information on Madoff's trading and investment returns on behalf of the Funds. *See, e.g.,* SAC, Ex. 3 at 1 (stating that there was a lack of independent data available to assist a prospective investor in his analysis of the Fund). Yet Citi Hedge did not comply with standard industry practices to verify information received from Madoff. SAC ¶ 182. In the absence of such investigation and knowing that the Kingate Defendants never

sought to obtain independent verification of the information provided by Madoff or even the existence of the assets entrusted to Madoff, Citi Hedge breached fiduciary duties owed to the Funds' investors by enabling the sale of shares of the Funds. *Id.* ¶ 196.

Finally, the Individual Defendants also owed fiduciary duties to Plaintiffs. Defendants Grosso and Ceretti were the organizers and masterminds of the Funds. The pair provided the link between the Funds and Madoff. *Id.* ¶¶ 62-63. The lion's share of the management fees collected by KML flowed to them. They were personally involved in marketing the Funds and approving the NAV figures compiled by Citi Hedge.

The claims against Sandra Manzke are not based solely on her status as a director of KML. Rather they are grounded in large part on her actions as a promoter and seller of shares of the Funds to members of the Class. Further, directors may assume fiduciary duties or duties of care to third parties in special circumstances. *See Peskin v. Anderson*, [2001] 1 BCLC 372 ("[a] duality of duties may exist"); *Stein v. Blake and Ors.* (No. 2), [1998] 1 BCLC 573 at ¶¶ 19, 22 (shareholder has a personal claim against a director who induced him to part with shares at an unfair price); Bompas Decl. ¶¶ 131-32; Bompas Further Decl. ¶ 116. *Stein* supports the principle that shareholders have a direct and personal claim against directors who induce them to purchase shares at inflated prices. Manzke had deep ties to Madoff and her knowledge of his investment advisory business. SAC ¶¶ 33, 58, 61, 81. Her access to inside information is a significant factor giving rise to a fiduciary duty. Bompas Decl. ¶ 116. She was involved in the solicitation of investors as a pitch person and dealer in the selling of shares to Plaintiffs and used her contacts with Madoff to induce Plaintiffs and members of the Class to purchase worthless shares. *See* SAC ¶ 3. Manzke owed a fiduciary duty to conduct due diligence on the nature and value of the securities that she was selling and to monitor the Funds' performance. SAC ¶ 4. If she was

aware of any discrepancies or irregularities in the manner that Madoff did business, she was obligated to stop selling shares of the Funds until the discrepancies had been properly investigated and resolved. *See, e.g.,* SAC ¶¶ 64-69.

**C.    The Kingate Defendants and Citi Hedge Breached Their Fiduciary Duties to Plaintiffs**

Defendants claim that even if the SAC properly alleges that a fiduciary duty existed between Plaintiffs on one hand and the Kingate Defendants and Citi Hedge on the other, Plaintiffs have not alleged a true breach of fiduciary duty as opposed to a breach of a duty to exercise reasonable skill and care in performance of services.  Br. at 74.  Defendants assert incorrectly that the only fiduciary duty that BVI and U.K. law recognize in this "context" is a duty of loyalty.  *Id.*  The precise context to which Defendants are referring is not specified – presumably, Defendants are referring to shareholders as a whole.

A fiduciary owes a duty of loyalty and good faith to its beneficiary.  Bompas Decl. ¶ 143.2.  Moreover, it is black letter law that a fiduciary breaches a duty of loyalty when it acts for its own benefit at the expense of the principal without the principal's consent.  The duty of loyalty is a short-hand label for a broad range of fiduciary duties that must be determined based on the facts and circumstances of a particular case.  As the Privy Council observed in *Arklow Investments Ltd. v. Maclean*, [2000] 1 WLR 594, "[t]he existence and extent of the duty [of loyalty] will be governed by the particular circumstances."  [2000] 1 WLR 954 at 598G.  Thus, the scope of the duty of loyalty owed by a fiduciary is based on the particular factual circumstances of each case.  Bompas Further Decl. ¶ 54.  Here, the Kingate Defendants and Citi Hedge assumed fiduciary duties to members of the Class in connection with their decisions to invest in the Funds.

Here, the same allegations that establish a breach of fiduciary duty under New York law suffice to show a breach under BVI or Bermuda law. Bompas Decl. at ¶¶ 125-130. The Kingate Defendants and Citi Hedge were obligated to perform due diligence to ascertain the nature and worth of the Funds' securities that they were marketing to investors. The SAC alleges that the Kingate Defendants and Citi Hedge ignored basic duties and failed to verify trading data that revealed Madoff was engaged in fraud. *See* SAC ¶¶ 64, 73, 193-194, 307.

Finally, even assuming *arguendo* that Defendants are correct that mere incompetence on the part of the Kingate Defendants and Citi Hedge did not constitute a breach of fiduciary duties, Br. at 74, the SAC also alleges that these defendants were guilty of gross negligence and reckless conduct. *See, e.g.*, SAC ¶¶ 5, 221. These allegations are sufficient to amount to a breach of fiduciary duty. Bompas Further Decl. ¶ 126.

## V. PLAINTIFFS HAVE ADEQUATELY PLED CLAIMS FOR AIDING AND ABETTING BREACH OF FIDUCIARY DUTY (COUNTS 13, 19, 26)

### A. Plaintiffs State Claims for Aiding and Abetting Breach of Fiduciary Duty under New York Law

Plaintiffs assert claims for aiding and abetting breach of fiduciary duty against Tremont Group (Count 13), PwC (Count 19), and Citi Hedge (Count 26). To state a claim for aiding and abetting a breach of fiduciary duty under New York law, a plaintiff must show "(1) breach of fiduciary obligations to another of which the aider and abettor had actual knowledge; (2) the defendant knowingly induced or participated in the breach; and (3) plaintiff suffered actual damages as a result of the breach." *Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 466 (S.D.N.Y. 2009); *Anwar I*, 728 F. Supp. 2d at 442. The second element is satisfied where "a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 295 (2d Cir. 2006).

Contrary to Defendants' assertions, Br. at 79 n.77, willful blindness is sufficient to satisfy the knowledge requirement. It is well-established that allegations of "conscious avoidance" are sufficient to satisfy the actual knowledge requirement. *Anwar I*, 728 F. Supp. 2d at 442; *Cromer Fin. Ltd. v. Berger*, No. 00-CV-2284, 2003 WL 21436164, at *9 (S.D.N.Y. June 23, 2003) (denying summary judgment on an aiding and abetting breach of fiduciary duty claim because plaintiff "rais[ed] questions of fact as to whether [defendant] consciously avoided confirming the existence of the … breach of fiduciary duty").

The SAC sufficiently alleges actual knowledge and participation. These allegations must be taken as true. The SAC details that Citi Hedge had longstanding and extensive involvement with the Funds and its managers. Citi Hedge and its predecessors in interest served as administrators of the Funds from their inception. SAC ¶ 178. In that role, Citi Hedge was highly involved in the Funds' affairs, maintaining the Funds' books and records, providing an employee to serve as secretary for the Funds, preparing financial statements for the Funds, and reconciling the Funds' accounting issues. *Id.* ¶ 187. Thus Citi Hedge was "in the room" when the Funds were conducting their business in breach of their duties to investors. Citi Hedge's employee was even obligated to organize and attend meetings of the Funds' boards of directors. Administration Agreement, SAC Ex. 15 ("AA") at § 4.2.7. Citi Hedge also served as the Funds' agent with the general public, and processed all subscription and redemption requests for the Funds' investors. SAC ¶¶ 187-88; AA §§ 4.4.1, 4.4.4. Citi Hedge was knowledgeable about proper Fund administration, having extensive experience in providing financial services to funds. *Id.* ¶¶ 184-

86.  Furthermore, Citi Hedge was aware of the roles consolidated in Madoff and other red flags, which demanded a higher level of scrutiny over Madoff's investments.  *Id.* ¶¶ 198-215.[20]

The SAC alleges that the Kingate Defendants occupied a superior position over Plaintiffs with respect to the management and control over the assets of the Funds and had superior access to confidential information about the investment of assets and superior access to Madoff.  *Id.* ¶ 281.  The SAC also alleges that Citi Hedge knew, as Plaintiffs allege it did, that the Kingate Defendants were committing breach of fiduciary duty by, for instance, failing to perform necessary and adequate due diligence and oversight over the Funds' investments.  *Id.* ¶¶ 319-20. Thus, the knowledge and participation requirements are satisfied.

Similar facts have been found sufficient to demonstrate actual knowledge in other cases. *See, e.g.*, *Anwar I*, 728 F. Supp. 2d at 443 (relying on the defendants' "aware[ness] of the roles consolidated in Madoff," and other red flags, together with the defendants' "familiarity with the [f]unds, as well as their general experience in providing financial services to funds" in concluding that plaintiffs adequately alleged "that the [defendants] consciously avoided confirming facts that, if known, would demonstrate" both aiding and abetting a breach of fiduciary duty and fraud) (internal quotation marks omitted); *Cromer Fin.*, 2003 WL 21436164, at *1, 9 (finding a material dispute of fact when plaintiffs argued that the defendant auditing firm "ignored evidence of [defendant's] fraud and failed their responsibilities as auditors").  As in these decisions, Plaintiffs here have alleged both actual knowledge and circumstances from which such knowledge can be inferred, and have satisfied the knowledge requirement.

---

[20] The red flags of which Citi Hedge was aware include: Madoff failed to trade through an independent broker; self-cleared all trading activities; and served as his own custodian.  *Id.* ¶ 198.  He refused to identify the counterparties with which he supposedly traded, *id.* ¶ 199; used an unknown accounting firm which publicly represented that it did not conduct audits, *id.* ¶ 201; reported his trades on paper despite claiming to be technologically advanced, *id.*¶ 202; and had impossible trading volume, execution, and dividends, *id.* ¶¶ 205-15.

The same is true with respect to PwC. PwC was aware of the fiduciary duties owed by the Kingate Defendants to Plaintiffs. SAC ¶ 281. PwC knew that Plaintiffs reasonably and foreseeably relied on the Kingate Defendants' purportedly adequate due diligence to invest and remain invested in the Funds. *Id.* ¶ 282. Despite knowledge of the Kingate Defendants' failure to perform adequate due diligence, PwC participated in the Kingate Defendants' breach of fiduciary duty by issuing unqualified audit reports and failing to conduct proper independent audits of the Funds. *Id.* ¶ 283. Even the deficient audits performed by PwC would have given them actual knowledge, or gave them knowledge which they willfully ignored, that the Kingate Defendants had performed no meaningful due diligence on BMIS, that they did not test the validity of Madoff's performance or strategy, and that they had no process in place to verify the existence of assets or the occurrence of transactions purportedly made by BMIS. *Id.* ¶¶ 173, 176-77. PwC had actual knowledge of, or was willfully blind to, the Kingate Defendants' breach of fiduciary duty. *Id.* Nevertheless, PwC participated in the Kingate Defendants' breach of fiduciary duty by providing clean audit opinions that enabled the Kingate Defendants to market the Funds' shares to unsuspecting investors. *Id.* ¶ 184.

Finally, the Tremont Group's ownership and control of Tremont made it aware of both the fiduciary duties that Tremont owed to Plaintiffs and of its breaches of those fiduciary duties. *Id.* ¶ 252. As alleged in the SAC, the Tremont Group had extensive ties with Madoff based on its management of at least five other feeder funds. *Id.* ¶ 79. The Tremont Group managed these feeder funds as a result of Madoff's long-standing relationship with the founder of the Tremont Group, Defendant Manzke. *Id.* ¶ 81. Madoff's calendar reflects that Manzke personally met with Madoff on at least two occasions. *Id.* ¶ 58. As the Tremont Group also acknowledged in a Form 10-K SB filed with the SEC in March 2001, many of its funds were designed "to provide

clients with vehicles for investments with 'hard-to-access' managers," of which Madoff was the most prominent. *Id.* ¶ 81.

The Tremont Group's longstanding and extensive involvement with the Funds and its managers indicates the Tremont Group's actual knowledge of Tremont's breaches of fiduciary duties. For instance, Plaintiffs allege that the Tremont Group knew that the Kingate Defendants (including Tremont) had no adequate system in place to monitor the Funds' investments in Madoff and that they were failing to perform necessary and adequate due diligence. *Id.* Under these circumstances, if the Tremont Group did not know of the breaches of fiduciary duties being perpetrated, it was because they were reckless in performing (and not performing) due diligence. *See Anwar I*, 728 F. Supp. 2d at 443 (relying on the defendants' "aware[ness] of the roles consolidated in Madoff," and other red flags, together with the defendants' "familiarity with the [f]unds, as well as their general experience in providing financial services to funds" in concluding that plaintiffs adequately alleged "that the [defendants] consciously avoided confirming facts that, if known, would demonstrate" both aiding and abetting a breach of fiduciary duty and fraud) (internal quotation marks omitted). The Tremont Group participated in Tremont's breaches of fiduciary duties, moreover, by helping to conceal and failing to act to prevent those breaches. SAC ¶ 253. Plaintiffs have thus adequately alleged both the Tremont Group's actual knowledge of Tremont's breaches of fiduciary duties and circumstances from which knowledge of such breaches can be inferred, as well as its participation in them.

### B. Plaintiffs State Claims for Aiding and Abetting Breach of Fiduciary Duty under BVI and Bermuda Law

Although Bermuda and BVI do not recognize a cause of action for "aiding and abetting a breach of fiduciary duty," they do have a functionally equivalent claim for accessory liability referred to as knowing assistance in breach of trust (also referred to as "dishonest assistance").

90

Bompas Decl. ¶¶ 160-69; Bompas Further Decl. ¶¶ 71-75. *In re AlphaStar Ins. Group. Ltd.*, 383 B.R. 231, 274 (Bankr. S.D.N.Y. 2008) ("Bermuda law recognizes a claim for 'dishonest assistance,' similar to the aiding and abetting claim under New York law. To establish liability, the plaintiff must show that the third-party dishonestly procured or assisted a breach of trust or fiduciary obligations."). The constituent elements for this liability are (i) the existence of a trust or fiduciary obligation, (ii) breaches of trust or fiduciary obligation, (iii) that the relevant defendant assists in or induces that breach of trust or fiduciary obligation, and (iv) the relevant defendant acts dishonestly in doing so. *Royal Brunei Airlines v Tan*, [1995] 2 AC 378; *see also* Bompas Further Decl. ¶ 133.

A defendant is dishonest if he fails to attain the standard which would be observed by an honest person in similar circumstances. Bompas Decl. ¶ 164; Bompas Further Decl. ¶ 134.2. Dishonesty may consist of suspicion coupled with a deliberate decision not to make inquiries which might result in knowledge that the transaction is not one in which a person can honestly participate. Bompas Decl. ¶164. The standard is objective, not subjective. *Id.* It is not necessary to use the label "dishonest" if, as here, the allegations in the complaint are sufficient for the court to make a finding of dishonesty. *Id.* ¶ 74.2. *See also Barlow Clowes Int'l v. Eurotrust Int'l*, [2006] 1 WLR 1476.

Taking the allegations in Counts 13 (Tremont Group), 19 (PwC), and 26 (Citco) as true, a claim for knowing assistance in breach of trust is established in each case. Bompas Decl. ¶¶ 160-69. The underlying claims for primary breach of fiduciary duty owed to Plaintiffs by the Kingate Defendants, including Tremont, are discussed above.

### 1. The Tremont Group Aided and Abetted Breach of Fiduciary Duty by Tremont (Count 13)

The SAC alleges that the Tremont Group was aware of the fiduciary duties owed by Tremont to the Class by virtue of its ownership and control of Tremont and the breach of these duties. SAC ¶ 252. The Tremont Group had close ties with Madoff based on its management of feeder funds with at least $3 billion invested with him. *Id.* ¶ 79. The feeder funds, including the Rye Funds[21] and the Kingate Funds, were managed and controlled by the Tremont Group through subsidiaries. *Id.* ¶¶ 79-80. Defendant Manzke, the Chairman and co-CEO of the Tremont Group, also served as a director of Kingate Global from 1995 to approximately 2005. *Id.* ¶ 33. Manzke introduced Ceretti and Grosso to Madoff and met frequently with him over the years. *Id.* ¶¶ 58, 81; *In re Bernard L. Madoff Inv. Secs. Llc*, 2015 WL 4734749 (Bankr. S.D.N.Y. Aug. 11, 2015). She actively participated in the marketing and other activities of Tremont on behalf of the Funds. SAC ¶ 35.

The Tremont Group provided substantial assistance to Tremont in the breaches of its duties that it perpetrated on investors. *Id.* ¶ 85. By virtue of its long-standing involvement with the Rye Funds and the Kingate Funds and its experience with fund management, the Tremont Group knew or was willfully blind to the fact that the due diligence and risk controls employed by Tremont were grossly deficient. *Id.* The Tremont Group should have directed Tremont to conduct proper due diligence and monitoring of Madoff and, if Madoff refused, discontinue marketing shares in the Funds to the public or resign as a co-manager of Kingate Global.

The Tremont Group failed to make proper inquiries that would have disclosed that Tremont was marketing worthless shares in the Kingate Funds to investors. Manzke, the founder and co-CEO of the Tremont Group, was on the board of Kingate Global until the end of 2005

---

[21] The "Rye Funds" were a group of five feeder funds managed by the Tremont Group through either Tremont or other Tremont Group subsidiaries. SAC ¶¶ 79-80.

and involved in the management of the Funds. SAC ¶ 33.[22] She had knowledge of and participated in the Funds' business in New York. *Id.* ¶¶ 33, 35.[23] She is alleged to have had access to overwhelming information indicating that Madoff's operation was a fraud – evidence should have discovered, but instead ignored. *Id.* ¶ 64. Manzke acted with a dishonest state of mind by allowing Tremont and the Funds to sell shares in the Funds to investors when she knew that Tremont and the other Defendants were not properly investigating the indicia of fraud surrounding Madoff of which she and the other Individual Defendants were aware. Manzke's knowledge and dishonest state of mind are imputed to the Tremont Group which she operated as founder and co-CEO. Moreover, the SAC alleges that the Tremont Group as one of the Kingate Defendants also had "overwhelming information indicating that Madoff's operation was a fraud," yet did nothing to verify Madoff's impossible trading information. *Id.* ¶ 64. These allegations are sufficient to satisfy the requirement of a dishonest state of mind on the part of the Tremont Group.[24] Bompas Decl. ¶ 74.2; *Barlow Clowes Int'l*, [2006] 1 WLR 1476 ("suspicion combined with a conscious decision not to make inquiries which might result in knowledge" states a claim of dishonest assistance).

The Tremont Group substantially assisted Tremont by helping to conceal Tremont's breaches of fiduciary duty and by failing to act when required to do so in the face of these breaches. SAC ¶ 352. The Tremont Group continued to allow its subsidiary to serve as the co-

---

[22] The SAC inadvertently states that Manzke was on the board of Kingate Global until 2003, rather than 2005. SAC ¶ 33.
[23] As an "Individual Defendant," Manzke is included in the definition of "Kingate Defendants." SAC ¶¶ 35-36.
[24] As discussed in Section XIV, a Rule 8 pleading standard applies to claims of breach of fiduciary duty and aiding and abetting breach of fiduciary duty. Even if Rule 9(b) were triggered by the requirement to plead a dishonest state of mind, Rule 9(b) provides that "malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Thus, allegations directed to Tremont's "dishonest state of mind" are sufficient.

manager of Kingate Global when it had the power to require Tremont to suspend its sales of shares in the Funds to warn investors of the risks in purchasing or holding the Funds' shares, and to resign its position as co-manager. Such circumstances have been found under Bermuda law to properly state a claim for dishonest assistance. *See Walsh v. Horizon Bank Int'l Ltd.*, [2008] SC (Bda) LR 20 Com at ¶ 149, *aff'd* [2009] CA (Bda) 6 Civ. (March 2009) (a bank continued to provide banking services to Canadian fraudsters engaged in diverting assets entrusted to it under an investment scheme; knowledge of the bank's officers of the diversion of assets was attributed to the bank). Bompas Decl. ¶ 75. The SAC's allegations are sufficient under Bermuda law to state a claim of dishonest assistance against the Tremont Group. Bompas Decl. ¶¶ 160-69; Bompas Further Decl. ¶¶ 71-75.

