UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE KINGATE MANAGEMENT LIMITED LITIGATION<br><br>This Document Relates To:  All Actions | Master File 09 Civ. 5386 (DAB) |

**JOINT REPLY MEMORANDUM OF LAW IN SUPPORT OF ALL DEFENDANTS' MOTION TO DISMISS THE CORRECTED SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

Page(s)

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT .......................................................................................................... 4

I. COUNTS 5–7, 9–11, 13, 15–19, 21–26 AND 28 ARE ALL PRECLUDED BY SLUSA ........................................................................................................ 4

    A. All Claims Against the "Kingate Defendants" (except Mutual Mistake) Are Group 1, 2 or 3 Claims Precluded By SLUSA (Counts 5, 6, 7, 9, 10, 11, 13 and 28) ............................................................................................ 5

        1. The Claims All Rest on Allegations That the "Kingate Defendants" Were Complicit in Madoff's Fraud ....................................................... 5

        2. Plaintiffs' Newfound "Inducement" Argument Would Also Lead to SLUSA Preclusion ............................................................................... 8

    B. All Claims Against Citi Hedge Are Group 2 or 3 Claims Precluded By SLUSA (Counts 21–26, 28) ............................................................................ 10

        1. The Claims All Rest on Alleged Misrepresentations and Omissions ...... 10

        2. To the Extent Plaintiffs' Claims Against Citi Hedge Do Not Rest on Misrepresentations or Omissions, They Are Instead Predicated on Allegations that Citi Hedge Aided and Abetted Madoff's Fraud ....... 13

    C. All Claims Against PwC Bermuda Are Group 2 or 3 Claims Precluded By SLUSA ........................................................................................................ 13

        1. Counts 15–17 and 19 Rest on Allegations That PwC Bermuda Misled Plaintiffs ................................................................................... 13

        2. Alternatively, Plaintiffs' Claims Against PwC Bermuda Are Predicated on a Theory That the Firm Aided and Abetted Madoff's Fraud ................................................................................................... 15

    D. Plaintiffs Cannot Avoid SLUSA Just Because Foreign Law Applies to Their Claims ................................................................................................. 15

II. PLAINTIFFS LACK STANDING TO PURSUE ANY OF THEIR CLAIMS .............. 18

    A. BVI Law Governs the Question of Plaintiffs' Standing ..................................... 18

    B. Plaintiffs Lack Standing to Bring Their Claims ................................................. 20

        1. Plaintiffs' Claims are Barred by the Rule Against Reflective Loss ......... 22

        2. Plaintiffs Also Lack Standing Under New York Law .............................. 28

III. THIS COURT LACKS PERSONAL JURISDICTION OVER CITI HEDGE (COUNTS 21–26, 28) .................................................................................... 32

IV. THE SAC ADDITIONALLY FAILS TO STATE ANY CLAIM AGAINST ANY OF THE DEFENDANTS UNDER BVI OR BERMUDA LAW ................................... 37

A.      Plaintiffs Apply the Wrong Pleading Standards on this Motion........................ 37

B.      Under New York's Choice of Law Analysis, BVI or Bermuda Substantive
        Law Applies to Plaintiffs' Claims....................................................... 41

V.      THE SAC FAILS TO STATE A CLAIM FOR  BREACH OF FIDUCIARY
        DUTY AGAINST ANY OF THE "KINGATE DEFENDANTS" OR CITI
        HEDGE – COUNTS 7 AND 21 ..................................................... 45

A.      The SAC Fails To State a Breach of Fiduciary Duty Claim Against the
        "Kingate Defendants" or Citi Hedge under BVI Law ....................... 45

        1.      Defendants Owed No Fiduciary Duty to Plaintiffs................... 45

        2.      Plaintiffs Allege No Facts Sufficient To Show That Any of The
                "Kingate Defendants" or Citi Hedge Breached Any Fiduciary Duty ...... 50

B.      Plaintiffs' Fiduciary Duty Claim Also Fails as to the Individual
        Defendants ......................................................................... 50

VI.     THE SAC FAILS TO STATE A CLAIM OF AIDING  AND ABETTING
        BREACH OF FIDUCIARY DUTY – COUNTS 13, 19 AND 26................................. 53

A.      The SAC Does Not Allege Any Underlying Breach of Fiduciary Duty.............. 53

B.      The SAC Fails to Adequately Plead Substantial Assistance .............................. 54

C.      The SAC Fails To Adequately Plead a Dishonest State of Mind ...................... 55

VII.    THE SAC FAILS TO STATE CLAIMS OF GROSS NEGLIGENCE OR
        NEGLIGENCE – COUNTS 5, 6, 15, 16, 22 AND 23..................................... 57

A.      Plaintiffs' Claims for Gross Negligence Fail as a Matter of Law (Counts 5,
        15 and 22) ......................................................................... 57

B.      The Plaintiffs' Claims for Negligence Fail as a Matter of Law.......................... 58

        1.      The SAC Does Not Plead That Defendants Owed Any Duties to
                Plaintiffs............................................................... 58

        2.      Plaintiffs Have Also Failed to Plead that Defendants Breached Any
                Duties ................................................................. 61

VIII.   THE SAC FAILS TO STATE A CLAIM FOR NEGLIGENT
        MISREPRESENTATION AGAINST CITI HEDGE OR PWC BERMUDA –
        COUNTS 17 AND 24.................................................................. 64

IX.     PLAINTIFFS CANNOT PURSUE A THIRD PARTY BENEFICIARY
        BREACH OF CONTRACT CLAIM AGAINST KML, TREMONT, THE FIM
        ENTITIES, PWC BERMUDA OR CITI HEDGE (COUNTS 9, 10, 18, 25)................. 65

A.      Plaintiffs' Claims Fail Under Bermuda and BVI Law........................ 65

B.     Even Under New York Law, Plaintiffs' Claims Still Fail Because Plaintiffs Are Not Intended Beneficiaries of Any Agreements ......................... 68

X.     PLAINTIFFS HAVE NO RIGHT TO A CONSTRUCTIVE TRUST – COUNT 11.................................................................................................................. 75

XI.    THE SAC FAILS TO STATE A CLAIM FOR MUTUAL MISTAKE – COUNT 12.................................................................................................................. 76

XII.   PLAINTIFFS CANNOT PURSUE AN UNJUST ENRICHMENT CLAIM AGAINST ANY OF THE DEFENDANTS (COUNT 28)............................................. 79

XIII.  PLAINTIFFS' CLAIMS AGAINST THE KML DEFENDANTS, MANZKE, AND THE FIM DEFENDANTS ARE TIME-BARRED. ............................................. 83

A.     The Limitations Period  Is Enforceable and Unambiguous ................. 83

B.     The Claims Against Manzke and FIM Limited Are Time-Barred ..................... 85

C.     The Claims Against KML, Tannenbaum and FIM Advisers Are Time-Barred.................................................................................................. 86

D.     The Claims Against FIM (USA), Grosso and Ceretti are Time-Barred ............. 87

E.     Plaintiffs' Arguments Regarding BVI Law Are Irrelevant Because New York Law Applies to the Analysis of the Limitations Period............................ 88

XIV.   IN THE ALTERNATIVE, INTERNATIONAL COMITY ALSO REQUIRES DISMISSAL ................................................................................................ 89

CONCLUSION................................................................................................ 94

**Cases**

2002 Lawrence R. Buchalter Alaska Tr. v. Philadelphia Fin. Life Assurance Co.,
  96 F. Supp. 3d 182 (S.D.N.Y. 2015).........................................................................43

7 West 57th Street Realty Co., LLC v. Citigroup, Inc.,
  No. 13 Civ. 981 (PGG), 2015 WL 1514539 (S.D.N.Y. Mar. 31, 2015).............................5, 33

Abbas v. Dixon,
  480 F.3d 636 (2d Cir. 2007)..............................................................................86

ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.,
  957 F. Supp. 1308 (S.D.N.Y. 1997).......................................................................45

Abrahams v. Young & Rubicam Inc.,
  79 F.3d 234 (2d Cir.1996)...............................................................................85

Abrams v. Donati,
  489 N.E.2d 751 (N.Y. 1985)...........................................................................28, 43

Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.,
  910 F. Supp. 2d 543 (S.D.N.Y. 2012)....................................................................64

Ackert v. Ausman,
  29 Misc. 2d 974 (Sup. Ct. N.Y. County 1961) ..........................................................18

Aetna Casualty & Surety Co. v. Aniero Concrete Co., Inc.,
  404 F.3d 566 (2d Cir. 2005).............................................................................38

Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I, LLC,
  637 F. Supp. 2d 185 (S.D.N.Y. 2009)....................................................................69

In re AlphaStar Ins. Grp., Ltd.,
  383 B.R. 231 (Bankr. S.D.N.Y. 2008)....................................................................55

Anwar v. Fairfield Greenwich Ltd.,
  118 F. Supp. 3d 591 (S.D.N.Y. 2015), amended on other grounds by No. 09-
  cv-118 (VM), 2015 WL 9450503 (S.D.N.Y. Aug. 28, 2015)......................................... passim

Anwar v. Fairfield Greenwich Ltd.,
  728 F. Supp. 2d 372 (S.D.N.Y. 2010)............................................................... passim

Arklow Investments Ltd. v. Maclean,
  [2000] 1 WLR 594......................................................................................50

Arnold Prods., Inc. v. Favorite Films Corp.,
    298 F.2d 540 (2d Cir. 1962) ..................................................................................71

Ashcroft v. Iqbal,
    556 U.S. 662 (2009) ..........................................................................................9, 40

AUSA Life Ins. Co. v. Ernst & Young,
    206 F.3d 202 (2d Cir. 2000) .................................................................................12

Baker v. Andover Assocs. Mgmt. Corp.,
    No. 6179/09, 2009 WL 7400085 (Sup. Ct. Westchester County Nov. 30,
    2009) ..................................................................................................................24, 29

Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.,
    No. 03 Civ. 1537(MBM), 2003 WL 23018888 (S.D.N.Y. Dec. 22, 2003),
    aff'd, 110 F. App'x 191 (2d Cir. 2004) ..............................................................69, 71

In re Banco Santander Sec.-Optimal Litig.,
    732 F. Supp. 2d 1305 (S.D. Fla. 2010), aff'd sub nom., Inversiones Mar
    Octava Limitada v. Banco Santander S.A., 439 F. App'x 840 (11th Cir. 2011) ..............41, 45

Bankers Trust Co. v. Rhoades,
    859 F.2d 1096 (2d Cir. 1989) ...............................................................................29

Barry v. Atkinson,
    No. 96 Civ. 8436 (PKL), 1998 U.S. Dist. LEXIS 7378 (S.D.N.Y. May 20,
    1998) ..................................................................................................................70

Bd. of Managers v. Lamontanero,
    616 N.Y.S.2d 744 (2d Dep't 1994) ........................................................................83

Beal Sav. Bank v. Sommer,
    865 N.E.2d 1210 (N.Y. 2007) ...............................................................................89

Bell Atl. Corp. v. Twombly,
    550 U.S. 544 (2006) .................................................................................... passim

In re Bernard L. Madoff Inv. Sec. LLC,
    740 F.3d 81 (2d Cir. 2014) ...................................................................................29

In re Bernard L. Madoff Inv. Sec. LLC,
    No. 08-01789 (SMB), 2015 WL 4734749 (Bankr. S.D.N.Y. Aug. 11, 2015) ........................91

Beswick v. Beswick,
    [1968] AC 58 .....................................................................................................66

Bigio v. Coca-Cola Co.,
No. 97 Civ. 2858(BJJ), 2010 WL 3377503 (S.D.N.Y. Aug. 23, 2010), aff'd,
675 F.3d 163 (2d Cir. 2012)........................................................................................40

BNP Paribas Mortg. Corp. v. Bank of Am., N.A.,
949 F. Supp. 2d 486 (S.D.N.Y. 2013)........................................................................75

Brown v. Guenther,
239 N.Y.S.2d 482 (1st Dep't 1963) ...........................................................................83

Calvin Klein Trademark Tr. v. Wachner,
123 F. Supp. 2d 731 (S.D.N.Y. 2000)........................................................................75

Caparo Indus. Plc. v. Dickman
[1990] 2 AC 605 .........................................................................................................64

Ceribelli v. Elghanayan,
990 F.2d 62 (2d Cir. 1993)..........................................................................................29

Chechele v. Scheetz,
819 F. Supp. 2d 342 (S.D.N.Y. 2011), aff'd, 466 F. App'x 39 (2d Cir. 2012).........67

Citigroup, Inc. v. AHW Investment Partnership,
2016 WL 2994902 (Del. May 24, 2016)....................................................................30

Clapper v. Amnesty Int'l USA,
133 S. Ct. 1138 (2013)................................................................................................32

Clark-Fitzpatrick, Inc. v. Long Island Railroad Co.,
516 N.E.2d 190 (N.Y. 1987).......................................................................................82

Commonwealth Land Title Ins. Co. v. Am. Signature Servcs., Inc.,
No. 13-CV-3266 (JFB)(WBW), 2014 WL 672926 (E.D.N.Y. Feb. 20, 2014) .........71

Conley v. Gibson,
355 U.S. 41 (1957)................................................................................................30, 60

Cont'l Cas. Co. v. PricewaterhouseCoopers, LLP,
933 N.E.2d 738 (N.Y. 2010).......................................................................................31

Cornwell v. Robinson,
23 F.3d 694 (2d Cir. 1994)..........................................................................................87

Cromer Fin. Ltd. v. Berger,
137 F. Supp. 2d 452 (S.D.N.Y. 2001)............................................................12, 32, 44

Cromer Fin. Ltd. v. Berger,
No. 00 CIV. 2498, 2001 WL 1112548 (S.D.N.Y. Sept. 19, 2001)..........................................12

Cromer Fin. Ltd. v. Berger,
No. 00-CV-2284, 2003 WL 21436164 (S.D.N.Y. June 23, 2003) ........................12, 56, 57, 59

CRT Invs., Ltd. v. BDO Seidman, LLP,
925 N.Y.S.2d 439 (1st Dep't 2011)....................................................................................36, 61

Daimler AG v. Bauman,
134 S. Ct. 746 (2014)..........................................................................................................33, 35

Day v. Cook,
[2002] 1 BCLC 1 .......................................................................................................................25

De Sole v. Knoedler Gallery, LLC,
974 F. Supp. 2d 274 (S.D.N.Y. 2013)........................................................................................86

Debary v. Harrah's Operating Co.,
465 F. Supp. 2d 250 (S.D.N.Y. 2006), aff'd sub nom., Catskill Dev. L.L.C. v.
Park Pl. Entm't Corp., 547 F.3d 115 (2d Cir. 2008)..................................................................69

Dep't of Economic Dev. v. Arthur Andersen & Co. (U.S.A.),
924 F. Supp. 449 (S.D.N.Y. 1996)............................................................................................70

DeRosa v. Nat'l Envelope Corp.,
595 F.3d 99 (2d Cir. 2010)..........................................................................................................34

EBC I, Inc. v. Goldman Sachs & Co.,
832 N.E.2d 26 (N.Y. 2005).........................................................................................................48

Ecoban Fin. Ltd. v. Grupo Acerero Del Norte, S.A. de C.V.,
108 F. Supp. 2d 349 (S.D.N.Y. 2000)........................................................................................18

Emergent Capital Inv. Mgmt. LLC v. Stonepath Grp., Inc.,
343 F.3d 189 (2d Cir. 2003)........................................................................................................63

Excimer Assocs, Inc. v. LCA Vision, Inc.,
292 F.3d 134 (2d Cir. 2002)........................................................................................................30

Feiner Family Trust v. Xcelera Inc.,
No. 10-cv-3431 (RPP), 2010 WL 3184482 (S.D.N.Y. Aug. 9, 2010)....................................17

Felske v. Hirschmann,
No. 10 Civ. 8899(RMB), 2012 WL 716632 (S.D.N.Y. Mar. 1, 2012)....................................85

Fen X. Chen v. Street Beat Sportswear, Inc.,
226 F. Supp. 2d 355 (E.D.N.Y. 2002) ...................................................................70

Fillmore E. BS Fin. Subsidiary LLC v. Capmark Bank,
552 F. App'x 13 (2d Cir. 2014) ...........................................................................54

Finch, Pruyn & Co. v. M. Wilson Control Servs., Inc.,
658 N.Y.S.2d 496 (3d Dep't 1997).......................................................................70

Finkelstein v. Warner Music Grp. Inc.,
820 N.Y.S.2d 264 (1st Dep't 2006) .....................................................................20

Fireman's Fund Ins. Co. v. Glass,
No. 94 CIV. 7375 (WK), 1997 WL 289858 (S.D.N.Y. May 30, 1997) .................75

Freeman v. Gordon & Breach, Sci. Publishers, Inc.,
398 F. Supp. 519 (S.D.N.Y. 1975).......................................................................35

Frontera Res. Azer. Corp. v. State Oil Co. of Azer. Republic,
582 F.3d 393 (2d Cir. 2009).................................................................................37

Giles v. Rhind,
[2003] Ch 618 ...............................................................................................26, 27

Gilstrap v. Radianz Ltd.,
443 F. Supp. 2d 474 (S.D.N.Y. 2006), aff'd, 233 F. App'x 83 (2d Cir. 2007).......66

GlobalNet Financial.com, Inc. v. Frank Crystal & Co.,
449 F.3d 377 (2d Cir. 2006).................................................................................41

Goodyear Dunlop Tires Operations, S.A. v. Brown,
564 U.S. 915 (2011).......................................................................................33, 35

In re Granite Partners, L.P.,
194 B.R. 318 (Bankr. S.D.N.Y. 1996)..................................................................26

Gucci Am., Inc. v. Weixing Li,
768 F.3d 122 (2d Cir. 2014)............................................................................32, 33

Gundlach v. IBM,
No. 11-cv-0846 (CS), 2012 WL 1520919 (S.D.N.Y. May 1, 2012), aff'd, 594
F. App'x 8 (2d Cir. 2014) .....................................................................................35

Halpert Enterprises, Inc. v. Harrison,
No. 07-1144, 2008 WL 4585466 (2d Cir. Oct. 15, 2008)......................................16

Hamilton v. Atlas Turner, Inc.,
  197 F.3d 58 (2d Cir. 1999) ........................................................................33

Harmelin v. Man Fin. Inc.,
  No. 06-1944, 2007 WL 3146666 (E.D. Pa. Oct. 26, 2007) ......................59

Hart v. Gen. Motors Corp.,
  517 N.Y.S.2d 490 (1st Dep't 1987) ..........................................................19

Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.,
  230 F.3d 549 (2d Cir. 2000) ......................................................................42

In re Herald, Primeo & Thema,
  730 F.3d 112 (2d Cir. 2013) ............................................................. *passim*

In re Herald, Primeo & Thema Sec. Litig.,
  No. 09 Civ. 289(RMB), 2011 WL 5928952 (S.D.N.Y. Nov. 29, 2011), aff'd
  sub nom., Herald I, 730 F.3d 112 (2d Cir. 2013) .....................................41

Higgins v. N.Y. Stock Exch., Inc.,
  806 N.Y.S.2d 339 (Sup. Ct. N.Y. County 2005) ......................................31

Holloway v. Ernst & Young LLP,
  No. 113346/09, 2010 WL 2927256 (Sup. Ct. N.Y. County July 21, 2010),
  aff'd, 918 N.Y.S.2d 726 (1st Dep't 2011) ................................................75

Hvide Marine Int'l, Inc. v. Emp'rs Ins. of Wausau,
  724 F. Supp. 180 (S.D.N.Y. 1989) ............................................................35

Int'l Ass'n of Machinists v. Varig S.A.,
  302 F. App'x 10 (2d Cir. 2008) .................................................................91

Int'l Bus. Machines Corp. v. Liberty Mut. Ins. Co.,
  363 F.3d 137 (2d Cir. 2004) ......................................................................41

Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.,
  146 F.3d 66 (2d Cir. 1998) ........................................................................72

J. Aron & Co. v. Panama R.R. Co.,
  175 N.E. 273 (N.Y. 1931) ..........................................................................83

Jamaica Hosp. Med. Ctr. v. Carrier Corp.,
  772 N.Y.S.2d 592 (2d Dep't 2004) ............................................................83

*Jazini v. Nissan Motor Co.*,
148 F.3d 181 (2d Cir. 1998) ................................................................................................... 35

*Johnson v. Gore Wood & Co.*,
[2002] 2 AC 1 ........................................................................................................................... 22

*Jonas v. Estate of Leven*,
116 F. Supp. 3d 314 (S.D.N.Y. 2015) ................................................................................... 40

*Jordan (Bermuda) Inv. Co. v. Hunter Green Invs. LLC*,
No. 00 Civ. 9214 (RWS), 2007 WL 2948115 (S.D.N.Y. Oct. 3, 2007) ....................... 36, 49

*JP Morgan Chase Bank v. Winnick*,
350 F. Supp. 2d 393 (S.D.N.Y. 2004) ................................................................................... 64

*KCG Americas LLC v. Brazilmed, LLC*,
15 Civ. 4600(AT), 2016 WL 900396 (S.D.N.Y. Feb. 26, 2016) ........................................ 83

*King v. Burwell*,
135 S. Ct. 2480 (2015) .............................................................................................................. 16

*In re Kingate Mgmt. Ltd. Litig.*,
784 F.3d 128 (2d Cir. 2015) ....................................................................................... *passim*

*Kirschner v. KPMG LLP*,
938 N.E.2d 941 (N.Y. 2010) ................................................................................................... 32

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
313 U.S. 487 (1941) .................................................................................................................. 88

*Klos v. Polskie Linie Lotnicze*,
133 F.3d 164 (2d Cir. 1997) ................................................................................................... 83

*Kottler v. Deutsche Bank AG*,
607 F. Supp. 2d 447 (S.D.N.Y. 2009) ................................................................................... 49

*Kramer v. Time Warner Inc.*,
937 F.2d 767 (2d Cir. 1991) ................................................................................................... 81

*Krupski v. Costa Crociere S.p.A.*,
560 U.S. 538 (2010) ............................................................................................................ 87, 88

*Lander v. Hartford Life & Annuity Ins. Co.*,
251 F.3d 101 (2d Cir. 2001) ................................................................................................... 17

LaSala v. Bordier et Cie,
519 F.3d 121 (3d Cir. 2008)......................................................................................16

LaSala v. TSB Bank, PLC,
514 F. Supp. 2d 447 (S.D.N.Y. 2007)......................................................................17

LaSala v. UBS, AG,
510 F. Supp. 2d 213 (S.D.N.Y. 2007)......................................................................17

Laydon v. Mizuho Bank, Ltd.,
No. 12 Civ. 3419(GBD), 2015 WL 1499185 (S.D.N.Y. Mar. 31, 2015) ................33

Lerner v. Fleet Bank, N.A.,
459 F.3d 273 (2d Cir. 2006)......................................................................38, 55, 56

Licci ex rel. Licci v. Lebanese Canadian Bank, SAL,
672 F.3d 155 (2d Cir. 2012)......................................................................................42

In re Lyondell Chem. Co.,
543 B.R. 127 (Bankr. S.D.N.Y. 2016).......................................................................35

Madeira v. Affordable Hous. Found., Inc.,
469 F.3d 219 (2d Cir. 2006)......................................................................................69

Marchak v. JP Morgan Chase & Co.,
84 F. Supp. 3d 197 (E.D.N.Y. 2015) ..............................................................6, 9, 10

Matana v. Merkin,
957 F. Supp. 2d 473 (S.D.N.Y 2013).......................................................................82

Meng v. Schwartz,
305 F. Supp. 2d 49 (D.D.C. 2004).............................................................................59

Meridian Horizon Fund, LP v. KPMG (Cayman),
487 F. App'x 636 (2d Cir. 2012) .......................................................57, 59, 61, 68

Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,
547 U.S. 71 (2006)......................................................................................................17

In re Methyl Tertiary Butyl Ether (MTBE) Prods Liab. Litig.,
959 F. Supp. 2d 476 (S.D.N.Y. 2013).......................................................................36

MGN Pension Trustees v. Morgan Stanley Trust Co.,
947 F. Supp. 611 (E.D.N.Y. 1996) ...........................................................................65

In re Mid-Island Hosp., Inc.,
276 F.3d 123 (2d Cir. 2002) ........................................................................................75

Miller v. HSBC Bank U.S.A., N.A.,
No. 13 Civ. 7500, 2015 WL 585589 (S.D.N.Y. Feb. 11, 2015) .............................................39

Missel v. County of Monroe,
351 F. App'x 543 (2d Cir. 2009) .................................................................................40

Morrison v. Nat'l Australia Bank,
561 U.S. 247 (2010) ....................................................................................................8

Musalli Factory for Gold & Jewelry v. JPMorgan Chase Bank, N.A.,
261 F.R.D. 13 (S.D.N.Y. 2009) ...................................................................................46

NAF Holdings, LLC v. Li & Fung (Trading) Ltd.,
118 A.3d 175 (Del. 2015) ............................................................................................30

Nat'l Credit Union Admin. Bd. v. HSBC Bank USA, Nat. Ass'n,
117 F. Supp. 3d 392 (S.D.N.Y. 2015)............................................................................73

Newman v. Family Mgmt. Corp.,
748 F. Supp. 2d 299 (S.D.N.Y. 2010), aff'd, 530 F. App'x 21 (2d Cir. 2013)...................6, 62

In re Nortel Networks, Inc.,
469 B.R. 478 (Bankr. D. Del. 2012) .............................................................................66

O'Brien v. Nat'l Prop. Analysts Partners,
719 F. Supp. 222 (S.D.N.Y. 1989)................................................................................21

In re Optimal U.S. Litig.,
813 F. Supp. 2d 351 (S.D.N.Y. 2011), amended on other grounds by 813 F.
Supp. 2d 383 (S.D.N.Y. 2011)................................................................................29, 31

Owens v. Haas,
601 F.2d 1242 (2d Cir. 1979)......................................................................................70

Pandozy v. Segan,
518 F. Supp. 2d 550 (S.D.N.Y. 2007), aff'd, 340 F. App'x 723 (2d Cir. 2009).....................21

Parmalat Cap. Fin. Ltd. v. Bank of Am. Corp.,
671 F.3d 261 (2d Cir. 2012).........................................................................................16

Pegasus Aviation IV, Inc. v. Aerolineas Austral Chile, S.A.,
No. 08 Civ. 11371 (NRB), 2012 WL 967301 (S.D.N.Y. Mar. 20, 2012)................................41

Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.,
14 Civ. 9443 (ER), 2016 WL 2859622 (S.D.N.Y. May 16, 2016)....................................49, 59

Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC,
446 F. Supp. 2d 163 (S.D.N.Y. 2006).................................................................................. *passim*

People v. Merkin,
No. 450879/09, 2010 WL 936208 (Sup. Ct. N.Y. County Feb. 8, 2010)...............................48

Peskin v. Anderson,
[2001] 1 BCLC 372 ...............................................................................................................53

Picard v. Fairfield Greenwich Ltd,
762 F.3d 199 (2d Cir. 2014)...................................................................................................90

Piccoli A/S v. Calvin Klein Jeanswear Co.,
19 F. Supp. 2d 157 (S.D.N.Y. 1998)................................................................................69, 71

Pls' State & Secs. Law Settlement Class Counsel v. Bank of N.Y. Mellon,
43 Misc.3d 887 (Sup. Ct. N.Y. County 2014) ..................................................................48, 58

Premium Mortg. Corp. v. Equifax Inc.,
583 F.3d 103 (2d Cir. 2009)............................................................................................68, 71

Primavera Familienstiftung v. Askin,
No. 95 Civ. 8905 (RWS), 1996 WL 494904 (S.D.N.Y. Aug. 30, 1996)................................32

Prince v. Suffolk Cty. Dep't of Health Servs.,
Nos. 89 Civ. 7243 (LAP), 89 Civ. 8085 (LAP), 1995 WL 144782 (S.D.N.Y.
Apr. 3, 1995)..........................................................................................................................87

Puricelli v. Argentina,
797 F.3d 213 (2d Cir. 2015)...................................................................................................15

Rahl v. Bande,
328 B.R. 387 (S.D.N.Y. 2005)................................................................................................38

Rasmussen v. A.C.T. Envtl. Servs. Inc.,
739 N.Y.S.2d 220 (3d Dep't 2002).........................................................................................30

Refco Grp. Ltd. v. Cantor Fitzgerald, L.P.,
No. 13 Civ. 165 (RA), 2014 WL 2610608 (S.D.N.Y. June 10, 2014)....................................35

Remington Rand Corp.-Del. v. Bus. Sys. Inc.,
830 F.2d 1260 (3d Cir. 1987).................................................................................................91

In re RHTC Liquidating Co.,
424 B.R. 714 (W.D. Pa. 2010)...............................................................................91

Richards v. City of New York,
433 F. Supp. 2d 404 (S.D.N.Y. 2006)..............................................................36, 70

Roby v. Corp. of Lloyd's,
996 F.2d 1353 (2d Cir. 1993).................................................................................43

Rolf v. Blyth, Eastman Dillon & Co.,
570 F.2d 38 (2d Cir. 1978).....................................................................................30

Romano v. Kazacos,
609 F.3d 512 (2d Cir. 2010).....................................................................................9

Rombach v. Chang,
355 F.3d 164 (2d Cir. 2004)...................................................................................38

Roselink Invs. L.L.C. v. Shenkman,
386 F. Supp. 2d 209 (S.D.N.Y. 2004)....................................................................18

Rosner v. Bank of China,
06 CV 13562, 2008 WL 5416380 (S.D.N.Y. Dec. 18, 2008), aff'd, 349 F.
App'x 637 (2d Cir. 2009) ..................................................................................56, 57

Royal & Sun Alliance Ins. Co. v. Century Int'l Arms, Inc.,
466 F.3d 88 (2d Cir. 2006).................................................................................89, 90

RSM Production Corp. v. Fridman,
643 F. Supp. 2d 382 (S.D.N.Y. 2009), aff'd, 387 F. App'x 72 (2d Cir. 2010).......37

Ruhrgas AG v. Marathon Oil Co.,
526 U.S. 574 (1999)...............................................................................................37

S. Cherry St., LLC v. Hennessee Grp. LLC,
573 F.3d 98 (2d Cir. 2009)......................................................................................8

S.E.C. v. Syron,
934 F. Supp. 2d 609 (S.D.N.Y. 2013)...............................................53, 60, 75, 91

Pinnacle Consultants ex rel. S'holder of Leucadia Nat'l Corp. v. Leucadia Nat'l
Corp.,
923 F. Supp 439 (S.D.N.Y. 1995), aff'd sub nom., Pinnacle Consultants, Ltd.
v. Leucadia Nat'l Corp., 101 F.3d 900 (2d Cir. 1996)...........................................45

Saltz v. First Frontier, L.P.,
    782 F. Supp. 2d 61 (S.D.N.Y. 2010), aff'd, 485 F. App'x 461 (2d Cir. 2012)........8, 29, 58, 62

San Diego Cty. Emps. Ret. Ass'n v. Maounis,
    749 F. Supp. 2d 104 (S.D.N.Y. 2010)....................................................................18, 20, 30, 68

Schwartz v. Think Strategy Capital Mgmt. LLC,
    797 F. Supp. 2d 439 (S.D.N.Y. 2011)....................................................................................48

Schwartzco Enters. LLC v. TMH Mgmt., LLC,
    60 F. Supp. 3d 331 (E.D.N.Y. 2014) ....................................................................................38

Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,
    513 B.R. 222 (S.D.N.Y. 2014)........................................................................................91, 92

Seghers v. Thompson,
    No. 06CIV308RMBKNF, 2006 WL 2807203 (S.D.N.Y. Sept. 27, 2006).............................20

Seneca Nation of Indians v. State of N.Y.,
    26 F. Supp. 2d 555 (W.D.N.Y. 1998), aff'd, 178 F.3d 95 (2d Cir. 1999) ..............................34

Serino v. Lipper,
    994 N.Y.S.2d 64 (1st Dep't 2014) .........................................................................................28

Serio v. Human Dynamics Corp.,
    No. 04 Civ. 5146(RMB)(AJP), 2008 WL 2600631 (S.D.N.Y. June 25, 2008).....................83

In re Seven Seas Petroleum, Inc.,
    522 F.3d 575 (5th Cir. 2008) .................................................................................................29

SFR Holdings Ltd. v. Rice,
    17 N.Y.S.3d 398 (1st Dep't 2015) .........................................................................................30

In re Sharp Int'l Corp.,
    403 F.3d 43 (2d Cir. 2005)....................................................................................................55

Shearson Lehman Hutton, Inc. v. Wagoner,
    944 F.2d 114 (2d Cir. 1991)..................................................................................................32

Shenwick v. HM Ruby Fund, L.P.,
    966 N.Y.S.2d 69 (1st Dep't 2013) .........................................................................................18

Simon v. Castello,
    172 F.R.D. 103 (S.D.N.Y. 1997) (Batts, J.)..........................................................................39

SNS Bank, N.V. v. Citibank, N.A.,
    777 N.Y.S.2d 62 (1st Dep't 2004) ...................................................................82

Spinelli v. Nat'l Football League,
    96 F. Supp. 3d 81 (S.D.N.Y. 2015).................................................................69

SSR II, LLC v. John Hancock Life Ins. Co. (U.S.A.),
    No. 652793/2011, 2012 WL 4513354 (Sup. Ct. N.Y. County Sept. 28, 2012)......54

Stein v. Blake and Ors. (No. 2),
    [1998] 1 BCLC 573 ......................................................................................53

Stephenson v. Citco Grp. Ltd.,
    700 F. Supp. 2d 599 (S.D.N.Y. 2010), aff'd sub nom., Stephenson v.
    PricewaterhouseCoopers, LLP, 482 F. App'x 618 (2d Cir. 2012) ....................18, 29

Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het
    Kapital Van Saybolt Int'l B.V. v. Schreiber,
    407 F.3d 34 (2d Cir. 2005).............................................................................34

Subaru Distribs. Corp. v. Subaru of Am., Inc.,
    425 F.3d 119 (2d Cir. 2005)...........................................................................69

Tooley v. Donaldson, Lufkin & Jenrette, Inc.,
    845 A.2d 1031 (Del. 2004) .....................................................................28, 29, 30

Tymoshenko v. Firtash,
    57 F. Supp. 3d 311 (S.D.N.Y. 2014)...............................................................82

United States v. Herman,
    No. 03 Civ.4416 RMB, 2005 WL 66894 (S.D.N.Y. Jan. 12, 2005)..................84, 85

USA United Holdings, Inc. v. Tse-Peo, Inc.,
    No. 9909/08, 2009 WL 1099462 (Sup. Ct. Kings County Apr. 23, 2009) .............83

VantagePoint Venture Partners 1996 v. Examen, Inc.,
    871 A.2d 1108 (Del. 2005) .............................................................................18

Varga v. McGraw Hill Fin. Inc.,
    No. 652410/2013, 2015 WL 4627748 (Sup. Ct. N.Y. County July 31, 2015) .......23

Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.,
    825 F.2d 709 (2d Cir. 1987)...........................................................................17

von Kaulbach v. Keoseian,
  783 F. Supp. 170 (S.D.N.Y. 1992)........................................................................41

W. Palm Beach Police Pension Fund v. Collins Capital Low Volatility
Performance Fund II, Ltd.,
  No. 09-80846-CIV, 2010 WL 2949856 (S.D. Fla. July 26, 2010) ........................................29

Weiss v. La Suisse,
  154 F. Supp. 2d 734 (S.D.N.Y. 2001).................................................................42, 43

In re Windsor Plumbing Supply Co.,
  170 B.R. 503 (Bankr. E.D.N.Y. 1994)..................................................................46

Winn v. Schafer,
  499 F. Supp. 2d 390 (S.D.N.Y. 2007).................................................................20, 40

Wiwa v. Royal Dutch Petroleum Co.,
  226 F.3d 88 (2d Cir. 2000)..............................................................................32

Yale Fishman v. Phila. Fin. Life Assurance Co.,
  No. 11-CV-1283, 2016 WL 2347921 (S.D.N.Y. May 3, 2016) ..............................................58

Yudell v. Gilbert,
  949 N.Y.S.2d 380 (1st Dep't 2012) .....................................................................28

Zamora v. JPMorgan Chase Bank, N.A.,
  14 CV 5344, 2015 WL 4653234 (S.D.N.Y. July 31, 2015)................................................56

Zutty v. Rye Select Broad Market Prime Fund, L.P.,
  No. 113209/09, 2011 WL 5962804 (Sup. Ct. N.Y. County Apr. 15, 2011)...........................29

**Statutes & Rules**

15 U.S.C. § 78bb(f)(1)(B)..................................................................................9

Fed. R. Civ. P. 8........................................................................................37, 39

Fed. R. Civ. P. 8(a) ....................................................................................49, 59

Fed. R. Civ. P. 9(b) .................................................................................. *passim*

Fed. R. Civ. P. 12(b)(1)...................................................................................1

Fed. R. Civ. P. 12(b)(2)...................................................................................1

Fed. R. Civ. P. 12(b)(6)..................................................................34

Fed. R. Civ. P. 12(h)(1)..................................................................33

Fed. R. Civ. P. 12(h)(1)(B)..............................................................33

Fed. R. Civ. P. 15(a)(1)..................................................................33

Fed. R. Civ. P. 15(c)(1)(C) ..............................................................88

## Other Authorities

H.R. Conf. Rep. No. 105-803 ...........................................................17

http://www.dictionary.com/browse/original (last visited July 25, 2016) .....................85

http://www.merriam-webster.com/dictionary/occurrence (last visited July 25, 2016)..........................................................................85

http://www.merriam-webster.com/dictionary/original (last visited July 25, 2016)....................85

Restatement (Second) of Conflict of Laws § 302, cmt. B (Am. Law Inst. 1971) .........................19

S. Rep. 105-182..........................................................................17

Defendants KML, Tremont, Tremont Group, FIM Limited, FIM Advisers, FIM (USA), Grosso, Ceretti, Manzke, Tannenbaum, Citi Hedge and PwC Bermuda[1] respectfully submit this reply memorandum of law in further support of their motion for an order, pursuant to Federal Rules of Civil Procedure 8(a), 9(b), 12(b)(1), 12(b)(2), and 12(b)(6), dismissing the SAC with prejudice. Accompanying this memorandum are (i) reply declarations of Narinder K. Hargun, Richard G. Evans, David Chivers, Simon Browne-Wilkinson, and Barbara Dohmann, setting forth the applicable principles of Bermuda and BVI law; and (ii) a compendium of the foreign law authorities cited by these declarants in their initial and reply declarations.[2] Following this memorandum as Appendix 1 is a list identifying the bases on which each Defendant has moved to dismiss the SAC, along with corresponding page references to the Moving Brief, Plaintiffs' opposition brief (the "Opposition" or "Opp. Br.") and this reply memorandum where each basis is addressed.

