UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X

IN RE KINGATE MANAGEMENT LTD.
LITIGATION

This Document Relates To:
All Actions

----------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/21/16

09-CV-5386 (DAB)
OPINION

DEBORAH A. BATTS, United States District Judge.

Plaintiffs were investors in two "feeder funds," which channeled billions of dollars in investments through Bernard L. Madoff ("Madoff") into Bernard L. Madoff Investment Securities LLC ("BMIS"). After Madoff's Ponzi scheme was exposed in December 2008, all of the Funds' investments in BMIS, and thus the value of Plaintiffs' investments, were lost. Plaintiffs now assert common law claims of negligence, gross negligence, negligent misrepresentation, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, mutual mistake, third party breach of contract, constructive trust, and unjust enrichment against Defendants, who were managers, consultants, administrators, and auditors of the two Funds. After remand from the Second Circuit Court of Appeals, before the Court is a Joint Motion of All Defendants to Dismiss the Corrected Second Amended Consolidated Class Action Complaint ("Joint Motion to Dismiss").

Defendants move to dismiss on a number of grounds: (1) SLUSA precludes most of Plaintiff's claims, (2) the Court lacks personal jurisdiction over Citi Hedge, (3) Plaintiff's claims against the Managers, Consultants, and Manzke are time-barred, (4) the Court should abstain from jurisdiction based on comity (5) Plaintiffs lack standing to sue, and (6) the SAC fails to state any claim against the Defendants.  For the reasons stated below, the Joint Motion to Dismiss is GRANTED in part and DENIED in part.

I.   BACKGROUND

A. Factual Background

The following facts are drawn from the Corrected Second Amended Consolidated Class Action Complaint ("Second Amended Complaint" or "SAC"), and are assumed true for the purposes of the Joint Motion to Dismiss.

1. The Parties

Plaintiffs are institutional and individual investors in two funds, Kingate Global Fund, Ltd. ("Kingate Global") and Kingate Euro Fund, Ltd. ("Kingate Euro," together with Kingate Global, the "Funds").  All Plaintiffs are located or reside outside of the United States.  (SAC ¶¶ 15-23.)  Plaintiffs bring their claims on behalf of a putative class of "all persons or entities who owned shares of the Funds as of December 10, 2008,

2

and were damaged thereby," excluding from the Class all Defendants and related persons and entities. (SAC ¶ 7.)

Defendants are the Funds' Bermuda-based managers, Kingate Management Limited ("KML") and Tremont (Bermuda) Limited ("Tremont") (collectively, the "Managers"); Tremont's United States-based corporate parent, Tremont Group Holdings, Inc. ("Tremont Group"); the Managers' U.K.-based consultant, FIM Limited, its successor-in-interest FIM Advisors LLP, and FIM (USA) Inc. ("FIM" or the "Consultant"); certain individual directors and officers of the Managers and the Consultant, Carlo Grosso, Frederico M. Ceretti, Sandra Manzke, and Michael G. Tannenbaum;[1] the Funds' Bermuda-based administrator, Citi Hedge Fund Services, Ltd. ("Citi Hedge") (as successor-in-interest to the prior administrators of the Funds, BISYS Hedge Fund Services Limited and Hemisphere Management Limited); and PricewaterhouseCoopers Bermuda, which was the Bermuda auditor of the Funds ("PwC Bermuda").

## 2. The Funds and Investment with BMIS

Kingate Global was established in February 1994, and began selling shares on March 1, 1995.  (SAC ¶ 39.)   Kingate Euro was

---

[1] Plaintiffs refer to the KML, Tremont, Tremont Group, and FIM Defendants, as well as Individual Defendants Grosso, Ceretti, Manzke, and Tannenbaum collectively as the "Kingate Defendants." (SAC ¶ 36.)

established in April 2000 and commenced operations on May 1, 2000.  (SAC ¶ 40.)  Both of the Funds were organized and operated in the British Virgin Islands.  (SAC ¶¶ 39-40.) Beginning on March 2, 1994, Kingate Global maintained an account with BMIS.  (SAC ¶ 39(b).)  Kingate Euro also maintained an account with BMIS.  (SAC ¶ 40(c).)[2]  Until 2008, "substantially all" of the Funds' assets were invested in BMIS.  (SAC ¶ 39(a), 40(a).)  Between March 1994 and December 10, 2008, Kingate Global invested $963.45 million with BMIS.  (SAC ¶ 54.)  From April 2000 through December 10, 2008, Kingate Euro invested $767.44 million with BMIS.  (Id.)  As of November 2008, the Funds' investments with BMIS were purportedly worth over $3 billion.  (Id.)

As is now well known, Madoff purportedly used a "split-strike conversion" strategy to manage invested assets, including those belonging to the Funds. However, the purported growth of and profits on assets invested with BMIS was entirely fictitious.[3]  When Madoff's Ponzi scheme was exposed in December

---

[2] The Funds' Account Agreements with BMIS were executed in New York, state that they are subject to the laws of the United States and New York law, and are deemed to have been made and performed in New York.  (SAC ¶ 41.)

[3] For a more detailed discussion of Madoff's scheme, see this Court's Order dated March 30, 2011, In re Kingate Mgmt. Ltd. Litig., No. 09 CIV. 5386 DAB, 2011 WL 1362106, at *1 (S.D.N.Y. Mar. 30, 2011).  (See also SAC ¶¶ 43-52.)

2008, the Funds' investments in BMIS, and thus the Plaintiffs' shares in the Funds, became worthless.  Both Funds are currently in liquidation proceedings in the Eastern Caribbean Supreme Court in the High Court of Justice of the British Virgin Islands.  (SAC ¶ 42.) The Funds' Joint Liquidators are litigating claims on behalf of the Funds against KML, FIM Limited, FIM Advisers LLP, Grosso, Ceretti, and PwC in Bermuda. (Barrett Decl. Exs. 4-7.)

### 3. Offering Documents and Service Agreements

#### 1. Information Memoranda and Subscription Agreements

In order to purchase shares in the Funds, every investor (or "subscriber") signed a Subscription Agreement ("SA").  The Subscription Agreement required that the investor make certain representations and warranties, including that the investor was a "professional investor," defined as either "an institution whose ordinary business or professional activity includes the buying and selling of investments," a "natural person [whose] individual net worth, or joint net worth with his/her spouse exceeds U.S. $1 million," or an institution with at least $5 million in assets.  (SAC Ex. 1, at S-8.)  The SA also required the investor to certify that it "possesses requisite knowledge and experience in financial matters such that it is capable of evaluating the merits and risks of an investment in the Fund

(including without limitation, the ability to suffer a complete loss of the investment . . .)" and "is and will be able to bear the economic risks of its investment in the Shares." (<u>Id.</u> at S-9.)  The SA also contemplated that the investor consulted with its own attorney, accountant or investment advisor about the potential investment.  (<u>Id.</u> at (j).)

The SA contains a provision entitled "Waiver of Statute of Limitations" which reads, in relevant part:

> Each investor in the Fund agrees to have
> waived, to the maximum extent permissible
> under the law, the right to bring any legal
> claim, action or other proceeding against
> the Fund, its Board of Directors and other
> officers unless such claim, action or
> proceeding is commenced within six (6)
> months from the date of the first to occur
> of (i) the original occurrence allegedly
> giving rise to such claim, action or
> proceeding, or (ii) the Shareholder's
> redemption of any Shares.

(SAC Ex. 1, at S-11.)

The SA also states that the "Subscriber agrees when entering into the Agreement to be bound by the laws of the BVI and in addition to the non-exclusive jurisdiction of the relevant courts therein subject to which laws this Agreement shall be governed and interpreted."   (<u>Id.</u>)

Pursuant to the Subscription Agreement, each investor in each of the Funds received a copy of an Information Memorandum ("IM") upon purchase of shares in the Funds, and was required to

6

acknowledge that the subscriber received, reviewed and understood the IM as a condition of buying shares. (SAC Ex. 1 at S-4.)[4]  The Information Memoranda detailed, <u>inter alia</u>, the investment process, the risks associated with investment, the roles and duties of the various parties associated with the Funds, and fees and expenses.  (SAC ¶ 70; Kingate Global Fund, Ltd. Amended and Restated Information Memorandum, Oct. 6, 2008 ("Kingate Global IM"), SAC Ex. 1).

    By the terms of each of the Memoranda, "no person [was] authorized . . . to give any information or make any representations [in connection with the offered securities] other than as contained" in the Memoranda. (Kingate Global IM.[5]) The IM also advised that the shares in the Funds "are not for sale to U.S. persons or to any member of the public in the British Virgin Islands."  (<u>Id.</u>)  Each Information Memorandum further advised investors that "[n]o person has been authorized to make any representations concerning the Fund or the . . . Shares which are inconsistent with those contained in this Memorandum, and any such representations should accordingly be treated as unauthorized and may not be relied upon by the

_____

[4] The Information Memoranda were periodically updated, but appear to be materially identical with respect to the provisions relevant to this lawsuit. (SAC at 16 n.1.)

[5] The first two pages of the Kingate Global IM are unnumbered. This quote appears on ECF page number 2.

recipient." (Id.[6])  The IM identified KML, FIM Advisers, and Citi Hedge as the Manager, Consultant, and Administrator, respectively, and explained that each was retained pursuant to a separate agreement.  (Kingate Global IM at ii-iii.)  The Management, Consultant, and Administration Agreements were made available to the investors at the Administrator's office.  (Id. at 32.)

The IM listed Defendant Tannenbaum as a partner and director of the Managers.  (Id. at 13.)  As to the Managers' responsibilities, the IM stated, in pertinent part:

> Pursuant to the Manager Agreement, the Manager evaluates and monitors the Investment Advisor and, in general, provides all necessary management services to the Fund.
> . . .
> Pursuant to the terms of the Manager Agreement, the Manager has agreed (i) to manage all aspects of the investment advisory services provided to the Fund, including the selection and evaluation of the Investment Advisor.

(Kingate Global IM at ii, 13; SAC ¶ 70.)

The Information Memoranda did not identify Madoff by name, but described the Investment Advisor as a "New York based NASD registered broker-dealer employing approximately 350 people and acting primarily as a market-maker in listed and unlisted stocks

---

[6] ECF page number 3.

and convertible securities." (SAC ¶ 53; Kingate Global IM at 14.)

In the section entitled "Certain Risk Factors," the IM stated, in relevant part:

> The Manager has delegated all investment management duties with regard to USD Shares to the Investment Advisor. As a result, the success of the Fund for the foreseeable future will depend on the ability of the Investment Advisor to achieve the Fund's investment objective. Neither the Manager nor the USD Shareholders have any control over the investment and trading decisions of the Investment Advisor, and no person should invest in the Fund unless willing to entrust all aspects of the investment management of the Fund to the selected Investment Advisor, having evaluated its capability to perform such functions.

(Kingate Global IM at 5.)

In a section entitled "Possibility of Fraud or Misappropriation," the IM provided:

> Neither the Fund nor the Custodian has actual custody of the assets. Such actual custody rests with the Investment Advisor and its affiliated broker-dealer. Therefore, there is the risk that the custodian could abscond with those assets. There is always the risk that the assets with the Investment Advisor could be misappropriated. In addition, information supplied by the Investment Advisor may be inaccurate or even fraudulent. The Manager is entitled to rely on such information (provided they do so in good faith) and is not required to undertake any due diligence to confirm the accuracy thereof.

(Id. at 9.)

9

The IM further stated:

> The Fund and the Manager, as independent
> legal entities, may be subject to lawsuits
> or proceedings by governmental entities or
> private parties.  Except in the event of a
> lawsuit or proceeding arising from a
> Director's or Manager's gross negligence,
> willful default, or fraud in the performance
> of its duties, expenses or liabilities of
> the Fund arising from any suit shall be
> borne by the Fund.

(Id. at 8.)

The IM also set forth the Administrator's responsibilities, which included communicating with the investors and the public, soliciting sales of the Funds' shares and collecting subscriptions, keeping the Funds' books and records, disbursing payments, and calculating the Net Asset Value ("NAV") and subscription and redemption prices.  (Id. at 15.)  In a section entitled "Determination of Net Asset Value" the IM explained the manner in which the NAV was calculated, and stated that the Administrator "verifies the prices attributed to the securities held by the USD shares of the Fund by reference to pricing sources independent of the Investment Advisor whenever reasonably possible." (Id. at 23; SAC ¶ 72.)

According to the IM, the Consultant was to render "consulting advice to the Manager with respect to certain aspects of the Fund's operational, administrative, marketing, accounting and legal matters."  (Kingate Global IM at 15.)  The

10

IM identified the founding members of FIM Advisers as Defendants Grosso and Ceretti.  (Id. at 14-15) The Information Memoranda stated that "[t]he Consultant is paid by the Manager for its services at no additional cost to the Fund." (Id. at 17.)

Like the Subscription Agreement, the IM contained a provision entitled "Shortened Period Within Which to Make Claims," which read:

> By executing a subscription agreement for Shares, each investor in the Fund shall be deemed to have waived, to the maximum extent permissible under law, the right to bring any legal claim, action or other proceeding against the Fund, the Manager or the Consultant unless such claim, action or proceeding is commenced within six (6) months from the date of the first to occur of (i) the original occurrence allegedly giving rise to such claim, action or proceeding or (ii) the Shareholder's redemption of any Shares.

(Id. at 19.)

### 2. Management Agreements

KML and Tremont managed the Funds pursuant to Management and Co-Management Agreements with the Funds, one of which is attached to the SAC and is incorporated herein.  (SAC ¶¶ 24(a), 25(b); Kingate Management Limited Management Agreement ("KML Agreement"), SAC Ex. 7.)[7]  The KML Agreement provided that KML

---

[7] The Court assumes that any Co-Manager Agreement with Tremont contained the same material terms.

would provide investment management, administrative, marketing and sales services to the Funds. (SAC ¶ 24(a).)

Section 5.9 of the KML Agreement, entitled "Delegation," provided, in relevant part:

> The Manager shall be authorized to delegate as appropriate, or in its discretion, any of the duties or obligations.
> . . .
> In the event of any such delegation of duties or obligations hereunder pursuant to any agreement consented to in writing by the Fund, the Manager shall be relieved and discharged of its obligations to perform the services so delegated other than the continuing obligation . . . to take reasonable measures to (i) ascertain the competence of the delegatee to perform the services so delegated, [and] (ii) monitor generally the faithful performance by the delegatee of the duties specified in the relevant delegation agreement.

(KML Agreement § 5.9.)

That section continued: "For the avoidance of doubt, the Manager has delegated responsibilities as follows, which have the consent of the Fund's Directors: i. To Madoff, investment advisory activities and custody services." (Id. § 5.9(d).) The KML Agreement stated that "substantially all of the Fund's assets is in custody with" BMIS. (Id. § 2.2.)

The KML Agreement also contained a clause entitled "Scope of Liabilities," which read:

> Neither the Manager nor its directors, officers, shareholders and employees, shall be liable to the Fund or its Shareholders

12

> for any losses, damages, expenses or claims
> occasioned by any act or omission of the
> Manager or directors, officers, shareholders
> or employees in connection with the
> performance of its services hereunder, other
> than as a result of its own gross
> negligence, bad faith, or willful or
> reckless malfeasance.

(Id. § 5.4.)[8]

In return for their services as Co-Managers, KML and Tremont received millions of dollars in management fees, calculated as 1.5% of each Funds' NAV.  (SAC ¶¶ 24(b), 25(c).)

The KML Agreement stated that it is "governed by and construed in accordance with the substantive laws of Bermuda," and that the parties thereto submitted to the non-exclusive jurisdiction of the Bermuda courts to settle any disputes arising between the parties to the agreement.  (KML Agreement § 5.12.)

### 3. Consulting Services Agreements

FIM Limited was appointed to "provide consultancy services," to KML and Tremont pursuant to a Consulting Services Agreement, dated December 1, 1995.  (SAC ¶ 27.) FIM Limited provided those services through July 31, 2005.  (Id.) Pursuant to a Consulting Services Agreement dated April 23, 2001, and effective May 1, 2000, FIM Limited provided consulting services

---

[8] The IM also notified investors of this limitation on liability. (Kingate Global IM at 13.)

to Kingate Euro.  (Barrett Decl., Ex. 11 ("FIM Agreement" ¶ 2).)
Thereafter, FIM Advisors rendered consulting services to the
Funds pursuant to an August 1, 2005 Consulting Services
Agreement. (SAC ¶ 28(b).)[9]

The Consulting Services Agreements provided that:

> The Manager now wishes to appoint FIM as a
> consultant to the Manager to provide it with
> consultancy and other services to assist in
> the day to day management of the Company's
> assets undertaken by the Manager under the
> Management Agreement.

(FIM Agreement ¶ (E).)  FIM's responsibilities included:

> provid[ing] such assistance, information and
> reports as the Manager and the Company's
> auditors may from time to time require in
> connection with the preparation of
> valuations in respect of the Company, the
> preparation by the Manager of periodic
> reports for submission to the Company and
> the provision of annual, semi-annual and
> other reports for the benefit of
> Shareholders or prospective Shareholders of
> the Company whether these are published by
> the Company or the Manager.

(Id. ¶ 8.)

The Consulting Services Agreement "waive[d] FIM's formal
duty of Best Execution as defined by the rules of [Investment
Management Regulatory Organisation]."  (Id. ¶ 2.2.)  In
addition, the Agreement provided:

> In the absence of gross negligence, fraud or
> willful default on the part of FIM, or

---

[9] Again, the Court assumes that the various Consulting Services
Agreement are materially identical.

14

> failure to comply with instructions of the
> Manager [], its directors, officers,
> employees or agents, FIM shall not be liable
> to the Manager or the Company for any act or
> omission in the course of or in connection
> with the services rendered by it hereunder
> or for any decline in the value of the
> assets of the Company or any loss whatsoever
> that may result to the Company or the
> Manager.

(Id. ¶ 13.1)  The Agreement also provided that the Manager would

indemnify FIM and its officers and employees "from and against

all claims, costs, charges, liabilities and expenses incurred by

them directly or indirectly from any act or omission in the

course of or in connection with the services provided by FIM,"

except if the claims or liabilities arose out of the "fraud,

willful default or gross negligence of FIM."  (Id. ¶ 13.2.)  The

Agreement was "governed by and construed in accordance with

Bermuda law."  (Id. ¶ 25.)[10]


### 4. Administration Agreements

Citi Hedge provided administration services to the Funds

pursuant to an Administration Agreement effective June 1, 2007.

(SAC ¶¶ 38(a), 179, Ex. 15 ("Administration Agreement").)

Pursuant to the Administration Agreement, the Funds appointed

the Administrator to provide "secretarial, registrar and

---

[10] The Agreement further provided that Bermuda courts had non-
exclusive jurisdiction over disputes arising out of the
Agreement, but that the parties were not prevented from
initiating proceedings in other jurisdictions.  (Id.)

transfer agency, accounting and other administrative services."
(Administration Agreement at 1.)  These duties included:

> (i) preparing and distributing monthly
> reports to the investors containing the
> amount of the Funds' net assets, the amount
> of any distributions from the Funds, and
> accounting and legal fees and all other fees
> and expenses of the Funds; (ii) maintaining
> the Funds' financial books and records;
> (iii) calculating the Funds' NAVs and
> subscription and redemption prices; (iv)
> handling communications with shareholders
> and the general public; (v) soliciting sales
> of the Funds' shares; (vi) accepting
> Subscriptions for share purchases; (vii)
> maintaining the Funds' corporate records and
> accounts; (viii) distributing payments of
> dividends and fees; (ix) conducting meetings
> of the Funds' shareholders; and (x) making
> redemptions from the Funds.

(SAC ¶ 38(b), 182.)

    With respect to calculation of the NAV, the Administration
Agreement provided that the Administrator calculate the NAV "in
accordance with the methodology contained in the Articles [of
association of the Funds], the Offering Memorandum or as
directed by the Directors [of the Fund] from time to time
utilising, whenever reasonably practicable, such independent
pricing services as chosen by the Administrator from time to
time." (Administration Agreement § 4.1.)

    Pursuant to the Administration Agreement,

> To the extent that the Administrator relies
> on information supplied by the Manager or
> any brokers or other financial
> intermediaries engaged by the Company in

> connection with performing its obligations
> hereunder, the Administrator's liability for
> the accuracy of any calculations utilising
> such information is limited to the accuracy
> of its own computations.  The Administrator
> is not liable for the accuracy of the
> underlying data provided to it.

(Administration Agreement § 10.6.)  According to the SAC, "Citi

Hedge was aware that all of the information regarding the Funds'

purported trading and assets was provided solely by Madoff."

(SAC ¶ 181.)

The Administration Agreement also stated that the

"Administrator shall not, in the absence of gross negligence,

willful default or fraud on its part be liable to the [Fund] or

to any Shareholder for any act or omission, in the course of, or

in connection with, the services rendered by it under this

Agreement."  (Administration Agreement § 10.3.)  In addition,

the Administration Agreement stated:

> In the absence of gross negligence, or
> willful default and provided that the
> directors, officers, employees, agents,
> delegates or affiliates of the Administrator
> are not parties to any fraud, the
> Administrator shall not be responsible to
> the [Fund] for any action taken by the
> Administrator upon the faith of any forged
> or fraudulent document in any case where,
> had the document not been forged or
> fraudulent, the action taken by the
> Administrator would have been the normal and
> reasonable action to be taken.

(Id. § 11.)

17

The Administration Agreement set forth a fee schedule for payment of administrative fees.[11]  Plaintiffs allege that Citi Hedge collected over $600,000 each of the years 2005-2007 in management fees with respect to Kingate Global, and approximately €132,000 and €146,118 in 2006 and 2007 with respect to Kingate Euro.  (SAC ¶ 183.)  The Administration Agreement is governed by BVI law.  (Administration Agreement § 18.)

### 5. Audit Engagement Letters

PwC Bermuda provided audit services to the Funds pursuant to a series of engagement letters.  (Tracey Decl. Exs. 23-32 ("Engagement Letters".))[12]  The Engagement Letters were "governed by and construed in accordance with the laws of Bermuda."  (2000 PwC Engagement Letter at 7.)  They also stated that PwC would "consider the Funds' internal control over financial reporting solely for the purpose of determining the nature, timing and extent of auditing procedures necessary for expressing [PwC's] opinion on the financial statements. This consideration will not

---

[11] The Information Memoranda stated that the Administrator receives "customary fees paid out of the Fund assets based on the nature and extent of the services performed by the Administrator for the Fund."  (Kingate Global IM at 17.)

[12] The various engagement letters are substantially the same. The Court here relies primarily on the December 14, 2000 Engagement Letter with Kingate Global and Kingate Euro.  (Tracey Decl. Ex. 25 at 2 ("2000 PwC Engagement Letter").)

be sufficient to enable [PwC] to render an opinion on the financial statements." (<u>See, e.g.</u>, 2000 PwC Engagement Letter at 2.) Further, the Engagement Letters stated that PwC would "design [its] audit to provide reasonable, but not absolute, assurance of detecting errors or fraud that would have a material effect on financial statements as well as illegal acts having a direct and material effect on the financial statement amounts." (<u>Id.</u>) The Engagement Letters warned that the "audit will not include a detailed audit of transactions, such as would be necessary to disclose errors or fraud that did not cause a material misstatement of the financial statements." (<u>Id.</u>) Additionally, they cautioned that "[b]ecause of the characteristics of fraud, . . . an audit designed and executed in accordance with generally accepted auditing standards may not detect a material fraud." (<u>Id.</u>) Further, they stated:

> Our audit is intended for the benefit of the Funds. The audit will not be planned or conducted in contemplation of reliance by any third party or with respect to any specific transaction. Therefore, items of possible interest to a third party will not be specifically addressed and matters may exist that would be assessed differently by a third party, possibly in connection with a specific transaction.

(<u>Id.</u> at 3.)

Pursuant to the Engagement Letters, the Managers were responsible for "adjusting financial statements to correct

material misstatements," and properly recording transactions in the account records.  (Id.)  In addition, the Managers were required to confirm, on behalf of the Management and Investment Advisor, inter alia, "the completeness and accuracy of financial records and related data"; "to the best of their knowledge and belief, the absence of illegal acts, fraud and other irregularities involving management or those employees who have significant roles in the control structure"; that "the Fund's reported net assets throughout the year have been properly computed"; and that "[t]he portfolio securities as shown in the financial statements are stated at value as determined in accordance with the valuation method" set forth in the IM. (Id. at 4-5.)