### 2. Citi Hedge Aided and Abetted Breach of Fiduciary Duty by the Kingate Defendants (Count 26)

As the Funds' Administrator and a leading financial services provider since the inception of the Funds, Citi Hedge was in a position to know everything there was to know about the operation of the Funds. The SAC alleges that Citi Hedge not only knew that the Kingate Defendants were breaching the fiduciary duties owed to Plaintiffs and the Class, but made those breaches possible. In particular, Citi Hedge knew that the due diligence and risk controls employed by the Kingate Defendants to monitor Madoff were grossly deficient in breach of their fiduciary duties. SAC ¶ 329. Nevertheless, Citi Hedge substantially assisted the Kingate Defendants in the breach by, among other things, receiving investments from Plaintiffs and calculating the Funds' NAV, transmitting Fund information from the Kingate Defendants to the Class, and allowing its name and the services it was ostensibly providing to be included in the Funds' Information Memoranda. *Id.* ¶ 320. Knowing what it knew about the Kingate Defendants and the public and private indications that Madoff's investment advisory business

was problematic, Citi Hedge acted dishonestly in continuing to assist the Kingate Defendants in the operation of the Funds and in the solicitation of investments from Plaintiffs and the Class. The facts alleged in the SAC are sufficient to state a claim for dishonest assistance under Bermuda law.  Bompas Decl. ¶ 169; Bompas Further Decl. ¶ 74.2.

### 3. PwC Aided and Abetted Breach of Fiduciary Duty by the Kingate Defendants (Count 19)

PwC audited the Funds from their inception.  SAC ¶ 86.  Over the course of repeated audits, PwC became aware of the risks factors associated with Madoff.  *Id.* ¶ 161.  PwC was also aware that the Kingate Defendants breached their fiduciary duties to investors by failing to perform any meaningful due diligence or monitoring of Madoff despite assurances to investors that they were keeping close tabs on Madoff.  *Id.* ¶ 281.  PwC knew that there was no independent market mechanism or evidence to value shares of the Funds and that the primary purpose of the audits was to assure investors that the assets of the Funds existed and were accurately valued.  *Id.* ¶ 93.  Under the circumstances, PwC was required to elevate the steps taken to verify the existence of the assets reported on the Funds' financial statements and to test the existence and effectiveness of controls at BMIS.  PwC's decision to ignore the known risk factors associated with Madoff and the lack of meaningful monitoring by the Kingate Defendants qualifies as a dishonest state of mind under U.K., Bermuda and BVI law.

The Funds' shares were not marketable without a clean audit opinion signed by PwC verifying the Funds' financial statements.  SAC ¶ 283.  Despite the suspicion of the Funds' returns, PwC did nothing to assure its audits were adequate under these circumstances.  *See, e.g.,* SAC ¶¶ 131, 135-37, 139, 145-54; *cf. Walsh*, [2008] SC Bda LR 20 Com.  Yet PwC continued to provide substantial assistance to the Funds by issuing unqualified audit opinions for the Funds year after year.  Plaintiffs and the Class would not have invested in the Funds,

made additional investments in the Funds or remained invested in the Funds if PwC had conducted a proper audit.  *Id.* ¶¶ 37(a), 283.

In sum, a court in Bermuda or the BVI would not summarily strike out the aiding and abetting claims against the Tremont Group, Citi Hedge and PwC. Bompas Decl. ¶ 167; Bompas Further Decl. ¶ 74.2.

## VI. PLAINTIFFS PROPERLY ALLEGE NEGLIGENCE-BASED CLAIMS (COUNTS 6, 16, 17, 23 & 24)

Plaintiffs bring negligence and negligent misrepresentation claims against the Kingate Defendants (Count 6), PwC (Counts 16 and 17), and Citi Hedge (Count 23 and 24). Defendants allege that Plaintiffs fail to allege facts giving rise to a special or fiduciary relationship between Defendants and investors sufficient to find a duty of care owed to Plaintiffs under New York or BVI law.  Br. at 81-83, n.80.[25]  According to Defendants, the only relationships alleged in the SAC are those between Defendants and the Funds or among Defendants themselves.  Defendants are wrong, as the negligence-based claims asserted in the SAC are based on Plaintiffs' relationship with Defendants.

### A.     Defendants Owed Duties Directly to Plaintiffs under New York Law

#### 1.     The SAC Satisfies New York's *Credit Alliance* Test as to PwC

Defendants (in a footnote) argue that Plaintiffs cannot sue PwC because they cannot satisfy the test established by *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536

---

[25] There is no compelling reason for BVI or Bermuda law to be applied.  The principal relationship between the distributors who marketed investments in the Funds and the investors was independent of the relationship between Plaintiffs as shareholders in the Funds and the Funds themselves.  The internal affairs rule does not apply to claims brought by Plaintiffs in their capacity as investors against service providers to the Funds.  *Roselink Investors LLC v. Shenkman*, 386 F. Supp. 2d 209, 225 (S.D.N.Y. 2004).  As explained above, New York law should govern this claim.

(1985) (hereafter, "*Credit Alliance*"). Br. at 82, n.80. Defendants' argument is wrong on the law and simply ignores the allegations in the SAC.[26]

In *Credit Alliance*, the Court of Appeals held that an auditor's liability is not limited to those with whom the auditor is in contractual privity; rather, the court held, an auditor also owes a duty of care to those who, although not in contractual privity, have a relationship with the auditor "sufficiently approaching privity." 65. N.Y.2d at 553. The underlying premise of the *Credit Alliance* holding is that this "near privity," as it has come to be called, is necessary to prevent "expos[ing] accountants to a liability in an indeterminate amount for an indeterminate time to an indeterminate class." *Ultramares Corp. v. Touche*, 255 N.Y. 170, 179 (N.Y. 1931).

The holding of *Credit Alliance* built on the holding of *White v. Guarente*, 43 N.Y.2d 356, 356 (N.Y. 1977), where the court confirmed an auditor's liability to an investor "not as a mere member of the public, but as one of a settled and particularized class" among the members of which the audit would be circulated. In *White*, the court held that a limited partner could sue the partnership's auditor because the auditor's "assumption of the task of auditing [the limited partnership] and preparing the [tax] returns was the assumption of a duty to audit and prepare carefully for the benefit of those in the fixed, definable and contemplated group whose conduct was to be governed," the limited partners. *Id.* at 361-62. Put another way, the limited partners were able to sue the auditors because providing audits to investors "was one of the ends and aim of the transaction." *Id.* at 362.

Consistent with these principles, in order to establish "near privity" in a claim against auditors *Credit Alliance* requires a showing that "(1) the accountants must have been aware that

---

[26] Defendants argue that the "SAC's conclusory assertions" do not satisfy *Credit Alliance*. Br. at 82, n.80. That argument itself ignores that the allegations in the SAC must be accepted as true for purposes of the motion to dismiss. *Ashcroft*, 556 U.S. at 678.

the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance." 65. N.Y.2d at 551. The SAC alleges facts that satisfy each element of *Credit Alliance* and that establish that "the end and aim" of PwC's audits was to provide assurance to the investors such as Plaintiffs that the Funds' financial statements fairly represented the financial condition of the Funds.

As alleged in the SAC, PwC issued and addressed its unqualified audit opinions to Plaintiffs: "the Shareholders of [Kingate Global/Kingate Euro]." *Id.* ¶ 87. Beyond addressing its audit reports to Plaintiffs, the SAC further alleges that PwC "was aware that investors in the Funds, including Plaintiffs and the Class, relied on PwC's audits of the Funds' financial statements…." *Id.* PwC thus consented to being identified to investors as the Funds' independent auditor. *Id.* ¶ 92. PwC further knew from reviewing the Service Agreements and the Information Memoranda that the Manager was obligated to "deliver, or arrange for the delivery by any authorized dealer selected by the Manager, to each person to whom Shares are offered a copy of the Fund's most recently published Information Memorandum and a copy of the Fund's most recently published annual report." Barrett Decl., Ex. 12, Management Agreement, § 4.4(a). The annual report contained financial statements examined and certified by PwC as the Funds' independent auditor. SAC Ex. 4, Kingate Global IM, dated 1 May 2006, at 33.

As also alleged in the SAC, PwC knew of its unique role in the ecosystem of the Funds: it knew that there was no independent market mechanism to value Plaintiffs' shares in the Funds. *Id.* ¶ 93. PwC thus knew that its audits were the only means upon which Plaintiffs could rely for

an independent valuation of their investment. *Id.* All of this is congruent with PwC's own view of its obligations to investors such as Plaintiffs. For example, as the SAC alleges, in defining the objectives for auditing similar Madoff feeder funds managed by Fairfield Greenwich, a related PwC entity acknowledged that one of the primary objectives of the audit was to provide the shareholders (*i.e.*, the investors) with independent reports that provide assurance on the financial information released by the funds.[27] *Id.* ¶ 88. Finally, the SAC also alleges that PwC knew the identities of Plaintiffs and the Class.[28] *Id.* ¶ 89.

Notably, a motion to dismiss negligence claims against other PwC entities in another Madoff-related case was denied because allegations similar to those asserted in the SAC were found to have satisfied *Credit Alliance*. In the *Anwar I* litigation, Judge Marrero repeatedly held that similar allegations were sufficient to satisfy the *Credit Alliance* factors. *Anwar I*, 728 F. Supp. at 457 ("The Court thus concludes that Plaintiffs, having pled facts sufficient to allege (1) an awareness by the PwC Member Firms that the financial reports were to be used for the particular purpose of evaluating Plaintiffs' investments in the Funds, (2) in furtherance of which the known investors and future investors were intended to rely, and (3) conduct on the part of the PwC Member Firms linking them to these investors, which evinces the accountants' understanding of the investors' reliance for purposes of defeating a motion to dismiss, have stated a plausible 'relationship so close as to approach that of privity with the PwC Member

---

[27] This highlights the inappropriateness of PwC's *Credit Alliance* argument at this stage of the proceedings. In the *Anwar* litigation, it came to light that PwC Canada, an auditor of the Fairfield Greenwich Funds, identified as the first of three audit "objectives" in its audit plans the giving of "[i]ndependent opinions and reports that provide assurance on financial information released by the funds," specifically "[f]or shareholders and other stakeholders." *Anwar v. Fairfield Greenwich Ltd.*, 306 F.R.D. 134, 141-42 (S.D.N.Y. 2015).

[28] The Management Agreement between KML and the Funds specified that the Funds' annual reports, which included the PwC audit reports, would be provided to prospective investors along with the Information Memoranda. PwC had access to the names and addresses of the shareholders in the Funds during the audit process.

firms.'").[29] Plaintiffs here have similarly pled facts sufficient to satisfy *Credit Alliance*. PwC's assertion that Plaintiffs have not stated a claim for negligence is, at the least, not appropriate for a motion to dismiss. *See*, *e.g.*, *Cromer Fin. Ltd. v. Berger*, 2001 WL 1112548, at n. 4 (S.D.N.Y. Sept. 19, 2001).

Defendants' reliance upon *SIPC v. BDO Seidman,* LLP, 222 F.3d 63, 74 (2d Cir. 2000), for the propositions that (i) "Plaintiffs' status as simply shareholders" does not satisfy the "known parties" prong of *Credit Alliance*; and (ii) there can be no "linking conduct" absent "direct contact" between Plaintiffs and PwC, Br. at 82 & n.80, is unavailing. In *BDO Seidman*, the court recognized that plaintiffs in *White* qualified as known parties because "the accounting firm knew, when it agreed to perform an audit, that a group of limited partners, including the plaintiff, would rely on that audit in preparing tax returns." *Id.* Indeed, the *BDO Seidman* court approvingly cited *Duke v. Touche Ross & Co.*, 765 F. Supp. 69, 77 (S.D.N.Y. 1991), where members of a "select group of qualified investors" were deemed "known parties." *Id.* The *BDO Seidman* court only held that a broker dealer's customers, who were not known to the accounting firm and to whom the accountant had not addressed its audit reports, were not "known parties" within the meaning of *Credit Alliance*. *Id.* ¶ 75.

The "known parties" prong of the *Credit Alliance* test does not require an auditor know a "particular" non-privity party by name. As recognized in *Credit Alliance*, while an accountant does not owe a duty to members of an "indeterminable class," *Ultramares Corp.*, 255 N.Y. at 184, an accountant owes a duty to "members of a particularized class among the members of

---

[29] *See also Anwar v. Fairfield Greenwich Ltd. ("Anwar III")*, 800 F. Supp. 2d 571 (S.D.N.Y. 2011); *Anwar v. Fairfield Greenwich Ltd. ("Anwar IV")*, 884 F. Supp. 2d 92 (S.D.N.Y 2012); *Anwar v. Fairfield Greenwich Ltd. ("Anwar V")*, 306 F.R.D. 134, 141 (S.D.N.Y. 2015) ("The Court now explicitly finds that Plaintiffs can show sufficient common evidence to demonstrate that the transmission of the PwC audit opinions to the Funds' investors was the 'end and aim of the transaction.'").

which a report would be circulated . . . ." *White*, 43 N.Y.2d at 363. That is precisely the case here, *see* SAC ¶ 88, where plaintiffs were members of a small, particularized class to which PwC directed its audit reports.

As the court held in *Cromer*, "audit reports addressed 'to the shareholders,' constitute 'substantial communication' between [the auditor] and the plaintiff-shareholders sufficient to satisfy the 'linking conduct' requirement" of *Credit Alliance*. *Cromer*, 2001 WL 1112548, at *5. That disposes of PwC's contrary argument, given the SAC's allegations. *See, e.g., Dorking Genetics v. United States*, 76 F.3d 1261, 1270 (2d Cir. 1996) (rejecting narrow reading of "linking conduct" requirement and construing *Credit Alliance* to permit action "even if the plaintiffs had never interacted directly with the defendant"). For example, in *Cromer Fin. Ltd. v. Berger*, 2003 WL 21436164, at *12 (S.D.N.Y. June 23, 2003), the court denied the auditors' summary judgment motion, noting that the auditors addressed the audit reports to the funds' shareholders and holding that the *Credit Alliance* criteria were met because, "[b]ased on the accountant's knowledge, the consequence [of plaintiffs' reliance on the audit] must have been the 'end and aim of the transaction.'" *Id.*

In view of this law, it is not surprising that courts have repeatedly sustained negligence claims against accountants by parties not in contractual privity with them, including in the *Anwar* case involving similar Madoff feeder funds audited by PwC. *See, e.g., AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202 (2d Cir. 2000); *Dinerstein v. Anchin, Block & Anchin*, 838 N.Y.S.2d 46 (N.Y. App. Div. 2007) (in a claim by shareholder, court denied auditor's motion for summary judgment in part because the "audit reports … were addressed to 'the Stockholders and Directors of [the company]'"); *Barrett v. Freifeld*, 883 N.Y.S. 2d 305 (N.Y. App. Div. 2009) (court allowed negligence claims to proceed because sufficient facts were alleged "to suggest"

that the accountants "were aware" that seller would use financial statements in connection with sale of a business).  In *AUSA Life Ins. Co.*, a company's investors asserted negligence claims against the company's auditors and the Second Circuit reversed the district court's dismissal of the claim, finding that privity existed under *Credit Alliance* because "[t]o the extent that the 'no-default' letters were intended to serve the purpose of conveying to the investors that the notes which they held were not in default, E&Y knew what the letters were for and E&Y knew for whom the letters were intended . . . ."  206 F.3d at 223.  The SAC pleads analogous facts and thus meets the *Credit Alliance* test as to PwC.

The SAC contains allegations that also establish that the Kingate Defendants and Citi Hedge owed Plaintiffs a duty of care.  For example, the SAC alleges sufficient facts showing on-going communications between the Funds' investors and these defendants.  Paragraph 3 of the SAC alleges that the Kingate Defendants "solicited investments from Plaintiffs which they oversaw, controlled, and managed by funneling them into Madoff's Ponzi scheme."  Paragraph 1 of the SAC states that "[a]s a result of Defendants' breaches of fiduciary and common law duties and of contractual obligations, investors were induced [by Defendants] to purchase and hold virtually worthless investments, thereby causing the investors to suffer massive out-of-pocket losses."

The Co-Management Agreements, the Administration Agreements, the Consultant Agreements and the Distributions Agreements all contemplate that while Defendants would market shares in the Funds to investors and remain in touch for as long as the investors were shareholders.  Investors could not become shareholders in the Funds without going through these authorized distributors of the Funds.  Likewise, investors were required to deal with Citi Hedge during the subscription process and received regular communications from Citi Hedge with

information on the NAV and the supposed performance returns of the Funds. Citi Hedge was the contact point for investors with questions concerning investments in the Funds. Kingate Euro Fund Amended and Restated Information Memorandum dated October 6, 2008 at cover page and 1 ("Please direct any inquiries to the Administrator." [in caps]); Kingate Global Fund Information Memorandum dated May 1, 2006 at cover page, in the Important Notices section and at 33 ("All communications and correspondence with the Fund and inquiries concerning the Fund and the Shares, including information concerning subscription and redemption procedures and current Net Asset Value, should be directed to the Administrator at the address set forth in the 'DIRECTORY' appearing elsewhere in this Memorandum.").

Likewise, the Subscription Agreements directed investors to the Manager, the Investment Advisor, the Administrator and Consultant to obtain answers to questions concerning the terms and conditions of the offering. SAC, Ex. 4, Subscription Agreement appended to the Kingate Global IM dated May 1, 2006 at S-8.

In *Anwar*, similar claims were found to state a duty of care under New York law. *See, e.g.*, *Anwar I*, 728 F. Supp. 2d at 434-35 (S.D.N.Y. 2010). As discussed, the relationship between Plaintiffs and the Kingate Defendants and Citi Hedge created fiduciary duties on the part of these defendants.

## 2. Defendants Breached the Duty of Care Owed to Plaintiffs and Acted with Gross Negligence

Under New York law, the elements of a claim for gross negligence are: "(1) the existence of a duty on defendant's part as to plaintiff; (2) breach of this duty; (3) conduct by the defendant evincing a reckless disregard for the rights of others or that 'smacks' of intentional wrongdoing; and (4) injury to the plaintiff as a result thereof." *Farash v. Cont'l Airlines, Inc.*, 574 F. Supp. 2d 356, 367-68 (S.D.N.Y. 2008); *Anwar I*, 728 F. Supp. 2d at 414. As discussed above, the SAC

alleges facts that establish claims for negligence against Defendants. The conduct alleged in the SAC establishes not only that Defendants breached their duties to Plaintiffs, but that they were reckless in doing so.

For example, Citi Hedge failed to "independently confirm and verify the pricing information provided by Madoff" and to reconcile information provided by Madoff as to the Funds' assets with independent sources. SAC ¶ 192. The Kingate Defendants entrusted the Funds' assets to Madoff without performing any meaningful due diligence or conducting any meaningful monitoring of Madoff and his operation. *Id.* ¶ 221. And PwC was so grossly negligent in conducting its putative audits that, among other things, it disregarded the auditing standards and issued clean opinions based on uncorroborated and un-reconciled information provided by Madoff. *Id.* ¶ 262. The fact that Defendants could purport to manage, administer, and audit billions of dollars in investments that turned out to be non-existent demonstrates that Defendants, at the least, acted with "reckless disregard." These allegations thus state a claim for gross negligence.

### 3. PwC and Citi Hedge Made Negligent Misrepresentations to Plaintiffs

A claim for negligent misrepresentation "requires the plaintiff to demonstrate (1) the existence of a special privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information." *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 910 F. Supp. 2d 543, 546 (S.D.N.Y. 2012). In the SAC, Plaintiffs allege each of these elements. SAC ¶¶ 268-75 (as to PwC), 294-97 (as to Citi Hedge).

As noted by Judge Marrero in *Anwar I*, "[c]ourts in this circuit have held that a determination of whether a special relationship exists is highly fact-specific and generally not susceptible to resolution at the pleadings stage." *Anwar I*, 728 F. Supp. 2d at 416 (quoting

*Century Pac., Inc. v. Hilton Hotels Corp.*, 2004 WL 868211, at *8 (S.D.N.Y. Apr. 21, 2004)).