## PRELIMINARY STATEMENT

Plaintiffs' Opposition confirms that their claims in this case should once again be dismissed, on multiple grounds.

All but one of the claims (mutual mistake, which fails for other reasons) are precluded by

---

[1] Capitalized terms have the meanings ascribed to them in Appendix 2 submitted herewith, which updates Appendix A submitted with the Memorandum of Law in Support of the Joint Motion of All Defendants to Dismiss the Corrected Second Amended Consolidated Class Action Complaint. (Dkt. No. 197) (referred to as "Moving Brief" and cited as "Mov. Br. at __").

[2] The declarations and affidavits submitted with Defendants' Moving Brief shall continue to be cited by reference to the declarant's or affiant's last name, followed by the paragraph or exhibit reference. For example, the Declaration of Narinder Hargun is cited as "Hargun ¶ __" or "Hargun Ex. __." The declarations submitted with this Reply Memorandum are cited by reference to the declarant or affiant's last name, followed by "Reply," followed by the paragraph or exhibit reference. For example, the Reply Declaration of Narinder Hargun is cited as "Hargun Reply ¶ __" or "Hargun Reply Ex. __." The declarations submitted by Plaintiffs of Anthony George Bompas dated November 4, 2010 (Dkt. No. 135) and May 6, 2016 (Dkt. No. 215) are cited as "Bompas ¶ __" and "Bompas Further ¶ __", respectively; the Declaration of Mark Diel dated November 4, 2010 (Dkt. No. 134) is cited as "Diel ¶ __" and the Declaration of David Barrett dated May 6, 2016 (Dkt. No. 216) is cited as "Barrett ¶ __."

SLUSA.  The essence of the SAC is that the Defendants, service providers to the Funds (or to the Manager) and individuals who worked for those service providers, were "complicit" in Madoff's fraud, "turned a blind eye" to it, and "willfully disregarded" it in order to keep a stream of fees flowing from the Funds.  SLUSA flatly precludes all such claims.  Under Kingate, such claims are in Group 3:  "The Group 3 allegations predicate liability on Defendants' aiding and abetting (rather than directly engaging in) the frauds underlying the Group 1 [direct misrepresentation or omission] claims."  In re Kingate Mgmt. Ltd. Litig., 784 F.3d 128, 135 (2d Cir. 2015).  Plaintiffs now insist the false conduct they allege is not an "essential legal element" of their claims, but this is irrelevant—it is pled throughout the SAC and is the underlying basis for all but one of Plaintiffs' claims against all Defendants.  Under SLUSA, such claims are precluded.

The Opposition provides yet another reason why SLUSA applies.  In an attempt to address their lack of standing (unsuccessfully, as explained below), Plaintiffs argue that all their claims are really direct "inducement" claims, i.e., claims that Defendants deceptively induced Plaintiffs to invest in the Funds.  But characterized as such, i.e., as claims of fraudulent or negligent misrepresentations or omissions, the claims plainly are precluded as belonging in Kingate Group 1 or 2 as assertions of fraudulent or negligent misrepresentations or omissions.  Either way, the claims must be dismissed.

If SLUSA does not preclude these claims, Plaintiffs' lack of standing to assert them also is apparent from the Opposition.  The losses Plaintiffs seek to recover—diminution in the value of their shares in the Funds, loss of the Fund's assets, and "overpayment" of fees by the Funds (or the Manager) to their service providers under the Service Agreements[3]—all are derivative or

---

[3] The "Service Agreements" refers collectively to the Management Agreements, the Co-Management Agreement, the CSAs, the Administration Agreements, the Auditor Agreements, and the Distribution Agreements. (Barrett Exs. 9, 10.)  The Distribution Agreements are cited herein as "DAs at § _."

"reflective" of losses directly suffered by the Funds. The Funds own these claims. The Funds are already pursuing those losses in litigation in Bermuda. That recoveries by shareholders might be different here compared to the Funds' potential recoveries in Bermuda, due to differences in the law or otherwise, does not change this: it is the nature of the losses being sought that is determinative.

In arguing that their claims are direct, Plaintiffs erroneously suggest they had a "special" or "separate" relationship with Defendants. The fact is that no relationship is pled. Plaintiffs' characterization is unsupported by any actual facts pleaded in the SAC. The same is true of the Opposition's reference to "distribution agreements," which are not mentioned a single time in the SAC. Beyond not being pled in the SAC, none of Plaintiffs' arguments change the reflective nature of the losses Plaintiffs seek in any event, which again is the decisive factor in the analysis.

Plaintiffs argue that an exception to the reflective loss rule applies because the Funds are "disabled" from bringing their own claims. To the contrary, as the Court is aware, the Funds have already brought the Bermuda Proceedings and are vigorously litigating them. The fact that the Funds might lose those cases, win less than Plaintiffs want, or distribute winnings in a different way, is irrelevant. Nothing in the reflective loss rule requires "winning" claims in foreign jurisdictions or distributing recoveries in any particular manner. Plaintiffs do not own the claims they are trying to bring and dismissal is required.

Even if Plaintiffs could overcome these obstacles, which they cannot, the SAC does not plead any viable claims against these Defendants for numerous additional reasons:

- They provide no basis for personal jurisdiction over Citi Hedge;

- Plaintiffs continue to engage in impermissible group pleading, lumping the Defendants together despite the Court's admonition not to do so;

- Their own expert agrees that several of their claims do not exist under applicable law;

- They plead no facts suggesting any Defendant undertook any duty to any Plaintiff, which is required for their tort claims;

- They cannot avoid their lack of privity with the Defendants, which is required for their contract claims;

- They cannot recover fees paid to any of the Defendants, because the Funds or KML, not the Plaintiffs, paid them; and

- They cannot avoid the unambiguous limitations periods contained in the very contracts they now seek to sue under.

Finally, comity of both types—of courts and of nations—provides an independent basis for dismissal. The Opposition fails to coherently address this point. Plaintiffs do not deny that both Funds are in liquidation in the BVI, that courts have found foreign bankruptcy proceedings to be among the most compelling cases for dismissal on comity grounds, or that the Funds' Joint Liquidators are already pursuing nearly identical claims in Bermuda against most of the Defendants named in this action. Most cases are not this clear cut. The Court should dismiss the SAC on comity grounds as well.

## ARGUMENT

### I. COUNTS 5–7, 9–11, 13, 15–19, 21–26 AND 28 <u>ARE ALL PRECLUDED BY SLUSA</u>

SLUSA precludes all of Plaintiffs' claims except mutual mistake. Defendants' Moving Brief demonstrates that Counts 5, 6, 7, 9, 10, 11, 13 and 28 against the "Kingate Defendants" are Group 3 claims within the Second Circuit's five-group <u>Kingate</u> scheme. (Mov. Br. at 40–41.) Under SLUSA, the Court must look beyond Plaintiffs' attempt to label their claims as based on (supposed) breaches of contract, fiduciary duty or the duty of due care. The claims themselves predicate liability on allegations that the "Kingate Defendants" either had knowledge of or were willfully blind to and therefore complicit in Madoff's fraud. Plaintiffs' new argument that these

claims really are all "inducement claims" does not change the outcome. If that characterization were correct, those claims would fall within Groups 1 or 2, which only underscores that they must be dismissed.

The claims against Citi Hedge (Counts 21–26) and PwC Bermuda (Counts 15–19) are all premised on supposed misrepresentations contained in various reports allegedly provided to Plaintiffs and/or on conduct allegedly designed to enable BLMIS to further its Ponzi scheme. They fall squarely within Groups 2 or 3 and are precluded.

Nor can Plaintiffs avoid dismissal based on a newfound argument that SLUSA would not apply if the Court finds that foreign law governs the underlying claims—this argument is barred by the Second Circuit's mandate, was waived by Plaintiffs in the briefing before this Court in 2010, and is incorrect in any event. All claims against all Defendants (other than mutual mistake) must be dismissed under SLUSA.

### A. All Claims Against the "Kingate Defendants" (except Mutual Mistake) Are Group 1, 2 or 3 Claims Precluded By SLUSA (Counts 5, 6, 7, 9, 10, 11, 13 and 28)

#### 1. The Claims All Rest on Allegations That the "Kingate Defendants" Were Complicit in Madoff's Fraud [4]

As Defendants demonstrated in the Moving Brief (at 36–41), the claims against the "Kingate Defendants," except Count 12 (mutual mistake), are "integrally tied to the underlying fraud committed by Madoff" and therefore precluded under SLUSA. In re Herald, Primeo & Thema, 730 F.3d 112, 119 (2d Cir. 2013) ("Herald I"). Every claim seeks to hold these

---

[4] There is no merit to Plaintiffs' suggestion that the "Kingate Defendants," in a letter to the Court dated June 18, 2015, waived their right to argue that SLUSA precludes Plaintiffs' gross negligence and negligence claims. (Opp. Br. at 17 n.2.) Defendants submitted that letter when proposing a briefing schedule for their dismissal motions. It was not a submission on the substance of Defendants' SLUSA arguments, which—three months in advance of receiving Plaintiffs' 95-page, 327-paragraph SAC—had not yet been fully formed.

Defendants liable on the ground that they supposedly "had overwhelming information indicating that Madoff's operation was a fraud—evidence they knew about or should have discovered, but instead ignored."  (SAC ¶ 64.)  Every claim is premised on Plaintiffs' theory that these Defendants, based on the supposed oversight they had over Madoff, had actual knowledge of or recklessly disregarded Madoff's fraud and nevertheless failed to perform their duties, enabling the fraud to continue, in exchange for fees tied to the Funds' NAV, which they either knew or should have known was artificially inflated.[5]  In short, Plaintiffs allege that every one of these "Kingate Defendants" was complicit in Madoff's fraud.  Regardless of how their claims are styled, they are all precluded under Group 3, or Group 1 or 2 to the extent the claims are based on allegations of inducement, because "the centrality of the fraudulent conduct to Defendants' alleged actions prohibits any of Plaintiffs' claims from being able to 'stand alone' without reference to [Madoff's] fraud or Defendants supposed knowledge of that fraud."  <u>Marchak v. JP Morgan Chase & Co.</u>, 84 F. Supp. 3d 197, 212 (E.D.N.Y. 2015) (dismissing negligence, aiding and abetting breach of fiduciary duty and unjust enrichment claims, among others, as precluded by SLUSA because "misrepresentations are a necessary component of each of Plaintiffs' state law claims"); <u>see also</u> <u>Newman v. Family Mgmt. Corp.</u>, 748 F. Supp. 2d 299, 312–13 & n.9 (S.D.N.Y. 2010) (dismissing claims of breach of fiduciary duty, gross negligence, aiding and abetting breach of fiduciary duty and unjust enrichment as precluded by SLUSA), <u>aff'd</u>, 530 F. App'x 21 (2d Cir. 2013); <u>accord</u> <u>Kingate</u>, 784 F.3d at 152 n.23 ("Only Groups 1, 2, and 3 allege Defendants to have been, in varying degrees, complicit in the falsity.").

Plaintiffs' Opposition confirms this.  It repeatedly points to allegations in the SAC that

---

[5] (SAC ¶¶ 1, 3, 64, 198–215, 219, 221–22, 224, 226, 229, 232–33, 235, 238–40, 243–47, 251–53, 322, 324 (all alleging "Kingate Defendants" breached supposed duties to Plaintiffs, assisted in such breaches, or improperly earned fees by ignoring clear evidence of Madoff's fraud and failing to disclose the fraud).)

the "Kingate Defendants" had actual knowledge of or acted in reckless disregard of Madoff's Ponzi scheme, and caused Plaintiffs' losses by failing to take action that enabled the scheme to continue.[6] Having premised their claims on these allegations in the SAC, Plaintiffs' argument that the SAC merely "alleges that [these] Defendants breached duties . . . not that Defendants were complicit in Madoff's scheme" is disingenuous. (Opp. Br. at 18.)

Plaintiffs argue that false conduct is not an "essential" legal element of their breach of duty and contract claims against the "Kingate Defendants" (Counts 5–7, 9–10). (See Opp. Br. at 25–39.) However, as explained by the Court of Appeals: "SLUSA's application to a claim turns on the claim's *theory of the defendant's liability*," regardless of the requisite legal elements of each claim. Kingate, 784 F.3d at 149 n.25 (emphasis added). Consequently,

> [w]hen the success of a class action claim depends on a showing that the defendant committed false conduct conforming to SLUSA's specifications, the claim will be subject to SLUSA, *notwithstanding that the claim asserts liability on the part of the defendant under a state law theory that does not include false conduct as an essential element*—such as breach of a contractual right to fair dealing. . . . [I]f the success of a claim depends on conduct specified in SLUSA, and the defendant was complicit in that conduct, the claim is covered by SLUSA even though plaintiffs have artfully avoided using SLUSA's terms.

Id. at 149 (emphasis added).

Plaintiffs allege that the "Kingate Defendants" propped up Madoff by, *at a minimum*,

---

[6] (See, e.g., Opp. Br. at 1 (arguing that "Defendants recklessly induced Plaintiffs to make and retain investments"), 12 (arguing that information allegedly received by the FIM Entities' investment committee was "another example of facts supporting an inference of knowledge about Madoff's conduct"), 12–14 (reciting countless "red flags" alleged in the SAC and arguing that the "Kingate Defendants were willfully blind to them"), 104 (arguing that the "Kingate Defendants," "*at the least*, acted with 'reckless disregard' [to Madoff's fraud]" (emphasis added)), 112 (alleging that "the Managers knew that information received from Madoff was unreliable and likely fabricated"), 136 ("The SAC is replete with allegations that the Manager and Co-Manager knew that information from Madoff was suspect" and conducted "recklessly insufficient due diligence"); see also SAC ¶¶ 1, 3, 64, 198–215, 219, 221–22, 224, 226, 229, 232–33, 235, 238–40, 243–47, 251–53, 322, 324 (alleging that the "Kingate Defendants" breached duties to Plaintiffs, assisted in such breaches, or improperly earned fees by ignoring Madoff's fraud and failing to disclose the fraud)).

turning a blind eye to and failing to disclose his fraudulent scheme.[7] Here, as in Herald I, "it is

obvious that [Defendants'] liability, under any claim, is premised on the participation in,

knowledge of, or at a minimum, *cognizable disregard of* [Madoff's fraud]." Herald I, 730 F.3d

at 119 n.7 (emphasis added). Under the artful pleading doctrine, Plaintiffs cannot disguise their

claims by labeling the same conduct a breach of contract, breach of fiduciary duty, or a breach of

a purported duty of care.[8] See, e.g., Kingate, 784 F.3d at 149. All of these Counts against the

"Kingate Defendants" are precluded under Group 3 and must be dismissed.

### 2. Plaintiffs' Newfound "Inducement" Argument Would Also Lead to SLUSA Preclusion

Plaintiffs abandoned federal securities claims that had been included in their Initial

Complaint in order to avoid dismissal based on Morrison v. Nat'l Australia Bank, 561 U.S. 247

(2010). After remand from the Second Circuit, they then amended their Amended Complaint to

eliminate explicit allegations of fraud in an effort to shoehorn themselves into Kingate Groups 4

---

[7] All claims alleging that Defendants were reckless or grossly negligent in their monitoring of Madoff should be deemed to allege intentional misconduct because, in this context, recklessness and gross negligence are equivalent states of mind. See, e.g., S. Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 109 (2d Cir. 2009) (explaining that reckless disregard for the truth is a "state of mind approximating actual intent, not merely a heightened form of negligence," and is pled by allegations "that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.") (citations omitted); Saltz v. First Frontier, L.P., 782 F. Supp. 2d 61, 75 (S.D.N.Y. 2010) (explaining that gross negligence is "conduct that evinces reckless disregard for the rights of others or 'smacks' of intentional wrongdoing" and is similarly pled by allegations "that the danger was either known to the defendant or so obvious that the defendant must have been aware of it") (citations omitted), aff'd, 485 F. App'x 461 (2d Cir. 2012). (See also Dohmann ¶¶ 67-68; Hargun Reply ¶ 50 (such allegations are closer to allegations of intentional misconduct rather than heightened negligence, which is not a recognized mental state in Bermuda); Evans Reply ¶¶ 3, 24; Chivers ¶ 98 n.21.)

[8] (Compare Opp. Br. at 18 (arguing that the SAC does not allege that "Defendants were complicit in Madoff's scheme") with Opp. Br. at 51–53 (arguing "New York has a strong interest in applying its laws to regulate the conduct of offshore fund promoters, managers and service providers *who raise money to fuel schemes orchestrated by fraudsters in New York*" (emphasis added)), 102 ("[T]he SAC alleges that the Kingate Defendants 'solicited investments from Plaintiffs which they oversaw, controlled and managed by funneling them into Madoff's Ponzi scheme,'" (citing SAC ¶ 3), and "that '[a]s a result of Defendants' breaches of fiduciary and common law duties and of contractual obligations, investors were induced to purchase and hold virtually worthless investments.'" (citing SAC ¶ 1)).)

and 5 and avoid dismissal under SLUSA.  But because doing so laid bare Plaintiffs' lack of standing, as discussed below, the Opposition tries to recast the SAC as premised on the "Kingate Defendants'" direct *inducement* of Plaintiffs to invest or hold shares in the Funds.[9]  This characterization would bring the claims not only into Group 3 under the Kingate framework but also into Groups 1 and/or 2.  In particular, were the Court to accept this argument, the claims would be that these Defendants made misrepresentations to induce Plaintiffs to purchase or hold investments, or employed some other "manipulative or deceptive device or contrivance."  See 15 U.S.C. § 78bb(f)(1)(B).[10]  Plaintiffs concede this: "Inducement claims are textbook examples of direct claims . . . that can be pursued by investors *who relied on misleading statements*."  (Opp. Br. at 59 (emphasis added).)

All such claims are precluded by SLUSA, regardless of whether the alleged inducement was the result of misrepresentations made intentionally, recklessly, or negligently.  See Kingate, 784 F.3d at 135 n.6 ("If allegations that otherwise fit within the description of Group 3, 4, or 5, require proof that the Defendants committed [knowing, intentional, or negligent misrepresentations or misleading omissions in connection with transactions in covered securities], then those allegations belong in Group 1 or 2 rather than in Group 3, 4, or 5."); Marchak, 84 F. Supp. 3d at 213–14 (dismissing claims of negligence, aiding and abetting breach

---

[9] (Opp. Br. at 1 ("Defendants recklessly induced Plaintiffs to make and retain investments."), 55 (action is against service providers "who induced and facilitated Plaintiffs' investments in the Funds, induced Plaintiffs to hold and increase their investments"), 61 (arguing that their claims are based on "Defendants' duties . . . and allege that Plaintiffs were induced to purchase and retain" their investments), 64 (arguing that Defendants have misconstrued their claims as premised on mismanagement when they are premised on "inducement"), 116–17 (alleging that the claims against the FIM Entities are "based in large part" on their "central role" in inducing them to invest in or remain invested in the Funds")).)

[10] The Court is "free to look beyond the face of the [complaint]" to determine whether SLUSA applies. Romano v. Kazacos, 609 F.3d 512, 519–20 (2d Cir. 2010); see also Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009) (requiring judges to draw on their "judicial experience and common sense" when evaluating pleadings).

of fiduciary duty and unjust enrichment, among others, as barred by SLUSA where "misrepresentations are a necessary component of each of Plaintiffs' state law claims")[11]; Anwar v. Fairfield Greenwich Ltd., 118 F. Supp. 3d 591, 605–06 (S.D.N.Y. 2015) ("Anwar VII") (dismissing negligent misrepresentation claims against auditor of Madoff feeder fund as barred by SLUSA), amended on other grounds by No. 09-cv-118 (VM), 2015 WL 9450503 (S.D.N.Y. Aug. 28, 2015). *Plaintiffs concede this*. (See Opp. Br. at 23 (acknowledging that both Kingate and Herald I hold that allegations that "predicate liability on charges that Defendants made misrepresentations and misleading omissions regarding the Funds' investments with Madoff and their oversight of the Funds' investments" fall into Group 1 or 2).)

## B. All Claims Against Citi Hedge Are Group 2 or 3 Claims Precluded By SLUSA (Counts 21–26, 28)

### 1. The Claims All Rest on Alleged Misrepresentations and Omissions

The claims against Citi Hedge all premise liability on alleged misrepresentations and misleading omissions in the NAV provided to Plaintiffs. (Mov. Br. at 43–46; see also SAC ¶¶ 38(b), 286, 294–95, 299–300, 305–06, 315, 320.) Such allegations fall under Group 2 and are precluded under SLUSA. Kingate, 784 F.3d at 151.

As with the "Kingate Defendants," Plaintiffs try to mask the underlying theory of their claims against Citi Hedge in order to circumvent SLUSA. When arguing that SLUSA does not

---

[11] Plaintiffs' attempt to distinguish Marchak and Herald I is both wrong and proves too much. (Opp. Br. at 26.) As Marchak makes clear, a plaintiff has no claim that he was "induced" to hold or retain shares unless he was "misled" by a representation, which makes it an essential part of the claim regardless of how it is pled. Marchak, 84 F. Supp. 3d at 212 (allegations that a plaintiff was misled into purchasing or holding, either implicit or explicit, are essential to those claims and therefore require SLUSA preclusion (citing several cases)); id. at 219–20 (explaining that claims premised on allegations of misstatements or omissions by investors against service providers regarding due diligence and monitoring of Madoff are precluded). Here, moreover, the allegations of "inducement" are essential to Plaintiffs' claims because (as demonstrated in Section II), Plaintiffs do not have standing to assert "mismanagement" claims against the "Kingate Defendants" because those are the Funds' claims. Id. at 212–13.

preclude their claims, Plaintiffs deny that the claims rest on any "false representation[s]" by Citi Hedge.[12] But they argue precisely the opposite to defend against dismissal on the basis of standing: that all claims are predicated on Citi Hedge's *inducement* of Plaintiffs to invest or hold shares in the Funds. (Opp. Br. at 59, 67.)[13] The obvious question is *how* did Citi Hedge allegedly induce these financial decisions? According to the SAC: "Citi Hedge induced Plaintiffs and the Class to make their initial investments in the Funds, to retain their investments in the Funds, and to make additional investments in the Funds *by issuing false NAV and account balance statements* for the Funds that Citi Hedge disseminated to Plaintiffs and the Class, or knew would be disseminated to Plaintiffs and the Class." (SAC ¶ 305 (emphasis added).)

Plaintiffs thus accept that *all* of their claims against Citi Hedge are based on Citi Hedge's allegedly false NAV and other communications, and therefore "premise liability on [Citi Hedge's] negligent misrepresentations and misleading omissions in connection with the Funds' investments with Madoff and with oversight of Madoff's operations." Kingate, 784 F.3d at 151. This is plainest in Count 24 (negligent misrepresentation). (See Mov. Br. at 44–45.) Plaintiffs' counterargument, that the NAV were representations about the value of the Funds, not "covered securities," (Opp. Br. at 40–41), was rejected by the Second Circuit:

---

[12] (See Opp. Br. at 31, 34 ("the 'essential' proof of [Count 25] is Citi Hedge's underlying breach of its contractual duties," not "statements that Citi Hedge made"), 35 (Count 21 "can be established without any deceptive conduct or complicity with Madoff"), 37 (Count 26 "does not require Plaintiffs to show that Citi Hedge engaged in any deceptive conduct").)

[13] Plaintiffs similarly repeat that Citi Hedge allegedly induced them to invest by providing incorrect information, through the NAV and generic fund communications. (Opp. Br. at 79, 83 (Count 21 rests on Citi Hedge's calculating the NAV and communicating with shareholders), 94 (Count 26 rests on Citi Hedge's calculating and transmitting the Funds' NAV to Plaintiffs), 102–03, 105 (Citi Hedge committed negligence, gross negligence and negligent misrepresentation because "investors . . . received regular communications from Citi Hedge with information on the NAV and the supposed performance returns of the Funds," and "[t]he SAC details the incorrect information provided, and omissions made, by [] Citi Hedge"), 118 ("Citi Hedge . . . publish[ed] pricing information that it knew to be false or should have known to be inaccurate."), and 128 (Count 25 rests on allegations that Citi Hedge was obligated "to keep the Funds' shareholders informed of the status and performance of their investments").)

[P]laintiffs, like the Herald plaintiffs, purchased the uncovered shares of the offshore Funds, expecting that the Funds were investing the proceeds in S & P 100 stocks, which are covered securities. We therefore rule that the essential element of SLUSA that requires falsity "in connection with" a purchase or sale of a covered security is satisfied in this case.

Kingate, 784 F.3d at 142. The Second Circuit held that allegations charging defendants with negligent misrepresentations are precluded as falling within Group 2. Id. at 151; see also Anwar VII, 118 F. Supp. 3d at 606.

That all of Plaintiffs' claims rely on alleged misrepresentations by Citi Hedge is also demonstrated by the cases Plaintiffs cite.[14] Though they cite these cases to support their arguments that the SAC states claims under state law, each case also upheld claims for federal securities law violations based on the same allegations that pleaded violations of state law.[15] Through these citations, Plaintiffs accept that their "state law claims [are] predicated on conduct" by Citi Hedge "specified in SLUSA's operative provisions, which reference the anti-falsity provisions of the 1933 and 1934 Acts." (Mov. Br. at 46 (citing Kingate, 784 F.3d at 147).)

Finally, Plaintiffs argue that the Court should allow their claims to continue to the extent that they do not "essentially" rely on precluded allegations under Kingate, but this fails to recognize that the Second Circuit determined that "any allegations of the type defined by Group 2" must be dismissed. 784 F.3d at 151. Thus, even if some other allegations are not precluded

---

[14] (See Opp. Br. at 78 (citing Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC, 446 F. Supp. 2d 163 (S.D.N.Y. 2006) to support viability of Count 21), 87 (citing Cromer Fin. Ltd. v. Berger, No. 00-CV-2284, 2003 WL 21436164, at *9 (S.D.N.Y. June 23, 2003) to support viability of Count 26), and 100–02 (citing Cromer Fin. Ltd. v. Berger, No. 00 CIV. 2498, 2001 WL 1112548, at *2 n.4 (S.D.N.Y. Sept. 19, 2001) and AUSA Life Ins. Co. v. Ernst & Young, 206 F.3d 202 (2d Cir. 2000) to support viability of claims against PwC Bermuda, and Counts 23 and 24 against Citi Hedge)).)

[15] See Pension Comm., 446 F. Supp. 2d at 182 (hedge fund administrator can be liable under Section 10(b) of the Exchange Act for creating false NAV); Cromer Fin. Ltd., 2003 WL 21436164, at **8–9 (recognizing similar holding under prior decision of Cromer Fin. Ltd. v. Berger, 137 F. Supp. 2d 452 (S.D.N.Y. 2001)); Cromer Fin. Ltd., 2001 WL 1112548, at *5 (denying motion to dismiss securities fraud claims brought against hedge fund administrator); AUSA, 206 F.3d 202 (reversing district court's dismissal of Section 10(b) and common law negligent misrepresentation claims).

under SLUSA, allegations of misrepresentations must be ignored in determining whether

Plaintiffs state claims against Citi Hedge under the laws of Bermuda, the BVI, or New York.

### 2. To the Extent Plaintiffs' Claims Against Citi Hedge Do Not Rest on Misrepresentations or Omissions, They Are Instead Predicated on Allegations that Citi Hedge Aided and Abetted Madoff's Fraud

Like those against the "Kingate Defendants," Plaintiffs' claims against Citi Hedge are

also precluded under SLUSA because they rest on allegations that Citi Hedge was aware of and

purposely or recklessly ignored information about BLMIS.[16]  These are simply claims that Citi

Hedge "aided and abetted . . . the frauds" of Madoff, which fall under Group 3 under the Second

Circuit's typology.  Kingate, 784 F.3d at 151; see also Herald I, 730 F.3d at 117–19.

### C. All Claims Against PwC Bermuda Are Group 2 or 3 Claims Precluded By SLUSA

### 1. Counts 15–17 and 19 Rest on Allegations That PwC Bermuda Misled Plaintiffs

Plaintiffs' claims against PwC Bermuda all premise liability on alleged

misrepresentations and misleading omissions in the audit opinions provided to Plaintiffs.  (SAC

¶¶ 37(a), 256, 262, 268, 283.)  The SAC contains numerous paragraphs alleging that PwC

Bermuda's audit reports were false or misleading in that they failed to confirm assets held and/or

investments made by Madoff and BLMIS.[17]  Plaintiffs repeatedly reference this theory

---

[16] (See Opp. Br. at 79 ("Citi Hedge failed . . . to independently confirm and verify the pricing information provided by Madoff" (citing SAC)), 83 ("Citi Hedge was also an *active participant* in the marketing of the Funds' shares.") (emphasis added)), 88 ("Citi Hedge was aware of the roles consolidated in Madoff and other red flags, which demanded a higher level of scrutiny over Madoff's investments."), 94–95 ("Knowing what it knew about the Kingate Defendants and the public and private indications that Madoff's investment advisory business was problematic, Citi Hedge acted dishonestly in continuing to assist the Kingate Defendants."), 104, 119 (Citi Hedge "was negligent in the performance of its other duties such as monitoring Madoff's performance returns, verifying that transactions had taken place as represented, and communicating accurate information to prospective and existing investors.").)

[17] (See, e.g., SAC ¶¶ 130–32 (alleging PwC Bermuda's "audits opinions" contained false statements regarding, *inter alia*, Madoff's handling of U.S. Treasury Bills), 151 (alleging PwC Bermuda's "audit

throughout their Opposition,[18] yet Plaintiffs mischaracterize their claims as falling within Group 4 to try to avoid preclusion. But, again, Plaintiffs cannot escape the theory of liability articulated in the SAC, which clearly places these claims in Group 2. See Kingate, 784 F.3d at 151.

Plaintiffs' attempt to avoid SLUSA preclusion based on the accountant hypothetical discussed in Kingate fails. The Second Circuit merely explained that a claim by a *client* alleging that his own accountant defrauded him may not be precluded under SLUSA because that claim is not necessarily premised on misrepresentations in connection with the sale of a security but on a direct duty owing from the accountant to his client to perform services directly to the client. (Mov. Br. at 50–51.) Even though Plaintiffs refer to themselves as "clients" of the various Defendants in their Opposition, they were never clients of PwC Bermuda (or any other Defendant). Their only claims are that PwC Bermuda made misrepresentations in audit opinions issued to the Funds, which are in connection with the sale of covered securities and therefore precluded. For the same reason, Plaintiffs' reliance on the hypothetical in Anwar VII fails.[19] PwC Bermuda's audit opinions—allegedly containing misrepresentations about the Funds' investment in BLMIS—cannot be separated from Plaintiffs' theory of liability.

Lastly, as explained supra at Section I(B)(1), Plaintiffs' attempt to distinguish their

---

opinions" contained false statements regarding Madoff's options trading activity).)

[18] (See, e.g., Opp. Br. at 9 ("Each year, PwC issued an unqualified audit opinion . . . stating that the financial statements and audit conformed with the requisite accounting and auditing standards."), 89 ("PwC participated in the Kingate Defendants' breach of fiduciary duty by issuing unqualified audit reports . . . ."), 98 ("As alleged in the SAC, PwC issued and addressed its unqualified audit opinions to Plaintiffs . . . ."), 105 ("The SAC details the incorrect information, provided and omissions made, by PwC and Citi Hedge, including incorrect information about their practices and . . . the value and existence of Plaintiffs' investments.").)

[19] 118 F. Supp. 3d at 605 ("Conceivably, an accountant, in violation of a duty of care and for reasons unrelated with any scheme to harm noncontractual parties, might issue a report containing inaccurate or incomplete information on which investors detrimentally rely, giving rise to negligence claims unrelated to securities claims by such investors based on falsity.").

negligent misrepresentation claim as unrelated to trading in "covered securities" was already rejected by the Second Circuit. Kingate, 784 F.3d at 142; see also Anwar VII, 118 F. Supp. 3d at 606; (Mov. Br. at 37.)

### 2. Alternatively, Plaintiffs' Claims Against PwC Bermuda Are Predicated on a Theory That the Firm Aided and Abetted Madoff's Fraud

Like the claims against the other Defendants, Plaintiffs' claims against PwC Bermuda also fall under Group 3 and must be dismissed. All alleged causes of action are predicated on allegations that PwC Bermuda "aided and abetted . . . the frauds" of Madoff by purposely and/or recklessly ignoring information about BLMIS. Kingate, 784 F.3d at 151; see also Herald I, 730 F.3d at 117–19.