Per the terms of the Engagement Letters, the Funds agreed to release PwC for any claims or liabilities "attributable to any knowing misrepresentation by management."  (Id. at 6.) Additionally, the Funds agreed to indemnify PwC for all claims "relating to [PwC]'s services under this engagement letter, except to the extent finally determined to have resulted from the wilful misconduct or fraudulent behaviour of [PwC] relating to such services."  (Id. at 6.)  Further, the Engagement Letters provided:

> In no event shall PricewaterhouseCoopers be
> liable to the Funds, whether a claim be in
> tort, contract or otherwise: (a) for any

> amount in excess of the total professional
> fees paid by the Funds under this engagement
> letter; or (b) for any consequential,
> indirect, lost profit or similar damages
> relating to [PwC]'s services provided under
> this engagement letter, except to the extent
> finally determined to have resulted from
> willful misconduct or fraudulent behaviour
> of [PwC] relating to such services.

(Id.)

The Engagement Letters provided that the Funds would not assign or transfer any claim against PwC arising out of the Letters to anyone.  (Id. at 9.)

### 4. Defendants' Wrongful Conduct

According to the SAC, Defendants breached common law tort, fiduciary, and contract-based duties by failing to conduct due diligence, exercise due care and monitor Madoff's activities. Plaintiffs claim that had Defendants exercised such care and fulfilled these duties, Plaintiffs would have instead "ceased transferring investor funds to Madoff and redeemed existing investments," thereby preventing Plaintiffs' loss.  (SAC ¶ 198-207, 210, 215.)

### 1. Red Flags

Plaintiffs allege that Defendants were aware or should have been aware of the following "red flags," which should have alerted Defendants to Madoff's fraud:

21

- Madoff did not segregate investment activities, serving as the custodian of Fund assets and "self-clearing" all trading activities, rather than trading through an independent broker, which increased the risk of self-dealing and fraud (SAC ¶ 198);

- Madoff refused to identify counterparties with whom he traded in over-the-counter, off-exchange transactions (SAC ¶ 199);

- Madoff claimed that he held all assets in government securities cleared (which did not actually exist) through the Government Securities Clearing Corporation and held at Bank of New York (SAC ¶ 200);

- Madoff used a tiny, unknown accounting firm, Friehling & Horowitz, which was unequipped to audit a company of BMIS' purported size (SAC ¶ 201);

- Madoff claimed that BMIS was technologically advanced and had a world-class trading floor, yet Madoff reported his trades using paper confirmation forms which contained only daily averages, had no information about exact times and prices of trades, and were susceptible to manipulation (SAC ¶ 202);

- Madoff used an unusual fee structure, charging a commission per trade rather than a percentage fee

based on the results of BMIS' investment activity (SAC ¶ 203);

- Madoff's reported trading volume was impossibly high, indicating that at least 237 times between 1998 and 2008, BMIS' purported trades for the Funds exceeded 10% of a stock's total trades (SAC ¶¶ 205-207);

- Madoff's purported execution of trades was statistically impossible, as he reported that between 1998 and 2008, approximately 81% of equity buys occurred in the lower half of the daily price range and approximately 74% of the equity sales occurred in the upper half of the daily trade range, which would have led the reported prices to gravitate toward the daily midpoint (SAC ¶¶ 208-210); and

- Madoff reported receiving dividends on money market funds in which he allegedly held Fund assets with unusual frequency and on dates which, approximately 97.3% of the time, were not the dates that the money market funds actually paid dividends (SAC ¶¶ 211-214).

2. KML, Tremont, and FIM Defendants

Plaintiffs allege that the Kingate Defendants breached their duties to Plaintiffs and, as a result, "investors in the Funds were induced to purchase and hold virtually worthless

23

investments."  (SAC ¶ 1.)  Specifically, Plaintiffs allege that
several of the Kingate Defendants were in close contact with
Madoff while managing, overseeing or administering the Funds.
Manzke met with Madoff in May 2005 and March 2006, and Grosso
met with Madoff in October 2006, March 2007, September 2007, and
September 2008.  (SAC ¶ 58.)  Grosso, Ceretti and other FIM
employees allegedly participated in 286 telephone conversations
with Madoff between 2004 and 2008.  (SAC ¶ 63.)

     Plaintiffs allege that the Kingate Defendants knew or
should have known that Madoff was a fraud.  Plaintiffs allege
that in response to a concern from a potential investor about
Madoff's role as both the broker and manager, Ceretti instructed
a Hempisphere employee to "keep them away for now and let me
know if they contact you again."  (SAC ¶ 198.)  Additionally, a
2007 FIM report stated that "[t]here is a lack of independent
oversight of the fund as there is no prime broker and the co-
managers have delegated substantially all of the trading
authority to the advisor."  (SAC ¶ 198 (alteration in
original).)  A March 2008 FIM investment committee report on 31
funds' holdings contained detailed information about 30 of the
funds, yet Kingate Global's page was blank.  (SAC ¶ 68.)  In a
November 2008 email from Defendant Grosso to FIM's Head of
Operational Due Diligence, Eric Lazear, Grosso noted "We have
never done much [due diligence on Kingate], as it will be

impossible to go inside Madoff to do a proper D[ue] D[iligence]." (SAC ¶ 69) (alterations in original).) After Madoff's Ponzi scheme was exposed, Lazear wrote to Grosso, "[Kingate] is not a fund that went through our normal diligence process and I think it should not be depicted as if it had." (SAC ¶ 69 (alteration in original).) Lazear stated that he believed that BMIS was a "scam" and that he had previously informed Grosso of "all of the details" supporting his belief. (Id.)

Plaintiffs also allege that the Managers failed to monitor and evaluate Madoff's firm and activities as required under the terms of the Information Memoranda. (SAC ¶ 71.) For example, the SAC alleges that the Kingate Defendants never sought to determine whether Madoff was, in fact, making the over-the-counter trades he claimed to be making or whether he traded with creditworthy counterparties. (SAC ¶¶ 74-75.) Plaintiffs allege that such an investigation would have uncovered that Madoff "was not known to regular participants in the over-the-counter options market." (Id. ¶ 75.) In addition, Plaintiffs allege that KML failed to monitor Citi Hedge and its oversight of Madoff. (SAC ¶ 72.)

25

### 3. Tremont Group

Plaintiffs allege that the Tremont Group had "extensive ties" and a "special relationship" with Madoff due to its management of at least five other "feeder funds" and Madoff's long-standing relationship with Defendant Manzke.  (SAC ¶¶ 79-84.)  The other feeder funds had over $3 billion invested in BMIS by December 2008.  (SAC ¶ 79.)  Plaintiffs allege that Tremont Group aided and abetted Tremont's breach of fiduciary duty by being "willfully blind to the fact that the due diligence and risk controls employed by Tremont were grossly deficient."  (SAC ¶ 85.)

### 4. Citi Hedge

As noted, Citi Hedge performed administrative duties for the Funds, including calculating the Funds' NAV. (SAC ¶ 38.) Citi Hedge also "communicat[ed] subscription and redemption requests to Madoff and obtain[ed] trade confirmations and monthly account statements from Madoff."  (SAC ¶ 38(c).)

According to the SAC, Citi Hedge held itself out as "among the world's largest providers of Hedge Fund Administration Services" and advertised that its hedge fund services in Bermuda was ranked as the number one administration service company by Global Custodian Magazine and HedgeFundNet.  (SAC ¶¶ 184-185.) Plaintiffs allege that Citi Hedge's responsibilities went beyond

that of a typical administrator, and that it was aware that its involvement lent credibility to the Funds.  (SAC ¶ 189.)

Nevertheless, Plaintiffs claim that Citi Hedge failed to monitor Madoff and improperly relied solely on Madoff's representations when calculating the Funds' NAVs.  In particular, Citi Hedge failed to verify trades and pricing reported by Madoff, which on at least 185 occasions contained prices outside of the daily trading ranges.  (SAC ¶ 73, 192.) Citi Hedge also allegedly failed to reconcile information provided by Madoff and the Managers.  (SAC ¶ 192.)  Further, Plaintiffs allege that Citi Hedge was aware that the Kingate Defendants did not independently verify the assets that Madoff was purportedly holding and trading.  (SAC ¶ 196.)

### 5. PwC Bermuda

PwC Bermuda, or its predecessor entity,[13] audited the Funds every year since their inception, issuing a "clean" audit opinion each time.  (SAC ¶ 86; Report of Independent Auditors ("PwC Audit Reports"), 2004-2007, SAC Exs. 8, 9, 10.)  PwC directed its Audit Reports to investors, beginning each audit opinion with "To the Shareholders of [the Funds]."  (SAC ¶ 87.)

---

[13] Plaintiffs allege that PwC Bermuda is "part of PricewaterhouseCoopers' global network of firms," and is required to maintain uniform standards with other PwC entities. (SAC ¶ 37.)

The PwC Audit Reports were included as the first page in the Funds' financial statements.  (Id.)

Each opinion, for Kingate Global from 2004 to 2007, and Kingate Euro for 2006 to 2007, was identical, and stated:

> In our opinion, the accompanying statements of assets and liabilities, including the schedules of investments, and the related statements of operations and of changes in net assets present fairly, in all material respects, the financial position of Kingate Global Fund, Ltd.[/Kingate Euro Fund, Ltd.] (the "Company") at December 31, 200[5-7], and the results of its operations and the changes in its net assets for the years then ended, in conformity with accounting principles generally accepted in the United States of America. . . . [PricewaterhouseCoopers'] responsibility is to express an opinion on these financial statements based on our audits. [PricewaterhouseCoopers] conducted [its] audits of these financial statements in accordance with auditing standards generally accepted in the United States of America. . . . We believe our audits provide a reasonable basis for our opinion.

(SAC ¶ 90 (alterations in original); PwC Audit Reports, Exs. 8, 9, 10.)

Plaintiffs allege that, notwithstanding this statement, PwC Bermuda violated the Generally Accepted Auditing Standards ("GAAS") and Statements of Accounting Standards ("SAS") promulgated by the American Institute of Certified Public Accountants ("AICPA").  (SAC ¶ 94.)  Plaintiffs also allege that based on these standards, PwC Bermuda had a duty to investigate

28

and understand the Funds' environments, including their own and
Madoff's internal controls, in order to estimate the degree of
risk of misstatement in the Funds' financial statements, and to
determine if internal checks were functioning properly.  (SAC ¶¶
104, 107.)  Specifically, Plaintiffs allege that PwC was
required to test:

> (i) the existence and valuation of the
> Funds' securities at every balance sheet
> date; (ii) the Funds' ownership of those
> securities; (iii) the occurrence and
> accuracy of the Funds' transactions in U.S.
> Treasuries, stocks, and options; and (iv)
> the reasonableness of the Funds' reported
> investment income.

(SAC ¶ 110 (emphasis omitted).)

Plaintiffs allege that PwC was aware of but failed to
account for several risks of fraud in Madoff's operations:
Madoff's "unusual multi-faceted role" as the manager, investment
advisor, broker-dealer, and custodian of the Funds' assets; the
unrealistic results and volume of his purported trading; and
that BMIS was a family-run company.  (SAC ¶¶ 100-102, 120, 121)
The lack of segregation between duties, Plaintiffs allege,
should have led PwC to conduct additional audit procedures, such
as confirming the existence of the assets, which it failed to
do.  (SAC ¶¶ 116-117.)

Plaintiffs allege that PwC conducted a number of visits to
BMIS in 2000, 2002, 2004, and 2006.  (SAC ¶ 122.)  A 2004 report

issued to PwC organizations in Ireland and the Netherlands reported on a meeting between Linda McGowan of PwC U.S., Scott Watson-Brown, a partner at PwC Bermuda, and Madoff, regarding another feeder fund. (SAC ¶¶ 123-124; Notes of Discussion ("2004 PwC Madoff Report"), SAC Ex. 13.) The conclusions made in the 2004 PwC Madoff Report were based on Madoff's own representations and were not verified by Brown-Watson or McGowen. (SAC ¶ 125.)

The 2004 PwC Madoff Report noted that "Madoff estimates that 99% of all trades are electronic, therefore records are updated daily and all reconciliations are performed daily (automated process)." (SAC ¶ 126; 2004 PwC Madoff Report at 1.) However, KML and Tremont received all trade confirmations in paper format, with a time lag that allowed Madoff to fabricate prices. (SAC ¶ 126.) The paper records also did not include time stamps or individualized prices for each trade, but rather daily averages. (Id.) Plaintiffs allege that because PwC reviewed only the paper copies of trade confirmations, it did not confirm that the electronic trading actually took place. (Id. ¶ 128.) PwC also did not test the feasibility of the trades. (Id. ¶¶ 162-163.)

In addition, PwC failed to confirm whether the Fund assets were held in U.S. Treasury bills, as stated in the annual financial statements. (Id. ¶¶ 129-132.) Thus, financial

statements for the Funds, which listed the assets supposedly held in U.S. Treasury bills, were false.  (Id. ¶¶ 155-158.)

A 2005 letter from a PwC entity in the Netherlands related to another feeder fund described the December 2004 meeting referenced in the 2004 PwC Madoff Report.  (Id. ¶ 135; Letter from PwC Netherlands re: Fairfield Greenwich Advisors, LLC, March 15, 2005 ("PwC Netherlands Letter"), SAC Ex. 12.)  The letter stated, in relevant part:

> In our previous conference call, we have informed you about the fact that PwC had a meeting in December 2004 with Bernard L. Madoff Investments Securities LLC (hereinafter 'BLM') in order to obtain and/or update PwC's understanding of the procedures in place at BLM. PwC has shared with PwC Rotterdam their procedures program, notes of meeting and conclusions for the purpose of our audit of Fairfield Sentry Limited.
> . . .
> The procedures performed by PwC were only directed towards obtaining an understanding of certain procedures and organization aspects of BLM for the purpose of gaining comfort thereon for the audits by several PwC offices of a number of funds having moneys managed by BLM.  . . . Therefore, the procedures performed are not directed to the providing of assurance in respect of internal control, nor to the detection of fraud, errors or illegal acts.  The procedures performed do not constitute an audit nor an investigation of the internal controls of/at BLM.  The procedures consisted of gathering factual information through an interview with Mr. Madoff . . . No testing of controls and procedures was performed.

(SAC ¶¶ 135, 137; PwC Netherlands Letter at 1-2.)

PwC also met with Madoff in 2006, and issued another report, which was substantially the same as the 2004 PwC Madoff Report. (SAC ¶ 134.) Madoff reported that there were "no changes occurring in the regulatory environment that [he] feels has an impact on the managed accounts" that BMIS advised. (Id.) However, Plaintiffs allege that this was false, because BMIS had been forced to register as an investment adviser with the Securities and Exchange Commission ("the SEC") in 2006. (Id.) PwC did not catch the omission, nor question Madoff about it. (Id.)

In 2007, PwC Bermuda partner Brown-Watson stated that PwC did not "step into 'reauditing' Madoff's auditor's work (i.e. we do not look at reconciliations, etc. that occur in the custody/brokerage part of the business." (SAC ¶ 138.) PwC did not speak with internal auditors at BMIS or otherwise test internal controls. (Id.) PwC also did not investigate the reputation and competence of Friehling & Horowitz, BMIS' auditor before relying on its reports or financial statements. (SAC ¶ 139.)

Plaintiffs also allege that because PwC worldwide audited funds investing approximately $16 billion in BMIS, it should have been aware that Madoff underreported the assets under his

management to the SEC in 2007, which should have triggered
further investigation.  (SAC ¶ 169-170.)

Finally, Plaintiffs allege that PwC Bermuda was required,
but failed, to understand the nature and extent of the services
and monitoring provided by the Kingate Defendants and to verify
the information provided by the Administrators.  (SAC ¶ 175.)

B. Procedural History

Plaintiffs filed the initial Complaint in this matter on
June 10, 2009. On May 18, 2010, Plaintiffs filed the Amended
Consolidated Class Action Complaint ("CAC").[14]  In the CAC,
Plaintiffs asserted common law claims for fraud, negligent
misrepresentation, gross negligence, negligence, breach of

---

[14] The original Complaint named the following Defendants: Bernard
L. Madoff, Kingate Management Limited, Tremont (Bermuda)
Limited, FIM Advisers LLP, CITI Hedge Fund Service Ltd, Graham
H. Cook, John E. Epps, Sandra Manzke, Charles Sebah, Keith R.
Bish, Christopher Wetherhill, Michael G. Tannenbaum, Phillip A.
Evans, Margaret Every, Shazieh Salahuddin, Johann Wong, and
Preston M. Davis.  On June 12, 2009, Plaintiffs filed the
Complaint in Silvana Worldwide Corp. v. Kingate Management Ltd.,
et al., No 09 Civ. 5470, naming the following Defendants:
Pricewaterhousecoopers, Pricewaterhousecoopers Bermuda, Citi
Hedge Fund Services, Limited, Bank of Bermuda Limited, Graham H.
Cook, John E. Epps, Carlo Grosso, Federico M. Ceretti, Michael
G. Tannenbaum, Christopher Wetherhill, Kingate Management
Limited, FIM Limited, FIM Advisers LLP, FIM (USA) Incorporated.
    By Order dated January 22, 2010, these and two other
actions were consolidated under the caption herein.  (ECF No.
38.)  Of the current Defendants, FIM Limited, FIM (USA), PwC
Bermuda, Grosso and Ceretti were not named in the June 10, 2009
Complaint, but were named in the June 12, 2009 Complaint.
Tremont Group was named for the first time in the SAC.

fiduciary duty, constructive fraud, third party beneficiary
breach of contract, mutual mistake, aiding and abetting breach
of fiduciary duty, aiding and abetting fraud, and unjust
enrichment.  (CAC ¶¶ 4-5.)  Plaintiffs also asserted claims
under the Securities Exchange Act of 1934.  (Id. ¶ 5.)

After the Supreme Court's decision in Morrison v. National
Australia Bank Ltd., Plaintiffs filed a Notice of Voluntary
Dismissal of Federal Securities Claims, requesting voluntary
dismissal of all of their claims under Sections 10(b) and 20(a)
of the Securities Exchange Act of 1934 (Counts 29, 30, 31, and
32 of the Amended Consolidated Class Action Complaint) as to all
Defendants.  Morrison v. Nat'l Australia Bank Ltd., 561 U.S.
247, 264 (2010).  This Court entered the voluntary dismissal of
all federal claims on November 12, 2010.  Thus, only Plaintiffs'
common law claims remained.

All Defendants moved for dismissal of the CAC on July 19,
2010. By Order dated March 30, 2011, this Court dismissed the
action in its entirety, finding that all of Plaintiffs' claims
were precluded by the Securities Litigation Uniform Standards
Act of 1998, Pub. L. No. 105-353, 112 Stat. 3227 ("SLUSA") and
preempted by New York's Martin Act.  In re Kingate Mgmt. Ltd.
Litig., No. 09 CIV. 5386 DAB, 2011 WL 1362106 (S.D.N.Y. Mar. 30,
2011) (hereinafter "Kingate I").

The Court held that the class action was a "covered class action," that the claims were "in connection with covered securities," and that each of the claims was precluded by SLUSA because all of the alleged misstatements and omissions concerned "Madoff's purported trading strategy and/or Defendants' alleged duties and promises to oversee Madoff, audit Madoff, or otherwise ensure that Madoff was purchasing covered securities on behalf of the Funds – and thus on behalf of Plaintiffs." Kingate I, 2011 WL 1362106 at *9.  Because the Court found that all of Plaintiffs' claims were precluded and that repleading would be futile, it did not reach the Defendants' remaining grounds for dismissal.  Plaintiffs appealed the dismissal to the Second Circuit Court of Appeals.

On April 23, 2015, the Second Circuit vacated the Court's dismissal of the action, set forth a framework for analyzing SLUSA preclusion, and remanded for further proceedings.  In re Kingate Management Ltd. Litig., 784 F.3d 128 (2d Cir. 2015) [hereinafter "Kingate II"].[15]  The Mandate issued on May 20, 2015.  By letters dated June 18, 2015, the Parties set forth their positions as to the application of SLUSA to Plaintiffs' claims in light of the Second Circuit's decision.  On July 8, 2015, the Court held a conference at which it set forth a

---

[15] The Second Circuit also noted that the Defendants raised a number of alternative grounds for dismissal, which remained open on remand.  Kingate II, 784 F.3d at 154 n.26.

schedule for Plaintiffs to again amend the complaint and for Defendants' anticipated motion to dismiss.  Defendants filed the Joint Motion to Dismiss on December 21, 2015, and it was fully submitted on July 28, 2016.  That Motion is now before the Court.

II.  DISCUSSION

Defendants move to dismiss on six main grounds: (1) SLUSA precludes most of Plaintiff's claims, (2) the Court lacks personal jurisdiction over Citi Hedge, (3) Plaintiff's claims against the Managers, Consultants, and Manzke are time-barred, (4) the Court should abstain from jurisdiction based on comity (5) Plaintiffs lack standing to sue, and (6) the SAC fails to state any claim against the Defendants.  The Court addresses each of these in turn.

A. Choice of Law

As a preliminary matter, the Parties dispute which substantive law governs this dispute.  Plaintiffs contend that New York law applies, while Defendants argue that BVI and/or Bermuda law applies.  In a federal action based on diversity jurisdiction, the Court must look to the choice of law rules of the venue state, New York, to determine which substantive law governs.  See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); In re Coudert Bros. LLP, 673 F.3d 180, 186–87

36

(2d Cir. 2012); Beth Israel Med. Ctr. v. Horizon Blue Cross &
Blue Shield of N.J., Inc., 448 F.3d 573, 582 (2d Cir. 2006);
GlobalNet Financial.Com., Inc. v. Frank Crystal & Co., Inc., 449
F.3d 377, 382 (2d Cir. 2006).

   Under New York's choice-of-law rules, the court first
determines whether there is an actual conflict between the laws
of the relevant jurisdictions. See Beth Israel, 448 F.3d at 582-
83.  An actual conflict exists where the applicable law from
each jurisdiction provides differing rules, and the differences
are "relevant," meaning that they "must have a 'significant
possible effect on the outcome'" of the case.  Fin. One Public
Co. Ltd. v. Lehman Bros. Special Fin., Inc., 414 F.3d 325, 331
(2d Cir. 2005) (citation omitted) (emphasis in original).  "This
does not imply, however, that before embarking on a choice-of-
law analysis a court must apply the relevant substantive rules
of each jurisdiction to the facts of the case and determine what
the various results would be and whether they would differ."
Id. at 331-32.

   The Parties have submitted extensive briefing and numerous
expert declarations interpreting BVI and Bermuda law, and
debating whether and how they conflict with New York law.[16]

_____

[16] Though the precise structures and bases for authority differ
somewhat between Bermuda and the BVI, for the purposes of this
Motion, based on the submissions of the Parties' experts, the
Court does not distinguish between the law of BVI and Bermuda,

Defendants have identified at least four differences between the law of New York and BVI/Bermuda that have the potential to affect significantly the outcome of the case: (a) standing requirements for corporate shareholders, (b) the absence of a cause of action for gross negligence under BVI/Bermuda law, (c) the absence of a cause of action for aiding and abetting breach of fiduciary duty under BVI/Bermuda law, and (d) the absence of a cause of action for third party breach of contract under BVI/Bermuda law.  While Plaintiffs claim that there is no genuine conflict between New York and BVI/Bermuda law, they concede that the causes of action of gross negligence, aiding and abetting breach of fiduciary duty, and third party breach of contract do not exist under BVI/Bermuda law.[17]   (Pls.' Opp. at 46-48, 90, 137-39.)  Instead, Plaintiffs argue that similar causes of action exist, or that the limitations on those actions are "in retreat."  (Id. at 139.)  However, the fact that the other similar protections may exist, or that law may be evolving in the BVI/Bermuda, does not eliminate the potential for a

---

as they are based on English law. (Chivers Decl. ¶¶ 16-21; Bompas Further Decl. ¶ 8.)  Unless otherwise noted, the Court refers to the law of the BVI and Bermuda collectively as "BVI/Bermuda law."

[17] Plaintiffs claim that the standing requirements under New York and BVI/Bermuda law are not substantively different.  (Pls.' Opp. at 55.)  However, BVI/Bermuda law contains a rule not present under New York law, the "reflective loss" principle.

conflict between the laws of New York and the BVI/Bermuda.
Therefore, because an actual conflict exists at least as to some
of Plaintiffs' claims, the Court proceeds with the choice of law
analysis.