Defendants Citi Hedge and PwC had an obligation to provide Plaintiffs with accurate

information, "even if that information originated from third parties," such as Madoff; and the

duty also permits claims based on the omission of correct information. *Abu-Dhabi*, 910 F. Supp.

2d at 547. The SAC details the incorrect information provided, and omissions made, by PwC

and Citi Hedge, including incorrect information about their practices and, most notably, the value

and existence of Plaintiffs' investments. The SAC thus more than sufficiently pleads the

elements of claims for negligent misrepresentation.

> **B.     Plaintiffs State Claims for Gross Negligence, Negligence and Negligent
> Misrepresentation under BVI and Bermuda Law**

Defendants and their foreign law experts premise their argument that Defendants owed

no duty to Plaintiffs under BVI and Bermuda law on the assumption that Plaintiffs had no direct

interactions with the Kingate Defendants or Citi Hedge. Br. at 73, 81; Chivers Decl. ¶¶ 71 ("No

personal interaction is pleaded as between any Plaintiffs or member of the class and any of the

KML/FIM Defendants."), 94, 104, 106-07, 111, 114, 116(b); Hargun Decl. ¶¶ 58, 114-16;

Evans Decl. ¶¶ 54-56, 69-70. Defendants are wrong.

The SAC alleges sufficient facts showing on-going communications between the

shareholders and Defendants. The Co-Management Agreements, the Administration

Agreements, the Consultant Agreements and the Distribution Agreements all contemplate that

Defendants would market shares in the Funds to investors and remain in contact for as long as

the investors were shareholders. Investors could not become shareholders in the Funds without

going through these authorized distributors of the Funds. Likewise, investors were required to

deal with Citi Hedge during the subscription process and received regular communications from

Citi Hedge with information on the NAV and the supposed performance returns of the Funds.

Citi Hedge was the contact point for investors with questions concerning investments in the Funds. *See, e.g.,* Ex. 2, Kingate Euro IM, dated October 6, 2008, at cover page and 1 ("Please direct any inquiries to the Administrator." [in caps]); Ex. 4, Kingate Global IM, dated May 1, 2006, at 33 ("All communications and correspondence with the Fund and inquiries concerning the Fund and the Shares, including information concerning subscription and redemption procedures and current Net Asset Value, should be directed to the Administrator at the address set forth in the 'DIRECTORY' appearing elsewhere in this Memorandum.").  As mentioned, the Subscription Agreements directed investors to to answer questions about the investments.

The SAC further alleges that "[a]s a result of Defendants' breaches of fiduciary and common law duties and of contractual obligations, investors were induced [by Defendants] to purchase and hold virtually worthless investments, thereby causing the investors to suffer massive out-of- pocket losses."  SAC ¶ 1.  Based on a review of the allegations in the SAC, Mr. Bompas concludes that the SAC makes the necessary allegations to establish a cause of action in negligence against the Kingate Defendants, Bompas Further Decl. ¶¶ 29-38; Citi Hedge, Bompas Decl. ¶¶ 105-06, Bompas Further Decl. ¶¶ 44-48; and PwC, Bompas Further Decl. ¶ 43.2.

Under BVI, Bermuda and U.K. law there are three separate ways that a duty of care can come into existence.  Bompas Decl. ¶¶ 68-70; Bompas Further Decl. ¶ 6.  *First*, liability may be based on an assumption of "responsibility."  *Customs and Excise Commissioners v. Barclays Bank Plc*, [2007] 1 AC 181.  Alternatively, the House of Lords recognized two other possible tests.  *Second*, the three-fold test articulated by the House of Lords in *Caparo v. Dickman*, [1990] 2 AC 605 (the three elements being foreseeability; proximity; and fairness, justice, and reasonableness).  *Third*, whether the alleged duty would be similar to the duties in other

recognized relationships (*e.g.*, principal and agent, solicitor and client). Bompas Decl. ¶ 68. The issue whether a defendant has assumed responsibility is judged objectively. *Id.* ¶ 69.4.

The absence of an assumption of responsibility, however, is not decisive. *Id.* ¶ 69.3. A duty may arise if either of the other two tests is satisfied. In view of the fact-intensive nature of the inquiry, the existence of a duty in the usual course of events will only be clear after full discovery and findings of fact by the trial judge. *Id.* ¶ 70. In order to strike out the SAC in its entirety, a Bermuda or BVI court would have to determine that there was no real prospect of the plaintiffs establishing at trial that there was a relevant direct relationship or interaction with defendants. Bompas Further Decl. ¶ 9.

The SAC alleges that the Kingate Defendants served as investment advisors and placement agents and exercised discretion. SAC ¶¶ 220, 225. Their principal role was marketing shares to investors and maintaining close relationships with them to ensure that they remained shareholders in the Funds. Under U.K. law, in certain types of relationships (such as solicitor-client or agent-principal), a fiduciary relationship will exist simply by virtue of the existence of the relationship. Bompas Further Decl. ¶ 58. A broker who holds himself out as having expertise in securities and recommends securities to investors owes duties of care to his customers. *Id.*; *Daly v. Sydney Stock Exchange Ltd.*, 160-CLR 371 (1986). The status of the Kingate Defendants as the appointed distributors of the Kingate shares with inside information concerning Madoff and his investment strategies carried with it duties of care to investors. Bompas Further Decl. ¶¶ 58-59. As such, the allegations in the SAC are sufficient to support the existence of a duty on the part of the Kingate Defendants under U.K., BVI or Bermuda law. Bompas Further Decl. ¶¶ 30-31.

Individual Defendants Manzke, Grosso and Ceretti were personally involved in the solicitation of new and existing investors in the Kingate Funds. *See, e.g., Bankruptcy Decision*, 2015 WL 4734749, at *10 ("Madoff told one potential investor that he did not meet with investors and [that he] should meet with Grosso to learn about BLMIS"). As discussed above, the SAC alleges that the FIM Entities, Manzke, Ceretti and Grosso were actively involved in the marketing of the Funds. In Mr. Bompas' opinion, the SAC pleads facts giving rise to the tort of negligence and that the claim would not be struck out if it had been raised in Bermuda, BVI or the U.K. Bompas Further Decl. ¶ 38.

### C.  Plaintiffs' Tort Claims Are Not Limited by Contracts among the Service Providers and the Funds or the Funds and the Shareholders

Defendants contend that the service providers owed exclusive duties to the Funds, and this exclusive relationship foreclosed any duties of care that Plaintiffs claim were owed to the Funds. Br. at 81; Hargun Decl. ¶¶ 68-79. They continue to ignore the direct relationships between investors and the Kingate Defendants, PwC and Citi Hedge in connection with the marketing of the Funds' shares and the special relationships that developed with investors as a result of these solicitations.

The contacts between the service providers and the Funds and each other do not constrain or limit the tort liability of the service providers to the investors. As Defendants point out, Plaintiffs were not parties to the Service Agreements. Consequently, they are not subject to the disclaimers in the Service Agreements under Bermuda law. Diel Decl. ¶¶ 31-32.

Mr. Hargun's argument that the contractual architecture created by Defendants would preclude Plaintiffs from filing suits against the service providers to the Funds or limit the scope of the relationship of Defendants with investors is misconceived. The U.K. courts are not handcuffed by private contractual arrangements. In *Henderson v. Merritt*, [1995] AC 154],

managing agents of insurance syndicates at Lloyds were held to owe a tortious duty of care to exercise due care and skill in favor of the "indirect" names who were one step removed from the managing agents in a contractual chain.[30]  The indirect names' contractual relationship was with so-called members' agents who, in turn, engaged the managing agents as sub-agents to underwrite insurance.  Lord Goff observed that he could not see why in principle the managing agents could not assume a duty of skill to more than one person in respect of the same activity – to both the members' agents and the indirect names.  [1995] A.C. 145 at 196.

Similarly, in *Riyad Bank & Others v. Ahli United Bank (UK) Plc.*, [2006] EWCA Civ. 780, the Court of Appeals held that appellant Ahli United Bank (UK) Plc. ("UBK") owed a duty of care to a plaintiff investing in operating leases of equipment even though it had no direct contractual relationship with the plaintiff.  Despite the lack of contractual privity, UBK created a special relationship with the plaintiff by touting its experience with operating leases.  Under these circumstances, UBK knew that the plaintiff would place trust and confidence in UBK.  The court rejected the same arguments Defendants make in this case that "no duty of care could arise because the contractual structure was inconsistent with any such duty."  *Id.*  The court instead found that UBK had assumed a duty of care directly to the plaintiff, notwithstanding the lack of contractual privity.  The court distinguished *Simaan General Contracting Co. v Pilkington Glass Ltd. (No. 2)*, [1998 QB 758], a case holding that where there is a contractual chain, that chain should not be by-passed in tort, on the grounds that "neither of these authorities considered a case where discussions and representations were made directly to the party, who, in the event

---

[30] Defendants' experts based their arguments on *Simaan General Contracting Co. v. Pilkington Glass Ltd. (No 2)*, [1988] 1 Q.B. 758, a case arising in the specialized field of building construction contracts.  In *Henderson*, Lord Goff, in fact, distinguished *Simaan* as a case arising in a unique context that had no application to the relationship between Plaintiffs, the Funds, and Citi Hedge.  Bompas Decl. ¶ 116.

suffered the loss. There cannot be a general proposition that, just because a chain exists, no responsibility for advice is ever assumed to a non-contractual party. It all depends on the case."

*Riyad Bank*, [2006] EWCA Civ. 780 at ¶ 32.

Here, Plaintiffs, similarly, are entitled to sue the Kingate Defendants and Citi Hedge notwithstanding the contractual chain between the Funds and their service providers because the Kingate Defendants and Citi Hedge communicated with and made representations to members of the Class and assumed responsibility directly to them. Bompas Further Decl. ¶ 49.

### D. The Exclusions, Disclaimers and Exculpatory Provisions in the Information Memoranda and Service Agreements Do Not Bar Plaintiffs' Claims

Defendants bear the burden of showing that an assumption of responsibility is belied by the contractual context. Lord Neuberger observed in his judgment in *Riyad Bank* that:

> Thus, the question . . . is whether in relation to the advice he gave, the adviser assumed responsibility to the claimant, in the light of the contractual context, as well as all the other circumstances, in which the advice was given. The way in which Lord Goff expressed himself in more than one place in his speech in the *Henderson* case . . . suggests that it is for the [defendant] to establish that the contractual context negatives an assumption of responsibility, not for the claimant to show that the assumption survives notwithstanding that context.

*Riyad Bank*, [2006] EWCA Civ. 780 at ¶ 47.

Defendants cannot show, as a matter of law, that Plaintiffs reasonably should have been aware of, much less bound by, inconspicuous disclaimers of liability in the Information Memoranda. SAC, Ex.4, Kingate Global IM, dated May 1, 2006, at 9-10. According to Defendants, these disclaimers in the fine print absolve them of all responsibilities that they had previously assumed to monitor and evaluate Madoff and, in the case of Citi Hedge, to calculate

accurate NAVs that were the sole basis for Plaintiffs to try and sell Fund shares and value their investments.[31]

      **1.**      **The Disclaimers and Exculpatory Provisions in the Information Memoranda and Service Agreements Cannot Bar Plaintiffs' Claims for Negligence and Negligent Misrepresentation against the Kingate Defendants**

The disclaimers relied upon by Defendants read:

> [I]nformation supplied by the Investment Adviser may be inaccurate or even fraudulent. The co-managers are entitled to rely on such information (provided they do so in good faith) and are not entitled to undertake any due diligence to confirm the accuracy thereof.

Br. at 83. This disclaimer was discretely placed in a lengthy list of "Certain Risk Factors" where it would easily escape detection even by a diligent investor. The disclaimer contradicts and undermines the statement in the Information Memoranda that the Co-Managers are responsible for the evaluation and monitoring of Madoff. Information Memoranda, ii; SAC ¶¶ 24(a), 25(b), 70. *See Veleron Holding BV v. Morgan Stanley*, 117 F. Supp. 3d 404 (S.D.N.Y. 2015) (Where a writing erects the essential structure of a relationship, even an express disclaimer cannot undo it.). It also would operate to exempt the Kingate Defendants and Tremont from compliance with industry standards for independent verification.

The disclaimer, however, is not absolute; it is conditioned on the Managers relying in "good faith" on information supplied by the Investment Adviser. The SAC alleges that because the Kingate Defendants failed to take reasonable steps to monitor and conduct due diligence concerning Madoff, any reliance on information received from Madoff was not in good faith. *Id.*

---

[31] Judge Marrero gave short shrift to similar disclaimers in another Madoff feeder fund's offering documents: "[d]efendants argue that these two anodyne sentences, innocuously embedded within a single-spaced document exceeding fifty pages in length, completely protect and absolve them from all liability for having funneled billions of dollars, even if done recklessly, into the largest financial fraud yet witnessed in the record of human wrongdoing and tragedy. The Court is not persuaded. This disclaimer does not reflect a warning hollered 'from the rooftops.'" *Anwar I*, 728 F. Supp. 2d at 412.

¶ 78. Furthermore, the Managers knew that information received from Madoff was unreliable and likely fabricated. SAC ¶¶ 64-65 (trades outside the daily range), 69 (Lazear informed Grosso that he believed Madoff was a scam and provided details before Madoff's arrest), 73 (Madoff provided prices outside the daily trading ranges on at least 185 occasions). Consequently, the disclaimer does not shield the Managers from liability because the Kingate Defendants did not rely on information from the Investment Adviser in "good faith." Bompas Futher Decl. ¶ 81.3.

Elsewhere, the Information Memorandum states that "the Manager Agreement provides that the Manager shall not be liable to the Fund or its Shareholders for any error of judgment or for any loss suffered by the Fund or its Shareholders in connection with its services in the absence of *negligence*, willful default, fraud, or dishonesty in the performance or non-performance of its obligations or duties." SAC, Ex. 4, Kingate Global IM, dated May 1, 2006, at 13; SAC, Ex. 5, Kingate Global IM, dated January 15, 2003, at 14-15 (emphasis added). This liability provision implicitly recognizes that the Manager owes duties to shareholders and that Plaintiffs can recover from management by showing negligence, willful default, fraud or dishonesty. Similarly, the general provisions in the Information Memoranda seeking to limit the liability of the FIM Entities and the Administrator do not exclude claims for negligence. "The Administration Agreement provides that the Administrator shall not be liable to the Manager, the Fund, or its Shareholders in the absence of *negligence,* willful default, fraud or dishonesty in the performance of its obligations or duties." SAC, Ex. 4, Kingate Global IM, dated May 1, 2006, at 15 (emphasis added). As summarized in the Information Memoranda, the exculpatory provision in the FIM Consulting Agreements mirrors the exculpatory provision applicable to the Administrator and the Manager(s). *Id.* The SAC states claims against Defendants for, *inter alia*,

negligence and gross negligence. Consequently, Plaintiffs' claims are in line with the contractual scheme set forth in the Information Memoranda and are not barred by the exemption provisions.

Defendants, however, seek to supplant the exculpatory language disclosed in the Information Memoranda with broader exculpation clauses in the actual Service Agreements purporting to bar claims by investors in the absence of the service provider's "own gross negligence, bad faith or willful or reckless malfeasance [or] disregard of any of its obligations under this Agreement." Br. at 18-19. Despite what Defendants state as fact in the Background section of their Motion, however, Br. at 15, 18, neither the Summary nor the Information Memorandum "incorporate by reference" the Management Agreements, the Administration Agreements or the Consulting Agreements (the "Service Agreements"). Defendants wrongly insist that a lead-in sentence in the Summary purporting to provide an overview of the Information Memorandum, in effect, imports the Service Agreements. A close reading of the sentence in question dispels this notion.

The "Summary" reads as follows:

> The information set out below should be read in conjunction with and is qualified in its entirety by the full text of this amended and restated Information Memorandum, as may be further amended and restated ("The Memorandum"), the memorandum and articles of association ("Memorandum and Articles of Association") of Kingate Global Fund, Ltd and the documents and agreements referred to herein, all of which are available from the Administrator upon request.

SAC, Ex. 5, Kingate Global Fund IM, dated January 15, 2003, at i.

The proper reading of this sentence is that the "information set out below" refers to the information in the Summary which is qualified in its entirety by the Information Memorandum, the Memorandum and Articles of Association and unspecified documents and agreements referred to herein [*i.e.*, the Summary]. The full Information Memorandum prevails over the

113

information in the Summary to the extent there are inconsistencies between the Summary and the full exposition in the body of the Information Memorandum. The qualification only applies to the Summary section, not to the full Information Memorandum. Similarly, any statements in the Summary are qualified by any conflicting information in the unnamed agreements. This does not mean, however, that the full text of the Information Memorandum incorporates or is qualified by the anonymous agreements. In fact, the information set forth in the Summary makes no mention of exemptions or disclaimers so the Service Agreements do not amplify, correct, or expand on information in the Summary

Rather than incorporate the Service Agreements by reference, the Information Memoranda include summaries of the exculpatory provisions in the Service Agreements. If investors should wish further information on the Service Agreements, the Summary advises them that the agreements are "available from the Administrator upon request." SAC, Ex. 5, Kingate Global Fund, January 15, 2003. But there is nothing in the Information Memoranda warning investors that in case of inconsistency in the exculpatory provisions, the text of the Service Agreements shall prevail over the summaries in the Information Memoranda.

Finally, to the extent that the Information Memorandum "qualifies" the Summary, the full Information Memorandum explains that that the Service Agreements "are available for inspection by Shareholders and prospective investors during business hours at the Administrator's office or at the office of the Manager in Hamilton, Bermuda." SAC, Ex. 4, Kingate Global IM, dated May 1, 2006, at 33. In other words, investors were obligated to fly to Bermuda to inspect the service agreements on site. As a practical matter, because most of the Plaintiffs were located in Continental Europe, particularly Italy and Switzerland, there is little chance that they ever saw the Service Agreements. *See* Barrett Decl., Ex. 1, Fourth Amended

Complaint, *Picard v. Ceretti*, at ¶ 96).  Disclaimers or exculpatory provisions in documents that were inaccessible and never seen by investors cannot possibly be dispositive of the issue whether Defendants owed duties of care to Plaintiffs.  Bompas Further Decl. ¶ 73.

Defendants also argue that the broader exculpatory provisions in the Service Agreements, but not the Information Memoranda, shielded representatives of the entities or persons who assisted KML (*i.e.*, Tannenbaum, Tremont Group, Manzke, FIM Advisers, FIM Limited, FIM (USA), Grosso and Ceretti).  Br. at 84.  The disclosures in the Information Memoranda regarding the exemptions, however, only name the Manager(s), Administrator and Consultant, not the Individual Defendants or related entities.  *See, e.g.,* SAC, Ex. 5, Kingate Global Fund IM, dated January 15, 2003, at 13, 15.  Similarly, the respective definitions of Manager(s), Administrator and Consultant do not include the Individual Defendants or related entities.  *Id.* at ii-iii.  In contrast, Section 5.4 of the Management Agreement(s) purports to exclude liability for directors, officers, and employees of the Manager(s), but there is no mention of this expanded coverage of related parties in the Information Memoranda.  Section 5.4, consequently, is of no avail to the Individual Defendants because the Service Agreements are not incorporated by reference in the Information Memoranda and the exculpatory provisions described in the Information Memoranda do not provide protection for the Individual Defendants.[32]

Even if the expanded exculpatory provisions in the Service Agreements were binding on Plaintiffs, which they are not, Defendants cannot exempt themselves from liability for gross negligence under Bermuda law.  Under Section 3 of the 2003 Bermuda Supply of Services (Implied Terms) Act, Plaintiffs owe a statutory duty of due care to exercise reasonable care and

---

[32] Under Bermuda law, Plaintiffs, in bringing tort actions against the service providers, would not be bound  by the exculpatory provisions, disclaimers, and waivers in the Service Agreements. Diel Decl. at ¶ 31.

skill in the course of their duties. This duty cannot be erased by contract. Section 6 of the Act

further provides: "[t]he terms implied by this Act in a contract for the supply of service shall

have effect notwithstanding any agreement, course of dealing between the parties or usage."