### D. Plaintiffs Cannot Avoid SLUSA Just Because Foreign Law Applies to Their Claims

Plaintiffs argue that if their claims are governed by foreign law, SLUSA does not apply to them. (Opp. Br. at 41–44.) But consideration of this argument is barred by the Second Circuit mandate. "[W]here a mandate directs a district court to conduct specific proceedings and decide certain questions, generally the district court must conduct those proceedings and decide those questions." Puricelli v. Argentina, 797 F.3d 213, 218 (2d Cir. 2015). Here, the Second Circuit held that SLUSA was applicable and remanded for this Court "to determine, on full briefing, which allegations of the Complaint fall into which of the categories we have described." Kingate, 784 F.3d at 152.[20]

In opposing to this Court Defendants' original motions to dismiss, Plaintiffs never argued

---

[20] Although Plaintiffs have since amended their Amended Complaint, none of the SAC amendments affect the application of the Second Circuit's mandate that the Court must determine whether "Plaintiffs' claims (or portions thereof) fall within the terms of SLUSA's preclusion and . . . to dismiss the precluded claims." Kingate, 784 F.3d at 153–54. The Second Circuit also directed that the alternate grounds for dismissal raised by Defendants remain open on remand. Id. at 154 n.26.

that SLUSA would not apply if the Court found that Bermuda or BVI law applied to their claims, even though (1) Plaintiffs raised numerous arguments to avoid SLUSA preclusion; (2) all of the Defendants argued that foreign law applied to the underlying claims and submitted foreign law authorities supporting their position; and (3) the decision on which Plaintiffs now rely most heavily, LaSala v. Bordier et Cie, 519 F.3d 121 (3d Cir. 2008), was issued over two and a half years before they filed their opposition to Defendants' original motions.[21]  Plaintiffs therefore waived the argument at that time and for purposes of their appeal.  See, e.g., Halpert Enterprises, Inc. v. Harrison, No. 07-1144, 2008 WL 4585466, at *3 (2d Cir. Oct. 15, 2008) (summary order) (refusing to address argument not raised before district court).  Under these circumstances, "[i]t is not reasonable to construe the [Second Circuit's] mandate as allowing alternative, dispositive bases for denying [Defendants' motion] to be raised for the first time on remand."  Parmalat Cap. Fin. Ltd. v. Bank of Am. Corp., 671 F.3d 261, 270–71 (2d Cir. 2012) (vacating district court decision for failure to apply "a mandate that focused specifically and exclusively" on a single question).[22]

Plaintiffs are wrong on the underlying legal issue in any event.  As the Supreme Court recently re-explained, statutory text must be read in its context and within the framework of the "overall statutory scheme."  King v. Burwell, 135 S. Ct. 2480, 2489 (2015).  SLUSA mandates

---

[21] (See Plaintiffs' Consolidated Mem. of Law, at 38–48, Dkt. No. 137 (Nov. 4, 2010).)

[22] Plaintiffs argued in their briefs to the Second Circuit that SLUSA did not apply to their claims if foreign law applied.  (Br. and Special Appx. For Plaintiffs-Appellants at 55–56, Dkt. No. 72 (2d Cir. 11-1397 May 21, 2012); Reply Br. of Plaintiffs-Appellants at 22, Dkt. No. 176 (2d Cir. 11-1397 Sept. 27, 2012) (citing LaSala).)  Defendants opposed this argument.  (Opp. Br. of Tremont Defendants at 37–38, Dkt. No. 126 (2d Cir. 11-1397 Aug. 20, 2012).)  Although the Second Circuit cited the very case on which Plaintiffs now hang their hat, the Court repeatedly described the Amended Complaint as asserting "only claims under state law," described the claims as "state law theories of liability," and remanded for application of SLUSA.  Kingate, 784 F.3d at 143 n.18 (citing LaSala v. Bordier, 519 F.3d 121), 144 (same), 132–33.

that class actions in the United States "alleging fraud in the sale of certain covered securities" "be governed *exclusively* by federal law." <u>Lander v. Hartford Life & Annuity Ins. Co.</u>, 251 F.3d 101, 108 (2d Cir. 2001) (emphasis added). SLUSA is accompanied by a "presumption that Congress envisioned a broad construction," based both on "ordinary principles of statutory construction" and "the particular concerns that culminated in SLUSA's enactment." <u>Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit</u>, 547 U.S. 71, 86 (2006); <u>see also</u> H.R. Conf. Rep. No. 105-803, at *13; S. Rep. 105-182, at *3 (recognizing purpose of SLUSA was to rectify "the dangers of maintaining differing federal and state standards of liability"). Under these principles, SLUSA's provisions apply to claims based upon the laws of foreign nations. <u>See, e.g.</u>, <u>LaSala v. UBS, AG</u>, 510 F. Supp. 2d 213, 237–38 (S.D.N.Y. 2007) (SLUSA's "state law" element satisfied where claims were based on Swiss law, whether explicitly invoked or not); <u>LaSala v. TSB Bank, PLC</u>, 514 F. Supp. 2d 447, 472 (S.D.N.Y. 2007) (same); <u>Feiner Family Trust v. Xcelera Inc.</u>, No. 10-cv-3431 (RPP), 2010 WL 3184482, at *4 (S.D.N.Y. Aug. 9, 2010) (claims to which Cayman Islands law applied satisfied SLUSA's "state law" element).

Finally, if Plaintiffs believe that their claims are predicated on foreign law, it only reinforces Defendants' argument that the SAC should be dismissed based on comity. <u>See</u> <u>infra</u> Section XIV. While Plaintiffs argue later in their Opposition that New York has an interest in applying *its* law to the claims at issue, New York certainly has no interest in allowing foreign Plaintiffs to pursue claims arising under foreign law asserted against foreign defendants based on conduct that occurred outside of the U.S., particularly where (as here) foreign bankruptcy proceedings, in which the claims should be adjudicated, are pending. <u>See, e.g.</u>, <u>Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.</u>, 825 F.2d 709, 714 (2d Cir. 1987) ("federal courts will recognize foreign bankruptcy proceedings provided the foreign laws comport with due process and fairly

treat claims of local creditors"); <u>Ecoban Fin. Ltd. v. Grupo Acerero Del Norte, S.A. de C.V.</u>, 108 F. Supp. 2d 349, 355 (S.D.N.Y. 2000) (dismissing on the basis of comity where Mexican law applied). For all of these reasons, all of Plaintiffs' claims (other than Count 12) must be dismissed as against all Defendants on the ground they are precluded under SLUSA.

## II.     PLAINTIFFS LACK STANDING TO PURSUE ANY OF THEIR CLAIMS

### A.     BVI Law Governs the Question of Plaintiffs' Standing

The law of the BVI, where the Funds were incorporated and entered into contracts, (SAC ¶¶ 39–40), governs whether Plaintiffs have standing to assert their claims. <u>See, e.g.</u>, <u>San Diego Cty. Emps. Ret. Ass'n v. Maounis</u>, 749 F. Supp. 2d 104, 126 (S.D.N.Y. 2010) (Batts, J.) ("When deciding issues of 'shareholder standing,' that is, whether claims should be brought directly or derivatively, courts must look to the law of the fund's state of incorporation.") (citation omitted). Contrary to Plaintiffs' assertions, the internal affairs doctrine is routinely applied in cases brought by shareholders against "third-party service providers" to the corporations in which they have invested. <u>See Stephenson v. Citco Grp. Ltd.</u>, 700 F. Supp. 2d 599, 608 (S.D.N.Y. 2010) (applying doctrine to claims against Madoff feeder fund's service providers), <u>aff'd sub nom.</u>, <u>Stephenson v. PricewaterhouseCoopers, LLP</u>, 482 F. App'x 618 (2d Cir. 2012); <u>Maounis</u>, 749 F. Supp. 2d at 126–27; <u>Shenwick v. HM Ruby Fund, L.P.</u>, 966 N.Y.S.2d 69, 70 (1st Dep't 2013) (applying law of place of fund's incorporation to determine standing in action against "managers, directors and investment advisors of the fund").[23]

Even if the internal affairs doctrine did not apply, the Court would not apply New York

---

[23] None of the cases Plaintiffs cite, (Opp. Br. at 55), hold differently. <u>See</u> <u>Roselink Invs. L.L.C. v. Shenkman</u>, 386 F. Supp. 2d 209 (S.D.N.Y. 2004) (plaintiffs were not shareholders); <u>VantagePoint Venture Partners 1996 v. Examen, Inc.</u>, 871 A.2d 1108 (Del. 2005) (reaffirming the mandatory application of the internal affairs doctrine and not addressing shareholder claims against third parties); <u>Ackert v. Ausman</u>, 29 Misc. 2d 974 (Sup. Ct. N.Y. County 1961) (plaintiffs were bringing a derivative suit on behalf of corporation).

law to the question of standing. Here, unlike in the cases on which Plaintiffs rely, (Opp. Br. at 56–57), New York has no interest in foreign investors' standing to bring suit for claims arising out of their investments in foreign Funds that were managed overseas. Cf. Anwar v. Fairfield Greenwich Ltd., 728 F. Supp. 2d 372, 400 (S.D.N.Y. 2010) ("Anwar II") (applying New York law because funds "operated largely out of New York City"); Pension Comm., 446 F. Supp. 2d at 193–94 (applying New York law because the "day-to-day operations of the Funds [were conducted] from their offices in New York"). The Funds were not managed or operated from New York. Both the Manager and Co-Manager, and all of the Defendant service providers, are foreign entities who conducted their business abroad. (SAC ¶¶ 24–28, 37–38.) Alleging that individual Defendants acting on behalf of their foreign companies participated in two to three meetings per year in New York, or that there were supposed calls to them from New York, does not change the analysis. (SAC ¶¶ 12, 58, 62–63.)

Plaintiffs assert that "investors in the Funds are scattered around the globe – but not in the BVI." (Opp. Br. at 57.) Plaintiffs ignore that no Plaintiff is located in New York because the Funds were *specifically prohibited* from accepting investments from U.S. investors.[24] (See SAC ¶¶ 14–23.) The far-flung locales of investors in the Funds highlight the particular appropriateness of applying the internal affairs doctrine: applying the law of New York (or the law of some other jurisdiction where an investor happens to be located) to Plaintiffs' standing would jeopardize the "need for uniformity in the application of the pertinent law to this controversy," especially while the Funds are bringing their own claims in Bermuda. Hart v. Gen. Motors Corp., 517 N.Y.S.2d 490, 494 (1st Dep't 1987); Restatement (Second) of Conflict of

---

[24] (See 2007 KG IM at 1, 20–21; 2007 KE IM at 1, 20–21 ("THE SHARES ISSUED BY KINGATE [GLOBAL AND EURO] FUND, LTD. ARE NOT FOR SALE TO U.S. PERSONS . . .").)

Laws § 302, cmt. B (Am. Law Inst. 1971) (internal affairs doctrine applies because of "the needs of the interstate and international systems [for] certainty, predictability and uniformity of result").

Plaintiffs are also wrong, (Opp. Br. at 58), that Defendants must first identify a conflict between BVI and New York law before the Court applies the internal affairs doctrine. See, e.g., Seghers v. Thompson, No. 06CIV308RMBKNF, 2006 WL 2807203, at *4 (S.D.N.Y. Sept. 27, 2006) (applying the law of the place of incorporation—there, the BVI—to shareholder standing without first finding a conflict); Maounis, 749 F. Supp. 2d at 126 (same) (Batts, J.); Winn v. Schafer, 499 F. Supp. 2d 390, 393 (S.D.N.Y. 2007) (same); Finkelstein v. Warner Music Grp. Inc., 820 N.Y.S.2d 264, 265 (1st Dep't 2006) (same). BVI law governs whether Plaintiffs have standing to assert their claims and, as discussed below, they do not.

### B.    Plaintiffs Lack Standing to Bring Their Claims

In the SAC, Plaintiffs' claims against the "Kingate Defendants" are based on alleged mismanagement of their duties.[25]  When it suits Plaintiffs' purposes, they admit as much.  (See, e.g., Opp. Br. at 17–18 (arguing that Plaintiffs will prove their breach of duty and negligence claims without any "essential" misrepresentations), 24 (describing Group 4 claims not precluded by SLUSA as breaching duties to provide competent services), 28–29 (arguing that negligence claims against the "Kingate Defendants" are premised on the failure to perform proper diligence on Madoff), 32–33 (arguing that their third-party beneficiary claims are premised on the failure

---

[25] (See SAC ¶¶ 65 ("Kingate Defendants" "should have made follow up inquiries"), 66 ("Kingate Defendants" "could have verified" Madoff's trading), 70–73, 75 ("Kingate Defendants" should have verified Madoff's trades and checked his counterparties), 76 ("Kingate Defendants" should have conducted due diligence), 78 ("Kingate Defendants" and Citi Hedge failed to monitor and evaluate Madoff and the information he provided), 215 (Defendants should have conducted due diligence), 218(c) (listing alleged common questions framed as mismanagement questions); see also SAC ¶¶ 221, 226, 238, 243–44, 324.)

to perform contractual obligations to conduct diligence and not on false statements), 37 (arguing that unjust enrichment, mutual mistake and constructive trust claims are premised on the failure to perform duties on which the fees were paid).) Under BVI (as well as New York) law, those are quintessential examples of reflective or corporate claims belonging to the Funds. (Mov. Br. at 53–57.) Plaintiffs and their expert previously acknowledged that only their fraud and misrepresentation claims against the Defendants would survive under BVI law, conceding that their remaining claims were barred by the rule against reflective loss. (Bompas ¶ 53.4.)

Now Plaintiffs seek to change their theory, arguing that all claims against all Defendants are predicated on alleged "inducement."[26] (Opp. Br. at 59–61, 66–67.) This fails for several reasons. "[I]t is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss." O'Brien v. Nat'l Prop. Analysts Partners, 719 F. Supp. 222, 229 (S.D.N.Y. 1989); see also Pandozy v. Segan, 518 F. Supp. 2d 550, 554 n.1 (S.D.N.Y. 2007) (refusing to consider new arguments raised in opposition papers, but not alleged in the complaint) (collecting cases), aff'd, 340 F. App'x 723 (2d Cir. 2009).[27] Regardless, under both BVI and New York law, whether styled as inducement or mismanagement, and whether based on misrepresentations or not, the claims belong to the Funds and cannot be asserted by shareholders like Plaintiffs.

---

[26] With respect to the "Kingate Defendants," Plaintiffs' sole allegation in the SAC to this effect related to all "Defendants" simply "labeled" the acts as inducement, (SAC ¶ 1), and this "formulaic recitation" is insufficient under the Federal Rules. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2006).

[27] Nor can Plaintiffs amend the SAC by pointing in their Opposition to Distribution Agreements that are not mentioned or relied on in the SAC. (E.g., Opp. Br. at 7–8.) Even were the Court to consider these contracts (which are between KML and FIM Limited), they do not vest Plaintiffs with standing to assert claims against FIM Limited. If FIM Limited failed to perform its obligations under those agreements, resulting in any decline in the value of the Funds' shares, any losses would be reflective of losses incurred by the Funds (or KML). Moreover, the SAC does not plead that any Plaintiff purchased any shares in the Funds through FIM Limited pursuant to the Distribution Agreements or that FIM Limited (or any other FIM Defendant) communicated with any of them, so the SAC does not plead any facts that can plausibly be construed as inducement by any FIM Defendant to cause Plaintiffs to purchase or hold investments in the Funds. In any event, any inducement claim under the Distribution Agreements would be precluded under SLUSA.

### 1. Plaintiffs' Claims are Barred by the Rule Against Reflective Loss

As Defendants demonstrated in the Moving Brief, the claims in the SAC, purportedly brought on behalf of all shareholders in the Funds after Madoff's fraud was discovered, (SAC ¶ 7), are by definition claims to redress harm allegedly suffered by all shareholders from "diminution in the value of a shareholding," and fit squarely within the reflective loss rule. Johnson v. Gore Wood & Co., [2002] 2 AC 1, 36B-D. (Mov. Br. at 52–57; see also SAC ¶ 54 (Plaintiffs "have lost their investments in the Funds").)

Plaintiffs' expert Anthony George Bompas acknowledged this in his first declaration. There, Bompas drew a distinction between, on the one hand, claims he asserted were premised on fraud and misrepresentation (Counts 1–4, 8, 14, 17, 19, 20, 24, 27) (the "misrepresentation claims"),[28] stating that these *were not* claims for losses that are reflective of the Funds' losses (Bompas ¶ 53.1-53.3), and on the other hand, the remaining claims (Counts 5–7, 9–13, 15–16, 18, 21–23, 25–26), which (at that time) he did not portray as claims premised on fraud or misrepresentation. (Bompas ¶ 53.4.) As to the "non-misrepresentation" claims, Bompas did not argue that Plaintiffs had any right to assert them. Instead, he opined that it was not yet clear whether the claims were "necessarily" barred by the reflective loss doctrine and that a court sitting in Bermuda may not necessarily strike out their claims. (Bompas ¶ 53.4 (emphasis added).) However, BVI pleading rules do not matter here.[29] Under applicable federal pleading standards, it is the "*plaintiff's* obligation to provide the grounds of his entitle[ment] to relief."

---

[28] Plaintiffs now concede that Counts 1–4, 8, 14, 20 and 27 are precluded by SLUSA, leaving only Counts 17, 19 and 24 in Bompas' "misrepresentation" category. (SAC, *in passim*.)

[29] Plaintiffs continue to argue in their Opposition that Bermuda or BVI pleading standards should apply. (Opp. Br. at 65–66.) Regardless, Bompas is wrong that any of Plaintiffs' claims (as pleaded in the SAC) would survive a strike out motion under BVI pleading standards based on the reflective loss doctrine. (See, e.g., Hargun Reply ¶¶ 31-32; Evans Reply ¶¶ 15-16; Chivers Reply ¶ 5; Browne-Wilkinson Reply ¶ 49.)

Twombly, 550 U.S. at 555 (alteration in original) (emphasis added) (citation omitted).  Plaintiffs

failed to do so with respect to any of these "non-misrepresentation" claims, or with respect to

Counts 17, 19 and 24, because all of these claims clearly seek to recover losses that are reflective

of the Funds' losses, and the Funds are therefore the only ones who have standing to assert those

claims.  (Mov. Br. at 54–57; Browne-Wilkinson Reply ¶¶ 4(5), 18.)  See also Varga v. McGraw

Hill Fin. Inc., No. 652410/2013, 2015 WL 4627748, at *15 (Sup. Ct. N.Y. County July 31, 2015)

(Cayman law reflective loss doctrine bars claim for fraudulent misrepresentation).

       In their Opposition, Plaintiffs and their expert now argue that all of Plaintiffs' remaining

claims are not barred by the reflective loss principle because they are supposedly premised on

wrongful "inducement" allegedly leading them to buy or hold shares in the Funds, as opposed to

Defendants' purported failures to perform services that they contracted to perform, including due

diligence on Madoff (i.e., mismanagement).  (Bompas Further ¶ 18; Opp. Br. at 66–69.)  This is

a distinction without meaning, as under any formulation Plaintiffs' losses (their lost investments)

are reflective of the total loss of the Funds' assets resulting from Madoff's fraud, and Plaintiffs'

arguments to the contrary otherwise fail:

       First, Plaintiffs' arguments hinge on the incorrect and irrelevant premise that their claims

are based on a "separate relationship" with the Defendants distinct from that of the Funds or

KML.  (Opp. Br. at 67–68.)  Plaintiffs have not alleged in the SAC that they have any

independent relationship with any of the Defendants.  Their claims all rest on the contractual

agreements (to the extent they even exist) *between* Defendants, on the one hand, and other

parties or the Funds themselves, on the other, or the corporate relationships between the entity

Defendants and their own officers and directors.  (Mov. Br. at 53–55.)  Even if Plaintiffs did

have some separate relationship with the Defendants, though, any losses they suffered are still

reflected by those suffered by the Funds.  The reflective loss principle does not turn on whether the "losses of the company and the plaintiff shareholder were caused by 'the same act or omission.'"  (Browne-Wilkinson Reply ¶¶ 18, 20 ("the rule is concerned with the nature of the shareholder's loss, as opposed to its cause of action"); see also Hargun Reply ¶ 7; Evans Reply ¶ 8; Chivers Reply ¶ 17 (where a defendant owes a duty to the company and a separate duty to the shareholder, only the company can sue where the shareholder's loss is reflective of the company's loss); Dohmann Reply ¶ 11.)[30]

The same is true of the argument that the Funds cannot sue their "distributors" or service providers for inducement.[31]  The nature of the losses sought is what matters.  (Bompas Further ¶ 27; see also Browne-Wilkinson Reply ¶¶ 18, 20; Chivers Reply ¶¶ 15-16 (reflective loss bars shareholders from bringing suit even where the shareholders' cause of action is different from the companies' cause of action and even if interpreted under an "inducement" theory); Hargun Reply ¶ 7; Evans Reply ¶ 8.)  Because the Plaintiffs are suing for the same losses incurred by the Funds, their claims are barred regardless of whether they are styled as "inducement" or mismanagement claims.  (Hargun Reply ¶¶ 5-6; Evans Reply ¶¶ 6-7; Chivers Reply ¶¶ 15-18.)

Plaintiffs also dispute that their losses are "comprised of a diminution in the value of their

---

[30] Plaintiffs' citation to Judge Marrero's decision in Anwar II, in support of their argument that had Defendants warned them of Madoff's Ponzi scheme they could have redeemed their investment before the scheme's revelation, is not relevant.  (Opp. Br. at 68 n.17.)  The decision concerned a discrete issue of New York fraud law; Plaintiffs are no longer alleging any fraud claims.  See Anwar II, 728 F. Supp. 2d at 445.  Further, Plaintiffs' argument is inconsistent with the many decisions that have dismissed shareholder claims against service providers to Madoff feeder funds on standing grounds.  See infra Section II(B)(2); see, e.g., Baker v. Andover Assocs. Mgmt. Corp., No. 6179/09, 2009 WL 7400085 (Sup. Ct. Westchester County Nov. 30, 2009).  All of the plaintiffs who brought those actions could have redeemed their investments before December 12, 2008, if not for the defendants' alleged breaches.  Nonetheless, those courts recognized that any injury those plaintiffs suffered was reflective and derivative of the loss suffered by the feeder funds.

[31] BVI and Bermuda do not recognize a claim for "inducement."  (Hargun Reply ¶ 5; Evans Reply ¶¶ 3, 6; Chivers Reply ¶ 16(i).)

Funds shares after purchase, due to mismanagement or otherwise," claiming instead that the losses occurred "immediately" at the point of subscription. (Opp. Br. at 68.) But this is contrary to the SAC, where they alleged they "have lost their investments in the Funds," (SAC ¶ 14), and were supposedly damaged by Defendants' ongoing failures to perform their supposed duties up to when Madoff's fraud became public. (SAC ¶¶ 4–5.) Moreover, the timing of Plaintiffs' losses is irrelevant: any losses Plaintiffs incurred are indistinguishable from the Funds' alleged claims for total loss of their assets. (Browne-Wilkinson Reply ¶ 4(6); Hargun Reply ¶ 7; Evans Reply ¶¶ 3, 8; Chivers Reply ¶¶ 17-18.)

Second, under BVI law a shareholder cannot bring a direct claim even where losses are "asymmetrical" or the company cannot fully remedy the loss allegedly inflicted on the shareholder. (Contra Opp. Br. at 69; see Hargun Reply ¶¶ 18-21, 30; Evans Reply ¶¶ 3, 12-13; Browne-Wilkinson Reply ¶¶ 38-39; Chivers Reply ¶¶ 13-14, 19-20 ("[T]he inability of the company to remedy the loss is not a ground for allowing the shareholder to bring a direct claim.")); see also Day v. Cook, [2002] 1 BCLC 1 (funds' claims to recover investors' losses trump those that can be brought by shareholders). Plaintiffs' argument that BVI law would provide a different recovery to shareholders in the Funds than in the Second Circuit, (Opp. Br. at 70), is precisely the reason for the reflective loss rule:

> If the purpose of the rule is to protect the creditors of the company, it necessarily involves the proposition that in some circumstances the company's claim may not wholly 'make good' the shareholder-plaintiff's loss, since the creditors will be paid off prior to any distribution of the company's assets to the shareholders. Yet, notwithstanding this, Lord Millett [in Johnson v. Gore Wood] plainly considered that the rule would apply.

(Browne-Wilkinson Reply ¶ 40; see also Hargun Reply ¶¶ 18-21, 30; Evans Reply ¶¶ 3, 12-13; Chivers Reply ¶¶ 19-20 ("It is important to understand that the principle applies regardless of whether the company will actually make a recovery and regardless of whether any of that

recovery will be received by shareholders").)  If correct, Plaintiffs' argument would mean that the rule against reflective loss would never apply in the context of bankrupt companies, a proposition with no legal support.  See In re Granite Partners, L.P., 194 B.R. 318, 327–28 (Bankr. S.D.N.Y. 1996) (shareholders lacked standing to pursue claims that belonged to a bankrupt Cayman fund).[32]

Third, Plaintiffs' attempt to ground their claims within the "exception" of Giles v. Rhind fails.  (Opp. Br. at 65, 70–73.)  That the Funds are already vigorously pursuing claims against several of the "Kingate Defendants" and PwC Bermuda belies Plaintiffs' argument that the Funds are "effectively disabled" from bringing their claims.  See Webster Sanderson Solicitors (a firm) [2009] PNLR 37; (Hargun Reply ¶ 25; Evans Reply ¶ 14; Chivers Reply ¶¶ 6-11 (for exception to apply, the company must be unable to pursue its claim due to defendant's wrongdoing, and not "because the company's claim might not succeed"); Browne-Wilkinson Reply ¶ 26(1)(a); Dohmann Reply ¶¶ 12-19.)  Unable to show that currently ongoing litigation is somehow "impractical or impossible," (Opp. Br. at 70), Plaintiffs try to argue only that "Defendant wrongdoers have effectively incapacitated the Funds from prevailing in the Bermuda actions."  (Opp. Br. at 71.)[33]  But the Giles v. Rhind "very limited" exception does not apply just because a defendant raises defenses to the claims being asserted by the company.  (Hargun Reply

---

[32] Neither Plaintiffs nor Bompas cites any authority for the proposition that the manner of distribution to shareholders renders the reflective loss principle inapplicable.  (Opp. Br. at 70.)  If Plaintiffs are correct that any recovery in this action would be on a net equity basis while distributions in the Bermuda Proceedings would be on a pro rata basis, that further supports application of the reflective loss rule, "to prevent double recoveries *and preferential payouts to shareholders* at the expense of other shareholders and creditors" according to the shareholder rights under BVI law.  (Opp. Br. at 73 (emphasis added).)

[33] Plaintiffs try to characterize all of the "Kingate Defendants" as "wrongdoers" for "intentionally fortifying" the Service Agreements with the disclaimers to fend off liability because they were supposedly aware that proper diligence was not being performed on Madoff.  (Opp. Br. at 72.)  The SAC contains no allegations to support these assertions, and it is absurd to characterize as "wrongdoing" a standard provision found in countless commercial agreements.

¶¶ 22-30; Evans Reply ¶ 14; Chivers ¶ 48; Chivers Reply ¶ 7; Browne-Wilkinson Reply ¶ 26(1)(b).)  Arguments to expand the exception have been flatly rejected under Bermuda and BVI law.  (Hargun Reply ¶ 24; Evans Reply ¶ 14; Chivers Reply ¶¶ 7-9.)  Thus, the contractual disclaimers in the Management Agreements, Co-Management Agreement or the CSAs do not bring Plaintiffs within the <u>Giles v. Rhind</u> exception.  Contrary to Plaintiffs' assertions, ███████

████████████████████████████████████████████████████████████████

███████ [34] but it would not provide any basis for the exception to apply in any event.  (Chivers Reply ¶¶ 10-12, 21-23.)[35]

Fourth, the suggestion that there may be other solutions available to prevent double recovery by the shareholders and the Funds is irrelevant.  (Opp. Br. at 73.)  Under BVI and Bermuda law, the reflective loss doctrine is substantive—not procedural—and its application is not discretionary.[36]  <u>See also</u> Johnson, [2002] AC1, 62E-63A ("The rule against reflective loss is a matter of principle; there is no discretion involved.").  When the rule applies—as it does here—

---

[34] Plaintiffs cite to a defense document filed by four of the FIM Defendants in the Bermuda Proceeding as support for their assertion, (Opp. Br. at 71, 73), █████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
███████.  (Barrett Ex. 5 ¶ 208; <u>see also</u> Chivers Reply ¶¶ 22, 23.)

[35] Plaintiffs argue that ██████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
███████████████  The Service Agreements make clear that any service provider that contracted with the Funds or with KML was an "independent contractor" and *not* an agent of the Funds or of KML.  (<u>See, e.g.</u>, 2006 KG MA ¶ 5.6; KG Co-MA § 5.6; CSAs at § 18.)

[36] Bompas concedes this by acknowledging that the rule is a "part of the law of companies." (Bompas ¶ 14; Bompas Further ¶ 26; <u>see also</u> Dohmann ¶ 49 (quoting *Johnson* and noting that "This is a matter of principle; there is no discretion involved."); Hargun Reply ¶¶ 9-12 (characterizing the rule as substantive); Evans Reply ¶ 10 (same); Chivers Reply ¶¶ 3-5 (same and addressing Bompas' mischaracterization of the rule); Browne-Wilkinson Reply ¶ 23 (same).)

it precludes the shareholder's cause of action entirely, not just the shareholder's ability to recover on a judgment, requiring that the claims be dismissed.  (Hargun Reply ¶ 32; Evans Reply ¶ 16; Chivers Reply ¶¶ 3-5; Browne-Wilkinson Reply ¶ 23; Dohmann Reply ¶¶ 20-26; see also Chivers Reply ¶ 24 (clarifying that the reflective loss doctrine is mandatory, rendering other "safeguards against double recovery" inappropriate).)

Plaintiffs have no right to pursue their remaining claims against these Defendants under BVI law because the claims belong to the Funds.  The claims must all be dismissed on this basis.

## 2.  Plaintiffs Also Lack Standing Under New York Law

Even if the Court were to determine that New York law applies, Plaintiffs still cannot assert their claims.  Under New York law, which applies the Delaware Supreme Court's "Tooley test"[37] for distinguishing between direct and derivative claims,[38] Plaintiffs' claims asserting causes of action "on behalf of all persons or entities who owned shares of the Funds," (SAC ¶ 7), are quintessential corporate claims and cannot be asserted directly by shareholders.  See Abrams v. Donati, 489 N.E.2d 751, 751 (N.Y. 1985) (a shareholder has no cause of action "[f]or a wrong against a corporation . . . [even] though he loses the value of his investment.").  There are, therefore, many cases in which courts have (applying New York law and the Tooley test) dismissed claims brought by investors in Madoff feeder funds against service providers to the funds on the ground that all those claims are derivative and therefore belong to the funds.  See,

---

[37] Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031 (Del. 2004).

[38] Plaintiffs argue that New York has not adopted the Tooley test based on their misreading of Yudell v. Gilbert, 949 N.Y.S.2d 380 (1st Dep't 2012) that Tooley was applied only "in this case." (Opp. Br. at 63 n.16 (citing Yudell, 949 N.Y.S.2d at 381).)  However, subsequent cases explicitly recognize that New York has adopted the Tooley test.  See, e.g., Serino v. Lipper, 994 N.Y.S.2d 64, 69 (1st Dep't 2014) ("[I]n the recent case of Yudell v. Gilbert, this court *adopted* the test developed by the Supreme Court of Delaware in Tooley v. Donaldson Lufkin & Jenrette, Inc. as a common sense approach to resolving such issues") (emphasis added) (citations omitted).

e.g., Baker, 2009 WL 7400085, at **17–18 (dismissing as derivative under New York law breach of fiduciary duty and negligence claims brought by investors in Madoff feeder fund against fund's managers and auditor); In re Optimal U.S. Litig., 813 F. Supp. 2d 351, 377–78 (S.D.N.Y. 2011) (dismissing as derivative under New York law claims of breach of fiduciary duty, aiding and abetting breach of fiduciary duty, gross negligence, breach of contract, and unjust enrichment against investment advisors who invested funds in Madoff), amended on other grounds by 813 F. Supp. 2d 383 (S.D.N.Y. 2011).[39]

All of Plaintiffs' arguments that they state direct claims under New York law fail. As described supra, Plaintiffs cannot recast, (Opp. Br. at 59), their claims as "inducement claims" because the SAC does not plead inducement, and any such claim would be precluded under SLUSA in any event. See supra Section I(A)(2).[40] Moreover, even if Plaintiffs had alleged "inducement claims" rather than "mismanagement claims," their claims belong to the Funds and

---

[39] See also Zutty v. Rye Select Broad Market Prime Fund, L.P., No. 113209/09, 2011 WL 5962804, at **5–8 (Sup. Ct. N.Y. County Apr. 15, 2011) (dismissing as derivative under Tooley breach of fiduciary duty and unjust enrichment claims brought by investors in Madoff feeder fund against manager, directors, and administrator); Stephenson, 700 F. Supp. 2d at 610–12 (dismissing as derivative under Tooley common law fiduciary duty, third-party beneficiary breach of contract and negligence claims against an administrator of a Madoff feeder fund), aff'd sub nom., Stephenson v. PricewaterhouseCoopers, LLP, 482 F. App'x 618 (2d Cir. 2012); Saltz, 782 F. Supp. 2d at 79 (dismissing as derivative under Tooley fiduciary duty claims brought by investors in Madoff "sub-feeder" fund against auditors and other advisors), aff'd, 485 F. App'x 461 (2d Cir. 2012); accord W. Palm Beach Police Pension Fund v. Collins Capital Low Volatility Performance Fund II, Ltd., No. 09-80846-CIV, 2010 WL 2949856, at **2–3 (S.D. Fla. July 26, 2010) (dismissing as derivative under Tooley, BVI and Florida law breach of fiduciary duty and negligence claims brought against, among others, investment advisor for failing to conduct necessary due diligence to discover Madoff's Ponzi scheme).

[40] Many of the cases Plaintiffs cite, (Opp. Br. at 60), demonstrate that their claims (however styled) are based on precisely the allegations precluded by SLUSA (for example, claims alleging fraud). See, e.g., In re Bernard L. Madoff Inv. Sec. LLC, 740 F.3d 81, 93–94 (2d Cir. 2014) (affirming that individual creditors lack standing to bring fraudulent conveyance claims unless the creditors can show that the third-party defendant made misrepresentations designed to induce investments in Madoff); In re Seven Seas Petroleum, Inc., 522 F.3d 575 (5th Cir. 2008) (holding that claims for conspiracy to defraud and aiding and abetting fraud can be direct); Bankers Trust Co. v. Rhoades, 859 F.2d 1096, 1098 (2d Cir. 1989) (recognizing standing for RICO conspiracy claims); Ceribelli v. Elghanayan, 990 F.2d 62, 62 (2d Cir. 1993) (same).)

are still derivative, "because the misrepresentations that allegedly caused [their] losses injured not just Plaintiff[s], but the Fund[s] as a whole." Maounis, 749 F. Supp. 2d at 127 (Batts, J.)[41]

The cases on which Plaintiffs rely are inapposite. In Anwar II, the basis for Plaintiffs' standing was the "fraud" committed by the defendants. 728 F. Supp. 2d at 401 ("The *fraud*[42] and breaches of duty were essential to the Funds' corporate forms thriving . . . .") (emphasis added). Pension Committee (on which Anwar II relies) similarly denied a motion to dismiss on the basis of standing in part because the claims pertained to "*fraudulent* misrepresentations, and not merely mismanagement of the Funds." 446 F. Supp. 2d at 205 (emphasis added) (citation omitted).[43] Judge Scheindlin (who wrote Pension Committee) later distinguished that decision on precisely those grounds: "And in sustaining a breach of fiduciary duty claim against a fund administrator brought by investors, Pension Committee did not address the question of shareholder standing," instead addressing standing only as to "plaintiffs' common law *fraud*

---

[41] This outcome is not altered by the Delaware Supreme Court's recent decision in Citigroup, Inc. v. AHW Investment Partnership, 2016 WL 2994902, at *1 (Del. May 24, 2016) ("Before evaluating a claim under Tooley, 'a more important initial question has to be answered: does the plaintiff seek to bring a claim belonging to her personally or one belonging to the corporation itself?'" (citing NAF Holdings, LLC v. Li & Fung (Trading) Ltd., 118 A.3d 175, 180 (Del. 2015))). In that case, plaintiffs were suing the issuer of the securities (Citigroup), not third parties who provided services to the issuer. Here by contrast Plaintiffs are not suing the Funds themselves, and as in Maounis, Plaintiffs are suing for "fiduciary duty claims or claims otherwise belonging to the corporation," so Delaware would apply Tooley to evaluate whether their claims must be asserted derivatively. AHW, 2016 WL 2994902, at *9. Additionally, Plaintiffs' claims here are not "ones that only the holders [of the shares] can assert"—indeed, the Funds are already asserting them in Bermuda. Id. Regardless, New York courts continue to apply Tooley as the first step in the direct/derivative analysis. SFR Holdings Ltd. v. Rice, 17 N.Y.S.3d 398 (1st Dep't 2015) (decided after NAF Holdings).