### 1. Choice of Law for Standing

With respect to choice of law for shareholder standing, New
York courts generally apply the so-called "internal affairs"
doctrine, which requires a court consider the law of the place
of incorporation to decide issues of the internal operations of
a corporation.  Anwar v. Fairfield Greenwich Ltd., 728 F. Supp.
2d 372, 400 n.8 (S.D.N.Y. 2010) (hereinafter "Anwar I").
However, the Second Circuit has made clear that application of
the internal affairs doctrine is not automatic.  Id. (citing
Norlin Corp. v. Rooney, 744 F.2d 255, 263 (2d Cir. 1984)
(discussing considerations that may override application of the
internal affairs rule)).  Instead, New York courts may take a
more flexible approach applying the "interests analysis," which
applies "'the law of the jurisdiction with the most significant
interest in, or relationship to, the dispute.'"  Id. (quoting
Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531,
1539 (2d Cir. 1997)). "The contacts of the parties and
occurrences with each jurisdiction are thus factors to be
considered in applying interest analysis, together with the

policies underlying each jurisdiction's rules, the strength of the governmental interests embodied in these policies, and the extent to which these interests are implicated by the contacts." Fin. One, 414 F.3d at 337.

Defendants argue that the Court should apply the "internal affairs" doctrine to find that the laws of the BVI, where the Funds were incorporated, determine shareholder standing. (Defs.' MTD at 52.)   Plaintiffs counter that the "interests analysis" should be used to find that New York law applies, because the internal affairs doctrine is not applicable in shareholder claims against third parties, and the internal affairs doctrine is not applied mechanically but instead considers the interests of the respective jurisdictions.  (Pls.' Opp. at 55.)

The Court finds that using either the internal affairs doctrine or the interests analysis, the appropriate law to be applied to the issue of standing is BVI/Bermuda law.  As noted, a simple application of the internal affairs doctrine would result in application of BVI law, since the Funds were incorporated under the laws of the BVI.  While Plaintiffs are correct that the internal affairs doctrine need not be applied strictly, the interests analysis also weighs in favor of application of BVI/Bermuda law.  The cases cited by the Plaintiffs, which rejected the internal affairs rule because the

40

corporations had no connections to the suggested jurisdiction
other than the fact of their incorporation and were no longer
operating in the jurisdictions of incorporation, are inapposite
to this case.  Here, the Defendants were not only incorporated
in the BVI, but held offices in and operated out of Bermuda, and
the Joint Liquidators for the Funds are currently litigating in
Bermuda presumably under BVI/Bermuda law.[18]  See Anwar I, 728 F.
Supp. 2d at 400 n.8; Pension Comm. of Univ. of Montreal Pension
Plan v. Banc of Am. Sec., LLC, 446 F. Supp. 2d 163, 194
(S.D.N.Y. 2006).  Furthermore, the Plaintiffs and the Funds
expected that BVI law would apply to disputes arising out of
their relationship, given that the Subscription Agreement
between the Plaintiffs and the Funds is governed by BVI law.
(SAC Ex. 1, at S-11.)  On the other hand, New York has no
interest in Plaintiffs' shareholder standing here, as neither
the Funds nor any of the Plaintiffs are located in the New York.
Indeed, the shares were off limits to potential investors in the
United States, including in New York, thus further reducing New
York's interest in the issue. (Kingate Global IM.[19])  The fact
that Madoff and his fraudulent scheme arose out of New York is

---

[18] The question of comity will be addressed in more detail below.

[19] ECF page number 2.

not sufficient to override BVI's interests in regulating the

relationship between BVI corporations and their shareholders. [20]

Accordingly, the Court finds that BVI law applies to the

issue of standing.

### 2. Choice of Law for Contract and Quasi-Contract Claims

Under New York's choice-of-law rules, courts use a "center

of gravity" or "groups of contacts" test to determine the law to

apply to contract and quasi-contract claims.  In re Allstate

Ins. Co., 81 N.Y.2d 219, 226 (N.Y. 1993); Fin. One, 414 F.3d at

336; Phillips v. Reed Grp., Ltd., 955 F. Supp. 2d 201, 238

(S.D.N.Y. 2013).  Significant contacts in a contract case

---

[20] In Montreal Pension, Judge Scheindlin pointed to the
underlying valuation fraud which occurred in New York, and which
Defendants relied on to calculate a Fund's NAV, as a basis for
applying New York law.  Montreal Pension, 446 F. Supp. 2d at
193.  In Anwar I, Judge Marrero found that the Funds at issue,
also feeder funds to BMIS, operated largely out of New York, as
did Madoff, and thus, that both Madoff's fraud and the
allegations of willful blindness to that fraud occurred in New
York.  Anwar I, 728 F. Supp. 2d at 400.  Here, other than
meetings in New York with Madoff conducted by Manzke, Ceretti,
and Grosso and PwC Bermuda, no other relevant conduct by the
Defendants is alleged to have taken place in New York.
    The Court also notes that both Montreal Pension and Anwar I
predate the Second Circuit's decision in this case in April
2015.  Though not addressing choice of law specifically, in the
context of SLUSA preclusion, the Second Circuit's clear
direction to this Court was to focus on the actions and alleged
misconduct of the Defendants, themselves, rather than third
party fraudsters, such as Madoff, whose underlying fraud led to
Plaintiffs' loss.  Applying that same reasoning in the choice of
law context, the Court finds further support for the finding
that BVI/Bermuda have a greater interest in and connection to
this matter than New York.

include: "the place of contracting, negotiation and performance; the location of the subject matter of the contract; and the domicile of the contracting parties." In re Allstate Ins. Co., 81 N.Y.2d at 227 (citing Restatement (Second) of Conflict of Laws § 188 (2)).

In contract disputes, "there is a 'strong public policy in favor of forum selection and arbitration clauses.'" Int'l Minerals & Res., S.A. v. Pappas, 96 F.3d 586, 592 (2d Cir. 1996) (citing Roby v. Corp. of Lloyd's, 996 F.2d 1353, 1361 (2d Cir. 1993), cert. denied, 510 U.S. 945 (1993)). "New York law is unambiguous in the area of express choice of law provisions in a contract. . . . Absent fraud or violation of public policy, contractual selection of governing law is generally determinative so long as the State selected has sufficient contacts with the transaction." Id. (citation, quotation and punctuation omitted). Nevertheless, "New York law allows a court to disregard the parties' choice when the 'most significant contacts' with the matter in dispute are in another state" or when the parties' "conduct during litigation may indicate assent to the application of another state's law." Cargill, Inc. v. Charles Kowsky Res., Inc., 949 F.2d 51, 55 (2d Cir. 1991).

Applying these rules to Plaintiffs' third party breach of contract claims (Counts 9, 10, 18 and 25), the Court finds that

43

BVI/Bermuda law applies.  Both the Subscription Agreement between the Plaintiffs and the Funds, and the various Service Agreements between the Funds and the Managers, Consultant, Administrator and Auditor of which Plaintiffs claim they are third party beneficiaries, contain choice of law provisions identifying BVI or Bermuda law as the governing law.  (SAC Ex. 1, at S-11 (Subscription Agreement governed by BVI law); KML Agreement § 5.12 (Management Agreement governed by Bermuda law); Admin. Agreement § 18) (Administration Agreement governed by BVI law); FIM Agreement ¶ 25 (Consulting Services Agreement governed by Bermuda law).)  The express choice of law provisions apply here, since they represent the clear intent of the parties and the selected governing law is sufficiently connected to the contracts.  As explained above, the Funds and the Defendants were all based in and working out of the BVI or Bermuda, and New York had few contacts with the transactions at issue beyond the fact that Madoff's underlying fraud was perpetrated there.

The fact that Plaintiffs are purportedly third party beneficiaries to the Service Agreements does not change the enforceability of the provisions, particularly given that the Plaintiffs were made aware of the Service Agreements through the IM and had the opportunity to review them if they wished.  <u>Roby v. Corp. of Lloyd's</u>, 996 F.2d at 1359 (applying contractual

choice of law provision to third party beneficiaries); see also

Anwar I, 728 F. Supp. 2d at 417.

Plaintiffs also argue that the choice of law provisions are
not enforceable because their application would contravene a
"fundamental public policy" of New York.  (Pls.' Opp. at 53.)
However, Plaintiffs have failed to identify any public policy of
New York that would be undermined by enforcement of the
provisions.  Plaintiffs argue that if the choice of law
provisions are upheld, and the Court finds that under BVI law
Plaintiffs lack standing, then Plaintiffs' remedy under New York
law would be foreclosed. Thus, Plaintiffs continue, the
"fundamental public policy" of New York would be undermined
because Defendants would have avoided successfully the
protections provided to Plaintiffs under New York law.  (Id. at
54.)  The Court struggles to find the logic in this circular
argument.  There are no allegations that the Defendants included
choice of law provisions in these Agreements in bad faith or
with the intent of contravening the more protective laws of
another jurisdiction.  Nor can Plaintiffs credibly make such an
argument, given that the Funds and the Managers, Consultant,
Administrator, and Auditor were, for the most part, located in
the BVI or Bermuda, the Plaintiffs were not located in New York,
and that Plaintiffs have argued elsewhere that the laws of New
York and the BVI/Bermuda are not substantively different. See

P.T. Adimitra Rayapratama v. Bankers Tr. Co., No. 95 CIV. 0786
(JSM), 1995 WL 495634, at *3 (S.D.N.Y. Aug. 21, 1995) (rejecting
plaintiffs' argument that "public policy renders unenforceable
any contractual choice of law or exclusive choice of forum
provisions by which a party would exempt itself from the
operation of United States remedial laws" where the other law to
be applied provides adequate remedies).  Thus, the choice of law
provisions are enforceable.

As to the quasi-contract claims, the relationships and
transactions giving rise to those claims exist only as a result
of the contracts.  Therefore, for the same reasons outlined
above, the Court finds that BVI/Bermuda law applies to
Plaintiffs' constructive trust, mutual mistake, and unjust
enrichment claims (Counts 11, 12, and 28).

### 3. Choice of Law for Tort Claims

For tort claims, New York courts again use the "interest
analysis," which, as noted above, applies "'the law of the
jurisdiction with the most significant interest in, or
relationship to, the dispute.'"  Anwar I, 728 F. Supp. 2d at 399
(quoting Lazard Freres & Co. v. Protective Life Ins. Co., 108
F.3d 1531, 1539 (2d Cir. 1997)); see also GlobalNet, 449 F.3d at
384.  In tort cases, the significant contacts are generally the
parties' domiciles and the locus of the tort.  In re Thelen LLP,

736 F.3d 213, 219 (2d Cir. 2013).  When the law is one which regulates conduct, "the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." GlobalNet, 449 F.3d at 384 (citing Cooney v. Osgood Mach., Inc., 81 N.Y.2d 66, 72 (N.Y. 1993)).  "If the conflict involves allocation of losses, the site of the tort is less important, and the parties' domiciles are more important."[21]  Id.

Defendants argue that the tort claims challenge conduct that occurred primarily in the BVI and Bermuda, where the Defendants managed, consulted, administered and audited the Funds.  (Defs.' MTD at 69.)  Plaintiffs argue that New York was the locus of the tort, since BMIS had custody of the assets in New York, the Funds' assets were purportedly invested in New

---

[21] As to the impact of the contractual choice of law provisions on choice of law in the tort context, the Second Circuit has clarified that "[u]nder New York law, then, tort claims are outside the scope of contractual choice-of-law provisions that specify what law governs construction of the terms of the contract, even when the contract also includes a broader forum-selection clause." Finance One, 414 F.3d at 335 (citing Krock v. Lipsay, 97 F.3d 640, 645 (2d Cir. 1996)) ("Under New York law, a choice-of-law provision indicating that the contract will be governed by a certain body of law does not dispositively determine that law which will govern a claim of fraud arising incident to the contract.")). The Circuit noted that "[p]resumably a contractual choice-of-law clause could be drafted broadly enough to reach such tort claims." Id.  The Court need not decide here whether the contracts apply to Plaintiffs' tort claims because the result would be the same, that BVI/Bermuda law is the appropriate law to be applied.

York, and "[t]he injury to the class relates to monies 'invested' in a New York-based Ponzi scheme." (Pls.' Opp. at 49-50.)  Plaintiffs also point to allegations that Defendants Ceretti, Grosso, and Manzke frequently met or spoke with Madoff in New York.  (Id. at 51.)  Lastly, Plaintiffs argue that New York law applies because the Plaintiffs are scattered around the world, and no foreign country has a greater interest.[22]  (Id. at 50-51)

The Court is not persuaded that the injury occurred in New York. None of the Plaintiffs are located in New York, and thus did not suffer the effects of their losses in New York. Furthermore, the tort cannot be said to have been committed in New York, since the Defendants were, for the most part, operating in the BVI or Bermuda.  There are no allegations that the Defendants reviewed the reports produced to the Funds by Madoff in New York, nor that any financial statements or other reports sent to Plaintiffs originated in New York.  While it is true that some of the Defendants interacted directly with Madoff in New York, and thus conducted at least some of the purportedly inadequate monitoring of Madoff in New York, they did so on behalf of the Funds and the Defendants located in BVI/Bermuda.

---

[22] Plaintiffs' argument that the fact that shares in the Funds could not be offered for sale to "any member of the public in the British Virgin Islands" supports a finding that New York law governs is misleading and meritless, given that the Funds could also not be sold to U.S. investors.  (Pls.' Opp. at 50.)

Therefore, the Court again finds that the interests analysis weighs in favor of applying BVI/Bermuda law to Plaintiffs' tort claims.  See GlobalNet 449 F.3d at 385) (holding that New York, rather than Florida, law applied to a negligence claim against an insurance broker licensed and operating out of New York for its failure to provide a cancellation notice to a Florida-based insured).

As to the breach of fiduciary duties claims, the Parties dispute whether the internal affairs doctrine or the interests analysis should apply to determine choice of law.  (Pls.' Opp at 51; Defs.' MTD at 70.)  However, because the Court finds that under either analysis, the appropriate governing law is that of the BVI/Bermuda, the Court finds that BVI/Bermuda law applies to Plaintiffs' breach of fiduciary duty claims.

### B. SLUSA Preclusion

Defendants' first ground for dismissal is SLUSA preclusion. Thus, the Court must decide whether any of Plaintiffs claims, and if so which ones, are precluded by SLUSA's limitation on class actions.[23]

---

[23] Plaintiffs argue that if the Court applies BVI/Bermuda law to their claims, then SLUSA no longer applies because SLUSA precludes only state law claims, not foreign law claims. (Pls.' Opp. at 41-42) (citing LaSala v. Bordier et Cie, 519 F.3d 121, 139 (3rd Cir. 2008)) (holding that claims brought under Swiss banking regulations were not preempted by SLUSA because SLUSA "only preempts covered class actions 'based upon the statutory

or common law of any State,' where 'State' is defined as 'any
State of the United States, the District of Columbia, Puerto
Rico, the Virgin Islands, or any other possession of the United
States'") (citing 15 U.S.C. §§ 78bb(f)(1), 78c(a)(16))).
Defendants counter that Plaintiffs waived the argument by
failing to raise it before this Court on the first Motion to
Dismiss, despite the centrality of the issue of SLUSA's
applicability.   (Defs.' Reply at 15-18.)   Though the Plaintiffs
did raise the argument before the Second Circuit on appeal, the
Circuit did not address it or the question of choice of law.
Thus, the Second Circuit's analysis treated Plaintiffs claims as
state law claims, found that SLUSA was applicable, and remanded
for the Court's consideration of which of Plaintiffs' claims
were precluded based on the categories it described.

The Court agrees with the Defendants that Plaintiffs waived
this argument by failing to raise it before this Court in the
first instance.   The Second Circuit has explained that "[a]s a
general matter, it is an uncompromising rule that lower courts
may not hear arguments that could have been raised prior to the
entry of judgment."   In re Coudert Bros. LLP, 809 F.3d 94, 100
(2d Cir. 2015) (citations and alterations omitted); see also
Call Ctr. Techs., Inc. v. Interline Travel & Tour, Inc., 622 F.
App'x 73, 75 (2d Cir. 2015) (upholding district court's
determination that defendant had waived choice of law argument
by raising it for the first time on remand, noting that
defendant "had every incentive to put its best case forward
prior to the initial appeal" and that "to allow [defendant] to
present a choice of law argument now would potentially unravel
[the Court of Appeals'] prior decision, a result that cannot be
consistent with the mandate.").

Even if the argument were not waived, the Court finds no
basis for it under current Second Circuit law.   As one of
Plaintiffs' cited cases recognizes, the Second Circuit has not
ruled on SLUSA's application to foreign law claims.   See In re
Petrobras Sec. Litig., No. 14-CV-9662 (JSR), 2016 WL 929346, at
*3 (S.D.N.Y. Mar. 12, 2016).   Further, Plaintiffs' cited cases
are distinguishable from the instant one.   In those cases,
plaintiffs sought to sue explicitly under foreign law.   Here,
however, Plaintiffs brought common law claims they argue should
be analyzed under New York law, but which the Court has
determined will be evaluated under BVI/Bermuda law following a
choice of law analysis.   On these facts, the Court declines to
extend the Third Circuit's rule in LaSala v. Bordier.   See
LaSala v. UBS, AG, 510 F. Supp. 2d 213, 237-38 (S.D.N.Y. 2007)
(applying SLUSA to claims alleged under state law, despite the
Court's holding that Swiss law applied to the claims, because

50

### 1. Standard of review

In <u>Kingate I</u>, this Court interpreted Defendants' Motions to Dismiss under Rule 12(b)(6).  <u>Kingate I</u>, 2011 WL 1362106, at *5. In <u>Kingate II</u>, the Second Circuit questioned whether dismissal pursuant to SLUSA is "best considered under Rule 12(b)(6), as a motion to dismiss for failure to state a claim, or under Rule 12(b)(1) (and/or 12(h)(3)), as a motion to dismiss for lack of subject-matter jurisdiction."  <u>Kingate II</u>, 784 F.3d 128 at 135 n.9.  The Circuit explained:

> A dismissal under SLUSA simply means that the lawsuit "may [not] be maintained" <u>as a covered class action</u>. 15 U.S.C. §§ 77p(b), 78bb(f)(1). It does not adjudicate against any plaintiff the right to recover on the claim. A dismissal under SLUSA would not be with prejudice, barring a plaintiff from filing a new, non-covered action asserting the same claims against the same defendants.

<u>Id.</u> (emphasis in original).  The Court thus finds it appropriate to revisit the characterization of Defendants' motion, insofar as it seeks to preclude Plaintiffs' claims based on SLUSA.

In a subsequent decision in <u>Anwar</u> following <u>Kingate II</u>, Judge Marrero noted that typically courts in this District consider dismissals under SLUSA as failing to state a claim pursuant to Rule 12(b)(6) or judgment on the pleadings under

---

"SLUSA requires only that the action 'purports to be based on state law,'" (quoting <u>Webster v. N.Y. Life Ins. & Annuity Corp.</u>, 386 F. Supp. 2d 438, 440 (S.D.N.Y. 2005))).

Rule 12(c).  Anwar v. Fairfield Greenwich Ltd., 118 F. Supp. 3d

591, 598 (S.D.N.Y. 2015), reconsideration denied in part, No.

09-CV-118 (VM), 2015 WL 10791912 (S.D.N.Y. Aug. 13, 2015), and

on reconsideration in part sub nom., 151 F. Supp. 3d 390

(S.D.N.Y. 2015) ("Anwar II").  However, in light of Kingate II,

he described the doctrinal complications of that approach:

> First, such an approach is inconsistent with
> the Second Circuit's indication that a
> dismissal under SLUSA should never be with
> prejudice. Generally, when deciding a Rule
> 12(b)(6) or Rule 12(c) motion, courts have
> discretion whether to dismiss with or
> without prejudice. When deciding a motion
> under Rules 12(b)(6) or 12(c), courts often
> grant plaintiffs leave to re-plead when
> dismissing without prejudice; but if an
> amended complaint could not correct
> fundamental defects that led to dismissal
> and thus the exercise would be futile,
> courts often dismiss with prejudice. Here,
> re-pleading would not save a claim that
> would otherwise be precluded by SLUSA. Under
> SLUSA, a properly pleaded claim is precluded
> not because of some deficiency in the
> pleading, but rather because of procedural
> mechanisms by which the particular claim was
> brought that conflict with the purposes of
> the statute.

Id.  On the other hand, dismissal for lack of subject matter

jurisdiction would necessarily be without prejudice.  Indeed,

"the alternative – dismissal with prejudice – would have 'the

effect of final adjudication on the merits' with res judicata

effect in both state and federal court."  Id. at 598-99 (citing

Hernandez v. Conriv Realty Assocs., 182 F.3d 121, 123 (2d Cir.

1999)) ("For this reason . . . Article III deprives federal courts of the power to dismiss a case with prejudice where federal subject matter jurisdiction does not exist.").

Second, though SLUSA does not address the issue specifically, the language of the statute "suggests that preclusion involves subject matter: a traditional state law claim could survive dismissal before a state or federal court — as long as that claim is not part of a 'covered class action.'" Id. at 598 (citing Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 87 (2006)) ("[SLUSA] simply denies plaintiffs the right to use the class-action device to vindicate certain claims. The Act does not deny any individual plaintiff, or indeed any group of fewer than [51] plaintiffs, the right to enforce any state-law cause of action that may exist.")). Finally, as Judge Marrero observed, the Second Circuit "has considered other aspects of SLUSA as raising a question of subject matter jurisdiction," including SLUSA's removal provision.  Id. at 599 (citing Romano v. Kazacos, 609 F.3d 512, 520–21 (2d Cir. 2010)).

The Court agrees that the appropriate lens for considering Defendants' Motion as to SLUSA is Rule 12(b)(1).  Rule 12(b)(1) of the Federal Rules of Civil Procedure provides for dismissal of a claim when the federal court lacks subject matter jurisdiction.  Under Rule 12(b)(1), even "a facially sufficient

complaint may be dismissed for lack of subject matter jurisdiction if the asserted basis for jurisdiction is not sufficient." Frisone v. Pepsico, Inc., 369 F. Supp. 2d 464, 469 (S.D.N.Y. 2005) (quoting Augienello v. Fed. Deposit Ins. Corp., 310 F. Supp. 2d 582, 587 (S.D.N.Y. 2004)).  When resolving issues of subject matter jurisdiction, a district court is not confined to the complaint and may refer to evidence outside the pleadings, such as affidavits. Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000) (citing Kamen v. Am. Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986)). The Court must nevertheless take all facts alleged in the Complaint as true and draw all reasonable inferences in Plaintiff's favor. Natural Res. Def. Council v. Johnson, 461 F.3d 164, 171 (2d Cir. 2006). Ultimately, however, Plaintiff "bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." Aurecchione v. Schoolman Transp. Sys., Inc., 426 F.3d 635, 638 (2d Cir. 2005).

### 2. SLUSA after Chadbourne, Herald, and Kingate

The Court previously dismissed this action in its entirety finding that all of Plaintiffs' claims were precluded by SLUSA. However, following remand from the Second Circuit in this matter, and in light of other intervening Supreme Court and Second Circuit case law, Chadbourne & Parke LLP v. Troice, 134

S. Ct. 1058 (2014), <u>In re Herald</u>, 730 F.3d 112 (2d Cir. 2013)

("<u>Herald I</u>"), and <u>In re Herald</u>, 753 F.3d 110 (2d Cir. 2014)

("<u>Herald II</u>"), which shed light on the scope of SLUSA

preclusion,[24] the Court now revisits its application of SLUSA to

Plaintiffs' claims.

> The relevant statutory provision provides:

>> No covered class action based upon the
>> statutory or common law of any State or
>> subdivision thereof may be maintained in any
>> State or Federal court by any private party
>> alleging—

>> (A) a misrepresentation or omission of a
>> material fact in connection with the
>> purchase or sale of a covered security; or

>> (B) that the defendant used or employed any
>> manipulative or deceptive device or
>> contrivance in connection with the purchase
>> or sale of a covered security.