Although the Act does not bar carve-outs for negligence claims, it does prohibit clauses that

purport to insulate defendants from liability for gross negligence.

<strong>2.    The Limitations on Liability in the Investment Management<br>Agreement Do Not Bar Plaintiffs' Claims against the FIM Entities,<br>Grosso, and Ceretti</strong>

Neither Plaintiffs nor the Funds are party to the Consulting Agreements between KML

and the FIM Entities. Since Plaintiffs are not parties, they are not bound by any exculpatory

provision in the Consulting Agreements between the FIM Entities, Grosso and Ceretti and KLM.

As described in the Information Memoranda, the FIM Entities' Consulting Services Agreement

with KML provides that the FIM Entities will not be liable to the Fund and its shareholders "for

any acts or omissions in the performance of its services in the absence of *negligence*, willful

default, fraud or dishonesty in the performance or non-performance of its obligations or duties."

SAC, Ex. 5, Kingate Global Fund IM, dated January 15, 2003, at 15 (emphasis added). The

Information Memoranda implicitly recognize that the FIM Entities owe duties to shareholders

and provide that they may be held liable for negligence. Consequently, the counts in the SAC

against the FIM Entities for negligence, gross negligence, and breach of fiduciary duty are not

barred.

The Distribution Agreements[33] between the FIM Entities and KML have no exculpatory

provisions that would bar the claims against the FIM Entities in the SAC. Plaintiffs' claims are

---

[33] Defendants refused Plaintiffs' requests for copies of all the Distribution Agreements in effect.
Barrett Decl., Ex. 1, Fourth Amended Complaint (at ¶ 51) against the Funds alleges that there
was an additional distribution agreement between KML and the FIM Entities dated August 1,
2005.

based in large part on the FIM Entities' central role in marketing the shares in the Funds to investors and inducing them to invest in or remained invested in the Funds without having conducted proper due diligence.

### 3. Plaintiffs' Claims against Citi Hedge Are Not Barred by Disclaimers, Exemptions or Exculpatory Provisions in the Information Memoranda

The second disclaimer relied upon by Defendants is contained in a bland statement in the Information Memoranda that "the Administrator may rely upon appropriate pricing services and information provided by the Investment Adviser." Br. at 83. On its face, this ostensibly innocuous statement does not affirmatively relieve the Administrator from complying with the industry-standard norm of verifying information with independent third-party sources. It is also contradicted by another statement in the Information Memoranda that Citi Hedge "verifies the prices attributed to the securities held by the USD Shares by references to pricing sources independent of the Investment Advisor whenever reasonably possible." SAC ¶ 72.

The disclaimer is followed by an exclusionary provision that purports to relieve Citi Hedge of liability "in the absence of gross negligence or willful default . . . for any loss suffered by the Fund or any shareholder by reason of an error in calculation resulting from any inaccuracy in the information provided by a pricing service or the Investment Advisor." SAC, Ex. 5, Kingate Global Fund IM, dated January 15, 2003, at 10. The SAC, however, alleges that Citi Hedge was grossly negligent in the performance of duties owed to investors in calculating the NAV and the value of Plaintiffs' investments. SAC ¶¶ 298-302.

Moreover, U.K. law requires that unusual or onerous exculpatory provisions in an agreement be fairly and reasonably brought to the attention of the party whose rights will be affected by the provision. *Interfoto Picture Library Ltd. v. Stiletto Visual Programmers Ltd.*, [1989] Q.B. 433 (Court of Appeal) (duty of fairness required that a provision for hefty holding

117

charges for delayed return of transparencies in a standard contract be specifically brought to the attention of the other party).  The decision quotes Lord Denning's observation in *J. Spurling Ltd. v. Bradshaw*, [1956] 1 W.LR. R. 461, a case involving an exculpatory clause in a warehousing contract:

> I quite agree that the more unreasonable a clause is, the greater the notice which must be given of it.  Some clauses which I have seen would need to be printed in red ink on the face of the document with a red hand pointing to it before the notice could be held sufficient.

[1989] Q.B. 433, 443.

The exculpatory provision in favor of Citi Hedge was buried in the fine print of the single-spaced Information Memoranda with no effort made to bring the provision to the attention of Plaintiffs.  SAC, Ex. 5, Global Fund IM, dated January 15, 2003, at 10.  To make matters worse, the provision purported to allow the Administrator to ignore standard industry practices requiring independent verification of pricing information provided by Madoff.  SAC ¶¶ 181, 191-94.  The blanket exemption should be held void and unenforceable.

Moreover, the exculpatory clause did not give Citi Hedge a blank check to publish pricing information that it knew to be false or should have known to be inaccurate.  If Citi Hedge knew or had reason to know that the information provided by Madoff was untrustworthy as alleged, SAC ¶ 193, failure to obtain independent verification of the pricing information constituted willful default of its obligations to investors.  The SAC alleges that Citi Hedge was on notice of irregularities and inconsistencies in the data provided by Madoff and breached its duty to the investors by failing to seek independent verification.  *Id.* ¶¶ 192-94 ("numerous questions and risks surrounding Madoff's operations and purported results should have caused Citi Hedge to increase its scrutiny of the information it received from Madoff, and seek

independent verification"), ¶ 307 ("Citi Hedge acted negligently because it knew or had information suggesting that its statements were not accurate.").

The third disclaimer identified by Defendants provides that "[the] Administrator is not liable for the accuracy of the underlying data provided to it." Br. at 83. This disclaimer does not appear in the Funds' Information Memoranda, but is in the Administration Agreement, a document that was only available for inspection in Bermuda. Moreover, the investors were not party to the Administration Agreement and, consequently, are not bound by the disclaimer. In any event, the disclaimer does not relieve Citi Hedge from liability if it relied on information from Madoff in bad faith because Citi Hedge knew or had reason to know that the information was inaccurate or suspicious.

As discussed, the Information Memoranda disclose that under the terms of the Administration Agreement, Citi Hedge shall not be liable "to the Manager, the Fund, or its Shareholders in the absence of *negligence*, willful default, fraud, or dishonesty in the performance or non-performance of its obligations or duties." SAC, Ex. 4, Kingate Global IM, dated May 1, 2006, at 15 (emphasis added). The wording of the Information Memoranda implicitly recognizes that the Administrator owed duties to the shareholders and that Citi Hedge could be held liable to Plaintiffs if it performed its duties or obligations negligently, dishonestly, or defaulted willfully. Even if Citi Hedge were entitled to rely on data supplied by Madoff to calculate NAVs, it was negligent in the performance of its other duties such as monitoring Madoff's performance returns, verifying that transactions had taken place as represented, and communicating accurate information to prospective and existing investors. The non-pricing claims against Citi Hedge in the SAC adequately allege negligence and negligent representation. Accordingly, they may not be struck out under Bermuda or BVI law.

## 4.    The Subscription Agreement Does Not Waive Plaintiffs' Claims

The Subscription Agreement is the only document signed by the shareholders, and it does not release the Kingate Defendants, Citi Hedge or PwC from liability or raise the threshold of liability. The Subscription Agreement does contain an indemnification provision that purports to indemnify and hold harmless the Fund, the Manager, Investment Adviser, Consultant and the Administrator and their respective employees, officers, directors, and agents "from loss . . . arising out of a breach of any representation or warranty *of the Subscriber* contained in any document furnished by the Subscriber in connection with the offering and sale of Shares." The indemnification provision on its face only applies to representations and warranties made by the subscriber in or in connection with the Subscription Agreement. Under BVI, Bermuda, and U.K. law, releases are strictly construed and to the extent there is any ambiguity in the clause limiting rights, it will be construed against the party seeking to enforce it. Bompas Decl. ¶ 80.

As discussed previously, the Information Memorandum does not incorporate the Service Agreements by reference. Further, the operative sentence in the Subscription Agreement relied upon by Defendants makes no reference to the Service Agreements, much less the exculpatory provisions in the agreements. *See, e.g.,* SAC, Ex. 4, Kingate Global Fund IM, May 1, 2006, at S-4 ("The undersigned subscriber . . . hereby subscribes for as many shares as may be purchased for the amount indicated below on the terms of the Information Memorandum and subject to the provision of the Memorandum and Articles of Association of the Fund."). Consequently, even if the exculpatory provisions in the Service Agreements as described in the Information Memoranda are terms binding on Plaintiffs, these provisions do not include the broader version of the exculpatory provisions found in the Service Agreements. For example, Plaintiffs' claims based on simple negligence are not excluded by the exculpatory provisions in the Service Agreements.

### E. Plaintiffs' Claims Against PwC For Negligence and Negligent Misrepresentation State Claims under Bermuda Law

PwC and its predecessor Coopers & Lybrand Bermuda audited the Funds every year since inception. SAC ¶ 86. Each year, PwC issued an unqualified audit opinion stating that the financial statements and audits complied with the requisite accounting and auditing standards. *Id.* ¶ 87. PwC was fully aware that the Funds were unmarketable without an audited financial opinion by a reputable accounting firm. *Id.* ¶¶ 87, 92. According to the Information Memoranda, "PricewaterhouseCoopers has given its written consent to the inclusion of its name, report, and reference to itself in the form and context in which they appear in the Memorandum." *Id.* ¶ 92.

As part of the audit process, PwC reviewed the agreements between the Manager and the Funds. *See, e.g.,* SAC, Ex. 7, Kingate Management Agreement, at 4.4. Under the heading "Offering Materials," the Management Agreement states:

> The Manager shall deliver or arrange for the delivery by any authorized dealer selected by the Manager, to each person to whom Shares are offered, a copy of the Fund's most recently published Information Memorandum and a copy of the Fund's most recently published annual report.

The PwC audit opinions were addressed to "The Shareholders of [Kingate Global and Kingate Euro Funds]." SAC ¶ 87. Kingate Global Report for 2006-2007, Ex. 9 to the SAC, Dkt. No. 53-9. PwC knew the identities of Plaintiffs because their names were included among the documents that PwC reviewed or had the ability to access in the course of its audit work. SAC ¶ 89. Consequently, the elements for finding assumption of responsibility or a special relationship are satisfied in this case. Bompas Further Decl. ¶ 102.2. Investor reliance on PwC's audit reports was foreseeable. There was proximity with the limited class of persons who sought

to purchase shares, re-invest in additional shares, or hold shares.  And it is fair, just, and reasonable to hold PwC liable for the economic damages resulting from its certification of the existence of fictitious assets.  *Id.*

Defendants argue that under U.K. law, accountants do not owe a duty of care to individual shareholders of the company that they audit and, consequently, a Bermuda court would strike out Plaintiffs' claims against PwC.  Br. at 86; Dohmann Decl. ¶¶ 71, 76-77.  Ms. Dohmann, PwC's expert on U.K. law, relies upon the House of Lord's decision in *Caparo v. Industries Plc. v. Dickman*, [1990] 2 AC 605, as authority for her conclusion that PwC did not owe a duty of care to individual shareholders.  *Caparo*, however, is inapposite.  The auditor was a "statutory" auditor under the U.K. Companies Act that was engaged to prepare an audit report for use at an annual meeting.  The scope of the engagement and the purpose of the audit was limited.

Prior to 2010, BVI law did not require professional funds such as the Funds to engage a statutory auditor or even to have financial statements audited each year.  Bompas Decl. ¶ 74; Bompas Further Decl. at ¶¶ 100-02.  The Kingate Funds voluntary chose to have the accounts audited by PwC because no sophisticated investor would purchase shares in an offshore company without verification of the financials by a reputable auditing firm.  This was particularly true in this case, where the Funds' investments were managed by an unidentified investment adviser in New York who was granted complete discretion to invest the assets of the Funds in accordance with an opaque investment strategy.  The PwC audit report was an indispensable part of the marketing of the Funds.

Moreover, the Funds never held annual general meetings other than on paper.  Subscribers were required in the Subscription Agreement to give KML a standing proxy to vote

their shares at a general annual meeting. Kingate Global Information Memorandum dated May 1, 2006 at S-14 (Dkt. No. 53-4 at 62); Bompas Further Decl. ¶ 100.2. The shareholders had no collective role in the management of the Funds. Thus, *Caparo* is distinguishable on its facts. Bompas Decl. ¶¶ 71-74; 100-04 (*Caparo* can be distinguished because the defendant auditor had not authorized its name to be used in marketing securities of the company under audit and was not aware that its name was being used for the purpose of attracting investors). The primary purpose for the audited financial statements was to give investors assurances that the Funds' assets were legitimately invested and accurately valued. *Id.* ¶ 101.42.

The end and aim of PwC's audits were to influence the investment decisions of investors. There is no bar under U.K. law to accountants assuming duties of care to investors or shareholders with respect to their investment decisions. Bompas Decl. ¶ 73.1 (citing *ADT Ltd. v. BDO Binder Hamlyn*, [1996] BCC 808 (judgment entered in favor of plaintiff who overpaid to acquire an alarm business in reliance upon negligently prepared audit statements of the target company); *Morgan Crucible Co. plc v. Hill Samuel & Co. Ltd.*, [1991] Ch. 295 (Court of Appeal allowed an action to go to trial where the plaintiff was a successful bidder suing the advisers, accountants, and directors of a company for negligent misrepresentation made in the audited financial statements, in an unaudited interim statement, and in a series of representations); *Coulthard & Ors v. Neville Russell*, [1998] B.B.C. 359 (motion to strike out denied where it was not plain and obvious that a claim alleging that a statutory auditor breached a duty owed to company's directors for providing negligent advice with respect to the legality of a loan to a related party failed to make out a viable claim). Bompas Decl. ¶ 74 & n. 26.

Ms. Dohmann's reliance[34] on *Benjamin v. KPMG Bermuda*, [2007] Bda L.R. 22, for the proposition that PwC owed no duty of care to the Kingate investors is misplaced because it involved a claim against statutory auditors. Bompas Further Decl. ¶ 101.[35] In B*enjamin*, the liquidator of two Ohio insurance companies brought suit in Bermuda against the auditors of three captive re-insurers incorporated in Barbados that had reinsured risks for the Ohio companies. The plaintiff claimed that defendant KPMG firms in Bermuda and Barbados, the auditors for the captive companies, were under a duty of care to the reinsured companies because "the auditors knew that the financial reports they prepared for the captives would be passed on by their clients to the reinsureds [the Ohio insurance companies] and would be utilized for their own financial purposes." *Id.* Although the captives were Barbados companies, they were managed substantially from Bermuda in terms of both (a) insurance management and (b) audit work. The Court noted that if the First Defendant [KPMG Bermuda] had been appointed as the auditor of a Bermudian company, it would have been protected by Section 90(3A) of the Companies Act 1981, but that this provision was not applicable because it was auditing an offshore company. The Barbados Companies Act was "in fulfillment of a statutory duty to report to the captives' shareholders in general meeting." Citing *Caparo*, the court observed that a statutory auditor does not provide information to those seeking to profit from dealings in the companies' shares. *Benjamin*, [2007] Bda L.R. 22 at ¶ 30. Further, "[i]t now appears to be settled law in Canada that the mere issuance of statutory audited financial statements does not give rise to a duty of care to anybody other than the company and the general body of shareholders for [whom] the audit

---

[34] Dohmann Decl. ¶ 76.

[35] *Benjamin v. KPMG Bermuda* is the only Bermuda case cited by Ms. Dohmann on the issue of auditor liability for negligence and negligent misrepresentation.

report is prepared." *Id.* at ¶ 33. Thus, the *Benjamin* court's decision turned on the status of the KPMG firms as "statutory auditors." *Id.* at ¶¶ 32-33.

In sum, the holding in *Benjamin* is limited to statutory audits and does not shield PwC for liability to shareholders. Moreover, even if PwC were acting as a statutory auditor, *Caparo* and *Benjamin* would not bar PwC from assuming a duty to shareholders it knew would be relying on its audit opinions to make investment decisions.

### F.    Plaintiffs' Claims for Gross Negligence State a Claim under BVI and Bermuda Law

Bermuda and BVI do not recognize a separate cause of action for gross negligence *per se*, but would treat the gross negligence claim as if it were a cause of action for simple negligence. To the extent that some of the contractual disclaimers in the service agreements purport to condition liability on proof that Defendants' actions constituted gross negligence, however, the Bermuda and BVI courts would consider the facts and circumstances alleged in the SAC in considering the standard and scope of Defendants' duty of care. Bompas Decl. ¶¶ 121-26; Bompas Further Decl. ¶¶ 110-13; Diel Decl. ¶ 44. The claims of gross negligence in Count 5 (Kingate Defendants), Count 15 (PwC), and Count 22 (Citi Hedge) would survive a strike out claim.

## VII.    PLAINTIFFS PROPERLY ALLEGE THIRD-PARTY BENEFICIARY BREACH OF CONTRACT CLAIMS (COUNTS 9-10, 18, 25)

### A.    Plaintiffs State Claims under New York Law

A valid third-party beneficiary breach of contract claim must allege that (1) a valid contract existed, (2) it was intended for the third party's benefit, and (3) that benefit was sufficiently immediate, rather than incidental. *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 251-52 (2d Cir. 2006). However, "[d]etermining intent is necessarily a factual endeavor," and thus, "third-party beneficiary status is a question of fact." *Debary v. Harrah's*

*Operating Co., Inc.*, 465 F. Supp. 2d 250, 261 (S.D.N.Y. 2006). Hence, where there is any ambiguity in the contractual language, courts typically refuse – even on summary judgment motions – to decide the issue of whether the contract intended to confer third-party beneficiary status. *See, e.g., Barry v. Atkinson*, 1998 WL 255431, at *3 (S.D.N.Y. May 19, 1998) (finding agreement ambiguous as to the rights of alleged third-party beneficiaries due to "the absence of any language in the agreement affirmatively bestowing such a right"). These manifestations of intent to benefit Plaintiffs, both in the contracts and in the parties' conduct alleged in the SAC, preclude dismissal. *See, e.g., Anwar I*, 728 F. Supp. 2d at 418-19 (sustaining third-party beneficiary breach of contract claims against fund managers); *id.* at 429 (sustaining third-party beneficiary breach of contract claims against fund administrators); *Flickinger v. Harold C. Brown & Co., Inc.*, 947 F.2d 595, 597, 600 (2d Cir. 1991); *Finch, Pruyn & Co. v. M. Wilson Control Servs.*, 658 N.Y.S.2d 496, 497-98 (N.Y. App. Div. 1997).

The claims are adequately pled even though Plaintiffs are not expressly named in the contracts as third-party beneficiaries. An "intention to benefit a third party may be gleaned from the contract as a whole and the party need not be named specifically as a beneficiary." *Owens v. Haas*, 601 F.2d 1242, 1250 (2d Cir. 1979) (*citing Newin Corp. v. Hartford Accident & Indem. Co.*, 371 N.Y.S.2d 884 (N.Y. 1975)); *see also Fen X. Chen v. Street Beat Sportswear, Inc.*, 226 F. Supp. 2d 355, 365 (E.D.N.Y. 2002); *Dep't of Econ. Dev. v. Arthur Andersen & Co.*, 924 F. Supp. 449, 482 (S.D.N.Y. 1996) (intent to benefit a third party need not be expressly stated in the contract or its identity even known at the time the contract is signed). Similarly, *Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I, LLC*, 637 F. Supp. 2d 185 (S.D.N.Y. 2009), recognized that the contract need not expressly mention the beneficiary. *Id.* at 191; *see also Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 124 (2d Cir. 2005) ("a contractual

requirement that the promisor render performance directly to the third party shows an intent to benefit the party").  In fact, where "the terms of the contract necessarily require the promisor to confer a benefit upon a third person, then the contract contemplates a benefit to that third person, and this is ordinarily sufficient to justify third-party-beneficiary enforcement of the contract, even though the contract also works to the advantage of the immediate parties thereto."  22 N.Y. Jur. 2d Contracts § 304.[36]

As described in further detail below, the SAC alleges that "KML and Tremont's duties pursuant to the Management Agreement included selecting and evaluating appropriate investment advisors and the allocation of assets with a chosen appropriate investment advisor. KML and Tremont also had a continuing obligation to ascertain Madoff's competence and monitor Madoff's performance and custody of the Funds' assets."  SAC ¶ 238.  In addition, the Management Agreements "evidence a clear intent to benefit the shareholders in the Funds."  *Id.* ¶ 236.  Similarly, the Consulting Services Agreements entered into by the FIM Entities "evince a clear intent to benefit" Plaintiffs.  *Id.* ¶ 241.  "The FIM Entities' duties included screening and nominating investment advisors for selection by KML and Tremont.  The FIM Entities also made recommendations regarding the proposed allocation of assets among investment managers.