[42] Once again demonstrating their ongoing efforts to circumvent SLUSA, Plaintiffs cite this statement from Anwar II but remove the word "fraud." (Opp. Br. at 62.)

[43] Plaintiffs mischaracterize the facts of many of the other cases they cite, which either apply a different pleading standard or turned on allegations of fraud. See, e.g., Excimer Assocs., Inc. v. LCA Vision, Inc., 292 F.3d 134, 140 (2d Cir. 2002) (applying Conley v. Gibson, 355 U.S. 41 (1957) pleading standard to allow plaintiffs to amend their complaint regarding standing); Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 42 (2d Cir. 1978) (claim involved aiding and abetting of fraud); Rasmussen v. A.C.T. Envtl. Servs. Inc., 739 N.Y.S.2d 220, 222 (3d Dep't 2002) (recognizing a fiduciary duty could be owed by investment advisor in cases sounding in fraud, but ultimately determining no duty was breached).

claims". Optimal, 813 F. Supp. 2d at 379 & n.205.

Plaintiffs' argument regarding supposed asymmetry of their losses and those of the Funds, (Opp. Br. at 62), does not change their lack of standing. Cont'l Cas. Co. v. PricewaterhouseCoopers, LLP, 933 N.E.2d 738, 743 (N.Y. 2010) (rejecting similar arguments and affirming dismissal of fraud claims because plaintiffs' only injury was for diminution in the value of their interests, which "they experienced . . . in their capacities as limited partners in common with all other limited partners"). While "individual shareholders' out-of-pocket losses" will always vary "depending upon when they partially or fully redeemed their shares . . . mere variation in losses does not give rise to claims by individual shareholders alleging corporate malfeasance." Optimal, 813 F. Supp. 2d at 380 n.212. If it did, the distinction between derivative and direct claims would be meaningless.[44]

Plaintiffs' argument that their losses are different from the Funds' because the Funds supposedly had $3 billion in assets before Madoff's fraud was revealed, and therefore "benefitted," is frivolous and inconsistent with their own theory of the case. (Opp. Br. at 62.) That value—reflecting amounts held by investors in the Funds—turned out to be based on fictitious profits. The Funds lost all of their assets, are "net losers," and are now in liquidation.[45]

Finally, Plaintiffs' argument that they somehow have standing because of the *in pari*

---

[44] Plaintiffs' argument that the Funds' losses are different because the losses must be reduced by any "net winnings," (Opp. Br. at 63), is nonsensical. Any investor's losses, including both Plaintiffs' and the Funds', are measured on a net equity basis, excluding fictitious profits redeemed by "net winners." Therefore, applying the same method to the Funds would balance out the net equity of all of the Funds' investors, providing an identical remedy to address identical harm.

[45] Plaintiffs' reliance on Higgins v. N.Y. Stock Exch., Inc. is misplaced. (Opp. Br. at 62–63.) In Higgins, the Court held that investors had standing because "the corporation who cashed-out the plaintiff was not harmed, but was arguably benefitted, albeit improperly . . . ." 806 N.Y.S.2d 339, 349 (Sup. Ct. N.Y. County 2005). Here, the Funds did not benefit from the alleged breaches of contract and duties by any of the Defendants. They are in liquidation, and suing several of the Defendants to recover their losses.

*delicto* defense under <u>Shearson Lehman Hutton, Inc. v. Wagoner</u>, 944 F.2d 114 (2d Cir. 1991), is backwards. <u>Wagoner</u> limits standing; it does not confer it. <u>See id.</u> at 120. To the extent the *in pari delicto* defense would bar a bankruptcy trustee's claims, it would also bar the derivative claims of shareholders suing on behalf of a corporation. <u>See Primavera Familienstiftung v. Askin</u>, No. 95 Civ. 8905 (RWS), 1996 WL 494904, at **13–14 (S.D.N.Y. Aug. 30, 1996); <u>Kirschner v. KPMG LLP</u>, 938 N.E.2d 941, 959 (N.Y. 2010) (rejecting argument by shareholders that derivative claims should not be subject to the *in pari delicto* defense).[46]

## III.  THIS COURT LACKS PERSONAL JURISDICTION OVER CITI HEDGE (COUNTS 21–26, 28)

Having failed to plead even a *prima facie* showing of personal jurisdiction over Citi Hedge, Plaintiffs offer a hodge-podge of arguments as to why they should be excused from this basic requirement. (Opp. Br. at 146–54.) These arguments all fail.

Citi Hedge did not waive its personal jurisdiction defense. When Citi Hedge moved to dismiss in 2010, controlling precedent in this Circuit made it clear "that it was properly subject to general personal jurisdiction here," <u>Gucci Am., Inc. v. Weixing Li</u>, 768 F.3d 122, 135–36 (2d Cir. 2014), because foreign hedge fund administrators with nearly any connection with the United States were held to be subject to general personal jurisdiction. <u>See Cromer Fin. Ltd. v. Berger</u>, 137 F. Supp. 2d 452, 476 (S.D.N.Y. 2001).[47] (<u>See</u> Amended Complaint ¶ 10 (alleging general personal jurisdiction as to all Defendants due to their "systematic and continuous

---

[46] Plaintiffs' argument is not only wrong as a matter of New York law, it also is based on pure speculation that the Funds "may" be subject to the defense. (Opp. Br. at 64.) As explained in Section II(B), Plaintiffs are wrong that any of the defendants in the Bermuda Proceedings ███████████████████████ ████████████████████ (<u>See</u> Chivers Reply ¶¶ 22, 23.) Standing is a constitutional requirement to bring suit that cannot be premised on speculation. <u>See, e.g.</u>, <u>Clapper v. Amnesty Int'l USA</u>, 133 S. Ct. 1138, 1143 (2013).

[47] <u>Accord</u> <u>Wiwa v. Royal Dutch Petroleum Co.</u>, 226 F.3d 88, 93–95 (2d Cir. 2000) (defendants can be subject to general jurisdiction even without "extensive direct contacts with New York").

contacts with New York").)[48]  The change of law represented by the Supreme Court's decision in

Daimler AG v. Bauman, 134 S. Ct. 746 (2014) undermined prior Second Circuit precedent and

made available a new personal jurisdiction defense that Citi Hedge raised at its first opportunity

(the present motion).  Accordingly, no waiver occurred.

Plaintiffs are wrong that Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S.

915 (2011), and not Daimler constituted the change in relevant law.  (Opp. Br. at 147–48.)  See 7

West 57th Street Realty Co., LLC v. Citigroup, Inc., No. 13 Civ. 981 (PGG), 2015 WL 1514539,

at **6–7 (S.D.N.Y. Mar. 31, 2015) (holding that Second Circuit "unequivocally" held in Gucci

that Daimler, not Goodyear, marked the change in law).  Moreover, Goodyear was decided *after*

this Court already issued its Dismissal Decision, and Plaintiffs cite no authority for the

proposition that Citi Hedge waived its personal jurisdiction defense by not raising Goodyear on

appeal.[49]  Contra Gucci, 768 F.3d at 135–36 (personal jurisdiction argument not waived when

raised for the first time after Daimler, even though there was an opportunity to raise the

argument after Goodyear).[50]

---

[48] At the time, any "'argument that the court lacked jurisdiction over [Citi Hedge] would have been
directly contrary to controlling precedent in this Circuit.'" Gucci, 768 F.3d at 135–36 (citation omitted).

[49] See Goodyear, 564 U.S. 915 (decided June 27, 2011); Dismissal Decision (decided Mar. 31, 2011).
Plaintiffs offer no authority for their position that Rule 12(h)(1) required Citi Hedge to raise its personal
jurisdiction argument in its appellee brief in the Second Circuit.  Contra Fed. R. Civ. P. 12(h)(1)(B) ("A
party waives any defense listed in Rule 12(b)(2)-(5) by failing to either: (i) *make it by motion* under this
rule; or (ii) *include it in a responsive pleading* or in an amendment allowed by Rule 15(a)(1) as a matter
of course."  (emphases added).

[50] Both cases Plaintiffs cite, (Opp. Br. at 148 n.44), are inapposite because they involved defendants who
took actions and positions in litigation without raising a then-viable personal jurisdiction defense, unlike
Citi Hedge, which raised the defense at the first available opportunity.  See Laydon v. Mizuho Bank, Ltd.,
No. 12 Civ. 3419(GBD), 2015 WL 1499185 (S.D.N.Y. Mar. 31, 2015) (defendants participated in a Rule
16 conference and represented to the court that they did not plan to raise a personal jurisdiction
argument); Hamilton v. Atlas Turner, Inc., 197 F.3d 58, 61–62 (2d Cir. 1999) (defendants participated in
discovery, joined a motion to transfer, and opposed a motion to consolidate without raising personal
jurisdiction).

Nor is Citi Hedge "estopped" from raising its jurisdiction defense. (Opp. Br. at 150.) Judicial estoppel requires that the party to be estopped take "clearly inconsistent" positions. DeRosa v. Nat'l Envelope Corp., 595 F.3d 99, 103 (2d Cir. 2010). That Citi Hedge's pre-Daimler motion to dismiss did not include a personal jurisdiction argument is entirely consistent with its post-Daimler argument that the Court lacks personal jurisdiction. Seneca Nation of Indians v. State of N.Y., 26 F. Supp. 2d 555, 565–66 (W.D.N.Y. 1998) (judicial estoppel does not extend "to include seemingly inconsistent legal positions," particularly when there has been an intervening "change in the [relevant] legal standard"), aff'd, 178 F.3d 95 (2d Cir. 1999).

Judicial estoppel is also inappropriate because the Court never relied on any statements by Citi Hedge, or any Defendant, regarding personal jurisdiction. (See Dismissal Decision at 23–24, 29–30.) Given the other threshold issues raised by Plaintiffs' Amended Complaint, the Court did not reach personal jurisdiction even as to those Defendants who raised the issue under pre-Daimler law. Id.[51] See Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapital Van Saybolt Int'l B.V. v. Schreiber, 407 F.3d 34, 44–45 (2d Cir. 2005) (requirements for judicial estoppel not met when court was never "squarely presented with the question" and therefore "earlier position was never adopted by the district court").

Plaintiffs' argument that estoppel should apply because Citi Hedge would derive some unfair advantage were the Court to conclude that it lacks personal jurisdiction is meritless. Plaintiffs claim they "relied on Citi Hedge's position in preparing the SAC," (Opp. Br. at 151), but before drafting the SAC Plaintiffs (and the Court) were on clear notice that Defendants

---

[51] (See Dkt. No. 71 (Memorandum of Law in Support of John Epps, et al.'s Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6) at 8–16) (raising issue of personal jurisdiction, not addressed in the Dismissal Decision).)

intended to raise personal jurisdiction defenses.[52]

Substantively, Plaintiffs do not meaningfully argue that the SAC provides a *prima facie* case for general personal jurisdiction. (Mov. Br. at 58.) See Daimler, 134 S. Ct. at 761 n.19 (corporation subject to general jurisdiction only in "formal place of incorporation or principal place of business," and, in "exceptional circumstances," forum where operations are particularly "substantial and of such a nature as to render the corporation at home in that State.").

Plaintiffs suggest that exceptional circumstances exist here because Citi Hedge is a "mere department" or "alter ego" of Citibank, N.A. or Citigroup Inc. (Opp. Br. at 152–54.)[53] However, Plaintiffs fail to allege any of the other factors required to make this showing besides common ownership.[54] Jazini v. Nissan Motor Co., 148 F.3d 181, 184–85 (2d Cir. 1998) (mere department requires that: (1) subsidiary is financially dependent upon parent; (2) parent interferes with executive personnel or fails to observe corporate formalities; and (3) parent exercises control over marketing and operational policies) (citation omitted); In re Lyondell Chem. Co., 543 B.R. 127, 143–47 (Bankr. S.D.N.Y. 2016)[55] (rejecting argument for alter ego personal jurisdiction

---

[52] (See Dkt. No. 180 (Defendants' Joint Letter to the Court dated June 18, 2015 ("In addition, there have been developments in the law with respect to issues originally briefed and never reached *and with respect to new defenses in some instances, including significant U.S. Supreme Court decisions relating to personal jurisdiction* and significant decisions in the jurisdictions whose foreign laws govern the claims.") (emphasis added).)

[53] Whether the "mere department" doctrine survives Daimler remains an open question. See Refco Grp. Ltd. v. Cantor Fitzgerald, L.P., No. 13 Civ. 165 (RA), 2014 WL 2610608, at *8 n.10 (S.D.N.Y. June 10, 2014).

[54] Common ownership is not sufficient to show that a subsidiary is a mere department of its parent. See Hvide Marine Int'l, Inc. v. Emp'rs Ins. of Wausau, 724 F. Supp. 180, 186 (S.D.N.Y. 1989).

[55] The other case Plaintiffs cite, (Opp. Br. at 153), was decided decades before Goodyear and Daimler, and explicitly rests on the now-rejected "agency theory" of general jurisdiction. Freeman v. Gordon & Breach, Sci. Publishers, Inc., 398 F. Supp. 519, 522 n.1 (S.D.N.Y. 1975). Plaintiffs improperly read Freeman "so broadly," beyond "the limited situation where the parent and subsidiary were so intertwined that they were dependent on each other in order to function." Gundlach v. IBM, No. 11-cv-0846 (CS), 2012 WL 1520919, at *9 n.11 (S.D.N.Y. May 1, 2012), aff'd, 594 F. App'x 8 (2d Cir. 2014).

absent well-pleaded allegations of improper corporate domination).  The mere fact that Citigroup

Inc.'s website describes various Citi entities as "integrated" or "united," (Opp. Br. at 153), is not

sufficient to conclude that Citi Hedge is a mere department of its parent.  See, e.g., In re Methyl

Tertiary Butyl Ether (MTBE) Prods Liab. Litig., 959 F. Supp. 2d 476, 492 (S.D.N.Y. 2013)

(statement by parent in public filing that it was "integrated" "does not stand for the proposition

that [the parent] participates directly in the business of its subsidiaries") (citation omitted).

The SAC also lacks allegations sufficient to support specific jurisdiction.  Plaintiffs offer

nothing to counter the authority cited by Citi Hedge in the Moving Brief.  (See Mov. Br. at 59–

62.)  The only case that Plaintiffs cite on the issue, Anwar II, did not discuss specific jurisdiction.

(See Opp. Br. at 151–52.)  And the *only* New York contact Plaintiffs allege—that Citi Hedge

valued a basket of New York Stock Exchange securities (i.e., SLUSA "covered securities")—is

insufficient to hale Citi Hedge into a New York court where, as here, "[a]ll of the relevant parties

to the cause of action (plaintiff, defendant, and [] client), and all of the work that [it] performed

were [abroad]," and "sending a few emails and engagement letters into New York [does not]

alter this result."  CRT Invs., Ltd. v. BDO Seidman, LLP, 925 N.Y.S.2d 439, 441 (1st Dep't

2011).

Ultimately, Plaintiffs' personal jurisdiction argument, to the extent they make one, is not

grounded in law, but on the assertion that it would be "unfair" if Citi Hedge were not subject to

jurisdiction in New York.  (Opp. Br. at 151.)  Plaintiffs have it precisely backwards:  it is unfair to

exercise jurisdiction in *New York* in a case brought by foreign investors, against a *Bermudan*

entity based on its provision of administrative services in *Bermuda*, to Funds that were

incorporated in the *BVI* and managed from *Bermuda*.  (SAC ¶¶ 14–25, 38(a), 39–40.)

Finally, Plaintiffs' last-gasp request for leave to amend the SAC or obtain jurisdictional

discovery—apart from confirming the deficiency of the SAC—should be denied.  (Opp. Br. at 152, 154.)  Plaintiffs were advised that personal jurisdiction would be raised in the motion to dismiss, they were granted yet another opportunity to amend their pleading, and they cannot claim to have been unaware of the requirement that they must plead that defendants are subject to the Court's jurisdiction.  See Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 575 (1999) ("Personal jurisdiction . . . is an essential element of district court jurisdiction, without which the court is powerless to proceed to an adjudication.").  Their request to conduct jurisdictional discovery should also be denied because they have not even made "a prima facie case for jurisdiction," Frontera Res. Azer. Corp. v. State Oil Co. of Azer. Republic, 582 F.3d 393, 401 (2d Cir. 2009) (citation omitted), and they should not be permitted to conduct an "unfounded fishing expedition for jurisdictional facts."  RSM Production Corp. v. Fridman, 643 F. Supp. 2d 382, 402 (S.D.N.Y. 2009) (citation omitted), aff'd, 387 F. App'x 72 (2d Cir. 2010).  All claims against Citi Hedge should be dismissed for lack of personal jurisdiction.

## IV.  THE SAC ADDITIONALLY FAILS TO STATE ANY CLAIM AGAINST ANY OF THE DEFENDANTS UNDER BVI OR BERMUDA LAW

In addition to the above reasons, which require dismissal of all Counts of the SAC, a claim-by-claim analysis shows that every claim asserted against every Defendant fails as a matter of law.

### A.  Plaintiffs Apply the Wrong Pleading Standards on this Motion

Plaintiffs argue that all their claims, other than their mutual mistake claim against the "Kingate Defendants," are subject to Rule 8 and not the heightened pleading standard of Rule 9(b).  In doing so, they mischaracterize Defendants' argument.  Defendants did not argue that Rule 9(b) applied "[b]ecause the claims ultimately arise from Madoff's fraud."  (Opp. Br. at 166.)  Plaintiffs' claims are all subject to Rule 9(b), regardless of the label that Plaintiffs places

on them, because all are premised on alleged dishonesty and/or recklessness *by the Defendants*—

not by Madoff. (Mov. Br. at 63–65.) This is apparent in the Opposition Brief, which accuses

Defendants of various misconduct, from "recklessly" or "wrongfully" inducing Plaintiffs to

invest in the Funds based (presumably, although this is never pleaded) on false promises to

perform standard procedures and diligence, to supposedly assisting in Madoff's Ponzi scheme by

intentionally ignoring obvious signs of fraud or acting despite having knowledge of that fraud.

(See Opp. Br. at 1, 10, 12, 13, 36, 72, 84, 86, 88 n.20, 89, 93, 137, 145.)[56] In other words,

Defendants allegedly made false statements to Plaintiffs to "induce" them, or aided and abetted

Madoff's Ponzi scheme. Both types of claims are subject to 9(b). Schwartzco Enters. LLC v.

TMH Mgmt., LLC, 60 F. Supp. 3d 331, 352 (E.D.N.Y. 2014) (non-fraud claims are subject to

9(b) because the complaint branded defendants "as liars, not thieves"); Lerner v. Fleet Bank,

N.A., 459 F.3d 273, 292–93 (2d Cir. 2006) (claims of aiding and abetting fraud are subject to

9(b)).[57]

Plaintiffs' specific argument that 9(b) does not apply to their negligent misrepresentation

claims is based on outdated law or inapposite cases. The Second Circuit, incorporating the

District Court's opinion in Aetna Casualty & Surety Co. v. Aniero Concrete Co., Inc., 404 F.3d

---

[56] Plaintiffs concede this by arguing that, to the extent that SLUSA does not apply to claims brought under foreign law, their fraud and aiding and abetting fraud claims against Defendants "would [again] be permissible." (Opp. Br. at 25 n.5; see also Opp. Br. at 44 n.12.) In other words, Plaintiffs insist that the SAC as drafted would also support claims of fraud and aiding and abetting fraud, which are quintessential claims covered by Rule 9(b).

[57] None of the cases Plaintiffs cite support their assertions that the claims as pled here are not subject to Rule 9(b). In fact, all the cases cited by Plaintiffs support the application of Rule 9(b). See, e.g., Rahl v. Bande, 328 B.R. 387, 412–13 (S.D.N.Y. 2005) ("the heightened pleading standard is applicable" when defendants are alleged to "have attempted to *induce* action or inaction on the part of the investors by means of falsehoods or material omissions") (emphasis added) (citation omitted). Contrary to Plaintiffs' contentions, (Opp. Br. at 166), Rombach applied Rule 9(b) to a negligence claim over the same objections as Plaintiffs make here because, like the negligence claims in the SAC, "the wording and imputations of the complaint are classically associated with fraud." Rombach v. Chang, 355 F.3d 164, 171–72 (2d Cir. 2004).

566 (2d Cir. 2005), held that Rule 9(b) applies to negligent misrepresentation claims whether "intentional" or "negligent." Id. at 583–84. See also Simon v. Castello, 172 F.R.D. 103, 105 (S.D.N.Y. 1997) (Batts, J.) (applying 9(b) to negligent misrepresentation claims without determining whether those claims incorporated the complaint's fraud claims).

Moreover, Plaintiffs incorrectly argue that they have met the Rule 9(b) standard, as well as the standards under Rule 8. Despite the SAC's 97 pages, and despite this Court's admonition that Plaintiffs plead specific facts as to each Defendant, Plaintiffs failed to do so and continue to lump Defendants together throughout their Opposition without any real differentiation. The term "Kingate Defendants" is used 134 times in the SAC, and the even more general term "Defendants" is used 84 times. Plaintiffs engage in this tactic to mask the fact that they are deliberately confusing the relationships that any Defendant had (or did not have) with the Plaintiffs, and the responsibilities that any Defendant undertook (or did not undertake). Plaintiffs say they were "induced" to invest, but the word "induced" appears as to all Defendants only once in their pleading,[58] and they never allege or explain what was said to them, when it was said, or which particular Defendant said it, let alone that any Plaintiff relied on anything supposedly said to them. They also repeat labels and conclusions and recite the elements of their causes of action, but allege no underlying facts to support their bald assertions. Despite the self-serving statement that the SAC is "so extensively detailed," the SAC does not satisfy the requirements of Rule 9(b) or even Rule 8.[59] (See also Mov. Br. at 22, 63–65.)

---

[58] Plaintiffs also use the word "induced" with respect to their claims of negligent misrepresentation against Citi Hedge and PwC Bermuda, which of course affirms again that their claims are barred by SLUSA. (SAC ¶¶ 269, 305.)

[59] See, e.g., Miller v. HSBC Bank U.S.A., N.A., No. 13 Civ. 7500, 2015 WL 585589, at *7 (S.D.N.Y. Feb. 11, 2015) (dismissing claim where plaintiff's "allegations fall short of Rule 9(b)'s requirements because she fails to plead the who, what, when, where and how of the alleged fraud.") (citations omitted); see also Twombly, 550 U.S. at 555 (Rule 8 "requires more than labels and conclusions, and a formulaic

Plaintiffs also ignore basic civil procedure by repeatedly invoking "the applicable standards that a Bermuda or BVI court would apply in deciding a strike out motion." (Opp. Br. at 66; see also Opp. Br. at 96, 107, 122, 125.) The Federal Rules of Civil Procedure govern whether Plaintiffs have stated a viable claim, not the pleading standards that a Bermuda or BVI court would apply. See, e.g., Schafer, 499 F. Supp. 2d at 393–94 & n.8 ("Finally, although Cayman Islands and English substantive law applies in this action, federal law governs procedural issues.") (collecting cases).

Nor are Plaintiffs helped by repeated invocation of their expert's ipse dixit assertion of how Plaintiffs' version of the facts should be applied to various legal principles under Bermuda and BVI law.[60] The Court need not give any weight to Plaintiffs' expert's legal conclusions as to how foreign law should be applied to the facts alleged in the SAC, particularly where presented without legal support, without any support in the SAC or underlying documents, and contradicted by the analysis of multiple other foreign law experts.[61]

---

recitation of the elements of a cause of action will not do."); Iqbal, 556 U.S. at 678 (plaintiffs must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged"); Missel v. County of Monroe, 351 F. App'x 543, 545 (2d Cir. 2009) ("[L]egal conclusions . . . are not factual allegations entitled to a presumption of truth.").

[60] (See, e.g., Opp. Br. at 81–82 ("In Mr. Bompas' [] opinion, if these allegations are borne out in discovery, this would be sufficient to find that a fiduciary duty existed between the Kingate Defendants and Plaintiffs."), 106 ("Based on a review of the allegations in the SAC, Mr. Bompas concludes that the SAC makes the necessary allegations to establish a cause of action against the Kingate Defendants."), and 108 ("In Mr. Bompas' opinion, the SAC pleads facts giving rise to the tort of negligence and that the claim would not be struck out if it had been raised in Bermuda, BVI or the U.K.").)

[61] See Bigio v. Coca-Cola Co., No. 97 Civ. 2858(BJJ), 2010 WL 3377503, at *4 (S.D.N.Y. Aug. 23, 2010) ("[T]he purpose of expert testimony . . . is to aid the Court in determining the content of the applicable foreign law—not to apply it to the facts of the case. Furthermore, the Court is not obliged to credit the parties' partisan application of the governing law.") (internal quotation omitted), aff'd, 675 F.3d 163 (2d Cir. 2012); Jonas v. Estate of Leven, 116 F. Supp. 3d 314, 330 (S.D.N.Y. 2015) ("The expert testimony should help the court understand the content of the governing law, but courts need not credit the experts' application of law to the facts of the case.").

**B.**     **Under New York's Choice of Law Analysis, BVI or Bermuda Substantive Law Applies to Plaintiffs' Claims**

As an initial matter, Plaintiffs' argument that the Court cannot apply BVI or Bermuda law unless it first finds conflict with New York law is wrong. Where the laws of one jurisdiction plainly govern, courts routinely apply them, dispensing with a determination of potential conflict with New York law. See von Kaulbach v. Keoseian, 783 F. Supp. 170, 174 (S.D.N.Y. 1992) (applying German law to contracts executed in Germany even where there was no difference between German and New York law, because Germany had paramount interest in regulating conduct within its borders and contacts with New York were "insignificant").[62]

New York is not among the relevant jurisdictions whose laws might apply here. This case is brought by exclusively foreign investors who, by signing a subscription agreement governed by BVI law, invested in BVI hedge funds managed and serviced by foreign entities (mostly Bermudan) pursuant to contracts all governed by Bermuda law. New York has no interest in assuring that its laws are applied to determine whether those foreign entities breached their alleged duties to these foreign Plaintiffs.[63] Thus, even if the Court were to find that there is

---

[62] See also Pegasus Aviation IV, Inc. v. Aerolineas Austral Chile, S.A., No. 08 Civ. 11371 (NRB), 2012 WL 967301, at **4, 6 (S.D.N.Y. Mar. 20, 2012) (assuming (without analyzing) that Argentinian law differs from New York law and applying Argentinian law because "not a single factor supports applying New York law"). The cases cited by Plaintiffs do not hold otherwise. In both GlobalNet Financial.com, Inc. v. Frank Crystal & Co., 449 F.3d 377 (2d Cir. 2006) and Int'l Bus. Machines Corp. v. Liberty Mut. Ins. Co., 363 F.3d 137 (2d Cir. 2004), New York law was relevant to the dispute. See, e.g., Int'l Bus. Machines Corp., 363 F.3d at 143 (New York courts permitted to apply New York law in absence of conflict only "if New York law is among the relevant choices . . .").

[63] See, e.g., In re Banco Santander Sec.-Optimal Litig., 732 F. Supp. 2d 1305, 1341–42, 1344 (S.D. Fla. 2010) (applying Irish law to a nearly identical suit by investors in Bahamian Madoff feeder funds after recognizing that the suit was "essentially a foreign dispute, albeit with a minimal and not particularly significant connection to the United States"; "when the Plaintiffs purposefully choose to invest outside of the United States, it cannot simultaneously be maintained that their relationship is centered here . . . The Court cannot imagine any scenario in which applicable choice of law principles would point to the application of United States law."), aff'd sub nom., Inversiones Mar Octava Limitada v. Banco Santander S.A., 439 F. App'x 840 (11th Cir. 2011); see also In re Herald, Primeo & Thema Sec. Litig., No. 09 Civ. 289(RMB), 2011 WL 5928952, at *16 (S.D.N.Y. Nov. 29, 2011) (recognizing that New York has

no difference between Bermuda/BVI law and New York law, it would not apply New York law. Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 672 F.3d 155, 157 (2d Cir. 2012) ("If no actual conflict exists, *and if New York is among the relevant jurisdictions*, the court *may* simply apply New York law.") (emphases added).  In any event, as noted <u>infra</u> in footnotes for each relevant count, there are substantive differences between the law of BVI/Bermuda on the one hand, and New York on the other, with respect to each of Plaintiffs' claims.

None of Plaintiffs' other attempts to avoid BVI and Bermuda law are convincing either. For example, with respect to the contract claims, Plaintiffs do not dispute that New York courts will generally enforce a choice of law provision where, as here, the law the parties selected bears some relationship to the transaction.  (Opp. Br. at 53.);  Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd., 230 F.3d 549, 556 (2d Cir. 2000) (enforcing contractual choice of law "[a]bsent fraud or violation of public policy").[64]  Instead, Plaintiffs argue that the contractual choice of BVI and Bermuda law should be disregarded as contrary to New York's "fundamental public policy," (Opp. Br. at 53–54), because they lack standing under BVI or Bermuda law to bring their purported claims against Defendants.

This argument has no support in the law. The public policy exception only applies when "New York's nexus with the case is substantial enough to threaten this State's public policy." Weiss v. La Suisse, 154 F. Supp. 2d 734, 736 (S.D.N.Y. 2001).  Here, Plaintiffs are *not* suing Madoff for breach of the contracts governing *Madoff's* relationship with the Funds; therefore, there is no nexus between New York and Plaintiffs' claims.  And even where a public policy

---

"minimal interest" in the case brought by foreign investors in four foreign Madoff feeder funds and dismissing on *forum non conveniens*), aff'd sub nom., Herald I, 730 F.3d 112 (2d Cir. 2013).

[64] The Subscription Agreements expressly provide that all investors in the Funds agreed to be bound by the laws of the BVI.  (See, e.g., Mov. Br. at 15.)  The Service Agreements also provide that they are governed by Bermuda or BVI law.  (See Mov. Br. at 10–11, 14, 66 n.67; DAs at § 19.)

exception might apply, it is extremely narrow.  See id. (public policy exception properly invoked "only when the application of foreign law would violate some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal") (citation omitted).

Plaintiffs fail to meet this narrow exception.  They merely complain that they lack standing under BVI/Bermuda law to pursue their claims and their remedy would therefore be foreclosed.[65]  As the Second Circuit has held, however, "it is not enough [to invoke the exception] that the foreign law . . . merely be different or less favorable than that of the United States."  Roby v. Corp. of Lloyd's, 996 F.2d 1353, 1363 (2d Cir. 1993).[66]  Moreover, the legal principle that certain claims can be brought only derivatively, not directly, by a shareholder is hardly a concept foreign to New York law,[67] much less offends any "fundamental principle of justice."

The same is true of Plaintiffs' quasi-contract claims.  While Plaintiffs rely entirely on Anwar II, they fail to acknowledge a critical distinction—Anwar II's conclusion rested on the court's determination that the Fairfield funds in that case were founded by Fairfield Greenwich Group, which ran the funds' operations from New York.  728 F. Supp. 2d at 389.  This is in

---

[65] Plaintiffs argue that applying the law they agreed would govern their claims would "circumvent the protections afforded to Plaintiffs under New York law."  (Opp. Br. at 54.)  Plaintiffs miss a fundamental point.  They did not bargain to have, and never had any reason to expect to have, *any* protections under New York law.  They all are foreign investors in foreign funds who contracted with foreign entities by signing agreements subject to foreign law.  Applying New York law to their claims would be inconsistent with the agreements and the parties' reasonable expectations.

[66] See also 2002 Lawrence R. Buchalter Alaska Tr. v. Philadelphia Fin. Life Assurance Co., 96 F. Supp. 3d 182, 208 (S.D.N.Y. 2015) ("This exception should only be used in instances in which the laws of the foreign state are 'truly obnoxious' to the public policy of the forum state.") (citations omitted).

[67] See, e.g., Donati, 489 N.E.2d at 751 ("For a wrong against a corporation a shareholder has no individual cause of action, though he loses the value of his investment or incurs personal liability in an effort to maintain the solvency of the corporation.") (citation omitted).

sharp contrast to this case, where the Funds and all its service providers operated entirely abroad. (SAC ¶¶ 24, 25 (the Managers); SAC ¶¶ 27, 28 (the Consultant); SAC ¶ 37 (the Auditor); SAC ¶ 38 (the Administrator).)  Under the "center of gravity" or "grouping of contacts" test, either Bermuda or BVI law governs Plaintiffs' quasi-contract claims.  (Mov. Br. at 67–68.)

New York has no interest in applying its laws to the tort claims either.  Under an "interests analysis," either BVI or Bermuda law applies.  (Mov. Br. at 68.)  Plaintiffs argue that "New York has a strong interest in applying its laws to regulate the conduct of *offshore* fund promotors, managers, and service providers" that allegedly engaged in tortious conduct while performing services for BVI-domiciled Funds from their offices in Bermuda.  (Opp. Br. at 51 (emphasis added).)  Plaintiffs' argument turns the proper choice of law analysis on its head:  the only nexus this case has to New York is that the Funds invested with Madoff.  (Opp. Br. at 49.) But Plaintiffs are not suing Madoff.  According to them, the crux of their tort claims is "that Defendants breached duties owed directly to Plaintiffs as investors in the Kingate Funds."  (Opp. Br. at 26.)  Whatever duties Defendants performed or allegedly failed to perform occurred in the foreign jurisdictions where the service provider Defendants are domiciled—not in New York. By contrast, in each of the cases on which Plaintiffs rely, the court found that New York had an interest in applying its laws because the *funds at issue* were being entirely or largely operated from New York (and, thus, New York was where the defendants' conduct that gave rise to the torts occurred).  See Anwar II, 728 F. Supp. 2d at 400 (applying New York law because the Funds were operated primarily from New York City); Pension Comm., 446 F. Supp. 2d at 194–95 (funds conducted day-to-day operations in New York and alleged torts arose from failure to verify information issued by the funds in New York); Cromer Fin. Ltd., 137 F. Supp. 2d at 492 (noting that because the funds were managed out of New York, "a substantial portion of the

fraudulent conduct has occurred in New York").  Here, because the service provider Defendants'

activities related to Plaintiffs' investments in the Funds occurred in BVI or Bermuda, New York

has no interest in assuring that its law is applied in this case.[68]

## V.    THE SAC FAILS TO STATE A CLAIM FOR BREACH OF FIDUCIARY DUTY AGAINST ANY OF THE "KINGATE DEFENDANTS" OR CITI HEDGE – COUNTS 7 AND 21

### A.    The SAC Fails To State a Breach of Fiduciary Duty Claim Against the "Kingate Defendants" or Citi Hedge under BVI Law[69]

#### 1.    Defendants Owed No Fiduciary Duty to Plaintiffs

Contrary to Plaintiffs' contention, a fiduciary relationship is not established simply

because one party supposedly played a "crucial role" or whenever "*one party* reposes trust and

confidence in the other."  (Opp. Br. at 80 (emphasis added); see also id. at 81–82.)  Under

Bermuda and BVI law,[70] no such relationship can or will exist unless the alleged fiduciary

---

[68] In re Banco Santander Sec.-Optimal Litig., 732 F. Supp. 2d at 1341 ("[T]he theory on which the Plaintiffs' case rests is that the Defendants' actions caused their substantial injury.  Therefore, the Court must look to the conduct of the Defendants, not to Madoff, in determining the place where the conduct causing the injury is centered.").