15 U.S.C. § 78bb(f)(1); <u>see also</u> <u>id.</u> § 77p(b).

> A "covered security" is "one that is 'listed, or authorized

for listing, on [the national exchanges]' or that is 'issued by

an investment company that is registered, or that has filed a

registration statement, under the Investment Company Act of

1940.'" <u>Kingate II</u>, 784 F.3d at 139 (alteration in original)

(quoting <u>Romanov v. Kazacos</u>, 609 F.3d 512, 520 n.3 (2d Cir.

2010)).  An omission or misrepresentation is "made in connection

---

[24] For a more detailed discussion of the history of SLUSA, and
the <u>Chadbourne</u>, <u>Herald I</u> and <u>Herald II</u> decisions, <u>see</u> <u>Kingate
II</u>, 784 F.3d at 141.

with" a covered security if it is "material to a decision by one or more individuals (other than the fraudster) to buy or to sell a 'covered security.'" Chadbourne, 134 S. Ct. at 1066.

In Kingate II, the Second Circuit clarified several ambiguities in the scope and application of SLUSA preclusion. As to whether shares in the offshore Funds at issue here were "covered securities" triggering SLUSA, the Circuit reasoned that although the shares were not, themselves, covered securities, it was sufficient for purposes of SLUSA preclusion that Plaintiffs "purchased the uncovered shares of the offshore Funds, expecting that the Funds were investing the proceeds in S & P 100 stocks, which are covered securities." Kingate II, 784 F.3d at 142 (citing Herald II, 753 F.3d at 113). Accordingly, the Second Circuit held that the Plaintiffs' claims satisfy the SLUSA preclusion element requiring "falsity 'in connection with' a purchase or sale of a covered security." Id.

Having found that Plaintiffs' claims were "in connection with" the sale or purchase of a "covered security," the Second Circuit next addressed the nature of the conduct alleged in the complaint:

> SLUSA requires courts first to inquire whether an allegation is of conduct by the defendant, or by a third party. Only conduct by the defendant is sufficient to preclude an otherwise covered class action. Second, SLUSA requires courts to inquire whether the allegation [of fraud] is

> necessary to or extraneous to liability
> under the state law claims.  If the
> allegation is extraneous to the complaint's
> theory of liability, it cannot be the basis
> for SLUSA preclusion.

Id. at 142-43.[25]

---

[25] As the Second Circuit explained, the history of securities
litigation and SLUSA supports this interpretation:

> Congress passed the anti-falsity provisions
> of the 1933 and 1934 [Securities] Acts to
> protect the United States securities markets
> and the investing public against securities
> frauds and deceptions. Some sixty years
> later, finding that baseless class-action
> claims in suits under these Acts were
> damaging the United States economy, Congress
> passed the [Private Securities Litigation
> Reform Act], imposing restrictions on such
> claims. Then, finding that plaintiffs were
> escaping the limitations of the PSLRA, which
> applied only to claims brought under the
> 1933 and 1934 Acts, by framing their class-
> action claims as violations of state law so
> that the PSLRA would not apply, Congress
> passed SLUSA for the purpose of closing that
> loophole. If ambiguous provisions of SLUSA
> are construed to make its prohibition apply
> whenever a falsity in connection with a
> transaction in a covered security is a
> necessary predicate of the plaintiffs'
> claim, even where the falsity is not
> chargeable to the defendant and the claim
> could not have been brought against the
> defendant under the federal securities laws
> (and could therefore not be subject to the
> PSLRA), SLUSA would bar state law claims in
> a manner unrelated to SLUSA's purposes. . .
> . The history and purpose of SLUSA thus give
> strong support to the proposition that its
> ambiguous language should be interpreted so
> that it applies to state law claims
> predicated on conduct by the defendant
> specified in SLUSA's operative provisions,

Applying this standard to Plaintiffs' claims, the Circuit vacated the dismissal, finding that this Court had not "determine[d] whether the state law claims depended on conduct specified in SLUSA, <u>committed by Defendants</u>."  <u>Id.</u> at 150 (emphasis in original).  In analyzing Plaintiffs' claims, the Circuit divided the claims into five categories:

> 1. Group 1 consists of those allegations that predicate the named Defendants' liability on their own fraudulent misrepresentations and misleading omissions (i.e., those made with scienter), made in connection with the Funds' investments with Madoff in covered securities and with their oversight of these investments.
>
> 2. The allegations of Group 2 are similar to Group 1, with the exception that liability is premised on the named Defendants' <u>negligent</u> misrepresentations and omissions, rather than intentional misrepresentations and omissions.
>
> 3. The Group 3 allegations predicate liability on Defendants' aiding and abetting (rather than directly engaging in) the frauds underlying the Group 1 claims.
>
> 4. The allegations of Group 4 predicate liability on Defendants' breach of contractual, fiduciary, or tort-based duties owed to Plaintiffs, resulting in failure to detect the frauds of Madoff and BMIS.
>
> 5. The allegations of Group 5 seek compensation for fees paid to the named Defendants by the Funds on the grounds that

---

> which reference the anti-falsity provisions of the 1933 and 1934 Acts.

<u>Id.</u> at 146-47.

> those Defendants failed to perform the
> duties for which the fees were paid, or that
> the fees based on purported profits and
> values of the Funds were computed on the
> basis of inaccurate values.

Id. at 134-35 (emphasis in original).

The Circuit found that claims falling into Groups 1, 2, and 3 were precluded by SLUSA because they were premised on misrepresentations and omissions, whether made fraudulently or negligently, by the defendant of the type prohibited by the anti-falsity provisions of the 1933 and 1934 Acts.  Id. at 150-51.  On the other hand, claims falling into Groups 4 and 5, which "predicat[ed] liability on Defendants' breach of contractual, fiduciary, or tort-based duties owed to Plaintiffs," or that "seek compensation for fees paid to the named Defendants by the Funds on the grounds that those Defendants failed to perform the duties for which the fees were paid, or that the fees based on purported profits and values of the Funds were computed on the basis of inaccurate values," do not require a showing of false conduct and thus are not precluded.  Id. at 151-52.[26]

---

[26] The Circuit noted that:

> The allegations falling in Groups 3, 4, and
> 5 do not include allegations proof of which
> depends on a showing that the named
> Defendants committed knowing, intentional,
> or negligent misrepresentations or
> misleading omissions in connection with
> transactions in covered securities. If

The Second Circuit provided examples of claims that would not contain the requisite false conduct by Defendants.  As is relevant to this action, the Second Circuit stated:

> As a first example, assume the plaintiffs, who are clients of a stockbroker, engaged an auditor to audit their accounts. The auditor examines the accounts of the plaintiffs' securities transactions, does so negligently, and finds everything in order. Later it emerges that the broker had committed frauds against the plaintiffs and that the auditor's negligent examination failed to uncover the frauds. The plaintiffs sue the auditor in a state-law class action, alleging negligence in failing to detect the stockbroker's frauds. It is true that the negligence claim includes an allegation of fraud in connection with transactions in covered securities and that the alleged fraud by the broker is an essential predicate of the plaintiffs' claims against the defendant auditor. However, the auditor is not alleged to have committed any of the conduct specified in SLUSA. The plaintiffs' claim, if brought in federal court under diversity or supplemental jurisdiction, would not be subject to the restrictions of the PSLRA because it would not charge the defendant with a violation of the securities acts. Such a suit appears to us to be outside the concerns of the federal securities laws, the PSLRA, and SLUSA.

---

> allegations that otherwise fit within the description of Group 3, 4, or 5, require proof that the Defendants committed such misrepresentations, then those allegations belong in Group 1 or 2 rather than in Group 3, 4, or 5.

<u>Id.</u> at 135 n.6.

<u>Id.</u> at 148.[27]

---

[27] The other examples were as follows:

> As a second example, assume the plaintiffs
> are the beneficiaries of insurance policies
> that protect them from losses in their
> investment portfolios attributable to fraud
> in connection with transactions in covered
> securities. After the plaintiffs are
> victimized by such a fraud, the plaintiffs
> bring a class action against the insurer,
> seeking payment on their policies. As in the
> stockbroker fraud example above, the
> complaint alleges fraud in connection with a
> transaction in a covered security that is an
> essential predicate of the plaintiffs'
> claims. However, the fraud is not that of
> the defendant insurer. The insurer is not
> being charged with securities fraud. The
> facts alleged would not show the insurer to
> have violated the referenced anti-falsity
> provisions of the 1933 and 1934 Acts. The
> plaintiffs' state law claims are not an
> evasion of the PSLRA and appear to us to be
> outside the scope of SLUSA.
>
> As a third example, the defendant was a firm
> engaged by the plaintiffs to maintain
> custody of the plaintiffs' property. The
> defendant firm engaged X as a contractor to
> perform services related to the custody. The
> defendant firm negligently failed to check
> into X's background before engaging him.
> Such an inspection would have revealed that
> X had been convicted of securities fraud
> under § 10(b). In the performance of his
> duties, X steals the plaintiffs' property.
> The plaintiffs file a class action against
> the defendant, alleging negligence in hiring
> X without checking his background. As in the
> previous two examples, the plaintiffs'
> claims include an allegation of fraud in
> violation of the federal securities laws
> (X's previous conviction for securities
> fraud which the defendant negligently failed

Importantly, the Circuit cautioned Plaintiffs against artful pleading to avoid the court's characterization of a claim as dependent on a theory of fraud:

> [P]laintiffs do not evade SLUSA by camouflaging allegations that satisfy this standard in the guise of allegations that do not. When the success of a class action claim depends on a showing that the defendant committed false conduct conforming to SLUSA's specifications, the claim will be subject to SLUSA, notwithstanding that the claim asserts liability on the part of the defendant under a state law theory that does not include false conduct <u>as an essential element</u>.

Id. at 149 (emphasis in original).[28]

---

> to discover). X's prior securities fraud conviction is necessary to the success of the plaintiffs' state law claim, but that fraud is not attributable to the defendant custodian and could not provide a basis for a claim against the defendant under the anti-falsity provisions of the 1933 and 1934 Acts. The plaintiffs' state law claims are not an evasion of the PSLRA and are outside the concerns of the federal securities laws. They are also potentially beyond Congress's limited power under Article One, Section Eight of the Constitution. Congress has no authority to regulate local maintenance of custody of property (unless interstate commerce is involved). Construing SLUSA as applying whenever a securities fraud is an essential predicate of the plaintiffs' claim would interpret SLUSA as barring suits over which Congress has no lawful authority.

Id. at 148-49.

[28] The Second Circuit also identified a second caveat, which is not relevant to the instant case.  It noted that "while SLUSA

Kingate II did not determine which of Plaintiffs' claims

fall into each of the categories, instead leaving that

determination to this Court on remand.[29]  Having considered the

Second Circuit's instructions in Kingate II, and upon review of

the Parties' briefing as to the appropriate categorization of

each of Plaintiffs' claims, the Court now analyzes whether each

of the claims alleged in the SAC is subject to SLUSA preclusion.

For the purpose of analyzing SLUSA preclusion, the Court assumes

that Plaintiffs would have standing to bring each claim, and

that they sufficiently pleaded each claim.  Defendants challenge

the SAC on both bases, which will be addressed following the

discussion of SLUSA preclusion.

> 1. Counts 1-4, 8, 14, 20, and 27 – Fraud,
>    Negligent Misrepresentation Constructive
>    Fraud, and Aiding and Abetting Fraud Claims

The Parties agree, and the SAC concedes, that Counts 1-4,

8, 14, 20, and 27 are precluded under SLUSA because they fall

---

applies only to allegations of conduct by the defendant that
would violate the anti-falsity provisions of the 1933 and 1934
Acts that are referenced in SLUSA's operative provisions, SLUSA
may apply even though there is no private claim (as opposed to
an enforcement action by the SEC) for that violation under the
1933 and 1934 Acts."  Id.

[29] In addition, the Circuit instructed that: "should the district
court determine that some of Plaintiffs' claims (or portions
thereof) fall within the terms of SLUSA's preclusion and others
do not, we direct the district court to dismiss the precluded
claims and proceed with respect to the other claims."  Id. at
153-54.

into categories 1, 2 or 3 as outlined by the Second Circuit in

Kingate II.  (ECF No. 180 ("Defs.' 6/18/15 Letter") at 2 n.1;

ECF No. 179 ("Pls.' 6/18/15 Letter").)  Counts 1-4 and 8 allege

fraud, negligent representation and constructive fraud against

the Kingate Defendants, fall into Groups 1 or 2 and are

therefore precluded.  (SAC at 72, 77.)  Counts 14, 20, and 27

allege aiding and abetting fraud against the Tremont Group, PwC

Bermuda and Citi Hedge, fall into Group 3, and are therefore

precluded.  (SAC at 81, 87, 93.)  Accordingly, Counts 1-4, 8,

14, 20, and 27 are hereby DISMISSED.

### 2. Count 12 – Mutual Mistake

The Parties also agree that Count 12, mutual mistake, is

not precluded by SLUSA.  (Defs.' 6/18/15 Letter at 2 n.2; Pls.'

6/18/15 Letter.)  Defendants contend, however, that Count 12

should be dismissed on other bases.  Those arguments will be

addressed below.

### 3. Counts 5, 6, 7, 9, 10, and 13 – Gross Negligence, Negligence, Breach of Fiduciary Duty, and Third Party Breach of Contract Claims against Kingate Defendants

Counts 5 and 6 allege gross negligence and negligence

against the Kingate Defendants for their alleged failure to

exercise due care in managing and monitoring Plaintiffs'

investments.  Count 7 alleges a breach of fiduciary duty against

the Kingate Defendants for failure to take steps to make and maintain investments in a prudent manner, ensure the accuracy and completeness of information provided to Plaintiffs, and to perform necessary due diligence and monitoring of the investments.  Count 9 alleges a third party breach of contract claim against Defendants KML and Tremont for violation of the Management Agreements entered into between KML and Tremont and the Funds, of which Plaintiffs claim they are intended third party beneficiaries.  Count 10 alleges a third party breach of contract claim against the Consultant FIM entities for violation of the Consulting Agreement between the FIM entities and the Funds, of which Plaintiffs claim they are intended third party beneficiaries.  Count 13 alleges that Tremont Group aided and abetted the breaches of fiduciary duty by its subsidiary, Tremont.

Defendants argue that all of the claims against the Kingate Defendants are precluded by SLUSA as falling into Group 3 under the Kingate II framework.[30]  Specifically, Defendants argue that each of these claims allege that the Defendants breached duties to Plaintiffs because Defendants "knew of or consciously

---

[30] Defendants previously agreed with Plaintiffs that Counts 5 and 6 were not precluded by SLUSA.  (Defs. 6/18/15 Letter at 2 n.2.) However, the Joint Motion to Dismiss appears to have abandoned this position and Defendants now argue that Counts 5 and 6 are precluded.

disregarded 'overwhelming information indicating that Madoff's operation was a fraud.'" (Defs.' MTD at 41 (citing SAC ¶ 64).) Plaintiffs argue that these claims fall into Group 4, and are therefore not precluded, because they "can be established without alleging any false conduct or complicity in Madoff's fraud" and "arise[] from the fact that Defendants breached duties owed directly to Plaintiffs as investors in the Kingate Funds." (Pls.' Opp. at 25-26.)  Plaintiffs argue these claims allege that the "Defendants negligently and recklessly failed to 'provide competent management, consulting, auditing, or administrative services to the Funds, thus allowing Madoff's frauds to go undetected, causing Plaintiffs' losses.'" (Id. at 26 (citing Kingate II, 784 F.3d at 151).)

The Court finds that Counts 5, 6, 7, 9, 10 and 13 fall into Group 4, and are therefore not precluded by SLUSA.  Each of these causes of action allege that the Defendants owed tort, fiduciary or contract-based duties to the Plaintiffs, which existed irrespective of Madoff's fraud.  Plaintiffs allege that Defendants breached these duties by failing to exercise due care in performing the services for which they were hired, such as by failing to manage and monitor the Funds' investments and ensure that Plaintiffs had accurate information about their investments.  Had Defendants not breached these duties,

Plaintiffs allege that they would have ceased making investments in Madoff and redeemed their shares earlier.

Although Plaintiffs allege that the breaches of duties resulted in Defendants' failure to detect Madoff's fraud, none of these claims require knowledge or complicity in Madoff's fraud, nor any fraudulent conduct on the part of the Defendants. Allegations that the Defendants failed to conduct due diligence which would have exposed Madoff's fraud are not equivalent to allegations that the Defendants were complicit in the fraud. These duty-based claims are precisely the types of claims that the Second Circuit directed would not be precluded under SLUSA, because they do not require "a showing of false conduct <u>by the named Defendants</u> of the sort specified in SLUSA." <u>Kingate II</u>, 784 F.3d at 152; <u>see also</u> <u>Anwar II,</u> 118 F. Supp. 3d at 614, 617 (finding negligence, gross negligence and breach of fiduciary duty claims against securities broker-dealer were not precluded by SLUSA because "[a]llegations of the underlying fraud are not essential for plaintiffs to plead a sufficient negligence or gross negligence claim" and that "the type of conduct at issue here – whether, for example, [defendants] did not perform analytical tests as demanded of a fiduciary — entails an inquiry that is wholly distinct from the falsity wrongdoing underlying Madoff fraud. Those duties exist and are breached <u>regardless</u> of whether the Funds were merely a funnel to Madoff.") (emphasis in

original); <u>see also</u> <u>Yale M. Fishman 1998 Ins. Tr. v. Phila. Fin.</u>
<u>Life Assurance Co.</u>, No. 11-CV-1283, 2016 WL 2347921, at *9-10,
12 (S.D.N.Y. May 3, 2016) (finding Plaintiffs' breach of
fiduciary duty, breach of contract, and gross negligence claims
against insurance companies that invested premiums in Madoff
feeder funds not precluded by SLUSA).[31]

Accordingly, the Court finds that Counts 5, 6, 7, 9, 10,
and 13 are not precluded by SLUSA.

---

[31] The Court agrees with Plaintiffs that Defendants' reliance on
<u>Marchak v. JPMorgan Chase & Co.</u>, 84 F. Supp. 3d 197, 213
(E.D.N.Y. 2015) is misplaced.  In <u>Marchak</u>, the Court held that
Plaintiffs claims against the defendant banks of (i) knowing
participation in a breach of trust, (ii) aiding and abetting
fraud, (iii) aiding and abetting breach of fiduciary duty, (iv)
aiding and abetting conversion, (v) unjust enrichment, (vi)
fraud on the regulator, and (vii) negligence, were precluded
under SLUSA.  The Court reasoned that allegations that the
defendants "knew that the transactions taking place in each of
[the] accounts did not coincide with any legitimate enterprise
and thus could only be plausibly explained by fraud," and that
the "[d]efendants knew, or at least consciously avoided knowing
that [the third party fraudster] did not purchase securities
bu[t] instead stole customers' money" contained fraud as a
"necessary component" of the claim.  <u>Id.</u> at 203.  Relying on
<u>Herald I</u>, the Court noted that "[t]his is true even if the
fraud, though essential to sustain the cause of action, is not
pled as fraud on the part of the defendant."  <u>Id.</u> at 212 (citing
<u>Herald I</u>, 730 F.3d at 119 n.7).  In both <u>Marchak</u> and <u>Herald I</u>,
however, the defendants were accused of more than failing to
exercise due care, but knowledge of and complicity in the third
party's fraud.

>          4. Counts 15-19 - Gross Negligence, Negligence,
>             Aiding and Abetting Breach of Fiduciary
>             Duty, Third Party Breach of Contract, and
>             Negligent Misrepresentation Claims against
>             PwC Bermuda

Counts 15 and 16 allege gross negligence and negligence against PwC Bermuda for, either recklessly or negligently, failing to audit properly the Funds in accordance with GAAS and GAAP auditing standards. Count 17 alleges negligent misrepresentation against PwC Bermuda for falsely representing to Plaintiffs that it had conducted its audits in accordance with industry standards and that the audit reports accurately represented the financial position of the Funds. Count 18 alleges a third party breach of contract claim against PwC Bermuda for its violation of the Audit Agreements entered into between PwC and the Funds, of which Plaintiffs claim they are intended third party beneficiaries. Count 19 alleges that PwC aided and abetted the breaches of fiduciary duty to the Plaintiffs by the Kingate Defendants.

Echoing their arguments about the Kingate Defendants, Defendants contend that all claims against PwC Bermuda amount to aiding and abetting Madoff's fraud, and thus are Group 3 claims that should be precluded. (Defs.' MTD at 48-49.) Defendants argue that Plaintiffs' allegations against PwC Bermuda are based on PwC's having information about Madoff and knowledge of risk factors which it "purposefully or recklessly ignored," such as

the lack of segregation of duties and internal controls at BMIS.
(Id. at 48.)  Thus, Defendants argue, the claims against PwC
Bermuda rely on its "alleged participation in, knowledge of, or,
at a minimum, cognizable disregard of Madoff's and [BMIS]'s
securities fraud."  (Id. at 49 (emphasis in original).)  In the
alternative, Defendants argue that the claims against PwC
Bermuda (except the third party breach of contract claim) are
Group 2 claims arising out of PwC Bermuda's "misrepresentations
and/or omissions supposedly made by PwC Bermuda in connection
with its audit of the Funds and in turn the Funds' investment in
[BMIS]," including false representations about the Funds' assets
and that it had conducted its audits in accordance with industry
standards.  (Id. at 49-50.)

     Plaintiffs argue that Plaintiffs' negligence and gross
negligence claims fit precisely into Kingate II's first example
of the type of claims not barred by SLUSA, the case of an
auditor negligently failing to detect third party fraud.  The
Court agrees.  Plaintiffs allege that PwC Bermuda conducted its
audits negligently, and thus failed to detect Madoff's fraud.
PwC's duty to exercise due care in performing its audits existed
regardless of whether the Funds' accounts were affected by
Madoff's underlying fraud.[32]  With respect to PwC's

_____

[32] The Court rejects Defendants' argument that the example is
inapposite because the hypothetical auditor was hired by the

representations that it had conducted the audits in accordance
with generally accepted domestic and international auditing
standards, the "[f]ailure to abide by such standards could
constitute a breach of duty, regardless of whether
representations implicating auditing standards were made in
financial documents." Anwar II, 118 F. Supp. 3d at 605 (finding
negligence claims against other PwC entities not precluded by
SLUSA).  Thus, neither Madoff's fraud nor PwC's potentially
fraudulent representations about its audit procedures are
essential elements of the negligence claims for the purpose of
SLUSA preclusion.

Similarly, the third party breach of contract and aiding
and abetting breach of fiduciary duty claims arise out of
separate duties allegedly owed to the Plaintiffs.  Plaintiffs
assert that they were intended beneficiaries of the Audit
Agreements between PwC Bermuda and the Funds, which PwC breached
by failing to conduct the audits in accordance with industry
standards.  Plaintiffs also assert that PwC aided and abetted
the Kingate Defendants' breaches of fiduciary duties by

---

plaintiffs, rather than a third party. (Defs.' MTD at 51; Pls.'
Opp. at 31.) At its core, Defendants' argument goes to the
question of whether the PwC owed a duty to the Plaintiffs,
rather than the question of whether the claim contains false
conduct by the Defendant of the type specified under the
Securities Act.  The Court addresses the question of whether PwC
Bermuda owed a duty to Plaintiff below in the discussions of
standing and whether Plaintiffs fail to state a claim against
PwC Bermuda.

"act[ing] with willful blindness or recklessness in conducting
its audits" and by "giving clean audit reports to the Funds'
Financial Statements." (Pls.' Opp. at 36 (citing SAC ¶¶ 281,
283).) Although, as with the negligence claims, Plaintiffs
claim that PwC misrepresented its compliance with auditing
standards and the financial position of the Funds, neither of
these claims contains, as an essential element, fraud on the
part of PwC Bermuda.