---

[36] *See also Flickinger v. Harold C. Brown & Co., Inc.*, 947 F.2d 595, 597, 600 (2d Cir. 1991) ("[w]here performance is to be rendered directly to a third party under the terms of an agreement, that party must be considered an intended beneficiary," in the context of a brokerage firm that was retained to provide clearing services for a broker's clients, and registered securities for plaintiff, shipped securities to plaintiff, and sent periodic activity statements to plaintiff); *Finch, Pruyn & Co. v. M. Wilson Control Servs.*, 658 N.Y.S.2d 496, 497-98 (N.Y. App. Div. 1997) (plaintiff manufacturer who hired an electrician to perform services at the plaintiff's power plant was a third-party beneficiary to a subcontract between electrician and mason, because "subcontract necessarily required [mason] to directly perform services at plaintiff's facility . . . in order to satisfy . . . obligations to plaintiff"); *Richards v. City of New York*, 433 F. Supp. 2d 404, 430 (S.D.N.Y. 2006) (children were third-party beneficiaries of a contract between the Administration for Children's Services and an agency licensing the children's foster care providers because "they are the people for whom the delegated services are to be provided").

The FIM Entities were also obligated to 'continuously monitor[]' the asset allocation and the investment advisor's performance." *Id.* ¶ 243.

The service providers hired by the Funds also performed services clearly designed to benefit Plaintiffs. PwC entered into contracts to audit the Funds in accordance with GAAS, and these "contracts evince a clear intent to benefit Plaintiffs and the Class, who had invested in the Funds, to whom the audit reports were addressed, and who relied upon PwC to audit the financial statements of the Funds and to opine that the financial statements fairly represented the financial condition of the Funds only if that professional opinion was based upon a proper audit of the Funds conducted in accordance with GAAS and other applicable auditing standards." *Id.* ¶ 278. Likewise, the Administration Agreements entered into by Citi Hedge "evince a clear intent to benefit shareholders by affirmatively recognizing Citi Hedge's obligation to keep the Funds' shareholders informed of the status and performance of their investments." *Id.* ¶ 312.

1.       **Plaintiffs Are Third-Party Beneficiaries of the Service Agreements**

a.       **Plaintiffs Are Third-Party Beneficiaries of the Management Agreements (Count 9)**

The Management Agreements, read in conjunction with the Information Memoranda, express an intention for the managers (KML and Tremont) to provide services to the investors. The Managers implicitly acknowledged that they owed duties to shareholders when they included a provision in the Management Agreements purporting to limit the scope of the Managers' liability to shareholders for performance of services:

> *5.4 Scope of Liabilities.* Neither the fund manager nor its directors, officers, shareholders and employees, shall be liable to the Fund *or its Shareholders* for any losses, damages, expenses or claims occasioned by any act or omission of the manager or directors, officers, shareholders or employees in connection with the performance of its services hereunder, other than as a result of its own gross negligence, bad faith, or willful or reckless malfeasance. [*sic*] disregard of any of its obligations under this Agreement.

128

SAC, Ex. 4, Management Agreement, dated January 1, 2006, at 5 (emphasis added); Tracey Ex. 15, Co-Management Agreement with Tremont, undated, at § 5.4.  The fact that the Managers attempted to impose contractual liability restrictions on shareholders, who were not parties to the Management Agreements, is an implicit admission that such duties existed and that shareholders could bring claims for breach of those duties.  Bompas Further Decl. ¶ 93; Diel Decl. ¶ 26.

In the *Anwar* case, Judge Marrero denied defendants' motion to dismiss plaintiffs' third-party beneficiary claims based on an administrative services contract between an administrator and a group of Madoff feeder funds, finding that the administrator was obligated under the agreement to provide services directly to shareholders:

> The Court is not persuaded by the Citco Defendants' motion to dismiss the third-party beneficiary claim with respect to the Administration Agreements.  The Administration Agreements contain language that, when viewed in the light most favorable to Plaintiffs, indicates an intent to benefit a third party.  The Fairfield Sentry and Fairfield Sigma Administrative Agreements explicitly state, for example, that the Citco Defendants shall, among other duties, "issue to Shareholders trade confirmations with respect to subscriptions, redemptions and transfers in accordance with the applicable Fund Documents"; "despatch[] [*sic*] to Shareholders notices, proxies, and proxy statements prepared by or on behalf of the Fund in connection with the holding of meetings of shareholders"; "deal[] with and reply[] to all correspondence and other communications addressed to the Fund in relation to the subscription, redemption, transfer (and where relevant, conversion) of Shares"; and "despatch [] to Shareholders and anyone else entitled to receive the same in accordance with the Fund Documents and any applicable law copies of the audited financial statements."  (*E.g.*, Fairfield Sigma Administration Agreement ¶ 3.6; *id.* Schedule 2 Part 2.) . . . Although the Administration Agreements do not explicitly name Plaintiffs as third-party beneficiaries, the Court is persuaded that Plaintiffs satisfactorily allege intent to permit third-party enforcement evident from within the four corners of the contract – especially given that the Administration Agreements require the Citco Defendants to render certain specific performance directly to Plaintiffs.

*Anwar I*, 728 F. Supp. 2d at 430.

Defendants contend that the presence of non-assignment and inurement provisions in Section 5.11 of the Management Agreement and Section 5.11 of the Co-Management Agreement

with Tremont negate an intention to benefit third parties.  Br. at 88.  This, however, is not the case.

The Kingate Global Management Agreement dated January 1, 2006 (SAC, Ex. 7) and the earlier Co-Management Agreement with Tremont (Dkt. 87-1;Tracey Decl., Ex. 16) do contain inurement and no-assignment clauses, but they do not on their face preclude the shareholders from being third-party beneficiaries.  The no-assignment clause is meaningless because both KML and Tremont were granted full discretion to delegate their duties and obligations to unrelated third parties without the consent of the Funds.  Kingate Global Management Agreement dated January 1, 2006, SAC, Ex. 7, § 5.9(a); Tremont Co-Manager Agreement § 5.9 (Dkt. 87-1).  Moreover, under New York law, "it is possible for parties to intend that a third party enjoy enforceable rights while at the same time intending to limit or preclude assignments."  *Piccoli v. Calvin Klein Jeanswear Co.*, 19 F. Supp. 2d 157, 164 (S.D.N.Y. 1998). That is precisely what occurred here – the non-assignment clause does not rule out enforcement by third-party beneficiaries.

The inurement clauses in the Management Agreements do not tip the balance against the Plaintiffs' third-party beneficiary claims in light of the ineffectual no-assignment provision. They merely provide that the Agreements are "binding upon and inure to the benefit of the parties hereto and their successors."  There is nothing in this non-exclusive language that prohibits shareholders from benefiting from and, if necessary, enforcing provisions requiring the Manager to perform services for the benefit of shareholders.

As Defendants point out (Br. at 88), the Kingate Euro Fund Manager Agreement, dated May 1, 2000, does contain an express provision barring third party beneficiaries:

> 4.15   *No Third Party Beneficiaries*.  Except as otherwise expressly provided for herein, the provision hereof are for the sole benefit of the parties hereto and their

successors and assigns (heirs and estates as the case may be) and shall not be construed as containing, and are not intended to confer, any rights, remedies or other benefits on any other persons.

Tracey Decl., Ex. 15 at 1.

Defendants neglect to mention, however, that the 2006 Kingate Global Manager Agreement (SAC, Ex. 7) and the undated Tremont Co-Manager Agreement (Dkt. 87-1) do not contain a similar express provision excluding third-party beneficiaries. The absence of this provision in the Kingate Global Management Agreements in combination with the provision for direct services to be provided to the shareholders and the inclusion of an exculpatory provision purporting to limit shareholder claims indicates that the Funds and the Managers did not intend to deny rights, remedies or other benefits to shareholders arising from the Management Agreements.

In a similar situation, Judge Marrero denied the motion of the administrator of the Fairfield Sentry Fund to dismiss third-party beneficiary claims despite the presence of non-assignment and inurement provisions in the administration agreement:

> ("[C]onflicting evidence" requires the "benefit of discovery and development of the factual record to aid in construing the contracts and discerning the parties' intent."); *see also Debary v. Harrah's Operating Co.*, 465 F. Supp. 2d 250, 261 (S.D.N.Y. 2006) ("[T]hird-party beneficiary status is a question of fact, because the issue turns on whether the contracting parties intended their agreement to directly benefit a third-party."). Moreover, the inurement and non-assignment clauses must be weighed against the Administration Agreements' directives to the Citco Defendants to render performance directly to the Plaintiffs.

*Anwar I*, 728 F. Supp. 2d at 430-31.

Plaintiffs respectfully submit that the same approach is warranted in this case where the Management Agreements and Information Memoranda require the Managers to provide services directly to shareholders and the Managers themselves have recognized in the Management

Agreements that they owe duties to shareholders. Decision on the third-party beneficiary contract claims against KML and Tremont should be deferred until completion of discovery.

        **b.**      **<u>Plaintiffs Are Third-Party Beneficiaries of the Consulting Services Agreements with the FIM Entities (Count 10)</u>**

Defendants FIM Advisers LLP and FIM Limited (the "FIM Entities") were parties to two service contracts with the Funds, both intended in part to benefit the shareholders. The Consulting Services Agreements ("CSA") required the FIM Entities to make recommendations regarding the proposed allocation of assets among investment managers and "to continuously monitor[ ]" the asset allocation and the investment advisor's performance. SAC ¶ 243. Section 8 of the CSA expressly requires that the FIM Entities shall "provide such assistance, information and reports as the Manager and the Company's auditors may from time to time require in connection with the preparation of valuations in respect of the Company, the preparation by the Manager of periodic reports for submission to the Company, and "the provision of annual, semi-annual and other reports *for the benefit of Shareholders or prospective Shareholders* of the Company." Barrett Decl., Ex. 11, CSA Agreement, dated April 23, 2001 § 8 (emphasis added). The FIM Entities breached the Consulting Services Agreement by ignoring non-public, serious risks surrounding Madoff's purported trading. *See* SAC ¶¶ 64-78, 192-95, 198-214.

In addition to the CSA, the FIM Entities served as a non-exclusive distributor of shares of the Funds pursuant to a distribution agreement dated April 23, 2001. Barrett Decl., Exs. 9 & 10, Distribution Agreement between KML & FIM, dated April 23, 2001. The agreement provided that the FIM Entities would provide services directly to the investors, including the maintenance of regulator contact with investors, the preparation of marketing and other materials, and the supervision of distribution lists to keep prospective and existing investors informed of

developments with regard to the Funds, all in accordance with IMRO and other applicable rules and regulations. *Id.* §§ 5.1, 5.3.

The CSA does not contain an inurement clause, but does bar assignments without consent. Barrett Decl., Ex. 11, CSA Agreement, dated April 23, 2001, § 17. There is no provision excluding third-party beneficiaries. The motions should be denied as to Count 10,or a decision should be deferred pending discovery and full development of the facts for the reasons set forth above.[37]

        **c.**      **Plaintiffs Are Third-Party Beneficiaries of the Administration Agreement with Citi Hedge (Count 25)**

Defendant Citi Hedge and its predecessors owed a duty to the shareholders to verify and calculate the Funds' NAV from sources independent of Madoff. SAC ¶ 181. Citi Hedge's calculation of NAV was conclusive and binding on all shareholders in the absence of bad faith or manifest error. *See, e.g.,* SAC, Ex. 4, Kingate Global Fund Ltd. Amended and Restated IM, dated May 1, 2006, at 24.

In addition, Citi Hedge owed a duty to the shareholders as third-party beneficiaries of the Administration Agreements, *inter alia*, (i) to communicate with the Funds' shareholders, (ii) to communicate with the general public, (iii) to accept the subscriptions of new shareholders, (iv) to calculate the subscription and redemption prices, (v) to prepare monthly reports for shareholders

[37]


on the Funds' performance and (vi) generally to provide accurate information to investors. *Id.* ¶¶ 38(b), 182, 192; *see also* SAC, Ex. 4, Kingate Global IM, dated May 1, 2006, at vii). The Administrators distributed monthly performance reports to the shareholders. *Id.* at 33.

Citi Hedge processed new subscriptions for investors, and investors remitted payments to Citi Hedge for their investments and received confirmations from Citi Hedge. *Id.* ¶ 188. In its promotional materials, Citi Hedge claimed to be the top fund administrator in the world and, consequently, obligated itself to provide the highest possible quality of administration services. *Id.* ¶ 187. The Funds' Information Memoranda instructed potential investors to contact the Administrator with inquiries concerning the Funds. SAC, Ex. 4, Kingate Global Fund, Ltd. Amended and Restated Information Memorandum dated 1 May 2006, at cover page.

The Administration Agreement contains an exculpatory provision stating that "[t]he Administrator shall not in the absence of gross negligence, willful default or fraud on its part be liable to the Company or to any Shareholder for any act or omission, in the course of, or in connection with any services rendered by it under the Agreement . . ." SAC, Ex. 15, § 10.3. The inclusion of this limitation on liability to shareholders is an implicit acknowledgement that the Administrator owed duties of performance to shareholders, as well as to the Fund. Bompas Further Decl. ¶ 106.1.

The Administration Agreements contain a non-assignment clause, but not an inurement clause or a provision barring third-party beneficiaries. As noted above, the non-assignment clause has no impact on the services to be provided by Citi Hedge to shareholders and standing alone is innocuous. *Piccoli*, 19 F. Supp. 2d at 164. In view of the numerous services to be performed by the Administrator for the benefit of shareholders and the exculpatory provision in the Administration Agreement directed at shareholders, the inclusion of a non-assignment clause

in the Administration Agreement deserves little or no weight.  The motion to dismiss the third-party beneficiary breach of contract claims against the Administrator should be denied.

### d.     Plaintiffs Are Third-Party Beneficiaries of the Engagement Agreements with PwC (Count 18)

PwC addressed its audit opinions to the shareholders of the Funds.  SAC ¶¶ 87, 278.  It authorized its name and reports to be used for marketing purposes in the Funds' Information Memoranda.  *Id.* ¶ 92.  Furthermore, PwC knew that the primary purpose of the audits was to provide investors in the Funds with assurances that the Funds' assets existed and were accurately valued.  *Id.* ¶ 93.  PwC was fully aware that the Funds agreed in the offering documents to furnish shareholders with annual reports containing financial statements audited by PwC.  *See, e.g.,* SAC, Ex. 4, Kingate Global IM, dated May 1, 2006, at 33.  Accordingly, PwC addressed its audit opinions to the shareholders of the Funds, not to the Directors of the Funds.  SAC ¶¶ 87, 278.  This establishes Plaintiffs' contract rights against PwC as third-party beneficiaries.

### 2.     Defendants Breached Duties Owed to Plaintiffs under the Service Contracts

Defendants contend that Plaintiffs fail to show that they breached any of their respective agreements.  They claim that the contractual duties said to be breached all are based on the faulty premise that Defendants improperly relied on false information provided by Madoff.  Br. at 90.  According to Defendants, various disclaimers and exemptions in the governing documents allowed them to rely without question on data supplied by Madoff.  As explained above, Defendants wrongly rely on disclaimers and exculpatory clauses.

KML and Tremont rely on a disclaimer in the "Certain Risk Factors" section of the Information Memoranda that:

> [Information] supplied by the Investment Adviser may be inaccurate or even fraudulent.  The Manager [or Co-Manager] is entitled to rely on such information

(provided they do so in good faith) and are not required to undertake any due diligence to confirm the accuracy thereof.

Br. at 90.

The SAC is replete with allegations that the Manager and Co-Manager knew that information from Madoff was suspect and, consequently, could not have relied on the information it knew or had ample reason to believe was wrong "in good faith." Bompas Further Decl. ¶ 80.4 (Defendants would have to prove good faith to rely on this exemption). The FIM Entities are not mentioned in or covered by this disclaimer. Moreover, the disclaimer is an empty statement because there are, of course, no agreements with the Funds authorizing the Managers to conduct recklessly insufficient due diligence. If effective, this one sentence would obliterate the primary obligation of the Managers to "evaluate and monitor" the undisclosed New York investment adviser. SAC, Ex. 4, Kingate Global IM, dated May 1, 2006, at ii; Barrett Decl., Ex. 13, Kingate Euro IM, dated May 1, 2006, at ii.

The FIM Entities in both the CSAs and the Distribution Agreements agree to conduct their business in accordance with the rules of the Investment Management Regulatory Organization Ltd. ("IMRO") and other applicable regulations, including IMRO regulations governing sales of securities. Even if the FIM Entities were within the ambit of the disclosure provision allowing uncritical reliance on information supplied by Madoff, it would be in violation of IMRO rules if it provided information to investors without undertaking due diligence into Madoff and having sought independent verification of the information received from him.

Citi Hedge, likewise, claims that it is immune from third-party breach of contract claims because the Administration Agreements exempted it from liability for the accuracy of the underlying data provided to it. This provision would not immunize Citi Hedge if it knew or should have known that the pricing information provided by Madoff was inaccurate. Nor does it

excuse Citi Hedge from its failure to investigate abundant information from public, and particularly private, non-public sources that Madoff's firm was engaging in illegal conduct, such as front-running or outright fraud, to achieve impossibly consistent returns. The general provision in the Information Memoranda limiting liability on the part of Citi Hedge in matters unrelated to pricing provides that Citi Hedge cannot be held liable "in the absence of negligence, willful default, fraud or dishonesty in the performance or non-performance of its duties." SAC, Ex. 4, Kingate Global IM, dated May 1, 2006, at 15. This disclaimer does not shield Citi Hedge from liability for third-party breach of contract claims and non-contractual duties of care owed to Plaintiffs.

PwC does not assert any defenses to third-party breach of contract claims against it based on exemptions, disclaimers or limitations of liability in its engagement letters.[38]

### B.   Plaintiffs State Claims for Third-Party Beneficiary Breach of Contract Under Bermuda and BVI Law

Defendants claim that Bermuda and the BVI continue to adhere to the common law doctrine of strict privity and, therefore, would not permit Plaintiffs to assert third-party beneficiary claims arising under the various agreement discussed above. Br. at 87. They seek to reinforce their arguments by references to the non-assignment and no-third-party beneficiary clauses in some of the agreements. *Id.* at 87-88. Defendants also assert that Plaintiffs have not pointed to a breach of the duties existing under these contracts. *Id.* at 89. Defendants' arguments are unavailing.

---

[38] For reasons explained in the standing section, Plaintiffs' third-party beneficiary breach of contract claims are not barred by the reflective loss principle. The Kingate Defendants and PwC have asserted defenses to the actions brought by the Funds in Bermuda (*e.g.*, *in pari delicto* and *ex turpi causa*) and there is no realistic prospect of making Plaintiffs and the Class whole. The Joint Liquidators have not sued Citi Hedge, and now are barred by the statute of limitations from doing so. *See* Bermuda Limitation Act 1984 § 7 (six years); N.Y. C.P.L.R. § 213(2) (same).

1.    **<u>Bermuda and BVI Will Likely Recognize the Rights of Third Parties to Enforce Contracts Meant for Their Benefit</u>**

The strict privity rule is fast disappearing in the U.K. and Commonwealth nations. Beginning in 1963, New Zealand disavowed the strict privity rule in the Contracts (Privity) Act of 1963. The U.K. followed suit in 1999. (*See* the Contracts (Rights of Third Parties) Act); then Singapore in 2002. (*See* Contracts (Rights of Third Parties) Act); the Cayman Islands in 2014 (Contracts (Rights of Third Parties) Law). Hong Kong effectively January 2016 (Contracts (Rights of Third Parties) Ordinance).