[69] To the extent Plaintiffs' breach of fiduciary duty claims are based on allegations that the "Kingate Defendants" and Citi Hedge negligently mismanaged, marketed, distributed and/or administered the Funds, they also should be dismissed because they are derivative claims which Plaintiffs lack standing to assert or are barred by exculpation provisions set forth in the Service Agreements and incorporated into the IMs.  See supra Section II(B–C) and infra Section VII(C).  To the extent the claims are based on allegations around the NAV, (Opp. Br. at 80), or that "these defendants were guilty of gross negligence and reckless conduct," (Opp. Br. at 86), or that these are "inducement claims," they are barred by SLUSA.

[70] There is a conflict between the laws of BVI/Bermuda and New York.  Under BVI/Bermuda law, a claim for breach of fiduciary duty requires proof of breach of the duty of loyalty, which is separate and distinct from the duty of care, (Mov. Br. at 74), whereas under New York law a breach of fiduciary duty claim can be based solely on a breach of a duty of care.  See Pinnacle Consultants ex rel. S'holder of Leucadia Nat'l Corp. v. Leucadia Nat'l Corp., 923 F. Supp 439, 447 (S.D.N.Y. 1995) (noting that breach of fiduciary duty claims can be premised on a breach of the duty of care), aff'd sub nom., Pinnacle Consultants, Ltd. v. Leucadia Nat'l Corp., 101 F.3d 900 (2d Cir. 1996); see also Pension Comm., 446 F. Supp. 2d at 193 (recognizing a conflict between New York law and BVI law on breach of fiduciary duty).  Plaintiffs mischaracterize ABF Capital Mgmt. v. Askin Capital Mgmt., L.P., 957 F. Supp. 1308, 1332 (S.D.N.Y. 1997), which considered only whether plaintiff-investors had *standing* to sue, not whether there was a conflict between the law of a Commonwealth country and New York.

*accepts* a plaintiff's proposal to repose trust and confidence in him. (Mov. Br. at 70–74; seealso Hargun ¶¶ 47, 48, 118; Evans ¶¶ 31, 58; Chivers ¶¶ 81-84, 86-90; Hargun Reply ¶ 52.2; Evans Reply ¶ 27; Chivers Reply ¶¶ 48, 50-51.) Because Counts 7 and 21 fail to allege that any of the "Kingate Defendants" or Citi Hedge agreed to act as a fiduciary for any Plaintiff, their fiduciary duty claim fails.[71]

Plaintiffs' counter-argument, that the "Kingate Defendants" (again, undifferentiated) owed them a fiduciary duty because they supposedly occupied a superior position in their "relationships" with Plaintiffs, through which they "acted as investment advisors," "exercised discretionary control over the [the investment of the Funds'] assets" and "had superior access to confidential information about Madoff's [trading] activities," (Opp. Br. at 76; see also id. at 80), and that Citi Hedge allegedly occupied a superior position because it "was responsible for calculating the NAV which valued both the Funds' and Plaintiffs' investments," (Opp. Br. at 80), is inconsistent with the SAC, Information Memoranda, and the Service Agreements. Those documents demonstrate that no such duty was assumed nor could any fiduciary duty have been created as a result of listing any service provider's credentials in the IMs.[72] (Hargun ¶ 139; Evans ¶ 77; Chivers ¶¶ 93-94; Hargun Reply ¶ 52.3; Evans Reply ¶ 27; Chivers Reply ¶ 50.)

The IMs made clear that (a) only the Investment Advisor had actual custody of the assets

---

[71] Plaintiffs' breach of fiduciary duty claims fail under New York law for the same reason. (See Mov. Br. at 73 n.72.) Musalli Factory for Gold & Jewelry v. JPMorgan Chase Bank, N.A., 261 F.R.D. 13, 26 (S.D.N.Y. 2009) (cited in Opp. Br. at 74) (dismissing claim of breach of fiduciary duty under New York law where plaintiff alleged that it "trusted and relied on Defendants," but "no acceptance of this duty by the Defendants [was] alleged" because"unilateral trust or confidence does not automatically create a fiduciary relationship; the trust or confidence must be accepted as well.") (internal quotation marks and citations omitted);) In re Windsor Plumbing Supply Co., 170 B.R. 503, 525–26 (Bankr. E.D.N.Y. 1994) (same). None of the cases cited by Plaintiffs, (see Opp. Br. at 74), holds otherwise.

[72] Plaintiffs' argument that a fiduciary relationship existed based on the recitations in the IMs about "each of the Kingate Defendants' decades of experience," (Opp. Br. at 76), is obviously wrong as to FIM (USA), which was not even mentioned in the IMs.

in the Funds' portfolios, and (b) none of the Defendants had any obligation—fiduciary or otherwise—to independently verify the existence of those assets or the accuracy of the trading information provided by Madoff and BLMIS pertaining to them.[73]  The "Kingate Defendants" and Citi Hedge were under no obligation to verify the existence of the securities Madoff purportedly purchased and sold on behalf of the Funds, much less agreed to undertake a fiduciary duty to "safeguard and monitor" the assets in the portfolios of the Funds.[74]

There are no factual allegations in the SAC or in the underlying documentation to support Plaintiffs' conclusory assertions that the "Kingate Defendants" or Citi Hedge acted as their "investment advisor" or exercised discretionary control over investment of the Funds' assets. (Opp. Br. at 80.)  Rather, as fully disclosed in the IMs, only the Funds' "Investment Advisor" (i.e., Madoff/BLMIS) exercised such control:

> *Neither the Co-Managers nor USD Shareholders will have any control over the investment and trading decisions of the Investment Advisor*, and no person should invest in the Fund unless willing to entrust all aspects of the investment management of the Fund to the selected Investment Advisor, having evaluated its capability to perform such functions.

(emphasis added).[75]  Thus, not even the Managers of the Funds had discretion or control over Plaintiffs' assets.  (See Hargun Reply ¶ 55; Evans Reply ¶ 27; Chivers Reply ¶¶ 49-50.)[76]

---

[73] (See Mov. Br. at 17–18 n.36.)  With respect to FIM, the CSAs contained a corresponding provision entitling FIM to rely on the information and documents provided to it pursuant to the agreements without any obligation to verify the accuracy of that information.  (See CSAs § 2.4.)

[74] Plaintiffs acknowledge that Citi Hedge was not required to independently calculate the NAV, because they argue that PwC Bermuda's audits "were the only means upon which Plaintiffs could rely for an independent valuation of their investment."  (Opp. Br. at 98–99.)

[75] (2000 KG IM at 5; 2003 KG IM at 5; 2006 KG IM at 5; 2007 KG IM at 5; 2008 KG IM at 5; 2000 KE IM at 5–6; 2003 KE IM at 6; 2004 KE IM at 6; 2006 KE IM at 6; 2007 KE IM at 6; 2008 KE IM at 6.)

[76] Plaintiffs' arguments as applied to the FIM Entities are even more strained, since the IMs make clear that FIM was merely acting as a Consultant to KML, and the CSAs make clear that FIM had no access to (let alone control or discretion over) any shareholder assets and no decision-making authority whatsoever. (E.g., 2007 KG IM at ii-iii, 14–15; CSAs at § 4.)  Plaintiffs have not alleged that FIM (USA) had any

Similarly, Citi Hedge had "no discretionary authority or control with respect to the management or disposition of financial instruments" of the Funds.[77]

Even if Plaintiffs had alleged these Defendants had special knowledge about Madoff, under Bermuda and BVI law, a fiduciary duty does not arise simply because a party may have had superior knowledge or even inside information. (Hargun Reply ¶ 52.3; Evans Reply ¶ 27; Chivers Reply ¶¶ 45-46, 50.)[78]

Plaintiffs' other argument, that the "Kingate Defendants" and Citi Hedge owed them fiduciary duties based on purported communications with potential and existing shareholders of the Funds, (Opp. Br. at 81, 83–84), has no basis in the SAC. (See also Opp. Br. at 102.) The SAC never alleges which (if any) Plaintiff received which (if any) communication or when they received these communications, which of these Defendants (if any) sold them shares in the Funds, communicated with or sent them monthly performance reports. (SAC ¶¶ 1, 3; see also

relationship whatsoever to the Funds (or to KML), and was therefore in no position to have any assets entrusted to it. The SAC similarly is devoid of such allegations as against Tremont Group.

[77] (ADMs ¶ 10.7.)

[78] Plaintiffs' claims fail under New York law for similar reasons. (See Mov. Br. at 73 n.72.) See also Pls' State & Secs. Law Settlement Class Counsel v. Bank of N.Y. Mellon, 43 Misc.3d 887, 898–99 (Sup. Ct. N.Y. County 2014) (dismissing substantially identical claim under New York law for breach of fiduciary duty arising from defendant's failure to detect Madoff's Ponzi scheme where, as here, defendant did not exercise discretionary control over investment decisions or have actual custody of the securities Madoff purported to purchase and sell for the fund).

Unlike here, the defendants in the cases Plaintiffs cite either exercised discretionary control over the assets at issue or misrepresented their ability to exercise such control. See Anwar II, 728 F. Supp. 2d at 415–16 (finding fiduciary relationship where defendants undertook affirmative duty to the plaintiffs to monitor Madoff and manage the fund by "exercis[ing] discretionary control over the Funds' assets"); see also Schwartz v. Think Strategy Capital Mgmt. LLC, 797 F. Supp. 2d 439, 442 (S.D.N.Y. 2011) (defendant promised to "independently verif[y] each prospective subfund's Assets Under Management"); EBC I, Inc. v. Goldman Sachs & Co., 832 N.E.2d 26, 34–36 (N.Y. 2005) (finding a fiduciary relationship where plaintiffs sufficiently alleged a direct advisory relationship with defendant); Pension Comm., 446 F. Supp. 2d at 197 (recognizing a fiduciary duty where defendants required by contract to independently value complex derivative instruments to calculate the funds' NAV); People v. Merkin, No. 450879/09, 2010 WL 936208, at *6 (Sup. Ct. N.Y. County Feb. 8, 2010) (Merkin falsely represented that he "would exercise discretion in managing the funds" but "he had already delegated all investment discretion to [Madoff]").

Chivers Reply ¶¶ 34-40A.)[79]  Plaintiffs thus fail to plead the basis for their legal argument under

Rule 8(a), and of course fail to set forth the "who, what, when, where and how" required by Rule

9(b).  See, e.g., Pehlivanian v. China Gerui Advanced Materials Grp., Ltd., 14 Civ. 9443 (ER),

2016 WL 2859622, at *5 (S.D.N.Y. May 16, 2016) (internal quotation marks and citation

omitted).  Even had Plaintiffs sufficiently alleged actual communications with the "Kingate

Defendants," an entity that sells investments on behalf of a fund is acting for the fund (or for

themselves) and does not undertake any fiduciary duty to the prospective purchaser.  (Hargun

Reply ¶ 57; Evans Reply ¶ 27; Chivers Reply ¶ 52.)  Moreover, merely disseminating monthly

reports to investors does not create any fiduciary duty to those investors.  (Hargun Reply ¶ 57;

Evans Reply ¶ 27; Browne-Wilkinson Reply ¶ 53.)  Similarly, allegations that Citi Hedge was

involved in marketing of shares and communicated with shareholders when processing Fund

subscriptions and redemptions and disseminating monthly performance reports to shareholders of

the Funds only describe routine administrative services, not that Citi Hedge owed obligations of

loyalty.  (Browne-Wilkinson Reply ¶ 53.)[80]

---

[79] Plaintiffs argue that there were face-to-face meetings "where the FIM Entities" supposedly
"recommended that the investors purchase shares in the Funds."  (Opp. Br. at 81.)  However, the SAC
does not allege even one meeting between any investor and any representative of any of the FIM Entities,
nor does it allege that any of the Plaintiffs purchased shares through FIM Limited under the Distribution
Agreements.  The Distribution Agreements do not require that FIM Limited provide monthly performance
reports to investors with whom it had no relationship.  And the CSAs between FIM and KML do not
require that FIM send any information or documents to investors in the Funds.  (CSAs at §§ 2.2, 3.)

[80] Any communications are also insufficient to state a claim of breach of fiduciary duty against the
"Kingate Defendants" or Citi Hedge under New York law.  See Kottler v. Deutsche Bank AG, 607 F.
Supp. 2d 447, 465–66 (S.D.N.Y. 2009) (defendants' "alleged fiduciary duty to Plaintiffs must be based on
something more than conclusory allegations to connect the Plaintiffs' decision to invest . . . with actions
by" the defendant, and dismissing breach of fiduciary duty claim under New York law where, like here,
"Plaintiffs have simply shown no connection between themselves and [defendant] other than the mailing
of documents"); Jordan (Bermuda) Inv. Co. v. Hunter Green Invs. LLC, No. 00 Civ. 9214 (RWS), 2007
WL 2948115, at **23–24 (S.D.N.Y. Oct. 3, 2007) (under New York law "the mere sending of periodic
account statements does not create a fiduciary duty" for a hedge fund administrator and "[w]here, as here,
[t]here is no competent evidence that [the administrator] participated in any investment of [plaintiff's]
funds, and instead merely provided nondiscretionary administrative services, no fiduciary duty exists"

### 2. Plaintiffs Allege No Facts Sufficient To Show That Any of The "Kingate Defendants" or Citi Hedge Breached Any Fiduciary Duty

Plaintiffs' fiduciary duty claims fail for the additional reason that BVI law recognizes a claim only for breach of the duty of loyalty, and Plaintiffs failed to plead any such breach. (See Mov. Br. at 74.) Effectively conceding this point in their Opposition,[81] Plaintiffs assert in wholly conclusory fashion that "the SAC also alleges that these defendants were guilty of gross negligence and reckless conduct" and that such allegations "are sufficient to amount to a breach of fiduciary duty." (Opp. Br. at 86.) Plaintiffs are wrong because they have not shown that any of the "Kingate Defendants" or Citi Hedge acted disloyally or in a manner that would affect their conscience, which is the touchstone of any breach of the duty of loyalty claim. (Hargun Reply ¶ 59; Evans Reply ¶ 27.)

### B. Plaintiffs' Fiduciary Duty Claim Also Fails as to the Individual Defendants

The legal principles described above that require dismissal apply equally to the Individual Defendants. In addition, the fiduciary duty claims fail against these defendants because under Bermuda and BVI law, officers and directors of companies only owe fiduciary duties to their company and not to its shareholders or the shareholders of another company.[82] (See Mov. Br. at 71–73.)

---

(last three alterations in original) (internal quotations and citations omitted) (collecting cases)).

[81] Plaintiffs' unsupported contention that "[t]he duty of loyalty is a short-hand label for a broad range of fiduciary duties," (Opp. Br. at 85), in no way demonstrates that allegations of mismanagement are sufficient to show breach of the duty of loyalty under BVI law. Moreover, Arklow Investments Ltd. v. Maclean, [2000] 1 WLR 594, (cited in Opp. Br. at 85), provides no authority for the proposition that the "duty of loyalty" can be used as pleading shorthand for all other fiduciary duties. (Hargun Reply ¶ 58; Evans Reply ¶ 27.)

[82] The Individual Defendants therefore only owed duties to the respective entity with which that Individual Defendant was affiliated (Tannenbaum to KML; Manzke to Tremont Group; and Grosso and Ceretti to FIM)—not to shareholders in the Funds.

Plaintiffs' response, once again, is to ignore BVI and Bermuda law and instead lump the Individual Defendants in their "Kingate Defendants" definition and argue that these "Kingate Defendants" owed them a duty. (Opp. Br. at 80–83.) But as confirmed by the IMs and the Service Agreements, none of these Individual Defendants undertook any obligations to Plaintiffs, contractual or otherwise, none of them undertook to perform diligence on Madoff, none acted as an "investment advisor" or "financial manager" to Plaintiffs, and none was entrusted with or had any control over Plaintiffs' assets, meaning that Plaintiffs have failed to plead a fiduciary duty claim. (See Mov. Br. at 72 n.70; Hargun ¶¶ 42-47; Evans ¶ 31; Chivers ¶¶ 78, 79, 85-90, 161; Hargun Reply ¶¶ 54-56; Evans Reply ¶ 27; Chivers Reply ¶¶ 48, 54.)

As to Grosso and Ceretti, Plaintiffs argue that they owed shareholders a fiduciary duty because they supposedly "organized the Funds" and "provided the link between the Funds and Madoff." (Opp. Br. at 84.) The SAC, however, contains no such allegation[83] and, even if it did, that would not establish a fiduciary relationship between any Plaintiff and either Grosso or Ceretti, because a person acting on their own behalf and for their own benefit is necessarily *not* undertaking to act for another. (Chivers Reply ¶¶ 52, 53 (describing requirement for fiduciary relationship); see also Hargun Reply ¶57 (soliciting investments cannot give rise to a fiduciary

---

[83] Plaintiffs rely on paragraphs 62–63 of the SAC as support for their assertions. (See Opp. Br. at 84.) However, those paragraphs merely allege that Grosso and Ceretti participated in a few dinners and meetings with Madoff, and in phone calls as representatives on behalf of FIM. The remaining allegations in the SAC specific to Grosso and Ceretti do not support this assertion and do not establish any relationship whatsoever with Plaintiffs. (See, e.g., SAC ¶¶ 30 (alleging that Grosso founded the FIM Entities, served as an officer of those entities and controlled those entities), 31 (alleging that Ceretti co-founded and was an officer of FIM Advisers), 35 (alleging that Individual Defendants "had knowledge of and participated in activities and transactions in New York" of the "entities with which they were associated"), 58–61 (alleging that Grosso participated in some meetings with Madoff and that Madoff's phone book included certain contact information for Grosso and Ceretti), 68 (alleging that a representative of KML sent an email to Grosso and Ceretti, presumably at their designated FIM-entity email addresses, requesting materials relating to the Funds), and 69 (alleging that Grosso exchanged emails with an employee of FIM (USA), who acknowledged that FIM (USA) did not perform due diligence relating to the Funds).)

duty); Evans Reply ¶ 27 (same).)  Similarly, Plaintiffs' argument, (Opp. Br. at 84), that Grosso

and Ceretti received distributions from KML in their capacity as shareholders of KML is not

alleged in the SAC and would not establish any fiduciary relationship in any event.  (Chivers

¶¶ 85 and 91 n.19; Chivers Reply ¶¶ 53, 54.)  Finally, Plaintiffs offer no citation to the SAC in

support of their statement that Grosso and Ceretti were "personally involved in marketing the

Funds and approving the NAV figures compiled by Citi Hedge."  (Opp. Br. at 84.)  There are no

allegations that Grosso or Ceretti had any direct dealings with any Plaintiff, or that either Grosso

or Ceretti approved any NAV figure compiled by Citi Hedge.[84]

Plaintiffs also argue that Manzke owed them a fiduciary duty based "in large part on her

actions as a promoter and seller of shares of the Funds to members of the Class," and not "based

solely on her status as a director."  (Opp. Br. at 84.)[85]  This argument fails for the same reasons:

the SAC alleges no facts to demonstrate any direct dealings between Manzke and Plaintiffs,[86] let

alone establishes that Plaintiffs relied on any such dealings when they decided to purchase shares

of the Funds.  Nor are there any allegations that Manzke undertook to act on behalf of any

---

[84] The "FIM Entities" did not even have responsibility under the CSAs or the Distribution Agreements for approving any NAV figures compiled by Citi Hedge.  (See CSAs and DAs, *in passim*.)  Nor could any contractual obligations of FIM form the basis of a fiduciary duty between Grosso or Ceretti and Plaintiffs. (Chivers ¶ 85; Chivers Reply ¶ 48.)  In fact, Plaintiffs specifically allege that the NAV was to be "independently calculated and reported by Citi Hedge."  (SAC ¶ 191; see also SAC ¶¶ 180, 189.)

[85] Bermuda and BVI law are both clear that the "mere fact of being a director is not sufficient to give rise to a fiduciary relationship with shareholders."  (See Hargun Reply ¶ 52.1; Evans Reply ¶ 27; Chivers Reply ¶ 42.)

[86] None of the cited paragraphs of the SAC discuss any direct dealings between Plaintiffs and Manzke. The paragraphs cited in the Opposition merely allege that Manzke had a relationship with Madoff and with other defendants.  (See SAC ¶¶ 33, 58, 60, 61, 81.)  The remaining paragraphs cited reference undifferentiated allegations against the "Kingate Defendants" that do not explain what Manzke individually is alleged to have done.  (See SAC ¶¶ 3, 4, 64–69.)  There are no facts alleged to show that any of the "Kingate Defendants" (including Manzke) solicited Plaintiffs' investments, much less what statements were made to induce them, or by whom or when, and therefore fail to provide Manzke (or any of the other "Kingate Defendants") with "fair notice of what the claim is and the grounds upon which it rests."  Twombly, 550 U.S. at 555 (internal quotations and citations omitted).

Plaintiff.[87]

Plaintiffs do not even mention Tannenbaum in the context of their fiduciary duty arguments, nor do they point to any allegations in the SAC specific to Tannenbaum that could support a fiduciary duty claim against him. Plaintiffs therefore concede that they have no viable fiduciary duty claim against Tannenbaum, and the claim must therefore be dismissed as to him as well. S.E.C. v. Syron, 934 F. Supp. 2d 609, 631 (S.D.N.Y. 2013) (opposition memorandum conceded point by failing to address it).[88]

## VI. THE SAC FAILS TO STATE A CLAIM OF AIDING AND ABETTING BREACH OF FIDUCIARY DUTY – COUNTS 13, 19 AND 26

### A. The SAC Does Not Allege Any Underlying Breach of Fiduciary Duty

As described in Section V and in the Moving Brief (at 70–74), the SAC fails to state a claim of breach of fiduciary duty against any of the KML Defendants, the Tremont Defendants, the FIM Defendants or Citi Hedge. For this reason alone, Counts 13, 19 and 26 of the SAC fail to state claims against Tremont Group, Citi Hedge and PwC Bermuda under BVI and Bermuda law[89] for "dishonest assistance." (See Hargun ¶¶ 160-63; Evans ¶¶ 98-101; Dohmann Reply

---

[87] Plaintiffs' reliance on dicta in Peskin v. Anderson, [2001] 1 BCLC 372 and Stein v. Blake and Ors. (No. 2), [1998] 1 BCLC 573, (Opp. Br. at 84), is misplaced. Neither decision suggests (much less holds) that a director assumes a fiduciary relationship with a company's shareholders by "promoting" or "selling" the company's shares. Both cases merely stand for the unremarkable proposition that a company's shareholder may assert a claim against a director of that company in narrow circumstances where there is a separate relationship between the director and the shareholder, such as where a director purchases shares directly from a shareholder (not through the company) for less than fair value. Those circumstances do not exist here. The SAC does not allege that Manzke entered into any separate dealings with any shareholders. Under both Bermuda and BVI law, "[s]oliciting investments by itself [simply cannot] give rise to a fiduciary duty." (Hargun Reply ¶ 57; Evans Reply ¶ 27.)

[88] Of course, under Bermuda or BVI law, the SAC also fails to allege any fiduciary relationship between Tannenbaum and the Plaintiffs. (See Chivers Reply ¶ 54; Mov. Br. at 73.)

[89] Unlike New York law, neither BVI nor Bermuda law recognize a claim for aiding and abetting breach of fiduciary duty. (Mov. Br. at 75; Bompas ¶ 132 ("[t]here is not a tort or cause of action which bears this name.").) Under the "analogous" claim for "dishonest assistance," Plaintiffs must plead a breach of the duty of loyalty, a requirement lacking under New York law. (Mov. Br. at 75–79.) See also Pension

53

**B.      The SAC Fails to Adequately Plead Substantial Assistance**

The aiding and abetting claims are also defective because the SAC alleges only in conclusory terms that these Defendants "substantially assisted" the underlying breaches of fiduciary duties. (Mov. Br. at 75.) For example, in Count 13, Plaintiffs' allegation that Tremont Group "substantially assisted Tremont by helping to conceal Tremont's breaches of fiduciary duty and by failing to act when required to do so in the face of those breaches," (SAC ¶ 253), does not identify any step Tremont Group allegedly took to "help conceal" Tremont's purported breaches of fiduciary duty. Plaintiffs simply seek to hold Tremont Group vicariously liable for Tremont's alleged wrongs because the latter is a wholly owned subsidiary of the former. (E.g., SAC ¶¶ 79, 80, 252.) This cannot support an aiding and abetting breach of fiduciary duty claim under Bermuda or BVI law. (See Mov. Br. at 76–77; Hargun ¶ 164; Evans ¶ 102; Hargun Reply ¶ 64; Evans Reply ¶ 31.)[91]

As to Citi Hedge or PwC Bermuda, Plaintiffs allege at most that these entities performed the services they agreed to perform under the Administration Agreements and Auditor Agreements. (See Opp. Br. at 87–89 (citing SAC ¶¶ 178, 187–88, 197 (describing duties that Citi Hedge undertook under Administration Agreements and alleging that Citi Hedge provided

---

Comm., 446 F. Supp. 2d at 193 (recognizing a conflict between New York and BVI law on aiding and abetting breach of fiduciary duty claims and aiding and abetting fraud claims).

[90] For the same reason, Plaintiffs fail to state claims under New York law for aiding and abetting a fiduciary breach. Fillmore E. BS Fin. Subsidiary LLC v. Capmark Bank, 552 F. App'x 13, 17 (2d Cir. 2014).

[91] Nor does this allegation support a claim for aiding and abetting under New York law. It is well-established that "a corporation may not be held liable for the actions of another company merely because it has an ownership interest in it." SSR II, LLC v. John Hancock Life Ins. Co. (U.S.A.), No. 652793/2011, 2012 WL 4513354, at *9 (Sup. Ct. N.Y. County Sept. 28, 2012) (citations omitted) (dismissing aiding and abetting breach of fiduciary duty claim under New York law on ground that allegations of corporate ownership standing alone were insufficient to state a claim).

"assistance" by functioning as administrator), 184, 283 (alleging that PwC Bermuda participated in the breach of fiduciary duty by issuing clean audit reports)).)  Such allegations do not support a claim of dishonest assistance or aiding and abetting a breach of fiduciary duty.  (Browne-Wilkinson ¶¶ 69, 71; Dohmann ¶¶ 88-89.)

### C.    The SAC Fails To Adequately Plead a Dishonest State of Mind

These claims also fail under Bermuda or BVI law because the SAC alleges no facts, as required under Rule 9(b), to substantiate its conclusory assertions that Tremont Group, Citi Hedge or PwC Bermuda acted with the requisite dishonest state of mind.[92]  (See Mov. Br. at 63–65.)  See also In re AlphaStar Ins. Grp., Ltd., 383 B.R. 231, 274–75 (Bankr. S.D.N.Y. 2008) (cited by Plaintiffs in Opp. Br. at 91) (applying Rule 9(b) to claim of dishonest assistance governed by Bermuda law and dismissing claim for failure to plead "with particularity that [the alleged aiders and abettors] did anything that would be considered 'dishonest' under Bermuda law.").  (Accord Bompas Further ¶ 134.2 ("I agree that it would be usual for a pleaded case to refer expressly to 'dishonesty' to make plain the nature of the claim [of dishonest assistance] being made.").)

Contrary to Plaintiffs' argument, (Opp. Br. at 87–96), mere allegations of recklessness, willful blindness, or other forms of constructive knowledge are not sufficient to adequately plead

_____

[92] The SAC's conclusory allegations that Tremont Group, Citi Hedge or PwC Bermuda "participated" in breaches of fiduciary duty by other Defendants (let alone did so "knowingly"), as required under New York law, fail to state a claim for the same reason.  (Mov. Br. at 79 n.77.)  While "knowing participation" may be established when a defendant "'helps conceal or fails to act when required to do so,'" (Opp. Br. at 86 (citing Lerner v. Fleet Bank, N.A., 459 F.3d 273 (2d Cir. 2006))), "mere inaction of an alleged aider and abettor constitutes [knowing participation] *only if the defendant owes a fiduciary duty directly to plaintiff*."  Lerner, 459 F.3d at 295 (emphasis added) (internal quotation marks and citation omitted).  These Defendants owed no such duty to Plaintiffs, so Plaintiffs' aiding and abetting claims must be dismissed.  See In re Sharp Int'l Corp., 403 F.3d 43, 51–52 (2d Cir. 2005) (allegations of concealment insufficient to state a claim of aiding and abetting breach of fiduciary duty under New York law where, as here, alleged aiders and abettors owed no fiduciary duty directly to plaintiffs).

dishonesty under both BVI and Bermuda law.  (See Mov. Br. at 77–79; Dohmann ¶¶ 88-89;

Hargun Reply ¶ 65.3; Evans Reply ¶ 32; Browne-Wilkinson Reply ¶ 60; Dohmann Reply

¶ 38.)[93]  For example, Plaintiffs claim that Tremont Group acted dishonestly because it and/or

Manzke allegedly had "'overwhelming information indicating that Madoff's operation was a

fraud - evidence they should have discovered, but instead ignored.'"  (Opp. Br. at 93 (quoting

SAC ¶ 64).)  At most, this allegation indicates only constructive knowledge under Bermuda and

BVI law and therefore fails to state a claim.[94]  (Hargun ¶ 166; Evans ¶ 104; Browne-Wilkinson

¶¶ 70-71; Dohmann ¶¶ 88-89; Hargun Reply ¶ 65.3; Evans Reply ¶ 32; Dohmann Reply ¶ 38.)

Count 13 also fails as against Tremont Group because Plaintiffs fail to provide factual support

for the proposition that Tremont Group had *any* direct relationship with the Funds, let alone a

"long-standing" one.  (Opp. Br. at 92 (citing SAC ¶ 85).)

 With respect to Citi Hedge, Plaintiffs similarly fail to allege a dishonest state of mind.

(Browne-Wilkinson ¶ 71; Browne-Wilkinson Reply ¶ 60.)  Instead, they are left repeating that

Citi Hedge performed its duties to the Funds pursuant to the Administration Agreements, such as

"receiving investments from Plaintiffs," "calculating the Funds' NAV," and transmitting

---

[93] The same is true under New York law.  (See Mov. Br. at 79 n.77.)  See also Lerner, 459 F.3d at 292 ("[A]ctual knowledge is required to impose liability on an aider and abettor under New York law.") (citations omitted).  Plaintiffs' reliance on Anwar II and Cromer fails because, unlike here, the complaints in both those cases provided detailed allegations of actual knowledge.  See, e.g., Anwar II, 728 F. Supp. 2d at 443 (plaintiffs alleged that administrator "knew that the Fairfield Defendants uniformly represented to Plaintiffs that they employed thorough due diligence . . . and verification of Fund managers, including Madoff") (citation omitted); Cromer Fin. Ltd., 137 F. Supp. 2d at 465–66 (S.D.N.Y. 2001) (allegations that defendant was "specifically alerted" to possible fraud, "yet simply accepted [the investment manager's] direction to ignore" it).

[94] This allegation also fails under New York law for the same reason.  See Rosner v. Bank of China, 06 CV 13562, 2008 WL 5416380, at **6–12 (S.D.N.Y. Dec. 18, 2008), aff'd, 349 F. App'x 637 (2d Cir. 2009); accord Zamora v. JPMorgan Chase Bank, N.A., 14 CV 5344, 2015 WL 4653234, at *3 (S.D.N.Y. July 31, 2015) (conscious avoidance not established by "conclusory allegations that 'willful blindness is the only possible explanation,' or that [defendant] 'should have suspected an embezzlement and money laundering scheme,' or that [defendant] exhibited 'conscious disregard for proper [industry] protocol'").

undescribed "Fund information" to the class.  (Opp. Br. at 94; SAC ¶¶ 319–20.)  To lengthen the list of acts that purportedly constituted "substantial assistance," Plaintiffs weakly allege that Citi Hedge "allow[ed]" its name (which did not even exist until 2007) to be used in the Funds' Information Memoranda.  (Opp. Br. at 94; SAC ¶ 320.)  None of this is sufficient to show that Citi Hedge acted with dishonesty.  (Browne-Wilkinson ¶¶ 70-71.)

The same is true for PwC Bermuda:  Plaintiffs' conclusory allegations fail to be "properly particulari[z]ed" to meet the element of dishonesty.  (Dohmann ¶ 88; see Dohmann Reply ¶¶ 37-38.)  Merely alleging that as "the auditor of the Funds, PwC was aware of the fiduciary duties owed by the Kingate Defendants to Plaintiffs . . . ", (SAC ¶ 281), and issued a clean audit report fail to establish dishonesty absent particular allegations that PwC Bermuda's actions were wholly inconsistent with innocence.  (Dohmann ¶¶ 88-89.)[95]

## VII.  THE SAC FAILS TO STATE CLAIMS OF GROSS NEGLIGENCE OR NEGLIGENCE – COUNTS 5, 6, 15, 16, 22 AND 23

### A.  Plaintiffs' Claims for Gross Negligence Fail as a Matter of Law (Counts 5, 15 and 22)

Plaintiffs fail to state claims for gross negligence under Bermuda or BVI law.  (Mov. Br. at 80.)  Plaintiffs and their expert concede that Bermuda and BVI *do not recognize* a separate claim for gross negligence.[96]  (See Opp. Br. at 46, 125; Bompas ¶ 121; Bompas Further ¶ 110;

---

[95] Under New York law, Plaintiffs have also failed to plead the knowledge element of "knowing participation" by Tremont Group, Citi Hedge or PwC Bermuda because they do not "satisfy Rule 9(b) by alleging . . . actual knowledge of a fraud based on allegations of . . . suspicions or ignorance of obvious 'red flags' or warning signs indicating the fraud's existence."  Rosner, 2008 WL 5416380, at *6; see also id. at **6–12; Meridian Horizon Fund, LP v. KPMG (Cayman), 487 F. App'x 636, 640–41 (2d Cir. 2012) ("[R]ed flags" insufficient to show scienter because they "were not only plainly disclosed to plaintiffs . . . but also to, *inter alios*, investors in and auditors of other Madoff feeder funds, and the SEC, none of whom discovered the Madoff scheme.").

[96] This is unlike New York, which does recognize such a tort.  See also Cromer Fin. Ltd., 137 F. Supp. 2d at 491–92 (recognizing a conflict between New York and Bermuda law on gross negligence).  Plaintiffs' expert also acknowledges that the 2008 English opinion upon which he relies to argue for a claim of

Diel ¶ 44; see also Hargun ¶¶ 125-26; Evans ¶¶ 63-64; Chivers ¶ 98; Browne-Wilkinson ¶ 43;

Dohmann ¶¶ 63-68; Hargun Reply ¶¶ 49, 50; Evans Reply ¶¶ 23-24; Chivers Reply ¶ 41;

Dohmann Reply ¶¶ 32-33.)[97]  All of Plaintiffs' "gross negligence" claims must therefore be

dismissed.[98]

## B.    The Plaintiffs' Claims for Negligence Fail as a Matter of Law

### 1.    The SAC Does Not Plead That Defendants Owed Any Duties to Plaintiffs

Plaintiffs premise their negligence claims on supposed "on-going communications

between the shareholders and Defendants."  (Opp. Br. at 105.)  However, as noted supra at

---

[97] Plaintiffs' argument that Bermuda and BVI law prohibit Defendants from exculpating themselves from liability for gross negligence, (see Opp. Br. at 115–16, 125), is irrelevant.  Defendants did not argue in their Moving Brief and do not argue here that Counts 5, 15, or 22 are subject to dismissal pursuant to the exculpation provisions.  Plaintiffs' other argument, that Bermuda and BVI law courts would look to the exculpatory provisions to determine the standard and scope of Defendants' duty of care for purposes of their negligence claims, (see Opp. Br. at 125), is also not relevant, as the inclusion of an exculpation provision cannot create a cause of action where none exists under the applicable foreign law.