However, the same cannot be said of Count 17, the negligent
misrepresentation claim. Plaintiffs allege that "PwC induced
Plaintiffs [] to hold their positions in the Funds and to
purchase additional interests in the Funds by <u>falsely
representing</u> to Plaintiffs [] that: (i) it had conducted its
audits in accordance with GAAS; and (ii) the Funds' financial
statements conformed with GAAP." (Defs.' MTD at 49-50 (citing
SAC ¶ 269) (emphasis added).) Plaintiffs also allege that PwC
made the false representations without "properly confirming the
existence of the Funds' assets" and knowing that Plaintiffs
would rely on the audit reports. (SAC ¶¶ 270-71.) Plaintiffs
argue that although negligent misrepresentation claims generally
fall in Group 2 and are therefore SLUSA precluded, negligent
misrepresentation claims unrelated to covered securities would
not fall within that category. (Pls.' Opp. at 39.) Plaintiffs
argue that PwC's representations were not "made in connection

with the Funds' investments with Madoff in covered securities
and with [Defendants'] oversight of these investments" because
the Fund investments reported on in the financial statements
were U.S. Treasury bills, which are not covered securities, and
the reports made no mention of Madoff or his alleged trading of
covered securities.  (Id. (citing Kingate II, 784 F.3d at 134
and SAC ¶ 269).)  Therefore, Plaintiffs argue, the negligent
misrepresentation claim arises out of "tort-based duties to
provide competent auditing services to the Funds" rather than
fraud.  (Pls.' Opp. at 40 (quoting Kingate II 784 F.3d at 151)
(alterations omitted).)

     Plaintiffs' arguments plainly fail.  As Plaintiffs concede,
negligent misrepresentation claims comprise Group 2 of the
Kingate II framework and are precluded.  The Court rejects
Plaintiffs' argument that the negligent misrepresentation claims
here are not "in connection with" covered securities because the
audit reports contained information about U.S. Treasury bills.
Kingate II held that Plaintiffs' claims were "in connection
with" covered securities since Plaintiffs "purchased the
uncovered shares of the offshore Funds, expecting that the Funds
were investing the proceeds in S & P 100 stocks, which are
covered securities."  Kingate II, 784 F.3d at 142.  Though
neither the Funds' shares nor the U.S. Treasury bills were

covered securities, Plaintiffs knew that the audit reports were based on investments in BMIS, which were covered securities.

Further, the negligent misrepresentation claim here is precluded because, as Judge Marrero explained in Anwar II,

> Whereas the negligence claims are predicated on the failure of the PwC Defendants to abide by auditing standards that may be required even absent such language in a financial document, the [] Plaintiffs' negligent misrepresentation claims turn on whether the PwC Defendants, knowing about the falsity, misrepresented that they had abided by those standards when they prepared the financial report for the Funds on which the [] Plaintiffs relied. Thus, although both types of claims involve the PwC Defendants' failure to follow standard auditing procedures, the negligent misrepresentation claims necessarily turn on some false conduct, while the negligence claims do not.

Anwar II, 118 F. Supp. 3d at 606 (holding that the negligent misrepresentation claims against PwC were precluded); see also Yale M. Fishman 1998 Ins. Tr., 2016 WL 2347921 at *13 (negligent misrepresentation claims precluded under SLUSA).

Moreover, if the Court found, as Plaintiffs argue, that the negligent misrepresentation claim arose out of "tort-based duties to provide competent auditing services to the Funds," rather than false conduct, it would be identical to the negligence claims set forth in Counts 15 and 16, a redundancy the Court sees no reason to indulge.  Therefore, the Court finds

74

that the negligent misrepresentation claim against PwC falls into Group 2, and is therefore precluded.

Accordingly, the Court finds that Counts 15, 16, 18, and 19, the gross negligence, negligence, third party breach of contract, and aiding and abetting breach of fiduciary duty claims, are Group 4 claims and are therefore not precluded. However, Count 17, negligent misrepresentation, falls into Group 2 and is therefore precluded.  Accordingly, Count 17 is DISMISSED.

> 5. Counts 21-26 - Gross Negligence, Negligence, Aiding and Abetting Breach of Fiduciary Duty, Third Party Breach of Contract, and Negligent Misrepresentation Claims against Citi Hedge

Count 21 alleges a breach of fiduciary duty claim against the Administrator, Citi Hedge, for failing to discharge properly its duties, including calculating the NAV and communicating with the Plaintiffs about their investments.  Counts 22 and 23 allege gross negligence and negligence against Citi Hedge for failing to exercising due care in the carrying out of its administrative duties to the Funds.  Count 24 alleges that Citi Hedge made negligent misrepresentations to Plaintiffs by issuing financial statements that contained false NAVs and account balance information.  Count 25 alleges a third party breach of contract claim against Citi Hedge for violation of the Administration

Agreements, of which Plaintiffs claim they are intended third party beneficiaries. Finally, Count 26 alleges that Citi Hedge aided and abetted the Kingate Defendants' breach of fiduciary duty.

Defendants argue that all of the claims against Citi Hedge are precluded under Group 2 because they are premised on "the fundamental theory that Citi Hedge miscalculated the NAV based on information from Madoff, then provided those misstatements to investors." (Defs.' MTD at 44-45.) Defendants also point to Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 446 F. Supp. 2d 163, 183 (S.D.N.Y. 2006) to support the argument that preparation of reports containing a false NAV, where the preparer knew that the underlying valuations were false, is sufficient to constitute a violation of the Exchange Act. (Defs.' MTD at 46.) Alternatively, Defendants argue that to the extent that the claims against Citi Hedge depend on claims that Citi Hedge purposefully or recklessly ignored risk factors that would have uncovered Madoff's fraud, the claims fall into Group 3. (Id. at 47.)

Plaintiffs respond that, like with the Kingate Defendants and PwC Bermuda, the negligence, gross negligence, third party breach of contract, and aiding and abetting breach of fiduciary duty claims are not precluded because they are based on duties owed to Plaintiffs that do not require any fraudulent or

deceptive conduct.  As for the negligent misrepresentation

claim, Plaintiffs again argue that the allegedly false

statements about the Funds' NAVs do not concern covered

securities, and do not assert complicity in Madoff's fraud.

Rather, Plaintiffs argue that the negligent misrepresentation

claim arises out of Citi Hedge's misconduct in failing to verify

properly the NAV and omitting information about Citi Hedge's own

conduct or omissions.  (Pls.' Opp. at 40-41.)

For the same reasons explained above, the Court finds that

the gross negligence, negligence, third party breach of

contract, and aiding and abetting breach of fiduciary duty

claims plainly fall into Group 4 and are not precluded by SLUSA.

Furthermore, as to those claims, the Court rejects Defendants'

argument that Pension Committee supports a finding that

calculation of a false NAV is false conduct for the purpose of

SLUSA preclusion here.  First, Pension Committee predated

Kingate II by almost ten years and thus was decided without the

guidance of the Second Circuit requiring courts to focus on

"conduct of the defendant specified in SLUSA's operative

provisions, which reference the anti-falsity provisions of the

1933 and 1934 Acts."  Kingate II, 784 F.3d at 149.  Thus, in

Pension Committee, the fact that the underlying valuation fraud

was committed by someone other than the defendant did not weigh

heavily on the court's decision.  Second, in contrast to Pension

Committee, there are no allegations in the SAC that Citi Hedge knew the underlying valuation data was false, and nevertheless calculated the NAV with the false information.  Plaintiffs allege only that Citi Hedge was aware that the information was provided by Madoff and failed to verify it.  (SAC ¶¶ 73, 181, 194.)  Because the breach of duty alleged does not require a finding of falsity, these claims are not precluded.

However, as to Count 24, the negligent misrepresentation claim, the Court finds that the claim is precluded for much the same reasons discussed above in relation to the negligent misrepresentation claim against PwC Bermuda. In contrast to the duty-based claims, the negligent misrepresentation claim depends on false conduct, here, the calculation and dissemination of a report containing false information.  Without the essential element of falsity, this claim would be a negligence claim identical to Counts 22 and 23.  Additionally, the Court again rejects Plaintiffs' argument that the NAV did not relate to covered securities, because Plaintiffs knew that the Fund effectively funneled investments into BMIS' purported covered securities and thus the values of the Funds were inextricably linked to covered securities.  Therefore, the negligent misrepresentation claim falls into Group 2, and is precluded.

In sum, Counts 21, 22, 23, 25, and 26, the gross negligence, negligence, third party breach of contract, breach

of fiduciary duty, and aiding and abetting breach of fiduciary duty claims are Group 4 claims and are not precluded.  However, Count 24, negligent misrepresentation, falls into Group 2 and is precluded. Therefore, Count 24 is DISMISSED.

### 6. Counts 11 and 28 – Constructive Trust and Unjust Enrichment

Count 11 alleges that the Kingate Defendants were unjustly enriched by the retention of fees they collected based on fictitious profits and assets, and that Plaintiffs are therefore entitled to a constructive trust to have those monies returned. Count 28 alleges that all Defendants were unjustly enriched by the retention of fees they collected to perform management, consulting, administration and auditing services when their performance of those services fell below the applicable standards of care.

The Court finds that Counts 11 and 28 fall into Group 5, and are not SLUSA precluded.  Plaintiffs allege in Count 11 that "[t]he Kingate Defendants were compensated by Plaintiffs and the Class with fees based on incorrect valuations of the Funds' assets," and were "unjustly enriched by the retention of fees that were predicated on fictitious profits and assets." (SAC ¶ 246-47.)  Count 28 alleges that the Defendants were unjustly enriched "by taking the monies of Plaintiffs and the Class in the form of commissions and other fees for the purported

management and administration of their investments, and the
purported, but in fact non-existent, capital appreciation of
such assets," when the Defendants' "performance was so far below
the applicable fiduciary and business standards that Plaintiffs
and the Class involuntarily conferred a benefit upon Defendants
without Plaintiffs and the Class receiving adequate benefit or
compensation in return." (SAC ¶ 323-24.) These claims fall
squarely within Group 5, which includes claims that "seek
compensation for fees paid to the named Defendants by the Funds
on the grounds that those Defendants failed to perform the
duties for which the fees were paid, or that the fees based on
purported profits and values of the Funds were computed on the
basis of inaccurate values." Kingate II, 784 F.3d at 135.
Although Madoff's underlying fraud resulted in the calculation
of fictitious profits and the resulting fees paid to Defendants,
that fraud is not alleged to have been conducted by Defendants,
nor is it essential to the claims of unjust enrichment and
constructive trust. See Yale M. Fishman 1998 Ins. Tr., 2016 WL
2347921 at *13 (unjust enrichment claims not precluded under
SLUSA).

Accordingly, Counts 11 and 28 fall into Group 5 and are not
precluded.

### 7. Summary of SLUSA Preclusion

For the reasons set forth above, the Court finds that Counts 5, 6, 7, 9, 10, 11, 12, 13, 15, 16, 18, 19, 21, 22, 23, 25, 26, and 28 fall into Groups 4 and 5 and are not precluded. The Court also finds that Counts 1-4, 8, 14, 17, 20, 24 and 27 fall into Groups 1, 2 or 3 and are precluded under SLUSA. Accordingly, Counts 1-4, 8, 14, 17, 20, 24 and 27 are hereby DISMISSED.

### C. Personal Jurisdiction over Citi Hedge

#### 1. Legal Standard for Personal Jurisdiction

In a motion to dismiss for lack of personal jurisdiction, the "plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." Penguin Gr. (USA), Inc. v. Am. Buddha, 609 F.3d 30, 34 (2d Cir. 2010) (citation omitted). "In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." Id. at 34-35 (quoting Thomas v. Ashcroft, 470 F.3d 491, 495 (2d Cir. 2006)). At the motion to dismiss phase, the prima facie showing may be established by "legally sufficient allegations of jurisdiction," id., and through the plaintiff's "own affidavits and supporting materials, containing an averment of facts that, if credited, would suffice to establish jurisdiction over the

81

defendant." <u>S. New England Tel. Co. v. Global NAPs Inc.</u>, 624
F.3d 123, 138 (2d Cir. 2010) (citation omitted); <u>see also</u>
<u>Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.</u>, 722 F.3d 81, 86
(2d Cir. 2013).

In the absence of an evidentiary hearing, the plaintiff's
"<u>prima facie</u> showing suffices, <u>notwithstanding any controverting</u>
<u>presentation by the moving party</u>, to defeat the motion."
<u>Dorchester</u>, 722 F.3d at 86 (internal citation omitted) (emphasis
in original).  The Court "construe[s] the pleadings and
affidavits in the light most favorable to plaintiffs, resolving
all doubts in their favor." <u>Id.</u> at 85 (internal citation
omitted).  However, the Court "will not draw argumentative
inferences in the plaintiff's favor" nor "accept as true a legal
conclusion couched as a factual allegation." <u>In re Terrorist</u>
<u>Attacks on Sept. 11, 2001</u>, 714 F.3d 659, 673 (2d Cir. 2013),
<u>cert. denied sub nom.</u> <u>O'Neill v. Al Rajhi Bank</u>, 134 S. Ct. 2870
(2014).

In New York,[33] to determine whether personal jurisdiction is
proper over a non-resident defendant, "[w]here, as here, the
plaintiffs premise their theory of personal jurisdiction upon
the New York long-arm statute, we first consider whether the

---

[33] In an action based on diversity jurisdiction, the state law of
the forum governs whether a federal court has personal
jurisdiction over the defendant.  <u>Hoffritz for Cutlery, Inc. v.</u>
<u>Amajac, Ltd.</u>, 763 F.2d 55, 57 (2d Cir. 1985).

requirements of the statute have been satisfied before proceeding to address whether the exercise of jurisdiction would comport with the Due Process Clause." Licci v. Lebanese Canadian Bank, SAL, 673 F.3d 50, 61 (2d Cir. 2012).

In New York, general jurisdiction arises out of N.Y. C.P.L.R. § 301.  Under New York law, a non-domiciliary is also subject to general personal jurisdiction if the defendant has "engaged in such a continuous and systematic course of 'doing business' here that a finding of its 'presence' in this jurisdiction" is warranted. Landoil Res. Corp. v. Alexander & Alexander Servs., Inc., 918 F.2d 1039, 1043 (2d Cir. 1990) (internal citations omitted); see also Hardware v. Ardowork Corp., 986 N.Y.S.2d 445, 446 (App. Div. 2014) (finding jurisdiction over individual defendant for "doing business" in New York).  Thus, "general jurisdiction is established if the defendant is shown to have 'engaged in continuous, permanent, and substantial activity in New York.'"  United Mobile Techs., LLC v. Pegaso PCS, S.A. de C.V., 509 F. App'x 48, 50 (2d Cir. 2013) (citing Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 95 (2d Cir. 2000)).

"For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." Daimler AG v.

83

<u>Bauman</u>, 134 S. Ct. 746, 760 (2014) (citing <u>Goodyear Dunlop Tires</u>
<u>Operations, S.A. v. Brown</u>, 564 U.S. 915, 919 (2011)).  Other
than in exceptional circumstances, "[w]ith respect to a
corporation, the place of incorporation and principal place of
business are 'paradigm bases for general jurisdiction.'" <u>Id.</u> at
761, n.19 (citations and internal alterations omitted).

　　　Personal jurisdiction for a foreign corporation may also be
established through an affiliate's actions under agency theory
"when it affiliates itself with a New York representative entity
and that New York representative renders services on behalf of
the foreign corporation that go beyond mere solicitation and are
sufficiently important to the foreign entity that the
corporation itself would perform equivalent services if no agent
were available."  <u>Wiwa v. Royal Dutch Petroleum Co.</u>, 226 F.3d
88, 95 (2d Cir. 2000).

　　　Additionally, specific jurisdiction may be available under
N.Y. C.P.L.R. § 302(a), New York's long-arm statute, where the
non-domiciliary:

> 1.  transacts any business within the state
> or contracts anywhere to supply goods or
> services in the state; or
> 2.  commits a tortious act within the state,
> . . .; or
> 3.  commits a tortious act without the state
> causing injury to person or property within
> the state . . . if he
> > (i)  regularly does or solicits
> > business, or engages in any other
> > persistent course of conduct, or

> derives substantial revenue from goods
> used or consumed or services rendered,
> in the state, or
> (ii)  expects or should reasonably
> expect the act to have consequences in
> the state and derives substantial
> revenue from interstate or
> international commerce . . . ; or
>> 4. owns, uses, or possesses any real
>> property situated within the state.

N.Y. C.P.L.R. § 302(a)(1)-(4). For the exercise of specific jurisdiction to be appropriate, there must be an "articulable nexus" or "substantial relationship" between the transaction and the claim asserted. Licci v. Lebanese Canadian Bank, 20 N.Y.3d 327, 339 (2012).

Personal jurisdiction over the Defendants must also satisfy due process requirements. The well-established test of International Shoe holds that the exercise of personal jurisdiction over a non-resident defendant requires that the defendant has had "certain minimum contacts with [the forum state], such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." See Int'l Shoe v. Washington, 326 U.S. 310, 316, (1945); Daimler, 134 S. Ct. at 754.  The Second Circuit has explained that due process has "two related components: the 'minimum contacts' inquiry and the 'reasonableness' inquiry." Chloe v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 164 (2d Cir. 2010) (citation omitted).

The minimum contacts test rests on whether a defendant's "conduct and connection with the forum state" are such that it "should reasonably anticipate being haled into court there." In re Terrorist Attacks, 714 F.3d at 673 (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)).  A non-resident defendant has minimum contacts with the forum state if he commits "some act by which the defendant purposely avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protection of its laws."  Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985) (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1940)). Furthermore, "the plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him."  Walden v. Fiore, 134 S. Ct. 1115, 1123 (2014).

Beyond minimum contacts, the Court may consider additional factors to determine whether the exercise of personal jurisdiction "would comport with 'fair play and substantial justice,'" including (1) the burden on the defendant, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interesting obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and

(5) the shared interest of the several states in furthering substantive social policies. <u>Burger King</u>, 471 U.S. at 476-77 (citation omitted).

## 2. Waiver of Personal Jurisdiction Defense

Pursuant to Rule 12(h), the defense of personal jurisdiction may be waived if it is omitted from a party's initial responsive pleading or motion to dismiss under Rule 12(b)(2). Fed. R. Civ. P. 12(h)(1); <u>City of New York v. Mickalis Pawn Shop, LLC</u>, 645 F.3d 114, 134 (2d Cir. 2011).  In addition, a party may be estopped from raising a personal jurisdiction defense in other situations.  "A court will obtain, through implied consent, personal jurisdiction over a defendant if '[t]he actions of the defendant [during the litigation] . . . amount to a legal submission to the jurisdiction of the court, whether voluntary or not.'" <u>Mickalis Pawn Shop</u>, 645 F.3d (quoting <u>Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee</u>, 456 U.S. 694, 703 (1982) (alterations in original)). The Second Circuit has held that a party who failed to litigate actively the personal jurisdiction defense for several years, and engaged in substantial pretrial proceedings "forfeited the defense by forgoing the opportunity to raise it sooner." <u>Id.</u> (citations omitted).

### 3. Application to Citi Hedge

The Court finds that Citi Hedge has forfeited its personal jurisdiction defense.  In 2010, the Parties litigated extensively multiple motions to dismiss from the various Defendants, including Citi Hedge.  Some of those motions, though notably not Citi Hedge's, alleged personal jurisdiction defenses.  The Court ruled on the motions to dismiss, ultimately granting them and dismissing the case in full based primarily on SLUSA preclusion, as discussed above.  In the Second Circuit's Opinion remanding the case, it noted that Defendants had raised a number of alternative grounds for dismissal, which remained open on remand.  See supra note 15.  In order to account for the Parties' stipulations regarding SLUSA preclusion and to streamline consideration of the Defendants' remaining grounds for dismissal, the Court set a schedule for the Plaintiffs to file the Second Amended Complaint, and for Defendants to file a consolidated Motion to Dismiss.  It is in this consolidated Joint Motion to Dismiss, now before the Court, that Citi Hedge first raised its personal jurisdiction defense.

Although Citi Hedge has not technically waived the personal jurisdiction defense pursuant to Rule 12(h) since it raised the defense in the instant Rule 12 Motion, the Court finds that Citi Hedge has forfeited the defense.  Citi Hedge did not raise personal jurisdiction in its initial responsive pleading, the

Motion to Dismiss the Amended Complaint.  Nor has it argued that it was first alerted to the jurisdictional defense by way of new or omitted facts in the Second Amended Complaint which were not present in the Amended Complaint.  Instead, Citi Hedge argues that the late-added defense is timely in light of intervening Supreme Court precedent, Daimler AG v. Bauman, 134 S. Ct. 746, 760 (2014), which according to Citi Hedge, "undermined prior Second Circuit precedent and made available a new personal jurisdiction defense that Citi Hedge raised at its first opportunity."  (Defs.' Reply at 33.)  The Court disagrees.

Daimler addressed the question of whether it would offend due process for a U.S. District Court in California to exercise general jurisdiction over Daimler, a German parent corporation, related to injuries attributable to its Argentinean subsidiary on the basis that a U.S. subsidiary of Daimler was subject to jurisdiction in California.  Daimler, 134 S. Ct. at 751.  The Court held that exercise of general jurisdiction over Daimler would violate due process, noting that "[s]uch exorbitant exercises of all-purpose jurisdiction would scarcely permit out-of-state defendants 'to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.'"  Id. at 761-62 (citing Burger King, 471 U.S. at 472).

Citi Hedge argues here that general jurisdiction is not appropriate because Citi Hedge is incorporated and has its principal place of business in Bermuda, making it "at home" there for the purpose of general jurisdiction.  Citi Hedge further argues that it did not transact business in or commit a tort in New York, thus making specific jurisdiction under New York's long-arm statute inappropriate.  Contrary to Citi Hedge's assertions, Daimler did not make any new defense available to it, as the facts of Daimler are distinguishable from Citi Hedge's situation.  Rather than asserting general jurisdiction over a parent company by way of the presence of a subsidiary in the U.S., the opposite circumstance applies here.  Moreover, Daimler did not address the scope of specific jurisdiction over a foreign company, which Citi Hedge also challenges here for the first time.  Accordingly, the Court finds that Citi Hedge forfeited its personal jurisdiction defense.  Therefore, the Joint Motion to Dismiss based on personal jurisdiction is DENIED.

### D. Timeliness of Claims Against the KML Defendants, Manzke, and the FIM Defendants

Defendants also assert that Plaintiffs' claims against Manzke, Grosso, Ceretti, FIM Limited, FIM Advisers, and KML are time-barred pursuant to the six-month limitations period in the

Information Memoranda and Subscription Agreements.[34]   (Defs.' MTD at 99-105.)   With respect to Manzke and FIM Limited, Defendants argue that because they each ceased involvement with the Funds years before the filing of the lawsuit, the "first occurrence" giving rise to the claims could not have occurred within six months of the date of filing, as required by the IM and SA. (Id. at 101.)   Similarly, as to KML and FIM Advisers, Defendants argue that the original occurrences giving rise to the claims occurred when those Defendants missed the various red flags which would have alerted them to Madoff's fraud, not when his fraud was actually discovered on December 11, 2008.   (Id. at 104-05.)   Finally, Defendants point out that FIM (USA), Grosso, and Ceretti were not named until June 12, 2009, six months and one day after Madoff's fraud was exposed.   Therefore, they argue, even assuming the six-month limitation period began to run when Madoff's fraud was discovered, the claims against FIM (USA), Grosso, and Ceretti were asserted after the six-month limitations period and do not relate back to the original

---

[34] The Parties do not dispute that New York law applies to the statute of limitations issue.  (Defs.' MTD at 100 n.99; Pls.' Opp. at 155-59.)   This "implied consent is sufficient to establish choice of law."   Motorola Credit Corp. v. Uzan, 388 F.3d 39, 61 (2d Cir. 2004) (quotations, citations, and ellipses omitted).