Canada also has relaxed strict privity rules. *See Brown v. Belleville (City)*, 2013 ONCA 148, at ¶ 79 (Ont. Ct. of App. 2013) ("It is important to note that the doctrine of privity of contract is of considerably diminished force in Canada as a continuing principle of contract law. . . . Thus while the doctrine survives in Canada, it persists only in weakened form."); *Frazer River Pile & Dredge Ltd. v. Can-Dive Services, Ltd.*, [1999] 3 S.C.R. 108 (Supreme Court of Canada) (principled exception to the privity rule allowed a charterer, not in privity with an insurance company, to assert a waiver of subrogation clauses in an agreement between the insurance company and the barge owner).

Defendants' experts fail to cite any recent Bermuda authorities rejecting third-party breach of contract claims.[39] As Defendants recognize, Bermuda law does recognize certain

_____

[39] The best the experts can do is cite *Beswick v. Beswick*, [1968] AC 58, an obsolete House of Lords case decided almost 50 years ago which was effectively discredited by the passage of the UK Contracts (Rights of Third Parties) Act 1999. Hargun Decl. fn. 8; Browne-Wilkinson Decl. ¶ 61. At issue in *Beswick* was whether a wife had personal standing, in addition to standing as an executrix, to enforce an annuity agreement in her favor. The validity of the agreement was not in dispute. The court held that the wife had standing to sue as executrix, but not in her personal capacity. The absurdity of the ruling lies in the fact that if her deceased husband had not appointed her as his executrix, his widow would have no remedy.

    *Frett v. The Owners and Other Persons Interested in the Ship Buckpasser Junneau 36*, the only BVI case cited by Tremont's expert, has nothing to do with third-party beneficiary enforcement of contract claims. The case was brought in admiralty by the owner of a marina

circumstances in which as a matter of equity, the courts may impose a 'constructive trust' as a remedy to enforce contracts in favor of a third party. Hargun Decl. ¶ 152. Bermuda has already begun to distance itself from the privity rule by a statute that allows third parties to bring claims against insurers to enforce insurance provisions intended for their benefit. *See* Third Parties (Rights Against Insurers) Act of 1963. Full recognition of the rights of third parties generally to enforce contracts that are clearly meant to benefit them. The principle that a third party ought to be able to enforce a contract intended for its benefit makes eminent sense, particularly in cases where the promisee is unwilling or unable to enforce the contractual obligation owed by the promisor.

The principle that a third-party beneficiary lacks standing to enforce a contract made for his benefit is in retreat throughout the common law world. There is no reason for this Court to assume that the Supreme Court of Bermuda or the BVI would cling to an antiquated concept of privity if the issue of third-party contractual rights were a   squarely presented to it. Indeed, by the time this case is ready for summary judgment or trial, the Bermuda and BVI legislatures may well follow the lead of the U.K. and many other commonwealth countries. Based on the allegations in the Complaint, a Bermuda or BVI court would  not dismiss the third-party beneficiary claims as "hopeless," "unarguable," "unsustainable" and "clear beyond"  doubt, particularly given the fact that the law in this area is still developing.   Diel Decl. ¶¶ 6, 24-27.

---

who had leased the marina to a bankrupt company. He sought to enforce claims *in rem* against a dozen yachts that had been moored at the marina while the bankrupt company was in possession. The court denied the claim on the grounds that the owner had no contractual claims against the yachts or their owners.

## VIII. PLAINTIFFS PROPERLY ALLEGE A CLAIM OF MUTUAL MISTAKE AGAINST THE KINGATE DEFENDANTS (COUNT 12)

### A. Plaintiffs State a Claim under New York Law

Under New York law, a contract is subject to rescission if a "mutual mistake … exist[s] at the time the contract is entered into and [is] substantial." *Gould*, 81 N.Y.2d at 453. Here, Plaintiffs allege that the Kingate Defendants each entered into contracts to be paid fees for their management of the Funds, based on the amount and value of the assets under management and amount of profits. SAC ¶ 249. These contracts were premised on a false assumption, however, namely that the Funds' assets were actually being invested by Madoff. On the contrary, as Plaintiffs have alleged, "there were no assets under management and no profits." *Id.* "[A] mistake about one of the central goals of an agreement is substantial," and Plaintiffs' allegations are therefore sufficient to allege a claim of mutual mistake. *Anwar I*, 728 F. Supp. 2d at 420 (false assumption that fund's assets were being invested by Madoff is sufficient to allege mutual mistake). That Plaintiffs also allege that certain of the Defendants were aware of Madoff's conduct, moreover, does not preclude a claim of mutual mistake – Plaintiffs are permitted to plead in the alternative. *Id.*

Defendants complain that Plaintiffs' allegations are not particularized. Br. at 95-96. But nothing more particular than that the assets were worthless and all fees were paid by mistake is necessary – or possible. Defendants cannot, and do not, complain that they do not understand what the alleged mistake was.

### B. Plaintiffs State a Claim under BVI and Bermuda Law

Defendants contend that Plaintiffs' claim against the Kingate Defendants for mutual mistake (Count 12) would be struck out under Bermuda or BVI law for two reasons: (1) the Funds, not the Plaintiffs, paid fees to the Kingate Defendants, and (2) the claim is barred under

the reflective loss principle because the Joint Liquidators' claims for mutual mistake are pending in the actions brought by the Joint Liquidators against certain of the Kingate Defendants. Br. at 95-96. Even assuming that the Kingate Defendants' summary of foreign law is correct with respect to the elements of a mutual mistake claim, Plaintiffs, nonetheless, have a viable claim for mutual mistake with respect to fees paid to the Kingate Defendants.

The Funds' Information Memoranda and Subscription Agreements provide for subscribers to pay a Subscription Charge[40] of up to 5% of the gross amount paid to acquire shares in the Funds. SAC, Ex. 4, Kingate Global IM, dated May 1, 2006 at iv. The subscription charge (front end load) paid by Plaintiffs as purchasers of shares was kept by the dealers (*e.g.*, KML, the FIM Entities, and Tremont) as compensation. Only the net amount of the subscription proceeds (minus the charge) was paid to the Funds in exchange for shares worth an equivalent amount at the then-NAV. The Manager and the dealers pocketed the subscription fee, not the Fund. Under the Co-Management Agreement, Tremont retained up-front and other fees paid by the purchasers. Tracey Decl, Ex. 15, Co-Management Agreement, undated, § 5.2(b). Accordingly, Plaintiffs, not the Funds, paid the Subscription Charge directly to the dealers (KML, the FIM Entities, and Tremont) under a mistaken belief that the net payments were being used to acquire shares in the Funds at an accurate NAV that was calculated in good faith and independently verified.

Defendants' argument that claims for restitution of the Subscription Charges by the Kingate Defendants would be barred by the reflective loss principle is incorrect because the

---

[40] The Subscription Charge is a five percent load fee paid to the Manager: "[a] sales charge of up to five percent (5%) of the amount invested is payable on subscription of the USD Shares, but such charge may be waived in whole or in part at the sole discretion of the Manager. The Manager may grant all or part of such charge to the dealers and independent third parties in connection with the solicitation of subscriptions." SAC, Ex. 4, Kingate Global IM, dated May 1, 2006, at iv.

Funds have no claim to the Subscription Charges and suffered no loss as a result of the payments. Similarly, Plaintiffs' loss resulting from the out-of-pocket payments of the 5% load fee is wholly unrelated to any diminution in the value of the Funds' shares. The action brought by the Joint Liquidator in Bermuda to recover management fees from certain of the Kingate Defendants does not trump Plaintiffs' claims of mistake because the Subscription Charges were not paid by the Funds and did not constitute management fees.

## IX. PLAINTIFFS CAN PURSUE AN UNJUST ENRICHMENT CLAIM IF NO CONTRACTUAL BASIS FOR RECOVERY EXISTS (COUNT 28)

### A. Plaintiffs State a Claim under New York Law

Plaintiffs allege a claim of unjust enrichment for the payments made to Defendants by the Funds "in the form of commissions and other fees for the purported management and administration of their investments, and the purported, but in fact non-existent, capital appreciation of such assets." SAC ¶ 28. A direct relationship is not required to assert unjust enrichment. *See In re Canon Cameras Litig.*, 2006 WL 1751245, at *2 (S.D.N.Y. June 23, 2006). Thus, "[t]o state a claim for unjust enrichment in New York, a plaintiff must allege that (1) defendant was enriched; (2) the enrichment was at plaintiff's expense; and (3) the circumstances were such that equity and good conscience require defendants to make restitution." *Intellectual Capital Partner v. Inst. Credit Partners LLC*, 2009 WL 1974392, at *8 (S.D.N.Y. July 8, 2009) (citation omitted).

Plaintiffs allege that "Defendants wrongfully collected hundreds of millions of dollars in unearned fees based on [] fictitious profits." SAC ¶ 4. Defendants collected these fees in the form of commissions and performance fees for the purported, but in fact non-existent and wholly fabricated, capital appreciation of the Funds. *Id.* ¶ 323. Based on Defendants' gross failures to perform their promised due diligence – and the fees those Defendants received despite their

142

failures – Plaintiffs most certainly did not receive "what they paid for." This suffices to plead unjust enrichment. *Anwar I*, 728 F. Supp. 2d at 421 (sustaining unjust enrichment claims); *see also Intellectual Capital Partner*, 2009 WL 1974392, at *8-9; *Space, Inc. v. Simowitz*, 2008 WL 2676359, at *3 (S.D.N.Y. July 7, 2008); *Cruz v. McAneny*, 816 N.Y.S.2d 486, 490-91 (N.Y. App. Div. 2006).[41]

Defendants argue that Plaintiffs' unjust enrichment claims fail where, as here, certain contracts govern. Br. at 98 n.94. At the same time, however, Defendants dispute the application of those agreements. *E.g.*, Br. at 87-89. They further dispute that Plaintiffs and certain Defendants were parties to the agreements. *Id.*; *see also* Br. at 95 (noting that Tremont Group, FIM (USA) and the Individual Defendants were not parties to the agreements). The significant disputes surrounding the relevant agreements preclude dismissal of the unjust enrichment claims. On a motion to dismiss, allegations must be taken as true. Defendants' arguments concerning the substance of the agreements must wait until the summary judgment or trial phases of the case. *See Depaola v. 2 Bros. Indus., Inc.*, 2011 WL 2743130, at *1 (N.Y. Sup. Ct. July 6, 2011) (denying motion to dismiss plaintiff's unjust enrichment claims, because "where[,] as in this case, there [is] a genuine dispute as to the existence of a contract, Plaintiff may proceed upon both theor[ies] and is not required to elect her remedy at the pleading stage") (citing *IIG Capital LLC v. Archipelago, LLC*, 36 A.D.3d 401 (N.Y. App. Div. 2007)).

### B. Plaintiffs State a Claim under BVI and Bermuda Law

Defendants advance two arguments why Plaintiffs' unjust enrichment claim against them would be struck out under Bermuda, BVI or U.K. law: (1) a claim for unjust enrichment, the

---

[41] Defendants argue, Br. at 97, that under Bermuda and BVI law, a claim for unjust enrichment "can only be asserted where there is a total failure of consideration." Here, they say, where Defendants provided at least *some* services, there was no such failure. *Id.* Even were the law of Bermuda or BVI to apply here, there was, in fact, a "total failure of consideration," because the assets upon which purported commissions and fees were based did not even exist.

equivalent of a claim for restitution under U.K. law, belongs solely to the Funds who paid the commissions and fees charged by Defendants; and (2) Plaintiffs fail to allege that there was a total failure of consideration in exchange for the payments because Defendants performed some services even if they are alleged to have done so incompetently or negligently.

Defendants ignore the fact that Plaintiffs, as investors in the Funds, were the true source of the payments to Defendants, not the Funds. Plaintiffs can reasonably allege the likelihood that the Funds followed practices similar to those of the Madoff feeder funds at issue in the *Anwar* litigation.[42] As such, Defendants paid themselves, including Citi Hedge and PwC, with the proceeds of subscriptions received each month and only remitted the net amount remaining after payment of management fees and redemptions to Madoff for investment. Courts in equity (as with respect to a claim of unjust enrichment) look to the substance of transactions, not the form.

As discussed above, Plaintiffs paid the Subscription Charges to the distributors – KML, Tremont, and the FIM Entities – and not the Funds. The Subscription Charges were taken off the top and the remainder was then turned over to the Funds in exchange for shares at the then-NAV price.

The core "services" provided by Defendants were performed not merely inadequately or incompetently. The value of such services was negative and amounted to a total failure of the consideration. Defendants purported to have performed proper due diligence and monitoring of

---

[42] The Fairfield Sentry Fund, a Madoff feeder fund, operated in this manner. Amounts received from investors for subscriptions were used to pay management fees and other fees of the Fairfield Defendants. The Fairfield Sentry fund only withdrew assets placed with Madoff when the new money from subscriptions could not cover the overhead costs. In Fairfield Sentry's case, more than half of the fee payments paid to the defendants originated from investor subscriptions and did not coincide with a withdrawal from an account at BMIS. *See* Barrett Decl., Ex. 3, Declaration of Mark McKeefry in Opposition to Trustee's Application for Enforcement of Automatic Stay and Issuance of Preliminary Injunction dated February 23, 2013, ¶2, Adv. Pro. No. 12 cv-02047 (BRL), (Dkt. 24). Mr. McKeefry is the General Counsel of Fairfield Greenwich Advisors.

Madoff's performance as an investment advisor, but instead ignored gross irregularities. Nor did Defendants conduct meaningful due diligence or verify that Madoff was engaged in a legitimate investment advisory business. SAC ¶ 3. Instead they purported to shift the risk of fraud to Plaintiffs through self-serving contractual exclusions and disclaimers. The only parties to benefit from Defendants' "services" were Defendants, who were paid lavish fees based on fictitious NAVs that they did nothing to earn.

The Individual Defendants were the principal beneficiaries of the management fees paid to KML.  *see also* Barrett Decl., Ex. 1, Trustee's Fourth Amended Complaint, ¶ 45. Similarly, Manzke benefited directly from the management fees paid to Tremont as its founder, high-level executive, and stakeholder. Under the circumstances of this case, a court in Bermuda or BVI would not find it "clear beyond all doubt" that Plaintiffs' claims for unjust enrichment were "hopeless," "unarguable," or "unsustainable." Diel Decl. ¶ 8.

## X. PLAINTIFFS ARE ENTITLED TO A CONSTRUCTIVE TRUST REMEDY AGAINST THE KINGATE DEFENDANTS

The elements of a constructive trust, under New York law are: (1) a fiduciary relationship, (2) a promise, (3) a transfer in reliance thereon and (4) unjust enrichment. *Plumitallo v. Hudson Atl. Land Co., LLC*, 903 N.Y.S.2d 127, 129 (N.Y. App. Div. 2010). Here, Plaintiffs have alleged a fiduciary relationship, a promise by the Kingate Defendants to conduct adequate due diligence and supervision of Madoff, an investment in the Funds in reliance on

these promises, and Defendants' unjust enrichment based on Madoff's fictitious profits.

Accordingly, Plaintiffs sufficiently allege the elements necessary to impose a constructive trust.

"Where, as here, there is a *bona fide* dispute as to the existence of a contract, or where the contract does not cover the dispute in issue, a plaintiff may proceed upon a theory of quasi-contract as well as breach of contract, and will not be required to elect his or her remedies." *Id.* at 128 (citing *Hochman v. LaRea*, 789 N.Y.S.2d 300, 301-02 (N.Y. App. Div. 2005)). This rule applies here because Defendants hotly dispute whether Plaintiffs have stated claims for breach of contract. Moreover, even if Plaintiffs are able to establish their contract claims against some Defendants, such as KML, Tremont, and the FIM Entities, they may not be able to do so against all of the Kingate Defendants.[43]

## XI.   JURISDICTION OVER CITI HEDGE IS PROPER

Despite having litigated this case for nearly seven years, Citi Hedge complains for the first time in its motion to dismiss the SAC that it is somehow unfair for this Court to exercise jurisdiction over it. Having taken advantage of the Court's jurisdiction to argue for the dismissal of claims under SLUSA and the Martin Act – initially with complete success – the Court should reject Citi Hedge's belated effort to evade this Court's authority.

In the Second Circuit, a plaintiff need only make a *prima facie* showing of personal jurisdiction over the defendant to defeat a Rule 12(b)(2) motion to dismiss prior to discovery. *Metro Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996). A plaintiff establishes a *prima facie* case by "pleading in good faith … legally sufficient allegations of jurisdiction." *Ball*, 902 F.2d at 197. Indeed, "[a]t that preliminary stage, the plaintiff's *prima facie* showing may be established solely by allegations." *Id.* at 197. In evaluating a plaintiff's

---

[43] Defendants argue, Br. at 94, that the Funds – not Plaintiffs – paid the management and consultant fees that Plaintiffs seek to recover in their claim for a constructive trust. For the reasons discussed above, *supra*, however, Plaintiffs have standing to assert this claim.

*prima facie* case, the district court must construe the jurisdictional facts from the pleadings in the light most favorable to the plaintiff, and resolve all doubts in the plaintiff's favor, "notwithstanding a controverting presentation by the moving party." *Law Debenture v. Maverick Tube Corp.*, 2008 WL 4615896, at *2 (S.D.N.Y. Oct. 15, 2008).

New York's long-arm statute stops short of the maximum exercise of personal jurisdiction that the Constitution permits; thus, once jurisdiction is established under Section 302(a)(1), determining the constitutionality of the exercise of specific personal jurisdiction in New York is "comparatively easy." *Picard v. Elbaum*, 707 F. Supp. 144, 149 (S.D.N.Y. 1989); *see also Greenlight Capital, Inc. v. Greenlight (Switz), S.A.*, 2005 WL 13682, at *4 (S.D.N.Y. Jan. 3, 2005) ("[I]f jurisdiction is proper under the CPLR, due process will be satisfied because CPLR § 302 does not reach as far as the constitution permits.").

More generally, "[a] court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, SA v. Brown*, 131 S. Ct. 2846, 2851 (2011); *accord Int'l Shoe*, 326 U.S. at 318. Although a corporation is always at home in the forum where it is incorporated or has its principal place of business, the Supreme Court has explicitly recognized that general jurisdiction is not limited to these locations. *Daimler AG v. Bauman*, 134 S. Ct. 746, 760 (2014); *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 447-48 (1952); *Int'l Shoe Co.*, 326 U.S. at 318.

Citi Hedge claims that the Supreme Court's decision in *Daimler* justifies its untimely jurisdictional challenge. *See* Br. at 58. But that argument is both too late and wrong. *First*, by failing to challenge jurisdiction either in this Court or at the Second Circuit, Citi Hedge has

waived any challenge to jurisdiction.[44]  Indeed, Citi Hedge affirmatively *availed* itself of the

Court's jurisdiction when it moved to dismiss the claims against it *on the merits*.  Moreover, Citi

Hedge failed to raise any personal jurisdiction issue at the Court of Appeals even though

*Goodyear* was decided in June 2011, well before Citi Hedge filed its brief on appeal.  *See* Brief

of Appellee Citi Hedge Fund Serv., *In re Kingate Mgt. Ltd. Litig.*, No. 11-1397 (2d Cir.), filed

on April 11, 2011, Dkt. No. 128 (never once mentioning personal jurisdiction nor *Goodyear*).

Citi Hedge's omission of *Goodyear* is telling because *Goodyear* is more apt than *Daimler*

to this case, because it involved jurisdiction over foreign subsidiaries of a domestic corporation.

There, the Ohio-based parent corporation did not contest that jurisdiction in North Carolina was

proper, even though the case was not filed in Ohio and involved an accident that occurred

overseas.  However, plaintiff's failure to sue the foreign subsidiaries in the *parent* Ohio, coupled

with a failure to assert that the subsidiaries were part of one global "unitary business," led the

Supreme Court to reject personal jurisdiction over the foreign subsidiaries.  *Goodyear*, 131 S.

Ct. at 2857.