[98] Plaintiffs' claims for gross negligence against the Defendants also fail under New York law.  As explained infra in Section VII(B), Plaintiffs do not state viable claims for plain negligence against the Defendants.  To the extent the Defendants owed duties defined by the Service Agreements, those duties were to the Funds or to each other, not to the Plaintiffs.  New York law "does not impose a tort duty of due care independent of" such contracts in cases that involve "solely economic harm."  Pls.' State & Secs. Law Settlement Class Counsel, 43 Misc.3d at 896.  Defendants' alleged conduct, namely relying on information they were entitled to rely on pursuant to their contracts, did not constitute "reckless disregard for the rights of others or "smack[] of intentional wrongdoing," because "allegations regarding [a] failure to discover or act on red flags [that Madoff was running a Ponzi scheme] are insufficient to establish such an extreme departure" from the standards of ordinary care.  Saltz, 782 F. Supp. 2d at 75–76 (citation omitted), aff'd, 485 F. App'x 461 (2d Cir. 2012).  The warnings and the exculpatory provisions in the IMs also demonstrate that Defendants did not recklessly disregard the rights of investors in the Funds.  Yale Fishman v. Phila. Fin. Life Assurance Co., No. 11-CV-1283, 2016 WL 2347921, at *12 (S.D.N.Y. May 3, 2016).  (See, e.g., 2008 KG IM at 9; 2008 KE IM at 10.)

Plaintiffs' gross negligence claim also fails under New York Law as to PwC Bermuda because "New York law does not recognize a cause of action for gross negligence against accountants unless the claim rises to the level of a fraud claim."  Anwar II, 728 F. Supp. 2d at 454.  Any such fraud claim would be barred by SLUSA.  See supra Section I; Kingate, 784 F.3d at 151.

Section IV(A), these allegations fail to satisfy either Rule 8(a) or 9(b), because Plaintiffs rely on "contemplated" communications, (Opp. Br. at 102, 105), by certain but not all of the service provider Defendants, without providing details about any actual communications with those or any other Defendant. Citing various agreements that may foresee communications, rather than specifying any supposedly "negligent" communications received from any Defendant and relied on by any Plaintiff, does not suffice. See Pehlivanian, 2016 WL 2859622, at *5.

Even if Plaintiffs did adequately allege they received specific communications from any Defendant, that would be insufficient to demonstrate a "special relationship"[99] or that such Defendant accepted such a relationship, as required by Bermuda and BVI law. (See Hargun ¶¶ 50, 52, 58, 131; Evans ¶¶ 33, 69; Chivers ¶¶ 100-01; Browne-Wilkinson ¶¶ 44-56; Dohmann ¶¶ 70-75; Hargun Reply ¶ 47; Evans Reply ¶ 21; Chivers Reply ¶¶ 34-40; Dohmann Reply ¶¶ 29-31.)[100]

Plaintiffs acknowledge, as they must, that Defendants did not assume "responsibility" towards them. (Opp. Br. at 107.) In order to avoid the obvious conclusion that the negligence claim should thus be dismissed, Plaintiffs assert that their claims would survive under the

---

[99] Under BVI and Bermuda law, claims for negligence and negligent misrepresentation require a showing of a special fiduciary relationship, akin to a contractual relationship, in which the defendant assumes responsibilities to the plaintiff.. (Mov. Br. at 81.) No such requirement exists under New York law. Accord Meng v. Schwartz, 305 F. Supp. 2d 49, 58 (D.D.C. 2004) (finding a conflict between the District of Columbia and Bermuda law on common law negligence). The Plaintiffs also misinterpret the holdings of the cases they cite. (Opp. Br. at 46.) See Cromer Fin. Ltd. v. Berger, No. 00 Civ. 2284 DLC, 2003 WL 21436164, at *10 (S.D.N.Y. June 23, 2003) (defendant failed to raise any potential conflict between New York and Bermuda law); Harmelin v. Man Fin. Inc., No. 06-1944, 2007 WL 3146666, at *2 (E.D. Pa. Oct. 26, 2007) (one party "made a substantial showing, not contested by the other parties . . . that . . . there is no conflict between Cayman law and Pennsylvania law") (emphases added).

[100] As to PwC Bermuda, no duty could ever be pled by these Plaintiffs. "Auditors of company accounts do not owe a general duty of care to third parties" under Bermuda or BVI law. (Dohmann Reply ¶ 29.) Plaintiffs fail to distinguish the controlling and dispositive Caparo decision. (Dohmann ¶¶ 71-75; Dohmann Reply ¶¶ 29-31.) Moreover, any claims based on allegations that Defendants breached a duty of care by negligently mismanaging the Funds are either exculpated, as explained in Section VII(C), or assert derivative claims that belong to the Funds themselves. See supra Sections II(B–C).

standard for a "Bermuda or BVI court" "to strike out the SAC in its entirety." (Opp. Br. at 107.)

Of course, the Federal Rules, not foreign pleading standards, apply to the claims. See supra

Section IV(A). Given the requirements of Twombly, Plaintiffs cannot avoid dismissal by

asserting that "full discovery and findings of fact," (Opp. Br. at 107), may unearth a claim. (See

also Bompas ¶ 62 ("I do not agree that on the present materials it can be demonstrated that, on no

possible view of the Complaint or of the facts which might be found, could the Plaintiffs hope to

prevail on the relevant counts.")[101]; cf. Hargun Reply ¶¶ 36-37, 47; Evans Reply ¶¶ 17, 21;

Chivers Reply ¶ 34.) Plaintiffs must plead facts "plausibly suggesting" that Defendants owed

them duties of care, not allegations that are at most "merely consistent with" liability. Twombly,

550 U.S. at 557.

Plaintiffs' negligence claims against the "Individual Defendants" also fail because under

Bermuda and BVI law, directors ordinarily do not owe shareholders of their own companies a

duty of care absent extraordinary circumstances lacking in this case, and certainly owe no duty to

shareholders of a separate company. See supra Section V(B). (See also Hargun ¶¶ 52, 62, 65;

Evans ¶¶ 33-36; Chivers ¶¶ 99–125; 157–60; Hargun Reply ¶ 55A; Evans Reply ¶ 27; Chivers

Reply ¶ 40A.) There are no allegations in the SAC that any Individual Defendant communicated

with any Plaintiff, let alone undertook any personal duty to any Plaintiff. (Opp. Br. at 108;

Hargun Reply ¶ 47; Evans Reply ¶ 21; Chivers Reply ¶ 38.)[102]

Finally, affiliates (such as FIM (USA) and Tremont Group) would not owe any duty to

---

[101] Tellingly, Bompas mimics the Supreme Court's former test from Conley, 355 U.S. at 45–46, abrogated by Twombly, 550 U.S. 544, that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." That test "has earned its retirement." Twombly, 550 U.S. at 563.

[102] Plaintiffs again fail to mention Tannenbaum in the negligence section of their Opposition, which means they have conceded the argument. Syron, 934 F. Supp. 2d at 631. Plaintiffs' negligence claim as to Tannenbaum also fails on its own. (Mov. Br. at 25, 81–83.)

Plaintiffs simply because a related company had a contractual relationship or undertook duties to

the Funds or to KML.[103]

### 2. Plaintiffs Have Also Failed to Plead that Defendants Breached Any Duties

Plaintiffs also fail to allege that Defendants breached any duties, given that Defendants

relied on information received from Madoff on which they were contractually entitled to rely.

(Mov. Br. at 83–84.) Contrary to Plaintiffs' argument, the Information Memoranda, which

Plaintiffs acknowledged they "received, reviewed, and understood,"[104] and which incorporate by

reference the terms of the Management Agreements, Co-Management Agreement,

Administration Agreements, and Consulting Services Agreements, provide that none of the

Defendants was required to undertake due diligence to verify the accuracy of information

provided by Madoff and were instead entitled to rely on that information without further

---

[103] As described in the Moving Brief, (at 82 n.80), Plaintiffs' negligence claims against all Defendants likewise fail under New York law. As to PwC Bermuda, Plaintiffs' reiteration of their conclusory allegations as to how PwC Bermuda was aware that Plaintiffs would purportedly rely on its audit opinions, that Plaintiffs were "known parties" to PwC Bermuda, and that PwC Bermuda addressed its audit opinions to "the Shareholders" of the Funds continue to fall short of alleging the requisite "near privity" relationship required under the Credit Alliance test. (Opp. Br. at 97–102); see, e.g., Meridian Horizon Fund, LP, 487 F. App'x at 642 (holding that plaintiffs were not a "known party" because "they failed to show that [defendants] were aware of the identities of the specific nonprivy parties who would be relying upon their reports and that no "linking" conduct was alleged because plaintiffs "failed to allege any form of direct contact between [plaintiffs] and the [defendant]"). This is especially true here, as Plaintiffs acknowledge that PwC Bermuda did not send its audit opinions to them directly. (Opp. Br. at 98.) Plaintiffs' allegations as to the "Kingate Defendants" and Citi Hedge similarly fail, because Plaintiffs merely reference generalized "on-going communications" between those Defendants and Plaintiffs and point to various provisions in the Service Agreements that "contemplate" potential correspondence with investors. (Opp. Br. at 102–03.) However, Plaintiffs have not pleaded that they actually received or relied on any such communications with any of the Defendants (either as a group or individually), or how such hypothetical communications could establish any duty to non-privity Plaintiffs. See CRT Inves, Ltd. v. BDO Seidman, LLP, 925 N.Y.S.2d 439, 441 (1st Dep't 2011) ("Where, as here, direct contact between the [defendant] and the plaintiff is minimal or nonexistent, the plaintiff cannot recover for the [defendant's] alleged negligence.").

[104] (See Mov. Br. at 15 n.27.)

inquiry.[105]  Such contractual disclaimers are enforceable under Bermuda and BVI law even though Plaintiffs were not parties to these service agreements.  (See Hargun ¶¶ 68-79, 133-34; Evans ¶¶ 36, 71-72; Chivers ¶¶ 118-26, 158; Browne-Wilkinson ¶¶ 55-56.)

### C.   The Exculpation Provisions Contained in the Service Agreements Separately Bar Plaintiffs' Tort Claims

As the Moving Brief makes clear, all claims based on allegations that the service provider Defendants were negligent in rendering services to the Funds (or KML) are exculpated pursuant to the express terms of the Management Agreements, Co-Management Agreements, CSAs, and Administration Agreements and also fail to state a claim under Bermuda or BVI law.  (See Mov. Br. at 42–43, 48 n.53.)[106]

Plaintiffs' argument that they are not bound by the exculpation provisions of the Service Agreements, (Opp. Br. at 112–20), and their alternative argument that the provisions do not bar their negligence claims, are wrong as a matter of law.  On their face, the exculpation provisions plainly and unambiguously exculpate all Defendants from liability for negligence.  (See Mov. Br. at 18–19 (reciting terms of exculpation clauses).)  To the extent there is any discrepancy between the Service Agreements and the IMs as to the scope of the exculpation provisions, the Service Agreements control.[107]  (See Hargun Reply ¶ 43; Evans Reply ¶ 18; Chivers Reply ¶ 68.)

Moreover, Plaintiffs cannot avoid the exculpation provisions in the Service Agreements by arguing that they were unaware of them.  (See Opp. Br. at 114.)  By signing Subscription

---

[105] (See Mov. Br. at 16–20, 83–84.)

[106] Claims based on allegations of mismanagement would also be exculpated under New York law.  See, e.g., Saltz, 782 F. Supp. 2d at 82–83; Newman, 748 F. Supp. 2d at 318 (each dismissing claims against service providers of Madoff feeder funds based on mismanagement as exculpated).

[107] (See Mov Br. at 15 n.28 (describing that each IM disclosed to investors that the information set forth in the IMs "is qualified in its entirety by, the full text of . . . [the Service Agreements]").)

Agreements before investing in the Funds, Plaintiffs had constructive, if not actual, knowledge of those provisions.  Plaintiffs represented and warranted in the SAs that they had "received, reviewed, and understood" the IMs, (Mov. Br. at 15 n.27), which summarized the provisions of the Service Agreements, including the exculpation provisions of those contracts.  (See Mov. Br. at 15–16 & nn.29, 30.)  The IMs further disclosed that copies of the Service Agreements were available to investors, including Plaintiffs, for review upon request.[108]

Each Plaintiff also represented and warranted in the SAs that it was a sophisticated investor in possession of the necessary "knowledge, expertise and experience in financial matters to evaluate the risks of investing in the Fund[s]," (Mov. Br. at 20–21 n.40),[109] and had "consulted with its own attorney, accountant or investment adviser with respect to [its] investment" in the Funds.[110]  Plaintiffs further represented and warranted in their SAs that prior to investing in the Funds they were afforded the opportunity "to obtain any additional information necessary to verify the information contained in the [IMs]."  (Mov. Br. at 21 n.40.)  As a matter of law, it thus became incumbent on Plaintiffs to familiarize themselves with the Service Agreements and they cannot now escape the consequences of their own failure to do so.  Plaintiffs' tort claims therefore are limited by the exculpation provisions of the Service Agreements even if, as they now claim, "there is little chance they ever saw the Service  Agreements." (Opp. Br. at 114; see

---

[108] (See 2000 KG IM at i; 2003 KG IM at i; 2006 KG IM at i; 2007 KG IM at i; 2008 KG IM at i; 2000 KE IM at i; 2003 KE IM at i; 2004 KE IM at i; 2006 KE IM at i; 2007 KE IM at ii; 2008 KE IM at ii (each of which disclosed to investors that copies of the Service Agreements "are available from the Administrator upon request").)

[109] Each Plaintiff's representations regarding its financial acumen demonstrates that Plaintiffs were sophisticated investors.  See Emergent Capital Inv. Mgmt. LLC v. Stonepath Grp., Inc., 343 F.3d 189, 196 (2d Cir. 2003) (under New York law, plaintiff's representations "that it had 'knowledge and experience in financial business matters' and that it could readily evaluate the risks of the transaction" demonstrated plaintiff was a sophisticated investor).

[110] (See 2003 KG SA at S-9; 2006 KG SA at S-8; 2007 KG SA at S-9; 2008 KG SA at S-9; 2003 KE SA at S-8; 2004 KE SA at 5; 2006 KE SA at S-8; 2007 KE SA at S-9; 2008 KE SA at S-9.)

Hargun ¶ 77; Evans ¶ 36; Hargun Reply ¶¶ 39-42A; Evans Reply ¶ 18.)

## VIII. THE SAC FAILS TO STATE A CLAIM FOR NEGLIGENT MISREPRESENTATION AGAINST CITI HEDGE OR PWC BERMUDA – COUNTS 17 AND 24

As described in the Moving Brief, Citi Hedge owed no generalized duty to Plaintiffs because Citi Hedge had no special relationship with Plaintiffs, and under Bermuda and BVI law there is no duty to prevent another from suffering a financial loss caused by a third party. (Mov. Br. at 85–86; Browne-Wilkinson ¶¶ 40-50.) Any duty imposed on Citi Hedge would conflict with the contractual disclaimers on which Citi Hedge was entitled to rely and by which Plaintiffs are bound. (E.g., 2008 KG IM at 10; 2008 KE IM at 10; ADMs ¶ 10.6.)

Plaintiffs' claim for negligent misrepresentation against PwC Bermuda fails for similar reasons. Under Bermuda law, an auditor does not owe a duty of care to the individual shareholders of the company it audits. (Dohmann ¶¶ 71-75, 76-77.) Accordingly, Caparo requires dismissal of Plaintiffs' negligence-based claims against PwC Bermuda. (Dohmann ¶¶ 71-75, 76-77; Dohmann Reply ¶¶ 29-31.)[111]

---

[111] Plaintiffs fail to state a claim for negligent misrepresentation under New York law as to Citi Hedge and PwC Bermuda for the same reasons discussed supra in Section VII(B)(1). Although Plaintiffs contend that the determination of a special relationship is "highly fact-specific," (Opp. Br. at 104), courts in this district have regularly resolved this issue at the pleadings stage. See, e.g., JP Morgan Chase Bank v. Winnick, 350 F. Supp. 2d 393, 402–04 (S.D.N.Y. 2004). Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc., 910 F. Supp. 2d 543 (S.D.N.Y. 2012), relied on by Plaintiffs, (Opp. Br. at 104), is readily distinguishable. Id. at 547 (noting "special relationship" based on defendant's knowledge of the identities of several plaintiffs). Moreover, the defendants in Abu Dhabi had no contractual disclaimers entitling them to rely on information provided to them in making their ratings.

## IX. PLAINTIFFS CANNOT PURSUE A THIRD PARTY BENEFICIARY BREACH OF CONTRACT CLAIM AGAINST KML, TREMONT, THE FIM ENTITIES, PWC BERMUDA OR CITI HEDGE (COUNTS 9, 10, 18, 25)

### A. Plaintiffs' Claims Fail Under Bermuda and BVI Law

Plaintiffs do not contest that under current law in both Bermuda and BVI,[112] non-parties to a contract have no right to recover damages for an alleged breach of that contract absent rare exceptions that do not apply here.  (Mov. Br. at 87; Opp. Br. at 137–39.)  This requires dismissal of Plaintiffs' claims.

Plaintiffs' argument that because this strict privity requirement has been eliminated in certain other Commonwealth countries (e.g., New Zealand, U.K., Hong Kong), this Court should assume that at some point in the future Bermuda and/or the BVI may decide to "follow the lead" of those countries and also eliminate the requirement, must be rejected.  (Opp. Br. at 139.)  First, the speculative hope as to the future of Bermuda and BVI law, where settled law is that non-parties to a contract cannot sue for an alleged breach of that contract, does not change current law in those jurisdictions.[113]  (Hargun ¶¶ 32-33, 109-10, 144-49; Evans ¶¶ 26-27, 49-50, 82-87; Chivers ¶¶ 129-30; Browne-Wilkinson ¶ 63; Dohmann ¶¶ 78-83.)  This is particularly true where, as here, the relevant contracts contain non-assignment and no third party beneficiary clauses making it clear that the rights conferred by the contracts are not intended to benefit third-

---

[112] There is a difference between the law of Bermuda/BVI and New York.  Both foreign jurisdictions adhere to the common law doctrine requiring strict privity, unlike New York.  (Mov. Br. at 86–89); see also MGN Pension Trustees v. Morgan Stanley Trust Co., 947 F. Supp. 611, 618 (E.D.N.Y. 1996) (finding a conflict between New York law, which recognizes third-party beneficiaries, and English law, which does not).

[113] Plaintiffs claim that Bermuda "has already begun to distance itself from the privity rule [through the Third Parties (Rights Against Insurers) Act of 1963, which] allows third parties to bring claims against insurers to enforce insurance provisions intended for their benefit."  (Opp. Br. at 139.)  This statute is not relevant to the claims being asserted in this action and does nothing to alter the existing law that a third party cannot bring a contract claim as a third party beneficiary.  (Hargun Reply ¶ 67; Evans Reply ¶ 34; Chivers Reply ¶ 63 n.24; Browne-Wilkinson Reply ¶ 55.)

parties, and contain no promises made in trust specifically for the benefit of third parties. (Hargun ¶¶ 109-10, 147; Evans ¶¶ 49-50, 85; Chivers ¶¶ 130-31; Dohmann ¶¶ 78-83.)  Plaintiffs have no basis for their invitation that this Court ignore relevant governing law.[114]  <u>Gilstrap v. Radianz Ltd.</u>, 443 F. Supp. 2d 474, 491 (S.D.N.Y. 2006) (federal courts should be hesitant to apply foreign law in a way that "would necessarily involve expanding, extending, or departing from well-settled and long established principles of foreign law"), <u>aff'd</u>, 233 F. App'x 83 (2d Cir. 2007); <u>see also</u> <u>In re Nortel Networks, Inc.</u>, 469 B.R. 478, 499 (Bankr. D. Del. 2012) ("This Court's role under Rule 44.1 is to determine foreign law *as currently applied* by English, Irish, and French courts.") (emphasis added).[115]

Plaintiffs also fail to rebut Defendants' arguments in the Moving Brief that no Defendant breached the underlying Service Agreements.  (<u>See</u> Mov. Br. at 89–93.)  While the SAC may allege in conclusory fashion that KML and Tremont "knew that information from Madoff was suspect and, consequently, could not have relied on information it knew or had ample reason to believe was wrong . . . ," (Opp. Br. at 136), the contractual disclaimers require Plaintiffs to allege

---

[114] Plaintiffs complain that Defendants do not cite "recent" Bermuda authorities rejecting third party beneficiary breach of contract claims, and argue that <u>Beswick v. Beswick</u>, [1968] AC 58 is "an obsolete House of Lords case" that was "effectively discredited by the passage of the UK Contract (Right of Third Parties) Act 1999."  (Opp. Br. at 138.)  Plaintiffs are wrong.  <u>Beswick</u> remains good law in the BVI, Bermuda, and England.  (Hargun Reply ¶ 67; Evans Reply ¶ 34; Chivers Reply ¶ 63; Browne-Wilkinson Reply ¶ 55; Dohmann Reply ¶ 35.)  Bompas does not address <u>Beswick</u> in his Further Declaration.

[115] Plaintiffs also argue that Bermuda law "recognize[s] certain circumstances in which, as a matter of equity, the courts may impose a 'constructive trust' as a remedy to enforce contracts in favor of a third party." (Opp. Br. at 138–39 (citing Hargun ¶ 152).)  However, the only claims that could potentially give rise to a constructive trust here are the breach of fiduciary duty and unjust enrichment claims, not the breach of contract claim, and those claims both fail.  (Hargun ¶ 152; <u>see also</u> Chivers Reply ¶¶ 64-65; Browne-Wilkinson Reply ¶ 53.)  The matter is not dealt with in Bompas' Further Declaration.  Moreover, there is nothing in the Service Agreements that evidences any intent that the Funds, KML, or Tremont held the benefit of those agreements on "trust" or acted as a "trustee" of these agreements for the Plaintiffs.  <u>See</u> <u>infra</u> Section IX(B).  (<u>See also</u> Hargun ¶¶ 44-49; Evans ¶¶ 82-87; Chivers ¶ 131; Chivers Reply ¶¶ 64-66 (under Bermuda or BVI law, a third party cannot enforce a contract, regardless of whether the contract contains an exculpatory provision or expressly confers a benefit on that third party).)

that the Managers acted in *bad faith* in relying on information received from Madoff, which they have not done.[116]  (Hargun Reply ¶ 44; Evans Reply ¶ 18; Chivers Reply ¶ 67.)

As to the FIM Entities, Plaintiffs' arguments, (Opp. Br. at 136), also fail.[117]  First, the claims against FIM (USA) fail because Plaintiffs do not contest that FIM (USA) was not a party to the CSAs, the Distribution Agreements or any other contract.  (Mov. Br. at 92.)  Second, the SAC does not allege that FIM provided any information under the CSAs to any of the named Plaintiffs, and the CSAs make clear that FIM had no obligation to KML to provide any documents or information to "investors."  (See SAC, *in passim*; CSAs, *in passim*.)[118]  Third, the CSAs did not obligate FIM to conduct any due diligence on Madoff and the CSAs make clear that FIM had the right to rely on information provided by the Managers.  (CSAs at § 2.4 ("FIM shall be entitled to rely on the authenticity and completeness" of all information provided by KML).)[119]

---

[116] To the extent Counts 9 and 10 of the SAC allege that KML or Tremont turned a blind eye to Madoff's fraud by conducting "recklessly insufficient due diligence," (Opp. Br. at 136), those Counts should be dismissed as precluded by SLUSA.  See supra Section I(A)**.**

[117] Plaintiffs cannot rely on the Distribution Agreements, which are between KML and FIM Limited, to support their claims.  (Opp. Br. at 136.)  The SAC does not contain any allegations that FIM Limited (or any of the other FIM Entities) sold Plaintiffs a single share in the Funds pursuant to those agreements, or that FIM Limited breached any provision in those agreements.  In fact, the SAC does not mention the Distribution Agreements at all.  See, e.g., Chechele v. Scheetz, 819 F. Supp. 2d 342, 347 (S.D.N.Y. 2011) (plaintiff could not rely on agreement to oppose motion to dismiss since "[c]omplaint [did] not reference the [agreement], much less 'rel[y] heavily upon its terms and effect'") (fourth alteration in original) (citation omitted), aff'd, 466 F. App'x 39 (2d Cir. 2012).

[118] Nor does the SAC allege that FIM Limited had any contact with any Plaintiffs under the Distribution Agreements, let alone provided any documents or information to any of them that would constitute a breach of those agreements.

[119] Without citation, Plaintiffs make an offhand reference to IMRO "regulations governing the sale of securities."  (Opp. Br. at 136.)  Even if Plaintiffs had pled that FIM Limited (or any of the other FIM Entities) sold shares to them under the Distribution Agreements—which they did not—Plaintiffs do not cite a single IMRO rule or any other regulation that would require FIM to perform independent due diligence on information provided by Madoff despite written agreements that disclaimed any such responsibility.

Plaintiffs have not pled that Citi Hedge breached the Administration Agreements.

Contrary to Plaintiffs' argument, (Opp. Br. at 136–37), Citi Hedge had no duty to uncover that

pricing information provided by Madoff was inaccurate, or investigate information that might

have suggested Madoff was running a Ponzi scheme.  It was instead entitled to rely on

information provided by Madoff in providing services to the Funds (*not* to audit the information

it received).  (ADMs ¶ 10.6 ("The Administrator is not liable for the accuracy of the underlying

data provided to it.").)  Plaintiffs knew this: the Information Memoranda, whose terms Plaintiffs

accepted when they signed the Subscription Agreement, stated that the Administrator was

entitled to rely on the data it received from Madoff.[120]  At most, Citi Hedge was required to

check pricing "*on the last Business Day of each calendar month*."  (2008 KG IM at 2, 23; 2008

KE IM at 2, 24 (emphasis added).)  But Plaintiffs do not allege a single instance where a month-

end price reported by Citi Hedge was erroneous.[121]

### B.    Even Under New York Law, Plaintiffs' Claims Still Fail Because Plaintiffs Are Not Intended Beneficiaries of Any Agreements

Plaintiffs' third-party beneficiary claims also fail under New York law because non-

parties can only sue to enforce contracts when the contractual terms "*clearly evidence* an intent

to permit enforcement by the third party in question."  <u>Premium Mortg. Corp. v. Equifax Inc.</u>,

---

[120] (<u>See</u> 2008 KG IM at S-4; <u>see also</u> 2008 KG IM at 10 ("The Administrator may rely upon appropriate pricing services and information provided by the Investment Advisor and shall not, in the absence of gross negligence or willful default be liable for any loss suffered by the Fund or any Shareholder by reason of any error in calculation resulting from any inaccuracy in the information provided by any pricing service or the Investment Advisor."); 2008 KE IM at 11–12 (same).)  <u>Cf.</u> <u>Maounis</u>, 749 F. Supp. 2d at 121 (no duty to shield investors from risk of which they were made aware).

[121] Nor do they explain how identifying any alleged inconsistencies in the information provided by Madoff would have uncovered his fraud, given that the relevant risks and supposed "red flags" "were not only plainly disclosed to plaintiffs . . . but also to, *inter alios*, investors in and auditors of other Madoff feeder funds, and the SEC, none of whom discovered the Madoff scheme."  <u>Meridian Horizon Fund, LP</u>, 487 F. App'x at 640–41 ("[T]he most compelling inference as to why Madoff's fraud went undetected for two decades was his proficiency in covering up his scheme and deceiving the SEC and other financial professionals.") (internal quotation marks and citation omitted).

583 F.3d 103, 108 (2d Cir. 2009) (emphasis added) (citation omitted).[122]  The supposed

"manifestations" in the Service Agreements of the parties' intent to benefit Plaintiffs, (Opp. Br.

at 126), do no such thing.[123]

Contrary to Plaintiffs' suggestion, (Opp. Br. at 125–26), courts routinely dismiss third

party beneficiary claims in these circumstances, including in several of the decisions cited in the

Opposition.  See, e.g., Anwar II, 728 F. Supp. 2d at 431 (cited at Opp. Br. at 126, 131)

(dismissing claim against fund custodians where custody agreements contained no language

"directing [defendants] to render performance directly to Plaintiffs");[124] see also Banco Espirito

Santo de Investimento, S.A. v. Citibank, N.A., No. 03 Civ. 1537(MBM), 2003 WL 23018888, at

**9–12 (S.D.N.Y. Dec. 22, 2003) (dismissing shareholder's third party beneficiary claims

against fund manager because, *inter alia,* contract contained exculpatory and inurement clauses

demonstrating parties' intent to limit liability to the fund), aff'd, 110 F. App'x 191 (2d Cir.

---

[122] See also Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I, LLC, 637 F. Supp. 2d 185, 191 (S.D.N.Y. 2009) (plaintiffs "must establish that the parties' intent to benefit [third parties] can be found on the face of the [agreements]").

[123] Plaintiffs' conclusory allegations that the agreements evidence a "clear intent" to benefit them, (see, e.g., Opp. Br. at 127), are legal conclusions entitled to no weight on a motion to dismiss.  See, e.g., Twombly, 550 U.S. at 555.  Similarly, Plaintiffs' allegations purporting to summarize the contractual terms are entitled to no weight as the Court can examine the plain language of the agreements themselves, which (as discussed above) make clear they were not intended to benefit Plaintiffs.  See, e.g., Spinelli v. Nat'l Football League, 96 F. Supp. 3d 81, 131 (S.D.N.Y. 2015) ("The provisions of the parties' agreements establish the rights of the parties and prevail over conclusory allegations in the complaint.").

[124] (See Opp. Br. at 125–31 (citing Air Atlanta, 637 F. Supp. 2d at 194 (dismissing claim because agreements "on their faces [did] not contain any expression of intent" to benefit plaintiff)).)  See also Piccoli A/S v. Calvin Klein Jeanswear Co., 19 F. Supp. 2d 157, 164 (S.D.N.Y. 1998) (dismissing claim because inurement and non-assignment provisions in the contract demonstrated parties' intent not to benefit third-party plaintiffs); Madeira v. Affordable Hous. Found., Inc., 469 F.3d 219, 252 (2d Cir. 2006) (affirming dismissal of third party beneficiary breach of contract claim where contract did not name, describe, or otherwise refer to third party beneficiary); Subaru Distribs. Corp. v. Subaru of Am., Inc., 425 F.3d 119, 125 (2d Cir. 2005) (affirming dismissal of third party beneficiary breach of contract claims where underlying agreements did not support inference that parties intended to benefit plaintiffs); Debary v. Harrah's Operating Co., 465 F. Supp. 2d 250, 263 (S.D.N.Y. 2006) (rejecting third party beneficiary breach of contract claim because defendants' contract did not clearly confer any benefit on plaintiffs), aff'd sub nom., Catskill Dev. L.L.C. v. Park Pl. Entm't Corp., 547 F.3d 115 (2d Cir. 2008).

2004).

The plain language of the Service Agreements demonstrates that the services provided by Defendants were rendered to, and for the benefit of, the Funds and/or the Managers (not Plaintiffs or other shareholders).[125] (Mov. Br. at 87–88.) The Management Agreements and Co-Management Agreement make clear that all of the services provided were to be rendered directly to and for the benefit of the Funds.[126] Plaintiffs' argument that KML and Tremont "implicitly acknowledged" that they owed duties to shareholders when they included an exculpation provision in the Management Agreements (Section 5.4) that limited their liability to the Fund or its Shareholders, (Opp. Br. at 128–29), turns logic on its head. The exculpatory provision further evidences the parties' intent *not* to create third party beneficiary status by expressly stating the managers had no liability whatsoever to shareholders for any claims they may attempt to assert,

---

[125] For this reason, the majority of the case law cited in Plaintiffs' Opposition is inapposite because the contracts in each of those cases expressly obligated defendants to provide a direct service to the third party plaintiffs. (See Opp. Br. at 126–27 & n.36 (citing Flickinger v. Harold C. Brown & Co., 947 F.2d 595, 600 (2d Cir. 1991) (contract provided for clearing services that were "to be rendered directly to [plaintiff]")); Finch, Pruyn & Co. v. M. Wilson Control Servs., Inc., 658 N.Y.S.2d 496, 498 (3d Dep't 1997) (contract "necessarily required [defendant] to directly perform services at plaintiff's facility"); Richards v. City of New York, 433 F. Supp. 2d 404, 430 (S.D.N.Y. 2006) (finding plaintiff-children were the "people for whom the delegated services are to be provided" under foster care services contract); Barry v. Atkinson, No. 96 Civ. 8436 (PKL), 1998 U.S. Dist. LEXIS 7378, at *3 (S.D.N.Y. May 20, 1998) (contract identified plaintiffs as beneficiaries and required defendant to pay them directly if goods were not delivered); Owens v. Haas, 601 F.2d 1242, 1250 (2d Cir. 1979) (finding "numerous clauses" in contract provided for safekeeping and protection of inmates such as plaintiff); Fen X. Chen v. Street Beat Sportswear, Inc., 226 F. Supp. 2d 355, 363–64 (E.D.N.Y. 2002) (contract recognized plaintiffs' "right to performance" and its "entire purpose" was to ensure plaintiffs were adequately paid); Dep't of Economic Dev. v. Arthur Andersen & Co. (U.S.A.), 924 F. Supp. 449, 482 (S.D.N.Y. 1996) (auditor prepared separate audit report for plaintiff and financial reports in accordance with plaintiffs' specific requirements).)

[126] (See, e.g., KG Co-MA §§ 2.1, 3.1, 4.1, 5.7(a), (b).) The Manager was required to "effect the investment strategy for the investment of the assets of the Fund . . . ." (§ 2.1); "assist the Fund . . . in the performance of certain of its administrative duties . . . ." (§ 3.1); "[sell] Shares of the Fund and advi[se] the Fund on general matters affecting the marketing of the Shares" (§ 4.1); and "afford the Fund's independent auditors reasonable access to documents pertaining to the Fund's activities . . . ." (§5.7(b).) The other Management Agreements contain similar or identical provisions. (See also 2000 KE MA §§ 2.1, 2.5, 3.1.)

in a derivative capacity, on behalf of the Funds.  See, e.g., Banco Espirito, 2003 WL 23018888,

at *9 (exculpatory provision in fund administration agreement demonstrates "plain intent" to

"limit duties rather than to generate an additional duty" to shareholders).  Contrary to Plaintiffs'

argument, (Opp. Br. at 129–31), the inurement and non-assignment clauses in several of the

Management Agreements further undercuts their claimed intended beneficiary status.[127]  See,

e.g., Commonwealth Land Title Ins. Co. v. Am. Signature Servcs., Inc., No. 13-CV-3266

(JFB)(WBW), 2014 WL 672926, at *7 (E.D.N.Y. Feb. 20, 2014) (collecting authorities) (finding

non-assignment clause "evinces an intent not to benefit any third parties"); Banco Espirito, 2003

WL 23018888, at *10 (inurement clause in fund agreement "makes plain the parties' intention to

preclude third-party enforcement") (citation omitted).  That KML and Tremont had the ability to

delegate certain duties under the Management Agreements does not impact the validity of the

non-assignment clause or diminish the parties' intention to limit to themselves the ability to

enforce the contract.  See, e.g., Arnold Prods., Inc. v. Favorite Films Corp., 298 F.2d 540, 543

(2d Cir. 1962) (finding party to contract may delegate its duties to another without assigning the

contract in its entirety).[128]

---

[127] The cases cited by Plaintiffs either do not support their proposition or are otherwise distinguishable.  In Piccoli, (Opp. Br. at 130), the court held that plaintiffs were not third party beneficiaries because the existence of inurement and non-assignment provisions in the contract made it "apparent . . . that the parties intended to limit to themselves the ability to enforce the agreement."  19 F. Supp. 2d at 164.  In Anwar II, (Opp. Br. at 129, 131), the court found Plaintiffs were third party beneficiaries of administration agreements because, unlike here, the agreements contained "multiple provisions" explicitly requiring the administrator-defendants to render "specific performance directly to the Plaintiffs."  728 F. Supp. 2d at 430.  Here, the Management Agreements do not require—and the Managers did not provide—any services "directly to the Plaintiffs."  Id. at 430.

[128] As Plaintiffs acknowledge, the Kingate Euro Fund Manager Agreement dated May 1, 2000 also contained an express provision barring third party beneficiaries.  (Opp. Br. at 130.)  However, the fact that this provision was not contained in other management agreements does not establish that those other agreements were intended to benefit third parties.  See Premium Mortg. Corp., 583 F.3d at 107 (contract must "clearly evidence" an intent by the parties to permit enforcement by third parties).