Complaint.  For the reasons set forth below, the Court rejects all of these arguments.[35]

First, the Court rejects the arguments that the "original occurrence" starting the clock for the limitations period was anything other than the date of discovery of Madoff's fraud, December 11, 2008.  Although Defendants may be correct that the allegations against KML, FIM Advisers, FIM Limited, and Manzke relate to conduct that occurred before that date, the

---

[35] The Parties also dispute the enforceability of the statute of limitations provisions.  Under New York law, the parties to a contract may agree on a shortened time period for bringing claims.  See N.Y. C.P.L.R. § 201.  "Absent proof that the contract is one of adhesion or the product of overreaching, or that the altered period is unreasonably short, the abbreviated period of limitation will be enforced."  John v. State Farm Mut. Auto. Ins. Co., 983 N.Y.S.2d 883, 884 (N.Y. App. Div. 2014) (alterations and citations omitted).  Plaintiffs argue that the six-month limitations period is "unreasonably short."  (Pls.' Opp. at 154-55.)  They also argue that the Subscription Agreements were contracts of adhesion because Plaintiffs were in an inferior bargaining position and could not negotiate the terms. (Id. at 155.) Plaintiffs' cited cases do not support a finding that, on the facts of this case, the six-month limitations period was unreasonably short. See, e.g., Dart Mech. Corp. v. City of New York., 994 N.Y.S.2d 90, 91 (N.Y. App. Div. 2014) (six-month limitations period in parties' contract not unreasonably short); Top Quality Wood Work Corp. v. City of New York, 595 N.Y.S.2d 22, 22 (N.Y. App. Div. 1993) (same). In addition, Plaintiffs were sophisticated investors who affirmed, as a prerequisite to purchasing shares, that they had reviewed and understood the terms of the IM and SA.  Accordingly, the Court finds the SA was not a contract of adhesion and the shortened limitations period is enforceable.

sophistication and scope of Madoff's fraud, and thus the
apparent success of the Funds, all but foreclosed the discovery
of the Defendants' allegedly wrongful conduct and Plaintiffs'
losses until Madoff's fraud was uncovered.  Moreover, as Judge
Marrero noted, "[u]p until Madoff's fraud was ultimately
revealed in December 2008, Plaintiffs — albeit not all of them
at once — could have redeemed their money and walked away
without ever suffering a loss. The Court finds it plausible that
. . . the loss was not actually sustained until Plaintiffs
sought to redeem their investments but could not." See Anwar I,
728 F. Supp. 2d at 445-46 (holding that the limitations period
for claims against feeder fund administrators and custodians did
not begin to run until Madoff's fraud was discovered, noting
that breach of fiduciary duty claims "[do] not commence until
the fiduciary has openly repudiated," (quoting Golden Pac.
Bancorp v. Fed. Deposit Ins. Corp., 273 F.3d 509, 518 (2d Cir.
2001) and negligence claims accrue "when all of the elements of
the tort can be truthfully alleged," including the loss (quoting
IDT Corp. v. Morgan Stanley Dean Witter & Co., 12 N.Y.3d 132,
140 (N.Y. 2009))).  Thus, the Court finds that the six-month
limitations period began to run on December 11, 2008.  Because
the claims against KML, FIM Advisers, FIM Limited, and Manzke
were filed on June 10, 2009, they are timely.

With respect to relation back of the claims against FIM
(USA), Grosso, and Ceretti, the Court finds that relation back
to the June 10, 2009 filing of the original Complaint is
appropriate.  Pursuant to Rule 15(c)(1), the following
requirements must be met for an amendment adding a new party to
a complaint to relate back to the date of the original pleading:

> (1) the claim must have arisen out of
> conduct set out in the original pleading;
> (2) the party to be brought in must have
> received such notice that it will not be
> prejudiced in maintaining its defense; (3)
> that party should have known that, but for a
> mistake of identity, the original action
> would have been brought against it; and ...
> [4] the second and third criteria are
> fulfilled within 120 days of the filing of
> the original complaint, and . . . the
> original complaint [was] filed within the
> limitations period.

Hogan v. Fischer, 738 F.3d 509, 517 (2d Cir. 2013) (quoting

Barrow v. Wethersfield Police Dept., 66 F.3d 466, 468-69 (2d

Cir. 1995) (emphasis and ellipses in original).  "[R]elation

back under Rule 15(c)(1)(C) depends on what the party to be

added knew or should have known, not on the amending party's

knowledge or its timeliness in seeking to amend the pleading."

Krupski v. Costa Crociere S. p. A., 560 U.S. 538, 541 (2010).

Further, "[t]hat a plaintiff knows of a party's existence does

not preclude her from making a mistake with respect to that

party's identity."  Id. at 549.  Thus, "a plaintiff might know

that the prospective defendant exists but nonetheless harbor a

misunderstanding about his status or role in the events giving rise to the claim at issue, and she may mistakenly choose to sue a different defendant based on that misimpression." Id. Relation back is not precluded in such circumstances.[36]

Here, Defendants argue that the added Defendants would have had no reason to believe that the omission of their names was a mistake, rather than a strategic decision. (Defs.' MTD at 103-04.) Defendants also argue that because Grosso's and Ceretti's names were listed in the IMs referenced in the original Complaint, they would not have considered the omission of their names in the original pleading a mistake. (Id. at 104.) The Court rejects these arguments and finds that relation back is appropriate. The allegations against FIM (USA), Grosso and Ceretti arise out of the same conduct and transactions as the original Complaint. Additionally, given that related entities

---

[36] The Second Circuit has noted that although "Rule 15(c) explicitly allows the relation back of an amendment due to a mistake concerning the identity of the parties, . . . the failure to identify individual defendants when the plaintiff knows that such defendants must be named cannot be characterized as a mistake." Scott v. Vill. of Spring Valley, 577 F. App'x 81, 82-83 (2d Cir. 2014) (quoting Hogan, 738 F.3d at 518) (alterations in original). Because of the complicated corporate structure of the various KML and FIM entities, the Court cannot say with certainty that Plaintiffs knew that Grosso and Ceretti should have been included in the original Complaint, which would preclude a finding that the omission was a "mistake" under Rule 15(c).

and parties were named in the original Complaint, the Court has no difficulty finding that FIM (USA), Grosso, and Ceretti would have been on notice that the action might have been brought against them but for a mistake or misunderstanding about their roles in the relevant entities and alleged wrongful conduct. Further, in light of the short gap between the filing of the two pleadings, only two days, the added Defendants were not prejudiced in defending their case by the delay in filing the claims against them.   See Anwar I, 728 F. Supp. 2d at 428. Accordingly, the claims against FIM (USA), Grosso, and Ceretti appearing in the June 12, 2009 Complaint relate back to the June 10, 2009 date and are timely.[37]

In sum, insofar as Defendants move to dismiss on the basis that Plaintiffs' claims are time barred, the Motion is DENIED.

### E. Comity

Defendants also argue that the Court should dismiss the SAC in its entirety because the Funds are the proper plaintiffs to pursue the claims set forth in the SAC, and the Funds are pursuing those claims in the Bermuda and BVI proceedings. (Defs.' MTD at 106.)   Although the Court considers the question

---

[37] The Court has considered Defendants' cited cases, In re Bernard L. Madoff Inv. Sec. LLC, 468 B.R. 620, 630 (Bankr. S.D.N.Y. 2012), and In re Enron Corp., 341 B.R. 460, 464 (Bankr. S.D.N.Y. 2006), and finds those facts to be distinguishable from the instant case.

of the proper plaintiff and the Funds' BVI and Bermuda proceedings in the context of standing, the Court declines to dismiss this action based on comity grounds, in light of that fact that the parties here are not identical, nor are all of the causes of action brought here alleged in those foreign proceedings. (Pls.' Opp. at 162.)

Moreover, the Second Circuit has made clear that abstention from jurisdiction is the exception, not the rule. <u>Royal & Sun All. Ins. Co. of Can. v. Century Int'l Arms, Inc.</u>, 466 F.3d 88, 93 (2d Cir. 2006) ("The task of a district court evaluating a request for dismissal based on a parallel foreign proceeding is not to articulate a justification <u>for</u> the exercise of jurisdiction, but rather to determine whether exceptional circumstances exist that justify the surrender of that jurisdiction.") (emphasis in original). Although Defendants are correct that under Second Circuit law, foreign bankruptcy proceedings are generally given extra deference, <u>id.</u> at 92-93, Plaintiffs are alleging (though ultimately failing to establish, on other grounds) distinct duties owed to them and additional causes of action not being raised by the Funds through the Joint Liquidators.[38]  Further, it is the Funds, rather than the

---

[38] Even if the Court did consider the BVI and Bermuda proceedings to be "parallel proceedings," dismissal would not be warranted on that ground alone.  Indeed, "concurrent jurisdiction in United States courts and the courts of a foreign sovereign does

Defendants, who are in liquidation in BVI and Bermuda.  Thus, it is not clear that the normal justification for deferring to foreign bankruptcy proceedings, to allow "equitable and orderly distribution of a debtor's property," would apply under these circumstances.  Id. at 93.  Because the Court finds no exceptional circumstances warranting abstention from the exercise of jurisdiction at this time, the Defendants' Motion to dismiss on comity grounds is DENIED.

### F. Standing

Defendants also move to dismiss on the ground that the Plaintiffs do not have standing to sue because the alleged wrongs, namely mismanagement and other breaches of duty by the Funds' service providers, were perpetrated against the Funds, and Plaintiffs were injured only indirectly.  (Defs.' MTD at 53.)  Plaintiffs counter that their claims against the Defendants are independent of the Funds' because (a) the Plaintiffs have causes of action against the Defendants arising out of breaches of duties owed directly to Plaintiffs which resulted in inducement of the Plaintiffs to purchase and

---

not result in conflict."  Id. (citing China Trade & Dev. Corp. v. M.V. Choong Yong, 837 F.2d 33, 36 (2d Cir. 1987)).  Instead, "[p]arallel proceedings in the same in personam claim should ordinarily be allowed to proceed simultaneously, at least until a judgment is reached in one which can be pled as res judicata in the other."  Id. (quotations omitted, alteration in original).

maintain shares in the Funds; (b) Plaintiffs suffered separate losses from the Funds that are not reflective of the Funds' loss, and (c) Plaintiffs would not be made whole by any proceeding or remedy sought on their behalf by the Funds. (Pls.' Opp. at 64-65.)  As noted above, the Court will apply BVI/Bermuda law to the question of standing.

### 1. Legal Standard for Shareholder Standing under BVI/Bermuda Law

The parties agree on the applicable legal standards for standing under BVI/Bermuda law.[39]  Under BVI/Bermuda law, the starting point for questions of shareholder standing is the principle set forth in <u>Foss v. Harbottle</u>, 2 Hare 461 (Eng. 1843), which provides that "[t]he proper plaintiff in an action in respect of a wrong alleged to be done to a corporation is, prima facie, the corporation."  (Hargun Decl. ¶ 81; Bompas Decl. ¶ 16.)  <u>See also</u> <u>Winn v. Schafer</u>, 499 F. Supp. 2d 390, 396 (S.D.N.Y. 2007); <u>Seghers v. Thompson</u>, No. 06-CIV-308 (RMB)(KNF), 2006 WL 2807203, at *4 (S.D.N.Y. Sept. 27, 2006) ("the proper plaintiff for a wrong done to [a] company is the company

---

[39] The Court notes that while the parties generally agree about the rules applicable to this case, the Parties' experts dispute application of those rules to Plaintiffs' claims.  The Court relies on the expert declarations insofar as they relate to <u>what</u> BVI/Bermuda law says on the relevant issues and directs the Court to applicable cases, but not on <u>how</u> such law should be or would be applied to Plaintiffs' claims in the courts of BVI or Bermuda.

itself."). Thus, "[a] shareholder cannot prosecute for the benefit of the company a cause of action belonging to the company unless it can be shown that the alleged wrongdoers are in control of the company and wrongly preventing the prosecution by the company of its cause of action." (Bompas Decl. ¶ 19.) Derivative actions, brought by shareholders on behalf of a company, may only be brought in certain circumstances and with leave of the court. (Evans Decl. ¶¶ 41-43; Bompas Decl. ¶ 18.)

The rule of <u>Foss v. Harbottle</u> was expanded upon in <u>Prudential Assurance Co. Ltd. v. Newman Industries Ltd (No 2)</u>, [1982] Ch. 204 at 210, which addressed the question of whether a shareholder can recover damages for his personal loss, where the loss to the company resulted in a diminution in the market value of the shareholder's shares. (Bompas Decl. ¶ 21; Hargun Decl. ¶ 88.) The Court of Appeal held that:

> [A] shareholder will have a right of action to recover any loss which he has been personally caused in consequence of the [fraud]. . . . But what he cannot do is to recover damages merely because the company in which he is interested has suffered damage. He cannot recover a sum equal to the diminution in the market value of his shares, or equal to the likely diminution in dividend, because such a "loss" is merely a reflection of the loss suffered by the company.

(Bompas Decl. ¶ 22; Dohmann Decl. ¶ 43 (citing <u>Prudential Assurance</u> at 222H-223E).) The Court further explained that

100

"[t]he plaintiff's shares are merely a right of participation in the company . . . . The shares themselves, his right of participation, are not directly affected by the wrongdoing.  The plaintiff still holds all the shares as his own absolutely unencumbered property."  (Bompas Decl. ¶ 22) (citing <u>Prudential Assurance</u> at 223.)

The so-called "reflective loss" rule has three main propositions, as set forth in more detail in <u>Johnson v. Gore Wood & Co</u>:

> (1) Where a company suffers loss caused by a breach of duty owed to it, only the company may sue in respect of that loss.  No action lies at the suit of a shareholder suing in that capacity and no other to make good a diminution in value of the shareholder's shareholding where that merely reflects the loss suffered by the company. . . . (2) Where a company suffers loss but has no cause of action to sue to recover that loss, the shareholder in the company may sue in respect of it (if the shareholder has a cause of action to do so), even though the loss is a diminution of value of the shareholding. . . . (3) Where a company suffers loss caused by a breach of duty to it, and a shareholder suffers a loss separate and distinct from that suffered by the company caused by a breach of duty independently owed to the shareholder, each may sue to recover the loss caused to it by breach of the duty owed to it but neither may recover loss caused to the other by breach of the duty owed to that other.

(Bompas Decl. ¶ 25; Dohmann Decl. ¶ 46 (citing <u>Johnson v. Gore Wood & Co.</u> [2002] 2 AC 1 at 35F-36B).)

The reflective loss rule applies even if the company fails to pursue the claim, or settles for less than the full value of the claim.  (See Hargun Decl. ¶ 94.2 (citing Johnson at 66) ("if the company chooses not to exercise its remedy, the loss to the shareholder is caused by the company's decision and not by the defendant's wrongdoing. . . [T]he same applies if the company settles for less than it might have done.  Shareholders (and creditors) who are aggrieved by the liquidator's proposals are not without remedy; they can have recourse to the Companies Courts, or sue the liquidator for negligence."); see also Gardner v. Parker [2004] EWCA Civ 781.

"The test is not whether the company could have made a claim in respect of the loss in question; the question is whether, treating the company and the shareholder as one for this purpose, the shareholders' loss is franked by that of the company."  (Hargun Decl. ¶ 93 (citing Johnson at 66).)  Thus, although it is "of course correct that a diminution in value of the plaintiff's shares [is] by definition a personal loss and not the company's loss," it "merely reflect[s] the diminution of the company's assets," and therefore the shareholder's claim cannot lie.  Johnson at 66.  The rule applies not only to share values but also to "all other payments which the shareholder might have obtained from the company if it had not been deprived of the funds."  (Id. ¶ 95 (citing Gardner at ¶ 31).)

Additionally, the reflective loss rule applies regardless of whether the causes of action alleged by the plaintiffs are the same in characterization as those of the company's. (Brown-Wilkinson Decl. ¶ 20(5); Bompas Further Decl. ¶¶ 27, 37.2.) In other words, if "the defendant wrongdoer owed duties both to the company and to the shareholder, it is irrelevant that the duties so owed may be different in content." (Hargun Decl. ¶ 95(5).)

However, as noted in the third proposition set forth in Johnson, the reflective loss rule does not apply where a shareholder has a direct cause of action against a wrongdoer which the company does not have, for example, where there was no duty owed to the company. (Bompas Further Decl. ¶ 43.1.) In addition, an exception to the rule exists "where, by reason of the wrong done to it, the company is unable to pursue its claim against the wrongdoer." (Hargun Decl. ¶ 97; Bompas Decl. ¶ 39) (quoting Gardner at ¶ 33).)

The reflective loss principle is driven by policy considerations. As Lord Bingham explained in Johnson:

> On the one hand the court must respect the principle of company autonomy, ensure that the company's creditors are not prejudiced by the action of the individual shareholders and ensure that a party does not recover compensation for a loss which another party has suffered. On the other, the court must be astute to ensure that the party who has in fact suffered loss is not arbitrarily denied fair compensation.

103

<u>Johnson</u> at 36.  Thus, the goal is to avoid double recovery on the part of the plaintiff shareholder: "[i]f the shareholder is allowed to recover in respect of such [reflective] loss, then either there will be double recovery at the expense of the defendant or the shareholder will recover at the expense of the company and its creditors and other shareholders." (Hargun Decl. ¶ 94.1 (citing <u>Johnson</u> at 62).)

### 2. Plaintiffs' Standing

Plaintiffs argue that they have standing and that their claims are not barred by the reflective loss principle because: (a) the Funds have suffered no loss for wrongful inducement, (b) Plaintiffs' losses are not reflective of a diminution in the value of Fund shares, and are asymmetrical to the losses of both the Funds and other shareholders, (c) the Funds' legal proceedings are not likely to make Plaintiffs whole for their losses, (d) the Funds do not have viable claims because they are subject to defenses in light of exclusionary clauses in the contracts and <u>in pari delicto</u>, (e) the reflective loss principle does not apply because Defendants' wrongdoing has disabled the Funds from effectively pursuing their claims, and (f) the Court may protect against double recovery in other ways. (Pls.' Opp. at 64-65.)

Because Plaintiffs assert direct claims, rather than derivative claims on behalf of the Funds,[40] the proper plaintiff rule, in its simplest form, does not apply to Plaintiffs' claims, and thus is no barrier to Plaintiffs' standing. Nevertheless, BVI/Bermuda law generally bars claims by shareholders even when they assert personal losses where that loss is reflective of the loss of the company.  Thus, the Court must analyze whether Plaintiffs' losses are reflective of the Funds' such that they are barred from pursuing their claims here.

Plaintiffs' first argument, that they have standing because they bring inducement claims which the Funds do not have, plainly fails. Plaintiffs primarily rely on New York law for the premise that "inducement" claims are textbook examples of direct claims which belong to shareholders, not the Funds.  (Pls.' Opp. at 59.)  Aside from the fact that Plaintiffs have not pointed to analogous BVI/Bermuda law on the point, the Court finds that framing Plaintiffs' claims as sounding in "inducement" does not help Plaintiffs to avoid dismissal.  As Defendants' expert, Mr. Chivers, points out, while it is true that the failure to provide accurate and complete information to Plaintiffs would

---

[40]  The parties agree that Plaintiffs do not seek, through the SAC, to bring a derivative action on behalf of the Funds for wrongs done to the Funds.  (See Bompas Decl. ¶ 12; Bompas Further Decl. ¶ 10-11; Hargun Decl. ¶ 86.)

not cause a loss to the Funds (and thus Plaintiffs' loss would not be reflective), a claim that Defendants provided misinformation to Plaintiffs and that Plaintiffs relied on that information to their detriment would amount to a misrepresentation claim, which would be precluded under SLUSA.[41] (Chivers Decl. ¶ 49; Defs.' Reply at 8-10.)  Moreover, the few references to inducement in the SAC are contained in the negligent misrepresentation causes of action, which have been dismissed under SLUSA.  Thus it is not clear to the Court that Plaintiffs have, indeed, pleaded inducement.[42]  Instead, the crux of Plaintiffs' remaining claims is that the Defendants breached tort, contractual or fiduciary duties to conduct due diligence and exercise care in providing services to the Funds and monitoring Plaintiffs' investments, and were unjustly enriched as a result. (Defs.' Reply at 20-21.)  Therefore, Plaintiffs'

---

[41] Indeed, in Plaintiffs' first expert report, Mr. Bompas opined that the claims containing allegations of inducement, namely, Plaintiffs' fraud and negligent misrepresentation causes of action, were not reflective of the Funds' losses.  (Bompas Decl. ¶ 53.1-3.)  However, he did not state an opinion as to whether Plaintiffs' other causes of action (now the only ones remaining after SLUSA preclusion) would be excluded under the reflective loss principle.  (Id. ¶ 53.4.)

[42] The only remaining allegation in the SAC invoking the inducement argument is the very first paragraph, where Plaintiffs conclusorily allege that "[a]s a result of Defendants' breaches of fiduciary and common law duties and of contractual obligations, investors in the Funds were induced to purchase and hold virtually worthless investments."  (SAC ¶ 1.)

argument that their inducement claims differ from the Funds'
mismanagement claims fails.

Even if Plaintiffs are correct that their claims arise out
of tort, fiduciary, or contract-based duty owed to them separate
and apart from those owed to the Funds, they will not have
standing if the losses they seek to recover are reflective of
the Funds' loss.  The Court has no basis for finding that
Plaintiffs' losses are not reflective of a diminution in the
value of Fund shares or are otherwise asymmetrical to the losses
of the Funds and other shareholders.  Plaintiffs claim that they
suffered immediate losses when they paid subscription fees to
purchase worthless shares, and that their losses do not reflect
a decline in value of the shares after the purchase.  (Pls.'
Opp. at 68-69.)  However, this argument does not present the
whole picture.  As a preliminary matter, once Plaintiffs
invested in the Funds, their cash became the property of the
Funds, and Plaintiffs' property interests transferred to shares
in the Funds. Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv.
Sec. LLC, 454 B.R. 285, 295-96 (Bankr. S.D.N.Y. 2011), aff'd sub
nom. In re Aozora Bank Ltd. v. Sec. Inv'r Prot. Corp., 480 B.R.
117 (S.D.N.Y. 2012), aff'd sub nom. In re Bernard L. Madoff Inv.
Sec. LLC, 708 F.3d 422 (2d Cir. 2013) (citing Johnson at 40).
(See also Bompas Decl. ¶ 140 ("[W]hen investing in the Funds,
[Plaintiffs] are alleged to have exchanged one asset for another

(a share or other security in the relevant Fund issued to the
Plaintiffs) with the consequences that as shareholders in the
Funds the Plaintiffs did not have any rights directly to the
underlying assets of the Funds.").)  Thus, any losses to
Plaintiffs' property, the shares, were by definition reflective
of the diminished value of the Funds' assets.

Next, although we all now know that the securities
purportedly held by BMIS did not actually exist, it does not
follow that the Plaintiffs' shares in the Funds were worthless
from the day they made their initial investments.  Insofar as
investors were able to, and successfully did, redeem their
shares for the fraudulently inflated value prior to the exposure
of Madoff's scheme in December 2008, Plaintiffs' shares were
similarly redeemable up until that time.  Thus, for practical
purposes, Plaintiffs' shares did not loss all value at the time
of purchase, but became worthless at the same time that the
Funds' assets did, when Madoff's fraud was exposed.  See Anwar
I, 728 F. Supp. 2d at 446.

In essence, then, Plaintiffs seek damages for the net loss
of their principal (presumably, their initial investment minus
the end value of their shares) and return of fees paid to the
Defendants.  (SAC ¶¶ 4, 198, 216, 247, 249.)  These are
precisely the types of claims that the Funds have asserted
against KML, the FIM entities, Grosso and Ceretti in the BVI

108

proceedings.[43]   In the Bermuda proceedings against KML, the FIM
entities, Grosso, Ceretti, and PwC Bermuda, the Funds seek
return of the fees improperly or unjustly paid to those
Defendants based on inflated NAV calculations, as well as other
damages arising from the breaches of duties.