But *Daimler* presented the opposite situation of this case and *Goodyear*.  In *Daimler*,

plaintiffs attempted to impute general jurisdiction over a German *parent* corporation through the

fact that it had subsidiaries that operated in the forum state.  Specific jurisdiction was plainly

lacking, and the Supreme Court unsurprisingly found that the mere presence of a subsidiary did

---

[44] *Daimler*, while applying the rule laid out in *Goodyear*, did not change the law expressed in *Goodyear* as to the limits of a Court's power in the realm of personal jurisdiction.  Citi Hedge waited *years* to raise personal jurisdiction following *Goodyear*.  A challenge to personal jurisdiction is waivable (or forfeitable) when not timely made, and Citi Hedge has thus forfeited any challenge.  *See, e.g., Laydon v. Mizhuo Bank, Ltd.*, 2015 WL 1499185 (S.D.N.Y. Mar. 31, 2015) ("conduct during those [seven] months and their failure to promptly raise the issue of personal jurisdiction" waived personal jurisdiction); *Hamilton v. Atlas Turner, Inc.*, 197 F.3d 58, 61 (2d Cir. 1999) ("whether forfeiture has occurred is a matter of federal procedural law"; challenge to personal jurisdiction was forfeited by participating in action for years without challenging jurisdiction).

not render the foreign parent corporation "at home" in the forum state to subject it to general jurisdiction for *any* litigation there. Here, however, Citi Hedge is not a foreign parent of a domestic subsidiary, but rather a foreign subsidiary of a domestic parent, which (unlike *Goodyear*) indisputably *is* at home in the forum state.[45] Because the parent corporation, which wholly owns and controls the subsidiary, is at home in New York, the general jurisdiction analysis is flipped from *Daimler*, which is *not* new authority. As a subsidiary totally controlled by its parent in New York, Citi Hedge has the requisite "continuous and systematic" ties to New York. It is perfectly reasonable and consistent with Due Process for a parent corporation to have its subsidiaries subject to general jurisdiction where the parent company is located, as New York law has long recognized. This by no means offends "'traditional notions of fair play and substantial justice,'" *Int'l Shoe*, 326 U.S. at 316, and nothing in *Daimler* alters this outcome.

## A. Specific Jurisdiction

Plaintiffs have properly alleged specific jurisdiction. Moreover, because Citi Hedge failed to contest specific jurisdiction in its first motion to dismiss, and nothing in the law of specific personal jurisdiction has changed since that time (*Daimler* involved only general jurisdiction), Citi Hedge has waived any defense in this regard, based on the same law discussed above at footnote 44.

In any event, even if Citi Hedge's untimely argument is considered, the standard of N.Y. C.P.L.R. § 302 is easily met here. Plaintiffs have adequately alleged that Citi Hedge

---

[45] Citibank N.A., which is headquartered in Manhattan, is the parent of Citibank Overseas Investment Corporation which is the parent of Citi Hedge. Citi Hedge is identified as an "International Nonbank Sub[sidiary] of Domestic Entities" by the U.S. Federal Reserve, *see* Federal Reserve System National Information Center, *available at* http://www.ffiec.gov/nicpubweb/nicweb/ InstitutionProfile.aspx?parID_RSSD=3639698&pardt_end=99991231. And Citi Hedge effectively conceded that it had so-pervasive business contacts with New York that general jurisdiction over it was consistent with the Constitution when it failed to contest jurisdiction in its original motion to dismiss.

"transact[ed] business within the state or contract[ed] anywhere to supply goods or services in the state," or "commit[ted] a tortious act within the state." N.Y. C.P.L.R. § 302(a)(1), (2)).

As Citi Hedge sets out, specific jurisdiction exists when a defendant transacts business in a state, and the claim arises from that business activity. Br. at 59 (*citing Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006)). All that is required for specific jurisdiction is "some articulable nexus" between the claim and the in-state activities. *Id.* While Citi Hedge argues that the parties to the Administration Agreement were located out of state, it ignores the numerous allegations which show Citi Hedge's ties to New York with respect to the claims at issue, and the services it agreed to provide that necessarily involved New York.

Citi Hedge agreed to undertake a crucial job: to calculate the NAVs of the Funds, and distribute those values to the Funds' shareholders. SAC ¶¶ 180-82. The calculation of the NAV was critical to Plaintiffs' purchases because it determined the amount of Fund shares received by investors. The SAC alleges that Citi Hedge knew that calculating the NAVs required it to conduct business in New York, including obtaining from Madoff all of the information on the Funds' purported trading and assets; and Citi Hedge had a duty to validate this information. *Id.* ¶¶ 53-54, 189-97. Although Citi Hedge now attempts to deflect the SAC's plain allegations, Citi Hedge is estopped from arguing that New York conduct was not instrumental to the claims against Citi Hedge: Citi Hedge itself made precisely that argument in its prior motion to dismiss, and the Court accepted that argument. *See* Dkt. No. 97 (Citi Hedge Memo in Support of Motion to Dismiss); Court's order and opinion on first motion to dismiss at 13-23.

> A potential consequence of a conflict between two factual statements made by the same party is judicial estoppel: 'Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.'

*In re Adelphia Recovery Trust*, 634 F.3d 678, 695 (2d Cir. 2011) (*quoting DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir.2010) (*quoting New Hampshire v. Maine*, 532 U.S. 742, 749 (2001))).[46]

Thus, Citi Hedge cannot now deny that it was responsible for valuing a basket of New York Stock Exchange securities, because that is precisely what Citi Hedge asserted in initially convincing the Court that claims were preempted by SLUSA. Dkt. No. 97 at 12-13 ("[T]he misrepresentations alleged in the Complaint – the due diligence of Madoff undertaken by the Manager, the quantity and quality of BMIS oversight promised by the Manager, and *the financial statements and NAVs of the Funds* – all 'coincided' with Madoff's purported purchase of covered securities on the New York Stock Exchange.") (emphasis added).[47] Plaintiffs relied on Citi Hedge's position in preparing the SAC, seeing no need to add many more jurisdictional allegations. Permitting Citi Hedge to change course now would render an unfair detriment to Plaintiffs. *See Adelphia Recovery Trust*, 634 F.3d at 696 (*citing New Hampshire*, 532 U.S. at 751).

In any event, as further discussed at Section II. B., regarding choice of law, there are extensive contacts with New York that create the required nexus to support specific jurisdiction over Citi Hedge. Other courts have found similar claims against similarly-situated fund

---

[46] Judicial estoppel "protect[s] the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001) (internal quotation marks and citations omitted). "Typically, judicial estoppel will apply if: 1) a party's later position is 'clearly inconsistent' with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel." *In re Adelphia Recovery Trust*, 634 F.3d 678, 695-96 (2d Cir. 2011) (quoting *DeRosa*, 595 F.3d at 103). It does not matter if Citi Hedge knew it intended to switch positions at the time of its earlier argument: "the proper focus is on the objective conduct of a party or its counsel." *Id.* at 696.

[47] In addition, Madoff claimed he was holding U.S. Treasury Bills on behalf of the Funds at the Bank of New York. SAC ¶ 64.

administrators proper for resolution in New York. *Anwar I*, 728 F. Supp. 2d 372. At the least, although Plaintiffs believe that the SAC more than adequately alleges specific jurisdiction against Citi Hedge, the appropriate remedy in light of Citi Hedge's change in position would not be dismissed, but rather leave to amend following jurisdictional discovery.

### B.    General Jurisdiction

Even after *Daimler*, general jurisdiction over Citi Hedge is proper here. The Supreme Court emphasized in *Daimler* that general jurisdiction is appropriate where a corporation has "continuous and systematic" affiliations "comparable to a domestic enterprise in that State." *Daimler*, 134 S. Ct. at 758 n.11. Such fora have the advantage of being relatively unique, such that general jurisdiction is not available in every forum in which the corporation transacts business. *See, e.g.*, *id.* at 760; *see also id.* at 759-60 (rejecting agency theory that would permit jurisdiction in every place where a corporation has a subsidiary or affiliate). Thus, a forum in which a corporation engages in high level administration and management of a substantial portion of the company's activities (a location of which there will rarely be more than one or two) may well qualify for general jurisdiction. *See Perkins*, 342 U.S. at 447-48.

As such, after *Daimler*, New York courts recognize that jurisdiction over foreign subsidiaries of a New York entity is appropriate where a subsidiary is a "mere department" of the parent. *See In re Lyondell Chem. Co. v. Blavatnik*, 543 B.R. 127, 143 (Bankr. S.D.N.Y. 2016). "Under New York law, establishing the exercise of personal jurisdiction over an alleged alter ego requires application of a less stringent standard than that necessary to pierce the corporate veil for purposes of liability: when veil piercing is only being used to assert jurisdiction, the question is whether the allegedly controlled entity was a shell for the allegedly controlling party, it is not necessary to show also that the shell was used to commit a fraud,

which is normally required to pierce the corporate veil for liability." *Id.* at 143 (internal quotations omitted).[48]

The SAC plainly alleges that Citi Hedge is a mere department of Citigroup's worldwide "Funds Services" business. SAC ¶¶ 184-86. Citigroup's website touted "the industry's largest global footprint with 53 proprietary branches"; "the strongest presence across all regions"; and the "most diversified product line in the industry." *Id.* ¶ 186. Citi's current website varies little from that excerpted in the SAC from 2010, and touts that:

> …. By *integrating our U.S. and European service teams with our offshore operations, we* incorporate support for all types of cross-border funds and investment managers of registered and unregistered structures. *Our* fund experts support our services in other major fund domiciles, Luxembourg, Dublin, the Cayman Islands, the British Virgin Islands and Singapore.
>
> Clients benefit from Bermuda's worldwide reputation for financial integrity and position as an offshore administration center. *Ours* is the most highly rated alternative investment fund services team in the region, ranked the #1 fund administrator for three straight years by Global Custodian magazine. *We* are also the only provider to receive the 2003 "Best in Class" designation from the magazine.

Citi Bermuda, *available at* https://www.citibank.com/tts/global_network/latam/bermuda.html (last accessed Feb. 29, 2016) (emphasis added). Citi Hedge admits that it "functions as an integral part of a united endeavor," and thus its status as a Citigroup subsidiary working in concert with other Citigroup subsidiaries renders it subject to the *in personam* jurisdiction of this Court. *Freeman v. Gordon & Breach, Sci. Publishers, Inc.*, 398 F. Supp. 519, 522-53 (S.D.N.Y. 1975). Again, if this were not in itself sufficient to support jurisdiction, the proper remedy

---

[48] *Citing GEM Advisors, Inc. v. Corporación Sidenor, S.A.*, 667 F. Supp. 2d 308, 319 (S.D.N.Y. 2009) (*citing Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)). *See also Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.*, 475 F. Supp. 2d 456 (S.D.N.Y. 2007); 1 C. Keating & G. O'Gradney, FLETCHER CYCLOPEDIA OF LAW OF PRIVATE CORPORATIONS § 43.70 (2007) ("[P]iercing the corporate veil for the purpose of acquiring jurisdiction over a subsidiary corporation does not require the same strict standards as are necessary to hold a parent corporation liable in damages for acts of its subsidiary.")

would not be dismissal but rather to proceed with discovery. Because the question as to whether jurisdiction is appropriate as a "mere department" or "alter ego" of a domestic corporation is fact intensive, courts routinely allow for discovery on the issues relevant to the relationships between the entities. *See, e.g., Hume v. Farr's Coach Lines, Ltd.*, 2015 WL 5773632, at *6 (W.D.N.Y. Sept. 30, 2015) (after *Daimler*, finding "[j]urisdictional discovery is … warranted to determine whether the 'mere department' or 'alter ego' theory of jurisdiction is satisfied in this case").

## XII. PLAINTIFFS' CLAIMS AGAINST THE KINGATE DEFENDANTS ARE TIMELY

Certain of the Kingate Defendants contest the timeliness of Plaintiffs' claims against them,[49] citing six-month shortened limitations periods contained in the Funds' Information Memoranda. The six-month limitations period only applies to claims brought under the Subscription Agreement and then only to claims against the Funds and the officers and directors of the Funds. The Information Memoranda incorrectly claim in a disclosure in the Information Memoranda that shareholders would be "deemed" by signing the Subscription Agreement to have accepted a blanket abbreviated limitation period for all claims and that this limitation period applied to all the Service Providers. Defendants' expansive application of the curtailed limitation period fails as a matter of contract law. Even assuming that these limitations periods are enforceable (and they are not), each of Plaintiffs' claims is timely because it was either brought within six months of Madoff's arrest – *i.e.*, the "original occurrence" giving rise to the claim – or because it relates back to a claim that was brought within six months of such "original occurrence."

---

[49] Defendants do not contest the timeliness of the claims against Tremont, Tremont Group, PwC, and Citi Hedge.

**A. Defendants' Six-Month Shortened Limitations Periods Are Unenforceable**

A contractually-shortened statute of limitations period is unenforceable "where the time period is unreasonably short or the provision is not clear and unambiguous." *USA United Holdings, Inc. v. Tse-Peo, Inc.*, 2009 WL 1099462, at *7 (N.Y. Sup. Ct. Apr. 23, 2009). In determining whether the period is unreasonably short, "consideration must be given to all provisions of the contract, the circumstances of its performance, and the relative abilities and bargaining positions of the parties." *Id.* at *21-22 (citing *Brown & Guenther v. North Queensview Homes, Inc.*, 18 A.D.2d 327, 329 (N.Y. App. Div. 1963) (it is "well established that the contractual limitation must not be 'so short as to be unreasonable in the light of the provisions of the contract and the circumstances of its performance and enforcement'") (citation omitted)).

Here, the Funds' Subscription Agreements purported to allow Plaintiffs just six months within which to assert claims – an unreasonably short period of time. The unreasonableness of this six-month period is underscored by the fact that the Subscription Agreements (and the Information Memoranda to which they refer) are boilerplate, take-it-or-leave-it form contracts of adhesion. *See Jamaica Hosp. Med. Ctr. v. Carrier Corp.*, 772 N.Y.S.2d 592, 593 (N.Y. App. Div. 2004) (form contracts of adhesion are an exception to enforcement of abbreviated contractual periods of limitation). The investors who signed them were hardly in the same bargaining positions as Defendants, who both drafted the limitations provisions and possessed vastly superior knowledge of the Funds and their own (mis)conduct. Nor is there any evidence that Plaintiffs had the opportunity to negotiate the limitations provisions. Furthermore, the terms of the limitations provisions – in particular, their requirement that claims be brought "within six months from … the original occurrence allegedly giving rise to such claim" – are not clear and unambiguous. Indeed, courts have invalidated similarly ambiguous language before. *See, e.g.*,

*USA United*, 2009 WL 1099462, at \*4 (finding that a limitations period triggered by "the date on which the [plaintiff] is made aware that a [cause] of action has arisen" to be ambiguous and unenforceable).

**B.    Even Assuming the Shortened Limitations Periods Are Enforceable, the Claims against the Kingate Defendants Are Timely**

### 1.    Claims against KML, Tannenbaum, Manzke, and FIM Advisers Are Timely

KML, Tannenbaum, Manzke, and FIM Advisers were all named in the initial complaint filed in this action on June 10, 2009 – within six months of the date when Madoff's fraud, and Defendants' failures to perform adequate due diligence to protect the Funds' investments, became known.  Plaintiffs' claims against these Defendants are thus timely.

Defendants argue that the "original occurrence" that triggered the running of the statute of limitations occurred earlier – namely, on the first date that Plaintiffs allege that the Defendant failed in its duties to investors. Defendants ignore, however, that although their improper conduct might have *begun* at an earlier date, it *continued* right up until December 11, 2008, the day Madoff's arrest became public.  *See, e.g.*, *State of N.Y. Workers' Compensation Bd. v. Madden*, 119 A.D.3d 1022, 1028 (N.Y. App. Div. 2014) (claims for breach of contract, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty against the auditor of a trust were timely where the alleged wrongs were "continuous and ongoing").  It was Madoff's confession, and the collapse of his Ponzi scheme, that were the culmination of Defendants' failures to perform the services they were obligated to perform.  This latter date, therefore, should be deemed to be the date that triggered the running of the statute of limitations.  As in *Anwar I*, the "limitations period begins to run 'when all elements of the tort" – including the Plaintiff's loss – "can be truthfully alleged.'"  *Anwar I*, 728 F. Supp. 2d at 445 (citing *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E. 2d 268, 274 (N.Y. 2008)).  Notably, "[u]p until Madoff's fraud was

ultimately revealed in December 2008, Plaintiffs – albeit not all of them at once – could have redeemed their money and walked away without ever suffering a loss." *Id.* Prior to that date, *Anwar* recognized as Judge Marrero has observed, an investor could have exited the Funds without financial consequence. Moreover, the term "original occurrence" is ambiguous – and indeed, it is undefined in the Funds' Information Memoranda. Its ambiguity must be resolved in favor of Plaintiffs, since, as contracts of adhesion, the Subscription Agreements are "strictly construed" against the drafters. *Allied Chem. Int'l Corp. v. Companhia de Navegacao Lloyd Brasileiro*, 775 F.2d 476, 482 (2d Cir. 1985). Even if the Court were to deem that the "original occurrence" occurred prior to December 11, 2008, the limitations period should be equitably tolled, because the continuing, hidden nature of Defendants' conduct was, itself, the reason why Plaintiffs' injury was not discovered earlier. *Greystone Equip. Fin. Corp. v. Motion Imaging, Inc.*, 2010 WL 1655454, at *9 (N.Y. Sup. Ct. Apr. 7, 2010) ("[t]he equitable estoppel doctrine precludes a defendant from raising the statute of limitations when defendant's affirmative wrongdoing, such as fraud, misrepresentation, or deception, prevented the plaintiff from bringing a timely action.").

### 2. Claims against FIM Limited, FIM USA, Grosso, and Ceretti Are Timely

FIM Limited, FIM USA, Grosso and Ceretti were all named in a complaint filed in this action on June 12, 2009. Even if Defendants' purported six-month limitations period were enforceable (and again, it is not), these claims relate back to the filing of the claims against FIM Advisers, two days earlier, under Federal Rule of Civil Procedure 15(c)(1).

Under Rule 15(c)(1), an amendment to a pleading relates back to the date of the original pleading when the added party "(i) received such notice of the action that it will not be prejudiced in defending on the merits; and (ii) knew or should have known that the action would

have been brought against it, but for a mistake concerning the proper party's identity." Fed. R. Civ. P. 15(c)(1)(C). Here, the parties to be added all were put on notice of the potential claims against them by the filing of the claims against FIM Advisers. Indeed, FIM Limited was the predecessor-in-interest to FIM Advisers, SAC ¶ 27; FIM USA was the American affiliate of FIM Advisers, *id.* ¶ 29; and Grosso and Ceretti, together, co-founded and served as officers of one or more of the FIM Entities and thereby controlled the FIM Entities, *id.* ¶¶ 30-31. The addition of FIM Limited, FIM USA, Grosso and Ceretti to this action only one day beyond the purported six-month limitations period could not possibly have prejudiced them, particularly when their affiliate, their successor, and/or the entity they co-founded was already a party.

Additionally, FIM Limited, FIM USA, Grosso and Ceretti knew, or should have known, that this action would have been brought against them but for a misapprehension of their identity and role in the underlying misconduct. In *Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538 (2010) – a decision Defendants fail to cite – the Supreme Court unanimously confirmed that it is the defendant's knowledge that it was inadvertently not named in an action (but should have been) that is relevant for purposes of Rule 15(c)(1)(C)(ii). According to the Supreme Court, "[t]he question under Rule 15(c)(1)(C)(ii) is not whether Krupski knew or should have known the identity of Costa Crociere as the proper defendant, but whether Costa Crociere knew or should have known that it would have been named as a defendant but for an error. Rule 15(c)(1)(C)(ii) asks what the prospective *defendant* knew or should have known during the Rule 4(m) period, not what the *plaintiff* knew or should have known at the time of filing her original complaint." *Krupski*, 560 U.S. at 548 (emphasis in original). As the Supreme Court noted, even a plaintiff who has actual knowledge of the existence of a defendant may make a mistake with respect to that defendant's identity: "A plaintiff may know that a prospective defendant – call him party A

– exists, while erroneously believing him to have the status of party B. Similarly, a plaintiff may

know generally what party A does while misunderstanding the roles that party A and party B

played in the 'conduct, transaction, or occurrence' giving rise to her claim." *Id.* at 549. In either

case, the claims properly relate back.