Plaintiffs are not intended beneficiaries of the CSAs between FIM and KML.[129]  The

excerpts from the agreements outlining the valuation and reporting services to be provided by

FIM to KML, (Opp. Br. at 132),[130] are selectively excerpted.  The CSAs are clear that all of

FIM's services were being provided directly to KML (not Plaintiffs):

> *FIM will provide such assistance, information, and reports as the Manager and the Company's auditors may from time to time require* in connection with the preparation of valuations in respect of the Company, the preparation *by the Manager* of period reports for submission to the Company, and the provision of annual, semi-annual and other reports for the benefit of Shareholders or prospective Shareholders of the Company whether these are published by the Company or the Manager. . . .

(KE CSA § 8 (emphases added); <u>see also</u> KG CSA § 8.)  The fact that FIM was tasked with

assisting *the Managers* to prepare reports "for the benefit of Shareholders," (Opp. Br. at 132), is

precisely the type of incidental benefit that is insufficient to support a third party beneficiary

breach of contract claim.  <u>See, e.g.</u>, <u>Anwar II</u>, 728 F. Supp. 2d at 431 (finding benefit to

shareholders was "merely incidental" where custody agreement "exclusively lay[s] out the duties

to the fund" and contained no language directing defendants to "render performance directly to

the Plaintiffs").  Any alleged obligation of FIM to make "recommendations regarding the

proposed allocation of assets" and "continuously monitor" performance, (Opp. Br. at 132), were

---

[129] As an initial matter, Plaintiffs' assertion that the "FIM Entities," generally, were "parties to two service contracts with the Funds" is false.  (Opp. Br. at 132.)  The CSAs were between FIM and KML, not the Funds, and FIM (USA) was not party to these agreements.  (CSAs at 1.)

[130] Plaintiffs also cite various allegations made by the Joint Liquidators in the Bermuda Proceedings in an attempt to support their third party beneficiary claims against FIM.  (Opp. Br. at 133 n.37.)  However, Plaintiffs cannot rely upon allegations from a complaint in a different matter, to support their claims here.  <u>See, e.g.</u>, <u>Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.</u>, 146 F.3d 66, 70 (2d Cir. 1998) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather [only] to establish the fact of such litigation and related filings.") (citation omitted).

also services provided directly to KML.[131]  Moreover, as Plaintiffs acknowledge, (Opp. Br. at

133), the CSAs—like the Management Agreements—contain anti-assignment clauses further

demonstrating the parties' intent not to make the Plaintiffs third party beneficiaries.  (See also

Mov. Br. at 88.)

Plaintiffs' reliance on the Distribution Agreements to support their third party beneficiary

claim as to the "FIM Entities," (Opp. Br. at 132), also fails.[132]  Again, Plaintiffs cannot rely on

any supposed breach of the Distribution Agreements because the SAC does not mention these

agreements.  Moreover, there is nothing in the Distribution Agreements demonstrating any intent

to benefit Plaintiffs.  Rather, the sole purpose of the Distribution Agreements was to authorize

FIM Limited to act on behalf of KML *opposite* to prospective investors.  The Distribution

Agreements make clear that FIM Limited's services were provided directly to KML[133] and,

moreover, contain the same anti-assignment clauses contained in the Management Agreements

and CSAs.  (See DAs § 12.)  Finally, the Distribution Agreements cannot form the basis of a

claim for breach of the CSAs, which are entirely separate and distinct agreements.  See, e.g.,

Nat'l Credit Union Admin. Bd. v. HSBC Bank USA, Nat. Ass'n, 117 F. Supp. 3d 392, 399

(S.D.N.Y. 2015) (holding that plaintiff's "status as a third-party beneficiary of [one set of

agreements] does not confer third-party beneficiary status for *completely separate agreements*").

Plaintiffs were likewise not third party beneficiaries of the Administration Agreements

between Citi Hedge and the Funds.  Again, per the contractual language of the agreements, Citi

---

[131] (See CSAs § 2.2 ("FIM hereby agrees . . . to act as a consultant to the *Manager* to provide such advice and recommendations as the *Manager* may from time to time require . . . .); see also KG CSA § 2.2.)

[132] The only FIM entity that is party to the DAs is FIM Limited.

[133] (See, e.g., DA § 3 ("[T]he distribution services to be provided by FIM [Limited] *to the Co-Manager* . . . include . . . introduction of such prospective investors *to the Co-Manager* . . . [and] the provision of such services *as may be required by the Co-Manager* to enable it [to] fulfill its duties with regard to the placement of Shares . . . .") (emphasis added).)

Hedge performed its administrative duties for the benefit of the Funds and KML, not Plaintiffs.[134]  As explained above, Plaintiffs are wrong that the non-assignment clause should be given no weight.  (Opp. Br. at 134–35.)  Nor do the exculpatory provisions acknowledge that Citi Hedge owed any duties to shareholders.  See supra Section VII(C).

Nor were Plaintiffs third party beneficiaries of the Auditor Agreements with PwC Bermuda.  Tellingly, Plaintiffs do not cite to the actual Auditor Agreements at all.  The reason is clear:  each of the Auditor Agreements makes plain that the audit services are solely for the benefit of the Funds, and not their investors.  For example, the agreements state that the engagement is to serve as "auditors of Kingate Global Fund, Ltd. and Kingate Euro Fund Ltd.";  that PwC Bermuda "will provide *the Funds* with our audit report"; and, notably, in the section entitled "Our Responsibilities and Limitations," that PwC Bermuda's audits:

> will not be planned or conducted in contemplation of reliance by any third party [which is specifically defined to include investors] . . . Therefore, items of a possible interest to a third party will not be specifically addressed and matters may exist that would be assessed differently by a third party, possibly in connection with a specific transaction.

(See, e.g., 2008 KG & KE AUD at 1, 2.)  The Auditor Agreements further provide that *any communications* with such third-party investors by PwC Bermuda would require written agreement from the investor acknowledging these provisions.  (Id.)  Plaintiffs point to PwC Bermuda's audit opinions as evidence of Plaintiffs' alleged third party beneficiary status under the agreements.  However, allegations that third parties received and relied on audit opinions are routinely rejected by courts as insufficient to plead third party beneficiary breach of contract

---

[134] (ADMs ¶ 17 ("Except as provided in Clause 5.2, neither the *benefit* nor the burden of this Agreement shall be assigned by either party save with the consent of the other party to this Agreement.") (emphasis added).)

claims under New York law.[135]

## X.     PLAINTIFFS HAVE NO RIGHT TO A CONSTRUCTIVE TRUST – COUNT 11

Plaintiffs do not argue that their "constructive trust" claim can survive under BVI or

Bermuda law,[136] (Opp. Br. at 145–46), and thus have conceded the point.  Syron, 934 F. Supp.

2d at 631; (see also Mov. Br. at 93–95 (to obtain a constructive trust remedy, Plaintiffs must

show fiduciary relationships or unjust enrichment); see also supra Section V and infra Section

XII).  Moreover, because Tremont Group, FIM (USA), and the Individual Defendants are not

alleged to have received any fees from the Funds (or Plaintiffs), there are no amounts over which

any constructive trust "claim" could be imposed as to them.  (Hargun ¶¶ 152-53; Evans ¶¶ 90-91;

Chivers ¶¶ 136-37.)[137]

---

[135] See, e.g., Holloway v. Ernst & Young LLP, No. 113346/09, 2010 WL 2927256, at *3  (Sup. Ct. N.Y. County July 21, 2010) (allegations regarding "material communications between [plaintiff] and [the auditor]," plaintiff's "position as the largest individual shareholder" and auditor's clear understanding "that [plaintiff] was a primary beneficiary of . . . audit and accounting services" insufficient to state third party beneficiary breach of contract claim against auditor), aff'd, 918 N.Y.S.2d 726 (Mem.) (1st Dep't 2011); Fireman's Fund Ins. Co. v. Glass, No. 94 CIV. 7375 (WK), 1997 WL 289858, at *4 (S.D.N.Y. May 30, 1997) (holding that "evidence of circumstance—apart from the contractual language" regarding fund's receipt of and reliance on auditor work product insufficient to support third party beneficiary breach of contract claim).

[136] BVI and Bermuda do not recognize claims by a third party for constructive trust, and the analogous claim for restitution is a claim that can only be asserted by the party who in fact made a payment (the 'payor')—not by third parties.  (Mov. Br. at 94.)  Further, under BVI and Bermuda law, claims for restitution can only be asserted where there is a total failure of consideration in exchange for the disputed payment.  (Mov. Br. at 97.)  This is in stark contrast to New York law, where a party claiming unjust enrichment must demonstrate only that the defendant benefited at the plaintiff's expense and that equity and good conscience require restitution.  In re Mid-Island Hosp., Inc., 276 F.3d 123, 129 (2d Cir. 2002).

[137] Plaintiffs also do not argue that they have a viable constructive trust "claim" under New York law, and instead seek the remedy of a constructive trust.  (Opp. Br. at 145–46.)  But as explained in the Moving Brief and above, however, under New York law there is no fiduciary relationship owed by any of the "Kingate Defendants" to Plaintiffs and no viable unjust enrichment claim against any of them.  Supra Section V(A) and infra Section XII.  Plaintiffs' request for this "remedy" therefore fails.  (See Mov. Br. at 95 n.92); see also Calvin Klein Trademark Tr. v. Wachner, 123 F. Supp. 2d 731, 736 (S.D.N.Y. 2000) (no right to constructive trust under New York law where underlying fiduciary duty claim fails); BNP Paribas Mortg. Corp. v. Bank of Am., N.A., 949 F. Supp. 2d 486, 515 (S.D.N.Y. 2013) (no right to constructive trust under New York law where unjust enrichment claim fails).

# XI. THE SAC FAILS TO STATE A CLAIM FOR MUTUAL MISTAKE – COUNT 12

As explained in the Moving Brief, there is no such claim for mutual mistake under Bermuda or BVI law, and the SAC fails to state a claim for restitution based on mutual mistake under Bermuda or BVI law against any of the "Kingate Defendants" with respect to the Service Agreements. (See Mov. Br. at 95–96; Hargun ¶¶ 100-01, 154-55; Evans ¶¶ 47-48, 92-93; Chivers ¶ 139, 170; Chivers Reply ¶ 62.) Plaintiffs do not dispute any of this.[138]

Plaintiffs' alternative argument fails. They assert that their mutual mistake claim is sufficient because they seek recoupment of "Subscription Charges" that they may or may not have paid directly to KML or Tremont when investing their capital with the Funds.[139] (Opp. Br. at 141-42.) This theory of liability was not in the SAC and, as noted above, Plaintiffs cannot amend their pleading via their Opposition. (See also Hargun Reply ¶ 68; Evans Reply ¶ 34; Chivers Reply ¶ 61 (noting that basis for this claim does not appear in SAC).)

Plaintiffs' new theory fails for several additional reasons as well. Pursuant to the IMs, Subscription Charges were paid to the Funds, not KML or Tremont. The Subscription Agreements provided that the "applicable subscription charges" were included in the Share price. (See 2008 KG IM at 18 ("The USD Shares may be purchased … at a price equal to the New

---

[138] Plaintiffs argue that Defendants "complain" that Plaintiffs' allegations of mistake are "not particularized." (Opp. Br. at 140.) Plaintiffs miss the point. There can be no mutual mistake claim against entities or individuals that are not alleged to be party to any contract and are not alleged to have received any fees. See Anwar II, 728 F. Supp. 2d at 420–21 (dismissing mutual mistake claims asserted against defendants who were not alleged to be parties to the partnership agreements governing the plaintiffs' relationship with the offshore funds).

[139] Plaintiffs also seek to rely on Section 5.2(b) of the Co-Management Agreement in an attempt to argue that additional "up-front" fees were paid to Tremont directly by investors rather than by Kingate Global. (See Opp. Br. at 142.) Notwithstanding Plaintiffs' assertion to the contrary, however, Section 5.2(b) of the Co-Management Agreement provides only that certain "[o]ther fees," separate and apart from the management fees paid to Tremont by Kingate Global, "shall be retained by and belong to the Co-Manager." (KG Co-MA at § 5.2(b).) Section 5.2(b) does not indicate who (if anyone) paid Tremont up-front and/or other fees, much less seeks to impose any such obligation on investors such as Plaintiffs who are not parties to the Co-Management Agreement.

Asset Value per USD Share … plus any applicable subscription charges."); 2007 KE IM at 18 (same).) All Subscription Payments were made to the benefit of the Funds. (See KG IM at S-2; KE IM at S-2.) Further while the Information Memoranda stated that the Subscription Charge could be "retained" by the Manager, the Information Memoranda also state that the Funds had discretion to use the Subscription Charges to pay any authorized dealers for the Funds. (See 2008 KG IM at 13 ("Such other, non-affiliated, authorized dealers may receive sales commissions *either directly from the Fund* (but payable . . . only to the extent of the permitted five percent (5%) subscription charge as described herein) *or* from the Manager.") (emphases added); 2007 KE IM at 13 (same).) The Funds would be considered the payor for all amounts paid from the Funds to KML or Tremont or any non-affiliated, authorized dealer.

The IMs also make clear that KML and Tremont had the discretion to waive all or part of any Subscription Charge otherwise due and accruing, or to share it with third parties involved in soliciting subscriptions for shares of the Funds:

> A subscription charge of up to five percent (5%) of the total dollar amount subscribed will be charged on subscription of the USD Shares, but such charge *may be waived in whole or in part* at the sole discretion of the Manager. The subscription charge, *if any*, will be retained by the Manager. The Manager *may grant all or part of such charge to dealers* and independent third parties in connection with the solicitation of subscriptions.

(E.g., 2006 KG IM at 18 (emphases added); accord 2003 KG IM at 19.) Plaintiffs do not allege anywhere in the SAC that any Plaintiff *actually paid* a Subscription Charge to KML or Tremont or that either of them shared any portion of any Subscription Charges with any other Defendant. (See SAC, *in passim*.) Moreover, to the extent that KML or Tremont shared a portion of the Subscription Charges paid by Plaintiffs with any other Defendant, KML or Tremont (not shareholders) would be the payor of any amount shared. (See Hargun ¶¶ 103–05, 122; Evans ¶¶ 48, 62.)

Nor, as explained above, does the SAC allege that any named Plaintiff purchased shares in the Funds through FIM Limited under the Distribution Agreements or paid any fees to FIM Limited. Even if it did, the Distribution Agreements make clear that the payor of any "Distribution Fee" to FIM Limited under those agreements is KML or the Funds—not investors in the Funds.[140] Under applicable Bermuda and/or BVI law, only KML or the Funds, *not shareholders*, (Opp. Br. at 141–42), would have a claim for restitution of any Distribution Fees paid to FIM Limited based on a mutual mistake. (See Chivers ¶ 140.)

In any event, Plaintiffs would not have a viable mutual mistake claim based on a supposed miscalculation of the amount due. The IMs make clear that Subscription Charges were to be calculated, to the extent levied, as a percentage of the "total dollar amount subscribed" by a subscribing shareholder.[141] The same is true of any Distribution Fees that may have been paid by KML to FIM Limited under the Distribution Agreements.[142] The SAC alleges no mistake of fact in connection with any such calculation. (See Hargun Reply ¶ 69; Evans Reply ¶ 34; Chivers Reply ¶ 62.) Plaintiffs' mutual mistake claim fails under Bermuda or BVI law.[143]

---

[140] (DAs at Schedule 1 (stating "[t]he Co-Manager may arrange to have the Company make payments directly to FIM for administrative convenience.").)

[141] (2000 KG IM at 19; 2003 KG IM at 19; 2006 KG IM at 18; 2007 KG IM at 18; 2008 KG IM at 18; 2004 KE IM at 19; 2008 KE IM at 19.)

[142] (DAs at § 6 (referring to Schedule 1 "Distribution Fees").)

[143] Count 12 also fails to state a claim for "mutual mistake" under New York law. Plaintiffs argue that the Service Agreements are "subject to rescission" because there was a "mutual mistake" at the time these agreements were entered into—namely, that the Funds' assets were being invested by Madoff. (Opp. Br. at 140.) However, Plaintiffs ignore Defendants' arguments that the SAC does not—and cannot—allege that Plaintiffs were party to any of the Service Agreements, which is a necessary element of any mutual mistake claim. (See Mov. Br. at 96 n.93.) Anwar II, on which Plaintiffs rely, makes this clear. (See Opp. Br. at 140.) There the court held that the only those plaintiffs who were party to the limited partnership agreements purportedly signed by mistake could assert a mutual mistake claim or seek rescission of those contracts, and dismissed the mutual mistake claims brought by plaintiffs, like Plaintiffs here, who had no contractual relationship with the defendants. See Anwar II, 728 F. Supp. 2d at 420–21.

## XII. PLAINTIFFS CANNOT PURSUE AN UNJUST ENRICHMENT CLAIM AGAINST ANY OF THE DEFENDANTS (COUNT 28)

Plaintiffs' unjust enrichment claim under Bermuda or BVI law fails against all of the Defendants because: (1) the relevant payments under the Service Agreements were made by the Funds (or in the case of FIM, by KML), not by Plaintiffs; and (2) Plaintiffs do not plead a *total failure* of consideration in exchange for the subject payments. (Mov. Br. at 97–98.) Plaintiffs' claim against Tremont Group, FIM (USA) and all of the Individual Defendants also fails because none of these Defendants is a party to any of the relevant contracts and none is alleged anywhere in the SAC to have received any payments. (See Mov. Br. at 98.)

Contrary to their contention, Plaintiffs were not the "true source of the payments to Defendants," (Opp. Br. at 144), which is clear from their own complaint. The SAC alleges that the Funds (or, in the case of the CSAs, KML) paid the management, administration, auditing and consulting fees to the Defendants, which is further confirmed by the IMs and underlying Service Agreements.[144]

Plaintiffs' other assertions are wholly ungrounded in the SAC. Plaintiffs absurdly argue that the Court should simply assume the Kingate Funds "followed practices similar to those of the [Fairfield] Madoff feeder funds at issue in the Anwar litigation," and that Defendants therefore "paid themselves . . . with the proceeds of subscriptions," but they fail to provide any case citation for how the Court can make this assumption or any record citation that they actually pleaded this allegation in the SAC, rather than that they "can reasonably allege [this] likelihood."

---

[144] (See SAC ¶¶ 24(b), 25(c), 27 (acknowledging that KML paid FIM under the CSAs), 156, 158 (referring to the Funds' Financial Statements, which show that the Funds paid all management fees, administration fees and auditor fees), 183, 322–26, Exs. 8–10; see also Mov. Br. at 8–9, 15–16 n.29, n.30, 56 n.60, 94 n.91, 97.)

(Opp. Br. at 144.)[145]  As noted above, repeatedly, Plaintiffs cannot amend the SAC through their Opposition Brief.

Indeed, even if Plaintiffs' arguments were not inconsistent with or unsupported by the SAC, they are insufficient to salvage their claim under BVI or Bermuda law.  (Hargun Reply ¶ 68; Evans Reply ¶ 34; Chivers Reply ¶¶ 56, 58 (payments for fees taken in connection with subscription agreements would be owned in equity by the Funds).)  The IMs, Management Agreements and Co-Management Agreement make clear that Subscription Charges could be charged in exchange for the Funds' issuance of shares, and potentially used by those entities to pay third parties who have entered into agreements to distribute shares in the Funds pursuant to separate agreements between those parties.  (See 2000 KG IM at 19; 2003 KG IM at 19; 2006 KG IM at 18; 2007 KG IM at 18; 2008 KG IM at 18; 2000 KE IM at 18; 2003 KE IM at 19; 2004 KE IM at 19; 2006 KE IM at 19; 2007 KE IM at 19.)  The mere fact that the Manager or Co-Manager was entitled to "maintain" a portion of the amount due from Plaintiffs to the Funds rather than pass the payment to the Funds and receive it back from the Funds does not alter the

---

[145] Plaintiffs make similar ungrounded arguments as to KML, Tremont and the "FIM Entities," who they lump together and label (in their Opposition) as "distributors" or "dealers" to whom Plaintiffs supposedly paid Subscription Charges directly.  (Opp. Br. at 141, 144.)  The words "Subscription Charge," "distributors" and "dealer" do not appear in the SAC as they relate to any Defendant.

As to the "FIM Entities," Plaintiffs appear to premise their argument that they were "payors" of Subscription Charges on the Distribution Agreements, which are the only agreements that potentially provide for the payment of "subscription-type" fees to FIM Limited.  As noted above, however, the SAC does not allege that any of the nine named Plaintiffs purchased any shares in the Funds through FIM Limited.  The Distribution Agreements appoint FIM Limited as a non-exclusive distributor of shares primarily in England.  (DAs at p. 2 at (F), §2.3.)  None of the named Plaintiffs are alleged to reside or conduct business in England and none are alleged to have had any dealings with FIM Limited.  Thus, there are no facts from which it can be inferred that Plaintiffs paid any "subscription charges" to FIM Limited.  (SAC ¶¶ 14–23.)  Finally, had any Plaintiff purchased shares in the Funds through FIM Limited, the Distribution Agreements show that any "Distribution Fee" owed to FIM Limited was paid by KML or the Funds– not by Plaintiffs – after the end of each quarter.  (See DAs at 1 (identifying KML and FIM Limited as the parties to the agreements), ¶ 6 (referring to the fees and expenses to be paid by KML under the agreements), and Schedule 1 (providing that KML would pay FIM Limited, or that KML "may arrange to have [the Funds] make payments directly to FIM [Limited] for administrative convenience").)

conclusion that the Funds are the payors of these fees. (Hargun Reply ¶ 68; Evans Reply ¶ 34; Chivers Reply ¶ 58.)

With respect to Tremont Group, FIM (USA) and the Individual Defendants, Plaintiffs' attempt to portray themselves as "payors" is frivolous. None of these Defendants is party to any of the relevant agreements and none is alleged to have performed services that would entitle them to management, consulting or even "subscription-type" fees. (Mov. Br. at 98.) Plaintiffs assert that there is supposedly a "significant dispute" as to whether these Defendants were parties to the relevant agreements. However, the agreements—all of which are referenced in the IMs and the SAC, and are attached as exhibits to this motion—conclusively demonstrate that none of these Defendants are parties. The SAC does not allege otherwise. Under Bermuda or BVI law, the claim must be dismissed. (Hargun Reply ¶ 68; Evans Reply ¶ 34; Chivers Reply ¶ 59.)

Plaintiffs nevertheless argue that their unjust enrichment claim against the Individual Defendants is viable because those Defendants were supposedly the "principal beneficiaries of the management fees paid [by the Funds] to KML." (Opp. Br. at 145.) Specifically, Plaintiffs argue that management fees paid to KML were "passed on" to trusts established for the benefit of Messrs. Grosso and Ceretti and their families, and that Manzke benefitted from management fees paid to Tremont as an "executive" and "stakeholder" in that entity. (Opp. Br. at 145.)[146] First and foremost, there are no facts alleged in the SAC to support any of these assertions, none of the documents on which Plaintiffs now rely are mentioned in the SAC and this Court cannot take "judicial notice" of allegations in another complaint for their truth.[147] Moreover, a claim in

---

[146] Plaintiffs are silent with respect to Tannenbaum; they again lump him with the other Individual Defendants but make no argument as to how he supposedly benefitted from management fees paid to KML.

[147] Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991) (courts will not take judicial notice of

restitution under Bermuda or BVI law cannot be maintained against an individual who may have ultimately "benefitted" from a payment made by one party to another. (Hargun Reply ¶ 68; Evans Reply ¶ 34; Chivers Reply ¶ 60.)[148]

Finally, Plaintiffs cannot claim that there was a total failure of consideration relating to the "Subscription Charges" or Distribution Fees allegedly paid to KML, Tremont or the "FIM Entities." (See Opp. Br. at 143 n.41.)[149] Plaintiffs would have received shares in the Funds in consideration for any Subscription Charges or Distribution Fees supposedly paid. (SAC ¶¶ 39(a), 40(a); see, e.g., 2007 KG IM at I, iii-iv, 18–19; 2007 KG SA at S-2; see Chivers Reply ¶¶ 56 (v), 57, 60.) Their restitution claim therefore fails under Bermuda or BVI law.[150]

---

documents filed in other courts "for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation."); Tymoshenko v. Firtash, 57 F. Supp. 3d 311, 320–21, n.5 (S.D.N.Y. 2014) (court cannot "take judicial notice of the allegations in a complaint filed" in another court to cure the defects in complaint.).

[148] Plaintiffs' experts, relying on allegations in a complaint filed in another action—which are not referenced in the SAC—concludes that a Bermuda court would not regard Plaintiffs' claims against the Individual Defendants as "hopeless." (Opp. Br. at 145.) However, as explained in Section IV(A), this Court is required to apply federal pleading rules to this claim. Moreover, a Bermuda court would not consider these un-pleaded allegations in assessing the viability of Plaintiffs' claim. (Chivers Reply ¶ 56.)

[149] Plaintiffs' argument does not even apply to FIM. Under the CSAs, FIM was paid a flat monthly fee for the services provided. FIM was not paid consulting fees based on the NAV of the Funds. (CSAs at Schedule 1 ("FIM shall be due a fixed monthly fee from the Manager . . . equal to USD 15,000.00 (fifteen thousand US dollars").) Again, FIM (USA) was not party to the CSAs and is not alleged to have received any fees.

[150] Plaintiffs' unjust enrichment claim also fails under New York law because there are valid and enforceable contracts governing the subject matter. (Mov. Br. at 98 n.94–95.) See also Clark-Fitzpatrick, Inc. v. Long Island Railroad Co., 516 N.E.2d 190, 193 (N.Y. 1987); SNS Bank, N.V. v. Citibank, N.A., 777 N.Y.S.2d 62, 66 (1st Dep't 2004). In response, Plaintiffs argue that Defendants "dispute" the "application" of the relevant agreements and whether Plaintiffs and certain Defendants are party to the agreements. (Opp. Br. at 143.) However, all of Plaintiffs' cases make clear that an unjust enrichment claim can only survive dismissal where there is a "genuine dispute as to the existence of a contract." Cf. Matana v. Merkin, 957 F. Supp. 2d 473, 495 n.10 (S.D.N.Y 2013) (dismissing unjust enrichment claim where investment agreements relating to Madoff feeder funds governed payment of fees to funds' service providers; distinguishing Anwar II). Here, there is no dispute about the *existence* or *validity* of the Service Agreements. Moreover, the fact that Plaintiffs are not parties to the Service Agreements (and cannot enforce them as third party beneficiaries) is irrelevant. "[U]nder New York law, a claim for unjust enrichment may be barred by a contract governing the dispute even if one of the parties to the lawsuit is

## XIII.   PLAINTIFFS' CLAIMS AGAINST THE KML DEFENDANTS, MANZKE, AND THE FIM DEFENDANTS ARE TIME-BARRED.

### A.   The Limitations Period  Is Enforceable and Unambiguous

Contrary to Plaintiffs' argument, under New York law[151] the six-month limitations period

is not unreasonably short, and the limitations provision is unambiguous.  (Opp. Br. at 155–56.)[152]

Courts applying New York law have repeatedly held that contractual agreements that

impose a six-month limitations period are reasonable, particularly where—as here—the plaintiffs

are sophisticated entities and individuals.  See, e.g., Bd. of Managers v. Lamontanero, 616

N.Y.S.2d 744 (2d Dep't 1994) (applying three-month limitations period to bar claim); J. Aron &

Co. v. Panama R.R. Co., 175 N.E. 273, 274–75 (N.Y. 1931) (collecting cases finding three-

month and six-month limitations periods valid).[153]  Nor are the Subscription Agreements

boilerplate "take-it-or-leave-it" unreasonable contracts of adhesion.  (Opp. Br. at 155.)  See Klos

---

not a party to the contract."  Serio v. Human Dynamics Corp., No. 04 Civ. 5146(RMB)(AJP), 2008 WL 2600631, at *3 (S.D.N.Y. June 25, 2008); see also KCG Americas LLC v. Brazilmed, LLC, 15 Civ. 4600(AT), 2016 WL 900396, at *7 (S.D.N.Y. Feb. 26, 2016) ("[P]rinciple [that existence of an express written agreement that governs the subject matter of the dispute precludes unjust enrichment] operates to bar an unjust enrichment claim brought against a non-party to the contract.").

[151] Plaintiffs do not challenge, and therefore concede, the application of New York law to the limitations period.  (See Opp. Br. at 155–59.)

[152] Plaintiffs also suggest in passing with no legal basis that the limitations period would only apply to claims brought under the Subscription Agreement and only against the Funds and its officers and directors.  (Opp. Br. at 154.)  However, the language of the limitations period—which is incorporated into the Subscription Agreement from the Information Memorandum by reference—on its face makes clear it applies "with regard to any matter relating to such Shareholder's investment in the Fund" and explicitly bars any claims against the Managers and Consultant, and thus accordingly extends to the Managers and Consultant's respective affiliates, executives, and directors.

[153] None of the cases relied on by Plaintiffs hold otherwise.  See Brown v. Guenther, 239 N.Y.S.2d 482, 484 (1st Dep't 1963) (holding that *15-day* contractual limitations period was unreasonable, while citing other cases in which courts upheld six-month contractual limitations periods as enforceable); Jamaica Hosp. Med. Ctr. v. Carrier Corp., 772 N.Y.S.2d 592, 593 (Mem.) (2d Dep't 2004) (dismissing complaint based on contractual limitations provision without discussion of the length of the provision, because Plaintiff failed to meet burden of demonstrating that the provision was unreasonable); USA United Holdings, Inc. v. Tse-Peo, Inc., No. 9909/08, 2009 WL 1099462, at *10 (Sup. Ct. Kings County Apr. 23, 2009) (concluding that a 60-day limitations period was unreasonable in the context of the necessary involvement of government entities and appeals in performing the agreement).

v. Polskie Linie Lotnicze, 133 F.3d 164, 168 (2d Cir. 1997) ("A contract of adhesion is a contract formed as a product of a gross inequality of bargaining power between parties. . . . Typical contracts of adhesion are standard-form contracts offered by large, economically powerful corporations to unrepresented, uneducated, and needy individuals on a take-it-or-leave-it basis, with no opportunity to change the contract's terms.") (internal quotation marks and citations omitted). Plaintiffs did not need to invest in the Funds and had countless other investment alternatives. There are no allegations in the SAC to suggest that there was any "unequal bargaining power." The IMs made clear that only qualified investors could participate, and recommended that all prospective investors engage counsel to review the agreements before determining whether to invest.

Plaintiffs' argument that the limitations period should not be enforced because of its supposed ambiguity, (Opp. Br. at 156–57), is frivolous. The Information Memoranda state that any claim, action or proceeding is waived "unless such claim, action or other proceeding is commenced within six months from . . . the original occurrence allegedly giving rise to such claim."[154] A court must look to the plain language of the agreement and "will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity." United States v. Herman, No. 03 Civ.4416 RMB, 2005 WL 66894, at *5 (S.D.N.Y. Jan. 12, 2005) (finding no ambiguity in contract with six-month limitations period).

The phrase "original occurrence" is not rendered ambiguous simply because it is not defined in the Information Memoranda. (Opp. Br. at 157.) The plain meaning of "original" is "the source or cause from which something arises" or "created, undertaken, or presented for the

---

[154] (Mov. Br. at 99 n.96.)

first time."[155]  The plain meaning of "occurrence" is "something that happens."[156]  The plain meaning of "original occurrence" is, therefore, "the first time that something happens." Plaintiffs do not even offer any alternate interpretation that might apply.[157]  The contractual limitations provision must therefore be enforced according to its terms.[158]

### B. The Claims Against Manzke and FIM Limited Are Time-Barred

The claims against FIM Limited and Manzke are time-barred because their involvement with the Funds ended *years* before Plaintiffs asserted their claims.  (Mov. Br. at 96–98.)  Manzke left Tremont in 2003, after which she had no further involvement with Kingate Global; FIM Limited stopped performing any services as a Consultant to KML with respect to both Funds effective August 1, 2005.  (Mov. Br. at 101.)  At the very least, then, Plaintiffs were required to bring their claims against these Defendants within six months of those dates.  They indisputably failed to do so.[159]  The claims are therefore untimely and the Court should dismiss them.

---

[155] See http://www.merriam-webster.com/dictionary/original (last visited July 25, 2016); http://www.dictionary.com/browse/original (last visited July 25, 2016).

[156] See http://www.merriam-webster.com/dictionary/occurrence (last visited July 25, 2016); http://www.merriam-webster.com/dictionary/occurrence (last visited July 25, 2016).

[157] Plaintiffs assert that courts have invalidated "similarly ambiguous" language before, citing USA United, 2009 WL 1099462, at *4.  However, the court in that case merely held that a limitations period that ran 60 days from when plaintiff was "made aware that a [cause] of action has arisen," id., at *5, was ambiguous because there were several competing interpretations of the provision being advanced.  That is not the case here.

[158] Plaintiffs' reliance on the principle that ambiguous provisions generally are construed against the drafter is misplaced because "the language of the contract is unambiguous, and . . . it is unnecessary to resort to the principles of construction applicable to ambiguous contracts."  Herman, 2005 WL 66894, at *5 (citation omitted).

[159] Plaintiffs appear to concede this point, having elected to not even address it in their Opposition.  See Felske v. Hirschmann, No. 10 Civ. 8899(RMB), 2012 WL 716632, at *3 (S.D.N.Y. Mar. 1, 2012) ("A plaintiff effectively concedes a defendant's arguments by his failure to respond to them."); see also Abrahams v. Young & Rubicam Inc., 79 F.3d 234, 237 n.2 (2d Cir.1996).

### C.    The Claims Against KML, Tannenbaum and FIM Advisers Are Time-Barred

Plaintiffs are wrong that their claims against KML, FIM Advisers, and Tannenbaum are timely because the wrongs were "continuing" and therefore their cause of action did not accrue until after Madoff's fraud became public, and that the Court should exercise its equitable discretion to toll the limitations period.  (Opp. Br. at 156–57.)  Plaintiffs' claims were expressly triggered and accrued at the "original occurrence" that gave rise to the claim, not any penultimate wrongs, which meant that any claim must be commenced within six months of the original occurrence.  (Mov. Br. at 101.)  Unlike here, the cases Plaintiffs cite involved contractual limitations provisions that did not explicitly require all claims be brought within a specific time period following the date of the original occurrence.  (Opp. Br. at 156 (citing State of N.Y. Workers' Compensation Bd. v. Madden, 989 N.Y.S.2d 156, 162 (3d Dep't 2014)); Anwar II, 728 F. Supp. 2d at 445–46).

The doctrines of equitable tolling or equitable estoppel apply only where a plaintiff was "induced by fraud, misrepresentations or deception to refrain from filing a timely action."  Abbas v. Dixon, 480 F.3d 636, 642 (2d Cir. 2007) (citation omitted).  Contrary to Plaintiffs' assertion that the "hidden nature of Defendants' [continuing] conduct" justifies equitable tolling, (Opp. Br. at 157), under New York law, a defendant's "mere silence or failure to disclose the wrongdoing is insufficient" to trigger equitable tolling.  De Sole v. Knoedler Gallery, LLC, 974 F. Supp. 2d 274, 319 (S.D.N.Y. 2013) (internal quotations omitted).  Moreover, courts have made clear that "a plaintiff may not rely on the same act that forms the basis for the claim" when seeking to benefit from equitable tolling, and instead equitable tolling is only warranted if "the later fraudulent misrepresentation . . . [is] for the purpose of concealing the former tort."  Id. at 319.  Plaintiffs have not alleged any such acts here.