Plaintiffs argue that these proceedings will not make them
whole and thus they should be able to bring their own claims
here.  They contend that the Joint Liquidators of the Funds are
"locked in a battle" with the Trustee of the Securities Investor
Protection Act ("SIPA") estate appointed in relation to the
liquidation of BMIS, and that the Trustee is seeking to
recapture money from the Funds and subordinate the Funds'
claims.  (Pls.' Opp. at 69-70.)  Additionally, Plaintiffs argue

---

[43] The Court recognizes that the proceedings commenced by the
Joint Liquidators are brought against only some of the
Defendants here – KML, FIM Limited, FIM Advisers, Ceretti, and
Grosso in one action, and PwC Bermuda in another – and do not
include claims against the Tremont Defendants, Manzke, and Citi
Hedge. As noted, the reflective loss principle applies even
where the company decides not to pursue or settles certain
claims.  See Johnson at 66 ("if the company chooses not to
exercise its remedy, the loss to the shareholder is caused by
the company's decision and not by the defendant's wrongdoing. .
. [T]he same applies if the company settles for less than it
might have done.")  As the claims against Tremont and Manzke are
nearly identical to those against the other Manager Defendants,
any losses that those Defendants allegedly caused to Plaintiffs
would also be reflective of the Funds' loss.  Any separate
claims against Citi Hedge would also be subject to dismissal
because Plaintiffs have not sufficiently pleaded a separate duty
owed to them by Citi Hedge, or that any such duty was breached.
See infra at § II.G.4.b.ii.

that the Joint Liquidators' efforts, even if successful, will
not compensate them fully because it is likely that
distributions would be made on a <u>pro rata</u> basis to all
shareholders owning shares in December 2008, based on
BVI/Bermuda law.  On the other hand, recovery here would be
distributed based on a "net equity" basis calculated based on
actual losses of principal, pursuant to Second Circuit law.
(<u>Id.</u> (citing <u>In re Bernard L. Madoff Inv. Sec. LLC</u>, 654 F.3d
229, 233 (2d Cir. 2011).)  This difference in methodologies is
particularly troubling to Plaintiffs because "net winners" who
had previously redeemed shares at the fraudulently inflated
price would still recover under the BVI system, leading to
"asymmetrical" losses by Plaintiffs, who are "net losers."  (<u>Id.</u>
at 63, 164)

        The Court rejects the arguments that because there may be a
more beneficial methodology for calculating loss in the Second
Circuit or the Plaintiffs may not recover as much through the
BVI liquidation proceedings, the reflective loss principle does
not apply.  First, the Court has determined that BVI/Bermuda law
applies to Plaintiffs' claims.  Thus, Plaintiffs should not get
the benefit of Second Circuit law when calculating the damages
owed to them.  Additionally, Plaintiffs' arguments directly
contradict the policy rationale behind the reflective loss rule.
As Lord Millet explained in <u>Johnson</u>, the reflective loss rule is

intended to prevent double recovery and to keep shareholders from "recover[ing] at the expense of the company and its creditors and other shareholders." (Brown-Wilkinson Reply Decl. ¶ 18 (citing Johnson at 62).) Permitting Plaintiffs to bring their claims here simply to avoid the effects of the SIPA proceedings, a process set up to handle claims on behalf of Madoff victims, or the BVI liquidation proceedings, which will address the liabilities to all investors and creditors of the Funds, strikes the Court as counterproductive. If Plaintiffs were permitted to proceed here, and also recovered through a disposition obtained by the Joint Liquidators in the BVI liquidation proceedings, they would receive the double recovery that the reflective loss rule is designed to prevent. Furthermore, Plaintiffs' claims here might prevent the Joint Liquidators from effectively pursuing the Funds' claims. See Johnson at 66 ("[The policy considerations] preclude the shareholder from going behind the settlement of the company's claim. If he were allowed to do so then,. . . if [the company's action] were brought by the liquidator, it would make it difficult for him to settle the action and would effectively take the conduct of the litigation out of his hands.").

Next, Plaintiffs argue that their claims fall into the Giles v. Rhind, [2003] Ch 618, exception to the reflective loss rule because the "Defendant wrongdoers have effectively

111

incapacitated the Funds from prevailing in the Bermuda actions."
(Pls.' Opp. at 71.)  Plaintiffs argue that the Funds' claims are
subject to defenses as a result of the Defendants' wrongdoing
that may bar recovery.  (Bompas Further Decl. ¶ 34.)  These
include defenses based on exculpatory clauses in the Offering
Documents and Service Agreements and in pari delicto, due in
large part to Defendants Ceretti's and Grosso's high level of
involvement in both the Funds and service organizations.  (Pls.'
Opp. at 71-72.)  Plaintiffs assert that Defendants Ceretti and
Grosso were the founders of the Funds, indirect owners of KML,
and "the masterminds behind the organizational structure" of the
Funds. (Id. at 72.)  Thus, they contend, "[i]t is a fair
inference" that the contracts were "intentionally fortified with
disclaimers" because Ceretti and Grosso knew that due diligence
was not being performed on Madoff.  (Id.)

In reply, Defendants point out that far from being
incapacitated from bringing claims, the Funds have indeed
brought claims against a number of the Defendants through the
Joint Liquidators in the Bermuda proceedings.  Additionally,
they argue that the Giles exception does not apply simply
because the defendant raises defenses to the company's claims or
the company might not succeed.  (Defs.' Reply at 26.)

The Court agrees with Defendants that the Giles exception
does not apply here.  First, as noted, the Funds have not been

112

incapacitated from bringing their claims because of the Defendants' wrongdoing.  The Joint Liquidators are litigating the Funds' claims against most of the Defendants.  Plaintiffs' expert asserts that the Giles exception applies where a cause of action is "illusory" or "excluded" due to an applicable defense. (Bompas Further Decl. ¶¶ 44-45.) However, his cited cases do not support the finding of such an "illusory" or "excluded" cause of action here.  See Kazakhstan Kagazy Plc v. Arip, [2014] 1 C.L.C. 451 ¶ 33 (holding that the Giles exception was "very limited" and did not apply where the defendant's fraud allegedly resulted in the companies' claims being time barred, because the companies had indeed sued and should have been aware of their claims prior to the running of the limitations period); Rehman v. Jones Lang La Salle, [2013] EWHC 1339 (QB) (reflective loss principle did not apply where the company was dissolved and therefore had no cause of action). Thus, that the Funds' claims may be subject to applicable defenses does not render the Funds "incapacitated" for the purpose of the Giles exception. (See Hargun Reply Decl. ¶ 25; Browne-Wilkinson Reply Decl. ¶ 28.)

In addition, Plaintiffs have not alleged that it is Defendants' wrongful conduct that is responsible for any applicable defenses or the "incapacitation" of the Funds. Though Plaintiffs' assertion that Ceretti and Grosso "intentionally fortified" the Service Agreements with

disclaimers is not without appeal given that Ceretti and Grosso allegedly had their hands in most of the organizations at issue here, that allegation appears nowhere in the SAC.  Plaintiffs cannot amend the SAC through their briefing.  Pearl River Union Free Sch. Dist. v. Duncan, 56 F. Supp. 3d 339, 371 (S.D.N.Y. 2014) (quoting Fadem v. Ford Motor Co., 352 F. Supp. 2d 501, 516 (S.D.N.Y. 2005), aff'd, 157 F. App'x 398 (2d Cir. 2005)) ("[i]t is long-standing precedent in this circuit that parties cannot amend their pleadings through issues raised solely in their briefs.").  Though the Court must draw reasonable inferences in their favor, Plaintiffs have not alleged sufficient wrongdoing on the part of the Defendants that would incapacitate the Funds from bringing their claims, as is required under Giles.  See Gardner, [2004] EWCA Civ 781 at 54, 57-58 (rejecting claim that company's settlement releasing defendant from liability warranted application of Giles v. Rhind exception where pleading was devoid of allegations that defendant forced company to release it).

More importantly, however, is that even if it were true that Ceretti and Grosso improperly structured the Offering Documents and Service Agreements to protect themselves and their various companies from liability, Plaintiffs, as sophisticated investors, were made aware of the numerous disclaimers and decided to invest in the Funds anyway.  As discussed more below,

114

any defenses based on exculpation clauses apply equally to the Plaintiffs and the Funds. It would not be the case, then, that declining to apply the reflective loss rule would allow Plaintiffs to bring their claims when the Funds would be unable to do so.

Finally, Plaintiffs argue that the Court can utilize other procedural safeguards, rather than the reflective loss rule, to protect against double recovery. (Pls.' Opp. at 73.) While Plaintiffs are correct that avoidance of double recovery is a primary policy consideration underlying the principle, they provide no legal authority under BVI/Bermuda law permitting the Court to disregard the rule and apply other safeguards. Their only citation is to a Stipulation of Settlement in another Madoff feeder fund case before Judge Marrero in this District. (Id.)[44] Without applicable legal authority, the Court has no basis for imposing other procedural safeguards in lieu of applying the reflective loss principle.

Accordingly, to the extent the Joint Motion to Dismiss challenges Plaintiffs' standing, it is GRANTED.

---

[44] The Court need not address the issue raised by the Parties about whether the reflective loss rule is substantive or procedural in nature. In either case, Plaintiffs have provided no legal authority for their case going forward because the Court can avoid double recovery through other procedural mechanisms.

G. Failure to State a Claim

      1. Legal Standard for Motion to Dismiss Under Rule 12(b)(6)

For a complaint to survive dismissal under Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007). "A claim has facial plausibility," the Supreme Court has explained,

> [W]hen the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

Ashcroft v. Iqbal, 556 U.S. 662 (2009) (quoting Twombly, 550 U.S. at 556–57). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (internal quotation marks omitted). "In keeping with these principles," the Supreme Court has stated,

> [A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint,

116

> they must be supported by factual
> allegations. When there are well-pleaded
> factual allegations, a court should assume
> their veracity and then determine whether
> they plausibly give rise to an entitlement
> to relief.

Iqbal, 556 U.S. at 679.

At this stage of the litigation, the Court must accept as true the factual allegations in the Complaint and draw all reasonable inferences in favor of the Plaintiff. See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1 (2002); Blue Tree Hotels Inv. (Canada) Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 217 (2d Cir. 2004). However, this principle is "inapplicable to legal conclusions," Iqbal, 556 U.S. at 678, which, like the Complaint's "labels and conclusions," Twombly, 550 U.S. at 555, are disregarded. Nor should a court "accept as true a legal conclusion couched as a factual allegation." Id. at 555.[45]

---

[45] Defendants argue that the heightened pleading standard of Rule 9(b) applies to Plaintiffs' claims because they "sound[] in dishonesty and recklessness." (Defs.' MTD at 63.)  With the exception of Count 12, mutual mistake, which Plaintiffs agree is subject to 9(b) pleading standards, Plaintiffs argue that Rule 8(a) governs.  (Pls.' Opp. at 166.)  The Court agrees with Plaintiffs.  Plaintiffs' negligence, gross negligence, breach of fiduciary duty, breach of contract, and unjust enrichment claims are all governed by the Rule 8(a) pleading standard.  See Rombach v. Chang, 355 F.3d 164, 178 (2d Cir. 2004)(negligence claims not subject to Rule 9(b)); Anwar I, 728 F. Supp. 2d at 437 ("claims for gross negligence, like claims of negligence, are governed by Rule 8(a), not Rule 9(b)"); Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 446 F.

2. Breach of Fiduciary Duty – Counts 7 & 21

Under BVI/Bermuda law, "a fiduciary is someone who has undertaken to act for or on behalf of another in a particular matter in circumstances which give rise to a relationship of trust and confidence.") (Chivers Decl. ¶ 81-82; Browne-Wilkinson Decl. ¶ 35; Bompas Decl. ¶ 132, 135.) In general, a director or officer of a company generally does not owe a fiduciary duty to individual shareholders, but rather to the company. (Chivers Decl. ¶ 81; Bompas Decl. ¶ 130-31) (citing Peskin v. Anderson [2001] 1 BCLC 372 ¶ 33-34.)) However,

> [e]vents may take place which bring the
> directors of the company into direct and
> close contact with the shareholders in a
> manner capable of generating fiduciary
> obligations, such as a duty of disclosure of

---

Supp. 2d 163, 196 (S.D.N.Y. 2006) ("Where a plaintiff alleges a breach of fiduciary duty by conduct not amounting to fraud, such as breach of a duty of care, disclosure, or loyalty, the general pleading standards set out by Rule 8(a) of the Federal Rules of Civil Procedure, not the heightened standards of Rule 9(b), apply."); Homeward Residential, Inc. v. Sand Canyon Corp., 298 F.R.D. 116, 124 (S.D.N.Y. 2014) (breach of contract claims "typically only need to meet the pleading requirements of Fed. R. Civ. P. 8(a)"); State Farm Mut. Auto. Ins. Co. v. Grafman, 655 F. Supp. 2d 212, 230 (E.D.N.Y. 2009) (citing Zucker v. Katz, 708 F. Supp. 525, 530 (S.D.N.Y. 1989)) (Rule 9(b) does not apply to unjust enrichment claims); Markovic v. N.Y.C. Sch. Const. Auth., No. 99 CIV. 10339 (AGS), 2000 WL 1290604, at *2 (S.D.N.Y. Sept. 13, 2000) (collecting cases). In light of the Second Circuit's instructions in Kingate II and this Court's dismissal of Plaintiffs' fraud-based claims herein based in SLUSA preclusion, Defendants' argument that Plaintiffs claims nevertheless sound in fraud despite their denomination, and should thus be subject to Rule 9(b), is moot.

> material facts to the shareholders, or an
> obligation to use confidential information
> and valuable commercial and financial
> opportunities . . . for the benefit of the
> shareholders.
> . . .
> These duties may arise in special
> circumstances which replicate the salient
> features of well-established categories of
> fiduciary relationships.  Fiduciary
> relationships, such as agency, involve
> duties of trust, confidence and loyalty.
> Those duties are, in general, attracted by
> and attached to a person who undertakes, or
> who, depending on all the circumstances, is
> treated as having assumed responsibility to
> act on behalf of, or for the benefit of,
> another person.  That other person may have
> entrusted or, depending on all the
> circumstances, may be treated as having
> entrusted, the care of his property,
> affairs, transactions or interests to him.

(Chivers Decl. ¶ 64 (quoting Peskin at ¶ 33-34).)

Defendants argue that none of the Defendants owed fiduciary duties directly to Plaintiffs, and that if they did owe such duties, they did not breach them.  The Court agrees.

As to the Individual Defendants, Manzke, Grosso, Ceretti, and Tannenbaum, the Court finds that Plaintiffs have not pleaded sufficient allegations to support any personal relationship with, let alone an undertaking of a fiduciary duty to, the Plaintiffs.  Under BVI/Bermuda law, absent special circumstances, the Individual Defendants, as officers of Kingate Global and Tremont (Manzke), the FIM entities (Grosso and

Ceretti) and KML (Tannenbaum), owed duties only to their
respective companies, rather than shareholders of their
companies or any third party.[46]  Plaintiffs have alleged no such
special circumstances.  Plaintiffs' only allegations against
Manzke relate to her various meetings and communications with
Madoff, but contain nothing that would enable this Court to
infer a special relationship between her and the Plaintiffs.
(See SAC ¶ 58.)  Similarly, Plaintiffs allege that Grosso and
Ceretti met with or spoke to Madoff on hundreds of occasions.
(Id. ¶¶ 63.)  However, Plaintiffs allege no direct contact
between Grosso and Ceretti and the Plaintiffs, or any assumption
of a fiduciary duty.  The sole allegation involving contact
between Ceretti and any investor asserts that, in response to
concerns about Madoff by a potential investor, Ceretti
instructed an employee to "keep them away for now and let me
know if they contact you again." (Id. ¶ 198.) Even assuming this
allegation to be true, potential investors are not members of
the proposed Class, nor can such a communication be considered
an undertaking of fiduciary duty.  Finally, as to Defendant

---

[46] Defendants argue that even if a company undertakes a fiduciary
duty to a third party, there is no duty by a director of that
company to the third party unless they have personally
undertaken such a duty. (Chivers Decl. ¶ 85.) Though Defendants
support this argument with only conclusory declarations by their
experts and not with relevant BVI/Bermuda case law, based on the
facts alleged in the SAC, the Court would have no basis for
finding an undertaking of duty in any case.

Tannenbaum, the SAC contains no specific allegations whatsoever regarding Tannenbaum's conduct. Therefore, the Court declines to find the undertaking of a fiduciary duty by any of the Individual Defendants. Accordingly, the Motion to Dismiss the breach of fiduciary duty claims against the Individual Defendants is GRANTED.

As to KML, Tremont, and FIM, even if they owed fiduciary duties to the Funds, the allegations do not support extension of those duties to Plaintiffs. The Court agrees with the Defendants that generalized allegations that the Defendants "occupied a superior position" over Plaintiffs, had "superior access to confidential information about Madoff," and that Plaintiffs relied upon the Defendants when deciding whether to invest and retain their investments in the Funds, are insufficient to create a relationship of trust and repose directly with Plaintiffs. (SAC ¶¶ 231, 252, 287-88.) Plaintiffs were required to certify that they were sophisticated investors in order to buy shares in the Funds. Moreover, the various Offering Documents and Service Agreements made clear that the service providers could delegate their duties, and did not provide services directly to Plaintiffs.[47] For example, the

---

[47] Though the Court recognizes that a fiduciary duty may arise in the absence of a contractual one, and vice versa, the Court considers the contractual relationships insofar as they provide

IM advised Plaintiffs that the Managers delegated all investment
decisions to the Investment Advisor, and that the Managers were
not required to do any due diligence of Madoff. (See Kingate
Global IM at 5, 9.)  The Consulting Services Agreement noted
that the Manager appointed FIM "to provide it with consultancy
and other services to assist in the day to day management of the
Company's assets undertaken by the Manager under the Management
Agreement," and the IM indicated that the Managers paid FIM at
no extra cost to the Funds.  (FIM Agreement ¶ (E); Kingate
Global IM at 17.)  Given this background, the Court finds that
KML, Tremont, and FIM did not owe fiduciary duties to the
Plaintiffs.

     The allegations relating to Citi Hedge contain more
personal contact with the Plaintiffs, including that Citi Hedge
was responsible for communicating with the investors and the
public, soliciting sales of the Fund's shares and collecting
subscriptions from shareholders, disbursing payments, and
calculating the NAV, which appeared in financial statements sent
to Plaintiffs.  (SAC ¶¶ 182, 188.)  Despite this, the IM stated
that the Administrator verified the underlying asset prices from
sources "independent of the Investment Advisor whenever
reasonably possible" and the Administration Agreements did not

insight into whether a fiduciary relationship existed.  (See,
e.g., Hargun Decl. ¶¶ 45-46.)

require Citi Hedge to confirm the accuracy of the underlying

data.  (Kingate Global IM at 23; Administration Agreement §

10.6; SAC ¶ 72.)  Thus, to the extent that Citi Hedge had any

fiduciary duty, it did not require oversight of Madoff's

operations or checking the underlying data it used to calculate

the NAV.  Taking Plaintiffs' allegations that Citi Hedge failed

to confirm the underlying data as true, the Court still finds no

breach of duty.  Therefore, the breach of fiduciary duty claim

against Citi Hedge also fails.[48]

Accordingly, Counts 7 and 21 are DISMISSED.

---

[48] In addition, Defendants argue that the only fiduciary duty
recognized under BVI/Bermuda law is the duty of loyalty, and
that no separate fiduciary duty of care exists under BVI/Bermuda
law. (Defs.' MTD at 74.)  In Bristol & West v. Mothew, Lord
Millet explained: "It is similarly inappropriate to apply the
expression [fiduciary duty] to the obligation of a trustee or
other fiduciary to use proper skill and care in the discharge of
his duties." [1998] Ch 1 at 16G.  He continued, "the existence
of a fiduciary relationship does not mean that every duty owed
by a fiduciary to the beneficiary is a breach of fiduciary duty.
In particular, a trustee's duty to exercise reasonable care,
though equitable, is not specifically a fiduciary duty." Id. at
17.  Further, the "[b]reach of fiduciary obligation, therefore,
connotes disloyalty or infidelity.  Mere incompetence is not
enough.  A servant who loyally does his incompetent best for his
master is not unfaithful and is not guilty of breach of
fiduciary duty." (Hargun Decl. ¶ 43 (citing Bristol & West v.
Mothew at 18F).)  Plaintiffs' expert does not disagree that
loyalty is the touchstone of fiduciary duty under BVI/Bermuda
law, but clarifies that this duty includes "a duty to act in
good faith, a duty not to make a profit out of his trust and a
duty not to place himself in a position where his duty and his
interest may conflict." (Bompas Decl. ¶ 143.2.)  He further
opines that Plaintiffs' allegations rise beyond mere
incompetence. (Id. ¶ 143.3.)  However, because the Court finds

### 3. Aiding and Abetting Breach of Fiduciary Duty – Counts 13, 19, 26

Counts 13, 19, and 26 allege that the Tremont Group, PwC Bermuda, and Citi Hedge aided and abetted the breaches of fiduciary duties by the Kingate Defendants.  As Plaintiffs concede, BVI/Bermuda law does not recognize a separate cause of action for aiding and abetting breach of fiduciary duty.  (Pls.' Opp. at 90.)  The Parties agree that the closest analogy is the tort of "knowing assistance in breach of trust" or "dishonest assistance." (Id.; Defs.' MTD at 75.)   To make out a claim for dishonest assistance, the plaintiff must allege that the defendant "dishonestly procures or assists in a breach of trust or fiduciary obligation." (Browne-Wilkinson Decl. ¶ 67 (citing Royal Brunei v. Tan, [1995] 2 WLR 64 at 76 E); Bompas Further Decl. ¶ 133.)  Thus, the elements of a claim of dishonest assistance are: (a) the existence of a trust or fiduciary obligation, (b) breach of trust or fiduciary obligation, (c) the defendant assists in or induces the breach of trust or fiduciary obligation, and (d) the defendant acts with a dishonest mind. (Bompas Further Decl. ¶ 133.)

Even assuming that the tort of dishonest assistance is sufficiently close to the cause of action for aiding and abetting breach of fiduciary duty that the Court should not

---

no fiduciary duty was owed, it need not determine the precise nature of fiduciary duties under BVI/Bermuda law.

dismiss these claims out of hand, the Court found above that
Plaintiffs had not alleged sufficiently the existence of
fiduciary relationships between the Defendants and the
Plaintiffs or that such duties were breached.  Without the
requisite underlying fiduciary duties or breaches thereof, no
claims of aiding and abetting those breaches can succeed.

Further, to the extent any such principal fiduciary duties were
alleged, Plaintiffs have alleged only conclusory allegations
that Tremont Group,[49] PwC Bermuda, and Citi Hedge knowingly
assisted in those breaches, but have provided no specific
allegations as to how they assisted or induced them, or whether
they acted dishonestly in doing so.  Accordingly, Counts 13, 19,
and 26 are DISMISSED.

---

[49] The allegations against Tremont Group, parent company of
Defendant Tremont, are particularly sparse.  Other than its
"long-standing involvement" in the Kingate Funds and other
Madoff feeder funds, Plaintiffs allege no specific actions by
Tremont Group from which the Court can reasonably infer
substantial assistance or a dishonest state of mind.  Plaintiffs
argue that the actions of Manzke who founded and was an officer
of Tremont Group, should be imputed to Tremont Group.
Plaintiffs allege that she was involved in the management of the
Funds, interacted frequently with Madoff, and had access to
information which would have revealed Madoff's fraud.  (Pls.'
Opp. at 92-93.)  Further, they argue she acted with a dishonest
mind by allowing Tremont and the Funds to sell shares in the
Funds when they were not conducting due diligence and
investigating risks of fraud.  These allegations amount to yet
another reframing of the argument that Defendants missed "red
flags" which would have uncovered Madoff's fraud, but do not
amount to substantial assistance with a dishonest state of mind.

### 4. Gross Negligence and Negligence – Counts 5, 6, 15, 16, 22, 23

Counts 5, 6, 15, 16, 22, and 23 allege that the Kingate Defendants, PwC Bermuda, and Citi Hedge were negligent or grossly negligent in managing Plaintiffs' investments. Plaintiffs allege that Defendants failed to act with reasonable care or were reckless in their failure to conduct due diligence of Madoff before and after selecting him as the Investment Advisor for the Funds, which Plaintiffs allege would have enabled them to discovery Madoff's fraud. As to PwC Bermuda, Plaintiffs also allege that it failed to conduct its audits in accordance with the Generally Accepted Auditing Standards and Statements of Accounting Standards.

### a. Legal Standard for Gross Negligence and Negligence under BVI/Bermuda Law

As noted above, Plaintiffs concede that BVI/Bermuda law does not recognize a cause of action for gross negligence. (Pls.' Opp. at 46; Bompas Decl. ¶ 121; Chivers Decl. ¶ 98.)[50] Accordingly, Counts 5, 15, and 22 are DISMISSED.

---

[50] The Parties agree that BVI/Bermuda courts would consider contractual provisions discussing "gross negligence" for purposes of determining whether a party's conduct falls within the scope of an exculpatory clause, but that it does not constitute a separate cause of action. (Hargun Decl. ¶ 127; Chivers Decl. ¶ 98 n.21; Bompas Decl. ¶ 122.)