Accordingly, the only issue is whether FIM Limited, FIM USA, Grosso and Ceretti were

properly on notice of the potential claims against them by virtue of the claims against FIM

Advisers. Here, where Grosso and Ceretti shared control of all three entities and where the

entities were closely related to each other, they indisputably were on notice. Thus the claims

against them are timely.

### C. The Abbreviated Statute of Limitations Is Only Applicable to Actions Against the Funds and Directors Relating to the Subscription Agreements Under BVI Law

If BVI law is applicable, Defendants' attempts to invoke the abbreviated limitations

provision would fail for the following reasons: (1) the waiver provision by its terms only applies

to claims brought against the Funds, its directors, and officers; (2) the waiver provision only

applies to claims related to the Subscription Agreement; (3) the disclosure in the Information

Memoranda cannot invent rights in favor of the Kingate Defendants that do not exist in the

underlying Subscription Agreements; (4) the abbreviated time period to sue would be tolled by

concealment on material facts on the part of Defendants; and (5) Defendants lack standing to

enforce the waiver provision if Defendants are correct that the BVI does not recognize the rights

of third-party beneficiaries to enforce contracts meant for their benefit.

*First*, the Information Memoranda state in the Subscriptions and Redemption section that

"by executing a subscription agreement for Shares, each investor in the Funds shall be deemed to

have waived, to the maximum extent permissible under law, the right to bring any legal claim,

action or other proceeding against the Fund, the Manager, or the Consultant unless such claim,

action or proceeding is commenced within six (6) months from the date of the first to occur of (i) the original occurrence allegedly giving rise to such claim, action or proceeding or (ii) the Shareholder's redemption of any Shares." The operative language with respect to the time to file claims is taken word for word from the Subscription Agreement. SAC, Ex. 4, Kingate Global IM, dated May 1, 2006, at § y at S-10. The disclosure in the body of the Information Memoranda merely describes and characterizes the purported legal effect of signing the Subscription Agreement.

*Second*, Defendants misinterpret and exaggerate the terms of the Subscription Agreement as a matter of basic contract law. By signing the Subscription Agreement, the Plaintiffs did not execute a waiver of the applicable statute of limitations as to the Kingate Defendants (with the exception of Manzke in her capacity as a director of the Kingate Global Fund).[50] The Subscription Agreement on its face provides that "each investor to the Fund agrees to have waived, to the maximum extent permissible under law, the right to bring any legal claim, action or other proceeding against *the Fund, its Board of Directors and other officers* within an abbreviated period. The KML Defendants (except Manzke) do not fall within the categories of the Fund, its Board of Directors and other officers. There is no mention of the Manager(s), the Administrator or the Consultant.[51] Under BVI, Bermuda, and U.K. law, releases are strictly construed and to the extent there is any ambiguity in the clause limiting rights, it will be construed *contra proferendem* against the party seeking to enforce the provision. Bompas Decl. ¶ 58; Bompas Further Decl. ¶ 140.

---

[50] Sandra Manzke is being sued for her actions marketing investments to Plaintiffs as an officer or employee of Tremont, not as a director of the Fund.
[51] This was done deliberately. Elsewhere, the Subscription Agreement includes the Manager, Investment Advisor, Consultant, and Administrator in the Indemnification Provision. SAC, Ex. 4, Kingate Global IM, dated May 1, 2006.

*Third*, the Subscription Agreement appears to be limited to legal actions relating to the enforcement of the Subscription Agreement itself. Section x entitled "Legal Actions," which appears immediately before section y "Waiver of Statute of Limitations," refers to "any legal action or any arbitration or other proceeding [] brought for the enforcement of this Agreement or because of an alleged dispute, breach, default or misrepresentation in connection with any provisions of this Agreement." Thus, the waiver provision would not be applicable to the claims brought by the Plaintiffs that are not based on the Subscription Agreement. Bompas Further Decl. ¶ 144.

*Fourth*, the Service Agreements do not include similar waiver of limitations provisions that would require the Funds, much less the shareholders, to file suit against Defendants within such an abnormally short period of time. In the absence of such provision in the underlying Service Agreements, the promoters of the Funds could not simply insert an abbreviated contractual limitation in the Information Memoranda, which is not mentioned in the Subscription Agreements, and insist that the limitation would be binding on the shareholders because they signed the Subscription Agreements.

*Fifth*, Under U.K. and BVI law, the purported contractual limitations period would not begin to run if Defendants concealed facts giving rise to the cause of action. Bompas Further Decl. ¶¶ 147- 48. The Kingate Defendants did just that. They claimed to be evaluating and monitoring Madoff, but they did nothing of the kind. Thus, the six-month statute of limitation period began to run at the earliest when Madoff confessed that he was running a Ponzi scheme in December 2008.

*Finally*, if Defendants are correct that the BVI or Bermuda adheres to the strict privity doctrine, then they lack standing to enforce the contractual limitations provision.  Only the Joint Liquidators could do so, and they are not parties to this action.  Bompas Further Decl. ¶ 145.

In sum, the abbreviated statute of limitations provision does not preclude Plaintiffs' claims against the Kingate Defendants under either New York or BVI law.

## XIII.  INTERNATIONAL COMITY DOES NOT SUPPORT, MUCH LESS REQUIRE, DISMISSAL

Defendants argue that international comity requires dismissal of Plaintiffs' claims in favor of proceedings in Bermuda where the "Funds have sued KML, FIM Limited, FIM Advisers, Grosso and Ceretti and, separately, PwC Bermuda."  Br. at 106.  Defendants' arguments are meritless.  Indeed, there is already related litigation pending in the United States.

Defendants argue that "there is 'one discrete category of foreign litigation that generally requires the dismissal of parallel district court actions—foreign bankruptcy proceedings.'"  *Id.* at 106 (citing *Royal & Sun Alliance Ins. Co. of Canada v. Century Int'l Arms, Inc.*, 466 F.3d 88, 92-93 (2d Cir. 2006)).  But Defendants completely ignore the key phrase in the Second Circuit authority they cite: "parallel district court actions."  The action before this Court is not "parallel" to the proceedings in Bermuda.  As an initial matter, the proceedings in Bermuda do not include all of the Defendants in this case – Defendants Manzke, Tannenbaum and Citi Hedge are not parties there.

Moreover, Plaintiffs here are pursuing their own direct claims which are distinct from the Funds' claims.  In *Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199 (2d Cir. 2014), the Second Circuit affirmed lower court decisions rejecting efforts by the Trustee of the bankruptcy estate of Madoff and BMIS to block the settlements reached in lawsuits brought against Madoff feeder fund defendants.  The Trustee argued that these lawsuits violated the Bankruptcy Code's

automatic stay and interfered with his efforts to collect and distribute money to Madoff's direct customers. In rejecting the Trustee's efforts to enjoin these lawsuits, the Second Circuit found that the suits involved individual claims brought by investors against defendants "for breaches of duties they owed directly to the plaintiffs." *Id.* at 210. "These independent duties distinguish the Actions from the Trustee's own claims and place them . . . outside the scope of the automatic stay." *Id.* at 210. Similarly, in *Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Varig S.A.*, 302 F. App'x 10, 12 (2d Cir. 2008), the Second Circuit held that "defendants have failed to carry their burden of demonstrating that the IAM-represented employees' claims are subject to the Brazilian bankruptcy proceeding or that comity is appropriate for some other reason." Because Plaintiffs' individual claims asserted in the SAC are *not being litigated by the Funds in Bermuda* – nor could they because they are different and independent claims – there is no basis for the Court to dismiss this action in favor of the Bermuda Proceedings.

Indeed, similar investor class actions involving investments in Madoff feeder funds have proceeded in this District even through the funds were in foreign liquidation proceedings. For instance, the *Anwar* action has been actively litigated for the past seven years without anyone raising the possibility that the case should be dismissed on the basis of comity. Instead, the plaintiffs in *Anwar* coordinated with the liquidators overseeing the funds' liquidation proceedings in the BVI. There was no objection to the class action on the grounds of comity, despite massive discovery and motion practice that ultimately resulted in settlements totaling over $230 million. *See, e.g., Anwar et al v. Fairfield Greenwich Limited et al.*, 09cv118 (S.D.N.Y.), Dkt. No. 1561, Joint Declaration of Co-Lead Counsel, March 18, 2016.

In addition, Defendants contend that the Bermuda Proceedings seek to "recover the same amounts Plaintiffs seek to recover here." Br. at 8. Defendants are wrong on this point too. As

discussed, Plaintiffs before this Court are "net losers" who suffered asymmetrical losses to the Funds which are pursuing their own claims in Bermuda.

Defendants' comity arguments here are similar to those faced by bankruptcy courts where there are parallel insolvency or liquidation proceedings taking place in a foreign country. For example, in *In re RHTC Liquidating Co.*, 424 B.R. 714 (Bankr. W.D. Pa. 2010), a foreign representative asked the court to dismiss an involuntary Chapter 7 proceeding filed in Pennsylvania in favor of a Canadian bankruptcy proceeding. The foreign representative "had been appointed as the 'Monitor' in the Canadian bankruptcy proceeding." *Id.* at 716. The Monitor's motion to dismiss was joined by the debtor. *Id.*

The court refused to dismiss the Chapter 7 case, holding "[i]t is not readily apparent why a court in the United States should voluntarily restrain itself from acting purely out of a sense of comity in these circumstances." *Id.* at 725. The court found that dismissal would be "an extraordinary remedy that is appropriate only where the court finds that *both* creditors and the debtor would be better served by a dismissal." *Id.* at 720 (emphasis in original). The court reasoned as follows:

> The Court starts with a presumption that these creditors have made a studied decision that their interests are best served by pursuing the involuntary Chapter 7 case in this Court rather than simply acquiescing in what happens in the Canadian Proceeding. Furthermore, the Petitioning Creditors have expressed a number of reasons for this conclusion, including a fear that their interests are not being sufficiently protected in the Canadian Proceeding, differences between Canadian and United States bankruptcy law that are detrimental to them, the existence of insufficiently explained post-petition asset transfers from Railpower U.S. to Railpower Canada which have occurred during the pendency of the Canadian Proceeding, and, the failure of the Monitor to aggressively pursue possible claims against Railpower Canada or insiders that could benefit the Railpower U.S. bankruptcy estate. The Petitioning Creditors contend that the continuance of the present case and the appointment of a Chapter 7 trustee is the best remedy for these problems.

*Id.* at 721. The Monitor argued that dismissal would benefit the creditors despite their objections because "distributions in the Canadian Proceeding are 'on the horizon' and a Chapter 7 trustee will just add another layer of expenses to dilute the available assets." *Id.* at 721. The court rejected these arguments because legal challenges in the Canadian proceeding would delay any potential distributions "regardless of what happens in this Court, so any 'imminent' distribution in Canada appears unlikely." *Id.* The court also found that the Chapter 7 proceeding "is not necessarily an expense-draining exercise" because it "seem[ed] more likely" that certain claims would be "pursued by a Chapter 7 trustee appointed by this Court rather than in the Canadian Proceeding." *Id.*

Here, the case for rejecting Defendants' comity arguments is even stronger than in *RHTC*. In *RHTC*, the motion to dismiss was brought by the Monitor overseeing the Canadian proceedings. In contrast, Defendants here are unilaterally seeking to dismiss investor claims without any support from the Joint Liquidators or the Bermuda courts. In any event, as noted, this action is pursuing Plaintiffs' direct claims that are not being litigated in Bermuda. *See In re AMC Inv'rs, LLC*, 406 B.R. 478, 488 (Bankr. D. Del. 2009) ("Granting an abstention motion pursuant to § 305(a)(1) requires more than a simple balancing of harm to the debtor and creditors; rather, the interests of both the debtor and its creditors must be served by granting the requested relief.") (quotation omitted).

In fact, other claims against certain of the Defendants in U.S. bankruptcy court have not been barred by comity. On April 17, 2009, the Madoff Trustee, Irving Picard, brought suit against the Funds and several Defendants here seeking to avoid and disallow allegedly fraudulent transfers. That case is in active litigation with Judge Bernstein having denied motions to dismiss the Trustee's Fourth Amended Complaint by the following Defendants here: Ceretti, Grosso,

165

FIM Limited, FIM Advisors, Kingate Management Limited and Citi Hedge. *See Bankruptcy Decision*, 2015 WL 4734749, at *2. Accordingly, international comity does not warrant dismissal of Plaintiffs' claims.

## XIV.  PLAINTIFFS FULLY MEET ANY APPLICABLE REQUIREMENTS OF RULE 9(b)

All of Plaintiffs' claims here, but one, must be evaluated under the notice-pleading standard of Rule 8. The SAC clearly "state[s] a claim to relief that is plausible on its face," and substantial facts suggesting "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft*, 556 U.S. at 678. There can be no confusion as to what it is Defendants are accused of in the SAC, and there is substantial detail backing each of the counts alleged and the underlying factual allegations. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Because the claims ultimately arise from Madoff's fraud, Defendants reflexively assert that all of the "claims should be dismissed," in their entirety, for failing to comply with Rule 9(b). Br. at 64. Defendants are wrong that the Rule 9(b) standard applies to all of Plaintiffs' claims. But in any event, they fail to identify how Plaintiffs' claims fall short of Rule 9(b). Rule 9(b) is not onerous. It merely requires that a party "state with particularity the circumstances constituting fraud or mistake." The SAC is so extensively detailed that it satisfies Rule 9(b) anyway, although the rule plainly only applies to "claims" that are actually "alleging fraud or mistake." Fed. R. Civ. P. 9(b). Plaintiffs do allege one count of mutual mistake (Count 12) that is subject to Rule 9(b); but the remainder of the SAC alleges contract, negligence, and fiduciary duty claims that are not covered by Rule 9(b).

The negligence and gross negligence claims[52] are governed by the Rule 8 pleading standard. *See, e.g.*, *Rombach v. Chang*, 355 F.3d 164, 178 (2d Cir. 2004) (negligence claims);

---

[52] Counts 5, 6, 15, 16, 22, and 23.

*Anwar I*, 728 F. Supp. 2d at 437 ("claims for gross negligence, like claims of negligence, are governed by Rule 8(a), not Rule 9(b)").  Despite some broad language that Rule 9(b) may apply to claims that "sound in fraud," *Rombach* specifically held that the heightened pleading standard applies only where "claims are premised on allegations of fraud."  *Rombach*, 355 F.3d at 170-71.  When read in conjunction with the Second Circuit's opinion in the instant case, it is plain that the specific claims asserted against each defendant must be considered when determining whether the claims are "premised on allegations of fraud" by that defendant.  *Id*. at 171; *see Kingate*, 784 F.3d at 132.  Here, as discussed, the claims remaining in the SAC do not allege fraud by any defendant.  Thus, Rule 8 applies to all of the negligence claims here.

Breach of fiduciary duty claims[53] are subject to Rule 8.  *See, e.g.*, *Montreal Pension I*, 446 F. Supp. 2d at 196 ("Where a plaintiff alleges a breach of fiduciary duty by conduct not amounting to fraud, such as breach of a duty of care, disclosure, or loyalty, the general pleading standards set out by Rule 8(a) … not the heightened standards of Rule 9(b), apply").  So too are contract claims.[54]  *See, e.g.*, *Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc.*, 341 F. Supp. 2d 258, 270 (S.D.N.Y. 2004) (breach of contract claims subject to Rule 8).  A claim for a constructive trust[55] likewise needs only meet Rule 8.  *See, e.g.*, *In re Black & Geddes, Inc.*, 16 B.R. 148, 152 (Bankr. S.D.N.Y. 1981).  The unjust enrichment claim[56] is the same.  *See State Farm Mut. Auto. Ins. Co. v. James M. Liguori, M.D., P.C.*, 589 F. Supp. 2d 221, 236 (E.D.N.Y. 2008).

"Rule 9(b) may or may not apply to a state law claim for negligent misrepresentation."  *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 188 (2d Cir. 2004);

---

[53] Counts 7, 13, 19, 21, and 26.
[54] Counts 9, 10, 18, and 25.
[55] Count 11.
[56] Count 28.

*cf. In re Vivendi Universal, S.A. Sec. Litig.*, 2004 WL 876050, at *2 (S.D.N.Y. Apr. 21, 2004) (applying Rule 8 to negligent misrepresentation claim), *and In re Parmalat Sec. Litig.*, 479 F. Supp. 2d 332, 339 n.30 (S.D.N.Y. 2007) (applying Rule 9(b) to negligent misrepresentation claim because it incorporated the fraud claims, and thus alleged intentional, not negligent, misrepresentation).  Here, the Rule 8(a) standard should apply because Plaintiffs' negligent misrepresentation claims (Counts 17 and 24) allege only negligent conduct, without implicating any allegations of fraud; but Plaintiffs have, in any event, also satisfied the Rule 9(b) pleading standard.

## **CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss should be denied.

May 6, 2016

Respectfully submitted,

By: */s/ David A. Barrett*
David A. Barrett
Howard L. Vickery
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, NY  10022
Tel: (212) 446-2300
Fax:  (212) 446-2350

Stuart H. Singer
Carlos M. Sires
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard, #1200
Ft. Lauderdale, Florida 33301
Tel: (954) 356-0011
Fax:  (954) 356-0022

Steven J. Toll
Daniel S. Sommers
Joshua S. Devore
S. Douglas Bunch
COHEN MILSTEIN SELLERS
 & TOLL PLLC

1100 New York Avenue, N.W.
East Tower, Suite 500
Washington, DC 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

***Co-Lead Counsel for Plaintiffs***

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that a true and correct copy of Plaintiff's Unredacted

Memorandum of Law in Opposition to the Joint Motion of All Defendants to Dismiss the

Corrected Second Amended Consolidated Class Action Complaint, Declaration of David A.

Barrett and Exhibits thereto was served by email on May 6, 2016 on:


Seth M. Schwartz
(seth.schwartz@skadden.com)
Jason C. Vigna (jason.vigna@skadden.com)
Four Times Square
New York, New York 10036
(212) 735-3000

*Attorneys for Defendants Tremont (Bermuda) Limited and Tremont Group Holdings, Inc.*


Carmine D. Boccuzzi, Jr.
(cboccuzzi@cgsh.com)
Samuel L. Raymond (sraymond@cgsh.com)
One Liberty Plaza
New York, New York 10006
(212) 225-2000

*Attorneys for Defendant Citi Hedge Fund Services Ltd.*

Dennis H. Tracey, III
(dennis.tracey@hoganlovells.com)
Sanford M. Litvack
(sanford.litvack@hoganlovells.com)
875 Third Avenue
New York, New York 10022
(212) 918-3000

*Attorneys for Defendant PricewaterhouseCoopers, Chartered Accountants, a Bermuda partnership*

Barry G. Sher (barrysher@paulhastings.com)
Jodi A. Kleinick
(jodikleinick@paulhastings.com)
Mor Wetzler (morwetzler@paulhastings.com)
Anthony Antonelli
(anthonyantonelli@paulhastings.com)
75 East 55th Street
New York, New York 10022
(212) 318-6000

*Attorneys for Defendants FIM Limited, FIM Advisers LLP,FIM (USA) Inc., Carlo Grosso and Federico Ceretti*

Laura Grossfield Birger (lbirger@cooley.com)
Abigail E. Belknap (abelknap@cooley.com)
1114 Avenue of the Americas
New York, New York 10036
(212) 479-6000

*Attorneys for Defendant Michael G. Tannenbaum*

Scott Reynolds
(scott.reynolds@chaffetzlindsey.com)
1700 Broadway, 33rd Floor
New York, New York 10019
(212) 257-6960

*Attorneys for Defendant Kingate Management Limited*

Jonathan D. Cogan
(jonathan.cogan@kobrekim.com)
Kimberly Perrotta Cole
(kimberly.cole@kobrekim.com)
Carrie A. Tendler
(carrie.tendler@kobrekim.com)
800 Third Avenue
New York, New York 10022
(212) 488-1200

*Attorneys for Defendant Sandra Manzke*

By: */s/ David A. Barrett*
      David A. Barrett