### D. The Claims Against FIM (USA), Grosso and Ceretti are Time-Barred

Plaintiffs' argument that their claims against FIM (USA), Grosso and Ceretti are timely because the claims relate back to the filing of claims in the Initial Complaint against FIM Advisers, (Opp. Br. at 157–59), also fails. A claim relates back only where the defendants knew or should have known that the action would have been brought against them absent Plaintiffs' mistake, such as where the Plaintiff mistakenly identifies the wrong party as a defendant, and the proper defendant is aware that they would have been named had Plaintiff not made a mistake. (Mov. Br. at 103–04.) Relation back does not apply where, as here, Plaintiffs made a conscious decision not to name defendants whose identities were known to them. (Mov. Br. at 103–04.) FIM (USA), Grosso and Ceretti were all mentioned and described in the Initial Complaint, establishing that Plaintiffs were fully aware of the identities of these parties and their relationship to the Funds yet chose not to name them as defendants in the Initial Complaint. These Defendants had no reason to believe that Plaintiffs made a mistake in failing to name them as parties: Plaintiffs named other individual defendants in the Initial Complaint, but not Grosso or Ceretti; Plaintiffs also named various entities that were service providers to the Funds or KML, but did not name FIM (USA). Under these circumstances, "relation back" does not apply.

Plaintiffs' reliance on Krupski v. Costa Crociere S.p.A., 560 U.S. 538 (2010) is misguided. (Opp. Br. at 158.) [160] Krupski merely held that the relation back doctrine applied

---

[160] Plaintiffs do not even address the cases cited by Defendants, which uniformly hold that relation back is inappropriate under these circumstances. (Mov. Br. at 99–100 (citing In re Bernard L. Madoff Inv. Secs. LLC, 468 B.R. 620, 628–30 (Bankr. S.D.N.Y. 2012) and In re Enron Corp., 341 B.R. 460 (Bankr. S.D.N.Y. 2006)).) See also Cornwell v. Robinson, 23 F.3d 694, 705 (2d Cir. 1994) (rejecting relation back where complaint identified the defendants at issue but failed to name them as parties); Prince v. Suffolk Cty. Dep't of Health Servs., Nos. 89 Civ. 7243 (LAP), 89 Civ. 8085 (LAP), 1995 WL 144782, at *9 (S.D.N.Y. Apr. 3, 1995) ("[C]ourts have denied relation back where a plaintiff is obviously aware of the proposed additional party throughout the litigation, and fails to join that party within the governing statute of limitations."). The other element of the relation back doctrine—prejudice—is irrelevant

where it should have been apparent to the unnamed defendant from the face of the complaint that the Plaintiff misidentified or failed to name the correct defendant, which is not the case here. Indeed, Krupski makes clear that a plaintiff's knowledge of the proper party's identity "bears on the defendant's understanding of whether the plaintiff made a mistake regarding the proper party's identity," id. at 548 (continuing, id. at 552), and that when a failure to name a defendant in an initial complaint "was the result of a fully informed decision as opposed to a mistake concerning the proper defendant's identity, the requirements of Rule 15(c)(1)(C)(ii) are not met." Defendants had no reason to believe that they were inadvertently omitted from the Initial Complaint due to a "mistake" by Plaintiffs—and Plaintiffs do not even claim to have made any such mistake—so the relation back doctrine does not apply.

### E. Plaintiffs' Arguments Regarding BVI Law Are Irrelevant Because New York Law Applies to the Analysis of the Limitations Period

As Defendants demonstrated in the Moving Brief, New York law applies to analysis of the limitations period. Plaintiffs apparently concede this, yet argue alternatively based on BVI law. However, there is no basis to apply BVI law to the limitations period analysis because courts sitting in diversity apply the statute of limitations rules of the state courts in which the federal court sits. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). (See Mov. Br. at 96 n.97.)

Moreover, Plaintiffs' arguments that the limitations provision only applies to the Funds, its officers and directors and only to claims under the Subscription Agreement are wrong. (Opp. Br. at 159–60.) The Subscription Agreements expressly incorporate the terms of the Information Memoranda, which make clear that the limitations provision also applies to the Manager and the

---

because this second element under Federal Rule of Civil Procedure 15(c)(1)(C) cannot be met.

Consultant and applies to any claims that could be asserted against them relating to the investment in the Funds, and Plaintiffs expressly agreed to be bound by the terms of the Information Memoranda when they executed the Subscription Agreements.  (See Mov. Br. at 15 n.27.)  These provisions must be read together, and are not inconsistent.  (Chivers Reply ¶ 68.)  See also Beal Sav. Bank v. Sommer, 865 N.E.2d 1210, 1213–14 (N.Y. 2007) (contracts must be read as a whole and construed to give effect to all provisions).[161]  The claims against these Defendants are therefore time-barred.

## XIV.  IN THE ALTERNATIVE, INTERNATIONAL COMITY ALSO REQUIRES DISMISSAL

Defendants demonstrated in the Moving Brief that both of the two distinct principles of international comity (comity of courts and comity of nations) require that this case be dismissed under well-established Second Circuit law.  (Mov. Br. at 106–12.)

As to comity of courts, Plaintiffs cannot make an end-run around the Funds and KML's foreign liquidation proceedings, or avoid the fact that BVI and Bermuda have a greater interest in applying their laws to this dispute.  Contrary to Plaintiffs' assertions, (Opp. Br. at 162), "[f]or two actions to be considered parallel, the parties in the actions need not be the same, but they must be substantially the same, litigating substantially the same issues in both actions."  Royal & Sun Alliance Ins. Co. v. Century Int'l Arms, Inc., 466 F.3d 88, 94 (2d Cir. 2006).  Thus, even if there are a few Defendants in this action who were not sued in the Bermuda Proceedings, comity of courts still applies.  Plaintiffs do not truly dispute that the defendants in both proceedings are

---

[161] Plaintiffs point out that Defendants have argued that BVI does not allow third parties to enforce contracts and, therefore, that these Defendants should not be able to enforce the contractual limitations provisions because they are not party to the Subscription Agreements or the IMs.  Plaintiffs' argument, of course, runs counter to their own attempts to enforce agreements to which they are not parties (i.e., the Management Agreement and the CSAs).  If the Court concludes that BVI permits Plaintiffs to enforce agreements to which they were not party, Defendants should also have that same right as "third party beneficiaries" of the Subscription Agreements.

substantially the same.

Likewise, comity does not require that the claims being asserted, or the potential damages recoverable, be the same in both proceedings—it applies where "substantially the same issues" are being litigated in both proceedings. Royal & Sun Alliance, 466 F.3d at 94. Plaintiffs do not—and cannot—dispute that the issues being litigated in the Bermuda Proceedings (which relate to Defendants' performance and receipt of payments under the various Service Agreements) are substantially the same as the issues that would be litigated in this action.

Plaintiffs' argument that their claims are distinguishable from the Funds' in the Bermuda Proceedings because Plaintiffs purport to assert their own, ostensibly direct claims against the same defendants, (Opp. Br. at 162–63), is entirely circular. Plaintiffs' claims are not different simply because Plaintiffs call them "their own," label them "direct," or attempt to characterize their losses as "asymmetrical." (Opp. Br. at 163–64; see supra Section II(B)(1).)

Similarly, comity of courts does not depend on whether the potential damages recoverable in both proceedings are the same (or even similar). But even if it did, the Funds' Joint Liquidators—who have the sole authority to pursue these claims—are seeking to recover the very same losses as Plaintiffs seek to recover here. (Tracey ¶¶ 5, 7–12 and Exs. 2–7; Chivers ¶¶ 29-32, 34-38, 49, 53-59, 61-66, 143 n.35; Chivers Reply ¶ 11; Dohmann Reply ¶¶ 5, 7-8; Letter dated July 22, 2016 from Sanford M. Litvack to Hon. Deborah A. Batts (submitted to Chambers via email) ("July 22 Letter").) None of the cases on which Plaintiffs rely support their argument that the SAC should be allowed to proceed despite the Funds' and KML's foreign liquidation proceedings and the Bermuda Proceedings. (Opp. Br. at 162–65.)[162]

---

[162] In Picard v. Fairfield Greenwich Ltd, 762 F.3d 199 (2d Cir. 2014), the court merely concluded that an action brought by investors against the funds did not violate the Bankruptcy Court's automatic stay, but there was no parallel foreign bankruptcy proceeding at issue, and the court therefore did not address

As to comity of nations, Plaintiffs do not even address it. They have therefore conceded

the point, and their claims should all be dismissed on this ground as well. <u>Syron</u>, 934 F. Supp.

2d at 631.

Plaintiffs assert that "other claims against certain of the Defendants in U.S. bankruptcy

court have not been barred by comity." (Opp. Br. at 165.) This is simply untrue. The

Bankruptcy Court hearing the adversary proceeding brought by Irving Picard, Trustee for the

BLMIS estate, denied the Funds' motion to dismiss but never addressed comity, which was not

raised.[163] But the *District Court* in that case *has* ruled on comity in motions to dismiss brought

by KML, FIM, Grosso, Ceretti and Citi Hedge in that action and, as the Moving Brief explains,

dismissed complaints (including in the adversary proceeding against the Defendants here who

are also parties to the bankruptcy proceeding) based in part on comity. <u>Sec. Inv'r Prot. Corp. v.</u>

<u>Bernard L. Madoff Inv. Sec. LLC</u>, 513 B.R. 222, 232 (S.D.N.Y. 2014). KML, FIM, Grosso,

Ceretti and Citi Hedge have moved the Bankruptcy Court to implement that decision and dismiss

the complaints against them (in part based on comity), have each filed detailed replies to that

---

comity of courts. In <u>Int'l Ass'n of Machinists v. Varig S.A.</u> (a one-page Summary Order), the court rejected dismissal on the basis of comity because the foreign debtor expressly stipulated in its foreign reorganization plan that parties like the plaintiffs there *could* bring suit in the U.S. 302 F. App'x 10, 12 (2d Cir. 2008). In <u>In re RHTC Liquidating Co.</u>, the court concluded that comity did not require dismissal because the relevant debtor was a U.S. entity, noting that the principles requiring a court to abstain on comity grounds in deference to foreign bankruptcy proceedings are not present when the debtor is a domestic company. 424 B.R. 714, 724 (W.D. Pa. 2010). Here, of course, the Funds are foreign debtors involved in foreign liquidation proceedings, and, as the Third Circuit made clear in a case cited in <u>RHTC</u>, that distinction warrants dismissal. <u>See</u> <u>Remington Rand Corp.-Del. v. Bus. Sys. Inc.</u>, 830 F.2d 1260, 1267–68 (3d Cir. 1987) ("In the foreign bankruptcy context, comity is based on the additional rationales that the foreign debtor's assets will be distributed in an equitable fashion…, *and that one who conducts his affairs with foreign corporations subjects himself to foreign bankruptcy laws*.") (emphasis added) (citations omitted).

[163] The court did consider (and deny) a motion to dismiss filed by the *Funds*, but the Funds made no comity argument because they had already asserted their own customer claims in the BLMIS estate. <u>See</u> <u>In re Bernard L. Madoff Inv. Sec. LLC</u>, No. 08-01789 (SMB), 2015 WL 4734749, at *1 (Bankr. S.D.N.Y. Aug. 11, 2015); (<u>see also</u> 09-1161, Adv. Proc. Dkt. Nos. 112, 147 (Bankr. S.D.N.Y.) (motion to dismiss filed by the Funds' Joint Liquidators not containing comity argument).)

effect, and have been heard for oral argument. (Adv. Pro. No. 09-1161, Dkt. Nos. 158 (motion to dismiss), 212 (KML Reply), 214 (FIM Entities, Grosso, Ceretti Reply), 217 (Citi Hedge Reply).)

In holding that comity required dismissal, Judge Rakoff explained the importance of respecting foreign bankruptcy proceedings and the need for deference to those proceedings:

> [M]any of the feeder funds are currently involved in their own liquidation proceedings in their home countries. These foreign jurisdictions have their own rules concerning on what bases the recipient of a transfer from a debtor should be required to disgorge it . . . investors in these foreign funds had no reason to expect that U.S. law would apply to their relationships with the feeder funds . . . . Given the indirect relationship between Madoff Securities and the transfers at issue here, these foreign jurisdictions have a greater interest in applying their own laws than does the United States.

Sec. Inv'r Prot. Corp., 513 B.R. at 232. Judge Rakoff therefore held that the Trustee's attempt to recover foreign transfers to service providers and other foreign transferees "would be precluded by concerns of international comity" and directed that the claims be dismissed on this alternate basis. Id. at 231; see also id. at 226.

Comity is designed to prevent parties like Plaintiffs from interfering with the orderly distribution of a foreign debtor's assets.[164] Consistent with Second Circuit precedent, the Court should defer to the parallel proceedings pending in Bermuda and BVI and dismiss based on

---

[164] As this Court is already aware, Plaintiffs have already interfered with the Funds' liquidation and orderly and equitable distribution of assets. ███████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ This is exactly what comity seeks to avoid.

comity of courts or, for the reasons explained in the Moving Brief, dismiss based on comity of

nations.  (<u>See</u> Mov. Br. at 110–12.)

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to dismiss the

SAC, with prejudice, and grant such other and further relief as may be necessary and proper.

Dated: July 28, 2016
      New York, New York

              Respectfully submitted,


              SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

              By: _____
                Seth M. Schwartz (seth.schwartz@skadden.com)
                SKADDEN, ARPS, SLATE,
                MEAGHER & FLOM LLP
                Four Times Square
                New York, New York 10036
                (212) 735–3000

              *Attorneys for Defendants Tremont (Bermuda) Limited and*
              *Tremont Group Holdings, Inc.*

PAUL HASTINGS LLP

By: _Jodi Kleinich_____

Barry G. Sher (barrysher@paulhastings.com)
Jodi A. Kleinick (jodikleinick@paulhastings.com)
Mor Wetzler (morwetzler@paulhastings.com)
Anthony Antonelli (anthonyantonelli@paulhastings.com)
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
(212) 318–6000

*Attorneys for Defendants FIM Limited, FIM Advisers LLP, FIM (USA) Incorporated, Carlo Grosso, and Federico Ceretti*

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By: _____
    Carmine D. Boccuzzi, Jr. (cboccuzzi@cgsh.com)
    Samuel L. Raymond (sraymond@cgsh.com)
    One Liberty Plaza
    New York, New York 10006
    (212) 225–2000

*Attorneys for Defendant Citi Hedge Fund Services Ltd.*

COOLEY LLP

By: _____

Laura Grossfield Birger (lbirger@cooley.com)
Abigail Belknap Seidner (aseidner@cooley.com)
1114 Avenue of the Americas
New York, New York 10036
(212) 479–6000

*Attorneys for Defendant Michael G. Tannenbaum*

HOGAN LOVELLS US LLP

By: _____
Dennis H. Tracey, III (dennis.tracey@hoganlovells.com)
Sanford M. Litvack (sanford.litvack@hoganlovells.com)
Marisa H. Lenok (marisa.lenok@hoganlovells.com)
875 Third Avenue
New York, New York 10022
(212) 918–3000

*Attorneys for Defendant PricewaterhouseCoopers,*
*Chartered Accountants, a Bermuda partnership*

CHAFFETZ LINDSEY LLP

By: _____
Scott Reynolds (scott.reynolds@chaffetzlindsey.com)
Erin Valentine (erin.valentine@chaffetzlindsey.com)
1700 Broadway, 33rd Floor
New York, New York 10019
(212) 257–6960

*Attorneys for Defendant Kingate Management Limited*

KOBRE & KIM LLP

By: _____
   Jonathan D. Cogan (jonathan.cogan@kobrekim.com)
   Kimberly Perrotta Cole (kimberly.cole@kobrekim.com)
   800 Third Avenue
   New York, New York 10022
   (212) 488–1200

*Attorneys for Defendant Sandra Manzke*

# APPENDIX 1: CHART OF DEFENSES

| Defendant | Defense | Pages in Motion to Dismiss | Pages in Opposition Brief | Pages in Reply Brief |
|---|---|---|---|---|
| **All Defendants** | SLUSA[1] | 36-41; 43-52 | 16-44 | 4-18 |
| | Lack of Standing | 52-57 | 55-73 | 18-32 |
| | Failure to State a Claim for Gross Negligence | 80 | 103-104; 125 | 57-58 |
| | Failure to State a Claim for Negligence | 81-85 | 96-103; 105-110 | 58-62 |
| | Failure to State a Claim for Unjust Enrichment | 96-98 | 142-145 | 79-82 |
| | Comity | 106-112 | 162-166 | 89-93 |
| **KML** | Exculpation | 42-43 | 110-120 | 62-64 |
| | Statute of Limitations | 99-105 | 154-162 | 83-89 |
| | Failure to State a Claim for Breach of Fiduciary Duty | 70-74 | 74-86 | 45-53 |
| | Failure to State a Claim for Third Party Beneficiary Breach of Contract | 86-93 | 125-139 | 65-75 |
| | Failure to State a Claim for Constructive Trust | 93-95 | 145-146 | 75 |
| | Failure to State a Claim for Mutual Mistake | 95-96 | 140-142 | 76-78 |
| **Tannenbaum** | Exculpation | 42-43 | 110-116; 120 | 62-64 |
| | Statute of Limitations | 99-105 | 154-157; 159-162 | 83-89 |
| | Failure to State a Claim for Breach of Fiduciary Duty | 70-74 | 74-86 | 45-53 |
| | Failure to State a Claim for Constructive Trust | 93-95 | 145-146 | 75 |
| | Failure to State a Claim for Mutual Mistake | 95-96 | 140-142 | 76-78 |
| **Tremont** | Exculpation | 42-43 | 110-120 | 62-64 |
| | Failure to State a Claim for Breach of Fiduciary Duty | 70-74 | 74-86 | 45-53 |
| | Failure to State a Claim for Third Party Beneficiary Breach of Contract | 86-93 | 125-139 | 65-75 |
| | Failure to State a Claim for Constructive Trust | 93-95 | 145-146 | 75 |

---

[1] None of the defendants contend that the defenses of SLUSA and exculpation apply to Count 12 (Mutual Mistake).

1

| Defendant | Defense | Pages in Motion to Dismiss | Pages in Opposition Brief | Pages in Reply Brief |
|---|---|---|---|---|
| | Failure to State a Claim for Mutual Mistake | 95-96 | 140-142 | 76-78 |
| **Tremont Group** | Exculpation | 42-43 | 110-120 | 62-64 |
| | Failure to State a Claim for Breach of Fiduciary Duty | 70-74 | 74-86 | 45-53 |
| | Failure to State a Claim for Aiding and Abetting Breach of Fiduciary Duty | 75-79 | 86-96 | 53-57 |
| | Failure to State a Claim for Third Party Beneficiary Breach of Contract | 86-93 | 125-139 | 65-75 |
| | Failure to State a Claim for Constructive Trust | 93-95 | 145-146 | 75 |
| | Failure to State a Claim for Mutual Mistake | 95-96 | 140-142 | 76-78 |
| **Manzke** | Exculpation | 42-43 | 110-120 | 62-64 |
| | Statute of Limitations | 99-105 | 154-162 | 83-89 |
| | Failure to State a Claim for Breach of Fiduciary Duty | 70-74 | 74-86 | 45-53 |
| | Failure to State a Claim for Constructive Trust | 93-95 | 145-146 | 75 |
| | Failure to State a Claim for Mutual Mistake | 95-96 | 140-142 | 76-78 |
| **FIM Entities** | Exculpation | 42-43 | 110-120 | 62-64 |
| | Statute of Limitations | 99-105 | 154-162 | 83-89 |
| | Failure to State a Claim for Breach of Fiduciary Duty | 70-74 | 74-86 | 45-53 |
| | Failure to State a Claim for Third Party Beneficiary Breach of Contract | 86-93 | 125-139 | 65-75 |
| | Failure to State a Claim for Constructive Trust | 93-95 | 145-146 | 75 |
| | Failure to State a Claim for Mutual Mistake | 95-96 | 140-142 | 76-78 |
| **Grosso and Ceretti** | Exculpation | 42-43 | 110-120 | 62-64 |
| | Statute of Limitations | 99-105 | 154-162 | 83-89 |
| | Failure to State a Claim for Breach of Fiduciary Duty | 70-74 | 74-86 | 45-53 |
| | Failure to State a Claim for Constructive Trust | 93-95 | 145-146 | 75 |
| | Failure to State a Claim for Mutual Mistake | 95-96 | 140-142 | 76-78 |
| **PwC Bermuda** | Failure to State a Claim for Aiding and Abetting Breach of Fiduciary Duty | 75-79 | 86-96 | 53-57 |
| | Failure to State a Claim for Third Party Beneficiary Breach of Contract | 86-89, 93 | 125-139 | 65-75 |

| Defendant | Defense | Pages in Motion to Dismiss | Pages in Opposition Brief | Pages in Reply Brief |
|---|---|---|---|---|
| | Failure to State a Claim for Negligent Misrepresentation | 85-86 | 103-104; 121-125 | 64 |
| **Citi Hedge** | Exculpation | 42-43 | 110-120 | 62-64 |
| | Lack of Personal Jurisdiction | 57-62 | 146-154 | 32-37 |
| | Failure to State a Claim for Breach of Fiduciary Duty | 70-74 | 74-86 | 45-53 |
| | Failure to State a Claim for Aiding and Abetting Breach of Fiduciary Duty | 75-79 | 86-96 | 53-57 |
| | Failure to State a Claim for Third Party Beneficiary Breach of Contract | 86-93 | 125-139 | 65-75 |
| | Failure to State a Claim for Negligent Misrepresentation | 85-86 | 104-105 | 64 |

## APPENDIX 2: UPDATED GLOSSARY OF DEFINED TERMS

| Defined Term | Definition |
|---|---|
| 1999 KG AUD | 1999 Audit Engagement Letter between PwC Bermuda and Kingate Global, dated February 2, 2000 (Tracey Ex. 23) |
| 2000 KE CSA | Consulting Services Agreement for Kingate Euro effective May 1, 2000 (Tracey Ex. 18) |
| 2000 KE IM | May 1, 2000 Information Memorandum for Kingate Euro (Tracey Ex. 10) |
| 2000 KE MA | 2000 Management Agreement for Kingate Euro (Tracey Ex. 15) |
| 2000 KE SA | 2000 Subscription Agreement for Kingate Euro (Tracey Ex. 10) |
| 2000 KG & KE AUD | 2000 Audit Engagement Letter between PwC Bermuda and the Funds, dated December 14, 2000 (Tracey Ex. 24) |
| 2000 KG CSA | Consulting Services Agreement for Kingate Global effective May 1, 2000 (Tracey Ex. 17) |
| 2000 KG IM | May 1, 2000 Information Memorandum for Kingate Global (SAC Ex. 6 ) |
| 2000 KG SA | 2000 Subscription Agreement for Kingate Global (SAC Ex. 6) |
| 2001 CSA Amendments | June 7, 2001 Amendments to the Consulting Services Agreements for Kingate Global and Kingate Euro (Tracey Exs. 19-20) |
| 2001 KE CSA Amendment | June 7, 2001 Amendment to the Consulting Services Agreement for Kingate Euro (Tracey Ex. 20) |
| 2001 KG & KE AUD | 2001 Audit Engagement Letter between PwC Bermuda and the Funds, dated December 11, 2001 (Tracey Ex. 25) |

1

2001 KG CSA Amendment ...................... June 7, 2001 Amendment to the Consulting Services Agreement for Kingate Global (Tracey Ex. 19)

2002 KG & KE AUD .............................. 2002 Audit Engagement Letter between PwC Bermuda and the Funds, dated November 7, 2002 (Tracey Ex. 26)

2003 KE IM ............................................ January 15, 2003 Amended and Restated Information Memorandum for Kingate Euro (Tracey Ex. 11)

2003 KE SA ............................................ 2003 Subscription Agreement for Kingate Euro (Tracey Ex. 11)

2003 KG & KE AUD .............................. 2003 Audit Engagement Letter between PwC Bermuda and the Funds, dated October 23, 2003 (Tracey Ex. 27)

2003 KG IM ............................................ January 15, 2003 Amended and Restated Information Memorandum for Kingate Global (SAC Ex. 5)

2003 KG SA ............................................ 2003 Subscription Agreement for Kingate Global (SAC Ex. 5)

2004 KE IM ............................................ May 1, 2004 Amended and Restated Information Memorandum for Kingate Euro (Tracey Ex. 12)

2004 KE SA ............................................ 2004 Subscription Agreement for Kingate Euro (Tracey Ex. 12)

2004 KG & KE AUD .............................. 2004 Audit Engagement Letter between PwC Bermuda and the Funds, dated November 3, 2004 (Tracey Ex. 28)

2004-2005 PwC KG Financial Statements ............................................... Financial Statements of Kingate Global for the years ending December 31, 2004 and 2005 with audit opinion by PricewaterhouseCoopers Bermuda (SAC Ex. 8)

2005 KG & KE AUD .............................. 2005 Audit Engagement Letter between PwC Bermuda and the Funds, dated September 29, 2005 (Tracey Ex. 29)

2006 KE IM ............................................... May 1, 2006 Amended and Restated Information Memorandum for Kingate Euro (Tracey Ex. 13)

2006 KE SA ............................................... 2006 Subscription Agreement for Kingate Euro (Tracey Ex. 13)

2006 KG & KE AUD ............................... 2006 Audit Engagement Letter between PwC Bermuda and the Funds, dated November 30, 2006 (Tracey Ex. 30)

2006 KG IM ............................................... May 1, 2006 Amended and Restated Information Memorandum for Kingate Global (SAC Ex. 4)

2006 KG SA ............................................... 2006 Subscription Agreement for Kingate Global (SAC Ex. 4)

2006 KG MA ............................................ January 1, 2006 Management Agreement for Kingate Global (SAC Ex. 7)

2006-2007 PwC KG Financial Statements ................................................ Financial Statements of Kingate Global for the years ending December 31, 2006 and 2007 with audit opinion of PricewaterhouseCoopers Bermuda (SAC Ex. 9)

2007 KE ADM ......................................... June 1, 2007 Amended and Restated Administration Agreement for Kingate Euro (Tracey Ex. 33)

2007 KE IM ............................................... August 1, 2007 Amended and Restated Information Memorandum for Kingate Euro (Tracey Ex. 14)

2007 KE SA ............................................... 2007 Subscription Agreement for Kingate Euro (Tracey Ex. 14)

2007 KG & KE AUD ............................... 2007 Audit Engagement Letter between PwC Bermuda and the Funds, dated November 6, 2007 (Tracey Ex. 31)

2007 KG ADM ......................................... June 1, 2007 Amended and Restated Administration Agreement for Kingate Global (SAC Ex. 15)

2007 KG IM ............................................... August 1, 2007 Amended and Restated Information Memorandum for Kingate Global (SAC Ex. 3)

2007 KG SA ............................................. 2007 Subscription Agreement for Kingate Global (SAC Ex. 3)

2008 KE IM ............................................. October 6, 2008 Amended and Restated Information Memorandum for Kingate Euro (SAC Ex. 2 )

2008 KE SA ............................................. 2008 Subscription Agreement for Kingate Euro (SAC Ex. 2)

2008 KG & KE AUD .............................. 2008 Audit Engagement Letter between PwC Bermuda and the Funds, dated October 30, 2008 (Tracey Ex. 32)

2008 KG IM ............................................. October 6, 2008 Information Memorandum for Kingate Global (SAC Ex. 1)

2008 KG SA ............................................. 2008 Subscription Agreement for Kingate Global (SAC Ex. 1)

AC ........................................................... Amended Consolidated Class Action Complaint dated May 18, 2010 (Docket No. 53)

Administration Agreements ...................... June 1, 2007 Amended and Restated Administration Agreement for Kingate Global (SAC Ex. 15) and June 1, 2007 Amended and Restated Administration Agreement for Kingate Euro (Tracey Ex. 33)

Administrator ........................................... Citi Hedge Fund Services Ltd. and its predecessors BISYS Hedge Fund Services Limited and Hemisphere Management Limited

ADMs                                                     Administration Agreements for Kingate Global and Kingate Euro

Amended Complaint ................................ Amended Consolidated Class Action Complaint dated May 18, 2010 (Docket No. 53)

Auditor .................................................... PricewaterhouseCoopers Bermuda and its predecessor, Coopers & Lybrand Bermuda

Auditor Agreements ................................. 1995 - 2008 Audit Engagement Letters for Kingate Global and 2000 - 2008 Audit Engagement Letters for Kingate Euro

Bermuda Audit Proceeding ........................ Proceeding commenced in the Supreme Court of Bermuda on January 29, 2010 by the Funds' Joint Liquidators against PricewaterhouseCoopers Bermuda

Bermuda Proceeding ................................ Proceedings commenced in the Supreme Court of Bermuda on December 22, 2010 by the Funds' Joint Liquidators for Kingate Global and Kingate Euro against, among others, Kingate Management Limited, FIM Limited, FIM Advisers LLP, Carlo Grosso, and Federico M. Ceretti

Bermuda Proceedings .............................. Bermuda Audit Proceeding and Bermuda Proceeding

Browne-Wilkinson .................................... Declarant Simon Browne-Wilkinson

BISYS ...................................................... BISYS Hedge Fund Services Limited

BLMIS ...................................................... Bernard L. Madoff Investment Securities LLC

BVI............................................................ British Virgin Islands

CAFA ........................................................ Class Action Fairness Act of 2005

Ceretti...................................................... Federico M. Ceretti

Chivers ...................................................... Affiant/Declarant David Chivers

Citi Hedge ................................................ Citi Hedge Fund Services Ltd.

Co-Management Agreement ..................... Undated Co-Management Agreement for Kingate Global (Tracey Ex. 16)

Co-Manager ............................................. Tremont (Bermuda) Limited

Consultant ................................................ FIM Limited or FIM Advisers LLP

Consulting Services Agreements .............. Consulting Services Agreements for Kingate Global and Kingate Euro, as amended (Tracey Exs. 17-18)

CSAs ........................................................ Consulting Services Agreements

DAs ........................................................... Distribution Agreements

Deeds of Novation .................................... August 1, 2005 deeds of novation substituting FIM Advisers LLP in place of FIM Limited as Consultant under the CSAs (Tracey Exs. 21-22)

Defendants ............................................... Kingate Management Limited, Tremont (Bermuda) Limited, Tremont Group Holdings, Inc., FIM Limited, FIM Advisers LLP, FIM (USA) Incorporated, Carlo Grosso, Federico M. Ceretti, Sandra Manzke, Michael G. Tannenbaum, PricewaterhouseCoopers Bermuda, and Citi Hedge Fund Services Ltd.

Dismissal Decision.................................... March 30, 2011 Order Dismissing Amended Complaint (Docket No. 173)

Distribution Agreements ........................... Distribution Agreements between KML and FIM Limited for Kingate Euro and Kingate Global (Barrett Exs. 9-10)

Dohmann.................................................. Declarant Barbara Dohmann

Evans....................................................... Declarant Richard G. Evans

Exchange Act ........................................... Securities Exchange Act of 1934

F&H ......................................................... Friehling & Horowitz

FIM........................................................... FIM Limited and FIM Advisers LLP

FIM (USA) ............................................... FIM (USA) Incorporated

FIM Advisers ........................................... FIM Advisers LLP

FIM Defendants ....................................... FIM Limited, FIM Advisers LLP, FIM (USA) Incorporated, Inc., Carlo Grosso and Federico M. Ceretti

FIM Entities ............................................. FIM Limited, FIM Advisers LLP and FIM (USA) Incorporated

FIM Limited.............................................. FIM Limited

| | |
|---|---|
| Funds | Kingate Global Fund, Ltd. and Kingate Euro Fund, Ltd. |
| Funds' Joint Liquidators | Joint liquidators appointed by the High Court of Justice of the BVI for Kingate Global and Kingate Euro |
| GAAP | Generally Accepted Accounting Principles |
| GAAS | Generally Accepted Auditing Standards |
| Grosso | Carlo Grosso |
| Hargun | Declarant Narinder K. Hargun |
| Hemisphere | Hemisphere Management Limited |
| IMs | Information Memoranda issued by Kingate Global or Kingate Euro |
| Individual Defendants | Michael G. Tannenbaum, Sandra Manzke, Carlo Grosso, and Federico M. Ceretti |
| Initial Complaint | Complaint dated June 10, 2009 (Docket No. 1) |
| Investment Advisor | Bernard L. Madoff Investment Securities LLC |
| July 22 Letter | Letter dated July 22, 2016 from Sanford M. Litvack to Hon. Deborah Batts (submitted to Chambers via email) |
| KE SA | Subscription Agreement for Kingate Euro (each attached to the associated Information Memorandum) |
| KG Co-MA | Undated Co-Management Agreement for Kingate Global (Tracey Ex. 16) |
| KG SA | Subscription Agreement for Kingate Global (each attached to the associated Information Memorandum) |

| | |
|---|---|
| Kingate Defendants.................................... | Kingate Management Limited, Michael G. Tannenbaum, Tremont (Bermuda) Limited, Tremont Group Holdings, Inc., Sandra Manzke, FIM Limited, FIM Advisers LLP, FIM (USA) Incorporated, Carlo Grosso, and Federico M. Ceretti |
| Kingate Euro ............................................. | Kingate Euro Fund, Ltd. |
| Kingate Funds .......................................... | Kingate Global Fund, Ltd. and Kingate Euro Fund, Ltd. |
| Kingate Global ......................................... | Kingate Global Fund, Ltd. |
| KML........................................................ | Kingate Management Limited |
| KML Defendants...................................... | Kingate Management Limited and Michael Tannenbaum |
| MAs | Management Agreements |
| Madoff..................................................... | Bernard Madoff |
| Management Agreements.......................... | May 1, 2000 Kingate Euro Fund, Ltd. Management Agreement (Tracey Ex. 15); March 1, 1995 Kingate Global Fund, Ltd. Management Agreement; May 1, 2000 Kingate Global Fund, Ltd. Management Agreement; and January 1, 2006 Kingate Global Fund, Ltd. Management Agreement (SAC Ex. 7) |
| Manager ................................................... | Kingate Management Limited |
| Manzke.................................................... | Sandra Manzke |
| Moving Brief............................................ | Joint Memorandum of Law in Support of All Defendants' Motion to Dismiss the Corrected Second Amended Consolidated Class Action Complaint (Docket No. 197) |
| Mov. Br.  ................................................. | Moving Brief |
| NAV ........................................................ | Net Asset Value |

Opposition.................................................. Plaintiffs' Memorandum of Law in Opposition to the Joint Motion of All Defendants to Dismiss the Corrected Second Amended Consolidated Class Action Complaint (Docket No. 214)

Opp. Br.. .................................................. Opposition Brief

PwC Bermuda ........................................... PricewaterhouseCoopers Bermuda

PwC KG Financial Statements.................. Financial Statements of Kingate Global for the years ending December 31, 2004 and 2005 and December 31, 2006 and 2007 (SAC Exs. 8 and 9)

SAC.......................................................... Corrected Second Amended Consolidated Class Action Complaint (Docket No. 189)

SAs.......................................................... 2000, 2003, 2004, 2006, 2007, and 2008 Subscription Agreements for Kingate Global and Kingate Euro (each attached to the associated Information Memoranda)

Scheduling Order ...................................... July 8, 2015 Scheduling Order (Docket No. 189)

Second Circuit Opinion............................. April 23, 2015 Opinion in In re Kingate Management Ltd. Litigation, 784 F.3d 128 (2d Cir. 2015) (Docket No. 254)

Service Agreements .................................. Management Agreements, Co-Management Agreement, Consulting Services Agreements, Administration Agreements, Auditor Agreements, and Distribution Agreements

SLUSA..................................................... Securities Litigation Uniform Standards Act

SIPA......................................................... Securities Investor Protection Act

Subscription Agreements .......................... 2000, 2003, 2004, 2006, 2007, and 2008 Subscription Agreements for Kingate Global and Kingate Euro (each attached to the associated Information Memoranda)

Tannenbaum.............................................. Michael G. Tannenbaum

Tracey....................................................... Declarant Dennis H. Tracey, III

Tremont...................................................... Tremont (Bermuda) Limited

Tremont Advisors ..................................... Tremont Advisers, Inc.

Tremont Defendants................................. Tremont (Bermuda) Limited, Tremont Group Holdings, Inc. and Sandra Manzke

Tremont Group.......................................... Tremont Group Holdings, Inc.