Similar to New York law, to establish a claim for negligence under BVI/Bermuda law, a plaintiff must allege (a) a duty of care, (b) breach of that duty, (c) injury to plaintiff, and (d) causation. (Bompas Decl. ¶ 60.)  In Customs and Excise Comm'rs v. Barclay Bank Plc, [2007] 1 A.C. 181, the House of Lords summarized the three tests for establishing a duty of care in negligence: (1) "whether, the defendant assumed responsibility for what he said and did vis-…-vis the claimant, or is to be treated as having done so"; (2) "the threefold test," which requires the claimant to show that the "loss to the claimant was a reasonably foreseeable consequence of what the defendant did or failed to do;" that "the relationship between the parties was one of sufficient proximity;" and that "in all the circumstances, it is fair, just and reasonable to impose a duty of care on the defendant towards the claimant"; and (3) "the incremental test," meaning that "the law should develop novel categories of negligence incrementally and by analogy with established categories." Id. at ¶ 4 (internal quotations omitted).  (See also Bompas Decl. ¶ 68; Bompas Further Decl. ¶ 63; Pls.' Opp. at 106-07.)  The three tests do not provide a "simple formula" for determining whether a duty is owed, but are to be considered based on the "detailed circumstances of the particular case and the particular relationship between the parties in the context of their legal and factual situation as a

whole." Customs and Excise Comm'rs at ¶ 8; see also id. ¶ 35, 53. "The assumption of responsibility test is to be applied objectively, and is not answered by consideration of what the defendant thought or intended." Id. at ¶ 5 (citation omitted).

As Lord Hoffman explained in Customs and Excise Commissioners, "a duty of care is ordinarily generated by something which the defendant has decided to do: giving a reference, supplying a report, managing a syndicate, making ginger beer." Id. at ¶ 38 (emphasis in original). In "cases in which the loss has been caused by the claimant's reliance on information provided by the defendant, it is critical to decide whether the defendant (rather than someone else) assumed responsibility for the accuracy of the information to the claimant (rather than to someone else) or for its use by the claimant for one purpose (rather than for another)." Id. at ¶ 35. The "paradigm situation" of assumption of responsibility is "a relationship having all the indicia of contract save consideration." Id. at ¶ 4.

With respect to duties owed by auditors or accountants to investors and shareholders of the audited company, the House of Lords has held that a duty may arise where there is sufficient proximity, such that:

> the defendant knew that his statement would
> be communicated to the plaintiff, either as
> an individual or as a member of an

128

> identifiable class, specifically in
> connection with a particular transaction or
> transactions of a particular kind (e.g. in a
> prospectus inviting investment) and that the
> plaintiff would be very likely to rely on it
> for the purpose of deciding whether or not
> to enter upon that transaction or upon a
> transaction of that kind.

Caparo Indus. PLC v. Dickman, [1990] 2 A.C. 605 at 621.[51]

A contractual disclaimer may be relevant to the question
of whether there has been assumption of responsibility.  Id. at
620-21.  As explained in McCullagh v. Lake Fox and Partners Ltd,
[1996] PNLR 205, 237:

> [T]he existence of the disclaimer [is] one
> of the facts relevant to answering the
> question whether there has been an
> assumption of responsibility by the
> defendants for the relevant statement.  This
> question must be answered objectively by
> reference to what the reasonable person in
> the position of [the Plaintiff] would have

---

[51] The Court of Appeal below, which was affirmed, held that the
auditors had a duty to shareholders but not to would-be
investors, as members of the public at large, who were
considering but had not yet decided to purchase shares in the
audited company.  Id. at 624, 626.  As to the scope of
liability, Lord Bridge explained that in practice,

> the interest of the shareholders in the
> proper management of the company is
> indistinguishable from the interest of the
> company itself and any loss suffered by the
> shareholders, e.g. by negligent failure of
> the auditor to discover and expose a
> misappropriation of funds by a director of
> the company, will be recouped by a claim
> against the auditors in the name of the
> company, not by individual shareholders.

Id. at 626.

> understood at the time he finally relied on
> the representation.

(Chivers Decl. ¶ 119 (alterations in original); Bompas Further

Decl. ¶ 70.)[52]

As to causation, Lord Millet explained in <u>Bristol & West v.</u>

<u>Mothew</u>:

> Where a plaintiff claims that he has
> suffered loss by entering into a transaction
> as a result of negligent advice or
> information provided by the defendant, the
> first question is whether the plaintiff can
> establish that the defendant's negligence
> caused him to enter into the transaction. If
> he cannot his claim must fail. But even if
> he can, it is not sufficient for him to
> establish that the transaction caused him
> loss. He must still show what (if any) part
> of his loss is attributable to the
> defendant's negligence. This is usually
> treated as a question of the measure of
> damages rather than causation, . . . but it
> must be acknowledged that it involves
> questions of causation.

[1996] EWCA Civ 533 at 10D.

---

[52] Plaintiffs' expert points out the apparent contradiction in
Defendants' argument that Plaintiffs are subject to the
contractual limitations on liability, even though as Defendants
repeatedly highlight that the Plaintiffs were parties to the
Service Agreements. (Bompas Further Decl. ¶ 72.)  The Court
finds no conflict in this position, however, since the
contractual provisions shed light on whether it would have been
reasonable for the Plaintiffs or Defendants to believe that a
duty of care existed, regardless of whether they were parties to
the contracts.

b. Application to Plaintiffs' Claims

The Parties' arguments largely mirror those made with respect to the breach of fiduciary duty claims.  Defendants again argue that the Defendants owed no duty to the Plaintiffs, and that due to the exculpatory clauses in the IM, Subscription Agreement and various Service Agreements, there was no breach of any such duty.  Plaintiffs contend that the Defendants owed duties to the Plaintiffs separate and apart from those owed to the Funds, and argue that the contracts between the Defendants and the Funds do not limit the Plaintiffs' claims against the Defendants.  The Court finds Plaintiffs' arguments to be without merit.

i. Kingate Defendants

With respect to the Kingate Defendants, including KML, Tremont, FIM, and the Individual Defendants, Plaintiffs have not alleged specific facts to support the existence of an assumption of responsibility by the Defendants to the Plaintiffs, separate and apart from any duties owed to the Funds by the Defendants. As noted above, the SAC is devoid of any allegations of direct contact between the Individual Defendants and the Plaintiffs; nor were the Individual Defendants party to any contract with the Plaintiffs.  The vast majority of the allegations against the Individual Defendants concern their interactions with

131

Madoff, concluding that because they had relationships and
access to information about Madoff, they should have discovered
his fraud.  These allegations are not sufficient to establish an
assumption of responsibility to the Plaintiffs directly.
Applying the threefold test of foreseeability, proximity, and
fairness would dictate the same result, given the absence of
proximity between the Individual Defendants and the Plaintiffs.

     With respect to KML, Tremont and FIM, Defendants argue, and
the Court agrees, that any assumption of responsibility was
between the Managers and the Funds or the Managers and the
Consultant, not the Plaintiff shareholders, and that the
Plaintiffs would have been aware of such a relationship, as it
was disclosed by the IM.  Even if the Managers or Consultant had
any direct relationship or contact with the Plaintiffs (which
the SAC does not allege), far from assuming any responsibility
to the Plaintiffs, the IM, Management Agreements, and Consultant
Agreement contained extensive warnings about risk factors
associated with investing in the Funds, and exculpatory or
limitations on liability clauses which purported to release the
Managers and their officers from any liability to the Funds and
their shareholders.  (See KML Agreement § 5.4 ("Neither the
Manager nor its directors, officers, shareholders and employees,
shall be liable to the Fund or its Shareholders for any losses,
damages, expenses or claims occasioned by any act or omission of

the Manager or directors, officers, shareholders or employees in connection with the performance of its services hereunder, other than as a result of its own gross negligence, bad faith, or willful or reckless malfeasance.").)  The same is true of the Consulting Services Agreements. (FIM Agreement § 13.1. ("In the absence of gross negligence, fraud or willful default on the part of FIM, or failure to comply with instructions of the Manager [], its directors, officers, employees or agents, FIM shall not be liable to the Manager or the Company for any act or omission in the course of or in connection with the services rendered by it hereunder or for any decline in the value of the assets of the Company or any loss whatsoever that may result to the Company or the Manager.")  The disclaimers in the Management Agreements and Consultant Agreement covered both KML and Tremont, as entities, and their officers and employees, i.e., Defendants Manzke and Tannenbaum.[53]  Although the Plaintiffs were not parties to the Management Agreements, they were made aware of the limited liability of the Managers through

---

[53] Though the limitation of liability clauses in the Consulting Services Agreements do not explicitly reference wrongdoing on the part of FIM's officers, directors or employees, in the absence of a justification for piercing the corporate veil, Ceretti and Grosso would not be subject to individual liability.

the IM, and had access to all of the Service Agreements.

(Kingate Global IM at 13.).[54]

In addition, the Court finds that even if there were an assumption of responsibility by the Kingate Defendants, it would not involve verifying the information coming from Madoff or conducting other due diligence.  The IM informed Plaintiffs that all investment decisions were delegated to the Investment

---

[54] Plaintiffs argue that the lack of contractual privity should not preclude the Court from finding a duty existed.  (See Pls.' Opp. at 108.)  Even if a duty could be established without contractual privity, the disclaimers and other indications in the contracts made clear that the scope of any such duty, whether to the Funds or the Plaintiffs, was limited.  The Court also rejects Plaintiffs arguments that the disclaimers were "inconspicuous" or were hidden in "fine print." (Pls.' Opp. at 110.)  Though it is true that the IM and other service agreements were lengthy, the disclaimers and disclosure of risk factors, particularly in the IM, were made plainly clear.  For example, the section in the IM entitled "Certain Risk Factors" ran 8 pages long and had unambiguous subsection titles, such as "Dependence on the Investment Advisor," "Market Risks," "No Manager Liability Beyond Fund Assets," and "Possibility of Fraud and Misappropriation." (Kingate Global IM at xi.)  But see Anwar I, 728 F. Supp. 2d at 412 (rejecting application of disclaimers of due diligence).  Finally, Plaintiffs argue that the limitations clauses do not limit liability for claims of negligence because the IM's description of the disclaimer clauses in the Services Agreements states that liability is not limited in the case of "negligence, willful default, fraud or dishonesty." (Pls.' Opp. at 112 (citing SAC Ex. 4 at 13; SAC Ex. 5 at 14-15).)  While Plaintiffs provide a correct recitation from the IMs, the underlying Management Agreements, Consulting Services Agreements and Administration Agreements are broader, protecting the service providers from liability except in the event of gross, not simple, negligence.   Because the Court finds that the Defendants did not owe duties to the Plaintiffs (or, at the very least, duties of the scope Plaintiffs allege), the Court need not determine whether the disclaimers, themselves, or the summaries of the disclaimers found in the IM, are applicable to Plaintiffs.

Advisor (Madoff), that the Managers were entitled to rely on all information provided by him, and that the Managers undertook no obligation to conduct due diligence.  (Kingate Global IM at 5, 9, 14.)  Therefore, there is no objective basis on which to find that the Kingate Defendants assumed responsibility to Plaintiffs, rather than the Funds, nor that they assumed responsibility for checking the information received by Madoff on behalf of the Plaintiffs.

### ii. Citi Hedge

With respect to Citi Hedge, as in the discussion of fiduciary duty, the Court notes that the SAC alleges more direct contact between the Plaintiffs and the Administrator than the other Defendants.  However, to the extent any direct duty arose out of those contacts between Citi Hedge and the Plaintiffs, its scope was limited by the terms of the IM and Administration Agreements, which permitted Citi Hedge to rely on the information provided to it by the Funds and Managers, and held it liable only for its own miscalculations.  Thus, for the same reasons discussed above, the Court finds that based on the circumstances of this case, Citi Hedge did not have a duty to conduct any due diligence on Madoff or look beyond the information provided to it by the Funds in calculating the NAV,

nor can it be said to have breached any duty for failing to do
so.  Accordingly, the negligence claims against Citi Hedge fail.

### iii. PwC Bermuda

As to PwC Bermuda, the Court finds that the SAC also
alleges more direct contact between the Plaintiffs and PwC than
some other of the Defendants.  Taking Plaintiffs' allegations as
true, PwC Bermuda was aware that the audit reports would be
communicated to the Plaintiffs, as the audit reports were
produced to Plaintiffs as attachments to the financial reports
provided to Plaintiffs and began "To the Shareholders of [the
Funds]."  (SAC ¶ 87.)  Further, it would have been objectively
reasonable for PwC Bermuda to know that the Plaintiffs would
likely rely on the audit reports in the course of specific
transactions in which they decided whether to retain or sell
their shares in the Funds because they were the only outside and
purportedly objective source of information about the Funds.
Though PwC Bermuda would not have been aware of any particular
shareholders' identity, the reports were not produced for the
public for generalized use, but for a specific purpose and
directed toward a specific group of investors.  On the other
hand, the Engagement Letters between the Funds and PwC Bermuda
stated that the audit reports were "intended for the benefit of
the Funds" and that the audits were not "planned or conducted in

contemplation of reliance by any third party with respect to any specific transaction." (2000 PwC Engagement Letter at 3.)

Nevertheless, even assuming there was a duty, the scope of the duty owed to Plaintiffs would not include review of the underlying material from Madoff given to PwC Bermuda by the Funds. The Audit Engagement Letters made clear that PwC Bermuda was entitled to rely on the information provided to it by the Managers, and that the Managers would provide complete and accurate information to PwC Bermuda to the best of their knowledge and belief. (Id. at 4-5.) Plaintiffs have not alleged any authority which would enable PwC to audit Madoff's firm in the course of auditing the Funds, nor is the Court aware of any. In addition, the Audit Engagement Letters disclosed that the audits, even if done in conformance with the GAAS, may not uncover all fraud, and contained a limitation on liability clause limiting PwC's liability to cases involving willful misconduct or fraudulent behavior by PwC.[55] (Id. at 6.)

---

[55] Insofar as Plaintiffs assert that PwC Bermuda was negligent because it violated the GAAS and SAS requirements, this Court and others have held that such allegations alone are not sufficient to allege the scienter required for federal securities fraud claims. See In re Merkin, 817 F. Supp.2d at 358; Anwar I, 728 F. Supp. 2d at 450; see also Stephenson v. Citco Grp. Ltd., 700 F. Supp. 2d 599, 609 (S.D.N.Y. 2010), aff'd on other grounds sub nom. Stephenson v. PricewaterhouseCoopers, LLP, 482 F. App'x 618 (2d Cir. 2012), as amended (June 13, 2012) ("Although allegations of GAAP violations and investigatory failures do not alone establish recklessness, they can when combined with allegations that the auditor ignored red flags. .

Accordingly, though PwC Bermuda may have some duty to the
Plaintiffs, the scope of that duty did not reach confirming the
underlying information provided by the Funds or conducting
checks on the internal controls at BMIS.[56]

In any event, even if the Court were to find that the
various Defendants owed duties to the Plaintiffs, the Court
finds that Plaintiffs' allegations that the Defendants failed to
heed red flags are insufficient to establish negligence.  The
Second Circuit and numerous Courts in this District have
considered claims arising out of similar allegations, that fund
managers, administrators, auditors and other service providers
knew or should have known about red flags that, if heeded, would
have uncovered Madoff's fraud.  While some judges have found
such allegations sufficient to allege fraud and other causes of

---

. . Thus, complaints alleging that an auditor had actual
knowledge of and consciously disregarded red flags have been
found to sufficiently plead scienter."). In Anwar I, Judge
Marrero suggested that violating professional standards might be
sufficient to allege negligent conduct, even if it was not alone
sufficient to allege fraud. Anwar I, 728 F. Supp. 2d at 450
("[T]he Court finds that Plaintiffs have failed to allege facts
that give rise to a strong inference of anything more than
neglect to uphold professional auditing standards.").

[56] The Court also notes that to the extent PwC Bermuda owes any
duty to Plaintiffs, any loss suffered by Plaintiffs as a result
of breach of that duty is reflective of the Funds' losses, and
thus Plaintiffs would not have standing to sue. See supra §
II.F.2.  This is bolstered by the fact that the Joint
Liquidators in the Funds BVI liquidation proceedings have sued
PwC Bermuda for precisely the same types of breaches of duty
that Plaintiffs allege here.

action, others have not. Compare Anwar I, 728 F. Supp. 2d at
411, 437 (finding allegations that defendants ignored red flags
sufficient to allege scienter, gross negligence, and aiding and
abetting breach of fiduciary duty) with S. Cherry St., LLC v.
Hennessee Grp. LLC, 573 F.3d 98, 112 (2d Cir. 2009) (finding
allegations insufficient to plead fraudulent intent or
recklessness); Stephenson v. PricewaterhouseCoopers, LLP, 768 F.
Supp. 2d 562, 573 (S.D.N.Y. 2011), aff'd, 482 F. App'x 618 (2d
Cir. 2012), as amended (June 13, 2012) (finding allegations that
auditor ignored red flags insufficient to allege scienter); In
re Merkin, 817 F. Supp. 2d at 356-57 (S.D.N.Y. 2011), vacated in
part on other grounds on reconsideration, 2015 WL 10847318, at
*3 (S.D.N.Y. Aug. 24, 2015).  As this Court has explained
before,

> it is now well-established that Madoff
> cleverly leveraged his considerable
> reputation in order to perpetrate his
> massive fraud, for many years, without
> detection by some of the most sophisticated
> entities in the financial world: the SEC,
> Wall Street banks, and the like. The list of
> victims that failed to detect Madoff's fraud
> is lengthy.

In re Merkin, 817 F. Supp. 2d at 356.  Until Madoff's scheme was
uncovered, the Defendants and Plaintiffs alike benefitted from
the purported, albeit falsified, high rates of return from BMIS,
and had little incentive to question Madoff's operations.  In

light of this, the Court cannot say that Plaintiffs' allegations against Defendants here rise to the level of negligence.

### 5. Third Party Breach of Contract – Counts 9, 10, 18, and 25

As with gross negligence and aiding and abetting breach of fiduciary duty causes of action, Plaintiffs concede that BVI/Bermuda law does not recognize a separate cause of action for third party breach of contract. (Pls.' Opp. at 137-39; Defs.' Reply at 65.)  Plaintiffs attempt to avoid dismissal on these claims by arguing that the strict privity rule is being relaxed in the U.K. and other commonwealth jurisdictions, and that a court in the BVI or Bermuda would not "cling to an antiquated concept of privity" and might consider third party beneficiary claims.  (Pls.' Opp. at 139.)  The Court has no basis for applying anything other than the current law.  See Gilstrap v. Radianz Ltd., 443 F. Supp. 2d 474, 491 (S.D.N.Y. 2006), aff'd, 233 F. App'x 83 (2d Cir. 2007) ("Though the federal courts are called upon not infrequently to apply the laws of other nations, they should be more hesitant to engage in such a task when doing so would necessarily involve expanding, extending, or departing from well-settled and long established principles of foreign law.").  Therefore, Counts 9, 10, 18, and 25 are DISMISSED.

### 6. Mutual Mistake, Unjust Enrichment/Constructive Trust – Counts 11, 12, and 28

Under BVI/Bermuda law, there is no separate cause of action for mutual mistake or constructive trust.  Instead, the BVI and Bermuda recognize causes of action for restitution based on a mistake of fact or law.  (<u>See</u> Chivers Decl. ¶ 139.)  In addition, there must be a total failure of consideration for a claim of restitution.  (Chivers Decl. ¶ 152; Hargun Decl. ¶ 106.)  Only the "payor" is entitled to restitution.  (Hargun Decl. ¶ 104.)[57]

Here, Plaintiffs allege that fees were paid to the Defendants "under a mutual mistake of the parties as to the amount and value of the assets under management and amount of profits."  (SAC ¶¶ 249.) Defendants seek dismissal of these claims because (a) the Funds, not the Plaintiffs, paid the fees, and thus are the "payors" entitled to restitution of any unjustly paid fees, (b) claims for restitution can only be asserted where there is a total failure of consideration, and (c) the claims are barred by the reflective loss principle.  In response, Plaintiffs argue that the fees were paid directly by Plaintiffs on top of the cost of their shares upon purchase, and that KML, Tremont, and FIM kept their fees and paid other

---

[57] Plaintiffs do not challenge Defendants' recitation of the foreign law applicable to these claims.  (Pls.' Opp. at 141.)

service fees before turning over the net amount of subscription proceeds to the Funds. (Pls. Opp. at 141.)

Plaintiffs' arguments fail.  Though the SAC alleges that Plaintiffs "actually paid" the management, administration, and professional fees to KML, Tremont, Citi Hedge, and PwC Bermuda (SAC ¶¶ 155, 158), it also alleges that the "payments were made from funds invested by Plaintiffs and the Class."  (SAC ¶ 183, 250).[58]  As discussed above, once Plaintiffs purchased shares in the Funds, they no longer had interests in the assets that they invested or control over those funds.  See supra § II.F.2.

Plaintiffs' argument that they paid the fees directly because the fees were added on top of the subscription fees and never reached the Funds is also unavailing.  The SAC is devoid of any such allegations, and, as noted above, Plaintiffs cannot amend their pleadings through their briefing on this Motion. Pearl River Union Free Sch. Dist. v. Duncan, 56 F. Supp. 3d 339, 371 (S.D.N.Y. 2014) (quoting Fadem v. Ford Motor Co., 352 F. Supp. 2d 501, 516 (S.D.N.Y. 2005), aff'd, 157 F. App'x 398 (2d Cir. 2005)).  In addition, Plaintiffs have not alleged a total failure of consideration (that is, no performance at all from Defendants), but rather that their performance was substandard

---

[58] Further, at least as to FIM, the IM forecloses this argument altogether, because it indicates that the Manager paid fees directly to FIM at no additional cost to the Funds (and therefore, to the Plaintiffs). (Kingate Global IM at 17.)

because they failed to do due diligence and otherwise heed red flags.  This is insufficient for a claim of unjust enrichment under BVI/Bermuda law.  (Hargun Decl. ¶ 107.)  Moreover, Defendants are correct that any loss that Plaintiffs suffered as a result of this mistake is reflective of the Funds' loss, and thus Plaintiffs would not have standing to bring the claim.  Indeed, as noted above, the Joint Liquidators are seeking repayment of the management and other fees on this very basis.  (Barrett Decl. Ex. 6, Re-Re-Re Amended Statement of Claim dated April 15, 2015, Kingate Global Fund Ltd. (In Liquidation) v. Kingate Management Ltd., Com. 2010:254).  Therefore, Counts 11, 12, and 28 are DISMISSED.

### III. Leave to Replead

When a complaint has been dismissed, permission to amend it shall be freely given "when justice so requires." Fed. R. Civ. P. 15(a).  However, a court may dismiss without leave to amend when amendment would be "futile", or would not survive a motion to dismiss.  Oneida Indian Nation of N.Y. v. City of Sherrill, 337 F.3d 139, 168 (2d Cir. 2003) (internal citations omitted), rev'd on other grounds sub nom. City of Sherrill v. Oneida Indian Nation of N.Y., 544 U.S. 197 (2005).

Here, because Plaintiffs do not have standing to assert their claims under BVI/Bermuda law, amendment would be futile. Accordingly, leave to replead is DENIED.

IV.  CONCLUSION

For the reasons stated above, Defendants' Joint Motion to Dismiss is:

- **GRANTED insofar as it seeks dismissal based on SLUSA preclusion for Counts 1-4, 8, 14, 17, 20, 24 and 27, but DENIED as to SLUSA preclusion for all other Counts;**

- **DENIED insofar as Plaintiffs' claims against KML Defendants, Manzke, and the FIM Defendants are not time-barred;**

- **DENIED insofar as Defendant Citi Hedge challenges personal jurisdiction over it;**

- **DENIED as to Defendants' request that the Court abstain from jurisdiction on comity grounds;**

- **GRANTED as to Plaintiffs' standing to assert all claims;**

- **GRANTED as to Counts 5, 9, 10, 13, 15, 18, 19, 22, 25, and 26 insofar as Plaintiffs have failed to state a claim for gross negligence, aiding and abetting breach of fiduciary duty, and third party breach of contract because such causes of action do not exist under BVI/Bermuda law;**

144

- GRANTED as to Counts 6, 7, 16, 21, and 23 insofar as Plaintiffs have failed to state a claim for the negligence and breach of fiduciary duty claims because Plaintiffs have not alleged sufficiently a duty or breach of such duty; and

- GRANTED as to Counts 11, 12, and 28 insofar as Plaintiffs have failed to state a claim for mutual mistake, constructive trust, and unjust enrichment because Plaintiffs have not alleged sufficiently that they were the payors of fees to the Defendants or that there was a total failure of consideration.

Accordingly, Defendants' Motion to Dismiss is DENIED in part, GRANTED in part, and all of Plaintiffs' claims are DISMISSED.  The Clerk of Court is directed to close the docket in this case.

SO ORDERED.

DATED:     New York, NY
           September 21, 2016

*Deborah A. Batts*
Deborah A. Batts
U.S. District Judge

145